[COMPLETE LIST OF COUNSEL
IDENTIFIED ON SIGNATURE PAGES]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: MYKEY TECHNOLOGY INC. PATENT LITIGATION | 2:13-ml-02461-GAF (PLAX) |
| | MDL NO. 2461 |
| | This document relates to: |
| MyKey Technology, Inc. | ALL CASES |
| Plaintiff, | |
| v. | **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |
| Intelligent Computer Solutions, Inc., et al. | |
| Defendants. | |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...............................................................................1

    **1.**  Overview of the Technology ...............................................1

    **2.**  U.S. Patent No. 6,813,682 (Write Blocking)...............................1

    **3.**  U.S. Patent No. 7,228,379 (Drive Wiping) ...............................2

    **4.**  U.S. Patent No. 7,159,086 (Drive Duplicating) ...........................3

II.    THE PROPER CONSTRUCTION OF THE DISPUTED CLAIM TERMS...4

  A. Disputed Terms of the '682 Patent...............................................4

    1. "Transparent to normal operation of the host and the storage device" (claim 1)..............................................................4

    2. "Interface emulator" (claim 1) and "IDE emulator component" (claim 13). .8

    3. "Host" (claims 1, 13, 30 and 40). ..................................10

    4. "Means for intercepting communications between a host and a storage device" (claim 40)..................................................11

    5. "Means for blocking other ones of the commands from being received by the storage device based on the comparison" (claim 40). .....................12

    6. "Means for forwarding selected ones of commands in the intercepted communications to the storage. . . known to not permanently modify a state of the storage device" (claim 40). ..................................13

  B. Disputed Terms of the '379 Patent...............................................14

    1. "User controllable switch" (claim 1). ..............................14

    2. "Stand-alone, dedicated function device for removing data from a long term memory component" and "stand-alone, dedicated function device" (claim 1)..........................................................................16

    3. "Hidden storage area" (claim 1-3)..................................19

    4. "Irretrievably remove data" (claim 1)...............................21

    5. "Casing being of a size that is portable by the user" (claim 1). ...............24

  C. Disputed Terms of the '086 Patent...............................................26

    1. "Exact copy" / "exact copies" (claims 1 and 18).........................26

    2. "User controllable switch" (claim 1). ..............................28

    3. "Means [for] initiating the copying procedure" (claim 18)..........................30

4. "Means for making an exact copy" (claim 18)..............................................30

5. "Means for reading and comparing the data on the source and destination devices and communicating result to a user" (claim 18)...........................31

6. "Stand-alone, dedicated function device for making exact copies of long term memory devices," "stand-alone, dedicated function copying device" (claims 1 and 18). .................................................................................32

7. "Control circuit issuing commands to. . . read and compare data on the source and destination devices" (claim 1). .................................................33

8. "Control circuit issuing commands to. . . restore the source drive to its original condition" (claim 1). ......................................................................34

9. "Means for opening hidden areas on the source device" (claim 18)...........36

10. "Means for restoring the source device to its original condition" (claim 18). ...........................................................................................................38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# **TABLE OF AUTHORITIES**

2

3 ## **Cases**

4

5 *Am. Calcar, Inc. v. Am. Honda Motor Co.,*
651 F.3d 1318 (Fed. Cir. 2011) ........................................................ 6

6

7 *Aristocrat Tech. Australia Pty Ltd. v. International Game Technology*,
521 F.3d 1328 (Fed. Cir. 2008) ...................................................... 31

8

9 *Aoyama.*,
656 F.3d 1293 (Fed. Cir. 2011) ...................................................... 12

10

11 *Atmel Corp. v. Info. Storage Devices, Inc.*,
198 F.3d 1374 (Fed. Cir. 1999) ...................................................... 40

12

13 *Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371, 1382, 1384 (Fed. Cir. 2009) ................................... 39

14

15 *Datamize, LLC v.Plumtree Coftware, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005) ...................................................... 24

16

17 *Function Media, L.L.C. v. Google, Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) ......................................... 31, 32, 37

18

19 *In re Donaldson Co.*,
16 F.3d 1189 (Fed. Cir.1994) ......................................................... 12

20

21 *Med. Instrumentation & Diagnostics Corp. v. Elektra AB*,
344 F.3d 1205(Fed. Cir. 2003) ................................................. 37, 38

22

23 *Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*,
248 F.3d 1303 (Fed. Cir. 2001) ...................................................... 38

24

25 *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*
671 F.3d 1291 (Fed. Cir. 2012) ...................................................... 12

26

27

28 *O2 Micro Intern Ltd. v. Beyond Innovation Tech. Co.*,

521 F.3d 1351 (Fed. Cir. 2008) ................................................................ 35

*O.I. Corp. v. Tekmar Co*,
115 F.3d 1576 (Fed. Cir.1997) ................................................................ 39

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
448 F.3d 1309 (Fed. Cir. 2006) ................................................................ 19

*PC Connector Solutions LLC v. SmartDisk Corp.*,
161 F.3d 1359 (2005)........................................................................... 21, 22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................ 6, 19, 21, 23

*Pressure Products Medical Supplies v. Greatbatch*,
599 F.3d 1308 (Fed. Cir. 2010) ........................................................ 37, 40

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ................................................................ 29

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ................................................................ 29

*WMS Gaming, Inc. v. International Game Technology*,
184 F. 3d 1339 (Fed. Cir. 1999) ................................................ 12, 30, 31, 38

## **Statutes**

35 U.S.C. § 112........................................................................... passim

## **Other Authorities**

Microsoft Computer Dictionary (4th Edition, 1999).................................... 18

# I.    INTRODUCTION

Defendants Intelligent Computer Systems, Inc., Logicube, Inc., CRU Acquisitions Group LLC, Digital Intelligence, Inc., Guidance Software, Inc., Guidance Tableau, LLC, TEFKAT LLC, and Robert Botchek (collectively, the "Defendants") submit this Opening Claim Construction Brief.   MyKey asserts infringement of three patents—United States Patent No. 6,813,682 ('682 patent) (attached as Ex. A), Patent No. 7,159,086 ('086 patent) (Ex. B), and Patent No. 7,228,379 ('379 patent) (Ex. C).   For each patent, MyKey asserts infringement of multiple claims.

## 1.    Overview of the Technology

The patents-in-suit relate to hardware devices and methods for forensically protecting, exactly duplicating or irretrievably deleting all of the content in non-volatile long term memory storage devices such as computer hard drives.  The products at issue are computer forensic devices such as forensic bridges (also known as write blockers), forensic duplicators, and drive wipers.  The products are used by governmental agencies such as the United States Department of Homeland Security, the Central Intelligence Agency, and the Federal Bureau of Investigation.



## 2.    U.S. Patent No. 6,813,682 (Write Blocking)

The '682 patent is titled, "Write Protection for Computer Long-Term Memory Devices," and discloses a write blocking device and method to allow examination of a computer hard drive without allowing data to be written to the hard drive.  ('682 patent: Col 1, ll. 17-33; Col. 2, ll. 22-25.)  This is useful, for example, when law enforcement seeks to examine a computer's hard drive and must preserve its integrity.   Since some operating systems modify the hard drive during operation, there is a need to ensure that all commands that may potentially write data to the hard drive are blocked.  (*Id*.)

The invention claimed by the '682 patent inserts a physical device between the host computer and the disk drive being examined that blocks all write commands to the

hard drive, preserving its integrity.  (*Id.*)  The write blocker of the '682 patent includes an interface emulator configured to emulate an interface presented by the storage device and a processor configured to examine commands from the host computer intended for the storage device and to allow only those commands that match a predetermined list of commands known not to modify the storage device to pass (a "white list" type system). (*Id.* at Col 2, ll. 22-37.)

An additional key aspect of the invention discussed throughout the specification of the '682 patent, is that the blocking device is designed to operate transparently to the host device and the storage drive.  That is, the blocking device does not appear to the host device or the storage drive.  (*Id.* at Col. 5, ll. 32-40).    And, all normal operations of the host device and storage device (such as write operations) must be perceived by each device to be performed correctly (*Id.* at Col. 9, l. 49–Col. 10, l. 12).  In other words, when the host device sends a write command to the disk drive, no error is received back and, subsequently, the host command can then "read" back the written data.  If, instead, of the blocking device being inserted, the host were directly connected to the storage device, the host would be able to read and write data to and from storage device.

### 3.   U.S. Patent No. 7,228,379 (Drive Wiping)

The '379 patent is titled, "Systems and Methods for Removing Data Stored on Long-Term Memory Devices."  The '379 patent is directed to a device for permanently removing data from long-term memory devices.  The '379 patent recognized that prior art systems and techniques were available for overwriting all of the data on a hard drive, but such prior art approaches apparently were inadequate.  For example, such solutions tended to be operating system dependent, required trained operators, were time-consuming, and still allowed data to be recovered.  ('379 patent: Col. 3, ll. 20-67.)

The '379 patent is directed to a method for irretrievably removing all of the magnetic record on a drive, including "hidden areas."  The device is configured so that

the control circuit automatically issues commands to open such hidden areas "without the need for human intervention."  The device automatically removes all of the data in the drive so that it cannot be recovered (*Id*. at Col. 10, ll. 41-50) by simply actuating a physical switch.  (*Id*. at Col. 4, ll. 6-15.)  The user merely has to flip a switch and the device automatically, permanently deletes all of the content of the drive without user intervention.



### 4.     U.S. Patent No. 7,159,086 (Drive Duplicating)

The '086 patent is titled, "Systems and Methods for Creating Exact Copies of Computer Long-Term Storage Devices," and discloses a portable device that will make an exact copy of a storage device while protecting the original from state changes. ('086 patent at Abstract; Col. 9:62-67.)  Use of this invention allows law enforcement to analyze and examine exact copies of confiscated storage devices, while preserving the integrity of the source.  (*Id*. at Col. 1, ll. 19-37.)  Because this invention is used in forensic investigations, it must be portable, simple to use, and reliable to make perfect, indistinguishable, exact copies.  (*Id*. at Col. 9, l. 62–Col. 10, l. 21.)

Some storage devices contain "hidden areas" that cannot be read or copied automatically.  (*Id*. at Col. 1, ll. 58-60; Col. 4, l. 38–Col. 5, l. 4.)  To copy any hidden areas on a source drive, the "invention" purportedly first opens, or renders accessible, the hidden areas before copying data.  (*Id*. at Col. 4, l. 54–Col. 5, l. 4; Col. 11, l. 2; Col. 12, l. 28.)  After the data on the source is copied to the destination, the invention reads the data on the destination drive and compares each unit of data to its corresponding unit of data on the source drive to be sure that the copy is an exact copy. (*Id*. at Col. 6, ll. 17-22.)  After the comparison is complete, the invention communicates the result, and automatically restores the source to its original state by closing, or rendering inaccessible, the hidden areas.  (*Id*. at Col. 4, l. 54–Col. 5, l. 12.)  The invention also establishes hidden areas on the destination drive such that it resembles an exact copy of the source drive.  (*Id*. at Col. 5, ll. 33-39.)

### 5.      Person of Ordinary Skill in the Art

A person of ordinary skill in the art of the three patents-in-suit (computer storage systems) would have a Bachelor of Science degree in Electrical Engineering or Computer Science, with 2-3 years of experience working in the field of computer storage systems.  (Gafford Decl. §13.1.[1])

## II.     THE PROPER CONSTRUCTION OF THE DISPUTED CLAIM TERMS

A chart setting forth each of the parties' proposed constructions for each disputed claim term is attached hereto as Ex. E.

### A.      Disputed Terms of the '682 Patent

### 1.  "Transparent to normal operation of the host and the storage device" (claim 1).[2]  Defendants' proposed construction closely mirrors that ordered by the International Trade Commission ("ITC",)[3] which was, "the blocking device operates in a way that all normal operations of the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device."  Defendants' proposed construction accepts the ITC construction, but merely adds the requirement of transparent appearance, which is not a point of dispute, as MyKey's proposed construction also requires transparent appearance.  Defendants' proposed construction is also consistent with the file history, the specification, and the plain and ordinary meaning of the claim language.  In contrast, MyKey's proposed construction is inconsistent with the file history, defies the plain meaning of "transparent" and

---

[1] A true and correct copy of Mr. Gafford's declaration is attached hereto as Ex. D.
[2] The "transparent to normal operation" terms and their corresponding proposed constructions are so similar that, for the purposes of brevity, this brief will only discuss the Claim 1 term in detail, while all such arguments also apply to the other disputed "transparent" terms in independent Claims 13, 25, 30 and 40.
[3] In a prior proceeding, the ITC construed a number of claim terms at issue in this case.  A true and correct copy of the ITC Claim Construction Order is attached hereto as Ex. F.

1 | completely rejects the ITC's prior construction.  Defendants' construction should be
2 | accepted.
3 |      The language of the claim is clear: "transparent to normal operation" means
4 | transparent in *operation*.  For a write blocker device to *operate* transparently to the
5 | host computer, the host computer must perceive that its write commands have been
6 | performed on the disk drive and without errors, exactly as it would were the write
7 | blocker not present, even though those commands have actually been blocked by the
8 | write blocker.  (Gafford Decl. § 14.5.1–14.5.7).  Writing and reading from a disk
9 | drive are, of course, normal operations.  (*Id.*)  The '682 patent discloses how such
10 | transparent operation is performed in the section entitled "READ VERIFICATION
11 | AFTER WRITING" at 9:48 to 10:30.  The '682 patent requires that a "temp drive"
12 | 870 is provided in the blocking device so that blocked write commands and
13 | associated data could be written.  Thereafter, when the host device wishes to read
14 | back such written data, the blocking device will send such data back from the temp
15 | drive 870 so that the host device perceives that the previous write command was
16 | successful.  By utilizing the temp drive 870, the host computer can read back
17 | information that it attempted to write to the storage device, so the storage device
18 | appears to be operating normally.  A construction of "transparent to normal
19 | operation" that allows for some normal operations to continue while other normal
20 | operations are blocked would not be "transparent" at all.
21 |      Additionally, the prosecution history requires that the "transparent operation"
22 | of the system must proceed without any reconfiguration of the host or the storage
23 | device.  During the prosecution of the '682 patent, to secure allowance of the claims
24 | and distinguish over the prior art, the applicants were forced to amend all claims to
25 | add the "transparent to normal operation" limitation.[4]  In describing this new claim
26 | limitation, applicants explained why the appropriate construction of "transparent to
27 | normal operation" must require no change or reconfiguration to the host or storage

[4] A true and correct copy of the '682 File History is attached hereto as Ex. G.

1    device:

2        As discussed, the blocking device appears to be a standard storage

3        device to the host.  Similarly, to the storage device, the blocking device

4        appears to be the host.  Accordingly, neither the host nor the storage

5        device need any special hardware or software *and neither the host nor*

6        *the storage device need to be reconfigured in any way*.

7    ('682 File History, Nov. 24, 2003 Amendment/Remarks, pg. 18 (MTI0000584)

8    (emphasis supplied).  The applicant further argued, when differentiating from

9    the prior art Kern patent:

10       Claim 1 further recites that the blocking device is *transparent to normal*

11       *operation* of the host and the storage device.  Kern clearly does not

12       disclose or suggest this feature of the invention.  As previously

13       mentioned, the controller of *Kern operates with host application*

14       *programs 110-112 that are specifically designed for controller 106* …

15       Applicants submit that this disclosure of Kern clearly *teaches away form*

16       *a blocking device that is transparent to normal operation* …

17    (*Id*. at 19-20 (MTI0000585-586) (emphasis supplied).

18       The Applicants expressly distinguished the "transparent to normal operation"

19    limitation from Kern primarily because Kern requires that custom applications

20    programs need to be loaded onto the host computer for the Kern blocking devices to

21    operate.  There can be no clearer disavowal of claim scope than arguing that a certain

22    prior art structure teaches away from the claimed invention.  *See e.g., Am. Calcar,*

23    *Inc. v. Am. Honda Motor Co.,* 651 F.3d 1318, 1339 (Fed. Cir. 2011).  Defendants and

24    the public should be permitted to rely upon those statements made by the inventors as

25    limiting the scope of their invention.  *Phillips v AWH Corp.*, 415 F.3d 1303, 1317

26    (Fed Cir. 2005) (en banc).  The prosecution history requires that "transparent

27    operation" proceed without any reconfiguration of the host and/or storage device.

28       Finally, in the context of these claims, the storage device, which the host

computer sees through the "transparent" blocking device, must be the same storage device that is attached to the blocking device, and not just any storage device, as MyKey proposes.  Again: to the host it must seem that the write blocker does not exist; plainly, the host must perceive the same storage device without any change. Defendants' construction, and the context of the claim, acknowledge that the host computer must see the actual storage device connected through the transparent write blocker, while MyKey's construction allows the host computer to see any unspecified storage device.[5]  Even MyKey's own expert agrees that the host computer should see the storage device connected to the transparent write-blocker and not just any unspecified storage device.

> Q.  *In the context of the first portion of your construction*, specifically the bit beginning that says to the host, the blocking device appears to be a standard drive interface … in context of Claim 1, *does the blocking device appear to be the storage device that's connected to the blocking device or any storage device?*
>
> MR. FREITAS:  Objection. Vague.
>
> THE WITNESS:  *It appears to be the storage device*; however, because the interface is being emulated, it's a storage device that is able to communicate with the interface of the host to which it is cabled.
>
> BY MR. MANCINO:  Q.  And as you answered earlier, *the interface that is being emulated is the interface of the storage device, correct?*
>
> A.  *Yes*.

(Berg Dep. 29:17-30:10, emphasis supplied.)[6]

---

[5] The Defendants' proposed construction identifies which specific storage device the host computer can see through the *transparent* write blocker (Defendants' construction requires "The blocking device appears to the host as *the storage device* [that is connected to the write-blocker]" while MyKey's construction only requires "To the host computer, the blocking device appears to be *a standard long-term storage device* interface …").
[6] A true and correct copy of Mr. Berg's deposition transcript is attached hereto as Ex. H.

1    MyKey's attempt to allow transparency to include an image of a different

2  storage device not actually connected to the host is unsupported by the specification

3  and its own expert's understanding of the term.  MyKey's construction should be

4  rejected.

5    **2. "Interface emulator" (claim 1) and "IDE emulator component" (claim**

6  **13).**  Defendants' construction requires that an interface emulator be: 1) an interface

7  component; 2) that mimics the interface presented by the storage device; and 3) and

8  operates with no reconfiguration of the host software.  This proposed construction is

9  well-supported by the evidence, and is almost identical to the ITC's construction (the

10  ITC construed "interface emulator" as "an interface component that mimics another

11  interface and operates with no reconfiguration of the host software"), with the sole

12  clarification that the interface being mimicked is that of the particular storage device.

13    MyKey's proposed construction, on the other hand, rejects the ITC's prior

14  construction, attempts to recapture subject matter it disavowed in order to traverse the

15  prior art, and is inconsistent with MyKey's own expert's sworn concession that in the

16  context of the claim, the storage device that is being mimicked by the interface emulator

17  must be the storage device connected to the other end of the write blocker, and not just

18  'any' storage device.  And, in proposing a construction for the "IDE emulator

19  component" term, MyKey again rejects its own expert's sworn concession that IDE

20  interfaces are not compatible with all ATA interfaces.

21    The plain language of claim 1 requires that the interface being emulated is the

22  interface of the storage device coupled to the other end of the write blocker.  This is

23  also consistent with the specification. The *only* embodiment disclosed in the '682

24  provides in detail that the blocking device **203** interposed between a host computer **201**

25  and an IDE disk drive **205** includes an "IDE drive emulator" **320** to emulate the drive of

26  the IDE disk drive **205**.   (*See, e.g.,* '682 patent: Col. 5, l. 22- Col. 6, l. 26, *see also* Fig.

27  3.)  MyKey's own expert testified that he agrees with this:

28    Q.  Okay.  So the interface emulator is mimicking the interface of

1  the storage device that is connected to the blocking device in the

2  context of this claim; correct?

3  A.  Yes.

4  (Berg Dep. 26:21-25.)

5  Nowhere in the specification is there a disclosure in which the interface

6  emulator emulates an interface of a disk drive or storage device that is different than the

7  storage device connected to the host.

8  The requirement that the interface emulator must emulate the interface of the

9  storage device that is connected to the host through the write blocker is also required

10  by the prosecution history.  When distinguishing over the Kern prior art reference, the

11  applicants stated that: "The interface 120 of Kern is described as 'an intelligent digital

12  input/output communication channel, or other interface suitable to the particular

13  application.' (Kern, col. 4, lines 48-50).  ***Nothing in Kern discloses or suggests that***

14  ***interface 120 emulates the interface presented by storage device(s) 108***. . . Thus, if

15  anything, Kern actually ***teaches away*** from this aspect of the invention."  (Applicants'

16  Resp. to Office Action, Nov. 24, 2003 at 19(MTI0000585) (emphasis supplied).)

17  The prosecution history also requires that the interface emulator operate with

18  no reconfiguration of the host software.  During prosecution, the applicants argued

19  that the prior art Kern patent did not disclose an "interface emulator" as claimed

20  because the host computer had to be reconfigured with new software in order to

21  communicate with the write blocker.  In an attempt to distinguish from Kern, the

22  applicants made express and unequivocal statements to the Patent Office attempting

23  to explain why the interface of Kern was different than the claimed "interface

24  emulator" component of the '682 patent:

25  ***Because Kern discloses host application programs 110-112 that are***

26  ***specifically designed to operate with controller 106, Applicants submit***

27  ***that there would be no need for interface 120 to emulate storage***

28  ***devices, as application programs 110-112 could be designed to operate***

1           **with any 'intelligent digital input/output channel.'**  Thus, if anything,

2           Kern actually teaches away from this aspect of the invention.

3 (*Id.*)  The Applicants informed the public that if the host device is configured with

4 programs specifically designed to operate with the write blocker device, then the

5 interface of the write blocker device does not need nor use interface emulation and

6 actually teaches away from the claimed invention.  In other words, Kern requires the

7 host software to be reconfigured (with application programs) in order to communicate

8 with the write blocker.  The public should be permitted to rely upon such express and

9 unequivocal statements in the prosecution history that confirm that a device that

10 requires reconfiguration of the host through software is ***not*** an interface emulator

11 within the meaning of these claims.  Defendants' proposed construction is consistent

12 with the statements made in prosecution.

13           With regard to an "IDE emulator component," rather than offering that an "IDE

14 Emulator" simply mimics an IDE Interface, MyKey relies entirely upon extrinsic

15 evidence (their expert's declaration) to argue that an IDE Emulator not only mimics an

16 IDE interface (as supported by the '682 specification), but also mimics any interface

17 compatible with ATA interfaces (not supported by the '682 specification).

18           But MyKey's expert, Mr. Berg, admitted during his deposition that SATA

19 interfaces are ***not compatible*** with IDE interfaces.  (Berg Dep. 45:2-15.)  This

20 incompatibility between SATA and IDE interfaces was also confirmed by Defendants'

21 expert, Mr. Gafford, during his deposition.  (Gafford Dep. 209:17-23.)[7]  In sum,

22 MyKey's expert-driven construction of IDE Emulator is over-broad and encompasses

23 SATA interfaces that are not compatible with IDE interfaces.  For at least these reasons,

24 MyKey's proposed construction for IDE Emulator must be rejected.

25          **3.  "Host" (claims 1, 13, 30 and 40).**  The terms proposed to be construed are:

26 "host" (claims 1, 13, and 40), "computer motherboard" (claim 25), and "host

27

28 [7] A true and correct copy of Mr. Gafford's deposition transcript is attached hereto as Ex. I.

computer" (claim 30). The correct meaning for each of these terms is "a computer or motherboard distinct from the blocking device that, in the absence of the blocking device, is able to read and write the storage device." The summary of the invention supports this construction and makes clear that the '682 patent is directed to a blocking device that is a bridge-type device that is physically inserted between a host computer and its storage device, for example: "Systems and methods consistent with the present invention address these and other needs by providing for an operating system independent blocking device that is physically inserted between a host computer and a storage device." ('682 patent: Col. 2, ll. 22-25.)

In order for the disclosed blocking device to be physically inserted as described, it must be physically distinct from the host and from the storage device. In order for the disclosed blocking device to be of any use, the host must in normal operation issue write commands to the storage device that result in modification of the information stored thereon. (Gafford Decl. § 14.6.2.)

**4. "Means for intercepting communications between a host and a storage device" (claim 40).** Because the '682 patent fails to describe sufficient structure to perform the function of "intercepting communications between a host and a storage device," claim 40 is invalid as indefinite under § 112.

MyKey proposes the structure: "an interface emulator 320, 720, 820, 920, and equivalents thereof" for this means-plus-function term. This recitation of structure is in fact limited to a series of boxes within the drawings of the specification, each of which looks virtually identical and each of which states only the words, "IDE Drive Interface Emulator." This is the entirety of MyKey's proposed structure for "means for intercepting communications between a host and a storage device."

MyKey's proposed structure does not include any disclosure for how to actually intercept communications between a host and a storage device. This means-plus-function claim term of the '682 patent represents impermissible functional claiming, as no specifics are provided in the '682 patent as to the steps necessary to intercept the

1    communications.  Instead, the claim recites only a desired result with no structural

2    support.

3         MyKey discloses no algorithm to accompany the desired function of

4    "intercepting communications between a host and a storage device."  Instead, it

5    merely points to the "black box" of the interface emulator and claims it is the

6    necessary structure to perform the interception.  This is insufficient under *WMS*

7    *Gaming* and its progeny.  None of the "structure" cited by MyKey discloses any

8    specific steps of an algorithm necessary to perform the function of "intercepting".

9         **5.  "Means for blocking other ones of the commands from being received**

10   **by the storage device based on the comparison" (claim 40).**  Defendants' proposed

11   construction includes all of the elements disclosed in the '682 patent that are

12   necessary to perform the function of blocking.  MyKey's proposed construction

13   selectively chooses only certain elements of the structure disclosed in the '682 patent.

14   This approach has been rejected by the Federal Circuit.

15        "[A] means-plus-function claim limitation is limited to the structure disclosed in

16   the specification and equivalents. . . If a patentee chooses to disclose a single

17   embodiment, then any means-plus-function claim limitation will be limited to the single

18   disclosed structure and equivalents thereof."  *Mettler-Toledo, Inc. v. B.-Tek Scales,*

19   *LLC,* 671 F.3d 1291, 1296 (Fed. Cir. 2012).  Each and every part of the structure

20   disclosed in the '682 patent that is necessary to perform the function of blocking must

21   be included in the structure of this claim.  In construing a means-plus-function claim, a

22   court "may not disregard the structure disclosed in the specification corresponding to

23   such language" in analyzing the question of indefiniteness under § 112.  *In re Aoyama*,

24   656 F.3d 1293, 1297 (Fed. Cir. 2011) (citing *In re Donaldson Co.,* 16 F.3d 1189, 1195

25   (Fed. Cir. 1994)).  MyKey cannot "pick and choose" certain necessary structural

26   elements to include in its construction, and eliminate others.  MyKey is limited to its

27   disclosure. Here, MyKey attempts to generalize the structure to "a processor."

28   However, the '682 patent does not disclose "a processor" to complete the task of

blocking as claimed.  Instead, the '682 patent discloses an entire system of elements, each of which is necessary to complete the function of "blocking" as disclosed in the specification.

The "Brief Description of the Drawings" in the '682 patent is clear that "Fig. 4 is a flow chart illustrating the operation of the blocking device" and "Fig. 5 is a block diagram illustrating the blocking device of Figs. 2 and 3 in even greater detail."  ('682 patent: Col. 3, ll. 28-31.)  There is no embodiment disclosed in the entirety of the '682 patent that performs the desired blocking function without performing steps 420, 430, 440, 450, and 460 of Fig. 4 with the components disclosed in Fig. 5 (except for 520, 525, 530, and 560).  Mr. Gafford confirms that these portions in Fig. 4 and Fig. 5 are necessary structure to perform the entirety of the function of blocking claimed in the '682 patent.  (Gafford Decl. § 14.3.1.)

MyKey has no reasonable, supportable explanation as to why the structure of this claim should be limited to only two of the steps of Fig. 4, and should not include the hardware elements of Fig. 5.  The '682 patent discloses a specific structure programmed in a specific manner, i.e., the elements of Fig. 5 (except 520, 525, 530, and 560), programmed to perform steps 420, 430, 440, 450, and 460 of Fig. 4, to complete the function of blocking as claimed.  This claim element should be limited to that expressly disclosed structure (and, more specifically, to *all* of that expressly disclosed structure), as provided by Defendants' proposed construction.

**6. "Means for forwarding selected ones of commands in the intercepted communications to the storage. . . known to not permanently modify a state of the storage device" (claim 40).**  Similar to the preceding claim term, the primary disagreement between the parties with regard to this term is the elements that must be included in the structure of this means-plus-function term.  Defendants' proposed construction includes all of the elements disclosed in the '682 patent that are necessary to perform the function of forwarding.  MyKey's proposed construction selectively chooses only certain elements of the structure disclosed in the '682 patent.

Mr. Gafford has opined that a person of ordinary skill in the art would understand that "the flow of control or forwarding commands passes through each and every one of the [above-cited elements of Fig. 4 and Fig. 5] in order to perform the recited function of forwarding commands."  (Gafford Decl. § 14.2.1.)  There is no embodiment in the entirety of its disclosure that performs the desired function of forwarding without performing all of the identified steps using the identified hardware of Fig. 5.  MyKey must be limited by the scope of its disclosure and the structure must be the entirety of the structure disclosed in the '682 patent rather than a cherry-picking of certain limited elements.

**B.     Disputed Terms of the '379 Patent**

**1.  "User controllable switch" (claim 1).**  The specification of the '379 discloses only a single type of actuated user controllable switch, which is an on/off switch that causes the control circuit to perform the required drive wiping functions: "As shown in Fig. 7, the external portion of the cleaning device 300 may include … an on/off switch 703…"  ('379 patent: Col. 9, ll. 1-4, *see also* Col. 9, ll. 12-26) ("The user may then connect the IDE drive cable 702 to the drive, turn power on to the host computer, and turn switch 203 to the on position (Acts 805, 806, and 807). In response, cleaning device 300 will power on and control the target drive to permanently delete its data.").  A person of ordinary skill in the art would understand that such physical switch would be an on/off switch as described and that the actuation of this physical on/off switch, alone, initiates the removal of all data from the target device.  (Gafford Decl. § 16.5.)  This is especially true in light of the fact that, as with the '086 patent, in the '379 patent, the applicants contended that prior art drive-wiping systems required "a moderately trained computer operator" who "must select the proper software, install the software, run the software, and then verify the results." ('379 patent: Col. 3, ll. 20-44), while the current invention utilized a "user controllable switch, when actuated by a user, causes the control circuit to commence permanently removing the data from the long-term memory component." (*Id.* at

Col. 4, ll. 6-15; Col. 9, ll. 12-17; Col. 9, ll. 49-66).  Thus, '379 patent is clear that this "user controllable switch" is a simple on/off switch rather than a complicated, menu-driven graphical user interface.

The prosecution history requires Defendants' construction.[8]  During prosecution, the Applicants amended independent claim 1 to require that the "user controllable switch" was a "user controllable *physical* switch," and argued that

> "The amendments to claim 1 emphasize that the device is a stand-alone, dedicated function device that includes a **physical switch**. The switch, when actuated by a user causes the control circuit to commence irretrievably removing the data from the long-term memory component."

('379 File History, Jan. 31, 2006 Amendment Remarks, pp. 13-14 (MTI0001954)) (emphasis supplied.)  Applicants further stated:

> Holzhammer also does not disclose or suggest a physical switch for activating a cleaning device …

('379 File History, Aug. 23, 2005 Amendment/Remarks, pg. 16. (MTI0001937).)

In a January 15, 2007 amendment, which was purportedly an amendment to dependent claim 15 to incorporate all of the recited subject matter of claim 1 (including the "physical" limitation), this "physical" limitation disappeared from the claim language.  Specifically, it stated:

> Allowable Subject Matter
>
> Examiner states: 'Claims 15-17 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims. ***Applicants have amended claims 15-17 in independent form, including the limitations of the base claim and intervening claims***.

---

[8] A true and correct copy of the '379 File History is attached hereto as Ex. J.

1  ('379 File History, January 15, 2007, Amendment Remarks, pg. 9

2  (MTI0002156)) (emphasis supplied).

3       The aspplicants did not inform the examiner that the "physical"

4  limitation was removed; and the examiner allowed the claim, which issued as

5  claim 1 in the '379 patent.[9]  Consequently, it is Defendants' position that this

6  "physical" switch limitation is still present and required for construction of the

7  "user controllable switch" term.  Defendants' construction should be adopted.

8  (*See also* Gafford Decl. § 16.5.)

9       **2.  "Stand-alone, dedicated function device for removing data from a long**

10 **term memory component" and "stand-alone, dedicated function device" (claim**

11 **1).**  Each and every aspect of Defendants' proposed construction of "Stand-alone,

12 dedicated function device for removing data from a long-term memory component" is

13 well-supported by the intrinsic evidence.  MyKey's proposed construction, on the

14 other hand, is less clear than language of the term itself.  Further, MyKey's circular

15 use of "dedicated" in its proposed construction does not assist the trier of fact, as

16 "dedicated" is at the core of the construction dispute.

17       The file history is clear as to the inventors' definition of "dedicated function:"

18 "Applicants understand 'stand-alone' to mean all the hardware, logic and circuitry

19 necessary to perform a task. . . Applicants understand 'dedicated function' to mean a

20 device that is configured at the factory for a specific purpose."  ('379 File History,

21 August 4, 2006 Amendment, pp. 13-14 (MTI0002095-2096).)  The inventors likened

22 the "invention" to "a Toaster Oven, such as the Cuisanart [sic] Convection Oven

23 Toaster Broiler with Exact Heat [which] uses a microcontroller to control some of its

24 functions and take input from a user, but it does not have any provisions to allow the

25 user to change its basic functionality."  ('379 File History, August 4, 2006

26 Amendment, pp. 13-14 (MTI0002095-96).)  In distinguishing their device from a

27

28 _____

[9] Defendants reserve the right to contend that this secret removal of "physical" from the claim language was intentionally misleading, rendering the claim unenforceable, pending discovery on this issue.

general purpose computer, the inventors explained that "A dedicated function, stand-alone device/appliance while portable, does <u>not</u> allow a user to change its functionality."  ('379 File History, August 4, 2006 Amendment, p. 15 (MTI0002097) (emphasis in original).)  The inventors further compared the device to a digital watch and an electric shaver:

> A digital watch has a microcontroller, ROM and RAM in it, but it is not possible for the user to reconfigure the device to perform any functions for which it was not designed.  Similarly, the Braun 8595 electric shaver uses a microcontroller to control its LCD screen and track battery usage, charging, and cleaning.  **It does not have any method for the user to change its programming or basic functionality.  The user may turn it on or off, and it then performs its stand-alone, dedicated function of vibrating the shaver head** in order to cut whiskers, should the user touch the shaving head to a whisker.

('379 File History, August 4, 2006 Amendment, p. 15 (MTI0002097)) (emphasis supplied.)

In summarizing the "Key Observations" regarding the "invention" to the Examiner, the inventors stated that "Applicants' stand-alone, dedicated-function cleaning device/appliance is not able to be reconfigured by a user."  ('379 File History, August 4, 2006 Amendment, p. 16 (MTI0002098).)  And, in distinguishing over Kung, the inventors stated that their "stand-alone, dedication function cleaning device/appliance is not user programmable/configurable."  ('379 File History, August 4, 2006 Amendment, p. 20 (MTI0002102).)  The intent of the applicant could not be clearer: a dedicated function device is a device designed and configured to perform its dedicated function - and only its dedicated function - without the ability to be reconfigured to perform any other.

The specific purpose of the "stand-alone, dedicated-function device," in the '379 patent is not in dispute.  As MyKey's proposed construction acknowledges, that

specific purpose is to "remove data from the long term memory component." (*See also* '379 patent: Abstract; claim 1.)  In comparing the technology claimed by the '379 patent to an iPod Shuffle, the inventors stated:  "When an iPod Shuffle is turned on, it plays music.  When our current device is turned on, it permanent [sic] removes data from a long-term memory component."  ('379 File History, Jan. 31, 2006 Amendment, p. 13, (MTI0002027).)  The file history further explains that "[t]he current device stores instruction in permanent memory and these instructions are executed directly when a physical switch is activated."  ('379 File History, Jan. 31, 2006 Amendment, p. 16, (MTI0002030).)  Finally, the inventors explained that "[u]pon activation of switch 703 the device/appliance initiates the cleaning operations on the drive attached to the cable 702."  ('379 File History, August 4, 2006 Amendment, p. 14 (MTI0002096).)  Thus, the inventors argued that the device automatically performs its specific function upon activation, which is also captured in the specification:  "a user controllable switch, when actuated by a user, causes the control circuit to commence permanently removing the data from the long-term memory component."  ('379 patent: Col. 4, ll. 12-15.)

In addition to the clear and consistent intrinsic evidence, Defendants' construction is also supported by the *Microsoft Computer Dictionary,* (Microsoft Press, 1999), 4th Ed., definition of "dedicated:"  "[o]f, pertaining to, or being a device, program or procedure devoted to a single task or function."

As Mr. Gafford summarized, each of the examples offered in the file history "illustrate to one of ordinary skill in the art that any complication of the cleaning device to provide other functions is not what the inventors meant when they used the term 'dedicated function' particularly when viewed in light of the single user controllable switch and the automatic sequencing of commands to the storage device for opening and cleaning."  (Gafford Decl. § 16.4.4.)

MyKey cites to no intrinsic evidence to refute Defendants' proposed construction, and  MyKey's citation to section VI., D of the Berg Declaration is

1  unpersuasive because Mr. Berg's statements directly contradict the specification and

2  file history.  For example, Mr. Berg claims that "this term should not be interpreted to

3  mean that the device can perform only a single function."  (Berg Decl. ¶ 61.)  This is

4  directly contrary to the statements the inventors made in the '379 File History, August

5  4, 2006 Amendment (*see* discussion, above) (dedicated function means a device that

6  is configured at the factory for *a* specific purpose.")  Because Mr. Berg's opinion is

7  contrary to, and completely divorced from the specification and the file history, it

8  should be rejected.  *See e.g., Phillips*, 415 F.3d at 1319 (The Federal Circuit views

9  "extrinsic evidence in general as less reliable" than intrinsic evidence; as a result,

10  extrinsic evidence should only be considered "in the context of the intrinsic

11  evidence," *i.e.*, the claims, specification, and prosecution history).  *See also Old Town*

12  *Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1318 (Fed. Cir. 2006)

13  (patentee "is not entitled to a claim construction divorced from the context of the

14  written description and prosecution history").

15  The intrinsic evidence makes plain that a stand-alone dedicated function device

16  is one that: (a) is configured for a single specific purpose: its dedicated function; (b)

17  contains everything necessary to perform that function; (c) performs that function

18  automatically upon being initiated; and (d) is not designed to be reconfigured to

19  perform other functions.  Defendants' construction captures these points and should

20  be adopted over MyKey's more vague proposal that fails to define the meaning of the

21  term in the manner discussed in the specification and file history.

22  **3.  "Hidden storage area" (claim 1-3).**  Contrary to Plaintiff's proposed

23  construction, nowhere in the intrinsic record of the '379 patent is there any

24  mention of a Host Protected Area ("HPA") or Device Configuration Overlay

25  ("DCO").  In contrast, in the '086 patent which was applied for approximately a year

26  and a half later, the applicants made direct reference to HPA and DCO.

27  What the intrinsic record does describe, however, is data on the drive that is

28  hidden from the operating system (*e.g.* Windows or Linux), *i.e.*, the software that

1    controls the "drive" sought to be wiped.

2        Specifically, in the specification, the applicants characterize "hidden

3    storage area," as follows:

4        This common scenario presents a couple of problems. In the case

5        where different partitions hold different formats of data, it may not

6        be possible to access one of the partitions for file deletion or

7        formatting. Windows [operating system] may not make the Linux

8        partition visible, so there would be nothing to delete. Even with

9        multiple partitions of the same data type, the data in the partitions

10       may all be visible to the user, but it would be up to the user to know

11       enough to delete all of the data in all of the partitions assigned to a

12       single drive. For untrained personnel, this might be difficult to

13       determine, so for them, the data may appear 'hidden.'

14   ('379 patent: Col. 3:8-19.)

15       In another portion of the specification, the hidden storage area is described as

16   an area on the drive that is hidden from the "computer."

17       Some target drives may contain data that the drive has been

18       instructed to classify as 'hidden' data. For example, a command

19       supported by many commercially available hard drives allows a

20       skilled programmer to reserve a portion of the storage media. Once

21       reserved, this area of the media is effectively hidden <u>from the</u>

22       <u>computer</u> by the drive. Standard queries about the amount of storage

23       on the drive return the full amount of storage minus the reserved

24       amount. This prevents standard data removal methods from

25       working as the computer is unaware that there is hidden data.

26   ('379: Col. 10, ll. 41-50, emphasis supplied).

27       Of course, since the drive is part of the computer, and cannot hide from itself,

28   the term "computer" in this context must be referring to the software that runs the

computer, *i.e.*, the operating system.  In this portion of the specification, it is the operating system – referred to in the above-cited portion of the specification as the "computer" – that is not programmed to read the "hidden" area in response to the "standard queries" issued by the operating system.

Therefore, for the reasons stated herein, and those stated in Mr. Gafford's Declaration the term, "hidden storage area" is properly construed as "an area on a long-term memory device that is hidden from the operating system."  (*See* Gafford Decl. § 16.2.)

**4.** "**Irretrievably remove data**" **(claim 1).**  MyKey's claim construction is fatally flawed in that it improperly attempts to capture subject matter not known at the time of the '379 patent application.  At a minimum, MyKey's claim construction must be modified to read as follows:  "remove data permanently such that it may not be recovered by any methods *for data recovery for hard drives as known as of June 21, 2001*."  Such a construction is completely consistent with Defendants' proposed construction because June 21, 2001 is the effective filing date of the '379 patent application and the only known method as of the effective filing date was the track jumping method–overwriting data on the tracks of a long-term memory component by writing to all the tracks multiple times with multiple data patterns and writing to the tracks non-sequentially in a pattern that forces the head to move from track to track in such a way as to introduce jitter in the position of the head in the long-term memory component.

The Federal Circuit requires "that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., *as of the effective filing date of the patent application*." *Phillips,* 415 F.3d at 1313 (emphasis supplied).  MyKey nonetheless argues for a claim construction that is not fixed in time and that captures methods for permanently deleting the contents of a drive that did not exist *as of the effective filing date of the patent application.*  "A claim cannot have different

1     meanings at different times." *See PC Connector Solutions LLC v. SmartDisk Corp.,*

2     406 F.3d 1359, 1363 (Fed. Cir. 2005) (confirmed in *Phillips*).  Instead "its meaning

3     must be interpreted as of its effective filing date." *Id.*

4         The only method known as of the effective filing date of the '379 patent that

5     specifically "renders the original data unrecoverable" was identified in the '379 patent

6     as follows:

7         "Operation of the Cleaning Device.  Cleaning device **300** operates on a

8         target drive inserted into interface connector **340** to permanently erase

9         the contents of the drive.  In general, cleaning device **300** removes data

10        from a hard drive by writing to all data tracks on a drive multiple times

11        with multiple data patterns.  Data tracks are not written to sequentially.

12        Instead, they are written in a pattern that forces the head to move from

13        track to track in such a way to introduce jitter in the absolute head

14        position. . . .  This process of writing with major jumps in head position

15        may be repeated numerous times with different data patterns.  By the end

16        of the cleaning process, the motion of the recording heads and the

17        changing data patterns renders the original data unrecoverable."

18     ('379: Col. 7, l. 64–Col. 8, l. 20, emphasis supplied).

19         MyKey's past admissions about the state of the art in recovery of overwritten

20     data as of the filing of the '379 patent are fatal to MyKey's current claim construction

21     position on "irretrievably remove data."  MyKey has admitted that "[w]hen the '379

22     patent application was filed (June 21, 2001), there was equipment that could interpret

23     residual magnetism on the edges of the tracks in floppy disks and legacy hard drives

24     (i.e., those manufactured before 2002)."  (Complainant MyKey's Opposition to CRU's

25     Motion for Summary Determination Based on Non-infringement of U.S. Pat. No.

26     7,228,379 at 12  (Filed in U.S.I.T.C. Investigation No. 337-TA-799).)[10]

27

28     [10] A true and correct copy of the public version of this document is attached hereto as Ex. K.

1    MyKey improperly argues for a claim construction based on improvements in

2    hard drives after the filing of the '379 patent while acknowledging that the "known

3    methods" for recovering data have changed over time, and change with respect to

4    different drives to which the "known methods" are applied.  *See id.,* at 12.  MyKey's

5    construction would leave the Court with a situation that is not only wrong under *PC*

6    *Connector* and *Phillips*, but is unworkable.

7        The only proper construction of "irretrievably remove data" is one that is tied to

8    what the applicants actually claimed to have invented for a data removal device. The

9    unrestricted "known methods of recovering" would alternately punish or reward,

10   unjustly in both cases, the patent owners, depending on the ongoing inventions of others

11   for disk technology and data recovery methods.

12       The '379 patent specification supports Defendants' construction by its detailed

13   depiction and discussion of "fuzzy" data areas that adjoin data tracks.  ('379 patent:

14   Figs. 2A and 2B and Col. 1, l. 63–Col. 2, l. 61.)  For example, "[H]owever, when

15   trying to irretrievably delete data by overwriting the data with 'zeros,' there is likely to

16   be remnants of the old data on the edges of the track. This data may potentially be

17   recovered." ('379: Col. 2, ll. 46-50.) With this statement, the inventors are telling the

18   public that mere overwriting does not "irretrievably remove data," because the fuzzy

19   area includes residual magnetism that could be interpreted by someone with the

20   correct equipment. ('379 patent: Col. 2, ll. 51-61, Gafford Decl. § 16.1.2.)  This

21   difficulty in "irretrievably" deleting data is solved in the '379 patent only by the

22   procedure that does not merely write patterns sequentially, but that moves the head to

23   create jitter to clean the "fuzzy" areas. ('379 patent: Col. 8, ll. 1-20.) The '379 patent

24   describes other methods for removing data but only asserts the non-sequential, jitter-

25   introducing method as irretrievably removing data. (Gafford Decl. § 16.1.3.)

26       Therefore, the Defendants' proposed construction should be adopted as the

27   correct understanding of what the applicants invented for irretrievably removing data

28   from a storage device, and MyKey's proposal to encompass the inventions of others

1  should be rejected.

2  **5.  "Casing being of a size that is portable by the user" (claim 1).**  The

3  Federal Circuit has warned that where there is no objective definition for determining

4  whether a claim limitation is met, the claim is indefinite.  *See Datamize, LLC v.*

5  *Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (claim limitation

6  requiring display in kiosk to be "'aesthetically pleasing'" rendered claim indefinite

7  insofar as the limitation's scope "depend[-ed] solely on the unrestrained, subjective

8  opinion of a particular individual purportedly practicing the invention.")

9  Here, each asserted claim of the '379 patent recites a device with a casing that

10  is portable by the user.  Further, the specification portions discussing the portability

11  of the design make clear that by "portable" the inventors meant something that is

12  easily carried by the user and that is small, lightweight, and physically compact.  (*See*

13  '379 patent: Col. 5, l. 23 ("device is physically compact"); Col. 6, ll. 21-24 ("Cleaning

14  device 300 may be designed as a relatively small, lightweight, and easily portable

15  device. In one implementation, cleaning device 300 is embodied in a case

16  approximately 8"×10"×1.5"."); 8:63-65 ("As previously mentioned, cleaning

17  device 300 may be constructed in a relatively small case, such as a case as small or

18  smaller than 8.5"×10"×1.5").)  In other words, the patent describes the portable

19  embodiment as a device that is approximately 127.5 cubic inches or smaller.

20  Yet, Plaintiff has accused of infringement a device that is 2,2278.5 cubic

21  inches in size (over 17 times the size of the sole "portable" embodiment of the patent)

22  and has a net weight of 35 pounds.  (*See* Ex. L) (ZClone '379 Infringement

23  Contentions at 27-29.)  Thus, either the claim limitation requiring portability is

24  indefinite because it lacks any objective measure by which to determine its proper

25  scope under *Datamize*, or some bounds need to be placed on the limitation to avoid

26  the purely subjective determination of what is or is not "portable."  Defendant's

27  construction places a reasonable boundary on the scope of the claims based on the

28  teaching of the specification, which describes the portable design of the invention as a

relatively small case, that is lightweight, easily portable, and approximately 8" x 10"
x 1.5" or smaller.

**6. "The control circuit open[s] a hidden storage area without user intervention" (claim 2).** The control circuit claimed in this term automatically opens hidden storage areas as part of the sequence of its normal operation without a separate or explicit request from the user to do so. Construction of this disputed term is necessary to resolve any ambiguity over the role of the user in accessing data in hidden storage areas. It is not enough, under this claim term, for a user to manually configure the device—e.g., through menu operations—to open and clean hidden storage areas on the drive.

The intrinsic evidence shows that the inventors contemplated a simple device that would automatically issue commands to open hidden storage areas without user intervention:

> Cleaning device 300 *may automatically issue these commands without the need for human intervention*, thus making the entire contents of the drive accessible for data removal.

('379 patent: Col. 10, ll. 51-56) (emphasis supplied).

> Additionally, the cleaning device *does not require that the operator have any particular knowledge of the target device*; it detects the capabilities and settings of the target device and adjusts the operating parameters for optimal performance *without user intervention.* Still further, the cleaning device removes data from all partitions on the target device, regardless of the data's format, and removes any reserved or protected data areas, so that all of the data storage areas on the target device are available for cleaning *without requiring user intervention*.

(*Id.* Col. 11, ll. 25-35) (emphasis supplied). Because the '379 patent contemplates that the invention must work automatically—without user intervention beyond initiating the device's operation and without requiring the

user to have any knowledge of the target device (as would be necessary to choose to configure the device to open hidden areas)—the term "without user intervention" necessarily requires that the user is not required to intervene *at any time* to configure the device to open hidden areas.

### C.   Disputed Terms of the '086 Patent

**1.   "Exact copy" / "exact copies" (claims 1 and 18).**  Defendants' proposed construction is consistent with and well-supported by the specification and the file history.  MyKey's proposed construction is incomplete; it does not reflect the fact that the file history and specification demonstrate that an "exact copy" means a copy that includes all of the same information as the original, that is arranged and formatted in the exact same manner as the original.

Defendants' construction is consistent with the specification, which explains that "One of the objectives of our invention is to make a copy *indistinguishable from a* [sic] *original*."  ('086 patent: Col. 5, ll. 21-22) (emphasis supplied).  The only way for a copy to be "indistinguishable" at a computer forensic level is for the copy to be formatted and arranged in the exact manner as on the long-term storage device.  Merely containing all the same data, or even containing all the same data in the same order, is insufficient because two drives containing the same data but formatted differently are forensically distinguishable.

The specification explains that one advantage of the invention of the '086 patent is that it is "operating system independent. . .This allows it to make a *perfect* copy of a drive regardless of the type of system that the drive was previously in."  ('086 patent: Col. 4, ll. 26-31) (emphasis supplied); *see also* ('086 patent: Col 3, ll. 38-40.)  Use of the adjectives "perfect" and "indistinguishable" throughout the specification to describe the "exact copy" that the invention makes demonstrates that the inventors intended "exact copy" to be interpreted as more than just a copy of all the data, but as a copy that includes all of the data that resides on a long-term memory device, formatted and

arranged in the exact manner as on the long-term memory device.  Only in that way will the copy be a perfect copy indistinguishable from the original.

Further, Provisional Application 60/443,387[11] (to which the '086 patent claims priority) specifically explains, under the heading, "The Need for a Simple Way to Make Exact Copies" that an exact copy is one that must be arranged in the exact same pattern as the original:

> In order to avoid this, a copy of the drive is typically made, and this copy is used by the forensics labs instead of the original.  For this process to work correctly, ***it is not enough for the copy to have all of the data files of the original, the data must be arranged on the copy in the exact same pattern*** as the original.

(Provisional Application, 60/443,387, p. 2) (emphasis supplied).

Finally, Mr. Gafford explains why an "exact copy" in the context of the '086 patent must be "arranged" in the exact same manner as the data from the source drive:

> The term "arranged" includes copying the hidden area access restriction (the maximum accessible address value) from the source drive to the destination drive, and ensuring that the hidden area of the destination drive is an exact copy of the hidden area of the source drive. If this is not done, then a forensic or security analysis of the destination drive will not be valid, because such analyses must consider the entire contents of a drive, and such an inaccurate copy would fall outside inventors' description of exact at 1:31-37, as cited above.

(Gafford Decl. § 15.4.3.)  Any copy that is not arranged and formatted in the exact same manner as the data on the source drive would not be useful for the purposes of the invention, and thus a person of ordinary skill in the art would understand the claim language to indicate a copy that is arranged and formatted

---

[11]  A true and correct copy of Provisional Application, 60/443,387 is attached hereto as Ex. M.

in the exact same manner.

MyKey's proposed construction lacks sufficient precision.  Specifically, MyKey omits the portion of the construction that requires that the data on the exact copy be "formatted and arranged" in the exact same manner as the source drive.  This construction is not consistent with the plain and ordinary meaning of the term "exact copy," the specification, or the file history.

**2.  "User controllable switch" (claim 1).**  Defendants' proposed construction– a simple physical switch having only 'on' and 'off' positions–is supported by the specification.  In fact, the specification's only detailed description of the "user controllable switch" term makes clear that the purported novelty of the claimed invention was a simple user interface with a single on/off switch to control the copying operation:

> In the preferred embodiment, the goal of making this device foolproof for use by an untrained person is accomplished in a number of ways. The first is that ***the device is controlled by a single switch***, such as Key Lock 4030. ***This switch has only two choices, on and off***. When switched on, the device starts operation and provides any required feedback to the user through one or more indicators, such as LEDs 4020.

('086 patent: Col. 7, ll. 26-33.)

The inventors repeatedly described their invention as having a "simple" user interface.  In the bbstract, the inventors described their "current invention" as a "simple device" with a "very simple user interface" that would "make[] it difficult and unlikely to use [their] device incorrectly."  ('086: Abstract.)  In the "Summary of the Invention" section, the inventors state their invention contains a "user controllable switch, [that] when actuated by a user, causes the control circuit to perform the copying procedure."  (*Id.*: Col. 2, ll. 15-17.)  In describing other "aspects" of their invention, the inventors disclose initiating the copying procedure with a switch.  (*Id.*: Col. 2, ll. 28-31) ("The method further includes *activating the copying device* via a

1   switch attached to the copying device, *making an exact copy, and signaling*

2   *completion of the copy process*.); (*Id*. Col. 2, ll. 39-41) (emphasis supplied) (same);

3   (*Id*. Col. 2, ll. 47-51) ("The device further includes control circuitry coupled to the

4   LEDs, the user settable switch and the interfaces, the control circuitry configured,

5   *when the switch is actuated by the user to make an exact copy*.") (Emphasis supplied.)

6          Not only did the inventors describe their invention as having a simple user

7   interface, *i.e.*, a simple physical switch having only on and off positions, they also

8   disparaged and disclaimed a Logicube prior art product–the Logicube Solitaire Forensic

9   Kit–that contained a menu-driven user interface.  According to the inventors, the

10  Logicube Solitaire had "numerous operating modes and options that must be specified

11  before making a copy," which options were "selected through the use of a number of

12  buttons and small display," and thus "require[d] a trained operator and [had] enough

13  options to cause confusion or errors on the part of its user."  (*See* '086 patent: Col. 1,

14  ll. 48-57; *see also,* Ex. N (MyKey's Resp. to Logicube's Interrog. No. 1 (identifying the

15  prior art referenced in the patent as Logicube's Solitaire Forensics Kit)).)  Thus, "user

16  controllable switch" cannot encompass a menu driven interface with multiple operating

17  modes selected through the use of a number of buttons, like that of the Logicube

18  Solitaire Forensics Kit, it must be a simple on/off switch.  *Retractable Techs., Inc. v.*

19  *Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In this case, while the

20  claims leave open the possibility that the recited 'body' may encompass a syringe body

21  composed of more than one piece, the specifications tell us otherwise. They expressly

22  recite that 'the invention' has a body constructed as a single structure, ***expressly***

23  ***distinguish the invention from the prior art based on this feature, and only disclose***

24  ***embodiments that are expressly limited to having a body that is a single piece.***")

25  (emphasis supplied); *see also SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys.*,

26  242 F.3d 1337, 1343 (Fed. Cir. 2001) ("That discussion in the written description

27  supports the district court's conclusion that ***the claims should not be read so broadly as***

28  ***to encompass the distinguished prior art structure***.")(emphasis supplied.)

**3.  "Means [for] initiating the copying procedure" (claim 18).**  Defendants' construction of the structure takes into account the specific structure recited in the specification to perform the stated function of "initiating the copying procedure;" that is, the "user controllable switch."

The specific characteristics of this switch-structure are disclosed in the specification at column 7, lines 26-33, which defines the characteristics of the "means [for] initiating the copying procedure," as follows:

> In the preferred embodiment, the goal of making this device foolproof
> for use by an untrained person is accomplished in a number of ways.
> The first is that the device is controlled by a ***single switch***, such as Key
> Lock 4030.  This switch has ***only two choices, on and off***.  When
> switched on, the device starts operation…

('086 patent: Col. 7, ll. 26-33) (emphasis supplied).

Not only did the inventors describe their invention as having a simple user interface, *i.e.*, a simple physical switch having only on and off positions, they also disparaged and *disclaimed* menu-driven user interface of the Logicube prior art product. (*See* '086 patent: Col. 1, ll. 48-57.)

Finally, as set forth in detail in the discussion above concerning the claim term "user controllable switch" in claim 1 of the '086 patent, Defendants' proposed claim construction is also consistent with the prosecution history.  For the sake of brevity, Defendants incorporate that discussion here, as though fully set forth.

**4.  "Means for making an exact copy" (claim 18).**  Because the '086 patent fails to describe sufficient structure to perform the function of "making an exact copy," claim 18 is invalid as indefinite under § 112.    MyKey proposes a structure that is "a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof."  But step 3070 of Fig. 3 reads, in its entirety: "copy all sectors."  Disclosing a processor programmed to copy all sectors, without more, is insufficient.

The Federal Circuit defined the rule for "computer-implemented means-plus-

function" claim terms in *WMS Gaming v. International Game Technology,* 184 F.3d 1339, 1349 (Fed. Cir. 1999):  "In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."  The reason for the requirement "that the patentee disclose the particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming."  *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  Where a patentee claims a means for performing a function, and discloses only a general purpose computer as the structure to perform that function, that is "pure functional claiming," of the type that *WMS Gaming* and its progeny prohibit.

Pointing only to a "processor" programmed to "copy all sectors," without providing any guidance as to how to copy all sectors or what algorithmic steps the processor must be programmed to perform in order to accomplish the desired function of copying all sectors renders claim 18 indefinite.  This is because "copy all sectors" is not an algorithm of specific steps to accomplish a desired function, but just a description of the desired function.  Putting the text "copy all sectors" in a box in a patent figure does not alter this reality.

**5.  "Means for reading and comparing the data on the source and destination devices and communicating result to a user" (claim 18).**  Because the '086 patent fails to describe sufficient structure to perform the function of "reading and comparing the data on the source and destination devices and communicating result to a user," claim 18 is invalid as indefinite under § 112.

Plaintiff's proposed structure is merely a single box in a flow chart that recites "compare all sectors."  This structure is woefully inadequate and merely repeats part of the recited function.  This is strikingly similar to the Federal Circuit's recent decision in *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310 (Fed. Cir. 2013),

in which the Federal Circuit found a means-plus-function limitation indefinite for lack of sufficient structure in the form of an algorithm in the specification.  The patentee in *Function Media* pointed to a piece of software referred to as the PGP as the means for carrying out the means limitation at issue.  *Function Media,* 708 F.3d at 1317.  The district court held that "the PGP is merely a black box that accomplishes the claimed function." *Id.* (citation omitted)(internal quotations marks omitted).  In affirming the district court's indefiniteness ruling, the Federal Circuit agreed, holding that the PGP software is "'simply an abstraction that describes the function to be performed.'" *Id.* at 1318 (citation omitted).  Like MyKey here, the patentee in *Function Media* similarly pointed to a flow chart as showing sufficient structure.  The Federal Circuit rejected that argument, finding the "flow charts" insufficient to disclose the algorithm by which the PGP performs the stated function.  *Id.*

**6.  "Stand-alone, dedicated function device for making exact copies of long term memory devices," "stand-alone, dedicated function copying device" (claims 1 and 18).**[12]  In both the '086 patent and the '379 patent, the inventors used "stand-alone, dedicated function device for …" and "stand-alone, dedicated function [] device."  By using the same precise terminology in the '086 patent application and the '379 patent application, the inventors clearly intended that these terms have the same or similar meanings.  Therefore, the intrinsic record of the '379 patent is instructive regarding the meaning of the terms used in both patents.  Defendants incorporate their earlier discussion of the "stand-alone, dedicated function" terms in '379 patent herein.

The '086 patent itself is also useful in determining the proper construction of this claim term.  For example, claim 1 of the '086 patent explains the singular purpose of the device is "making exact copies of long-term memory devices."  Further, the '086 patent at column 2, lines 15-17 explains that such a device performs its specific purpose automatically: "[a] user controllable switch, when actuated by a user, causes the control

---

[12] The parties agree that these terms should be construed in the same way.

1  circuit to perform the copying procedure."  Finally, the "Background of the Invention"

2  section of the '086 patent explains how prior art devices and methods were deficient

3  because they were "multi-function" devices and therefore resulted in to user error.  The

4  inventors criticized a prior art Logicube device as being too confusing for an operator to

5  use without error because it had too many functions.  Specifically, the inventors

6  explained that the Logicube's option to "delete the contents" of a drive causes user

7  confusion.  ('086 patent: Col. 1, ll. 50-57.)  MyKey should not now be allowed to

8  construe this disputed claim term to include features that the inventors specifically

9  disavowed (i.e., multiple functions, including a delete function).

10     Defendants' proposed construction directly relies on the '086 patent itself and as

11  viewed in light of the inventors' statements to the U.S. Patent and Trademark Office in

12  the '379 patent.  MyKey's proposed construction is circular and adds no clarity to the

13  meaning of the term.  Defendants' construction should be adopted.

14     **7.  "Control circuit issuing commands to. . . read and compare data on the**

15  **source and destination devices" (claim 1).**  The specification discloses only one

16  embodiment for reading and comparing data on the source and destination devices --

17  on a byte by byte basis in every sector of one drive to every sector of the other drive.

18  ('086 patent: Fig 3, Col. 6, ll. 17-22; *see also,* Gafford Decl. § 15.1.1.)  Thus,

19  Defendants' proposed construction should be adopted:  "commands are issued to the

20  source and destination devices so that, on a unit by unit basis, data on the source

21  device is read and compared with corresponding data on the destination device."

22     The expert testimony of Mr. Gafford explains that a unit is a quantity of data as

23  stored on the drive convenient for a processor to quickly compare, such as a byte.  (*Id.*)

24  Mr. Gafford further explains that one of ordinary skill in the art would understand that

25  "reading and comparing data" means reading "each element of data from one medium

26  and compar[ing] that to data at the same address in the other medium. . . it simply does

27  not mean reading data, transforming it by some mathematical process to a non-unique

28  representation of that data, and comparing the result of that process to similarly

processed data from the other medium."  (Gafford Decl. § 15.1.2.)

While MyKey contends that this limitation requires no construction, no construction here would allow MyKey to argue that the comparison could be less than a unit by unit comparison such that it would be possible to run a comparison that would no longer find all differences between the data on the source and destination drives.  (*Id.*)  This result would run contrary to the plain meaning of the claimed invention which is to make the destination drive an exact copy of the source drive that is indistinguishable from the source.  ('086 patent, claim 1) ("A stand-alone, dedicated function device for making exact copies . . ."); (*Id*. Col. 5, ll. 21-22 ("One of the objectives of our invention is to make a copy indistinguishable from an original.")

**8. "Control circuit issuing commands to. . . restore the source drive to its original condition" (claim 1).**  The central dispute between the parties with this term is whether the invention requires that the drive is restored to its original condition *automatically* after copying without additional user intervention or choice, or whether the claim language can be interpreted to include an additional required user intervention before the drive is restored to its original condition.  Defendants contend that the invention claims a duplicator device that, when activated, makes the copy and restores the drive to its original condition, all in sequence and all performed by the duplicator itself.  MyKey would interpret the language to allow the restoration to original condition to be performed by the host through a separate, manual power cycling initiated separately by the user sometime after the duplicator is used.  MyKey's interpretation conflicts with both the plain claim language itself and with the support in the specification.  Also, the construction of "original condition" is important in that it must be construed to reflect that the original condition of the source drive includes normally inaccessible "hidden areas" and that restoring the source drive to its original condition requires that the "hidden areas" be restored to their inaccessible condition.  If the hidden areas are not fully restored, then the drive

1  is not returned to its original condition in any meaningful way.

2      When the meaning of a claim term is disputed, the court has a duty to resolve

3  it.  *See O2 Micro Intern.Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361

4  (Fed. Cir. 2008).  A determination that a term "needs no construction" or has the

5  "plain and ordinary meaning" is inadequate when reliance on the "plain and ordinary

6  meaning" does not resolve the dispute.  *See id*.  Here, MyKey's reliance on the

7  supposed plain and ordinary meaning does not resolve the dispute because it leaves

8  unresolved the two questions of whether the restoration can require a manual step or

9  is performed automatically by the duplicator and whether the restoration includes full

10  restoration of the hidden areas.  Therefore, MyKey's proposal that the claim term

11  does not require construction should be rejected.

12      Defendants' proposed construction is required by the specification.  First, the

13  inventors distinguished their invention over what was well known in the art by

14  touting automatic restoration of hidden areas:  "Current stand-alone devices have

15  several limitations. . . They do not restore hidden areas automatically."  ('086 patent:

16  Col. 1, ll. 58-62.)  This language indicates that the invention of the '086 patent must

17  *automatically* restore hidden areas of the source drive.  Further, the specification

18  provides that, "under normal circumstances, our device would make the change, copy

19  the data, and restore the DCO to its original configuration."  ('086 patent: Col. 4, ll.

20  64-66.)  This language implies automatic restoration as part of the sequence of

21  operations.

22      Further, in discussing the restoration function, the specification claims to use

23  the method of U.S. Provisional Patent No. 60/443,388.[13]  The only algorithms for

24  restoring the source drive that are disclosed in U.S. Provisional Patent No.

25  60/443,388 describe control logic that automatically restores a source drive, without

26  room or need for additional user intervention after initiating the copy.  *See e.g.,* Fig.

27

28  _____
[13]  A true and correct copy of U.S. Provisional Patent No. 60/443,388 is attached
hereto as Ex. O.

3, Fig. 6, Fig. 8 (and, Fig. 8 is described as "a flow chart illustrating the logic in auto restoring a drive.")  (*See* U.S. Provisional Patent No. 60/443,388, p. 4.)  Moreover, Mr. Gafford explains that manually turning a device on and off is not contemplated by the '388 provisional application, which "discloses that the restoration method involves the issuance of certain commands to the drive after the copying process for restoring the drive to its original condition after the copying step has been completed."  (Gafford Decl. § 15.2.3.)  The issuance of these commands (and those further disclosed at pp. 7-8 of the provisional application) requires much more than simply cycling the device power on and off because turning the device off would not cause a device to issue such commands.

Finally, Mr. Gafford further explains that the "restoring element" disclosed in the '086 patent is an action by the invention (i.e., the duplicator) itself, not a separate user-initiated action.  A user cycling the source drive off and on sometime after performing the copying function is not an action by the duplicator:

> The restoring element requires an action by the duplicator, as recited. While some kinds of hidden regions, when opened by the duplicator, will close when power is removed from the drive and reapplied, this is not an action performed by the duplicator. . . [The inventors] applied for and got claims that go to actions performed by their duplicator, and power cycling restoration of a hidden area is not an action of the disclosed and claimed duplicator.

Gafford Decl. § 15.2.4.  The language of this term is "*control circuit* issuing commands to. . . .restore the source drive."  Because the plain language of the claim requires that restoring the source drive to its original condition is a step that must be completed by the duplicator itself (specifically the control circuit of the duplicator), this claim must be construed as Defendants propose.

**9.  "Means for opening hidden areas on the source device" (claim 18).**  As discussed above, a patentee cannot benefit from the functional claiming allowed by

1   35 U.S.C. § 112 for a processor-implemented invention while only disclosing a

2   "black box" algorithm that provides no structure.  *Function Media*, 708 F.3d at 1317.

3   In addition, a disclosed structure in the specification can only be a corresponding

4   structure for construing the claim if the specification clearly links or associates that

5   disclosed structure to the function recited in the claim.  *Med. Instrumentation &*

6   *Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003).  A patentee

7   fails to "clearly link" an algorithm to the claimed function by simply referencing

8   "prior art, identified by nothing more than its title and citation in a patent, to provide

9   corresponding structure for a means-plus-function limitation." *Pressure Prods. Med.*

10  *Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1317 (Fed. Cir. 2010).  This is

11  because "[s]imply mentioning prior art references in a patent does not suffice as a

12  specification description to give the patentee outright claim to all of the structures

13  disclosed in those references."  *Id.*

14       MyKey's proposed structure fails to point to any algorithm, and fails to clearly

15  link any disclosed structure to the function of the limitation -- opening hidden areas on

16  the source device.  In fact, there is only one sentence in the portions of the specification

17  cited by MyKey that even discusses opening the hidden areas to make them available

18  for the copying process.  This disclosure states solely that "[i]f the data is hidden using

19  the HPA method, *the drive may be instructed to make the hidden area accessible*

20  *temporarily*."  ('086 patent: Col. 4, ll. 54-55.)   This is not sufficient structure; it simply

21  states the outcome of that claimed function.  This term is indefinite as a matter of law.

22       MyKey's assertion that the '388 Provisional Application referenced in the '086

23  patent discloses a structure for the recited function also fails.  That Application is

24  neither incorporated by reference into the specification nor is it clearly linked to the

25  function of opening hidden areas on the source device.  Rather, this Application relates

26  to the restoration of the source device to its original condition.  (*See* U.S. Provisional

27  Patent No. 60/443,388 entitled "Systems and Methods for Restoring Critical Data to

28  Computer Long-Term Memory Device Controllers.")  Under Federal Circuit precedent,

a plaintiff may not use a structure clearly linked to another function  (i.e., "restoring the source device to its original condition") to satisfy the structure requirement for a different function to which it is not clearly linked.    *Med. Instrumentation*, 344 F.3d at 1216 ("[I]n *Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.,* 248 F.3d 1303 (Fed. Cir. 2001), we rejected a similar attempt by a patentee to include, as additional corresponding structure for one function, structure that was not clearly linked to that function but was clearly linked in the specification to a different function.")  This term is invalid for indefiniteness.

**10.  "Means for restoring the source device to its original condition" (claim 18).**  This term is also indefinite under *WMS Gaming* and its progeny.  The portion of the specification that MyKey points to as disclosing the "algorithm" to carry out the function of restoring the source drive to its original condition is insufficient.  Specifically, MyKey points to the language contained in the '086 patent at Col. 4, ll. 54-60.  The language cited by MyKey states, *in its entirety*:

> If the data is hidden using the HPA method, the drive may be instructed to make the hidden area accessible temporarily. When a temporary change command is issued, the drive resorts to its previous state the next time that the drive is powered off and on again. If, however, the DCO method is used, there is no such temporary change command. Making a change to DCO settings is permanent until changed again.

This language provides absolutely no description of the algorithm that a processor must perform that will allow it to complete the stated function of "restoring the source drive to its original condition."  Instead, this language discusses the challenges known in the art in restoring DCO areas, and provides no solution to those challenges.  In fact, the cited text concludes with the recognition that:  "Making a change to DCO settings is permanent until changed again" ('086 patent: Col. 4, ll. 59-60), without any description of how that "permanent" change is undone by the invention of the '086 patent.  This passage does not provide the necessary structure for restoring a

1    "hidden area."  MyKey's proposal must be rejected.

2         Furthermore, MyKey's "alternate" structure is not supported.  First, the '086

3    patent does not clearly associate the elements of the "alternate" proposed structure with

4    the function of restoring the source drive to its original condition.  The obligation to

5    clearly associate structure with function is the *quid pro quo* for employing § 112, ¶ 6.

6    *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997).  Failure to provide

7    sufficient, specific disclosure directly linking the recited function to a particular

8    structure is fatal under 35 U.S.C. § 112, ¶¶ 2 and 6. *See Blackboard, Inc. v.*

9    *Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009).  MyKey first cites to the

10   abstract to support its alternate structure.  Nothing in the abstract provides any guidance

11   regarding the algorithm used to restore the source drive to its original condition.  In fact,

12   the abstract does not even so much as mention the restorative step.  ('086: Abstract.)

13   MyKey next cites to Col. 3, l. 54- Col. 4, l. 25.  This portion of the specification also

14   makes no mention of the restorative step, or how it is performed.  Third, MyKey points

15   to Figs. 1, 4, 5, 6, and 7, and the accompanying text, which also, far from providing any

16   specific disclosure that directly links "restoring the source drive to its original

17   condition" say absolutely nothing about the restorative step. Fourth, MyKey cites to the

18   (086 File History, May 12, 2006 Amendment, at page 6 (MTI0001591)[14] as support for

19   its proposed structure.  This cite also provides no information regarding the algorithm

20   employed to restore the source drive, but rather, provides only the bare language that

21   was added by that amendment: "means for restoring the source device to its original

22   condition."  Nowhere in any of MyKey's citations do the steps described in MyKey's

23   proposed alternate structure appear.  This is not sufficient.

24        Finally, MyKey cites to U.S. Provisional Application 60/443,388 as support for

25   its proposed alternate structure.  Importantly, this application was not incorporated by

26   reference in the '086 patent, and therefore the contents of the 60/443,388 application are

27   not part of the disclosure of '086 patent and may not be relied upon as disclosed

28   _____

[14] A true and correct copy of the '086 File History is attached hereto as Ex. P.

structure for purposes of 35 U.S.C. § 112.  Case law is clear: Section 112 requires that corresponding structure in a "means-plus-function" claim must be "described in the specification."  *See e.g., Pressure Products*, 599 F.3d at 1316-1317; *see also Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999).  Here, the title of the provisional application "Systems and Methods for Restoring Critical Data to Computer Long-Term Memory Device Controllers" is not sufficient "structure" as a matter of law.  The provisional application has not been incorporated by reference into the '086 patent.  The disclosure of the provisional application is not available to save this claim term from indefiniteness.  Because the '086 patent fails to describe any structure to perform the recited function, claim 18 is invalid as indefinite under U.S.C. § 112.

Dated: February 19, 2014          By:    /s/ Kevin W. Kirsch

Kevin W. Kirsch
Scott R. Stanley
Jared A. Brandyberry
David A. Mancino
Baker & Hostetler LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Tel: 513-929-3485
Fax: 513-929-0303
Email: kkirsch@bakerlaw.com
Email: sstanley@bakerlaw.com
Email: jbrandyberry@bakerlaw.com
Email: dmancino@bakerlaw.com


Lisa Damji
Baker and Hostetler LLP
12100 Wilshire Boulevard 15th Floor
Los Angeles, CA 90025
Tel: 310-979-8450
Fax: 310-820-8859
Email: ldamji@bakerlaw.com


Attorneys for Defendant *Guidance Software Inc.* and *Guidance Tableau LLC*

By: */s/ David Cooper*
David Cooper
Owen Dukelow
Desmond J. Kidney, II,
KOLISCH HARTWELL
520 S.W. Yamhill Street, Suite 200
Portland, Oregon 97204
Telephone: (503) 972-9191
Email: coop@khpatent.com
Email: owen@khpatent.com

Attorneys for Defendant *CRU Acquisition Group LLC*
By: */s/ Mark Mizrahi*
Mark Mizrahi
Wolf Rifkin Shapiro Schulman and Rabkin LLP
11400 W Olympic Blvd, Ninth Floor
Los Angeles, CA 90064
Tel: (310)478-4100
Fax: (310)479-1422
Email: MMizrahi@wrslawyers.com

Attorney for Defendant *Intelligent Computer Solutions, Inc.*

By: */s/ Brian Martinez*
Brian Martinez
Arnold and Porter LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California 90017-5844
Telephone: 213.243.4000
Facsimile: 213.243.4199
Email: Brian.Martinez@aporter.com

Attorney for Defendant *Logicube, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/ Alejandro Menchaca
Perry M. Goldberg (SBN 168976)
Jenny Nugent (SBN 237669)
GOLDBERG, LOWENSTEIN &
WEATHERWAX LLP
11400 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
Telephone: (310) 203-9222
Facsimile: (310) 388-0652
Email: Goldberg@glwllp.com
Email: Nugent@glwllp.com

Alejandro Menchaca
MCANDREWS, HELD & MALLOY, LTD.
500 W. Madison Street
34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100
Email: Amenchaca@mcandrews-ip.com

Attorneys for Defendant
*Digital Intelligence, Inc.*

By: /s/ Paul J. Stockhausen
Paul J. Stockhausen
Jessica Hutson Polakowski
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  (414) 298-1000
Facsimile:  (414) 298-8097
Email: pstockhausen@reinhartlaw.com
Email:  jpolakowski@reinhartlaw.com

Attorneys for Defendants *Tefkat LLC* and
*Robert Botchek*

# PROOF OF SERVICE

I declare that I am employed with the law firm of Kolisch Hartwell, 520 S.W. Yamhill Street, Suite 200, Portland, Oregon 97204.  I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on February 19, 2014, I served the following:

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

☒   **BY ELECTRONIC SERVICE** by electronically mailing a true and correct copy through Baker & Hostetler LLP's electronic mail system to the e-mail addresses set forth below per agreement of the parties in accordance with Fed. R. Civ. P. 5(b).

[SEE ATTACHED SERVICE LIST]

☐   **BY MAIL** by placing the envelope for collection and mailing following our ordinary business practices.  I am readily familiar with the firm's practice of collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in Cincinnati, Ohio, in sealed envelopes with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on February 19, 2014.

/s/ Owen Dukelow
Owen Dukelow

## SERVICE LIST

1

2 Robert E. Freitas
  Craig R. Kaufman
3 Kaiwen Tseng
  Qudus B. Olaniran
4 FREITAS TSENG & KAUFMAN LLP
  100 Marine Parkway, Suite 200
5 Redwood Shores, California  94065
  Tel: (650) 593-6300
6 Fax: (650) 593-6301
  Email: rfreitas@ftklaw.com
7 Email: ckaufman@ftklaw.com
  Email: ktseng@ftklaw.com
8 Email: qolaniran@ftklaw.com

9 Attorneys for Plaintiff
  *MyKey Technology Inc.*

David Cooper
Owen Dukelow
KOLISCH HARTWELL
520 S.W. Yamhill Street, Suite 200
Portland, Oregon 97204
Telephone: (503) 972-9191
Email: coop@khpatent.com
Email: owen@khpatent.com

Attorneys for Defendant *CRU
Acquisition Group LLC*

10 Mark Mizrahi
   Wolf Rifkin Shapiro Schulman and
11 Rabkin LLP
   11400 W Olympic Blvd, Ninth Fl
12 Los Angeles, CA 90064
   Tel: (310)478-4100
13 Fax: (310)479-1422
   Email: MMizrahi@wrslawyers.com

14 Attorney for Defendant *Intelligent
   Computer Solutions, Inc.*
15

Brian Martinez
Arnold and Porter LLP
777 South Figueroa Street, Forty-Fourth
Floor
Los Angeles, California  90017-5844
Telephone: 213.243.4000
Facsimile: 213.243.4199
Email: Brian.Martinez@aporter.com

Attorney for Defendant *Logicube, Inc.*

16 Paul J. Stockhausen

17 Jessica Hutson Polakowski
   Reinhart Boerner Van Deuren s.c.
18 1000 North Water Street, Suite 1700
   Milwaukee, WI 53202
19 Office: 414-298-8186
   *pstockhausen@reinhartlaw.com*
20
   Attorneys for Defendants *Tefkat LLC
21 and Robert Botchek*

Perry M. Goldberg (SBN 168976)
Jenny Nugent (SBN 237669)
GOLDBERG, LOWENSTEIN &
WEATHERWAX LLP
11400 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
Telephone: (310) 203-9222
Facsimile: (310) 388-0652
Email: Goldberg@glwllp.com
Email: Nugent@glwllp.com

Alejandro Menchaca
MCANDREWS, HELD & MALLOY,
LTD.
500 W. Madison Street
34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100
Email: Amenchaca@mcandrews-ip.com

Attorneys for Defendant
*Digital Intelligence, Inc.*

22

23

24

25

26

27

28