# EXHIBIT D

Expert Report of Thomas A. Gafford Regarding Construction of Claim Terms

IN RE: MYKEY TECHNOLOGY INC. PATENT LITIGATION
January 17, 2014

INTRODUCTION & BACKGROUND

1.  My name is Thomas A Gafford.  I am an electrical engineer and the owner of
    Gafford Technology, a firm that specializes in computer and electronics
    engineering, consulting, and design.  The following is a brief review of my
    experience and qualifications.  I graduated with a Bachelor of Science in
    Electrical Engineering from the University of Washington, Seattle, in 1972.  I
    also attended the Master of Science in Electrical Engineering program at
    Stanford University, Palo Alto, California from 1972 to 1973, and I continued
    to work at Stanford in the Artificial Intelligence Laboratory until 1976.  Prior to
    college, I served in the U.S. Air Force, where I had extensive experience with
    analog and digital signaling, control, and communications systems as a
    member of the maintenance team for the S.A.G.E. air defense computer
    system at McChord Air Force Base, Tacoma, Washington.  I also attended
    the U.S.  Air Force S.A.G.E. Computer Training Course in 1967 at Keesler
    Technical Training Center in Biloxi, Mississippi.

2.  I have over 40 years of experience in areas relating to complex signal
    processing systems, including digital circuit design, digital control systems,
    and computer design.   In particular I have extensive experience in storage
    systems and software, as well as experience in computer forensic discovery
    and analysis.   My experience with computers and digital systems began
    when I was in the Air Force, with the S.A.G.E. system, and continued
    throughout my employment at Stanford and at a Silicon Valley start-up
    company that I founded, to this day.  Additional details regarding my
    qualifications are described in my Curriculum Vitae, a true and correct copy of
    which is attached hereto.

3.  This report is based on information known to me as of the date of this report,
    and I reserve the right to modify or expand upon my opinions based on new
    information and in response to additional discovery, rulings, reports and
    testimony.

    PRIOR TESTIMONY

4.  Attached is a list of cases in which I have testified as an expert witness at
    trial, hearing, or by deposition during the last four years.

    PUBLICATIONS

5.  I am the author of no publications within the last ten years.

1

SCOPE OF ASSIGNMENT

6.  I have been retained by respondents in connection with the above-captioned matter.

7.  I am compensated in this matter on an hourly basis and my compensation is not dependent on the outcome of the matter.  I am being reimbursed for my time spent on this case at my usual fee of $600 per hour and for my out-of-pocket expenses.

8.  I have been asked to consider the meaning of certain claim terms to one of ordinary skill in the art of the subject matter of the patents in suit, in light of the disclosures of those patents and of statements made by applicants to the Patent and Trademark Office in obtaining the issued claims.

INFORMATION CONSIDERED IN FORMING MY OPINIONS

9.  I have considered the patents in suit, their file histories and cited prior art, and my own knowledge and experience in the computer storage system art, in forming the opinions that I express in this report.

10. I have further considered Microsoft Computer Dictionary Fourth Edition (Microsoft Press, 1999).  Copies of the relevant portions of this dictionary are in Exhibit 3.

11. I understand that the meaning of a particular claim term is to be viewed from the perspective of one of ordinary skill in the art at the time of the application for patent.  I also understand that patent claims must be read in view of the patent's written description and drawings, and the patent's prosecution history.

EXHIBITS TO BE USED

12. In addition to documents cited in this report, demonstrative and summary exhibits may be created in accordance with the Court's pretrial scheduling order, based on the opinions expressed in this report.

OPINIONS

13. My opinions and beliefs expressed below are from the perspective of one of ordinary skill in the art at the time the patent applications were filed.  I was a person of at least ordinary skill at that time.

    13.1.      I believe the art of the patents in suit is that of computer storage systems, and that a person of ordinary skill in this art at the time the

2

applications leading to the patents in suit were filed would have a BS degree in electrical engineering or computer science with 2-3 years of experience in computer storage systems.

14. U.S. Patent No. 6,813,682 (the '"682 patent")

    14.1.      "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands"

        14.1.1.      I have accepted for the purpose of my analyses in this matter the language of the claims following the phrase 'means for' as the function for which structure must be found unless I state otherwise herein. The portion of the decision steps 420, 440, 450 and 460, executed by the processor, that compare the received command with known commands comprise the structure disclosed for this comparing element. There are differences between how the functions of the claimed invention are recited, and how the functions are disclosed. Because of these differences, there is no single element in figure 4 that has a one to one correspondence with a single element of the claim. The decision boxes in the flow chart would be implemented by a PHOSITA (person having ordinary skill in the art) with at least a comparison instruction followed by at least one branch instruction. Thus the structure for comparing is the compare instruction of the box, and the forwarding and blocking structure is the branch instruction or the non-branch path from the comparison.

    14.2.      "means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device"

        14.2.1.      The 'yes' branch of steps 440 and 450, the portion of 460 that processes and does not discard additional commands, and steps 470 and 480, together with all the hardware elements in Fig. 5 except for 520, 525, 530, and 560 comprise the structure of the program that forwards such commands. The basis for my opinion is that the flow of control for forwarding commands passes through these portions of the elements in the figure in order to perform the recited function of forwarding commands to the storage.

    14.3.      "means for blocking other ones of the commands from being received by the storage device based on the comparison"

        14.3.1.      A processor programmed to perform the 'no' branches of steps 420, 430, 440, 450, and the 'discard' portion of 460, together with all the hardware elements in Fig. 5 except for 520, 525, 530, and

3

560.  These portions of the flow chart in Fig. 4 are the ones that block commands not forwarded.

14.4.      "interface emulator"

14.4.1.        The correct definition for the term interface emulator is "an interface component that mimics the interface presented by the storage device and operates with no reconfiguration of the host software." First of all, "interface emulator" is not a term of art, rather, it is a term described in the disclosure of the '682 patent at 2:27-33 as "Specifically, the blocking device includes an interface emulator configured to emulate an interface presented by a storage device and an interface for connecting to a storage device."  The Microsoft Computer Dictionary (1999) defines "emulator" as "[h]ardware or software designed to make one type of computer or component act as if it were another, " and defines "emulation" as "the process of a computer, device, or program imitating the function of another computer, device or program."  The drive interface emulator portion of the blocking device is hardware designed to act as if it were a storage device interface.

14.4.2.        Finally, the interface emulator must not require a reconfiguration of the host software to perform its function, in accordance with applicants' criticism of Kern that Kern's application programs 110-112 could be designed to operate with any "intelligent digital input/output channel." Put another way, the software and any configuration the software required to operate the storage device without the blocker needs no change to operate the storage device with the blocker, as applicants stated, for example, here:

14.4.2.1.  "Accordingly, neither the host nor the storage device need any special hardware or software and neither the host nor the storage device need to be reconfigured in any way. The blocking device simply needs to be inserted between the host and the storage device and it is ready to operate." Office Action Response, Nov. 24, 2003, at 18.

14.4.3.        A host that accesses a storage device does so through a specific interface, such as IDE, SCSI, USB, FireWire, etc.  Each interface requires a particular configuration of software to work with that device through that interface.  The '682 patent proposes that the connection to the device is removed and reconnected to the device through a bridge type device such as a write blocker.  If the interface provided by the write blocker to the host is not identical to that provided by the storage device to the host, then the host software must be reconfigured to work with the storage device through the new

4

interface.  The software in the host that is configured for this purpose is called a device driver.  Device drivers are written for a specific interface such as one of the above, and if the interface for example is changed from IDE to SCSI, a different device driver must be used by the host, which requires the host be reconfigured.  Even if the blocker provides the same kind of interface already in use by the drive, if the emulation of the drive interface isn't identical, using the same parameters such as speed and type of transfers permitted, then the driver itself needs to be reconfigured to work with the imperfect emulation.

14.5.      "transparent to normal operation [of the host and the storage device]" and "transparently to normal operation [of the host and the IDE storage device]" and "transparent to normal operation [of the computer motherboard and the storage device]" and "transparently to [the host computer and the long-term storage device]" and "transparently to normal operation [of the host and the storage device]"

14.5.1.      The correct definition for these phrases, which are all used to characterize the behavior of the claimed blocking device, is for the blocking device to appear to the host as the storage device and to appear to the storage device as the host, and for the blocking device to operate in such a way that all normal operations of the host, and all normal operations of the storage device, continue when the blocking device is interposed between them, with no need for reconfiguration of the host or storage device.  The term "transparent" is defined, in the Microsoft Computer Dictionary (1999), in the context of computers, to mean "In computer use, of, pertaining to, or characteristic of a device, function, or part of a program that works so smoothly and easily that it is invisible to the user." I believe the dictionary alone is sufficient to support my opinion, but there is more. In the same paper of the office action quoted above, applicants described the newly-added 'transparent' language in all the claims thus:

14.5.1.1.  "Advantages associated with transparent operation of the blocking device are discussed in numbered paragraph 38 of the specification.  As discussed, the blocking device appears as a standard storage device to the host.  Similarly, to the storage device, the blocking device appears to be the host.  Accordingly, neither the host nor the storage device need any special hardware or software and neither the host nor the storage device need to be reconfigured in any way.  The blocking device simply needs to be inserted between the host and the storage device and it is ready to operate." Office Action Response, Nov. 24, 2003, at 18.

5

14.5.2.      It is important to understand, however, that in this statement applicants are conflating appearance with operation.   It is not, in fact, enough that the host side of the device "looks" like a drive, nor that the drive side of the device "looks" like a host.  These characteristics are covered by the 'emulate' language in the claim.  The reason this is not enough is detailed in the disclosure at 9:48-10:30, in the description of a problem that arises with the structure of blocking device 203, and that is solved by the structure of blocking device 803.  When a host computer writes a drive, using device 203, the write information is not passed to the drive.  If, in the course of normal operation, the host then wishes to read that information from the drive, the information returned by the drive will NOT be what was previously sent by the host in the write operation, which was blocked by the device.  One example of normal operation given in the disclosure is the host's reading the drive after writing it to verify the data was correctly written.  The structure of 803 solves this problem by using a "temp" drive to receive the information written by the host, and a data structure in the RAM 840 to keep track of such writes, so that a subsequent read to the same location returns to the host data from the temp drive.  In the disclosure, only the structure of element 803 is capable of providing the claimed transparent operation.

14.5.3.      Applicants go on to state why Kern is not transparent:

14.5.3.1.  "Claim 1 further recites that the blocking device is transparent to normal operation of the host and the storage device.  Kern clearly does not disclose or suggest this feature of the invention.  As previously mentioned, the controller of Kern operates with host application programs 110-112 that are specifically designed for controller 106.  Host application programs 110-112 are described as transmitting an input access key with data requests.  (Kern, col.  4, lines 29-29).  Additionally, Kern, in Fig.  7, describes the sequence performed by a new host in order to participate in future allocation and/or data access requests.  (Kern, Fig.  7 and col.  10, line 27 through col.  11, line 6).  As described in these sections, a number of explicit communication steps are taken between a new host and controller 120 before a host can use the storage device(s) 108, including exchanging a key (step 704) and reconfiguring the interface of the host application (step 706). Applicants submit that this disclosure of Kern clearly) teaches away from a blocking device that is transparent to normal operation of the host and storage device, as recited in amended claim 1." Office Action Response, Nov. 24, 2003, at 19-20.

6

14.5.4.     Therefore in order to practice transparent operation, all of the host's normal operations such as reading and writing and verifying, and all of the storage device's normal operations, must continue with no change in host software or configuration when the blocking device is installed.  Normal operation between a host and a storage device without a blocking device includes the host writing the device and reading back what it wrote.  Normal operation between a host and a storage device **with** a blocking device should include the host reading back what it previously "wrote" to the storage device.

14.5.5.     The disclosure of the '682 patent includes a single example of transparent operation.  The embodiment of Fig. 8, as further described at 9:50-10:31 includes storage 870 and address mapping structure in processor 830 for storing the data written by the host without modifying the storage device, so that this data may be retrieved by the host, allowing the host to operate without error.

14.5.6.     By "normal operations continue" I mean that write commands by the host to the blocking device (which is emulating the storage device) proceed without error, and that the host can read back what it wrote, so that the same normal operations of a host and a storage device without a blocking device, operate the same with a blocking device.

14.5.7.     The transparency limitation requires at least that the emulation must be exact as described above, but goes farther than that in requiring that all operations of the particular host and the particular drive must continue as though the blocking device were not in use.  The emulation limitation will not be met if the blocker does not provide the same interface to the host that the drive provided.  It is not sufficient for the blocker to present to the host some storage device, if the blocker does not present to the host the same drive, reconfiguration will be required.  In addition to this emulation aspect of transparency, all other operations of the host must proceed without fault.  If as is usual, a storage device is normally accessible to the host for reading and writing, so that data written can be read back, we say that the drive is mounted for reading and writing.  If a blocker is inserted that discards write data from the host, and the host is not reconfigured to mount the drive read only, then the host will fail when it reads data from an address it wrote, because the wrong data will be returned.  Thus the particular drive must appear to be connected to the host via the blocker, and the particular drive must appear to be able to be written and read normally.  The figure 8 structure permits the blocked storage device to appear to be able to be written and read, because the data that is written is stored in the temp drive and when read, is provided to the host.  None of the other embodiments

7

will provide this appearance, because the data read from a location previously written will be incorrect.

14.6.   "host" (construction applies equally to "host computer," "computer motherboard," or "motherboard.")

14.6.1.   The correct meaning for this term is "a computer or motherboard distinct from the blocking device that, in the absence of the blocking device, is able to read and write the storage device." The  summary of the invention supports this construction and makes clear that the '682 patent is directed to a blocking device that is a bridge-type device that is physically inserted between a host computer and its storage device, for example:

14.6.1.1.   "Systems and methods consistent with the present invention address these and other needs by providing for an operating system independent blocking device that is physically inserted between a host computer and a storage device." ('682 patent 2:22-25)

14.6.2.   In order for the disclosed blocking device to be physically inserted as described, it must be physically distinct from the host and from the storage device.  In order for the disclosed blocking device to be of any use, the host must in normal operation issue write commands to the storage device that result in modification of the information stored thereon.

14.7.   "IDE emulator component"

14.7.1.   The correct meaning for this term is "an interface component that mimics the interface presented by the IDE storage device and operates with no reconfiguration of the host software."  The reason this is correct is that the only difference between this element and the "interface emulator" element is the explicit recitation of the type of interface, namely, IDE.

15. U.S.  Patent No.  7,159,086 (the '"086 patent")

15.1.   "control circuit issuing commands to . . .  read and compare data on the source and destination devices"

15.1.1.   This language means that "commands are issued to the source and destination devices so that, on a unit by unit basis, data on the source device is read and compared with the corresponding data on the destination device." The only teaching in the disclosure of this process is a byte by byte comparison of the data in every sector

8

of one drive to every sector of the other drive, in Fig. 3 and the specification at 6:17-22. This disclosure reinforces the claimed action of compare the data on the source with the data on the destination, on a unit by unit basis. This byte by byte, sector by sector read and compare structure is the only structure disclosed for performing the recited function. By unit I mean a quantity of data as stored on the drive convenient for a processor to quickly compare, such as a byte.

15.1.2.     The plain and ordinary meaning of reading and comparing data to one of ordinary skill in the art is to do exactly that. Read each element of data from one medium and compare that to data at the same address in the other medium. When such a process is performed, there is no doubt that any difference whatsoever between the two sets of data will be discovered. It simply does not mean reading data, transforming it by some mathematical process to a non-unique representation of that data, and comparing the result of that process to similarly processed data from the other medium. By non-unique I mean that if it is possible for two different input data items to be transformed into the same output data, then the transformation is not unique. With a non-unique transformation, it is no longer true that all possible differences between data on the two media have been found.

15.2.     "control circuit issuing commands to . . . restore the source drive to its original condition"

15.2.1.     In my opinion this means that "commands are issued to the source drive, automatically after copying, to restore the drive to its unaltered state after the source device has been altered to provide access to hidden areas." The language "original condition" refers to the "open hidden areas" commands elsewhere in this element, together with the disclosure that the use of the DCO method involves changes to the drive ('086 4:58-60). The reason that these commands must be issued automatically is that the applicants informed the public that not to do so practices the prior art, "Current stand-alone devices have several limitations. They do not copy hidden areas (HPA and DCO) automatically. They do not restore hidden areas automatically. They do not perform a read and compare verification after making a copy." ('086, 1:58-62) Applicants' disclaimer of scope is clear. This automatic restoring structure is the only structure disclosed for performing the recited function.

15.2.2.     The specification discloses the details of this restore operation as follows (see, 5:6-12): "It is still vitally important to be able to copy a Source drive, even with the risk of a change in the drive. Our invention uses the method as described in the U.S. Provisional

Patent No. 60/443,388 entitled 'System and Method for Restoring Critical Data to Computer Long-Term Memory Device Controllers' to provide a method for restoring a drive to its original configuration."

15.2.3.　　The '388 Provisional application, cited in the specification of the '086 Patent, discloses that the restoration method involves the issuance of certain commands to the drive after the copying process, such as SET_MAX_ADDRESS or DEVICE_CONFIGURE_SET, for restoring the drive to its original state.　Consequently, this claim term requires that the copying device issues a command to the drive that operates to restore the drive to its original condition after the copying step has been completed.

15.2.4.　　The restoring element requires an action by the duplicator, as recited.　While some kinds of hidden regions, when opened by the duplicator, will close when power is removed from the drive and reapplied, this is not an action performed by the duplicator.　Inventors could not have created their invention without having the ATAPI standard in hand that describes all the ways a drive area may be hidden and revealed, and could have discussed aspects of the standard in their disclosure, but they did not.　They applied for and got claims that go to actions performed by their duplicator, and power cycling restoration of a hidden area is not an action of the disclosed and claimed duplicator.

15.3.　　"hidden area" and "hidden areas"

15.3.1.　　This phrase means "an area on a long-term memory device that is not counted towards the reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay." The basis for my opinion includes the disclosure at 4:38-56 "In order to meet the goal of creating a perfect copy of a Source drive on a Destination drive, all of the data that resides on the Source must be copied.　This would not seem to be a problem, but drives have functions that allow for data to be hidden.　In order to make a copy, the hidden data must be made available to our device.　There are two primary methods for hiding data on an IDE hard drive.　One is by setting a Host Protected Area (HPA) and the other is by using the Device Configuration Overlay function."

15.4.　　"exact copy" and "exact copies"

15.4.1.　　"Exact copy" means "a copy that includes all of the data that resides on a long-term memory device, and formatted and arranged in the exact manner as on the long-term memory device." Likewise, "exact copies" refers to more than one "exact copy." The basis for my

10

opinion is the repeated, and clear, emphasis by applicants that their invention makes a copy of all data a long-term storage device; i.e., a "perfect" copy usable for computer forensics and security, as follows:

15.4.1.1. "An example of another situation in which it is desirable to make exact copies of long-term memory storage device is in the area of computer security. Corporate Security and Corporate IT personnel are frequently tasked with making exact copies of long-term memory storage devices. Typically this involves a wide variety of devices running under an assortment of operating systems." 1:31-37.

15.4.2.     The applicants state, for example, that their invention "does not care what kind of data is on the drive, it simply makes a copy of a drive.  This allows it to make a perfect copy of a drive regardless of the type of system that the drive was previously in." 4:30-31.  "In order to meet the goal of creating a perfect copy of a Source drive on a Destination drive, all of the data that resides on the Source must be copied.  This would not seem to be a problem, but drives have functions that allow for data to be hidden. In order to make a copy, the hidden data must be made available to our device." 4:38-43. "All of the sectors are then copied from the Source drive to the Destination 3070." 6:14-16.  "Still further, the copying device copies data from all partitions on the source device, regardless of the data's format, and removes any reserved or protected data areas, so that all of the data storage areas on the target device are available for copying without requiring user intervention." 10:12-16.

15.4.3.     Further, the provisional application on which this patent is based, serial no. 60/443,387, supports the "arranged" portion of my opinion where it states on page 2: "For this process to work correctly, it is not enough for the copy to have all of the data files of the original, the data must be arranged on the copy in the exact same pattern as the original."  The term "arranged" includes copying the hidden area access restriction (the maximum accessible address value) from the source drive to the destination drive, and ensuring that the hidden area of the destination drive is an exact copy of the hidden area of the source drive.  If this is not done, then a forensic or security analysis of the destination drive will not be valid, because such analyses must consider the entire contents of a drive, and such an inaccurate copy would fall outside inventors' description of exact at 1:31-37, as cited above.

15.4.4.     An exact copy of a source drive includes the structure, size, and contents of the source drive.  If the source drive includes a hidden area, an exact copy of the source drive includes the exact

11

same structure, size, and contents of the source drive's hidden area and the exact same structure, size, and contents of the source drive's non-hidden areas.

15.5.     "stand-alone, dedicated function device for making exact copies of long-term memory devices" and "stand-alone, dedicated function [copying] device"

15.5.1.     This language means "a device that is configured at the factory for the specific purpose of automatically making an exact copy of a source long-term memory device on a destination long-term memory device, and includes all the hardware, logic and circuitry necessary to perform such specific purpose, and does not include an option to delete the contents of the destination long-term memory device."

15.5.2.     The inventors clarified these claim terms in the file history of the '379 patent.  Because the inventors used the same, precise phraseology, it makes sense here to look to the way in which the inventors defined these terms employing that precise phraseology in making representations to the patent office.  It is reasonable to assume that the inventors applied the same definition consistently across their patent portfolio, except when they explicitly disavow or disclaim said language. For that reason, I looked to the file history of the '379 patent for support in construing this claim.

15.5.3.     Specifically, the following citations from the '379 file history pertaining to "stand-alone, dedicated function device" are persuasive in construing these terms in the '086 patent:

15.5.3.1.  "*Applicants understand 'dedicated function' to mean a device that is configured at the factory for a specific purpose*. For example, a Toaster Oven ... uses a microcontroller to control some of its functions and take input from a user, but it does not have any provisions to allow the user to change its basic functionality." '379 patent, 8-4-06 Amendment, pg. 13-14

15.5.3.2.  "*Applicants understand 'stand- alone' to mean all the hardware, logic and circuitry necessary to perform a task*." '379 patent, 8-4-06 Amendment, pg. 13

15.5.3.3.  "A portable computer is a device that can accept user programming to perform a function. *A dedicated function, stand alone device/appliance while portable, does not allow a user to change its functionality*." '379 patent, 8-4-06 Amendment, pg. 14

12

15.5.3.4. "Key Observations
- Applicants' stand-alone, dedicated function cleaning device/apparatus has limited functionality,
- *Applicants' stand-alone, dedicated-function cleaning device/appliance is not able to be reconfigured by a user...*

'379 patent, 8-4-06 Amendment, pg. 16

15.5.3.5. "Kung is user programmable/configurable. *Applicants' stand-alone, dedicated function cleaning device/appliance is not user programmable/configurable.*" '379 patent, 8-4-06 Amendment, pg. 20

15.5.3.6. "*Like the Braun 8595 electric shaver Applicants' stand-alone, dedicated function cleaning device/appliance does not have any method for a user to change its functionality or programming.*" '379 patent, 8-4-06 Amendment, pg. 26-27

15.5.3.7. "In this most basic iteration, once a user has plugged the stand-alone, dedicated function cleaning device/appliance into a wall socket and attached a drive cable 702 **a user only has two choices**, one to leave the device/appliance as it, **or to activate the switch 703 to start a cleaning procedure**.  That is the total functionality of the device/appliance available to a user."  '379 patent, 8-4-06 Amendment, pg. 14

15.5.4.      Additionally, the language of claim 1 of the '086 patent itself supports the proposed construction herein: A stand-alone, dedicated function device for *making exact copies of long-term memory devices*

15.5.5.       And, the specification further requires automation of the copying function:  "A user controllable switch, when actuated by a user, causes the control circuit to perform the copying procedure." '086 patent,  Col. 2, ll. 15-17.

15.5.6.      The foregoing illustrate to one of ordinary skill in the art that any complication of the copying device to provide other functions is not what the inventors meant when they used the term 'dedicated function' particularly when viewed in light of the single user controllable switch and the automatic sequencing of commands to the storage device for opening and copying.  Each and every one of these examples provided by the inventors in the prosecution history of the '379 are examples of simple, "dedicated function" devices that allow an untrained operator to easily execute a single function correctly by the simple act of activating the device.

13

15.5.7.     Further, the language of the specification is clear that the invention claimed by the '086 patent has limited functionality. Specifically, the specification distinguished the invention of the '086 patent from the prior art Logicube device because the Logicube device "has numerous operating modes and options that must be specified before making a copy.  Options are selected through the use of a number of buttons and a small display.  One of the options is to delete the contents of what will be the destination drive.  This device requires a trained operator and it has enough options to cause confusion or errors on the part of its user."  '086 patent, Col. 1, ll. 50-57. Because the patentee distinguished the invention from the Logicube device by disavowing the ability to 'delete the destination drive, the invention of the '086 patent does not include an option to delete the contents of the destination long-term memory device."

15.6.     "user controllable switch"

15.6.1.     This language means "a simple physical switch having only 'on' and 'off' positions."  This is supported by the specification in several ways.  Specifically, the specification explicitly states that the single switch (e.g., Key Lock) includes only "on" and "off" choices. Figure 4 depicts the simple two-position Key Lock switch, the specification stresses the simplicity of the claimed invention, and the specification distinguishes the claimed invention from the "confusing" prior art Logicube device.

15.6.2.     In the inventors' only embodiment addressing "user controllable switch," they clarified the simplicity of their switch:  "[T]he goal of making this device foolproof for use by an untrained person is accomplished in a number of ways. The first is that the device is controlled by a single switch, such as Key Lock 4030. This switch has only two choices, on and off." 7:25-30.

15.6.3.     Further, the language of the specification is clear that the invention claimed by the '086 patent has simple operation to avoid user confusion and user errors. Specifically, the specification distinguished the invention of the '086 patent from the prior art Logicube device because the Logicube device has "a number of buttons and a small display," which causes "confusion or errors on the part of its user."  Col. 1, ll. 50-57.  Because the patentee distinguished the invention from the Logicube device by disavowing a more complex user interface, the invention of the '086 patent is further limited to a simple physical switch.

16. U.S.  Patent No.  7,228,379 (the '"379 patent")

14

16.1.     "irretrievably remove data"

    16.1.1.     This language means "overwrite data on the tracks of a long-term memory component by writing to all the tracks multiple times with multiple data patterns and writing to the tracks non-sequentially in a pattern that forces the head to move from track to track in such a way as to introduce jitter in the position of the head in the long-term memory component."

    16.1.2.     A person having ordinary skill in the art understands that data can be removed for ordinary purposes by overwriting it once.  If one could not rely on having the old data replaced by the newly written data in a storage device, the storage device would be useless.  Simple overwrite is how data is written and read in the ordinary course of computer system operations with storage devices.  I also understand that the inventors are teaching that their invention does something more than simply overwriting data.  When data is overwritten in the usual way, by simply writing new data, the ordinary operation of reading the drive will read the new data, not the old.  But the disclosure teaches that "someone with the correct equipment" may be able to recover data that was simply overwritten ('379 patent 2:60-61).  The disclosure teaches that special measures must be taken to defeat this person with the correct equipment.  The meaning I wrote above comes from the cleaning measures taught in the section of the disclosure in columns 7 and 8 entitled "Operation of the Cleaning Device".

    16.1.3.     The importance of jitter in the definition above is that overwriting once will not produce jitter in the head position, and as the disclosure at 8:1-5 states, overwriting multiple times sequentially is still not good enough to defeat the person with the correct equipment.  Instead, tracks must be written out of order (i.e., non-sequentially), to require the head to move in different ways for the different times the same track is overwritten, in order to irretrievably remove data.

16.2.     "hidden storage area"

    16.2.1.     This phrase means "an area on a long-term memory device that is hidden from the operating system."   The basis for my opinion is a portion of the specification, "Some target drives may contain data that the drive has been instructed to classify as "hidden" data.  For example, a command supported by many commercially available hard drives allows a skilled programmer to reserve a portion of the storage media.  Once reserved, this area of the media is effectively hidden from the computer by the drive.  Standard queries about the amount of storage on the drive return the full amount of storage

minus the reserved amount.  This prevents standard data removal methods from working as the computer is unaware that there is hidden data." 10:41-50.

16.3.     "the control circuit is further configured to open a hidden storage area on the long-term memory component before irretrievably removing the data"

   16.3.1.     This language means that the "control circuit automatically opens a hidden storage area on the long-term memory component before irretrievably removing the data in response to the user's actuation of the switch to command irretrievable removal of all data". One of ordinary skill in the art understands from the claim language that the control circuit is responsible for a sequence of operations. First, the circuit opens the hidden storage area, and second, it removes the data.  It is important to understand that the control circuit, not a person, initiates these two actions.  This meaning is further supported by the inventors arguing that the device is simple to operate because only a single button need be pressed by the user to operate the device.  For example the disclosure states "The user may then connect IDE drive cable 702 to the drive, turn power on to the host computer, and turn switch 703 to the "on" position (Acts 805, 806, and 807). In response, cleaning device 300 will power on and control the target drive to permanently delete its data." ('379, 9:21-25)  Applicants also stated to the examiner the following:

      16.3.1.1.   "When an iPod Shuffle is turned on, it plays music.  When our current device is turned on it permanent[ly] removes data from a long-term memory component.  Neither an iPod nor our device can be used to run word-processing software or write a memo, or many other functions that a Portable Computer has." 1-31-06 Amendment, pp. 12-13

      16.3.1.2.   "In this most basic iteration, once a user has plugged the stand-alone, dedicated function cleaning device/appliance into a wall socket and attached a drive cable 702 **a user only has two choices**, one to leave the device/appliance as is, **or to activate the switch 703 to start a cleaning procedure**.  That is the total functionality of the device/appliance available to a user." 8-4-06 Amendment, pg. 14

      16.3.1.3.   "The amendments to claim 1 emphasize that the device is a stand-alone device **that includes a physical switch**.  **The switch, when actuated by a user causes the control circuit to commence irretrievably removing the data from the long-term memory component**.  As described in the originally filed

16

specification, a stand-alone device that is **actuated with a simple physical switch** to erase long-term memory components provides a number of advantages over conventional erasing solutions, such as software run from a conventional operating system."  8-23-05 Amendment, pg. 13

16.3.2.     This emphasis on simple operation and a single user switch to initiate cleaning makes clear that the control circuit must take responsibility for sequencing opening and cleaning from a single command from the user, to avoid incomplete cleaning of the storage device.

16.4.     "stand-alone, dedicated function device for removing data from a long-term memory component" and "stand-alone, dedicated function device"

16.4.1.     The language of these terms means "a device that is configured at the factory for the specific purpose of automatically removing data from a long-term memory component, and includes all the hardware, logic and circuitry necessary to perform such specific purpose, and the device does not have any way for a user to change its functionality, programming or configuration."

16.4.2.     The intrinsic evidence makes it clear how the inventors defined these claim terms.  In some places, the inventors explicitly defined portions of the "stand-alone, dedicated function device" terms (e.g., "dedicated function" and "stand-alone").  In some places, the inventors differentiated the claimed invention from known devices/appliances.  In some places, the inventors characterized the functionality of their claimed invention.

16.4.3.     A person having ordinary skill in the art would understand that these express definitions and statements were intended to clarify the meaning of the "stand-alone, dedicated function device" terms. Several citations from the application and the prosecution history support the meaning stated above, as follows:

16.4.3.1.   "*Applicants understand 'dedicated function' to mean a device that is configured at the factory for a specific purpose.* For example, a Toaster Oven ... uses a microcontroller to control some of its functions and take input from a user, but it does not have any provisions to allow the user to change its basic functionality." 8-4-06 Amendment, pg. 13-14

17

16.4.3.2.  Claim 1: A stand-alone, dedicated function device for *removing data from a long- term memory component*, comprising: ...

16.4.3.3.  "*Applicants understand 'stand- alone' to mean all the hardware, logic and circuitry necessary to perform a task.*" 8-4-06 Amendment, pg. 13

16.4.3.4.  "A portable computer is a device that can accept user programming to perform a function. *A dedicated function, stand alone device/appliance while portable, does not allow a user to change its functionality.*" 8-4-06 Amendment, pg. 14

16.4.3.5.  "Key Observations
- Applicants' stand-alone, dedicated function cleaning device/apparatus has limited functionality,
- *Applicants' stand-alone, dedicated-function cleaning device/appliance is not able to be reconfigured by a user...*

8-4-06 Amendment, pg. 16

16.4.3.6.  "*Kung is user programmable/configurable. Applicants' stand-alone, dedicated function cleaning device/appliance is not user programmable/configurable.*" 8-4-06 Amendment, pg. 20

16.4.3.7.  "*Like the Braun 8595 electric shaver Applicants' stand-alone, dedicated function cleaning device/appliance does not have any method for a user to change its functionality or programming.*" 8-4-06 Amendment, pg. 26-27

16.4.3.8.  "In this most basic iteration, once a user has plugged the stand-alone, dedicated function cleaning device/appliance into a wall socket and attached a drive cable 702 **a user only has two choices**, one to leave the device/appliance as it, **or to activate the switch 703 to start a cleaning procedure**.  That is the total functionality of the device/appliance available to a user."  8-4-06 Amendment, pg. 14

16.4.4.       The foregoing illustrate to one of ordinary skill in the art that any complication of the cleaning device to provide other functions is not what the inventors meant when they used the term 'dedicated function' particularly when viewed in light of the single user controllable switch and the automatic sequencing of commands to the storage device for opening and cleaning.  Each and every one of these examples provided by the inventors in the prosecution history are examples of simple, "dedicated function" devices that allow an

18

untrained operator to easily execute a single function correctly by the simple act of activating the device.

16.5.      "user controllable switch"

16.5.1.        This language means "a simple physical switch, including two positions 'on' and 'off', that when actuated by the user that causes the control circuit to issue all the commands recited herein, and is not a menu driven interface."

16.5.1.1.  The reason this element must be simple is found in the inventors urging simplicity in the citations below and above as explained regarding the "stand-alone, dedicated function device" terms.  The reason it must cause the control circuit to issue all commands for cleaning is given above in 16.3.  The reason it cannot be a menu driven interface is because menu driven interfaces only exist when there are multiple commands that must be selected, and presenting the user with multiple choices guarantees that the user controllable switch is not simple.

16.5.1.2.  "The switch, when actuated by a user causes the control circuit to commence irretrievably removing the data from the long-term memory component. As described in the originally filed specification, a stand-alone device that is actuated with a simple physical switch to erase long-term memory components provides a number of advantages over conventional erasing solutions, such as software solutions run from conventional operating systems. (See Specification, paragraphs 36 and 69, and portions of the Background of the Invention section of the application in paragraphs 3 through 18)." Jan 31, 2006 Amendment (especially, pp. 13-14)

16.5.1.3.  "The switch, when actuated by a user causes the control circuit to commence irretrievably removing the data from the long-term memory component. As described in the originally filed specification, a stand-alone device that is actuated with a simple physical switch to erase long-term memory components provides a number of advantages over conventional erasing solutions, such as software solutions run from conventional operating systems. (See Specification, paragraphs 36 and 69, and portions of the Background of the Invention section of the application in paragraphs 3 through 18)." August 24, 2005 Amendment (especially, pg. 13-16).

16.5.1.4.  "The application specific device is physically small and has simple interface that is usable by non-computer professionals." January 18, 2007 Applicant Remarks at 9.

16.6.      "the control circuit open [sic] a hidden storage area without user intervention"

16.6.1.      This language means "the control circuit automatically issues commands to open a hidden storage area without need for a user to request the control circuit to do so".  This builds on the discussion in 16.3 above, and expressly requires "without user intervention."

16.6.2.      Further support for this meaning is found in the specification:

16.6.2.1.  "In one implementation, cleaning device 300 may issue appropriate commands to target drives that contain hidden data to release the hidden data. Cleaning device 300 may automatically issue these commands without the need for human intervention, thus making the entire contents of the drive accessible for data removal."  Col. 10, ll. 51-56.

16.6.2.2.  "Still further, the cleaning device removes data from all partitions on the target device, regardless of the data's format, and removes any reserved or protected data areas, so that all of the data storage areas on the target device are available for cleaning without requiring user intervention." Col. 11, ll. 31-35.

January 17, 2014

_____
Thomas A. Gafford

848 N. Rainbow Blvd. #2628 • LAS VEGAS, NV 89107-1103
PHONE 702.736.8660 • FAX 702.541.9509 • EMAIL TOM@GAFFORD.COM

# THOMAS A. GAFFORD
# Gafford Technology

October 6, 2013

SUMMARY OF QUALIFICATIONS

• Extensive knowledge of analog and digital electronic circuitry, digital computer technology, computer peripherals and computer system design, control systems, operating systems, and transaction processing software.

• Skilled articulation of technical material for both non-technical and technical audiences, with special attention to claim construction issues.

• In-depth analysis of electronic and computer apparatus and functionality.

EDUCATION

**University of Washington**                                          Seattle, Washington
*Earned Bachelor of Science in Electrical Engineering, 1972*
Key areas of concentration included digital and analog circuit analysis and electromagnetics.

**Stanford University**                                          Palo Alto, California
*Enrolled in Master of Science in Electrical Engineering, 1972-73.*
Coursework included logic, circuit and computer design, computer architecture, LISP and ALGOL programming, software algorithm design, and system programming.

PROFESSIONAL EXPERIENCE

1986-    **Gafford Technology**                                          Las Vegas, Nevada
Now      *Founder and Owner*
         Firm undertakes R&D projects, provides computer system-related services, and offers analysis and presentation services that clearly and concisely explain computer and electronic technology to assist clients in litigation efforts.

         Specific services include consulting in computer system design, software selection, and network configuration; providing expert factual analysis, claim interpretation assistance, prior art investigation and testimony in patent and hardware / software systems litigation; conducting R&D projects in peripheral switch design and application of hardware design language tools to peripheral interconnection design.  Firm has manufactured and sold peripheral switching equipment.

1983-    **Softix, Incorporated**                                          Campbell, California
1986     *Co-Founder and Head of Engineering*
         Firm designed and produced reliable and easily maintained systems to control and sell entertainment tickets by ticket agencies and large arena complexes in the United States, Canada,

Australia, and Hong Kong.  The firm was sold in 1987.

Responsibilities included co-managing software development efforts; developing architecture, design, sales, contracting, production, and field support of large-scale software and hardware systems; analyzing, debugging, and writing software application and driver programs for feature enhancements and system integration.

Also responsible for selection, evaluation, integration, installation, customer staff training, and repair support of all hardware components of dual minicomputer systems; for research into graphic printing systems suitable for ticket sales; for development of peripheral switch equipment for evolving system requirements; for the manufacture and sale of peripheral switching equipment.

| | | |
|---|---|---|
| 1976-<br>1983 | **G Systems** | Santa Clara, California |

*Founder and Owner*
Firm managed hardware and software design and development of computer transaction processing systems for a variety of applications and customers, as well as consulting in other hardware design projects.

Projects included design of hardware and software interfaces for disk controller; co-design of mainframe computer and design of mainframe computer elements; design of replacement printer which substituted all traditionally hard-wired functions with software functionality in communication and mechanism controls; design of peripheral switches incorporated into system product; writing of communications software and device drivers.  Assisted legal team in patent litigation as technical expert in disk control systems.

| | | |
|---|---|---|
| 1973-<br>1976 | **Stanford University Artificial Intelligence Laboratory** | Palo Alto, California |

*Engineer*
Position was responsible for computer engineering projects including support of robotics research.

Duties included design, construction, and debugging motor controls and sensor electronics for a robotic arm and its computer interfaces; maintenance and enhancement of large assembly-language software system used for logic design and PC board layout; maintenance of hardware for mainframe timesharing system for lab staff,  including ARPANET connection and Xerographic printing equipment.

| | | |
|---|---|---|
| 1967-<br>1970 | **United States Air Force**<br>**McChord Air Force Base** | Tacoma, Washington |

*Sergeant and Instructor*
Maintenance technician for air defense computer system; electronics instructor in on-the-job training programs;  specialist in analysis and repair of problems in areas beyond standard training and documentation.

## PATENTS

United States Patent #5,621,899                    August 15, 1997
*Method for Operating a Repeater for Distributed Arbitration Digital Data Buses*

United States Patent #5,684,966                    November 4, 1997
*Switch for Distributed Arbitration Digital Data Buses*

United States Patent #5,758,109                    May 26, 1998
*Repeater/Switch for Distributed Arbitration Digital Data Buses*

2

United States Patent #6,154,799                     November 11, 2000
*Repeater/Switch for Distributed Arbitration Digital Data Buses*

ADDITIONAL PROFESSIONAL ACTIVITIES
***Institute of Electrical and Electronic Engineers Life Member***

# CASE EXPERIENCE

Cases are grouped into four areas.  All cases listed required extensive research and technical analysis.  Where expert testimony at trial also occurred, it is noted.  The party who is my client is underlined.  Cases marked '*trial*' at the right margin included deposition unless specifically noted, cases marked 'arbitration testimony' do not.

CIRCUIT DESIGN
Experience in this area involves low-level analysis of electronic circuits, usually without regard for any larger system in which the circuits might be used.

| *Date* | *Case* | |
|---|---|---|
| 01/94 to 07/94 | **Wang v. Mitsubishi** | *deposition, trial* |
| | Patent litigation relating to memory modules. | |
| 11/95 to 03/96 | **Waffer v. Fritz Forwarding** | *arbitration hearing* |
| | Litigation involving value of computer monitors based on service history and construction quality. | |
| 11/96 to 12/97 | **United Technology Automotive v. National Semiconductor** | |
| | Patent litigation relating to power control integrated circuits. | |
| 05/97 to 09/98 | **Oneac v. Raychem** | *deposition* |
| | Patent litigation relating to circuits for telephone line surge suppression. | |
| 06/97 to 06/97 | **Harris Semiconductor v. Hyundai** | |
| | Patent litigation involving static ram IC circuitry. | |
| 12/98 to 03/00 | **Xerox v. Hewlett-Packard** | *deposition* |
| | Patent litigation relating to electrical circuitry of thermal inkjet printheads. | |
| 02/01 to 09/02 | **ICS v. Realtek, ICS v. Cypress, Cypress v. ICS** | *deposition, tutorial, Markman* |
| | Patent litigation involving clock generator IC circuits. | |
| 05/01 to 07/01 | **Altera v. Xilinx, Xilinx v. Altera** | |
| | Patent litigation involving FPGA circuitry. | |
| 3/12 to present | **Cascades v. Hynix** | |
| | Patent litigation involving DRAM circuitry. | |

# CASE EXPERIENCE

## CONTROL OF SYSTEMS

Case experience in this area involves design of electronics that control other systems; the electronics may or may not include computers or software, since the emphasis is on the control design.

*Dates*                   *Case*

11/85 to 01/87      **IJR v. Colt Industries**
Patent litigation relating to circuitry controlling Electrical Discharge Machining equipment.

06/87 to 01/90      **BRC v. Shoup**
Patent litigation relating to control of electronic voting machines.

02/88 to 10/89      **IJR v. Sodick**
Further patent infringement litigation involving same technology as above, with emphasis on extensive analysis of software.

03/88 to 10/88      **Westek v. Tri-Lite**                 *deposition, trial*
Patent infringement litigation relating to touch sensitive lamp dimmer modules. Managed creation of animated model of patented invention and accused infringing circuit.

02/90 to 01/93      **FMC v. Hennessy**
Trade secret litigation involving technology of automotive wheel service equipment and associated electronics and optics.

09/90 to 02/93      **Telepanel v. Pricelink, ERS v. Telepanel**
Patent infringement litigation involving retail shelf price electronic display systems.

11/90 to 03/91      **Astro Med. v. Western Graphtec**
Patent infringement litigation in the area of thermal printing chart recorders.

07/91 to 01/93      **IGT v. Bally**                 *deposition*
Patent infringement litigation involving microcomputer-controlled gaming machines.

08/91 to 07/92      **Intermedics v. Ventritex**
Trade secret litigation involving analog and digital circuitry used in pacemaker and defibrillation devices.

01/92 to 05/92      **Qume v. Ultra-Stor**
Trade secret litigation involving microcomputer disk drive controllers.

01/92 to 11/92      **Eswaran v. AT&T**                 *deposition*
Patent infringement litigation involving microcomputer controlled telephone answering machines.

03/92 to 12/92      **Honeywell v. Seatt**                 *deposition*
Patent infringement case involving microcomputer-controlled thermostats.

11/92 to 04/95      **Lemelson v. Mitsubishi**
Patent litigation relating to machine vision and computer information storage and retrieval.

4

| | | |
|---|---|---|
| 02/93 to 08/94 | **Lockwood** v. American Airlines<br>Patent infringement litigation involving transaction processing systems and terminals. | |
| 08/93 to 06/94 | **Maxtor** v. NEC<br>Patent litigation relating to disk drive electronics. | |
| 10/93 to 09/94 | **Octel** et al. v. Theis<br>Patent litigation relating to voice message storage and retrieval. | *trial* |
| 04/94 to 01/95 | **A&L Technologies** v. Resound<br>Patent litigation involving electronics for the control of hearing aid amplifiers. | *deposition, trial* |
| 05/94 to 05/95 | **Fonar** v. General Electric<br>Patent litigation involving the control of magnetic resonance imaging (MRI) equipment. | *deposition, trial* |
| 7/94 to 12/94 | **Golden Enterprises v. AT&T**<br>Trade secret litigation involving the control of voice prompting systems. | *deposition* |
| 10/94 to 04/96 | **Golden Enterprises v. Rockwell**<br>Patent litigation relating to the control of telephone announcement systems. | |
| 12/94 to 02/95 | **Midtronics** v. Telecom Assistance Group<br>Patent litigation involving control electronics for battery chargers. | |
| 03/95 to 11/95 | **Worldtronics v. Black & Decker**<br>Patent litigation relating to appliance timing and control. | *deposition* |
| 03/95 to 10/95 | **Tidel v. Mallory**<br>Litigation relating to remote sensing of fluid storage and delivery systems. | |
| 07/95 to 09/96 | **Global Gaming** v. IGT<br>Patent litigation involving computerized slot machine control technology. | *deposition, trial* |
| 07/95 to 07/00 | **Quantum Group** v. American Sensors et al.<br>Patent litigation involving carbon monoxide detector control technology. | *deposition* |
| 07/95 to 06/01 | **Sudbury Systems v. Dictaphone**<br>Patent litigation involving voice storage and retrieval control technology. | *deposition* |
| 07/95 to 01/96 | **Alevy v. Fairplan**<br>Litigation relating to the value of appliance monitoring computers. | |
| 06/96 to 08/00 | **IMS** v. Haas, et al.<br>Patent litigation in technology relating to machine tool controls. | *deposition, trial* |
| 02/97 to 11/98 | **Foxboro v. Honeywell**<br>Patent and contract litigation in technology relating to industrial process control communication systems. | *deposition* |
| 06/97 to 09/05 | **Fulhorst v. UTA** et al.<br>Patent litigation in technology relating to automobile alarm control circuits. | |
| 06/97 to 01/98 | **Card-Monroe** v. Tuftco<br>Patent litigation in technology for carpet tufting machine controls. | *deposition* |

5

| | | |
|---|---|---|
| 07/97 to 03/99 | **Worldtronics v. <u>High Performance Appliances</u>**<br>Patent litigation in technology relating to appliance timing and control. | |
| 01/98 to 08/98 | **Quorum v. <u>Emerson Electric</u>**<br>Patent litigation brought against Quorum International in technology relating to AC motor control. | |
| 01/98 to 11/98 | **<u>Honeywell</u> v. Foxboro**<br>Patent litigation in technology relating to industrial process control sensor systems. | *deposition, trial* |
| 01/99 to 05/99 | **<u>Relume</u> v. Philips et al.**<br>Patent litigation relating to control of LED traffic signal lamp power supplies. | |
| 06/99 to 11/99 | **<u>Regent Lighting</u> v. DESA**<br>Patent litigation relating to control of motion sensitive outdoor lighting. | |
| 03/99 to 03/00 | **<u>Midtronics</u> v. Actron**<br>Patent litigation relating to electronic control of automobile battery testing equipment. | |
| 01/00 to 06/00 | **UTA v. <u>Praxair</u> et al.**<br>Insurance litigation involving value of instrumentation electronics. | |
| 01/00 to 05/00 | **<u>Fonar</u> v. Healthsouth**<br>Patent litigation involving the control electronics of magnetic resonance imaging (MRI) equipment. | |
| 03/00 to 07/00 | **<u>Dark Horse</u> v. Sega**<br>Patent litigation involving control of arcade game machines. | |
| 03/00 to 06/00 | **Lemelson v. <u>Maxim</u>**<br>Patent litigation involving control of semiconductor process equipment. | |
| 04/00 to 08/03 | **Chamberlain v. <u>Lynx</u>**<br>Patent litigation involving garage door controls. | |
| 04/00 to 03/01 | **<u>Calabrese</u> v. Bosch, et al.**<br>Patent litigation involving industrial data communication system. | |
| 05/00 to 06/03 | **<u>Snap-On</u> v. Hunter, Hunter v. <u>Snap-On</u>**<br>Patent litigation involving controls for automotive repair instruments. | *deposition* |
| 10/00 to 10/01 | **SSK v. <u>Clapper Industries</u>**<br>Trade secret litigation involving gaming machine controls. | |
| 11/00 to 04/02 | **<u>Beery</u> v. Thomson C.F.**<br>Patent litigation involving television channel selection systems. | *Markman* |
| 02/01 to 06/01 | **<u>Laser Sight</u> v. Visx, Visx v.<u>Laser Sight</u>**<br>Patent litigation involving vision correction machine controls. | *deposition* |
| 03/01 to 10/02 | **<u>Digi</u> v. Stallion**<br>Patent litigation involving serial communications controllers. | |
| 06/01 to 06/01 | **<u>Phone-Tel</u>**<br>Negotiations over telecommunication system control patents with Verizon. | |

6

| | | |
|---|---|---|
| 06/01 to 06/02 | **Soundview v. Sony et al.** | *deposition* |
| | Patent litigation involving parental control circuit for TV. | |
| 06/01 to 06/03 | **Lear Automotive** | |
| | Consulting for patent enforcement in automotive electronics related portfolio. | |
| 09/01 to 05/03 | **Schneider Automation v. Opto-22 Corp.** | *deposition* |
| | Patent litigation involving web accessible programmable controllers. | |
| 01/02 to 08/02 | **Cacheflow et al. v. NCT** | |
| | Patent litigation involving file caching system controls. | |
| 01/02 to 04/02 | **Emhart v. Bottero** | |
| | Patent litigation involving control of glass bottle making machinery. | |
| 01/02 to 03/03 | **St. Clair v. Sony Corp.** | *deposition, trial* |
| | Patent litigation involving digital camera software and hardware control apparatus. | |
| 03/02 to 09/02 | **Advanced Communication v. Premiere Retail** | |
| | Patent litigation involving store promotion display media control systems. | |
| 09/02 to 09/03 | **Jackson v. Nortel et al.** | *deposition* |
| | Patent litigation involving telephone line remote control apparatus. | |
| 02/03 to 04/03 | **Catalina v. Coolsavings** | *Markman* |
| | Patent litigation involving an automated sales coupon dispensing control system. | |
| 03/03 to 10/04 | **St. Clair v. Casio et al.** | *deposition, trial* |
| | Patent litigation involving digital camera software and hardware control apparatus. | |
| 04/05 to 04/05 | **Solaia v. Rockwell et al.** | *deposition* |
| | Patent litigation relating to interface between spreadsheet programs and industrial control systems. | |
| 08/05 to 09/05 | **Guidant v. St. Jude** | |
| | Patent litigation relating to control of cardiac pacemakers. | |
| 09/05 to 01/11 | **Midtronics v. DHC, WEL, Argus** | *deposition, trial* |
| | Patent litigation relating to electronic control of automobile and stationary battery testing equipment. | |
| 10/05 to 10/06 | **Fortunet v. Planet Bingo and Melange** | *deposition* |
| | Patent litigation relating to control of gambling terminals. | |
| 01/06 to 05/06 | **EMD v. Wi-Tronix** | |
| | Trade secret litigation relating to control of locomotive data systems. | |
| 04/06 to 10/08 | **Positive Technologies v. Benq, et al.** | *deposition* |
| | Patent litigation involving to flat panel display control. | |
| 04/06 to 12/06 | **In re NCT** | |
| | Patent re-exam proceedings for claims involving file caching system controls. | |
| 12/06 to 05/08 | **St. Clair v. Kodak** | *deposition* |

Patent litigation involving digital camera software and hardware control apparatus.

| | |
|---|---|
| 02/07 to 03/08 | **Visto Corporation v. Good Technology, Research In Motion, Microsoft**<br>Patent litigation involving network synchronization of handheld computers to servers |
| 06/08 to present | **Copper v. Sony, Nintendo**<br>Patent litigation involving wireless control of apparatus |
| 07/08 to present | **Beery v. DirecTV et al.**<br>Patent litigation involving television channel selection systems. |
| 07/08 to 09/08 | **Cisco**<br>Patent litigation involving control of power delivery over Ethernet |

11/08 to 4/10         **St. Clair v. Samsung, et al.**                                    *deposition*
                      Patent litigation involving digital camera software and hardware control apparatus.

05/10 to 4/11         **Positive Technologies v. Sony, et al.**
                      Patent litigation relating to flat panel display control.

03/11 to 06/11        **Greatcall v. Dyna**                                               *hearing*
                      Dispute submitted for arbitration involving design of cellular telephone terminals and systems.

03/11 to present      **Personalized Media Communications v. Echostar, et al.**            *deposition*
                      Patent litigation involving control of satellite broadcast systems and components.

11/11 to present      **MyKey v. Guidance et al.**                          *deposition, markman, trial (ITC)*
                      Patent litigation involving control of forensic storage apparatus

4/12 to 12/12         **Patent Harbor v. Funai**                                    *deposition, trial*
                      Patent litigation involving control of DVD recorders

4/12 to present       **Honeywell v. ICM Controls**
                      Patent litigation involving control of HVAC equipment

2/13 to present       **ICM Controls v. Honeywell**
                      Patent litigation involving control of HVAC equipment

5/13 to present       **J2 v. Nextiva**
                      Patent litigation involving control of fax server systems

8

# CASE EXPERIENCE

<u>COMPUTER DESIGN</u>
Case experience in this area involves design of the computer itself, usually without regard to how the computer may be used.

| *Dates* | *Case* | |
|---|---|---|
| 01/81 to 02/82 | **Microcomputer Systems v. DEC**<br>Patent infringement litigation involving computer disk storage control apparatus. | *trial* |
| 06/89 to 09/90 | **Motorola v. Hitachi**<br>Patent and contract litigation involving microcomputer design.  Assistance in preparation of industry leaders as testifying experts in issues involving microprocessor architecture and circuit design. | *trial* |
| 08/91 to 02/93 | **T.I. v. Daewoo**<br>Patent infringement litigation involving personal computer and microprocessor design. | *deposition* |
| 03/93 to 12/94 | **Lemelson v. Apple Computer**<br>Patent litigation relating to computer image storage and retrieval apparatus. | *deposition* |
| 06/94 to 01/95 | **T.I. v. AST**<br>Patent litigation involving design of personal computers. | |
| 06/95 to 03/96 | **MTI v. CMD, et al.**<br>Patent litigation involving RAID storage system design. | |
| 08/95 to 08/98 | **ACM v. LADWP**<br>Litigation relating to the value of used computer equipment. | |
| 04/97 to 07/98 | **Zeny v. Acer**<br>Trade secret litigation in technology of PC motherboard design. | |
| 04/97 to 12/97 | **Matra v. IBM**<br>Contract litigation in technology relating to PC motherboard design and manufacturing. | |
| 06/00 to 07/03 | **Orbsak v. General Instrument**<br>Patent litigation involving digital broadcast multiplexing apparatus. | |
| 06/02 to 01/05 | **Intergraph v. Hewlett Packard, et al.**<br>Patent litigation relating to computer cache memory system design. | *deposition* |
| 05/05 to 04/06 | **Ampex v. Kodak**<br>Patent litigation relating to an image manipulation system. | |
| 07/05 to 06/06 | **Optima v. Sonic Solutions, et al.**<br>Patent litigation relating to a CD writing system. | |
| 10/05 to 10/07 | **TPL v. NEC, et al.**<br>Patent litigation relating to microprocessor design. | |
| 01/06 to 03/06 | **Microlinc v. Intel et al.**<br>Patent investigation as to infringement of claims involving high speed bus design. | |

9

| 01/06 to 01/07 | **Orbsak**<br>Prior art investigation involving digital broadcast multiplexing apparatus. | |
| 07/08 to 04/10 | **AMD v. Samsung, Samsung v. AMD**<br>Patent litigation involving various computer system and circuit issues | |
| 01/09 to 02/11 | **Acqis v. Appro et al**.<br>Patent infringement litigation regarding modular computer design | *deposition, trial* |
| 09/10 to 03/11 | **Xpoint v. AMD et al.**<br>Patent infringement litigation relating to I/O system design | |
| 10/12 to 04/13 | **USEI v. Digi et al.**<br>Patent infringement litigation relating to network controller design | |
| 05/13 to 10/13 | **HTC v. TPL et al.**<br>Patent infringement litigation relating to CPU design | *deposition, trial* |
| 07/13 to present | **Acqis v. Ericsson et al**.<br>Patent infringement litigation regarding modular computer design | |

10

# CASE EXPERIENCE

<u>COMPUTER SOFTWARE</u>

Case experience in this area emphasizes large software systems without regard to the computer on which they may run.

*Dates*                                        *Case*

02/89 to 11/92       **U.S. v. <u>Anthony Fairchild</u>**                                        *trial*
                     Issues related to destruction of data as a result of software installation and operation.

10/91 to 07/92       **Maho v. <u>Banner Aeronautical</u>**                                  *deposition*
                     Wrongful termination defense in issues related to shift from batch-type system design and operation procedures to current generation software system design and operational procedures.

01/93 to 01/94       **CHA v. <u>PCC</u>**
                     Issues relating to computer media discovery.

03/93 to 12/94       **<u>Qantel</u> v. Signature Systems, et al.**
                     Trade secret litigation relating to operating system, communication protocol design, and compiler development.

11/93 to 01/94       **<u>FMC</u> v. Cowart**                                              *deposition*
                     Trade secret litigation relating to image processing and database analysis systems.

06/96 to 12/97       **<u>Crane</u> v. Durametallic, et al.**
                     Trade secret litigation involving gas seal analysis software.

01/98 to 01/99       **<u>Robertson Machine</u> v. Serpa**
                     Trade secret litigation in matters relating to NC programming information.

05/98 to 07/99       **Retrac v. <u>ETM</u>**                                          *deposition, trial*
                     Trade secret litigation in matters relating to transaction processing software.

05/98 to 10/03       **Power Quest v. <u>V-Communications</u>**                         *deposition*
                     Patent litigation in matters relating to disk partitioning software.

07/98 to 08/98       **Interactive Systems v. <u>DSL Transportation</u>**              *deposition*
                     Contract litigation in matters relating to software development practices.

03/99 to 04/99       **Soft Art v. <u>Microsoft</u>**
                     Trade secret litigation relating to accessibility of spell checking software.

07/99 to 06/01       **GEAC v. <u>HCL</u>**                                            *deposition*
                     Software contract relating to completion and quality of a large commercial software project.

10/00 to 12/00       **OAS v. <u>Design Collection</u>**
                     Software performance litigation.

01/02 to 12/02       **Newport v. <u>Warenet</u>**                                     *deposition*
                     Trade secret litigation relating to web site software.

| | | |
|---|---|---|
| 12/03 to 07/04 | **Default Proof** v. Home Depot, et al.<br>Patent litigation relating to transaction processing and debit card systems | *deposition* |
| 12/05 to 10/07 | **Premier International** v. Apple Computer<br>Patent litigation relating to electronic media organization, purchase and presentation | |
| 08/10 to 03/11 | **Datatern, Inc.**<br>Assisted client in database software licensing campaign. | |
| 08/11 to 05/12 | **Kelora** v. eBay et al.<br>Patent litigation relating to a client-server based searching method | |
| 12/11 to 02/13 | **Wellogix** v. ADP, Inc.<br>Patent litigation relating to a method of managing project invoices | |
| 10/12 to present | **Walker Digital** v. Google et al.<br>Patent litigation relating to display of photos in vehicle guidance systems. | *deposition* |
| 10/12 to present | **Tesseron** v. Oce<br>Patent litigation relating to a document printing system | |
| 10/12 to 12/12 | **Rovi** v. **Mitsubishi et al.**<br>Patent litigation relating to control of video on demand playback | |
| 01/13 to 01/14 | **CSG** v. TOA<br>Patent litigation relating to a method of scheduling technician workload | |

12

Thomas A. Gafford
January 17, 2014

Pursuant to FRCP 26(a)(2)(B), this is a list of all cases in which I have given testimony at trial (T), hearing (H) or at deposition (D) in the last four years.  All are Federal District Courts except ITC where noted, date given is date of most recent testimony.  I am the author of no publications within the last 10 years.

| date & type of test. | parties | client | case number | subject matter |
|---|---|---|---|---|
| 12/2013 (D) | Honeywell v. ICM | Honeywell | District of Minnesota 11-CV-569 JNE/TNL | Heating control design |
| 10/2013 (D,T) | HTC v. TPL et al. | HTC | N. Disttrict of CA, 5:08-cv-00882-PSG | Computer CPU design |
| 01/2013 (D) | Walker Digital v. Google et al. | Walker | D. of Delaware, 1:11-cv-309-SLR | Data display software |
| 12/2012 (DT) | Patent Harbor v. Funai | Funai | E. District of TX, 6:10-cv-00361 | Creation of video media index |
| 07/2012 (HD) | MyKey v. Guidance et al. | Guidance and CRU | ITC 337-TA-799 | Forensic storage device tools |
| 04/2012 (D) | eBay et al v. Kelora | Kelora | N. District of CA, 4:10-cv-04947-CW | Client-Server interactive search |
| 07/2011 (D) | PMC v. Dish | Dish | E. Dist. Of Tx, Marshall Div., CASE NO. 2:08-CV-70-CE | Television broadcasting and reception technology |
| 06/2011 (H) | Greatcall v. Dyna | Greatcall | AAA Arb. 73 494 00433 10 | Cell phone terminal and system design |
| 02/2011 (TD) | Acqis v. Appro et al. | Acqis | E. Dist of TX, Tyler Div. 6:09-cv-00148-LED | Blade Server system structure and control |
| 01/2011 (T) | Midtronics, Inc. et al. vs Aurora Performance Products LLC, etc., et al. | Midtronics | E. Div., N Dist. of IL 06-C-3917 | Control of battery testers |
| 03/2010 (D) | St. Clair v. FujiFilm | St. Clair | DISTRICT OF DELAWARE C.A. No. 08-373-JJF-LPS | Digital camera control and data recording formats |
| 03/2010 (D) | St. Clair v. HTC | St. Clair | DISTRICT OF DELAWARE C.A. No. 06-404-JJF-LPS | Digital camera control and data recording formats |
| 03/2010 (D) | St. Clair v. HTC, Hewlett Packard, Fujifilm, JVC, Panasonic, Kyocera, Nokia, Palm | St. Clair | DISTRICT OF DELAWARE C.A. No. 04-1436-JJS-LPS | Digital camera control and data recording formats |
| 03/2010 (D) | St. Clair v. Kyocera, Palm | St. Clair | DISTRICT OF DELAWARE C.A. No. 06-404-JJF-LPS | Digital camera control and data recording formats |
| 03/2010 (D) | St. Clair v. RIM | St. Clair | DISTRICT OF DELAWARE C.A. No. 08-371-JJF-LPS | Digital camera control and data recording formats |
| 02/2010 (D) | St. Clair v. Hewlett Packard | St. Clair | DISTRICT OF DELAWARE C.A. No. 04-1436-JJS-LPS | Digital camera control and data recording formats |
| 02/2010 (D) | St. Clair v. JVC, Panasonic | St. Clair | DISTRICT OF DELAWARE C.A. No. 04-1436-JJF-LPS | Digital camera control and data recording formats |
| 02/2010 (D) | St. Clair v. Nokia | St. Clair | DISTRICT OF DELAWARE C.A. No. 04-1436-JJF-LPS | Digital camera control and data recording formats |