# EXHIBIT F-1

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

In the Matter of

**CERTAIN COMPUTER FORENSIC DEVICES
AND PRODUCTS CONTAINING SAME**

Inv. No. 337-TA-799

**ORDER NO. 45:**     **CONSTRUING THE TERMS OF THE ASSERTED CLAIMS OF
THE PATENTS AT ISSUE**

(May 8, 2012)

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................1

II.    IN GENERAL......................................................................................................2

III.   RELEVANT LAW ..............................................................................................2

IV.    LEVEL OF ORDINARY SKILL IN THE ART ................................................5

V.     THE '682 PATENT .............................................................................................6
    A.      Overview..............................................................................................6
    B.      Agreed-Upon and Disputed Claim Terms .........................................11
          1.      Construction of Agreed-Upon Claim Terms.........................11
               a)      "means for intercepting communications between a host and a storage device"..................................................11
               b)      "means for blocking other ones of the commands from being received by the storage device based on the comparison".......11
               c)      "means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device."........................................12
               d)      "means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device"..................................................................13
          2.      Construction of Disputed Claim Terms ...............................14
               a)      "transparent to normal operation [of the host and storage device" / "transparently to normal operation [of the host and the IDE storage device]" / "transparent to normal operation [of the computer motherboard and the storage device]" / "transparently to [the host computer and the long-term storage device]" / "transparently to normal operation [of the host and the storage device]"...........14
               b)      "interface emulator"...............................................................19
                c)      "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host"........23
                d)      "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands" ..................................................................................25
                e)      "means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the device" ..............................30

VI.    THE '086 PATENT ...........................................................................33
    A.    Overview...........................................................................................33
    B.    Agreed-Upon and Disputed Claim Terms ......................................35
        1.    Construction of Agreed-Upon Claim Term ...........................35
            a)    "exact copy"...............................................................35
            b)    "hidden areas" and "hidden area" .............................35
            c)    "user controllable switch".........................................35
            d)    "means for interfacing with a source drive" ............36
            e)    "means for interfacing with one or more destination
                  devices"......................................................................36
            f)    "means for initiating the copying procedure".........37
            g)    "means for comparing the size of the source device to the size of a
                  destination device and communicating result to a user"..........37
            h)    "means for making an exact copy" .........................38
            i)    "means for reading and comparing the data on the source and
                  destination devices and communicating result to a user"........38
            j)    "means for indicating areas on a source drive that were
                  unreadable" ................................................................39
        2.    Construction of Disputed Claim Terms .................................39
            a)    "stand-alone, dedicated function [copying] device"...............39
            b)    "control circuit issuing commands to . . . read and compare data on
                  the source and destination devices" .........................................43
            c)    "control circuit issuing commands to . . . restore the source drive to
                  its original condition" ..............................................................46
            d)    "means for opening hidden areas on the source drive"...........49
            e)    "means for restoring the source device to its original
                  condition"..................................................................................51

VII.   THE '379 PATENT .........................................................................54
    A.    Overview...........................................................................................54
    B.    Agreed-Upon and Disputed Claim Terms .......................................55
        1.    Construction of Agreed-Upon Claim Terms...........................55
            a)    "hidden storage area".................................................55
            b)    "user controllable switch"..........................................55
        2.    Construction of Disputed Claim Terms .................................56
            a)    "stand-alone, dedicated function device" ...............56
            b)    "irretrievably remove data".......................................59
            c)    "the control circuit is further configured to open a hidden
                  area . . . before irretrievably removing data" ..........................60

## I.    INTRODUCTION

This Investigation was instituted by the Commission on August 29, 2011 to determine whether certain computer forensic devices and products containing the same infringe U.S. Patent Nos. 6,813,682 (the "'682 patent"), 7,159,086 (the "'086 patent"), and 7,228,379 (the "'379 patent").[1]  *See* 76 Fed. Reg. 53,695-696 (Aug. 29, 2011).  The named respondents are CRU Acquisitions Group LLC; CRU-Dataport LLC; Digital Intelligence, Inc.; Guidance Software, Inc., and Guidance Tableau LLC (collectively, "Respondents").

Pursuant to Ground Rule 5A, a *Markman* hearing was held January 19, 2012 regarding the interpretation of certain terms of the asserted claims of the patents at issue, namely:

- Claims 1–8, 11–13, 16–38, and 40–45 of the '682 patent;

- Claims 1–9, 13–18, 20, and 21 of the '086 patent; and

- Claims 1 and 2 of the '379 patent.

Prior to the hearing, Complainant MyKey Technology Inc. ("MyKey"), Respondents, and the Commission Investigative Staff ("Staff") met and conferred in an effort to reduce the number of disputed claim terms to a minimum.  The parties also filed initial and reply claim construction briefs, wherein each party offered its construction for the claim terms in dispute, along with support for its proposed interpretation.  After the hearing and pursuant to Order No. 10, the parties submitted an updated Joint Claim Construction Chart.[2]

---

[1] Complainants are the owner, by assignment, of the patents-in-suit.  (Compl. at ¶¶ 2, 4; *see also* Compl. Exs. 4, 5.)

[2] The claim terms discussed in detail in this Order were identified in the Updated Joint Proposed Claim Construction Chart as being agreed upon or remaining in dispute.  For convenience, the briefs and chart submitted by the parties are referred to hereafter as:

| CMIB | MyKey's Initial *Markman* Brief |
|------|----------------------------------|
| CMRB | MyKey's Reply *Markman* Brief |
| RMIB | Respondents' Initial *Markman* Brief |
| RMRB | Respondents' Reply *Markman* Brief |
| SMIB | Staff's Initial *Markman* Brief |
| SMRB | Staff's Reply *Markman* Brief |

## II.   IN GENERAL

The claim terms construed in this Order are done so for the purposes of this Section 337 Investigation.  Those terms not in dispute need not be construed.  *See Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (noting that the administrative law judge need only construe disputed claim terms).

Hereafter, discovery and briefing in this Investigation shall be governed by this construction of the claim terms.  **All** other claim terms shall be deemed undisputed and shall be interpreted by the undersigned in accordance with "their ordinary meaning as viewed by one of ordinary skill in the art." *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1073 (2003).

## III.   RELEVANT LAW

"An infringement analysis entails two steps.  The first step is determining the meaning and scope of the patent claims asserted to be infringed.  The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996).  Claim construction is a "matter of law exclusively for the court." *Id.* at 970-71.  "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979.  As the Federal Circuit

| JC | Updated Joint Proposed Claim Construction Chart |
|---|---|

in *Phillips* explained, courts must analyze each of these components to determine the "ordinary

and customary meaning of a claim term" as understood by a person of ordinary skill in art at the

time of the invention. 415 F.3d at 1313. "Such intrinsic evidence is the most significant source

of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v.

Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

      "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention

to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir.

2004)). "Quite apart from the written description and the prosecution history, the claims

themselves provide substantial guidance as to the meaning of particular claims terms." *Id.* at

1314; *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir.

2001) ("In construing claims, the analytical focus must begin and remain centered on the

language of the claims themselves, for it is that language that the patentee chose to use to

'particularly point [ ] out and distinctly claim [ ] the subject matter which the patentee regards as

his invention.'"). The context in which a term is used in an asserted claim can be "highly

instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted

or unasserted, may also provide guidance as to the meaning of a claim term. *Id.*

      The specification "is always highly relevant to the claim construction analysis. Usually it

is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification

may reveal a special definition given to a claim term by the patentee that differs from the

meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at

1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of

claim scope by the inventor." *Id.* As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa´ per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Id.* at 1317; *see also Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* at 1317. "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

If, after a review of the intrinsic and extrinsic evidence, a claim term remains ambiguous, the claim should be construed so as to maintain its validity. *Phillips*, 415 F.3d at 1327. Claims, however, cannot be judicially rewritten in order to fulfill the axiom of preserving their validity. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Thus, "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Id.*

## IV. LEVEL OF ORDINARY SKILL IN THE ART

MyKey submits that "a person of ordinary skill in the art of the inventions of the Asserted Patents would have had a bachelor's degree in a discipline such as electrical engineering, computer science or mathematics, along with three to five years of technology industry experience that included work with computer forensic devices or work with storage systems, firmware, operating systems, device drivers and computer operations." (CMIB at 16.)

Respondents, on the other hand, believe "[a] person of ordinary skill in the art of the three patents-in-suit (computer storage systems) would have a Bachelor of Science degree in Electrical Engineering or Computer Science, with 2-3 years of experience working in the field of computer storage systems. (RMIB at 13.)

In Staff's view, the level of ordinary skill proposed by Respondents is more appropriate. (SMIB at 6.) First, Staff disagrees with MyKey's inclusion of mathematics as a possible field of study for it would not be helpful in the relevant art of the asserted patents. (*Id.*) Second, Staff prefers the broader work description (*i.e.,* "in computer storage systems") in Respondents' proposal.

Accordingly, as to "one of ordinary skill in the art," the undersigned finds that, with respect to the three asserted patents, one of ordinary skill in the art would have a bachelor's

degree in electrical engineering, computer science, or an equivalent field, with three to four years experience working with computer storage systems.  In addition, one of ordinary skill in the art shall be commensurate with the time of the respective inventions, *i.e.*, the effective filing date for each of the patents-in-suit.

## V.    THE '682 PATENT

### A.    Overview

The '682 patent is entitled "Write Protection For Computer Long-Term Memory Devices."  The '682 patent issued on November 2, 2004 to named inventors Stephen Bress and Mark Joseph Menz, and was subsequently assigned to MyKey.  The '682 patent relates to a blocking device that provides read and write protection for computer long-term storage devices.  ('682 patent at Abstract.)  The '682 patent has 45 claims of which claims 1–8, 11–13, 16–38, and 40–45 are asserted against Respondents.  Claims 1, 13, 25, 30, and 40 are independent claims.  Claims 2–8, 11, 12, 16–24, 26–29, 31–38, 41–45 are dependent claims.  The asserted claims read as follows (with the first instance of the agreed-upon terms highlighted in *italics* and the first instance of the disputed terms highlighted in **bold**):

1.    A blocking device comprising: an **interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host**; an interface for connecting to the storage device; and a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, wherein the blocking device is **transparent to normal operation of the host and the storage device**.

2.    The blocking device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.

3.      The blocking device of claim 1, wherein the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator.

4.      The blocking device of claim 3, wherein, when the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

5.      The blocking device of claim 1, wherein the processor drops those of the commands that do not match the predetermined set of commands, and, after dropping one of the commands, returns status information to the host that indicates that the dropped command was successfully completed.

6.      The blocking device of claim 1, further comprising: additional interfaces for connecting to additional storage devices.

7.      The blocking device of claim 6, wherein each of the interfaces is independently coupled to the processor.

8.      The blocking device of claim 1, further including light emitting diodes (LEDs) coupled to the processor and configured to transmit status information relating to the status of the blocking device.

11.     The blocking device of claim 1, wherein the processor examines feature information from the storage device that relate to features supported by the storage device and the processor zeroes any features not supported by the processor before making the feature information available to the host.

12.     The blocking device of claim 1, wherein the processor supports a removable drive feature set with the host and the processor returns a write protected error code to the host when the processor drops one of the commands.

13.     A device comprising: an IDE emulator component, the IDE emulator component including a physical interface designed to engage a first cable that connects to a host that controls an IDE storage device; an IDE interface configured to engage a second cable that connects to the IDE storage device; and a logic circuit connecting the IDE emulator component to the IDE interface and configured to: compare commands received at the IDE emulator component to a predetermined set of commands that are known to not modify a state of the IDE storage device, and to allow transmission of the commands from the IDE emulator component to the IDE interface when the comparison indicates that the received command is in the predetermined set of commands, wherein the device operates **transparently to normal operation of the host and the IDE storage device**.

- 7 -

16.    The device of claim 13, wherein when the logic circuit receives data back from the IDE
storage device the logic circuit forwards the received data to the host through the IDE
emulator component.

17.    The device of claim 16, wherein, when the comparison indicates the command includes a
capabilities request command relating to the IDE storage device, the logic circuit
modifies data received from the IDE storage device relating to the capabilities request
command to reflect the capability of the IDE storage device as affected by the presence
of the device.

18.    The device of claim 13, wherein the logic circuit commands not in the predetermined set
of commands and, after blocking transmission of one of the commands, returns status
information to the host that indicates that the blocked command was successfully
executed.

19.    The device of claim 13, further comprising: a second interface for connecting to a second
IDE storage device.

20.    The device of claim 19, wherein each of the interfaces is independently coupled to the
logic circuit.

21.    The device of claim 13, further including light emitting diodes (LEDs) coupled to the
logic circuit and configured to transmit status information relating to the status of the
device.

22.    The device of claim 13, further including: a temporary storage device coupled to the logic
circuit, the logic circuit storing data corresponding to commands that are not allowed to
be transmitted to the IDE interface in the temporary storage device.

23.    The device of claim 22, wherein when read commands are received from the host that
refer to data stored in the temporary storage device, the logic circuit returns the data from
the temporary storage device to the host.

24.    The device of claim 13, wherein the logic circuit examines feature information from the
IDE storage device that relates to features supported by the IDE storage device and
removes any feature information not supported by the device before making the feature
information available to the host.

25.    A method comprising: intercepting communications between a computer motherboard
and a local non-volatile storage device for the motherboard; comparing commands in the
communications between the motherboard and the storage device to a predetermined set
of commands; forwarding selected ones of the commands to the storage only when, based
on the comparison, the commands are determined to be commands that are in a
predetermined set of commands known to not permanently modify a state of the storage
device; and blocking other commands from being received by the storage device, wherein
the intercepting communications, comparing commands, forwarding selected ones of the

commands, and blocking selected other ones of the commands is **transparent to normal operation of the computer motherboard and the storage device**.

26.    The method of claim 25, further comprising: forwarding data from the storage device to the motherboard in response to a read command received from the motherboard and forwarded to the storage device.

27.    The method of claim 25, wherein the storage device is an integrated device electronics (IDE) disk drive.

28.    The method of claim 25, wherein the commands forwarded to the storage device include a capabilities request command, the method further comprising: modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as modified by operation of the method.

29.    The method of claim 28, further comprising, after blocking a command: returning status information to the motherboard that indicates that the blocked command was successfully executed by the storage device.

30.    A computer system comprising: a host computer; a long-term storage device; and a blocking device coupled between the host computer and the storage device, the blocking device configured to: intercept commands from the host to the storage device, pass commands to the storage device only when the commands are in a predetermined set of commands that are known to not permanently modify a state of the storage device, and block other commands from reaching the storage device, wherein the intercepting commands, blocking commands, and passing commands are performed by the blocking device **transparently to the host computer and the long-term storage device**.

31.    The computer system of claim 30, wherein the blocking device further includes: an interface emulator configured to emulate the storage device to the host; and an interface configured to connect the blocking device to the storage device.

32.    The computer system of claim 31, wherein the interface emulator emulates an Integrated Device Electronics (IDE) interface and the storage device is an IDE disk drive.

33.    The computer system of claim 30, wherein the blocking device receives data back from the storage device in response to one of the passed commands and forwards the received data to the host.

34.    The computer system of claim 30, wherein, when the passed commands include a capabilities request command relating to the storage device, the blocking device modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

35.    The computer system of claim 30, wherein the blocking device, after blocking one of the commands, returns status information to the host that indicates that the blocked command was successfully completed.

36.    The computer system of claim 30, wherein the blocking device further includes light emitting diodes (LEDs) configured to transmit status information relating to the status of the blocking device.

37.    The computer system of claim 30, wherein the blocking device further includes: a temporary storage device, the blocking device storing data from the host corresponding to blocked commands in the temporary storage device.

38.    The computer system of claim 37, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the blocking device returns the data from the temporary storage device to the host.

40.    A blocking device comprising: *means for intercepting communications between a host and a storage device*; **means for comparing commands in the communications between the host and the storage device to a predetermined set of commands; means for forwarding selected ones of commands in the intercepted communications to the storage device only when, based on the comparison, the commands that are in a predetermined set of commands are determined to be commands that are known to not permanently modify a state of the storage device**; and *means for blocking other ones of the commands from being received by the storage device based on the comparison*, wherein the blocking device operates **transparently to normal operation of the host and the storage device**.

41.    The blocking device of 40, wherein the storage device is an integrated device electronics (IDE) disk drive.

42.    The blocking device of 40, wherein the commands forwarded to the storage device include a capabilities request command, and the means for forwarding further comprises: *means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device.*

43.    The blocking device of 40, further comprising: *means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device.*

44.    The blocking device of claim 2, wherein the interface emulator is configured to emulate an IEEE 1394 connection.

45.    The computer system of claim 31, wherein the interface emulator emulates an IEEE 1394 connection and the storage device is an IDE disk drive.

- 10 -

**B.      Agreed-Upon and Disputed Claim Terms**

**1.      Construction of Agreed-Upon Claim Terms**

**a)      "means for intercepting communications between a host and a storage device"**

The parties agree that the term "means for intercepting communication between a host and a storage device," which appears in claim 40 of the '682 patent, should be construed as:

Function:      intercepting communications between a host and a storage device

Structure:      an interface emulator 320, 820, 920, and equivalents thereof.

(JC at 1.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for intercepting communications between a host and a storage device" as:

*Function:*      *intercepting communications between a host and a storage device*

*Structure:*      *an interface emulator 320, 820, 920, and equivalents thereof.*

**b)      "means for blocking other ones of the commands from being received by the storage device based on the comparison"**

The parties agree that the term "means for blocking other ones of the commands from being received by the storage device based on the comparison," which appears in claim 40 of the '682 patent, should be construed as:

Function:      blocking other ones of the commands from being received by the storage device based on the comparison

Structure:      a processor programmed to perform step 420 of Fig. 4, and equivalents thereof.

(*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for blocking other ones of the commands from being received by the storage device based on the comparison" as:

**Function:**   ***blocking other ones of the commands from being received by the storage device based on the comparison***

**Structure:**   ***a processor programmed to perform step 420 of Fig. 4, and equivalents thereof.***

          **c)**   **"means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device"**

The parties agree that the term "means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device," which appears in claim 42 of the '682 patent, should be construed as:

Function:   modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device

Structure:   a processor programmed to perform steps 450 and 480 of Fig. 4, and equivalents thereof.

(*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device" as:

**Function:**   ***modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device***

**Structure:**   ***a processor programmed to perform steps 450 and 480 of Fig. 4, and equivalents thereof.***

- 12 -

          **d)**     **"means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device"**

The parties agree that the term "means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device," which appears in claim 43 of the '682 patent, should be construed as:

| | |
|---|---|
| Function: | returning status information to the host that indicates that the blocked command was successfully executed by the storage device |
| Structure: | a processor programmed to perform step 430 of Fig. 4 and the algorithm described in 6:16-25, 6:33-47, and 12:33-45, and equivalents thereof. |

(*Id.* at 1-2.)

Accordingly, the undersigned hereby adopt the parties' proposed construction and shall construe the term "means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device" as:

| | |
|---|---|
| ***Function:*** | ***returning status information to the host that indicates that the blocked command was successfully executed by the storage device*** |
| ***Structure:*** | ***a processor programmed to perform step 430 of Fig. 4 and the algorithm described in 6:16-25, 6:33-47, and 12:33-45, and equivalents thereof.*** |

- 13 -

2.      **Construction of Disputed Claim Terms**

a)      **"transparent to normal operation [of the host and storage device]" / "transparently to normal operation [of the host and the IDE storage device]" / "transparent to normal operation [of the computer motherboard and the storage device]" / "transparently to [the host computer and the long-term storage device]" / "transparently to normal operation [of the host and the storage device]"**

The parties agree that the different variations of the term "transparent," which appear in claims 1, 13, 25, 30, and 40 of the '682 patent should be construed the same way.  The parties, however, disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| The blocking device appears to the host as a storage device and appears to the storage device as a host | The blocking device operates in a way that all normal operations of the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device | The blocking device operates in a way that all normal operations of the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device |

MyKey asserts that no construction of the term "transparent" is needed because "transparent" has a plain and ordinary meaning.  (CMIB at 25-26.)  Should, however, the undersigned deem construction necessary, MyKey contends that the intrinsic evidence supports construing the term as "the blocking device appears to the host as a storage device and appears to the storage device as a host."  (*Id.* at 26 (citing '682 patent at 5:32-40 ("To host computer 201, blocking device 203 appears to be a standard drive interface . . . and presents to the host 201 the memory, registers and control signals that a drive would normally present to host 201.  To drive

205, blocking device 20[3]³ appears to be a host computer, and presents to drive 205 the memory, registers, and control signals that host 201 would normally present to drive 205.  In other words, blocking device 203 is transparent to the system.”)).)

MyKey objects to Staff's and Respondents' construction on two grounds.  First, MyKey argues nothing in the intrinsic record requires that “all normal operations” of the host and the storage device must continue when the blocking device is interposed between the host and the drive.  (CMIB at 26; CMRB at 10-11.)  Instead, MyKey contends that the specification defines “transparent” in reference to the appearance of the blocking device and not in reference to the operation of the device.  (CMIB at 26-27 (“There is no mention of ‘all normal operations,’ and no requirements that they ‘continue.’”).)  Second, MyKey disputes that “reconfiguration” was disclaimed during prosecution (CMIB at 26; CMRB at 6-10 (arguing that Staff and Respondents improperly rely on language that recites an advantage of the invention over the prior art).)  MyKey insists that U.S. Patent No. 6,336,187 (“*Kern*”) was traversed based on its explicit communication steps and not on the fact that one of those steps was the reconfiguration of the interface of the host application.  (CMRB at 8.)

Because they believe “transparent to normal operation” does not have a plain and ordinary meaning,⁴ Staff and Respondents argue that it should be construed as “the blocking device operates in a way that all normal operations of the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device.”  (RMIB at 22; RMRB at 11; SMIB at 11;

---

³ The '682 patent mistakenly refers to “blocking device 205” in this sentence.  It is clear from the rest of the specification that the blocking device is labeled 203 in the diagrams and 205 is the identifier given to the drive.  (*See* '682 patent at 5:23-52.)

⁴ Staff and Respondents concede that “transparent” on its own, as well as in the context of computers, has an ordinary and customary meaning, but argue that the larger phrase “transparent to normal operation” requires construction. (*See* RMIB at 22-23; SMIB at 11 (citing 1999 Microsoft Computer Dictionary definition of transparent as “pertaining to, or characteristic of a device, function or part of a program that works so smoothly and easily that it is invisible to the user.”).)

SMRB at 3.)  According to Staff and Respondents, their construction is not only supported by the claim language itself, but required by the prosecution history.  MyKey's proposed construction, in Staff's and Respondents' view, fails because it ignores the contextual language of the disputed claim terms (*i.e.*, "transparent to normal operation") and the unequivocal disclaimer made during prosecution to secure the issuance of the '682 patent.  (RMRB at 11; SMRB at 4-5.)

Staff and Respondents assert that in the context of the claim language, "['transparent'] is not directed to transparent appearance; rather, it is directed to transparent operation of the blocking device."  (RMIB at 23; SMIB at 11.)  Staff and Respondents submit that transparent operation of the blocking device is only possible if all normal operations of the host and storage device continue.  (RMRB at 13; SMIB at 12 ("any change in the normal operation of the storage device or host, would, in the context of the claimed invention, indicate that the interaction with the blocking device were not transparent.").)[5]  Staff and Respondents further contend that during prosecution of the '682 patent, the Applicant made certain unequivocal statements about the meaning of the "transparent to normal operation" limitation. (RMIB at 22; RMRB at 14-15; SMIB at 12; SMRB 4-5.)  Specifically, Staff and Respondents claim in responding to the rejection over *Kern,* the Applicants distinguished the '682 invention on the basis that "neither the host nor the storage device need any special hardware or software" and "neither the host nor the storage device need to be reconfigured in any way," thereby disclaiming any devices that would require reconfiguration.  (SMRB at 4-5; RMIB at 24-26.)

As an initial matter, the undersigned agrees with Respondents and Staff that there is no ordinary and customary meaning for these terms.  Thus, the first issue to be resolved is whether "transparent" refers only to the appearance of the blocking device or whether it refers to the

---

[5] Staff also contends that if the host or storage device must be reconfigured when the blocking device is interposed, the blocking device is not transparent.  (SMRB at 4.)

operation of the blocking device. The undersigned finds Respondents' and Staff's arguments persuasive. While the specification highlights both the transparent appearance of the blocking device and its transparent operation, the plain language of the asserted claims refers *only* to transparent operation. (*Compare* '682 patent at 5:31-42; 10:1-12 *with* 12:35-36 ("the blocking device is transparent to normal operation of the host and the storage device"), 14:34-35 ("the device operates transparently to normal operation of the host and the IDE storage device"), 15:50-54 (the blocking of selected commands "is transparent to normal operation of the computer motherboard and the storage device"), 16:19-21 (command intercepting, blocking, and passing "are performed by the blocking device transparently to the host computer and the long-term storage device"), 17:16-17 ("the blocking device operates transparently to normal operation of the host and the storage device").) Moreover, consistent with the claim language, the specification states that the "blocking device is physically inserted between a host computer storage system and the storage device and is transparent to the host and storage device." (*Id.* at 3:50-55.) Because MyKey's proposed construction wholly ignores the requirement for transparent operation, its alternative construction fails.

The next issue is whether the claimed transparency excludes any blocking device that requires the host or storage device to be reconfigured before the blocking device can be inserted between the host and storage device. First, the undersigned agrees with Staff and Respondents that implicit in the phrase "transparent to normal operations" is the requirement that all normal operations of the host and storage drive continue. In other words, no reconfiguration of the host or storage drive is needed. Common sense dictates that if the blocking device interrupts or alters the normal operation of the host or storage device, the blocking device is not transparent.

Second, during prosecution of the '682 patent, the Applicants made the following statements in order to overcome the §102(e) rejection based on *Kern*:

- Advantages associated with transparent operation of the blocking device are discussed in numbered paragraph 38 of the specification. As discussed, the blocking device appears as a standard storage device to the host. Accordingly, ***neither the host nor the storage device need to be reconfigured in any way***. The blocking device simply needs to be inserted between the host and the storage device and it is ready to operate. ('682 Prosecution History, 11/24/03 Amendment at 18 (emphasis added).)

- Claim 1 further recites that the blocking device is transparent to normal operation of the host and the storage device. ***Kern clearly does not disclose or suggest this feature of the invention***. (*Id.* at 19 (emphasis added).)

- As described in these sections, a number of explicit communication steps are taken between a new host and controller 120 before a host can use the storage device(s) 108, including exchanging a key (step 704) and reconfiguring the interface of the host application (step 706). ***Applicants submit that this disclosure of Kern clearly teaches away from a blocking device that is transparent to normal operation of the host and storage device***. (*Id.* at 20 (emphasis added).)

The undersigned therefore finds that the '682 Applicants did indeed disclaim devices that would require reconfiguration. As Respondents rightly noted in their *Markman* presentation, there can be no clearer disavowal of claim scope than arguing that a certain prior art structure teaches away from the claimed invention. *See Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.,* 400 F.3d 910, 915 (Fed. Cir. 2005); *Am. Calcar, Inc. v. Am. Honda Motor Co.,* 651 F.3d at 1318, 1339-40 (Fed. Cir. 2011); *Omega Eng'g., Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed. Cir. 2003). As a result, the construction of "transparent to normal operation" must reflect Applicants' disclaimer. *See Omega Eng'g.,* 334 F.3d at 1324.

Accordingly, the undersigned hereby construes all of the "transparent" operation limitations to mean that ***"the blocking device operates in a way that all normal operations of***

*the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device.*"

> b)   **"interface emulator"**

The term "interface emulator" appears in claims 1, 31, 32, 44, and 45 of the '682 patent. While the parties agree that the "interface emulator" mimics another interface, they disagree on the proper claim construction, and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This claim term does not require construction and should be afforded its ordinary and customary meaning, which is "a component that emulates an interface" | A non-intelligent interface component that mimics another interface and operates with no reconfiguration of the host software | An interface component that mimics another interface and operates with no reconfiguration of the host software |

MyKey argues that the term "interface emulator" is easily understood by one of ordinary skill, and as such, does not require construction.  (CMIB at 17 ("One of ordinary skill in the art at the time of the invention would understand 'interface emulator' to simply mean a component that emulates an interface.").)  MyKey objects to both Respondents' and Staff's constructions, disputing that any claim scope was surrendered in order to traverse *Kern* during prosecution of the '682 patent.  (CMRB at 1-3 ("Nothing in this passage provides an unequivocal statement that the interface emulator of the '682 patent must be either intelligent or non-intelligent . . . nothing in this passage contains a disclaimer of any interface that operates with a change to, or reconfiguration of, the host software.").)  Rather, MyKey contends that *Kern* was distinguished on the basis that it "does not disclose, suggest, or teach an interface emulator." (CMIB at 18-19 (citing '682 Prosecution History, 11/24/03 Amendment at 19  ("Although Kern discloses a 'controller interface 120,' the controller interface 120 of Kern does not emulate an interface presented by a storage device.")).)  MyKey reiterates its argument against the "no reconfiguration" limitation set forth in regard to "transparent to normal operations," again

- 19 -

asserting that Staff and Respondents are improperly reading an advantage of the invention into the claims.  (*Id.* at 21-23; CMRB at 3-5.)

Respondents dispute that the term "interface emulator" has a plain and ordinary meaning,[6] and contend that the prosecution history requires that the term "interface emulator" be construed as "a non-intelligent interface component that mimics another interface and operates with no reconfiguration of the host software."  (RMIB at 17-18; RMRB at 2.)  Respondents assert that an intelligent interface and reconfiguration were both unequivocally disavowed when, in differentiating the claims of the '682 patent application from *Kern,* the applicants argued:

> Although Kern discloses a "controller interface 120," the controller interface 120 of Kern does not emulate an interface presented by a storage device. The interface 120 of Kern is described as "an intelligent digital input/output communication channel, or other interface suitable to the particular application." (Kern, col. 4, lines 48-50).  Nothing in Kern discloses or suggests that interface 120 emulates the interface presented by storage device(s) 108.  Because Kern discloses host application programs 110-112 that are specifically designed to operate with controller 106, Applicants submit that there would be no need for interface 120 to emulate storage devices, as application programs 110-112 could be designed to operate with any 'intelligent digital input/output channel. Thus, if anything, Kern actually teaches away from this aspect of the invention.

(RMRB at 4-5 (citing '682 Prosecution History, 11/24/03 Amendment at 19); *see also* RMIB at 20-21.)  This passage, according to Respondents, distinguishes the '682 patent on the bases that [1] *Kern's* interface was an intelligent input/output communication channel; and [2] *Kern* "required the host computer to be configured with software specifically designed to operate with the device."  (RMRB at 5.)

---

[6] Respondents note that, alone, the term "emulator" has a plain meaning to one of ordinary skill.  (RMIB at 17 (quoting the 1999 version of the Microsoft Computer Dictionary's definition of emulator as "[h]ardware or software designed to make one type of computer or component act as if it were another").)

Staff submits that "interface emulator" should be construed as "an interface component
that mimics another interface and operates with no reconfiguration of the host software." (SMIB
at 15; SMRB at 5-6.) Staff agrees with MyKey that there was no disclaimer of an intelligent
interface emulator. (SMIB at 18.) In Staff's view, the statements relied upon by Respondents
"do not rise to the level of a disclaimer of any device that is 'intelligent,'" but rather, describe
why the controller in *Kern* would not need an interface emulator." (*Id.*) Staff, however, agrees
with Respondents that the '682 "[a]pplicants disclaimed any possible interface emulator that
reconfigures the host in any way." (*Id.* at 17.) In support, Staff relies on the '682 patent's
discussion regarding blocking device 203, of which the interface emulator is a component. (*Id.*
(quoting '682 patent at 5:32-36).) Staff further submits "that a blocking device that is required to
reconfigure the host would not 'emulate' an interface to the host." (SMRB at 5-6 (arguing that
implicit in "emulate" is that the blocking device must operate without reconfiguration).)

The parties agree that the "interface emulator" mimics another interface. (CMIB at 17;
RMIB at 17-18; SMIB at 15.) The dispute therefore centers on whether the applicants
disclaimed any reconfiguration of the blocking device and an "intelligent" interface component.
The undersigned has already determined hereinabove that the applicants disclaimed any
reconfiguration of the blocking device. (*See* Section V.B.2(a), *supra*.) The interface emulator is
a component of the blocking device. (*See* '682 patent at 5:32-36.) Thus, because the claimed
"interface emulator" is a component of the blocking device, its construction – like that of
"transparent to normal operation" – must reflect the applicants' disclaimer.

As to whether the applicants disclaimed an "intelligent" interface component, the
undersigned agrees with Staff and MyKey, finding that there was no prosecution history
disclaimer. Rather than differentiating based on intelligent and non-intelligent interface

- 21 -

components, the Applicants drew a distinction based on *Kern*'s failure to disclose an interface emulator, stating: "Although Kern discloses a 'controller interface 120,' the controller interface 120 of Kern does not emulate an interface presented by a storage device." ('682 Prosecution History, 11/24/03 Amendment at 19.)  The Applicants then describe why the *Kern* controller interface — "an intelligent digital input/output communication channel, or other interface suitable to the particular application"— would not need such an interface.  (*Id.* (quoting *Kern* at 4:48-50 and reiterating that "[n]othing in Kern discloses or suggests that interface 120 emulates the interface presented by storage device(s) 108.")  Thus, contrary to Respondents' assertion, the passage relied upon by Respondents' and Applicants' use of the word "intelligent" therein to describe the *Kern* controller interface does not rise to the level of a "clear and unambiguous" disavowal of all intelligent interface components.  *See Seachange Int'l Inc. v. C-COR, Inc.,* 413 F.3d 1361, 1373 (Fed. Cir. 2005) ("A disclaimer must be clear and unambiguous.").

Accordingly, the undersigned hereby construes the term "interface emulator" to mean "***an interface component that mimics another interface and operates with no reconfiguration of the host software.***"

c)       "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host"

The term "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host" appears in claim 1 of the '682 patent.   The parties disagree on the proper claim construction, and construe the term as follows:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This claim term does not require construction and should be afforded its ordinary and customary meaning | A non-intelligent interface component, separate from the processor, configured to present to the host an interface identical to the interface of the storage device connected to the blocking device, and that operates with no reconfiguration of the host software | None |

MyKey submits that no construction is necessary as the meaning of this term is readily apparent to one of ordinary skill in the art.  (CMIB at 24.)  MyKey reiterates its objection to Respondents' contention that the "interface emulator" must be non-intelligent and that it operates with no change to the host software.  (*Id.*)  MyKey also objects to Respondents' requirement that the interface to the host be "identical" to the interface to the storage device, arguing that the claim language and other intrinsic evidence include no such requirement.  (*Id.*)  In addition, MyKey claims that the "'682 patent explicitly teaches that the host interface may be an IEEE 1394 connection and that the storage device interface may be an IDE connection, which is not identical to the IEEE 1394 connection."  (*Id.* at 24-25.)  Thus, one of ordinary skill in the art, MyKey asserts, would understand that the interface presented to the host may not be identical to the interface of the storage device connected to the blocking device.  (*Id.* at 25 (citing MyKey Ex. 4, Berg Rebuttal Rpt. at 7).)

- 23 -

Respondents assert that this term requires the interface emulator to be separate from the processor and configured to present to the host an interface identical to the interface of the storage device connected to the blocking device.  (RMRB at 8.)  In response to MyKey's arguments, Respondents contend that nowhere in the specification is a non-identical interface structure disclosed and supported.  (*Id.* at 9 (arguing that the invention does not allow, as MyKey alleges, for a first type of interface (*e.g.*, IEEE 1394 interface) on the blocking device to connect with a second type of interface (*e.g.*, IDE interface) on the host computer).)  Respondents also contend that claim 45 does not implicate the doctrine of claim differentiation for the claim was added late in prosecution and thus, does not qualify as supporting disclosure.  (*Id.* at 10.)

In the Staff's view, "[t]he requirements that the claimed 'interface emulator' mimic an interface and that the blocking device be 'transparent to normal operation' each set forth the only type of interaction required by the claim."  (SMRB at 6.)  Staff therefore submits that the additional language proposed by Respondents is "not necessary and is, to some extent, redundant."  (*Id.*)

The undersigned has already construed the term "interface emulator" as an "an interface component that mimics another interface and operates with no reconfiguration of the host software."  (*See* Section V.B.2(b), *supra*.)  Thus, only "configured to emulate an interface presented by a storage device and configured to connect to a host" need be construed.  In this regard, the undersigned agrees with MyKey and Staff, finding this language to be plain on its face.[7]  The undersigned therefore declines to include Respondents' "identical" limitation in the construction of this term.

---

[7] The undersigned notes that Respondents, in their *Markman* presentation, concede that construction of this term is redundant.  (*See* RDX-682-36 (stating that they agree that construction of this term is redundant, but "seek to clarify the relationship of the emulator to the host and the storage device.").)

Accordingly, the undersigned hereby construes the phrase "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host" to have its plain and ordinary meaning.

> **d)** **"means for comparing commands in the communications between the host and the storage device to a predetermined set of commands"**

The phrase "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands" appears in claim 40 of the '682 patent. The parties agree that this term is subject to 35 U.S.C. § 112(6) and also agree on the claimed function. The parties, however, disagree on the structure, and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| Function: The parties agree that the function is the claim language<br><br>Structure: a processor programmed to perform steps 420, 440, and 460 in Fig. 4, and equivalents thereof. | Function: The parties agree that the function is the claim language<br><br>Structure: a processor programmed to perform steps 420, 440, 450, and 460 in Fig. 4, and equivalents thereof. | Function: The parties agree that the function is the claim language<br><br>Structure: a processor programmed to perform steps 420, 440, 450, and 460 in Fig. 4, and equivalents thereof. |

The parties' dispute centers on whether this limitation requires a processor to perform step 450 in Figure 4 of the '682 patent. Respondents and Staff believe it does. MyKey believes it does not.

MyKey contends that algorithm step 450 relates to a capabilities request and is therefore not relevant to "means for comparing commands in the communications between the host and storage device to a predetermined set of commands." (CMIB at 29.) MyKey cites to dependent claim 42 in support, arguing that claim 42 is the claim directed to the embodiment of the invention relating to the capabilities requests. (*Id.*) In particular, MyKey states:

> Claim 42, which depends from claim 40, further limits the invention
> of claim 40 by reciting "wherein the commands forwarded to the
> storage device include a capabilities request command." If the
> scope of "means for comparing commands" . . . must be limited by
> requiring a capabilities request command, as Respondents and Staff
> contend, the limitation of claim 42 "wherein the commands
> forwarded to the storage device include a capabilities request
> command" would be completely superfluous.

(CMRB at 13.)  MyKey further argues that under the doctrine of claim differentiation, it is

improper for Respondents to import a limitation (*i.e.*, step 450) from a dependent claim into the

dependent claim from which it depends.  (*Id.*)

Respondents assert that the specification expressly describes the "capabilities request

command" of step 450 as part of the algorithm defining the structure for this term.  (RMIB at 29

(quoting '682 patent at 6:34-7:3); RMRB at 17-19.)  Respondents insist that it is improper for

MyKey to "arbitrarily" remove the capabilities request command (step 450) from the algorithm.[8]

(*Id.*)  Removing step 450 from the algorithm would not only result in an incomplete process in

Figure 4, but also, Respondents argue, reject express language in the specification describing this

part of the algorithm.  (RMIB at 29 (citing '682 patent at 6:34-7:3); RMRB at 19 (arguing that

either both step 440 and 450 are necessary components or neither step is necessary and since

MyKey has conceded that step 440 is necessary, step 450 is also necessary).)

Staff, like Respondents, believes step 450 is required by the claimed function.  (SMIB at

19.)  Staff submits that "[b]ecause the claim language refers to 'a predetermined ***set*** of

command***s***,'" meaning more than one command, it is the Staff's view that steps associated with

the only two disclosed commands (*i.e.,* the read command and the capabilities request command)

must be included in the corresponding structure.  (SMIB at 21 (emphasis original); SMRB a 7.)

---

[8] To the extent MyKey argues that capabilities requests are not commands, Respondents contend that the term
"capabilities request" is repeatedly described as a "command" throughout the specification.  (RMIB at 30 (citing
'682 patent at 6:3-6, 6:52-55).)

Staff explains that without the capabilities request step 450, there would be no "predetermined set of commands," as required by the claim; instead, "[t]here would be only one pre-approved command – the read command." (*Id.*)  Staff further asserts that MyKey's claim differentiation argument must fail because dependent claim 42 adds the structure of step 480, which is not part of the Staff's construction (or Respondents') for this term.[9]  (SMIB at 21; SMRB at 7 ("step 480 differentiates the Staff's construction of independent claim 40 and dependent claim 42.").)

All parties agree that the relevant disclosure of the corresponding structure is set forth in Figure 4:



('682 patent at Fig. 4.)  The parties also agree that the "means for comparing" must include a processor programmed to perform steps 420, 440, and 460.  As discussed *supra,* the sole dispute among the parties is whether this limitation requires a processor to perform step 450.  The

---

[9] Respondents adopt Staff's position rejecting MyKey's claim differentiation argument.  (RMRB at 19.)

undersigned agrees with Respondents and Staff, finding the specification to be dispositive. *See*

*Phillips*, 415 F.3d at 1315.

      The algorithm shown in Figure 4 is described in the specification as follows:

> FIG. 4 is a flow chart illustrating the operation of blocking device 203 in additional detail. To begin, host 201 communicates a command to drive 205 (act 400). The blocking device 203 captures and holds communications until they are examined (act 410). The communication is examined for whether it is a write or format command and/or any command that changes data on the drive 205. If yes, the command and any associated data is accepted by blocking device 203, and then discarded, blocking it from the protected drive 205 (acts 420 and 430). Because the blocking device 203 accepts the command and any data associated with the command, such as the data the host 201 intends to write to drive 205, the host 201 believes the command and associated data has been successfully sent to drive 205.
>
> Host communications that are not data changing commands are examined to determine if they are read commands (act 440). If it is a read command, embedded processor 330 passes the command to the protected drive 205 and any returned data is passed to host 201 (act 470). ***If the command is not a read command, embedded processor 330 examines the command to determine if it is a capabilities request (act 450). If the command is a capabilities request, embedded processor 330 reports the drive's capabilities back to host 201 (act 480).*** In some cases, certain drive capabilities may be modified by the processing time required by blocking device 203. Accordingly, in this situation, embedded processor 330 may modify the reported capabilities to reflect the actual capability of the drive 205 including any latency introduced by blocking device 203 (act 480). For example, embedded processor 330 may report back the actual drive storage space but may report a modified drive throughput rate that reflects any delay introduced by the blocking device 203. Finally, if the command is not recognized by embedded processor 330, the embedded processor 330 may discard the command (act 460). By discarding non-recognized commands, embedded processor 330 can ensure that only safe commands are passed.

('682 patent at 6:34-7:3 (emphasis added).)  As this passage makes clear, the algorithm disclosed

in Figure 4 expressly *includes* the capabilities request command (step 450).  In other words,

nothing in the '682 patent suggests that this part of the algorithm is, as MyKey wrongly suggests, optional.

MyKey attacks Respondents' and Staff's construction under the doctrine of claim differentiation.  The undersigned finds MyKey's arguments unpersuasive.  Claim 42 defines a specific algorithm for forwarding data in step 480 if the step 450 capabilities request command comparison is a match.  Because step 480 is not part of Staff's or Respondents' construction, adopting their construction will not result in claim 40 and 42 having identical scope.  Moreover, as the Federal Circuit has noted, "claim differentiation is a rule of thumb but does not trump the clear import of the specification." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("the doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence.").

Accordingly, the undersigned hereby construes the term "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands" as:

> **Function:** **comparing commands in the communications between the host and the storage device to a predetermined set of commands**
>
> **Structure:** **a processor programmed to perform steps 420, 440, 450, and 460 in Fig. 4 and equivalents thereof.**

e)   **"means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the device "**

The phrase "means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device" appears in claim 40 of the '682 patent.  The parties agree that this element should be construed under § 112(6) and also agree on the claimed function.  The parties, however, disagree on the corresponding structure[10], and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| Function:  The parties agree that the function is  forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device | Function:  The parties agree that the function is forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device | Function:  The parties agree that the function is forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device |
| Structure:  a processor programmed to perform step 470 in Fig. 4, and equivalents thereof. | Structure:  a processor programmed to perform steps 470 and 480 in Fig. 4, and equivalents thereof. | Structure:  a processor programmed to perform steps 470 and 480 in Fig. 4, and equivalents thereof. |

The parties have proffered essentially the same arguments here as they did for the "means for comparing" limitation.  Like that limitation, the parties agree that support in the specification is found in Figure 4 of the '682 patent and that the "means for forwarding" must include a processor programmed to perform step 470.  The sole point of dispute is whether step 480 is required by the claimed function.  Staff and Respondents insist that the "capabilities request" command (step 480) should be part of the algorithm.  MyKey disagrees.

In the undersigned's view, Figure 4 makes clear that the algorithm expressly *includes* the capabilities request command (step 480).

---

[10] The corresponding structure set forth herein differs from the one originally proposed (and briefed) by the parties. As the parties noted at the *Markman* hearing, "there was an error that was shared by MyKey, by [Respondents], and also by the Staff attorney, concerning the steps that are supposed to be in the corresponding structure related to that claim function for the 'means for forwarding' term."  (1/19/12 Tr. at 137:19-24.)



Fig. 4

('682 patent at Fig. 4.)  The specification, in describing Figure 4, confirms that step 480 is indeed required by the claimed function:

> FIG. 4 is a flow chart illustrating the operation of blocking device 203 in additional detail. To begin, host 201 communicates a command to drive 205 (act 400). The blocking device 203 captures and holds communications until they are examined (act 410). The communication is examined for whether it is a write or format command and/or any command that changes data on the drive 205. If yes, the command and any associated data is accepted by blocking device 203, and then discarded, blocking it from the protected drive 205 (acts 420 and 430). Because the blocking device 203 accepts the command and any data associated with the command, such as the data the host 201 intends to write to drive 205, the host 201 believes the command and associated data has been successfully sent to drive 205.

> Host communications that are not data changing commands are examined to determine if they are read commands (act 440). If it is a read command, embedded processor 330 passes the command to the protected drive 205 and any returned data is passed to host 201 (act 470). **_If the command is not a read command, embedded processor 330 examines the command to determine if it is a capabilities request (act 450). If the command is a capabilities_**

- 31 -