# EXHIBIT F-2

> ***request, embedded processor 330 reports the drive's capabilities***
> ***back to host 201 (act 480).*** In some cases, certain drive capabilities
> may be modified by the processing time required by blocking
> device 203. Accordingly, in this situation, embedded processor 330
> may modify the reported capabilities to reflect the actual capability
> of the drive 205 including any latency introduced by blocking
> device 203 (act 480). For example, embedded processor 330 may
> report back the actual drive storage space but may report a
> modified drive throughput rate that reflects any delay introduced
> by the blocking device 203. Finally, if the command is not
> recognized by embedded processor 330, the embedded processor
> 330 may discard the command (act 460). By discarding non-
> recognized commands, embedded processor 330 can ensure that
> only safe commands are passed.

(*Id.* at 6:34-7:3 (emphasis added).)

MyKey again attacks Respondents' and Staff's construction under the doctrine of claim differentiation. For MyKey's argument to succeed, claim 40 and 42 must be identical in scope under Respondents' and Staff's proposed construction. Claim 40, however, encompasses both the read command and the capabilities request command and both of those associated means for forwarding those commands. In contrast, claim 42 only addresses the step 450 capabilities request command the associated means for forwarding that command. Because claim 40 is broader than claim 42, MyKey's claim differentiation argument fails. Furthermore, as the undersigned noted hereinabove, while claim differentiation is a "rule of thumb," it does not "trump the clear import of the specification." *Eon-Net LP*, 653 F.3d at 1323.

Accordingly, the undersigned hereby construes the "means for forwarding commands in the communications between the host and the storage device to a predetermined set of commands" as:

> ***Function:***   ***forwarding selected ones of commands in the intercepted***
> ***communications to the storage . . . known to not permanently modify a***
> ***state of the storage device***

> **Structure:**     *a processor programmed to perform steps 470 and 480 in Fig. 4, and equivalents thereof.*

## VI.    THE '086 PATENT

### A.    Overview

The '086 patent is entitled "Systems And Methods For Creating Exact Copies Of Computer Long-Term Storage Devices."  The '086 patent issued on January 2, 2007 to named inventors Steven Bress and Mark Joseph Menz and was subsequently assigned to MyKey.  The '086 patent describes a device for creating exact copies of computer long-term memory devices. ('086 patent at Abstract.)  The '086 patent has 21 claims of which MyKey has asserted claims 1– 9, 13–18, and 20–21.  Claims 1 and 18 are independent claims.  The asserted claims read as follows (with the first instance of the agreed-upon terms highlighted in *italics* and the first instance of the disputed terms highlighted in **bold**):

1.    A **stand-alone, dedicated function device** for making exact copies of long-term memory devices comprising: an interface for connecting to a storage device (source); one or more interfaces for connecting to the storage device(s) (destination); wherein the interfaces are electronically isolated from each other through the use of separate interface circuitry for each interface; a *user controllable switch* that, when actuated by a user, causes the device to commence a copy; and a control circuit coupled to the interface (source) and the interface(s) (destination), the **control circuit issuing commands to**: compare the size of the source device to the size of a destination device and communicate result to a user, open *hidden areas* on the source device, make an *exact copy* of the storage device connected to the interface (source), **read and compare data on the source and destination devices** and communicate result to a user, **restore the source drive to its original condition**, wherein the copying device is operating system independent.

2.    The copying device of claim 1, wherein a user controllable switch is connected to the control circuit to interrupt the verification procedure.

3.    The copying device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.

4.    The copying device of claim 1, wherein the hidden area the control circuit removes or modifies is a Host Protected Area (HPA).

5.    The copying device of claim 1, wherein the hidden area the control circuit removes or modifies is Device Configuration Overlay settings (DCO).

- 33 -

6.  The copying device of claim 1, wherein the control circuit sets the size of a copied device to the size of a source device.

7.  The copying device of claim 1, further comprising: one or more additional interfaces for connecting to display and/or output devices, to produce a report.

8.  The copying device of claim 1, wherein the control circuit writes a standard bit pattern on a copy device to indicate unreadable data on the source device.

9.  The copying device of claim 1, further including light emitting diodes (LEDs) coupled to the control circuit and configured to transmit status information relating to the status of the copying device.

13.  The copying device of claim 1, further comprising: a casing configured to contain the control circuit and the interface, the user controllable switch being mounted on the casing, the casing being of a size that is portable by the user.

14.  The copying device of claim 13, further comprising: cables emanating from the casing and connected to the interfaces, the cables being configured to connect to long-term memory devices.

15.  The copying device of claim 14, wherein the cables are Integrated Device Electronics (IDE) cables.

16.  The copying device of claim 1, further comprising: a power supply configured to supply power to the control circuit.

17.  The device of claim 16, further comprising: drive power cords emanating from the casing and configured to supply power from the power supply to the long-term memory components.

18.  A stand-alone, dedicated function copying device comprising: *means for interfacing with a source drive*, wherein the source device is protected from accidental state changes; *means for interfacing with one or more destination devices*; *means initiating the copying procedure*; *means for comparing the size of the source device to the size of a destination device and communicating result to a user*; **means for opening hidden areas on the source device**; *means for making an exact copy*; *means for reading and comparing the data on the source and destination devices and communicating result to a user*; **means for restoring the source device to its original condition**, wherein the copy device is operating system independent.

20.  The copying device of 18, further comprising: *means for indicating areas on a source device that were unreadable.*

21.  The copying device of 1, wherein the source and destination devices have different interfaces.

- 34 -

**B.     Agreed-Upon and Disputed Claim Terms**

**1.     Construction of Agreed-Upon Claim Terms**

**a)     "exact copy"**

The parties agree that the term "exact copy," which appears in claims 1–9, 13–18, and 20–21, should be construed as "a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas." (JC at 4.)

The undersigned hereby adopts the parties' proposed construction and shall construe "exact copy" to mean "*a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas*."

**b)     "hidden areas" and "hidden area"**

The parties agree that the terms "hidden areas" and "hidden area," which appear in claims 1–9, 13–18, and 20–21, should be construed as "an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay." (*Id.*)

The undersigned hereby adopts the parties' proposed construction and shall construe the terms "hidden area" and "hidden areas" and to mean "*an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay*."

**c)     "user controllable switch"**

The parties agree that the term "user controllable switch," which appears in claims 1–9, 13–17, and 21, should be construed as "a switch that can be controlled by a user of the device." (*Id.*)

The undersigned hereby adopts the parties' proposed construction and shall construe the term "user controllable switch" to mean "*a switch that can be controlled by a user of the device*."

### d) "means for interfacing with a source drive"

For the term "means for interfacing with a source drive," which appears in claims 18 and 20, the parties agree that the function is "interfacing with a source drive" and the corresponding structure is "Source drive interface circuitry 1030, Interface connector 1040, and Drive cable 610 in Figs. 1 and 6, and equivalents thereof." (*Id.* at 4-5.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for interfacing with a source drive" as:

> **Function:** *interfacing with a source drive*
>
> **Structure:** *Source drive interface circuitry 1030, Interface connector 1040, and Drive cable 610 in Figs. 1 and 6, and equivalents thereof.*

### e) "means for interfacing with one or more destination devices"

For the term "means for interfacing with one or more destination devices," which appears in claims 18 and 20, the parties agree that the function is "interfacing with one or more destination devices" and the corresponding structure is "Destination drive interface circuitry 1050, Interface connector 1060, and Drive cable 630 in Figs. 1 and 6, and equivalents thereof." (*Id.* at 5.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for interfacing with one or more destination devices" as:

> **Function:** *interfacing with one or more destination drives*
>
> **Structure:** *Destination drive interface circuitry 1050, Interface connector 1060, and Drive cable 630 in Figs. 1 and 6, and equivalents thereof.*

**f)     "means [for] initiating the copying procedure"**

For the term "means [for] initiating the copying procedure," which appears in claims 18 and 20, the parties agree that the function is "initiating the copying procedure" and the corresponding structure is "a switch and equivalents thereof."  (*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means [for] initiating the copying procedure" as:

> *Function:*     *initiating the copying procedure*
>
> *Structure:*    *a switch and equivalents thereof.*

**g)     "means for comparing the size of the source device to the size of a destination device and communicating result to a user"**

For the term "means for comparing the size of the source device to the size of a destination device and communicating result to a user," which appears in claims 18 and 20, the parties agree that the function is "comparing the size of the source device to the size of a destination device and communicating result to a user" and the corresponding structure is "(a) processor 4010 or 7000 programmed to perform steps 3020, 3040, 3050 of Fig. 3, and (b) status LEDs 4020 in Fig. 4, or a printer, printer communication circuitry 1090 and printer communication interface 1100, and equivalents thereof."  (*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for comparing the size of the source device to the size of a destination device and communicating result to a user" as:

> *Function:*     *comparing the size of the source drive to the size of a destination device and communicating result to a user*
>
> *Structure:*    *(a) processor 4010 or 7000 programmed to perform steps 3020, 3040, 3050 of Fig. 3, and (b) status LEDs 4020 in Fig. 4, or a printer, printer communication circuitry 1090 and printer communication interface 1100, and equivalents thereof.*

h)      **"means for making an exact copy"**

For the term "means for making an exact copy," which appears in claims 18 and 20, the parties agree that the function is "making an exact copy" and the corresponding structure is "a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof." (*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for making an exact copy" as:

> **Function:**    *making an exact copy*
>
> **Structure:**    *a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof.*

i)      **"means for reading and comparing the data on the source and destination devices and communicating result to a user"**

For the term "means for reading and comparing the data on the source and destination devices and communicating result to a user," which appears in claims 18 and 20, the parties agree that the function is "reading and comparing the data on the source and destination devices and communicating result to a user" and the corresponding structure is "a processor programmed to perform step 3075 in Fig. 3, and equivalents thereof." (*Id.* at 6.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for reading and comparing the data on the source and destination devices and communicating result to a user" as:

> **Function:**    *reading and comparing the data on the source and destination devices and communicating results to a user*
>
> **Structure:**    *a processor programmed to perform steps 3075 in Fig. 3, and equivalents thereof.*

**j)    "means for indicating areas on a source device that were unreadable"**

For the term "means for indicating areas on a source device that were unreadable," which appears in claim 20, the parties agree that the function is "indicating areas on a source device that are unreadable" and the corresponding structure is "a processor 4010 or 7000, and status LEDs 4020 in Fig. 4, or a printer, Printer Communication Circuitry 1090 and Printer Communication Interface 1100, and equivalents thereof." (*Id.* at 6.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for indicating areas on a source device that were unreadable" as:

> **Function:**    *indicating areas on a source device that are unreadable*
>
> **Structure:**    *a processor 4010 or 7000, and status LEDs 4020 in Fig. 4, or a printer, Printer Communication Circuitry 1090 and Printer Communication Interface 1100, and equivalents thereof.*

**2.    Construction of Disputed Claim Terms**

**a)    "stand-alone, dedicated function [copying] device"**

The term "stand-alone, dedicated function [copying] device" appears in claims 1–9, 13–18, and 20–21 of the '086 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term should be afforded its plain and ordinary meaning: "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long term memory devices." | A physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long-term memory devices without additional hardware or software components, and not reconfigurable to perform any other function by an end user. | This is a limitation that should be given its plain and ordinary meaning: "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software [are] dedicated to making exact copies of long term memory devices." |

MyKey argues that this term is not a claim limitation and thus does not require construction because it appears in the preamble of independent claims 1 and 18 and the body of the claims recites a structurally complete invention without the preamble. (CMIB at 30.) MyKey asserts that if the undersigned determines this term is indeed a limitation, then its construction is preferable because Respondents add limitations to this term that are lacking in both the claims and specification. (*Id*. at 32; CMRB at 15.) To counter Respondents' added limitation of "not reconfigurable to perform any other function by an end user," MyKey points to the specification as reciting both an example of a prior-art stand-alone device that is reconfigurable, (CMIB at 32 (citing '086 patent at 1:48-57)), as well as reconfigurable aspects of the '086 invention, such as printing or bit pattern parameters, (*id*. at 33 (citing '086 patent at 10:22-27)). MyKey also disagrees with Respondents' inclusion of "without additional hardware or software components" to define "dedicated function" because the specification recites components such as a printer that connect to the device. (*Id*.)

Respondents argue that their inclusion of "without additional hardware or software components, and not reconfigurable to perform any other function by an end user" is consistent with the plain and ordinary meaning of the term "stand alone, dedicated function." (RMIB at 34.) In support, Respondents cite the Microsoft Computer Dictionary as defining "dedicated" as "devoted to a single task" and argue that their construction is consistent with MyKey's and Staff's construction of the same term in the '379 patent. (*Id*.) Furthermore, Respondents argue that MyKey's construction is erroneous because it proposes that any device can be a dedicated function device, including the prior art devices listed in their prosecution history, so long as one of those functions is copying. (RMRB at 22-23.) Respondents also argue that the specification defines prior art long-term memory devices as (1) dedicated stand-alone devices and (2) non-

dedicated devices that employ software on a PC, asserting that MyKey's invention is a sub-class of "dedicated stand-alone devices" that is uniquely "dedicated function" devices. (RMIB at 35 (citing '086 patent at 1:38-58).)

Staff argues that the phrase in the preamble of claims 1 and 18 "stand-alone, dedicated function" is a claim limitation because it was added during prosecution of the '086 patent to limit the claim scope. (SMIB at 40.) Staff argues that its construction of this limitation in the '086 patent is different from that in the '379 patent because (1) the patents are not of the same ancestry and (2) the '379 specification defines the phrase in detail whereas the plain meaning is sufficient for the '086 patent. (*Id*. at 40-41.) Staff disagrees with Respondents' assertion that Staff's construction is circular because one skilled in the art would understand the plain meaning of having "hardware and software dedicated to making exact copies of long term memory devices." (*Id*. at 42.) Further, Staff asserts that neither the claim language nor the specification require Respondents' additional limitations. (SMRB at 14-15.)

The undersigned finds Staff's arguments persuasive. This term is indeed a claim limitation, despite appearing in the preamble, because deletion of the preamble "phrase does [affect] the structure or steps of the claimed invention." *Catalina Mktg., Int'l v. Coolsavings.com*, 289 F.3d 801, 809 (Fed. Cir. 2002). Here, the specification of the '086 patent repeatedly refers to a "stand-alone, dedicated function device" as possessing particular attributes that are reflected in its structure. For instance, the invention is "operating system independent," ('086 patent at 2:19-20), portable, (*id.* at 9:64-65), and requires structure that can implement logic such that the "copying device does not require that the operator have any particular knowledge of the source device" (*id.* at 10:7-8; *see also id.* at Figs. 4-5 (disclosing structure of an operating-system independent preferred embodiment)). These excerpts from the specification

also support Staff's construction that the devices in claims 1 and 18 are "not a general purpose

computer system" that operates via operating system software. (*See also id.* at 10:31-39.)

MyKey's reliance on the '379 prosecution history carries little weight because the prosecution

history of that patent is extrinsic evidence to the '086 patent. *Phillips*, 415 F.3d at 1317 (holding

that extrinsic evidence is generally viewed as less reliable than the patent itself and its

prosecution history).

   For the reasons set forth below, Staff's construction (and MyKey's alternate proposed

construction) that claims 1 and 18 have "hardware and software [that] is dedicated to making

exact copies of long term memory devices" shall be adopted.  All parties agree that the claim

construction should include the language: "a physical device, which is not a general purpose

computer system, that stands apart from the source drive and the one or more destination devices

whose hardware and software is dedicated to making exact copies of long-term memory

devices." (JC at 6-7.)  Respondents, however, propose the inclusion of the additional phrase

"without additional hardware or software components, and not reconfigurable to perform any

other function by an end user."

   The '086 patent describes a stand-alone, dedicated function device that can be

reconfigured by a user, including reconfiguring it to perform variations on its functionality, such

as (1) copy only, (2) copy while scanning for one or more bit patterns, or (3) scanning only for

one or more bit patterns:

> Additionally, the copying device may be *configured* to
> display a report of the copying process and information
> about the devices involved.  The copying device may be 25
> *configured* to accept one or more bit patterns to scan during
> the copying process.  The copying device may be further
> *configured* to perform a scan only.

('086 patent at 10:22-27 (emphasis added).)  Thus, Respondents' proposal to add the language "not reconfigurable to perform any other function by an end user" is not persuasive.

Respondents' contention that the stand-alone, dedicated function [copying] device must perform its function "without additional hardware or software components" is also incorrect. The '086 patent describes the use of "additional components," such as a printer, that is used in conjunction with the stand-alone, dedicated function [copying] device to perform its function:

> For additional detailed status, a printer may be connected to the device through communication port 4120.  Information sent to the printer may include Drive identification information to uniquely identify the drive being copied. Should any errors occur, such as a bad sector on the Source disk, the sector number may be printed.

(*Id.* at 7:39-44; *see also id.* at 2:35-39, 2:47, Figs. 1 and 2.)  Therefore, Respondents' proposal to add the phrase "without additional hardware or software" shall also not be adopted.

Accordingly, the undersigned hereby construes "stand-alone, dedicated function [copying] device" according to its plain and ordinary meaning, which is "***a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software are dedicated to making exact copies of long term memory devices***."

> **b)** **"control circuit issuing commands to . . . read and compare data on the source and destination devices"**

The term "control circuit issuing commands to . . . read and compare data on the source and destination devices" appears in claims 1–9, 13–17, and 21 of the '086 patent.  The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| The claim term does not require construction and should be afforded its ordinary and customary meaning. | Commands are issued to the source and destination devices so that, on a unit by unit basis, each unit of data on the source device | This claim term does not require construction and should be given its ordinary and customary meaning, which is: "a circuit |

- 43 -

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| | is read and compared with each unit of corresponding data on the destination device. | coupled between the source interface and the destination interface(s), which issues commands to read the data from the source drive, read the data from the destination device(s), and compare the data read from the source drive with the data read from the destination device(s)." |

MyKey argues that this claim term does not require construction because its meaning is apparent to one skilled in the art. (CMIB at 34.) MyKey asserts that Respondents' construction improperly limits the claim to a single embodiment as the claim itself and specification do not require a "unit by unit" comparison. (*Id.* at 35.) MyKey cites the specification as not restricting the reading function to a particular embodiment because it states that "[a]s technology evolves, the preferred embodiment of this invention is likely to as well." (*Id.* (quoting '086 patent at 9:14-15).) As an example, MyKey proposes that the present invention could compare data using a hash checksum algorithm or by reading the error code of the destination device. (*Id.*) MyKey also rejects the Staff's construction because it improperly limits the claim to a specific type of comparison between source and destination devices where *all* data must be compared. (*Id.* at 36.) Rather, MyKey supports a broad conception of "read and compare" where only some of the drives' data can be compared. (*Id.*)

Respondents argue that their construction clarifies that data are read and compared on a unit-by-unit basis. (RMIB at 43.) Respondents cite the specification as stating that "every byte in every sector" of the source drive is read and compared to the corresponding byte/sector in the destination drive. (RMIB at 43 (quoting '086 patent at 6:17-22, Fig. 3).) Respondents also argue that the device makes an exact copy, requiring the device to read and compare the entire copy. (*Id.* at 44.) Respondents assert that MyKey's arguments are erroneous because MyKey fails to

provide a construction for the disputed term and MyKey's examples, including comparing a hash checksum, ignore the claim limitation that the comparison be made using "data on" the drives. (RMRB at 39.)

Staff agrees with MyKey that Respondents improperly narrow the claim via its "unit by unit" limitation because that limitation is neither required by the claim nor the specification. (SMIB at 43.)  Rather, Staff asserts that the claim merely requires that the device compare the data without restriction on the particular manner of doing so, agreeing with MyKey's alternative examples of data comparison.  (*Id.*)  However, Staff asserts that MyKey's construction is too broad because the specification requires that the data are copied exactly from the storage device, which means *all* data stored on the storage device.  (*Id.* at 44 (citing '086 patent at 6:16-20).)

The undersigned agrees with Staff's construction, which is consistent with the specification's description of the device's reading and comparing control circuitry.  *Phillips*, 415 F.3d at 1313.  The specification does not limit this term to a particular embodiment, thereby precluding Respondents' construction that the data must be compared on a unit-by-unit basis. ('086 patent at 9:7-15.)  That the '086 patent only discloses an embodiment with a unit by unit comparison is not determinative of this issue.  *See Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("even when a patent describes only a single embodiment, claims will not read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction.").  The language in the construction adopted herein that the "circuit [is] coupled between the source interface and the destination interface(s)" is accurate in light of the general structure of the device as disclosed in Figure 6 of the '086 patent.

- 45 -

Additionally, the undersigned finds that the construction adopted requires the conclusion

that the device reads and compares *all* of the data on the source and destination drives because of

the parties' agreed construction of "exact copy," a term appearing in independent claim 1.  ('086

patent at 10:56.)

Accordingly, the undersigned hereby construes "control circuit issuing commands to . . .

read and compare data on the source and destination devices" as "***a circuit physically coupled***

***between the source interface and the destination interface(s), which issues commands to read***

***the data from the source drive, read the data from the destination device(s), and compare the***

***data read from the source drive with the data read from the destination device(s)***."

> c)       **"control circuit issuing commands to . . . restore the source
> drive to its original condition"**

The term "control circuit issuing commands to . . . restore the source drive to its original

condition" appears in claims 1–9, 13–17 and 21 of the '086 patent.  The parties disagree on the

proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This claim term does not require construction and should be afforded its plain and ordinary meaning, which is "a circuit coupled between the source interface and the destination interface(s), which issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive." | Commands are issued to the source drive, automatically after copying, to restore the drive to its unaltered state after the source device has been altered to provide access to hidden areas. | Plain and ordinary meaning, which is "a circuit coupled between the source interface and the destination interface(s), which issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive." |

MyKey argues that its construction, in agreement with Staff's, is the plain and ordinary

meaning of the claim term.  (CMIB at 38.)  MyKey asserts that Respondents' inclusion of the

limitation "*automatically* after copying" (emphasis added) is improper as neither the claim nor

the specification require automatic commands after copying. (*Id.*)  Rather, MyKey argues that

the '086 patent's specification discloses one embodiment where such commands are issued *prior*

to copying and another where verification can be cancelled by the user, precluding automatic

operation. (*Id.* (citing '086 patent at 4:54-58, 5:13-19).)  Similarly, MyKey asserts that

Respondents' construction is wrong to require that the verification commands are issued after the

copying commands because the intrinsic evidence has no such limitation. (*Id.* at 39.)

      Respondents argue that their construction is similar to Staff's except that the restore

commands are issued automatically after copying. (RMIB at 45.)  One reason for the

"automatic" limitation, Respondents argue, is the '086 patent's criticism of devices that do not

automatically copy and restore. (*Id.* at 45-46.)  Respondents also stress that the order of the

copying, verification, and restoration steps is important because, otherwise, the device would not

restore all changes properly. (*Id.*)  Further, Respondents argue that MyKey is wrong to imply

that the fact that a command can be cancelled is tantamount to the command never having been

issued. (*Id.* at 46.)

      Staff agrees with MyKey that the plain and ordinary meaning of this claim term suffices,

and that MyKey's and Staff's constructions properly include "the power-on restoration

embodiment" where restoration of HPA areas occurs after a power on/off cycle. (SMIB at 48-49

(quoting '086 patent at 4:54-58).)  Staff disagrees with Respondents' construction because

although it is consistent with the specification, the intrinsic evidence does not require the

"automatic" limitation. (*Id.* at 49.)  However, Staff agrees with Respondents' argument that the

phrase "original condition" in claim 1 requires the restoration operation to be performed *after* the

hidden area is accessed to allow for copying. (*Id.* at 50.)

The undersigned agrees with Staff's construction, finding its proposed construction does not improperly limit the device to automatic restoration. *Vitronics*, 90 F.3d at 1580 (holding that the plain meaning of a claim term controls unless the patentee disavows that full scope of a claim term in the intrinsic evidence). The undersigned also agrees with Staff's construction including the language "a circuit coupled between the source interface and the destination interface(s)" because that language is consistent with the general, broad device design disclosed in the '086 patent where there are three basic elements, as shown in Figure 6 (*i.e.*, the source disk drive, the copying device, and the destination disk drive). ('086 patent at Fig. 6.) Similarly, the plain meaning of drive restoration as defined in the intrinsic evidence, such as at column 4, lines 54 through 61 of the '086 patent, parallels the following language in Staff's construction: ". . . issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive."

The undersigned disagrees with Respondents that the criticism of non-automatic verification in the prior art requires that the present invention include automatic verification after copying. The Federal Circuit has stated that "even a direct criticism of a particular technique [does] not rise to the level of clear disavowal." *Thorner v. Sony Computer Entm't Am. LLC*, 699 .3d 1362, 1366 (Fed. Cir. 2012) (citing *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)). Here, the criticism of non-automatic verification processes in the prior art does not rise to a clear disavowal of those processes that would warrant Respondents' claim construction. *Id.* Furthermore, Staff's construction, unlike Respondents', properly allows for the "power-on restoration embodiment," which may be *manually* enacted by the user powering on and off the device. ('086 patent at 4:54-58.)

The undersigned agrees with Staff and Respondents that the phrase "original condition" in claim 1 requires the restoration operation to be performed *after* the hidden area is accessed to allow for copying. The '086 patent discloses restoration occurring after copying, which is the logical progression of operations for this art. (*E.g.*, '086 patent at 4:64-65 ("Under normal circumstances, our device would make the change, copy the data, and restore the DCO to its original configuration."), claims 1, 18 (reciting the restoration function or structure after the copying function or structure).)

Accordingly, the undersigned hereby construes "control circuit issuing commands to . . . restore the source drive to its original condition" as "*a circuit coupled between the source interface and the destination interface(s), which issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive.*"

> d)    **"means for opening hidden areas on the source device"**

The term "means for opening hidden areas on the source device" appears in claims 18 and 20 of the '086 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term is subject to 35 U.S.C. § 112(6). | This term is subject to 35 U.S.C. § 112(6). | This term is subject to 35 U.S.C. § 112(6). |
| **Function**: opening hidden areas on the source device. | **Function**: opening hidden areas on the source device. | **Function**: opening hidden areas on the source device. |
| **Structure**: a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive. | **Structure**: Respondents contend that this element lacks sufficient structure and so violates 35 U.S.C. § 112. | **Structure**: a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive. |

MyKey argues that the specification discloses sufficient structure for implementing the
claimed function – *i.e.*, "a processor programmed to issue a temporary change command to the
source instructing the device to make its hidden area temporarily accessible to the copying
device." (CMIB at 40-41 (citing '086 patent at Figs. 1, 4, 5, and 6, 4:54-61); CMRB at 25.)
MyKey agrees with Staff that the cases relied upon by Respondents—who argue that the '086
patent improperly incorporates structure by reference—are clearly distinguishable from the
present case where sufficient structure is recited in the '086 patent's specification alone in the
form of a processor. (CMRB at 25-26.)

Respondents contend that this element lacks sufficient structure in violation of 35 U.S.C.
§ 112(6) because "a processor programmed as set forth in column 4 of the '086 patent" is
insufficient. (RMIB at 48.) That is, Respondents argue that "a bare processor, without
programming, does not satisfy § 112," and MyKey and Staff incorrectly rely on another patent
for programming to instruct that processor. (RMRB at 51.) Furthermore, Respondents assert
that MyKey's failure to disclose sufficient structure also renders claim 18 invalid as indefinite
under 35 U.S.C. § 112(2). (RMIB at 48.)

Staff argues that the relevant structure here is properly disclosed by the '086 patent.
(SMRB at 18-19.) Staff argues that the '086 patent indicates that there is a temporary change
command that allows a HPA hidden area to be made accessible, (SMIB at 52 (citing '086 patent
at 4:54-61)), and the DCO hidden area is accessible without such command, (SMRB at 19 (citing
'086 patent at 4:47-58)). Thus, "unhiding" the data requires using a processor to instruct the
source drive to report its true size. (*Id.* (citing '086 patent at 4:47-58).) Further, Staff argues that

the '388 provisional patent application[11] that is incorporated in the '086 patent by reference, also supports this reading. (*Id.*)

For the reasons set forth below, the undersigned adopts MyKey's and Staff's construction. It is well known in the art of computer engineering that the function of opening hidden areas on a source drive is accomplished via a processor programmed to unhide those areas. (*E.g.*, '086 patent at 4:46-64, Fig. 5.) The '086 patent clearly contemplates the device opening hidden areas on the source drive by issuing commands, and the processor disclosed therein is sufficient structure for opening those areas—as exemplified by the Intel 80386 EX embedded processor disclosed in Figure 5. (*Id.*) The undersigned believes that reference to other documents, such as the '388 application, is not necessary for one skilled in the art to practice the invention. (*Id.*)

Accordingly, the undersigned hereby construes "means for opening hidden areas on the source drive" as:

> **Function:**  *opening hidden areas on the source drive*
>
> **Structure:**  *a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive.*

> **e)**  **"means for restoring the source device to its original condition"**

The term "means for restoring the source device to its original condition" appears in claims 18 and 20 of the '086 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

---

[11] *See* '086 patent at 5:5-12 for a discussion of the '388 provisional patent application.

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term is subject to 35 U.S.C. § 112(6). | This term is subject to 35 U.S.C. § 112(6). | This term is subject to 35 U.S.C. § 112(6). |
| **Function**: restoring the source device to its original condition. | **Function**: restoring the source device to its original condition. | **Function**: restoring the source device to its original condition. |
| **Structure**: processor programmed as set forth in 4:54-60 of the '086 patent OR processor and flash memory, where the processor is programmed (1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and (2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and (3) to instruct the source drive(s) to restore itself to the original configuration. | **Structure**: Respondents contend that this element lacks sufficient structure and so violates 35 U.S.C. § 112. | **Structure**: processor and flash memory, where the processor is programmed (1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and (2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and (3) to instruct the source drive(s) to restore itself to the original configuration. |

MyKey argues that one skilled in the art would find that the '086 patent provides sufficient structure for the disputed term.  (CMIB at 44 (citing '086 patent at 4:54-58, Figures 1, 4-6).)  MyKey asserts that for HPAs, such structure is a processor that instructs the drive to either make its hidden area available or power on and off the drive so that it is restored to its original state—with the areas hidden again—when powered back on.  (*Id.*)  Similarly, MyKey asserts that for DCOs, where a temporary change command is inapplicable, such structure is a processor and flash memory where the processor issues commands to retrieve and change

command settings and the memory stores the drive's original settings with a unique identifier for
the drive.  (*Id.* at 45.)

Respondents argue that the '086 patent at column 4, lines 54-60 provides insufficient
structure for this disputed claim term.  (RMIB at 50.)  Respondents assert that the specification
acknowledges the technical problems associated with restoring DCO areas but fails to disclose
how a permanent change to that device—*i.e.*, opening a DCO area—is undone.  (*Id.*)
Respondents conclude that the specification fails to disclose a processor structure that is
programmed to restore DCO areas.  (*Id.*; RMRB at 61.)

Staff argues that the '086 patent discloses sufficient structure for restoring HPA and DCO
areas and also discloses how to program that structure to restore the source drive.  (SMIB at 57.)
Staff asserts that the specification states that the invention uses the method or algorithm
disclosed in the '388 application for both HPA and DCO areas, but reference to the '388
application is not required to define the structure in the claim as the '086 patent alone is
sufficient.  (SMIB at 57; SMRB at 22).  That is, Staff contends that the '086 patent correctly
*identifies* the structure required by § 112(6) for this claim term and Respondents are incorrect to
require that the patent fully *describes* the structure without reference to incorporated documents.
(SMRB at 23-24.)  Staff asserts that a processor and flash memory are properly disclosed such
that one skilled in the art would be able to use the algorithm in the '086 patent to program the
processor.  (SMIB at 60.)

For the reasons set forth below, the undersigned adopts Staff's construction.  The
specification recites the technical problem of restoring DCO and HPA areas and one skilled in
the art of computer engineering reading the '086 patent would understand how to create a
program operating on processor and flash memory structures that solves the problem.  ('086

patent at 4:54-61.)  That is, in light of the patent's description of accessing both DCO and HPA hidden areas in column 4, lines 54-61, one skilled in the art could program a processor and flash memory to restore hidden areas according to the steps listed in Staff's construction of this term. (*Id.*)  The undersigned believes that reference to other documents such as the '388 application is not necessary for one skilled in the art to practice the invention.  (*Id.*)

Accordingly, the undersigned hereby construes "means for restoring the source device to its original condition" as:

> **Function:**   ***restoring the source to its original device***

> **Structure:**   ***processor and flash memory, where the processor is programmed (1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and (2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and (3) to instruct the source drive(s) to restore itself to the original configuration.***

## IV.    THE '379 PATENT

### A.    Overview

The '379 patent is entitled "Systems And Methods For Removing Data Stored On Long-Term Memory Devices."  The '379 patent issued on June 5, 2007 to named inventors Steven Bress, Dan Bress, Mike Menz, and Mark Joseph Menz, and was subsequently assigned to MyKey.  The '379 patent describes an application-specific device for erasing data from a long-term storage device.  (*See* '379 patent at Abstract.)  The '379 patent has 3 claims of which MyKey has asserted independent claim 1 and dependent claim 2.  These claims read as follows (with the first instance of the agreed-upon terms highlighted in *italics* and the first instance of the disputed terms highlighted in **bold**):

1.    A **stand-alone, dedicated function device** for removing data from a long-term memory component, comprising: an interface for connecting the stand-alone, dedicated function device to the long-term memory component; a control circuit configured to control the long-term memory component through the interface to **irretrievably remove data** from the long-term memory component without regard to data content or data storage format of the data on the long-term memory component by overwriting the data of the long-term memory component; a *user controllable switch* that, when actuated by a user, causes the control circuit to commence irretrievably removing all the data from the long-term memory component; a casing configured to contain the control circuit and the interface, the casing being of a size that is portable by the user; a power supply configured to supply power to the control circuit; wherein **the control circuit is further configured to open a *hidden storage area* on the long-term memory component before irretrievably removing the data**.

2.    The device of claim 1, wherein the control circuit opens a hidden storage area without user intervention.

### B.    Agreed-Upon and Disputed Claim Terms

#### 1.    Construction of Agreed-Upon Claim Terms

##### a)    "hidden storage area"

The parties agree that the term "hidden storage area," which appears in claims 1 and 2, should be construed as "an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay." (JC at 10.)

The undersigned hereby adopts the parties' proposed construction and shall construe "hidden storage area" to mean "*an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay*."

##### b)    "user controllable switch"

The parties agree that the term "user controllable switch," which appears in claims 1 and 2, should be construed as "a switch that can be controlled by a user of the device." (*Id.*)

The undersigned hereby adopts the parties' proposed construction and shall construe

"user controllable switch" to mean *a switch that can be controlled by a user of the device*."

### 2.   Construction of Disputed Claim Terms

#### a)   "stand-alone, dedicated function device"

The term "stand-alone, dedicated function device" appears in claims 1 and 2 of the '379

patent.  The parties disagree on the proper claim construction and have proposed the following

constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term should be afforded its plain and ordinary meaning: "a physical device, which is not a general purpose computer system, that stands apart from a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component." | A physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to irretrievably remove data from a long-term memory without additional hardware or software components, and not reconfigurable to perform any other function by an end user. | A physical device which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices and is dedicated to irretrievably remove data from a long-term memory without additional hardware or software components, and not reconfigurable to perform any other function by an end user. |

MyKey argues that Respondents' and Staff's constructions are erroneous because the

specification gives examples of how the device can have more than a single function, citing the

Logicube example in the '086 patent and optional formatting, copying, partitioning, and printing

functions in the '379 specification.  (CMIB at 47-49 (citing '379 patent at 10:64-11:6).)  MyKey

asserts that the prosecution history does not preclude multiple functions because the applicants

merely distinguished the device from a general purpose computer.  (*Id.* at 48; CMRB at 32.)

Further, MyKey argues that this term includes reconfigurable devices because the specification

discloses reconfiguration to perform partitioning, copying, formatting, multiple device erasure,

and to accommodate various interfaces and cleaning levels.  (CMIB at 49; CMRB at 33-34.)

- 56 -

Respondents argue that MyKey's position is inconsistent with statements made in the prosecution history.  (RMIB at 51-52.)  For example, during prosecution, the applicants stated that "[they] understand 'dedicated function' to mean a device that is configured at the factory for a specific purpose . . . [and] does not allow a user to change its functionality."  (RMRB at 64 (citing to August 8, 2006 Amendment and quoting Applicants stating they "understand 'dedicated function' to mean a device that is configured at the factory for a specific purpose.").)  Respondents conclude that these statements mean that the single-function claimed device is not able to be reconfigured by a user.  (RMIB at 53.)  Respondents argue that MyKey's conclusion that any device can be a dedicated function device so long as one of the functions is erasing is illogical because it dismisses the words "dedicated function."  (RMRB at 62.)  Further, Respondents disagree with MyKey's argument that the device has multiple functions like partitioning and copying because that is a breakdown of the device's single function into sub-functions.  (*Id.* at 63.)

Staff asserts that the applicants of the '379 patent disclaimed that the device could be reconfigured during prosecution.  (SMIB at 26.)  Staff points to applicants' argument that their device contrasts with that in the Holzhammer reference that includes a personal computer system and conventional operating system.  (*Id.* at 28.)  Staff notes that because that argument by applicants did not overcome the rejection, they further limited the scope of the device by arguing that "stand-alone [means] all the hardware, logic and circuitry necessary to perform a task . . . dedicated function [means] a device that is configured at the factory for a specific purpose . . . [and] does not allow a user to changes [sic] its functionality."  (*Id.* at 28-29.)  Staff argues that MyKey's examples of reconfiguration, such as changing the cleaning level, relate to the single function of data removal and thus, do not actually require device reconfiguration, while the

printing and graphical display options do not perform data removal and are not part of the stand-alone device.  (*Id.* at 30.)

The undersigned finds MyKey's arguments persuasive.  The prosecution history clarifies that "stand-alone [means] all the hardware, logic and circuitry necessary to perform a task" and "dedicated function [means] a device that is configured at the factory for a specific purpose . . . [and] does not allow a user to changes [sic] its functionality."  (MyKey Ex. 10, Amendment (Aug. 4, 2006) at 13.)  Here, "stand-alone" means that the device may operate independent of additional hardware—such as a general purpose computer—to perform the device's main function of erasing a drive.  (*Id.*)  However, there is no limitation on the possibility of additional hardware or software components to achieve ancillary functions such as device control, partitioning, or formatting the target drive. (*See* '379 patent at 10:64-11:6.)  "Stand-alone" also means that the device is operating system independent and thus, is not a general purpose computer.  (*Id.* at Abstract.)  Similarly, while "dedicated function" requires that the device is always capable of performing its essential function of drive erasure, that term does not preclude that aspects of the device may be reconfigured to perform optional functions.  (*Id.* at 10:64-11:6); *Thorner*, 699 F.3d at 1366.  Staff and Respondents are incorrect to argue that the functions disclosed at column 10, line 64 *et seq.* are sub-functions of the device's single function of erasing data from a long-term device.  This argument is incorrect because the optional functions of partitioning and formatting are not included in claim 1 and thus, are not sub-functions required for the device to perform its dedicated function of drive erasure.  (*See* '379 patent at 12:22-44.)

Accordingly, the undersigned hereby construes "stand-alone, dedicated function device" as "***a physical device, which is not a general purpose computer system, that stands apart from***

*a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component*."

> **b)** **"irretrievably remove data"**

The term "irretrievably remove data" appears in claims 1 and 2 of the '379 patent.  The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term does not require construction and should be afforded its plain and ordinary meaning, which is: "remove data permanently such that it may not be recovered by any known methods." | To eliminate previously recorded information such that it is unrecoverable, by doing more than merely writing one or more data patterns to the data areas. | Plain and ordinary meaning, which is: "remove data permanently such that it may not be recovered by any known methods." |

MyKey argues that Respondents' construction is limited to one of multiple embodiments where data are erased based on fuzzy data and jitter.  (CMIB at 50 (citing '379 patent at 8:21-39).)  MyKey argues that the specification discloses a simple cleaning embodiment that is inconsistent with Respondents' construction requiring multiple commands.  (*Id*. at 51 (citing '379 patent at 8:55-58).)  MyKey thus asserts that the claim language merely requires "irretrievably remov[ing] data" without regard to a particular removal method.  (CMRB at 36.)

Respondents argue that "irretrievably remove data" is not expressly defined by the specification, but various excerpts recite embodiments where removal involves more than just writing one or more data patterns to the data areas.  (RMIB at 53-54 (citing '379 patent at 2:47-63 (noting incomplete edge-data removal by overwriting the data with zeros), 8:1-18 (discussing jitter in addition to writing multiple times with multiple data patterns)).)  Respondents also cite the underlying Provisional Application Number 60/299,783 as describing alternative methods of eliminating data, such as applying a magnetic field to the disk, concluding that "irretrievably remove data" must mean something more than simple overwriting.  (*Id.* at 54-55.)

Staff argues that its construction does not cover a device that simply overwrites data patterns with data, (SMRB at 11), because the specification notes that there are conventional methods that allow some of the original data to be recovered, (SMIB at 32 (citing '379 patent at 2:30:67).) Staff contends that Respondents' construction is vague and begs the question whether there are any methods that do less than "writing one or more data patterns to the data areas." (*Id.* at 31.)

The undersigned finds Staff's arguments persuasive. The claim term "irretrievably remove data" in this case is to be accorded its plain and ordinary meaning. The citation by Respondents to various parts of the specification does not alter the plain and ordinary meaning of the claim term "irretrievably removing data."

Accordingly, the undersigned hereby construes "the control circuit is further configured to open a hidden area . . . before irretrievably removing data" as "***remove data permanently such that it may not be recovered by any known methods***."

> c) **"the control circuit is further configured to open a hidden area . . . before irretrievably removing data"**

The term "the control circuit is further configured to open a hidden area . . . before irretrievably removing data" appears in claims 1 and 2 of the '379 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| Plain and ordinary meaning | The control circuit automatically opens a hidden storage area on the long-term memory component before irretrievably removing the data in response to the user's actuation of the switch to command the irretrievable removal of all data | Plain and ordinary meaning |

MyKey argues that this claim term's meaning is apparent to one skilled in the art so a construction limiting the language to a particular embodiment is inappropriate. (CMIB at 51.) In particular, MyKey asserts that Respondents' construction, which limits the claim to an embodiment where the hidden areas are opened "automatically," is erroneous. (*Id.*) Rather, MyKey argues that the '379 patent's specification explicitly states that whether or not hidden areas are opened automatically is an optional implementation. (*Id.* at 52 (citing '379 patent at 10:51-60); CMRB at 36-37.) MyKey also argues that Respondents' language regarding the "user controllable switch" is superfluous in light of other language in claim 1. (CMIB at 52.)

Respondents contend that in light of the specification and prosecution history, this term requires that the hidden storage areas are "automatically" opened. (RMIB at 59.) Respondents argue that this feature is "automatic" because the specification emphasizes that the operations of the device do not require specialized knowledge or operator training. (*Id.* at 59-60 (citing '379 patent at 11:15-40); RMRB at 69-70.) Respondents also argue that the prosecution history limits the invention to a single function that is easy to use via a single button that performs all operations. (RMIB at 60.)

Staff argues that this term does not require construction and/or should be given its plain and ordinary meaning. (SMIB at 35.) Staff rejects Respondents' construction because it adds limitations to a claim that is plain and clear on its face, (*id.*), and the specification's general statements about the device's simplicity do not rise to the level of a disclaimer of subject matter. (SMRB at 13.)

The undersigned finds MyKey's and Staff's arguments persuasive. The claim language would be understood by one skilled in the art to encompass a variety of embodiments where commands, such as opening hidden areas, may or may not be automatic. (*See* '379 patent at

10:51-55 ("In **_one implementation_**, cleaning device 300 may issue appropriate commands to target drives that contain hidden data to release the hidden data.  Cleaning device 300 **_may automatically_** issue these commands without the need for human intervention.") (emphasis added).)  Therefore, this claim term does not require construction and should be afforded its plain and ordinary meaning.  Respondents' construction both improperly limits the claim to a particular embodiment.  *See Laitram*, 863 F.2d at 865.  Contrary to Respondents' contentions, the general statements in the specification regarding the device's simplicity do not rise to the level of an express intent to limit the claim's scope.  *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).

Accordingly, the undersigned hereby construes "irretrievably remove data" in accordance with its plain and ordinary meaning.


**SO ORDERED.**


Charles E. Bullock
Chief Administrative Law Judge

- 62 -

IN THE MATTER OF CERTAIN COMPUTER FORENSIC      337-TA-799
DEVICES AND PRODUCTS CONTAINING THE SAME

<u>CERTIFICATE OF SERVICE</u>

I, Lisa R. Barton, hereby certify that the attached **ORDER NO. 45** has been served upon, **Daniel E. Valencia, Esq.**, Commission Investigative Attorney, and the following parties via first class mail and air mail where necessary on _____ May 9 _____, **2012.**

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, DC   20436

**FOR COMPLAINANT MyKEY TECHNOLOGY INC.:**

| | |
|---|---|
| James H. Lin, Esq. | (  ) Via Hand Delivery |
| **FREITAS, TSENG, BAIK & KAUFMAN LLP** | (  ) Via Overnight Mail |
| 100 Marine Parkway | ( ✓ ) Via First Class Mail |
| Suite 200 | (  ) Other:_____ |
| Redwood City, CA  94065 | |

**FOR RESPONDENTS GUIDANCE SOFTWARE, INC. & GUIDANCE TABLEAU LLC:**

| | |
|---|---|
| William C. Bergmann, Esq. | (  ) Via Hand Delivery |
| **BAKER & HOSTETLER LLP** | (  ) Via Overnight Mail |
| 1050 Connecticut Avenue NW | ( ✓ ) Via First Class Mail |
| Washington, DC  20036 | (  ) Other:_____ |

**FOR RESPONDENTS DIGITAL INTELLIGENCE, INC.:**

| | |
|---|---|
| Alejandro Menchaca, Esq. | (  ) Via Hand Delivery |
| **MCANDREWS, HELD & MALLOY, LTD** | (  ) Via Overnight Mail |
| 500 West Madison Street, 34th Floor | ( ✓ ) Via First Class Mail |
| Chicago, IL  60661 | (  ) Other:_____ |

**IN THE MATTER OF CERTAIN COMPUTER FORENSIC**
**DEVICES AND PRODUCTS CONTAINING THE SAME**

337-TA-799

**FOR RESPONDENTS YEC CO. LTD.:**

Lizbeth R. Levinson, Esq.
**KUTAK ROCK LLP**
1101 Connecticut Avenue, NW
Washington, DC  20036

( ) Via Hand Delivery
( ) Via Overnight Mail
( ✓ ) Via First Class Mail
( ) Other:_____

**FOR RESPONDENTS CRU ACQUISITIONS GROUP LLC & CRU-DATA PORT LLC:**

David Cooper
**KOLISCH HARTWELL, P.C.**
520 S.W. Yamhill Street, Suite 200
Portland, OR  97204

( ) Via Hand Delivery
( ) Via Overnight Mail
( ✓ ) Via First Class Mail
( ) Other:_____

**IN THE MATTER OF CERTAIN COMPUTER FORENSIC**          337-TA-799
**DEVICES AND PRODUCTS CONTAINING THE SAME**

<u>PUBLIC  MAILING  LIST</u>

Heather Hall                                            (  ) Via Hand Delivery
**LEXIS – NEXIS**                                       (  ) Via Overnight Mail
9443 Springboro Pike                                    ( ✓) Via First Class Mail
Miamisburg, OH  45342                                   (  ) Other:_____

Kenneth Clair                                           (  ) Via Hand Delivery
**THOMSON WEST**                                        (  ) Via Overnight Mail
1100 – 13th Street NW                                   ( ✓) Via First Class M ail
Suite 200                                               (  ) Other:_____
Washington, DC  20005