# EXHIBIT G-3

Information Disclosure Statement Under 37 C.F.R. § 1.97(b)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 3

If there is any fee due in connection with the filing of this Statement, please charge the fee to our Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____

Brian E. Ledell
Reg. No. 42,784

**26615**

PATENT TRADEMARK OFFICE

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800

Date:  May 27, 2003

MTI0000431

SHEET 1 OF 1

| INFORMATION DISCLOSURE CITATION PTO-1449 | | 26615 PATENT TRADEMARK OFFICE | ATTORNEY'S DKT No. 0032-0003 | | APPLICATION No. 09/961,417 |
| | | | APPLICANT(S) Steven BRESS et al. | | |
| | | | FILING DATE September 25, 2001 | | GROUP 2185 |

## U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NO. | DATE | NAME | CLASS | SUBCLASS | FILING DATE |
|---|---|---|---|---|---|---|
| MB | 6,516,999 B1 | 02-11-03 | Bélonoznik | 235 | 382 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

RECEIVED

MAY 2 8 2003

Technology Center 2100

## FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NO. | DATE | COUNTRY | CLASS | SUBCLASS | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| | |
| | |

| EXAMINER | DATE CONSIDERED 8-22-03 |
|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant(s).

MTI0000432

Patent
Attorney's Docket No. 0032-0003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of )
)
Steven BRESS et al. )            Group Art Unit: 2185
)
Application No.: 09/961,417 )    Examiner: Unassigned
)
Filed: September 25, 2001 )
)
For: WRITE PROTECTION FOR )
COMPUTER LONG-TERM )
MEMORY DEVICES )

RECEIVED

MAY 2 8 2003

Technology Center 2100

## INFORMATION DISCLOSURE STATEMENT TRANSMITTAL LETTER

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window, Mail Stop DD
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

Enclosed is an Information Disclosure Statement and accompanying form PTO-1449 for

the above-identified patent application.

☒    No additional fee for submission of the IDS is required.

☐    The fee of $180.00 as set forth in 37 C.F.R. § 1.17(p) is also enclosed.

☐    A certification under 37 C.F.R. § 1.97(e) is also enclosed.

☐    A certification under 37 C.F.R. § 1.97(e), a petition requesting consideration of

the information disclosure statement, and the petition fee of $130.00 as set forth

in 37 C.F.R. § 1.17(i) are also enclosed.

MTI0000433

Information Disclosure Statement Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

☐   Charge $ _____   to Deposit Account No. 50-1070 for the fee due.

☐   A check in the amount of $ _____   is enclosed for the fee due.

The Commissioner is hereby authorized to charge any appropriate fees under 37 C.F.R. §§ 1.16, 1.17 and 1.21 that may be required by this paper, and to credit any overpayment, to Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____

Brian E. Ledell
Reg. No. 42,784

26615
PATENT TRADEMARK OFFICE

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800

Date: May 27, 2003

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

## CHANGE OF ADDRESS/POWER OF ATTORNEY

FILE LOCATION    21X1    SERIAL NUMBER 09961417    PATENT NUMBER

THE CORRESPONDENCE ADDRESS HAS BEEN CHANGED TO CUSTOMER #  26615

THE PRACTITIONERS OF RECORD HAVE BEEN CHANGED TO CUSTOMER #  26615

ON 05/23/03 THE ADDRESS OF RECORD FOR CUSTOMER NUMBER  26615 IS:

> HARRITY & SNYDER, LLP
> 11240 WAPLES MILL ROAD
> SUITE 300
> FAIRFAX VA 22030

AND THE PRACTITIONERS OF RECORD FOR CUSTOMER NUMBER  26615 ARE:

39574    39996    41428    42784    43367    43417

RECEIVED

JUN 0 2 2003

Technology Center 2100

PTO INSTRUCTIONS: PLEASE TAKE THE FOLLOWING ACTION WHEN THE
CORRESPONDENCE ADDRESS HAS BEEN CHANGED TO CUSTOMER NUMBER:
RECORD, ON THE NEXT AVAILABLE CONTENTS LINE OF THE FILE JACKET,
'ADDRESS CHANGE TO CUSTOMER NUMBER'. LINE THROUGH THE OLD
ADDRESS ON THE FILE JACKET LABEL AND ENTER ONLY THE 'CUSTOMER
NUMBER' AS THE NEW ADDRESS. FILE THIS LETTER IN THE FILE JACKET.
WHEN ABOVE CHANGES ARE ONLY TO FEE ADDRESS AND/OR PRACTITIONERS
OF RECORD, FILE LETTER IN THE FILE JACKET.
THIS FILE IS ASSIGNED TO GAU 2187.

PTO-FMD
TALBOT-1/97

MTI0000435



MTI0000436

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

May 16, 2011

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

**APPLICATION NUMBER:** *09/961,417*
**FILING DATE:** *September 25, 2001*
**PATENT NUMBER:** *6,813,682*
**ISSUE DATE:** *November 02, 2004*

By Authority of the
**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

T. WALLACE

**Certifying Officer**

PART (2) OF (2) PART(S)

MTI0000437

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **Notice of References Cited** | | 09/961,417 | BRESS ET AL. |
| | | Examiner | Art Unit | |
| | | NGOC V DINH | 2187 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-6,336,187 | 01-2002 | Kern et al. | 713/161 |
| | B | US-6,446,209 | 09-2002 | Kern et al. | 713/193 |
| | C | US-5,991,402 | 11-1999 | Jia et al. | 705/59 |
| | D | US-6,126,070 | 10-2000 | Fukuzumi, Tomoya | 235/380 |
| | E | US-6,230,288 | 05-2001 | Kuo et al | 714/38 |
| | F | US-6,216,205 | 04-2001 | Chin et al | 711/131 |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

MTI0000438

US006336187B1

(12) **United States Patent**
Kern et al.

(10) Patent No.: **US 6,336,187 B1**
(45) Date of Patent: **Jan. 1, 2002**

(54) **STORAGE SYSTEM WITH DATA-DEPENDENT SECURITY**

(75) Inventors: **Robert Frederic Kern; Mark Anthony Sovik**, both of Tucson, AZ (US)

(73) Assignee: **International Business Machines Corp.**, Armonk, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/096,962**

(22) Filed: **Jun. 12, 1998**

(51) Int. Cl.[7] .......................................... G06F 1/24
(52) U.S. Cl. ..................... **713/161**; 713/165; 713/168; 713/200
(58) Field of Search ....................................... 713/161, 168, 713/200, 165, 166, 193; 705/54; 707/9; 711/164

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,322,576 A | | 3/1982 | Miller ........................ 178/22.07 |
| 4,423,287 A | | 12/1983 | Zeidler ........................ 178/22.08 |
| 4,888,800 A | | 12/1989 | Marshall et al. ............. 380/21 |
| 4,947,318 A | * | 8/1990 | Mineo ........................ 713/200 |
| 5,070,528 A | | 12/1991 | Hawe et al. ................ 380/48 |
| 5,276,876 A | * | 1/1994 | Coleman et al. ............ 709/104 |
| 5,432,929 A | * | 7/1995 | Escola et al. ............... 707/9 |
| 5,436,972 A | * | 7/1995 | Fischer ...................... 380/286 |
| 5,455,863 A | | 10/1995 | Brown et al. ............... 380/23 |
| 5,469,556 A | * | 11/1995 | Clifton ...................... 711/163 |
| 5,557,765 A | | 9/1996 | Lipner et al. ............... 380/21 |
| 5,572,673 A | * | 11/1996 | Shurts ........................ 713/200 |
| 5,592,549 A | * | 1/1997 | Nagel et al. ................ 705/52 |
| 5,615,264 A | | 3/1997 | Kazmierczak et al. ....... 380/4 |
| 5,633,934 A | | 5/1997 | Hember ...................... 380/50 |
| 5,678,046 A | * | 10/1997 | Cahill et al. ............... 707/200 |
| 5,748,744 A | * | 5/1998 | Levy et al. ................. 380/52 |
| 5,857,021 A | * | 1/1999 | Kataoka et al. ............ 705/54 |
| 5,922,073 A | * | 7/1999 | Shimada .................... 713/200 |
| 5,996,075 A | * | 11/1999 | Matena ...................... 713/200 |
| 5,999,930 A | * | 12/1999 | Wolff ........................ 707/8 |

OTHER PUBLICATIONS

A. V. Le et al., "Method for Authenticating Key Data Set Records Using Message Authentication Codes", IBM Technical Disclosure Bulletin, vol. 34, No. 9, pp. 104–108, Feb. 1992.

* cited by examiner

*Primary Examiner*—Thomas R. Peeso
(74) *Attorney, Agent, or Firm*—Dan Hubert & Associates

(57) **ABSTRACT**

A host-independent storage facility selectively provides data-dependent security by initially storing a security key in association with a storage region, where that key must be presented by any host seeking access to the region. The storage system includes a storage controller coupled to a digital data storage and one or more hosts. Initially, the controller receives a set-access-key command from one of the hosts, identifying a storage region, an operation parameter identifying prohibited types of storage operations, and a reference access key. The controller stores the access key and the operation parameter in a reference location associated with the identified storage region. Later, the controller may receive storage access requests from the hosts. Requests include an identification of a requested storage region, an access type, and an input access key. In response, the controller retrieves the reference access key and operation parameter associated with the requested storage region. If the requested access type is not prohibited by the operation parameter, the controller executes the storage access request. Also, if the requested access type is prohibited by the retrieved operation parameter, the controller nonetheless executes the storage access request if the input and reference access keys match.

**17 Claims, 5 Drawing Sheets**



MTI0000439



FIGURE 1

MTI0000440



FIGURE 2



FIGURE 3

MTI0000441



FIGURE 4

U.S. Patent          Jan. 1, 2002          Sheet 4 of 5          US 6,336,187 B1



FIGURE 5

MTI0000443



FIGURE 6

FIGURE 7

MTI0000444

US 6,336,187 B1

1

# STORAGE SYSTEM WITH DATA-DEPENDENT SECURITY

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a digital data storage system with data dependent, rather than user dependent, storage security. More particularly, the invention concerns a data dependent storage facility implemented by a host-independent storage controller that selectively provides security for storage regions by initially storing access keys in association with the regions, where any host seeking access to the region must present the associated key.

### 2. Description of the Related Art

In many different working environments, there is a need to store great amounts of data. Consequently, mass data storage systems are more popular today than ever. Mass storage systems are implemented in magnetic tape drives, optical disks, magnetic "hard" disk drives, and the like. One commercially available mass storage system is the RAMAC storage subsystem, manufactured and sold by International Business Machines Corp. (IBM).

To get the most out of their mass storage systems, system administrators often configure a common storage for access by multiple different users. The common storage is often coupled to individual user computers by a server machine implementing a local or wide area network. The common storage may be a single device, but more often comprises many different physical storage devices. Some examples of multi-user mass storage systems are: (1) corporate Intranet systems accessed by employee users, (2) telephone records accessible by telephone operators (users) located around the state, nation, or world, (3) banking records accessed by remote customers (users) operating automatic teller machines, and (4) engineering design specifications or models accessed by engineers (users) working together on a technical project. A variety of other arrangements are also known.

In these systems, security of common storage is one difficult challenge facing storage system engineers. Since the common storage is effectively coupled to all users (via intermediate server machines), it is often necessary to consider the user's identity in deciding whether to provide (or deny) access to stored data. Some data may be suitable for all users to access, whereas other data may be only suitable for access by selected users. As an example, it may be desirable to provide all employees of the company access to the company's telephone directory stored on a common storage facility, while making personnel files available only to those in the human resources department.

Many known data security mechanisms address the security problem by operating a central host or server as an access gate. This is feasible since the server alone is attached to the common storage, therefore constituting a natural gate. In this arrangement, all access requests are routed through this server, which accepts or rejects each request according to the identity of the requesting user and the content of the request. The server implements its security features by running a security software program. As one variation of this arrangement, there may be multiple servers coupled to the common storage, with each server running the same security program under the same operating system. For example, each server may comprise an IBM model S/390 product using the MVS operating system, where each server is coupled to a RAMAC storage subsystem.

Although these storage configurations have proven satisfactory in many cases, they are not completely satisfactory

2

for some users. In particular, system expense can be high because of the need to purchase dedicated server machines. As an alternative, it can be more cost efficient to operate an existing host machine as the security gate, in addition to its existing functions in the system. However, this places a substantial burden on the host, making the host a bottleneck for user access of the common storage. In addition, the host's security duties retard unrelated application programs running on the host.

To relieve security duties of a common host or server, some systems couple each user or host computer directly to a component of the common storage, such as a storage controller, and shift security duties to the hosts. Advantageously, this direct-connect arrangement eliminates the cost of a central server. To uphold a consistent, universal security plan, each host in this arrangement must be running the same security program, regardless of which machine is accessing the common storage, access of each dataset must be limited to the same set of users. This approach is useful when all hosts use the same operating system, and can easily run identical security programs.

However, this configuration is not practical when the user/host computers employ a variety of incompatible operating systems. This situation is especially likely today because there are many different makes of computer, with each being particularly suited to certain applications. For example, access to common storage may be sought by all of the following machines: a WINDOWS based personal computer, a SUN workstation, a UNIX based computer, and a MVS based mainframe computer. With incompatible user/host machines, this direct-connect environment is unworkable because of the difficulty in implementing the identical security programs on the diverse platforms.

In summary, even though the foregoing arrangements constitute significant advances and may even enjoy widespread commercial success today, there are not completely adequate for some applications due to some unsolved problems.

## SUMMARY OF THE INVENTION

Broadly, the present invention concerns a storage system with storage security that is provided according to the storage region being accessed, rather than the user. The storage system of the invention selectively provides security for storage regions by initially storing an access key in association with the region, where that key must be presented by any host seeking access to the region.

The storage system includes a storage controller coupled to a digital data storage and one or more host computers. Initially, one of the hosts receives an allocate command from an application program, user, or other source. A reference access key of the allocate command is provided (generated) by the application requesting the storage allocation. The host allocates the requested storage and also issues a set-access-key demand to the controller. This command identifies the type of access protection (read, read/write), the storage region to be protected, and the reference access key to be used by the controller in gating access to the associated storage region. If the controller receives no set-access-key request for a given storage range, then the controller will not require any access key before accepting read or write operations involving that storage region.

Later, the controller may receive storage access requests from the hosts. Each request includes an identification of the requested storage region, an access type, and (if necessary) an input access key. In response, the controller retrieves any

MTI0000445

US 6,336,187 B1

3

reference access key and access type information associated with the identified storage region. If the storage region is access-key protected and the requester provided a matching key, then the operation is allowed. If the keys don't match (i.e., wrong key or no key provided), then the controller determines if the requested operation is protected; if not, the operation is allowed. If the operation is protected and the keys do not match, the operation is failed, and an error condition may be returned to the requesting host.

In one embodiment, the invention may be implemented to provide a method to provide security for storage regions by initially storing a security key in association with the region, where that key must be presented by any host seeking access to the region. In another embodiment, the invention may be implemented to provide an apparatus, such as a data storage system, providing storage security. In still another embodiment, the invention may be implemented to provide a signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital data processing apparatus to perform method steps for providing storage security.

The invention affords its users with certain distinct advantages. Advantageously, the invention provides data-dependent security implemented in a storage controller, enabling a variety of different host computers to have access to a common storage facility. With the invention, the hosts may run incompatible operating systems without sacrificing storage security. As another benefit, the invention is inexpensive because it implements data security measures using a storage controller rather than a separate server machine. Similarly, the invention does not burden the processing and input/output resources of existing host machines with security functions. The invention also provides a number of other advantages and benefits, which should be apparent from the following description of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of the hardware components and interconnections of a data storage system in accordance with the invention.

FIG. 2 is a block diagram of a digital data processing machine in accordance with the invention.

FIG. 3 shows an exemplary signal-bearing medium in accordance with the invention.

FIG. 4 is a flowchart showing operations performed to allocate data storage according to the invention.

FIG. 5 is a flowchart showing controller operations performed to process a storage access request according to the invention.

FIG. 6 is a flowchart showing host operations performed to initiate a storage access operation according to the invention.

FIG. 7 is a flowchart operations performed by a new host to join the data storage system of the invention.

DETAILED DESCRIPTION

The nature, objectives, and advantages of the invention will become more apparent to those skilled in the art after considering the following detailed description in connection with the accompanying drawings. As mentioned above, the invention concerns a data dependent storage facility implemented by a host-independent storage controller that selectively provides security for storage regions by initially storing a security key in association with the region, where that key must be presented by any host seeking access to the region.

4

Hardware Components & Interconnections
Storage System Overall Structure

One aspect of the invention concerns a data storage system, which may be embodied by various hardware components and interconnections as shown by the system 100 of FIG. 1. The system 100 includes multiple hosts 102–104, a controller 106, and one or more storage devices 108 ("storage"). The hosts 102–104 are coupled to the controller 106, and may also be coupled to each other by links 114–118. The hosts include respective host application programs 110–112.
p Hosts

Among other functions, the application programs 110–112 generate "storage access requests" seeking access to the storage 108. "Access" includes various types of operations, such as reading data from the storage 108, writing data to the storage 108, and the like. In the presently illustrated example, each storage access request includes the following components:

1) Identification of a target storage region, within the storage 108.

2) A requested access type, e.g., read or write.

3) If the requested access type is "write", data to be written.

4) An input access key, which is used by the controller 106 to determine whether the requesting application program should have access to the requested storage region.

The hosts 102–104 may comprise various hardware devices suitable to generate storage access requests, such as personal computers, mainframe computers, computer workstations, supercomputers, or other suitable machines. As in the illustrated embodiment, the hosts 102–104 may be running respective application programs 110–112, from which the need for storage access arises. According to one advantage of the invention, the hosts 102–104 may be running a variety of different operating systems (not shown), which may even be incompatible with each other. Some exemplary operating systems include MVS, UNIX, WIN-DOWS NT, etc.

The hosts 102–104 may be interconnected by communications links 114, 116, 118, such as wires, cables, fiber optic lines, wireless links, satellite, telephone lines, etc. Although not shown, the hosts 102–104 may include respective interfaces, such as ESCON links, small computer system interfaces (SCSIs), etc. The hosts 102–104 are also coupled to the controller 106 via a controller interface 120, such as an intelligent digital input/output communication channel, or other interface suitable to the particular application.
Controller

Generally, the controller 106 serves to receive storage access requests from the hosts 102–104 and implement them by passing appropriate commands to the storage 108. According to the invention, the controller 106 additionally operates as a gate, selectively accepting or refusing hosts' access requests by implementing a data security scheme. Since this scheme is implemented by the controller 106 rather than one or more hosts 102–104, the hosts are available for other tasks. Additionally, the controller's centrality and independence from the hosts 102–104 is conductive to access by hosts of many different operating systems.

The controller 106 includes a controller security module 122, which performs the controller's security functions. The security module 122 may comprise a hardware component, such as one or more computers, microprocessors, or other digital data processing apparatus. Alternatively, the security module 122 may be an application program comprising a

MTI0000446

US 6,336,187 B1

5

sequence of programming instructions executed by one or more processors of the controller 106. As an example, the controller 106 may be implemented by an IBM RAMAC controller, where the storage 108 comprises a RAMAC magnetic disk drive storage system.

Generally, before granting storage access to the hosts 102–104, the controller's gating function requires it to consult a "reference location" containing various information about storage regions in the storage 108. The controller 106 evaluates information in the reference location against contents of the storage access request to determine whether the request should be permitted. The contents and use of the reference location are discussed in greater detail below.

The reference location constitutes storage space accessible to the controller 106, and may be provided by data stored at the controller 106, as illustrated by the storage use map 124. Table 1 (below) depicts an example of the storage use map 124, in the form of a lookup table.

TABLE 1

Exemplary Storage Use Map

| STORAGE ACCESS REGION | REFERENCE ACCESS KEY | OPERATION PARAMETER |
|---|---|---|
| 00001 | 1 | WRITE |
| 00002 | 1 | WRITE |
| 00003 | 1 | WRITE |
| 00004 | NONE | NO SECURITY |
| 00005 | NONE | NO SECURITY |
| 00006 | 2 | READ/WRITE |
| 00007 | 2 | READ/WRITE |
| 00008 | NONE | NO SECURITY |

In the example of Table 1, the "storage access region" column identifies storage regions in the devices 108. The "reference access key" lists an access key with which the input access key must match in order for the storage access request to succeed. In this simplified example, reference access keys of "1" and "2" are provided for ease of explanation. For each storage access region, the associated "operation parameter" designates operations that are prohibited without the requesting host's application program submitting an input access key that matches the prescribed reference access key. As a variation, Table 1 may be condensed by listing abbreviated pointers to other storage locations that contain the actual values of storage access region, reference pointer, and/or operation parameter. Furthermore, Table 1 may be encrypted by controller 106 to secure the access key from accidental/malicious access.

As an alternative to the storage use map 124, the reference location may be located in another location, such as the storage 108 itself. For example, as discussed more thoroughly below, certain reference data associated with each storage region in the devices 108 may be stored in the actual storage region itself. Furthermore, whether stored in the controller 106, storage 108, or elsewhere, the reference location may be provided by a variety of other data structures, such as linked lists, relational databases, lookup tables, etc.

Storage

As explained above, the storage 108 serves to store user data in the system 100, and may also contain one or more reference locations containing security data. The storage 108 may be implemented by one or more storage devices of various types, such as magnetic disk drive, magnetic tape, optical disk, optical tape, semiconductor memory, or any other suitable digital data storage medium. The storage 108 may be configured as a single "logical" device, where data

6

is actually stored on separate physical devices. As a specific example, the storage 108 may be implemented by an IBM RAMAC disk drive system, of which the controller 106 is one component.

Exemplary Digital Data Processing Apparatus

Another aspect of the invention concerns a digital data processing apparatus, implementing a host-independent storage facility that selectively provides data-dependent access by initially storing an access key in association with a storage region, where that key must be presented by any host seeking access to the region. This apparatus may be embodied by various hardware components and interconnections, and may be implemented by the controller 106, for example.

FIG. 2 shows an example of one digital data processing apparatus 200. The apparatus 200 includes a processor 202, such as a microprocessor or other processing machine, coupled to a storage 204. In the present example, the storage 204 includes a fast-access storage 208, as well as nonvolatile storage 206. The fast-access storage 208 may comprise random access memory, and may be used to store the programming instructions executed by the processor 202. The nonvolatile storage 206 may comprise, for example, one or more magnetic data storage disks such as a "hard drive", a tape drive, or any other suitable storage device. The apparatus 200 also includes an input/output 210, such as a line, bus, cable, electromagnetic link, or other means for exchanging data with the processor 202.

Despite the specific foregoing description, ordinarily skilled artisans (having the benefit of this disclosure) will recognize that the apparatus discussed above may be implemented in a machine of different construction, without departing from the scope of the invention. As a specific example, one of the components 206, 208 may be eliminated; furthermore, the storage 204 may be provided on-board the processor 202, or even provided externally to the apparatus 200.

Operation

In addition to the various hardware embodiments described above, a different aspect of the invention concerns a data dependent storage facility implemented by a host-independent storage controller that selectively provides security for storage regions by initially storing an access key in association with the region, where that key must be presented by any host seeking access to the region.

Signal-Bearing Media

In the context of FIGS. 1–2, such a method may be implemented, for example, by operating the controller 106, as embodied by a digital data processing apparatus 200, to execute a sequence of machine-readable instructions. These instructions may reside in various types of signal-bearing media. In this respect, one aspect of the present invention concerns a programmed product, comprising signal-bearing media tangibly embodying a program of machine-readable instructions executable by a digital data processor to perform a method to provide security for storage regions by initially storing an access key in the region, where that key must be presented by any host seeking access to the region.

This signal-bearing media may comprise, for example, RAM (not shown) contained within the controller 106, as represented by the fast-access storage 206. Alternatively, the instructions may be contained in another signal-bearing media, such as a magnetic data storage diskette 300 (FIG. 3), directly or indirectly accessible by the processor 202. Whether contained in the storage 204, the diskette 300, or elsewhere, the instructions may be stored on a variety of

US 6,336,187 B1

7

machine-readable data storage media, such as DASD storage (e.g., a conventional "hard drive" or a RAID array), magnetic tape, electronic read-only memory (e.g., ROM, EPROM, or EEPROM), an optical storage device (e.g. CD-ROM, WORM, DVD, digital optical tape), paper "punch" cards, or other suitable signal-bearing media including transmission media such as digital and analog and communication links and wireless. In an illustrative embodiment of the invention, the machine-readable instructions may comprise software object code, compiled from a language such as "C", etc.

Allocating Storage

FIG. 4 shows a sequence 400 performed to allocate space in the storage 108 according to the invention. For ease of explanation, but without any limitation intended thereby, the example of FIG. 4 is described in the context of the environment described above in FIGS. 1–3. The sequence is initiated in step 402, when one of the application programs 110–112 issues a request to its respective host 102–104 to allocate storage space. The allocation request may specify relevant aspects of the allocation operation, such as the type of storage device to be used (if the storage 108 contains different storage modes), etc. Allocated storage "regions" may correspond to any convenient unit of granularity, such as a disk sector, disk track, disk "extent", volume, address range, block, tape track, file, dataset, etc. Storage regions may also have user-specified sizes, in which event this additional characteristic may be included in the allocation request. If desired, one or more storage regions may comprise subsets of a larger data structure, such as a database, file, storage group, dataset, etc; advantageously, this embodiment facilitates different levels of security for subsets of a larger data structure.

In step 406, the application program 110–112 sets a desired level of security for the allocated storage. The types of security are also called "operation parameters", and in this example include (1) read and write prohibited, (2) write prohibited, and (3) no security, which may be a default value if no operation parameter is specified. With a read and write prohibited operation parameter, the controller 106 will prevent hosts from reading or writing the associated storage region unless the host presents a required access key. With a write prohibited region, as discussed in greater detail below, the controller 106 will prevent hosts from writing the storage region unless the host presents a required access key. Hosts may still read data from this storage region without presenting the associated access key. All hosts can freely read and write data from/to "no security" storage regions.

After step 406, the application program 110–112 generates an access key if some type of security was selected in step 406. This key constitutes a "reference" access key, to be stored in the reference location and used to evaluate future host access requests to this storage region, as explained below. The key may comprise an alphabetic, numeric, alphanumeric, or other machine-readable code that is unique with respect to other storage regions' access keys. As an example, the access key may comprise a 256-bit digital number, selected in accordance with a public key encryption scheme, used as discussed below. If the present storage allocation request seeks to extend an already-allocated storage region, step 408 may use the region's existing key instead of generating a new one.

After step 408, step 410 carries out the requested allocation operation. In step 412, the application 110–112 issues an allocation command to the host 102–104, commanding the host 102–104 to assign security and access key to a storage region of the appropriate size. In step 414, the host 102–104

8

assigns a storage region for the requesting application 110–112 and carries out the requested allocation by representing that storage region's allocation in a storage map (not shown). In addition, the host directs the controller 106 to associate the provided operation parameter (security level) and access key with the defined storage region. The host 102–104 may provide its directions to the controller 106, for example, by issuing a set-access-key command, which specifically directs the controller 106 to associate the access key and operation parameter with the allocated storage region.

Following step 414, in response to the host's set-access-key command, the controller 106 stores the operation parameter and reference access key in a prescribed reference location, in association with the allocated storage region. As mentioned above, one example of the reference location is the storage use map 124; in this embodiment, the controller 106 in step 416 stores the reference access key and operation parameter in the map 124. In another example, the reference location may comprise storage space in the allocated storage region itself; in this example, step 416 involves storing these items in the allocated storage region. For example, they may be stored at the first address of the allocated storage region, in a header, in a prefix or suffix, or in another easily retrievable location.

After step 416, the requested allocation is complete, and the sequence 400 ends in step 418. The allocated storage region is now available for access by the hosts 102–104.

Host Initiation of Storage Access Request

FIG. 6 shows a sequence 600 performed by an application 110–112 to initiate access of the storage 108. In response to these operations, as discussed below, the controller 106 performs various tasks to carry out the storage access. For ease of explanation, but without any limitation intended thereby, the example of FIG. 6 is described in the context of the environment described above in FIGS. 1–3. In this example, the sequence 600 is executed by the application program (e.g. 110–112) of the requesting host.

The sequence 600 begins in step 602 when the application program of the requesting host receives a data request. This request, for example, may constitute a request to read data from the storage 108 or store data to the storage 108. In the illustrated example, the data request may be received from a source such as another application program of the requesting host, a user terminal or other input device (not shown) coupled to the host, another computer coupled to the host, etc.

In response to the data request of step 602, the application program determines whether the data request is a "read" or "write" in step 604. After step 604, the application program generates an appropriate storage access request in step 606 or steps 608–610.

Namely, if the request is a "read", the application program in step 606 generates a read request in the form of a storage access request. If the request is a "write", the application program receives the data to be written in step 608, and then generates the write request in step 610.

In either case, the storage access request in this example includes the following components:

1) Identification of a target storage region, within the devices 108. This component may come with the data request received by the application program, e.g., identification of a particular storage device or partition, etc. As an alternative, the target storage region may be particularly identified by the application program or another facility of the host, for example.

2) A requested access type, e.g., read or write. This component is determined by step 604, discussed above.

MTI0000448

US 6,336,187 B1

9

3) If the requested access type is "write", data to be written. This component comes from step 608.

4) An "input" access type, which will be used by the controller 106 to determine whether the requesting host should have access to the requested storage region. As one example, the input access key may be provided to the requesting host's application program by the original source of the data request (step 602). If the storage access request does not seek access to storage space for which the requested operation type is otherwise prohibited, the input access key may be omitted.

After step 606 or 610, the application program in step 612 passes the generated storage access request to the controller 106. Passage may occur, for example, through the requesting host's operating system. Following step 612, the sequence 600 ends in step

**Controller Gating in Response to Host Storage Access Request**

FIG. 5 shows a sequence 500 performed by the controller 106 in response to the requesting host's storage access request, which the host submitted to the controller 106 in step 612 (FIG. 6). For ease of explanation, but without any limitation intended thereby, the example of FIG. 5 is described in the context of the environment described above in FIGS. 1–3. In this example, the controller's actions are executed by the security module 122.

The sequence 500 begins in step 502, which may occur when the controller 106 is powered up or otherwise activated. In step 504, the controller 106 receives the storage access request submitted by the requesting host (step 612, FIG. 6). As mentioned above, the storage access request includes identification of a target storage region, an operation type, write data (if the operation type is "write"), and an input access key (if the operation requests access that is otherwise prohibited).

In response to step 504, the controller 106 determines whether target storage region is protected, i.e., whether a reference location associates a reference access key with the target storage region. In the illustrated hardware environment, this is performed by the controller 106 consulting the storage use map 124. If the target storage region does not have an associated reference access key, this area has no security protection and further analysis is unnecessary. In this case, the routine 500 passes from step 506 to step 516, where the controller 106 directs the storage 108 to complete the requested operation. Following step 516, the sequence 500 ends in step 518.

If the target storage region is protected, however, step 506 advances to step 508. In step 508 the controller 106 determines whether the requested operation type is protected. Namely, the controller 106 consults the reference location to retrieve the operation parameter associated with the target storage region, and thereby determine which operation types are prohibited without submittal of the reference access key. In the illustrated hardware environment, step 508 is performed by the controller 106 consulting the storage use map 124 to determine whether the requested operation type (received in step 504) is prohibited. If the requested operation type is not prohibited, step 508 advances to step 516, where the controller 106 directs the storage 108 to complete the requested operation in step 516, and then the sequence 500 ends in step 518.

If step 508 finds the requested operation type to be prohibited, however, the routine 500 advances to step 510. In step 510, the controller 106 checks the host-submitted input access key (received in step 504) against the reference access key (found in the reference location, e.g. storage use

10

map 124). Step 510 involves comparing the input and reference access keys to see whether they match. If not, the input access key is not valid. In this case, the controller 106 returns an error condition to the requesting host in step 514. Otherwise, if the input access key matches the reference access keys, the input access key is valid, and the controller 106 directs the storage 108 to complete the requested operation in step 516. After steps 514 or 516, the sequence 500 ends in step 518.

As one enhancement to the embodiment described above, the controller 106 may direct the storage 108 to employ the reference access key in encoding or decoding data during the storage operation of step 516. In this embodiment, if the requested storage area is protected (i.e., it has an associated reference access key), and the host-submitted input access key is valid, the controller 106 uses the access key to encode or decode data involved in the storage access operation. The controller 106 may use either the input access key or the reference access key, since step 512 found them to be the same.

For example, if the requested operation type is a "read", the controller 106 uses the key to decode data from the requested storage region and then provides the decoded data to the requesting host. Analogously, if the requested operation type is a "write", the controller 106 uses the key to encode the write data supplied by the host and then stores the encoded data in the identified storage region. Encoding and decoding in this embodiment may use a number of different techniques that are well known to those in the relevant art. For instance, one useful technique is public key encryption. By using such encoding/decoding, stored data enjoys two levels of protection: (1) one level, by requiring the requesting host to submit a proper input access key to access the storage region, and (2) another level, by encoding data of the storage region with the key.

**Activate New Host**

FIG. 7 shows a sequence 700 performed by a new host in order to join the system 100, and participate in future allocation and/or data access requests. For ease of explanation, but without any limitation intended thereby, the example of FIG. 7 is described in the context of the environment described above in FIGS. 1–3. Generally, to add a new host, an application program of the new host obtains access keys for the storage regions of future accesses. In addition, the new host must configure its own interface (not shown) with the controller 106 to properly communicate the contents of a storage access request.

More particularly, after the sequence 700 begins in step 702, the new host's application program 110–112 obtains one or more access keys from a source such as other hosts 102–104, the controller 106, user input, system administrator, etc. This step is optional, however, since there may be no need or intention for the new host to access storage regions that are already protected. A host-host exchange of access keys may be conducted over the links 114, 116, 118, for example.

After step 704, the new host's application program reconfigures its interface with the controller in step 706. The new host's interface (not shown) may comprise an ESCON interface, small computer standard interface (SCSI), parallel or serial port, telephone modem, or any other digital data communications medium compatible with the particular embodiment of controller used in the system 100. In one example, the host interface may already be configured to receive storage access requests e.g., components such as identification of a target region, operation type, etc.; in this case, step 706 involves reconfiguring the host interface to

MTI0000449

US 6,336,187 B1

**11**

accept submittal of input access keys in the future. In the case of an ESCON interface, this may involve adding a new channel command word, or modifying an existing channel command word to accept an input access key. In the case of a SCSI interface, the SCSI protocol is modified in step 706 to accept the input access parameter.

Bypass

Optionally, an internal setting may be provided within the controller 106 to bypass the data access storage key checking in certain predefined environments or events. For example, bypass may be desirable during disaster recovery, backup, data migration, and other operations.

Reset Access Key & Operation Parameter

As an additional enhancement to the foregoing embodiment, the controller 106 may additionally recognize a "reset-access-key" command issued by hosts 102–104. The reset-access-key command directs the controller 106 to alter the access characteristics of an allocated storage region. An illustrative reset-access-key includes the existing reference access key, along with a replacement reference key and/or operation parameter for the storage region. In response, the controller 106 validates the provided reference key, and then proceeds to update its reference location (e.g., storage use map 124 or storage region itself). Otherwise, if the host-submitted access key is invalid, the controller 106 fails the reset request.

Other Embodiments

While the foregoing disclosure shows a number of illustrative embodiments of the invention, it will be apparent to those skilled in the art that various changes and modifications can be made herein without departing from the scope of the invention as defined by the appended claims. Furthermore, although elements of the invention may be described or claimed in the singular, the plural is contemplated unless limitation to the singular is explicitly stated.

What is claimed is:

1. A data security method for use in a storage system including a storage controller coupled to a digital data storage and one or more hosts, the storage containing one or more storage regions each associated with a reference access key, the storage also containing one or more storage regions without any associated reference access key, where the storage regions associated with reference access keys contain the associated reference access keys, the method comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of a requested storage region;

the controller determining whether the requested storage region is associated with a reference access key by reading at least some of the requested storage region to determine whether a reference access key is contained therein;

if the requested storage region is not associated with a reference access key, the controller executing the request;

if the requested storage region is associated with a reference access key, the controller determining whether the request includes an input access key by matching the associated reference access key;

if the request includes a matching access key, the controller executing the storage access request;

if the request lacks a matching access key, the controller aborting the storage access request.

2. A data security method for use in a storage system including a storage controller coupled to a digital data

**12**

storage and one or more hosts, the storage containing one or more storage region each associated with a reference access key, the storage also containing one or more storage regions without any associated reference access key, where the storage regions associated with reference access keys contain the associated reference access keys, the method comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of a requested storage region and an access type;

the controller determining whether the requested storage region is associated with a reference access key by reading at least some of the requested storage region to determine whether a reference access key is contained therein, and

if the requested storage region is not associated with a reference access key, the controller executing the request;

if the requested storage region is associated with a reference access key, the controller retrieving an operation parameter associated with the requested storage region and identifying prohibited access types for the requested storage region, and if the requested access type is not prohibited, executing the storage access request;

if the requested storage region is associated with a reference access key and the requested access type is prohibited, the controller determining whether the request includes an input access log matching the reference access key,

if the request lacks a matching access key, aborting the storage access request;

if the request includes a matching access key, the controller executing the requested storage access request.

3. A method for allocating space in a storage system including a storage controller coupled to a digital data storage and one or more hosts, the method comprising:

a first one of the hosts receiving an allocation request the allocation including:

an identification of a requested storage region;

a reference access key; and

an operation parameter identifying prohibited types of storage operations involving the requested storage region;

the first host responding to the allocation request by allocating the requested storage region;

only if the operation parameter identifies one or more prohibited storage operations,

the first host additionally issuing a set-access-key command to the controller; and

in response to the set-access-key command the controller storing the reference key and the operation parameter in a reference location in association with the allocated storage region.

4. The method of claim 3, the reference location being in the allocated storage region.

5. The method of claim 3, the reference location being a storage use map stored outside the requested storage region and containing all allocated storage regions' operation parameters and reference access keys.

6. The method of claim 3, the method further comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of the requested storage region, an access type, and an input access key;

US 6,336,187 B1

**13**

in response to the storage access request, the controller retrieving the reference access key and operation parameter; and

only if the requested access type is not prohibited by the retrieved operation parameter or the input access key of the request matches the retrieved reference access key, the controller executing the storage access request, otherwise aborting the request.

7. A signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital processing apparatus to perform a data security method in a storage system including a storage controller coupled to a digital data storage and one or more hosts, the storage containing one or more storage regions associated with access keys, the storage also containing one or more storage regions without associated access keys, where the storage regions associated with reference access keys contain the associated reference access keys, the method comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of a requested storage region;

the controller determining whether the requested storage region is associated with a reference access key by reading at least some of the requested storage region to determine whether a reference access key is contained therein,

if the requested storage region is not associated with a reference access key, the controller executing the request;

if the requested storage region is associated with a reference access key, the controller determining whether the request includes an input access key matching the associated reference access key;

if the request includes a matching access key, the controller executing the storage access request;

if the request lacks a matching access key, the controller aborting the storage access request.

8. A signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital processing apparatus to perform a data security method in a storage system including a storage controller coupled to a digital data storage and one or more hosts, the storage containing one or more storage regions each associated with a reference access key, the storage also containing one or more storage regions without any associated reference access key, where the storage regions associated with reference access keys contain the associated reference access keys, the method comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of a requested storage region and an access type;

the controller determining whether the requested storage region is associated with a reference access key by reading at least some of the requested storage region to determine whether a reference access key is contained therein, and

if the requested storage region is not associated with a reference access key, the controller executing the request;

if the requested storage region is associated with a reference access key, the controller retrieving an operation parameter associated with the requested storage region and identifying prohibited access types for the requested storage region, and if the requested access type is not prohibited, executing the storage access request;

**14**

if the requested storage region is associated with a reference access key and the requested access type is prohibited, the controller determining whether the request includes an input access log matching the reference access key,

if the request lacks a matching access key, aborting the storage access request;

if the request includes a matching access key, the controller executing the requested storage access request.

9. A signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital processing apparatus to perform a method to allocate space in a storage system including a storage controller coupled to a digital data storage and one or more hosts, the method comprising:

a first one of the hosts receiving an allocation request including:

an identification of a requested storage region;

a reference access key; and

an operation parameter identifying prohibited types of storage operations involving the requested storage region;

the first host responding to the allocation request by allocating the requested storage region;

only if the operation parameter identifies one or more prohibited storage operations,

the first host additionally directing the controller to store the reference access key and the operation parameter in a reference location in association with the allocated storage region.

10. The medium of claim 9, the reference location being in the allocated storage region.

11. The medium of claim 9, the reference location being a storage use map stored outside the requested storage region and containing all allocated storage regions' operation parameters and reference access keys.

12. A data storage system accessible by one or more hosts, comprising:

a digital data storage containing one or more storage regions each associated with a reference access key, the storage also including one or more storage regions without any associated reference access key, where the storage regions associated with reference access keys contain the associated reference access keys;

a storage controller, coupled to the storage and the hosts, the controller being programmed to selectively provide access to the storage by performing a method comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of a requested storage region;

the controller determining whether the requested storage region is associated with a reference access key by reading at least some of the requested storage region to determine whether a reference access key is contained therein,

if the requested storage region is not associated with a reference access key, the controller executing the request;

if the requested storage region is associated with a reference access key, the controller determining whether the request included an input access key matching the associated reference access key;

if the request includes a matching access key, the controller executing the storage access request;

US 6,336,187 B1

15

if the request lacks a matching access key, the controller aborting the storage access request.

13. A data storage system accessible by one or more hosts, comprising:

a digital data storage containing one or more storage regions each associated with a reference access key, the storage also containing one or more storage regions without any associated reference access key, where the storage regions associated with reference access keys contain the associated reference access keys; and

a storage controller, coupled to the storage and the hosts, the controller being programmed to selectively provide access to the storage by performing a method comprising:

the controller receiving a storage access request from one of the hosts, the request including an identification of a requested storage region and an access type;

the controller determining whether the requested storage region is associated with a reference access key by reading at least some of the requested storage region to determine whether a reference access key is contained therein, and

if the requested storage region is not associated with a reference access key, the controller executing the request;

if the requested storage region is associated with a reference access key, the controller retrieving an operation parameter associated with the requested storage region and identifying prohibited access types for the requested storage region, and if the requested access type is not prohibited by the operation parameter, executing the storage access request;

if the requested storage region is associated with a reference access key and the requested access type is prohibited by the operation parameter, the controller determining whether the request includes an input access key matching the reference access key,

if the request lacks a matching access key, aborting the storage access request;

if the request includes a matching access key, the controller executing the requested storage access request.

16

14. A data storage system accessible by one or more hosts, comprising:

a digital data storage; and

one or more hosts coupled to the storage via a storage controller, each host being programmed to allocate space in the storage by:

the host receiving an allocation request including:

an identification of a requested storage region;

a reference access key; and

an operation parameter identifying prohibited types of storage operations involving the requested storage region;

in response to the allocation request, the host allocating the requested storage region;

only if the operation parameter identifies one or more prohibited storage operations, the host issuing a set-access-key command to the controller;

the storage controller, programmed to respond to the set-access-key by storing the reference access key and the operation parameter in a reference location in association with the allocated storage region.

15. The system of claim 14, the reference location being in the requested storage region.

16. The system of claim 14, the reference location being a storage use map stored outside the requested storage region.

17. The system of claim 14, the controller being further programmed to process storage access requests by:

the controller receiving a storage access request from one of the hosts, the request including an identification of the requested storage region, an access type, and an input access key;

in response to the storage access request, the controller retrieving the reference access key and operation parameter;

only if the requested access type is not prohibited by the retrieved operation parameter or the input access key of the request matches the retrieved reference access key, the controller executing the storage access request, otherwise aborting the request.

* * * * *

MTI0000452

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,336,187 B1                                    Page 1 of 1
DATED         : January 1, 2002
INVENTOR(S)   : Kern et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Column 12,</u>
Line 2, change "storage region" to -- storage regions --.

<u>Column 14,</u>
Line 66, change "tire" to -- the --.

Signed and Sealed this

Seventh Day of May, 2002

*Attest:*

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

MTI0000453

US0064462O9B2

(12) **United States Patent**
Kern et al.

(10) Patent No.: **US 6,446,209 B2**
(45) Date of Patent: **Sep. 3, 2002**

(54) **STORAGE CONTROLLER CONDITIONING HOST ACCESS TO STORED DATA ACCORDING TO SECURITY KEY STORED IN HOST-INACCESSIBLE METADATA**

(75) Inventors: **Robert Frederic Kern; Mark Anthony Sovik**, both of Tucson, AZ (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/825,456

(22) Filed: Apr. 3, 2001

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/096,962, filed on Jan. 12, 1998.

(51) Int. Cl.[7] ........................... G06F 1/24
(52) U.S. Cl. ...................... 713/193; 713/164; 713/165; 713/168
(58) Field of Search ........................... 713/164, 165, 713/168, 200, 201, 193

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,322,576 A | 3/1982 | Miller | 178/22.07 |
| 4,423,287 A | 12/1983 | Zeidler | 178/22.08 |
| 4,888,800 A | 12/1989 | Marshall et al. | 380/21 |
| 5,070,528 A | 12/1991 | Hawe et al. | 380/48 |
| 5,455,863 A | 10/1995 | Brown et al. | 380/23 |
| 5,557,765 A | 9/1996 | Lipner et al. | 380/21 |
| 5,615,264 A | 3/1997 | Kazmierczak et al. | 380/4 |
| 5,633,934 A | 5/1997 | Hember et al. | 380/50 |

OTHER PUBLICATIONS

A.V. Le et al., "Method for Authenticating Key Data Records Using Message Authentication Codes," IBM Technical Disclosure Bulletin, vol. 34, No. 9, pp., 104–108, Feb. 1992.

Article entitled "Enterprise Systems Architecture/390 Principles of Operation," by IBM, date is more than one year before filing, pp., 3–8–3–15.

*Primary Examiner*—Thomas R. Peeso
(74) *Attorney, Agent, or Firm*—Dan Hubert & Associates

(57) **ABSTRACT**

A storage controller conditions host access to stored data objects upon host provision of a proposed key with matching or other prescribed relation to a security key stored in host-inaccessible metadata that is associated with the stored data object. The security key may be established upon writing the data or allocating storage space, for example. This enables the storage controller or device to be attached directly to a network without compromising security or having to add an intermediate server to perform security functions. Another implementation concerns sound recording playback devices that only play sound tracks for which the user has purchased an appropriate security key.

**50 Claims, 9 Drawing Sheets**





U.S. Patent        Sep. 3, 2002        Sheet 1 of 9        US 6,446,209 B2

**FIGURE 1A**



*FIGURE 1B*



*FIGURE 1C*



*FIGURE 1D*



MTI0000456

**U.S. Patent**          Sep. 3, 2002          Sheet 3 of 9          US 6,446,209 B2

*FIGURE 1E*



MTI0000457

U.S. Patent

Sep. 3, 2002

Sheet 4 of 9

US 6,446,209 B2



*FIGURE 1F*

MTI0000458



**FIGURE 2**



**FIGURE 3**

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 31 of 216   Page ID #:1044

*FIGURE 4A*



MTI0000460

U.S. Patent          Sep. 3, 2002          Sheet 7 of 9          US 6,446,209 B2



*FIGURE 4B*

*FIGURE 5*



*FIGURE 6*

*600*



MTI0000463

US 6,446,209 B2

**1**

## STORAGE CONTROLLER CONDITIONING HOST ACCESS TO STORED DATA ACCORDING TO SECURITY KEY STORED IN HOST-INACCESSIBLE METADATA

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of co-pending U.S. application Ser. No. 09/096,962, entitled "STORAGE SYSTEM WITH DATA-DEPENDENT SECURITY," filed on Jun. 12, 1998 in the names of the present inventors.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention concerns access security for digital data. More particularly, the invention is implemented in a storage or device controller to regulate data security using a key and other parameters stored in metadata. Among other benefits, this enables the storage controller or device to be attached directly to a network without compromising security or having to add an intermediate server to perform security functions.

#### 2. Description of the Related Art

To get the most out of their storage systems, system administrators often provide common storage for access by multiple different users. The common storage is often coupled to individual user computers via intermediate hardware such as storage servers and networks. The common storage may be a single device, but more often comprises many different physical storage devices. Some examples of multi-user storage systems are: (1) corporate Intranet systems accessed by employee users, (2) telephone records accessible by telephone operator-users located around the state, nation, or world, (3) banking records accessed by remote customer-users operating automatic teller machines, and (4) engineering design specifications or models accessed by engineer-users working together on a technical project. A variety of other arrangements are also known.

In these systems, security of common storage is one difficult challenge facing storage system engineers. Since the common storage is effectively coupled to all users (via intermediate server machines), it is often necessary to consider the user's identity in deciding whether to provide (or deny) access to stored data. Some data may be suitable for all users to access, whereas other data may be only suitable for access by selected users. As an example, it may be desirable to provide all employees of the company access to the company's telephone directory stored on a common storage facility, while making personnel files available only to those in the human resources department.

Many known data security mechanisms address this problem by operating a central host or server as an access gate. This is feasible when the server alone is attached to the common storage, and therefore constitutes a natural gate. In this arrangement, all access requests are routed through this server, which accepts or rejects each request according to the identity of the requesting user and the content of the request. The server implements its security features by running a security software program. As one variation of this arrangement, there may be multiple servers coupled to the common storage, with each server running the same security program under the same operating system. These multiple servers can provide more users with concurrent access to the common storage. One example of a server comprises an IBM model S/390 product using the MVS operating system, where each server is coupled to a RAMAC storage subsystem.

**2**

Although conventional server-based storage configurations have proven satisfactory in many cases, many organizations are moving toward "network attached storage," which aims to save costs by placing storage systems directly on the network and thereby avoiding intermediate server machines. For especially convenient widespread and accessible use, storage systems are even coupled directly to the Internet in many cases. This avoids the need to purchase a dedicated server machine to serve as an intermediate security gate. This arrangement is especially beneficial for data that is being distributed, posted, or otherwise made available to users on a "read-only" basis because known mechanisms at the device or storage controller level may be invoked to universally prevent changes to the data.

Although this arrangement is beneficial insofar as it saves costs and conveniently makes data widely available, there are still some limitations. Chiefly, conventional network attached storage is not adequate for those users seeking to make data widely accessible yet selectively permit some users to modify and delete data. To implement more advanced security schemes, network designers must add-in intermediate security gates such as storage servers. In addition to the added cost, compatibility problems can arise, especially with data that is being shared on such a widespread basis as the Internet. Namely, it may be difficult or prohibitively expensive to program the server with a security scheme that is compatible with a diverse array of expected machines, such as WINDOWS machines, UNIX machines, MVS computers, SUN workstations, etc.

Consequently, known storage and security arrangements are not completely adequate due to these and other unsolved problems.

### SUMMARY OF THE INVENTION

Broadly, the invention provides access security for stored digital data by using a storage or device controller to regulate data security according to a security key and other parameters stored in metadata. This enables the storage controller or device to be attached directly to a network without compromising security or having to add an intermediate server to perform security functions.

The storage system of this invention includes a storage controller coupled to a digital data storage. The controller is also coupled to, or at least accessible by, one or more hosts. The digital data storage contains host-accessible user data accessed by the storage controller on behalf of hosts, as well as host-inaccessible metadata used by the storage controller to manage the user data. Initially, the storage controller receives a write request from one of the hosts. Such a request includes a proposed key and target data to be written to storage. The storage controller stores the target data as host-accessible user data, and also stores the key as host-inaccessible metadata associated with the target data. Thereafter, the storage controller requires hosts to provide a key matching or having another prescribed relation to the stored key as a condition to granting future host requests to access the stored target data.

In one embodiment, the invention may be implemented to provide a method of conditioning host access to stored data according to keys stored in host-inaccessible metadata. In another embodiment, the invention may be implemented to provide an apparatus, such as a data storage system, utilizing storage controllers configured to condition host access to stored data according to keys stored in host-inaccessible metadata. In still another embodiment, the invention may be implemented to provide a signal-bearing medium or tangibly

MTI0000464

US 6,446,209 B2

3

embodying a program of machine-readable instructions executable by a machine such as a storage controller to manage storage as discussed herein. Similarly, the invention may also be embodied by logic circuitry configured to manage storage as discussed herein.

The invention affords its users with certain distinct advantages. For instance, by using a storage controller rather than a server or host machine as a security gate, the invention provides storage security for a variety of different host computers that utilize comparatively incompatible operating systems. As another benefit, the invention is inexpensive because it may be implemented to provide data security using a network attached storage controller without using an expensive server machine. Similarly, the invention does not burden the processing and input/output resources of existing host machines with security functions, since security is implemented on the storage controller level. The invention is also beneficial because it provides a flexibility in implementation and may be applied in a variety of different environments. For instance, the invention may be applied to sound recordings to limit playback to users that have purchased an appropriate key. The invention also provides a number of other advantages and benefits, which should be apparent from the following description of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a block diagram of the hardware components and interconnections of a data storage system according to the invention.

FIGS. 1B–1E are block diagrams showing different system configurations according to the invention.

FIG. 1F is a block diagram showing several exemplary storage tracks and their constituent data objects and metadata according to the invention.

FIG. 2 is a block diagram of a digital data processing machine according to with the invention.

FIG. 3 shows an exemplary signal-bearing medium according to the invention.

FIG. 4A is a flowchart showing operations performed to allocate data storage according to the invention.

FIG. 4B is a flowchart showing operations performed to write data to storage according to the invention.

FIG. 5 is a flowchart showing controller operations performed to process a Read request according to the invention.

FIG. 6 is a flowchart showing operations performed by a new host to join the data storage system of the invention.

DETAILED DESCRIPTION

The nature, objectives, and advantages of the invention will become more apparent to those skilled in the art after considering the following detailed description in connection with the accompanying drawings.

HARDWARE COMPONENTS & INTERCONNECTIONS

Storage System

One aspect of the invention concerns a data storage system, which may be embodied by various hardware components and interconnections as shown by the system 100 of FIG. 1A. The system 100 includes multiple host machines 102–104, a network 130, a storage controller 106, and digital data storage 108 ("storage"). The host machines 102–104 are coupled to the network 130. Optionally, some or all of the hosts may be interconnected by various links (not shown). The hosts include respective host application programs 110–112. As used herein, "host" comprises any machine, user, application program, process, or other entity, that submits storage access requests to the storage controller 106. Furthermore, storage access requests of the illustrated hosts may arise from other sources (not shown), such as wireless telephones, sensors, satellites, or other sources.

Hosts

As illustrated, the host machines 102–104 comprise various hardware devices suitable to generate storage access requests, such as personal computers, mainframe computers, computer workstations, supercomputers, or other suitable machines. The illustrated host machines 102–104 may be running respective application programs 110–112, from which the need for nonvolatile storage access arises. According to one advantage of the invention, the host machines 102–104 may be running a variety of different operating systems (not shown), which may even be incompatible with each other.

Some exemplary operating systems include MVS, UNIX, WINDOWS NT, etc.

Some or all of the host machines 102–104 may be interconnected by communications links (not shown) such as wires, cables, fiber optic lines, wireless links, satellite, telephone lines, etc. Alternatively, some or all of the host machines 102–104 may be completely unrelated, such as different host machines coupled to the Internet (i.e., the network 130) at different sites around the world. The host machines 102–104 may include respective interfaces (not shown), such as ESCON links, small computer system interfaces (SCSIs), telephone/DSL/cable modems, intelligent channels, and the like to interface with each other, the network 130, etc.

As mentioned above, each host machine 102–104 may be running one or more application programs, exemplified by the programs 110–112. Among other functions, the application programs 110–112 generate "storage access requests" seeking access to the storage 108. In the presently illustrated example, each storage access requests includes one or more of the following components:

1) A requested access type, such as Read, Write, Update, Allocate, Allocate and Write, etc.

2) If the requested access type is "Write", one or more data objects to be written to storage 108.

3) A key (optional) to be used by the controller 106 in determining access rights to the data objects involved in the subject access request.

4) In the case of an allocation request, specification of a storage size to allocate or identification of a particular storage region to allocate.

The contents, processing, and use of storage access requests are discussed in greater detail below.

Network

Optionally, the system 100 may also include one or more networks, such as the illustrative network 130. The network 130 is helpful to illustrate the embodiment (as shown in FIG. 1A) where the storage controller 106 provides network-attached storage.

The network 130 comprises any desired communication path(s) interconnecting host machines such as 102–104. One example is the public Internet or a corporate Intranet. Other examples include bus, star, or token ring configurations. The network 130 may utilize one or more local, metropolitan, and/or wide area networks. The network 130 may utilize TCP/IP, Systems Network Architecture, Ethernet, or any other desired protocol. Ordinarily skilled artisans (having the benefit of this disclosure) will also recognize other network configurations and protocols to implement the network 130.

MTI0000465

US 6,446,209 B2

5

With the foregoing connection of the network 130 to the storage controller 106, the storage controller 106 acts as network-attached storage, benefitting from the cost-savings of omitting a server or other intermediate gate. Nonetheless, a server, secondary host, or other machine may be interposed between the storage controller 106 and host machines 104 if desired. Furthermore, the network 130 may be omitted from the system entirely, in which case the storage controller 106 is coupled to a host machine 102–104 individually, coupled to a server or other intermediate machine that is itself coupled to the host machine, or coupled to a user interface for direct access by users.

Storage Controller—Introduction

Broadly, the storage controller 106 comprises a special purpose digital data processing machine dedicated to managing storage of data upon the storage 108. In contrast to servers and other machines, the storage controller 106 works with formatting, layout, encoding, parity checking, error correction, and other aspects of physically storing data on the media encompassed by the storage 108. Accordingly, the storage controller 106 generates, reads, formats, and utilizes host-invisible metadata that is stored with host-accessible "user data" in the storage 108. In contrast, the host machines 102–104 and application programs 110–112 deal with the user data itself, but cannot access the metadata. The hosts may reference user data according to logical addresses, in which case the storage controller 106 translates between logical addresses (as used by the hosts) and physical addresses (relating to the storage media itself).

The storage controller 106 may be implemented in a number of different ways. For instance, the storage controller 106 may be implemented by a device controller. Some examples include a hard drive controller, optical disk controller, CD-ROM controller, tape drive, floppy diskette drive, or other mechanism that is associated with a particular removable or nonremovable media type. In another embodiment, the storage controller 106 may comprise one or more supervisory processing machines managing a number of subservient device controllers. Some examples include the IBM xSeries 150 Network Attached Storage, IBM Enterprise Storage Server Models F10 and F20, IBM RAMAC product line, etc. FIGS. 1B–1D illustrate several exemplary configurations of storage controllers and devices, as discussed below.

The storage controller 106 includes an interface 120 to communicate with the network 130 (as illustrated), server, host, etc. The interface 120 may comprise an intelligent digital input/output communication channel, modem, interface card, bus, backplane, port, connector, or any other interface suitable to the particular application.

Digital Data Storage

As explained above, the storage 108 serves to store data as directed by the storage controller 106. The storage 108 may include storage media along with one or more device controllers that are managed by the storage controller 106, as in the examples of FIGS. 1B–1C. In a different example, the storage 108 may include the media only, where the media's device driver embodies the storage controller 106, as in the example of FIG. 1D.

In any case, the storage 108 may be implemented by media of various types, such as magnetic disk drive, magnetic tape, optical disk, optical tape, semiconductor memory, a combination of the foregoing, or any other suitable digital data storage media. The storage 108 may be configured as a single "logical" device, where data is actually stored on separate physical devices. As a specific example, the storage 108 may be implemented by the magnetic disk drive media units of an IBM RAMAC disk drive system.

6

Non-Network Implementation

As still another example of the implementation of this invention, any of the embodiments of FIGS. 1B–1D may be implemented as a local storage/retrieval apparatus by substituting a user interface for the component as "network." In this embodiment, as described in greater detail below, the storage or device controller grants different access rights to people operating the user interface depending upon the security key that they supply.

FIG. 1E describes a particular example of this embodiment, including a playback device 174 that comprises a music CD player that selectively plays songs stored on removable CD media 176 according to a security key entered by a user 178 via a user interface 170. Security functions are implemented by device controller 172. Here, the CD media 176 is write-only, and the approved security keys for each song are stored on the media at the time of manufacture.

The user interface 170 may comprise a keypad for entering security keys. To enhance security, instead of using a keypad, the user interface 170 may comprise a module to receive tangible security keys such as 171, which comprise plug-in chips/cassettes that are plugged-in to the interface 170, magnetic cards that are swiped or waved past the interface 170, etc., where the tangible security key 171 contains a machine-readable representation of a security key. In this embodiment, users purchase a music CD for one low price, and then purchase the tangible security key containing the security key associated with to the songs they wish to hear. Although CDs are given in the foregoing example, other media may be used without departing from the invention.

Storage Controller—Gate Function

In addition to its function in managing the storage 108, the controller 106 operates as a gate, selectively accepting or refusing hosts' access requests according to a preestablished data security scheme. Since this scheme is implemented by the controller 106 rather than one or more hosts 2–104, the hosts are available for other tasks. Additionally, the storage controller's centrality and independence from the hosts 102–104 is conducive to access by hosts of many different operating systems. Furthermore, the controller's security features enable the storage controller 106 to be used as network-attached storage, providing security without the need for a server or other intermediate security gate.

Storage Controller—Gate Function, First Example

The controller 106 includes a controller security module 122, which performs the controller's security functions. The security module 122 may comprise a hardware component, such as one or more computers, microprocessors, logic circuits, ASICs, or other digital data processing apparatus. Alternatively, the security module 122 may be an application program comprising a sequence of programming instructions executed by one or more processors of the controller 106.

Generally, as a condition to granting storage access to hosts, the controller's gating function requires it to consult a "reference location" containing a security key associated with the data being sought. The stored security key may be called the "reference security key." The controller 106 evaluates the reference security key against a proposed security key from the storage access request to determine whether the request should be permitted. The contents and use of security keys are discussed in greater detail below.

The reference location constitutes storage space accessible to the controller 106, and in one example comprises data (including the reference security key) stored at the

MTI0000466

US 6,446,209 B2

7

controller 106 as illustrated by the storage use map 124. The
map 124 may be located elsewhere if desired such as in the
storage 108 or other site accessible to the controller 108.
TABLE 1 (below) depicts an example of the storage use map
124, in the form of a lookup table.

TABLE 1

| EXEMPLARY STORAGE USE MAP | | |
| --- | --- | --- |
| STORAGE REGION | REFERENCE SECURITY KEY | SECURITY TYPE |
| 00001 | 1 | WRITE |
| 00002 | 1 | WRITE |
| 00003 | 1 | WRITE |
| 00004 | NONE | NO SECURITY |
| 00005 | NONE | NO SECURITY |
| 00006 | 2 | READ/WRITE |
| 00007 | 2 | READ/WRITE |
| 00008 | NONE | NO SECURITY |

In the example of TABLE 1, the "storage region" column
identifies regions in the storage 108. The "reference security
key" lists an access key that governs access to the associated
storage region. The storage controller 106 may utilize the
reference security key to govern access to the storage region
according to various techniques, such as password, public/
private key encryption, or others as explained in detail
below. In this simplified example, reference keys of "1" and
"2" are provided for ease of explanation, however more
complicated codes may be used. For each storage region, the
associated "security type" (also called "access level") des-
ignates the security precautions applicable to the corre-
sponding storage region. For example, the security type may
specify operations that are prohibited without the requesting
host submitting an input key (also called "proposed security
key") that satisfies the prescribed reference security key. The
security type may require the storage controller to prevent,
without host provision of a proposed security key that
satisfies the reference security key, one or more of the
following operations: read, write, delete, update, format, etc.

As a variation, TABLE 1 may be condensed by listing
abbreviated pointers to other storage locations that contain
the actual values of storage region, reference security key,
and/or security type. Furthermore, TABLE 1 may be
encrypted by controller 106 to prevent accidental/malicious
access of its contents.

As still another variation, TABLE 1 may omit anything to
do with read security, wherein the storage controller 106
stores user data encrypted with an associated security key,
and read security is thereby inherently provided by the
storage controller 106 decrypting user data with whatever
proposed key is supplied by the host. In this example,
encryption may use the public/private key architecture,
where each user can only encrypt all public data and private
data associated with the user's private key.

Storage Controller—Gate Function, Second Example

As an alternative to the storage use map 124, the storage
controller 106 may carry out its gate function by incorpo-
rating the reference security key into metadata associated
with user data in the storage 108. In this embodiment, the
storage use map 124 may be omitted.

FIG. 1F describes an example of a subsection of storage
108 implementing this feature. For ease of discussion FIG.
1F illustrates the contents of several exemplary tracks
150–153 of data that reside upon a magnetic disk storage
medium in the storage 108. Although it is understood that
disk tracks are actually circular, the tracks 150–153 are
shown in linear form for ease of explanation. Each track

8

150–153 includes a respective region of user data 160–163
and an associated region of metadata 155–158. The metadata
regions 155–158 may precede the user data regions 160–163
(as shown), follow the user data, be interspersed with the
user data, or another arrangement as suits the application.

The storage controller 106 initially stores the user data on
behalf of hosts that provide the data; the storage controller
106 may also carry out host requests to modify, read, delete,
or otherwise manage such user data. Thus, the user data
160–163 is said to be host-accessible. In contrast, the
metadata 155–158 is used solely by the storage/device
controllers to manage storage and retrieval of the user data.
In this sense, the metadata 155–158 is host-inaccessible.

The block 140 shows the contents of metadata 155 in
greater detail, according to one example. The metadata
block 140 includes information such as the track address
142, number of bytes 142 of user data in that track, error
correction control information 144, parity information 145,
a reference security key 146, and security type 147. Different
or other 141, 148 items of metadata may also be used,
depending upon the application. The reference security key
146 and security type 147 have function and content as
described above in conjunction with TABLE 1.

Without any intended limitation, the foregoing example
shows items of metadata 155–158 that number one per track
150–153. In this example, each item of metadata (and its
reference key and security type) pertains to one track, which
constitutes the storage region associated with that metadata.
Thus, in this example, the reference security key 146 gov-
erns host access to the track 150. As a further enhancement,
a reference security key may be associated with a multi-
track data object by listing that reference security key in the
metadata of each track occupied by the data object. The
present invention also contemplates a variety of other
approaches, where the reference security key 146 and secu-
rity type 147 are stored in metadata associated with a data
object, extent, byte, range of tracks or address, sector, block,
record, file, page, record, logical cylinder, logical device,
physical device, or another suitable arrangement depending
upon the application. Furthermore, multiple security keys
may be provided with each item of user data, with one,
some, or all of the security keys having a different security
type associated therewith.

In the case of removable storage media (such as CD-ROM
or floppy diskettes), it may be advantageous to structure the
metadata and/or user data to be unreadable by conventional
device controllers. This prevents reading of the media by a
conventional device controller that is not programmed to
honor the security-features of the metadata 155–158.

Storage Controller—Gate Function, Second Example (CD-
ROM)

FIG. 1F is now re-described in the context FIG. 1E,
described above. Here, the storage 108 comprises a CD or
other sound recording 176 and the storage controller 106
comprises a playback device 174. In this example, reference
one or more s are incorporated into metadata associated with
recorded songs, tracks, or other segments at the time of
manufacture, and the storage use map 124 is omitted. In As
example, rather than describing tracks of a magnetic storage
disk, the items 150–153 refer to music "tracks" on the sound
recording media, where each track corresponds (for
example) to a different song. Each track 150–153 includes a
respective region of sound recording data (referred to as a
"song without any intended limitation") 160–163 and an
associated region of metadata 155–158. The metadata
regions 155–158 may precede the songs 160–163 (as
shown), follow the songs, be interspersed with the songs, or
another arrangement as suits the application.

MTI0000467

US 6,446,209 B2

**9**

All contents of the sound recording are permanently written at the time of manufacture. Therefore, neither the metadata 155–158 nor the songs 160–163 are rewritable. The songs 160–163 are said to be user-accessible, since they are audibly played back to the user 178. In contrast, the metadata 155–158 are used solely by the controller 172 to manage retrieval of the songs, and is therefore considered user-inaccessible. The metadata 155–158 is structured to prevent reading by conventional CD players.

The block 140 shows the contents of metadata 155 in greater detail, according to one example. The metadata block 140 includes information such as the address 142 of the associated song 160 on the media 176, number of bytes 142 that the song 160 occupies in that track, error correction control information 144, paging information 145, a reference security key 146, and security type 147. Different or other 141, 148 items of metadata may also be used, depending upon the application. The reference security key 146 and security type 147 have function and content similar to that described above, however only the security type "Playback Requires Security Key" is utilized. Thus, if a user cannot provide the requisite security key, the device controller 172 will not play the subject song. Optionally, additional reference keys and associated security types (not shown) may be provided with each track. In this way, the CD manufacturer or record label may offer an inexpensive license enabling users to listen to a limited number of songs (such as songs one, two, and three), and a more expensive license enabling users to listen to all songs on the media 176. Furthermore, if desired, a sufficient number of security keys and security types may be stored to anticipate access to every possible combination of some or all of the songs on the CD, so that users could purchase a license limited to songs desired by that user. In this embodiment, rather than pressing dozens of media with different combinations of songs thereon (as in the current state of the art), every song of an artist may be put on a single media, with user access limited by security key to the songs associated with that security key.

**Exemplary Digital Data Processing Apparatus**

The storage controller 106 (or device controller 172) may be embodied by various hardware components and interconnections. One example is given by the digital data processing apparatus 200 in FIG. 2. The apparatus 200 includes a processor 202, such as a microprocessor or other processing machine, coupled to a storage 204. In the present example, the storage 204 includes a fast-access storage 206, as well as nonvolatile storage 208. The fast-access storage 206 may comprise random access memory, and may be used to store the programming instructions executed by the processor 202. The nonvolatile storage 208 may comprise, for example, one or more magnetic data storage disks such as a "hard drive", a tape drive, or any other suitable storage device. The apparatus 200 also includes an input/output 210, such as a line, bus, cable, electromagnetic link, or other means for exchanging data with the processor 202.

Despite the specific foregoing description, ordinarily skilled artisans (having the benefit of this disclosure) will recognize that the apparatus discussed above may be implemented in a machine of different construction, without departing from the scope of the invention. As a specific example, one of the components 206, 208 may be eliminated; furthermore, the storage 204 may be provided on-board the processor 202, or even provided externally to the apparatus 200.

**OPERATION**

In addition to the various hardware embodiments described above, a different aspect of the invention concerns

**10**

a method of providing access security for digital data by using a storage or device controller to regulate data security according to a security key and other parameters stored in the data's metadata. This enables the storage controller or device controller to be attached directly to a network without compromising security or having to add an intermediate server to perform security functions.

**Signal-Bearing Media**

In the context of FIGS. 1A–2, such a method may be implemented, for example, by operating the storage controller 106 (or device controller 172), as implemented by a digital data processing apparatus 200, to execute a sequence of machine-readable instructions. These instructions may reside in various types of signal-bearing media. This signal-bearing media may comprise, for example, RAM (not shown) contained within the controller 106, as represented by the fast-access storage 206. Alternatively, the instructions may be contained in another signal-bearing media, such as a magnetic data storage diskette 300 (FIG. 3), directly or indirectly accessible by the processor 202. Whether contained in the storage 204, the diskette 300, or elsewhere, the instructions may be stored on a variety of machine-readable data storage media, such as DASD storage (e.g., a conventional "hard drive" or a RAID array), magnetic tape, electronic read-only memory (e.g., ROM, EPROM, or EEPROM), an optical storage device (e.g. CD-ROM, WORM, DVD, digital optical tape), paper "punch" cards, or other suitable signal-bearing media including transmission media such as digital and analog and communication links and wireless. In an illustrative embodiment of the invention, the machine-readable instructions may comprise software object code, compiled from a language such as "C", etc.

**Allocating Storage**

FIG. 4A shows a sequence 400 performed to allocate space in the storage 108 according to the invention. For purposes of illustration, without any limitation, allocation as discussed herein is a host-managed operation. Allocation may be driven by the storage controller 106 in other examples. For ease of explanation, but without any limitation intended, the example of FIG. 4A is described in the context of the environment described above in FIGS. 1A–1D, 1F, 2, 3.

The sequence is initiated in step 402, when one of the application programs 110–112 experiences conditions requiring allocation of storage. The condition causing step 402 may further dictate relevant aspects of the necessary allocation operation, such as (1) the type of storage device to be used in the allocation operation if the storage 108 contains different types of storage media, (2) the size of region to allocate, and (3) other pertinent aspects. Allocated storage regions may be expressed in terms of any convenient or appropriate unit of granularity, such as one or more disk sectors, disk tracks, disk "extents", logical volumes, address ranges, blocks, tape tracks, files, datasets, etc. Storage regions may also have user-specified sizes, in which event this additional characteristic may be included in the allocation request. If desired, one or more storage regions may comprise subsets of a larger data structure, such as a database, file, storage group, dataset, etc; advantageously, this embodiment may facilitate different levels of security for subsets of a larger data structure.

In step 406, the application program 110–112 chooses a desired level of security for the region to be allocated. In this example, the levels of security, also called "security types" or "access levels" include:

1) "read/write protect" where both Reads and Writes are prohibited. Here, the storage controller 106 prevents

US 6,446,209 B2

11

reading and writing to the associated storage region unless the host presents an appropriate key.

2) "write protect" where Writes are prohibited but Reads permitted. Here, as discussed in greater detail below, the controller 106 will prevent hosts from writing the storage region unless the host presents an appropriate key. The associated storage region may be freely read.

3) "none" or "no security," where any host can read and write to this storage region without presenting a key. As an example, "none" may be used as a default value if another security type is not chosen.

In addition to the foregoing security types, additional parameters may be included, such as a per-access specification that applies the specified security type only for certain accesses, such as "all" accesses by a host, or only the "first" access by the host. After step 406, the application program 110–112 generates a reference security key (if some type of security was selected in step 408) to be used by the controller 106 in regulating future host access to the allocated storage region. The "reference" security key provides a reference copy against which hosts' proposed keys are to be evaluated. The reference security key of step 408 may comprise an alphabetic, numeric, alphanumeric, or other machine-readable code. As an example, the reference security key may comprise a 256-bit digital number, selected in accordance with a public key encryption scheme, as discussed below. Optionally, the application programs 110–112 may be configured such that, if the host seeks to extend an already-allocated storage region, the storage step 408 utilizes the region's existing reference security key instead of generating a new one.

After step 408, the application program 110–112 issues a request to allocate storage or extend allocation of already-allocated storage (step 412). This request includes the reference security key and security type of steps 406, 408 and may be issued in the form of a command to a host operating system, another application program on the same host that manages storage requests, or directly to the storage controller 106. If the allocation command is issued to the host machine or another application program, step 414 is performed, where the recipient relays the allocation request to the controller 106, for example, by issuing an allocate command with a set-reference-key parameter, specifically directing the controller 106 to associate the provided reference key and security type with the storage region to be allocated. On the other hand, if the allocation request is given directly to the storage controller 106, step 414 may be omitted. As an alternative to the foregoing, the recipient storage controller 106 may provide the security key on behalf of the host, in which case step 408 is omitted.

Following step 414, (or step 412 if step 414 is omitted) the controller 106 stores the security type and reference security key in a prescribed reference location, in association with the allocated storage region (step 416). As mentioned above, one example of the reference location is the storage use map 124; in this embodiment, the controller 106 in step 416 stores the key and security type in the map 124. In another example, the reference location may comprise host-inaccessible metadata in the allocated storage region itself, as explained above in conjunction with FIG. 1F; in this example, step 416 involves storing these items in metadata such as 155–158, the associated user data being empty.

After step 416, the requested allocation is complete, and the sequence 400 ends in step 418. In the allocated storage region is now available for selective access by the hosts, depending upon the established security type and the hosts' ability to provide an acceptable key.

12

Writing Data to Storage

FIG. 4B shows a sequence 450 performed to write data to the storage 108 according to the invention. For ease of explanation, but without any limitation intended, the example of FIG. 4B is described in the context of the environment described above in FIGS. 1A–1D, 1F, 2, 3. The sequence 450 is initiated in step 462, when an occasion arises for one of the application programs 110–112 to write data to the storage 108.

In step 464, the application program 110–112 chooses a desired security type for the data to be written. The security types in this example include read/write protect, write protect, and none as explained above. After step 464, the application program 110–112 generates a reference security key (step 466); step 466 may be omitted if "none" was selected as the security type in step 464. The reference security key of step 466 comprises an alphabetic, numeric, alphanumeric, or other machine-readable code as discussed above.

Optionally, the application programs 110–112 may be configured such that, if the present Write operation seeks to append, update, or otherwise modify previously written data, step 466 comprises the application program attempting to supply the believed reference security key for the previously written data.

After step 466, the application program 110–112 issues a write request (step 468). The write request constitutes a command to write data to the storage 108, and may specify relevant aspects of the operation, such as the type of storage device to be used in the Write operation if the storage 108 contains different storage modes, and other pertinent aspects. More particularly, step 468 involves the application program 110–112 issuing a Write request along with the user data to be written, a proposed key (if attempting to modify existing data), and a new reference key and security type (if writing new data). The request of step 468 may be issued to a host operating system, another application program on the same host that manages storage requests, or directly to the storage controller 106.

If the Write request is issued to the host machine or another application program, step 470 is performed, where the recipient relays the Write request to the controller 106. In the case of a new Write, the recipient may provide its directions to the controller 106 by issuing a Write command with a set-reference-key parameter, specifically directing the controller 106 to associate the provided reference key and security type with the user data proposed for storage. For data that already exists on the storage 108, the Write request recipient may provide its directions to the controller 106 in the form of a Write command with a proposed-key-parameter.

Following step 470, the controller 106 determines whether the user data proposed for storage is new or existing in the storage 108 (step 472). This is performed by cross-referencing information from the Write request (from step 470) with information that the controller 106 maintains about data in the storage 108. If the proposed data object is new, the controller 106 stores the data, and also stores the security type and reference security key in a prescribed reference location, in association with the allocated storage region (step 482). As mentioned above, one example of the reference location is the storage use map 124; in this embodiment, the controller 106 in step 482 stores the reference security key and security type in the map 124. In another example, the reference location may comprise host-inaccessible metadata in the user data itself, as explained above in conjunction with FIG. 1F; in this example, step 482

MTI0000469

US 6,446,209 B2

13

involves storing these items in the metadata associated with the identified user data. For example, they may be stored preceding the user data, in a metadata header, as shown in FIG. 1F. Other locations may be used instead, such as metadata interspersed throughout the data object, a metadata suffix, or another location. In the case of a write operation, step 482 also involves the storage controller 106 writing the user data to storage 108.

As one enhancement to the embodiment described above, the controller 106 may direct the storage 108 to employ the reference security key to encode the user data during the Write operation of step 482. Namely, the controller 106 may use the reference security key to encode the user data supplied by the host and then store the data as encoded. Encoding and decoding in this embodiment may use a number of different techniques that are well known to those in the relevant art. For instance, one useful technique is public/private key encryption. By using such encoding/ decoding, stored data enjoys two levels of protection: (1) one level, by the controller 106 requiring requesting hosts to submit a proper proposed key to access the user data, and (2) another level, by encoding the user data itself with the security key.

On the other hand, if the proposed user data to be written already exists in storage, step 472 advances to step 474, where the controller 106 consults the reference security key and security type fields 146–147 associated with the user data to determine the security type and reference security key. The controller 106 in step 476 then determines whether the proposed Write operation is allowed. Namely, the Write operation is not allowed if the security type of the existing user data is "read/write protect" or "write protect" and the proposed key is not appropriate to the reference security key. For instance, the proposed/reference keys may be required to match, or there be a match between derivatives of one or both. If the Write operation is not allowed, step 476 advances to step 480, where the controller 106 rejects the requested Write operation. For instance, the controller 106 may return an error message to the requesting host. On the other hand, if the requested Write is permitted, step 476 advances to step 480, where the controller 106 performs the Write operation upon the storage 108. Optionally, the controller 106 may direct the storage 108 to employ the reference security key in encoding data during the Write operation of step 480.

The sequence 450 ends after completion of steps 478, 480, or 482.

Reading Data from Storage—General

FIG. 5 shows a sequence 500 of reading data from storage 108. For ease of explanation, but without any limitation intended thereby, the example of FIG. 5 is described in the context of the environment described above in FIGS. 1A–1D, 1F, 2, 3.

The sequence 500 begins in step 502 when an occasion arises for one of the application programs 110–112 to read data from the storage 108. This may originate from a source such as an internal process of the application program, another application program of the requesting host, a user terminal or other input device (not shown) coupled to the host, another computer coupled to the host, etc. In step 503, responsive to the event of step 502, the application program generates a Read request including (1) identification of desired user data ("target user data"), such as by name, logical or physical storage location, storage device, etc., and (2) a proposed key for use by the controller 106 to determine whether the application program should have access to the requested user data. If the Read request of step 503 seeks

14

access to user data whose security type is "none," the proposed key may be omitted from step 503. The Read request of step 503 may be issued to the host machine, another application program, or directly to the controller 106.

In step 504, the controller 106 receives the Read request of step 503. In response, the controller 106 determines whether the target user data is protected, i.e., whether a reference location has associated a reference security key with the target user data (step 506). This is performed by the controller 106 consulting the storage use map 124 (one example) or the metadata (another example). If the target user data does not have an associated reference security key, this storage region has no security protection and further analysis is unnecessary. In this case, the routine 500 passes from step 506 to step 516, where the controller 106 operates the storage 108 to read and output the requested user data. Following step 516, the sequence 500 ends in step 518.

If the target user data is protected, however, step 506 advances to step 508. In step 508 the controller 106 determines user data's security type. Namely, the controller 106 consults the reference location to retrieve the security type associated with the target user data, and thereby determine whether Read operations are permitted without submittal of a suitable proposed access key. In one example, step 508 may be performed by the controller 106 consulting the security type 147 in metadata to see whether Read operations are protected. Alternatively, step 508 may be performed by the controller 106 consulting the storage use map 124 to determine whether Read operations are protected. If Read operations are not protected, step 508 advances to step 516, where the controller 106 directs the storage 108 to read and output the requested data object (step 516), and then the sequence 500 ends in step 518. Optionally, the reference security key may be used to decrypt the user data if the user data has been encrypted.

If step 508 finds that Reads of the requested user data are protected, the routine 500 advances from step 508 to step 510. In step 510, the controller 106 checks the host-submitted proposed key (received in step 504) against the reference security key (found in the reference location, e.g., key 146 or storage use map 124). In one example, step 510 involves comparing the proposed and reference security keys to see whether they match. Alternatively, step 510 may apply a predetermined processing sequence to derive a second key from the proposed key (such as by decryption using a different, prescribed private key), with this derived key being compared against the reference key. Alternative, the reference security key may be processed to derive a second key, with this derived key being compared to the proposed key. Other alternatives are also contemplated, such as processing both reference and proposed keys and comparing their derivatives.

At any rate, if the proposed key (or its derivative) does not match the reference security key, the proposed key is not valid. In this case, step 512 advances to step 514 where the controller 106 returns an error condition to the requesting host. Otherwise, if step 512 finds that the proposed key (or its derivative) matches the reference access key (or its derivative), the proposed access key is valid, and the controller 106 directs the storage 108 to complete the requested Read operation in step 516. After steps 514 or 516, the sequence 500 ends in step 518.

As one enhancement to the embodiment described above, the controller 106 may direct the storage 108 to employ the reference security key in decoding data during the Read operation of step 516. In this embodiment, the controller 106

MTI0000470

US 6,446,209 B2

15

uses the reference security key to decode the stored user data, and then provides the decoded data to the requesting host. Such decoding may utilize a number of different techniques that are well known to those in the relevant art, such as public/private key encryption.

After step 516, the routine 500 ends in step 518.

Reading Data from Storage—Local User Interface, Read-Only Media

Another description of FIG. 5 is now made to specifically illustrate the playback of data from CD media 176 in the environment of FIG. 1E. In this example, the CD media 176 comprises a read-only music CD that is provided with one or more reference security keys 146 and operation parameters 147 (as described in FIG. 1F) at the time of manufacture. In this embodiment, the storage use map 124 is omitted, since the media 176 contains security information in its metadata. As described above, the media 176 may contain several different reference security keys 146 in association with each song.

Referring to FIG. 5 in conjunction with FIG. 1E, the sequence 500 begins in step 502 when a user 178 decides to listen to one or more songs on the CD 176. The user 178 submits a proposed security key by entering the key into the user interface 170, or by providing a tangible security key 171 to the interface 170. In step 503, responsive to the event of step 502, the user interface 170 generates a Play request including (1) identification of one or more desired songs, such as by name, logical or physical storage location, storage device, etc., and (2) the user's proposed key. Also in step 503, the interface 170 forwards the Play request to the device controller 172 to determine whether the user should have access to the requested user data. If the Play request of step 503 seeks access to user data whose security type is not "Playback Requires Security Key," the proposed key may be omitted from step 503.

In step 504, the controller 172 receives the Play request of step 503. In response, the controller 172 determines whether the target song tracks is protected, i.e., whether each requested song track has an associated reference key (step 506). This is performed by the controller 172 consulting the song track's metadata. If the target song track does not have any associated reference keys, this area has no security protection and further analysis is unnecessary. In this case, the routine 500 passes from step 506 to step 516, where the controller 172 provides an audible output of the requested song track from the media 176. Following step 516, the sequence 500 ends in step 518.

If the target song track is protected, however, step 506 advances to step 508. In step 508 the controller 172 determines song track's security type. Namely, the controller 172 consults security type 147 in metadata stored on the media 176 to determine whether Play operations are permitted without submittal of a suitable proposed access key. If Play operations are not protected, step 508 advances to step 516, where the controller 172 interacts with the media 176 to read and output (Play) the requested song track (step 516), and then the sequence 500 ends in step 518. Optionally, the proposed key may be used to decrypt the requested song if the song has been stored on the media 176 with encryption.

If step 508 finds that Playback of the requested song track is protected, the routine 500 advances from step 508 to step 510. In step 510, the controller 172 checks the user-submitted proposed key (received in step 504) against the reference security key (found in the requested song's metadata). In one example, step 510 involves comparing the proposed and reference security keys to see whether they match. Alternatively, step 510 may apply a predetermined

16

processing sequence to derive a second key from the proposed key (such as by decryption using a prescribed private key), with this derived key being compared against the reference security key. Alternative, the reference security key may be processed to derive a second key, with the derived key being compared to the proposed key. Other alternatives are also contemplated, such as processing both reference and proposed keys and comparing their derivatives.

At any rate, if the proposed key (or its derivative) does not match the reference security key, step 512 concludes that the proposed key is not valid. In this case, the controller 172 returns an error condition to the requesting host in step 514. Otherwise, if the proposed key (or its derivative) matches the reference access key (or its derivative), step 512 concludes that the proposed access key is valid, and the controller 172 directs the storage 108 to complete the requested Play operation in step 516. After steps 514 or 516, the sequence 500 ends in step 518.

Activate New Host

FIG. 6 shows a sequence 600 performed by a new host in order to join the system 100, and participate in future allocation and/or data access requests. For ease of explanation, but without any limitation intended thereby, the example of FIG. 6 is described in the context of the environment described above in FIGS. 1A–3. Generally, to add a new host, the new host obtains reference security keys for the user data to be accessed in the future. In addition, the new host must configure its own interface (not shown) with the controller 106 to properly communicate the contents of a storage access request.

More particularly, after the sequence 600 begins in step 602, the new host obtains one or more existing reference security keys from a source such as other hosts 102–104, the controller, 106, application programs 110–112, user input, system administrator, etc. This step is optional, however, since there may be no need or intention for the new host to access user data that is already protected. A host-host exchange of reference security keys may be conducted over the network 130 or over the links (not shown), for example.

After step 604, the new host's application program reconfigures its interface with the controller in step 606. The new host's interface (not shown) may comprise an ESCON interface, small computer standard interface (SCSI), parallel or serial port, telephone modem, or any other digital data communications medium compatible with the particular embodiment of controller used in the system 100. In one example, the host interface may already be configured to receive storage access requests, e.g., components such as identification of targeted user data, security types, etc.; in this case, step 606 involves reconfiguring the host interface to accept submittal of proposed keys in the future. In the case of an ESCON interface, this may involve adding a new channel command word, or modifying an existing channel command word to accept an proposed access key. In the case of a SCSI interface, the SCSI protocol is modified in step 606 to accept the input access parameter.

Advantageously, the addition of new hosts does not require any security modification since the reference security keys are stored at the controller 106 or storage 108.

Bypass

Optionally, an internal setting may be provided within the controller 106 to bypass key checking in certain predefined environments or events. For example, bypass may be desirable during disaster recovery, backup, data migration, and other operations.

Reset Access Key & Operation Parameter

MTI0000471

US 6,446,209 B2

**17**

As an additional enhancement to the foregoing embodiment, the controller 106 may additionally recognize a "reset-key" command issued by hosts 102–104. The reset-key command directs the controller 106 to alter the access characteristics of an allocated storage region or stored data object. An illustrative reset-key includes a proposed key, along with a replacement reference security key and/or security type for the allocated storage region or user data. In response, the controller 106 validates the proposed key, and then proceeds to update its reference security key, and storage use map 124 (or metadata). Otherwise, if the proposed key is invalid, the controller 106 fails the reset request. Along these lines, the invention also contemplates a "clear-key" command issued by hosts 102–104 to remove security protection of an allocated storage region or stored data object.

**OTHER EMBODIMENTS**

While the foregoing disclosure shows a number of illustrative embodiments of the invention, it will be apparent to those skilled in the art that various changes and modifications can be made herein without departing from the scope of the invention as defined by the appended claims. Furthermore, although elements of the invention may be described or claimed in the singular, the plural is contemplated unless limitation to the singular is explicitly stated. Additionally, ordinarily skilled artisans will recognize that operational sequences must be set forth in some specific order for the purpose of explanation and claiming, but the present invention contemplates various changes beyond such specific order.

What is claimed is:

1. A data storage method for use in a storage system including a storage controller serving one or more hosts where the storage controller is coupled to a digital data storage, the storage containing host-accessible user data accessed by the storage controller on behalf of hosts and host-inaccessible metadata used by the storage controller to manage storage of the host-accessible data, the method comprising operations of:

the storage controller receiving a write request from one of the hosts, the request including target data and a security key;

the storage controller storing the target data in the digital data storage and storing the security key in metadata in association with the target data;

requiring host provision of a security key with prescribed relationship to the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

2. The method of claim 1, the requiring operation comprising:

requiring host provision of a security key matching the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

3. The method of claim 1, the requiring operation comprising:

as a condition to granting future host requests to access the target data in the digital data storage, requiring host provision of a security key that matches the stored security key when processed by a predetermined encryption process.

4. The method of claim 1, the operation of the storage controller storing the target data comprising operations of: encrypting the target data with the security key and storing the encrypted target data.

**18**

5. The method of claim 1, where the digital data storage comprises a storage device including a device controller, and the storage controller is embodied in the device controller.

6. A data storage method for use in a storage system including a storage controller coupled to a digital data storage where the storage controller serves one or more hosts, the storage containing host-accessible user data accessed by the storage controller on behalf of hosts and host-inaccessible metadata used by the storage controller to manage storage of the host-accessible data, the method comprising operations of:

the storage controller receiving an allocation request from one of the hosts;

the storage controller allocating a region of the digital data storage and storing a security key in metadata associated with the allocated region;

requiring host provision of a security key with prescribed relation to the stored security key as a condition to granting future host requests to access data in the allocated region of the digital data storage.

7. The method of claim 6, the requiring operation comprising:

requiring host provision of a security key matching the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

8. The method of claim 6, the requiring operation comprising:

as a condition to granting future host requests to access the target data in the digital data storage, requiring host provision of a security key that matches the stored security key when processed by a predetermined encryption process.

9. The method of claim 6, where the digital data storage comprises a storage device including a device controller, and the storage controller is embodied in the device controller.

10. A data security method for use in a storage system including a storage controller responsive to one or more hosts where the storage controller is coupled to a digital data storage, the storage containing host-accessible user data accessed by the storage controller on behalf of hosts and host-inaccessible metadata used by the storage controller to manage storage of the host-accessible data, the method comprising operations of:

the storage controller receiving a storage access request from one of the hosts, the request including a proposed security key and an identification of a requested data object contained on the digital data storage;

the storage controller retrieving a security key stored in metadata of the requested data object in the digital data storage, and then determining whether the stored security key and the proposed security key exhibit a prescribed relationship; and

only if the proposed and stored security keys exhibit the prescribed relationship, the storage controller executing the storage access request, otherwise aborting the storage access request.

11. The method of claim 10, the method being implemented such that the storage controller comprises a sound recording player and the host is a user.

12. A signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital processing apparatus to perform data storage operations in a storage system including a storage controller coupled to a digital data storage and serving data requests of one or more hosts, the storage containing host-accessible user data

MTI0000472

US 6,446,209 B2

**19**

accessed by the storage controller on behalf of hosts and host-inaccessible metadata used by the storage controller to manage storage of the host-accessible data, the operations comprising:

the storage controller receiving a write request from one of the bosts, the request including target data and a security key;

the storage controller storing the target data in the digital data storage and storing the security key in metadata in association with the target data;

requiring host provision of a security key with prescribed relation to the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

13. The medium of claim 12, the requiring operation comprising:

requiring host provision of a security key matching the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

14. The medium of claim 12, the requiring operation comprising:

as a condition to granting future host requests to access the target data in the digital data storage, requiring host provision of a security key that matches the stored security key when processed by a predetermined encryption process.

15. The medium of claim 12, the operation of the storage controller storing the target data comprising operations of:

encrypting the target data with the security key and storing the encrypted target data.

16. The medium of claim 12, where the digital data storage comprises a storage device including a device controller, and the storage controller is embodied by the device controller.

17. A signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital processing apparatus to perform data storage operations in a storage system including a storage controller coupled to a digital data storage and serving data requests of one or more hosts, the storage containing host-accessible user data accessed by the storage controller on behalf of hosts and host-inaccessible metadata used by the storage controller to manage storage of the host-accessible data, the operations comprising:

the storage controller receiving an allocation request from one of the bosts;

the storage controller allocating a region of the digital data storage and storing a security key in metadata associated with the allocated region;

requiring host provision of a security key with prescribed relation to the stored security key as a condition to granting future host requests to access data in the allocated region of the digital data storage.

18. The medium of claim 17, the requiring operation comprising:

requiring host provision of a security key matching the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

19. The medium of claim 17, the requiring operation comprising:

as a condition to granting future host requests to access the target data from the digital data storage, requiring host provision of a security key that matches the stored

**20**

security key when processed by a predetermined encryption process.

20. A signal-bearing medium tangibly embodying a program of machine-readable instructions executable by a digital processing apparatus to perform data storage operations in a storage system including a storage controller coupled to a digital data storage and serving one or more hosts, the storage containing host-accessible user data accessed by the storage controller on behalf of hosts and host-inaccessible metadata used by the storage controller to manage storage of the host-accessible data, the operations comprising:

the storage controller receiving a storage access request from one of the hosts, the request including a proposed security key and an identification of a requested data object contained on the digital data storage;

the storage controller retrieving a security key stored in metadata of the requested data object in the digital data storage, and then determining whether the stored security key and the proposed security key exhibit the prescribed relationship; and

only if the proposed and stored security keys exhibit the prescribed relationship, the storage controller executing the storage access request, otherwise aborting the storage access request.

21. A data storage system accessible by one or more hosts, comprising:

a digital data storage containing user data and describing the user data;

the storage controller, coupled to the storage, and programmed to utilize the metadata to manage the user data while rendering the metadata inaccessible to hosts and to selectively access the user data on behalf of hosts by performing operations comprising:

receiving a write request from one of the hosts, the request including target data and a security key;

storing the target data in the digital data storage and storing the security key in metadata in association with the target data;

requiring host provision of a security key with prescribed relation to the stored security key as a condition to granting future host requests to access the target data in the digital data storage.

22. The system of claim 21, where the digital data storage comprises a storage device including a device controller, and the storage controller is embodied by the device controller.

23. The system of claim 21, where the storage controller is embodied by a digital data processing apparatus dedicated to managing one or more device controllers.

24. The system of claim 21, where the storage controller comprises a disk drive controller and the storage comprises magnetic disk media.

25. The system of claim 21, where the storage controller comprises a removable storage media controller.

26. The system of claim 21, further comprising a computer network coupled to the storage controller and interconnecting the storage controller to the hosts.

27. A data storage system accessible by one or more hosts, comprising:

a digital data storage containing user data and metadata describing the user data;

a storage controller, coupled to the storage, and programmed to utilize the metadata to manage the user data while rendering the metadata inaccessible to hosts and to selectively access the user data on behalf of hosts and programmed to perform further operations comprising:

MTI0000473

US 6,446,209 B2

**21**

the storage controller receiving an allocation request
from one of the hosts;

the storage controller allocating a region of the digital
data storage and storing a security key in metadata
associated with the allocated region;

requiring host provision of a security key with pre-
scribed relation to the stored security key as a
condition to granting future host requests to access
data in the allocated region of the digital data stor-
age.

28. The system of claim 27, where the digital data storage
comprises a storage device including a device controller, and
the storage controller is embodied by the device controller.

29. The system of claim 27, where the storage controller
is embodied by a digital data processing apparatus dedicated
to managing one or more device controllers.

30. The system of claim 27, where the storage controller
comprises a disk drive controller and the storage comprises
magnetic disk media.

31. The system of claim 27, where the storage controller
comprises a controller for removable storage media.

32. The system of claim 27, further comprising a com-
puter network coupled to the storage controller and inter-
connecting the storage controller to the hosts.

33. A storage controller programmed to perform opera-
tions to manage access to digital data storage containing
host-accessible user data accessible by the storage controller
on behalf of hosts and also containing host-inaccessible
metadata accessible by the storage controller to manage
storage of the host-accessible data, the operations compris-
ing:

the storage controller receiving a storage access request
from one of the hosts, the request including a proposed
security key and an identification of a requested data
object contained on the digital data storage;

the storage controller retrieving a security key stored in
metadata of the requested data object in the digital data
storage, and then determining whether the stored secu-
rity key and the proposed security key exhibit a pre-
scribed relationship; and

only if the proposed and stored security keys exhibit the
prescribed relationship, the storage controller execut-
ing the storage access request, otherwise aborting the
storage access request.

34. The storage controller of claim 33, the storage con-
troller being programmed such that the execution of the
storage access requests comprises playback of recorded
sounds contained on the digital data storage.

35. A data storage system accessible by one or more hosts,
comprising:

digital data storage means for containing user data; and

the storage controller means, coupled to the storage
means, for utilizing the metadata to manage the user
data while rendering the metadata inaccessible to hosts
selectively accessing the user data on behalf of host:

receiving a write request from one of the hosts, the
request including target data and a security key;

storing the target data in the storage means and storing
the security key in metadata in association with the
target data;

requiring host provision of a security key with pre-
scribed relation to the stored security key as a
condition to granting future host requests to access
the target data in the storage means.

36. A data storage system accessible by one or more hosts,
comprising:

**22**

digital data storage means for containing user data and
metadata describing the user data;

the storage controller means, coupled to the storage
means, for utilizing the metadata to manage the user
data while rendering the metadata inaccessible to hosts
selectively accessing the user data on behalf of hosts
and managing access to the digital data storage by hosts
by:

the storage controller receiving an allocation request
from one of the hosts;

the storage controller allocating a region of the storage
means and storing a security key in metadata asso-
ciated with the allocated region;

requiring host provision of a security key with pre-
scribed relation to the stored security key as a
condition to granting future host requests to access
data in the allocated region of the storage means.

37. A data storage system accessible by one or more hosts,
comprising:

digital data storage means for containing user data and
metadata describing the user data;

the storage controller means, coupled to the storage
means, for utilizing the metadata to manage the user
data while rendering the metadata inaccessible to hosts
selectively accessing the user data on behalf of hosts
and managing access to the digital data storage by hosts
by:

the storage controller receiving a storage access request
from one of the hosts, the request including a pro-
posed security key and an identification of a
requested data object contained on the storage
means;

the storage controller retrieving a security key stored in
metadata of the requested data object in the storage
means, and then determining whether the stored
security key and the proposed security key exhibit a
prescribed relationship; and

only if the proposed and stored security keys exhibit the
prescribed relationship, the storage controller
executing the storage access request, otherwise
aborting the storage access request.

38. A method of distributing sound recordings with selec-
tive playback characteristics, comprising operations of:

distributing machine-readable data storage media to
customers, each including numerous sound segments
each segment including a sound recording and meta-
data including an associated security key;

where the data storage media have a format that is
unreadable by conventional playback devices, by
including specific structure for use by playback devices
requiring customer input of a security key with pre-
scribed relationship to the stored security key as a
condition to playback of the sound recording associated
with the security key;

selling security keys to customers.

39. The method of claim 38, where certain sound seg-
ments are associated with multiple security keys such that
different keys provide access to different combinations of
sound segments.

40. The method of claim 39, where one security key
provides access to all sound segments on a data storage
medium.

41. The method of claim 39, where some data storage
media have sound segments that do not include any asso-
ciated security key.

MTI0000474

US 6,446,209 B2

23

24

**42.** The method of claim **10**, where:

if the storage access request is a read operation, the operation of executing the storage access request further comprises reading the requested data object and using at least one of the proposed security key and retrieved security key to decode the data object.

**43.** The method of claim **10**, wherein the operations further comprise:

the storage controller retrieving an operation parameter associated with the requested data object, said operation parameter identifying allowed access types for the requested data object;

the storage controller additionally requiring that the storage access request be allowed in order to execute the storage access request.

**44.** The method of claim **43**, wherein:

the access types including the following operations: reading data from the storage, and writing data to the storage; and

each operation parameter designates one or more of the access types as being allowed.

**45.** The medium of claim **20**, where:

if the storage access request is a read operation, the operation of executing the storage access request further comprises reading the requested data object and using at least one of the proposed security key and retrieved security key to decode the data object.

**46.** The medium of claim **20**, wherein the operations further comprise:

the storage controller retrieving an operation parameter associated with the requested data object, said operation parameter identifying allowed access types for the requested data object;

the storage controller additionally requiring that the storage access request be allowed in order to execute the storage access request.

**47.** The medium of claim **46**, wherein:

the access types including the following operations: reading data from the storage, and writing data to the storage; and

each operation parameter designates one or more of the access types as being allowed.

**48.** The storage controller of claim **33**, where the storage controller is programmed such that:

if the storage access request is a read operation, the operation of executing the storage access request further comprises reading the requested data object and using at least one of the proposed security key and retrieved security key to decode the data object.

**49.** The storage controller of claim **33**, the storage controller being programmed such that the operations further comprise:

the storage controller retrieving an operation parameter associated with the requested data object, said operation parameter identifying allowed access types for the requested data object;

the storage controller additionally requiring that the storage access request be allowed in order to execute the storage access request.

**50.** The controller of claim **49**, wherein the controller is programmed such that:

the access types including the following operations: reading data from the storage, and writing data to the storage; and

each operation parameter designates one or more of the access types as being allowed.

* * * * *

MTI0000475

US005991402A

# United States Patent [19]

## Jia et al.

| [11] | Patent Number: | 5,991,402 |
|---|---|---|
| [45] | Date of Patent: | Nov. 23, 1999 |

[54] **METHOD AND SYSTEM OF DYNAMIC TRANSFORMATION OF ENCRYPTED MATERIAL**

[75] Inventors: **Zheng Jia**, Germantown; **Ji Shen**, Gaithersburg, both of Md.

[73] Assignee: **AegiSoft Corporation**, Rockville, Md.

[21] Appl. No.: **08/935,955**

[22] Filed: **Sep. 23, 1997**

[51] Int. Cl.⁶ ...................................... **H04K 1/02**

[52] U.S. Cl. ......................... 380/9; 380/9; 380/3; 380/4; 380/23; 380/25; 705/59; 713/164; 713/165; 713/166; 713/190

[58] Field of Search ................................. 380/3, 4, 23, 25

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| 5,151,938 | 9/1992 | Griffin, III et al. .................. 380/43 |
|---|---|---|
| 5,388,211 | 2/1995 | Hornbuckle ............................. 395/200 |
| 5,410,598 | 4/1995 | Shear ........................................ 380/4 |
| 5,537,143 | 7/1996 | Steingold et al. ...................... 348/13 |
| 5,708,709 | 1/1998 | Rose .......................................... 380/4 |
| 5,717,756 | 2/1998 | Coleman .................................. 380/25 |
| 5,758,069 | 5/1998 | Olson ............................... 395/187.01 |
| 5,764,762 | 6/1998 | Karnicrczak et al. ................... 380/4 |
| 5,790,663 | 8/1998 | Lee et al. ................................. 380/4 |
| 5,805,706 | 9/1998 | Davis ........................................ 380/49 |
| 5,825,883 | 10/1998 | Archibald et al. ...................... 380/25 |
| 5,826,011 | 10/1998 | Chou et al. ........................... 395/186 |

Primary Examiner—Tod R. Swann
Assistant Examiner—Paul E. Callahan
Attorney, Agent, or Firm—Pennie & Edmonds LLP

[57] **ABSTRACT**

The present invention provides a method and system that enables software-on-demand and software subscription services based on a dynamic transformation filter technology. The invention is also useful in the distribution of other electronic material. The apparatus utilized in this invention does not create any intermediate storage of decrypted material that is under the protection of this technology. Instead, the apparatus is implemented as a virtually integral part of the operating system that monitors and "filters" all read, write, and open/execute access to and from the I/O devices, such as a hard drive. As the protected material is being accessed for read, write or open/execute, the transformation filter positions itself in the critical path which is required for loading the material through the low level file system layer to the high level application layer. The material enters the transformation filter in its encrypted state. The transformation filter decrypts the material in real-time as it goes through, and hands over the material in its original state to the upper level operating system component to fulfill the access requests. Because the need for intermediate storage is eliminated, the decrypted material in its original state is only visible to integral parts of the operating system components and not to other system users. As a result, security is significantly improved over prior art systems.

**20 Claims, 4 Drawing Sheets**



Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 48 of 216   Page ID #:1061



FIG. 1

MTI0000477

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 49 of 216   Page ID #:1062



FIG. 2

MTI0000478



FIG. 3

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 51 of 216   Page ID #:1064



FIG. 4

MTI0000480

5,991,402

| 1 | 2 |

# METHOD AND SYSTEM OF DYNAMIC TRANSFORMATION OF ENCRYPTED MATERIAL

## BACKGROUND OF THE INVENTION

### 1. The Technical Field

This invention relates to metered usage of computer software and other intellectual property existing in electronic digital format. The end result of the invention enables services such as software-on-demand and software subscription. This invention can also be applied to the prevention of piracy of computer software and other intellectual property.

### 2. Description of the Prior Art

In the current consumer market, computer software and other intellectual property existing in digital format are primarily marketed the same as other hard goods commodities. However, while video tapes and other hard goods are rented routinely, software products typically are still available only on a purchase basis. As a result, at least two useful services generally are not available: software-on-demand and software subscription. Software-on-demand is a service that would allow consumers to pay for software products on a per-use basis. Software subscription is a service that would make one or more software products available to consumers on a periodic subscription basis such as once a month.

Despite the obvious benefits of these services, the inherent nature of software products has posed significant technical challenges to enabling technology providers. In order to successfully support these services, the enabling technology should meet the following criteria:

I. Security. Software product made available in software-on-demand and subscription format should be protected and regulated in a totally secure manner. The enabling technology must defend the software from the most skilled and determined hackers. In particular, at no time should the software in its original state be present on an intermediate storage medium, because this simply opens the door for skilled system level hackers. There is also the possibility that utilities would become available that would make such an intermediate storage medium accessible to the public.

II. Non-Intrusiveness. The enabling technology should not require modification of source code in order to protect and meter usage. In contrast, intrusive technology embeds itself in the source code of software products and requires recompilation of the software. This effort introduces significant overhead in the protection process in terms of extra coding and testing resources, and is highly error prone.

III. Minimal System Overhead. The enabling technology should not impose significant overhead while protecting, launching, and metering usage of the software product. Typical overhead introduced by enabling technology includes the need for extra RAM and hard disk storage space, the launching of the protecting process before decrypting protected software, and competition for other system resources, such as the CPU, while monitoring usage.

IV. Immunity From System Clock Reset. By altering a computer system's clock setting, users of software products can significantly prolong their allowed usage period and consequently compromise the effectiveness of software-on-demand and software subscription services. The enabling technology should be able to detect and take counter-measure actions against system clock resets.

V. Perpetual Protection And Metering. Once a software publisher puts his software under the protection and

control of the enabling technology, it should be perpetually protected and controlled. Subsequent copies and reinstallation should not disable the protection and control.

VI. User Friendliness. The enabling technology should not alter a computer user's environment in a way that causes changes in system settings that are noticeable to the user. The user interface should be totally intuitive and easy to use.

Available prior art protection techniques are based on "wrapper" and "redirection" technologies. A "wrapper" often takes the form of a operating system shell program or an altered start-up code section of the protected software. Its function is to shield direct access to the protected software. When the protected software is accessed by users, the "wrapper" will be executed first. The protected software in its encrypted state will be then decrypted and restored on a temporary storage medium in its original state. The "wrapper" will then redirect the access to the restored software on the temporary storage medium.

A system developed by TestDrive Corporation in Santa Clara, Calif., offers try-before-buy software evaluation services. This system converts an original version of software to a disabled version that may be used for a limited trial or evaluation period. If purchase of software is desired, an unlock code may be purchased that converts the software to its original state. In a preferred embodiment, this prior art system is applied to chosen material, such as a computer program, and a portion of the material is separated from the original material. In this way, a denatured version of the original material that includes the separated portion of the material and the residual portion of the material is produced. During the trial period, the denatured version of the material is placed into a temporary storage medium but only the separated portion is readily accessed by a system user. Alternatively, the separated portion of the material may be replaced with a modified portion, for example, a counter may be included to limit the number of times the material may be accessed, or interfering material may be added to the original material, such as beeps in an audio signal, or a mask in a visual signal.

Several drawbacks in these "wrapper" and "redirection" technology based systems are obvious.

I. Security flaw. Since "wrapper" and "redirection" technology requires a temporary storage medium to physically host either all the restored software or the residual portion of the software in its original state, the very existence of the material in its original state accessible by a system user makes the system vulnerable to hacker attacks. It is possible for an operating system expert to gain access to the material in its original state and redistribute a pirated version of the material. A utility software program could also possibly be developed to perform this act of piracy repeatedly and can be made available in the public domain to further damage the effectiveness of the enabled services. While wrapper and redirection technologies can protect software from novice attacks, they are not highly secure against experts.

II. System overhead. Launching the "wrapper" program, physically storing the restored software in its original state, and creating and administrating the temporary storage medium all impose delay before launching the user desired software product. These activities also compete for other system resources with other processes run by the operating system.

III. Space overhead. Storage of the restored software product in its original state in Random Access Memory (RAM)

MTI0000481

5,991,402

3

will require greater than 100% more RAM space than the protected software normally requires. In a multiple process operating system, where multiple protected software can be executed simultaneously, this overhead requirement can be multiplied and significantly impact the system's performance.

IV. Unwelcome Nuisance. The creation of a temporary storage medium in a computer system, such as a virtual device, is an artifact normally unwelcome and foreign to computer system users. Therefore, the user will eventually want to purchase the original material in its entirety to eliminate the nuisance and artifacts generated by wrapper and redirection technologies. Thus, these technologies do not lend themselves to providing perpetual usage metering and protection services.

Currently there is no known highly secure method that provides real time decryption of encrypted software or other electronic material without redirecting and storing the decrypted material on a temporary medium.

## SUMMARY OF THE INVENTION

The present invention provides a method and system that enables software-on-demand and software subscription services based on a dynamic transformation filter technology. The invention is also useful in the distribution of other electronic materials. The apparatus utilized in this invention does not create any intermediate storage of decrypted material that is under the protection of this technology. Instead, the apparatus is implemented as a virtually integral part of the operating system that monitors and "filters" all read, write, and open/execute access to and from the I/O devices, such as a hard drive. As the protected material is being accessed for read, write or open/execute, the transformation filter positions itself in the critical path which is required for loading the material through the low level file system layer to the high level application layer. The material enters the transformation filter in its encrypted state. The transformation filter decrypts the material as it goes through, and hands over the material in its original state to the upper level operating system component to fulfill the access requests. Because the need for intermediate storage is eliminated, the decrypted material in its original state is only visible to integral parts of the operating system components and not to other system users. As a result, security is significantly improved over prior art systems.

The transformation filter is formed by converting a programmable service that is provided by the operating system for a totally different purpose into a "filtering" security and regulating service. Preferably, in the case of Windows 95™ software, this programmable service is a virtual device driver; and in the case of Windows NT™ it is a kernel mode driver.

The present invention can operate with material that is not intrusively embedded inside the protected material. It provides an utility that encrypts any material with a few easy to follow steps. The invention adopts standard data encryption mechanisms made available by the U.S. government and commercial companies. However, the apparatus in this invention provides enhanced key management capabilities to further ensure security of the encrypted material. All material installed on the consumer's PC goes through two encryption processes. The second encryption process requires a dynamically unique key generated from the computer user's unique ID. The dynamic generation of the key ensures that no unlocking key can be obtained directly from files stored on the hard disk.

The present invention make it possible for the transformation filter to perpetually regulate, meter, and charge for

4

the usage of software products and other intellectual property existing in digital format. Such material can be ordered on-demand multiple times and can also be available on a subscription basis. Copying of the installed material to other computers will only produce an encrypted version of the material. However, a permanent copy of the decrypted material can be generated at the discretion of its publisher.

The invention provides components of the system that allows users of such material to connect via a modem or existing private network, and Internet connection to a clearing house server. The clearing house server will in turn generate an authorization code for enabling metered usage of the material upon receiving an order and a charge card number. Currently acceptable charge cards include regular credit cards and debit cards. Future payment methods will illustratively include smart cards and digital cash. These components of the system will also be able to process customer returns and exchanges.

The present invention is able to operate with material distributed via all possible channels, such as electronic material distribution over the Internet, CD-ROMs distributed at physical store fronts, DVDs, VCDs, cable modem, and other broadcasting channels.

The present invention also operates in an network environment where access to material over a network file system is equally regulated and metered by the system.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects, features and advantages of the invention will be more readily apparent from the following detailed description of the invention in which:

FIG. 1 is a high level architecture diagram depicting components of the system, their relative positions and inter-relationships and the direction of data flow;

FIG. 2 depicts the process of encrypting and packaging of original material into a protected state;

FIG. 3 depicts the process of installing the protected product onto a user's computer, including the generation of a unique ID and a second encryption with a user unique key; and

FIG. 4 is a flowchart depicting the internal process flow of the transformation filter.

## DETAILED DESCRIPTION OF THE INVENTION

The current invention is a method and apparatus that is integrated into the internals of an operating system, such as Microsoft Windows 95 or Window NT. This method and apparatus enables dynamic decryption of encrypted material in real time without redirection to a temporary storage medium. Consequently the invention allows software products and other materials in electronic format to be protected through encryption and to be made available for regulated and metered usage.

In the preferred embodiment of the present invention, a transformation filter is implemented as a kernel level program operating in a multi-process operating system environment; and the encrypted material is application software. However, the invention may also be applied to other contexts such as the distribution of audio or visual materials in encrypted form.

FIG. 1 is a high level architecture diagram depicting the position and function of the transformation filter within the operating system.

High level application programs, including local applications and network applications 101, 102, 103, request access

MTI0000482

5,991,402

<table>
<tr><td>5</td><td>6</td></tr>
</table>

to software materials residing on system I/O devices 106 to perform read, write, and open/execute activities. These requests must be submitted to the operating system components like an OS file system manager 107 or a network service provider 108, and be relayed to a file system driver layer or a network file system driver layer 105 which is also on the kernel level. In accordance with the invention, a transformation filter 104 is positioned between the applications 101, 102, 103 and the file system driver layer 105. Illustratively, in the context of Windows 95™ Software, the transformation filter is implemented as a virtual device driver, and in the case of Windows NT™ it is implemented as a kernel mode driver.

If access requests coming from local and/or network applications to file system drivers are considered to be going "downstream", then all data being read from I/O devices to upper layers of the operating system are considered to be going "upstream". Both downstream (from application down to file system) and upstream (from file system to application) data must go through a particular path which is referred to as the critical path in this document. Transformation filter 104 is in the critical path.

Whenever data passes through the transformation filter in an upstream direction, the transformation filter performs the necessary transformation that converts the encrypted software into its original state. The software that has been transferred to its original state is then handed over to upper layers of the operating system. If the request is from an application, e.g., an image viewer to open a file for display, the transformed software material will eventually be handed over to the application. From the requesting application's perspective, opening this encrypted software material is no different from opening any other original software material. The transformation process is totally transparent to the requesting application. If the request is to execute the file (e.g., double mouse clicking on the file) and the original software material is an executable program, the transformed software will be handed over to the operating system's loader to execute in memory. This process is considered "filtering" because encrypted software moving upstream goes into the apparatus and comes out in its decrypted state as if it went through a filtering device. No intermediate storage of the decrypted software is ever exposed to system users during the whole "filtering" process. All handing-over and decrypting processes take place inside the operating system as internal activities in a highly secure fashion.

Transformation filter 104 is implemented as if it were an integral part of the operating system. Extra security measures are built into transformation filter 104 so that it not only is capable of "filtering" upstream and downstream data, but also monitors hacking activities within the operating system and takes countermeasures to prevent any security breaches from taking place.

FIG. 2 is a block diagram depicting the process of encrypting the original software material into its pre-installed encrypted stage. As shown in FIG. 2, original software material $M_O$ 201 is encrypted by application of a transformation function $f_E$ 202 in an encryption process $P_E$ 203. The encryption process preferably is a standard encryption process such as DES or RSA. The result of this encryption process is encrypted software $M_E$ 204, which may be transmitted securely over various distribution channels, such as CD-ROMs, the Internet, and others.

During a second process $P_P$ 209, four other components that support successful regulation and metering of the software's usage are added to $M_E$ 204. These components are a

license manager 205, a client application 206, a transformation filter 207, and a product specific signature data 208. License manager 205 is a software program that is responsible for maintaining a license database including data on usage of the encrypted software, interfacing with users of the encrypted software material $M_E$, and terminating usage of the encrypted software material upon expiration of an authorized usage period. Client application 206 is a software program that is used to request from a clearinghouse server authorization to use the encrypted software material $M_E$, and to receive from the clearinghouse server an appropriate authorization code. This activity may also involve some form of electronic payment, such as provision of a credit or debit card number. In addition, the client application may also include the capability of obtaining pricing, promotion and upgrade information and downloading additional software. Transformation filter 207 is the software which controls access to the encrypted software material $M_E$. Further details of this software are described in conjunction with FIGS. 1 and 4. Product specific signature data 208 is a code unique to the particular encrypted software material $M_E$.

The output of process 209 is a single output file $M_I$ 210, which is the pre-installation software material and comprises all the input components 204, 205, 206, 207, 208. Process 209 preferably just combines components 204, 205, 206, 207, 208 into a single software product. Alternatively, process 209 could also involve an additional encryption process.

In the preferred embodiment of the invention, output file $M_I$ takes on the name, icon and other properties of the original software material. Therefore, from an external point of view, this file appears to be identical to the original software. This embodiment is primarily for the purpose of eliminating extra steps for software publishers in packaging their software products.

Subsequently, software publishers can use their favorite installation packaging utility, such as InstallShield™, to put their software into a normal installation package as if the encryption processes of FIG. 2 had never taken place.

FIG. 3 is a block diagram depicting the process of installing encrypted software material onto a user's PC. In a preferred embodiment, output file $M_I$ launches its own installation process 302 after a user goes through normal procedures for installing the software just as if the software had never been encrypted. Installation process $P_I$ 302 spawns off the key components of the pre-installation software material $M_I$ 210/301. First, a license manager 303, a client application 304 and a transformation filter 305 are extracted and installed in proper hidden places in the system. Product specific signature data 306 and the encrypted software $M_E$ are also obtained.

Simultaneously, user profile data and operating system specific information, represented as $D_P$ 307 is transformed by a transformation function $f_I$ 308 in process $P_{IU}$ 312 to generate a unique ID 313 for the customer. Any number of conventional techniques can be used in process 312 to generate unique ID 313. Advantageously, we prefer to use a time stamp with a precision measured in milliseconds in generating the unique ID because the probability that two users will install their software at the same millisecond is virtually zero. Unique ID 313 is subsequently used in all phases and components of the system.

Product specific signature data 306, unique ID 313 and the encrypted software $M_E$ are supplied to a process $P_{EX}$ 309. Process $P_{EX}$ uses the inverse of the transformation function $f_E$ to decrypt the software material and thereby restore the

MTI0000483

5,991,402

7

original material $M_O$. Such decryption processes are well known. Then, it immediately re-encrypts $M_O$ with a unique encryption key based on the unique ID 313 and the product specific signature data 306. Again, standard encryption processes such as DES or RSA may be used. The result is a uniquely encrypted software material $M_U$ 310. The software material $M_U$ is then installed above driver layer 105 (See FIG. 1).

In the preferred embodiment, the invention never stores the unique encryption key used for the generation of $M_U$. Whenever necessary, this unique key can be dynamically regenerated using the same inputs (the unique ID and the product specific signature data) and key generation process. This key management strategy makes it extremely difficult to compromise the encrypted software material. The uniqueness of the key also assures that no identical encrypted software material exists on any two user's computers once the software is installed.

At the end of installation, a license database DL 311 is generated that keeps all license information, a usage counter, and other important information to successfully implement a usage regulation and metering process described below in conjunction with FIG. 4. The license database identifies the encrypted software as being "registered", that is, being subject to the usage regulation of the present invention. The database is also stored in the computer system.

Referring to FIG. 1, transformation filter 104 is installed in the computer system so that it intercepts all requests to access software files resident on I/O devices 106. In the Windows 95™ operating system this is accomplished by installing the transformation filter as a virtual device driver. In the Windows NT™ operating system this is accomplished by installing the transformation filter as a kernel mode driver.

User activities such as read, write, execute the software or open software material for viewing are processed by the operating system. A higher level operating system process (e.g., a local or network application 101, 102, 103 of FIG. 1) is responsible for passing a request for such activities to driver layer 105 through transformation filter 104.

FIG. 4 illustrates the detailed internal process flow of the transformation filter. As indicated by box 416, the transformation filter continuously monitors the operating system for all I/O requests. When such a request reaches the transformation filter, it initiates the get software+license info process 403. This process obtains the license information (if any) for the requested software including the latest status on the software's usage, license, authorization code, expiration date, product specific signature data 208/306, along with other pertinent information. Subsequently, two validation tests are applied: a test if the software is registered (step 406) and a test if the license is valid (step 407). If the requested software was not registered, the transformation filter simply transfers control back to the operating system's requesting process at step 413 without taking any further actions. If the software is registered, the transformation filter checks at step 407 whether there is a valid license for it. In case there is no valid license, a client application is launched at step 414 to prompt the user to order more usage or purchase the software.

The order entry process is handled by the client application component of the system. The client application connects the user's computer to a clearinghouse server via a modem or existing Internet connections. The clearinghouse server, upon receiving a valid credit card or debit card

8

number, in turn generates an authorization code to activate legitimate usage of the registered software.

If a valid license for the software is present and the execution is within the authorized usage period, the transformation filter starts a security monitor process 408 to perform a scan of any third party processes that might be attempting to hijack data going out of the transformation filter after being decrypted. In case that suspicious activity is present in the operating system, the transformation filter takes countermeasures to eliminate the potential threat.

Next, the unique key to be used to decrypt the encrypted software is generated in key generation process 409. This key is generated from the unique ID 313 and the product specific signature data 306. Using the generated decryption key and the inverse of encryption process 309, the transformation filter then decrypts in real-time all the encrypted portion of the software in the decrypting transformation process 410. The decrypted software in its original state is then handed-over at step 413 to the requesting process. The operating system may now successfully process the execution or feed the decrypted software material to an application that requested access.

Once the decrypted software is handed-over to the requesting process, the transformation filter starts a usage metering counter at step 411. While the usage counter runs, the transformation filter continually tests at step 412 the amount of usage for a violation of the license terms or expiration of the license. In case there is a violation of the terms of the license for the software or the license has expired, the transformation filter starts a process at step 415 to launch the license manager. The license manager is responsible for properly maintaining and updating the license database, and interacting with the user by prompting him with various messages and taking in the user's feedback. Whenever necessary, the license manager is responsible for terminating usage of the registered software material after given the user warnings and a reasonable amount of time to respond. The license manager may transfer control to the client application to prompt the user to order more usage when the license expires.

The present invention enables the whole process of encrypting, registering, ordering, activating, decrypting, regulating and metering the usage of software materials. Business services that will benefit consumers, including but not limited to, software-on-demand, software rental, software subscription, try-before-buy, can be adequately supported by the method and system of this invention.

Two examples of the application of the invention in the provision of software are software-on-demand and software subscription services.

The essence of software-on-demand services is to make software available at the consumer's finger tip whenever the consumer desires to use the software. The software material made available through this service can be application software, such as accounting software, games, education and entertainment software, CAD software, etc. The software material can also be any electronically stored material such as audio, video, other forms of multimedia content, or it simply takes the form of plain binary or text file. This service is supported by the invention in the following way:

1. A publisher uses the invention to encrypt his software materials following the steps of FIG. 1. The encrypted software material becomes a registered software known to a clearinghouse server.

2. The software material is then packaged using any commercially available installation packaging software, for

MTI0000484

5,991,402

9

example InstallShield. Multiple programs or other software material from one or several publishers may be combined in one software package.

3. The software material is distributed to users through various channels, such as the Internet/WWW, CD-ROM, DVD, or VCD.

4. The user chooses from an online based electronic catalog listing all available material in the software package. He or she decides to install one or more software programs or other material onto his or her computer following the steps of FIG. 2.

5. The user then decides to use one of the software programs or other material.

6. The user issues an execute command or invokes an application to access the software program or other material.

7. The user is prompted via the client application to pay for such usage with a credit card or other type debit card number.

8. The user is connected to a clearinghouse server facility via modem or over Internet connection. If there is a firewall (for corporate users), the invention will operate with the procedure to pass through the authorization process of the firewall.

9. The user reviews pricing information retrieved from the clearinghouse server by the client application.

10. The user confirms the order.

11. The clearinghouse server issues an authorization code.

12. The authorization code activates the desired software material. The usage counter is updated to record this ordering session.

13. The user reissues the execution or access command.

14. The transformation filter dynamically perform the necessary transformation to enable proper usage of the software material.

15. Usage is metered and regulated by the license manager application.

Software subscription services follow the similar steps of software-on-demand services, except the payment for the services is on a monthly basis. Users also normally have the option of using multiple products every month.

Another example of the application of the invention is in the distribution of audio/visual or textual material. Such material may be encrypted, prepared and distributed in essentially the same fashion as application software. The user then selects the material he wants to see or hear and obtains it in a fashion similar to the way he obtains the software except that in this case the visual material is displayed and the audio material is used to drive a speaker system.

What is claimed:

1. A method of operating a virtual device driver or kernel mode driver to control the usage of encrypted material that has been installed on a computer comprising the steps of:

monitoring all requests for access to the encrypted material;

upon receiving a request for access to the encrypted material, obtaining the encrypted material;

determining if a license exists to use the material;

if a license exists, decoding the encrypted material in real-time;

monitoring how much the decoded material is used; and

determining if the usage of the material complies with the license.

2. The method of claim 1 wherein the encrypted material is encrypted using a first key that is unique to a user and a second key that is unique to the material that is encrypted.

10

3. The method of claim 2 wherein the first key includes a time stamp.

4. The method of claim 3 wherein the time stamp has a precision measured in milliseconds.

5. The method of claim 2 further comprising the step of generating from the first key and the second key a third key for use in decoding the encrypted material.

6. The method of claim 1 wherein the encrypted material installed on the computer is encrypted by decrypting a first version of the material to produce an unencrypted version and then re-encrypting the material using a first key that is unique to a user and a second key that is unique to the material that is encrypted.

7. The method of claim 1 further comprising the step of obtaining a license to use the material if it is found that a license does not exist.

8. The method of claim 1 further comprising the step of performing a security check of the computer before decrypting the encrypted material.

9. The method of claim 1 wherein the encrypted material is a computer program.

10. The method of claim 1 wherein a software package is installed on the computer, said software package comprising an encrypted portion, a unique code, and decrypting software for decrypting the encrypted portion, said method further comprising the steps of:

separating from the software package the encrypted portion, the unique code and the decryption software;

storing said decryption software so that it is invoked whenever an attempt is made to access the encrypted portion;

generating a unique ID from profile data and an encryption algorithm;

decrypting the encrypted portion of the software to produce an unencrypted portion;

encrypting the unencrypted portion using the unique ID and the unique code to produce a second encrypted portion; and

storing said second encrypted portion in said computer.

11. The method of claim 10 wherein the unique ID includes a time stamp.

12. The method of claim 11 wherein the time stamp has a precision measured in milliseconds.

13. A method for installing software on a computer, said software comprising an encrypted portion, a unique code, and decrypting software for decrypting the encrypted portion, said method comprising the steps of:

separating from the software the encrypted portion, the unique code and the decryption software;

storing said decryption software so that it is invoked whenever an attempt is made to access the encrypted portion;

generating a unique ID from profile data and an encryption algorithm;

decrypting the encrypted portion of the software to produce an unencrypted portion;

encrypting the unencrypted portion using the unique ID and the unique code to produce a second encrypted portion;

storing the second encrypted portion in said computer.

14. Apparatus as implemented in a virtual device driver in a computer operating system for operating a computer on which encrypted material has been stored comprising:

means for monitoring all requests for access to the encrypted material;

MTI0000485

5,991,402

11

means for obtaining the encrypted material upon receiving a request for access to said material;

means for determining if a license exists to use the material;

means for decoding the encrypted material in real-time if a license exists;

means for monitoring how much the encrypted material is used; and

means for determining if the usage of the material complies with the license.

15. The apparatus of claim 14 wherein the encrypted material is a computer program.

16. A method of operating a computer comprising the steps of:

installing on the computer a software package, said software package comprising an encrypted portion, a unique code, and decrypting software for decrypting the encrypted portion, said step comprising the steps of:

separating from the software package the encrypted portion, the unique code and the decryption software;

storing said decryption software so that it is invoked whenever an attempt is made to access the encrypted portion;

generating a unique ID from the profile data and an encryption algorithm;

decrypting the encrypted portion of the software to produce an unencrypted portion;

encrypting the unencrypted portion using the unique ID and the unique code to produce a second encrypted portion; and

storing the second encrypted portion in said computer; and after the software package has been installed,

12

monitoring all requests for access to the second encrypted portion;

upon receiving a request for access to the second encrypted portion. obtaining said portion;

determining if a license exists to use said portion;

if a license exists, decoding the second encrypted portion in real-time;

monitoring how much the decoded portion is used; and

determining if the usage of the decoded portion complies with the license.

17. The method of claim 13 wherein the unique ID includes a time stamp.

18. The method of claim 17 wherein the time stamp has a precision measured in milliseconds.

19. Apparatus as implemented in a kernel mode driver in a computer operating system for operating a computer on which encrypted material has been stored comprising:

means for monitoring all requests for access to the encrypted material;

means for obtaining the encrypted material upon receiving a requests for access to the encrypted material;

means for determining if a license exists to use the material;

means for decoding the encrypted material in real-time if a license exists;

means for monitoring how much the encrypted material is used; and

means for determining if the usage of the material complies with the license.

20. The apparatus of claim 19 wherein the encrypted material is a computer program.

* * * * *

MTI0000486

US006126070A

# United States Patent [19]

## Fukuzumi

[11] **Patent Number:** 6,126,070

[45] **Date of Patent:** Oct. 3, 2000

[54] **IC MEMORY CARD WITH SECURITY CHECK**

[75] Inventor: **Tomoya Fukuzumi**, Tokyo, Japan

[73] Assignee: **Mitsubishi Denki Kabushiki Kaisha**, Tokyo, Japan

[21] Appl. No.: **09/024,981**

[22] Filed: **Feb. 17, 1998**

[30] **Foreign Application Priority Data**

Aug. 25, 1997 [JP] Japan ........................... 9-227941

[51] Int. Cl.⁷ ........................ **G06K 5/00**; G06K 19/06; H04L 9/00

[52] U.S. Cl. ................... **235/380**; 235/382; 235/492; 713/193

[58] Field of Search ........................ 235/492, 380, 235/382.5, 382; 380/4, 23, 50; 713/193, 159

[56] **References Cited**

### U.S. PATENT DOCUMENTS

4,882,474  11/1989  Anderl et al. ......................... 235/380

### FOREIGN PATENT DOCUMENTS

6-295267  10/1994  Japan .

### OTHER PUBLICATIONS

Jose Zoreda and Jose Oton, Smart Cards, pp. 5, 6, and 39–45, 1994.

Primary Examiner—Donald Hajec
Assistant Examiner—Daniel H. Sherr

[57] **ABSTRACT**

An IC memory card for use with a host information processing has an interface with the host information processor, a common memory having one or more IC memories and a security circuit for prohibiting access to the common memory if address data input from the host processor does not coincide with preset data. The IC memory card may further provide with an attribute memory which stores a security data and attribute information about the IC card wherein the security circuit checks not only the address data but also the data read out from the attribute memory to enhance the security.

**14 Claims, 13 Drawing Sheets**



1 : IC memory card

## Fig.1



1 : IC memory card

MTI0000488

*Fig.2*



*Fig.3*



MTI0000489

*Fig.4*



42 : Counter

*Fig.5*

| Input | | | | | Output |
|---|---|---|---|---|---|
| CLK | /R | LO | EP | ET | QA~QD |
| × | L | × | × | × | L |
| ↑ | H | L | × | × | Data preset |
| ↑ | H | H | H | H | Count |
| × | H | H | L | × | Does not count (Data holding) |
| × | H | H | × | L | Does not count (Data holding) |

MTI0000490

U.S. Patent          Oct. 3, 2000          Sheet 4 of 13          6,126,070

*Fig.6*



45 : Decoder IC

MTI0000491

**U.S. Patent**          Oct. 3, 2000          Sheet 5 of 13          **6,126,070**

## Fig.7

| Input | | | | | Output that becomes LOW |
|---|---|---|---|---|---|
| INHIBIT | D1 | D2 | D3 | D4 | |
| L | L | L | L | L | S0 |
| L | H | L | L | L | S1 |
| L | L | H | L | L | S2 |
| L | H | H | L | L | S3 |
| L | L | L | H | L | S4 |
| L | H | L | H | L | S5 |
| L | L | H | H | L | S6 |
| L | H | H | H | L | S7 |
| L | L | L | L | H | S8 |
| L | H | L | L | H | S9 |
| L | L | H | L | H | S10 |
| L | H | H | L | H | S11 |
| L | L | L | H | H | S12 |
| L | H | L | H | H | S13 |
| L | L | H | H | H | S14 |
| L | H | H | H | H | S15 |
| H | $\times$ | $\times$ | $\times$ | $\times$ | All outputs become H |

MTI0000492

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 64 of 216   Page ID #:1077

*Fig.8*



46 : Decoder IC

MTI0000493

U.S. Patent          Oct. 3, 2000          Sheet 7 of 13          6,126,070

*Fig.9*



MTI0000494

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 66 of 216   Page ID #:1079

*Fig.10*



MTI0000495

*Fig.11*

| CLK | R | D | Q |
|-----|---|---|---|
| ↗ | H | H | H |
| ↗ | H | L | L |
| ↘ | H | ✕ | Does not change |
| ✕ | L | ✕ | L |

MTI0000496

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 68 of 216   Page ID #:1081

*Fig.12*



MTI0000497

## Fig.13



95 : IC memory card

MTI0000498

Fig.14



Fig.15



MT0000500

**U.S. Patent**          Oct. 3, 2000          Sheet 13 of 13          **6,126,070**

*Fig.16*     PRIOR ART



6,126,070

1

# IC MEMORY CARD WITH SECURITY CHECK

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to IC memory cards that comply with PC card standards and are used as external storage media for information processing equipment such as notebook personal computers, portable terminal units, and the like.

### 2. Description of the Related Art

FIG. 16 is a block diagram illustrating an example of prior IC memory cards. Referring to FIG. 16, an IC memory card 200 comprises an interface section 202 that complies with PC card standards and interfaces with a host system apparatus 201, a common memory section 203 that stores data from host system apparatus 201 and consists of SRAM or flash memory or the like, an attribute memory section 204 that stores attribute information about IC memory card 200, and a power-supply control circuit 205 that provides to each section of IC memory card 200 externally input source power and also generates and outputs a reset signal.

Interface section 202 is composed of an address bus buffer 207, an address decoder 208, a card mode controller 209, and a data bus buffer 210. The connection between IC memory card 200 and host system apparatus 201 is, for example, made by a plug-and-socket connector that is formed of male and female connector members, so that interface section 202 usually contains the female connector member. However, the connectors are omitted from FIG. 16.

Address bus buffer 207 and address decoder 208 are connected to the host system apparatus 201 through an address bus 211; card mode controller 209 is connected to the host system apparatus 201 through a control bus 212; and data bus buffer 210 is connected to the host system apparatus 201 through a data bus 213. Power-supply control circuit 205 is connected to the host system apparatus 201. Power-supply control circuit 205 is connected to address bus buffer 207, card mode controller 209, and data bus buffer 210 through a reset signal line, onto which a reset signal /RES is output. Power-supply control circuit 205 is also connected to each section through a power line, onto which a source voltage Vcc is output. However, these connections are omitted from FIG. 16.

Further, address bus buffer 207 is connected to common memory section 203 through an internal address bus 214. Card mode controller 209 is connected to common memory section 203, attribute memory section 204, and data bus buffer 210 through a plurality of signal lines 215. Data bus buffer 210 is connected to common memory section 203 and attribute memory section 204 through an internal data bus 216. Address decoder 208 is connected to card mode controller 209.

In this construction, power-supply control circuit 205 provides to each section the source power input through interface section 202 from host system apparatus 201. Power-supply control circuit 205 generates a reset signal /RES to output to address bus buffer 207, card mode controller 209, and data bus buffer 210, when the source power input from host system apparatus 201 rises to HIGH level and falls to LOW level.

Address bus buffer 207 receives address data from host system apparatus 201 through address bus 211 and outputs the input address data into common memory section 203 and attribute memory section 204 through internal address bus

2

214. Further, address decoder 208 receives the address data from host system apparatus 201 and decodes the address data to output a control signal into card mode controller 209 and outputs a chip select signal into common memory section 203 and attribute memory section 204.

In addition to the control signal from address decoder 208, card mode controller 209 is also provided with a card-mode control signal comprising an output enable signal, a write enable signal, a card enable signal, and a memory-space select signal and the like through control bus 212. Here, the memory-space select signal selects one of the memory spaces of common memory section 203 and attribute memory section 204. Card mode controller 209 then generates from these signals a memory control signal, which consists of an output enable signal, a write enable signal, a chip select signal, and the like, for controlling common memory section 203 and attribute memory section 204, and also generates an I/O control signal. Card mode controller 209 then outputs the memory control signal into common memory section 203 and attribute memory section 204 through signal lines 215 and outputs the I/O control signal into data bus buffer 210.

Data bus buffer 210 performs I/O control, on data bus 213 and internal data bus 216, of data between host system apparatus 201 and common memory section 203 and of data between host system apparatus 201 and attribute memory section 204, based on the I/O control signal input from card mode controller 209. Further, common memory section 203 and attribute memory 204 perform the writing and reading of data through internal data bus 216, based on the address data input through internal address bus 214 and the memory control signal input through signal lines 215.

The IC memory card described above can be used with host system apparatus produced by a plurality of manufacturers, as far as they are compatible with the architecture of the IC memory card. Also, those who have access to the memory content of the IC memory card are not limited to the users of a particular host system apparatus. Therefore, as long as the host system apparatus runs on the same operating system, any one who has a knowledge of the operating system can freely read data out from common memory section 203 and write data into common memory section 203, when the IC memory card is used as an external storage medium. That means there has been a problem of being unable to maintain security of the data stored in common memory section 203.

## SUMMARY OF THE INVENTION

The present invention has been therefore devised to solve the above problem. An essential object of the present invention is to obtain IC memory cards that have a function of enhancing the security of data stored in their memory by preventing the easy reading of data from memory and the easy writing of data into memory.

According to one embodiment of the present invention, an IC memory card comprises an interface section that interfaces with a host system apparatus, a common memory section that is formed of at least one IC memory and stores data, and a security circuit section that prohibits and permits access to the common memory section. The security circuit section prohibits access to the common memory section, if address data input from the host system apparatus in a predetermined number of cycles through the interface section does not agree with preset data. The security circuit section permits access to the common memory section, if address data input from the host system apparatus in a

MTI0000501

6,126,070

3

predetermined number of cycles through the interface section agrees with the preset data. In other words, if a signal having a predetermined pattern is not output during a predetermined number of cycles, then access to the common memory section is impossible. Therefore, the reading of data from memory or the writing of data into memory is not easily done, so that the security of data stored in the memory is enhanced.

Preferably, the above security circuit section has a data generating circuit that generates predetermined data in each cycle, a comparison circuit that compares in each cycle the data generated by the data generating circuit with the address data input from the host system apparatus to output the comparison result, and a judgment circuit that judges, based on the comparison results output from the comparison circuit, whether the processing of prohibiting access to the common memory section should be performed or not, to prohibit and permit access to the common memory section, depending on the judgment.

If the above data generating circuit is formed of a binary counter that counts based on a predetermined signal input from the host system apparatus, then the security circuit can be composed of logic circuits. Therefore, the security function can be implemented with simple circuitry.

Further, the above comparison circuit can be composed of a first decoder that decodes the data generated by the data generating circuit, a second decoder that decodes the address data input from the host system apparatus, and a comparison section that compares in each cycle the data decoded by the first decoder with the data decoded by the second decoder to output the comparison result. In this case, the combination of the comparisons performed in the cycles for the data generated by the data generating circuit and the data input from the host system apparatus can be changed by the comparison section.

According to another embodiment of the present invention, an IC memory card comprises an interface section that interfaces with a host system apparatus, a common memory section that is formed of at least one IC memory and stores data, an attribute memory section that has a security-data storage area for storing predetermined security data and stores attribute information about the card, and a security circuit section that prohibits and permits access to the common memory section. The security circuit section checks the address data input from the host system apparatus and also checks the data read out from the attribute memory based on the checked attribute data. The security circuit section then permits access to the common memory section, if the checked address data agrees with the address data that indicates the location of the security-data storage area and if the read data agrees with the security data. The security circuit section prohibits access to the common memory section, if checked address data does not agree with the address data that indicates the location of the security-data storage area or if the read data does not agree with the security data.

In this construction, in order to access the common memory section, it is necessary that not only does the data read out from the attribute memory section by the host system apparatus agree with predetermined security data, but also the address data input from the host system apparatus agrees with predetermined address data about the security-data storage area. Therefore, the reading of data from memory and the writing of data into memory are not easily done, so that the security of data stored in memory is enhanced.

4

In this case, the security circuit section may be constructed so that access to the common memory section should be prohibited, unless a control signal for the reading of data from the attribute memory section is input from the host system apparatus, when the address data is checked. The security of data stored in the memory is further enhanced by this means.

Further, the above security circuit section may have an address-data setting section that sets predetermined address data indicating the location of the security-data storage area, an address-data comparison section that compares the address data input from the host system apparatus with the predetermined address data set in the address-data setting section to output the comparison results, a data setting section that sets predetermined security data, a data comparison section that compares the data read out from the attribute memory section based on the address data input from the host system apparatus with the predetermined security data set in the data setting section to output the comparison results, a judgment circuit that judges whether to prohibit access to the common memory section or not, depending on the comparison results output from the address-data comparison section and the data comparison section, to prohibit and permit access to the common memory section, depending on the judgment.

Further, the above judgment circuit may be constructed so that access to the common memory section should be prohibited, unless a control signal for the reading of data from the attribute memory section is input from the host system apparatus, when the comparison results are input from the address-data comparison section.

In any of these cases, the checking of the address data about the common memory section input from the host system apparatus can be prohibited, so that the reading of data from memory or the writing of data into memory is not easily done. Therefore, the security of data stored in memory can be enhanced.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and features of the present invention will become clear from the following description taken in conjunction with the preferred embodiments thereof and the accompanying drawings throughout which like parts are designated by like reference numerals, and in which:

FIG. 1 is a block circuit diagram illustrating an IC memory card in a first embodiment of the present invention;

FIG. 2 is a timing chart illustrating a predetermined pattern of the address data word Ad1 to Ad4;

FIG. 3 is a block circuit diagram illustrating the security circuit section 6 in FIG. 1;

FIG. 4 is a circuit diagram illustrating the data generating circuit 31 in FIG. 3;

FIG. 5 illustrates the truth table of the counter 42 in FIG. 3;

FIG. 6 is a circuit diagram illustrating the first decoder 32 in FIG. 3;

FIG. 7 illustrates the truth table of the decoder IC 45 in FIG. 6;

FIG. 8 is a circuit diagram illustrating the second decoder 33 in FIG. 3;

FIG. 9 is a circuit diagram illustrating the comparison section 34 in FIG. 3;

FIG. 10 is a circuit diagram illustrating the judgment circuit 35 in FIG. 3;

MTI0000502

6,126,070

5

FIG. 11 illustrates the truth table of the D flip-flops 71 to 86 in FIG. 10;

FIG. 12 is a timing chart illustrating signals at normal time in the security circuit section 6;

FIG. 13 is a block circuit diagram illustrating an IC memory card of a second embodiment in the present invention;

FIG. 14 illustrates the memory space of the attribute memory section 5 in FIG. 13;

FIG. 15 is a block circuit diagram illustrating an example of the security circuit section 91 in FIG. 13; and

FIG. 16 is a block diagram illustrating a prior IC memory card.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The preferred embodiments according to the present invention will be described below in conjunction with the attached drawings. In the following description, the symbol / put in front of symbols which denote various signals indicates the inversion of the signal level, hereby showing that the signals are active-low.

### FIRST EMBODIMENT

Referring to FIG. 1, an IC memory card 1 comprises an interface section 3 that complies with PC card standards and interfaces with a host system apparatus 2 having information processing equipment, a common memory section 4 that stores data from host system apparatus 2 and includes IC memory such as SRAM and flash memory and the like, an attribute memory section 5 that stores attribute information about IC memory card 1 and includes IC memory of EEPROM, a security circuit section 6 that prohibits access to common memory section 4 by host system apparatus 2 unless a predetermined procedure is executed, and a power-supply control circuit 7 that provides to each section of IC memory card 1 the source power input from the outside and also generates and outputs a reset signal /RES.

Interface section 3 is formed of an address bus buffer 11, an address decoder 12, a card mode controller 13, and a data bus buffer 14. The connection between IC memory card 1 and host system apparatus 2 is, for example, made by a plug-and-socket connector that is formed of male and female connector members, so that interface section 3 usually contains the female connector member. However, the connectors are omitted from FIG. 1.

Further, address bus buffer 11 is connected to the host system apparatus 2 through address signal lines A1 to Am, where m is a natural number. An address data word Ad1 to Adm is input through address signal lines A1 to Am. Address decoder 12 is connected to the host system apparatus 2 through address signal lines A0 and Am+1 to An, where n is a natural number such that n>m. An address data bit Ad0 and an address data word Adm+1 to Adn are input through address signal lines A0 and Am+1 to An.

Address signal lines A0 to An form an address bus 21. Ad0 is the least significant bit and Adm is the greatest significant bit of the address data word Ad0 to Adn. Address bus buffer 11 is connected to common memory section 4 and attribute memory section 5 through internal address bus 22. The address data word Ad1 to Adm input from address bus 21 is input to common memory section 4 and attribute memory section 5 through internal address bus 22.

Card mode controller 13 is connected to the host system apparatus 2 through control signal lines C0 to C3. A card enable signal /CE1 is input through control signal line C0; a card enable signal /CE2 is input through control signal line C1; a write enable signal /WE is input through control signal line C2; and an output enable signal /OE is input through control signal line C3. Security circuit section 6 is connected to card mode controller 13 and connected to the host system apparatus 2 through control signal lines C0, C1, C4 and predetermined address signal lines, for example, address signal lines A0 to A4. A memory-space select signal /REG that selects one of the common memory section 4 and attribute memory section 5 for memory space is input to security circuit section 6 through control signal line C4. Control signal lines C0 to C4 form a control bus 23.

Data bus buffer 14 is connected to the host system apparatus 2 through a data bus 24 formed of data lines D0 to D15. Data bus buffer 14 performs the input and output of a data word Dd0 to Dd15 through data lines D0 to D15. Further, data bus buffer 14 is connected to common memory section 4 through internal data lines Da0 to Da15 and is connected to attribute memory section 5 through internal data lines Da0 to Da7. Common memory section 4 performs the input and output of the data word Dd0 to Dd15 through internal data lines Da0 to Da15. Attribute memory section 5 performs the input and output of the data word Dd0 to Da15 through data lines Da0 to Da7. Internal data lines Da0 to Da15 form internal data bus 25. Data lines D0 to D15 are respectively associated with internal data lines Da0 to Da15.

Further, address decoder 12 is connected to common memory section 4 and attribute memory section 5 through internal control signal lines 26 and is connected to card mode controller 13 through an internal control signal line 27. Card mode controller 13 is connected to common memory section 4, attribute memory section 5, and data bus buffer 14 through internal control signal lines 28.

Power-supply control circuit 7 is connected to the host system apparatus 2, receiving power from host system apparatus 2, and provides to each section of IC memory card 1 the source voltage Vdd. However, the connections are omitted from FIG. 1. Also, power-supply control circuit 7 is connected to security circuit section 6, address buffer 11, address decoder 12, card mode controller 13, and data bus buffer 14 to transmit a reset signal /RES. However, these connections are also omitted from FIG. 1. Power-supply control circuit 7 generates the reset signal /RES to output into security circuit section 6, address bus buffer 11, address decoder 12, card mode controller 13, and data bus buffer 14, when the source power input from host system apparatus 2 rises to HIGH level and falls to LOW level.

In the above construction, address decoder 12 generates a chip select signal /CS for selecting an IC memory in common memory section 4 and attribute memory section 5, from the address data word Adm+1 to Adn input through address signal lines Am+1 to An. Address decoder 12 then outputs the chip select signal /CS into common memory section 4 and attribute memory section 5 through internal control signal line 26.

The least significant bit Ad0 in the address data word Ad0 to Adn expresses a choice of whether the internal data lines Da0 to Da7 should be used or the internal data lines Da8 to Da15 should be used. For example, if Ad0 is at LOW level, then address decoder 12 outputs a signal that selects internal data lines Da0 to Da7 into card mode controller 13 through internal control line 27; if Ad0 is at HIGH level, then address decoder 12 outputs a signal that selects internal data lines Da8 to Da15 into card mode controller 13 through internal control line 27. The address data word Ad1 to Adm input to to

6,126,070

7

address bus buffer 11 is input to common memory section 4 and attribute memory section 5 through internal address bus 22.

If card enable signals /CE1 and /CE2 are both at LOW level, then card mode controller 13 ignores the select signal input from address decoder 12 and controls the data bus buffer 14 so that all the data lines of data bus 24 and internal data bus 25 should be used. If card enable signal /CE1 is at LOW level, and if card enable signal /CE2 is at HIGH level, then card mode controller 13 uses data lines D0 to D7 of data bus 24 and controls the data bus buffer 14 so that either internal data lines Da0 to Da7 should be used or data lines Da8 to Da15 should be used, depending on the select signal from address decoder 12.

Further, if card enable signal /CE1 is at HIGH level, and if card enable signal /CE2 is at LOW level, then card mode controller 13 ignores the select signal input from address decoder 12, uses data lines D8 to D15, and controls data bus buffer 14 so that internal data lines Da8 to Da 15 should be used. If at least one of the card enable signals /CE1 and /CE2 is at LOW level, then card mode controller 13 outputs a signal that enables address decoder 12 into internal control signal line 27. If card enable signals /CE1 and /CE2 are both at HIGH level, then card mode controller 13 does not output a signal that enables address decoder 12, so that IC memory card 1 becomes a state of standing by.

Card mode controller 13 outputs the write enable signal /WE and the output enable signal /OE into common memory section 4, attribute memory section 5, and data bus buffer through internal control signal lines 28, depending on the write enable signal /WE input from control signal line C2 and the output enable signal /OE input from control signal line C3. Card mode controller 13 also outputs a signal that gives instructions on which one of common memory section 4 and attribute memory section to select for memory space, into address decoder 12 through internal control signal line 27, depending on the output level of security circuit section 6. Address decoder 12 generates the chip select signal /CS, following the instruction signal memory space input from card mode controller 13, to output into common memory section 4 and attribute memory section 5 through internal control signal lines 26.

Security circuit section 6 detects the signal level in each cycle of each address data bit of the address data word Ad1 to Ad4 that is input during a predetermined number of cycles, to check whether the signal level agrees with a corresponding signal level of preset signal levels. If all the checked signal levels agree with the corresponding preset signal levels, then security circuit section 6 outputs the memory-space select signal /REG, which has been input from host system apparatus 2 through control signal line C4, into card mode controller 13. If at least one of the checked signal levels does not agree with the corresponding preset signal level, then security circuit section 6 outputs a signal that selects attribute memory section 5 into card mode controller 13, regardless of the memory-space select signal /REG input from host system apparatus 2 through control signal line C4.

In the following description, it is assumed that host system apparatus 2 outputs HIGH level of the memory-space select signal /REG, when selecting common memory section 4; and host system apparatus 2 outputs LOW level of the memory-space select signal /REG, when selecting common memory section 4.

FIG. 2 is a timing chart of a predetermined pattern of the address data word Ad1 to Ad4. If the address data word Ad1

8

to Ad4 input from host system apparatus 2 varies during 16 cycles as shown in FIG. 2, security circuit section 6 outputs the memory-space select signal /REG, which has been input from host system apparatus 2 through control signal line C4, into card mode controller 13. If the address data word Ad1 to Ad4 input from host system apparatus 2 does not vary as shown in FIG. 2 during the 16 cycles, then security circuit section 6 outputs a LOW level signal that selects attribute memory section 5 into card mode controller 13, regardless of the memory-space select signal /REG input from host system apparatus 2 through control signal line C4.

Card mode controller 13 outputs into address decoder 12 a signal that gives instructions for selecting common memory section 4, if receiving a HIGH level signal from security circuit section 6. Card mode controller 13 outputs into address decoder 12 a signal that gives instructions for selecting attribute memory section 5, if receiving a LOW level signal from security circuit section 6. Therefore, when a LOW level signal is output from security circuit section 6, attribute memory section 5 is automatically selected, so that access to common memory section 4 becomes impossible.

In other words, if address data of a predetermined pattern is input, for example, if the signal levels of the address data word Ad1 to Ad4 vary in a predetermined pattern during a predetermined number of cycles are input, then security circuit section 6 permits access to common memory section 4. If the signal levels of the address data word Ad1 to Ad4 varying in a pattern different from the predetermined pattern are input, then security circuit section 6 prohibits access to common memory section 4. In this way, access to common memory section 4 by unspecified systems or by unspecified operators can be made impossible.

FIG. 3 is a block circuit diagram illustrating an example of the security circuit section 6 in FIG. 1. The operation of security circuit section 6 is described in the following with reference to FIG. 3. In FIG. 3, it is assumed that the predetermined number of cycles is 16, and the address data word Ad1 to Ad4 is word. Referring to FIG. 3, security circuit section 6 has a data generating circuit 31 that generates a 4-bit data word QdA to QdD in each of the 16 cycles, where the data word QdA to QdD varies with the cycles, a first decoder 32 that converts each 4-bit data word QdA to QdD generated by data generating circuit 31 into a hexadecimal number, and a second decoder 33 that converts each address data word Ad1 to Ad4 input from host system apparatus 2 into a hexadecimal number.

Further, security circuit section 6 has a comparison section 34 that compares each 16-bit data word output from first decoder 32 with a corresponding 16-bit data word output from second decoder 33 and a judgment circuit 35 that judges whether the 16-bit data word output from first decoder 32 is the same as the corresponding 16-bit data word output from second decoder 33, based on the comparison results output from comparison section 34. First decoder 32, second decoder 33, and comparison section 34 form a comparison circuit section.

Data generating circuit 31 is connected to the host system apparatus 2 through control signal lines C0, C1. Data generating circuit 31 generates the 4-bit data word QdA to QdD, in each of the 16 cycles, from the card enable signals /CE1 and /CE2 input from control signal lines C0, C1 to output the 4-bit data word into first decoder 32. Data generating circuit 31 is also connected to power-supply control circuit 7 and receives the reset signal /RES. Second decoder 33 is connected to the host system apparatus 2 through address signal lines A1 to A4 and receives address

MTI0000504

6,126,070

9

data Ad1 to Ad4 from the address signal lines A1 to A4. First decoder 32 and second decoder 33 are connected to comparison section 34. Comparison section 34 is connected to judgment circuit 35. Judgment circuit 35 is connected to card mode controller 13.

The 4-bit data word QdA to QdD output from data generating circuit 31 is input to first decoder 32 and output into comparison section 34 after being decoded into a 16-bit data word Sd0 to Sd15. Here, each 4-bit data word represents one of the predetermined 16 different elements of data. First decoder 32 uniquely associates one of the 16 bits of the data word Sd0 to Sd15 with each of the 16 4-bit data words QdA to QdD; first decoder 32 then sets only the uniquely associated bit of the data word Sd0 to Sd15 at LOW level to output into comparison section 34.

Similarly, second decoder 33 uniquely associates one of the 16 bits of the data word Sda0 to Sda15 with each of the 16 4-bit data words Ad1 to Ad4. Second decoder 33 then sets only the uniquely associated bit of the data word Sda0 to Sda15 at LOW level to output into comparison section 34. Comparison section 34 compares in each cycle the 16-bit data word Sd0 to Sd15 with the 16-bit data word Sda0 to Sda15 to output the comparison result into judgment circuit 35.

Judgment circuit 35 outputs the memory-space select signal /REG, which has been input from host system apparatus 2, into card mode controller 13, if the address data word Ad1 to Ad4 input from host system apparatus 2 is the same as the 4-bit data word QdA to QdD in every cycle of the 16 cycles. If the address data word Ad1 to Ad4 input from host system apparatus 2 is different from the 4-bit data word QdA to QdD in at least one of the 16 cycles, then judgment circuit 35 outputs a signal that selects attribute memory section 5 into card mode controller 13, regardless of the memory-space select signal /REG input from host system apparatus 2. In this way, by controlling the signal level of the memory-space select signal /REG to be input to card mode controller 13, judgment circuit 35 makes it impossible for unspecified systems or unspecified operators to access common memory section 4.

FIG. 4 is a circuit diagram illustrating the data generating circuit 31. Data generating circuit 31 is composed of an AND circuit 41 and a synchronous 4-bit binary counter 42, called counter hereafter, that uses, for example, the MOS standard logic IC 74HC161. One input of AND circuit 41 is connected to control signal line C0 and receives the card enable signal /CE1 from host system apparatus 2. The other input is connected to control signal line C1 and receives the card enable signal /CE2 from host system apparatus 2.

The output of AND circuit 41 is applied to the clock input CLK of counter 42. The reset input /R of counter 42 is connected to power-supply control circuit 7 and receives the reset signal /RES. The inputs DA, DB, DC, DD of counter 42 are grounded. The ET (ENABLE T), EP (ENABLE P), and LO (LOAD) inputs are applied to the source voltage Vdd.

FIG. 5 illustrates the truth table of 74HC161 that forms counter 42. The ET, EP, and LO inputs are applied to the source voltage Vdd. Therefore, if the reset signal /RES is at HIGH level, then counter 42 counts whenever the card enable signals /CE1 and /CE2 are both at HIGH level, that is, the clock input CLK rises to HIGH level. If the reset signal /RES is at LOW level, then counter 42 is reset, so that the outputs QA to QD all become LOW level, and counter 42 returns to the initial state.

FIG. 6 is a circuit diagram illustrating the first decoder 32. First decoder 32 is formed of 4–16 line decoder 45, called

10

decoder IC hereafter, that uses, for example, the C-MOS standard logic IC 4515B. Referring to FIG. 6, in decoder IC 45, the output QA of counter 42 is applied to the data input D1; the output QB of counter 42 is applied to the data input D2; the output QC of counter 42 is applied to the data input D3; and the output QD of counter 42 is applied to the data input D4. Also, in decoder IC 45, the INHIBIT input is applied to the output of judgment circuit 35, and the STROB input is applied to the source voltage Vdd. Decoder IC 45 outputs the 16-bit data word Sd0 to Sd15 through the data outputs S0 to S15, depending on the data word input to the data inputs D1 to D4.

FIG. 7 illustrates the truth table of 4515B that forms decoder IC 45. Referring to FIG. 7, if the INHIBIT input is at LOW level in decoder IC 45, then only one of the outputs S0 to S15 becomes LOW level, corresponding to the data word input through the data inputs D1 to D4. If the INHIBIT input is at HIGH level, then the outputs S0 to S15 become all HIGH level, regardless of the data word input through the data inputs D1 to D4.

FIG. 8 is a circuit diagram illustrating the second decoder 33. Similarly as first decoder 32, second decoder 33 is formed of 4–16 line decoder 46 that uses, for example, the C-MOS standard logic IC 4515B. Referring to FIG. 8, in decoder IC 46, the address signal line A1 is applied to the data input D1; the address signal line A2 is applied to the data input D2; the address signal line A3 is applied to the data input D3; and the address signal line A4 is applied to the data input D4. Also, in decoder IC 46, the INHIBIT input is applied to the output of judgment circuit 35, and the STROB input is applied to the source voltage Vdd. Decoder IC 46 outputs the 16-bit data word Sda0 to Sda15 through the data outputs S0 to S15, depending on the data word input to the data inputs D1 to D4. A figure illustrating the truth table of 4515B that forms decoder IC 46 is the same as FIG. 7 and omitted from here.

FIG. 9 is a circuit diagram illustrating comparison section 34. Referring to FIG. 9, comparison circuit 34 is formed of 16 OR circuits 51 to 66. One input of each OR circuit 51 to 66 is uniquely applied to one of the outputs S0 to S15 of decoder 45. The other input of each OR circuit 51 to 66 is applied to a corresponding one of the outputs S0 to S15 of decoder 46. Here, the outputs S0 of decoders 45 and 46 are applied to OR circuit 51; the outputs S1 of decoders 45 and 46 are applied to OR circuit 52; and so forth. The output of each OR circuit 51 to 66 is connected to judgment circuit 35.

In this way, OR circuit 51 receives data bit Sd0 through its one input and data bit Sda0 through its other input; OR circuit 52 receives data bit Sd1 through its one input and data bit Sda1 through its other input; and so forth. Therefore, each OR circuits 51 to 66 receives a corresponding data bit of Sd0 to Sd15 through its one input and receives a corresponding data bit of Sda0 to Sda15 through its other input.

The output of each OR circuit 51 to 66 becomes LOW level if and only if both its inputs are LOW level. If the combination of the connections of the data outputs S0 to S15 of decoder IC 45 applied to the inputs of OR circuits 51 to 56 or the combination of the connections of the data outputs S0 to S15 of decoder IC 46 applied to the inputs of OR circuits 51 to 56 is changed, then the address data word Ad1 to Ad4 varying during the 16 cycles can be checked in a different order against the data word QdA to QdD output from counter 42 in the 16 cycles.

FIG. 10 is a circuit diagram illustrating the judgment circuit 35. In FIG. 10, the outputs of OR circuits 51 to 66 are respectively denoted by OR0 to OR15. Referring to FIG. 10,

MTI0000505

6,126,070

11

judgment circuit 35 is composed of 16 D flip-flops 71 to 86, an inverter circuit 88, and an AND circuit 89. The input of inverter circuit 88 is applied to address signal line A0. The output of inverter circuit 88 is applied to each D input of the D flip-flops 71, 73, 75, 77, 79, 81, 83, and 85. Each D input of the D flip-flops 72, 74, 76, 78, 80, 82, and 84 is applied to address signal line A0. In D flip-flop 71, the clock input CLK is applied to the output of OR circuit 51; the reset input R is connected to power-supply control circuit 7 and receives the reset signal /RES; and the Q output is applied to the reset input R of D flip-flop 72.

In D flip-flop 72, the clock input CLK is applied to the output of OR circuit 52, and the Q output is applied to the reset input R of D flip-flop 73. In D flip-flop 73, the clock input CLK is applied to the output of OR circuit 53, and the Q output is applied to the reset input R of D flip-flop 74. In D flip-flop 74, the clock input CLK is applied to the output of OR circuit 54, and the Q output is applied to the reset input R of D flip-flop 75. In D flip-flop 75, the clock input CLK is applied to the output of OR circuit 55, and the Q output is applied to the reset input R of D flip-flop 76.

In D flip-flop 76, the clock input CLK is applied to the output of OR circuit 56, and the Q output is applied to the reset input R of D flip-flop 77. In D flip-flop 77, the clock input CLK is applied to the output of OR circuit 57, and the Q output is applied to the reset input R of D flip-flop 78. In D flip-flop 78, the clock input CLK is applied to the output of OR circuit 58, and the Q output is applied to the reset input R of D flip-flop 79. In D flip-flop 79, the clock input CLK is applied to the output of OR circuit 59, and the Q output is applied to the reset input R of D flip-flop 80.

Further, in D flip-flop 80, the clock input CLK is applied to the output of OR circuit 60, and the Q output is applied to the reset input R of D flip-flop 81. In D flip-flop 81, the clock input CLK is applied to the output of OR circuit 61, and the Q output is applied to the reset input R of D flip-flop 82. In D flip-flop 82, the clock input CLK is applied to the output of OR circuit 62, and the Q output is applied to the reset input R of D flip-flop 83. In D flip-flop 83, the clock input CLK is applied to the output of OR circuit 63, and the Q output is applied to the reset input R of D flip-flop 84.

In D flip-flop 84, the clock input CLK is applied to the output of OR circuit 64, and the Q output is applied to the reset input R of D flip-flop 85. In D flip-flop 85, the clock input CLK is applied to the output of OR circuit 65, and the Q output is applied to the reset input R of D flip-flop 86. In D flip-flop 86, the clock input CLK is applied to the output of OR circuit 66, and the Q output is applied to one input of AND circuit 89. The other input of AND circuit 89 is connected to the host system apparatus 2 through control signal line C4 and receives the memory-space select signal /REG. The output of AND circuit 89 forms the output of judgment circuit 35, that is, the output of security circuit section 6, and connected to card mode controller 13.

FIG. 11 illustrates the truth table of D flip-flops 71 to 86. As shown in FIG. 11, the Q output of each D flip-flop 71 to 86 memorizes and continues to output the state at the D input at a positive edge of the signal input to the clock input CLK until the next positive edge of the signal input to CLK.

FIG. 12 is a timing chart illustrating signals at normal time in security circuit section 6. FIG. 12 shows the address data word Ad0 to Ad4 input to security circuit section 6 from host system apparatus 2, the signal /CE input to the clock input CLK of counter 42, and the data words QdA to QdD output from the outputs QA to QD of counter 42. In FIG. 12, it is assumed that the signal level of the address data bit Ad0

12

varies in every cycle. Changes in signal levels are shown for 15 cycles from the first to 16th cycle. Changes in the signal level of the address data bit Ad0 is made at HIGH level of the signal /CE. The first cycle starts, when power is turned on. In the first cycle, the reset signal /RES is input to counter 42 from power-supply control circuit 7, so that all the outputs QA to QD of counter 42 become LOW level.

First, the operation of each part of security circuit section 6 in the first cycle is described in the following. Only the data output S0 of the data outputs S0 to S15 of decoder IC 45 becomes LOW level, and the other data outputs S1 to S15 become HIGH level. Therefore, only the output OR0 of OR circuit 51 in all OR circuits 51 to 66 of comparison section 34 becomes LOW level, and the other outputs OR1 to OR15 of OR circuits 52 to 66 become HIGH level.

When power is turned on, a LOW level reset signal /RES is input from power-supply control circuit 7 to the reset input R of D flip-flop 71 in judgment circuit 35, so that the Q output of D flip-flop 86 becomes LOW level. At this time, in D flip-flops 71 to 86, only the clock input CLK of D flip flop 71 becomes LOW level, and the clock inputs CLK of the other flip-flops 72 to 86 become HIGH level. At the same time, a LOW level address data bit Ad0 is input to inverter circuit 88, so that the Q output of D flip-flop 71 is latched at HIGH level from the second cycle onwards, since the clock input CLK changes from LOW to HIGH in the second cycle and remains at HIGH level. However, in the first cycle, the LOW level Q output of D flip-flop 86 is applied to one input of AND circuit 89.

In the second cycle, only the clock input CLK of D flip flop 72 becomes LOW level, and the clock inputs CLK of the other D flip-flops 71 and 73 to 86 become HIGH level. At the same time, the address data bit Ad0 changes from LOW to HIGH, so that the Q output of D flip-flop 72 becomes HIGH level. Therefore, the Q output of D flip-flop 71 is latched at HIGH level from the third cycle onwards, since the clock input CLK changes from LOW to HIGH in the third cycle and remains at HIGH level.

Similarly, from the third to 16th cycle, the Q outputs of D flip-flops 73 to 86 become successively to HIGH level. When the Q output of D flip-flop 86 is finally latched at HIGH level, the one input of AND circuit 89 becomes HIGH level, so that the memory-space select signal /REG input from host system apparatus 2 is output into card mode controller 13 through AND circuit 89. In this way, the security operation of security circuit section 6 is cancelled.

On the other hand, if the address data word Ad1 to Ad4 does not agree with the 4-bit data word QdA to QdD generated by counter 42 in at least one of the 16 cycles, then the Q output of D flip-flop 86 is latched at LOW level, so that a LOW level signal is input to card mode controller 13 from AND circuit 89, regardless of the memory-space select signal /REG input from host system apparatus 2. In this case, host system apparatus 4 cannot access common memory section 4.

As described above, in the IC memory card of the first embodiment in accordance with the present invention, security circuit section 6 permits access to common memory section 4 by host system apparatus 2, if the address data word Ad1 to Ad4 input from the host system apparatus during a predetermined number of cycles through address signal lines A1 to A4 agrees with a preset data word in every cycle. Security circuit section 6 prohibits access to common memory section 4 by host system apparatus 2, if the address data Ad1 to Ad4 does not agree with the preset data word in

6,126,070

13

at least one cycle. In other words, if a signal having a
predetermined pattern is not output during a predetermined
number of cycles, then access to common memory section
4 is impossible. Therefore, the reading of data from memory
or the writing of data into memory is not easily done, so that
the security of data stored in the memory is enhanced.
Further, security circuit section 6 can be composed of logic
circuits. Therefore, the security function can be imple-
mented with simple circuitry.

SECOND EMBODIMENT

In a second embodiment described in the following, the
attribute memory section has a data storage area that stores
security data at a predetermined address. The security data
is then used as a password.

FIG. 13 is a block circuit diagram illustrating an IC
memory card of the second embodiment. Those components
identical with the ones in FIG. 1 are denoted by the same
symbols, and their descriptions are omitted from here. Only
those different from the ones in FIG. 1 are described in the
following.

FIG. 13 differs from FIG. 1 in that the circuitry of the
security circuit section is different. Referring to FIG. 13, an
IC memory card 95 comprises an interface section 3, a
common memory section 4, an attribute memory section 5,
a security circuit section 91 that prohibits access to common
memory section 4 by host system apparatus 2 unless a
predetermined procedure is executed, and a power-supply
control circuit 7 that provides to each section of IC memory
card 95 the source power input from the outside and also
generates and outputs a reset signal /RES.

Security circuit section 91 is connected to the host system
apparatus 2 through control signal lines C0, C1, C3, C4 and
address signal lines A1 to Am. Security circuit section 91 is
also connected to attribute memory section 5 through inter-
nal data lines Da0 to Da7 and also connected to card mode
controller 13.

FIG. 14 illustrates the memory space of the attribute
memory section 5. Attribute memory section 5 has a card-
attribute storage area 101 for storing attribute information
about IC memory card 95, a security-data storage area 102
for storing predetermined security data. Security-data stor-
age area 102 is located at a predetermined address of
attribute memory section 5. FIG. 15 is a block circuit
diagram illustrating an example of security circuit section
91. Referring to FIG. 15, security circuit section 91 has an
address-data setting section 105 that sets predetermined
address data for comparison to judge whether address data
input from host system apparatus 2 is correct or not for
indicating the location of security-data storage area 102, an
address-data comparison section 106 that compares address
data input from host system apparatus 2 with the address
data set in address-data setting section 105.

Security circuit section 91 further has a data setting
section 107 that sets security data for comparison to judge
whether the security data read out from attribute memory
section 5 by host system apparatus 2 is correct or not, a data
comparison section 108 that compares the data read out from
attribute memory section 5 by host system apparatus 2 with
the predetermined security data set in data setting section
107. Security circuit section also has AND circuits having 2
inputs 109, 110, a NAND circuit having 4 inputs 111, and a
D flip-flop 112. Here, only one input of NAND circuit 111
is non-inverted input, and the other three inputs are inverted
inputs.

The inputs of address-data comparison section 106 are
applied to address signal lines A1 to Am and address data

14

setting section 105. The output of address-data comparison
section 106 is applied to the non-inverted input of NAND
circuit 111. The inputs of data comparison section 108 are
applied to internal data lines Da0 to Da7 and data setting
section 107. The output of data comparison section 108 is
applied to the D input of D flip-flop 112. One input of AND
circuit 109 is applied to control signal line C0 and receives
the card enable signal /CE1. The other input of AND circuit
109 is applied to control signal line C1 and receives the card
enable signal /CE2.

In NAND circuit 111, one inverted input is applied to the
output of AND circuit 109; the other two inverted inputs are
respectively applied to control signal lines C3, C4 and
respectively receive the output enable signal /OE and the
memory-space select signal /REG. The output of NAND
circuit 111 is applied to the clock input CLK of D flip-flop
112. The Q output of D flip-flop is applied to one input of
AND circuit 110. The reset input R of D flip-flop 112 is
connected to power-supply control circuit 7 and receives the
reset signal /RES.

The other input of AND circuit 110 is connected to the
host system apparatus 2 through control signal line C4 and
receives the memory-space select signal /REG. The output
of AND circuit 110 forms the output of security circuit
section 91 and is connected to card mode controller 13. The
data set in address data setting section 105 and data setting
section 107 are formed by hardware. The data are set, for
example, by using pull-up resistors and pull-down resistors
and the like.

In the above construction, address-data comparison sec-
tion 106 compares the address data word Ad1 to Adm input
from host system apparatus 2 with the address data word for
comparison set in address-data setting section 105. Address-
data comparison section 106 outputs a HIGH level signal
into the non-inverted input of NAND circuit 111, if the
address data words agree with each other. Address-data
comparison section 106 outputs a LOW level signal into the
non-inverted input, if the address data words do not agree
with each other. The output of AND circuit 109 becomes
LOW level, if at least one of the card enable signals /CE1
and /CE2 is at low level. The output of AND circuit 109
becomes HIGH level, if both card enable signals /CE1 and
/CE2 are at HIGH level.

The output of NAND circuit 111 becomes LOW level, if
its non-inverted input becomes HIGH level, and if all its
inverted inputs become LOW level. Usually, when the card
enable signals /CE1, /CE2, memory-space select signal
/REG, and output enable signal /OE output from host system
apparatus 2 are all at LOW level, host system apparatus 2 is
in the mode of reading data out from attribute memory
section 5. When host system apparatus 2 is in the mode of
reading data out from attribute memory section 5, and if
address-data comparison section 106 outputs a HIGH level
signal as its comparison result, that is, the address data
words agree with each other, then NAND circuit 111 nor-
mally outputs a LOW level signal.

On the other hand, data comparison section 108 compares
the data read out from attribute memory section 5 by host
system apparatus 2 with the data for comparison set in data
setting section 107. If they agree with each other, then data
comparison section 108 outputs a HIGH level signal into the
D input of D flip-flop 112. If they do not agree with each
other, then data comparison section 108 outputs a LOW
level signal into the D input of D flip-flop 112. The low level
signal output from NAND circuit 111 is applied to the clock
input CLK of D flip-flop 112. A figure illustrating the truth
table of D flip-flop 112 is the same as FIG. 11.

MTI0000507

6,126,070

15

Next, after the reading of data from attribute memory section 5, the clock input CLK of D flip-flop 112 changes from LOW into HIGH, so that the Q output is latched at HIGH level, which is the signal level of the D input at this time. Therefore, one input of AND circuit 110 becomes HIGH level, and the memory-space select signal /REG input from host system apparatus 2 is output into card mode controller 13 through AND circuit 110, so that the security operation by security circuit section 91 is cancelled.

On the other hand, suppose address-data comparison section 106 outputs a LOW level signal as its comparison result, that is, the address data words do not agree with each other, or address comparison section 108 outputs a LOW level signal as its comparison result, that is, the data words do not agree with each other. In this case, the Q output of D-flip-flop 112 is latched at LOW level. Then card mode controller 13 receives a LOW level signal from AND circuit 110, regardless of the memory-space select signal /REG input from host system apparatus 2, so that host system apparatus 2 cannot access common memory section 4.

In this way, the IC memory card of the second embodiment in accordance with the present invention has security-data storage area 102 at a predetermined address of attribute memory section 5 and prohibits and permits access to common memory section 4, depending on the comparison results. Security circuit section 91 permits access to common memory section 5, if the address data input from host system apparatus 2 agrees with the predetermined address data stored in security-data storage area 102 and if the data read out from attribute memory section 5 by host system apparatus 2 agrees with the security data stored in security-data storage area 102. Otherwise, security circuit section 91 prohibits access to common memory section 4 by host system apparatus 2.

Consequently, in order to access common memory section 4, it is necessary that not only does the data read out from attribute memory section 5 by host system apparatus 2 agree with predetermined security data, but also the address data input from host system apparatus 2 agrees with the predetermined address data stored in security-data storage area 102. Therefore, the output of data from memory or the writing of data into memory is not easily done, so that the security of data stored in the memory is enhanced, and the security function can be implemented with simple circuitry.

Although the present invention has been fully described in connection with the preferred embodiments thereof and the accompanying drawings, it is to be noted that various changes and modifications are apparent to those skilled in the art. Such changes and modifications are to be understood as included within the scope of the present invention as defined by the appended claims unless they depart therefrom.

What is claimed is:

1. An IC memory card used with a host system apparatus for processing information and having a memory for storing data, said IC memory card comprising:

an interface section that interfaces with said host system apparatus;

a common memory section that is formed of at least one IC memory and stores data; and

a security circuit section that selectively prohibits and permits access to said common memory section, said security circuit section prohibiting access to said common memory section when address data input from said host system apparatus via said interface section in a predetermined number of cycles does not agree with

16

preset data, and permitting access to said common memory section when address data input from said host system apparatus via said interface section in the predetermined number of cycles agrees with said preset data.

2. The IC memory card defined in claim 1, wherein said security circuit section includes;

a data generating circuit that generates predetermined data for each cycle,

a comparison circuit that compares, for each cycle, the data generated by said data generating circuit with the address data input from said host system apparatus to output the comparison result, and

a judgment circuit that judges, based on the comparison results output from said comparison circuit, whether access to said common memory section should be prohibited or not.

3. The IC memory card defined in claim 2, wherein said data generating circuit is formed of a binary counter that counts based on a predetermined signal input from said host system apparatus.

4. The IC memory card defined in claim 2, wherein said comparison circuit includes;

a first decoder that decodes the data generated by said data generating circuit,

a second decoder that decodes the address data input from said host system apparatus, and

a comparison section that compares in each cycle the data decoded by said first decoder with the data decoded by said second decoder to output the comparison result.

5. The IC memory card of claim 1, wherein said security circuit section receives said address data input from said host system apparatus via an address bus included in said interface section.

6. The IC memory card of claim 5, wherein said interface section includes:

an address bus buffer for storing said address data input from said host system apparatus.

7. The IC memory card of claim 6, wherein said interface section further includes:

a card mode controller for controlling access to said common memory section in accordance with an output of said security circuit section.

8. An IC memory card used with a host system apparatus for processing information and having a memory that stores data, said IC memory card comprising:

an interface section that interfaces with said host system apparatus;

a common memory section that is formed of at least one IC memory and stores data;

an attribute memory section having a security-data storage area for storing predetermined security data and storing attribute information about said IC memory card; and

a security circuit section that selectively prohibits and permits access to said common memory section, said security circuit section checking the address data input from said host system apparatus and also checking the data read out from said attribute memory section based on the checked address data, wherein

said security circuit section permits access to said common memory section when the checked address data agrees with the address data that indicates the location of said security-data storage area and the read data agrees with said security data, and

MTI0000508

6,126,070

17

said security circuit section prohibits access to said common memory section when the checked address data does not agree with the address that indicates the location of said security-data storage area or when the read data does not agree with said security data.

9. The IC memory card defined in claim 8, wherein said security circuit section prohibits access to said common memory section, unless a control signal for the reading data from said attribute memory section is input from said host system apparatus, when said address data is checked.

10. The IC memory card defined in claim 8, wherein said security circuit section includes;

an address-data setting section that sets predetermined address data indicating the location of said security-data storage area,

an address-data comparison section that compares the address data input from said host system apparatus with the predetermined address data set in said address-data setting section to output the comparison results,

a data setting section that sets predetermined security data,

a data comparison section that compares the data read out from said attribute memory section based on the address data input from said host system apparatus with the predetermined security data set in said data setting section to output the comparison results, and

18

a judgment circuit that judges whether or not to prohibit access to said common memory section, depending on the comparison results output from said address-data comparison section and said data comparison section.

11. The IC memory card defined in claim 10, wherein said judgment circuit prohibits access to said common memory section, unless a control signal for reading data from said attribute memory section is input from said system apparatus, when the comparison results are input from said address-data comparison section.

12. The IC memory card of claim 8, wherein said security circuit section receives said address data input from said host system apparatus via an address bus included in said interface section.

13. The IC memory card of claim 12, wherein said interface section includes:

an address bus buffer for storing said address data input from said host system apparatus.

14. The IC memory card of claim 13, wherein said interface section further includes:

a card mode controller for controlling access to said common memory section in accordance with an output of said security circuit section.

* * * * *

MTI0000509

US006230288B1

(12) **United States Patent**
Kuo et al.

(10) Patent No.: **US 6,230,288 B1**
(45) Date of Patent: **May 8, 2001**

(54) **METHOD OF TREATING WHITESPACE DURING VIRUS DETECTION**

(75) Inventors: Chengi Jimmy Kuo, Torrance; Jivko Koltchev, Campbell; Dao-Chen Zheng, Cupertino, all of CA (US); Joseph Peter, Hillsboro, OR (US)

(73) Assignee: Network Associates, Inc., Santa Clara, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/181,880

(22) Filed: Oct. 29, 1998

(51) Int. Cl.[7] ............................................. H02H 3/05
(52) U.S. Cl. ............................. 714/38; 713/200
(58) Field of Search ........................ 714/38, 39, 49, 714/25; 713/200; 705/51

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,283,856 | * 2/1994 | Gross et al. | 395/51 |
| 5,293,629 | * 3/1994 | Conley et al. | 395/700 |
| 5,752,058 | * 5/1998 | Van De Vanter | 395/793 |
| 5,867,647 | * 2/1999 | Haigh et al. | 395/186 |
| 6,006,035 | * 12/1999 | Nabahi | 395/712 |

* cited by examiner

Primary Examiner—Norman M. Wright
(74) Attorney, Agent, or Firm—Pennie & Edmonds LLP

(57) **ABSTRACT**

A method is provided for detecting computer viruses that infect text-based files. In accordance with a preferred embodiment, a collection of virus signatures reflecting sequences of characters or instructions known to be found in such viruses is maintained on a computer system. A virus detection program is also maintained for the purpose of comparing the contents of computer files to the virus signatures. Upon execution of the virus detection program, whitespace within text-based files is transformed such that each sequence of whitespace characters is replaced by a single whitespace character. Virus signatures of viruses known to infect text files are similarly transformed. A transformed text-based file is then searched for at least one of said virus signatures. The user is alerted to a possible virus infection if any of the virus signatures are found in a file. In another preferred embodiment, an additional collection of at least one virus signature containing sequences of characters or instructions known to be found in viruses that infect executable computer files is maintained on the computer system. A transformed text-based file is searched for at least one of the additional virus signature, which are not transformed before the search.

**23 Claims, 2 Drawing Sheets**



MTI0000510

U.S. Patent

May 8, 2001

Sheet 1 of 2

US 6,230,288 B1



FIG. 1

MTI0000511



FIG. 2

MTI0000512

US 6,230,288 B1

1

## METHOD OF TREATING WHITESPACE DURING VIRUS DETECTION

### FIELD OF THE INVENTION

This invention relates to the field of computers and computer networks. In particular, the present invention relates to the treatment of whitespace while searching computer files for a computer virus.

### BACKGROUND OF THE INVENTION

A computer virus can be defined as a sequence of commands or instructions that interfere with a user's operation of, or cause damage to, his or her computer system. Computer viruses may damage a computer system directly, such as by deleting files or formatting a disk, or indirectly, such as by altering the system's protective measures and thus making the computer vulnerable to probing or other attacks.

Computer viruses therefore present a significant threat to the integrity and reliability of computer systems and will continue to present such a threat due to the trend toward interconnection of computers. The increase in computer-to-computer communications, via the internet for example, has caused a commensurate increase in the spread of viruses because infected files are spread more easily and rapidly than ever before.

Virus detection is thus an essential element in the effective maintenance of computer systems. In order to detect a computer virus, a virus detection program is generally employed in conjunction with a series of virus "profiles" or "signatures" which represent characteristics or patterns of known viruses. One type of virus detection routine monitors a program suspected of being infected by a virus. The program's behavior is compared to a profile of operating characteristics of a known virus and, if a match is found, the program is assumed to contain a virus.

While virus creators once focused on binary executable computer files (e.g., those with .EXE or .COM file extensions), they have broadened their horizons to target, for example, macros (such as those executed by word processing or spreadsheet programs) and even text-based files (e.g., word processing files, ASCII text files, etc). While many text files are unsuitable for performing malicious actions on behalf of a virus creator, others, such as batch and script files, contain instructions that are executed in conjunction with binary executable programs.

By way of illustration, mIRC is an internet relay chat program that allows multiple computer users, using computers remote from each other, to "converse" via the internet. A communication channel, or "chat room," is established by a user wishing to discuss a topic. Within a chat room, a user at one computer types messages that are received and displayed on the screen of the other users in the same chat room. Users can come and go from conversations, establish private communication channels, etc.

Upon its invocation, and during its execution, mIRC automatically invokes a number of script files to perform various functions. For example, EVENTS.INI contains instructions that mIRC applies in response to certain messages or events (e.g., a particular user joins the conversation, a conversant uses a specified word or phrase, etc.). Another script file, COMMANDS.INI, lists shortcut commands a user may employ. If, for example, the user frequently sends a particular message or response, he or she may create a short command (similar to a macro) which, when entered, is translated by mIRC into the longer message or response.

2

When one known version of mIRC is started by a user, a script file named SCRIPT.INI is executed. One command that may be included in SCRIPT.INI places the user's computer into a file transfer mode. This mode, which can be turned on and off, allows remote users in the same chat room to search the storage units (e.g., disk drives) attached to a user's computer system and to retrieve files residing on those storage units. This mode can be beneficial in the sharing of information between users, but, if it is included in the user's SCRIPT.INI without the user's knowledge, the contents of his or her computer system become vulnerable to pilferage.

Another command that may be executed in SCRIPT.INI causes the user's SCRIPT.INI file to be automatically transmitted to the computer system of each person who joins the user's chat room. Upon receipt of the file, the remote user's existing SCRIPT.INI file may be overwritten with the received version. If the transferred SCRIPT.INI file also enables file transfer mode (as described above), the remote user's computer system will, unknown to the user, become vulnerable the next time the script file is run.

These two "features" of mIRC are, in combination, sometimes termed the "mIRC virus." The virus propagates like a worm (i.e., it copies the entire file as opposed to simply inserting viral code into an uninfected file) and exposes a user's computer system to probing and file theft.

Text files such as the script files used by mIRC contain various character and formatting codes which may alter the appearance of the file and/or its output, but which have no effect upon the execution of script or batch commands within the file. For example, when individual commands within SCRIPT.INI are executed, individual words may be separated by one space character, two spaces, a dozen spaces, a line feed, a tab character, etc. These are generally known as "whitespace" because they are invisible characters that merely serve to separate visible, printable, characters.

When a text file is edited, its whitespace is often reformatted or rearranged in order to yield a particular textual appearance. The resulting text file may contain the identical sequence of printable characters as a known virus, but have as little as one difference in the whitespace dividing the characters of that sequence. Further, multiple text files infected with the same virus do not always manifest the virus in identical forms. For example, one text file may have been edited subsequent to its infection, thus altering the appearance of the resident virus (including whitespace within the virus). Although still capable of performing its intended task, the textual appearance of the virus in the one file is different from its appearance in a second, unmodified, infected text file. As a result, when both infected text files are searched for a specific pattern or sequence of commands representing the virus in its unmodified form, an infected file will not necessarily be identified. In other words, a viral signature that has been modified will not be detected by a virus detection program and the user will unknowingly continue to use an infected file.

With viruses that cause indirect damage, such as the mIRC virus, the user's computer may be exposed to probing attacks for an extended period of time before the user becomes aware of and purges the virus. Because the user is unlikely to notice any direct, obvious damage caused by the virus (e.g., deleted files, formatted disks), there is nothing to alert the user to the infection.

As a related problem, some virus detection programs falsely report the presence of a virus in a text file that merely describes or refers to a known virus. For example, a text or

MTI0000513

US 6,230,288 B1

3

word processing file may contain at least one textual extract—such as messages or other viral indicators that have been known to appear on the display of an infected computer system—from viruses known to infect executable computer files. The extracts may be included in the text file for informational purposes, such as to educate users as to known virus symptoms. When a virus detection program searches computer files for viruses by using indicia such as these extracts, the program may erroneously report that the text or word processing file contains a virus.

There is, therefore, a need in the art for a method of detecting a text-based virus in a text file regardless of how the whitespace within the virus and the file is formatted. There is also a need for a method of reducing the frequency with which virus detection programs falsely identify text-based files as being infected.

SUMMARY OF THE INVENTION

In accordance with a preferred embodiment, a method is provided to uniformly transform whitespace within a text-based computer file so that each combination of non-whitespace characters within the file is separated by the same code, preferably a whitespace character or characters. In this embodiment, on a computer system having at least one computer file, a sequence of virus detection instructions is maintained for searching the files for at least one computer viruse. A collection of virus signatures comprising computer-readable codes that are known or that are likely to be found in an infected file, or in a virus capable of infecting a file, is also maintained.

Prior to, or in conjunction with, searching a text computer file on the computer system for a virus that infects text files, whitespace (i.e., space, tab, line feed, etc.) within the file is transformed. Advantageously, each sequence of whitespace characters is replaced by a common whitespace sequence, illustratively a single space. A virus signature representing a virus known to infect text files is similarly transformed.

The virus detection instructions are then executed to compare a transformed virus signature to the contents of the transformed text file. Detection of a virus signature within the file indicates that the file is infected with the associated virus. A user is alerted if a file is determined to be infected.

In another preferred embodiment, the transformed text file is also searched for a virus signature associated with a virus that infects executable files. In this embodiment, the virus signature is not transformed before being compared to the file contents.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of the preferred embodiments will become more readily apparent from the following detailed description, which should be read in conjunction with the accompanying drawings, in which:

FIG. 1 is a block diagram of a representative computer system; and

FIG. 2 is a flowchart demonstrating a method of treating whitespace in accordance with a preferred embodiment.

DETAILED DESCRIPTION

Referring to FIG. 1, there is shown a representative computer system in which a method in accordance with a preferred embodiment may be implemented. Computer system 10 illustratively incorporates an IBM-compatible personal computer, but one skilled in the art will understand that computer system 10 is not limited to a particular size, class or model of computer.

4

Computer system 10 includes a central processing unit ("CPU") 12, a memory unit 14, at least one storage device 16, input device 18, a display device 20, a communication interface 22, and a printer 24. A system bus 26 is provided for communicating between the above elements.

Storage device 16 illustratively includes at least one removable or fixed disk drive, compact disc, DVD, or tape. Input device 18 is a keyboard, mouse, or other similar device. Display device 20 illustratively is a computer display, such as a CRT monitor, LED display or LCD display. Communication interface 22 may be a modem, a network interface, or other connection to external electronic devices, such as a serial or parallel port. Printer 24 is a hard copy output device such as a laser printer, dot matrix printer, or plotter.

Storage devices 16 contain a virus detection program 36 (e.g., a search engine) and a file containing at least one virus signature 38. Virus signatures 38 are sequences of computer-readable characters that portray viruses found within textual and/or executable computer files in that they match the behavior exhibited by, or a series of characters found within, known viruses. Virus detection program 36 comprises computer-readable instructions which, when executed by CPU 12, search for viruses within computer files on storage devices 16 and/or memory unit 14. Viruses in these computer files are identified by the detection of tell-tale characteristics which match one of virus signatures 38.

Virus detection program 36 operates by opening files on computer 10 and searching each one for at least one virus signature 38. One efficacious program for searching computer files for virus signatures is VirusScan™, a leading antivirus application produced by Network Associates, Inc., formerly known as McAfee Associates. VirusScan™ is a software application offered for sale in a variety of forms by a number of vendors. VirusScan™ is accompanied by documentation in printed form (see, e.g., "VirusScan Quick Start Guide", McAfee Associates 1997, accompanying the CD-ROM version of VirusScan for Windows 95, Windows NT, Windows 3.1x, DOS and OS/2), in computer-readable form (see, e.g., the directory \MANUALS on the CD-ROM version of VirusScan for Windows 95, Windows NT, Windows 3.1x, DOS and OS/2) and on the World Wide Web at http://www.nai.com. The contents of these documents are hereby incorporated by reference into the present application. Other information related to VirusScan™ may be found in U.S. patent application Ser. No. 09/001,611, filed Dec. 31, 1997, the disclosure of which is hereby incorporated by reference into the present application.

In one form, the VirusScan™ application is adapted in accordance with the present invention for use on a user's client computer running on a Windows 95™ platform. A primary routine used by this antivirus application is "SCAN.EXE." In general, the program SCAN.EXE operates by comparing the contents of a file with at least one known virus signature to determine if there is match. In accordance with the present invention, the program SCAN-.EXE has been adapted to serve as virus detection program 36 and to more effectively search for text-based viruses. Further, SCAN.EXE has been adapted to decrease or eliminate the erroneous detection of viruses within text or word processing files. Finally, SCAN.EXE retains its former capability of scanning executable files for viruses. In a typical configuration, SCAN.EXE draws upon at least one of the virus signature file, herein represented by the file name SCAN.DAT.

In accordance with a preferred embodiment, SCAN.EXE is modified to process text files on computer 10 prior to, or

MTI0000514

US 6,230,288 B1

5

in conjunction with, being searched for virus signatures 38. As modified, SCAN.EXE transforms a text file's "whitespace." As used herein, "whitespace" refers to a set of whitespace characters or whitespace sequences that may be found in a computer file. A "whitespace sequence" refers to a sequence of at least one whitespace character, and "whitespace character" refers to a non-printable or invisible character that may be used for formatting or control purposes, illustratively including any or all of the following: space, backspace, tab, vertical tab, line feed, form feed, and carriage return. For example, in IBM-compatible personal computers the whitespace characters are the decimal ASCII character codes 8–13 and 32. In contrast, printable characters illustratively include alphanumeric characters (e.g., those with decimal ASCII character codes in the range 48–57, 65–90 and 97–122) as well as punctuation marks and typographic symbols (e.g., decimal ASCII character codes 33–47, 58–64, 91–96 and 123–126).

In particular, SCAN.EXE performs a whitespace transformation on the text file by replacing each of the various whitespace sequences found in the text file with a common whitespace sequence, e.g., a single whitespace character such as a space. All whitespace sequences within text-based files are thus transformed by SCAN.EXE to common, uniform, representations. The result of this transformation is text files in which words and other series of visible, printable, characters are separated only by a single, known, character. Therefore, when the transformed text file is to be searched, the search procedure need not be concerned with the myriad possible whitespace sequences that may have been found in the original file. This is advantageous because users may edit an infected text file before it is searched, and thereby modify whatever whitespace was originally included in the virus. Because of such user modifications, searching for a text virus based on a profile or signature including anything more than the basic whitespace formatting provided by the present invention will likely fail to find the virus in infected files that were edited.

Prior to being compared to the contents of the transformed text file, a virus signature that represents a text-based virus is also subjected to the same whitespace transformation applied to the text-based file. Thus, in a preferred embodiment, each whitespace sequence within the computer-readable characters of the virus signature is transformed to a single whitespace character, and this character is the same as the whitespace character inserted in the transformed text file. By uniformly transforming all whitespace sequences within both the virus signature and a file to be searched, a virus in an infected file is much more likely to be located.

In the presently described preferred embodiment, the file being searched is only transformed if it is a text file. It is, however, transformed not only when being searched for text-based viruses, but also when being searched for viruses that are known to attack executable files (e.g., those with .EXE or .COM extensions). As described below, by transforming the text file when searching for executable file viruses, the frequency with which false detections occur is decreased.

In particular, in some instances, a text file may simply report or list a known virus profile or signature (e.g., a message printed on the display of an infected computer system) that is associated with a virus that attacks executable files. In such a case, the text file is not actually infected but a comparison of the text file with at least one virus signature would be likely to yield a match and an incorrect indication that the text file was infected with a virus. However, by

6

transforming the text file, including any internal references to or lists of virus profiles and signatures, but not transforming the signature of an executable virus before a match is attempted, it is unlikely that a match will be found. As a result, false detections of the executable virus within text-based files will be minimized.

Finally, when searching an executable file for virus signatures in accordance with a preferred embodiment, there is generally no transformation associated with the file or signatures in the signature file. Since executable files are not generally edited by users, there is generally no need to accommodate various whitespace formats. The whitespace configuration reflected in any file infected by an executable file virus will most likely match the whitespace configuration of the virus signature.

Thus, in a preferred embodiment, the following matrix identifies when to transform a file being searched for a virus or the virus signature representing the virus for which the file is being searched.

| When searching | For text virus | For executable virus |
|---|---|---|
| Text files | Transform text file and virus signature | Transform text file, but not virus signature |
| Executable files | Transform virus signature. Do not transform file. | Do not transform file or virus signature |

FIG. 2 is a flowchart demonstrating a method of treating whitespace in accordance with a preferred embodiment. In the illustrated method the virus detection procedure (e.g., the virus detection program SCAN.EXE) is invoked "on demand" by a system user. It is understood, however, that this method is easily modified for execution in response to a specified event (e.g., booting or shutting down computer system 10) or at a specified time (e.g., every night at a pre-scheduled time). SCAN.EXE can also be configured to search all or a subset of files on computer system 10. A user may choose to search files on all or a subset of storage devices and memory units and may choose to search only particular types of files (e.g., executable, text-based).

In step 50 SCAN.EXE, as modified with instructions capable of transforming text files, is installed on computer system 10 along with SCAN.DAT, which includes at least one virus signature. The virus signatures incorporated in SCAN.DAT represent virus behavior or sequences of characters derived from known and/or suspected viruses. The whitespace within virus signatures pertaining to text-based viruses is transformed, as discussed above, before such virus signatures are added to SCAN.DAT.

In step 52 a user invokes SCAN.EXE to search at least one file on computer system 10 for computer viruses. SCAN.EXE opens (step 54) a first file and determines (step 56) whether the file is an executable file (such as an executable program's object code) or a text file (such as script, batch, data and word processing files). At step 56, SCAN.EXE illustratively examines the first 100 characters of the file. As long as at least approximately 90% of them are printable characters, the file is considered a text file. For purposes of the presently illustrated embodiment, printable characters may include any or all whitespace characters (as described above), alphanumeric characters, punctuation marks, and typographic symbols. Illustratively, the ASCII character set comprising the decimal ranges of 8–13 and

MTI0000515

US 6,230,288 B1

7

32–126 are considered printable characters. One skilled in the art will understand that a wider range of characters may be considered printable without exceeding the scope of the preferred embodiments.

If determined to be a text-based file, the whitespace within the file is transformed (step 58) as described above. Subsequently, a virus signature from SCAN.DAT is selected (step 60) for comparison with the contents of either the executable file or the transformed text file.

If a text file is being searched for a virus that targets text files, the virus signature will already have been similarly transformed (e.g., prior to being added to SCAN.DAT). In particular, each whitespace sequence within the computer-readable characters of the virus signature will have been transformed to the same whitespace character, and that character will be identical to the character to which the text file whitespace is transformed.

Virus signatures relating to text-based viruses are illustratively identified as such at the time they are added to SCAN.DAT. Advantageously, flags in SCAN.DAT are set to indicate the type of virus that the virus signature represents and/or the type or types of files that the associated virus infects (e.g., executable, text-based). Thus, when added to SCAN.DAT in the presently illustrated preferred embodiment, text-based virus signatures that are to be compared to text files are transformed and segregated from virus signatures that are to be compared to executable files.

In another mode of operation, however, the original format of whitespace within the text-based virus signatures added to SCAN.DAT is left intact. In this mode of operation, then, the whitespace of such text-based virus signatures is transformed after the signature is selected to be compared to the contents of the executable or transformed text file.

The file, whether textual in nature or executable, is then searched (step 62) for the selected virus signature. If the virus signature is found (step 64) within the file, thus indicating the file is infected, a user is alerted (step 66).

If the virus signature is not found within the file (step 64), SCAN.EXE determines (step 68) whether the open file is to be searched for another virus signature. If the open file is to be searched for another signature, the illustrated method returns to step 60. Otherwise, SCAN.EXE determines (step 70) whether another file on computer system is to be searched. If not, the program exits; otherwise, SCAN.EXE resumes at step 54.

Various preferred embodiments have been described. The descriptions are intended to be illustrative, not limiting. Thus, it will be apparent to those skilled in the art that modifications may be made to the invention as described without departing from the scope of the claims set out below. For example, while preferred embodiments have been described in terms of transforming each whitespace sequence to a single whitespace character, it will be understood that other transformation procedures can be used. Generally speaking, methods of whitespace handling in accordance with the preferred embodiments are applicable wherever whitespace sequences between successive blocks of text are converted according to similar rules in both text files and the virus signatures associated with viruses that infect text files. A particularly advantageous rule is that all whitespace sequences, regardless of length or of the specific whitespace character content, are converted to the same code which comprises a whitespace character or characters.

One of skill in the art will also understand that text file whitespace sequences may instead be converted into other, non-whitespace, characters. For example, a visible, printable

8

character or characters may be used to replace whitespace sequences between successive blocks of text in a particular word processing environment. In addition, there may be instances in which no transformation of the virus signature is necessary. For instance, the virus signature may have previously been transformed into a sequence in accordance with a whitespace transformation rule. In such case the original virus signature can be stored in a compressed format.

What is claimed is:

1. A method of searching a text-based computer file for a computer virus known to infect text-based files using a stored sequence of computer-readable characters associated with the computer virus, comprising the steps of:

transforming whitespace within the text-based file in accordance with a whitespace transformation rule to form a transformed text-based file;

transforming whitespace within the stored sequence of computer-readable characters in accordance with said whitespace transformation rule to form a transformed sequence of computer-readable characters; and

searching said transformed text-based file for at least one occurrence of said transformed sequence of computer-readable characters, wherein the computer virus is detected upon an identification of at least one such occurrence.

2. The method of claim 1, said whitespace comprising at least one whitespace sequence, wherein said whitespace transformation rule is designed to transform said at least one whitespace sequence into a common predetermined whitespace sequence.

3. The method of claim 2, wherein said common predetermined whitespace sequence comprises a single whitespace character.

4. The method of claim 1, wherein prior to the step of transforming whitespace within the text-based file, a step of determining whether the computer file is indeed a text-based file is performed, said determining step comprising the steps of:

examining a predetermined number of characters in the computer file; and

determining whether a percentage of the examined characters that are printable characters exceeds a predetermined percentage.

5. The method of claim 4, wherein said predetermined percentage is greater than or equal to 90 percent.

6. The method of claim 4, wherein printable characters comprise ASCII character codes in the decimal range of 8–13 and 32–126.

7. The method of claim 4, wherein said predetermined number of characters is greater than or equal to 100.

8. The method of claim 3, wherein said single whitespace character is a space character.

9. The method of claim 8, wherein said whitespace sequence comprises at least one from the group consisting of: space, tab, vertical tab, line feed, form feed, carriage return, and null characters.

10. The method of claim 1, said whitespace comprising at least one whitespace sequence, wherein said whitespace transformation rule is designed to transform said at least one whitespace sequence into a common predetermined non-whitespace sequence.

11. The method of claim 10, wherein said at least one whitespace sequence comprises at least one from the group consisting of: space, tab, vertical tab, line feed, form feed, carriage return, and null.

MTI0000516

US 6,230,288 B1

9

**12.** A method of searching for a virus in a computer file that includes whitespace, the method comprising the steps of:

storing at least one virus profile;

determining whether the computer file is a text file;

if the computer file is a text file, reformatting the contents of the computer file to convert a sequence of whitespace characters into a single code; and

comparing the contents of the computer file with said at least one virus profile.

**13.** The method of claim **12** wherein said at least one virus profile comprises a plurality of whitespace characters, said method further comprising the step of transforming successive whitespace characters in said plurality of characters to a single code if the computer file is a text file.

**14.** The method of claim **12** wherein said single code is a space character.

**15.** The method of claim **12** wherein said sequence of whitespace characters comprises at least one from the group consisting of: space, tab, vertical tab, line feed, form feed, carriage return, and null.

**16.** The method of claim **12** wherein whitespace characters are non-printable computer-readable characters.

**17.** The method of claim **12** wherein said determining step comprises the steps of:

examining a predetermined number of characters in the file; and

determining the percentage of the examined characters that are printable characters;

10

wherein said computer file is determined to be a text file if 90% or more of the predetermined number of characters are printable characters.

**18.** The method of claim **17** wherein printable characters comprise ASCII character codes in the decimal range of 8–13 and 32–126.

**19.** A method of searching a computer file for a computer virus comprising the steps of:

storing a virus profile comprising a sequence of computer-readable characters associated with a computer virus;

determining whether the computer file is a text-based file;

transforming whitespace within the computer file if the computer file is a text-based file; and

searching said computer file for said virus profile.

**20.** The method of claim **19** further comprising the step of transforming whitespace thin the virus profile if the virus is known to infect text-based files.

**21.** The method of claim **19** wherein said transforming step comprises the steps of:

identifying a sequence of at least one whitespace character, said sequence containing only non-printable, computer-readable characters; and

replacing said sequence of at least one whitespace character with a code.

**22.** The method of claim **21** wherein the code is a single whitespace character.

**23.** The method of claim **21** wherein the code is a single non-whitespace character.

* * * * *

MTI0000517

| ***Office Action Summary*** | **Application No.** 09/961,417 | **Applicant(s)** BRESS ET AL. | |
|---|---|---|---|
| | **Examiner** NGOC V DINH | **Art Unit** 2187 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>03</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and it will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>25 September 2001</u>.

2a)☐ This action is **FINAL**.　　2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-53</u> is/are pending in the application.

　　4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-53</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

　　Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11)☐ The proposed drawing correction filed on _____ is: a)☐ approved b)☐ disapproved by the Examiner.

　　If approved, corrected drawings are required in reply to this Office action.

12)☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

　　a)☐ All　b)☐ Some *　c)☐ None of:

　　　1.☐ Certified copies of the priority documents have been received.

　　　2.☐ Certified copies of the priority documents have been received in Application No. _____.

　　　3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

　　* See the attached detailed Office action for a list of the certified copies not received.

14)☒ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

　　a) ☐ The translation of the foreign language provisional application has been received.

15)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)　　　　　　　　　　4)☐ Interview Summary (PTO-413) Paper No(s). _____.

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)　5)☐ Notice of Informal Patent Application (PTO-152)

3)☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) <u>2,4-5</u>.　6)☐ Other: _____.

MTI0000518



**UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

26615        7590        08/27/2003

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA  22030

| EXAMINER |
|---|
| DINH, NGOC V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2187 | |

DATE MAILED: 08/27/2003

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

MTI0000519

Application/Control Number: 09/961,417
Art Unit: 2187

## DETAILED ACTION

## INFORMATION DISCLOSURE STATEMENT

The Prior Art IDS statements filed September 09, 2001; April 30, 2003 and May 27, 2003 have been considered in the examination of the claims now pending. As required by M.P.E.P. 609 C(2), copies of the PTOL-1449 initiated and date by the Examiner is attached to the instant office action.

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

Claims 1-2, 4-8, 10-14, 32-34, 36-39, 41-44, 46-50, 52-53 are rejected under 35 U.S.C.102 (e) as being anticipated by Kern et al. PN 6,336,187.

**1.As per claims 1, 38 and 39:**

Kern teaches a computer system comprising: a host computer, a long term storage device and a blocking device between a host and a storage device [fig. 1], the blocking device comprising: an interface emulator [controller (106), fig. 1] configured to emulate an interface presented by the storage device; and interface [120, fig. 1] for connecting to the storage device; and a processor [102, fig. 1] coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands [e.g., reference location, operation parameters; col. 7, lines 34-60 to pass to the storage device via the interface [col. 1, lines 50-65; col. 2, line 45 to col. 3, line 10; col. 4, lines 51-65; col. 5, lines 5-15].

**2.As per claims 2, 4-8, 10-14 and 41-44, 46-48:**

Kern further teaches the commands in the predetermined set of commands are commands recognized by the processor as not modifying a storage state of the storage

MTI0000520

Application/Control Number: 09/961,417                                        Page 3

Art Unit: 2187

device [col. 4, lines 20-30]; the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator; the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device [abstract; col. 6 line 40 to col. 7, line60].

Kern further teaches the processor drops those of the commands that do not match the predetermined set of commands, and after dropping one of the matching commands, return status information to the host [e.g., error condition; col. 3, lines 5-10; col. 10, lines 1-10] that indicates that the dropped command was successfully completed; the blocking device further comprising: additional interfaces for connecting to additional storage devices, and each of the interfaces is independently coupled to the processor [col. 4, lines 40-65; col. 7, lines 34-65]; a temporary storage [124, fig. 1; 206, fig. 2] coupled to the processor , the processor storing data from the host corresponding to the dropped commands in the temporary storage, when read commands are received from the host that refer to data stored in the temporary storage, the processor returns the data from the temporary storage to the host [col. 5, lines 5-60; col. 6, lines 5-35];

Kern further teaches the blocking device including: a user configurable memory storing instructions [208, fig. 2] that define protected areas on the storage device, the processor dropping those of the commands that match the predetermined set of commands when the matching commands are commands that would otherwise modify the protected areas on the storage device; the processor examines feature information from the storage device that relate to features supported by the storage device and the processor zeroes any features not supported by the processor before making the feature information available to the host;  [col. 7, line 20 to col. 8 line 45; col. 9, lines 20-65].

**3. As per claims 32-34, 36-37:**

Kern teaches the claimed apparatus. Therefore, Kern teaches the claimed method of steps in claims 32-34, 36-37.

MTI0000521

Application/Control Number: 09/961,417                                          Page 4

Art Unit: 2187

**4.As per claims 49-50, 52-53:**

Claims 49-50, 52-53 are written in means plus same function format as claims 1-2, 5-

6, therefore the same rejection is applied.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of
> this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art
> to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

Claims 3, 9, 15-16, 18-28, 25-28, 35, 40, 45, 51 are rejected under 35 U.S.C 103(a) as

being unpatentable over Kern et al and in view of well known features of which Official

Notice is hereby taken.

**5.   As per claims 3 and 40 :**

Kern teaches the claimed apparatus as noted above.

Kern, however, does not explicitly teach the interface is an IDE.

It would have been obvious to one having ordinary skill in the art at the time the

invention was made to employ interface which use integrated device electronics

(IDE) in a given pattern for the application desired for using the IDE because this

type of circuitry is a smaller and less complicated, circuit boards and fewer

interconnect cables, gives IDE a distinct cost advantage over other disk drive

interface technologies. The IDE is commonly but not exclusively known in the art as

firmware, is well known and official notice is taken thereof.

**6.As per claims 9, 24 and 45:**

Kern teaches the claimed apparatus as noted above.

Kern, however, does not explicitly teach the light emitting diodes (LEDs) embedded

in the blocking device coupled to the processor and configured to transmit status

information relating to the status of the blocking device.

It would have been obvious to one having ordinary skill in the art at the time the

invention was made to use LEDs for transmitting status information relating to the

MTI0000522

Application/Control Number: 09/961,417                                          Page 5
Art Unit: 2187

status of the blocking device to help insure that the failed blocking device is readily
identifiable to the system administrator. The LEDs are used in the pertinent art as an
indicator for monitoring the status of device, and are well known and official notice is
taken thereof.

**7.As per claim 15:**

Kern teaches an emulator [controller, (106), fig. 1] component including a physical
interface designed to engage a first cable that connect to a host that control an storage
device; an interface configured to engage a second cable that connects to the storage
device and a logic circuit connecting the emulator component to the interface and
configured to compare commands received at the emulator component to a
predetermined set of commands, and to block transmission of one or more of the
commands from the emulator component to the interface when the comparison
indicates that the logic circuit does not recognize the received command is a
command that modifies the storage device [fig. 1; col. 1, lines 50-65; col. 2, line 45 to
col. 3, line 10; col. 4, lines 51-65; col. 5, lines 5-15].

Kern, however, does not explicitly teach the emulator [e.g., controller] and the
interface are an IDE.

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to employ interface which use integrated device electronics
(IDE) in a given pattern for the application desired for using the IDE because this
type of circuitry is a smaller and less complicated, circuit boards and fewer
interconnect cables, gives IDE a distinct cost advantage over other disk drive
interface technologies. The IDE is commonly but not exclusively known in the art as
firmware, is well known and official notice is taken thereof.

**8.  As per claim 16:**

Kern teaches the claimed apparatus as noted above.

Kern, however, does not explicitly teach the programmable logic device (PLD).

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to implement PLD into Kern blocking device. This is because of

MTI0000523

Application/Control Number: 09/961,417                                         Page 6
Art Unit: 2187

the high-density logic integration of PLD, thereby offering a significant savings on
chip board real-estate.  Moreover, using a PLD offers the ability to adjust to future
engineering changes. The PLD is used in the pertinent art as an logic programming
device and is well known and official notice is taken thereof.

9.  **As per claims 18-23, 25-28:**

Kern further teaches the commands in the predetermined set of commands are
commands that modify a storage state of the storage device [col. 4, lines 13-30]; the
logic circuit receives data back from the storage device and forwards the received
data to the host through the interface emulator; the commands include a capabilities
request command relating to the storage device, the logic circuit modifies data
received from the storage device relating to the capabilities request command to
reflect the capability of the storage device as affected by the presence of the device
[abstract; col. 6 line 40 to col. 7, line60].

Kern further teaches after blocking transmission of one of the commands, return
status information to the host [e.g., error condition; col. 3, lines 5-10; col. 10, lines 1-
10] that indicates that the blocked command was successfully executed; the device
further comprising: a second interface for connecting to a second storage devices, and
each of the interfaces is independently coupled to the logic circuit [col. 4, lines 40-65;
col. 7, lines 34-65]; a temporary storage [124, fig. 1; 206, fig. 2] coupled to the logic
circuit , the logic circuit storing data corresponding to the blocked commands in the
temporary storage, when read commands are received from the host that refer to data
stored in the temporary storage, the logic circuit returns the data from the temporary
storage to the host [col. 5, lines 5-60; col. 6, lines 5-35];

Kern further teaches the device including: a user configurable memory storing
instructions [208, fig. 2] that define protected areas on the storage device, the logic
circuit blocking received commands that match would modify the protected areas on
the storage device; the logic circuit examines feature information from the storage
device that relate to features supported by the storage device and the logic circuit

MTI0000524

Application/Control Number: 09/961,417                                      Page 7
Art Unit: 2187

removes any features not supported by the processor before making the feature information available to the host [col. 7, line 20 to col. 8 line 45; col. 9, lines 20-65].

**10. As per claim 35:**

Kern teaches the claimed apparatus. Therefore, Kern teaches the claimed method of steps in claim 35.

**11. As per claim 51:**

Claim 51 is written in means plus same function format as claim 3, therefore the same rejection is applied.

Claim 17 are rejected under 35 U.S.C 103(a) as being unpatentable over Kern et al, and in view of Chin et al PN 6,216,205.

**12. As per claim 17:**

Kern teaches the claimed apparatus as noted above.

Kern does not teach the dual port memory buffer.

Chin teaches a dual port memory buffer [col. 2, lines 29-32].

It would have been obvious to one having ordinary skill in the art at the time the invention was made to further include dual port memory into Kern blocking device. Doing so would allow read and write operations to occur independently of each other and achieve fast fall-through capability since data written into a dual-port memory can be immediately accessed for reading [col. 2, lines 29-33].

Claims 29-31 are rejected under 35 U.S.C 103(a) as being unpatentable over Kern et al, and in view of Kuo et al PN 6,230,288.

**13. As per claim 29:**

Kern teaches the claimed apparatus as noted above.

Kern does not teach the computer virus definition file.

Kuo teaches the computer virus definition file [e.g., virus signatures (38), fig. 1; abstract; col. 1, lines 28-35; col. 4, lines 49-65].

MTI0000525

Application/Control Number: 09/961,417                                    Page 8
Art Unit: 2187

It would have been obvious to one having ordinary skill in the art at the time the invention was made to further include the virus definition file as taught by Kuo into Kern blocking device. Doing so would allow the system quickly identify and eliminate the commands that are infected with computer viruses prior to the execution of those infected commands. Consequently, protection of data and information can be achieved readily and information can be protected against destruction from the outside viruses.

Claims 30-31 are rejected under 35 U.S.C 103(a) as being unpatentable over Kern et al, and in view of Kuo et al, and further in view of well known features of which Official Notice is hereby taken.

**14. As per claim 30:**

Kern-Kuo teaches the claimed apparatus as noted above.

Kern-Kuo does not teach the programmable logic device (PLD).

It would have been obvious to one having ordinary skill in the art at the time the invention was made to implement PLD into Kern blocking device. This is because of the high-density logic integration of PLD, thereby offering a significant savings on chip board real-estate. Moreover, using a PLD offers the ability to adjust to future engineering changes. The PLD is used in the pertinent art as a logic programming device and is well known and official notice is taken thereof.

**15. As per claim 31:**

Kern-Kuo teaches the claimed apparatus as noted above.

Kern-Kuo does not teach the Integrated Device Electronics (IDE).

It would have been obvious to one having ordinary skill in the art at the time the invention was made to employ interface which use integrated device electronics (IDE) in a given pattern for the application desired for using the IDE because this type of circuitry is a smaller and less complicated, circuit boards and fewer interconnect cables, gives IDE a distinct cost advantage over other disk drive interface technologies. The IDE is commonly but not exclusively known in the art as firmware, is well known and official notice is taken thereof.

MTI0000526

Application/Control Number: 09/961,417                                                Page 9
Art Unit: 2187

### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

a.  Kern et al PN 6,446,209 discloses storage controller and security.

b.  Fukuzumi PN 6,126,070 discloses Memory card with security check.

c.  Jia et al PN 5,991,402 discloses transformation filter.

d.  Chin et al PN 6,216,205 discloses controlling memory having tri-port buffer.

e.  Katsetos et al PN 6,546,438 discloses system for interfacing components

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Ngoc Dinh whose telephone number is (703) 305-3023.  The examiner can normally be reached on Monday-Friday 8:30 AM-5:00 PM. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Donald A. Sparks, can be reached on (703) 308-1756. The fax phone numbers for the organization where this application or proceeding is assigned are (703) 746-7239 for regular communications and (703) 746-7238 for After Final communications.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is (703) 305-3900.

NGOC DINH                                          DONALD SPARKS
Patent Examiner                                    Supervisory Patent Examiner
ART UNIT 2187                                       Technology Center 2100
August 22, 2003

MTI0000527



Patent
Attorney's Docket No.  0032-0003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of | ) |
| | ) |
| Steven BRESS et al. | )   Group Art Unit:  2187 |
| | ) |
| Application No.:  09/961,417 | )   Examiner:  N. V. Dinh |
| | ) |
| Filed:  September 25, 2001 | ) |
| | ) |
| For:  WRITE PROTECTION FOR | ) |
|     COMPUTER LONG-TERM | ) |
|     MEMORY DEVICES | ) |

### INFORMATION DISCLOSURE STATEMENT UNDER 37 C.F.R. § 1.97(c)

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

Pursuant to 37 C.F.R. §§ 1.56 and 1.97(c), applicant(s) bring(s) to the attention of the

Examiner the documents listed on the attached PTO 1449. This Information Disclosure

Statement is being filed after the events recited in Section 1.97(b) but, to the undersigned's

knowledge, before the mailing date of either a Final Action or a Notice of Allowance. Under the

provisions of 37 C.F.R. § 1.97(c), this Information Disclosure Statement:

☒  includes a certification as specified by Section 1.97(e).

☐  is accompanied by a fee of $180.00 as specified by Section 1.17(p).

MTI0000528

Information Disclosure Statement Under 37 C.F.R. § 1.97(c)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

☐ **Certification 1**: Each document listed in this Information Disclosure Statement was cited in a communication from the _____ Patent Office in a counterpart foreign application, and this Information Disclosure Statement is being filed within three months of the mailing date of that communication.

☒ **Certification 2**: Based on reasonable inquiry, no document listed in this Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart foreign application, and no document listed in this Information Disclosure Statement was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing date of this Information Disclosure Statement.

☒ Copies of the listed documents are attached.

☐ Copies of the listed documents were previously submitted in a prior application, serial no. _____, filing date _____, upon which applicant(s) rely(ies) for the benefits provided in 35 U.S.C. § 120. Applicant(s) respectfully request(s) that the Examiner consider the listed documents and indicate that they were considered by making appropriate notations on the attached form.

☐ The following is a concise statement of relevance of the non-English language documents.

　　1. _____ discloses _____.

　　2. _____ discloses _____.

☐ English translations of the non-English documents are enclosed.

☐ In lieu of a statement of relevance or translation of the non-English documents, an English language version of a search report from the _____ Patent Office in a corresponding application citing these documents and setting forth the relevance thereof is enclosed.

MTI0000529

Information Disclosure Statement Under 37 C.F.R. § 1.97(c)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 3

This submission does not represent that a search has been made or that no better art exists and does not constitute an admission that each or all of the listed documents are material or constitute "prior art." If the Examiner applies any of the documents as prior art against any claims in the application and applicant(s) determine(s) that the cited document(s) do not constitute "prior art" under United States law, applicant(s) reserve(s) the right to present to the office the relevant facts and law regarding the appropriate status of such documents.

Applicant(s) further reserve(s) the right to take appropriate action to establish the patentability of the disclosed invention over the listed documents, should one or more of the documents be applied against the claims of the present application.

If any copending application(s) is/are cited on the attached PTO 1449, the Examiner's attention is directed to the foregoing application(s) in compliance with § 2001.06(b) of the Manual of Patent Examining Procedure. By identifying the copending application(s), the assignee and/or applicant of the application(s) do not waive confidentiality of the application(s). Accordingly, the U.S. Patent and Trademark Office is requested to maintain the confidentiality of the copending application(s) under 35 U.S.C. § 122.

MTI0000530

Information Disclosure Statement Under 37 C.F.R. § 1.97(c)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 4

If there is any fee due in connection with the filing of this Statement, please charge the

fee to our Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date:  November 24, 2003

MTI0000531

SHEET 1 OF 1

| INFORMATION DISCLOSURE CITATION PTO-1449 | Customer Number 26615 | ATTORNEY'S DKT NO. 0032-0003 | APPLICATION NO. 09/961,417 |
| | | APPLICANT(S) Steven BRESS et al. | |
| | | FILING DATE September 25, 2001 | GROUP 2187 |

### U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NO. | DATE | NAME | CLASS | SUBCLASS | FILING DATE |
|---|---|---|---|---|---|---|
| M2 | 6,629,184 B1 | 09-30-03 | Berg et al. | 710 | 306 | 05-18-00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NO. | DATE | COUNTRY | CLASS | SUBCLASS | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| | |
| | |
| | |

| EXAMINER | DATE CONSIDERED 01/16/04 |
|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant(s).

MTI0000532

US006629184B1

(12) **United States Patent**
Berg et al.

(10) Patent No.: **US 6,629,184 B1**
(45) Date of Patent: **Sep. 30, 2003**

(54) **METHOD AND APPARATUS FOR INHIBITING A SELECTED IDE COMMAND**

(75) Inventors: **Charles R. Berg**, Cupertino, CA (US); **Bao Pham**, San Jose, CA (US)

(73) Assignee: **IGT**, Reno, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/573,663

(22) Filed: **May 18, 2000**

(51) Int. Cl.7 ........................... G06F 13/38; G06F 13/40
(52) U.S. Cl. ........................................ 710/306; 710/305
(58) Field of Search ................................ 710/305–317

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,126,890 A | 6/1992 | Wade et al. | |
| 5,268,960 A | * 12/1993 | Hung et al. | 713/200 |
| 5,559,993 A | * 9/1996 | Elliott et al. | 711/163 |
| 6,272,533 B1 | * 8/2001 | Browne | 709/213 |
| 2002/0040418 A1 | 4/2002 | Bress et al. | 711/112 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1293406 A | 5/2001 |
| EP | 0 877 059 | 3/1968 |
| GB | 2 230 881 | 10/1990 |
| JP | 03110620 | 5/1991 |
| JP | 10003362 | 1/1998 |
| JP | 10133951 | 5/1998 |
| WO | 93/09495 | 5/1993 |
| WO | 02/27445 | 4/2002 |

OTHER PUBLICATIONS

Fujitsu IDE Hard Disk Drives—Feb. 18, 2000 (admitted prior art).
Bit Micro Networks E–Disk ATX35 Ultra DMA Flash Disk and Solid State Disk Storage Solution—Feb. 18, 2000 (admitted prior art).
U.S. patent application to Stockdale, 09/338,262 filed Jun. 22, 1999.
PCT International Search Report for International Application No. PCT/US01/16257 dated Oct. 31, 2002.
English language abstract of Publication No. CN 1293406 A.

* cited by examiner

*Primary Examiner*—Rupal Dharia
(74) *Attorney, Agent, or Firm*—Marshall, Gerstein & Borun

(57) **ABSTRACT**

An interface circuit replaces a selected IDE command received from a host computer with an invalid command and routes the invalid command to a data storage device. In this manner, the interface circuit provides convenient, cost-effective technique for preventing a selected IDE command sent by the host computer from reaching the data storage device. Moreover, by replacing the selected command with an invalid command, rather than merely blocking the selected command, the data storage device can respond with an error message rather than leaving the data storage device and the IDE bus in a non-deterministic state that might require user intervention. The interface circuit is particularly well-suited for preventing a host computer from writing to an IDE hard disk drive in a gaming machine.

**58 Claims, 19 Drawing Sheets**



**U.S. Patent**     Sep. 30, 2003     Sheet 1 of 19     US 6,629,184 B1

# FIG. 1 (PRIOR ART)



MTI0000534

Case 2:13-ml-02461-GAF-PLA Document 38-10 Filed 02/19/14 Page 106 of 216 Page ID #:1119

## FIG. 2
### (PRIOR ART)



MTI0000535



FIG. 3 (PRIOR ART)



FIG. 4 (PRIOR ART)

MTI0000536

U.S. Patent

Sep. 30, 2003

Sheet 4 of 19

US 6,629,184 B1

| NAME | SOURCE | SIGNAL | PIN | PIN | SIGNAL | SOURCE | NAME |
|---|---|---|---|---|---|---|---|
| RESET | I | RESET | 1 | 2 | GROUND | | GROUND |
| DATA BUS BIT 7 | I/O | DD7 | 3 | 4 | DD8 | I/O | DATA BUS BIT 8 |
| DATA BUS BIT 6 | I/O | DD6 | 5 | 6 | DD9 | I/O | DATA BUS BIT 9 |
| DATA BUS BIT 5 | I/O | DD5 | 7 | 8 | DD10 | I/O | DATA BUS BIT 10 |
| DATA BUS BIT 4 | I/O | DD4 | 9 | 10 | DD11 | I/O | DATA BUS BIT 11 |
| DATA BUS BIT 3 | I/O | DD3 | 11 | 12 | DD12 | I/O | DATA BUS BIT 12 |
| DATA BUS BIT 2 | I/O | DD2 | 13 | 14 | DD13 | I/O | DATA BUS BIT 13 |
| DATA BUS BIT 1 | I/O | DD1 | 15 | 16 | DD14 | I/O | DATA BUS BIT 14 |
| DATA BUS BIT 0 | I/O | DD0 | 17 | 18 | DD15 | I/O | DATA BUS BIT 15 |
| GROUND | | GROUND | 19 | 20 | N.C. | | NO CONNECTION |
| DMA REQUEST | O | DMARQ | 21 | 22 | GROUND | | GROUND |
| I/O WRITE | I | DIOW | 23 | 24 | GROUND | | GROUND |
| I/O READ | I | DIOR | 25 | 26 | GROUND | | GROUND |
| I/O CHANNEL READY | O | IORDY | 27 | 28 | SPSYNC: CSEL | | SPINDLE SYNC or CABLE SELECT |
| DMA ACKNOWLEDGE | I | DMACK | 29 | 30 | GROUND | | GROUND |
| INTERRUPT REQUEST | O | INTRQ | 31 | 32 | IOCS16 | O | 16 BIT I/O |
| ADDRESS BIT 1 | I | DA1 | 33 | 34 | PDLAG | | PASSED DIAGNOSTIC |
| ADDRESS BIT 0 | I | DA0 | 35 | 36 | DA2 | I | ADDRESS BIT 2 |
| CHIP SELECT 0 | I | CS1FX | 37 | 38 | CS3FX | I | CHIP SELECT 1 |
| DRIVE ACTIVE/ DRIVE 1 PRESENT | O | DASP | 39 | 40 | GROUND | | GROUND |

FIG. 5 (PRIOR ART)

MTI0000537

## FIG. 6 (PRIOR ART)

| COMMAND NAME | COMMAND CODE |
|---|---|
| NOP | 00h |
| CFA REQUEST EXTENDED ERROR CODE | 03h |
| DEVICE RESET | 08h |
| READ SECTOR(S) | 20h |
| WRITE SECTOR(S) | 30h |
| CFA WRITE SECTORS WITHOUT ERASE | 38h |
| READ VERIFY SECTOR(S) | 40h |
| SEEK | 70h |
| CFA TRANSLATE SECTOR | 87h |
| EXECUTE DEVICE DIAGNOSTIC | 90h |
| INITIALIZE DEVICE PARAMETERS | 91h |
| DOWNLOAD MICROCODE | 92h |
| PACKET | A0h |
| IDENTIFY PACKET DEVICE | A1h |
| SERVICE | A2h |
| SMART | B0h |
| CFA ERASE SECTORS | C0h |
| READ MULTIPLE | C4h |
| WRITE MULTIPLE | C5h |
| SET MULTIPLE MODE | C6h |
| READ DMA QUEUED | C7h |
| READ DMA | C8h |
| WRITE DMA | CAh |
| WRITE DMA QUEUED | CCh |
| CFA WRITE MULTIPLE WITHOUT ERASE | CDh |
| GET MEDIA STATUS | DAh |
| MEDIA LOCK | DEh |
| MEDIA UNLOCK | DFh |
| STANDBY IMMEDIATE | E0h |
| IDLE IMMEDIATE | E1h |
| STANDBY | E2h |
| IDLE | E3h |
| READ BUFFER | E4h |
| CHECK POWER MODE | E5h |
| SLEEP | E6h |
| FLUSH CACHE | E7h |
| WRITE BUFFER | E8h |
| IDENTIFY DEVICE | ECh |
| MEDIA EJECT | EDh |
| SET FEATURES | EFh |
| SECURITY SET PASSWORD | F1h |
| SECURITY UNLOCK | F2h |
| SECURITY ERASE PREPARE | F3h |
| SECURITY ERASE UNIT | F4h |
| SECURITY FREEZE LOCK | F5h |
| SECURITY DISABLE PASSWORD | F6h |
| READ NATIVE MAX ADDRESS | F8h |
| SET MAX ADDRESS | F9h |
| VENDOR SPECIFIC | 9Ah,C0h-C3h,8xh,F0h,F7h,FAh-FFh |
| RETIRED | 11h-1Fh,71h-7Fh,94h-99h, DBh-DDh,E9h |
| OBSOLETE | 10h,21h-23h,31h-33h,3C,41h, 50h,C9h,CBh,EEh |

MTI0000538

U.S. Patent

Sep. 30, 2003

Sheet 6 of 19

US 6,629,184 B1

IDE command and control register

**FIG. 7** (PRIOR ART)

| ADDRESS | | | | | NAME AND FUNCTION | |
|---|---|---|---|---|---|---|
| CS1FX | CS3FX | DA2 | DA1 | DA0 | READ ACCSESS | WRITE ACCSESS |
| *COMMAND REGISTER BLOCK* | | | | | | |
| 1 | 0 | 0 | 0 | 0 | DATA REGISTER | DATA REGISTER |
| 1 | 0 | 0 | 0 | 1 | ERROR REGISTER | FEATURE REGISTER |
| 1 | 0 | 0 | 1 | 0 | SECTOR COUNT REGISTER | SECTOR COUNT REGISTER |
| 1 | 0 | 0 | 1 | 1 | SECTOR NUMBER REGISTER SECTOR NUMBER OR BLOCK ADDRESS 0-7 | SECTOR NUMBER REGISTER SECTOR NUMBER OR BLOCK ADDRESS 0-7 |
| 1 | 0 | 1 | 0 | 0 | CYLINDER REGISTER 0 CYLINDER 0-7 OR BLOCK ADDRESS 8-15 | CYLINDER REGISTER 0 CYLINDER 0-7 OR BLOCK ADDRESS 8-15 |
| 1 | 0 | 1 | 0 | 1 | CYLINDER REGISTER 1 CYLINDER 8-15 OR BLOCK ADDRESS 16-23 | CYLINDER REGISTER 1 CYLINDER 8-15 OR BLOCK ADDRESS 16-23 |
| 1 | 0 | 1 | 1 | 0 | DRIVE/HEAD REGISTER DRIVE/HEAD NUMBER OR BLOCK ADDRESS 24-27 | DRIVE/HEAD REGISTER DRIVE/HEAD NUMBER OR BLOCK ADDRESS 14-31 |
| 1 | 0 | 1 | 1 | 1 | STATUS REGISTER | COMMAND REGISTER |
| *CONTROLREGISTER BLOCK* | | | | | | |
| 0 | 1 | 0 | 0 | 0 | NOT USED | NOT USED |
| 0 | 1 | 0 | 0 | 1 | NOT USED | NOT USED |
| 0 | 1 | 0 | 1 | 0 | NOT USED | NOT USED |
| 0 | 1 | 0 | 1 | 1 | NOT USED | NOT USED |
| 0 | 1 | 1 | 0 | 0 | NOT USED | NOT USED |
| 0 | 1 | 1 | 0 | 1 | NOT USED | NOT USED |
| 0 | 1 | 1 | 1 | 0 | ALTERNATE STATUS REGISTER | CONTROL REGISTER |
| 0 | 1 | 1 | 1 | 1 | ADDRESS REGISTER | NOT USED |

MTI0000539

IDE status register

| 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|
| BSY | DRDY | DWF | DSC | DRQ | CORR | IDX | ERR |

## FIG. 8 (PRIOR ART)

IDE error register

| 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|
| BBK | UNC | MC | IDNF | MCR | ABRT | TK0NF | AMNF |

## FIG. 9 (PRIOR ART)

MTI0000540



FIG. 10A

FIG. 10B

FIG. 10C

FIG. 10 D

FIG. 10 E

Case 2:13-ml-02461-GAF-PLA  Document 38-10  Filed 02/19/14  Page 113 of 216  Page ID #:1126



FIG. IIA

FIG. IIB

FIG. IIC

MTI0000542



FIG. 11D

FIG. 11E

FIG. 12

MTI0000543

U.S. Patent

Sep. 30, 2003

Sheet 11 of 19

US 6,629,184 B1

FIG. 13



MTI0000544

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 116 of 216   Page ID #:1129



FIG. 14



FIG. 15

MTI0000545



**FIG. 16**

MTI0000546



FIG. 17



FIG. 18

MTI0000548

## FIG. 19



FIG. 20A

100
102
GND
DD8
DD9
DD10
DD11
DD12
DD13
DD14
DD15
(KEYPIN)
GND
GND
GND
CSEL
GND
RESVD
PDIAG-
DA2
CS1-
GND
RESET-
DD7
DD6
DD5
DD4
DD3
DD2
DD1
DD0
GND
DMARQ
DIOW-
DIOR-
IORDY
DMACK-
INTRQ
DA1
DA0
CSO-
DASP-
R1
R2
R3
R4
R5
R6
R7
R8
104
TD7
TD6
TD5
TD4
TD3
TD2
TD1
TD0
VCC
C1
C2
C3
C4
106
108
12V
12V return
5V return
5V



FIG. 20B

132
136
VCC
1A1
1A2
1A3
1A4
1A5
1A6
1A7
1A8
1A9
1A10
2A1
2A2
2A3
2A4
2A5
2A6
2A7
2A8
2A9
2A10
1OE-
2OE-
1B1
1B2
1B3
1B4
1B5
1B6
1B7
1B8
1B9
1B10
2B1
2B2
2B3
2B4
2B5
2B6
2B7
2B8
2B9
2B10
HD0
HD1
HD2
HD3
HD4
HD5
HD6
HD7
TD0
TD1
TD2
TD3
TD4
TD5
TD6
TD7
D0
D1
D2
D3
D4
D5
D6
D7
DA0
DA1
DA2
CS0-
CS1-
DIOH-
DIOW
NOWRITE-
CLK
PASSTHRU-
ERRCMD-
QNOWRITE-
R9
R10
R11
R12
R13
R14
R15
R16
RESET-
166
130

U.S. Patent     Sep. 30, 2003     Sheet 19 of 19     US 6,629,184 B1



FIG. 21

US 6,629,184 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## METHOD AND APPARATUS FOR INHIBITING A SELECTED IDE COMMAND

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to selective IDE command transfer, and more particularly to a method and apparatus for inhibiting a selected IDE command (such as a write command) sent from a host computer from reaching a data storage device (such as a hard disk drive).

2. Description of Related Art

Host computers utilize data storage devices to provide increased storage capabilities to fulfill user demands. Hard disk drives are popular data storage devices. A hard disk drive generally includes several disks that each contain concentric tracks on both of their primary surfaces-for storing data, a spin motor that rotates the disks about a central axis at a substantially constant rate, heads that read data from and write data to the disks (with one head per disk surface), an actuator assembly that radially positions the heads above the desired tracks, and circuitry such as a preamplifier, read channel and controller that transfers data between the heads and the host computer.

The host computer delivers access requests to the hard disk drive whenever the host computer desires to store or retrieve data. To perform the access request, the hard disk drive first positions the heads above the desired tracks of the rotating disks specified by the access request. Once the heads are properly positioned, the requested data transfer takes place. Writing is performed by delivering a write signal with polarity-switching current to a selected head while the head is positioned above the desired track, and the head induces magnetically polarized-transitions into the desired track that are representative of the data being stored. Reading is performed by the head sensing the magnetically polarized transitions on the track. As the disk spins below the head, the magnetically polarized transitions induce a varying magnetic field in the head which the head converts into an analog read signal that is amplified by the preamplifier, converted into a digital signal and processed by the read channel, and provided to the host computer.

The hard disk drive communicates with the host computer by an interface (or bus). The interface can be defined in many layers, including the cable or connector, the protocol, the peripheral device, and the commands. Although the ST412/506 and Enhanced Small Device Interface (ESDI) interfaces were widely used for earlier generations of hard disk drives, as more electronics (such as the formatter, data buffer and controller) have been integrated into more modern and intelligent drives, these earlier interfaces have been replaced by other interfaces. The two most popular modern hard disk drive interfaces are Integrated Drive Electronics (IDE) and Small Computer Systems Interface (SCSI). The IDE interface is often referred to as the AT-Attachment (ATA) since the integrated electronics within the drive emulate the hard disk controller of an IBM AT personal computer.

The IDE and SCSI interfaces differ in many respects. For instance, IDE permits the hard disk drive to integrate more electronics than SCSI. IDE typically links the host computer to one or two hard disk drives and/or CD-ROMs, whereas SCSI can link the host computer to seven or more devices including hard disk drives, tape drives, printers, scanners, CD-ROMs, optical storage and WORM drives, processors, and communication devices. IDE employs a 40-wire ribbon

cable, whereas SCSI employs a 50-wire ribbon cable for an 8-bit data bus that links the host computer to seven devices. Further, Wide SCSI and Ultra SCSI implementations with 16- and 32-bit data buses, respectively, use wider cables that link the host computer to 15 and 31 devices, respectively. IDE is preferred over SCSI for low cost and ease of use, whereas SCSI offers more speed and capability than IDE and is often the choice over IDE in high-end PCs and workstations.

A critical factor in the mass production of host computer systems is the associated production costs of the bus and related interface circuitry. Generally, the more signals a bus has and the more sophisticated the associated control logic, the more costly it becomes. The success of IDE and SCSI can be attributed to the availability of economical bus interface components and the fact that a simple ribbon cable can be used to interconnect the devices. However, the cost of IDE hard disk drives typically is significantly less than the cost of SCSI hard disk drives. For example, IDE hard disk drives can cost on the order of 50% less than SCSI hard disk drives with comparable performance (storage capacity, data transfer rate, average seek time, etc.). Moreover, IDE controllers are usually integrated on the motherboard of the host computer, whereas SCSI controllers are usually separate cards that must be purchased separately from the host computer and installed in one of the slots in the host computer. Thus, another disadvantage of SCSI hard disk drives as compared to IDE hard disk drives is the need to purchase an SCSI controller and to consume a slot in the host computer that might otherwise be used for another peripheral device.

In some applications, the host computer should be prevented from performing certain operations on the hard disk drive. For example, in gaming machines such as casino slot machines, it may be desirable to prevent the host computer from writing to the hard disk drive in order to prevent unauthorized changes to programs and data stored on the hard disk drive. As more gaming machines move towards personal computer based platforms, a convenient, cost-effective technique to write-inhibit the hard disk drive would be highly desirable.

SCSI hard disk drives typically have write-inhibit capability, however, as mentioned above, SCSI hard disk drives typically are significantly more expensive than IDE hard disk drives and require a slot in the host computer. IDE hard disk drives with write-protect jumpers have been reported in the literature. For instance, the Fujitsu M261xT IDE hard disk drives with write-protect jumpers have been discontinued, and the Bitmicro Networks E-Disk ATX35 solid state IDE hard disk drive with a write-protect jumper is prohibitively expensive. Unfortunately, the vast majority of IDE hard disk drives do not have write-protect jumpers or any other hardware-implemented write-inhibit capability. In another approach, U.S. Pat. No. 5,126,890 to Wade et al. discloses a security module for a removable hard disk drive, the module has a lockable hardware write protection feature in which a four position lock can be set to generate a control signal, and the hard disk drive becomes write protected in response to the control signal.

Furthermore, merely blocking a write command sent from a host computer along an IDE bus so that it fails to reach the hard disk drive is not a viable approach since this may leave the drive and the IDE bus in a non-deterministic state that requires user intervention.

Accordingly, none of the existing solutions provides a satisfactory approach to preventing the host computer from

MTI0000553

US 6,629,184 B1

**3**

sending selected commands to a data storage device while allowing the manufacturer to choose from a wide variety of data storage devices. More particularly, none of the existing solutions provides a satisfactory technique for inhibiting a host computer from writing to an IDE hard disk drive while retaining the flexibility of selecting whatever IDE hard disk drive best suits the particular application.

## SUMMARY OF THE INVENTION

The present invention solves the above and other problems, and thereby advances the useful arts, by providing an interface circuit that replaces a selected IDE command received from the host computer with an invalid command and routes the invalid command to a data storage device. Preferably, the interface circuit is placed between an IDE port of the host computer and an IDE port of a hard disk drive. In this manner, the interface circuit provides a convenient, cost-effective technique for inhibiting a selected IDE command sent by the host computer from reaching the data storage device. The interface circuit can be used with any IDE data storage device. Moreover, by replacing the inhibited command with an invalid command, rather than merely blocking the inhibited command, the data storage device can provide an error message rather than leaving the data storage device and IDE bus in a non-deterministic state that might require user intervention.

Generally speaking, the interface circuit includes a first port for communicating with an IDE interface of a host computer, a second port for communicating with an IDE interface of a data storage device, and a control circuit that sends an invalid command rather than a selected IDE command to the second port in response to receiving the selected IDE command at the first port.

Preferably, the data storage device is a hard disk drive, the selected IDE command is a write command, and the invalid command is a reserved IDE command. It is also preferred that the interface circuit routes any communication other than the selected command(s) received from the host computer to the data storage device, thereby permitting the host computer to read an error message that the data storage device generates in response to the invalid command.

In one embodiment, the interface circuit includes an external device that permits a user to enable and disable the command-inhibit function of the control circuit. When the command-inhibit function is enabled, the control circuit sends the invalid command rather than the selected IDE command to the second port in response to the selected IDE command being received at the first port. When the command-inhibit function is disabled, the control circuit sends the selected IDE command rather than the invalid command to the second port in response to the selected IDE command being received at the first port. The external device can be a mechanical switch or a pair of jumper pins.

In another embodiment, the interface circuit includes a printed circuit board, the first port is a 40-pin male connector that extends from a first major surface of the printed circuit board and plugs into an IDE ribbon cable connected to the host computer, and the second port is a 40-pin female connector that extends from a second major surface of the printed circuit board and plugs into the IDE port of the hard disk drive.

The present invention also includes a method of selectively transferring IDE commands between a host computer and a data storage device. In one embodiment, the method includes sending an IDE command from the host computer to a first IDE bus not connected to the data storage device,

**4**

determining that the data storage device should not receive the IDE command, sending an invalid command rather than the IDE command to a second IDE bus connected to the data storage device, and sending an error message that the data storage device provides in response to the invalid command from the data storage device to the host computer via the first and second IDE buses. This not only prevents the host computer from sending the command to the data storage device, but also notifies the host computer that the desired operation has failed.

The method may also include periodically sending another IDE command from the host computer to the data storage device via the first and second buses to determine whether the data storage device received the IDE command that it should not have received.

The invention is particularly well-suited for preventing a host computer from writing to an IDE hard disk drive in a gaming machine such as a slot machine.

It is therefore an object of the present invention to provide an interface circuit that inhibits a selected IDE command sent by a host computer from reaching a data storage device.

It is another object of the present invention to provide an interface circuit that enables a data storage device to provide an error message to a host computer when a selected IDE command sent by the host computer has not reached the data storage device.

It is a further object of the present invention to provide a convenient, cost-effective technique for assuring that a host computer cannot make unauthorized changes to programs and data stored on an IDE data storage device.

These and other objects, features and advantages of the invention will be further described and more readily apparent from a review of the detailed description of the preferred embodiments which follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following detailed description of the preferred embodiments can best be understood when read in conjunction with the following drawings, in which:

FIG. 1 is a perspective view of a conventional gaming machine as generally known in the art in which the structures and methods of the present invention may be advantageously applied;

FIG. 2 is a block diagram of the electrical components in the gaming machine in FIG. 1;

FIG. 3 is top plan view of the IDE bus in FIG. 2;

FIG. 4 is a perspective view of the connection between the hard disk drive and the IDE bus in FIG. 2;

FIG. 5 lists the IDE interface pin assignments in FIG. 2;

FIG. 6 lists the IDE commands defined by the ATA-5 specification;

FIG. 7 illustrates the IDE command register block in the hard disk drive in FIG. 2;

FIG. 8 illustrates the IDE status register in the hard disk drive in FIG. 2;

FIG. 9 illustrates the IDE error register in the hard disk drive in FIG. 2;

FIGS. 10A–10E are mechanical views of the adapter board of the present invention;

FIGS. 11A–11E are mechanical views, similar to FIGS. 10A–10E, respectively, showing the adapter board of the present invention installed between the hard disk drive and the IDE bus in FIG. 4;

FIG. 12 is a block diagram of the adapter board of the present invention;

US 6,629,184 B1

5

FIG. 13 is a block diagram of the programmable array logic in FIG. 12;

FIG. 14 is a block diagram of the invalid command generator in FIG. 12;

FIG. 15 is a circuit diagram of the data switch in FIG. 12;

FIG. 16 is a simplified timing diagram of programmed I/O operations using the adapter board of the present invention;

FIG. 17 is simplified timing diagram of a write operation using the adapter board of the present invention when the write-inhibit function is disabled;

FIG. 18 is a simplified timing diagram of an attempted write operation using the adapter board of the present invention when the write-inhibit function is enabled;

FIG. 19 is a flow chart illustrating the operation of the adapter board of the present invention;

FIG. 20 is a schematic diagram of an implementation of the adapter board of the present invention; and

FIG. 21 is a logic diagram of the programmable array logic in FIG. 20.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

While the present invention is susceptible to various modifications and alternative forms, specific embodiments thereof have been shown by way of example in the drawings and will herein be described in detail. It should be understood, however, that it is not intended to limit the invention to the particular form disclosed, but on the contrary, the invention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the invention as defined by the appended claims.

FIG. 1 is a perspective view of an electronic gaming machine 2 that may embody the present invention.

FIG. 2 is a block diagram of the electrical components of gaming machine 2. Central processing unit (CPU) 10 such as a Pentium™ based microprocessor from Intel Corporation interfaces with bus controller 12 to access information available from various components and information from random access memory (RAM) 14 such as a 32 megabyte dynamic RAM. Bus controller 12 sends and receives information via system bus 16 to the various components. System bus 16 is not limited to a particular type and can be an ISA bus, EISA bus, PCI bus, or others. Moreover, system bus 16 can be linked to an external bus connector to further extend the system. Upon powering-up gaming machine 2, read only memory (ROM) 18 such as a battery-backed non-volatile static RAM is read and is used to configure the initial operational parameters.

Hard disk drive 20 provides mass data storage for gaming machine 2. Hard disk drive 20 stores game specific data set, such as program data, image data specifying the rules of various different games and the types of images or image sequences to be displayed to the game player, and sound data. Hard disk drive 20 has a storage capacity that is a function of the number of game variations provided as well as the amount of data for each game. In general, the more motion video designed into a particular game, the more storage required for the game software. Hard disk drive 20 is coupled to system bus 16 via IDE adapter 22 and IDE bus 24. More particularly, IDE adapter 22 is connected to system bus 16, and IDE bus 24 is connected between hard disk drive 20 and IDE adapter 22. Thus, hard disk drive 20 is an IDE data storage device and all communications between hard disk drive 20 and IDE adapter 22 occur along IDE bus 24 and conform to the IDE (or ATA) protocol.

6

Information to be displayed is written to frame buffer 26 and sent to display monitor 28. Sound input/output component 30 and speaker 32 broadcast sound information. Network interface 34 enables gaming machine 2 to be connected to a network such that a number of gaming machines can be connected for multi-player action. One or more parallel ports 36 and serial ports 38 provide connections to peripheral devices. Timer 40 provides clock pulses for synchronizing the components and the operation of gaming machine 2.

Block 42 illustrates the components dedicated to the operation of the game. These components can be a separate subsystem with its own system bus and the like. In the alternative, all of the components of gaming machine 2 can be integrated as a single system. Here, in this illustration, expansion bus 44 connects gaming machine 2 to a custom gaming subsystem network 46. Mechanical buttons 48 provide for user selection and input. Lights 50 can be programmed to flash in certain colors or patterns in-response to a particular condition or system state. Hopper 52 tracks and dispenses coin drops and winnings. Hard meters 54 track in absolute terms the number of coins and bills accepted and the number of coins dispensed. Credit display 56 can be installed inside the cabinet of gaming machine 2 to display the available credits. Bill acceptor 58 is connected to serial port 60, as is external screen 62 to display low level messages. Diagnostic display 64 and coin diverter 66 are both connected to watchdog timer 68. Coin comparator 70 ascertains the type of coins received. Interface switches 72 receive signals from a number of switches, including switches embedded in CPU box 74, doors 76, and bill stacker 78.

For illustration purposes, CPU 10, bus controller 12, RAM 14, bus 16, ROM 18, IDE adapter 22, frame buffer 26, sound I/O 30, network interface 34, parallel port 36, serial port 38 an timer 40 are considered the host computer in gaming machine 2. Of course, a wide variety of host computer configurations can be utilized, the critical elements being a processor coupled to an IDE adapter for communicating with an IDE data storage device.

FIG. 3 is a top plan view of IDE bus 24 which includes system connector 80, master connector 82, slave connector 84, and ribbon cable 86. Connectors 80, 82 and 84 are each 40-pin female connectors crimped on 18-inch, 40-pin ribbon cable 86. System connector 80 is connected to IDE adapter 22, master connector 82 is connected to hard disk drive 20, and slave connector 84 is left unconnected (for illustration purposes gaming device 2 does not include a slave hard disk drive, although it could).

FIG. 4 is a perspective view of the connection between hard disk drive 20 and IDE bus 24. Hard disk drive 20 includes side 90 that includes IDE connector 92 and power connector 94. IDE connector 92 is a 40-pin male connector that mates with master connector 82. In addition, power connector 94 is a 4-pin male connector that mates with and receives power from 4-pin female connector 96 of power cable 98. Thus, IDE bus 24 provides the IDE interface for hard disk drive 20, and power cable 98 provides the electrical power to hard disk drive 20.

FIG. 5 is a table of the IDE interface pin assignments. The ATA standard specifies signals by their names as well as by their abbreviations. Both the signal names and their abbreviations are written in capital letters. The signals that are active low are indicated with a bar over the name. Regarding the direction of data flow, I means to the drive, O means from the drive, I/O means bidirectional.

FIG. 6 lists the IDE commands defined in the ATA-5 specification. The IDE commands each have a unique com-

US 6,629,184 B1

7

mand code (or opcode) in the range of 00h to FFb, where the trailing h signifies the hexadecimal numbering system in which each digit represents 1 of 16 numbers (0–15). Thus, there are 256 IDE command codes. As is seen, some IDE command codes represent defined IDE commands, other IDE command codes represent vendor specific commands, retired commands, or obsolete commands, and still other IDE command codes are reserved meaning they are undefined in current specifications. Some defined IDE commands are mandatory and other defined IDE commands are optional but may be implemented in accordance with the ATA standard. The reserved IDE commands are not understood by IDE data storage devices. Therefore, sending a reserved IDE command to an IDE data storage device causes the IDE data storage device to generate an error message.

Hard disk drive 20 (and other IDE data storage devices) contains a command register block and a control register block. The command register block contains various registers at addresses 1F0h to 1F7h, and the control register block contains various registers at addresses 3F6h to 3F7h. Chip select 0 (CS1FX) and chip select 1 (CS3FX) differentiate between the blocks. As the names suggest, when the chip select 0 is asserted (or active) and chip select 1 is deasserted (or negated) an address in the range of 1F0h to 1FFh is selected which accesses the command register block. Likewise, when chip select 0 is deasserted and chip select 1 is asserted an address in the range of 3F0h to 3FFb is selected which accesses the control register block. Address bits 0 to 2 (DA0 to DA2) select a particular register within the blocks.

FIG. 7 illustrates the IDE command register block in hard disk drive 20. The IDE command register block includes a command register (1F7h during write access), a status register (1F7h during read access), and an error register (1F1h during read access). IDE commands are written to the command register, the status register contains the status of hard disk drive 20 as of the last command, and if an error bit in the status register is set then the error register contains the error code of the last executed command.

FIG. 8 illustrates the DE status register in hard disk drive 20. The status bits are BSY (busy), DRDY (drive ready), DWF (drive write fault), DSC (drive seek complete), DRQ (data request), CORR (corrected data), IDX (index) and ERR (error). In particular, ERR indicates an error has occurred in the process of executing the previous command, and that the error register contains further information about the nature of the error.

FIG. 9 illustrates the IDE error register in hard disk drive 20. The error bits are BBK (bad block detected), UNC (uncorrectable data error), MC (media change), IDNF (ID not found), MCR (media change requested), ABRT (aborted command), TK0NF (track 0 not found) and AMNF (address mark not found). In particular, ABRT indicates that the command was interrupted because it was illegal or because of a disk drive error.

During normal operation, gaming machine 2 does not need to write to hard disk drive 20. Rather, hard disk drive 20 is used solely for storing programs and data that are read by CPU 10. Thus, gaming machine 2 uses hard disk drive 20 as a read-only device. Nonetheless, in certain circumstances CPU 10 may attempt to write to hard disk drive 20, for instance due to a programming error or an unauthorized user attempting to alter or destroy stored information that is intended to be inaccessible to the user. Furthermore, hard disk drive 20 lacks write-inhibit capability. As a result, it would be highly desirable to provide a convenient, cost-

8

effective technique for assuring that CPU 10 cannot write to hard disk drive 20 even if it attempts to do so.

The adapter board of the present invention solves this problem. Generally speaking, the adapter board of the present invention provides an interface circuit that includes a first port for communicating with an IDE interface of a host computer, a second port for communicating with an IDE interface of a data storage device, and a control circuit that sends an invalid command rather than a selected IDE command to the second port in response to receiving the selected IDE command at the first port.

FIGS. 10–10E provide mechanical views of adapter board 100 of the present invention. More particularly, FIG. 10A is a perspective view of a first major surface of adapter board 100, FIG. 10B is a perspective view of a second major surface of adapter board 100, FIG. 10C is a top plan view of the first major surface of adapter board 100, FIG. 10D is a side elevational view of adapter board 100, and FIG. 10E is a top view of adapter board 100.

Adapter board 100 includes IDE connectors 102 and 104, power connectors 106 and 108, jumper pins (not shown) that receive jumper 110 and control circuit 112. IDE connector 102 is a 40-pin connector that mates with master connector 82 on IDE bus 24, and IDE connector 104 is a 40-pin female connector that mates with IDE connector 92 on hard disk drive 20. Power connector 106 is a 4-pin male connector that mates with connector 96 of power cable 98, and power connector 108 is a 4-pin female connector that mates with power connector 94 on hard disk drive 20. Power connectors 106 and 108 are directly connected to one another. Jumper 110 is a small piece of plastic that slides over and electrically connects the jumper pins thereby enabling the write-inhibit function. Control circuit 112 is operatively coupled between IDE connectors 102 and 104 and provides the write-inhibit function when jumper 110 is installed.

Adapter board 100 also includes a printed circuit board 120 with first major surface 122 and opposing second major surface 124. First major surface 122 faces IDE bus 24, and second major surface 124 faces hard disk drive 20 in the opposite direction. Sides (or edges) 126 and 128 are disposed between major surfaces 122 and 124 and are orthogonal to one another. Control device 112 includes programmable array logic (PAL) 130 and data switch 132. Power connector 108 is connected to printed circuit board 120 by four flexible C-shaped power leads 134. Holes 140 and 142 extend through major surfaces 122 and 124. Rectangular cut-out portion 144 includes side 146 (parallel to side 126) and side 148 (parallel to side 128) that provide clearance for power connector 108.

As is seen, IDE connector 102, power connector 106, jumper 110, PAL 130, data switch 132 and power leads 134 extend from first major surface 122, and IDE connector 104 and power connector 108 extend from second major surface 124. IDE connector 102, power connector 106, the jumper pins (not shown), PAL 130, and data switch 132 are mounted on first major surface 122, IDE connector 104 is mounted on second major surface 124, jumper 110 is mounted on the jumper pins, and power connector 108 is mounted on the ends of power leads 134. In this manner, power connector 108 can be independently positioned with respect to IDE connector 104 to facilitate inserting and removing adapter board 100 from hard disk-drive 20. PAL 130 is soldered to printed circuit board 120 to prevent field modification. For convenience of illustration, various resistors and capacitors mounted on major surface 122, and various interconnection wiring lines on major surfaces 122 and 124 are not shown.

MTI0000556

US 6,629,184 B1

9

Adapter board 100 has a width (along side 126) of 3.8 inches and a height (along side 128) of 2.5 inches. Rectangular cut-out portion 144 has a width (along side 146) of 1.13 inches and a height (along side 148) of 0.60 inches.

FIGS. 11A–11E are mechanical views, similar to FIGS. 10A–10E, respectively, showing adapter board 100 installed between hard disk drive 20 and IDE bus 24. As is seen, adapter board 100 is directly connected to hard disk drive 20 and IDE bus 24. Since IDE bus 24 includes ribbon cable 86, IDE bus 24 can easily extend to IDE connector 102 rather than to IDE connector 92 on hard disk drive 20. Likewise, power cable 98 can easily extend to power connector 106 rather than to power connector 94 on hard disk drive 20. Adapter board 100 has precisely the same width as hard disk drive 20 and is aligned width-wise with the vertical sides of hard disk drive 20. In addition, adapter board 100 requires relatively little space that is otherwise unused. Thus, adapter board 100 can be easily and conveniently installed between hard disk drive 20 and IDE bus 24.

If desired, a metal strap (not shown) can be mounted to adapter board 100 using bolts 142 and 144, and the metal strap can also be mounted to rails (not shown) in gaming machine 2 that support hard disk drive 20. The metal strap can improve the mechanical attachment between adapter board 100 and hard disk drive 20 and reduce the likelihood that connectors 82 and 102 or connectors 96 and 106 become inadvertently separated from one another, for instance due to mechanical vibration or shock to gaming machine 2 by a frustrated game player.

During operation of gaming machine 2, adapter board 100 prevents CPU 10 from sending IDE commands 3xh, C5h, CAh and CBh to hard disk drive 20 (where "x" designates any hexadecimal number). The inhibited IDE commands include the following write commands: write sector(s) (30h), CFA write sectors without erase (38h), write multiple (C5h), and write DMA (CAh). Although adapter board 100 inhibits other IDE commands as well (31h–37h, 35h–3Fh and CBh), these commands are not expected to be issued (see FIG. 6) and this simplifies the decoding logic in PAL 130. If adapter board 100 merely inhibited these write commands, hard disk drive 20 and IDE bus 24 might be left in a non-deterministic state requiring user intervention after CPU 10 issued any of these commands. Therefore, in addition to inhibiting these IDE write commands, adapter board 100 replaces these commands with reserved command 01h which is sent to hard disk drive 20 in their place. As seen in FIG. 6, IDE command code 01h is not explicitly listed, and therefore, is reserved. Thus, reserved command 01h (or IDE command code 01h) is an invalid command that is not understood by hard disk drive 20. As a result, hard disk drive 20 responds to reserved command 01b by generating an error message and no write operation is performed.

More particularly, when hard disk drive 20 receives reserved command 01b in its command register, hard disk drive 20 immediately determines that 01h is an invalid command, and in response to this determination, generates an interrupt by asserting line INTRQ, and generates an error message by setting ERR in the status register and ABRT in the error register. CPU 10 responds to the interrupt by reading the status register and detecting that ERR is set, and then responds to ERR being set by reading the error register and detecting that ABRT is set. In this fashion, CPU 10 is informed that the write operation has not occurred.

FIG. 12 is a block diagram of adapter board 100. Connectors 102 and 104 are connected to one another by central bus 150. PAL 130 is connected to connector 102 by control/

10

data bus 152 and to data switch 132 by control bus 154. Data switch 132 is connected to connector 102 by data bus 156, to connector 104 by data bus 158, and to invalid command generator 136 by data bus 160. Connectors 106 and 108 are connected to one another by power bus 162, and PAL 130, data switch 132 and invalid command generator 136 are all connected to power bus 164 which is connected to power bus 162. PAL 130 is also connected to jumper pins 166 adapted to receive jumper 110.

Central bus 150 is a 32-line bidirectional bus that includes all the IDE signal lines except data bus bits 0–7 (DD0–DD7). Control/data bus 152 is a 15-line unidirectional bus that includes data bus bits 0–7 (DD0–DD7), chip selects 0 and 1 (CS1FX, CS3FX), address bits 0–2 (DA0–DA2), I/O write (DIOW), and reset (RESET). Control bus 154 is a 2-line unidirectional bus that includes two control bits (1OE, 2OE). Data buses 156 and 158 are each an 8-line bidirectional bus that includes data bus bits 0–7 (DD0–DD7). Data bus 160 is an 8-line unidirectional bus that includes eight data bits (DD0–DD7). Thus, buses 150, 152, 156 and 158 transfer various IDE signals (see FIG. 5) to and/or from connector 102 and/or connector 104, whereas buses 154 and 160 transfer various control and data signals from PAL 130 and invalid command generator 136 to data switch 132. Power bus 162 is a 4-line bus that includes four power lines (+12V, ground, ground, +5V), and power bus 164 is a 2-line power bus that provides the third and fourth power lines (ground, +5V) from power bus 162.

Stated differently, printed circuit board 120 routes the lower eight data bus bits (DD0–DD7) on connector 102 to PAL 130 and to data switch 132, routes the chip selects (CS1FX, CS3FX), address bits (DA0–DA2), I/O write (DIOW) and reset (RESET) on connector 102 to PAL 130, routes all 40 IDE signal lines on connector 102 except for the lower eight data bus bits (DD0–DD7) to connector 104, and routes the lower eight data bus bits (DD0–DD7) on connector 104 to data switch 132. Printed circuit board 120 also routes the four power lines on connector 106 to connector 108 and routes two of these power lines (ground and +5V) to PAL 130, data switch 132 and invalid command generator 136. Power leads 134 constitute the portion of power bus 162 connected to connector 108. In addition, printed circuit board 120 routes various control and data signals from PAL 130 and invalid command generator 136 to data switch 132.

PAL 130 senses the presence or absence of jumper 110 on jumper pins 166 at power-up. If jumper 110 is present at power-up than the write-inhibit function is enabled, whereas if jumper 110 is absent at power-up than the write-inhibit function is disabled. After power is applied, PAL 130 remains in the mode set at power-up regardless of whether jumper 110 is subsequently removed or installed until power is removed and re-applied, at which time the presence or absence of jumper 110 is re-evaluated to determine whether the write-inhibit function is enabled or disabled. Thus, the existence of jumper 110 is latched only during a hard reset in response to the reset signal (RESET).

When the write-inhibit function is enabled (i.e., jumper 110 is installed at power-up), PAL 130 selectively controls data switch 132 to route the reserved command (01b), rather than the inhibited IDE commands (3xh, C5h, CAh, CBb), to connector 104.

Data switch 132 serves to couple either data bus 156 or data bus 160 to data bus 158. PAL 130 controls the operation of data switch 132 via the two control lines on control bus 154. When PAL 130 asserts the first control line (1OE), data switch 132 couples data bus 156 to data bus 158.

US 6,629,184 B1

11

As a result, all 40 IDE signal lines are bidirectionally coupled between connectors 102 and 104 via buses 150, 156 and 158, and adapter board 100 is essentially transparent with respect to the IDE communications between hard disk drive 20 and IDE bus 24. That is, adapter board 100 has essentially no effect on the IDE interface, and the IDE communications between hard disk drive 20 and IDE bus 24 are essentially the same as if connector 82 was plugged into connector 92 (see FIG. 4). On the other hand, when PAL 130 asserts the second control line ($\overline{2OE}$), data switch 132 couples data bus 160 to data bus 158. Invalid command generator 136 sets the 8 data lines (D0–D7) of data bus 160 to 01h, which provides the reserved command used to replace the inhibited IDE commands.

Thus, PAL 130 asserts the first control line and deasserts the second control line to permit normal IDE operations; however, when PAL 130 expects an IDE command it evaluates whether the incoming IDE command should be inhibited. If so, PAL 130 asserts the second control line so that data switch 132 couples reserved command 01h to bus 158, otherwise PAL 130 asserts the first control line so that data switch 132 couples the non-inhibited IDE command to bus 158.

FIG. 13 is a block diagram of PAL 130. PAL 130 includes command detector and decoder 170 and jumper detection circuit 172. Command detector and decoder 170 includes detection logic that determines when an IDE command is expected and decoding logic that determines whether the IDE command is one of the inhibited commands. Jumper detection circuit 172 determines at power-up, as indicated by the reset signal ($\overline{RESET}$), whether or not jumper 110 is installed at jumper pins 166 and communicates this status to command detector and decoder 170 along line 174. If so, command detector and decoder 170 enables the write-inhibit function, if not, it disables the write-inhibit function.

When the write-inhibit function is enabled, command detector and decoder 170 usually asserts the first control line ($\overline{1OE}$) and deasserts the second control signal ($\overline{2OE}$) so that data switch 132 couples bus 156 to bus 158. However, when the detection logic determines that chip select 0 ($\overline{CS1FX}$), address bits 0–2 (DA0–DA2) and I/O write ($\overline{DIOW}$) are asserted and chip select 1 ($\overline{CS3FX}$) is deasserted, the detection logic acknowledges that CPU 10 is selected to write to the command register (see FIG. 7) and will soon be issuing the command along the lower eight data bus bits (DD0–DD7). When the command arrives, the decoder logic determines whether the command is one of the inhibited commands (3xh, C5h, CAh, CBh). If so, command detector and decoder 170 immediately asserts the second control line ($\overline{2OE}$) and deasserts the first control line ($\overline{1OE}$) so that data switch 132 routes the invalid command 01h from data bus 160 to data bus 158, and then asserts the first control line ($\overline{1OE}$) and deasserts the second control line ($\overline{2OE}$) once the detector logic determines that CPU 10 has released the data bus bits (DD0–DD7) so that normal IDE communications may resume. Otherwise, if the decoder logic determines that the command is not one of the inhibited commands, command detector and decoder 170 continues to assert the first control line ($\overline{1OE}$) and deassert the second control line ($\overline{2OE}$) so that data switch 132 routes the non-inhibited command from data bus 156 to data bus 158.

FIG. 14 is a block diagram of invalid command generator 136. Invalid command generator 136 provides reserved command 01h at data lines D0–D7. That is, data line D0 is set to one and data lines D1–D7 are set to zero.

FIG. 15 is a circuit diagram of data switch 132. Data switch 132 includes inverters 180 and 182 and transistors

12

184, 186, 188 and 190. For convenience of illustration, control lines ($\overline{1OE}$) and ($\overline{2OE}$) on bus 154, data bus bits DD0 and DD7 on buses 156 and 158, and data lines D0 and D7 on bus 160 are shown, whereas data bus bits DD1–DD6 on buses 156 and 158, data lines D1–D6 on bus 160 and the associated twelve transistors are omitted.

Transistors 184, 186, 188 and 190 are each N-channel metal-oxide-semiconductor field-effect transistors (MOSFETs). Therefore, for each transistor, when a one (or high signal) is applied to its gate (or input terminal) a conductive path occurs between its source and drain (or output terminals); likewise, when a zero (or low signal) is applied to its gate a high-impedance path occurs between its source and drain.

As is seen, the input of inverter 180 is connected to the first control line ($\overline{1OE}$), the output of inverter 180 is connected to the gates of transistors 184 and 186, the source and drain of transistor 184 are connected between data bus bits DD0 of buses 156 and 158, and the source and drain of transistor 186 are connected between data bus bits DD7 of buses 156 and 158. Similarly, the input of inverter 182 is connected to the second control line ($\overline{2OE}$), the output of inverter 182 is connected to the gates of transistors 188 and 190, the source and drain of transistor 188 are connected between data line D0 of bus 160 and data bus bit DD0 of bus 158, and the source and drain of transistor 190 are connected between data line D7 of bus 160 and data bus bit DD7 of bus 158.

When the first control line ($\overline{1OE}$) is asserted (low), inverter 180 provides a high signal to the gates of transistors 184 and 186, thereby turning on transistors 184 and 186 and coupling data bus bits DD0 and DD7 of buses 156 and 158 (data bus bits DD1–DD6 of buses 156 and 158 are similarly coupled). When the first control line ($\overline{1OE}$) is deasserted (high), inverter 180 provides a low signal to the gates of transistors 184 and 186, thereby turning off transistors 184 and 186 and decoupling data bus bits DD0 and DD7 of buses 156 and 158 (data bus bits DD1–DD6 of buses 156 and 158 are similarly decoupled). The assertion and deassertion of the second control line ($\overline{2OE}$) serves to couple and decouple data lines D0–D7 on bus 160 to and from data bus bits DD0–DD7 on bus 158 in the same manner.

FIG. 16 is a simplified timing diagram of programmed I/O operations using adapter board 100. Accesses by CPU 10 to the IDE command register block (see FIG. 7) in hard disk drive 20 are executed via programmed I/O. This includes the reading of status information from the status register, the reading of error information from the error register, the setting of parameters in various registers in the command register block, and the writing of commands to the command register in the command register block.

For a programmed I/O data transfer, CPU 10 first puts the address on the address lines as depicted by address valid at time 192. The address consists of the chip selects ($\overline{CS1FX}$, $\overline{CS3FX}$) and address bits (DA0–DA2). Shortly thereafter, CPU 10 asserts the I/O write signal ($\overline{DIOW}$) for write access or the I/O read signal ($\overline{DIOR}$) for read access at time 193. For a write access, CPU 10 places the data on the data bus bits, for a read access, CPU 10 reads data placed on the data bus bits by hard disk drive 20. The data must be valid at the time the I/O write signal ($\overline{DIOW}$) (in the case of a write) or the I/O read signal ($\overline{DIOR}$) (in the case of a read) is deasserted at time 194. In other words, during a write, hard disk drive 20 recognizes whatever data is on the data bus bits when the I/O write signal ($\overline{DIOW}$) is deasserted, and during a read, CPU 10 recognizes whatever data is on the data bus

MTI0000558

US 6,629,184 B1

13

bits when the I/O read signal (DIOR) is deasserted. Shortly thereafter, the address and data lines are released at time 199 and the cycle is complete.

When programmed I/O occurs other than when CPU 10 attempts to write an inhibited command to the command register and the write-inhibit function is enabled, adapter board 100 has essentially no effect on the operation. The delay introduced by transistors 84, 86, 88 and 90 is negligible, and the data is written to or read from hard disk drive 20 when the I/O write signal (DIOW) or the I/O read signal (DIOR) is deasserted at time 194.

When programmed I/O occurs and CPU 10 attempts to write an inhibited command to the command register and the write-inhibit function is enabled, the inhibited command is provided by CPU 10 at time 196 and travels through data switch 132 and across bus 158 to hard disk drive 20. At the same time, PAL 130 receives the inhibited command, determines that it is an inhibited command, and in response to this determination deasserts the first control line (1OE) and asserts the second control line (2OE). Data switch 132 responds to the deassertion of the first control line (1OE) and the assertion of the second control line (2OE) by decoupling bus 156 from bus 158 and coupling bus 160 to bus 158, thereby providing the reserved command 01h rather than the inhibited command to hard disk drive 20 at time 198. PAL 130 and data switch 132 are high-speed devices that rapidly perform these functions long before the I/O write signal (DIOW) is deasserted at time 194. Therefore, although the inhibited command is applied to hard disk drive 20 at time 196, the reserved command 01h replaces the inhibited command at time 198. Between times 196 and 198, PAL 130 and data switch 132 determine that the inhibited command has been issued and replace it with the reserved command 01h. The delay between times 196 and 198 is approximately 3 nanoseconds. Thus, the invalid command 01b replaces the inhibited command long before the I/O write signal (DIOW) is deasserted, and when the I/O write signal (DIOW) is deasserted, the invalid command 01b rather than the inhibited command is written into the command register in hard disk drive 20. Thereafter, when CPU 10 releases the address and data at time 199, PAL 130 asserts the first control line (1OE) and deasserts the second control line (2OE), and in response to the control lines changing states, data switch 132 couples bus 156 to bus 158 and decouples bus 160 from bus 158, thereby restoring normal IDE communications between CPU 10 and hard disk drive 20.

It is critical to note that hard disk drive 20 does not recognize or understand that the inhibited command was placed on data bus 158. Hard disk drive 20 merely latches the contents of bus 158 when the I/O write signal (DIOW) is deasserted.

Therefore, it is understood that in the context of the present invention, the inhibited command is prevented or inhibited from reaching the IDE data storage device, and therefore is never sent to or received by the IDE data storage device, when the inhibited command is replaced by an invalid command before the IDE data storage device can recognize the inhibited command, even if the inhibited command has been applied to the IDE port of the IDE data storage device. In other words, although the inhibited command may be briefly applied to the IDE port of the data storage device, it is effectively meaningless noise that is never latched in the command register of the data storage device and has no affect on the data storage device.

FIG. 17 is a simplified timing diagram of a write operation using adapter board 100 when the write-inhibit function is

14

disabled. Generally speaking, the programming and execution of the commands for an IDE interface proceeds in three phases: (1) the command phase in which the CPU prepares the parameter registers and passes the command code to start the execution; (2) the data phase in which for commands involving disk access the drive positions the read/write heads and eventually transfers the data between the disk and the CPU, and (3) the result phase in which the drive provides status information for the executed command in the corresponding registers and generates an interrupt request (INTRQ).

More particularly, FIG. 17 illustrates the conventional implementation of the write sector(s) command (30h) for a single sector when the write-inhibit function is disabled. CPU 10 first writes any required parameters to the address and feature registers (step 200). In addition, CPU 10 reads the drive ready bit (DRDY) in the status register to confirm that hard disk drive 20 is ready to accept a command. If the drive ready bit (DRDY) is set, CPU 10 next writes the write sector(s) command to the command register (step 202). In response to receiving the write sector(s) command in the command register, hard disk drive 20 clears the drive ready bit (DRDY) and sets the data request bit (DRQ) in the status register thereby signaling that it is waiting to receive data, CPU 10 reads the status register and in response to the data request bit (DRQ) writes 512 bytes of data to the sector buffer in hard disk drive 20 (step 204). Once the sector buffer is full, hard disk drive 20 clears the data request bit (DRQ) and sets the busy bit (BSY) in the status register thereby signaling that CPU 10 may not access any other registers in the command register block (step 206). As soon as the data in the sector buffer has been fully written to the disk, hard disk drive 20 clears the busy bit (BSY), sets the drive ready bit (DRDY) and generates an interrupt request (INTRQ). In response to the interrupt request, CPU 10 reads the status register (step 208). Since an error in the execution of the write sector(s) command did not occur, the error bit (ERR) in the status register and the aborted command bit (ABRT) in the error register remain cleared.

FIG. 18 is a simplified timing diagram of an attempted write operation using adapter board 100 when the write-inhibit function is enabled. In this instance, the programming never gets past the command phase since hard disk drive 20 responds to the invalid command from adapter board 100 by generating an interrupt request.

More particularly, FIG. 18 illustrates the attempted implementation of the write sector(s) command (30h) for a single sector when the write-inhibit function is enabled. CPU 10 first writes any required parameters to the address and feature registers (step 210) and reads the drive ready bit (DRDY) in the status register to confirm that hard disk drive 20 is ready to accept a command. If the drive ready bit (DRDY) is set, CPU 10 next attempts to write the write sector(s) command to the command register. However, adapter board 100 recognizes the write sector(s) command as one of the inhibited commands and therefore replaces it with the reserved command 01b (step 212). In response to receiving the reserved command 01b, hard disk drive 20 sets the error bit (ERR) in the status register, sets the aborted command bit (ABRT) in the error register, and generates an interrupt request (INTRQ). In response to the interrupt request, CPU 10 reads the status register, determines that an error has occurred, reads the error register, and determines that the write sector(s) command was aborted (step 214).

FIG. 19 is a flow chart illustrating the operation of adapter board 100. PAL 130 initially instructs data switch 132 to couple the lower eight data bus bits of hard disk drive 20 and

US 6,629,184 B1

**15**

IDE interface 24 (step 220). If PAL 130 determines at power-up that jumper 110 is absent then PAL 130 remains latched in this mode and the write-inhibit function is disabled (step 222). On the other hand, if PAL 130 determines at power-up that jumper 110 is present then PAL 130 detects whether CPU 10 is attempting to write to the command register in hard disk drive 20 (step 224). If so, PAL 130 waits for the command (step 226). When PAL 130 receives the command, PAL 130 determines whether the command is one of the inhibited commands (step 228). If so, PAL 130 instructs data switch 132 to route the invalid command to hard disk drive 20 until CPU 10 releases the command (step 230), at which time PAL 130 instructs data switch 132 to couple the lower eight data bus bits of hard disk drive 20 and IDE interface 24 and decouple the invalid command from the lower eight data bus bits of hard disk drive 20. Otherwise, if the command is not one of the inhibited commands, PAL 130 instructs data switch 132 to route the command to hard disk drive 20.

If desired, CPU 10 can periodically issue the inhibited commands to confirm that adapter board 100 has been installed and is enabled and functioning properly. For instance, CPU 10 can periodically issue the write sector(s) command in an attempt to change the data stored at a selected sector in hard disk drive 20 and then read the sector to determine whether the data has been changed. In this manner, CPU 10 can determine whether the write sector(s) command was executed or inhibited. In the event the command was executed, CPU 10 can halt operation of gaming machine 2.

FIG. 20 is a schematic diagram of an implementation of adapter board 100 which Applicant has constructed. For convenience of illustration, the signals that are active low are indicated with a trailing dash (–) instead of a bar over the name. Furthermore, although some of the signal or terminal names may differ from those previously used, the correspondence will be apparent to those skilled in the art. For instance, chip selects 0 and 1 at pins 37 and 38, respectively, are labeled CS0– and CS1–, respectively, and obviously correspond to  $\overline{CS1FX}$  and  $\overline{CS3FX}$ , respectively. Furthermore, since CPU 10 provides programmed I/O modes that do not use the 16 bit I/O signal ( $\overline{IOCS16}$ ), pin 32 on connectors 102 and 104 is labeled rsrvd and is not coupled between connectors 102 and 104. That is, since no communications occur along line 32 of IDE bus 24, it is not necessary for bus 150 between connectors 102 and 104 to include this line.

Capacitors C1–C4 provide noise immunity for PAL 130 and data switch 132, and resistors R1–R16 serve to limit current. PAL 130 asserts the signal at the passthru-terminal (16) to instruct data switch 132 at the IOE- terminal (48) to couple the first input port (1A3–1A10) to the first output port (1B3–1B10). Likewise, PAL 130 asserts the signal at the errcmd-terminal (17) to instruct data switch 132 at the 2 OE-terminal (47) to couple the second input port (2A3–2A10) to the second output port (2B3–2B10). As is seen, the first input port is coupled to the data bus bits of connector 102, the second input port is coupled to invalid command generator 136 (i.e., 01h), and the first and second output ports are tied together and coupled to the data bus bits (DD0–DD7) of connector 104.

PAL 130 also generates a signal at the qnowrite-terminal (20) that indicates whether the write-inhibit function is enabled or disabled. If the write-inhibit function is enabled then qnowrite-is low, whereas if the write-inhibit function is disabled then qnowrite-is high. The qnowrite-terminal permits adapter board 100 to communicate the status of the

**16**

write-inhibit function to the external environment. For instance, an LED can be coupled to qnowrite-that turns on when the write-inhibit function is disabled thereby generating a warning signal to the external environment.

The components of adapter board 100 in FIG. 20 are as follows:

| Component | Description |
|---|---|
| Connector 102 | Molex 15-80-0403 |
| Connector 104 | 3M 3540-4500JL |
| Connector 106 | Molex 15-24-4157 |
| Connector 108 | Molex 15-24-3031 |
| PAL 130 | Lattice GAL22V10D-25LP |
| Data Switch 132 | Texas Instruments SN74CBTD16210DGGR |
| Capacitor C1 | 22 microfarads |
| Capacitor C2 | 0.01 microfarads |
| Capacitor C3 | 0.1 microfarads |
| Resistor R1–14 and R16 | 22 ohms |
| Resistor R15 | 30 kilohms |

FIG. 21 is a logic diagram of PAL 130 in FIG. 20. The structure and operation of PAL 130 in FIG. 20 may be completely understood with reference to is diagram. For instance, AND gate 240 detects the presence of x5h commands, AND gate 242 detects the presence of xAh or xBh commands, AND gate 244 detects the presence of Cxh commands, and AND gate 246 detects the presence of 3xh commands. Accordingly, AND gate 250 detects the presence of the C5h command, and AND gate 252 detects the presence of the CAh and CBh commands. Thus OR gate 254 detects the presence of the 3xh, C5h, CAh and CBh commands which, as mentioned above, are the inhibited commands. AND gates 256 and 258 detect whether CPU 10 is attempting to write to the command register in hard disk drive 20. Accordingly, AND gate 260 determines whether CPU 10 is attempting to write one of the inhibited commands to the command register. If so, AND gate 260 asserts a high signal at its output, which is inverted by inverter 262 so that errcmd—is (asserted) while passthru—is high (desserted). Likewise, if CPU 10 is not attempting to write one of the inhibited commands to the command register, AND gate 260 asserts a low signal at its output, which is inverted by inverter 262 so that errcmd—is high (deasserted) while passthru—is low (asserted). Finally, AND gates 264, 266 and 268 in combination with OR gate 270 provide the jumper detection circuit 272 which determines whether jumper 110 is installed at jumper terminals 166 during power-up. If jumper 110 is not installed, the output of OR gate 270 is high which causes qnowrite—to go high (deasserted), errcmd—to go high (deasserted) and passthru—to go low (asserted).

Those skilled in the art will recognize other logic descriptions useful in particular applications which may be programmed into PAL 130.

The present invention is particularly well-suited for use in gaming machines such as a card games (e.g., poker and black jack), slot games (e.g., three reel single or multi-line) and roulette games, although the invention can also be used in set-top boxes, set-back boxes, retail kiosks and other devices in which it is desirable to inhibit a host computer from sending a selected command to an IDE data storage device. The present invention is also particularly well-suited for preventing a selected command from reaching an IDE hard disk drive, although the invention can be used with other IDE data storage devices such as solid state (or flash) disk drives, CD-ROM drives and tape drives. Likewise, the

US 6,629,184 B1

17

present invention is particularly well-suited for inhibiting a write command from reaching an IDE data storage device, although the invention can be used to inhibit any selected IDE commands from reaching the IDE data storage device. For instance, in addition to or as an alternative to inhibiting the IDE write commands, the present invention can be used to inhibit the media lock (DEh), media unlock (DFh), sleep (E6h), standby (E0h, E2h), download microcode (92h) and/or packet (A0h) commands, among others.

The present invention may include numerous other variations. For instance, the jumper pins can be replaced by another type of user-accessible mechanical switch, such as a dual-in-line package switch, or alternatively the jumper pins can be eliminated such that the write-inhibit function is permanently enabled. The adapter board can recognize the presence or absence of the jumper only at power-up, or alternatively the adapter board can recognize the presence or absence of the jumper whenever power is applied. Multiple jumpers can be used to enable and disable inhibiting multiple IDE commands. The invalid command which replaces the inhibited IDE commands need not be limited to reserved command 01h, and can be implemented with other reserved commands, retired commands, obsolete commands, or other commands that cause the IDE data storage device to generate an error message.

The present invention can also be used for IDE buses that employ master and slave data storage devices. For instance, if it desired to write-inhibit only one of these devices, then the adapter board can be connected between the one device and the associated connector of the IDE bus. If it is desired to write-inhibit both devices, then the adapter board can be connected between the host computer and the system connector (e.g., connector 80) of the IDE bus.

The present invention is also well-suited for IDE buses of all shapes and sizes. For instance, the present invention can be used with a 40-pin IDE bus, a 44-pin IDE bus that includes the 40 pins on IDE bus 24 and the four power and ground lines on power cable 98, a 64-pin PCMCIA bus that includes the 40 pins on IDE bus 24 and 24 other pins, and other types of IDE buses. Likewise, if the host computer does not utilize a line (such as line 32) on the IDE bus, the present invention can couple or decouple that line between the host computer and the IDE data storage device as a matter of design choice.

The present invention can also be implemented so that the inhibited command is never applied at any time to the IDE port of the data storage device, for instance by decoupling the lower eight data bus bits of the IDE bus from the IDE port of the data storage device when an IDE command is expected and then coupling either the IDE command or the invalid command to the IDE port of the data storage device depending on whether the IDE command is an inhibited command.

Moreover, the best presently known mode of implementation of the present invention depends upon numerous factors, including limitations and requirements of the operating system, hardware design complexity versus cost tradeoffs, software complexity versus cost tradeoffs, performance considerations, and other factors.

Those skilled in the art will readily implement the steps necessary to provide the structures and methods disclosed herein, and will understand that the process parameters, materials, dimensions, and sequence of steps are given by way of example only and can be varied to achieve the desired result as well as variations which are within the scope of the invention. Variations and modifications of the

18

embodiments disclosed herein may be made based on the description set forth herein, without departing from the spirit and scope of the invention as set forth in the following claims.

What is claimed is:

1. An interface circuit, comprising:

a first port for providing an Integrated Drive Electronics (IDE) interface with a host computer;

a second port for providing an IDE interface with a data storage device, the second port comprising a plurality of data lines different from an input/output (I/O) write line; and

a control circuit, operatively coupled between the first and second ports, the control circuit configured to detect an IDE command from a first set of IDE commands at the first port, and configured to generate, in response to the detected IDE command from the first set, signals on at least a subset of the plurality of data lines of the second port, wherein the generated signals correspond to an invalid command different than the detected IDE command of the first set.

2. The interface circuit of claim 1, wherein the first set of IDE commands comprises at least one of a write command, a media lock command, a media unlock command, a sleep command, a standby command, a download microcode command and a packet command.

3. The interface circuit of claim 1, wherein the first set of IDE commands comprises a write command.

4. The interface circuit of claim 1, wherein the invalid command is a reserved IDE command.

5. The interface circuit of claim 4, wherein the reserved IDE command is 01h.

6. The interface circuit of claim 1, wherein the first port comprises a plurality of data lines, and wherein the control circuit is further configured to detect an IDE command from a second set of IDE commands at the first port, and configured to route, in response to the detected IDE command from the second set, signals on at least a subset of the plurality of data lines of the first port to the at least a subset of the plurality of data lines of the second port.

7. The interface circuit of claim 6, wherein the second set of IDE commands includes a read command.

8. The interface circuit of claim 6, wherein the second set of IDE commands comprises all IDE commands not in the first set of IDE commands.

9. The interface circuit of claim 1, wherein the control circuit is further configured to route data received at the second port to the first port.

10. The interface circuit of claim 1, wherein the first port is a 40-pin male IDE connector and the second port is a 40-pin female IDE connector.

11. The interface circuit of claim 1, including a printed circuit board, wherein the first and second ports and the control circuit are mounted on the printed circuit board, and the first and second ports extend from opposing major surfaces of the printed circuit board.

12. The interface circuit of claim 1, in combination with an IDE hard disk drive coupled to the second port.

13. The interface circuit of claim 1, wherein the first port comprises a plurality of data lines, and wherein the control circuit comprises:

a logic device, coupled to the first port, configured to generate a control output in response to IDE commands received at the first port; and

a data switch having a control input, and at least first and second data inputs, and a data output, the control input

US 6,629,184 B1

coupled to receive the control output of the logic device, the first data input coupled to at least a subset of the plurality of data lines of the first port, the second data input coupled to receive the invalid command, and the data output coupled to the at least a subset of the plurality of data lines of the second port.

14. The interface circuit of claim 13, wherein the logic device comprises programmable array logic.

15. The interface circuit of claim 13, wherein the data switch is a bi-directional switch.

16. The interface circuit of claim 13, wherein the first data input of the data switch comprises a plurality of first data input lines, wherein the second data input of the data switch comprises a plurality of second data input lines, wherein the data output of the data switch comprises a plurality of data output lines, wherein the data switch comprises a first plurality of MOS transistors, each of the first plurality of MOS transistors selectively coupling a respective one of the first data input lines to a respective one of the data output lines, wherein the data switch further comprises a second plurality of MOS transistors, each of the second plurality of MOS transistors selectively coupling a respective one of the second data input lines to a respective one of the data output lines.

17. The interface circuit of claim 13, wherein the first data input of the data switch comprises the lower eight IDE data bus bits of the IDE interface with the host computer, wherein the data output of the data switch comprises the lower eight IDE data bus bits of the IDE interface with the data storage device.

18. The interface circuit of claim 1, wherein the first port comprises a plurality of data lines, and wherein the control circuit is coupled to receive a mode input;

wherein the control circuit is configured to, if the mode input indicates a first mode of operation, generate, in response to the detected IDE command from the first set, signals on the at least a subset of the plurality of data lines of the second port, wherein the generated signals correspond to the invalid command, and

wherein the control circuit is configured to, if the mode input indicates a second mode of operation, couple signals on at least a subset of the plurality of data lines of the first port to the at least a subset of the plurality of data lines of the second port when the IDE command from the first set of IDE commands is at the first port.

19. The interface circuit of claim 18, further comprising a mechanical switch, wherein the mode input is generated based on the state is of the mechanical switch.

20. The interface circuit of claim 18, further comprising a plurality of jumper pins, wherein the mode input is generated based on whether two of the plurality of jumper pins are electrically connected.

21. The interface circuit of claim 1, wherein the at least a subset of the plurality of data lines of the second port correspond to the lower eight IDE data bus bits of the IDE interface with the data storage device.

22. The interface circuit of claim 21, wherein the first port comprises at least the lower eight IDE data bus bits of the IDE interface with the host computer;

wherein the control circuit is configured to selectively couple the lower eight IDE data bus bits of the IDE interface with the host computer with the lower eight IDE data bus bits of the IDE interface with the data storage device based on detection of IDE commands from the first set of IDE commands at the first port.

23. A computer system, comprising:

a host computer;

a storage device; and

an interface circuit coupled between an IDE port of the host computer and an IDE port of the storage device, the IDE port of the storage device comprising a plurality of data lines different from an input/output (I/O) write line;

wherein the interface circuit is configured to detect an IDE command from a first set of IDE commands at the IDE port of the host computer, and configured to generate, in response to the detected IDE command from the first set, signals on at least a subset of the plurality of data lines to the IDE port of the storage device, wherein the generated signals correspond to an invalid command different than the detected IDE command of the first set;

wherein the interface circuit is further configured to detect an IDE command from a second set of IDE commands at the IDE port of the host computer, and configured to route, in response to the detected IDE command from the second set, signals on at least a subset of the plurality of data lines of the IDE port of the host computer to the at least a subset of the plurality of data lines of the IDE port of the storage device.

24. The computer system of claim 23, wherein the interface circuit includes a first 40-pin connector coupled to the IDE port of the host computer, a second 40-pin connector coupled to the IDE port of the IDE storage device, a third 4-line connector coupled to a power supply port of the host computer, and a fourth 4-line connector coupled to a power supply port of the storage device.

25. The computer system of claim 24, wherein the first 40-pin connector is connected to an IDE ribbon cable, the IDE ribbon cable is connected to the IDE port of the host computer, and the second 40-pin connector is connected to the IDE port of the storage device.

26. The computer system of claim 23, wherein the second set of IDE commands comprises all IDE commands not in the first set of IDE commands.

27. The computer system of claim 26, wherein the interface circuit is further configured to route data received at the IDE port of the storage device to the IDE port of the host computer.

28. The computer system of claim 23, wherein the storage device is configured to generate an error message in response to receiving the invalid command via the IDE port of the storage device.

29. The computer system of claim 23, wherein the invalid command is a reserved IDE command.

30. The computer system of claim 23, wherein the computer system is a gaming machine.

31. The computer system of claim 23, wherein the interface circuit is coupled to receive a mode input;

wherein the interface circuit is configured to, if the mode input indicates a first mode of operation, generate, in response to the detected IDE command from the first set, signals on the at least a subset of the plurality of data lines of the IDE port of the storage device, wherein the generated signals correspond to an invalid command different than the detected IDE command of the first set, and

wherein the interface circuit is configured to, if the mode input indicates a second mode of operation, route signals on the at least a subset of the plurality of data lines of the IDE port of the host computer to the at least

US 6,629,184 B1

21

a subset of the plurality of data lines of the IDE port of the storage device when the IDE command from the first set is at the IDE port of the host computer.

32. The interface circuit of claim 23, wherein the storage device comprises a hard disk drive.

33. A method of informing a host computer that an attempted operation on a data storage device has been prevented, comprising:

sending a IDE command from the host computer to a first IDE bus not connected to the data storage device;

determining that the data storage device should not receive the IDE command;

sending an invalid command rather than the IDE command to a second IDE bus connected to the data storage device; and

sending an error message generated by the data storage device in response to the invalid command from the data storage device to the host computer via the first and second IDE buses.

34. The method of claim 33, wherein the IDE command is a write command.

35. The method of claim 33, wherein the host computer periodically sends another IDE command to the data storage device via the first and second buses to determine whether the data storage device received the IDE command that should not have been received by the data storage device.

36. The method of claim 33, wherein the first IDE bus includes a ribbon cable and the second IDE bus excludes a ribbon cable.

37. The method of claim 33, wherein the data storage device is a hard disk drive.

38. A method of preventing a host computer from writing to a data storage device, comprising:

sending a write command from the host computer to a first IDE bus not connected to the data storage device; and

sending an invalid command rather than the write command to a second IDE bus connected to the data storage device such that when the host computer deasserts an IDE I/O write signal the data storage device recognizes the invalid command rather than the write command, thereby preventing the host computer from writing to the data storage device.

39. The method of claim 38, further comprising sending an error message that the data storage device generates in response to the invalid command from the data storage device to the host computer via the first and second IDE buses.

40. The method of claim 38, further comprising sending a read command from the host computer to the data storage device via the first and second IDE buses to determine whether the write command was recognized by the data storage device.

41. The method of claim 38, wherein the first IDE bus includes a ribbon cable and the second IDE bus excludes a ribbon cable.

42. The method of claim 38, wherein the data storage device is a hard disk drive.

43. An interface device, comprising:

a first port for providing an Integrated Drive Electronics (IDE) interface with a host computer;

a second port for providing an IDE interface with a data storage device, the second port comprising a plurality of data lines different from an input/output (I/O) write line; and

a control device, operatively coupled between the first and second ports, the control device configured to detect an

22

IDE command from a first set of IDE commands at the first port, and configured to generate, in response to the detected IDE command from the first set, signals on at least a subset of the plurality of data lines of the second port, wherein the generated signals correspond to an invalid command different than the detected IDE command of the first set.

44. The interface device of claim 43, wherein the control device comprises a logic circuit.

45. The interface device of claim 43, wherein the invalid command comprises a command that, when received by an IDE storage device, the IDE storage device generates an error message in response.

46. The interface device of claim 43, wherein the first set of IDE commands comprises at least one of a write command, a media lock command, a media unlock command, a sleep command, a standby command, a download microcode command and a packet command.

47. The interface device of claim 43, wherein the first set of IDE commands comprises a write command.

48. The interface device of claim 43, wherein the invalid command is a reserved IDE command.

49. The interface device of claim 48, wherein the reserved IDE command is 01h.

50. The interface device of claim 43, wherein the first set comprises a plurality of data lines, and wherein the control device comprises:

a logic device, coupled to the first port, configured to generate a control output in response to IDE commands received at the first port; and

a data switch having a control input, and at least first and second data inputs, and a data output, the control input coupled to receive the control output of the logic device, the first data input coupled to at least a subset of the plurality of data lines of the first port, the second data input coupled to receive the invalid command, and the data output coupled to the at least a subset of the plurality of data lines of the second port.

51. The interface device of claim 43, wherein the at least a subset of the plurality of data lines of the second port correspond to the lower eight IDE data bus bits of the IDE interface with the data storage device.

52. The interface device of claim 51, wherein the first port comprises at least the lower eight IDE data bus bits of the IDE interface with the host computer;

wherein the control device is configured to selectively couple the lower eight IDE data bus bits of the IDE interface with the host computer with the lower eight IDE data bus bits of the IDE interface with the data storage device based on detection of IDE commands from the first set of IDE commands at the first port.

53. A method of interfacing a host computer with a data storage device, comprising:

detecting an Integrated Drive Electronics (IDE) command from a first set of IDE commands at a first port coupled to the host computer; and

in response to the detected IDE command from the first set, generating an invalid command, different than the detected IDE command, at a second port coupled to the data storage device;

wherein the invalid command is written to a command register of the data storage device rather than the detected IDE command from the first set.

MTI0000563

US 6,629,184 B1

23

**54.** The method of claim 53, further comprising:

detecting an IDE command from a second set of IDE commands at the first port; and

in response to the detected IDE command from the second set, coupling data lines of the first port to data lines of the second port;

wherein the detected IDE command from the second set is written to the command register of the data storage device.

**55.** The method of claim 54, wherein the second set of IDE commands comprises all of the IDE command not included in the first set of IDE commands.

**56.** The method of claim 55, wherein detecting the IDE command from the second set of IDE commands comprises

24

detecting that the IDE command at the first port is not an IDE command included in the first set of IDE commands.

**57.** The method of claim 53, wherein the first set of IDE commands comprises at least one of a write command, a media lock command, a media unlock command, a sleep command, a standby command, a download microcode command and a packet command.

**58.** The method of claim 53, wherein the first set of IDE commands comprises commands that, when received by an IDE storage device, the IDE storage device generates an error message in response.

*   *   *   *   *



#8
SP

Patent
Attorney's Docket No. 0032-0003 12-04-03

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of | ) |
| | ) |
| Steven BRESS et al. | )     Group Art Unit: 2187 |
| | ) |
| Application No.: 09/961,417 | )     Examiner: N. V. Dinh |
| | ) |
| Filed: September 25, 2001 | ) |
| | ) |
| For:   WRITE PROTECTION FOR | ) |
|       COMPUTER LONG-TERM | ) |
|       MEMORY DEVICES | ) |

RECEIVED
DEC 03 REC'D
TC 2100

## INFORMATION DISCLOSURE STATEMENT
## TRANSMITTAL LETTER

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

Enclosed is an Information Disclosure Statement and accompanying form PTO-1449 for

the above-identified patent application.

☒     No additional fee for submission of the IDS is required.

☐     The fee of $180.00 as set forth in 37 C.F.R. § 1.17(p) is also enclosed.

☒     A certification under 37 C.F.R. § 1.97(e) is also enclosed.

☐     Charge $ _____ to Deposit Account No. 50-1070 for the fee due.

☐     A check in the amount of $ _____ is enclosed for the fee due.

MTI0000565

Information Disclosure Statement Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

The Commissioner is hereby authorized to charge any appropriate fees under 37 C.F.R.

§§ 1.16, 1.17 and 1.21 that may be required by this paper, and to credit any overpayment, to

Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date: November 24, 2003

MTI0000566



PATENT
Attorney Docket No. 0032-0003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                     )
                                          )
Steven Bress et al.                       )
                                          )
Serial No.:  09/961,417                   )   Group Art Unit:  2187
                                          )
Filed:   September 25, 2001               )   Examiner:  N. Dinh
                                          )
For:   WRITE PROTECTION FOR               )
       COMPUTER LONG-TERM MEMORY          )
       DEVICES                            )

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window, Mail Stop Fee Amendment
Crystal Plaza Two, Lobby, Room 1B03
Arlington, VA 22202

**RECEIVED**

DEC 0 1 2003

Technology Center 2100

Sir:

## AMENDMENT

In response to the Office Action of August 27, 2003 please amend this

application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 16 of this paper.

11/28/2003 BGAYAS11 00000005 09961417
01 FC:2202                    27.00 OP

1

*Ser... Number: 09/961,417*
*Docket Number: 0032-0003*

**Amendments to the Claims**:

This listing of claims will replace all prior versions, and listings, of claims in the application:

1. (currently amended)  A blocking device connected between a host and a storage device, the blocking device comprising:

an interface emulator configured to emulate an interface presented by a the storage device and  configured to connect to a host;

an interface for connecting to the storage device; and

a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, wherein

the blocking device is transparent to normal operation of the host and the storage device.


2. (original) The blocking device of claim 1, wherein the commands in the predetermined set of commands are commands recognized by the processor as not modifying a storage state of the storage device.


3. (original)  The blocking device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.


2

MTI0000568

*Ser. Number: 09/961,417*
*Docket Number: 0032-0003*

4. (original)  The blocking device of claim 1, wherein the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator.

5. (original)  The blocking device of claim 4, wherein, when the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

6. (currently amended)  The blocking device of claim 1, wherein the processor drops those of the commands that do not match the predetermined set of commands, and, after dropping one of the ~~matching~~ commands, returns status information to the host that indicates that the dropped command was successfully completed.

7. (original)  The blocking device of claim 1, further comprising: additional interfaces for connecting to additional storage devices.

8. (original)  The blocking device of claim 7, wherein each of the interfaces is independently coupled to the processor.

3

MTI0000569

Ser.   Number: 09/961,417
Docket Number: 0032-0003

9. (original)  The blocking device of claim 1, further including light emitting
diodes (LEDs) coupled to the processor and configured to transmit status
information relating to the status of the blocking device.

10. (original)  The blocking device of claim 1, further including:
a temporary storage device coupled to the processor, the processor
storing data from the host corresponding to the dropped commands in the
temporary storage device.

11. (original)  The blocking device of claim 10, wherein when read
commands are received from the host that refer to data stored in the temporary
storage device, the processor returns the data from the temporary storage device
to the host.

12. (original)  The blocking device of claim 1, further including:
a user configurable memory connected to the processor, the user
configurable memory storing instructions that define protected areas on the
storage device, the processor dropping those of the commands that match the
predetermined set of commands when the matching commands are commands
that would otherwise modify the protected areas on the storage device.

13. (original)  The blocking device of claim 1, wherein the processor
examines feature information from the storage device that relate to features

4

MTI0000570

*Ser. . Number: 09/961,417*
*Docket Number: 0032-0003*

supported by the storage device and the processor zeroes any features not
supported by the processor before making the feature information available to
the host.

14. (original)  The blocking device of claim 1, wherein the processor
supports a removable drive feature set with the host and the processor returns a
write protected error code to the host when the processor drops one of the
commands.

15. (currently amended)  A device comprising:

an IDE emulator component, the IDE emulator component including a
physical interface designed to engage a first cable that connects to a host that
controls an IDE storage device;

an IDE interface configured to engage a second cable that connects to the
IDE storage device; and

a logic circuit connecting the IDE emulator component to the IDE interface
and configured to: compare commands received at the IDE emulator component
to a predetermined set of commands, and to block transmission of one or more
of the commands from the IDE emulator component to the IDE interface when
the comparison indicates that the~~logic~~ the logic circuit does not recognize the
received command or the comparison indicates that the received command is a
command that modifies the storage device, wherein

5

Ser. . Number: 09/961,417
Docket Number: 0032-0003

the device operates transparently to normal operation of the host and the IDE storage device.

16.  (original)  The device of claim 15, wherein the logic circuit includes:

an embedded processor,

a computer memory connected to the embedded processor, the embedded processor loading program instructions from the computer memory during device initialization, and

a programmable logic device (PLD) coupled to the embedded processor, the IDE emulator component, and the IDE interface.

17.  (original)  The device of claim 16, wherein the PLD includes:

a bus driver component configured to transfer data between the embedded processor, the IDE emulator component, and the IDE interface,

a first dual port memory buffer connected between the bus driver and the IDE interface,

a first set of communication lines connecting the bus driver directly to the IDE interface and indirectly to the IDE interface through the first dual port memory buffer,

a second dual port memory buffer connected between the bus driver and the IDE emulator component, and

6

MTI0000572

Serial Number: 09/961,417
Docket Number: 0032-0003

a second set of communication lines connecting the bus driver directly to the IDE emulator component and indirectly to the IDE emulator component through the second dual port memory buffer.

18. (original) The device of claim 15, wherein the commands in the predetermined set of commands are commands that modify a storage state of the IDE storage device.

19. (original) The device of claim 15, wherein when the logic circuit receives data back from the IDE storage device the logic circuit forwards the received data to the host through the IDE emulator component.

20. (original) The device of claim 19, wherein, when the comparison indicates the command includes a capabilities request command relating to the IDE storage device, the logic circuit modifies data received from the IDE storage device relating to the capabilities request command to reflect the capability of the IDE storage device as affected by the presence of the device.

21. (original) The device of claim 15, wherein the logic circuit, after blocking transmission of one of the commands, returns status information to the host that indicates that the blocked command was successfully executed.

22. (original) The device of claim 15, further comprising:

7

Ser.... Number: 09/961,417
Docket Number: 0032-0003

a second interface for connecting to a second IDE storage device.

23.  (original)  The device of claim 22, wherein each of the interfaces is independently coupled to the logic circuit.

24.  (original)  The device of claim 15, further including light emitting diodes (LEDs) coupled to the logic circuit and configured to transmit status information relating to the status of the device.

25.  (original)  The device of claim 15, further including:
a temporary storage device coupled to the logic circuit, the logic circuit storing data corresponding to blocked commands in the temporary storage device.

26.  (original)  The device of claim 25, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the logic circuit returns the data from the temporary storage device to the host.

27.  (currently amended)  The device of claim 15, further including:
a user configurable memory connected to the logic circuit, the user configurable memory storing instructions that define protected areas on the IDE storage device, the logic circuit blocking received commands that ~~match~~ would modify the protected areas on the IDE storage device.

8

MTI0000574

Ser... Number: 09/961,417
Docket Number: 0032-0003

28. (original)  The device of claim 15, wherein the logic circuit examines feature information from the IDE storage device that relates to features supported by the IDE storage device and removes any feature information not supported by the device before making the feature information available to the host.

29. (currently amended)  A device comprising:

an emulator component, the emulator component including a physical interface designed to connect to a host that controls a storage device;

an interface configured to connect to the storage device; and

a logic circuit connecting the emulator component to the interface and configured to compare information received at the emulator component to a computer virus definition file and to block transmission of the information from the emulator component to the interface when the comparison indicates a match with the computer virus definition file, wherein

the device operates transparently to normal operation of the host and the storage device.



30. (original)  The device of claim 29, wherein the logic circuit includes:

an embedded processor;

a computer memory connected to the embedded processor, the embedded processor loading program instructions from the computer memory during device initialization; and

9

Ser... Number: 09/961,417
Docket Number: 0032-0003

a programmable logic device (PLD) coupled to the embedded processor, the emulator component, and the interface.

31.  (original)  The device of claim 29, wherein the interface is an Integrated Device Electronics (IDE) interface and the storage device is an IDE disk drive.

32.  (currently amended)  A method comprising:

intercepting communications between a computer motherboard and a local non-volatile storage device for the motherboard;

comparing commands in the communications between the motherboard and the storage device to a predetermined set of commands;

forwarding selected ones of the commands to the storage device based on the comparison; and

blocking selected other ones of the commands from being received by the storage device based on the comparison, wherein

the intercepting communications, comparing commands, forwarding selected ones of the commands, and blocking selected other ones of the commands is transparent to normal operation of the computer motherboard and the storage device.

33.  (original)  The method of claim 32, wherein the predetermined set of commands relate to commands that modify the storage device.

10

MTI0000576

Se)... Number: 09/961,417
Docket Number: 0032-0003

34. (original)  The method of claim 33, further comprising:

forwarding data from the storage device to the motherboard in response to a read command received from the motherboard and forwarded to the storage device.

35. (original)  The method of claim 32, wherein the storage device is an integrated device electronics (IDE) disk drive.

36. (original)  The method of claim 32, wherein the commands forwarded to the storage device include a capabilities request command, the method further comprising:

modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as modified by operation of the method.

37. (original)  The method of claim 36, further comprising, after blocking a command:

returning status information to the motherboard that indicates that the blocked command was successfully executed by the storage device.

38. (currently amended)  A computer system comprising:

a host computer;

11

MTI0000577

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

a long-term storage device; and

a blocking device coupled between the host computer and the storage device, the blocking device configured to:

intercept commands from the host to the storage device,

block certain commands from reaching the storage device,

and pass other ones of the commands to the storage device, wherein the intercepting commands, blocking certain commands, and passing other ones of the commands are performed by the blocking device transparently to the host computer and the long-term storage device.

39.   (currently amended)  The computer system of claim 38, wherein the blocking device further includes:

an interface emulator configured to emulate the interface of the storage device to the host; and

an interface configured to connect the blocking device to the storage device.

40.   (original)  The computer system of claim 39, wherein the interface emulator emulates an Integrated Device Electronics (IDE) interface and the storage device is an IDE disk drive.

MTI0000578

*Ser. Number: 09/961,417*
*Docket Number: 0032-0003*

41. (original)  The computer system of claim 38, wherein the blocked commands are commands that would otherwise modify a storage state of the storage device.

42. (original)  The computer system of claim 38, wherein the blocking device receives data back from the storage device in response to one of the passed commands and forwards the received data to the host.

43. (original)  The computer system of claim 38, wherein, when the passed commands include a capabilities request command relating to the storage device, the blocking device modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

44. (original)  The computer system of claim 38, wherein the blocking device, after blocking one of the commands, returns status information to the host that indicates that the blocked command was successfully completed.

45. (original)  The computer system of claim 38, wherein the blocking device further includes light emitting diodes (LEDs) configured to transmit status information relating to the status of the blocking device.

13

MTI0000579

Ser.... Number: 09/961,417
Docket Number: 0032-0003

46. (original)  The computer system of claim 38, wherein the blocking device further includes:

a temporary storage device, the blocking device storing data from the host corresponding to blocked commands in the temporary storage device.

47. (original)  The computer system of claim 46, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the blocking device returns the data from the temporary storage device to the host.

48. (original)  The computer system of claim 38, wherein the blocking device further includes:

a user configurable memory, the user configurable memory storing instructions that define protected areas on the storage device, the blocking device dropping those of the commands that would otherwise modify the protected areas on the storage device.

49. (currently amended)  A blocking device comprising:

means for intercepting communications between a host and a storage device;

means for comparing commands in the communications between the host and the storage device to a predetermined set of commands;

14

MTI0000580

Ser. . Number: 09/961,417
Docket Number: 0032-0003

means for forwarding selected ones of commands in the intercepted communications to the storage device based on the comparison; and

means for blocking selected other ones of the commands from being received by the storage device based on the comparison, wherein the blocking device operates transparently to normal operation of the host and the storage device.

50.  (original)  The blocking device of 49, wherein the commands blocked by the means for blocking relate to commands that modify the storage device.

51.  (original)  The blocking device of 49, wherein the storage device is an integrated device electronics (IDE) disk drive.

52.  (original)  The blocking device of 49, wherein the commands forwarded to the storage device include a capabilities request command, and the means for forwarding further comprises:

means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device.

53.  (original)  The blocking device of 49, further comprising:

means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device.

15

*Ser. . Number: 09/961,417*
*Docket Number: 0032-0003*

54.  (new)  The blocking device of claim 3, wherein the interface emulator is configured to emulate an IEEE 1394 connection.

55.  (new)  The device of claim 29, wherein the emulator component connects to the host via an IEEE 1394 connection.

56.  (new)  The device of claim 39, wherein the interface emulator emulates an IEEE 1394 connection and the storage device is an IDE disk drive.

16

MTI0000582

*Se... ... Number: 09/961,417*
*Docket Number: 0032-0003*

### REMARKS

In the Office Action of September 25, 2001, the Examiner rejected the pending claims 1-53. More particularly, the Examiner rejected claims 1, 2, 4-8, 10-14, 32-34, 36-39, 41-44, 46-50, 52, and 53 under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 6,336,187 to Kern et al. (hereafter "Kern"); rejected claims 3, 9, 15, 16, 18-28, 35, 40, 45, and 51 under 35 U.S.C. § 103(a) as being unpatentable over Kern in view of Official Notice; rejected claim 17 under 35 U.S.C. § 103(a) as being unpatentable over Kern in view of U.S. Patent No. 6,216,205 to Chin et al. (hereafter "Chin"); and rejected claims 29-31 under 35 U.S.C. § 103(a) as being unpatentable over Kern in view of U.S. Patent No. 6,230,288 to Kuo et al. (hereafter "Kuo").

By this Amendment, Applicants have amended claims 1, 15, 29, 32, 38, 39, and 49 to clarify the invention and amended claims 6 and 27 to correct minor typographical errors. Additionally, claims 54-56 have been added. The new claims relate to the use of an IEEE (Firewire) connection between the device and the host. Support for these claims can be found, for example, in paragraphs 28 and 29 of the originally filed specification, which generally discloses that interfaces other than IDE, such as Firewire or other "modern" interfaces, may be used.

Claims 1, 2, 4-8, 10-14, 32-34, 36-39, 41-44, 46-50, 52, and 53 stand rejected under 35 U.S.C. § 102(e) in view of Kern. For the following reasons, Applicants respectfully traverse this rejection.

17

MTI0000583

Serial Number: 09/961,417
Docket Number: 0032-0003

Claim 1, as amended, is directed to a blocking device connected between a host and a storage device.  The blocking device includes an interface emulator, an interface for connecting to the storage device, and a processor.  The processor performs a number of functions, including allowing only commands that match a predetermined set of commands to pass to the storage device via the interface.  Additionally, as amended, claim 1 also recites that the blocking device is transparent to normal operation of the host and the storage device.

Advantages associated with transparent operation of the blocking device are discussed in numbered paragraph 38 of the specification.  As discussed, the blocking device appears as a standard storage device to the host.  Similarly, to the storage device, the blocking device appears to be the host.  Accordingly, neither the host nor the storage device need any special hardware or software and neither the host nor the storage device need to be reconfigured in any way.  The blocking device simply needs to be inserted between the host and the storage device and it is ready to operate.

Kern is directed to a storage system that provides data security via a security key that must be presented by a host before the storage controller will give the host access to the storage device(s).  (Kern, abstract).  The storage security of Kern is provided according to the storage region being accessed.  (Kern, col. 2, lines 42-45).  Although Kern states that the storage controller is "host-independent," each host of Kern includes a respective host application program, such as host application programs 110-112 (Fig. 1).  (Kern, col. 4, lines 3-28).  The host application programs 110-112 are specifically designed to

18

MTI0000584

Ser. Number: 09/961,417
Docket Number: 0032-0003

operate with controller 106, by for example, transmitting an access key to

controller 106.

In contrast to Kern, the device of claim 1 includes, among other things, an

interface emulator configured to emulate an interface presented by a storage

device. Although Kern discloses a "controller interface 120," the controller

interface 120 of Kern does not emulate an interface presented by a storage

device. The interface 120 of Kern is described as "an intelligent digital

input/output communication channel, or other interface suitable to the particular

application." (Kern, col. 4, lines 48-50). Nothing in Kern discloses or suggests

that interface 120 emulates the interface presented by storage device(s) 108.

Because Kern discloses host application programs 110-112 that are specifically

designed to operate with controller 106, Applicants submit that there would be no

need for interface 120 to emulate storage devices, as application programs 110-

112 could be designed to operate with any "intelligent digital input/output

channel." Thus, if anything, Kern actually teaches away from this aspect of the

invention.

Claim 1 further recites that the blocking device is transparent to normal

operation of the host and the storage device. Kern clearly does not disclose or

suggest this feature of the invention. As previously mentioned, the controller of

Kern operates with host application programs 110-112 that are specifically

designed for controller 106. Host application programs 110-112 are described as

transmitting an input access key with data requests. (Kern, col. 4, lines 29-29).

Additionally, Kern, in Fig. 7, describes the sequence performed by a new host in

19

*Se. . . Number: 09/961,417*
*Docket Number: 0032-0003*

order to participate in future allocation and/or data access requests. (Kern, Fig. 7 and col. 10, line 27 through col. 11, line 6). As described in these sections, a number of explicit communication steps are taken between a new host and controller 120 before a host can use the storage device(s) 108, including exchanging a key (step 704) and reconfiguring the interface of the host application (step 706). Applicants submit that this disclosure of Kern clearly teaches away from a blocking device that is transparent to normal operation of the host and storage device, as recited in amended claim 1.

Applicants remind the Examiner that anticipation under 35 U.S.C. § 102(e) is present only if each and every element as set forth in the claim is found, either expressly or inherently, in a single prior art reference. See MPEP § 2131. In the present case, Applicants submit that Kern clearly does not disclose, or even suggest, each element recited in claim 1. Accordingly, for at least the reasons given above, Applicants submit that the rejection of claim 1 is improper and should be withdrawn.

Independent claims 32, 38, and 49 recite features similar to those recited in claim 1. Based on similar rationale as that given above, Applicants submit that the rejection of these claims should also be withdrawn.

At least by virtue of their dependency on one of claims 1, 32, 38, and 49, Applicants submit the rejection of dependent claims 2, 4-8, 10-14, 33, 34, 36, 37, 39, 41-44, 46-48, 50, 52, and 53 should also be withdrawn. Additionally, these dependent claims recite features not disclosed or suggested by Kern. Claim 5, for instance, further recites that when a command include a capabilities request

20

Se.   .l Number: 09/961,417
Docket Number: 0032-0003

command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device. The Examiner appears to contend that this feature of the invention is disclosed by Kern in the abstract and at col. 6, line 40 through col. 7, line 60. (Office Action, numbered paragraph 2). Applicants have reviewed this section of Kern, and submit that nowhere in this section does Kern disclose a capabilities request command relating to the storage device, much less modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device. Accordingly, for these reasons also, Applicants submit that claim 5 defines features not disclosed or suggested by Kern. Claims 36 and 43 recite features similar to claim 5, and accordingly, these claims are similarly not disclosed or suggested by Kern.

Dependent claim 6 recites that the processor drops commands that do not match the predetermined set of commands, and, after dropping one of the commands, returns status information to the host that indicates that the dropped command was successfully completed. In contrast to this claimed feature, Kern explicitly discloses returning an error condition to a requesting host when an access key does not match. (Kern, col. 10, lines 1-4). Returning an error condition is significantly different than returning information indicating that a dropped command was successfully executed. Accordingly, for these reasons also, Applicants submit that claim 6 defines features not disclosed or suggested

21

MTI0000587

Se.  .l Number: 09/961,417
Docket Number: 0032-0003

by Kern.  Claims 37 and 44 recite features similar to claim 6, and accordingly,
these claims are similarly not disclosed or suggested by Kern.

Dependent claim 10 recites a temporary storage device coupled to the
processor, the processor storing data from the host corresponding to the dropped
commands in the temporary storage device.  Although Kern may disclose
storage devices in controller 106 (e.g., Fig. 1, element 124; Fig. 2, element 206),
these storage devices are not disclosed or suggested by Kern as storing data
from the host corresponding to the dropped commands.  Instead, storage map
124 of Kern is disclosed as a table that stores data that relates to the storage
access keys and permitted operations that may be performed on the various
regions defined in the storage devices.  (Kern, col. 5, lines 13-49).  Storage 206
of Kern is disclosed as storing programming instructions used to implement
controller 106.  (Kern, col. 6, lines 48-62).  Accordingly, for these reasons also,
Applicants submit that claim 10 defines features not disclosed or suggested by
Kern.  Claim 46 recites features similar to claim 10, and accordingly, these claims
are similarly not disclosed or suggested by Kern.

Claims 3, 9, 15, 16, 18-28, 35, 40, 45, and 51 stand rejected under 35
U.S.C. § 103(a) as being unpatentable over Kern.  In making these rejections,
the Examiner gives Official Notice that a number of features recited in these
claims are well known in the art.  In particular, the Examiner states that the claim
features relating to an IDE interface, the light emitting diodes (LEDs), and the
programmable logic device (PLD) are well known in the art.  (Office Action,
numbered paragraphs 5-8).

22

MTI0000588

Se.  .l Number: 09/961,417
Docket Number: 0032-0003

Although Applicants do not agree that the features cited by the Examiner as being well known in the art would have been obvious modifications to the teachings of Kern, Applicants submit that even if Kern was modified as the Examiner suggests, Kern would still not disclose or suggest each feature recited in claims 3, 9, 15, 16, 18-28, 35, 40, 45, and 51. Dependent claims 3, 9, 35, 40, 45, and 51, for example, depend from one of independent claims 1, 32, 38, or 49. Thus, at least by virtue of their dependency from one of these claims, Applicants submit that the rejection of claims 3, 9, 35, 40, 45, and 51 are improper and should be withdrawn.

Independent claim 15 and its dependent claims 16 and 18-28 were also rejected by the Examiner as being obvious over Kern in view of Official Notice. Claim 15, as amended, recites a number of features similar to claim 1. Accordingly, Applicants submit that for reasons similar to those given above relating to claim 1, Kern does not disclose or suggest each feature of claim 15. Accordingly, the rejection of claim 15 should be withdrawn. The rejection of claims 16-28, at least by virtue of their dependency on claim 15, should also be withdrawn.

In addition, dependent claims 20, 21, and 25 recite additional features that are similar to the features recited in claims 5, 6, and 10, respectively. Accordingly, for reasons similar to those given above for claims 5, 6, and 10, in addition to the dependency of claims 20, 21, and 25 from claim 15, the rejection of claims 20, 21, and 25 should be withdrawn.

MTI0000589

Se.  ¦ Number: 09/961,417
Docket Number: 0032-0003

Claim 17 stands rejected under 35 U.S.C. § 103(a) in view of Kern and Chin. The Examiner appears to be relying on Chin for the disclosure of a dual-port memory buffer. Applicants have reviewed Chin and submit that Chin fails to make up for the deficiencies of Kern discussed above relating to claims 1 and 15. Accordingly, at least by virtue of the dependency of this claim on claim 15, Applicants submit that the rejection of claim 15 should be withdrawn.

Claims 29-31 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Kern in view of Kuo. In the rejection based on Kern and Kuo, the Examiner concedes that Kern does not disclose the virus definition file recited in claim 29, but states that this feature is disclosed by Kuo and that one of ordinary skill in the art would have found it obvious to modify Kern to include the virus definition file disclosed by Kuo. For at least the following reasons, Applicants respectfully traverse this rejection.

Claim 29, as amended, is directed to a device including an emulator component, an interface, and a logic circuit. The logic circuit connects the emulator component to the interface and is configured to compare information received at the emulator component to a computer virus definition file and to block transmission of the information from the emulator component to the interface when the comparison indicates a match with the computer virus definition file. The device operates transparently to normal operation of the host and the storage device.

Kuo discloses how to scan text files on a computer for viruses using a virus detection program. (Kuo, Abstract). More specifically, Kuo is concerned

24

MTI0000590

Se.   ' Number: 09/961,417
Docket Number: 0032-0003

with finding and preventing viruses in the white space of text files.  (Id.).  The

virus detection program of Kuo compares a set of virus signatures to the text files

to determine whether a particular text file is infected.  (Id.).

Applicants submit that the virus detection program of Kuo is a

conventional computer executable file.  Accordingly, if one or ordinary skill in the

art were to combine the disclosures of Kern and Kuo, as the Examiner suggests,

the most likely combination would be the system of Kern in which the virus

detection programs of Kuo execute on hosts 102-104 of Kern.  Thus, Kern, even

if combined with Kuo, would not include the logic circuit recited in claim 29, which

connects the emulator component to the interface of claim 29.

Additionally, Applicants submit that claim 29 recites additional features

that are not disclosed or suggested by either of Kern or Kuo.  In particular, as

recited in claim 29, the emulator component, the interface, and logic circuit define

a device that  is transparent to normal operation of the host and the storage

device.  As discussed above relating to claim 1, the controller of Kern is not

transparent to the operation of the host computer systems of Kern.

Accordingly, for at least these reasons, the rejection of claim 29 is

improper and should be withdrawn.  The rejection of claims 30 and 31, at least by

virtue of their dependency on claim 29, is also improper and should be

withdrawn.

In numbered paragraphs 14 and 15 of the Office Action, the Examiner

additionally rejects claims 30 and 31 as being unpatentable over Kern and Kuo,

and further in view of Official Notice. In particular, the Examiner states that the

MTI0000591

*Se. l Number: 09/961,417*
*Docket Number: 0032-0003*

claim features relating to an IDE interface and the programmable logic device (PLD) are well known in the art.

Although Applicants do not agree that the features cited by the Examiner as being well known in the art would have been obvious modifications to the teachings of Kern and Kuo, Applicants submit that even if Kern and Kuo were modified as the Examiner suggests, these patents would still not disclose or suggest each feature recited in claims 30 and 31. Thus, Applicants submit that the rejection of claims 30 and 31 are improper and should be withdrawn.

Additionally, Applicants submit that newly added claims 54-56 are not disclosed or suggested by the prior art of record. Thus, these claims should be indicated as allowable.

In view of the foregoing remarks, Applicants submit that the claimed invention is neither anticipated nor rendered obvious in view of the references cited against this application. Applicants, therefore, request the Examiner's reconsideration and reexamination of the application, and the timely allowance of the pending claims.

26

MTI0000592

*Se.. .l Number: 09/961,417*
*Docket Number: 0032-0003*

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made.  Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account 50-1070 and please credit any excess fees to such deposit account.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E Ledell
Reg. No. 42,784

Date:  November 24, 2003

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
Telephone: 571-432-0800
Facsimile:  571-432-0808
Customer Number:  26615

27

MTI0000593



2187

Patent
Attorney's Docket No. 0032-0003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of | ) |
| | ) |
| Steven BRESS et al. | ) Group Art Unit: 2187 |
| | ) |
| Application No.: 09/961,417 | ) Examiner: N. V. Dinh |
| | ) |
| Filed: September 25, 2001 | ) |
| | ) |
| For: WRITE PROTECTION FOR | ) |
| COMPUTER LONG-TERM | ) |
| MEMORY DEVICES | ) |

RECEIVED

DEC 0 1 2003

Technology Center 2100

### AMENDMENT/REPLY TRANSMITTAL LETTER

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window, Mail Stop Fee Amendment
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202



Sir:

Enclosed is a reply for the above-identified patent application.

☐ A Petition for Extension of Time is also enclosed.

☐ A Terminal Disclaimer and a check for ☐ $55.00 ☐ $110.00 to cover the requisite Government fee are also enclosed.

☐ Applicant(s) request continued examination under 37 C.F.R. § 1.114 and enclose the ☐ $370.00 ☐ $740.00 fee due under 37 C.F.R. § 1.17(e).

☐ Applicant(s) previously submitted _____, on _____, for which continued examination is requested.

☐ A request for Entry and Consideration of Submission under 37 C.F.R. § 1.129(a) is also enclosed.

MTI0000594

Amendment/Reply Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

☐     No additional claim fee is required.

☒     An additional claim fee is required, and is calculated as shown below:

| AMENDED CLAIMS | | | | | |
|---|---|---|---|---|---|
| | No. of Claims | Highest No. Of Claims Previously Paid For | Extra Claims | Rate | Additional Fee |
| Total Claims | 56 | 53 | 3 | x $18.00 = | $54.00 |
| Ind. Claims | 6 | 6 | 0 | x $ 86.00 = | $0.00 |
| If Amendment adds multiple dependent claims, add $280.00 | | | | | $0.00 |
| Total Amendment Fee | | | | | $54.00 |
| If Small entity status is claimed, subtract 50% of Total Amendment Fee | | | | | $27.00 |
| **TOTAL ADDITIONAL FEE DUE FOR THIS AMENDMENT** | | | | | $27.00 |

☒     A claim fee in the amount of $ __27.00__ is enclosed.

☐     Charge $ _____ to Deposit Account no. 50-1070.

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made.  Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account No. 50-1070 and please credit any excess fees to such deposit account.

MTI0000595

Amendment/Reply Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 3

The Commissioner is hereby authorized to charge any other appropriate fees that may be required by this paper that are not accounted for above, and to credit any overpayment, to Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____

Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date:  November 24, 2003

MTI0000596



### UNITED STATES PATENT AND TRADEMARK OFFICE



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

26615     7590     02/02/2004

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA  22030

| EXAMINER |
|---|
| DINH, NGOC V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2187 | *10* |

DATE MAILED: 02/02/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

MTI0000597

*PRL*

| **Office Action Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 09/961,417 | BRESS ET AL. |
| | Examiner | Art Unit |
| | NGOC V DINH | 2187 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>03</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>24 November 2003</u>.
2a) ☐ This action is **FINAL**.  2b) ☒ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) <u>1-56</u> is/are pending in the application.
 4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) <u>1-4,6-9,12,15-19,21-24,27,29-35,38-42,44,45,48-51 and 53-56</u> is/are rejected.
7) ☐ Claim(s) <u>5,10,11,13,14,20,25,26,28,36,37,43,46,47 and 52</u> is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
 Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
 Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. §§ 119 and 120**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
 a) ☐ All  b) ☐ Some * c) ☐ None of:
  1. ☐ Certified copies of the priority documents have been received.
  2. ☐ Certified copies of the priority documents have been received in Application No. _____.
  3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
 * See the attached detailed Office action for a list of the certified copies not received.
13) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application) since a specific reference was included in the first sentence of the specification or in an Application Data Sheet. 37 CFR 1.78.
 a) ☐ The translation of the foreign language provisional application has been received.
14) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121 since a specific reference was included in the first sentence of the specification or in an Application Data Sheet. 37 CFR 1.78.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) <u>8</u>.
4) ☐ Interview Summary (PTO-413) Paper No(s). _____.
5) ☐ Notice of Informal Patent Application (PTO-152)
6) ☐ Other: _____.

MTI0000598

Application/Control Number: 09/961,417                                              Page 2
Art Unit: 2187

## DETAILED ACTION

This Office Action is responsive to Amendment filed 11/24/03.

Applicant's previous arguments are moot with regard to claims 1-23 in view of the new rejection.

## INFORMATION DISCLOSURE STATEMENT

The Applicant's submission of the IDS filed 11/24/03 have been considered. As required by M.P.E.P. 609 C(2), a copy of the PTOL-1449 is attached to the instant office action.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claims 54-56 contains the trademark/trade name IEEE 1394. Where a trademark or trade name is used in a claim as a limitation to identify or describe a particular material or product, the claim does not comply with the requirements of 35 U.S.C. 112, second paragraph. See *Ex parte Simpson*, 218 USPQ 1020 (Bd. App. 1982). The claim scope is uncertain since the trademark or trade name cannot be used properly to identify any particular material or product. A trademark or trade name is used to identify a source of goods, and not the goods themselves. Thus, a trademark or trade name does not identify or describe the goods associated with the trademark or trade name. In the present case, the trademark/trade name is used to identify/describe a firewire connection and, accordingly, the identification/description is indefinite.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

Application/Control Number: 09/961,417                                           Page 3

Art Unit: 2187

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 1-2, 4, 6-8, 12, 41-42, 44-45, 48, 50, 53 are rejected under 35 U.S.C 103(a) as

being unpatentable over Bergsten PN 6,345,368, and in view of Kern et al PN 6,336,187.

**1. As per claim 1:**

Bersten teaches a computer system comprising: a host computer, a long term storage

device; an interface emulator embedded in a storage controller [21; fig. 1, 2] configured

to emulate an interface presented by the storage device; and interface [15, fig. 3] for

connecting to the storage device; the storage controller is transparent to the host and

storage arrays; the storage controller provides write protection [abstract; col. 5, lines 48-

55; col. 6, lines 22-30; col. 8, lines 35-45; col. 15, line 65-66].

Bersten does not teach a processor coupled to the interface emulator and the interface, the

processor examining commands received through the interface emulator that are

generated by the host and intended for the storage device, the processor allowing only

those of the commands that match a predetermined set of commands.

Kern teaches a processor [122, fig. 1; col. 4, lines 62-67; fig. 2] coupled to the interface

emulator and the interface, the processor examining commands received through the

interface emulator that are generated by the host and intended for the storage device, the

processor allowing only those of the commands that match a predetermined set of

commands [e.g., reference location, operation parameters; col. 7, lines 34-60 to pass to

the storage device via the interface [col. 1, lines 50-65; col. 2, line 45 to col. 3, line 10;

col. 4, lines 51-65; col. 5, lines 5-15].

It would have been obvious to one having ordinary skill in the art at the time the

invention was made to include a blocking device of Kern into Bersten's computer system

in order to provide write protected for data blocks, virus protection, therefore the security

firewalls of the system is increased [col. 15, line 65 to col. 16, line 5].

MTI0000600

Application/Control Number: 09/961,417                                   Page 4
Art Unit: 2187

**2.  As per claim 2:**

Bersten does not teach the commands in the predetermined set of commands are commands recognized by the processor as not modifying a storage state of the storage device.

Kern teaches the commands in the predetermined set of commands are commands recognized by the processor as not modifying [e.g., read access type] a storage state of the storage device [col. 4, lines 20-30].

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include the teaching of Kern as mentioned above into Bersten's computer system in order to provide write protected for data blocks, virus protection, therefore the security firewalls of the system is increased [col. 15, line 65 to col. 16, line 5].

**3.  As per claim 4:**

Bersten teaches the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator [fig. 1, 2].

**4.  As per claim 6:**

Bersten does not teach the processor drops those of the commands that do not match the predetermined set of commands, and after dropping one of the matching commands, return status information to the host that indicates that the dropped command was successfully completed.

Kern teaches the processor drops those of the commands that do not match the predetermined set of commands, and after dropping one of the matching commands, return status information to the host [e.g., error condition; col. 3, lines 5-10; col. 10, lines 1-10] that indicates that the dropped command was successfully completed.

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include the teaching of Kern as mentioned above into Bersten's computer system in order to provide write protected for data blocks, virus protection, therefore the security firewalls of the system is increased [col. 15, line 65 to col. 16, line 5].

Application/Control Number: 09/961,417                                    Page 5
Art Unit: 2187

5. **As per claims 7-8:**

Bersten teaches additional interfaces for connecting to additional storage devices, and each of the interfaces is independently coupled to the processor [fig. 1,2; col. 17, lines 55-65].

6. **As per claim 12:**

Bersten does not teach a user configurable memory storing instructions [208, fig. 2] that define protected areas on the storage device, the processor dropping those of the commands that match the predetermined set of commands when the matching commands are commands that would otherwise modify the protected areas on the storage device.

Kern teaches a user configurable memory storing instructions [208, fig. 2] that define protected areas on the storage device, the processor dropping those of the commands that match the predetermined set of commands when the matching commands are commands that would otherwise modify the protected areas on the storage device.

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include the teaching of Kern as mentioned above into Bersten's computer system in order to provide write protected for data blocks, virus protection, therefore the security firewalls of the system is increased [col. 15, line 65 to col. 16, line 5].

7. **As per claims 41-42:**

Claims 41-42 are rejected as the same reason as set forth in claims 18, 4.

8. **As per claims 44-45, 48:**

Claims 44-45, 48 are rejected as the same reason as set forth in claims 6, 9, 12.

9. **As per claims 50, 53:**

Claims 50, 53 are reject as the same reason as set forth in claims 18, 6.

Claim 3, 9, 15-16, 18-19, 21-25, 27, 29-31, 35, 40, 51, 54-56 are rejected under 35 U.S.C 103(a) as being unpatentable over Bersten, in view of Kern et al, and in view of well known features of which Official Notice is hereby taken.

10. **As per claim 3:**

Bersten-Kern teaches the claimed apparatus as noted above.

MTI0000602

Application/Control Number: 09/961,417                                   Page 6

Art Unit: 2187

Bersten-Kern, however, does not explicitly teach the interface is an IDE.

However, it would have been obvious to one having ordinary skill in the art at the time the invention was made to employ interface which use integrated device electronics (IDE) in a given pattern for the application desired for using the IDE because this type of circuitry is a smaller and less complicated, circuit boards and fewer interconnect cables, gives IDE a distinct cost advantage over other disk drive interface technologies. The IDE is commonly but not exclusively known in the art as firmware, is well known and official notice is taken thereof.

**11. As per claims 9, 24, 45:**

Bersten-Kern teaches the claimed apparatus as noted above.

Bersten-Kern does not explicitly teach the light emitting diodes (LEDs) embedded in the blocking device coupled to the processor and configured to transmit status information relating to the status of the blocking device.

However, it would have been obvious to one having ordinary skill in the art at the time the invention was made to use LEDs for transmitting status information relating to the status of the blocking device to help insure that the failed blocking device is readily identifiable to the system administrator. The LEDs are used in the pertinent art as an indicator for monitoring the status of device, and are well known and official notice is taken thereof.

**12. As per claim 15, 31, 35, 40, 51:**

Bersten-Kern teaches the claimed limitations as mentioned in claim 1 above, and the further limitation of "the received command is a command that modifies the storage device" [e.g., write access type] is taught by Kern [col. 4, lines 15-25].

Bersten-kern dose not teach the emulator and the interface are an IDE.

However, it would have been obvious to one having ordinary skill in the art at the time the invention was made to employ interface which use integrated device electronics (IDE) in a given pattern for the application desired for using the IDE because this type of circuitry is a smaller and less complicated, circuit boards and fewer interconnect cables, gives IDE a distinct cost advantage over other disk drive interface technologies. The IDE

MTI0000603

Application/Control Number: 09/961,417                                            Page 7
Art Unit: 2187

is commonly but not exclusively known in the art as firmware, is well known and official notice is taken thereof.

**13. As per claim 16:**

Bersten-Kern teaches the claimed apparatus as noted above.

Bersten-Kern does not teach the programmable logic device (PLD) coupled to the embedded processor, the IDE emulator component, and the IDE interface.

However, it would have been obvious to one having ordinary skill in the art at the time the invention was made to implement PLD into Bersten-Kern blocking device. This is because of the high-density logic integration of PLD, thereby offering a significant savings on chip board real-estate. Moreover, using a PLD offers the ability to adjust to future engineering changes. The PLD is used in the pertinent art as a logic programming device and is well known and official notice is taken thereof.

**14. As per claim 18:**

Claim 18 is rejected as the same reasons as set forth in claim 2, and the further claimed limitation of "the commands in the predetermined set of command are commands that modify [e.g., write access type] a storage state of the IDE storage device" is taught by Kern [col. 4, lines 15-25].

**15. As per claims 19, 21:**

Claim 19, 21 are rejected as the same reasons as set forth in claims 4, 6.

**16. As per claims 22-23, 27:**

Claims 22-23, 27 are rejected as the same reasons as set forth in claims 7-8, 12.

**17. As per claim 29-30:**

Claims 29-30 are rejected as the same reasons as set forth in claims 1, 16 above.

Furthermore, Bersten teaches a computer virus definition file [col. 16, lines 1-5] for comparison between the information received at the emulator and the virus in the virus definition file.

**18. As per claims 54-56:**

Bersten-Kern teaches the claimed apparatus as noted above.

Bersten-Kern does not teach the interface emulator is an IEEE1394 connection.

Application/Control Number: 09/961,417                                           Page 8
Art Unit: 2187

However, as Applicant cited in his spec (page 8, lines 10-12) that IEEE 1394 is a well
known firewire connection. Therefore, it would have been obvious to one having
ordinary skill in the art at the time the invention was made to implement IEEE 1394
connection into Bersten-Kern computer system. This is because The IEEE 1394 standard
defined in 1995 is an international standard for implementing a cost-effective and high-
speed digital interface.  The IEEE 1394 serial bus provides high-speed data transport of
several hundreds of megabits per second and therefore enables real-time transport
required for digital video data transmission.  The IEEE 1394 further provides so-called
plug-and-play function by which devices can be added or removed by users without
initial settings.  These advantages cause the IEEE 1394 digital interface to provoke
widespread attention as a digital interconnect for both computer peripherals
and consumer electronics including digital video cameras and digital television
sets.


Claim 17 are rejected under 35 U.S.C 103(a) as being unpatentable over Bersten, in view
of Kern et al, and in view of Chin et al PN 6,216,205.

**19.  As per claim 17:**

Bersten-Kern teaches the claimed apparatus as noted above.

Bersten-Kern inherently teaches the PLD includes a bus driver component configured to
transfer data between the embedded processor, the emulator component and the interface;
a first set of communication lines connecting the bus driver directly to the interface and
indirectly to the interface through the first port memory buffer; a second set of
communication lines connecting the bus driver directly to the interface and indirectly to
the interface through the second port memory buffer [Bersten, 24, fig. 4; Kern, 124, fig.
1]. This is because the address, data, and control lines from the microprocessor in the
system are routed to PLD where their information is buffered and latched as necessary in
PLD's buffers.  The Buffers and bus drivers help control the data flow and distribution of
the address and data buses from the microprocessor to other portions of PLD.

Bersten-Kern does not teach the memory devices are a dual port memory buffer.

Chin teaches a dual port memory buffer [col. 2, lines 29-32].

MTI0000605

Application/Control Number: 09/961,417                                    Page 9
Art Unit: 2187

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to further include the first and second dual port memory into
Bersten-Kern blocking device. Doing so would allow read and write operations to occur
independently of each other and achieve fast fall-through capability since data written
into a dual-port memory can be immediately accessed for reading [col. 2, lines 29-33].

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the
basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in a patent granted on an application for patent by another filed in the United States before
> the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the
> requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for
> patent.

Claims 32-34, 38, 49 are rejected under 35 U.S.C.102 (e) as being anticipated by Kern et
al. PN 6,336,187.

**20.  As per claims 32:**

Kern teaches a method comprising: intercepting communications between a computer
motherboard and a local non-volatile storage device for the motherboard [fig. 1-2];
comparing commands in the communications between the motherboard and the storage
device to a predetermined set of commands; forwarding selected ones of the commands
to the storage device based on the comparison; and blocking selected other ones of the
commands from being received by the storage device based on the comparison [e.g.,
reference location, operation parameters; col. 7, lines 34-60 to pass to the storage device
via the interface [col. 1, lines 50-65; col. 2, line 45 to col. 3, line 10; col. 4, lines 51-65;
col. 5, lines 5-15].

**21.  As per claims 33-34:**

Kern teaches the predetermined set of commands relate to commands that modify the
storage device; forwarding data from the storage device to the motherboard in response to
a read command received from the motherboard and forwarded to the storage device col.
3, lines 1-10; col. 4, line 13-28; col. 5, lines 5-30].

MTI0000606

Application/Control Number: 09/961,417                              Page 10
Art Unit: 2187

**22. As per claims 38:**

The computer system in claim 38 is for carrying out the method of claim 32. Therefore
claim 38 is rejected as the same reason as set forth in claim 32.

**23. As per claim 49:**

Claim 49 is rejected as the same reason as set forth in claim 32.


### Allowable Subject Matter

**24.** Claims 5, 10-11, 13-14, 20, 25-26, 28, 36-37, 43, 46-47, 52 are objected to as being
dependent upon a rejected base claim, but would be allowable if rewritten in independent
form including all of the limitations of the base claim and any intervening claims.


### Conclusion

25. The prior art made of record and not relied upon is considered pertinent to applicant's
disclosure.

a. Reardon PN 6,212,635 discloses network security system with security controller
transparent to host and storage.

b. Wambach et al PN 6,33,648 discloses Computer memory with anti-virus and interface
controller transparent to host and storage.

Any inquiry concerning this communication or earlier communications from the
examiner should be directed to Ngoc Dinh whose telephone number is (703) 305-3023.
The examiner can normally be reached on Monday-Friday 8:30 AM-5:00 PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Donald A. Sparks, can be reached on (703) 308-1756. The fax phone numbers
for the organization where this application or proceeding is assigned are (703) 746-7239
for regular communications and (703) 746-7238 for After Final communications.

Application/Control Number: 09/961,417                                    Page 11
Art Unit: 2187

Any inquiry of a general nature or relating to the status of this application or proceeding
should be directed to the receptionist whose telephone number is (703) 305-3900.

NGOC DINH                                    DONALD SPARKS
Patent Examiner                              Supervisory Patent Examiner
ART UNIT 2187                                Technology Center 2100
January 16, 2004

MTI0000608

| *Notice of References Cited* | | Application/Control , 09/961,417 | | Applicant(s)/Patent Under Reexamination BRESS ET AL. | |
|---|---|---|---|---|---|
| | | Examiner NGOC V DINH | | Art Unit 2187 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-6,345,368 | 02-2002 | Bergsten, James R. | 714/11 |
| | B | US-6,330,648 | 12-2001 | Wambach et al. | 711/163 |
| | C | US-6,212,635 | 04-2001 | Reardon, David C. | 713/165 |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 10

MTI0000609

US006345368B1

(12) **United States Patent**　　　　　(10) Patent No.:　　US 6,345,368 B1
Bergsten　　　　　　　　　　　　　　(45) Date of Patent:　　Feb. 5, 2002

(54) **FAULT-TOLERANT ACCESS TO STORAGE ARRAYS USING ACTIVE AND QUIESCENT STORAGE CONTROLLERS**

(75) Inventor: **James R. Bergsten**, Saratoga, CA (US)

(73) Assignee: **LSI Logic Corporation**, Milpitas, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/231,245**

(22) Filed: **Jan. 15, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/828,888, filed on Mar. 31, 1997, now Pat. No. 6,073,209.

(51) Int. Cl.7 ........................... G06F 13/00; H05K 10/00
(52) U.S. Cl. ........................... 714/11; 714/4; 711/114; 711/162; 707/204
(58) Field of Search ........................ 711/162, 114; 714/4, 11; 707/204

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,872,106 A | * 10/1989 | Slater | ........................... 714/13 |
| 5,155,729 A | * 10/1992 | Rysko et al. | ........................... 714/11 |
| 5,155,845 A | * 10/1992 | Beal et al. | ........................... 714/6 |
| 5,255,270 A | 10/1993 | Yanai et al. | |
| 5,530,845 A | 6/1996 | Hiatt et al. | |
| 5,546,535 A | * 8/1996 | Stallmo et al. | ........................... 714/9 |
| 5,574,950 A | * 11/1996 | Hathorn et al. | ........................... 710/8 |
| 5,720,029 A | 2/1998 | Kern et al. | |
| 5,742,792 A | 4/1998 | Yanai et al. | |
| 5,761,705 A | 6/1998 | Dekoning et al. | |
| 5,799,141 A | * 8/1998 | Galipeau et al. | ........................... 714/13 |

| | | | |
|---|---|---|---|
| 5,857,208 A | 1/1999 | Ofek | |
| 5,928,367 A | 7/1999 | Nelson et al. | |
| 5,953,729 A | 9/1999 | Cabrera et al. | |
| 5,975,738 A | * 11/1999 | DeKoning et al. | ........... 364/184 |
| 5,996,086 A | * 11/1999 | Delaney et al. | ................ 714/4 |
| 6,052,797 A | 4/2000 | Ofek et al. | |

* cited by examiner

*Primary Examiner*—Hiep T. Nguyen
(74) *Attorney, Agent, or Firm*—Blakely Sokoloff Taylor Zafman

(57)　　　　　　　**ABSTRACT**

A network comprises at least one host processing system, a number of storage controllers, each coupled to one of a plurality of storage arrays, each storage array including at least one mass storage device. Each storage controller may be couple to at least one host processing system and to at least one other storage controller to control access of the host processing systems to the mass storage devices. Multiple copies of data are maintained in storage arrays that are geographically remote to each other, such that any copy can be accessed by any host. Each storage controller includes an interface with a host that emulates a mass storage device and an interface with a local storage array that emulates a host. The interfaces to the host and local storage arrays are independent of the type of host or devices in the local storage array. Two or more hosts may be dissimilar to each other, and two or more storage arrays may include dissimilar mass storage devices. Hosts access stored data using virtual addressing. During a data access, the storage controller maps an address provided by the accessing host to a real physical location in any of the storage arrays, such that the actual location of the data is transparent to the host. The storage controllers provide automatic back-up and error correction as well as write protection of back-up copies.

**31 Claims, 33 Drawing Sheets**



Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 182 of 216   Page ID #:1195



**FIG. 1**

MTI0000611



**FIG. 2**



**FIG. 3**

MTI0000612

U.S. Patent

Feb. 5, 2002

Sheet 3 of 33

US 6,345,368 B1



FIG. 4

MTI0000613

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 185 of 216   Page ID #:1198



**FIG. 5**

MTI0000614



FIG. 6



**FIG. 7**

MTI0000616

U.S. Patent

Feb. 5, 2002

Sheet 7 of 33

US 6,345,368 B1



**FIG. 8**

MTI0000617

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 189 of 216   Page ID #:1202



**FIG. 9**

MTI0000618



**FIG. 10**

MTI0000619



**FIG. 11**

MTI0000620

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 192 of 216   Page ID #:1205



**FIG. 12**



**FIG. 13**

MTI0000622



**FIG. 14**

MTI0000623

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 195 of 216   Page ID #:1208



**FIG. 15**

MTI0000624



**FIG. 16**

MTI0000625



**FIG. 17**



**FIG. 18**

MTI0000627



**FIG. 19**



Fig. 20

MTI0000629



Fig. 21

MTI0000630



Fig. 22A



Fig. 22B

MTI0000631



Fig. 23

MTI0000632



Fig. 24

MTI0000633



Fig. 25



Fig. 26

U.S. Patent

Feb. 5, 2002

Sheet 26 of 33

US 6,345,368 B1



Fig. 27

MTI0000636

U.S. Patent

Feb. 5, 2002

Sheet 27 of 33

US 6,345,368 B1



Fig. 28

MTI0000637

U.S. Patent

Feb. 5, 2002

Sheet 28 of 33

US 6,345,368 B1



Fig. 29

MTI0000638



Fig. 30



Fig. 31

MTI0000641



Fig. 32



Fig. 33

Case 2:13-ml-02461-GAF-PLA   Document 38-10   Filed 02/19/14   Page 214 of 216   Page ID #:1227



Fig. 34

MTI0000643

US 6,345,368 B1

1

# FAULT-TOLERANT ACCESS TO STORAGE ARRAYS USING ACTIVE AND QUIESCENT STORAGE CONTROLLERS

This is a continuation-in-part of application Ser. No. 08/828,888 filed on Mar. 31, 1997, now U.S. Pat. No. 6,073,209.

## FIELD OF THE INVENTION

The present invention pertains to the field of computer systems. More particularly, the present invention relates to storage controllers for controlling data transfers between one or more host processing systems and one or more data storage subsystems.

## BACKGROUND OF THE INVENTION

Computer systems sometimes handle valuable or irreplaceable data. Data maintained by a computer system may be of vital importance, for example, in business applications such as airline reservations, bank account management, electronic funds transfers, shipping and receiving, and inventory control. Consequently, there is a need to ensure that valuable data is adequately protected against loss or damage.

It is common to store large volumes of data on non-volatile mass storage devices, such as magnetic or optical disks. Occasionally, however, a mass storage device will fail, resulting in the loss of stored data. Consequently, it is a common practice to store a back-up copy of data that is considered valuable on a separate, back-up storage device. For practical reasons, however, it is often necessary to locate the back-up storage device in the same geographic vicinity as the primary storage device. As a result, both the primary data and the back-up copy may be lost or destroyed due to fire, theft, vandalism, or natural disaster. Hence, there is a need for the capability to store multiple back-up copies of data in geographically separate locations, while still permitting quick and easy access by a host computer to any back-up copy.

## SUMMARY OF THE INVENTION

One aspect of the present invention is a storage controller configured to selectively operate in either an active mode or a quiescent mode. When in the active mode, the storage controller provides a host processing system with access to a storage array. When in the quiescent mode, the storage controller monitors the status of an active storage controller that provides the host processing system with access to the storage array and responds to a failure of the active storage controller by automatically switching to the active mode.

Other features of the present invention will be apparent from the accompanying drawings and from the detailed description which follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limitation in the figures of the accompanying drawings, in which like references indicate similar elements and in which:

FIG. 1 illustrates a computing system in which a number of storage controllers provide multiple host computers with access to multiple storage arrays.

FIG. 2 illustrates a computing system according to an embodiment in which one storage controller is connected to multiple other storage controllers.

2

FIG. 3 is a block diagram of a storage controller.

FIG. 4 is a block diagram illustrating functional modules of a storage controller.

FIG. 5 is a block diagram illustrating a host computer system including a storage controller according to the present invention.

FIG. 6 is a flow diagram illustrating a check routine performed in response to an input/output request.

FIG. 7 is a flow diagram illustrating a routine for mapping a host address to a logical address.

FIG. 8 illustrates a tree hierarchy used by a storage controller to map a host address to a logical address.

FIG. 9 is a flow diagram illustrating a routine for mapping a logical address to a physical address.

FIG. 10 is a flow diagram illustrating a routine for staging data from a mass storage device.

FIG. 11 is a flow diagram illustrating a read error recovery routine.

FIG. 12 is a flow diagram illustrating a routine for destaging data to a mass storage device.

FIG. 13 is a flow diagram illustrating a write error recovery routine.

FIG. 14 is a flow diagram illustrating a routine for reading data from a mass storage device in response to a requests from a host.

FIG. 15 is a flow diagram illustrating a routine for writing data to a mass storage device in response to a request from a host.

FIG. 16 is a flow diagram illustrating a routine for transmitting data to a remote storage controller.

FIG. 17 is a flow diagram illustrating a remote communications error recovery routine.

FIG. 18 is a flow diagram illustrating a routine for establishing copies.

FIG. 19 is a flow diagram illustrating a routine for performing automatic detection and correction of data errors.

FIG. 20 is a flow diagram illustrating a routine for creating a set of copies of data at a remote location in the network.

FIG. 21 is a flow diagram illustrating a particular embodiment of the routine of FIG. 20.

FIGS. 22A and 22B are block diagrams showing two ways in which a set of duplicate MSDs may be coupled to a storage controller for purposes of the routine of FIG. 21.

FIG. 23 is a flow diagram illustrating a routine performed in the local storage controller for copying data onto a duplicate set of MSDs.

FIG. 24 is a flow diagram illustrating a routine performed in the local storage controller for re-establishing a set of copies.

FIG. 25 is a flow diagram illustrating a routine performed in the remote storage controller for re-establishing a set of copies.

FIG. 26 is a flow diagram illustrating an alternative embodiment of the routine of FIG. 20.

FIG. 27 is a block diagram illustrating the coupling between a redundant pair of local storage controllers according to a first embodiment.

FIG. 28 is a block diagram illustrating the coupling between a redundant pair of local storage controllers according to a second embodiment.

MTI0000644

US 6,345,368 B1

| 3 | 4 |
|---|---|

FIG. 29 is a block diagram illustrating the coupling between a redundant pair of local storage controllers contained within a single housing and coupled on a shared bus, in accordance with a third embodiment.

FIG. 30 illustrates a routine that may be implemented by a primary storage controller in conjunction with responding to a write request from a host processing system.

FIG. 31 illustrates a routine that may be implemented in a secondary storage controller in conjunction with monitoring and assuming the functions of the primary storage controller.

FIG. 32 illustrates the durations of multiple "time-frozen" copies of a set of data with respect to each other.

FIG. 33 is a flow diagram illustrating a routine that may be implemented in a storage controller in connection with creating and maintaining multiple "time-frozen" back up copies.

FIG. 34 is a flow diagram illustrating a routine that may be implemented in a storage controller for storing and forwarding copies of data.

DETAILED DESCRIPTION

A storage controller capable of providing multiple host computers system with access to multiple storage arrays is described. As will be described below in detail, the storage controller allows multiple host computer systems at different locations to access any of multiple copies of stored data. The storage controller automatically creates and manages multiple back-up copies while the host computer systems are "on line" in a manner that is both non-disruptive of, and transparent to, the host computer systems and their users. Further, the storage controller automatically detects and correct errors in stored data and automatically replaces faulty copies. Moreover, the storage controller is not dependent upon any particular hardware or software configuration of the host computer system which it services or the mass storage devices which it accesses. The storage controller emulates a local storage array for the host computer system which it services and emulates a host computer system for the local storage array which it accesses. Host computer systems access stored data using virtual device addresses, which are mapped to real device addresses by the storage controller.

FIG. 1 illustrates a computing system in which a number of storage controllers of the present invention provide a number of host computer systems with access to a number of storage arrays. Specifically, the computing system includes M storage controllers, 3-1 through 3-M, which may be located remotely with respect to each other; M host computers, 2-1 through 2-M, each of which is locally coupled to a different one of storage controllers 3-1 through 3-M; and M storage arrays, 4-1 through 4-M, each of which is locally coupled to a different one of storage controllers 3-1 through 3-M. Each of the storage arrays includes a number of mass storage devices (MSDs) coupled to its local storage controller in a daisy chain configuration. Specifically, storage array 4-1 includes N MSDs, 4-1-1 through 4-1-N; storage array 4-2 includes O MSDs, 4-2-1 through 4-2-O; and, storage array 4-M includes P MSDs, 4-M-1 through 4-M-P.

Each of the storage controllers is coupled to another storage controller via a communication link 9. A portion of communication link 9 between two geographically-separated storage controllers may be provided by a local area network (LAN). For example, in one embodiment, a given communication link 9 may be implemented partly on

a Fast Ethernet; other portions of the link 9 can be implemented as an Asynchronous Transfer Mode (ATM) link, a T1 or T3 link, a Fiber Distributed Data Interface (FDDI) link, or any other suitable type of link.

Note that any of the data communication paths 7, 8, and 9 may actually consist of two or more redundant, physical paths. Therefore, a failure of any single physical connection does not affect the ability to access any stored data.

Each of the host computer systems 2 may be a conventional computer system. For example, a host computer system may be a personal computer (PC), a mini-computer, or a mainframe. In addition, any of the host computer systems may be a server for one or more client computer systems (not shown).

Each MSD includes a non-volatile facility for storing large volumes of data, such as a magnetic disk or tape, an optical storage device such as Compact Disk-ROM (CD-ROM), CD-Recordable (CD-R), Digital Versatile Disk (DVD), a magneto-optical (MO) device, or the like. The MSDs within the computing system need not be of the same device type. That is, the MSDs in any given storage array may use a different type of storage medium from those in any other storage array.

Each storage array may be located geographically distant from the other storage arrays. Multiple copies are generally maintained on different, geographically-separated storage arrays. Hence, the loss of one or more MSDs in a given storage array will not result in the complete loss of data. With respect to a given (local) storage controller, any or all of the other (remote) storage controllers, host computer systems, and storage arrays may therefore be located at distant locations to the local storage controller.

Storage controllers 3-1 through 3-M cooperate to provide any of host computer systems 2-1 through 2-M with access to any of storage arrays 4-2 through 4-M. Each one of storage controllers 3-1 through 3-M directly services one local host computer system and one local storage array in one embodiment. For example, in the embodiment shown in FIG. 1, storage controller 3-1 services and is directly coupled to its local host computer system 2-1 via a data communication path 7. Storage controller 3-1 is directly coupled to its local data storage array 4-1 via communication path 8.

In one embodiment, each storage controller communicates with its local host computer system and its local storage array using standard Small Computer Systems Interface (SCSI) protocols. Consequently, operation of a storage controller in the manner described herein is not dependent upon the particular hardware or software configuration of any host computer or storage array, as long as those devices are SCSI-compatible. Note that in other embodiments, however, the data communication paths 7 and 8 may conform to other protocols and standards, such as serial SCSI, Fiber Channel, or ESCON. Thus, because data paths 7 and 8 are conventional interfaces, a storage controller can be used concurrently with host computers and MSDs having different configurations. For example, one host computer in the system may be a mainframe computer system while another host computer is a PC; similarly, one storage array in the system may consist of conventional magnetic hard disk drives while another storage array consists of CD-ROM or DVD drives.

The storage controllers in the computing system cooperate to allow any of the host computer systems to access data located in any of the storage arrays. For example, host computer system 2-1 may access data located on any MSD

MTI0000645