# EXHIBIT G-4

US 6,345,368 B1

5

in storage array 4-1 by communicating with storage controller 3-1. In addition, host computer system 2-1 may access data located in remote storage array 4-M by communicating with remote storage controller 3-M via storage controllers 3-1, 3-2, etc. As will be explained below, data is accessed using virtual addressing, such that a host computer system has no knowledge of which physical storage device is being accessed.

The storage controllers operate in peer-to-peer relationships (rather than master-slave relationships) with each other when responding to remote access requests. Any storage controller can access data in a remote storage array serviced by any other storage controller. Communication between individual storage controllers takes place on communication links 9 using a common protocol implemented by all storage controllers in the system. Note that various different protocols might be used for this purpose. A description of the details of such a protocol is not necessary for a complete understanding of the present invention and is therefore not provided herein.

The remote access capabilities of the storage controllers can be used advantageously in a variety of ways. The storage controllers can be used to enable sharing and centralized control of storage media. For example, the MSDs in any of the storage arrays may include CD-ROM devices, so that CD-ROMs in one a storage arrays may be shared by all host computers. Use of the devices can be recorded by one of the storage controllers. Access to CD-ROM data can therefore be monitored and controlled by a user, such as a system administrator, using the storage controller. The storage controllers also permit low-volume production of CD-Rs without specialized equipment. For example, a limited quantity of CD-R disks can be produced by writing to a single, logical CD-R drive corresponding to multiple physical CD-R devices within one or more storage arrays.

The present invention is not limited to the specific configuration shown in FIG. 1. For example, the system configuration might alternatively include only a single host computer which is coupled to multiple geographically-separated storage arrays using multiple storage controllers. In another embodiment, a storage controller may have a direct interface with more than one host or may have redundant interfaces with the same host. Each storage controller might also be coupled to more than one other storage controller, as illustrated in FIG. 2, in which storage controller 3-1 is connected to a number of other storage controllers, 3-2 through 3-M.

The storage controllers provide a number of functions and services to the host computer systems. In particular, the storage controllers automatically provide multiple back-up copies of stored data in a manner that is transparent to, and non-disruptive of, all of the host computer systems. For example, when a given data file is saved by a local host computer to its local storage array, the local storage controller causes one or more back-up copies of the data file to be stored in one or more of the remote storage arrays, without any intervention from or interruption to the local host computer. The process of backing-up data can be initiated by any storage controller in the system. This allows centralized back-up of any or all of the host computers. The number of back-up copies to be created and the locations to which the back-up copies are to be stored can be configured in advance by a system administrator. For example, these parameters can be programmed into a storage controller by connecting a keyboard and a display to ports on the storage controller. Alternatively, the storage controller can be configured by using one of the host computers to transmit

6

configuration commands and data to the storage controller. Further, a storage controller can be configured remotely via a local storage controller. The storage controllers also perform automatic block error detection and reassignment, as will be described below in detail.

The remote data access, data mirroring, and path redundancy provided by the storage controllers allow recovery from many possible failure modes, such as failure of a communication medium, failure a host computer, or failure of a storage device.

In general, when the system of FIG. 1 is first set up, or when MSDs are added to the system, all data from a "primary" MSD are automatically copied to one or more newly-added MSDs. Such copying is performed while the host computers are operating, although the copying process is transparent to the host computers 2-1 through 2-M. Copying can be throttled to reduce the impact on system performance. Once all copies are established (brought into a consistent state), only changed data are subsequently written to the secondary MSDs in response to changes dictated by a host computer.

Each of the storage controllers also provides virtualized data access and emulation, as mentioned above. A local storage controller will emulate its local storage array from the viewpoint of its local host computer system; similarly, the local storage controller will emulate its local host computer system from the viewpoint of its local storage array. Such emulation is implemented, in part, by using a common communication interface for data communication paths 7 and 8, such as SCSI. Again, in other embodiments, the data communication paths 7 and 8 may conform to other protocols and standards, such as serial SCSI, Fiber Channel, or ESCON.

A local host computer accesses data by transmitting a (virtual) host address to its local storage controller. The host address is then mapped to a real address representing a location on one or more physical MSDs, as will be described below in detail. The mapping is completely transparent to all of the host computers. To improve performance, the storage controller may distribute a single copy among multiple MSDs, which may be located in different storage arrays. Hence, in the above described mapping process, a single host address may map to multiple physical addresses, which may be distributed among multiple MSDs, and such multiple MSDs may be located in different storage arrays.

FIG. 3 illustrates a high-level block diagram of the hardware architecture of a storage controller according to one embodiment of the present invention. Note that the illustrated embodiment is only an example; many variations on this architecture are possible for purposes of the present invention. The storage controller 3 includes a central processing unit (CPU) 10, random-access memory (RAM) 11, a non-volatile storage facility (NVSF) 12, and an internal MSD 13, each coupled to a bus 17. Bus 17 may represent multiple physical or logical buses, which may be interconnected by various bridges, controllers, and/or adapters. NVSF 12 may be, or may include, for example, a programmable non-volatile storage device, such as flash memory or electrically-erasable programmable read-only memory (EEPROM). MSD 13 may be any conventional device that is suitable for non-volatile storage of large volumes of data, such as any of those discussed above. Also coupled to the bus 17 are a host device interface 14, a storage device interface 15, a controller device interface 16, and input/output (I/O) device interfaces 18 and 19. I/O device interfaces 18 and 19 are also coupled to separate, external connectors on the storage controller 3.

US 6,345,368 B1

7

The host device interface 14 connects communication path 7 to the bus 17 in order to connect a local host computer to the storage controller 3. The storage device interface 15 connects communication path 8 to the bus 17 in order to connect a local storage array to storage controller 3. In one embodiment, host device interface 14 and storage device interface 15 each comprise a SCSI adapter, such that communication between storage controller 3 and the local host computer and storage array is performed using SCSI protocols. As is well-known, the SCSI standard allows multiple peripheral devices to be connected to a host device in a daisy chain configuration. From the viewpoint of the local storage array, the storage controller 3 emulates the host device. From the viewpoint of the host device, the storage controller 3 emulates the local storage array.

The controller device interface 16 connects communication path 9 to the bus 17 in order to connect a remote storage controller to storage controller 3. Controller device interface 16 may be an Ethernet, ATM, T1, T3, or FDDI adapter, or any other suitable device, depending upon the nature of the communication link 9.

I/O device interfaces 18 and 19 may be used to connect a keyboard and a monitor to the bus 17. I/O interface 18 and 19 may therefore be used by a systems administrator to initially configure the storage controller 3, input commands and control information to the storage controller 3, obtain status information from the storage controller 3, and other functions. Further, these interfaces 18 and 19 can be used to remotely perform these same functions on a remote storage controller via (local) storage controller 3 and communication link 9.

In one embodiment, functions of a storage controller are carried out by its CPU 10 executing sequences of instructions that are contained in a memory. More specifically, execution of the sequences of instructions contained in the memory causes the CPU 10 to perform steps according to the present invention which will be described below. For example, instructions may be loaded into RAM 11 for execution by the CPU 10 from a persistent store, such as the NVSF 12 or MSD 13. In other embodiments, hardwired circuitry may be used in place of, or in combination with, software instructions to implement the present invention. Thus, features of the storage controller are not limited to any specific combination of hardware circuitry and software, nor to any particular source for the instructions executed by a computer system.

FIG. 4 shows functional modules within a storage controller 3. Each of these functional modules may be embodied in hardware, software, or a combination of hardware and software. In one embodiment, the storage controller 3 includes an operating system (OS) 20 coupled to emulation drivers 21, physical drivers 22, communication drivers 23, and local memory 24. Memory 24 is used as a cache for certain functions and may include RAM 11, NVSF 12, and/or MSD 13 (see FIG. 3), or a combination thereof.

The OS 20 controls the overall operation of the storage controller, including emulation, data flow, caching of data in the local memory 24, control of data mirroring, and error recovery. Emulation drivers 21 are controlled by the OS 20 to provide communication of data between the storage controller 3 and the local host computer 2 via communication path 7. In particular, the emulation drivers 21 receive read and write requests from the host computer 2 and convert the read and write requests into a format recognized by the OS 20. The emulation drivers 21 further function to transfer any data received from the local storage array or a

8

remote storage array to the local host computer. The communication drivers 23 are controlled by the OS 20 to provide communication of data between the storage controller 3 and remote storage controllers via communication path 9. The physical drivers 22 are controlled by the OS 20 to transfer data between the storage controller 3 and its local storage array. Such transfer includes the transformation of commands and control data from the format used by the storage controller 3 to the format recognized by the local storage array (e.g., SCSI).

In an alternative embodiment, a storage controller 3 may be an internal component of a host computer, rather than a separate, external unit. FIG. 5 illustrates a host computer 2-R according to one such embodiment. The host computer 2-R includes a CPU 30, a RAM 31, an NVSF 32, an MSD 33, a modem 34, a network adapter 35, and a storage controller 36, each of which is coupled to a bus 37. The local bus 37 may be any conventional local bus, such as a PCI (Peripheral Component Interconnect) bus. In this embodiment, the storage controller 36 may be constructed on an add-in card inserted in the host computer 2-R. The storage controller 36 provides all of the functionality of the storage controllers described above and has essentially the same architecture. However, in contrast with the storage controllers described above, the storage controller is directly connected to the local bus 37 of the host processing system. This embodiment therefore eliminates the need for the emulation drivers 21 illustrated in FIG. 4. Communication paths 8 and 9 to the local storage array and the remote storage controllers, respectively, are provided through one or more external connectors on the host computer 2-R. The modem 34 and network adapter 35 each allow the host computer 2-R to communicate with other computer systems, such as clients or other hosts.

The functions of the storage controllers will now be described in greater detail. Each storage controller is configured to provide capability to gracefully recover from numerous types of failure modes, including block errors, device failures, and failure of communication paths, in a manner that is transparent to all hosts. For example, if an error occurs during an I/O operation, and the error is determined to result from failure of a communication medium (e.g., failure of one of the communication paths 7, 8 or 9), the storage controller automatically performs the operation using an alternate communication path, if available. If the error is determined to be a device failure (i.e., failure of an MSD), then the storage controller automatically attempts to perform the write operation to an alternate storage device. If the error is a block error, the system automatically attempts to refresh the block or, if necessary, to reassign the data to an alternate block.

In response to each I/O request (read or write) from a host, the storage controller performs a series of standard checks before carrying out the operation. FIG. 6 illustrates a routine for performing the standard checks. It is first determined, in step 601, whether the storage device identified by the host exists. As noted above, this device will be a virtual device. If the device exists, as is discussed below, If the device does exist, then the routine proceeds to step 602. Otherwise, the routine exits in step 610 with a "no device" error being provided to the host. If the device exists, then in step 602, it is determined whether the device to be accessed is off-line. If not, the routine proceeds to step 603. If the device is off-line, the routine exits in step 610 with a "no device" error being provided to the host. If the device is not off-line, then in step 603, it is determined whether the device has been reset. If so, the routine exits in

MTI0000647

US 6,345,368 B1

**9**

step 612 with a reset notification being provided to the host. If the device has not been reset, then the routine proceeds to step 604, in which it is determined whether the device is ready. If the device is not ready, then in step 613 the routine exits with a "not ready" error being provided to the host. If the device is ready, then in step 605 it is determined whether the device is busy. If so, the routine exits in step 614 with the setting of a "busy" condition. If the device is not busy, then in step 606 it is determined whether the device or particular blocks to be accessed are reserved. If so, the routine exits in step 615 with a "reservation conflict" error being provided to the host. If the device or blocks to be accessed are not reserved, then in step 607 it is determined whether the starting block of the file to be accessed exists on the device. If not, the routine exits in step 616 with an "illegal request" error being provided to the host. If starting block exists on the device, then it is determined in step 608 whether the starting block-plus-block count exceeds the device capacity. If so, the routine exits in step 616 with an "illegal request" error being provided to the host. Otherwise, the routine exits in step 609 with a "checks complete without error" condition being provided to the host.

As mentioned above, the storage controllers use virtual-to-real device mapping to provide transparency of I/O operations to the host computers, as will now be described. A single host (virtual) address may map to a single physical address, or, to improve performance, the storage controller may map a single host address to multiple physical addresses, which may be distributed among multiple MSDs located in different storage arrays. A storage controller maps a host address to one or more physical addresses using a two-part process that is transparent to all hosts. Specifically, a host address received from a host computer system is first mapped to a logical address, and the logical address is then mapped to a physical (real) address in one or more MSDs.

FIG. 7 illustrates the process of mapping a virtual address to a logical address. Because a given storage controller may have an interface with more than one host or multiple paths to the same host, each host address includes a host interface identifier (ID) that identifies the particular host or redundant path with which the access request is associated. Hence, in step 701, the storage controller receives a host interface ID and a host (memory) block number. In step 702, the storage controller determines whether the host device ID and block number map exactly to a logical device. This determination can be made by checking the status of a single bit representing whether or not the mapping is exact.

The storage controller maintains and uses a tree structure such as that illustrated in FIG. 8 to map the host interface ID and block number to a logical device. The tree structure 40 of FIG. 8 comprises a number of elements 41, 42 and 43. Each element includes a field designating a range of memory blocks as well as pointers to both a logical device and a logical block for that range. In addition, each element includes a pointer to another element corresponding to a different memory range. For example, the range of memory blocks represented by element 42 may be a lower range than that represented by element 41. Accordingly, element 41 would include a pointer to element 42 which is designated as a pointer to lower memory ranges. Similarly, element 43 may correspond to a range of memory blocks that is higher than the range of element 41. Accordingly, element 41 includes a pointer to element 43 which is identified as a pointer to higher memory ranges. Each element in the tree structure 40 similarly includes pointers to elements representing lower and higher memory ranges (except for elements in the bottom-most level of the tree).

**10**

Hence, referring again to FIG. 7, if it is determined in step 702 that the mapping between the host device and the logical device is exact, then in step 707 the output of the process is simply a logical device ID and a logical block number. If there is not an exact mapping, however, then in step 703 the process accesses the top element (e.g., element 41 in FIG. 8) in the virtual-to-logical mapping tree structure. In step 704, the host block number is compared to the element range in the top element in the tree. If the host block number falls below that range, then the process points to the element representing the next lower range (e.g., element 42 in FIG. 8) in step 706; step 704 is then repeated. If, in step 704, the host block number falls higher than the range of the top element in the tree, then in step 705 the process points to the element in the tree representing the next higher range (e.g., element 43 in FIG. 8); the process then repeats from step 704. If the block number is determined to fall within the range of the top (or current) element in the tree in step 704, then the process proceeds to step 707 by outputting the logical device and logical block number in the top (or current) element.

FIG. 9 illustrates the second part of the address mapping process, in which a logical address is mapped to a physical address. In step 901, the logical device ID and logical block number determined in the host-to-logical mapping process (FIG. 7) is input. In step 902, the storage controller determines whether the logical device maps exactly to the physical device. As in the above-described routine, this determination can be made based upon the status of a single bit. If the mapping is exact, then the process proceeds to step 907, in which the appropriate physical device ID and physical block number are output. Otherwise, the process proceeds to step 903, in which the routine points to the top element of a logical-to-physical mapping tree. The logical-to-physical mapping tree is similar in structure to, and is accessed in essentially the same manner as, the host-to-logical mapping tree of FIG. 8. In step 904, the logical block number is compared to the element range in the top element in the tree. If the logical block number falls below that range, then the process points to the element representing the next lower range in step 906; step 904 is then repeated. If the logical block number falls higher than the range of the top element in the tree in step 904, then in step 905 the process points to the element in the tree representing the next higher range; the process then repeats from step 904. If the block number is determined to fall within the range of the top (or current) element in the tree in step 904, then the process proceeds to step 907 by outputting the correct physical device and physical block number in the top (or current) element.

At various times, the storage controller must read data from one or more MSDs into its internal memory ("the cache") or transfer data from the cache to one or more MSDs; these procedures are known as "staging" and "destaging", respectively. Staging is generally performed, for example, when executing a host read request. Destaging is generally performed when executing a host write request.

FIG. 10 illustrates a routine for staging data, which can be performed by a storage controller of the present invention. In step 1001, the storage controller selects the "nearest" free device housing the data of interest. In this context, the term "nearest" refers to the mass storage device associated with the smallest overall access time or earliest availability, rather than referring to physical distance. (Note, however, that physical distance may be a factor in the total access time.) In a given situation, the nearest storage device may be the local memory within the local storage controller, an MSD within the local storage array, or an MSD within a remote

MTI0000648

US 6,345,368 B1

11

storage array. After selecting the nearest free device, in step **1002** the logical block address of the data is mapped to a physical block address in the manner described above. In step **1003**, the block or blocks are read from the selected device using the physical block address. If the read is successful (step **1004**), then in step **1005** a read error recovery routine is called if any block was bad. The read error recovery routine is discussed below in connection with FIG. 11. If the read is not successful, and no additional copies of the data are available (step **1010**), then a read error message is presented to the host and the routine exits in step **1011**. If the read was unsuccessful and additional copies are available, then the routine repeats from step **1002** by mapping the block of the next available copy to a physical block. After a successful read (step **1004**), and after calling the read error recovery routine (step **1005**), then in step **1008** it is determined whether the staged data was requested by the host; if not, the routine exits. If so, the storage controller reconnects to the host (i.e., acquires exclusive use of communication link 8, which may be a SCSI bus) and transfers the block or blocks to the host in step **1007**. If there is more data to be transferred (step **1008**), then the storage controller disconnects from the host in step **1012**, and the routine then repeats from step **1001**. The storage controller disconnects from the host at this time because it is desirable not to monopolize the link 8 with the host while accessing the additional data. If there is no more data to be transferred, then an ending status message is presented to the host in step **1009**, and the routine then exits.

FIG. 11 illustrates the read error recovery routine. In response to a read error, in step **1101** the data of interest is read from the next-nearest physical copy. Again, "nearest" refers to overall access time or earliest availability, rather than physical distance. If the read is successful (step **1102**), then an attempt is made in step **1103** to write the data to the bad block and to verify the write operation (i.e., to refresh the data block). If the write is successful (step **1104**), then that fact is logged in step **1108**, and the routine exits. If the attempt to rewrite the data is unsuccessful, then a write error recovery routine is called in step **1105**, after which the routine exits. The write error recovery routine is discussed below in connection with FIG. 13. If the read operation (step **1101**) is unsuccessful, and if no additional copies are available (step **1106**), the routine exits in step **1107** with an error code presented to the host. If additional copies are available, Exclusive Lock is set for that block, so that no other device may access that block during the write operation. In contrast, multiple devices are permitted to read from a given block of data at the same time. A read on a block is performed by obtaining a Shared Lock on that block. A device may obtain a shared Lock on a data block, regardless of the current status of Shared Lock, provided Exclusive Lock for that block is not already set. When a read is initiated on a given

12

block, Shared Lock for that block is set, so that no device may write to that block during the read operation.

The storage controller can optionally be configured to delay and "merge" multiple destaging tasks to avoid multiple updates of the same physical blocks. In other words, instead of executing each destaging task, the storage controller may simply accumulate and log several destaging tasks in internal memory without executing them, and then subsequently perform a single "merged" destaging task to implement the aggregate effect of the accumulated destaging tasks.

Referring now to FIG. 12, when destaging is to be performed with respect to a given block, then Shared Lock for that block is set in step **1201**. In step **1202**, the first (or next) physical device is selected. In step **1203**, the logical block address is mapped to a physical block address in the manner described above. In step **1204** the data is written to the physical device identified in step **1203**. If the write is successful (step **1205**), and if no read back verification was requested (step **1206**), then in step **1208** the copy is marked as identical with that stored in the cache, and Shared Lock is cleared. It is desirable to mark a copy as identical with that stored in the cache in order to keep an accurate map of consistency between copies. If the write is not successful, then in step **1214** a call is made to the write error recovery routine. If error recovery is successful (step **1215**), then the routine proceeds to step **1208** (described above). Otherwise, copying is suspended and a "hot spare" is assigned (if available) in step **1216**, and the routine exits. Note that strict adherence to the ordering of steps shown in FIG. 12 is not required in order to perform destaging according to the present invention; hence, multiple copies of data can be written simultaneously during destaging.

Following step **1208**, it is next determined whether a host requires an ending status message (step **1209**). If not, and if there are no additional copies stored in physical storage (step **1210**), then the routine exits in step **1211**. If no ending status is required by a host (step **1209**), and there are additional copies (step **1210**), then the routine repeats from step **1202** with selection of the next physical device. If there are no additional copies, the routine exits in step **1211**. If ending status is required by a host (step **1209**), then in step **1212** the storage controller reconnects to the host (reacquires possession of the bus 8). Ending status is then presented to the host and the storage controller disconnects from the bus in step **1213**. The routine then proceeds from step **1210**.

FIG. 13 illustrates the write error recovery routine. In response to a write error, in step **1301** the faulty block is reassigned and written to a new block; this step is accompanied by verification of the write operation. If the write is successful (step **1302**), then in step **1306** the new location of the block is logged and the routine exits. If the write was not successful, then the data is written to the internal MSD (i.e., MSD 13 in FIG. 3) in step **1303**. Note that the internal MSD of the storage controller is generally not accessible to a host. After writing to the internal MSD, it is determined in step **1304** whether a hot spare MSD is available for the new copy. If no hot spare is available, then in step **1307** the location of the data is logged and the routine exits. If a hot spare is available, then in step **1305** an "establish" routine is performed to establish a new copy of the data on the hot spare. The establish routine is discussed below in connection with FIG. 18. The routine exits after establishing the new copy.

FIG. 14 illustrates a routine for performing a standard read operation in response to a request by a host. In step **1401**, a storage controller receives a data read request from

US 6,345,368 B1

13

a host. Next, in step 1402 the standard checks routine (see FIG. 6) is performed. If any of the standards checks fail, then the routine exits in step 1410, presenting an error status message to the host. If none of the standard checks fail, then in step 1403 the storage controller identifies the appropriate logical device based on the host interface and virtual block number received from the host in step 1403. This is done in the manner discussed above in connection with FIG. 8. Next, if the requested block is cached (stored in the storage controller's internal memory 24), then it is determined in step 1405 whether Exclusive Lock is set for the requested block. If Exclusive Lock is set or if the block was not cached, then in step 1411 the storage controller disconnects from the host, and in step 1412 a staging task is queued. The routine exits after queuing a staging task. If Exclusive Lock was not set in step 1405, then in step 1406 Shared Lock is set and the data is transferred to the host from the cache. After transferring the data to the host, Shared Lock is cleared in step 1407. Then, it is determined in step 1408 whether additional blocks have been requested. If so, the routine repeats from step 1403. If no additional blocks have been requested, then in step 1409 an ending status message is presented to the host, and the storage controller disconnects from the bus 8. The routine then exits.

As noted above, the storage controller may maintain multiple copies of a given set of data on different MSDs (which fact may be transparent to the hosts). Consequently, to improve performance, the storage controller can optionally be configured to concurrently read different subsets (i.e., blocks) of the set of data from different copies stored on different devices. This technique, which may be referred to as "spreading" reads, may reduce the overall time required to read the complete set of data in some cases.

FIG. 15 illustrates a routine for performing a standard write operation in response to a request from a host. In step 1501, the storage controller receives a write request from a host. Next, in step 1502 the standard checks (FIG. 6) are performed. If any of the standard checks fail, then the routine exits in step 1513, presenting an error status message to the host. Assuming none of the standard checks fail, then in steps 1503 and 1504, respectively, it is determined whether the device or any of the blocks to be written to are designated as read-only. If the device or any of the blocks are read-only, then the routine exits, presenting an "illegal request" message to the host (steps 1514 and 1515). If neither the device nor any block is read-only, then in step 1505 the storage controller maps the host interface to the appropriate logical device using the technique described above (FIG. 7). After identifying the appropriate logical device, it is determined in step 1506 whether the block is already cached in the storage controller's internal memory 24. If the block is already cached, then in step 1507 it is determined whether it possible to obtain Exclusive Lock on the requested block. As noted above, in order to obtain Exclusive Lock, neither Shared Lock nor Exclusive Lock for that block can be set. If Exclusive Lock can be obtained, then in step 1508 the data is transferred from the host to the appropriate block in the internal memory 24. If Exclusive Lock is not possible, then in step 1516 the storage controller disconnects from the host and waits for Exclusive Lock in step 1517. Once Exclusive Lock is obtained, then in step 1518 the storage controller reconnects to the host and, in step 1508, transfers the data from the host to the internal memory 24, as described above.

Referring again to step 1506, if the block to be written was not already cached, then in step 1519 it is determined whether the write operation is an update write (i.e., the writing of a partial block). With SCSI protocol, partial

14

blocks cannot be written; only complete blocks can be written. However, other protocols which might be used in conjunction with the present invention might permit an update write. Accordingly, if the requested write operation is not an update write, then in step 1520 an empty block is allocated in the internal cache and the routine proceeds to step 1507 by obtaining Exclusive Lock, if possible. If the requested write operation is an update write, then in step 1521 the storage controller disconnects from the host. After disconnecting from the host, the storage controller stages the block from physical storage in step 1522 and then reconnects to the host in step 1518. The data is then transferred from the host to the appropriate block in the internal memory 24 in step 1508, as described above. Note that the process of disconnecting from the host while staging a block to be updated (steps 1521 and 1522) may be performed by an asynchronous task.

After a block is transferred from the host to the internal memory 24 in step 1508, then if an ending status message is required (step 1509), the status message is presented to the host and the storage controller disconnects from the bus 8 in step 1510. After disconnecting from the bus in step 1510, or if no ending status message was required, then in step 1511 the cache copy is marked as different from the physical copies. Next, in step 1512 a destaging task is queued, and the routine exits.

As in the case of a read operation, if multiple copies are maintained, the storage controller can optionally be configured to concurrently write different portions of a data set to different copies stored on different devices (i.e., "spread" the writes) in order to improve performance. Also, the storage controller can be configured to "simulate" a write to an MSD without actually writing to a physical device for certain cases. This procedure may be desirable for purposes of writing temporary data, such as data generated only for a specific job. In such cases, the storage controller simply writes the data to its internal memory 24 and then, if required, presents ending status to the host.

As mentioned above, a local storage controller of the present invention can communicate with one or more remote storage controllers for purposes of accessing a remote storage array. FIG. 16 illustrates a routine which can be performed by a local storage controller for transferring data to a remote storage controller. If there is data to be sent (step 1601) to a remote storage controller, then in step 1602 the local storage controller transmits the data onto the link 9 in packet form and waits for an acknowledgment from the remote storage controller. If a wait time-out occurs (step 1603) before an acknowledgment is received, then in step 1612 a line error recovery routine is called. The line error recovery routine is discussed below in connection with FIG. 17. If no wait time-out occurs before the acknowledgment is received, then if a request complete message is required by the host (step 1604) the storage controller waits in step 1605 for a "request complete" message from the remote storage controller. If no "request complete" message is received before a wait time-out occurs (step 1606), then the storage controller calls the line error recovery routine in step 1607. If no "request complete" message is required, or if no time-out occurs before the "request complete" message arrives, the routine repeats from step 1601.

FIG. 17 illustrates the line error recovery routine. In step 1701, a communications data packet is sent to the remote storage controller. If the transmission is successful (step 1702), then if alternate paths to that storage controller exist (step 1703), the routine repeats from step 1701 using an alternate path. Otherwise, the routine exits in step 1704 with

US 6,345,368 B1

15

the notification of an error condition. If the transmission was successful in step 1702, then the routine exits.

FIG. 18 illustrates the establish routine for establishing (ensuring consistency between) copies. Assume now that at least one copy of a given file has already been created from an "original" (which may be a previously-created copy). In step 1801, the storage controller identifies one or more contiguous blocks of data in the file. In step 1802, it is determined whether the corresponding blocks are identical between the original and the copy. If so, then in step 1803 one or more other contiguous blocks of data are examined, starting from the next block copy boundary. Next, in step 1804, if the extent of the storage device hog not been reached, then the routine repeats from step 1801. If the extent of the device has been reached, then the copy has been established and the routine exits. If the blocks are determined not to be identical in step 1802, then in step 1805 the storage controller obtains (sets) Exclusive Lock for each of those blocks and reads the blocks from the source file. If the read is successful (step 1806), then Exclusive Lock is exchanged for Shared Lock and the blocks are written to the destination device in step 1808. If the read was not successful, then in step 1807 the read error recovery routine is called. After exchanging Exclusive Lock for Shared Lock and writing to the destination (step 808), in step 1809 it is determined whether the write was successful. If not, the write error recovery routine is called in step 1811. If the write was successful, then in step 1810 the corresponding blocks of the two different copies are marked as identical and the routine proceeds from step 1803 (described above). Note that during the establish routine double buffering may occur; that is, one or more subsequent reads may overlap in time with previous writes in order to improve performance.

Each of the storage controllers may also implement automatic block error detection and reassignment. When the storage controller is idle, it automatically examines data stored in any of the MSDs for errors and corrects detected errors, where possible. FIG. 19 illustrates a routine performed by the storage controller for implementing these functions. In step 1901, the storage controller attempts to read a block of data from a given location. Note that this given location may be within the local storage array or it may be within one of the remote storage arrays. This attempted read (step 1901) operation is not performed in response to any request from a host computer; it is performed on the storage controller's own initiative in response to the storage becoming idle. In step 1902, it is determined whether the block was successfully read. If the block was successfully read, then in step 1903 it is determined whether all blocks have been examined; if so, the routine ends. If all blocks have not been examined, then the storage controller attempts to read another block of data in step 1904, and the process repeats from step 1902. If the block was not read successfully, then in step 1905 the storage controller calls the read error recovery routine (FIG. 11).

A storage controller can also be used to migrate data from one storage array to another. The storage controller can be configured to perform data migration automatically and in a manner that is transparent to, and non-disruptive of, any host computer. Further, in contrast with prior systems, which maintain only a single back-up copy of given file, the storage controllers described herein allow two or more back-up copies of a file to be created and maintained in addition to a primary copy. Any copy is then accessible to any host computer connected in the system.

A storage controller further allows data blocks to be write protected, so that a block cannot be modified from any host

16

computer. Write protection may be desirable for purposes such as virus protection or implementation of security firewalls. Write protection can be achieved by configuring the storage controller appropriately at set-up time or by inputting a write protect command to the storage controller from a host computer.

In some applications it may be desirable to copy the contents of an entire storage array to a storage array at a remote location. However, the amount of data to be transferred may be quite large (e.g., in the terabyte range, for some applications). Also, the links 9 between the remote locations may be slow relative to the amount of data to be transferred. Consequently, it may be too time consuming to transfer the data over the communication links 9 to a remote storage array. The following technique addresses this problem.

Referring to FIG. 20, the technique, in general, is as follows. Initially, a set of copies of the data of interest is made locally at 2001. At 2002 the set of copies is suspended, and at 2003 the suspended set is reestablished at a remote location. FIG. 21 illustrates a particular embodiment of this technique. Assume that the entire contents of a local storage array is to be copied to a remote location. Hence, at 2102 a duplicate array of MSDs is installed locally (i.e., coupled to a local storage controller). FIGS. 22A and 22B illustrate two alternative ways in which the duplicate array 4' of MSDs can be connected to the local storage controller 3. Specifically, the duplicate array 4' of MSDs may be connected directly to the storage controller 3 via a spare interface on the storage controller 3, as shown in FIG. 22A. Alternatively, as shown in FIG. 22B, the duplicate array 4' may be attached "behind" the original array 4 in a daisy chain fashion.

Next, at 2102, the data of interest is copied from the local storage array in which it is stored to the duplicate storage array. At 2103, the set of copied data is suspended, i.e., parity is no longer maintained. The local storage controller then begins to maintain a map of all changes made to the data from the time the set of copies was suspended until the set is reestablished as described below. Thus, at 2104, the duplicate array of MSDs is transported to the remote location and, at 2105, is installed by coupling it to the remote storage controller. At 2106 the set of copies is reestablished in a manner which will be described below. It will be recognized that one advantage of this technique is that there is little or no disruption to the host processing system and exposure to loss of data.

FIG. 23 illustrates a routine that may be performed by the local storage controller according to the foregoing technique. Specifically, at 2301 the local storage controller copies the data onto the duplicate set of MSDs. At 2302 the local storage controller suspends the set of copies and maintains a map of changes to the data. FIG. 24 illustrates a routine that may be performed by the local storage controller in connection with reestablishing the set of copies. At 2401, the local storage controller receives a signal from the remote storage controller identifying one or more devices in the duplicate set. At 2402 the local storage controller recognizes the specified identity or identities of the devices as having been previously installed locally and, accordingly, sends an acknowledgement and the change data to the remote storage controller that originated the signal. At 2403 the local storage controller clears its change map.

FIG. 25 illustrates a routine that may be performed by the remote storage controller in connection with reestablishing the data. In accordance with the present technique, each of the MSDs in the system is identified to the storage control-

US 6,345,368 B1

17

ters in the system by a unique serial number. The serial number may be stored in a read only memory, for example, within each MSD. This identification method is in contrast with methods in which devices are identified by their topological location in the system. Thus, at 2501, the remote storage controller periodically polls the storage devices that are connected to it locally for their serial numbers. Each storage controller maintains a record of the devices to which it is connected locally. Accordingly, upon receiving the responses identifying the devices, the storage controller sends the serial numbers of all newly connected MSDs (i.e., all MSDs connected since the previous poll) to all other storage controllers in the system. The storage controller then waits for a predetermined time-out period for a response from any of the other storage controllers. If, at 2503, a message is received from another storage controller asserting "ownership" of the newly installed MSD(s) prior to the expiration of the time-out period, then at 2504, the storage controller waits to receive change data from such other storage controller. In this context, a storage controller's asserting ownership means that the storage controller indicates that the identified MSD(s) were previously connected to it locally. If no such message is received from another storage controller at 2503, then the routine ends. After the storage controller has received the change data from the other storage controller, at 2505 it reestablishes the copies using the received change data to update the newly installed local MSDs.

FIG. 26 illustrates an alternative embodiment of the technique of FIG. 20. The alternative embodiment avoids the need to move a duplicate set of MSDs from one location to another. In particular, at 2601, a local host processing system is shut down. All of the data of interest is then copied from the original local set of MSDs to a set of tapes or other equivalent form of non-volatile MSD at 2602. At 2603 the local host processing system is then reactivated with the copy set suspended, and the maintenance of a change map is initiated. At 2604, the data on the tapes (or other MSD) is then loaded onto the remote set of MSDs, and at 2605 the change data is transmitted via communication links 9 to the remote storage controller based on the change map maintained by the local storage controller. At 2606, the remote storage controller uses the change data to update the data that has been loaded onto its locally installed MSDs from the tapes.

Referring again to FIG. 1, the communication links between the various components in the system may be redundant physical links in order to protect against potential failures of any one communication links, as noted above. Another potential failure mode, however, is the failure of one of the storage controllers 3. In particular, it is desirable to avoid a situation in which any data becomes unavailable to any host 2 in the system. Accordingly, the following technique addresses the potential for failure of any one storage controller.

In general, the technique includes providing two or more redundant storage controllers for each storage array 4. In one embodiment, discussed henceforth, a pair of redundant storage controllers is used. One of the pair of storage controllers is a primary storage controller which, under normal circumstances, operates on behalf of the local host and storage array. The other storage controller of the pair is a secondary storage controller which functions as a "hot backup" in the event of failure of the primary storage controller. The secondary storage controller is a quiescent system, the presence of which, under normal circumstances, is transparent to the host processing system and the storage

18

array. In the event of a failure of the primary storage controller, the secondary storage controller assumes primary status, i.e., assumes the operational responsibilities of the primary storage controller. Thus, the potential for a single-point failure caused by one storage controller is avoided.

An example of a configuration which uses a primary/secondary storage controller pair is illustrated in FIG. 27. A host processing system may be attached to two or more redundant storage controllers via either separate or shared I/O channels. FIG. 27 illustrates a configuration in which host 2-1 is connected to both a primary storage controller 3-1A and a secondary storage controller 3-1 B via a shared I/O channel. Similarly, a storage array may be connected to the storage controllers via a shared or separate I/O channels. FIG. 27 illustrates a configuration in which storage array 4-1 is connected to both the primary and secondary storage controllers 3-1A and 3-1B, respectively, via a shared I/O channel 8.

FIG. 28 shows a configuration in which both the host 2-1 and storage array 4-1 are connected to the primary and secondary storage controllers 3-1A and 3-1B, respectively, via separate I/O channels, i.e., channels 7A and 7B, respectively, and channels 8A and 8B, respectively. The primary and secondary storage controllers 3-1A and 3-1B are connected by one or more "fast" communication lines 51, which form a private communication channel between the redundant storage controllers.

The primary storage controller 3-1A responds to host I/O requests. The secondary storage controller 3-1B does not respond to host I/O requests. Both the primary and the secondary storage controller have access to the MSDs 4-1 and have communication links 9 to any other active storage controllers in the system. Data written to a storage array by the host processing system 2-1 are moved to the cache (internal memory) of the primary storage controller 3-1A and transmitted on the communication paths 51 to the secondary storage controller 3-1B. The primary storage controller 3-1A provides the host processing system 2-1 with completion status only after receiving an acknowledgment from the secondary storage controller 3-1B that the data has been received. When the write data are successfully written to the MSDs 4-1, the primary storage controller 3-1A signals the secondary storage controller 3-1B to release the data.

The secondary storage controller 3-1B monitors the operation of the primary storage controller 3-1A via private communication channel 51. If the primary storage controller 3-1A fails, the secondary storage controller takes over for the primary storage controller 3-1A (i.e., assumes primary status) and begins to respond to host I/O requests. Any data in the cache of the (formerly) secondary storage controller 3-1B that have not been released by the (formerly) primary storage controller 3-1A are destaged to the MSDs 4-1.

The private communication channel between the redundant storage controllers for any given storage array may be implemented using any suitable fast communication link, such as a gigabit Ethernet link, or as illustrated in FIG. 29, as a shared bus, such as a PCI bus. In the embodiment of FIG. 29, the two redundant storage controllers 3-1A and 3-1 B communicate via bus 52 and are installed within a single housing 3-1. The communication between the primary and secondary storage controller may be implemented using any appropriate communication protocol.

FIG. 30 illustrates a routine that may be implemented by a primary storage controller in conjunction with responding to a write request from a host processing system. At 3001, the primary storage controller receives a write request and

US 6,345,368 B1

19

associated data from the host processing system. At 3002, the primary storage controller writes the data to the local MSDs and sends the write request and data to its secondary storage controller. At 3003, the primary storage controller determines whether it has received an acknowledgment from the secondary storage controller prior to the expiration of a timeout period. If not, an error recovery routine is called at 3007, and the routine then proceeds to 3005. If an acknowledgment is received within the timeout period, then at 3004 the primary storage controller sends a completion status message to the host processing system. At 3005, it is determined whether the data has been written successfully to the local MSDs. If not, an appropriate error recovery routine is called at 3008 and the routine exits. If the data has been written successfully, then at 3006 the primary storage controller signals the secondary storage controller to release the data, and the routine ends.

FIG. 31 illustrates a routine that may be implemented by a secondary storage controller in conjunction with monitoring and (if necessary) assuming the status of a primary storage controller. At 3101, the secondary storage controller sends a status request to the primary storage controller with which it is associated via the private communication channel. At 3102, the secondary storage controller determines whether an acknowledgment has been received from the primary storage controller before the expiration of a timeout period. If an acknowledgment is received within the timeout period, then at 3103 the secondary storage controller determines whether a predetermined period of time has elapsed, and, if so, the routine repeats from 3101 with the sending of another status request to the primary storage controller. If no acknowledgment of the status request is received within the timeout period, then at 3104 the secondary storage controller assumes primary status. That is, the secondary storage controller assumes all functions of the primary storage controller, which is assumed to have failed. Upon assuming primary status, the storage controller destages any unreleased data in its internal cache to the local MSDs, and the routine ends. When and if the failed primary storage controller is brought back into service, it may assume either primary or secondary status, as desired. Thus, the secondary storage controller operates as a quiescent system, which monitors the primary storage controller and does not respond to host I/O requests, but acts only as a secondary cache on behalf of the primary storage controller. Thus, a single-point failure due to the failure of any one storage controller is avoided.

In a data storage system such as illustrated in FIG. 1, it may be desirable to maintain multiple "time-frozen" copies of data. A "time-frozen" copy is an unmodified copy of the data as it appeared at a given instant in time. Time-frozen copies may be useful for debugging purposes. For example, time-frozen copies may be useful for diagnosing and recovering from a failure of a host processing system or storage device.

One problem associated with maintaining time-frozen copies is how to do so while software applications are running on the host processing system or systems. If backup copies are created while software applications are running, then the potential exists for a write to occur during copying, such that the resulting copy is not truly "time-frozen". Thus, the data copy may be inconsistent if a write took place during the copying process. One prior art approach to the problem of maintaining time-frozen copies is to shut down all applications during the back-up process. The back-up process is often a relatively slow process, however, and when large volumes of data are involved, shutting down the

20

applications may be impractical or undesirable. Another approach is to maintain a duplicate set of the data of interest and, when back-up is desired, to suspend one of the copies of the set, create a new copy from the suspended copy, and then reestablish the pair of copies once the back-up is complete. One problem with this second approach, however, is that while the back up is taking place, there is no longer redundancy in the data storage, i.e., there is no longer a duplicate copy available. Moreover, the back-up process, as noted above, may be time consuming, resulting in a temporary exposure to loss of data.

Accordingly, the following technique allows multiple time-frozen copies to be created and maintained while applications are running on the host processing systems, without creating exposure to loss of data or requiring software applications to be shut down. Any of the storage controllers in the system may be configured to maintain multiple time-frozen copies of the data of interest. The time-frozen back up copies are maintained in the internal memory of the storage controller. For a given storage controller, the data of interest may represent data on its local storage array or data on one or more remote storage arrays. Further, at any given point in time, the storage controller may maintain multiple time-frozen copies, each representing the state of the data of interest at a different point in time.

FIG. 32 illustrates an example of this technique. In particular, a storage controller makes a first copy, Copy A, of the data of interest at time $t_0$. At a later time, $t_1$, the storage controller makes another copy of the data, Copy B, which reflects any writes that have been performed subsequent to time $t_0$. The storage controller may be configured to discard Copy A at this time, or, as shown, Copy A may be retained until a later time. In the illustrated example, Copy A is retained until time $t_2$, when a third copy, Copy C, is made, which reflects all writes to the data that occurred prior to time $t_2$. Copy B is maintained until time $t_3$, when a fourth copy, Copy D, is created, reflecting all writes to the data prior to time $t_3$. Copy C is maintained until time $t_4$, and Copy D is maintained until time $t_5$. It will be recognized that many other approaches may be used in terms of the number of copies maintained at a given point in time and the times at which copies are discarded and/or created. For example, it is not necessary that the copies overlap in time, although it may be desirable; further, copies may be created and/or discarded at specific points in time (e.g., specific time of day) or at predetermined time intervals (e.g., hourly).

Thus, a storage controller so configured provides the ability to retrieve data created before a given time, even if that data has been modified by host I/O operations. The back-up data is automatically captured at specified intervals, stored in the internal cache of the storage controller, and deleted at specified times or after specified retention periods. Data modified by a host processing system are first copied to storage within the storage controller. Since this storage is transparent to any attached host processing systems, any data mirroring (local and/or remote) continues while this back up facility is operational. Any writes to the data of interest are written only to the MSDs in the storage array and not to the time-frozen copies in the internal cache. Host read operations which access a predetermined primary device address receive the data from the storage array as modified. Any of the time-frozen copies stored in the internal cache of the storage controller may be accessed by a host processing system by accessing a predetermined secondary device address.

After one of the time-frozen copies has been created by the storage controller, subsequent copies are created by

MTI0000653

US 6,345,368 B1

21

storing only the data that has been modified by a host processing system. Data that have not been modified since the previous copy was created are not copied. A host application program may optionally modify one or more of the time-frozen copies by accessing the appropriate secondary device address. This capability allows for application testing, debugging, and/or failure recreation.

In one embodiment, the copies are stored on an internal MSD of the storage controller. In addition to storing the time-frozen copies, the internal cache may also store various other types of data, including copies of data that could not be written to any physical device due to physical device or communication errors.

FIG. 33 illustrates a routine that may be implemented in a storage controller in connection with the creation and maintenance of multiple time-frozen frozen copies, as described above. At 3301, a storage controller makes a back up copy and stores it in its internal cache, along with a time stamp indicating the time of creation of the copy. At 3302, if the storage controller has received a host request to modify the stored data, then the storage controller modifies the data only on the local MSDs and not in its internal cache. If no write request was received, then the routine proceeds to 3304. At 3304, if a read request has been received, then it is determined at 3305 whether the primary address has been specified. If not, the routine proceeds to 3307. If the primary address was specified, then at 3306 the storage controller accesses the appropriate copy on the local MSDs and provides this copy to the host. If the primary address was not specified, then at 3311 the storage controller accesses the appropriate copy in its internal cache and provides it to the host. At 3307, it is determined whether a copy interval has elapsed. Note that, as mentioned above, other embodiments are possible, such as those in which copies are created at specific times of day, rather than at predetermined time intervals. Thus, if the copy interval has elapsed, then at 3308 any modified data are copied from the local MSDs to the internal cache and time stamped. If the copy interval has not yet elapsed, then the routine proceeds to 3309, in which it is determined whether any copies have expired. If so, then at 3310 any expired copies are deleted. If no copies have expired, or after any expired copies have been deleted, the routine repeats from 3302. Note that many variations on the above routine are possible.

Thus, the above-described technique allow back up of consistent time-frozen data without requiring the shutting down of host applications. In addition, this technique allows users to retrieve accidentally deleted or overwritten files that existed at the time of the synchronization by copying the files from the internal cache of a storage controller to a primary physical storage device.

The internal storage facilities of the storage controllers described above are advantageous for many reasons. One advantage of this internal caching capability is that it enables data residing on a local storage device to be copied multiple times to different remote locations by sending only a single copy of the data between remote storage controllers. In particular, a storage controller can send a single copy of data residing on its local storage array to one or more remote storage controllers. Each such remote storage controller that receives the single copy can then store the copy in its internal cache and copy it multiple times to various different physical devices in its local storage array. Each controller can then pass on another single copy to one or more other remote storage controllers. This technique allows a virtually unlimited number of copies to be created on different remote storage arrays while substantially reducing the amount of data traffic across the remote communication links 9.

22

FIG. 34 illustrates a routine that can be implemented in a storage controller in accordance with this technique. At 3401, a storage controller receives a single copy of data from a remote storage controller. The storage controller then stores the received copy in its internal cache at 3402. At 3403, the storage controller stores one or more copies of the received data in MSDs in its local storage array. If it is determined at 3404 that forwarding of the data was requested or required, then at 3405, the storage controller forwards one copy each to one or more remote storage controllers. If no forwarding was requested or required, the routine ends. Hence, data can be mirrored on two or more remote devices on the same remote system by sending only a single copy of the data from a local system to the remote system.

Thus, a storage controller capable of providing multiple host computers system with access to multiple storage arrays has been described. Although the present invention has been described with reference to specific exemplary embodiments, it will be evident that various modifications and changes may be made to these embodiments without departing from the broader spirit and scope of the invention as set forth in the claims. Accordingly, the specification and drawings are to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

1. A storage controller comprising:

a processor; and

a memory accessible to the processor and having sequences of instructions stored therein which configure the storage controller to selectively operate in either an active mode or a quiescent mode, such that the storage controller is configured to provide a host processing system with access to a storage array when in the active mode, and such that the storage controller is further configured to, when in the quiescent mode, monitor the status of an active storage controller, the active storage controller providing the host processing system with access to the storage array, and respond to a failure of the active storage controller by automatically switching to the active mode.

2. A storage controller according to claim 1, further comprising:

a first interface with the host processing systems for emulating the storage array; and

a second interface with the storage array for emulating the host processing system.

3. A storage controller according to claim 1, further comprising a port for communicating with a remote active storage controller.

4. A storage controller according to claim 1, wherein the memory further comprises sequences of instructions which further configure the storage controller to, when in the quiescent mode:

receive a write request, the write request having write data associated therewith; and

respond to the write request by caching the write data; and provide an acknowledgement to the active storage controller that the write data has been cached.

5. A storage controller according to claim 1, wherein the memory further comprises sequences of instructions which further configure the storage controller to, when in the active mode:

receive a write request from the host processing system, the write request having write data associated therewith;

US 6,345,368 B1

23

cause the write data to be stored in the storage array; and

signal completion of the write request to the host processing system only after receiving an acknowledgement from a quiescent storage controller that the write data has been cached by the quiescent storage controller.

6. A quiescent storage controller operable to provide a host processing system with access to a storage device, the quiescent storage controller comprising:

a processor;

a first port for communicating with an active storage controller, the active storage controller providing the host processing system with access to the storage device; and

a memory accessible to the processor and having sequences of instructions stored therein which configure the quiescent storage controller to:

use the first port to monitor a status of the active storage controller;

respond to a failure of the active storage controller by automatically assuming an active status and operating in substitution for the active storage controller.

7. A quiescent storage controller according to claim 6, further comprising:

a first interface with the host processing systems for emulating the storage device; and

a second interface with the storage device for emulating the host processing system.

8. A quiescent storage controller according to claim 6, further comprising a second port for communicating with a remote active storage controller.

9. A quiescent storage controller according to claim 6, wherein the memory further comprises sequences of instructions which configure the quiescent storage controller to:

receive a writ e request, the write request having write data associated therewith; and

respond to the write request by caching the write data; and provide an acknowledgement to the active storage controller that the write data has been cached.

10. A quiescent storage controller according to claim 9, wherein the first active storage controller is further configured to provide an acknowledgement of the write request to the host processing system in response to receiving an acknowledgement from the quiescent storage controller that the write data has been cached.

11. A quiescent storage controller according to claim 10, wherein the first active storage controller is further configured to signal the quiescent storage controller to release the cached write data in response to writing the data successfully to the first storage array.

12. A storage controller comprising:

means for receiving a request from a host processing system to perform a write operation to store data in a storage device;

means for causing the data to be stored in the storage device in response to the request;

means for waiting for a signal from a second storage controller indicating that the second storage controller has cached the data in response to the request; and

means for acknowledging the write operation to the host processing system only after receiving the signal indicating that the second storage controller has cached the data.

13. A storage controller according to claim 12, further comprising means for signaling the second storage control-

24

ler to release the cached data only after receiving an indication from the storage device that the data has been stored in the storage device.

14. A storage controller comprising:

means for emulating a storage device to a host processing system;

means for emulating the host processing system to the storage device;

means for enabling the storage controller to operate in either an active mode or a quiescent mode;

means for monitoring the status of an active storage controller when in the quiescent mode, the active storage controller providing the host processing system with access to the storage array;

means for automatically switching to the active mode in response to detecting a failure of the active storage controller; and

means for providing the host processing system with access to the storage device when in the active mode.

15. A storage controller according to claim 14, further comprising means for communicating with a remote active storage controller when in the active mode.

16. A storage controller according to claim 14, further comprising:

means for receiving a write request associated with the host processing system, the write request having write data associated therewith; and

means for caching the write data in response to the write request when in the quiescent mode; and

means for provide an acknowledgement to the active storage controller that the write data has been cached.

17. A storage controller according to claim 16, further comprising:

means for causing the write data to be stored in the storage device only when in the active mode; and

means for acknowledging the write request to the host processing system when in the active mode only after receiving a signal from a quiescent storage controller that the write data has been cached by the quiescent storage controller.

18. A system comprising:

a host processing system;

a storage array;

a first active storage controller coupled to the host processing system and the storage array;

a second active storage controller coupled to the first active storage controller;

a second storage array coupled to the second active storage controller; and

a quiescent storage controller coupled to the first active storage controller by a private communication channel, the quiescent storage controller including means for automatically operating as an active storage controller in place of the first active storage controller in response to a failure of the first active storage controller.

19. A system according to claim 18, wherein the quiescent storage controller further comprises:

means for receiving a write request based on a write request from the host processing system, the write request associated with write data; and

means for caching the write data in response to the write request.

20. A system according to claim 19, wherein the first active storage controller comprises means for providing an

MTI0000655

25

acknowledgement of the write request to the host processing system only after receiving an acknowledgement from the quiescent storage controller that the write data has been cached.

21. A system according to claim 20, wherein the first active storage controller comprises means for signaling the quiescent storage controller to release the cached write data in response to writing the data successfully to the first storage array.

22. A system comprising:

a plurality of host processing systems;

a plurality of storage arrays;

a plurality of active storage controllers, each of the active storage controllers coupled to one of the host processing systems, one of the storage arrays, and another one of the active storage controllers, each of the active storage controllers having a first interface with one of the host processing systems for emulating a mass storage device, each of the active storage controllers further having a second interface with a local storage array for emulating a host processing system, the plurality of active storage controllers cooperating to permit any of the host processing systems to access data stored in any of the storage arrays; and

a quiescent storage controller coupled to a first one of the storage controllers by a private communication channel, the quiescent storage controller configured to automatically operate as an active storage controller in response to detecting a failure of the first one of the active storage controllers.

23. A system according to claim 22, wherein the first one of the active storage controllers is configured to provide a signal to the quiescent storage controller in response to a successful data write by the active storage controller.

24. A system according to claim 22, wherein the quiescent storage controller is further configured to receive a write request from a first one of the host processing systems the write request having write data associated therewith, and to respond to the write request by caching the write data.

25. A system according to claim 24, wherein the first one of the active storage controllers is further configured to provide an acknowledgement of the write request to the first one of the host processing systems in response to receiving an acknowledgement from the quiescent storage controller that the write data has been cached.

26. A system according to claim 25, wherein the first one of the active storage controllers is further configured to signal the quiescent storage controller to release the cached

26

write data in response to writing the data successfully to a first one of the storage arrays.

27. A method of operating a storage controller, the method comprising:

receiving a request from a host processing system to perform a write operation to store data in a storage device;

causing the data to be stored in the storage device in response to the request;

waiting for a signal from a second storage controller indicating that the second storage controller has cached the data in response to the write request; and

acknowledging the write operation to the host processing system only after receiving the signal indicating that the second storage controller has cached the data.

28. A method according to claim 27, further comprising signaling the second storage controller to release the cached data only after receiving an indication from the storage device that the data has been stored in the storage device.

29. A method of operating a storage controller, the method comprising:

monitoring a status of an active storage controller while in a quiescent mode, the active storage controller providing a host processing system with access to a storage array; and

in response to detecting a failure of the active storage controller, automatically switching from the quiescent mode to an active mode to substitute for the active storage controller, including:

emulating the storage device to the host processing system; and

emulating the host processing system to the storage device.

30. A method according to claim 29, further comprising communicating with a remote active storage controller when in the active mode.

31. A method according to claim 29, further comprising, while in the quiescent mode:

receiving a write request originating from the host processing system, the write request having write data associated therewith;

caching the write data; and

providing an acknowledgement to the active storage controller that the write data has been cached.

*   *   *   *   *

| **Interview Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 09/961,417 | BRESS ET AL. |
| | Examiner | Art Unit | |
| | NGOC V DINH | 2187 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _NGOC V DINH_.                                    (3)_BRIANT LEDELL_.

(2) _DONALD A. SPARKS_.                          (4)_Steve. Bress_

Date of Interview: _18 February 2004_.

Type: a)☐ Telephonic   b)☐  Video Conference
      c)☒ Personal [copy given to: 1)☐ applicant    2)☐ applicant's representative]

Exhibit shown or demonstration conducted:   d)☐ Yes      e)☐ No.
   If Yes, brief description: _____.

Claim(s) discussed: _____.

Identification of prior art discussed: _____.

Agreement with respect to the claims f)☐ was reached.   g)☐ was not reached.   h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: _See Continuation Sheet_.

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW.  (See MPEP Section 713.04).  If a reply to the last office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  See Summary of Record of Interview requirements on reverse side or on attached sheet.

Examiner Note:  You must sign this form unless it is an
Attachment to a signed Office action.

_____
Examiner's signature, if required

U.S. Patent and Trademark Office
PTOL-413 (Rev. 04-03)                    Interview Summary                    Paper No. 10

MTI0000657

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

**37 CFR §1.2 Business to be transacted in writing.**
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

MTI0000658

**Continuation Sheet (PTOL-413)**                                    Application No.  09/961,417

Continuation of Substance of Interview including description of the general nature of what was agreed to if an
agreement was reached, or any other comments:

[6, 345, 26 B]

During the interview, The prior ART of Bergsten and
Kern et al [6,336,187] were discussed.

The Applicant discussed how the invention is distinguish
over the prior ART. The Applicant proposed the
Amendment that would further distinguish over the
Invention by the prior ART.

NDinG
02/18/04

David Spink

3

MTI0000659

PATENT
Attorney Docket No. 0032-0003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                          )
                                               )
Steven Bress et al.                            )
                                               )
Serial No.: 09/961,417                         )      Group Art Unit:  2187
                                               )
Filed:   September 25, 2001                    )      Examiner:  N. Dinh
                                               )
For:   WRITE PROTECTION FOR                    )
       COMPUTER LONG-TERM MEMORY               )
       DEVICES                                 )

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window, Mail Stop Non-Fee Amendment
Crystal Plaza Two, Lobby, Room 1B03
Arlington, VA 22202

Sir:

### AMENDMENT

In response to the Office Action of February 2, 2004 please amend this

application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 16 of this paper.

1

MTI0000660

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

**Amendments to the Claims**:

This listing of claims will replace all prior versions, and listings, of claims in the application:

1. (currently amended)  A blocking device comprising:

an interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host;

an interface for connecting to the storage device; and

a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, wherein

the blocking device is transparent to normal operation of the host and the storage device.


2. (canceled)

3. (original)  The blocking device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.


2

MTI0000661

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

4. (original)  The blocking device of claim 1, wherein the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator.

5. (original)  The blocking device of claim 4, wherein, when the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

6. (previously presented)  The blocking device of claim 1, wherein the processor drops those of the commands that do not match the predetermined set of commands, and, after dropping one of the commands, returns status information to the host that indicates that the dropped command was successfully completed.

7. (original)  The blocking device of claim 1, further comprising:

   additional interfaces for connecting to additional storage devices.

8. (original)  The blocking device of claim 7, wherein each of the interfaces is independently coupled to the processor.

3

MTI0000662

*Se._ Number: 09/961,417*
*Docket Number: 0032-0003*

9. (original)  The blocking device of claim 1, further including light emitting
diodes (LEDs) coupled to the processor and configured to transmit status
information relating to the status of the blocking device.

10. (currently amended)  The blocking device of claim 1, further including:

a temporary storage device coupled to the processor, the processor
storing data from the host corresponding to <u>at least one command that does not
match the predetermined set of commands</u> the dropped commands in the
temporary storage device.

11. (original)  The blocking device of claim 10, wherein when read
commands are received from the host that refer to data stored in the temporary
storage device, the processor returns the data from the temporary storage device
to the host.

12. (canceled)

13. (original)  The blocking device of claim 1, wherein the processor
examines feature information from the storage device that relate to features
supported by the storage device and the processor zeroes any features not
supported by the processor before making the feature information available to
the host.

4

MTI0000663

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

~~14~~ 12. (original)  The blocking device of claim 1, wherein the processor

supports a removable drive feature set with the host and the processor returns a

write protected error code to the host when the processor drops one of the

commands.

~~15~~ 13. (currently amended)  A device comprising:

an IDE emulator component, the IDE emulator component including a

physical interface designed to engage a first cable that connects to a host that

controls an IDE storage device;

an IDE interface configured to engage a second cable that connects to the

IDE storage device; and

a logic circuit connecting the IDE emulator component to the IDE interface

and configured to: compare commands received at the IDE emulator component

to a predetermined set of commands, and to block transmission of one or more

of the commands from the IDE emulator component to the IDE interface when

the comparison indicates that the logic circuit does not recognize the received

command or the comparison indicates that the received command is a command

that modifies a state of the storage device, wherein

the device operates transparently to normal operation of the host and the

IDE storage device.

~~16~~ 14. (original)  The device of claim ~~15~~ 13, wherein the logic circuit includes:

an embedded processor,

5

Se*...* Number: 09/961,417
Docket Number: 0032-0003

a computer memory connected to the embedded processor, the

embedded processor loading program instructions from the computer memory

during device initialization, and

a programmable logic device (PLD) coupled to the embedded processor,

the IDE emulator component, and the IDE interface.

17. (original)  The device of claim 16, wherein the PLD includes:

a bus driver component configured to transfer data between the

embedded processor, the IDE emulator component, and the IDE interface,

a first dual port memory buffer connected between the bus driver and the

IDE interface,

a first set of communication lines connecting the bus driver directly to the

IDE interface and indirectly to the IDE interface through the first dual port

memory buffer,

a second dual port memory buffer connected between the bus driver and

the IDE emulator component, and

a second set of communication lines connecting the bus driver directly to

the IDE emulator component and indirectly to the IDE emulator component

through the second dual port memory buffer.


18.  (canceled)


6

MTI0000665

Ser... Number: 09/961,417
Docket Number: 0032-0003

19. (original)  The device of claim 13, wherein when the logic circuit receives data back from the IDE storage device the logic circuit forwards the received data to the host through the IDE emulator component.

20. (original)  The device of claim 19, wherein, when the comparison indicates the command includes a capabilities request command relating to the IDE storage device, the logic circuit modifies data received from the IDE storage device relating to the capabilities request command to reflect the capability of the IDE storage device as affected by the presence of the device.

21. (original)  The device of claim 13, wherein the logic circuit, after blocking transmission of one of the commands, returns status information to the host that indicates that the blocked command was successfully executed.

22. (original)  The device of claim 13, further comprising:

a second interface for connecting to a second IDE storage device.

23. (original)  The device of claim 19, wherein each of the interfaces is independently coupled to the logic circuit.

24. (original)  The device of claim 13, further including light emitting diodes (LEDs) coupled to the logic circuit and configured to transmit status information relating to the status of the device.

7

*Ser.... Number: 09/961,417*
*Docket Number: 0032-0003*

25. (original)  The device of claim 15, further including:

a temporary storage device coupled to the logic circuit, the logic circuit

storing data corresponding to blocked commands in the temporary storage

device.

26. (original)  The device of claim 25, wherein when read commands are

received from the host that refer to data stored in the temporary storage device,

the logic circuit returns the data from the temporary storage device to the host.


27. (canceled)

28. (original)  The device of claim 15, wherein the logic circuit examines

feature information from the IDE storage device that relates to features supported

by the IDE storage device and removes any feature information not supported by

the device before making the feature information available to the host.


Claims 29-31 (canceled)

MTI0000667

Ser. Number: 09/961,417
Docket Number: 0032-0003

32. (currently amended) A method comprising:

intercepting communications between a computer motherboard and a local non-volatile storage device for the motherboard;

comparing commands in the communications between the motherboard and the storage device to a predetermined set of commands;

forwarding selected ones of the commands to the storage device when, based on the comparison, the commands are determined to be commands that are known to not permanently modify a state of the storage device; and

blocking selected other ones of the other commands from being received by the storage device based on the comparison, wherein

the intercepting communications, comparing commands, forwarding selected ones of the commands, and blocking selected other ones of the commands is transparent to normal operation of the computer motherboard and the storage device.

33. (canceled)

34. (currently amended) The method of claim 33 32, further comprising:

forwarding data from the storage device to the motherboard in response to a read command received from the motherboard and forwarded to the storage device.

9

MTI0000668

*Ser. Number: 09/961,417*
*Docket Number: 0032-0003*

35. (original)  The method of claim 32, wherein the storage device is an integrated device electronics (IDE) disk drive.

36. (original)  The method of claim 32, wherein the commands forwarded to the storage device include a capabilities request command, the method further comprising:

modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as modified by operation of the method.

37. (original)  The method of claim 36, further comprising, after blocking a command:

returning status information to the motherboard that indicates that the blocked command was successfully executed by the storage device.

38. (currently amended)  A computer system comprising:

a host computer;

a long-term storage device; and

a blocking device coupled between the host computer and the storage device, the blocking device configured to:

intercept commands from the host to the storage device,

~~block certain commands from reaching the storage device,~~

10

MTI0000669

*Se.. i Number: 09/961,417*
*Docket Number: 0032-0003*

and pass ~~other ones of the~~ commands to the storage device <u>only when the commands are known to not permanently modify a state of the storage device, and</u>

<u>block other commands from reaching the storage device,</u>

wherein the intercepting commands, blocking ~~certain~~ commands, and passing ~~other ones of the~~ commands are performed by the blocking device transparently to the host computer and the long-term storage device.

39. (previously presented)  The computer system of claim 38, wherein the blocking device further includes:

an interface emulator configured to emulate the storage device to the host; and

an interface configured to connect the blocking device to the storage device.

40.  (original)  The computer system of claim 39, wherein the interface emulator emulates an Integrated Device Electronics (IDE) interface and the storage device is an IDE disk drive.

41. (canceled)

11

MTI0000670

Ser.  Number: 09/961,417
Docket Number: 0032-0003

42. (original)  The computer system of claim 38, wherein the blocking device receives data back from the storage device in response to one of the passed commands and forwards the received data to the host.

43. (original)  The computer system of claim 38, wherein, when the passed commands include a capabilities request command relating to the storage device, the blocking device modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

44. (original)  The computer system of claim 38, wherein the blocking device, after blocking one of the commands, returns status information to the host that indicates that the blocked command was successfully completed.

45. (original)  The computer system of claim 38, wherein the blocking device further includes light emitting diodes (LEDs) configured to transmit status information relating to the status of the blocking device.

46. (original)  The computer system of claim 38, wherein the blocking device further includes:

a temporary storage device, the blocking device storing data from the host corresponding to blocked commands in the temporary storage device.

MTI0000671

*Ser..1 Number: 09/961,417*
*Docket Number: 0032-0003*

47. (original)  The computer system of claim 46, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the blocking device returns the data from the temporary storage device to the host.

48. (original)  The computer system of claim 38, wherein the blocking device further includes:

a user configurable memory, the user configurable memory storing instructions that define protected areas on the storage device, the blocking device dropping those of the commands that would otherwise modify the protected areas on the storage device.

49. (currently amended)  A blocking device comprising:

means for intercepting communications between a host and a storage device;

means for comparing commands in the communications between the host and the storage device to a predetermined set of commands;

means for forwarding selected ones of commands in the intercepted communications to the storage device when, based on the comparison, the commands are determined to be commands that are known to not permanently modify a state of the storage device; and

means for blocking ~~selected other~~ other ones of the commands from being received by the storage device based on the comparison, wherein

13

MTI0000672

*Se. .l Number: 09/961,417*
*Docket Number: 0032-0003*

the blocking device operates transparently to normal operation of the host and the storage device.

50. (canceled)

51. (original)  The blocking device of 49, wherein the storage device is an integrated device electronics (IDE) disk drive.

52. (original)  The blocking device of 49, wherein the commands forwarded to the storage device include a capabilities request command, and the means for forwarding further comprises:

means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device.

53. (original)  The blocking device of 49, further comprising:

means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device.

54. (previously presented)  The blocking device of claim 3, wherein the interface emulator is configured to emulate an IEEE 1394 connection.

55. (canceled)

14

MTI0000673

Serial Number: 09/961,417
Docket Number: 0032-0003

56.  (currently amended)  The ~~device~~ computer system of claim 39, wherein the interface emulator emulates an IEEE 1394 connection and the storage device is an IDE disk drive.

15

MTI0000674

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

<u>REMARKS</u>

Applicants appreciate the courtesy extended to Applicants in the interview
conducted at the Patent and Trademark Office on February 18, 2004.  In the
interview, the differences between the Bergsten and Kern patents and the
present invention were discussed.  In particular, the differences between
Bergsten and Kern were discussed with reference to claims 1 and 2.
Additionally, potential amendments to the claims were discussed to more clearly
distinguish claim 1 from the Bergsten and Kern references.

In the Office Action, the Examiner indicated that claims 5, 10, 11, 13, 14,
20, 25, 26, 28, 36, 37, 43, 46, 47, and 52 are directed to allowable subject
matter.  Additionally, in the Office Action, Examiner rejected claims 54-56 under
35 USC § 112, second paragraph, as containing the trademark name IEEE 1394.
Further, the Examiner rejected claims 1, 2, 4, 6-8, 12, 41-42, 44-45, 48, 50 and
53 under 35 U.S.C. §103(a) as being unpatentable over U.S. Patent No.
6,345,368 to <u>Bergsten</u> ("Bergsten") in view of U.S. Patent No. 6,336,187 to <u>Kern</u>
<u>et al.</u> ("Kern"); rejected claims 3, 9, 15, 16, 18, 19, 21-25, 27, 29-31, 35, 40, 51,
and 54-56 under 35 USC § 103(a) as being unpatentable over Bergsten in view
of Kern and further in view of features for which Official Notice was given;
rejected claim 17 under 35 U.S.C. § 103(a) as being unpatentable in view of
Bergsten and Kern, and further in view of U.S. Patent No. 6,216,205 to <u>Chin et</u>
<u>al.</u> ("Chin"); and rejected claims 32-34, 38, and 49 under 35 U.S.C. § 102(e) in
view of Kern.

16

*Se. .l Number: 09/961,417*
*Docket Number: 0032-0003*

As an initial matter, Applicants note that although claim 25 was indicated as containing allowable subject matter (paragraph 24 of Office Action), claim 25 was also indicated as being rejected under 35 U.S.C. § 103(a) in paragraph 9 of the Office Action.  Applicants request clarification as to the status of this claim.

By this Amendment, Applicants have amended claims 1, 10, 15, 32, 34, 38, 49, and 56 to more clearly define the invention and cancelled claims 2, 12, 18, 27, 29-31, 33, 41, 50, and 55.

Regarding the rejection under 35 USC section 112, Applicants submit that the term IEEE 1394 is an acceptable claim term.  The Examiner states in the rejection that the trademarked term "IEEE 1394" is being used to identify a FireWire connection.  Applicant believe that the Examiner has the meaning of these two terms confused.  In particular, the term FireWire$^{TM}$ is a trademark of Apple Corporation but the term IEEE 1394 refers to a standard IEEE specification.  Thus, Applicants submit that the rejection of his claim is improper and should be withdrawn.

Claims 1, 2, 4, 6-8, 12, 41-42, 44, 45, 48, 50, and 53 stand rejected under 35 U.S.C. § 103(a) over Bergsten in view of Kern.  For the following reasons, Applicants respectfully traverse this rejection.

Claim 1, as amended, is directed to a blocking device that includes an interface emulator, an interface for connecting to the storage device, and a processor.  The processor performs a number of functions, such as examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the

17

MTI0000676

*Se.  .l Number: 09/961,417*
*Docket Number: 0032-0003*

commands that match a predetermined set of commands to pass to the storage device via the interface.  The predetermined set of commands are commands that are known to not permanently modify a state of the storage device.  Further, the blocking device of claim 1 is transparent to the normal operation of the host and the storage device.

Bergsten is directed to the fault-tolerant access to storage arrays.  According to Bergsten, the storage controller may be coupled to at least one host processing system and to at least one other storage controller to control access of the host processing systems to the mass storage devices.  (Bergsten, Abstract).  In Bergsten, multiple copies of data are maintained in storage arrays that are geographically remote to each other such that any copy can be accessed by any host.  (Id.).  Bergsten further discloses that the storage controllers can provide automatic backup and error correction as well as write protection of backup copies.  Regarding write protection of backup copies, this aspect of Bergsten is further discussed at column 15, line 66 through column 16, line 6 of Bergsten.  This section of Bergsten generally discloses that certain data blocks can be write protected so that a block cannot be modified from any host computer.  Bergsten also further discloses that write protection may be desirable for purposes such as virus protection or implementation of security firewalls.

As discussed in the interview, the write protection features provided by Bergsten appear to be selectively applied to certain data blocks.  This is consistent with the general concept of a network storage controller, which in addition to providing access to a potentially large storage array, may provide

MTI0000677

Serial Number: 09/961,417
Docket Number: 0032-0003

additional value-added features such as automatic data backup, error correction, and write protection of certain data blocks.

In contrast to Bergsten, claim 1, as amended, recites a blocking device that includes, among other things, a processor that examines "commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device" (emphasis added).

Thus, as recited in claim 1, only commands that are known to not permanently modify a state of the storage device are allowed to pass to the storage device. Bergsten is not concerned with protecting the state of a storage device. Instead, Bergsten merely discloses that certain blocks of a storage array may be protected from having a user write data to those blocks. Nowhere does Bergsten disclose or suggest a set of allowable commands as recited in claim 1.

As discussed in Applicants' specification in, for example, paragraph 44, there may be additional commands other than a "write" command that can modify a state of the drive. Bergsten prohibits users from writing data to certain blocks of data, but is not concerned with protecting the state of the storage device. Accordingly, Applicants submits that Bergsten fails to disclose or suggest the features of claim 1, including allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface,

MTI0000678

*Se.. ..al Number: 09/961,417*
*Docket Number: 0032-0003*

the predetermined set of commands being commands that are known to not permanently modify a state of the storage device.

Kern, as discussed in the prior Amendment, is directed to a storage system that provides data security via a security key that must be presented by a host before the storage controller will give the host access to the storage device(s). (Kern, abstract). The storage security of Kern is provided according to the storage region being accessed. (Kern, col. 2, lines 42-45). Kern is similar to Bergsten in that Kern provides a storage controller that allows for configurable protection of certain areas of storage devices. Kern, like Bergsten, however, is not concerned with protecting the state of a storage device. Accordingly, Applicants submit that Kern also fails to disclose or suggest a device that allows only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, as is recited in claim 1.

For at least the foregoing reasons, Applicants submit that neither Bergsten nor Kern discloses or suggests each of the features recited in claim 1. Accordingly, the rejection of claim 1 should be withdrawn.

The rejection of claims 4, and 6-8, at least by virtue of their dependency on claim 1, should also be withdrawn. Additionally, these dependent claims recite additional features not disclosed or suggested by Bergsten or Kern. Claim 6, for instance, recites that the processor drops commands that do not match the predetermined set of commands, and, after dropping one of the commands,

20

MTI0000679

*Se..al Number: 09/961,417*
*Docket Number: 0032-0003*

returns status information to the host that indicates that the dropped command was successfully completed. The Examiner relies on Kern to disclose this feature. Applicants disagree. Kern, in contrast to this claimed feature, explicitly discloses returning an error condition to a requesting host when an access key does not match. (Kern, col. 10, lines 1-4). Returning an error condition is significantly different than returning information indicating that a dropped command was successfully executed. Accordingly, for these reasons also, Applicants submit that claim 6 defines features not disclosed or suggested by Kern.

In addition to rejecting claims 1, 2, 4, 6-8, and 12 under 35 U.S.C. § 103(a), the Examiner also rejects dependent claims 41, 42, 44, 45, 48, 50, and 53 based on Bergsten and Kern. These dependent claims depend from claims 38 and 49, which were rejected by the Examiner under 35 U.S.C. § 102(e) in view of Kern.

Claim 38, as amended, is directed to a computer system that includes a host computer, a long-term storage device, and a blocking device coupled between the host computer and the storage device. The blocking device intercept commands from the host to the storage device, passes commands to the storage device only when the commands are known to not permanently modify a state of the storage device, and blocks other commands from reaching the storage device. For reasons similar to those discussed above regarding claim 1, Applicants submit that Kern does not disclose or suggest at least these

MTI0000680

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

features of the invention recited in claim 38.  Accordingly, the rejection of this

claim under 35 U.S.C. § 102(e) should be withdrawn.

Independent claim 49 is directed to a blocking device that includes, among

other things, means for forwarding selected ones of commands in the intercepted

communications to the storage device when, based on the comparison, the

commands are determined to be commands that are known to not permanently

modify a state of the storage device.  For reasons similar to those discussed

above regarding claims 1 and 38, Applicants submit that Kern does not disclose

or suggest at least these features of the invention recited in claim 49.

Accordingly, the rejection of this claim under 35 U.S.C. § 102(e) should be

withdrawn.

Claims 42, 44, 45, 48, and 53 variously depend from claims 38 and 49.  At

least by virtue of their dependency from one of claims 38 and 49, Applicants

submit that the rejection of these claims should also be withdrawn. Additionally,

these dependent claims recite additional features not disclosed or suggested by

Bergsten or Kern.  Claim 44, for instance, recites "after blocking one of the

commands, returns status information to the host that indicates that the blocked

command was successfully completed." As discussed above with reference to

claim 6, Kern and Bergsten do not disclose or suggest, after blocking one of the

commands, returning status information that indicates that the blocked command

was <u>successfully</u> completed.  If anything, Kern teaches away from this feature, as

Kern explicitly discloses returning error information when a write command is not

implemented.

22

MTI0000681

*Serial Number: 09/961,417*
*Docket Number: 0032-0003*

Applicants note that although claim 39 was not explicitly addressed by the Examiner in any of the rejections, claims 40 and 56, which depend from claim 39, were rejected under 35 U.S.C. § 103(a) based on Bergsten and Kern. Applicants assume that the Examiner intended to reject claim 39 based on Bergsten and Kern. Clarification on this point is requested.

In any event, Applicants submit that claims 39, 40, and 56 are allowable over the prior art of record, at least by virtue of their dependency on claim 38.

Independent claim 32 and its dependent claim 34 were also rejected under 35 U.S.C. § 102(e) in view of Kern. Claim 32, as amended, is a method that includes, among other things, "forwarding selected ones of the commands to the storage device when, based on the comparison, the commands are determined to be commands that are known to not permanently modify a state of the storage device; and blocking other commands from being received by the storage device based on the comparison." Thus, for reasons similar to those given for claim 1, Applicants submit that the rejection of this claim based on Kern is improper and should be withdrawn. The rejection of dependent claim 34, at least by virtue of its dependency on claim 32, is also improper.

Claims 3, 9, 15, 16, 18, 19, 21-25, 27, 29-31, 35, 40, 51, and 54-56 stand rejected under 35 USC § 103(a) as being unpatentable over Bergsten in view of Kern and further in view of features for which Official Notice was given. In particular, the Examiner generally states that Kern and Bergsten disclose many of the features of these claims but concedes that neither reference discloses an

23

MTI0000682

Serial Number: 09/961,417
Docket Number: 0032-0003

IDE interface.  The Examiner contends, however, that one of ordinary skill in the art would have found it obvious to employ an IDE interface.

Independent claim 15 defines a device that includes a number of elements, including an IDE emulator component, the IDE emulator component including a physical interface designed to engage a first cable that connects to a host that controls an IDE storage device, an IDE interface configured to engage a second cable that connects to the IDE storage device, and a logic circuit connecting the IDE emulator component to the IDE interface.  The logic circuit is configured to compare commands received at the IDE emulator component to a predetermined set of commands, and to block transmission of one or more of the commands from the IDE emulator component to the IDE interface when the comparison indicates that the logic circuit does not recognize the received command or the comparison indicates that the received command is a command that modifies a state of the storage device.

Applicants submit that Bergsten and Kern fail to disclose or suggest the features recited in claim 15.  For example, the logic circuit of claim 15 is recited as blocking "transmission of one or more of the commands … when … the logic circuit does not recognize the received command or the comparison indicates that the received command is a command that modifies a state of the storage device."  As discussed above, Kern and Bergsten are devoid of any such disclosure.  At most, Kern and Bergsten disclose prohibiting execution of certain predetermined commands such as write commands.  Nothing in these references discloses or suggests, however, blocking transmission of a command when the

MTI0000683

Serial Number: 09/961,417
Docket Number: 0032-0003

command is not recognized.  In contrast, Kern and Bergsten, if anything, teach away from this feature of the invention, as both appear to only disclose blocking select predetermined operations, which would inherently be recognized operations.  In rejecting claim 15, (Office Action, pages 6-7), the Examiner did not address this feature of the invention.  If the Examiner continues this rejection, Applicants request that this feature of claim 15 be addressed.

Claims 3 and 9, which were also rejected under 35 U.S.C. §103(a) in view of Bergsten, Kern, and Official Notice, depend from claim 1.  Applicants submit that at least by virtue of their dependency from claim 1, the rejection of these claims should be withdrawn.

Pending dependent claims 16, 19, 21-24, 35, 40, 46, and 51 were additionally rejected in view of Bergsten, Kern, and Official Notice.  The rejection of these claims, at least by virtue of their dependency from one of independent claims 15, 32, 38, and 49, should be withdrawn.  Additionally, these dependent claims recite additional features not disclosed or suggested by Bergsten, Kern, and Official Notice.  Claim 21, for instance, recites that the logic circuit, after blocking transmission of one of the commands, returns status information to the host that indicates that the blocked command was successfully executed.  As was previously discussed with regard to claim 6, Bergsten and Kern completely fail to disclose or suggest any such feature.

Claim 17 stands rejected under 35 U.S.C. § 103(a) in view of Kern and Chin.  The Examiner appears to be relying on Chin for the disclosure of a dual-port memory buffer.  Applicants have reviewed Chin and submit that Chin fails to

25

MTI0000684

*S.  .al Number: 09/961,417*
*Docket Number: 0032-0003*

make up for the deficiencies of Kern discussed above relating to claims 1 and 15. Accordingly, at least by virtue of the dependency of this claim on claim 15, Applicants submit that the rejection of claim 15 should be withdrawn.

In view of the foregoing remarks, Applicants submit that the claimed invention is neither anticipated nor rendered obvious in view of the references cited against this application. Applicants, therefore, request the Examiner's reconsideration and reexamination of the application, and the timely allowance of the pending claims.

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made. Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account 50-1070 and please credit any excess fees to such deposit account.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E Ledell
Reg. No. 42,784

Date: March 2, 2004

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
Telephone: 571-432-0800
Facsimile: 571-432-0808
Customer Number: 26615

26

MTI0000685

Patent

Attorney's Docket No.  0032-0003

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re Patent Application of | ) | |
| | ) | |
| Steven Bress et al. | ) | Group Art Unit:  2187 |
| | ) | |
| Application No.:  09/961,417 | ) | Examiner:  Ngoc V. Dinh |
| | ) | |
| Filed:  September 25, 2001 | ) | |
| | ) | |
| For:  WRITE PROTECTION FOR | ) | |
| COMPUTER LONG-TERM | ) | |
| MEMORY DEVICES | ) | |

**AMENDMENT/REPLY TRANSMITTAL LETTER**

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window, Mail Stop Non-Fee Amendment
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

**RECEIVED**

MAR 0 3 2004

Technology Center 2100

Sir:

Enclosed is a reply for the above-identified patent application.

☐    A Petition for Extension of Time is also enclosed.

☐    A Terminal Disclaimer and a check for ☐  $55.00   ☐  $110.00   to cover the requisite Government fee are also enclosed.

☐    Applicant(s) request continued examination under 37 C.F.R. § 1.114 and enclose

    the  ☐  $385.00   ☐  $770.00    fee due under 37 C.F.R. § 1.17(e).

    ☐  Applicant(s) previously submitted _____ on _____, for which continued examination is requested.

☐    A request for Entry and Consideration of Submission under 37 C.F.R. § 1.129(a) is also enclosed.

MTI0000686

Amendment/Reply Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

☒   No additional claim fee is required.

☐   An additional claim fee is required, and is calculated as shown below:

| AMENDED CLAIMS | | | | | |
|---|---|---|---|---|---|
| | No. of Claims | Highest No. Of Claims Previously Paid For | Extra Claims | Rate | Additional Fee |
| Total Claims | | Minus claims paid | | x  $18.00 = | $ |
| Ind. Claims | | Minus ind. clms. pd. | | x  $86.00 = | $ |
| If Amendment adds multiple dependent claims, add $280.00 | | | | | $0.00 |
| Total Amendment Fee | | | | | $ |
| If Small entity status is claimed, subtract 50% of Total Amendment Fee | | | | | $0.00 |
| TOTAL ADDITIONAL FEE DUE FOR THIS AMENDMENT | | | | | $ |

☐   A claim fee in the amount of $ _____ is enclosed.

☐   Charge $ _____ to Deposit Account no. 50-1070.

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made.  Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account No. 50-1070 and please credit any excess fees to such deposit account.

MTI0000687

Amendment/Reply Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 3

The Commissioner is hereby authorized to charge any other appropriate fees that may be required by this paper that are not accounted for above, and to credit any overpayment, to Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
    Brian E. Ledell
    Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date: March 2, 2004



Patent #
Attorney's Docket No. 0032-0003    13

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of    ) | |
| ) | |
| Steven BRESS et al.    ) | Group Art Unit: 2187 |
| ) | |
| Application No.: 09/961,417    ) | Examiner: N. V. Dinh |
| ) | |
| Filed: September 25, 2001    ) | |
| ) | |
| For:   WRITE PROTECTION FOR    ) | |
| COMPUTER LONG-TERM    ) | |
| MEMORY DEVICES    ) | |

**RECEIVED**

MAR 1 2 2004

Technology Center 2100

### INFORMATION DISCLOSURE STATEMENT UNDER 37 C.F.R. § 1.97(c)

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

Pursuant to 37 C.F.R. §§ 1.56 and 1.97(c), applicant(s) bring(s) to the attention of the

Examiner the documents listed on the attached PTO 1449. This Information Disclosure

Statement is being filed after the events recited in Section 1.97(b) but, to the undersigned's

knowledge, before the mailing date of either a Final Action or a Notice of Allowance. Under the

provisions of 37 C.F.R. § 1.97(c), this Information Disclosure Statement:

☒   includes a certification as specified by Section 1.97(e).

☐   is accompanied by a fee of $180.00 as specified by Section 1.17(p).

MTI0000689

Information Disclosure Statement Under 37 C.F.R. § 1.97(c)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

☒ **Certification 1:** Each document listed in this Information Disclosure Statement was cited in a communication from the <u>European Patent Office</u> in a counterpart foreign application, and this Information Disclosure Statement is being filed within three months of the mailing date of that communication.

☐ **Certification 2:** Based on reasonable inquiry, no document listed in this Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart foreign application, and no document listed in this Information Disclosure Statement was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing date of this Information Disclosure Statement.

☒ Copies of the listed documents are attached.

☐ Copies of the listed documents were previously submitted in a prior application, serial no. _____, filing date _____, upon which applicant(s) rely(ies) for the benefits provided in 35 U.S.C. § 120. Applicant(s) respectfully request(s) that the Examiner consider the listed documents and indicate that they were considered by making appropriate notations on the attached form.

☐ The following is a concise statement of relevance of the non-English language documents.

1. _____ discloses _____.

2. _____ discloses _____.

☐ English translations of the non-English documents are enclosed.

☐ In lieu of a statement of relevance or translation of the non-English documents, an English language version of a search report from the _____ Patent Office in a corresponding application citing these documents and setting forth the relevance thereof is enclosed.

MTI0000690

Information Disclosure Statement Under 37 C.F.R. § 1.97(c)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 3

This submission does not represent that a search has been made or that no better art exists and does not constitute an admission that each or all of the listed documents are material or constitute "prior art." If the Examiner applies any of the documents as prior art against any claims in the application and applicant(s) determine(s) that the cited document(s) do not constitute "prior art" under United States law, applicant(s) reserve(s) the right to present to the office the relevant facts and law regarding the appropriate status of such documents.

Applicant(s) further reserve(s) the right to take appropriate action to establish the patentability of the disclosed invention over the listed documents, should one or more of the documents be applied against the claims of the present application.

If any copending application(s) is/are cited on the attached PTO 1449, the Examiner's attention is directed to the foregoing application(s) in compliance with § 2001.06(b) of the Manual of Patent Examining Procedure. By identifying the copending application(s), the assignee and/or applicant of the application(s) do not waive confidentiality of the application(s). Accordingly, the U.S. Patent and Trademark Office is requested to maintain the confidentiality of the copending application(s) under 35 U.S.C. § 122.

MTI0000691

Information Disclosure Statement Under 37 C.F.R. § 1.97(c)
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 4

If there is any fee due in connection with the filing of this Statement, please charge the

fee to our Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date: March 11, 2004

MTI0000692

SHEET 1 OF 1

| INFORMATION DISCLOSURE CITATION PTO-1449 | Customer Number 26615 | ATTORNEY'S DKT NO. 0032-0003 | APPLICATION NO. 09/961,417 |
|---|---|---|---|
| | | APPLICANT(S) Steven BRESS et al. | |
| | | FILING DATE September 25, 2001 | GROUP 2187 |

## U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NO. | DATE | NAME | CLASS | SUBCLASS | FILING DATE |
|---|---|---|---|---|---|---|
| MD | 5,369,616 | 11-29-94 | Wells et al. | 365 | 218 | 03-07-94 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NO. | DATE | COUNTRY | CLASS | SUBCLASS | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| MD | Patent Abstracts of Japan, Vol. 1995, No. 05, June 30, 1995 & JP 7 037207, February 7, 1995; 1 page. |
| MD | Peter Gutmann: "Secure Deletion of Data from Magnetic and Solid-State Memory," Proceedings of the USENIX Security Symposium, July 22, 1996; 14 pages. |

| EXAMINER | | DATE CONSIDERED | 05/06/04 |
|---|---|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant(s).



US005369616A

# United States Patent [19]

## Wells et al.

[11] Patent Number: 5,369,616

[45] Date of Patent: Nov. 29, 1994

[54] **METHOD FOR ASSURING THAT AN ERASE PROCESS FOR A MEMORY ARRAY HAS BEEN PROPERLY COMPLETED**

[75] Inventors: Steven E. Wells, Citrus Heights; Eric J. Magnusson, Orangevale, both of Calif.

[73] Assignee: Intel Corporation, Santa Clara, Calif.

[21] Appl. No.: 207,228

[22] Filed: Mar. 7, 1994

### Related U.S. Application Data

[63] Continuation of Ser. No. 969,032, Oct. 30, 1992, abandoned.

[51] Int. Cl.⁵ ............................................... G06F 13/16
[52] U.S. Cl. .............................. 365/218; 365/201; 365/900; 371/21.6
[58] Field of Search ...................... 365/218, 900, 201; 371/21.6

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,642,759 | 2/1987 | Foster | 364/200 |
| 4,644,494 | 2/1987 | Muller | 364/900 |
| 4,763,305 | 8/1988 | Kuo | 365/201 |
| 4,802,117 | 1/1989 | Chrosny et al. | 364/900 |
| 4,896,262 | 1/1990 | Wayama et al. | 364/200 |
| 4,958,315 | 9/1990 | Balch | 364/900 |
| 5,012,425 | 4/1991 | Brown | 364/464.02 |
| 5,101,490 | 3/1992 | Getson, Jr. et al. | 395/425 |
| 5,111,385 | 5/1992 | Hattori | 395/425 |
| 5,131,089 | 7/1992 | Cole | 395/500 |
| 5,199,033 | 3/1993 | McGeoch et al. | 371/10.1 |
| 5,200,959 | 4/1993 | Gross et al. | 371/21.6 |

| | | | |
|---|---|---|---|
| 5,224,070 | 6/1993 | Fandrich et al. | 365/185 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2088442 | 7/1993 | Canada | 13/16 |
| 0175458A2 | 3/1986 | European Pat. Off. . | |
| 0392895 | 10/1990 | European Pat. Off. | 16/6 |
| 2665791 | 2/1992 | France | 365/218 |
| 2251323 | 1/1992 | United Kingdom | 12/2 |
| 2251324 | 1/1992 | United Kingdom | 12/2 |

### OTHER PUBLICATIONS

Solid–State Mass Storage Arrives, Product Feature, Memory Card Systems & Design, Jul./Aug. 1992.

*Primary Examiner*—Viet Q. Nguyen
*Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman

[57] **ABSTRACT**

A method for insuring that an erase operation practiced on a block of flash EEPROM transistors is carried out reliably including the steps of: writing whenever the erasure of a block of the flash EEPROM array is to commence to a position in the array to indicate that an erasure of the block has commenced, writing whenever the erasure of a block of the flash EEPROM array is complete to the position in the array to indicate that an erasure of the block has been completed, testing to determine any positions in the array which indicate that an erasure of a block has commenced but not been completed upon applying power to the flash EEPROM array, and reinitiating an erase if any positions in the array exist which indicate that an erasure of a block has commenced but not been completed.

**4 Claims, 5 Drawing Sheets**





**FIG_1**



**FIG_2**

MTI0000695



FIG_3

| | | | |
|---|---|---|---|
| 1 | 1 | 1 | ERASE |
| 1 | 1 | 0 | PROGRAM BIT TO INDICATE ERASE SUCCESSFUL |
| 1 | 0 | 0 | PROGRAM BIT TO MARK FOR CLEANUP |
| 0 | 0 | 0 | PROGRAM BIT TO INDICATE ERASE STARTED |

FIG_6

MTI0000696

VALID
DIRTY
DIRTY
VALID
DIRTY
VALID
DIRTY
DIRTY
DIRTY
VALID
VALID
VALID
B0
VALID
VALID
DIRTY
VALID
VALID
DIRTY
DIRTY
VALID
VALID
DIRTY
VALID
DIRTY
B1
VALID
VALID
VALID
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
B7
20
VALID
VALID
VALID
DIRTY
DIRTY
VALID
DIRTY
DIRTY
DIRTY
DIRTY
VALID
VALID
B8
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
UNUSED
B15
LS PS
LS PS
LS PS
LS PS
LS PS
LS PS
LS PS
17
23
CSM & WSM
MICROPROCESSOR
ROM
READ/WRITE CONTROL 21

FIG_4

U.S. Patent

Nov. 29, 1994

Sheet 4 of 5

5,369,616



FIG_5

MTI0000698



ERASE BLOCK OF MEMORY SETTING ALL BITS OF BLOCK ERASE STATUS AREA TO ONE

IF ERASE SUCCESSFUL, SET FIRST BIT TO ZERO

IF POWER UP, SCAN BLOCKS IN ERASE STATUS AREAS FOR 1 × 0 PATTERN. IF NOT FOUND, REPEAT ERASE FOR BLOCK

NOT 1 × 0

1 × 0

SET SECOND BIT TO ZERO TO INDICATE CLEANUP FOR ERASE

SET THIRD BIT TO ZERO TO INDICATE ERASE STARTED

FIG_7

COMMENCE ERASE, RECORD ERASE COMMENCE IN SECTOR APART FROM BLOCK ERASED

INVALIDATE ERASE COMMENCE SECTOR FOR BLOCK SUCCESSFULLY ERASED

IF POWER UP, TEST FOR ERASE COMMENCE SECTORS, REPEAT ERASE FOR BLOCK IF FOUND

FOUND

NOT FOUND

REUSE BLOCK

FIG_8

MTI0000699

5,369,616

| 1 | 2 |

## METHOD FOR ASSURING THAT AN ERASE PROCESS FOR A MEMORY ARRAY HAS BEEN PROPERLY COMPLETED

This is a continuation of application Ser. No. 07/969,032, filed Oct. 30, 1992, abandoned.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to memory arrays and, more particularly, to methods for assuring that an erase operation has taken place in a flash electrically erasable programmable read only memory (flash EEPROM) array.

2. History of the Prior Art

Modern computer systems make extensive use of long term memory. Typically this memory is provided by one or more hard (fixed) disk drives. A hard disk drive is an electro-mechanical device which includes one or more flat circular disks fixed to rotate rapidly about a central axis. Each flat disk has opposite surfaces which are coated with some form of magnetic material upon which bits of data may be stored by a magnetic head carried by a mechanical arm. The bits are stored in fixed size sectors of a plurality of tracks which lie on each side of a magnetic disk. A typical disk drive used in personal computers today is capable of storing forty or more megabytes of data.

Such disk drives are very useful and have become almost a necessity to the operation of personal computers. However, such electro-mechanical drives do have their drawbacks. They are relatively heavy and increase the weight of a computer, especially a portable computer, significantly. More importantly, electro-mechanical hard disk drives are very susceptible to shock. A hard disk drive in a portable computer which is dropped is quite likely to cease functioning with a catastrophic loss of data.

Recently, forms of long term storage other than electro-mechanical hard disk drives have become feasible for use in computers. One of these forms of long term storage is called flash EEPROM. Flash EEPROM memory is comprised of a large plurality of floating gate transistors arranged as memory cells in typical row and column fashion with circuitry for accessing individual cells and placing the memory transistors of those cells in one of two memory conditions. In contrast to the transistors used in dynamic random access memory, a flash memory cell (like other EPROM cells) retains information when power is removed. Flash EEPROM memory has a number of characteristics which adapt it to use as long term memory. It is light in weight and occupies very little space. More importantly, it is especially rugged. It will withstand without adverse effects repeated drops each of which would destroy a typical electro-mechanical hard disk.

A peculiarity of flash EEPROM, however, is that one form is erased by applying a high voltage simultaneously to the source terminals of all of the transistors (cells) used in a large portion of the array. Because these source terminals are all connected to one another in the array by metallic busing, the entire portion of the array must be erased at once. While an electro-mechanical hard disk will typically store information in a first area of the disk and then rewrite that same area of the disk when the information changes, this is not possible with a flash memory array without erasing all of the valid information that remains in that portion of the array along with the invalid (dirty) information.

Because of this, a different arrangement is used for rewriting data and erasing dirty sectors of a flash EEPROM array. First, the entire array is divided into smaller separately erasable blocks so that when a block is erased the amount of valid data which must be reprogrammed is reduced. Typically, the array is composed of a number of silicon chips; and each such chip includes a number of such blocks. Then, when the information at a data entry changes, the changed information is written to a new sector on an available block rather than written over the old data; and the old data is marked dirty. After a sufficient number of sectors on a block have been marked dirty, the entire block is erased. When erasure occurs, all of the valid data in the block to be erased is written to a new block; and then the dirty block is erased and put back into use as a clean block of memory. Because of this involved erasure process, it typically takes as much as two seconds to erase a block of a flash EEPROM array. However, because erasure need not occur with each entry which is rewritten, erasure may be delayed until a block contains a sufficient amount of dirty information that cleanup is feasible. This reduces the number of erasure operations to a minimum and allows erasure to occur in the background when the facilities for controlling the array are not otherwise occupied with reading and writing.

A problem which occurs with this and other forms of flash EEPROM, however, is that the background erasing process may be occurring at an instant at which power is removed from the system. This might occur with a power outage but is as likely to occur whenever the system is simply turned off since the process of erasure occurs in the background so far as the computer operating system is concerned. If a block of an array of flash EEPROM cells is in the process of erasure (in one embodiment, the memory cells are being switched from all cells being in the zero state to all cells being in the one state) when power is removed from the system, the cells of that block may or may not be placed into an erased state. Since it is impossible to program cells which are not in the one state, an ineffective erase operation leaves a block temporarily unusable. Consequently, when the power is turned back on, it is desirable for the system to be able to determine the condition of any blocks of the array which were being erased when power was removed so that the erase process may be repeated and those blocks may be properly utilized by the system.

### SUMMARY OF THE INVENTION

It is, therefore, an object of the present invention to provide a method for determining the reliability of an erase operation in a flash EEPROM array.

It is another object of the present invention to provide a method by which blocks of a flash EEPROM array which were in the process of being erased when power was removed may be tested to determine whether an effective erase occurred.

These and other objects of the present invention are realized in a method for insuring that an erase operation practiced on a block of flash EEPROM transistors is carried out reliably including the steps of writing whenever the erasure of a block of the flash EEPROM array is to commence to a position in the array to indicate that an erasure of the block has commenced, writing whenever the erasure of a block of the flash EEPROM array

MTI0000700

5,369,616

3

is complete to the position in the array to indicate that an erasure of the block has been completed, testing to determine any positions in the array which indicate that an erasure of a block has commenced but not been completed upon applying power to the flash EEPROM array, and reinitiating an erase if any positions in the array exist which indicate that an erasure of a block has commenced but not been completed.

These and other objects and features of the invention will be better understood by reference to the detailed description which follows taken together with the drawings in which like elements are referred to by like designations throughout the several views.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an illustration of a single memory transistor used in a flash EEPROM array.

FIG. 2 is a diagram illustrating the distribution of transistors in two different conditions.

FIG. 3 illustrates a number of possible distributions of memory cells after an erase operation.

FIG. 4 is a block diagram illustrating a portion of a flash EEPROM array.

FIG. 5 illustrates the arrangement of data in a single block of a flash memory array.

FIG. 6 is a diagram illustrating a series of bits stored in an erase status area in accordance with the invention.

FIG. 7 illustrates the steps of a method for assuring the reliability of an erasure operation in accordance with the invention.

FIG. 8 illustrates the steps of a second method for assuring the reliability of an erasure operation in accordance with the invention.

### NOTATION AND NOMENCLATURE

Some portions of the detailed descriptions which follow are presented in terms of symbolic representations of operations on data bits within a computer memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. The operations are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these quantities take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated. It has proven convenient at times, principally for reasons of common usage, to refer to these signals as bits, values, elements, symbols, characters, terms, numbers, or the like. It should be borne in mind, however, that all of these and similar terms are to be associated with the appropriate physical quantities and are merely convenient labels applied to these quantities.

Further, the manipulations performed are often referred to in terms, such as adding or comparing, which are commonly associated with mental operations performed by a human operator. No such capability of a human operator is necessary or desirable in most cases in any of the operations described herein which forms part of the present invention; the operations are machine operations. In all cases the distinction between the method operations in operating a computer and the method of computation itself should be borne in mind. The present invention relates to a method for operating a computer in processing electrical or other (e.g. mechanical, chemical) physical signals to generate other desired physical signals.

4

### DETAILED DESCRIPTION

As outlined above, a difficulty with flash EEPROM arises from the fact that it is not reprogrammable until it has been erased. Using the typical operating voltages available, the transistors of a flash EEPROM can only be switched from a one to a zero condition. The condition can be reversed to one only by applying a voltage higher than typical operating voltages (usually twelve volts) to the source terminals of the memory transistors. Flash EEPROM in which data has been stored is erased by first programming all of the cells which are in a one condition to a zero condition and then applying a high voltage to the source terminals of all of the transistors in the array to place all in the one condition. Because these source terminals are all connected together by metallic busing in the array, the entire array must be erased at once. While an electro-mechanical hard disk drive will typically store information in a first area of the disk and then rewrite that same area of the disk when the information changes, this is not possible with flash EEPROM memory without erasing all of the valid information that remains in the array along with the invalid (dirty) information. This requires that the entire array be reprogrammed with the valid information once it has been erased. As may be appreciated, such a process, if used as each entry changed, would significantly slow the operation of any computer system using flash memory in place of an electro-mechanical hard disk drive. Moreover, because the erase process is so complicated, it is quite slow; it typically requires between one and two seconds. Such an erase time would seem to preclude the use of flash EEPROM as volatile memory.

However, a new method of erasing and rewriting the flash array has been devised which differs from that typically used for electro-mechanical hard disk drives and which allows flash EEPROM to be used for long term storage where data is rapidly changing. A new arrangement is disclosed in U.S. patent application Ser. No. 07/969,131, entitled *Method and Circuitry for a Solid State Memory Disk*, S. Wells, filed on even date herewith, and assigned to the assignee of the present invention. In that arrangement, a typical long term storage array is comprised of flash memory arranged in a series of blocks which are separately erasable. This reduces the amount of reprogramming necessary each time an erase occurs. In one embodiment, the array is divided into a number of silicon chips each of which is subdivided into sixteen subblocks. Each subblock is, in fact, physically paired with a subblock on another of the silicon chips to create a logical block of the array in which odd bytes of data are stored on the subblock of one chip and even bytes of data are stored on the subblock of the other chip. Each of the logical blocks of flash memory is separately erasable from all other such blocks. However, even with this division of data into individually-erasable blocks, erasure of a block effects erasure of such a very large amount of information that to attempt to erase all of the data and then replace the valid data with each rewrite of a sector would be impossible.

In order to overcome this problem, data is written to any block of the flash memory array which has space available. Thus data is written to an empty position in the array no matter what the apparent address of the data or the address on the block. A piece of data to be written to a sector five, for example, is written to the

MTI0000701

5,369,616

<table>
<tr><td>5</td><td>6</td></tr>
</table>

next available sector of a block being written no matter where that may be; and a lookup table which records the physical position on the block together with the logical address (sector five) is kept apart from the flash memory array. This arrangement of the array allows a first block to be written sector by sector, a second block to be written in the same sequential manner, and so on. When a sector is rewritten, the data is written to a new physical position, the data in the lookup table is changed to record the new physical position against the logical sector number, and the first position at which the data was written is marked as dirty. After some period of time, a sufficient number of blocks will have been filled that it will be desirable to release space by moving the valid information from some especially dirty block to some other block and erasing the entire block from which the valid information has been moved. This has the effect of freeing an additional number of sectors equal to all of the sectors on the erased block which have previously been marked as dirty.

An especial advantage of the arrangement is that since erasure of invalid sectors need not occur each time the sector is rewritten, the erasure of blocks may be delayed to occur in the background and relatively infrequently when contrasted to the amount of information change occurring in the array. Thus, erasure may be adjusted to occur when the facilities of the array are not otherwise occupied with reading and writing. In this manner, the external host which is writing to and receiving information from the flash array is typically not aware that an erasure is taking place even though the erasure requires one or two seconds.

A problem which may occur, however, is that the background erasing process may be happening at an instant at which power is removed from the system. This might take place when a power outage occurs but is as likely to happen whenever the system is simply turned off or when a removable storage disk is removed from system since the process of erasure occurs in the background so far as the computer operating system is concerned. If a block of an array of flash EEPROM cells is in the process of erasure (in one embodiment, the memory cells are being switched from all cells being in the zero state to all cells being in the one state) when power is removed from the system, the cells of that block may or may not be placed into an erased state. Since it is impossible to program cells which are not in the one state, an ineffective erase operation leaves a block temporarily unusable. Consequently, when the power is turned back on, it is desirable for the system to be able to determine the condition of any blocks of the array which were being erased when power was removed so that the erase process may be repeated and those blocks may be properly utilized by the system.

FIG. 1 should lead to a better under standing of the problem. FIG. 1 illustrates a single memory transistor 10 of the type used in a flash memory array in partially completed form. As may be seen, the transistor 10 is a floating gate MOS field effect transistor having a drain region 11, a source region 12, a floating gate 14, and a control gate 15. The source region 12 and the drain region 11 are embedded in the silicon substrate material which separates the two areas and are typically doped with an arsenic dopant, and the source region may be additionally doped with a phosphorous dopant. The 65 polysilicon floating gate 14 is generally disposed between the drain and source regions and insulated from them by a layer of silicon dioxide. The control gate 15 is insulated from the floating gate 14, typically, by a layer of silicon dioxide. The N channel device may be fabricated directly in a P type substrate or formed in some other well known manner. Conductors are connected to each of the drain 11, source 12, and control gate 15 for applying signals to affect the flow of electrons and holes between the various parts of the transistor 10. In one embodiment, the control gate 15 is fabricated on a second layer of polysilicon and is part of a continuous strip of polysilicon forming a wordline in the array of which the transistor is a part. The transistor may be constructed using well-known CMOS technology.

Floating gate transistors are programmed by negatively charging the floating gate 14 by coupling the word line connected to the control gate 15 to a potential of approximately +12 volts, the drain region to approximately +7 volts, and the source region to ground. With these conditions, channel hot electron injection occurs through the oxide layer 14. To erase the cell, the drain region is floated, the word line connected to the control gate 15 is grounded, and a potential of approximately +12 volts is applied to the source region. Under these conditions, charge is tunneled from the floating gate. A cell is read by applying a positive potential (less than that which would cause charge to transfer onto the floating gate) to the control gate 15, applying ground to the source region, and applying a potential of 1 volt to the drain region. Current through the device is sensed to determine if the floating gate is or is not negatively charged. If there is charge on the floating gate, then no drain current flows when a cell is read. Thus, a programmed cell produces a zero output value when interrogated. In contrast, if the transistor has not been programmed and no charge exists on the floating gate, then drain current flows when the cell is read. Thus, a transistor 10 which has not been programmed provides an output of one when interrogated.

It is, therefore, typical that a block of an array of flash EEPROM memory cells are all erased, that is, placed in the condition in which no charge is stored on the floating gate and in which interrogation will produce a one value prior to data being stored in the array. This is accomplished by providing a high voltage Vpp (typically twelve volts) to the source terminals of all of the memory transistors at once while holding the gate terminals at ground and floating the drain terminals. Then once the cells have been erased, as data is stored in the memory cells of the block, those cells which are to store a one condition remain in the condition in which they were placed by erasure while those cells which are to store a zero condition are switched to the programmed condition.

When a sufficient amount of a block of the array contains invalid information that it is time to again erase the array, this is accomplished in a two step process. First, all of the cells in the one condition are programmed to the zero condition, and then the entire block is erased by applying the high voltage at the source terminals of all of the cells.

From the above discussion, it will be seen that the ability of a memory transistor to provide a value of one or zero depends upon whether charge is stored or is not stored on the floating gate. As would be expected, the amount of charge stored by each of the memory cells of a flash memory array is not identical to that stored by all other memory cells but varies in a typical distribution pattern. FIG. 2 illustrates such a distribution pattern for

5,369,616

7

a first set of memory cells (shown to the left in the figure) which are in the erased state and a second set of cells (shown to the right in the figure) which are in the programmed state. The vertical axis illustrates the relative number of cells in each condition while the horizontal axis is a measure of the gate-source voltage which must be applied to cause each cell to conduct, the Vt of the cell. In an array in which all of the memory transistors are functioning correctly and within tolerances, the voltage Vcc (which is the gate-source voltage applied to interrogate the cells) is greater than the voltage Vt of each of the erased cells and less than the voltage Vt of each of the programmed cells. Thus, when the voltage Vcc is applied to interrogate an erased cell, the cell will provide a one value. Alternatively, when the voltage Vcc is applied to interrogate a programmed cell, the cell will provide a zero value.

Not only do each of the erased cells have a Vt value less than the interformation voltage, but a sufficient margin is also provided in a properly operating array that variations in transistor characteristics over a lifetime, charge loss, variations in temperature, variations in Vcc, and other variations in operating conditions do not affect the ability of the cells to switch conditions, to provide output values when interrogated, or to retain a condition indefinitely. Thus, it is important that sufficient margins be provided between the interrogation voltages (Vcc) applied and the threshold voltages Vt for both the erased transistors and the programmed transistors. Such margins are illustrated in FIG. 2 as Vme and Vmp.

As explained above, when an array (or an individually erasable block of an array) which contains invalid data is to be erased, first, all of the cells in the one state are preconditioned by programming them to the zero state; and then the entire array is erased by applying the high voltage at the source terminals of all of the cells (which are now in the programmed state). Thus, those cells in FIG. 2 lying in the group to the left are first programmed so that they are moved to the distribution group at the right; and then all of the cells are erased so that they are moved to the distribution group at the left.

When the cells are erased, the large voltage Vpp is applied to the source terminals of all of the memory transistors. If everything goes well, all of the erased transistors have threshold voltages Vt which lie at least the margin Vme below the interrogation voltage Vcc. However, if power is lost during the operation, the charge on the floating gates of some of the transistors may not have been completely removed; and the threshold voltages Vt of the apparently erased transistors may lie in a distribution pattern anywhere along the horizontal axis. Some of the transistors may have been erased, some may have been erased but have insufficient margin for reliable operation, others may not have been erased at all. In any case, it is necessary to determine whether the transistors were erased or not. If they were not erased, then the erasure must be repeated so that the array may be used. FIG. 3 illustrates a number of possible distribution patterns for memory cells after an erasure during which power failed. In the distribution pattern labelled "a," a large proportion of the sectors were not erased at all. In the distribution pattern labelled "b," most of the transistors were erased; but there is insufficient margin for at least half of the transistors to provide for temperature, voltage, and other variations. In the distribution pattern labelled "c," all of the transistors were erased; but there is insufficient margin for a

8

small number of transistors to provide for temperature, voltage, and other variations. However, were the transistors in this block tested using prior art methods to determine whether they had been successfully erased, the indication would be that a successful erasure had occurred; however, this is not an indication that the transistors are reliable. In distribution d, all of the transistors were erased; and will function correctly and reliably. As can be seen from the different patterns, it is desirable to have a reliable method to test for a correct erasure

In the new arrangement described in the U.S. patent application entitled *Method and Circuitry for a Solid State Disk*, a typical long term storage array is comprised of flash memory divided into a series of individually erasable blocks. FIG. 4 illustrates a group of sixteen such blocks B0–B15 positioned on a single silicon chip 20; the blocks B0–B15 may be considered logical blocks for the purpose of this explanation made up of two physical subblocks residing on different silicon substrates. Also shown are a flash memory controller 21 and a separate memory array 23 apart from the flash memory array 20 for storing information used in the control of the writing to, reading from, and erasure of the flash memory array. Each of the logical blocks B0–B15 of flash memory is separately erasable from all other such blocks. However, each of the logical blocks of the array typically holds 128 kilobytes of data, sufficient to hold 256 sectors of information normally stored on the tracks of an electro-mechanical hard disk drive. Thus, a thirty eight flash array with sixteen individually-erasable subblocks per chip holds about the same amount of data as does a thirty megabyte hard disk. Even with this division of data into 240 individually-erasable blocks, erasure of a block effects erasure of a very large amount of information. Consequently, no attempt is made to erase all of the data and then replace the valid data with each rewrite of a sector.

Instead, data is written to any logical block of the flash memory array which has space available no matter what the apparent address of the data or the address on the block. A piece of data to be written to a particular sector is written to the next available sector of a block being written no matter where that may be; and a lookup table 17 is kept in the array 23 which records the physical position on the block with the logical address. This arrangement of the array allows a first block B0 to be written sector by sector, a second block B1 to be written in the same sequential manner, and so on. When the data in a sector changes so that the sector needs to be rewritten, the data is written to a new physical position, the data in the lookup table 17 is changed to record the new physical position against the logical sector number, and the first position at which the data was written is marked as invalid (dirty) so that an attempt to read that physical position produces an error signal.

After some period of time, a sufficient number of blocks will be filled that it will be desirable to release space by moving the valid information from some especially dirty block to some other block and then erasing the entire block from which the valid information has been read. This releases for use a number of sectors equal to the numbers of dirty sectors on the erased block.

FIG. 5 is an idealized drawing useful in understanding the way data is stored on each block of the array 20. FIG. 5 illustrates a typical block 30 as a rectangle. The rectangular area includes a plurality of transistor de-

MTI0000703

5,369,616

9

vices arranged to provide the 128K bytes of storage which each block provides. As mentioned previously, the area of an individual block is actually split between subblocks on two physical chips, one of which holds odd numbered bytes of data and one of which holds even numbered bytes of data. The individual transistors and the various column and row select lines and other conductors for operating the block are not illustrated but are well known to those skilled in the art of designing flash memory.

As may be seen in FIG. 5, data is stored in the block 30 beginning at the top of the block almost to the bottom. At the top of the block 30 are stored in identification fields or headers the logical sector numbers used by the operating system as addresses for the data. For example, a first sector number 58112 is stored in the first header at the top. With the sector number is stored a pointer value; other information such as an indication of validity may also be stored in each header. The pointer value is an offset from the beginning position on the block 30 and points to a physical address; on the block 30 at which the data for logical sector 58112 is stored. An arrow in FIG. 5 illustrates this physical position at which the first bits of data for the logical sector are stored. In the case of logical sector 58112 which is the first sector on the block 30, the data is written from the address at the address stored with the sector number 58112 to a point at the beginning of the lower data area which is marked by a beginning pointer value illustrated by an arrow extending from the upper left hand corner of the block 30.

FIG. 5 shows a second logical sector 5 and its pointer directed to a physical position on the block 30 which stores the first bit of the data for sector 5. The data for sector 5 is stored in an area which begins just above the most recent data sector written (sector 58112) and extends downward so that the last row of the new data sector lies in the row just above the first row of sector 58112.

The data stored in any sector of the block 20 may be retrieved by going to the position on the block 20 where the sector number is stored and retrieving the pointer to the beginning position of the data and the pointer to the beginning position of the sector whose number is stored immediately above the sector number being retrieved. As was pointed out above, the physical position of the sector number is stored in a lookup table 17 (which is preferably held in static random access memory 23 on the circuit board which holds the other components of the array 20) with the chip number, the block, and other information (such as row and column addresses) for retrieving the data. It should be noted that below the lower data position on each block 30 is an area reserved for block status information. This area is utilized in carrying out the present invention.

The unusual arrangement for rewriting data used by a flash memory array requires that the memory allocation system continually make new memory available for data to be written and rewritten. This requires that some number of blocks always be available in order to allow blocks holding invalid data to be cleaned up and their dirty sectors released.

FIG. 6 illustrates a reliable mechanism for determining whether the transistors of a block of flash memory have been erased so that they will function dependably. FIG. 6 illustrates a series of different conditions of three bits of a block erase status area which is stored in a permanent position on each block (or each subblock if

10

subblocks on more than one chip form a logical block) of a flash memory array, preferably in the block status area below the bottommost entry to which data is written. In one embodiment of the array, this area of memory transistors in which the block erase status region is positioned is utilized to store various information related to control of the blocks of the memory. For example, information regarding blocks which may no longer be operative and the number of erase operations to which the block has been subjected may be stored in this area.

In FIG. 7 are illustrated the steps of the method which causes the conditions of the three bits used to record the erase status to vary as well as the steps of a process for checking the reliability of the erasure operation. Typically, although not necessarily, the process is implemented in software carried out by a microprocessor which is a part of the controller 21. The process may be stored in read only memory which is also a part of the controller 21.

When a block of flash memory is erased, the three bits of the block erase status area for that block of memory which are stored in memory transistors on the block are erased with the rest of the memory transistors on the block and are, consequently, set to one values. A command state machine which may be logically considered to be is a part of the flash memory controller 21 sends a signal to indicate when it has completed the erase operation successfully. The command state machine acts as an interface for read, write and erase operations to the chips of the array. Although discussed as a logical part of the controller 21, in one embodiment the command state machine and its associated write state machine are physically a part of each of the chips of the array. Essentially, the command state machine reads the condition of all cells of the block and compares the conditions read with the expected condition after an erase. The details of the operations by which this signal and other control signals for operating the flash memory array are generated are described in detail in U.S. patent application Ser. No. 07/655,643, entitled *Command State Machine,* Fandrich et al, filed Feb. 11, 1991, and assigned to the assignee of the present invention, and in U.S. patent application Ser. No. 07/654,375, entitled *Circuitry and Method For Programming and Erasing A Non-volatile Semiconductor Memory,* Kynett et al, filed Feb. 11, 1991, and assigned to the assignee of the present invention. When the erase complete signal is returned by the command state machine indicating that the erase has been completed successfully (and with margin Vme), the process of the present invention causes the rightmost bit of the three bits illustrated in FIG. 6 to be set to a zero. The three status bits remain in this condition until the block is next ready to be erased. When a block of flash memory is targeted for erasure the controller 21 provides another signal, then the middle bit of the block erase status area is set to a zero. When the valid data has all been written to one or more other blocks so that erase may occur, the last of the bits to the left in the figure is programmed to a zero. The process for generating the signals indicating that a block has been targeted for erase and that all the valid data has been written to is described in detail in U.S. patent application Ser. No. 07/969,760, entitled *A Method Of Cleaning Up A Solid State Memory Disk Storing Floating Sector Data,* S. Wells, filed on even date herewith, and assigned to the assignee of the present invention. Then, when the block is erased, all of the transistors in all three of the bit

5,369,616

11

positions of the block erase status area are set to the one condition. Thus, when an erase has been completed, all three bits of the erase status area are changed to ones. Finally, the successful erase signal is returned by the command state machine as explained above, and the rightmost bit is switched to a zero. The erase status process described repeats in a similar manner when the block is again erased after the block fills with new data and a significant portion of that new data becomes invalid.

Power may be removed from the array for various reasons during a period in which a block is being erased. Because the bits of the block erase status area change with the steps of the erase procedure, it is possible to determine at what point during an erase process the power was removed. For example, the flash memory controller only sends the signal indicating that erase has been accomplished after the entire erase process has occurred and the values stored in the block have been read out of the array and compared with the expected condition. Consequently, if this signal has been received, then the erase process has been completed at least as well as the system is capable of completing the process. If power is interrupted at the point at which valid data has been removed from the block and before erase has actually occurred, then all three bits of the block erase status area will be zero. Thus, the review of the block erase status area of a block will indicate whether any individual block has been reliably erased or not. If the block holds the pattern one/one/zero in the block erase status area, then it has been reliably erased. If the block holds the pattern one/zero/zero in the block erase status area, then it has been targeted for erase but erase has not yet started; valid data may have been moved from some sectors of the block to other blocks, but such data will have been marked invalid when that sector has been moved. If, on the other hand, the block holds the pattern one/one/one or zero/zero/zero, then the erase cannot be considered to be reliable since it was interrupted after the erase started but before the erase completed successfully signal was returned; and the erase procedure must be repeated.

Thus, the controller 21 of the flash memory array includes a short program in ROM which is used to interrogate the block erase status area of each of the blocks of the flash memory array whenever the system power is turned on. If the block erase status area of any block is found in the one/one/one or the zero/zero/zero condition, then that block must be erased before it may be used.

In order to increase the assurance that the erase has actually taken place for all of the transistors of each block, when the last bit (leftmost in the FIG. 6) of the erase status bits is programmed to a zero to indicate that erase has begun, the application of the programming voltage is repeated a number of times. This has the effect of forcing that lowest transistor to the far right of the rightmost distribution pattern illustrated in FIG. 2. This position is illustrated by an X in FIG. 2.

Consequently, this transistor on the block is among the hardest (if not the hardest) transistor to erase. Consequently, when the block erase status table of that block of the flash memory array is interrogated, the Vt of that transistor will probably be closest to Vcc in the left distribution pattern. Thus, if the scan of the block erase status table shows a zero in the leftmost bit position on the application of power, the erase was marginal; and the block is erased again.

12

It is conceivable that the transistor which stores the last bit (leftmost in the FIG. 6) which is programmed to a zero a plurality of times to indicate that erase has begun will not fall in the appropriate position in the distribution pattern. However, the system appears to be quite reliable.

As mentioned above, when a block of memory is distributed between a pair of individual chips, the probability of producing an incorrect result in the erase status bits may be reduced by providing a set of erase status bits for each sub-block. This will guard against the occurrence of a condition in which the rightmost bit in the one of the erase status areas is the hardest to switch and is not completely erased when power is removed. Consequently, that erase status area will appear to show that the erase was successfully completed. A second erase status area will make this occurrence much more unlikely. Even more protection may be gained by mirroring the erase status bits in each block status area so that four or even eight sets of erase status areas (each with three bits) exist for each block.

However, to obviate the possibility of the distribution pattern leaving insufficient margin even though the multiply-programmed bit has been switched to a one value, a second method for accomplishing the reliable erasure of a block of flash memory is illustrated in the flow chart of FIG. 8. Rather than using three bits on a block to determine the status of the erase operation, another solution is to store data regarding the erase operation in a sector on another block of the array 20 illustrated in FIG. 4. Whenever an erase is initiated, data is written to a sector indicating that "block 53 has an erase initiated." When the erase process is completed and the signal is returned from the flash memory controller, the sector is invalidated by marking the invalid bit in the header with the logical sector number. Then, whenever power is applied to the system, the sectors of all blocks are scanned for a special sector of this type. If the flash memory controller detects such a sector during power up, the system assumes that the erase operation did not occur and reinitiates the erase of the block. This second method of providing erase reliability assures that the information regarding the initiation and termination of the erase operation is correctly recorded and is not itself distorted by the failure of the erase operation in the block being erased.

Although the present invention has been described in terms of a preferred embodiment, it will be appreciated that various modifications and alterations might be made by those skilled in the art without departing from the spirit and scope of the invention. For example, an especially reliable solution to the problem is to use both types of checks to insure reliability of the erase operation. The invention should therefore be measured in terms of the claims which follow.

What is claimed is:

1. A method for insuring that each erase operation practiced on a block of flash EEPROM transistors which is part of a flash EEPROM memory array is carried out reliably, each flash EEPROM transistor storing a bit having a first state and a second state, each erase operation bringing the bits in the block to the first state, the method comprising the steps of:

    designating a first group of three bits in the block to represent the condition of erase operations;

    b) programming to the second state a first bit of the first group of three bits to indicate that an erase operation should take place on the block;

5,369,616

13

c) programming to the second state a second bit of the first group of three bits before an erase operation begins;

d) beginning a first erase operation, completion of the first erase operation bringing all bits of the first group of three bits to the first state;

e) if the first erase operation was successfully completed programming to the second state a third bit of the first group of three bits;

f) testing all bits of the first group of three bits to determine their condition in response to the reapplication of power to the flash EEPROM array; and

g) initiating a second erase operation unless the third bit of the first group of three bits is in the second state and the first and the second bit of the three bits both are in the first state.

14

2. The method of claim 1 in which the step of programming to the second state the second bit of the three bits comprises applying programming signals to the second bit of the first group of three bits a plurality of times such that the second bit of the first group of three bits becomes more difficult to erase.

3. The method of claim 1 wherein step a) includes designating a second group of three bits in the block to represent the condition of erase operations and wherein steps b)–f) are also performed on the second group of three bits.

4. The method of claim 2 wherein step a) includes designating a second group of three bits in the block to represent the condition of erase operations and wherein steps b)–f) are also performed on the second group of three bits.

*  *  *  *  *

XP-002190890



The following paper was originally published in the
Proceedings of the Sixth USENIX
Security Symposium
San Jose, California, July 1996.

P.D. 22-07-1996
P. complete

For more information about USENIX Association contact:

1. Phone:        (510) 528-8649
2. FAX:          (510) 548-5738
3. Email:        office@usenix.org
4. WWW URL: http://www.usenix.org

# Secure Deletion of Data from Magnetic and Solid-State Memory

Peter Gutmann
*Department of Computer Science*
*University of Auckland*
pgut001@cs.auckland.ac.nz

## Abstract

With the use of increasingly sophisticated encryption systems, an attacker wishing to gain access to sensitive data is forced to look elsewhere for information. One avenue of attack is the recovery of supposedly erased data from magnetic media or random-access memory. This paper covers some of the methods available to recover erased data and presents schemes to make this recovery significantly more difficult.

## 1. Introduction

Much research has gone into the design of highly secure encryption systems intended to protect sensitive information. However work on methods of securing (or at least safely deleting) the original plaintext form of the encrypted data against sophisticated new analysis techniques seems difficult to find. In the 1980's some work was done on the recovery of erased data from magnetic media [1] [2] [3], but to date the main source of information is government standards covering the destruction of data. There are two main problems with these official guidelines for sanitizing media. The first is that they are often somewhat old and may predate newer techniques for both recording data on the media and for recovering the recorded data. For example most of the current guidelines on sanitizing magnetic media predate the early-90's jump in recording densities, the adoption of sophisticated channel coding techniques such as PRML, the use of magnetic force microscopy for the analysis of magnetic media, and recent studies of certain properties of magnetic media recording such as the behaviour of erase bands. The second problem with official data destruction standards is that the information in them may be partially inaccurate in an attempt to fool opposing intelligence agencies (which is probably why a great many guidelines on sanitizing media are classified). By deliberately under-stating the requirements for media sanitization in publicly-available guides, intelligence agencies can preserve their information-gathering capabilities while at the same time protecting their own data using classified techniques.

This paper represents an attempt to analyse the problems inherent in trying to erase data from magnetic disk media

MTI0000707

and random-access memory without access to specialised equipment, and suggests methods for ensuring that the recovery of data from these media can be made as difficult as possible for an attacker.

## 2. Methods of Recovery for Data stored on Magnetic Media

Magnetic force microscopy (MFM) is a recent technique for imaging magnetization patterns with high resolution and minimal sample preparation. The technique is derived from scanning probe microscopy (SPM) and uses a sharp magnetic tip attached to a flexible cantilever placed close to the surface to be analysed, where it interacts with the stray field emanating from the sample. An image of the field at the surface is formed by moving the tip across the surface and measuring the force (or force gradient) as a function of position. The strength of the interaction is measured by monitoring the position of the cantilever using an optical interferometer or tunnelling sensor.

Magnetic force scanning tunneling microscopy (STM) is a more recent variant of this technique which uses a probe tip typically made by plating pure nickel onto a prepatterned surface, peeling the resulting thin film from the substrate it was plated onto and plating it with a thin layer of gold to minimise corrosion, and mounting it in a probe where it is placed at some small bias potential (typically a few tenths of a nanoamp at a few volts DC) so that electrons from the surface under test can tunnel across the gap to the probe tip (or vice versa). The probe is scanned across the surface to be analysed as a feedback system continuously adjusts the vertical position to maintain a constant current. The image is then generated in the same way as for MFM [4] [5]. Other techniques which have been used in the past to analyse magnetic media are the use of ferrofluid in combination with optical microscopes (which, with gigabit/square inch recording density is no longer feasible as the magnetic features are smaller than the wavelength of visible light) and a number of exotic techniques which require significant sample preparation and expensive equipment. In comparison, MFM can be performed through the protective overcoat applied to magnetic media, requires little or no sample preparation, and can produce results in a very short time.

Even for a relatively inexperienced user the time to start getting images of the data on a drive platter is about 5 minutes. To start getting useful images of a particular track requires more than a passing knowledge of disk formats, but these are well-documented, and once the correct location on the platter is found a single image would take approximately 2-10 minutes depending on the skill of the operator and the resolution required. With one of the more expensive MFM's it is possible to automate a collection sequence and theoretically possible to collect an image of the entire disk by changing the MFM controller software.

There are, from manufacturers sales figures, several thousand SPM's in use in the field today, some of which have special features for analysing disk drive platters, such as the vacuum chucks for standard disk drive platters along with specialised modes of operation for magnetic media analysis. These SPM's can be used with sophisticated programmable controllers and analysis software to allow automation of the data recovery process. If commercially-available SPM's are considered too expensive, it is possible to build a reasonably capable SPM for about US$1400, using a PC as a controller [6].

Faced with techniques such as MFM, truly deleting data from magnetic media is very difficult. The problem lies in the fact that when data is written to the medium, the write head sets the polarity of most, but not all, of the magnetic domains. This is partially due to the inability of the writing device to write in exactly the same location each time, and partially due to the variations in media sensitivity and field strength over time and among devices.

In conventional terms, when a one is written to disk the media records a one, and when a zero is written the media records a zero. However the actual effect is closer to obtaining a 0.95 when a zero is overwritten with a one, and a 1.05 when a one is overwritten with a one. Normal disk circuitry is set up so that both these values are read as ones, but using specialised circuitry it is possible to work out what previous "layers" contained. The recovery of at least one or two layers of overwritten data isn't too hard to perform by reading the signal from the analog head electronics with a high-quality digital sampling oscilloscope, downloading the sampled waveform to a PC, and analysing it in software to recover the previously recorded signal. What the software does is generate an "ideal" read signal and subtract it from what was actually read, leaving as the difference the remnant of the previous signal. Since the analog circuitry in a commercial hard drive is nowhere near the quality of the circuitry in the oscilloscope used to sample the signal, the ability exists to recover a lot of extra information which isn't exploited by the hard drive electronics (although with newer channel coding techniques such as PRML (explained further on) which require extensive amounts of signal processing, the use of simple tools such as an oscilloscope to directly recover the data is no longer possible).

Using MFM, we can go even further than this. During normal readback, a conventional head averages the signal over the track, and any remnant magnetization at the track edges simply contributes a small percentage of noise to the total signal. The sampling region is too broad to distinctly detect the remnant magnetization at the track edges, so that the overwritten data which is still present beside the new data cannot be recovered without the use of specialised

MTI0000708

techniques such as MFM or STM (in fact one of the "official" uses of MFM or STM is to evaluate the effectiveness of disk drive servo-positioning mechanisms) [7]. Most drives are capable of microstepping the heads for internal diagnostic and error recovery purposes (typical error recovery strategies consist of rereading tracks with slightly changed data threshold and window offsets and varying the head positioning by a few percent to either side of the track), but writing to the media while the head is off-track in order to erase the remnant signal carries too much risk of making neighbouring tracks unreadable to be useful (for this reason the microstepping capability is made very difficult to access by external means).

These specialised techniques also allow data to be recovered from magnetic media long after the read/write head of the drive is incapable of reading anything useful. For example one experiment in AC erasure involved driving the write head with a 40 MHz square wave with an initial current of 12 mA which was dropped in 2 mA steps to a final level of 2 mA in successive passes, an order of magnitude more than the usual write current which ranges from high microamps to low milliamps. Any remnant bit patterns left by this erasing process were far too faint to be detected by the read head, but could still be observed using MFM [8].

Even with a DC erasure process, traces of the previously recorded signal may persist until the applied DC field is several times the media coercivity [9].

Deviations in the position of the drive head from the original track may leave significant portions of the previous data along the track edge relatively untouched. Newly written data, present as wide alternating light and dark bands in MFM and STM images, are often superimposed over previously recorded data which persists at the track edges. Regions where the old and new data coincide create continuous magnetization between the two. However, if the new transition is out of phase with the previous one, a few microns of erase band with no definite magnetization are created at the juncture of the old and new tracks. The write field in the erase band is above the coercivity of the media and would change the magnetization in these areas, but its magnitude is not high enough to create new well-defined transitions. One experiment involved writing a fixed pattern of all 1's with a bit interval of 2.5 µm, moving the write head off-track by approximately half a track width, and then writing the pattern again with a frequency slightly higher than that of the previously recorded track for a bit interval of 2.45 µm to create all possible phase differences between the transitions in the old and new tracks. Using a 4.2 µm wide head produced an erase band of approximately 1 µm in width when the old and new tracks were 180° out of phase, dropping to almost nothing when the two tracks were in-phase. Writing data at a higher frequency with the original tracks bit interval at 0.5 µm and the new tracks bit interval at 0.49 µm allows a single MFM image to contain all possible phase differences, showing a dramatic increase in the width of the erase band as the two tracks move from in-phase to 180° out of phase [10].

In addition, the new track width can exhibit modulation which depends on the phase relationship between the old and new patterns, allowing the previous data to be recovered even if the old data patterns themselves are no longer distinct. The overwrite performance also depends on the position of the write head relative to the originally written track. If the head is directly aligned with the track, overwrite performance is relatively good; as the head moves offtrack, the performance drops markedly as the remnant components of the original data are read back along with the newly-written signal. This effect is less noticeable as the write frequency increases due to the greater attenuation of the field with distance [11].

When all the above factors are combined it turns out that each track contains an image of everything ever written to it, but that the contribution from each "layer" gets progressively smaller the further back it was made. Intelligence organisations have a lot of expertise in recovering these palimpsestuous images.

# 3. Erasure of Data stored on Magnetic Media

The general concept behind an overwriting scheme is to flip each magnetic domain on the disk back and forth as much as possible (this is the basic idea behind degaussing) without writing the same pattern twice in a row. If the data was encoded directly, we could simply choose the desired overwrite pattern of ones and zeroes and write it repeatedly. However, disks generally use some form of run-length limited (RLL) encoding, so that the adjacent ones won't be written. This encoding is used to ensure that transitions aren't placed too closely together, or too far apart, which would mean the drive would lose track of where it was in the data.

To erase magnetic media, we need to overwrite it many times with alternating patterns in order to expose it to a magnetic field oscillating fast enough that it does the desired flipping of the magnetic domains in a reasonable amount of time. Unfortunately, there is a complication in that we need to saturate the disk surface to the greatest depth possible, and very high frequency signals only "scratch the surface" of the magnetic medium. Disk drive manufacturers, in trying to achieve ever-higher densities, use the highest possible frequencies, whereas we really require the lowest frequency a disk drive can produce. Even this is still rather high. The best we can do is to use the

MTI0000709

lowest frequency possible for overwrites, to penetrate as deeply as possible into the recording medium.

The write frequency also determines how effectively previous data can be overwritten due to the dependence of the field needed to cause magnetic switching on the length of time the field is applied. Tests on a number of typical disk drive heads have shown a difference of up to 20 dB in overwrite performance when data recorded at 40 kFCI (flux changes per inch), typical of recent disk drives, is overwritten with a signal varying from 0 to 100 kFCI. The best average performance for the various heads appears to be with an overwrite signal of around 10 kFCI, with the worst performance being at 100 kFCI [12]. The track write width is also affected by the write frequency - as the frequency increases, the write width decreases for both MR and TFI heads. In [13] there was a decrease in write width of around 20% as the write frequency was increased from 1 to 40 kFCI, with the decrease being most marked at the high end of the frequency range. However, the decrease in write width is balanced by a corresponding increase in the two side- erase bands so that the sum of the two remains nearly constant with frequency and equal to the DC erase width for the head. The media coercivity also affects the width of the write and erase bands, with their width dropping as the coercivity increases (this is one of the explanations for the ever-increasing coercivity of newer, higher-density drives).

To try to write the lowest possible frequency we must determine what decoded data to write to produce a low-frequency encoded signal.

In order to understand the theory behind the choice of data patterns to write, it is necessary to take a brief look at the recording methods used in disk drives. The main limit on recording density is that as the bit density is increased, the peaks in the analog signal recorded on the media are read at a rate which may cause them to appear to overlap, creating intersymbol interference which leads to data errors. Traditional peak detector read channels try to reduce the possibility of intersymbol interference by coding data in such a way that the analog signal peaks are separated as far as possible. The read circuitry can then accurately detect the peaks (actually the head itself only detects transitions in magnetisation, so the simplest recording code uses a transition to encode a 1 and the absence of a transition to encode a 0. The transition causes a positive/negative peak in the head output voltage (thus the name "peak detector read channel"). To recover the data, we differentiate the output and look for the zero crossings. Since a long string of 0's will make clocking difficult, we need to set a limit on the maximum consecutive number of 0's. The separation of peaks is implemented as some form of run-length-limited, or RLL, coding.

The RLL encoding used in most current drives is described by pairs of run-length limits $(d, k)$, where $d$ is the minimum number of 0 symbols which must occur between each 1 symbol in the encoded data, and $k$ is the maximum. The parameters $(d, k)$ are chosen to place adjacent 1's far enough apart to avoid problems with intersymbol interference, but not so far apart that we lose synchronisation.

The grandfather of all RLL codes was FM, which wrote one user data bit followed by one clock bit, so that a 1 bit was encoded as two transitions (1 wavelength) while a 0 bit was encoded as one transition (« wavelength). A different approach was taken in modified FM (MFM), which suppresses the clock bit except between adjacent 0's (the ambiguity in the use of the term MFM is unfortunate. From here on it will be used to refer to modified FM rather than magnetic force microscopy). Taking three example sequences 0000, 1111, and 1010, these will be encoded as 0(1)0(1)0(1)0, 1(0)1(0)1(0)1, and 1(0)0(0)1(0)0 (where the ()s are the clock bits inserted by the encoding process). The maximum time between 1 bits is now three 0 bits (so that the peaks are no more than four encoded time periods apart), and there is always at least one 0 bit (so that the peaks in the analog signal are at least two encoded time periods apart), resulting in a (1,3) RLL code. (1,3) RLL/MFM is the oldest code still in general use today, but is only really used in floppy drives which need to remain backwards-compatible.

These constraints help avoid intersymbol interference, but the need to separate the peaks reduces the recording density and therefore the amount of data which can be stored on a disk. To increase the recording density, MFM was gradually replaced by (2,7) RLL (the original "RLL" format), and that in turn by (1,7) RLL, each of which placed less constraints on the recorded signal.

Using our knowledge of how the data is encoded, we can now choose which decoded data patterns to write in order to obtain the desired encoded signal. The three encoding methods described above cover the vast majority of magnetic disk drives. However, each of these has several possible variants. With MFM, only one is used with any frequency, but the newest (1,7) RLL code has at least half a dozen variants in use. For MFM with at most four bit times between transitions, the lowest write frequency possible is attained by writing the repeating decoded data patterns 1010 and 0101. These have a 1 bit every other "data" bit, and the intervening "clock" bits are all 0. We would also like patterns with every other clock bit set to 1 and all others set to 0, but these are not possible in the MFM encoding (such "violations" are used to generate special marks on the disk to identify sector boundaries). The best we can do here is three bit times between transitions, which is generated by repeating the decoded patterns 100100,

MTI0000710

010010 and 001001. We should use several passes with these patterns, as MFM drives are the oldest, lowest-density drives around (this is especially true for the very-low-density floppy drives). As such, they are the easiest to recover data from with modern equipment and we need to take the most care with them.

From MFM we jump to the next simplest case, which is (1,7) RLL. Although there can be as many as 8 bit times between transitions, the lowest sustained frequency we can have in practice is 6 bit times between transitions. This is a desirable property from the point of view of the clock-recovery circuitry, and all (1,7) RLL codes seem to have this property. We now need to find a way to write the desired pattern without knowing the particular (1,7) RLL code used. We can do this by looking at the way the drives error-correction system works. The error- correction is applied to the decoded data, even though errors generally occur in the encoded data. In order to make this work well, the data encoding should have limited error amplification, so that an erroneous encoded bit should affect only a small, finite number of decoded bits.

Decoded bits therefore depend only on nearby encoded bits, so that a repeating pattern of encoded bits will correspond to a repeating pattern of decoded bits. The repeating pattern of encoded bits is 6 bits long. Since the rate of the code is 2/3, this corresponds to a repeating pattern of 4 decoded bits. There are only 16 possibilities for this pattern, making it feasible to write all of them during the erase process. So to achieve good overwriting of (1,7) RLL disks, we write the patterns 0000, 0001, 0010, 0011, 0100, 0101, 0110, 0111, 1000, 1001, 1010, 1011, 1100, 1101, 1110, and 1111. These patterns also conveniently cover two of the ones needed for MFM overwrites, although we should add a few more iterations of the MFM-specific patterns for the reasons given above.

Finally, we have (2,7) RLL drives. These are similar to MFM in that an eight-bit-time signal can be written in some phases, but not all. A six-bit-time signal will fill in the remaining cracks. Using a « encoding rate, an eight-bit-time signal corresponds to a repeating pattern of 4 data bits. The most common (2,7) RLL code is shown below:

| The most common (2,7) RLL Code | |
| --- | --- |
| Decoded Data | (2,7) RLL Encoded Data |
| 00 | 1000 |
| 01 | 0100 |
| 100 | 001000 |
| 101 | 100100 |
| 111 | 000100 |
| 1100 | 00001000 |
| 1101 | 00100100 |

The second most common (2,7) RLL code is the same but with the "decoded data" complemented, which doesn't alter these patterns. Writing the required encoded data can be achieved for every other phase using patterns of 0x33, 0x66, 0xCC and 0x99, which are already written for (1,7) RLL drives.

Six-bit-time patterns can be written using 3-bit repeating patterns. The all-zero and all-one patterns overlap with the (1,7) RLL patterns, leaving six others:

```
001001001001001001001001
  2   4   9   2   4   9
```

in binary or 0x24 0x92 0x49, 0x92 0x49 0x24 and 0x49 0x24 0x92 in hex, and

```
011011011011011011011011
  6   D   B   6   D   B
```

in binary or 0x6D 0xB6 0xDB, 0xB6 0xDB 0x6D and 0xDB 0x6D 0xB6 in hex. The first three are the same as the MFM patterns, so we need only three extra patterns to cover (2,7) RLL drives.

Although (1,7) is more popular in recent (post-1990) drives, some older hard drives do still use (2,7) RLL, and with the ever-increasing reliability of newer drives it is likely that they will remain in use for some time to come, often being passed down from one machine to another. The above three patterns also cover any problems with endianness issues, which weren't a concern in the previous two cases, but would be in this case (actually, thanks to the strong

MTI0000711

nfluence of IBM mainframe drives, everything seems to be uniformly big-endian within bytes, with the most significant bit being written to the disk first).

The latest high-density drives use methods like Partial-Response Maximum-Likelihood (PRML) encoding, which may be roughly equated to the trellis encoding done by V.32 modems in that it is effective but computationally expensive. PRML codes are still RLL codes, but with somewhat different constraints. A typical code might have (0,4,4) constraints in which the 0 means that 1's in a data stream can occur right next to 0's (so that peaks in the analog readback signal are not separated), the first 4 means that there can be no more than four 0's between 1's in a data stream, and the second 4 specifies the maximum number of 0's between 1's in certain symbol subsequences. PRML codes avoid intersymbol influence errors by using digital filtering techniques to shape the read signal to exhibit desired frequency and timing characteristics (this is the "partial response" part of PRML) followed by maximum-likelihood digital data detection to determine the most likely sequence of data bits that was written to the disk (this is the "maximum likelihood" part of PRML). PRML channels achieve the same low bit error rate as standard peak-detection methods, but with much higher recording densities, while using the same heads and media. Several manufacturers are currently engaged in moving their peak-detection-based product lines across to PRML, giving a 30-40% density increase over standard RLL channels [14].

Since PRML codes don't try to separate peaks in the same way that non-PRML RLL codes do, all we can do is to write a variety of random patterns because the processing inside the drive is too complex to second-guess. Fortunately, these drives push the limits of the magnetic media much more than older drives ever did by encoding data with much smaller magnetic domains, closer to the physical capacity of the magnetic media (the current state of the art in PRML drives has a track density of around 6700 TPI (tracks per inch) and a data recording density of 170 kFCI, nearly double that of the nearest (1,7) RLL equivalent. A convenient side-effect of these very high recording densities is that a written transition may experience the write field cycles for successive transitions, especially at the track edges where the field distribution is much broader [15]. Since this is also where remnant data is most likely to be found, this can only help in reducing the recoverability of the data). If these drives require sophisticated signal processing just to read the most recently written data, reading overwritten layers is also correspondingly more difficult. A good scrubbing with random data will do about as well as can be expected.

We now have a set of 22 overwrite patterns which should erase everything, regardless of the raw encoding. The basic disk eraser can be improved slightly by adding random passes before and after the erase process, and by performing the deterministic passes in random order to make it more difficult to guess which of the known data passes were made at which point. To deal with all this in the overwrite process, we use the sequence of 35 consecutive writes shown below:

previous passes and "echo cancel" passes by subtracting the known overwrite data).

If the device being written to supports caching or buffering of data, this should be disabled to ensure that physical disk writes are performed for each pass instead of everything but the last pass being lost in the buffering. For example physical disk access can be forced during SCSI-2 Group 1 write commands by setting the Force Unit Access bit in the SCSI command block (although at least one popular drive has a bug which causes all writes to be ignored when this bit is set - remember to test your overwrite scheme before you deploy it). Another consideration which needs to be taken into account when trying to erase data through software is that drives conforming to some of the higher-level protocols such as the various SCSI standards are relatively free to interpret commands sent to them in whichever way they choose (as long as they still conform to the SCSI specification). Thus some drives, if sent a FORMAT UNIT command may return immediately without performing any action, may simply perform a read test on the entire disk (the most common option), or may actually write data to the disk (the SCSI- 2 standard includes an initialization pattern (IP) option for the FORMAT UNIT command, however this is not necessarily supported by existing drives).

If the data is very sensitive and is stored on floppy disk, it can best be destroyed by removing the media from the disk liner and burning it, or by burning the entire disk, liner and all (most floppy disks burn remarkably well - albeit with quantities of oily smoke - and leave very little residue).

## 4. Other Methods of Erasing Magnetic Media

The previous section has concentrated on erasure methods which require no specialised equipment to perform the erasure. Alternative means of erasing media which do require specialised equipment are degaussing (a process in which the recording media is returned to its initial state) and physical destruction. Degaussing is a reasonably effective means of purging data from magnetic disk media, and will even work through most drive cases (research has shown that the aluminium housings of most disk drives attenuate the degaussing field by only about 2 dB [16]).

The switching of a single-domain magnetic particle from one magnetization direction to another requires the overcoming of an energy barrier, with an external magnetic field helping to lower this barrier. The switching depends not only on the magnitude of the external field, but also on the length of time for which it is applied. For typical disk drive media, the short-term field needed to flip enough of the magnetic domains to be useful in recording a signal is about 1/3 higher than the coercivity of the media (the exact figure varies with different media types) [17].

However, to effectively erase a medium to the extent that recovery of data from it becomes uneconomical requires a magnetic force of about five times the coercivity of the medium [18], although even small external magnetic fields are sufficient to upset the normal operation of a hard disk (typically a few gauss at DC, dropping to a few milligauss at 1 MHz). Coercivity (measured in Oersteds, Oe) is a property of magnetic material and is defined as the amount of magnetic field necessary to reduce the magnetic induction in the material to zero - the higher the coercivity, the harder it is to erase data from a medium. Typical figures for various types of magnetic media are given below:

| Typical Media Coercivity Figures | |
| --- | --- |
| Medium | Coercivity |
| 5.25" 360K floppy disk | 300 Oe |
| 5.25" 1.2M floppy disk | 675 Oe |
| 3.5" 720K floppy disk | 300 Oe |
| 3.5" 1.44M floppy disk | 700 Oe |
| 3.5" 2.88M floppy disk | 750 Oe |
| 3.5" 21M floptical disk | 750 Oe |
| Older (1980's) hard disks | 900-1400 Oe |
| Newer (1990's) hard disks | 1400-2200 Oe |
| 1/2" magnetic tape | 300 Oe |
| 1/4" QIC tape | 550 Oe |
| 8 mm metallic particle tape | 1500 Oe |
| DAT metallic particle tape | 1500 Oe |

MTI0000713

| Pass No. | Data Written | Encoding Scheme Targeted | | |
|---|---|---|---|---|
| 1 | Random | | | |
| 2 | Random | | | |
| 3 | Random | | | |
| 4 | Random | | | |
| 5 | 01010101 01010101 01010101 0x55 | (1,7) RLL | | MFM |
| 6 | 10101010 10101010 10101010 0xAA | (1,7) RLL | | MFM |
| 7 | 10010010 01001001 00100100 0x92 0x49 0x24 | | (2,7) RLL | MFM |
| 8 | 01001001 00100100 10010010 0x49 0x24 0x92 | | (2,7) RLL | MFM |
| 9 | 00100100 10010010 01001001 0x24 0x92 0x49 | | (2,7) RLL | MFM |
| 10 | 00000000 00000000 00000000 0x00 | (1,7) RLL | (2,7) RLL | |
| 11 | 00010001 00010001 00010001 0x11 | (1,7) RLL | | |
| 12 | 00100010 00100010 00100010 0x22 | (1,7) RLL | | |
| 13 | 00110011 00110011 00110011 0x33 | (1,7) RLL | (2,7) RLL | |
| 14 | 01000100 01000100 01000100 0x44 | (1,7) RLL | | |
| 15 | 01010101 01010101 01010101 0x55 | (1,7) RLL | | MFM |
| 16 | 01100110 01100110 01100110 0x66 | (1,7) RLL | (2,7) RLL | |
| 17 | 01110111 01110111 01110111 0x77 | (1,7) RLL | | |
| 18 | 10001000 10001000 10001000 0x88 | (1,7) RLL | | |
| 19 | 10011001 10011001 10011001 0x99 | (1,7) RLL | (2,7) RLL | |
| 20 | 10101010 10101010 10101010 0xAA | (1,7) RLL | MFM | |
| 21 | 10111011 10111011 10111011 0xBB | (1,7) RLL | | |
| 22 | 11001100 11001100 11001100 0xCC | (1,7) RLL | (2,7) RLL | |
| 23 | 11011101 11011101 11011101 0xDD | (1,7) RLL | | |
| 24 | 11101110 11101110 11101110 0xEE | (1,7) RLL | | |
| 25 | 11111111 11111111 11111111 0xFF | (1,7) RLL | (2,7) RLL | |
| 26 | 10010010 01001001 00100100 0x92 0x49 0x24 | | (2,7) RLL | MFM |
| 27 | 01001001 00100100 10010010 0x49 0x24 0x92 | | (2,7) RLL | MFM |
| 28 | 00100100 10010010 01001001 0x24 0x92 0x49 | | (2,7) RLL | MFM |
| 29 | 01101101 10110110 11011011 0x6D 0xB6 0xDB | | (2,7) RLL | |
| 30 | 10110110 11011011 01101101 0xB6 0xDB 0x6D | | (2,7) RLL | |
| 31 | 11011011 01101101 10110110 0xDB 0x6D 0xB6 | | (2,7) RLL | |
| 32 | Random | | | |
| 33 | Random | | | |
| 34 | Random | | | |
| 35 | Random | | | |

The MFM-specific patterns are repeated twice because MFM drives have the lowest density and are thus particularly easy to examine. The deterministic patterns between the random writes are permuted before the write is performed, to make it more difficult for an opponent to use knowledge of the erasure data written to attempt to recover overwritten data (in fact we need to use a cryptographically strong random number generator to perform the permutations to avoid the problem of an opponent who can read the last overwrite pass being able to predict the

MTI0000714

US Government guidelines class tapes of 350 Oe coercivity or less as low-energy or Class I tapes and tapes of 350-750 Oe coercivity as high-energy or Class II tapes. Degaussers are available for both types of tapes. Tapes of over 750 Oe coercivity are referred to as Class III, with no known degaussers capable of fully erasing them being known [19], since even the most powerful commercial AC degausser cannot generate the recommended 7,500 Oe needed for full erasure of a typical DAT tape currently used for data backups.

Degaussing of disk media is somewhat more difficult - even older hard disks generally have a coercivity equivalent to Class III tapes, making them fairly difficult to erase at the outset. Since manufacturers rate their degaussers in peak gauss and measure the field at a certain orientation which may not be correct for the type of medium being erased, and since degaussers tend to be rated by whether they erase sufficiently for clean rerecording rather than whether they make the information impossible to recover, it may be necessary to resort to physical destruction of the media to completely sanitise it (in fact since degaussing destroys the sync bytes, ID fields, error correction information, and other paraphernalia needed to identify sectors on the media, thus rendering the drive unusable, it makes the degaussing process mostly equivalent to physical destruction). In addition, like physical destruction, it requires highly specialised equipment which is expensive and difficult to obtain (one example of an adequate degausser was the 2.5 MW Navy research magnet used by a former Pentagon site manager to degauss a 14" hard drive for 1« minutes. It bent the platters on the drive and probably succeeded in erasing it beyond the capabilities of any data recovery attempts [20]).

# 5. Further Problems with Magnetic Media

A major issue which cannot be easily addressed using any standard software-based overwrite technique is the problem of defective sector handling. When the drive is manufactured, the surface is scanned for defects which are added to a defect list or flaw map. If further defects, called grown defects, occur during the life of the drive, they are added to the defect list by the drive or by drive management software. There are several techniques which are used to mask the defects in the defect list. The first, alternate tracks, moves data from tracks with defects to known good tracks. This scheme is the simplest, but carries a high access cost, as each read from a track with defects requires seeking to the alternate track and a rotational latency delay while waiting for the data location to appear under the head, performing the read or write, and, if the transfer is to continue onto a neighbouring track, seeking back to the original position. Alternate tracks may be interspersed among data tracks to minimise the seek time to access them.

A second technique, alternate sectors, allocates alternate sectors at the end of the track to minimise seeks caused by defective sectors. This eliminates the seek delay, but still carries some overhead due to rotational latency. In addition it reduces the usable storage capacity by 1-3%.

A third technique, inline sector sparing, again allocates a spare sector at the end of each track, but resequences the sector ID's to skip the defective sector and include the spare sector at the end of the track, in effect pushing the sectors past the defective one towards the end of the track. The associated cost is the lowest of the three, being one sector time to skip the defective sector [21].

The handling of mapped-out sectors and tracks is an issue which can't be easily resolved without the cooperation of hard drive manufacturers. Although some SCSI and IDE hard drives may allow access to defect lists and even to mapped-out areas, this must be done in a highly manufacturer- and drive-specific manner. For example the SCSI-2 READ DEFECT DATA command can be used to obtain a list of all defective areas on the drive. Since SCSI logical block numbers may be mapped to arbitrary locations on the disk, the defect list is recorded in terms of heads, tracks, and sectors. As all SCSI device addressing is performed in terms of logical block numbers, mapped-out sectors or tracks cannot be addressed. The only reasonably portable possibility is to clear various automatic correction flags in the read-write error recovery mode page to force the SCSI device to report read/write errors to the user instead of transparently remapping the defective areas. The user can then use the READ LONG and WRITE LONG commands (which allow access to sectors and extra data even in the presence of read/write errors), to perform any necessary operations on the defective areas, and then use the REASSIGN BLOCKS command to reassign the defective sections. However this operation requires an in-depth knowledge of the operation of the SCSI device and extensive changes to disk drivers, and more or less defeats the purpose of having an intelligent peripheral.

The ANSI X3T-10 and X3T-13 subcommittees are currently looking at creating new standards for a Universal Security Reformat command for IDE and SCSI hard disks which will address these issues. This will involve a multiple-pass overwrite process which covers mapped-out disk areas with deliberate off-track writing. Many drives available today can be modified for secure erasure through a firmware upgrade, and once the new firmware is in place the erase procedure is handled by the drive itself, making unnecessary any interaction with the host system beyond the sending of the command which begins the erase process.

MTI0000715

Long-term ageing can also have a marked effect on the erasability of magnetic media. For example, some types of magnetic tape become increasingly difficult to erase after being stored at an elevated temperature or having contained the same magnetization pattern for a considerable period of time [22]. The same applies for magnetic disk media, with decreases in erasability of several dB being recorded [23]. The erasability of the data depends on the amount of time it has been stored on the media, not on the age of the media itself (so that, for example, a five-year-old freshly-written disk is no less erasable than a new freshly-written disk).

The dependence of media coercivity on temperature can affect overwrite capability if the data was initially recorded at a temperature where the coercivity was low (so that the recorded pattern penetrated deep into the media), but must be overwritten at a temperature where the coercivity is relatively high. This is important in hard disk drives, where the temperature varies depending on how long the unit has been used and, in the case of drives with power-saving features enabled, how recently and frequently it has been used. However the overwrite performance depends not only on temperature-dependent changes in the media, but also on temperature-dependent changes in the read/write head. Thankfully the combination of the two common media used in current drives with various common types of read/write heads produce a change in overwrite performance of only a few hundredths of a decibel per degree over the temperature range -40°C to +40°C, as changes in the head compensate for changes in the media [24].

Another issue which needs to be taken into account is the ability of most newer storage devices to recover from having a remarkable amount of damage inflicted on them through the use of various error-correction schemes. As increasing storage densities began to lead to multiple-bit errors, manufacturers started using sophisticated error-correction codes (ECC's) capable of correcting multiple error bursts. A typical drive might have 512 bytes of data, 4 bytes of CRC, and 11 bytes of ECC per sector. This ECC would be capable of correcting single burst errors of up to 22 bits or double burst errors of up to 11 bits, and can detect a single burst error of up to 51 bits or three burst errors of up to 11 bits in length [25]. Another drive manufacturer quotes the ability to correct up to 120 bits, or up to 32 bits on the fly, using 198-bit Reed-Solomon ECC [26]. Therefore even if some data is reliably erased, it may be possible to recover it using the built-in error-correction capabilities of the drive. Conversely, any erasure scheme which manages to destroy the ECC information (for example through the use of the SCSI-2 WRITE LONG command which can be used to write to areas of a disk sector outside the normal data areas) stands a greater chance of making the data unrecoverable.

# 6. Sidestepping the Problem

The easiest way to solve the problem of erasing sensitive information from magnetic media is to ensure that it never gets to the media in the first place. Although not practical for general data, it is often worthwhile to take steps to keep particularly important information such as encryption keys from ever being written to disk. This would typically happen when the memory containing the keys is paged out to disk by the operating system, where they can then be recovered at a later date, either manually or using software which is aware of the in-memory data format and can locate it automatically in the swap file (for example there exists software which will search the Windows swap file for keys from certain DOS encryption programs). An even worse situation occurs when the data is paged over a network, allowing anyone with a packet sniffer or similar tool on the same subnet to observe the information (for example there exists software which will monitor and even alter NFS traffic on the fly which could be modified to look for known in-memory data patterns moving to and from a networked swap disk [27]).

To solve these problems the memory pages containing the information can be locked to prevent them from being paged to disk or transmitted over a network. This approach is taken by at least one encryption library, which allocates all keying information inside protected memory blocks visible to the user only as opaque handles, and then optionally locks the memory (provided the underlying OS allows it) to prevent it from being paged [28]. The exact details of locking pages in memory depend on the operating system being used. Many Unix systems now support the mlock()/munlock() calls or have some alternative mechanism hidden among the mmap()-related functions which can be used to lock pages in memory. Unfortunately these operations require superuser priviledges because of their potential impact on system performance if large ranges of memory are locked. Other systems such as Microsoft Windows NT allow user processes to lock memory with the VirtualLock()/VirtualUnlock() calls, but limit the total number of regions which can be locked.

Most paging algorithms are relatively insensitive to having sections of memory locked, and can even relocate the locked pages (since the logical to physical mapping is invisible to the user), or can move the pages to a "safe" location when the memory is first locked. The main effect of locking pages in memory is to increase the minimum working set size which, taken in moderation, has little noticeable effect on performance. The overall effects depend on the operating system and/or hardware implementations of virtual memory. Most Unix systems have a global page replacement policy in which a page fault may be satisfied by any page frame. A smaller number of operating systems

MTI0000716

use a local page replacement policy in which pages are allocated from a fixed (or occasionally dynamically variable) number of page frames allocated on a per- process basis. This makes them much more sensitive to the effects of locking pages, since every locked page decreases the (finite) number of pages available to the process. On the other hand it makes the system as a whole less sensitive to the effects of one process locking a large number of pages. The main effective difference between the two is that under a local replacement policy a process can only lock a small fixed number of pages without affecting other processes, whereas under a global replacement policy the number of pages a process can lock is determined on a system-wide basis and may be affected by other processes.

In practice neither of these allocation strategies seem to cause any real problems. Although any practical measurements are very difficult to perform since they vary wildly depending on the amount of physical memory present, paging strategy, operating system, and system load, in practice locking a dozen 1K regions of memory (which might be typical of a system on which a number of users are running programs such as mail encryption software) produced no noticeable performance degradation observable by system- monitoring tools. On machines such as network servers handling large numbers of secure connections (for example an HTTP server using SSL), the effects of locking large numbers of pages may be more noticeable.

# 7. Methods of Recovery for Data stored in Random-Access Memory

Contrary to conventional wisdom, "volatile" semiconductor memory does not entirely lose its contents when power is removed. Both static (SRAM) and dynamic (DRAM) memory retains some information on the data stored in it while power was still applied. SRAM is particularly susceptible to this problem, as storing the same data in it over a long period of time has the effect of altering the preferred power-up state to the state which was stored when power was removed. Older SRAM chips could often "remember" the previously held state for several days. In fact, it is possible to manufacture SRAM's which always have a certain state on power-up, but which can be overwritten later on - a kind of "writeable ROM".

DRAM can also "remember" the last stored state, but in a slightly different way. It isn't so much that the charge (in the sense of a voltage appearing across a capacitance) is retained by the RAM cells, but that the thin oxide which forms the storage capacitor dielectric is highly stressed by the applied field, or is not stressed by the field, so that the properties of the oxide change slightly depending on the state of the data. One thing that can cause a threshold shift in the RAM cells is ionic contamination of the cell(s) of interest, although such contamination is rarer now than it used to be because of robotic handling of the materials and because the purity of the chemicals used is greatly improved. However, even a perfect oxide is subject to having its properties changed by an applied field. When it comes to contaminants, sodium is the most common offender - it is found virtually everywhere, and is a fairly small (and therefore mobile) atom with a positive charge. In the presence of an electric field, it migrates towards the negative pole with a velocity which depends on temperature, the concentration of the sodium, the oxide quality, and the other impurities in the oxide such as dopants from the processing. If the electric field is zero and given enough time, this stress tends to dissipate eventually.

The stress on the cell is a cumulative effect, much like charging an RC circuit. If the data is applied for only a few milliseconds then there is very little "learning" of the cell, but if it is applied for hours then the cell will acquire a strong (relatively speaking) change in its threshold. The effects of the stress on the RAM cells can be measured using the built-in self test capabilities of the cells, which provide the ability to impress a weak voltage on a storage cell in order to measure its margin. Cells will show different margins depending on how much oxide stress has been present. Many DRAM's have undocumented test modes which allow some normal I/O pin to become the power supply for the RAM core when the special mode is active. These test modes are typically activated by running the RAM in a nonstandard configuration, so that a certain set of states which would not occur in a normally-functioning system has to be traversed to activate the mode. Manufacturers won't admit to such capabilities in their products because they don't want their customers using them and potentially rejecting devices which comply with their spec sheets, but have little margin beyond that.

A simple but somewhat destructive method to speed up the annihilation of stored bits in semiconductor memory is to heat it. Both DRAM's and SRAM's will lose their contents a lot more quickly at Tjunction = 140°C than they will at room temperature. Several hours at this temperature with no power applied will clear their contents sufficiently to make recovery difficult. Conversely, to extend the life of stored bits with the power removed, the temperature should be dropped below -60°C. Such cooling should lead to weeks, instead of hours or days, of data retention.

# 8. Erasure of Data stored in Random-Access Memory

Simply repeatedly overwriting the data held in DRAM with new data isn't nearly as effective as it is for magnetic

MTI0000717

media. The new data will begin stressing    relaxing the oxide as soon as it is written, and the oxide will immediately begin to take a "set" which will either reinforce the previous "set" or will weaken it. The greater the amount of time that new data has existed in the cell, the more the old stress is "diluted", and the less reliable the information extraction will be. Generally, the rates of change due to stress and relaxation are in the same order of magnitude. Thus, a few microseconds of storing the opposite data to the currently stored value will have little effect on the oxide. Ideally, the oxide should be exposed to as much stress at the highest feasible temperature and for as long as possible to get the greatest "erasure" of the data. Unfortunately if carried too far this has a rather detrimental effect on the life expectancy of the RAM.

Therefore the goal to aim for when sanitising memory is to store the data for as long as possible rather than trying to change it as often as possible. Conversely, storing the data for as short a time as possible will reduce the chances of it being "remembered" by the cell. Based on tests on DRAM cells, a storage time of one second causes such a small change in threshold that it probably isn't detectable. On the other hand, one minute is probably detectable, and 10 minutes is certainly detectable.

The most practical solution to the problem of DRAM data retention is therefore to constantly flip the bits in memory to ensure that a memory cell never holds a charge long enough for it to be "remembered". While not practical for general use, it is possible to do this for small amounts of very sensitive data such as encryption keys. This is particularly advisable where keys are stored in the same memory location for long periods of time and control access to large amounts of information, such as keys used for transparent encryption of files on disk drives. The bit-flipping also has the convenient side-effect of keeping the page containing the encryption keys at the top of the queue maintained by the system's paging mechanism, greatly reducing the chances of it being paged to disk at some point.

## 9. Conclusion

Data overwritten once or twice may be recovered by subtracting what is expected to be read from a storage location from what is actually read. Data which is overwritten an arbitrarily large number of times can still be recovered provided that the new data isn't written to the same location as the original data (for magnetic media), or that the recovery attempt is carried out fairly soon after the new data was written (for RAM). For this reason it is effectively impossible to sanitise storage locations by simple overwriting them, no matter how many overwrite passes are made or what data patterns are written. However by using the relatively simple methods presented in this paper the task of an attacker can be made significantly more difficult, if not prohibitively expensive.

## Acknowledgments

The author would like to thank Nigel Bree, Peter Fenwick, Andy Hospodor, Kevin Martinez, Colin Plumb, and Charles Preston for their advice and input during the preparation of this paper.

## References

[1] "Emergency Destruction of Information Storing Media", M.Slusarczuk et al, Institute for Defense Analyses, December 1987.

[2] "A Guide to Understanding Data Remanence in Automated Information Systems", National Computer Security Centre, September 1991.

[3] "Detection of Digital Information from Erased Magnetic Disks", Venugopal Veeravalli, Masters thesis, Carnegie-Mellon University, 1987.

[4] "Magnetic force microscopy: General principles and application to longitudinal recording media", D.Rugar, H.Mamin, P.Guenther, S.Lambert, J.Stern, I.McFadyen, and T.Yogi, *Journal of Applied Physics*, Vol.68, No.3 (August 1990), p.1169.

[5] "Tunneling-stabilized Magnetic Force Microscopy of Bit Tracks on a Hard Disk", Paul Rice and John Moreland, *IEEE Trans.on Magnetics*, Vol.27, No.3 (May 1991), p.3452.

[6] "NanoTools: The Homebrew STM Page", Jim Rice, NanoTools: The Homebrew STM Page.

[7] "Magnetic Force Scanning Tunnelling Microscope Imaging of Overwritten Data", Romel Gomez, Amr Adly, Isaak Mayergoyz, Edward Burke, *IEEE Trans.on Magnetics*, Vol.28, No.5 (September 1992), p.3141.

MTI0000718

[8] "Comparison of Magnetic Fields of Thin-Film Heads and Their Corresponding Patterns Using Magnetic Force Microscopy", Paul Rice, Bill Hallett, and John Moreland, *IEEE Trans.on Magnetics*, **Vol.30, No.6** (November 1994), p.4248.

[9] "Computation of Magnetic Fields in Hysteretic Media", Amr Adly, Isaak Mayergoyz, Edward Burke, *IEEE Trans.on Magnetics*, **Vol.29, No.6** (November 1993), p.2380.

[10] "Magnetic Force Microscopy Study of Edge Overwrite Characteristics in Thin Film Media", Jian- Gang Zhu, Yansheng Luo, and Juren Ding, *IEEE Trans.on Magnetics*, **Vol.30, No.6** (November 1994), p.4242.

[11] "Microscopic Investigations of Overwritten Data", Romel Gomez, Edward Burke, Amr Adly, Isaak Mayergoyz, J.Gorczyca, *Journal of Applied Physics*, **Vol.73, No.10** (May 1993), p.6001.

[12] "Relationship between Overwrite and Transition Shift in Perpendicular Magnetic Recording", Hiroaki Muraoka, Satoshi Ohki, and Yoshihisa Nakamura, *IEEE Trans.on Magnetics*, **Vol.30, No.6** (November 1994), p.4272.

[13] "Effects of Current and Frequency on Write, Read, and Erase Widths for Thin-Film Inductive and Magnetoresistive Heads", Tsann Lin, Jodie Christner, Terry Mitchell, Jing-Sheng Gau, and Peter George, *IEEE Trans.on Magnetics*, **Vol.25, No.1** (January 1989), p.710.

[14] "PRML Read Channels: Bringing Higher Densities and Performance to New-Generation Hard Drives", Quantum Corporation, 1995.

[15] "Density and Phase Dependence of Edge Erase Band in MR/Thin Film Head Recording", Yansheng Luo, Terence Lam, Jian-Gang Zhu, *IEEE Trans.on Magnetics*, **Vol.31, No.6** (November 1995), p.3105.

[16] "A Guide to Understanding Data Remanence in Automated Information Systems", National Computer Security Centre, September 1991.

[17] "Time-dependant Magnetic Phenomena and Particle-size Effects in Recording Media", *IEEE Trans.on Magnetics*, **Vol.26, No.1** (January 1990), p.193.

[18] "The Data Dilemna", Charles Preston, Security Management Journal, February 1995.

[19] "Magnetic Tape Degausser", NSA/CSS Specification L14-4-A, 31 October 1985.

[20] "How many times erased does DoD want?", David Hayes, posting to comp.periphs.scsi newsgroup, 24 July 1991, message-ID 1991Jul24.050701.16005@sulaco.lone star.org.

[21] "The Changing Nature of Disk Controllers", Andrew Hospodor and Albert Hoagland, *Proceedings of the IEEE*, **Vol.81, No.4** (April 1993), p.586.

[22] "Annealing Study of the Erasability of High Energy Tapes", L.Lekawat, G.Spratt, and M.Kryder, *IEEE Trans.on Magnetics*, **Vol.29, No.6** (November 1993), p.3628.

[23] "The Effect of Aging on Erasure in Particulate Disk Media", K.Mountfield and M.Kryder, *IEEE Trans.on Magnetics*, **Vol.25, No 5** (September 1989), p.3638.

[24] "Overwrite Temperature Dependence for Magnetic Recording", Takayuki Takeda, Katsumichi Tagami, and Takaaki Watanabe, *Journal of Applied Physics*, **Vol.63, No.8** (April 1988), p.3438.

[25] Conner 3.5" hard drive data sheets, 1994, 1995.

[26] "Technology and Time-to-Market: The Two Go Hand-in-Hand", Quantum Corporation, 1995.

[27] "Basic Flaws in Internet Security and Commerce", Paul Gauthier, posting to comp.security.unix newsgroup, 9 October 1995, message-ID gauthier.813274073@espresso.cs.ber keley.edu.

[28] "cryptlib Free Encryption Library", Peter Gutmann, cryptlib.

MTI0000719

*Secure Deletion of Data from Magnetic and Solid-State Memory / Peter Gutmann / pgut001@cs.auckland.ac.nz*

19-9-2002 17:4

MTI0000720



#3 Bech
3-22-04
Patent

Attorney's Docket No.  0032-0003

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of ) | |
| ) | |
| Steven BRESS et al. ) | Group Art Unit: 2187 |
| ) | |
| Application No.: 09/961,417 ) | Examiner:  N. V. Dinh |
| ) | |
| Filed:  September 25, 2001 ) | |
| ) | |
| For:  WRITE PROTECTION FOR ) | |
| COMPUTER LONG-TERM ) | |
| MEMORY DEVICES ) | |

**RECEIVED**

MAR 1 2 2004

Technology Center 2100

### INFORMATION DISCLOSURE STATEMENT
### TRANSMITTAL LETTER

U.S. Patent and Trademark Office
2011 South Clark Place
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

Enclosed is an Information Disclosure Statement and accompanying form PTO-1449 for

the above-identified patent application.

☒   No additional fee for submission of the IDS is required.

☐   The fee of $180.00 as set forth in 37 C.F.R. § 1.17(p) is also enclosed.

☒   A certification under 37 C.F.R. § 1.97(e) is also enclosed.

☐   Charge $ _____ to Deposit Account No.  50-1070 for the fee due.

☐   A check in the amount of $ _____     is enclosed for the fee due.

MTI0000721

Information Disclosure Statement Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

The Commissioner is hereby authorized to charge any appropriate fees under 37 C.F.R.

§§ 1.16, 1.17 and 1.21 that may be required by this paper, and to credit any overpayment, to

Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
    Brian E. Ledell
    Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date: March 11, 2004

MTI0000722



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

26615     7590     05/27/2004

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA   22030

| EXAMINER |
|---|
| DINH, NGOC V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2187 | |

DATE MAILED: 05/27/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

MTI0000723

*P-PG*

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/961,417 | BRESS ET AL. |
| | Examiner | Art Unit |
| | NGOC V DINH | 2187 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _03_ MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on _11 March 2004_.
2a) ☒ This action is **FINAL**.   2b) ☐ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4) ☒ Claim(s) _1,3-11,13-17,19-26,28,32,34-40,42-49,51-54 and 56_ is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☐ Claim(s) _1,3-9,15-17,19-24,32,34-40,42-45,48,49,51-54 and 56_ is/are rejected.
7) ☐ Claim(s) _10,11,13,14,25,26,28,46 and 47_ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All   b)☐ Some *   c)☐ None of:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

## Attachment(s)

| | |
|---|---|
| 1) ☒ Notice of References Cited (PTO-892) | 4) ☐ Interview Summary (PTO-413) |
| 2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948) | Paper No(s)/Mail Date. _____ |
| 3) ☒ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08) Paper No(s)/Mail Date _13_. | 5) ☐ Notice of Informal Patent Application (PTO-152) |
| | 6) ☐ Other: _____. |

MTI0000724

Application/Control Number: 09/961,417                                    Page 2
Art Unit: 2187

## DETAILED ACTION

1.  This Office Action is responsive to Amendment filed 3/11/04 in which claims 1,

10, 15, 32, 34, 38, 49, 56   are amended. Claims 2, 12, 18, 27, 29-31, 33, 41, 50, 55

are canceled.

Applicant's previous arguments are moot with in view of the new rejection.


## INFORMATION DISCLOSURE STATEMENT

2.  The Applicant's submission of the IDS filed 3/11/04 have been considered. As

required by M.P.E.P.  609 C(2), a copy of the PTOL-1449 is attached to the instant

office action.


### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of
> this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art
> to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 1, 4-8, 32, 34, 36-39, 42-44, 48 are rejected under 35 U.S.C 103(a) as being

unpatentable over Bergsten PN 6,345,368, in view of Kern et al PN 6,336,187, and

further in view of Shaath et al PN 6,654,864.

## 3.  As per claim 1:

Bergsten teaches blocking device [e.g., storage controller allows data block to be write

protected, col. 15, lines 65-66; Fig. 1] connected between a host and a storage device, the

blocking device comprising: an interface emulator [21; fig. 4] configured to emulate an

interface presented by the storage device; an interface for connecting to the storage

device; and a processor coupled to the interface emulator and the interface [col. 6, lines

22-30]; the storage controller is transparent to the host and storage device [abstract; col.

5, lines 48-55];

Bergsten does not teach a processor coupled to the interface emulator and the interface,

the processor examining commands received through the interface emulator that are

Application/Control Number: 09/961,417                                   Page 3
Art Unit: 2187

generated by the host and intended for the storage device, the processor allowing only
those of the commands that match a predetermined set of commands.

Kern teaches a processor [122, fig. 1; col. 4, lines 62-67; fig. 2] coupled to the interface
emulator and the interface, the processor examining commands received through the
interface emulator that are generated by the host and intended for the storage device, the
processor allowing only those of the commands that match a predetermined set of
commands [e.g., reference location, operation parameters; col. 7, lines 34-60 to pass to
the storage device via the interface [col. 1, lines 50-65; col. 2, line 45 to col. 3, line 10;
col. 4, lines 51-65; col. 5, lines 5-15].

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to include a blocking device [106, fig. 1] comprising a processor of
Kern into Bergsten's computer system in order to provide write protected for data blocks,
virus protection, therefore the security firewalls of the system is increased [col. 15, line
65 to col. 16, line 5].

Bergsten does not teach the predetermined set of commands being commands that are
known to not permanently modify a state of the storage device.

Shaath teaches the predetermined set of commands being commands [e.g., comparing
the intercepted file system command to each of the at least a disabled file system
command, abstract; col. 2, lines 45-55] that are known to not permanently modify a state
of the storage device [e.g., file delete, file overwrite; abstract; col. 3, lines 1-60; col. 7,
lines 40-50; col. 8, lines 6-45; formatting, col. 9, lines 10-20].

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to include the teaching of Shaath as mentioned above into Bergsten-
Kern system in order to prevent alteration or deletion of the data [Shaath et al, col. 15-
19].

**4. As per claims 4, 42:**

Bergsten teaches the processor receives data back from the storage device in response to
the commands passed to the storage device and forwards the received data to the host
through the interface emulator [fig. 1, 2].

MTI0000726

Application/Control Number: 09/961,417                                      Page 4
Art Unit: 2187

**5.  As per claims 5, 43:**

Bergsten-Kern teaches the claimed limitations as mentioned above.

Bergsten-Kern does not teach when the commands includes a capabilities request command relating to the storage device, the processor modified data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as effected by the presence of the blocking device.

Shaath teaches when the commands includes a capabilities request command relating to the storage device, the processor modified data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as effected by the presence of the blocking device [col. 8, lines 40-45; col. 9, lines 30-40].

**6.  As per claims 6, 44:**

Bergsten does not teach the processor drops those of the commands that do not match the predetermined set of commands, and after dropping one of the matching commands, return status information to the host that indicates that the dropped command was successfully completed.

Kern teaches the processor drops those of the commands that do not match the predetermined set of commands, and after dropping one of the matching commands, return status information to the host [e.g., error condition; col. 3, lines 5-10; col. 10, lines 1-10] that indicates that the dropped command was successfully completed.

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include the teaching of Kern as mentioned above into Bergsten-Shaath's computer system in order to provide write protected for data blocks, virus protection, therefore the security firewalls of the system is increased [col. 15, line 65 to col. 16, line 5].

**7.  As per claims 7-8:**

Bergsten teaches additional interfaces for connecting to additional storage devices, and each of the interfaces is independently coupled to the processor [fig. 1,2; col. 17, lines 55-65].

MTI0000727

Application/Control Number: 09/961,417                                    Page 5
Art Unit: 2187

**8.  As per claims 32, 34, 36-37:**

Claims 32, 34, 36-37 basically are the operating steps that carried out by the
corresponding elements in claims 1, 3-11, 13-14. Accordingly, claims 32, 34, 36-37 are
rejected as the same reasons as set forth in claims 1, 3-11, 13-14.

**9.  As per claims 38-39:**

The blocking device as claimed in claims 38-39 are rejected for the same reasons as set
forth in claim 1. The further limitations "a host computer" taught by Bergsten [fig. 1].

**10.  As per claim 48:**

Bergsten-Shaath teaches the claimed limitation as mentioned above.

Bergsten-Shaath does not teach a user configuration memory storing instructions that
defined protected areas on the storage device, the blocking device dropping those of the
commands that would otherwise modify the protected areas on the storage device.

Kern teaches user configuration memory storing instructions that defined protected areas
on the storage device, the blocking device dropping those of the commands that would
otherwise modify the protected areas on the storage device [col. 5, lines 1-30; col. 9, line
48 to col. 10, line 10].

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to include the teaching of Kern as mentioned above into Bergsten-
Shaath's computer system in order to provide write protected for data blocks, virus
protection, therefore the security firewalls of the system is increased [col. 15, line 65 to
col. 16, line 5].


Claim 49, 52 are rejected under 35 U.S.C 103(a) as being unpatentable over Bergsten, in
view of Shaath.

**11.  As per claim 49:**

Bergsten teaches a blocking device comprising: means for intercepting communications
between a host and a storage device; the blocking device operates transparently to normal
operation of the host and the storage device [fig. 1; abstract; col. 5, lines 48-55].

Bergsten does not teach means for comparing commands in the communications between
the host and the storage device to a predetermined set of commands; means for

MTI0000728

Application/Control Number: 09/961,417                                    Page 6
Art Unit: 2187

forwarding selected ones of commands in the intercepted communications to the storage
device based on the comparison; and means for blocking selected other ones of the
commands from being received by the storage device based on the comparison.

Shaath teaches a method for comparing commands in the communications between the
host and the storage device to a predetermined set of commands; means for forwarding
selected ones of commands in the intercepted communications to the storage device
based on the comparison; and means for blocking selected other ones of the commands
from being received by the storage device based on the comparison [col. 3, lines 13-55;
col. 8, lines 5-45; col. 10, lines 22-65].

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to include the teaching of Shaath as mentioned above into Bergsten
system in order to prevent alteration or deletion of the data [Shaath et al, col. 15-19].

**12.  As per claim 52:**

Bergsten teaches the claimed limitations as mentioned above.

Bergsten does not teach when the commands includes a capabilities request command
relating to the storage device, the processor modified data received from the storage
device relating to the capabilities request command to reflect the capability of the storage
device as effected by the presence of the blocking device.

Shaath teaches when the commands includes a capabilities request command relating to
the storage device, the processor modified data received from the storage device relating
to the capabilities request command to reflect the capability of the storage device as
effected by the presence of the blocking device [col. 8, lines 40-45; col. 9, lines 30-40].

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to include the teaching of Shaath as mentioned above into Bergsten-
Kern system in order to prevent alteration or deletion of the data [Shaath et al, col. 15-
19].

MTI0000729

Application/Control Number: 09/961,417                                      Page 7
Art Unit: 2187

Claim 51 is rejected under 35 U.S.C 103(a) as being unpatentable over Bergsten, in view of Shaath and in view of well known features of which Official Notice is hereby taken.

**13. As per claim 51:**

Bergsten-Shaath teaches the claimed apparatus as noted above.

Bergsten-Shaath does not teach the storage device is an IDE disk drive.

However, it would have been obvious to one having ordinary skill in the art at the time the invention was made to employ storage device which use integrated device electronics (IDE) in a given pattern for the application desired for using the IDE because this type of circuitry is a smaller and less complicated, circuit boards and fewer interconnect cables, gives IDE a distinct cost advantage over other disk drive interface technologies. The IDE is commonly but not exclusively known in the art as firmware, is well known and official notice is taken thereof.


Claim 53 is rejected under 35 U.S.C 103(a) as being unpatentable over Bergsten, in view of Shaath, and further in view of Kern.

**14. As per claim 53:**

Bergsten-Shaath teaches the claimed apparatus as noted above.

Bergsten-Shaath does not teach returning status information to the host that indicates that the blocked command was successfully executed by the storage device.

Kern teaches returning status information to the host that indicates that the blocked command was successfully executed by the storage device [e.g., error condition; col. 3, lines 5-10; col. 10, lines 1-10].

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include the teaching of Kern as mentioned above into Bergsten-Shaath's computer system in order to provide write protected for data blocks, virus protection, therefore the security firewalls of the system is increased [col. 15, line 65 to col. 16, line 5].

MTI0000730

Application/Control Number: 09/961,417                                   Page 8
Art Unit: 2187

Claim 3, 9, 15-16, 19, 20-24, 35, 40, 45, 54, 56 are rejected under 35 U.S.C 103(a) as
being unpatentable over Bergsten, in view of Kern et al, in view of Shaath and in view of
well known features of which Official Notice is hereby taken.

**15. As per claim 3:**

Bergsten-Kern-Shaath teaches the claimed apparatus as noted above.

Bergsten-Kern-Shaath, however, does not explicitly teach the interface is an IDE.

However, it would have been obvious to one having ordinary skill in the art at the time
the invention was made to employ interface which use integrated device electronics
(IDE) in a given pattern for the application desired for using the IDE because this type of
circuitry is a smaller and less complicated, circuit boards and fewer interconnect cables,
gives IDE a distinct cost advantage over other disk drive interface technologies. The IDE
is commonly but not exclusively known in the art as firmware, is well known and official
notice is taken thereof.

**16. As per claims 9, 24, 45:**

Bergsten-Kern-Shaath teaches the claimed apparatus as noted above.

Bergsten-Kern-Shaath does not explicitly teach the light emitting diodes (LEDs)
embedded in the blocking device coupled to the processor and configured to transmit
status information relating to the status of the blocking device.

However, it would have been obvious to one having ordinary skill in the art at the time
the invention was made to use LEDs for transmitting status information relating to the
status of the blocking device to help insure that the failed blocking device is readily
identifiable to the system administrator. The LEDs are used in the pertinent art as an
indicator for monitoring the status of device, and are well known and official notice is
taken thereof.

**17. As per claim 15, 35, 40:**

Bergsten-Kern-Shaath teaches the claimed limitations as mentioned in claim 1 above,
Bergsten-kern-shaath dose not teach the emulator and the interface are an IDE.

However, it would have been obvious to one having ordinary skill in the art at the time
the invention was made to employ interface which use integrated device electronics
(IDE) in a given pattern for the application desired for using the IDE because this type of

MTI0000731

Application/Control Number: 09/961,417                                    Page 9
Art Unit: 2187

circuitry is a smaller and less complicated, circuit boards and fewer interconnect cables, gives IDE a distinct cost advantage over other disk drive interface technologies. The IDE is commonly but not exclusively known in the art as firmware, is well known and official notice is taken thereof.

**18. As per claim 16:**

Bergsten-Kern-Shaath teaches the claimed apparatus as noted above.

Bergsten-Kern-Shaath does not teach the programmable logic device (PLD) coupled to the embedded processor, the IDE emulator component, and the IDE interface.

However, it would have been obvious to one having ordinary skill in the art at the time the invention was made to implement PLD into Bergsten-Kern blocking device. This is because of the high-density logic integration of PLD, thereby offering a significant savings on chip board real-estate.  Moreover, using a PLD offers the ability to adjust to future engineering changes. The PLD is used in the pertinent art as a logic programming device and is well known and official notice is taken thereof.

**19. As per claims 19-21:**

Per claim 19, it would follow necessarily when the well known feature IDE is incorporated into the teaching of Bergsten in the manner as mentioned in the rejection of claim 15. By doing so, the Bergsten interface emulator and storage would be IDE interface emulator and storage.

Per claims 20-21, it would follow necessarily when the well known feature IDE is incorporated into the teaching of Bergsten in the manner as mentioned in the rejection of claims 5-6. By doing so, the Bergsten storage would be IDE storage.

**20. As per claims 22-23:**

Per claims 22-23, it would follow necessarily when the well known feature IDE is incorporated into the teaching of Bergsten in the manner as mentioned in the rejection of claims 7-8. By doing so, the Bergsten storage would be IDE storage.

**21. As per claims 54, 56:**

Bergsten-Kern teaches the claimed apparatus as noted above.

Bergsten-Kern does not teach the interface emulator is an IEEE1394 connection.

Application/Control Number: 09/961,417                                        Page 10
Art Unit: 2187

However, as Applicant cited in his spec (page 8, lines 10-12) that IEEE 1394 is a well
known firewire connection. Therefore, it would have been obvious to one having
ordinary skill in the art at the time the invention was made to implement IEEE 1394
connection into Bergsten-Kern computer system. This is because The IEEE 1394
standard defined in 1995 is an international standard for implementing a cost-effective
and high-speed digital interface.  The IEEE 1394 serial bus provides high-speed data
transport of several hundreds of megabits per second and therefore enables real-time
transport required for digital video data transmission.  The IEEE 1394 further provides
so-called plug-and-play function by which devices can be added or removed by users
without initial settings.  These advantages cause the IEEE 1394 digital interface to
provoke widespread attention as a digital interconnect for both computer peripherals
and consumer electronics including digital video cameras and digital television
sets.


Claim 17 are rejected under 35 U.S.C 103(a) as being unpatentable over Bergsten, in
view of Kern et al, in view of Shaath and in view of Chin et al PN 6,216,205.

**22.  As per claim 17:**

Bergsten-Kern-Shaath teaches the claimed apparatus as noted above.

Bergsten-Kern-Shaath implicitly teaches the PLD includes a bus driver component
configured to transfer data between the embedded processor, the emulator component and
the interface; a first set of communication lines connecting the bus driver directly to the
interface and indirectly to the interface through the first port memory buffer; a second set
of communication lines connecting the bus driver directly to the interface and indirectly
to the interface through the second port memory buffer [Bergsten, 24, fig. 4; Kern, 124,
fig. 1]. This is because the address, data, and control lines from the microprocessor in the
system are routed to PLD where their information is buffered and latched as necessary in
PLD's buffers.  The Buffers and bus drivers help control the data flow and distribution of
the address and data buses from the microprocessor to other portions of PLD.

Bergsten-Kern-Shaath does not teach the memory devices are a dual port memory buffer.

Chin teaches a dual port memory buffer [col. 2, lines 29-32].

MTI0000733

Application/Control Number: 09/961,417                                        Page 11
Art Unit: 2187

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to further include the first and second dual port memory into
Bergsten-Kern-Shaath blocking device. Doing so would allow read and write operations
to occur independently of each other and achieve fast fall-through capability since data
written into a dual-port memory can be immediately accessed for reading [col. 2, lines
29-33].

### *Allowable Subject Matter*

23.  Claims 10-11, 13-14, 25-26, 28, 46-47 are objected to as being dependent upon a
rejected base claim, but would be allowable if rewritten in independent form including all
of the limitations of the base claim and any intervening claims.

### CONCLUSION

24.  Any inquiry concerning this communication or earlier communications from the
examiner should be directed to Ngoc Dinh whose telephone number is (703) 305-3023.
The examiner can normally be reached on Monday-Friday 8:30 AM-5:00 PM.
If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Donald A. Sparks, can be reached on (703) 308-4908. The fax phone numbers
for the organization where this application or proceeding is assigned are (703) 746-7239
for regular communications and (703) 308-1756 for After Final communications.
Any inquiry of a general nature or relating to the status of this application or proceeding
should be directed to the receptionist whose telephone number is (703) 305-3900.

NGOC DINH                                    DONALD SPARKS
Patent Examiner                              Supervisory Patent Examiner
ART UNIT 2187                                Technology Center 2100
May 14, 2004

MTI0000734

| *Notice of References Cited* | Application/Control No. 09/961,417 | Applicant(s)/Patent Under Reexamination BRESS ET AL. | |
|---|---|---|---|
| | Examiner NGOC V DINH | Art Unit 2187 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-6,654,864 | 11-2003 | Shaath et al. | 711/163 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)              Notice of References Cited              Part of Paper No. 14

MTI0000735

US006654864B2

US 6,654,864 B2

(12) **United States Patent**

Shaath et al.

(10) Patent No.:     **US 6,654,864 B2**
(45) Date of Patent:     **Nov. 25, 2003**

(54) **METHOD AND SYSTEM FOR PROVIDING RESTRICTED ACCESS TO A STORAGE MEDIUM**

(75) Inventors: **Kamel Shaath**, Kanata (CA); **Jonathan Gossage**, Nepean (CA); **Tony Walker**, Stittsville (CA); **Yasser Lulu**, Ottawa (CA); **Fu Yaqun**, Nepean (CA)

(73) Assignee: **Kom Networks, Inc.**, Kanata (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/032,467**

(22) Filed: **Jan. 2, 2002**

(65)     **Prior Publication Data**

US 2002/0078295 A1 Jun. 20, 2002

**Related U.S. Application Data**

(62) Division of application No. 09/267,787, filed on Mar. 15, 1999, now Pat. No. 6,336,175.

(30)     **Foreign Application Priority Data**

Jul. 31, 1998     (CA) .............................................. 2244626

(51) Int. Cl.$^7$ .............................................. G06F 12/14
(52) U.S. Cl. .............................................. 711/163; 707/9
(58) Field of Search .............................. 711/163; 707/9; 713/200

(56)     **References Cited**

U.S. PATENT DOCUMENTS

4,757,533 A     7/1988  Allen et al.

| | | | |
|---|---|---|---|
| 4,947,318 A | * | 8/1990 | Mineo ........................ 713/193 |
| 4,958,314 A | | 9/1990 | Imai et al. |
| 4,975,898 A | | 12/1990 | Yoshida |
| 5,214,627 A | | 5/1993 | Nakashima et al. |
| 5,434,562 A | | 7/1995 | Reardon |
| 5,495,533 A | * | 2/1996 | Linehan et al. ............. 380/277 |
| 5,537,636 A | | 7/1996 | Uchida et al. |
| 5,708,650 A | | 1/1998 | Nakashima et al. |
| 5,717,683 A | | 2/1998 | Yoshimoto et al. |
| 5,778,365 A | | 7/1998 | Nishiyama |
| 5,825,728 A | | 10/1998 | Yoshimoto et al. |
| 5,850,566 A | | 12/1998 | Solan et al. |
| 5,949,601 A | * | 9/1999 | Braithwaite et al. .......... 360/60 |
| 5,978,914 A | * | 11/1999 | Carley et al. ................ 713/200 |
| 6,044,373 A | * | 3/2000 | Gladney et al. ............... 707/10 |
| 6,286,087 B1 | * | 9/2001 | Ito et al. ..................... 711/111 |
| 6,336,187 B1 | * | 1/2002 | Kern et al. ................. 713/161 |

* cited by examiner

*Primary Examiner*—Hiep T. Nguyen
(74) *Attorney, Agent, or Firm*—Venable LLP; Ralph P. Albrecht; Jung H. Kim

(57)     **ABSTRACT**

A method of restricting file access is disclosed wherein a set of file write access commands are determined from data stored within a storage medium. The set of file write access commands are for the entire storage medium. Any matching file write access command provided to the file system for that storage medium results in an error message. Other file write access commands are, however, passed onto a device driver for the storage medium and are implemented. In this way commands such as file delete and file overwrite can be disabled for an entire storage medium.

**9 Claims, 7 Drawing Sheets**



MTI0000736

U.S. Patent

Nov. 25, 2003

Sheet 1 of 7

US 6,654,864 B2



FIG. 1

MTI0000737

U.S. Patent    Nov. 25, 2003    Sheet 2 of 7    US 6,654,864 B2



**FIG. 2**

MTI0000738

**U.S. Patent**     Nov. 25, 2003     Sheet 3 of 7     US 6,654,864 B2



FIG. 3

U.S. Patent

Nov. 25, 2003

Sheet 4 of 7

US 6,654,864 B2



FIG. 4

MTI0000740

U.S. Patent

Nov. 25, 2003

Sheet 5 of 7

US 6,654,864 B2

```
        ┌─────────────────────┐
        │   PROVIDE REQUEST    │
        │   FOR DATA STORAGE   │
        └─────────────────────┘
                  │
        ┌─────────────────────┐
        │   INTERCEPT REQUEST  │
        └─────────────────────┘
                  │
```

DOES STORAGE MEDIUM SUPPORT REQUEST

NO

CAN REQUEST BE MODIFIED

NO

SEND ERROR TO APPLICATION

YES

YES

PROVIDE REQUEST TO FILE SYSTEM LAYER OR TO DEVICE DRIVER

MODIFY REQUEST

FIG. 5

MTI0000741

U.S. Patent

Nov. 25, 2003

Sheet 6 of 7

US 6,654,864 B2



FIG. 6

MTI0000742

MTI0000743

**U.S. Patent**     Nov. 25, 2003     Sheet 7 of 7     US 6,654,864 B2



FIG. 7

US 6,654,864 B2

1

# METHOD AND SYSTEM FOR PROVIDING RESTRICTED ACCESS TO A STORAGE MEDIUM

This application is a divisional of U.S. application Ser. No. 09/267,787, filed Mar. 15, 1999, now U.S. Pat. No. 6,336,175.

## FIELD OF THE INVENTION

The present invention relates to data storage and more particularly to a method of providing restricted write access on a data storage medium.

## BACKGROUND OF THE INVENTION

In the past, operating systems restricted file access based on three criteria. The first criterion relates to the physical limitations of the storage device. For example, a CD-ROM drive only provides read access and therefore is restricted to read-only operation. The second relates to limitations of the storage medium. For example, a CD is a read-only medium, a CDR is a read/write medium but when a CD is full, the writer becomes a read-only medium, and so forth. The third relates to file access privileges. For example, in the UNIX operating system a file is stored with a set of access privileges including read and write privileges. Some files are read only and others are read/write and so forth.

Unfortunately, these access privileges fail to adequately provide protection for archival storage devices such as magnetic tape or removable optical media.

An example of a popular operating system is Windows NT®. Using Windows NT®, device drivers are hidden from applications by a protected subsystem implementing a programming and user interface. Devices are visible to user-mode programs, which include protected subsystems, only as named file objects controlled by the operating system input/output (IO) manager. This architecture limits an amount of knowledge necessary to implement device drivers and applications. In order to provide reasonable performance, the two separated systems, device drivers and applications, operate independently.

For example, when a write operation is requested by an application, the request is made via a file object handle. The application does not actually communicate with the storage device nor does the device driver for that storage device communicate with the application. Each communicates with the operating system independently. Thus, when the write command is issued for writing data to a device, the data is stored in buffer memory while the destination device is being accessed. A successful completion status is provided to the application. When the destination storage device is available, the stored data is written to the destination storage device. When the storage device is unavailable or fails to support write operations, the data is not successfully written. An error message may result, but will not be directed toward the application since it is not known to the device driver or is inaccessible. For example, the application may have terminated before the error occurs. Alternatively, no error message results and when the buffer is flushed or when the system is rebooted, the data is lost. Neither of these results is acceptable in normal computer use.

Fortunately, most devices are easily verified as to their capabilities. Read only devices are known as well as are read/write devices. Because a CD-ROM drive never becomes a read/write device, it is easily managed. When a device supports both read/write media and read only media the problem becomes evident.

2

In order better to highlight the problem, an example is presented. When a hard disk is full, accessing a file results in updating of file information relating to a last access date and so forth, journaling. File access information is updated each time a file is retrieved. The information requires no extra memory within the hard disk and therefore, the status of the hard disk, full or available disk space, is unimportant since the new file access information overwrites previous file access information. Thus, the file system writes to storage media even when full, so long as the capability of doing so exists.

When an archive data store is used with a data store device, it is often desirable that it not be written to. Therefore, accessing a file requires that the file access information is not updated—journaling is not performed. Unfortunately, when the data store device is accessed via a read/write file object handle, updating of the file access information is performed by the file system. As such, the data store is altered even when this is not desired. Further, since a single data store device accepts any number of different data stores during a period of time when the file system is in continuous operation, it is impractical if not impossible to remount the data store device with a new data store device driver and a new file object handle whenever the read/write privileges change. Currently, there is no adequate solution to overcome this problem.

In an attempt to overcome these and other limitations of the prior art, it is an object of the present invention to provide a method of limiting access privileges for a storage medium that supports increased flexibility over those of the prior art.

## SUMMARY OF THE INVENTION

In accordance with the invention there is provided a method of providing restricted access to a storage medium in communication with a computer comprising the step of:

executing a file system layer on the computer, the file system layer supporting a plurality of file system commands;

executing a trap layer on the computer, the trap layer logically disposed above the file system layer;

providing to the trap layer at least a disabled file system command relating to the storage medium and supported by the file system for the storage medium;

intercepting data provided to the file system layer including an intercepted file system command;

comparing the intercepted file system command to each of the at least a disabled file system command to produce at least a comparison result; and,

when each of the at least a comparison result is indicative of other than a match, providing the intercepted file system command to the file system layer.

In some embodiments an application layer is in execution logically above the trap layer such that the trap layer is logically disposed between the application layer and the file system layer; and when a comparison result from the at least a comparison result is indicative of a match, providing an error indication to the application layer. Preferably, the error indication is provided from the trap layer.

In accordance with the invention there is further provided a method of restricting access to a storage medium in communication with a computer, the method comprising the step of:

executing a file system layer on the computer, the file system layer supporting a plurality of file system commands;

MTI0000744

US 6,654,864 B2

3

providing to the file system layer at least a disabled file system command for the storage medium, the disabled file system command supported by the file system for the storage medium, the at least a disabled file system command being other than all write commands, other than all read commands, and other than all write commands and all read commands;

comparing file system commands provided to the file system layer to each of the at least a disabled file system command to produce at least a comparison result; and, when each of the at least a comparison result is indicative of other than a match, executing the file system command.

In an embodiment the method also comprises the following steps: providing an indication of a data write access privilege for the entire logical storage medium, the data write access privilege indicative of a restriction to alteration of a same portion of each file stored on the logical storage medium; and restricting file access to the logical storage medium in accordance with the indication while allowing access to free space portions of the same logical storage medium.

In accordance with the invention there is also provided a method of restricting access by a computer to a storage medium other than a write once medium in communication with the computer, the method comprising the steps of: providing an indication of a data write access privilege for the entire logical storage medium indicating a disabled operation relating to alteration of a portion of each file stored within the logical storage medium, the indication other than a read only indication; and, restricting file access to each file within the logical storage medium in accordance with the same indication while allowing access to free space portions of the same logical storage medium. In an embodiment the indication comprises at least one of the following: write access without delete, write access without rename; write access without overwrite, and write access without changing file access privileges.

In accordance with the invention there is also provided a method of restricting access by a computer to a storage medium other than a write once medium in communication with the computer, the method comprising the steps of: providing an indication of a data write access privilege for the entire logical storage medium indicating a disabled operation relating to alteration of data within the logical storage medium, the indication other than a read only indication, the disabled operations supported by the storage medium; and restricting write access to data within the logical storage medium in accordance with the same indication while allowing access to free space portions of the same logical storage medium. A logical storage medium consists of a single physical storage medium or a single partition within a storage medium. Typically a disabled operation relates to destruction of data stored within a storage medium. Operations of this type include delete file, overwrite file, and rename file.

The present invention is preferably applied to removable storage media and more preferably to optical storage media such as removable optical rewritable disks.

According to an aspect of the present invention, restricted write access privileges for data stored within a data storage medium are supported. Advantageously, access privileges of this type allow write access to storage media or data files but limit that access in certain respects. These restrictions permit some level of control over a storage medium while providing some write privileges.

BRIEF DESCRIPTION OF THE DRAWINGS

Exemplary embodiments of the invention will now be described in conjunction with the drawings in which:

4

FIG. 1 is a simplified block diagram of an NT® operating system architecture during a process of opening a file is shown;

FIG. 2 is a simplified block diagram of an NT® operating system architecture during a process of IRP processing is shown;

FIG. 3 is a simplified block diagram of an operating system according to the invention;

FIG. 4 is a simplified block diagram of a system for opening a file such as that shown in FIG. 1 modified according to the invention;

FIG. 5 is a simplified flow diagram of a method of storing data in a storage medium forming part of a system such as that of FIG. 1;

FIG. 6 is a simplified flow diagram of a method of providing software settable access privileges within Windows NT®; and,

FIG. 7 is a simplified block diagram of the invention wherein the file system layer includes means for performing the functions of the trap layer.

DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, a simplified block diagram of a Windows NT® (NT) operating system architecture during a process of opening a file is shown. NT drivers are hidden from end users by an NT protected subsystem that implements an already familiar NT programming interface. Devices are visible only as named file objects controlled by the NT Input/Output (IO) Manager to user-mode programs including protected subsystems.

An NT protected subsystem, such as the Win32® subsystem, passes IO requests to the appropriate kernel-mode driver through the IO system services. A protected subsystem insulates its end users and applications from having to know anything about kernel-mode components, including NT drivers. In turn, the NT IO Manager insulates protected subsystems from having to know anything about machine specific device configurations or about NT driver implementations.

The NT IO Manager's layered approach also insulates most NT drivers from having to know anything about the following: whether an IO request originated in any particular protected subsystem, such as Win32 or POSIX; whether a given protected subsystem has particular kinds of user-mode drivers; and, the form of any protected subsystem's IO model and interface to drivers.

The IO Manager supplies NT drivers with a single IO model, a set of kernel-mode support routines. These drivers carry out IO operations, and a consistent interface between the originator of an IO request and the NT drivers that respond to it results. File system requests are a form of IO request.

A subsystem and its native applications access an NT driver's device or a file on a mass-storage device through file object handles supplied by the NT IO Manager. A subsystem's request to open such a file object and to obtain a handle for IO to a device or a data file is made by calling the NT IO system services to open a named file, which has, for example, a subsystem-specific alias (symbolic link) to the kernel-mode name for the file object.

The NT IO Manager, which exports these system services, is then responsible for locating or creating the file object that represents the device or data file and for locating the appropriate NT driver(s).

US 6,654,864 B2

**5**

The system follows a process described below in accordance with FIG. 1 for performing a file open operation. The subsystem calls an NT IO system service to open a named file. The NT IO Manager calls the Object Manager to look up the named file and to help it resolve any symbolic links for the file object. It also calls the Security Reference Monitor to check that the subsystem has the correct access rights to open that file object.

If the volume is not yet mounted, the IO Manager suspends the open request, calling one or more NT file systems until one of them recognises the file object as some thing it has stored on one of the mass storage devices the file system uses. When the file system has mounted the volume, the IO Manager resumes the request.

The IO Manager allocates memory (a RAM Cache) for and initialises an IRP (IO request packet) for the open request. To NT drivers, an open is equivalent to a "create" request. The IO Manager calls the file system driver, passing it the IRP. The file system driver accesses its IO stack location in the IRP to determine what operation to carry out, checks parameters, determines if the requested file is in cache memory, and, if not sets up the next lower driver's IO stack location in the IRP.

Both drivers process the IRP and complete the requested IO operation, calling kernel-mode support routines supplied by the IO Manager and by other NT components. The drivers return the IRP to the IO Manager with the IO status block set in the IRP to indicate whether the requested operation succeeded and/or why it failed. The IO Manager gets the IO status from the IRP, so it can return status information through the protected subsystem to the original caller. The IO Manager frees the completed IRP.

The IO Manager returns a handle for the file object to the subsystem if the open operation was successful. If there was an error, it returns appropriate status information to the subsystem.

After a subsystem successfully opens a file object that represents a data file, a device, or a volume, the subsystem uses the returned file object handle to request that device for IO operations (typically in the form of read, write, or device IO control requests). These operations are carried out by calling the IO System services. The IO Manager routes these requests as IRPs sent to appropriate NT drivers.

Referring to FIG. 2, a simplified block diagram of an NT® operating system architecture during a process of IRP processing is shown. The IO Manager calls the file system driver (FSD) with the IRP it has allocated for the subsystem's read/write request. The FSD accesses its IO stack location in the IRP to determine what operation it should carry out.

The FSD sometimes breaks the originating request into smaller requests by calling an IO support routine one or more times to allocate IRPs, which are returned to the FSD with zero-filled IO stack location(s) for lower-level driver(s). At its discretion, the FSD can reuse the original IRP, rather than allocating additional IRPs as shown in FIG. 2, by setting up the next-lower driver's IO allocation in the original IRP and passing it on to lower drivers.

For each driver-allocated IRP, the FSD calls an IO support routine to register an FSD-supplied completion routine so the driver is able to determine whether a lower driver satisfied the request and free each driver allocated IRP when lower drivers have completed it. The IO Manager calls the FSD-supplied completion routine whether each driver-allocated IRP is completed successfully, with an error status, or cancelled. A higher-level NT driver is responsible for

**6**

freeing any IRP it allocates and sets up on its own behalf for lower-level drivers. The IO Manager frees the IRPs that it allocates after all NT drivers have completed them. Next, the FSD calls an IO support routine to access the next lower-level driver's IO stack location in its FSD-allocated IRP in order to set up the request for the next-lower driver, which happens to be the lowest-level driver in FIG. 2. The FSD then calls an IO support routine to pass that IRP on to the next driver.

When it is called with the IRP, the physical device driver checks its IO stack location to determine what operation (indicated by the IRP MJ XXX function code) it should carry out on the target device, which is represented by the device object in its IO stack location and passed with the IRP to the driver. This driver can assume that the IO Manager has routed the IRP to an entry point that the driver defined for the IRP-MJ XXX operation (here IRP MJ READ or IRP MJ WRITE) and that the higher-level driver has checked the validity of other parameters for the request.

If there were no higher-level driver, such a device driver would check whether the input parameters for an IRP MJ XXX operation are valid. If they are, a device driver usually calls IO support routines to tell the IO Manager that a device operation is pending on the IRP and to either queue or pass the IRP on to another driver-supplied routine that accesses the target device in the form of a physical or logical device such as a disk or a partition on a disk.

The device driver determines whether the device driver is already busy processing another IRP for the target device, queues the IRP if it is, and returns. Otherwise, the IO Manager routes the IRP to a driver-supplied routine that starts the IO operation on its device.

When the device interrupts, the driver's interrupt service routine (ISR) does only as much work BS as is necessary to stop the device from interrupting and to save necessary context about the operation. The ISR then calls an IO support routine with the IRP to queue a driver-supplied DPC routine to complete the requested operation at a lower hardware priority than the ISR.

When the driver's DPC gets control, it uses the context as passed in the ISRs call to IoRequestDpc to complete the IO operation. The DPC calls a support routine to dequeue the next IRP when present and to pass that IRP on to the driver-supplied routine that starts IO operations on the device. The DPC then sets status about the just completed operation in the IRPs IO status block and returns it to the IO Manager with IoCompleteRequest.

The IO Manager zeroes the lowest-level driver's IO stack location in the IRP and calls the file system's registered completion routine with the FSD-allocated IRP. This completion routine checks the IO status block to determine whether to retry the request or to update any internal state maintained about the original request and to free its driver-allocated IRP. The file system often collects status information for all driver-allocated IRPs it sends to lower-level drivers in order to set IO status and complete the original IRP. When it has completed the original IRP, the IO Manager returns NT status, the subsystem's native function, to the original requestor of the IO operation.

FIG. 2 also shows two IO stack locations in the original IRP because it shows two NT drivers, a file system driver and a mass-storage device driver. The IO Manager gives each driver in a chain of layered NT drivers an IO stack location of its own in every IRP that it sets up. The driver-allocated IRPs do not necessarily have a stack location for the FSD that created them. Any higher-level driver

MTI0000746

US 6,654,864 B2

7

that allocates IRPs for lower-level drivers also determines how many IO stack locations the new IRPs should have, according to the StackSize value of the next-lower driver's device object.

An NT file system driver accesses the file object through its IO stack location in IRPs. Other NT drivers usually ignore the file object.

The set of IRP major and minor function codes that a particular NT driver handles are sometimes device-type-specific. However, NT device and intermediate drivers usually handle the following set of basic requests:

IRP MJ CREATE—open the target device object, indicating that it is present and available for IO operations;

IRP MJ READ—transfer data from the device;

IRP MJ WRITE—transfer data to the device;

IRP MJ DEVICE CONTROL—set up or reset the device according to a system-defined, device, specific IO control code; and

IRP MJ CLOSE—close the target device object.

In general, the IO Manager sends IRPs with at least two IO stack locations to device drivers of mass-storage devices because an NT file system is layered over NT drivers for mass-storage devices. The IO Manager sends IRPs with a single stack location to any physical device driver that has no driver layered above it.

Referring to FIG. 3, a block diagram of an operating system is shown. The block diagram presents a simplified view of operating system functionality according to the invention. An application layer for supporting application execution communicates with an input/output layer of the computer. The input/output layer includes a display and a file system layer. The application layer communicates with the file system layer for performing read operations and write operations with storage media. Disposed between the application layer and the file system layer is a trap layer also referred to as a filter layer. Each file system access request that is transmitted from the application layer to the file system layer is intercepted by the trap layer. In the trap layer restrictions relating to access privileges are implemented. For example, some requests are blocked and error messages are returned to the application layer. Other requests are modified and the modified request passed onto the file system. When a data store is read only, a request to open a file for read write access is modified to an open file for read-only access; a request to delete a file is blocked and an error message is returned. The use of a trap layer is applicable when the present invention is implemented within an existing operating system such as Windows NT®. Alternatively, an operating system supporting restricted write access is designed and restrictions relating to access privileges are implemented within the file system layer.

Referring to FIG. 4, a simplified block diagram of opening a file within Windows NT® according to the invention is shown. The diagram is based on the diagram of FIG. 1. The thick black line represents the trap layer or filter layer for preventing some file system operations from passing from the application layer to the file system layer. Accordingly, a data store device operates as a read/write device with a single device driver. The trap layer prevents write operations or, alternatively, other predetermined operations from being performed on a specific data store. The trap layer achieves this by blocking some requests and by modifying other requests. In this way, some operations are prevented without requiring modifications to existing applications. Thus, one data store may be read only while another is read/write. Unlike prior art implementations, an application requesting a write operation to a data store that is read-only, receives an accurate and appropriate error message. There is no data lost by the device driver and, in fact, the device driver is freed of the trouble of dealing with file system commands which cannot be completed.

Also, the use of the trap layer allows for implementation of more complicated file access privileges based on data stored within each individual storage medium. For example, a storage medium may indicate read-write access but may not support delete operations. Device drivers perform low level commands such as read and write. Delete, is a write operation, the device driver performing write operations to obfuscate of overwrite a file. As is evident, the device driver supports delete operations as does any read/write data store. However, by indicating to the trap layer that delete operations are not supported, all delete requests passed from the application layer for the specific data store are intercepted by the trap layer and an error message is returned to the application layer. No delete operation for a file is passed to the file system layer and therefore, the device driver does not perform the write operations for obfuscating or overwriting the file because none is received. It is evident that preventing file deletion is advantageous for protecting archived data and data histories.

Another operation which is advantageously restricted is overwriting of files. When a request is made to overwrite a file, typically the data within the file is overwritten. Overwriting of file data is a simple work around to perform a file delete when that operation is blocked. Alternatively in some devices, the data to overwrite is written to an unused portion of a storage medium and an address of the file data within a file allocation table is changed. The storage locations of the old file data are then considered free. Preventing data overwrite is performed according to the invention by modifying requests or blocking requests as necessary. Further, by trapping requests to overwrite file data according to the invention, a user friendly error message becomes possible. When an application provides a request to overwrite a file, an error message indicating that overwrite is not permitted and that a file name is needed to save the data is provided. The trap layer, upon receiving the file name from the error message, modifies the request in accordance therewith and in accordance with permitted operations and passes the modified request to the file system layer. Accordingly, data integrity is preserved with minimal inconvenience to users of the system.

It is also useful to restrict access to file access permissions. Often, permissions are global across a storage medium and altering of the permissions is not desirable. Still, many operating systems provide for file and storage medium related access privileges. These are modifiable at any time. Since privileges are generally static, there are advantages to setting up privileges for a storage medium such that during normal operation and with normal file system operations, the privileges are static. Preferably, there is at least a way to modify the global privileges in case it is desirable to do so. Preventing alteration of privileges prevents individuals having access to files from modifying access privileges in any way.

Another operation that is usefully restricted is overwriting of zero length files. Some operations within some applications create a zero length file and then overwrite it. Thus preventing overwriting of zero length files directly affects those applications. An example of such an application and operation is the "save as" command in Microsoft Word®. Thus, preventing overwriting of zero length files effectively prevents "save as" from functioning on the associated medium.

US 6,654,864 B2

9

Similarly, renaming a file is useful for obfuscating data. Preventing renaming of files prevents hiding existing files or making them more difficult to locate. For example, changing a client's information file name from "Client 101 Information" to "To Do Feb. 18" would make the file hard to locate. Thus, rename is an operation that it is desirable to restrict. Reasons for restricting the other listed operations are evident. Further, restricting other operations may also be advantageous and the present application is not limited to these operations.

Above mentioned operations which are advantageously restricted include overwriting files, changing file access permissions and medium access privileges, renaming files, formatting a medium and so forth. For example, a medium that does not allow any of the above mentioned operations provides a complete archival history of the medium's content and prevents alteration or deletion of the data. Such a medium is very useful for backing up office files or electronic mail.

Referring to FIG. 5, a flow diagram of a method of storing data in a storage medium forming part of a system such as that of FIG. 3 is shown. An application in execution on the system seeks to store a data file on a storage medium within the file system layer of the system. A request and data for storage within the file is transmitted from the application layer to the file system layer. The request includes an operation and data relating to a destination storage medium on which to store the data. The trap layer intercepts the request and the data and determines whether the storage medium selected supports the operation. When the storage medium supports the operation, the request and the data is passed on to the file system layer. When necessary, the request is modified prior to provision to the file system layer. In the file system layer the operation is conducted according to normal file system layer procedures. When the storage medium does not support the operation in its original or a modified form, the trap layer returns an indication of this to the application layer. The operation and the data are not passed onto the file system layer. This provides additional access privilege functionality.

Referring to FIG. 6, a simplified flow diagram of a method of providing software settable access privileges within Windows NT® is shown. A storage medium is mounted within a computer system. The storage medium has stored thereon data relating to access privileges for the storage medium. Upon mounting the storage medium, data relating to physical limitations of the read/write device are loaded into the device driver for that device within the file system layer. The limitations are recognised by the system software. Also upon mounting the storage medium, the data relating to access privileges for the storage medium are loaded into the trap layer. The trap layer limits operations performed on the storage medium to those supported by the read/write device by limiting the requests passed onto the file system layer or, when the trap layer forms part of the file system layer, by filtering and/or modifying the requests. The data relating to access privileges for the storage medium are used to limit those requests provided to the file system layer.

When the storage medium is a data store for archiving purposes, there are evident advantages to treating the storage medium as a read-only storage medium. For example, once the data store is full, setting it to read-only allows its use without risking tampering or accidental modification. Therefore, media specific access privileges are advantageous.

Referring to FIG. 7, a simplified block diagram of the invention wherein the file system layer includes means for

10

performing the functions of the trap layer is shown. Such an embodiment, operates in a similar fashion to those described above. The file system receives all file access requests and compares them to those that are not permitted. When an access command is not permitted on an indicated storage medium, an error message is returned to the application layer. When an access command is permitted, it is performed on the appropriate storage medium. The access command may be that requested or, alternatively, a modified form of the requested command resulting in a supported operation.

The term logical storage medium is used herein and in the claim that follow to designate either a physical storage medium or a portion of physical storage medium that is treated by the operating system as a separate storage medium. Thus, a partitioned hard disk with two partitions consists of one physical storage medium and two logical storage media.

Numerous other embodiments of the invention may be envisaged without departing from the spirit and scope of the invention.

What is claimed is:

1. A method of restricting access by a computer to a logical storage medium other than a write once medium in communication with the computer, the method comprising the steps of:

providing an indication of a data write access privilege for the entire logical storage medium, the data write access privilege indicative of a restriction to alteration of a same portion of each file stored on the logical storage medium; and

restricting file access to the logical storage medium in accordance with the indication while allowing access to free space portions of the same logical storage medium.

2. A method as defined in claim 1, comprising the steps of:

writing further file data to the free space portions of the same logical storage medium; and,

restricting file access to the further file data in accordance with the indication while allowing access to remaining free space portions of the same logical storage medium.

3. The method as defined in claim 1, wherein the indication of a data write access privilege is one of the following: write access without delete, write access without rename, write access without overwrite, and write access without changing file access privileges.

4. The method as defined in claim 1, wherein storage medium is a removable storage medium.

5. A method of restricting access by a computer to a storage medium other than a write once medium in communication with the computer, the method comprising the steps of:

providing an indication of a data write access privilege for the entire logical storage medium indicating a disabled operation relating to alteration of a portion of each file stored within the logical storage medium, the indication other than a read only indication; and

restricting file access to each file within the logical storage medium in accordance with the same indication while allowing access to free space portions of the same logical storage medium.

6. The method as defined in claim 5, wherein the indication comprises at least one of the following: write access without delete, write access without rename, write access without overwrite, and write access without changing file access privileges.

7. The method as defined in claim 6, wherein logical storage medium is a single physical storage medium and

MTI0000748

US 6,654,864 B2

11

wherein a single physical storage medium consists of a single logical storage medium.

8. The method as defined in claim 6, wherein storage medium is a removable storage medium.

9. A method of restricting access by a computer to a storage medium other than a write once medium in communication with the computer, the method comprising the steps of:

providing an indication of a data write access privilege for the entire logical storage medium indicating a disabled

12

operation relating to alteration of data within the logical storage medium, the indication other than a read only indication, the disabled operations supported by the storage medium; and

restricting write access to data within the logical storage medium in accordance with the same indication while allowing access to free space portions of the same logical storage medium.

* * * * *

MTI0000749

# Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

**37 CFR §1.2 Business to be transacted in writing.**
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable. Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
  (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

## Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

2

MTI0000750

Continuation Sheet (PTOL-413)

Application No.  09/961,417

Continuation of Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments:

During the interview the limitation "the predetermined set of commands being commands that are known to not permanently modify a state of the storage device," was specifically discussed. The applicant's indicated that, for at least this limitation, the claims are distinguishable over the prior art of Bergsten, Kern et al. and Shaath et al. The examiner indicated that applicant's remarks will be considered and the examiner's position will be reviewed based on the above noted remarks.

The examiner also indicated that he would contact applicant after the rejection and remarks have been reviewed.

3

MTI0000751

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

| | |
|---|---|
| 26615      7590      08/10/2004 | **EXAMINER** |
| HARRITY & SNYDER, LLP | DINH, NGOC V |
| 11240 WAPLES MILL ROAD | |

| | ART UNIT | PAPER NUMBER |
|---|---|---|
| SUITE 300 | 2187 | #15 |
| FAIRFAX, VA  22030 | | |

DATE MAILED: 08/10/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

MTI0000752

| **Interview Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 09/961,417 | BRESS ET AL. |
| | Examiner | Art Unit |
| | NGOC V DINH | 2187 |

All participants (applicant, applicant's representative, PTO personnel):

(1) _NGOC V DINH_.

(2) _Brian Ledell_.

(3) DONALD SPARKS

(4) STEVE BRESS.

Date of Interview: 07/15/04

Type:  a)☐  Telephonic  b)☐  Video Conference
        c)☒ Personal [copy given to: 1)☒ applicant     2)☐ applicant's representative]

Exhibit shown or demonstration conducted:  d)☐ Yes   e)☐ No.
        If Yes, brief description: _____.

Claim(s) discussed: _____.

Identification of prior art discussed: _____.

Agreement with respect to the claims f)☐ was reached.  g)☐ was not reached.  h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: _See Continuation Sheet_.

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW.  (See MPEP Section 713.04.  If a reply to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  See Summary of Record of Interview requirements on reverse side or on attached sheet.

DONALD SPARKS
SUPERVISORY PATENT EXAMINER

Examiner Note:  You must sign this form unless it is an Attachment to a signed Office action.

Examiner's signature, if required

U.S. Patent and Trademark Office
PTOL-413 (Rev. 04-03)                    Interview Summary                    Paper No. 14

MTI0000753

Sent By: HARRITY&SNYDER,LLP;          571 432 0808   5-Aug-04   9:48AM;          Page 5
ELJmg
AE
8-17-04

Patent
Attorney's Docket No. **0032-0003**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

RECEIVED
CENTRAL FAX CENTER

AUG - 5 2004

OFFICIAL

| | |
|---|---|
| In re Patent Application of | ) |
| | ) **Mail Stop AF** |
| Steven BRESS et al. | ) |
| | ) |
| Application No.: 09/961,417 | ) Group Art Unit: 2187 |
| | ) |
| Filed:  September 25, 2001 | ) |
| | ) Examiner:  Ngoc V. Dinh |
| For:  WRITE PROTECTION FOR COMPUTER | ) |
|        LONG-TERM MEMORY DEVICES | ) |

### AMENDMENT AFTER FINAL

U.S. Patent and Trademark Office
220 20th Street S.
Customer Window, **Mail Stop AF**
Crystal Plaza Two, Lobby, Room 1B03
Arlington, VA 22202

Sir:

        In response to the final Office Action, dated May 27, 2004, please amend the

present application as follows.

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 15 of this paper.

MTI0000754

Sent By: HARRITY&SNYDER,LLP;                571 432 0808;      5-Aug-0..  9:48AM;         Page 6

PATENT
U.S. Patent Application No. 09/961,417

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1. (previously presented)  A blocking device comprising:

an interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host;

an interface for connecting to the storage device; and

a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, wherein

the blocking device is transparent to normal operation of the host and the storage device.

2. (canceled)

2. (original)  The blocking device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.

-2-

MTI0000755

sent By: HARRITY&SNYDER,LLP;                571 432 0808;             5-Aug-04   9:48AM;              Page 7

PATENT
U.S. Patent Application No. 09/961,417

3
2. (original)   The blocking device of claim 1, wherein the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator.

4
3. (original)  The blocking device of claim 3, wherein, when the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

5
4. (previously presented)  The blocking device of claim 1, wherein the processor drops those of the commands that do not match the predetermined set of commands, and, after dropping one of the commands, returns status information to the host that indicates that the dropped command was successfully completed.

6
7. (original)  The blocking device of claim 1, further comprising:

    additional interfaces for connecting to additional storage devices.

7
8. (original)  The blocking device of claim 6, wherein each of the interfaces is independently coupled to the processor.

-3-

MTI0000756

PATENT
U.S. Patent Application No. 09/961,417

8. (original)  The blocking device of claim 1, further including light emitting
diodes (LEDs) coupled to the processor and configured to transmit status information
relating to the status of the blocking device.

10. (previously presented)  The blocking device of claim 1, further including:
a temporary storage device coupled to the processor, the processor storing data
from the host corresponding to at least one command that does not match the
predetermined set of commands in the temporary storage device.

11. (original)  The blocking device of claim 10, wherein when read commands
are received from the host that refer to data stored in the temporary storage device, the
processor returns the data from the temporary storage device to the host.

12. (canceled)

13. (original)  The blocking device of claim 1, wherein the processor examines
feature information from the storage device that relate to features supported by the
storage device and the processor zeroes any features not supported by the processor
before making the feature information available to the host.

14. (original)  The blocking device of claim 1, wherein the processor supports a
removable drive feature set with the host and the processor returns a write protected error
code to the host when the processor drops one of the commands.

-4-

MTI0000757

Sent By: HARRITY&SNYDER,LLP;        571 432 0808;   5-Aug-0-   9:49AM;        Page 9

PATENT
U.S. Patent Application No. 09/961,417

13  ~~15.~~ (currently amended)  A device comprising:

an IDE emulator component, the IDE emulator component including a physical interface designed to engage a first cable that connects to a host that controls an IDE storage device;

an IDE interface configured to engage a second cable that connects to the IDE storage device; and

a logic circuit connecting the IDE emulator component to the IDE interface and configured to: compare commands received at the IDE emulator component to a predetermined set of commands <u>that are known to not modify a state of the IDE storage device</u>, and to ~~block~~ <u>allow</u> transmission of ~~one or more of~~ the commands from the IDE emulator component to the IDE interface when the comparison indicates that the <u>received command is in the predetermined set of commands</u> ~~logic circuit does not recognize the received command or the comparison indicates that the received command is a command that modifies a state of the storage device~~, wherein

the device operates transparently to normal operation of the host and the IDE storage device.

14  ~~16.~~ (original)  The device of claim ~~15~~ 13, wherein the logic circuit includes:

an embedded processor,

a computer memory connected to the embedded processor, the embedded processor loading program instructions from the computer memory during device initialization, and

-5-

MTI0000758

PATENT
U.S. Patent Application No. 09/961,417

a programmable logic device (PLD) coupled to the embedded processor, the IDE

emulator component, and the IDE interface.

15
17. (original) The device of claim 14 16, wherein the PLD includes:

a bus driver component configured to transfer data between the embedded

processor, the IDE emulator component, and the IDE interface,

a first dual port memory buffer connected between the bus driver and the IDE

interface,

a first set of communication lines connecting the bus driver directly to the IDE

interface and indirectly to the IDE interface through the first dual port memory buffer,

a second dual port memory buffer connected between the bus driver and the IDE

emulator component, and

a second set of communication lines connecting the bus driver directly to the IDE

emulator component and indirectly to the IDE emulator component through the second

dual port memory buffer.

18. (canceled)

16       13
19. (original) The device of claim 18, wherein when the logic circuit receives

data back from the IDE storage device the logic circuit forwards the received data to the

host through the IDE emulator component.

-6-

MTI0000759

PATENT
U.S. Patent Application No. 09/961,417

*17*

20. (original) The device of claim 19, *16* wherein, when the comparison indicates the command includes a capabilities request command relating to the IDE storage device, the logic circuit modifies data received from the IDE storage device relating to the capabilities request command to reflect the capability of the IDE storage device as affected by the presence of the device.

*18*

21. (currently amended) The device of claim 15, *13* wherein the logic circuit blocks commands not in the predetermined set of commands and, after blocking transmission of one of the commands, returns status information to the host that indicates that the blocked command was successfully executed.

*19*

22. (original) The device of claim 18, *13* further comprising:

a second interface for connecting to a second IDE storage device.

*20*

23. (original) The device of claim 22, *19* wherein each of the interfaces is independently coupled to the logic circuit.

*21*

24. (original) The device of claim 18, *13* further including light emitting diodes (LEDs) coupled to the logic circuit and configured to transmit status information relating to the status of the device.

*22*

25. (currently amended) The device of claim 15, *13* further including:

-7-

MTI0000760

PATENT
U.S. Patent Application No. 09/961,417

a temporary storage device coupled to the logic circuit, the logic circuit storing data corresponding to ~~blocked~~ commands <u>that are not allowed to be</u> <u>transmitted to the</u> <u>IDE interface</u> in the temporary storage device.

23  26. (original)  The device of claim 2̶8̶. 22, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the logic circuit returns the data from the temporary storage device to the host.

27.  (canceled)

24  28. (original)  The device of claim 2̶5̶ 13, wherein the logic circuit examines feature information from the IDE storage device that relates to features supported by the IDE storage device and removes any feature information not supported by the device before making the feature information available to the host.

Claims 29-31 (canceled)

25  3̶2̶. (currently amended)  A method comprising:

intercepting communications between a computer motherboard and a local non-volatile storage device for the motherboard;

comparing commands in the communications between the motherboard and the storage device to a predetermined set of commands;

-8-

MTI0000761

PATENT
. U.S. Patent Application No. 09/961,417

forwarding selected ones of the commands to the storage device <u>only</u> when, based on the comparison, the commands are determined to be commands that are <u>in a predetermined set of commands</u> known to not permanently modify a state of the storage device; and

blocking other commands from being received by the storage device, wherein the intercepting communications, comparing commands, forwarding selected ones of the commands, and blocking selected other ones of the commands is transparent to normal operation of the computer motherboard and the storage device.

33. (canceled)

26 34. (previously presented) The method of claim 32, 25 further comprising:

forwarding data from the storage device to the motherboard in response to a read command received from the motherboard and forwarded to the storage device.

27 35. (original) The method of claim 32, 25 wherein the storage device is an integrated device electronics (IDE) disk drive.

28 36. (original) The method of claim 32, 25 wherein the commands forwarded to the storage device include a capabilities request command, the method further comprising:

modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as modified by operation of the method.

-9-

MTI0000762

*PATENT*
U.S. Patent Application No. 09/961,417

*29* *37.* (original) The method of claim *36,* further comprising, after blocking a command:

returning status information to the motherboard that indicates that the blocked command was successfully executed by the storage device.

*28*

*30* *38.* (currently amended) A computer system comprising:

a host computer;

a long-term storage device; and

a blocking device coupled between the host computer and the storage device, the blocking device configured to:

intercept commands from the host to the storage device,

pass commands to the storage device only when the commands are <u>in a predetermined set of commands that are</u> known to not permanently modify a state of the storage device, and

block other commands from reaching the storage device,

wherein the intercepting commands, blocking commands, and passing commands are performed by the blocking device transparently to the host computer and the long-term storage device.

*31* *39.* (previously presented) The computer system of claim *38,* wherein the blocking device further includes:

*30*

an interface emulator configured to emulate the storage device to the host; and

-10-

MTI0000763

Sent By: HARRITY&SNYDER,LLP;          571 432 0808;   5-Aug-0..  9:50AM;      Page 15

PATENT
U.S. Patent Application No. 09/961,417

an interface configured to connect the blocking device to the storage device.

32   40. (original)  The computer system of claim 39, wherein the interface emulator

emulates an Integrated Device Electronics (IDE) interface and the storage device is an

IDE disk drive.

41. (canceled)

33   42. (original)  The computer system of claim 28, wherein the blocking device

receives data back from the storage device in response to one of the passed commands

and forwards the received data to the host.

34   43. (original)  The computer system of claim 28, wherein, when the passed

commands include a capabilities request command relating to the storage device, the

blocking device modifies data received from the storage device relating to the capabilities

request command to reflect the capability of the storage device as affected by the

presence of the blocking device.

35   44. (original)  The computer system of claim 28, wherein the blocking device,

after blocking one of the commands, returns status information to the host that indicates

that the blocked command was successfully completed.

-11-

MTI0000764

PATENT
U.S. Patent Application No. 09/961,417

36  36. (original)  The computer system of claim 30, wherein the blocking device
further includes light emitting diodes (LEDs) configured to transmit status information
relating to the status of the blocking device.

37  37. (original)  The computer system of claim 30, wherein the blocking device
further includes:

a temporary storage device, the blocking device storing data from the host
corresponding to blocked commands in the temporary storage device.

38  38. (original)  The computer system of claim 37, wherein when read commands
are received from the host that refer to data stored in the temporary storage device, the
blocking device returns the data from the temporary storage device to the host.

39  39. (original)  The computer system of claim 30, wherein the blocking device
further includes:

a user configurable memory, the user configurable memory storing instructions
that define protected areas on the storage device, the blocking device dropping those of
the commands that would otherwise modify the protected areas on the storage device.

40  40. (currently amended)  A blocking device comprising:

means for intercepting communications between a host and a storage device;

means for comparing commands in the communications between the host and the
storage device to a predetermined set of commands;

-12-

MTI0000765

Sent By: HARRITY&SNYDER,LLP;          571 432 0808;          5-Aug-0-.  9:50AM;          Page 17/21

*PATENT*
U.S. Patent Application No. 09/961,417

means for forwarding selected ones of commands in the intercepted

communications to the storage device <u>only</u> when, based on the comparison, the

commands <u>that are in a predetermined set of commands</u> are determined to be commands

that are known to not permanently modify a state of the storage device; and

    means for blocking other ones of the commands from being received by the

storage device based on the comparison, wherein

    the blocking device operates transparently to normal operation of the host and the

storage device.


    50. (canceled)

*41*

    51. (original)  The blocking device of 49, *40* wherein the storage device is an

integrated device electronics (IDE) disk drive.

*42*

    52. (original)  The blocking device of 46, *40* wherein the commands forwarded to

the storage device include a capabilities request command, and the means for forwarding

further comprises:

    means for modifying data received from the storage device relating to the

capabilities request command to reflect the capabilities of the blocking device.

*40*

*43*

    53. (original)  The blocking device of 49, further comprising:

    means for returning status information to the host that indicates that the blocked

command was successfully executed by the storage device.

-13-

PAGE 17/21 * RCVD AT 8/5/2004 10:35:21 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/1 * DNIS:8729306 * CSID:571 432 0808 * DURATION (mm-ss):04-20

MTI0000766

sent By: HARRITY&SNYDER,LLP;                571 432 0808;   5-Aug-0..  9:51AM;               Page 18/21

PATENT
U.S. Patent Application No. 09/961,417

54. (previously presented)  The blocking device of claim 3, wherein the interface

emulator is configured to emulate an IEEE 1394 connection.

55. (canceled)

56. (previously presented)  The computer system of claim 39, wherein the

interface emulator emulates an IEEE 1394 connection and the storage device is an IDE

disk drive.

-14-

MTI0000767

PATENT
U.S. Patent Application No. 09/961,417

## REMARKS

In the final Office Action of May 27, 2004, the Examiner rejected claims 1, 4-8, 32, 34, 36-39, 42-44, and 48 under 35 U.S.C. § 103(a) in view of U.S. Patent No. 6,345,368 to Bergsten, U.S. Patent No. 6,336,187 to Kern et al., and U.S. Patent No. 6,654,864 to Shaath et al.; and rejected claim 17 under 35 U.S.C. § 103(a) in view of Bergsten, Kern et al., and Shaath et al., and further in view of U.S. Patent No. 6,216,205 to Chin. Further, in the Office Action, the Examiner indicated that dependent claims 10, 11, 13, 14, 25, 26, 28, 46, and 47 contain features that are allowable.

By this Amendment, Applicants propose amending claims 15, 21, 25, 32, 38, and 49.

Applicants appreciate the in-person interview that the Examiner conducted with Applicants on July 15, 2004. As described in the Interview Summary form PTOL-413, in this interview, claim 1, and in particular, the recitations of claim 1 relating to "the predetermined set of commands being commands that are known to not permanently modify a state of the storage device," were discussed. Applicants explained that the newly cited Shaath et al., along with Bergsten and Kern et al., fails to disclose or suggest this feature of the invention. The Examiner agreed with the Applicants, and agreed to re-consider the final Office Action in view of the interview. In telephone conversations with Applicants' representative on July 27, 2004 and July 30, 2004, the Examiner indicated to Applicants' representative that that claim 1 and its dependent claims were allowable over the prior art of record and suggested amendments to some of the other independent claims such that these claims would recite the above-mentioned feature relating to a predetermined set of commands. The Examiner indicated that if the claims

-15-

MTI0000768

PATENT
U.S. Patent Application No. 09/961,417

were amended in this manner, all the pending claims would be allowable over the prior art of record.

Although Applicants do not necessarily concede that <u>Bergsten</u>, <u>Kern et al.</u>, and <u>Shaath et al.</u>, either alone or in combination, disclose or suggest each of the features recited in independent claims 15, 32, 38, and 49, in order to expedite prosecution, Applicants propose amending these claims in the manner discussed with the Examiner in the communications on July 27th and July 30th. Applicants further propose amending dependent claims 21 and 25 to conform with the amendments to claim 15. Accordingly, Applicants submit that currently pending claims 1, 3, 4-11, 13-17, 19-26, 28, 32, 34-40, 42-49, 51-54, and 56 are now allowable. An indication of such is respectfully requested.

Applicants respectfully request that this Amendment under 37 C.F.R. § 1.116 be entered by the Examiner, placing claims 1, 3, 4-11, 13-17, 19-26, 28, 32, 34-40, 42-49, 51-54, and 56 in condition for allowance. Applicants submit that the proposed amendments of claims 15, 21, 25, 32, 38, and 49 do not raise new issues or necessitate the undertaking of any additional search of the art by the Examiner, as this Amendment should allow for immediate action by the Examiner.

In view of the foregoing amendments and remarks, Applicants respectfully request the Examiner's reconsideration of this application, and the timely allowance of the pending claims.

-16-

MTI0000769

PATENT
U.S. Patent Application No. 09/961,417

To the extent necessary, a petition for an extension of time under 37 C.F.R. §

1.136 is hereby made.  Please charge any shortage in fees due in connection with the

filing of this paper, including extension of time fees, to Deposit Account No. 50-1070

and please credit any excess fees to such deposit account.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E. Ledell
Registration No. 42,784

Date:  August 5, 2004

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800

-17-

MTI0000770

SPM TC 2100
FINAL SEARCH DATE  0 8 - 0 9 - 04
DELIVER TO GOV'T DATE 0 8 - 09 - 04

MTI0000771

Patent
Attorney's Docket No. 0032-0003

<u>Certificate of Transmission</u>

I hereby certify that this correspondence consisting of 20 pages is being facsimile transmitted to the Patent and Trademark Office on August 5, 2004, to facsimile number (703) 872-9306.

Brian E. Ledell
Reg. No. 42,784

RECEIVED
CENTRAL FAX CENTER

AUG - 5 2004

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

OFFICIAL

| | | |
|---|---|---|
| In re Patent Application of | ) | AF |
| | ) | |
| Steven BRESS et al. | ) | Group Art Unit: 2187 |
| | ) | |
| Application No.: 09/961,417 | ) | Examiner: Ngoc V. Dinh |
| | ) | |
| Filed: September 25, 2001 | ) | |
| | ) | |
| For:  WRITE PROTECTION FOR COMPUTER | ) | |
| LONG-TERM MEMORY DEVICES | ) | |

<u>AMENDMENT/REPLY TRANSMITTAL LETTER</u>

U.S. Patent and Trademark Office
220 20th Street S.
Customer Window, Mail Stop AF
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

Enclosed is a reply for the above-identified patent application.

☐  A Petition for Extension of Time is also enclosed.

☐  A Terminal Disclaimer and a check for ☐ $55.00 ☐ $110.00  to cover the requisite Government fee are also enclosed.

☐  A Request for Continued Examination under 37 C.F.R. § 1.114 is enclosed.

☐  A request for Entry and Consideration of Submission under 37 C.F.R. § 1.129(a) is also enclosed.

MTI0000772

Amendment/Reply Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 2

☒   No additional claim fee is required.

☐   An additional claim fee is required, and is calculated as shown below:

| AMENDED CLAIMS | | | | | |
|---|---|---|---|---|---|
| | No. of Claims | Highest No. Of Claims Previously Paid For | Extra Claims | Rate | Additional Fee |
| Total Claims | | Minus | | x $18.00 = | |
| Ind. Claims | | Minus | | x $ 86.00 = | |
| If Amendment adds multiple dependent claims, add $290.00 | | | | | |
| Total Amendment Fee | | | | | |
| If Small entity status is claimed, subtract 50% of Total Amendment Fee | | | | | |
| TOTAL ADDITIONAL FEE DUE FOR THIS AMENDMENT | | | | | |

☐   A claim fee in the amount of $ _____ is enclosed.

☐   Charge $ _____ to Deposit Account no. 50-1070.

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made. Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account No. 50-1070 and please credit any excess fees to such deposit account.

MTI0000773

Amendment/Reply Transmittal Letter
Application Serial No. 09/961,417
Attorney's Docket No. 0032-0003
Page 3

The Commissioner is hereby authorized to charge any other appropriate fees that may be required by this paper that are not accounted for above, and to credit any overpayment, to Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615
Date: August 5, 2004

MTI0000774

Sent By: HARRITY&SNYDER,LLP;            571 432 0808;        5-Aug-0.. 9:47AM;          Page 1

# HARRITY & SNYDER, L.L.P.

11240 WAPLES MILL ROAD, SUITE 300
FAIRFAX, VIRGINIA 22030
TELEPHONE (571) 432-0800
FACSIMILE (571) 432-0808

**RECEIVED**
CENTRAL FAX CENTER

AUG - 5 2004

**OFFICIAL**

## FACSIMILE TRANSMITTAL

| TO: | | FROM: | |
|---|---|---|---|
| Name: | Ngoc V. Dinh | Name: | Brian E. Ledell |
| Firm: | U.S. P.T.O. | Phone No.: | (571) 432-0800 |
| Fax No.: | 703-872-9306 | Fax # Verified by: | rwa |
| Phone No.: | 703-305-3023 | # Pages (incl. this): | 21 |
| Subject: | Serial No. 09/961,417 | Date: | August 5, 2004 |

Message:

Please see attached Amendment/Reply Transmittal and Amendment After Final for U.S. Serial No. 09/961,417.

If there is a problem with this transmission, notify the sender at the number above.

This facsimile is intended only for the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If you have received this facsimile in error, please notify the sender immediately by telephone (collect), and return the original message by first-class mail to the above address.

MTI0000775

| *Notice of Allowability* | Application No. | Applicant(s) |
|---|---|---|
| | 09/961,417 | BRESS ET AL. |
| | Examiner | Art Unit |
| | NGOC V DINH | 2187 |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to 08/05/04.

2. ☒ The allowed claim(s) is/are <u>1,3-11,13-17,19-28,32,34-40,42-49,51-54 and 56</u>.

3. ☒ The drawings filed on <u>25 September 2001</u> are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
          International Bureau (PCT Rule 17.2(a)).
    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
       .1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .
    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
       Paper No./Mail Date _____ .
    Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☒ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date _____
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____ .

U.S. Patent and Trademark Office
PTOL-37 (Rev. 1-04)                 **Notice of Allowability**                 Part of Paper No./Mail Date 2004080

#17

MTI0000776

Application/Control Number: 09/961,417                                    Page 2

Art Unit: 2187

## DETAILED ACTION

1.  This Office Action is responsive to Amendment filed 08/05/04, wherein claims 2, 12, 18, 29-31, 33, 41, 50 and 55 have been canceled, claims 15, 21, 25, 32, 38 and 49 have been amended.

### Reasons for allowance

2.  The primary reasons for allowance of claims 1, 15, 32, 38 and 49 in the instant application is the combination with the inclusion of the limitation of "allowing only those of the commands that match a predetermined set of commands ..., the predetermined set of commands being commands that are known to not permanently modify a state of the storage device".

Because claims 3-11, 13-14, 16-17, 19-28, 34-37, 39-40, 42-48, 51-54 depend directly or indirectly on claims 15, 32, 38 and 49. These claims are considered allowable for at least the same reasons noted above.

### Conclusion

3.  The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

a.  Jiang et al PN 4,654,829 discloses non-volatile read/write memory with protected module.

Any inquiry concerning this communication or earlier communications from the Examiner should be directed to Ngoc Dinh whose telephone number is (703) 305-3032.  The examiner can normally be reached on Monday-Friday 8:30 AM-5:00 PM. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Donald A. Sparks, can be reached on (703) 308-1756. The fax phone numbers for the organization where this application or proceeding is assigned are (703) 746-7239 for regular communications and (703) 746-7238 for After Final communications.

Application/Control Number: 09/961,417                                  Page 3
Art Unit: 2187

Any inquiry of a general nature or relating to the status of this application or

proceeding should be directed to the receptionist whose telephone number is (703)

305-3900.

NGOC DINH

Patent Examiner

ART UNIT 2187

August 23, 2004

DONALD SPARKS
SUPERVISORY PATENT EXAMINER

| *Notice of References Cited* | Application/Control No. 09/961,417 | Applicant(s)/Patent Under Reexamination BRESS ET AL. | |
|---|---|---|---|
| | Examiner NGOC V DINH | Art Unit 2187 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-4,654,829 | 03-1987 | Jiang et al. | 365/189.03 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 20040805

MTI0000779

# United States Patent [19]

Jiang et al.

[11] **Patent Number:** 4,654,829

[45] **Date of Patent:** Mar. 31, 1987

[54] **PORTABLE, NON-VOLATILE READ/WRITE MEMORY MODULE**

[75] Inventors: Ching-Lin Jiang, Dallas; Robert D. Lee, Denton, both of Tex.

[73] Assignee: Dallas Semiconductor Corporation, Dallas, Tex.

[21] Appl. No.: 682,701

[22] Filed: Dec. 17, 1984

[51] Int. Cl.⁴ .................................... G11C 13/00
[52] U.S. Cl. ............................ 365/229; 365/226; 365/189; 371/66
[58] Field of Search ................... 365/229, 221, 226; 235/492, 380; 371/66

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,145,760 | 3/1979 | Ward et al. | 365/226 |
| 4,256,955 | 3/1981 | Giraud et al. | 235/380 |
| 4,381,458 | 4/1983 | Anstey et al. | 307/66 |
| 4,408,119 | 10/1983 | Decavele | 235/380 |
| 4,449,206 | 5/1984 | Tokitsu et al. | 365/229 |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| 1549307 | 7/1979 | United Kingdom |
| 2067018 | 7/1981 | United Kingdom |

## OTHER PUBLICATIONS

Mostek MK3805N, Preliminary Data Sheet from Mostek 1982/1983 Microelectronic Data Book.
Motorola MC68HC68R1 and MC68HC68R2, Advance Information Data Sheet Printed 5-84.
National Semiconductor COP499/COP399, Low Power CMOS Memory Data Sheet.
Mostek Application Note Entitled NMOS RAM Offers Non-Volatility with DATASAVE.
Catalyst Research Corporation Data Sheet for NVRM IA Non-Volatile RAM Module.
Mostek MK48Z02, CMOS RAM Data Sheet.
Article from Businessweek, Oct. 15, 1984, Entitled "How 'Smart' Cards Can Outwit the Credit Crooks".

*Primary Examiner*—Terrell W. Fears
*Attorney, Agent, or Firm*—David N. Leonard

[57] **ABSTRACT**

A portable, non-volatile read/write memory module includes a battery for providing standby power that is coupled to a monolithic integrated circuit. Five terminals of the module are removably connected to a host electronic system for transfer of data to and from the module. One of the terminals is a chip enable input that may optionally be used for providing operating power to the monolithic integrated circuit. The monolithic integrated circuit further includes control circuitry that may optionally be coded for providing a security feature for access to data stored in the memory module.

**6 Claims, 11 Drawing Figures**





FIG. 1

FIG. 2



FIG. 4

POWER COMPARATOR AND SWITCHING CIRCUIT — 78

MTI0000781



FIG. 3

MTI0000782



FIG. 5

COMMAND FORMAT

INSTRUCTION COMMAND BIT NO.

IDENTIFICATION CODE

BYTE ADDRESS

READ OR WRITE COMMAND

BURST MODE TRANSFER OR SINGLE BYTE TRANSFER

FIG. 6

SINGLE BYTE WRITE

WRITE COMMAND

BYTE ADDRESS

IDENTIFICATION CODE

WRITE DATA

SINGLE BYTE MODE

FIG. 7

BURST MODE READ

READ COMMAND

ADDRESS ZERO

IDENTIFICATION CODE

1024 BITS READ DATA

BURST MODE

U.S. Patent   Mar. 31, 1987   Sheet 3 of 5   4,654,829



FIG. 8

MTI0000784



FIG. 9A

FIG. 9B

FIG. 10

MTI0000785

1

## PORTABLE, NON-VOLATILE READ/WRITE MEMORY MODULE

### REFERENCE TO RELATED APPLICATION

Reference is made to a related application entitled Space-Saving Back-up Power Supply, Ser. No. 660,937 filed Oct. 15, 1984, in the names of Smith, Jr., et al. The '937 application discloses and claims a module for providing battery back-up to an electronic circuit such as a large scale integrated circuit memory.

### TECHNICAL FIELD

The present invention generally relates to electronic systems and, more particularly, is concerned with apparatus for providing a non-volatile read/write memory module.

### BACKGROUND OF THE INVENTION

An easily-portable and non-volatile read/write memory module or cartridge is useful in many electronic applications. Such applications include ones in which it is advantageous to physically associate electrically-stored information or data with a tangible object that may be moved from place to place. In such applications, the function of the portable memory is similar to that of a tag. For ease of interconnection, compactness, and reliability, it is desirable that a portable memory module have a minimum number of terminals for removable connection to a host electronic system. Another useful feature for a portable memory module is a means for preventing unauthorized access to the data stored in the module.

In the past, various portable, non-volatile memory modules or cartridges have been devised. One such cartridge comprises a plastic housing having mounted therein a read-only memory integrated circuit mounted on a printed circuit board. Electrical terminals of the read-only memory integrated circuit are connected via conductors on the printed circuit board to terminals on an edge of the printed circuit board. The edge terminals of the printed circuit board are recessed in an opening at one side of the plastic housing and are adapted to be plugged into a multi-pin socket of a host electronic system. This cartridge requires connection to more than twenty terminals. Moreover, data cannot be electrically written to the memory of such a cartridge.

Other non-volatile memories include EPROMs (ultraviolet light erasable and electrically programmable read-only memories) and EEPROMS (electrically erasable and electrically programmable read-only memories). The long time typically required to modify data or information stored in such memories is unacceptable for certain applications.

Non-volatile memory modules having read/write memory (RAM) have also been devised. One such portable, non-volatile memory includes lithium batteries piggybacked onto a 2K×8 static CMOS RAM which is packaged in a 24-pin dual-in-line package. Such a package—having a large number of exposed pins or terminals—is not well-suited for this purpose.

The above-described prior art memory modules typically require connection from the host electronic system to considerably more than five terminals of the module. It is advantageous, however, to have a smaller number of required terminals. For a reduced number of terminals, serially-accessible RAMS have been devised. One such memory is a CMOS static RAM organized

2

128×8 and packaged in an 8-pin dual-in-line package with no battery attached and with no standby power control logic included therein. Data is transferred to and from the RAM using synchronous serial communication. Seven pins of the package are utilized: an operating power supply input pin, a ground pin, a serial clock pin, two chip-enable pins, a data-input pin, and a data-output pin. The first 8-bit byte serially transferred after the chip is enabled is an input command byte that defines the starting RAM address and whether subsequent transfers are to be reads or writes. For multiple transfers (burst mode) the RAM address automatically increments as long as the RAM remains enabled. For this memory module, no provision is made to prevent unauthorized access.

It is known in the prior art that further pin or terminal reduction can be accomplished by combining the input and output pins into a single I/O pin. Additionally, it is heretofore known to provide only one chip enable input rather than two. Furthermore, it should be apparent that the serial clock input pin could be eliminated if asynchronous serial communication, rather than synchronous, were desirable or acceptable for a particular application.

None of the above-mentioned prior art approaches for portable, non-volatile memory, however, have proposed elimination of the operating power supply input pin. In this regard, it is important to distinguish an operating power supply input from a standby power supply input. In connection with providing non-volatility to a RAM integrated circuit, it has been proposed in the prior art to eliminate a standby power supply input pin by using a write enable pin to provide standby power; a conventional power supply input pin, though, provides operating power whenever the RAM is not in the standby mode.

In accordance with the foregoing, a need exists for a portable, non-volatile read/write memory module having a reduced number of pins or terminals for interconnection to a host electronic system. A need also exists for preventing unauthorized access to data stored in such a memory module.

### SUMMARY OF THE INVENTION

The present invention provides a portable, non-volatile read/write memory module having as few as five terminals for interconnection to a host electronic system. This small number of required terminals for interconnection is advantageous in the packaging of the memory module into a miniature, rugged, and low-cost package.

In an alternative embodiment of the invention, the number of required terminals for interconnection is further reduced by eliminating a separate operating power supply input terminal.

Another feature of the invention is the provision of security whereby electronic circuitry is provided for preventing unauthorized reading or writing of data stored in the module.

The memory module of the present invention includes a battery connected to a monolithic integrated circuit for providing standby power to the monolithic integrated circuit. The monolithic integrated circuit includes: a serially-accessible read/write data storage means for the storage and retrieval of data; a chip enable input terminal and chip enable circuitry; a primary power supply input terminal for providing operating

MTI0000786

4,654,829

3

power to the data storage means whenever the voltage of the primary power supply input terminal is greater than that of the battery; and comparator and switching circuitry which is automatically operative to select the chip enable input terminal as the source of operating power to the data storage means if both of the following conditions are satisfied: (1) the voltage of the primary power supply input is less than that of the battery, and (2) the voltage of the chip enable input terminal is greater than that of the battery. The monolithic integrated circuit may additionally or alternatively include: circuitry for receiving a serial sequence of data bits representative of an identification code; circuitry for comparing the received sequence of bits to a predetermined bit code; and circuitry responsive to the result of such comparison for enabling the writing and reading of data to and from the read/write data storage means.

As is apparent from the foregoing summary, it is a general object of the present invention to provide a novel and improved portable, non-volatile read/write memory module.

Other objects and advantages, and a more complete understanding of the invention may be obtained by referring to the following detailed description of a preferred embodiment when taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of an assembled portable, non-volatile read/write memory module according to one aspect of the invention.

FIG. 2 is an exploded perspective view of the memory module of FIG. 1.

FIG. 3 is a block and logic functional diagram illustrating a monolithic integrated circuit utilized in the memory module of FIGS. 1 and 2, and illustrating interconnection of the monolithic integrated circuit to a battery of the memory module and to a host electronic system.

FIG. 4 is a circuit functional diagram illustrating a power comparator and switching circuit utilized in the monolithic integrated circuit shown in FIG. 3.

FIG. 5 is a symbolic representation of the command format utilized in the monolithic integrated circuit of FIG. 3.

FIG. 6 is a set of waveforms illustrating the basic timing of single byte write command for the monolithic integrated circuit of FIG. 3.

FIG. 7 is a set of waveforms illustrating the basic timing of a burst mode read command for the monolithic integrated circuit of FIG. 3.

FIG. 8 is block and logic functional diagram of a control logic circuit utilized in the monolithic integrated circuit of FIG. 3.

FIGS. 9A–9B are logic and circuit functional diagrams of a code comparison circuit utilized in the control logic circuit of FIG. 8.

FIG. 10 is a logic and circuit functional diagram of an identification code read-only circuit utilized in the control logic circuit of FIG. 8.

DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

A hand-held, portable, non-volatile read/write memory module 20 according to the invention is shown in FIG. 1. For use as an electronic tag, it is desirable that the memory module 20 be small, rugged, low-cost, have a small number of connector terminals, and be protected

4

against unauthorized and inadvertent access. The present preferred embodiment has a width of approximately 0.6 inches, a length of approximately 0.7 inches, and a thickness of approximately 0.3 inches. The memory module 20 includes a set of terminals 22, 24, 26, 28, and 30 adapted for removably making electrical connection to nodes of a host electronic system 32 (not shown in FIG. 1). Front and rear housing pieces 34 and 36 are made of plastic and function as a protective outer shell for the memory module 20.

An exploded view of the memory module 20 is shown in FIG. 2. The memory module 20 includes a specially-shaped metal piece 38, an end portion of which comprises the terminal 22. In the preferred embodiment, the metal piece 38 has a formed end portion 40. In an alternative embodiment, the metal piece 38 is eliminated.

Also included in the memory module 20 is a battery 42. In the preferred embodiment, the battery 42 is a standard 3-volt lithium cell manufactured by Ray-O-Vac as model BR1225. The battery 42 has a positive terminal 44 to which is spot-welded a metal tab 46. The battery 42 has a negative terminal 48 to which is spot-welded a metal tab 50.

The memory module 20 further includes a monolithic integrated circuit 52 which is housed in a dual-in-line integrated circuit package 54. Four pins along one side of the integrated circuit package 54 comprise the terminals 24, 26, 28, and 30. Each of the terminals 24, 26, 28, and 30 extends in a straight manner in a plane parallel to the longitudinal ends of the body of the integrated circuit package 54 and, when the memory module 20 is assembled, passes through a corresponding aperture 56 in the front housing piece 34. The terminal 22 of the metal piece 38 similarly passes through an aperture 58 of the front housing piece 34. The apertures 56 and 58 are located in a wall 60 of the front housing piece 34. The wall 60 is sufficiently recessed from front edge 62 of the front housing piece 34 so as to prevent the terminals 22, 24, 26, 28, and 30 from extending beyond the plane of the front edge 62. The integrated circuit package 54 additionally has terminals 64 and 66 which are located on the opposite side from the terminals 24, 26, 28, and 30. Each of the terminals 24, 26, 28, 30, 64, and 66 are interconnected within the integrated circuit package 54 to the monolithic integrated circuit 52.

The terminal 66 is electrically connected by conventional soldering to the formed end portion 40 of the metal piece 38. The terminal 64 is electrically connected by conventional soldering to the metal tab 46, thereby making electrical connection to the positive terminal 44 of the battery 42. Similarly, the terminal 30 is electrically connected by conventional soldering to the metal tab 50, thereby making electrical connection to the negative terminal 48 of the battery 42.

After the monolithic integrated circuit 52 is electrically connected to the metal piece 38 and to the battery 42, the terminals 22, 24, 26, 28, and 30 are inserted through the apertures 58 and 56 of the front housing piece 34. A measured amount of a liquid encapsulating material such as Axicon XT-5038-9 insulation compound (not shown) is dispensed into the cavity of the rear housing piece 36 and the front housing piece 34 is next fitted to the rear housing piece 36—the battery 42, the monolithic integrated circuit 52, and the metal piece 38 being located in the partially-filled cavity of the rear housing piece 36. The liquid encapsulating material

MTI0000787

4,654,829

5

flows around the other elements in the cavity and is caused to become solidified by curing.

FIG. 3 illustrates interconnection of the monolithic integrated circuit 52 to the battery 42 and to electrical nodes of the host electronic system 32. The terminal 22 is removably connected (in the manner of a plug and socket) to a primary power supply node 68 of the host electronic system 32. Similarly, the terminal 24 is removably connected to a chip enable output node 70, the terminal 26 to an input/output node 72, the terminal 28 to a clock output node 74, and the terminal 30 to a ground node 76.

The primary power supply node 68 provides a voltage VCCI which typically is at 5.0 volts; the chip enable output 70 provides a chip enable signal E; the ground node 76 provides a ground voltage-reference GND; the clock output node 74 provides a signal CLK for synchronously clocking data to and from the monolithic integrated circuit 52; and the input/output node 72 provides or receives a signal I/O which is the data that is transferred to and from the monolithic integrated circuit 52. The battery 42 provides to the terminal 64 a voltage herein designated as voltage BAT.

The monolithic integrated circuit 52 includes a power comparator and switching circuit 78 for providing a signal PWROFF and an output designated herein as VCCO. In addition to GND, which is coupled to all circuits of the monolithic integrated circuit 52, the voltage VCCI and the chip enable signal E and the voltage BAT are coupled to inputs of the power comparator and switching circuit 78. The power comparator and switching circuit 78 compares the voltages of these three inputs and automatically couples one of the three inputs to VCCO through one of three switching transistors. The voltage VCCI is coupled to VCCO if the voltage VCCI is greater than the voltage BAT. Alternatively, the chip enable signal E is coupled to VCCO if (1) the voltage VCCI is less than the voltage BAT and (2) the voltage of the chip enable signal E is greater than the voltage BAT. In the further alternative, the voltage BAT is coupled to VCCO if both the voltage VCCI and the voltage of the chip enable signal E are less than the voltage BAT. With the exception of two comparators within the power comparator and switching circuit 78, VCCO is utilized to power all circuits of the monolithic integrated circuit 52.

The monolithic integrated circuit 52 may be either in an operating mode or in a standby mode. To be in the operating mode, either the voltage VCCI or the chip enable signal E must be at a voltage greater than that of the voltage BAT. Under such conditions the signal PWROFF is a logic 0 (a voltage at or near GND). Conversely, when both the voltage VCCI and the chip enable signal E are at voltages less than that of the voltage BAT, the signal PWROFF is a logic 1 (a high voltage); for this condition the monolithic integrated circuit 52 is in the standby mode, receiving standby power from the battery 42 through the terminal 64.

From the foregoing description of the power comparator and switching circuit 78, it should be apparent that, for an alternative embodiment, the terminal 22 and its associated terminal 24 may be completely eliminated (and eliminating any need for the metal piece 38) if the chip enable output node 70 is designed to be capable of providing sufficient operating voltage and current to power the monolithic integrated circuit 52 in its operating mode. The monolithic circuit 52 in the preferred embodiment is implemented with CMOS cir-

6

cuitry and requires the chip enable output 70 typically provide less than 16 mA at 3.8 volts. (If, however, the voltage VCCI of typically 5.0 volts is provided, then the chip enable output node 70 normally is not used as a source of power and is only required to typically provide less than 0.25 mA at a logic 1 state.)

Referring to FIG. 4, there is illustrated a circuit functional diagram of the power comparator and switching circuit 78. Included therein are three P-channel transmission transistors 80, 82, and 84, with each having its drain coupled to VCCO. As illustrated, the sources of the P-channel transmission transistors 80, 82, and 84 are respectively coupled to the voltage VCCI, the chip enable signal E, and the voltage BAT. A voltage comparator 86, a voltage comparator 88, and logic gates 90, 92, 94, and 96 cooperate to cause one of the three P-channel transmission transistors 80, 82, and 84 to become conductive, thereby coupling to VCCO in the heretofore-described manner either the voltage VCCI, the chip enable signal E, or the voltage BAT. Each of the P-channel transmission transistors 80, 82, and 84 is made to have a large width to length ratio in order to minimize the voltage drop across whichever one of the three transistors is conductive.

Although all other circuitry of the monolithic integrated circuit 52 is powered from VCCO, the voltage comparator 86 is powered from VCCI and the voltage comparator 88 is powered from the chip enable signal E. The voltage comparator 86 and the voltage comparator 88 are of conventional design.

When the state of the output of the logic gate 96 is a logic 0 the P-channel transmission transistor 84 is conductive and the signal PWROFF produced at the output of an inverter 98 is a logic 1.

Referring again to FIG. 3, it can be seen that the signal PWROFF is input to an E buffer 98, an inverter 100, a clock buffer 102, an input buffer 104, and a RAM 106. The signal PWROFF causes the E buffer 98 to be unresponsive to the chip enable signal E, the clock buffer 102 to be unresponsive to the signal CLK, the input buffer 104 to be unresponsive to the signal I/O, and the RAM 106 to be unresponsive to a signal designated herein as ENABLE which is output from a control logic circuit 108.

The clock buffer 102 produces a signal CLK1 at its output. The signal CLK1 is forced to a logic 1 state whenever the signal PWROFF is a logic 1. An inverter 110 is responsive to the signal CLK1 for generating a signal CLK1' which is input to an AND gate 112. The AND gate 112 is responsive to an enable signal E1 produced by the E buffer 98, to the signal CLK1', to a signal READ which is produced by the control logic circuit 108, and to the signal ENABLE, for producing an output enable signal E3 which is applied to an output buffer 114. Whenever the signal E3 is a logic 0, the output of the output buffer 114 is caused to be in a high impedance state.

An AND gate 116 is responsive to the enable signal E1 and to the output of the inverter 100 for producing a signal E2 which is utilized to enable the control logic circuit 108. The control logic circuit 108 is responsive to the signal E2, to the signal CLK1, and to a signal DIN for controlling the transfer of data to and from the RAM 106. The input buffer 104 is responsive to the signal PWROFF and to the signal I/O for producing the signal DIN. The control logic circuit 108 provides byte address signals A0, A1, A2, A3, A4, A5, A6 and bit address signals B0, B1, B2, and a signal WRITE, as well

MTI0000788

4,654,829

7

as the previously mentioned signal ENABLE and the signal READ.

The RAM 106 is addressed as a conventional 1024×1 RAM but, as utilized in the monolithic integrated circuit 52, may be conceptually regarded as being organized into 128, 8-bit bytes, and wherein each 8-bit byte is serially transferred to or from the RAM 106. The byte address signals A0–A6 determine which one of the 128 bytes is to be written or read, and the bit address signals B0–B2 determine which bit within the addressed byte is accessed for writing or reading. The signal WRITE is a logic 1 when data is to be written to the RAM 106, and the signal ENABLE is a logic 1 when data is either to be written to or to be read from the RAM 106.

The signal DIN provides data to be written to the RAM 106. Data is input to the RAM 106 on the falling edge of the signal CLK1', which corresponds to the rising edge of the signal CLK. For a read operation from the RAM 106, the RAM 106 provides an output signal DOUT to the output buffer 114. The output buffer 114 is responsive to the signal E3 and to the signal DOUT for providing output data to the terminal 26.

The control logic circuit 108 provides a security feature for controlling the serial transfer of data to and from the RAM 106. The single chip enable signal E must transition from a logic 0 to a logic 1 as the first step for gaining access to the RAM 106. The immediately following 24 transitions from a logic 0 to a logic 1 of the signal CLK will cause data applied to the terminal 26 (the signal I/O) to be input via the signal DIN to the control logic circuit 108. In this manner, 24 data bits that comprise an instruction command are received.

Referring now to FIG. 5, there is illustrated a symbolic representation of the instruction command format utilized in the monolithic integrated circuit 52. The first 8 bits of the 24-bit sequence define whether the operation following receipt of the instruction command will be a read, a write, or no operation. The bit pattern for a read (the right-most bit being the first received) is 01000010 and for a write is 10011101. Any other received pattern will result in no access to the RAM 106.

The instruction command bit 24 (the last-received bit of the instruction command) defines whether a read or write transfer is to be performed following receipt of the instruction command is to be a single byte transfer or a burst mode transfer. For a single byte transfer, the bit 24 must be a logic 0; for a burst mode transfer, the bit 24 must be a logic 1.

For a single byte transfer, the instruction command bits 9 through 15 define the address of the byte of the RAM 106 which is to be accessed for reading or writing. For a burst mode transfer, each of the instruction command bits 9 through 15 is required to be a logic 0. In the burst mode, reading or writing commences at byte address 0. After the 8 bits of a byte of the RAM 106 have been serially transferred, the byte address automatically increments by 1 for transfer of the next byte. In this manner, all 128 consecutive bytes of the RAM 106 may be serially read or written. Fewer than all of the 128 bytes can be transferred by causing the chip enable signal E to transition from a logic 1 to a logic 0 before all 128 bytes have been transferred.

A security feature is provided in conjunction with instruction command bit 16 through bit 23. These 8 bits comprise an identification code that is compared to a predetermined bit code stored in the control logic circuit 108. Access to the RAM 106 for reading or writing

8

is enabled only if the instruction command identification code matches the predetermined bit code. If the code does not match, it is required that the chip enable signal E return to a logic 0 and transition again to a logic 1 prior to any transfer of data to or from the RAM 106.

Referring to FIG. 6, the timing relationship between the signal CLK, the chip enable signal E, and the signal I/O for a single byte write is illustrated. Input of the instruction command and the write data is synchronous; the signal I/O is sampled by the control logic circuit 108 on the rising edge (transition from a logic 0 to a logic 1) of the signal CLK.

The timing relationship of the signal CLK, the chip enable signal E, and the signal I/O for a burst mode read is illustrated in FIG. 7. As with the single byte write, the 24-bit instruction command is synchronously input after the chip enable signal E transitions from a logic 0 to a logic 1. The portion of the signal I/O that comprises the instruction command is sampled on the rising edge of the signal CLK, but data is output on the falling edge of the signal CLK.

Referring to FIG. 8, a block and logic functional diagram of the control logic circuit 108 is illustrated. The state of the signal E2 is a logic 0 when either the chip enable signal E is a logic 0 or the signal PWROFF is a logic 1. When the signal E2 is a logic 0, an inverter 118 causes the state of its output signal S/R to be a logic 1. Signal S/R is input to a 25-bit shift register 120. The 25-bit shift register 120 is comprised of 25 conventional master/slave D-type clocked latches, each of which has a D-input and Q and Q' outputs. The Q output of the right-most bit provides a signal SRO; the Q' output of the next right-most 8 bits provide signals SR1' through SR8'; the Q and Q' outputs of the next 15 bits provide output signals SR9 through SR23 and SR9' through SR23', respectively; and the Q output of the left-most bit provides a signal SR24.

As is conventional, with the exception of the D-input of the left-most bit and the Q-output of the right-most bit, the Q output of a bit is coupled to the D-input of the immediately right adjacent bit. Within each bit, data at the D-input is sampled by the master when a signal CLK2 is a logic 0, and is clocked from the master to the slave when the signal CLK2 transitions to a logic 1. Each master of the right-most 24 bits has a reset input and the master of the left-most bit has a set input. These set and reset inputs are coupled to the output of the inverter 118. The output of the inverter 118 additionally is coupled to an input of an OR gate 122 and, accordingly, causes the signal CLK2 which is provided by the OR gate 122 to be a logic 1 whenever the signal S/R is a logic 1. Consequently, the bits comprising the 25-bit shift register 120 are responsive to a logic 1 state of the signal S/R for presetting the Q output of the left-most bit to a logic 1 state and the other 24 bits of the 25-bit shift register 120 to a logic 0 state.

After the signal E2 becomes a logic 1, an AND gate 124 and the OR gate 122 are responsive to the signal CLK1 for generating the signal CLK2 which causes the logic 1 state which is initially stored in the left-most bit position to be shifted to the right from register to register of the 25-bit shift register 120 as the instruction command is serially received via the signal DIN. After 24 cycles of the signal CLK2, the signal SRO will transition from a logic 0 state to a logic 1 state. Because the OR gate 122 receives the signal SRO as an input, further clocking of the 25-bit shift register 120 is inhibited until

MTI0000789

4,654,829

9

the signal SRO later is caused to become a logic 0 by the resetting action of the signal S/R.

Conventional logic comprising a write or read command detector 126 is responsive to the signals SR1' through SR8' for generating the signal READ, the signal WRITE, and a signal R/W. The signal R/W is a logic 1 when the write or read command detector 126 detects either a valid read or a valid write command. Similarly, a burst command detector 128 is responsive to the signals SR24 and SR9' through SR15' for generating a signal BURST. The signal BURST is a logic 1 only if the signals SR24 and SR9' through SR15' are all at a logic 1 or if the signal SR24 is a logic 0 (in which case the signals SR9' through SR15' are don't-cares with regard to generating a logic 1 for the signal BURST).

An identification code read-only circuit 130 generates signals UDB0 through UDB7. A code comparison circuit 132 is responsive to the signals UDB0 through UDB7 and to the signals SR16' through SR23' and to the signals SR16 through SR23 for generating a signal MATCH. The signal MATCH is a logic 1 only if the bit pattern represented by the signals UDB0 through UDB7 is identical to the bit pattern represented by the signals SR16 through SR23.

An AND gate 134 is responsive to the signals R/W, BURST, and MATCH for generating a logic 1 at the D-input to a clocked latch 136 after a sequence of data bits comprising a valid instruction command has been received and stored in the 25-bit shift register 120. Inverters 138, 140 and a capacitor 142 are responsive to the signal SRO for generating a signal CLK3. The signal CLK3 is delayed relative to the signal applied to the D-input of the clocked latch 136 and, thus, (through an OR gate 144) is effective to clock the D-input logic state to the Q output of the clocked latch 136. The Q output of the clocked latch 136 provides the signal ENABLE.

A RAM address counter 146 is responsive to the signals E2, CLK1, SR24, and ENABLE for providing signals B0, B1, B2 and a set of signals CA0 through CA6. The signals B0, B1, B2, and CA0 through CA6 provide a binary count sequence that changes at the rate of the signal CLK1. As previously mentioned, the signals B0 through B2 are utilized in serially addressing the bits within the addressed byte of the RAM 106. The byte address for the RAM 106 is provided by the signals A0 through A6 which are output from an address multiplexor 148. The signal SR24 causes the address multiplexor 148 to select for the byte address the set of signals SR9 through SR15 for a single byte transfer instruction and causes the address multiplexor 148 to select the set of signals CA0 through CA6 for a series of byte addresses in conjunction with a burst mode transfer.

A logic 0 to logic 1 transition of a signal ENDCNT is generated by the RAM address counter 146 after 8 bits have been transferred in conjunction with a single byte transfer operation or after 128 bytes have been transferred in conjunction with a burst mode transfer operation. Also, the signal ENDCNT will transition to a logic 1 at any time that the signal E2 transitions from a logic 1 to a logic 0. The signal ENDCNT causes the gated latch 136 to immediately reset and the signal ENABLE to transition to a logic 0, thereby inhibiting any further reading or writing of the RAM 106 until the signal ENABLE once again is caused to transition to a logic 1 state in the aforesaid manner.

10

Referring to FIG. 9A, a logic functional diagram of the code comparison circuit 132 is illustrated. The code comparison circuit 132 includes exclusive-NOR gates 150, 152, 154, 156, 158, 160, 162, 164 and logic gates 166, 168, 170. FIG. 9B illustrates a circuit implementation (FIG. 9B(b)) of an exclusive-NOR gate (FIG. 9B(a)) as utilized in the code comparison circuit 132. Included therein are P-channel transistors 172, 174, and N-channel transistors 176, 178.

Referring to FIG. 10, a logic and circuit functional diagram of the identification code read-only circuit 130 as utilized in the control logic circuit 108 of FIG. 8 is illustrated. In the preferred embodiment, the identification code read-only circuit 130 is fabricated with conventional CMOS integrated circuit processing methods. Such CMOS processing permits conductive interconnections to selectively or optionally be open-circuited in accordance with metal mask options. Another method of selective interconnection is provided wherein conductive polycrystalline silicon links may be cut or burned open with a laser after all other CMOS integrated circuit wafer processing steps have been completed.

It is desirable that the identification code read-only circuit 130 be adapted to be programmable by either the metal mask option method or by the laser method. In the preferred embodiment, each of the eight UDB0 through UDB7 outputs of the identification code read-only circuit 130 is programmable by either method. Accordingly, the monolithic integrated circuit 52 can be personalized with a choice of one of 256 possible codes. For manufacturing test purposes (prior to such personalization) and for applications where personalized programming is not required, it is desirable that the identification code read-only circuit 130 provide a known predetermined code without any programming steps.

The identification code read-only circuit 130 includes metal links 180, 182, and 184 which are metal-mask programmable to either be conductive or open-circuited. If the metal links 180, 182, and 184 are programmed to be conductive, current flow through the respectively attached N-channel transistors 186, 188, 190 is not interrupted. Also included in the identification code read-only circuit 130 are polycrystalline silicon links 192, 194, and 196. Prior to any laser programming, the polycrystalline silicon links 192, 194, 196 will likewise not interrupt any current flow through the respective N-channel transistors 186, 188, 190. With both the metal link 180 and the polycrystalline silicon link 192 being conductive, because the width to length ratio of the N-channel transistor 186 is much larger than that of the P-channel transistor 198, the state of a node 200 will be a logic 0 irrespective of the state of a signal INIT applied to the gate of a P-channel transistor 198. Inverters 202, 204 are responsive to a logic 0 on the node 200 for producing a logic 0 on a line 206 which is coupled to the output of the inverter 204. With a logic 0 applied to the input of the N-channel transistor 190 via the line 206, the N-channel transistor 188 and a P-channel transistor 208 operate to cause the state of a node 210 to be a logic 1. An inverter 212 is responsive to a logic 1 on the node 210 for producing a logic 0 for the signal UDB0.

The metal links 182, 184, the N-channel transistors 188, 190, the polycrystalline silicon links 194, 196, the P-channel transistor 208, the inverter 212, and a P-channel transistor 216 comprise a programmable circuit 214.

MTI0000790

4,654,829

11

There is an identical programmable circuit 214 for each of the outputs UDB1 through UDB7. In the same manner as for the signal UDB0, if all the metal links 180, 182, 184, and the polycrystalline silicon links 192, 194, 196 are conductive, each of the signals UDB1 through UDB7 will be a logic 0. Thus, without any programming steps an all 0's code is provided.

To program the programmable circuit 214, either the metal link 180 is made to be open-circuited or the polycrystalline silicon link 192 is opened in order that the N-channel transistor 186 cannot cause the node 200 to be at a logic 0. Instead, the node 200 is caused to become a logic 1 when an inverter 218, which is responsive to the signal E2, causes the P-channel transistor 198 to become conductive. Once the node 200 has become a logic 1 it will remain a logic 1 (so long as power is supplied to the monolithic integrated circuit 52) as a result of latching action of the inverter 202 and a P-channel transistor 220, independent of the signal E2. The inverters 202, 204 are responsive to a logic 1 on the node 200 for producing a logic 1 on the line 206. If it is desired that the output of the programmable circuit 214 be a logic 1, either the metal link 182 is programmed to be open-circuited or the polycrystalline silicon link 194 is opened. For these conditions the N-channel transistor 190 will cause the node 210 to be at a logic 0 and the output of the inverter 212 will accordingly be a logic 1.

If, however, either the metal link 180 or the polycrystalline silicon link 192 is opened and it is desirable that the programmable circuit 214 be programmed to provide a logic 0 at its output, either the metal link 184 is programmed to be open-circuited or the polycrystalline silicon link 196 is opened. For these conditions, the N-channel transistor 188 and the P-channel transistor 208 will cooperate to cause the node 210 to be a logic 1 and the output of the inverter 212 will accordingly be a logic 0.

For an alternative embodiment, rather than programming the metal link 180 to be open-circuited or causing the polycrystalline silicon link 192 to be opened, the threshold voltage required to cause the N-channel transistor 186 to become conductive may be made programmable with ion implantation; that is, the N-channel transistor 186 can optionally be made to have a normal threshold voltage or a threshold voltage so high that it can never become conductive for any value of the voltage VCCO that is within the specified allowable range of operating voltage for the monolithic integrated circuit 52. In a similar manner, the threshold voltage of the N-channel transistor 188 can be made programmable in lieu of programming the metal link 182 or the polycrystalline silicon link 194. And, likewise, the threshold voltage of the N-channel transistor 190 can be made programmable in lieu of programming the metal link 184 or the polycrystalline silicon link 196.

The portable, non-volatile read/write memory module of the present invention and many of its attendant advantages will be readily understood from the foregoing description. It will be apparent that various changes may be made in the form, construction, and arrangement of the parts thereof without departing from the spirit and scope of the invention or sacrificing all of its material advantages.

What is claimed is:

1. A non-volatile read/write memory module for use in conjunction with a host electronic system, said host electronic system having a ground voltage-reference

12

node and having a chip enable output node which provides a chip enable signal, comprising:

a battery having first and second terminals;

a monolithic integrated circuit including:

  a. a ground terminal coupled to said first battery terminal and adapted for removably making electrical connection to said ground voltage-reference node of said host electronic system;

  b. a chip enable input terminal adapted for removably making electrical connection to said chip enable output node of said host electronic system;

  c. a serially-accessible read/write data storage means for the storage and retrieval of data;

  d. chip enable means coupled to said chip enable input terminal and responsive to said chip enable signal for enabling the serial transfer of data to and from said data storage means; and

  e. electronic circuit means coupled to said ground terminal and to said second battery terminal and further coupled to said chip enable input terminal for automatically coupling either said second battery terminal or said chip enable input terminal as the source of power to said data storage means, said electronic circuit means including comparator and switching means for selecting as the source of power whichever of the chip enable input terminal or second battery terminal has the highest voltage; and

a housing for supporting the battery and the integrated circuit, whereby a hand-held, portable module is provided.

2. A non-volatile read/write memory module for use in conjunction with a host electronic system, said host electronic system having a ground voltage-reference node and having a chip enable output node which provides a chip enable signal and having a primary power supply node, comprising:

a battery having first and second terminals;

a monolithic integrated circuit including:

  a. a ground terminal coupled to said first battery terminal and adapted for removably making electrical connection to said ground voltage-reference node of said host electronic system;

  b. a chip enable input terminal adapted for removably making electrical connection to said chip enable output node of said host electronic system;

  c. a serially-accessible read/write data storage means for the storage and retrieval of data;

  d. chip enable means coupled to said chip enable input terminal and responsive to said chip enable signal for enabling the serial transfer of data to and from said data storage means;

  e. a primary power supply input terminal adapted for removably making electrical connection to said primary power supply node of said host electronic system; and

  f. electronic circuit means coupled to said ground terminal and to said second battery terminal and further coupled to said chip enable input terminal and coupled to said primary power supply input terminal for automatically coupling either said second battery terminal or said chip enable input terminal or said primary power supply input terminal as the source of power to said data storage means, said electronic circuit means including comparator and switching means for

MTI0000791

4,654,829

13

selecting as the source of power: (1) the said primary power supply input terminal if the voltage of the said primary power supply input terminal is greater than that of the said second battery terminal, or (2) the said second battery terminal if the voltage of the said second battery terminal is greater than that of both the said primary power supply input terminal and the said chip enable input terminal, or (3) the said chip enable input terminal if the voltage of the said chip enable input terminal is greater than that of both the said primary power supply input terminal and the said second battery terminal; and

a housing for supporting the battery and the integrated circuit; whereby a hand-held, portable module is provided.

3. A non-volatile read/write memory module for use in conjunction with a host electronic system, said host electronic system including serial data generation means for providing a sequence of data bits, comprising:

a battery having first and second terminals;

a monolithic integrated circuit coupled to said first and second terminals of said battery for receiving standby power from said battery and including:

a. a serially-accessible read/write data storage means for the storage and retrieval of data; and

b. control logic means for controlling the serial transfer of data to and from said data storage means, said control logic means including:

i. a data input adapted for serially receiving data bits from said host electronic system;

14

ii. serial register means coupled to said data input for serially storing a sequence of data bits received by said data input;

iii. read-only circuit means for providing a predetermined bit code, wherein said bit code comprises a plurality of data bits that are not electrically alterable after once having been programmed;

iv. comparison means coupled to said serial register means and coupled to said read-only circuit means for comparing a sequence of data bits stored in said serial register means to said predetermined bit code and for generating a comparison signal that is indicative of whether the said sequence of data bits matches said predetermined bit code; and

v. circuit means responsive to said comparison signal for enabling the writing and reading of data to and from said data storage means; and

a housing for supporting the battery and the integrated circuit, whereby a hand-held, portable module is provided.

4. The module according to claim 1 wherein said monolithic integrated circuit and said host electronic system are electrically connected by no more than five electrical connectors.

5. The module according to claim 2 wherein said monolithic integrated circuit and said host electronic system are electrically connected by no more than five electrical connectors.

6. The module according to claim 3 wherein said monolithic integrated circuit and said host electronic system are electrically connected by no more than five electrical connectors.

* * * * *



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## NOTICE OF ALLOWANCE AND FEE(S) DUE

26615        7590        08/25/2004

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA 22030

| EXAMINER |
| --- |
| DINH, NGOC V |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2187 | |

DATE MAILED: 08/25/2004

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

TITLE OF INVENTION: WRITE PROTECTION FOR COMPUTER LONG-TERM MEMORY DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- |
| nonprovisional | NO | $1330 | $300 | $1630 | 11/26/2004 |

THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. **PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN **THREE MONTHS** FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. **THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (OR AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS ABANDONED.

### HOW TO REPLY TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 4

PTOL-85 (Rev. 08/04) Approved for use through 04/30/2007.

MTI0000793

## PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), to: **Mail**
or **Fax**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
(703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

26615      7590      08/25/2004

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA 22030

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (703) 746-4000, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/23/2001 | Steven Bress | 0032-0003 | 6920 |

TITLE OF INVENTION: WRITE PROTECTION FOR COMPUTER LONG-TERM MEMORY DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1330 | $300 | $1630 | 11/26/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| DINH, NGOC V | 2187 | 711-112000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. The following fee(s) are enclosed:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of fee(s):

☐ A check in the amount of the fee(s) is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. Change in Entity Status (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.     ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.
NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____      Date _____

Typed or printed name _____     Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 08/04) Approved for use through 04/30/2007.      OMB 0651-0033      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

MTI0000794

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

| | | | | EXAMINER |
| 26615    7590    08/25/2004 | | | | DINH, NGOC V |

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA 22030

| ART UNIT | PAPER NUMBER |
|---|---|
| 2187 | |

DATE MAILED: 08/25/2004

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 266 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 266 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (703) 305-1383. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

FTOL-85 (Rev. 08/04) Approved for use through 04/30/2007.

MTI0000795

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Bress | 0032-0003 | 6920 |

26615    7590    08/25/2004

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA 22030

| EXAMINER |
|---|
| DINH, NGOC V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2187 | |

DATE MAILED: 08/25/2004

17

### Notice of Fee Increase on October 1, 2004

If a reply to a "Notice of Allowance and Fee(s) Due" is filed in the Office on or after October 1, 2004, then the amount due will be higher than that set forth in the "Notice of Allowance and Fee(s) Due" because an increase in fees effective on October 1, 2004 is anticipated. See Revision of Patent Fees for Fiscal Year 2005; Proposed Rule, 69 Fed. Reg. 25861, 25863, 25864 (May 10, 2004).

The current fee schedule is accessible from WEB site (http://www.uspto.gov/main/howtofees.htm).

If the fee paid is the amount shown on the "Notice of Allowance and Fee(s) Due" but not the correct amount in view of the fee increase, a "Notice of Pay Balance of Issue Fee" will be mailed to applicant. In order to avoid processing delays associated with mailing of a "Notice of Pay Balance of Issue Fee," if the response to the Notice of Allowance is to be filed on or after October 1, 2004 (or mailed with a certificate of mailing on or after October 1, 2004), the issue fee paid should be the fee that is required at the time the fee is paid. See Manual of Patent Examining Procedure (MPEP), Section 1306 (Eighth Edition, Rev. 2, May 2004). If the issue fee was previously paid, and the response to the "Notice of Allowance and Fee(s) Due" includes a request to apply a previously-paid issue fee to the issue fee now due, then the difference between the issue fee amount at the time the response is filed and the previously-paid issue fee should be paid. See MPEP Section 1308.01.

Effective October 1, 2004, 37 CFR 1.18 is proposed to be amended by revising paragraphs (a) through (c) to read as set forth below. As stated above, the final fee may be a different amount, and applicant should check the WEB site given above when paying the fee.

Section 1.18 Patent post allowance (including issue) fees.

(a) Issue fee for issuing each original or reissue patent,
except a design or plant patent:
    By a small entity (Sec. 1.27(a))...................... $670.00
    By other than a small entity......................... $1,340.00
(b) Issue fee for issuing a design patent:
    By a small entity (Sec. 1.27(a))...................... $245.00
    By other than a small entity........................... $490.00
(c) Issue fee for issuing a plant patent:
    By a small entity (Sec. 1.27(a))...................... $325.00
    By other than a small entity........................... $650.00

Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

PTOL-85 (Rev. 08/04) Approved for use through 04/30/2007.

MTI0000796

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), to: **Mail**    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or **Fax**    (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

26615      7590      08/25/2004

HARRITY & SNYDER, LLP
11240 WAPLES MILL ROAD
SUITE 300
FAIRFAX, VA 22030

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (703) 746-4000, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/961,417 | 09/25/2001 | Steven Ehress | 0032-0003 | 6920 |

TITLE OF INVENTION: WRITE PROTECTION FOR COMPUTER LONG-TERM MEMORY DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1,330. $665.00 | $300 | $1630 $965.00 | 11/26/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| DINH, NGOC V | 2187 | 711-112000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  Harrity & Snyder LLP

2  _____

3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent):   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are enclosed:

☒ Issue Fee

☒ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies ___

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.

☒ Payment by credit card. Form PTO-2038 is attached.

☐ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number ___ (enclose an extra copy of this form).

5. Change in Entity Status (from status indicated above)

☒ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.
NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____   Date  September 3, 2004

Typed or printed name  Brian E. Ledell   Registration No.  42,784

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 08/04) Approved for use through 04/30/2007.      OMB 0651-0033      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

MTI0000797

Patent
Attorney's Docket No. 0032-0003

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| In re Patent Application of | ) |
| | ) |
| Steven Bress et al. | ) Group Art Unit: 2187 |
| | ) |
| Application No.: 09/961,417 | ) Examiner: Ngoc V. Dinh |
| | ) |
| Filed: September 25, 2001 | ) |
| | ) |
| For: WRITE PROTECTION FOR | ) |
| COMPUTER LONG-TERM | ) |
| MEMORY DEVICES | ) |

**ISSUE FEE TRANSMITTAL COVER SHEET**

U.S. Patent and Trademark Office
220 20th Street S.
Customer Window, Mail Stop Issue Fee
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

The Commissioner is hereby authorized to charge any other appropriate fees that may be required regarding the attached Issue Fee Transmittal (Form PTOL-85) to Deposit Account No. 50-1070.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

By: _____
Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road, Suite 300
Fairfax, Virginia 22030
(571) 432-0800
Customer Number: 26615

Date: September 3, 2004

Patent

Attorney's Docket No. 0032-0003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of )
)
Steven Bress et al. ) Group Art Unit: 2187
)
Patent No. 6,813,682 B2 )
Application No.: 09/961,417 ) Examiner: Ngoc V. Dinh
)
Issued: November 2, 2004 )
Filed: September 25, 2001 )
)
For: WRITE PROTECTION FOR COMPUTER )
LONG-TERM MEMORY DEVICES )

Certificate
NOV 1 0 2004
of Correction

## REQUEST FOR CERTIFICATE OF CORRECTION

U.S. Patent and Trademark Office
220 20th Street S.
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, Virginia 22202

Sir:

    The above-referenced Letters Patent contains errors. Applicants respectfully request that the

attached Certificate of Correction (1 page) be issued under seal and recorded in the records of

patents. Since the errors were incurred through the fault of the U.S. Patent and Trademark

Office, no fee is required.

                    Respectfully submitted,

                    HARRITY & SNYDER, L.L.P.

By: _____
               Brian E. Ledell
               Reg. No. 42,784

11240 Waples Mill Road, Suite 300
Fairfax, Virginia 22030
(571) 432-0800

Date: November 8, 2004

NOV 1 2 2004

MTI0000799

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   6,813,682 B2

DATED        :   November 2, 2004

INVENTOR(S) :   Steven Bress et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the claims section, claim 18, column 15, line 6: 
insert --blocks-- after "circuit."

MAILING ADDRESS OF SENDER:              PATENT NO. 6,813,682 B2

Harrity & Snyder, L.L.P.
11240 Waples Mill Road
Suite 300
Fairfax, VA 22030

NOV 1 2 2004

MTI0000800

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,813,682 B2                                    Page 1 of  1
DATED        : November 2, 2004
INVENTOR(S)  : Steven Bress et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 15,
Line 6, insert — blocks -- after "circuit."

Signed and Sealed this

Eighteenth Day of January, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

MTI0000801



Patent
Attorney's Docket No. 0032-0003

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## UTILITY PATENT
## APPLICATION TRANSMITTAL LETTER

Box PATENT APPLICATION
Commissioner for Patents and Trademarks
Washington, D.C. 20231

Sir:

Enclosed for filing is the utility patent application of <u>Steven BRESS and Mark Joseph MENZ</u> for <u>WRITE PROTECTION FOR COMPUTER LONG-TERM MEMORY DEVICES</u>.

Also enclosed are:

☒ <u>9</u> sheet(s) of ☒ formal ☐ informal drawing(s);

☐ claim for foreign priority under 35 U.S.C. §§ 119 and/or 365 is ☐ hereby made to _____ filed in _____ on _____;

☐ in the declaration;

☐ a certified copy of the priority document;

☐ a General Authorization for Petitions for Extensions of Time and Payment of Fees;

☒ applicant(s) is/are entitled to Small Entity Status;

☐ an Assignment document and Assignment Recordation Cover Sheet;

☒ an Information Disclosure Statement and PTO-1449;

☐ A Request for Non-Publication is enclosed; and

☐ Other: _____;

☒ Executed ☐ unexecuted declarations of the inventor(s)

☒ also are enclosed ☐ will follow.

☐ Please amend the specification by inserting before the first line the sentence -- This application claims priority under 35 U.S.C. §§ 119 and/or 365 to _____ filed in _____ on _____; the entire content of which is hereby incorporated by reference.--

☐ A bibliographic data entry sheet is enclosed.

Utility Patent Application Transmittal Letter
Attorney's Docket No. 0032-0003
Page 2

☒ The filing fee has been calculated as follows   ☐ and in accordance with the enclosed preliminary amendment:

| CLAIMS | | | | | |
|---|---|---|---|---|---|
| | No. of Claims | | Extra Claims | Rate | Fee |
| Basic Application Fee | | | | | $710.00 |
| Total Claims | 53 | Minus 20 = | 33 | x $18.00 = | $594.00 |
| Ind. Claims | 6 | Minus 3 = | 3 | x $80.00 = | $240.00 |
| If multiple dependent claims are presented, add $270.00 | | | | | |
| Total Application Fee | | | | | $1544.00 |
| If Small entity status is claimed, subtract 50% of Total Application Fee | | | | | $772.00 |
| Add Assignment Recording Fee if Assignment document is enclosed | | | | | |
| TOTAL APPLICATION FEE DUE | | | | | $772.00 |

☐ This application is being filed without a filing fee. Issuance of a Notice to File Missing Parts of Application is respectfully requested.

☒ A check in the amount of  $772.00 (filing fee and additional claims fee)  is enclosed for the fee due.

☐ A check in the amount of  $ 40.00 (Assignment Recordation fee)  is enclosed for the fee due.

☐ Charge $_____ to Deposit Account No. 50-1070 for the fee due.

MTI0000803

Utility Patent Application Transmittal Letter
Attorney's Docket No. 0032-0003
Page 3

☒ The Commissioner is hereby authorized to charge any appropriate fees under 37 C.F.R. §§ 1.16, 1.17, and 1.21 that may be required by this paper, and to credit any overpayment, to Deposit Account No. 50-1070.  This paper is submitted in duplicate.

Respectfully submitted,

HARRITY & SNYDER, L.L.P.

26615
PATENT TRADEMARK OFFICE

By: _____
Brian E. Ledell
Reg. No. 42,784

11240 Waples Mill Road
Suite 300
Fairfax, Virginia 22030
(571) 432-0800

Date:  September 25, 2001

MTI0000804

**Command Register**          **Read Sector Command**

| Register | Data | |
|---|---|---|
| Features | | ～115 |
| Sector Count | Sector Count | ～101 |
| Sector Number | Sector Number or LBA | ～102 |
| Cylinder Low | Cylinder Low or LBA | ～103 |
| Cylinder High | Cylinder High or LBA | ～104 |
| Device/Head | Device ID and Head Number or LBA | ～105 |
| Command | 020h | ～106 |

Fig. 1A

**Command Register**          **Write Sector Command**

| Register | Data | |
|---|---|---|
| Features | | ～115 |
| Sector Count | Sector Count | ～101 |
| Sector Number | Sector Number or LBA | ～102 |
| Cylinder Low | Cylinder Low or LBA | ～103 |
| Cylinder High | Cylinder High or LBA | ～104 |
| Device/Head | Device ID and Head Number or LBA | ～105 |
| Command | 030h | ～106 |

Fig. 1B

MTI0000805

MTI0000806





Host Computer ~201

Drive Cable ~202

Blocking Device ~203

Drive Cable ~204

Disk Drive ~205

Fig. 2



Fig. 3



Fig. 4

MTI0000808



Fig. 5

MTI0000809

Fig. 6



MTI0000810



Fig. 7



Fig. 8

MTI0000812



Fig. 9

MTI0000813

US006813682B2

## (12) United States Patent
Bress et al.

(10) Patent No.: US 6,813,682 B2
(45) Date of Patent: Nov. 2, 2004

(54) **WRITE PROTECTION FOR COMPUTER LONG-TERM MEMORY DEVICES**

(76) Inventors: **Steven Bress**, 9801-C Gable Ridge Ter., Rockville, MD (US) 20850; **Mark Joseph Menz**, 114 Rawlings Ct., Folsom, CA (US) 95630

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 266 days.

(21) Appl. No.: **09/961,417**

(22) Filed: **Sep. 25, 2001**

(65) **Prior Publication Data**

US 2002/0040418 A1 Apr. 4, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/237,761, filed on Sep. 29, 2000.

(51) Int. Cl.⁷ .............................................. **G06F 12/00**
(52) U.S. Cl. ...................... **711/112**; 711/163; 711/164; 713/161; 713/164; 713/165; 713/166
(58) Field of Search ............................... 711/112, 164; 713/161, 164, 165, 166

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,654,829 A | * | 3/1987 | Jiang et al. | 365/189.03 |
| 4,734,851 A | | 3/1988 | Director | 364/200 |
| 4,811,293 A | | 3/1989 | Knothe et al. | 365/189 |
| 5,144,660 A | | 9/1992 | Rose | 380/4 |
| 5,268,960 A | | 12/1993 | Hung et al. | 380/4 |
| 5,289,540 A | | 2/1994 | Jones | 380/4 |
| 5,325,499 A | | 6/1994 | Kummer et al. | 395/425 |
| 5,369,616 A | | 11/1994 | Wells et al. | 365/218 |
| 5,557,674 A | | 9/1996 | Yeow | 380/4 |
| 5,687,379 A | | 11/1997 | Smith et al. | 395/726 |
| 5,991,402 A | * | 11/1999 | Jia et al. | 705/59 |
| 6,041,385 A | | 3/2000 | Shipman et al. | 710/200 |
| 6,041,394 A | | 3/2000 | Halligan et al. | 711/166 |
| 6,092,161 A | | 7/2000 | White et al. | 711/163 |
| 6,126,070 A | * | 10/2000 | Fukuzumi | 235/380 |
| 6,212,635 B1 | * | 4/2001 | Reardon | 713/165 |
| 6,216,205 B1 | * | 4/2001 | Chin et al. | 711/131 |
| 6,230,788 B1 | * | 5/2001 | Kuo et al. | 714/38 |
| 6,330,648 B1 | * | 12/2001 | Wambach et al. | 711/163 |
| 6,336,187 B1 | * | 1/2002 | Kern et al. | 713/161 |
| 6,345,368 B1 | * | 2/2002 | Bergsten | 714/11 |
| 6,446,209 B2 | * | 9/2002 | Kern et al. | 713/193 |
| 6,516,999 B1 | | 2/2003 | Bélonožnik | 235/382 |
| 6,629,184 B1 | | 9/2003 | Berg et al. | 710/306 |
| 6,654,864 B2 | * | 11/2003 | Shaath et al. | 711/163 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 93/09495 | 5/1993 |
| WO | WO 93/13477 | 7/1993 |
| WO | WO 01/88724 A2 | 11/2001 |

OTHER PUBLICATIONS

Patent Abstracts of Japan, Publication No. 06337781, Dec. 6, 1994, NEC Home Electron Ltd.
Patent Abstracts of Japan, vol. 1995, No. 05, Jun. 30, 1995 & JP 7 037207, Feb. 7, 1995; 1 page.
Peter Gutmann: "Secure Deletion of Data from Magnetic and Solid-State Memory," Proceedings of the USENIX Security Symposium, Jul. 22, 1996; 14 pages.

* cited by examiner

*Primary Examiner*—Donald Sparks
*Assistant Examiner*—Ngoc V Dinh
(74) *Attorney, Agent, or Firm*—Harrity & Snyder, LLP

(57) **ABSTRACT**

A blocking device provides read and write protection for computer long-term storage devices, such as hard drives. The blocking device is placed between a host computer and the storage device. The blocking device intercepts communications between the host and the storage device and examines any commands from the host to the storage device. Certain commands, such as commands that may modify the storage device, may be discarded.

**45 Claims, 9 Drawing Sheets**



U.S. Patent

Nov. 2, 2004

Sheet 1 of 9

US 6,813,682 B2

**Command Register**          **Read Sector Command**

Fig. 1A

| Register | Data | |
|---|---|---|
| Features | | 115 |
| Sector Count | Sector Count | 101 |
| Sector Number | Sector Number or LBA | 102 |
| Cylinder Low | Cylinder Low or LBA | 103 |
| Cylinder High | Cylinder High or LBA | 104 |
| Device/Head | Device ID and Head Number or LBA | 105 |
| Command | 020h | 106 |

**Command Register**          **Write Sector Command**

Fig. 1B

| Register | Data | |
|---|---|---|
| Features | | 115 |
| Sector Count | Sector Count | 101 |
| Sector Number | Sector Number or LBA | 102 |
| Cylinder Low | Cylinder Low or LBA | 103 |
| Cylinder High | Cylinder High or LBA | 104 |
| Device/Head | Device ID and Head Number or LBA | 105 |
| Command | 030h | 106 |

MTI0000815



Fig. 2



Fig. 3

MTI0000817

U.S. Patent     Nov. 2, 2004     Sheet 4 of 9     US 6,813,682 B2



Fig. 4

U.S. Patent

Nov. 2, 2004

Sheet 5 of 9

US 6,813,682 B2



Fig. 5

MTI0000819

U.S. Patent

Nov. 2, 2004

Sheet 6 of 9

US 6,813,682 B2

Fig. 6



MTI0000820



Fig. 7

MTI0000821

Case 2:13-ml-02461-GAF-PLA   Document 38-11   Filed 02/19/14   Page 178 of 223   Page ID #:1407



Fig. 8



Fig. 9

U.S. Patent

Nov. 2, 2004

Sheet 9 of 9

US 6,813,682 B2

MTI0000823

US 6,813,682 B2

1

## WRITE PROTECTION FOR COMPUTER LONG-TERM MEMORY DEVICES

### RELATED APPLICATION

This application claims priority under 35 U.S.C. § 119 based on U.S. Provisional Application No. 60/237,761, filed Sep. 29, 2000, the disclosure of which is incorporated herein by reference.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to computer memory devices and, more specifically, to mechanisms for controlling user access to the memory devices.

#### 2. Description of Related Art

There are many situations in which it is desirable to allow data to be read from a non-volatile long-term memory storage device, such as a computer hard drive, but not allow data to be written to the device. For example, law enforcement officials have occasion to confiscate long-term memory storage devices. Once confiscated, the law enforcement officials need to be able to examine the storage device without changing the storage state of the device. Some operating systems, such as the Windows® operating systems from Microsoft Corporation, may modify the storage device when accessing files on the device, even if the user is only trying to read files from the device. In addition, during startup, operating systems such as Windows® will write up to hundreds of megabytes of data to a storage device as the operating system initializes. These situations are not acceptable when trying to preserve the state of a storage device to its as-confiscated state.

An example of another situation in which it is desirable to allow data to be read from a storage device but not written is in the area of computer security. A computer that is connected to other computers through a network, such as the Internet, is vulnerable to attack. A malicious hacker may attempt to write/change data on a target computer. Although most modern computers have some form of software password protection, these passwords can be bypassed, or "hacked," by a determined attacker. In addition, attacks can come from viruses that are inadvertently transmitted between computers. One way to minimize or prevent damage from such attacks is to block the modification of all of or of certain predetermined sensitive areas of the computer's storage device.

There are a number of known conventional techniques for write protecting memory devices, such as hard drives. One class of early techniques revolved around the concept of disabling a write gate signal transmitted between the drive's controller and the drive's storage media. These techniques are not easy to implement with more modern hard drives, however, because the drive controller and storage media are integrated into a single closed system. Accordingly, the write gate signal is no longer easily accessible. Further, within the more modern integrated hard drives, the write gate signal may be implemented as a signal etched onto an integrated circuit and would, thus, be difficult to electrically contact even if the drive were opened.

A second class of drive write protection techniques is based on software protection of the drive. In general, these techniques involve the installation of software that modifies the read/write parameters of the system. One disadvantage of these techniques is that they tend to be operating system specific. This creates the potential burden of properly

2

installing, updating, and operating the software. Additionally, because installing software may change the state of the storage device, software techniques are not appropriate in situations, such as in law enforcement, in which not changing the state of the storage device is a priority.

A final class of drive protection techniques is based on inserting hardware devices designed to operate with particular computer configurations, such as a card inserted into a host's PCI bus. Such devices are also not without their limitations. For example, the devices may only work with certain types of computer systems or may only block predefined write commands. These limitations can be problematic if the device is not compatible with the desired computer system or if new write commands are introduced which are not recognized by the device.

Accordingly, there is a need in the art for an improved mechanism for write protecting a memory device, such as a disk drive.

### SUMMARY OF THE INVENTION

Systems and methods consistent with the present invention address these and other needs by providing for an operating system independent blocking device that is physically inserted between a host computer and a storage device.

One aspect of the invention is directed to a blocking device including a plurality of elements. Specifically, the blocking device includes an interface emulator configured to emulate an interface presented by a storage device and an interface for connecting to a storage device. Additionally, the blocking device includes a processor coupled to the interface emulator and the interface. The processor examines commands received through the interface emulator that are generated by a host and intended for the storage device and allows only those of the commands that match a predetermined set of commands to pass.

A second aspect of the invention is directed to a device that includes an IDE emulator component, an IDE interface, and a logic circuit. The IDE emulator component includes a physical interface designed to engage a first cable that connects to a host that controls an IDE storage device. The IDE interface is configured to engage a second cable that connects to the IDE storage device. The logic circuit connects the IDE emulator component to the IDE interface and compares commands received at the IDE emulator component to a predetermined set of commands and blocks transmission of one or more of the commands from the IDE emulator component to the IDE interface when the comparison indicates that the logic circuit does not recognize the received command or the comparison indicates that the received command is a command that modifies the storage device.

Another device consistent with the invention includes an emulator component, the emulator component including a physical interface designed to connect to a host that controls a storage device. Additionally, an interface is configured to connect to the storage device and a logic circuit connects the emulator component to the interface and is configured to compare information received at the emulator component to a computer virus definition file and to block transmission of storage commands from the emulator component to the interface when the comparison indicates a match with the computer virus definition file.

Another aspect of the invention is a method that intercepts communications between a computer motherboard and a local storage device and compares commands in the com-

MTI0000824

US 6,813,682 B2

3

munications between the motherboard and the storage device to a predetermined set of commands. Additionally, the method includes forwarding selected ones of the commands to the storage device based on the comparison and blocking selected other ones of the commands from being received by the storage device based on the comparison.

Yet another aspect of the invention is directed to a computer system. The computer system includes a host computer, a long-term storage device, and a blocking device coupled between the host computer and the storage device. The blocking device is configured to intercept commands from the host to the storage device and to block certain commands from reaching the storage device and to pass other ones of the commands to the storage device.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate the invention and, together with the description, explain the invention. In the drawings,

FIGS. 1A and 1B are diagrams illustrating register layouts for an IDE interface;

FIG. 2 is a diagram illustrating a blocking device consistent with concepts of the invention;

FIG. 3 is a diagram illustrating the blocking device of FIG. 2 in additional detail;

FIG. 4 is a flow chart illustrating the operation of the blocking device;

FIG. 5 is block diagram illustrating the blocking device of FIGS. 2 and 3 in even more detail;

FIG. 6 is diagram graphically illustrating the functionality of portions of the blocking device shown in FIG. 5;

FIG. 7 is a diagram illustrating an embodiment of a blocking device capable of supporting two drives;

FIG. 8 is a diagram illustrating a blocking device capable of correctly operating with an operating system that uses read-back-after-write commands; and

FIG. 9 is a diagram illustrating a blocking device capable of implementing more complex blocking rules.

DETAILED DESCRIPTION

The following detailed description of the invention refers to the accompanying drawings. The same reference numbers in different drawings identify the same or similar elements. Also, the following detailed description does not limit the invention. Instead, the scope of the invention is defined by the appended claims and equivalents.

A blocking device is described herein that blocks certain operations, such as read or write operations, as they are transmitted to a storage device. The blocking device is physically inserted between a host computer system and the storage device and is transparent to the host and the storage device.

The storage device may be any type of long-term non-volatile memory device. For example, the storage device may be a hard disk drive or compact flash memory. In one implementation, the storage device uses an Integrated Drive Electronics (IDE) interface. An IDE interface is a well-known electronic interface that is frequently used to connect a computer's motherboard and disk drive. In IDE drives, the disk drive controller is built into the physical case of the disk drive. The IDE interface provides a relatively high level interface between the motherboard and the disk drive.

Although concepts consistent with the present invention are primarily described herein in relation to an IDE magnetic

4

hard disk drive, these concepts may be implemented with other types of IDE media, such as flash memory with an IDE interface. Flash memories are a special type of semiconductor random access memory that retains its data after power has been removed from the system. Other types of media useable with an IDE interface include magnetic tape and optical media, such as a compact disc (CD) and a digital versatile disc (DVD). In addition to the IDE interface, concepts consistent with the invention may be applied in a straightforward manner to other types of high level storage interfaces, such as the well known Small Computer System Interface (SCSI) standard or a hard drive connected through an IEEE 1394 (Firewire) connection.

For the sake of clarity the remaining description herein will be described with reference to an IDE magnetic hard drive, although, as mentioned above, the concepts of the invention are not limited to such drives. One skilled in the art would appreciate that other modern long-term storage device interfaces share similar functionality that could be incorporated into the concepts described herein.

IDE Drive

As previously mentioned, communications with an IDE drive occurs through its IDE interface. The IDE interface is a well-defined interface that has addressable memory registers in which the host device (e.g., the computer motherboard) can write commands. The host may also read these registers to, for example, retrieve status information. The IDE interface may additionally include memory used to buffer data going to or coming from the storage media.

FIGS. 1A and 1B are diagrams illustrating register layouts for an IDE interface through which a host transmits read commands (FIG. 1A) and write commands (FIG. 1B). When reading from a drive, the host uses sector count register 101, sector number register 102, cylinder low register 103, cylinder high register 104, device ID/head number register 105, and command register 106. The host writes the number of sectors that it would like to read into sector count register 101. The host writes to registers 102, 103, 104, and part of register 105 to tell the drive how many sectors are to be read by the command. In order to read a sector from a drive, the host writes a series of bytes to these registers.

Register 101 is a sector count register that tells the drive how many sectors should be read by the read command. For older drives, the sector was specified in a more convoluted way, using sector number register 102, cylinder number registers 103 and 104, and a head number in register 105. For backwards compatibility, these designations are still shown in the illustrated drive command table. More recent drives may use the Logical Block Addressing mode, or LBA, to describe the starting sector number. In this mode, the starting sector number is directly specified.

Register 105 has one bit reserved to specify a device number. Up to two drives may share the same IDE cable. This reserved bit is used to select between the two drives. With two drives, one is designated as a "master" device and the other is designated as a "slave" device. Both drives on the cable receive all of the commands, but only the drive that corresponds to the state of the reserved bit will act on commands.

The drive begins to execute commands when the host writes a read command (illustrated as hexadecimal number 020 in FIG. 1A) to register 106. For a read command, the drive will retrieve data from the drive platters and start transferring data to the host.

FIG. 1B illustrates the register layout for a write command. The register layout is similar to that of a read

MTI0000825

US 6,813,682 B2

5

command. Sector count register 101 holds the number of sectors that are to be written. Also, the address of the starting sector is set in sector number register 102, cylinder low register 103, cylinder high register 104, and device ID/head number register 105 in the same manner in which the host sets the starting sector for a read command. The drive begins to execute the write commands when the host writes a write command (illustrated as hexadecimal number 030) to command register 106. In general, the only difference between the read and write command is in the value written to the command register 106.

In FIGS. 1A and 1B, register 115 is a "feature" register through which an IDE drive may pass data. As can be seen from the above description of the read and write register layouts, the host must write data to at least some of registers 101–106 in order to issue either a read or a write command to the drive. Therefore, for the drive to be read, the interface lines connecting the host to the IDE drive must be allowed to operate. The drive has no way to determine whether the incoming command will be a read or write until the command register is written.

BLOCKING DEVICE

FIG. 2 is a diagram illustrating a blocking device 203 consistent with the present invention. Blocking device 203 may be a physical device inserted between a host computer 201 and a long-term storage device, such as hard disk drive 205. Host computer 201 may be connected to blocking device 203 through a standard cable 202. Similarly, drive 205 may be connected to blocking device 203 through a standard cable 204.

To host computer 201, blocking device 203 appears to be a standard drive interface, such as an IDE drive interface, and presents to the host 201 the memory, registers, and control signals that a drive would normally present to host 201. To drive 205, blocking device 205 appears to be a host computer, and presents to drive 205 the memory, registers, and control signals that host 201 would normally present to drive 205. In other words, blocking device 203 is transparent to the system. This is advantageous, as blocking device 203 is therefore operating system independent and does not require software to be installed on host 201. Moreover, blocking device 203 may be physically designed to aid an untrained user in connecting it in the correct direction. More specifically, in one implementation, the cables may be color coded or physically mated to encourage the user to connect the cables in the correct direction. When cables 202 and 204 are plugged into blocking device 203, the blocking device is completely installed and ready to operate. Accordingly, installation of blocking device 203 can be performed by users that are relatively unsophisticated in the computer field.

FIG. 3 is a diagram illustrating blocking device 203 in additional detail. Blocking device 203 includes three main components: an IDE drive emulator 320, embedded processor 330, and IDE drive interface 360. When host 201 attempts to communicate with drive 205, the host 201 is actually communicating with IDE drive emulator 320. Drive emulator 320 delays the communication from host 201 until embedded processor 330 has examined the communication. Embedded processor 330, based on its examination of the command from host 201, may either pass the command to IDE drive interface 360 or drop (block) the command. IDE drive interface 360 is a standard IDE drive interface that connects blocking device 203 to drive 205.

Embedded processor 330 may be additionally coupled to RAM 340 and ROM 350. RAM 340 and ROM 350 are

6

computer readable media that may store processing instructions and data used by embedded processor 330.

In operation, if embedded processor 360 determines that a command received at IDE drive interface emulator 320 is an acceptable command to pass along to the drive, such as a read request or a capabilities request, embedded processor 330 passes the command to the registers in drive 205 through IDE drive interface 360. Additionally, with certain commands, embedded processor 360 may modify the command such that it will not modify the drive. IDE drive interface 360 may receive any requested information back from drive 205. This received information may then pass through embedded processor 330 and IDE drive interface emulator 320 before it is transmitted to host 201.

If embedded processor 330 determines that a command received through IDE drive interface 320 is a write command, embedded processor 330 drops the command and, thus, does not write anything to drive 205. Blocking device 203, however, will continue to accept the correct amount of data from host 201 as specified in the write command. Embedded processor 330 may simply discard this data and may then return status information to host 201 that indicates that the write was successful. From the point of view of host 201, the data transfer will have succeeded.

Because the only data path to drive 205 goes through blocking device 203, there is no data path to the drive for even an accidental write, thereby providing absolute write protection. Further, because the blocking device 203 only allows commands that it knows are safe (i.e., commands that will not modify the drive) to pass, the drive cannot be modified by the host.

FIG. 4 is a flow chart illustrating the operation of blocking device 203 in additional detail. To begin, host 201 communicates a command to drive 205 (act 400). The blocking device 203 captures and holds communications until they are examined (act 410). The communication is examined for whether it is a write or format command and/or any command that changes data on the drive 205. If yes, the command and any associated data is accepted by blocking device 203, and then discarded, blocking it from the protected drive 205 (acts 420 and 430). Because the blocking device 203 accepts the command and any data associated with the command, such as the data the host 201 intends to write to drive 205, the host 201 believes the command and associated data has been successfully sent to drive 205.

Host communications that are not data changing commands are examined to determine if they are read commands (act 440). If it is a read command, embedded processor 330 passes the command to the protected drive 205 and any returned data is passed to host 201 (act 470). If the command is not a read command, embedded processor 330 examines the command to determine if it is a capabilities request (act 450). If the command is a capabilities request, embedded processor 330 reports the drive's capabilities back to host 201 (act 480). In some cases, certain drive capabilities may be modified by the processing time required by blocking device 203. Accordingly, in this situation, embedded processor 330 may modify the reported capabilities to reflect the actual capability of the drive 205 including any latency introduced by blocking device 203 (act 480). For example, embedded processor 330 may report back the actual drive storage space but may report a modified drive throughput rate that reflects any delay introduced by the blocking device 203. Finally, if the command is not recognized by embedded processor 330, the embedded processor 330 may discard the

MTI0000826

US 6,813,682 B2

7

command (act 460). By discarding non-recognized commands, embedded processor 330 can ensure that only safe commands are passed.

In an alternate implementation to that described above, embedded processor 330 may maintain a list of "forbidden" commands. Any received commands that are in the list are dropped.

## DETAILS OF AN IMPLEMENTATION OF THE BLOCKING DEVICE

FIG. 5 is block diagram illustrating an exemplary implementation of blocking device 203 in additional detail. The blocking device includes microprocessor 510 and programmable logic device (PLD) 590. Microprocessor 510 may be an embedded processor, such as the 80386 EX embedded processor manufactured by Intel Corporation, of Santa Clara, Calif. The integrated design of microprocessor 510 allows relatively little additional circuitry to be used to create a small, dedicated computer system. PLD 590 complements microprocessor 510 by performing logical operations required by the microprocessor 510 or other circuitry of the device 203. ROM 580 stores configuration data that is initially loaded into PLD 590 on start-up. Similarly, EPROM 550 stores the initial code necessary to initialize and run microprocessor 510. Static RAM (SRAM) 540 is also connected to microprocessor 510, and is used for temporary program and data storage. Crystal oscillator 570 provides clocking signals to microprocessor 510 and PLD 590. In one implementation, crystal oscillator 570 generates a 50 MHz clock signal.

Microprocessor 510 may control a number of external devices, such as LED status indicators 520 and a processor key lock 530. Through LED status indicators 520, microprocessor 510 may provide easily understandable feedback to a user. Processor key lock 530 is a physical interface through which a user must insert a physical key to enable microprocessor 510.

In addition to connecting to host 201 and drive 205 through interfaces 320 and 360, respectively, microprocessor 510 may be connected to external devices via RS-232 port 525 and RS-232 transceiver 560. RS-232 port 525 may be a standard DB9 connector that allows connections using a standard DB9 male to female serial cable.

One of ordinary skill in the art will recognize that the components shown in FIG. 5 may be selected from a wide variety of commercially available components. In one implementation, the components in FIG. 5 may be selected as follows: PLD 590, part number EP1 K50QC208-2, available from Altera Corporation of San Jose, Calif.; ROM 580, part number EPC1 PC8, available from Altera Corporation; EPROM 550, part number AT27LV020A90JC, available from Atmel Corporation, of San Jose, Calif.; and SRAM 540, part number CY7C1021V33L12ZCT, available from Cypress Corporation, of San Jose, Calif.

FIG. 6 is diagram that graphically illustrates the functionality of PLD 590 in additional detail. Address, data, and control lines from the processor 510 are routed to PLD 590 where their information is buffered and latched as necessary in buffers 620. Buffers 620 serve to reduce the electrical load on the processor and to stabilize the signal timing. Buffer read and write signals 630 and 640 control the direction of the bus drivers 650. Thus, bus drivers 650 may write data into buffers 620 when read signal 630 is active and read data out of buffers 620 when write signal 640 is active. Buffers 620 and bus drivers 650 help control the data flow and distribution of the address and data busses from the processor 510 to other portions of PLD 590.

8

Buffering and signal conditioning for the disk drive 205 is provided by drive buffers 695, which form the drive interface with the disk drive 205. Through the bus drivers 650, the microprocessor 510 can directly read and write to the drive interface. Instead of directly communicating with drive buffers 695, bus drivers 650 may indirectly communicate with drive buffers 695 through dual ported RAM sector buffer 680. Sector buffer 680 provides an additional layer of buffering between the microprocessor 510 and the drive 205. This allows the drive to write one sector's worth of data to RAM at high speed, while the processor 510 reads a previous sector's worth of data. By allowing the operations to overlap in this fashion, the processor 510 is not restricted to running at the speed of the drive 205, and is free to handle other functions until it needs the data in the sector buffer 680.

Buffering and signal conditioning for host 201 is provided by drive buffers 696, which form the interface with the host 201. Through bus drivers 650, microprocessor 510 can directly read and write to the host buffers 696. A second way that microprocessor 510 and the drive 205 may communicate is through the dual ported RAM sector buffer 690. In a manner similar to the drive interface, the sector buffer 690 allows the host 201 to communicate at high speed without requiring immediate attention from the processor 510.

In addition to sector buffer 690, two other sections of dual ported RAM are provided by the PLD 590. These are control registers dual port RAM 670 and command registers dual port RAM 660. The control registers 670 may include eight bytes of RAM that appears to host 201 to be the hard drive's control register. Similarly, register 660 may be eight bytes of data that appears to the host to be the hard drive's command register. It is through these registers that the host 201 issues commands to the drive 205.

After a command has been written to the command byte of the command register 660, PLD 590 notifies microprocessor 510 that a command is pending. At this point, the acts illustrated in FIG. 4 are initiated. Because the command and control registers are both created with dual port RAM, the processor 510 may wait until the entire command has been issued to interrogate the contents of these registers. This provides for a zero wait state performance to the host 201, allowing for optimal system performance.

## MULTIPLE DRIVE SUPPORT

As previously mentioned, a standard IDE interface can support up to two different drives connected through a single cable to the host. Generally, one of the drives is set as the master drive and the other is set as the slave drive. The host selects whether a command is intended for the master or the slave by setting a bit in the device ID/head number register 105.

FIG. 7 is a diagram illustrating an embodiment of a blocking device 703 capable of supporting two drives 705 and 706. Blocking device 703 is similar to blocking device 203, as shown in FIGS. 2, 3, and 5. That is, blocking device 703 is connected to the host through IDE drive interface emulator 720, which connects the host to embedded processor 730. RAM 740 and ROM 750 may store processing instructions and data used by embedded processor 730. Unlike blocking device 203, however, blocking device 703 includes two IDE drive interfaces, labeled as drive interface 760 and drive interface 765.

In operation, embedded processor 730 examines register 105 to determine the intended destination for data received from the host and then forwards the data to the appropriate

MTI0000827

US 6,813,682 B2

9

one of drive interfaces 760 and 765. Generally, jumper switches on the drives are used to set whether a particular drive operates as a master or a slave drive. During start up, embedded processor 730 may read the state of the jumper switches to determine the correct settings for the drives. Subsequently, embedded processor 730 transfers the data received from the host to the appropriate one of the two drives 705 and 706.

In a conventional dual-drive IDE interface, because a single cable connects both drives to the host, line noise or a line glitch could cause communications from the host meant for one drive to go to the other. With blocking device 703, however, because there are two independent cables from the blocking device 703 to drives 705 and 706, the drives are not exposed to the possibility of misinterpreting for which drive a signal is intended. Thus, once a valid signal reaches blocking device 703, a glitch on the drive cable will not cause an operation by the wrong drive.

Configuring a drive as a master or a slave requires that a user change physical jumpers on the drive. Conflicts may arise if two drives are configured as both master or both slave. Because blocking device 703 provides a unique and isolated IDE interface to each drive that it protects, even if there is a conflict, blocking device 203 can still independently communicate with each of the drives.

Further, blocking device 703 may operate so that while a data transfer is going on between the host and the blocking device 703, there is no activity on the signals going to a protected drive. This minimizes the possibility that any glitch on the data or control lines could inadvertently cause the drive to write data. In order for a write to occur, numerous registers need to be written to the drive with correct data. With blocking device 703 keeping the signals in a known state, it is unlikely that a random glitch would happen upon a sequence of data that could cause a write.

Blocking device 703 provides other benefits through virtue of its having one drive per IDE interface. Given the wide range of speeds of IDE devices, it may be unwise to run one device at a dramatically different speed than another on the same cable. The slower drive may misinterpret commands not intended for it, with unpredictable results. Accordingly, often when multiple devices are on an IDE cable, the fastest possible data transfer is at the speed of the slowest device. Because blocking device 703 provides each drive with its own interface, each drive can operate at its highest supported speed.

READ VERIFICATION AFTER WRITING

There are situations in which a host writes data to a drive and immediately tries to verify that the data was in fact written by attempting to read it back. In particular, some commands used by some older operating systems, such as DOS, act in this manner. FIG. 8 is a diagram illustrating an exemplary embodiment of a blocking device 803 capable of correctly operating with an operating system that uses read-back-after-write commands.

In general, blocking device 803 is similar to blocking device 203, except that blocking device 803 additionally includes a "temp drive" 870, which is a long term storage device such as a hard disk drive. More particularly, as shown in FIG. 8, blocking device 803 includes an embedded processor 830 that is coupled to drive interface emulator 820, drive interface 860, and temp drive 870. Additionally, embedded processor 830 may be connected to RAM 840 and ROM 850, which may store data and instructions used by embedded processor 830.

10

In operation, embedded processor 830, instead of discarding the data associated with blocked write commands, stores the data in temp drive 870. The drive being protected (i.e., drive 805) is not modified. Embedded processor 830 keeps track of the addresses written to temp drive 870. During a subsequent read operation that reads an address previously written to temp drive 870, embedded processor 830 returns the data stored in temp drive 870. For read requests that do not correspond to data previously written to temp drive 870, data is returned from drive 805. In this manner, blocking device 803 and drive 805 appear to the host as a normally functioning disk drive.

In one implementation, because it is reasonable that the host may write as much data as drive 805 can hold, temp drive 870 is as large as drive 805.

After a predetermined amount of time after a write to temp drive 870, when it is no longer reasonable to expect a read after write verification, embedded processor 830 may erase the data (or otherwise cause it to become not available) written to the temp drive 870. After this time all new read requests provide data from the protected drive 805. Blocking device 803 may also erase data on temp drive 870 if a new command comes in to read or write a different area of drive 805. This would indicate that any read after write verification of the earlier data had already occurred.

Although temp drive 870 is shown integrated within blocking device 803, in other implementations, temp drive 870 may be a separately attached drive. For example, in the implementation shown in FIG. 7, the temp drive may be a drive attached to second drive interface 765.

SELECTIVE BLOCKING

The implementations of the blocking devices described thus far have had a relatively simple blocking mechanism, such as blocking all write commands. In certain situations, however, it may be desirable for the embedded processor to implement more complex blocking rules.

FIG. 9 is a diagram illustrating an exemplary embodiment of a blocking device 903 capable of implementing more complex blocking rules. In general, blocking device 903 is similar to blocking device 203, except that blocking device 903 additionally includes a user interface 945 and non-volatile writeable memory 940 instead of RAM. Through user interface 940, which may be, for example, a USB (universal serial bus) port or a simple serial connection, users may store custom programming in memory 940. Memory 940 may be, for example, flash memory.

Rewriteable non-volatile memory 940 may be used to hold user changeable configuration information. The configuration information may, for example, instruct embedded processor 930 to allow write operations to pass to certain portions of drive 905, but to block all other write operations. In one implementation, in order to improve device security, users may only modify memory 940 through a separate physical cable connected to interface 945. Before modifying memory 940, embedded processor 930 may require that the user enter an appropriate user ID and password. Alternatively, blocking device 903 may require the user to insert a hardware key instead of a password before accepting user communications. In this fashion, blocking device 903 can be protected from attack from a remote device. In addition, blocking device 903 is protected from a local attack as long as the user IDs and passwords are kept secure.

Users may specify in memory 940 areas of drive 905 that the embedded processor 930 is to block (or not block) from write access. A user may configure memory 940 such that

US 6,813,682 B2

11

only a portion of drive 905 is blocked. This may be described in terms of a range of sectors. For a host connected to a network such as the Internet, this could provide absolute security against unauthorized access, whether accidental or intentional.

Often, the goal of a hacker is to disrupt the operating system on a host computer, causing it to crash. In other cases, the hacker tries to change restricted data on the system. With blocking device 903, the area of the drive 905 containing the operating system could be protected against writing, while user data areas, such as Web sites where data is collected from customers, could remain changeable. In this implementation, no type of attack can permanently harm important system files.

In a similar manner, it is possible to block unauthorized reads with blocking device 903. In this implementation, blocking device 903 may be configured with a list of passwords or other authorization information, and a corresponding list of areas of the drive 905 that require authorization to access. If a user does not provide appropriate authorization information, read and write access to the drive 905 is denied by blocking device 903.

## VIRUS BLOCKING

Blocking device 903, in an alternate implementation, may be programmed to provide computer virus protection. Memory 940, or another memory accessible directly from the host, may be programmed with a virus definition table. Embedded processor 930 may then compare the data associated with write commands from the host against the virus definition table. If the comparison indicates that a virus may be present, embedded processor 930 can block the suspected write operation(s). In this manner, virus checks can be made in real-time by embedded processor 930 without taking any processing resources from the host.

Blocking device 903 may additionally provide feedback to users or to the host relating to the status of its virus checking. The feedback may be communicated in a number of ways. For example, a USB port or a serial port may be used to send information to an external device or to the host. Alternatively, a simple light may be actuated or the information may be transmitted back to the host as a drive error.

## NEW FEATURE PROTECTION

More recent IDE drives may support additional features or commands not supported by older IDE drives. A host may determine the feature supported by a particular drive by issuing an "identify device" command to the drive. The drive responds by returning a data structure indicating its supported features. In one implementation, blocking device 203 (FIG. 3) may examine the data structure received from drive 205 and zero out any features not supported by the blocking device 203. In this manner, if a future version of an IDE drive supports a command, such as an erase command, that embedded processor 330 was not programmed to recognize, blocking device 203 could inform the host that the drive does not support this feature. Accordingly, the host would not attempt to modify the drive using that command.

## HOSTS THAT USE LOCAL WRITE CACHE

Some host computer systems may use a local cache to improve the performance of their disk drive. In this local cache, data written to the disk drive is also written to local memory, such as local semiconductor random access memory. If a subsequent read command requests a portion

12

of the data that was previously written to the cache, the host can retrieve the data directly from the cache and will not have to read from the slower disk drive.

Hosts using a local cache may encounter problems when connected to a disk drive through the above-described implementations of the blocking device. In particular, with the blocking device installed, the data in the cache may not accurately reflect the data on the disk drive, as the data on the disk drive was never truly written. Accordingly, in systems that include such a local hard drive cache, the user may, if allowed by the operating system, simply turn off the local hard drive cache.

In another implementation, blocking device 203 may support a removable drive feature set and report itself to the host as a removable drive. Many operating systems support the removable drive feature set. One feature of the removable drive feature set is that a write request may be rejected by the target drive with a "write protected error" code. This allows the operating system to gracefully fail and to not mark the write cache as valid. Accordingly, in operating systems that support the removable drive feature set and that use a local disk cache, embedded processor 330, in addition to dropping data that the host attempts to write to the disk drive, may also issue a write protected error code to the host.

In yet another implementation, the blocking device may report to the host that the drive media is either not present or has been changed since the last write. In both of these cases, the operating system should fail gracefully and not mark the write cache data as valid.

## SUPPORT FOR OBSOLETE COMMANDS

Embedded processor 330 may be configured to respond to certain commands with a predetermined response pattern. For example, in systems with older BIOS (basic input/output system) software, the BIOS may issue a "recalibrate drive" command during system start-up. Generally, the recalibrate drive command causes the hard drive to perform a potentially time consuming calibration operation that may modify the drive. Embedded processor 330 may handle the recalibrate drive command by accepting the command and reporting a successful completion of the command to the host. However, embedded processor 330 does not pass the command to the disk drive. In this manner, the system is able to successfully initialize.

## SUMMARY

As described above, a blocking device is inserted between a host computer system and a storage device. The blocking device blocks certain commands, such as write commands, from being sent to the storage device. An embedded processor within the blocking device controls functionality of the blocking device. The functionality of the embedded processor can be programmably modified to allow for a number of different possible blocking options.

Although the blocking device has been primarily described as blocking write commands, one of ordinary skill in the art will appreciate that the blocking device could instead or additionally block read commands.

It will be apparent to one of ordinary skill in the art that the embodiments as described above may be implemented in many different forms of software, firmware, and hardware in the implementations illustrated in the figures. The actual software code or specialized control hardware used to implement aspects consistent with the present invention is not limiting of the present invention. Thus, the operation and

US 6,813,682 B2

13

behavior of the embodiments were described without specific reference to the specific software code, it being understood that a person of ordinary skill in the art would be able to design software and control hardware to implement the embodiments based on the description herein.

The foregoing description of preferred embodiments of the present invention provides illustration and description, but is not intended to be exhaustive or to limit the invention to the precise form disclosed. Modifications and variations are possible in light of the above teachings or may be acquired from practice of the invention.

No element, act, or instruction used in the description of the present application should be construed as critical or essential to the invention unless explicitly described as such. Also, as used herein, the article "a" is intended to include one or more items. Where only one item is intended, the term "one" or similar language is used.

The scope of the invention is defined by the claims and their equivalents.

What is claimed:

1. A blocking device comprising:
an interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host;
an interface for connecting to the storage device; and
a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, wherein the blocking device is transparent to normal operation of the host and the storage device.

2. The blocking device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.

3. The blocking device of claim 1, wherein the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator.

4. The blocking device of claim 3, wherein, when the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

5. The blocking device of claim 1, wherein the processor drops those of the commands that do not match the predetermined set of commands and, after dropping one of the commands, returns status information to the host that indicates that the dropped command was successfully completed.

6. The blocking device of claim 1, further comprising:
additional interfaces for connecting to additional storage devices.

7. The blocking device of claim 6, wherein each of the interfaces is independently coupled to the processor.

8. The blocking device of claim 1, further including light emitting diodes (LEDs) coupled to the processor and configured to transmit status information relating to the status of the blocking device.

9. The blocking device of claim 1, further including:
a temporary storage device coupled to the processor, the processor storing data from the host corresponding to at

14

least one command that does not match the predetermined set of commands in the temporary storage device.

10. The blocking device of claim 9, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the processor returns the data from the temporary storage device to the host.

11. The blocking device of claim 1, wherein the processor examines feature information from the storage device that relate to features supported by the storage device and the processor zeroes any features not supported by the processor before making the feature information available to the host.

12. The blocking device of claim 1, wherein the processor supports a removable drive feature set with the host and the processor returns a write protected error code to the host when the processor drops one of the commands.

13. A device comprising:
an IDE emulator component, the IDE emulator component including a physical interface designed to engage a first cable that connects to a host that controls an IDE storage device;
an IDE interface configured to engage a second cable that connects to the IDE storage device; and
a logic circuit connecting the IDE emulator component to the IDE interface and configured to: compare commands received at the IDE emulator component to a predetermined set of commands that are known to not modify a state of the IDE storage device, and to allow transmission of the commands from the IDE emulator component to the IDE interface when the comparison indicates that the received command is in the predetermined set of commands, wherein
the device operates transparently to normal operation of the host and the IDE storage device.

14. The device of claim 13, wherein the logic circuit includes:
an embedded processor,
a computer memory connected to the embedded processor, the embedded processor loading program instructions from the computer memory during device initialization, and
a programmable logic device (PLD) coupled to the embedded processor, the IDE emulator component, and the IDE interface.

15. The device of claim 14, wherein the PLD includes:
a bus driver component configured to transfer data between the embedded processor, the IDE emulator component, and the IDE interface,
a first dual port memory buffer connected between the bus driver and the IDE interface,
a first set of communication lines connecting the bus driver directly to the IDE interface and indirectly to the IDE interface through the first dual port memory buffer,
a second dual port memory buffer connected between the bus driver and the IDE emulator component, and
a second set of communication lines connecting the bus driver directly to the IDE emulator component and indirectly to the IDE emulator component through the second dual port memory buffer.

16. The device of claim 13, wherein when the logic circuit receives data back from the IDE storage device the logic circuit forwards the received data to the host through the IDE emulator component.

17. The device of claim 16, wherein, when the comparison indicates the command includes a capabilities request

US 6,813,682 B2

15

command relating to the IDE storage device, the logic circuit modifies data received from the IDE storage device relating to the capabilities request command to reflect the capability of the IDE storage device as affected by the presence of the device.

**18.** The device of claim 13, wherein the logic circuit commands not in the predetermined set of commands and, after blocking transmission of one of the commands, returns status information to the host that indicates that the blocked command was successfully executed.

**19.** The device of claim 13, further comprising:

a second interface for connecting to a second IDE storage device.

**20.** The device of claim 19, wherein each of the interfaces is independently coupled to the logic circuit.

**21.** The device of claim 13, further including light emitting diodes (LEDs) coupled to the logic circuit and configured to transmit status information relating to the status of the device.

**22.** The device of claim 13, further including:

a temporary storage device coupled to the logic circuit, the logic circuit storing data corresponding to commands that are not allowed to be transmitted to the IDE interface in the temporary storage device.

**23.** The device of claim 22, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the logic circuit returns the data from the temporary storage device to the host.

**24.** The device of claim 13, wherein the logic circuit examines feature information from the IDE storage device that relates to features supported by the IDE storage device and removes any feature information not supported by the device before making the feature information available to the host.

**25.** A method comprising:

intercepting communications between a computer motherboard and a local non-volatile storage device for the motherboard;

comparing commands in the communications between the motherboard and the storage device to a predetermined set of commands;

forwarding selected ones of the commands to the storage only when, based on the comparison, the commands are determined to be commands that are in a predetermined set of commands known to not permanently modify a state of the storage device; and

blocking other commands from being received by the storage device, wherein

the intercepting communications, comparing commands, forwarding selected ones of the commands, and blocking selected other ones of the commands is transparent to normal operation of the computer motherboard and the storage device.

**26.** The method of claim 25, further comprising:

forwarding data from the storage device to the motherboard in response to a read command received from the motherboard and forwarded to the storage device.

**27.** The method of claim 25, wherein the storage device is an integrated device electronics (IDE) disk drive.

**28.** The method of claim 25, wherein the commands forwarded to the storage device include a capabilities request command, the method further comprising:

modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as modified by operation of the method.

16

**29.** The method of claim 28, further comprising, after blocking a command:

returning status information to the motherboard that indicates that the blocked command was successfully executed by the storage device.

**30.** A computer system comprising:

a host computer;

a long-term storage device; and

a blocking device coupled between the host computer and the storage device, the blocking device configured to:

intercept commands from the host to the storage device,

pass commands to the storage device only when the commands are in a predetermined set of commands that are known to not permanently modify a state of the storage device, and

block other commands from reaching the storage device,

wherein the intercepting commands, blocking commands, and passing commands are performed by the blocking device transparently to the host computer and the long-term storage device.

**31.** The computer system of claim 30, wherein the blocking device further includes:

an interface emulator configured to emulate the storage device to the host; and

an interface configured to connect the blocking device to the storage device.

**32.** The computer system of claim 31, wherein the interface emulator emulates an Integrated Device Electronics (IDE) interface and the storage device is an IDE disk drive.

**33.** The computer system of claim 30, wherein the blocking device receives data back from the storage device in response to one of the passed commands and forwards the received data to the host.

**34.** The computer system of claim 30, wherein, when the passed commands include a capabilities request command relating to the storage device, the blocking device modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

**35.** The computer system of claim 30, wherein the blocking device, after blocking one of the commands, returns status information to the host that indicates that the blocked command was successfully completed.

**36.** The computer system of claim 30, wherein the blocking device further includes light emitting diodes (LEDs) configured to transmit status information relating to the status of the blocking device.

**37.** The computer system of claim 30, wherein the blocking device further includes:

a temporary storage device, the blocking device storing data from the host corresponding to blocked commands in the temporary storage device.

**38.** The computer system of claim 37, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the blocking device returns the data from the temporary storage device to the host.

**39.** The computer system of claim 30, wherein the blocking device further includes:

a user configurable memory, the user configurable memory storing instructions that define protected areas on the storage device, the blocking device dropping those of the commands that would otherwise modify the protected areas on the storage device.

US 6,813,682 B2

17

40. A blocking device comprising:

means for intercepting communications between a host and a storage device;

means for comparing commands in the communications between the host and the storage device to a predetermined set of commands;

means for forwarding selected ones of commands in the intercepted communications to the storage device only when, based on the comparison, the commands that are in a predetermined set of commands are determined to be commands that are known to not permanently modify a state of the storage device; and

means for blocking other ones of the commands from being received by the storage device based on the comparison, wherein

the blocking device operates transparently to normal operation of the host and the storage device.

41. The blocking device of 40, wherein the storage device is an integrated device electronics (IDE) disk drive.

18

42. The blocking device of 40, wherein the commands forwarded to the storage device include a capabilities request command, and the means for forwarding further comprises:

means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device.

43. The blocking device of 40, further comprising:

means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device.

44. The blocking device of claim 2, wherein the interface emulator is configured to emulate an IEEE 1394 connection.

45. The computer system of claim 31, wherein the interface emulator emulates an IEEE 1394 connection and the storage device is an IDE disk drive.

* * * * *

MTI0000832

US005268960A

# United States Patent [19]

## Hung et al.

[11] Patent Number: 5,268,960

[45] Date of Patent: Dec. 7, 1993

[54] **WRITE PROTECTION DEVICE FOR COMPUTER HARD DISK**

[75] Inventors: Chan-Chi Hung, Hsinchu; Sheng-Yuan Lee, Chupei; Yao-Jung Kuo, Hsinchu, all of Taiwan

[73] Assignee: Value Technology, Inc., Taiwan

[21] Appl. No.: 918,420

[22] Filed: Jul. 22, 1992

[51] Int. Cl.⁵ ............................................ G06F 13/12
[52] U.S. Cl. .................................. 380/4; 380/49; 380/50; 360/60; 360/69
[58] Field of Search .................. 360/60, 69; 380/2, 4, 380/23, 25, 49, 50; 340/825.31, 825.34

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,734,851 | 3/1988 | Director | .................... | 360/60 X |
| 5,012,514 | 4/1991 | Renton | .................... | 380/4 |

*Primary Examiner*—Bernarr E. Gregory
*Attorney, Agent, or Firm*—Poms, Smith, Lande & Rose

[57] **ABSTRACT**

A hard disk protection device comprising a decoding circuit which receives signals from the address and data buses of a personal computer to decode the signals associated with hard disk write actions and generating a signal to suppress the signal of IOW line so as to disable the write function of the hard disk. A switch is provided for a user to disconnect the decoding circuit from the hard disk so as to allow the hard disk to be operated as a conventional hard disk.

15 Claims, 1 Drawing Sheet



MTI0000833



FIG. 1

MTI0000834

5,268,960

1

## WRITE PROTECTION DEVICE FOR COMPUTER HARD DISK

### FIELD OF THE INVENTION

The present invention relates generally to a hard disk write protection device and in particular to an electronic circuit for disabling write function of a personal computer hard disk.

### BACKGROUND OF THE INVENTION

Personal computers usually have at least a disk drive to serve data storage means. The disk drive used in a personal computer can be classified as floppy disk drive which use a floppy magnetic disks, such as $5\frac{1}{4}$" disks or $3\frac{1}{2}$ disks, and hard disk drive (also referred to as fixed disk drive).

For floppy disks, a write protection notch is provided on the enclosure thereof. Once the notch is covered by, for example, a section of an adhesive tape, the disk drive is prohibited to write data to the protected disks. There is, however, no similar device for protecting hard disks from being written accidently or undesirably.

Currently, there is commercial software available in the market for protecting the hard disks from being accidently over-written. The disadvantage is that to execute such software, the main memory space of the computer must be occupied by the software and thus reducing the availability of the main memory space. Further, the central processing unit of the computer is also shared by such a software when the software is executed and thus lowering the efficiency of the central processing unit in handling other jobs.

It is therefore desirable to have a hard disk write protection device in the form of hardware so as to prevent undesired write action of the hard disks while maintaining the original availability of the main memory space and the central processing unit to the users of a computer.

### OBJECTS OF THE INVENTION

The primary object of the present invention is therefore to provide a hard disk write protection device for protecting the hard disks of personal computers from being inadvertently over-written and thus protect the data stored therein from being unintentionally destroyed.

It is another object of the present invention to provide a hard disk write protection device which is capable to be set between a normal mode, in which the hard disk is operated as a conventional hard disk, and a write protection mode, in which the hard disk write protection device will automatically check data signals transferred in address bus and data buss to initiate the write protection function and thus disabling the write function of the hard disk.

To achieve the above-mentioned object, there is provided a hard disk protection device comprising a decoding circuit which receives signals from the address and data buses of a personal computer to decode the signals associated with hard disk write actions and generating a signal to suppress the signal of IOW line so as to disable the write function the hard disk. A switch is provided for a user to disconnect the decoding circuit from the hard disk so as to allow the hard disk to be operated as a conventional hard disk.

Other objects and advantages of the invention will be apparent from the following description of a preferred

2

embodiment taken in connection with the only one drawing which is:

### BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a circuit diagram showing the circuit comprised in the hard disk write protection device in accordance with the present invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawing, a hard disk write protection device in accordance with the present invention comprises a decoding circuit 1 and a disabling circuit 2. The inputs of the decoding circuit 1 are respectively connected to the address and data buses of a personal computer (not shown). In the drawing, symbols SA0–SA9 respectively represent signal lines of the address bus and symbols SD0–SD7 respectively represent signal lines of the data bus. By decoding signals forwarded to the decoding circuit 1 via the data bus and the address bus, the decoding circuit 1 generates a write protection control signal on an output terminal CON thereof. This write protection control signal is then sent to the disabling circuit 2 for actuating the disabling circuit 2 to disable the write function of the hard disk (not shown) of the personal computer.

The decoding circuit 1 comprises at least four inverters (I1, I2, I3 and I4), six OR gates (R1–R6) and two NAND gates (N1 and N2). All signal lines of the address bus are directly connected to NAND gate N1, except signal lines SA3 and SA9. SA3 is connected to an input of NAND gate N1 via invertor I1. With this arrangement, a hexadecimal signal on the address bus with a primary part of 1F7 and a secondary part of 177 which represents an I/O address of the hard disk can be decoded among other signals on the address bus.

As to the data bus signals, conventionally, hexadecimal signal 50 represents a FORMAT TRACK command and hexadecimal signals 30–33 represent WRITE SECTOR commands. In the embodiment shown in the drawing, invertor I2, I3 and I4 and OR gates R1–R4 are arranged in accordance with any known technique to decode other signals present on the data bus. Two of the OR gates, R3 and R4, and an invertor, I4, are used to decode the signals of hexadecimal 50 and transferring this signal to OR gate R6. The hexadecimal signals 30–33 are decoded by OR gates R1 and R2 and invertors I2 and I3 and the result thereof is sent to OR gate R5. Since such an arrangement is quite common to those skilled in the art, it is not necessary to provide a more detailed description.

The outputs of OR gates R5 and R6 are connected to the inputs of NAND gate N2 so that once the decoding circuit 1 encounters the above-mentioned hexadecimal signals, the write protection control signal is generated on the output terminal CON of NAND gate N2. This write protection control signal is used to control the actuation of the disabling circuit 2.

The disabling circuit 2 comprises a tri-state buffer I5 of which the inputs are respectively connected to the output CON of the decoding circuit and an I/O control signal line LOW. When the computer attempts to over-writes the hard disk, including writing to sectors of the hard disk and formatting tracks of the hard disk, a LOW signal is generated on the CON terminal and the tri-state buffer I5 cuts off the connection of the IOW line to

MTI0000835

5,268,960

3

the hard disk so as to disable the hard disk. If the computer takes other actions than over-writing the hard disk, then a HIGH signal is present on the CON terminal and the IOW line is connected to the hard disk via the tri-state buffer 15 to perform hard disk operations.

A switch SW1 is disposed to provide a direct connection of the IOW line the hard disk. If the switch is set to contact A which is in connection with the output of the tri-state buffer 15, the IOW line is connected to the hard disk via the tri-state buffer 15 and thus controlled by the tri-state buffer 15. If the switch is set to contact B which is a by-pass line of the IOW line, then the IOW line is directly connected to the hard disk and thus the hard disk operates and a conventional hard disk and the hard disk write protection device of the present invention is disabled.

It is apparent that although the invention has been described in connection with a preferred embodiment, those skilled in the art may make changes to certain features of the preferred embodiment without departing from the spirit and scope of the invention as defined in the appended claims.

What is claimed is:

1. A hard disk write protection circuit for use in a digital storage system which includes a hard disk drive assembly for storing digital data therein, at least one host processor, at least one address bus and data bus coupling said hard disk drive assembly and host processor, and an input/output control line coupled to said host processor for controlling data transfer command signals to said hard disk drive assembly, said write protection circuit comprising:

a decoding circuit having an output and a plurality of inputs respectively connected to said address and data buses;

said decoding circuit generating a write protection control signal at said output upon having decoded either a WRITE SECTOR command signal or a FORMAT TRACK command signal received from said data bus together with a hard disk input-/output address command signal received from said address bus;

a disabling circuit having an output and at least a first input connected to said decoding circuit output and a second input connected to said input/output control line:

said disabling circuit suppressing a data transfer command signal transmitted on said input/output control line when said first input receives a write protection control signals from said decoding circuit; and

switching means for selectably activating and deactivating said disabling circuit;

said switching means coupling said disabling circuit output to said hard disk drive assembly when said disabling circuit is activated;

whereby said hard disk drive assembly operates as a conventional hard disk drive assembly when said disabling circuit is deactivated.

2. A hard disk write protection circuit as defined in claim 1, wherein said FORMAT TRACK command signal is represented by hexadecimal instruction code 50, said WRITE SECTOR command signal is represented by any of hexadecimal instruction codes 30, 31, 32 and 33, and the input/output address command signal is combination of instruction codes comprising a primary part and a secondary part;

4

said primary part represented by hexadecimal instruction code 1F7 and said secondary part represented by hexadecimal instruction code 177, said hexadecimal instruction code format conforming to a conventional scheme for representing computer instructions.

3. A hard disk write protection circuit as defined in claim 2, wherein said decoding circuit comprises at least one invertor and at least one NAND gate to decode said hexadecimal instruction code combination 1F7 and 177 received from said address bus, and said decoding circuit also comprises a plurality of invertors and OR gates to decode any of said hexadecimal instruction codes 50, 30, 31, 32 or 33 received from said data bus;

whereby a HIGH signal represented by a positive potential relative to ground is generated at the output of said decoding circuit until said decoding circuit decodes hexadecimal instruction code combination 1F7 and 177 together with any of hexadecimal instruction codes 50, 30, 31, 32 or 33 received from said address and data buses respectively after which a LOW signal represented by relative ground is generated at the output of said decoding circuit.

4. A hard disk write protection circuit as defined in claim 1, wherein said disabling circuit comprises a tri-state buffer having an output and at least a first and second input;

said first input being connected to said decoding circuit output and said second input being connected to said input/output control line;

whereby a data transfer command signal on said input/output control line is suppressed when said first input receives a write protection signal from said decoding circuit, and a data transfer command signal on said input/output control line is not suppressed when no said write protection signal is received by said first input.

5. A hard disk write protection circuit as defined in claim 1, wherein said switching means includes a switch having an output connected to said hard disk drive assembly, a first switchable input connected to said input/output control line, and a second switchable input connected to the output of said disabling circuit;

whereby said disabling circuit is activated when said second switchable input is selected, and said disabling circuit is deactivated when said first switchable input is selected.

6. A hard disk write protection circuit as defined in claim 1, wherein said decoding circuit is responsive to a plurality of over-write command signals received from said data bus.

7. A hard disk write protection circuit for use in a digital storage system which includes a hard disk drive assembly for storing digital data therein, at least one host processor, at least one address bus and data bus coupling said hard disk drive assembly and host processor, and an input/output control line coupled to said host processor for controlling data transfer command signals to said hard disk drive assembly, said write protection circuit comprising:

a decoding circuit having an output and a plurality of inputs respectively connected to said address and data buses;

said decoding circuit generating a write protection control signal at said output upon having decoded an over-write command signal received from said data bus together with a hard disk input/output

MTI0000836

5,268,960

| 5 | 6 |

address command signal received from said address bus; and

a disabling circuit having an output coupled to said hard disk drive assembly and at least a first input connected to said decoding circuit output and a second input connected to said input/output control line;

said disabling circuit suppressing a data transfer command signal transmitted on said input/output control line when said first input receives a write protection control signal from said decoding circuit.

8. A hard disk write protection circuit as defined in claim 7, wherein said decoding circuit is responsive to a plurality of over-write command signals received from said data bus.

9. A hard disk write protection circuit as defined in claim 7, including a switch interposing said hard disk drive assembly and said disabling circuit output for selectably activating and deactivating said disabling circuit;

said switch having an output connected to said hard disk drive assembly, a first switchable input connected to said input/output control line, and a second switchable input connected to the output of said disabling circuit;

whereby said disabling circuit is activated when said second switchable input is selected, and said disabling circuit is deactivated when said first switchable input is selected thereby providing a coupling of said input/output control line to said hard disk drive assembly.

10. A hard disk write protection circuit as defined in claim 7, wherein said decoding circuit generates a write protection signal at said output upon having decoded either a FORMAT TRACK or WRITE SECTOR command signal received from said data bus together with a hard disk input/output address command signal received from said address bus.

11. A hard disk write protection circuit as defined in claim 10, wherein said FORMAT TRACK command signal is represented by hexadecimal instruction code 50, said WRITE SECTOR command signal is represented by any of hexadecimal instruction codes 30, 31, 32 or 33, and the input/output address command signal is a combination of instruction codes comprising a primary part and a secondary part;

said primary part represented by hexadecimal instruction code 1F7 and said secondary part represented by hexadecimal instruction code 177, said hexadecimal instruction code format conforming to a con-

ventional scheme for representing computer instructions.

12. A hard disk write protection circuit as defined in claim 11, wherein said decoding circuit comprises at least one invertor and at least one NAND gate to decode said hexadecimal instruction code combination 1F7 and 177 received from said address bus, and said decoding circuit also comprises a plurality of invertors and OR gates to decode any of said hexadecimal instruction codes 50, 30, 31, 32 and 33 received from said data bus;

whereby a HIGH signal represented by a positive potential relative to ground is generated at the output of said decoding circuit until said decoding circuit decodes hexadecimal instruction code combination 1F7 and 177 together with any of hexadecimal instruction codes 50, 30, 31, 32 or 33 received from said address and data buses respectively after which a LOW signal represented by relative ground is generated at the output of said decoding circuit.

13. A hard disk write protection circuit for use in a digital storage system which includes a hard disk drive assembly for storing digital data therein, at least one host processor, at least one address bus and data bus coupling said hard disk drive assembly and host processor, and an input/output control line coupled to said host processor for controlling data transfer command signals to said hard disk drive assembly, said write protection circuit comprising:

means for decoding an over-write command signal received from said data bus, said over-write command signal instructing the transfer of data to said hard disk drive assembly;

means for generating a write protection control signal after said decoding means decodes said over-write command signal; and

means for disabling data transfer command signals on said input/output control line after said disabling means receives a write protection control signal from said generating means, thereby preventing the transfer of data to said hard disk drive assembly.

14. A hard disk write protection circuit as defined in claim 13, including switching means for selectably activating and deactivating said disabling means, whereby said hard disk drive assembly operates as a conventional hard disk drive assembly when said disabling means is deactivated.

15. A hard disk write protection circuit as defined in claim 13, wherein said decoding circuit is responsive to a plurality of over-write command signals received from said data bus.

* * * * *



US006516999B1

(12) **United States Patent**
Bélonožnik

(10) Patent No.: **US 6,516,999 B1**
(45) Date of Patent: **Feb. 11, 2003**

(54) **METHOD OF PROTECTING DATA STORED IN THE MEMORY DEVICE OF A COMPUTER SYSTEM AND EQUIPMENT TO CARRY OUT THIS METHOD**

(75) Inventor: **Jaroslav Bélonožnik**, Praha (CZ)

(73) Assignee: **Solid Access Technologies Limited Liability Company**, Newburyport, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/581,076**

(22) PCT Filed: **Oct. 12, 1999**

(86) PCT No.: **PCT/CZ99/00036**

§ 371 (c)(1),
(2), (4) Date: **Jul. 27, 2000**

(87) PCT Pub. No.: **WO00/22497**

PCT Pub. Date: **Apr. 20, 2000**

(30) **Foreign Application Priority Data**

Oct. 14, 1998  (CZ) ........................................ PV 3300-98

(51) Int. Cl.⁷ ............................................... G06K 5/00
(52) U.S. Cl. ..................... 235/382; 235/379; 235/380; 235/451; 235/492
(58) Field of Search ................................. 235/379, 380, 235/382, 451, 492

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,669,281 A  *  6/1987  Young ............................. 70/57

| 5,187,352 A | * | 2/1993 | Blair et al. | ................... | 235/382 |
| 5,341,422 A | * | 8/1994 | Blackledge, Jr. et al. | ....... | 380/4 |
| 5,375,243 A | * | 12/1994 | Parzych et al. | ................... | 395/725 |
| 5,643,086 A | * | 7/1997 | Alcorn et al. | ................... | 463/29 |
| 5,651,139 A | * | 7/1997 | Cripe et al. | ................... | 395/490 |
| 5,657,473 A | | 8/1997 | Killean et al. | | |
| 5,768,382 A | * | 6/1998 | Schneier et al. | ............... | 380/23 |
| 5,812,821 A | * | 9/1998 | Sugi et al. | ................... | 395/500 |
| 5,983,317 A | * | 11/1999 | Kanda et al. | ............... | 711/112 |
| 6,012,636 A | * | 1/2000 | Smith | ........................... | 235/380 |

* cited by examiner

*Primary Examiner*—Michael G. Lee
*Assistant Examiner*—Seung Ho Lee
(74) *Attorney, Agent, or Firm*—Nath & Associates PLLC; Gary M. Nath; Marvin C. Berkowitz

(57) **ABSTRACT**

A method of protecting data, stored in a memory device of a computer system connected to a SCSI interface, against unauthorized access whereby access by the computer system to the memory device is either permitted or refused, depending upon the authorization of a request, by an exchange of information between the computer system and the memory device at the SCSI interface. Authorization is by means of identification of an authorized user. During access by the computer system to the memory device, any kind of operation with the memory device can be blocked, or access permission given for memory readout only, or for readout and recording, or only for recording. The equipment for carrying out the method includes a memory device connected by a SCSI bus to a host computer system, while between the memory device and the host computer system there an additional control unit with authorization block is inserted.

18 Claims, 1 Drawing Sheet



**U.S. Patent**                    Feb. 11, 2003                    US 6,516,999 B1



MTI0000839

US 6,516,999 B1

1

## METHOD OF PROTECTING DATA STORED IN THE MEMORY DEVICE OF A COMPUTER SYSTEM AND EQUIPMENT TO CARRY OUT THIS METHOD

### FIELD OF THE INVENTION

The invention involves a method of protecting data, stored in the memory device of a computer system, connected to the SCSI interface, against unauthorised access, and equipment for carrying out this method.

### DESCRIPTION OF THE PRIOR ART

The protection of data saved in the computer system against unauthorised change or deletion is among the important safeguards in the proposal and implementation of a strategy for protecting information systems. The problem of protection is currently solved partly by means of an operating system partly by use of memory devices of the WORM type (Write Once Read Many, for example recordable CD-ROM) and partly by use of media having the possibility of mechanical blocking of recording (for example, diskettes, tapes, MOD etc.) Normal operating systems protect data by assigning authorisations for recording, readout and execution for each file. These authorisations are assigned only to the owner, group of owners or individual users of the computer system which, given the thousands of files that these systems contain, makes the effective safe dispensing of authorisations extremely difficult. Moreover, an authorisation is valid only for the normal user of a computer system. There is always exists a group of people who, individually or as a team, can have unrestricted access to all the files, and at any given moment may or may not have accreditation by their organisation or the file owner. The system administrators make up this team having unrestricted rights to all the files. However, each owner also has unrestricted access to his own files, which in the case of a database set, for example, can have far-reaching consequences.

Use of memory devices of the WORM type noticeably restricts the possibilities for modification or effacing of individual memories by a systems administrator. Aside for the disadvantages in terms of limited capacity and transmission speed, it is obvious that the system does not guarantee the accuracy of the data and is unsuitable for storing data for the medium term, because during each modification it is necessary to create and change the whole medium.

Use of media with mechanical blocking capacity is complicated by their low capacity (for example diskettes), speed of access to data (for example DAT-type tapes), or by the speed of recording (for example MOD). Also, none of these media guarantees accuracy of the data.

The solution of the above problems must therefore proceed from the following assumptions. Protected data must be reliably protected against change and erasing. Only a small and strictly defined group of users can have the right to record (erase) protected data. It is necessary to ensure reliable and dependable identification of users and an effective method of clear verification of authorised users.

It is not easy to identify in the patent literature, the nearest technical solutions dealing with the given problem. In Czech utility model No. 831, for example, a mechanism is describe for protecting computers against infiltration of unwanted programs and against unacceptable damaging of data. A technical solution is described here which employs the internal bus of the personal computer for communication between the electrical circuit and the software portion. The

2

electrical circuit described comprises a memory circuit, connected across a comparator to a driver. Protection against infiltration of unwanted programs consists here of the fact that a sequence of bytes is transmitted by the program along the internal bus of the computer; these bytes are deposited in the memory circuit and by means of the comparator an evaluation occurs in the electrical circuit of the identity of the bytes transmitted and, depending upon the results, recording onto the hard disk may or may not occur. The arrangement described is limited in its scope to the personal computer, equipped with the appropriate internal bus and is therefore strictly dependent upon the specific type of computer.

### SUMMARY OF THE INVENTION

The above objectives of the invention are attained by the method of protecting data, stored in the memory devices of a computer system connected to a SCSI interface, against unauthorised access. The basis of the invention lies in the fact that communication between the computer system and the memory device at the SCSI interface is screened and, depending upon the authorisation of a request, access by the computer system to the memory device is either permitted or refused. Authorisation of a request is by means of identification of an authorised user, access by the computer system to the memory device is in the form of the blocking of any kind of operation with the memory device, or permission to access for memory device readout only, or for readout and recording of data in the memory device, or only for recording of data in the memory device as the case may be. Equipment for carrying out the above method of data protection comprises a memory device connected by the SCSI bus to a host computer system. Between this memory device and the host computer system there is integrated into the SCSI bus an additional control unit with authorisation block.

The advantage is the clear verification of authorised users, assignment of the right to adjust the control units to a strictly defined individual or a team of authorised users. In contrast to existing protection of data, here it is a question of safe protection of data by hardware means, which cannot be circumvented by any software methods. Identification of authorised users can be made on the basis of very precise prior specifications, for example a combination of any particular requests (the users alone can chose the degree of security of data protection). At the same time the users can be divided into various groups with authorisation for data readout only or also for recording, and can block all operations as the case may be.

The memory device can consist of a hard disk, a disk subsystem, optical disk, tape unit, re-writable compact disk or electronic memory device. The additional control unit can consist of an electronic control unit, comprising microprocessors or SCSI control units with control software as the case may be. The authorisation block can consist of a lock with mechanical key with contacts, a connector with storage memory device of the EEPROM, EPROM or ROM type, a connector for inserting touch-memory, a chip card or magnetic card scanner, or a user identification scanner as the case may be. The equipment for carrying out the method of protection with a memory device connected by the SCSI bus to the host computer system can comprise, in an alternative embodiment, an additional control unit directly connected to the memory device and connected at the same time to the SCSI bus. On the basis of output from the authorisation block, the electronic unit in the additional control unit directly controls the memory device across the specific

MTI0000840

US 6,516,999 B1

3

interface of the memory device (the disk can be equipped by the manufacturer with a supplementary electronic control, for example blocking of recording or access) and also screens and actuates any control signals from the SCSI. In another embodiment of the invention, the data portion of the SCSI bus can be connected directly to the memory device, while the command portion of the SCSI bus is interrupted by the insertion of an additional control unit, connected to the memory device. As long as the data portion of the SCSI bus between the host computer system and the memory device is not interrupted, the flow of data to the memory device is not slowed down and only the command portion of the SCSI bus is controlled.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention can be more clearly explained by means of the drawings, in conjunction with the following description of concrete embodiments. FIG. 1 is a block diagram showing the arrangement of the equipment for carrying out the data protection method, where between the memory device and the host computer system an additional control unit is inserted into the SCSI bus, to which it is connected or of which is constitutes the authorisation block. In FIG. 2 an additional control unit is directly connected to the memory device and is at the same time connected to the SCSI bus. FIG. 3 shows a further modification of the equipment for carrying out the method of protecting data according to this invention, where the data portion of the SCSI bus is connected directly to the memory device, while the command portion of the SCSI bus is interrupted by the insertion of an additional control unit connected to the memory device.

EXAMPLES OF PREFERRED EMBODIMENTS

FIG. 1 shows the arrangement of one of the possible embodiments of the equipment for carrying out the method of protecting data, stored in the memory device of a computer system connected to a SCSI interface, against unauthorised access. The equipment comprises a memory device DS connected by the SCSI bus to the host computer system US. Between the memory device DS and the host computer system US an additional control unit RJ comprising an electronic unit EJ, to which an authorisation block OV is connected, is integrated into the SCSI bus. The additional control unit RJ monitors the flow of commands from the host computer system US across the SCSI bus and, according to the status of the authorisation block OV, either passes these commands on to the memory device DS or blocks their passage. At the exit from the authorisation block OV a signal occurs establishing the level of access of the host computer system US across the control unit RJ to the memory device DS. Thus for example, by pressing an electronic key (touch memory) at the contact of the authorisation block OV, according to the weight of this key, a signal from the authorisation block OV is given to make the appropriate adjustment to the electronic unit EJ in the control unit RJ, which affects the communication access of the host computer system US, through the control unit RJ, to the memory device DS. Instead of an electronic key, it is possible to use other identifying equipment according to the user's needs, for example, a lock with mechanical key and contacts, fingerprint reader, cornea reader, keyboard, etc. The electronic unit EJ (for example, the microprocessor in the electronic unit EJ) interprets the commands to the SCSI bus. It reacts to the output from the authorisation block OV by transmitting some commands by the SCSI bus to the memory device DS or modifying them (for example, it

4

checks whether the communication to the SCSI bus actually involves the protected memory device DS or another memory device), or it disallows access to the protected memory DS.

In the case of the modification of the equipment, as illustrated in FIG. 2, the electronic unit EJ in the additional control unit RJ controls the memory device DS directly (for example, a disk is equipped by the manufacturer with a supplementary electronic control, to block recording or access) and also surveys and controls any control signals from the SCSI bus. On the basis of the output from the authorisation block OV, the additional control unit 1U controls the memory device DS by means of a specific interface and any control signals from the SCSI bus.

FIG. 3 illustrates further possible alternative embodiments of the equipment for carrying out the method of protecting data according to this invention. The data portion D of the SCSI bus is connected directly here to the memory device DS, while the command portion D+C of the SCSI bus is interrupted by the insertion of an additional command unit RJ, connected to the memory device DS. As long as the data portion of the SCSI bus between the host computer system US and the memory device DS is not interrupted, slowdown in the flow of data to the memory device DS does not occur and only the command portion of the SCSI bus is controlled. For reasons of speed of data transfer from the host computer system US to the memory device DS, the data portion is connected directly to the memory device D and is also connected to the command unit RJ to assure read-out of commands from the SCSI bus.

The specific use of any of the three basic equipment variants described depends on the features of the connected memory device DS, or on the type of SCSI bus used. Thus, for example, the additional control unit RJ including the memory device DS can be situated inside the host computer system US (internal embodiment), can also be situated outside this host computer system US. The advantage is that it is possible to connect them to any host computer system US with an SCSI bus. The additional control unit RJ can contain an enciphering unit for coding data stored in the memory device DS. Any computer with SCSI interface can be a host computer system US.

The technical solution according to the invention as described assures the protection of disk subsystems against unauthorised recording. In a specific embodiment it is possible, by means of contact memory, to switch over to the Read-Write (write enable) mode and the Read-Only (write protect) mode on disk subsystems, and the read and write protect mode as the case may be. In such a case it can consist of a disk subsystem arrangement, electronic key programmer, program equipment and sets of electronic keys. To ensure effective control, operations involving modification of data can be permitted only in the presence of at least two people.

The solution can be completely integrated into the disk subsystem, in which is located a blocking unit (additional control unit) which controls communications on the SCSI bus between the control unit and disk unit. The blocking unit also communicates with the identification chip—contact memory scanners (part of the authorisation block OV).

On the cover of the disk subsystem there are three scanner-openings, into which pin-type jack connectors are inserted. In these connectors are located contact memories. The scanner-openings are moreover located in a locked case on which there is an indicator of the mode of the disk subsystem or of the presence of contact memories. It is

MTI0000841

US 6,516,999 B1

5

possible to switch from the Read-Only mode to the Read-Write mode just by a simultaneous insertion of three, two or one connector from the group of four, five on six which, for the whole period of the Read-Write mode, will be plugged into the openings and locked into the cases. The mode of the changed disk subsystem is indicated on the case by placing a LED diode, for example red for the Read-Write mode and green for the Read-Only mode. The disk subsystem to the whole extent of its capacity, is blocked against recording, in the Read-Only mode. If an attempt is made to record on the disk subsystem in the Read-Only mode, the recording command is refused at the level of the disk subsystem and of the SCSI control unit, and an error report is sent by the SCSI which provokes a corresponding system reaction at the level of the operational system, and also at the applicant level (for example of the database system). The operational system detects transfers in the disk subsystem in the Read-Only mode during connection of the disk as a Write-Protected system (function of the operational system), and thus at the level of the operational system recording on the disk subsystem is already rendered impossible. In the event of penetration of the protection of the operational system, the blocking unit in the Read-Only mode renders recording onto the disk unit physically impossible. It is possible to put the blocking unit out of operation only by removing the disk module from the computer and then dismantling it. Protection against unauthorised changes to the disk therefore depends upon the impossibility of manipulating the inner module.

A contact memory, located in the body of a miniature pin-type connector, serves as a secure identification element (authorisation block OV). From the point of view of the electric signals, connection including attachment is effected by means of two connectors and full communication is ensured against faults by a cyclical code. Each chip has a unique identification code added by the manufacturer so that impossibility of duplication is ensured. It is possible to arrange the contact memories parallel to each other, thus achieving a combination of individual advantages during the current holding, but also an increase in the level of security (thanks to the special algorithm identification of the parallel connected memories).

The additional control unit RJ controls the disk (memory device DS) located in the disk module, so that it is possible to switch between the Read-Only and Read-Write modes, or render the disk inaccessible as the case may be. On the additional control unit RJ there is a sleeve into which is inserted the electronic key for the unit (authorisation block OV). Any change to this key calls for the dismantling of the disk subsystem. Unless the key is inserted, the control unit blocks the disk and makes it impossible to work with it. The control unit has information stored in the memory device concerning the unique identification of each key that can be inserted into it. A change in this information calls for pre-programming of the control unit. Memories of the Touch Memory type are used as an electronic key, the key being welded and sealed in a cinch-type connector. The basis of the control unit is a single-chip microprocessor, which contains and executes the control program of the unit. Its memory device (for example of the PEROM-type) contains a list of authorised keys and is locked so that it is impossible to read or change it by any hardware means. It is only possible to efface the memory and program again, including the program. The keys have a unique number, each has its weight and identification string information concerning the weight and the string can be programmed by the user. The additional control unit RJ in real time uninterruptedly selects the

6

presence of the keys inserted. The selection process is as follows (in simplified terms). The unit checks whether the identification string of a key is identical and agrees with the string in the control unit. It checks whether the unique number of an individual key is in the list of keys. It calculates the weight of individual keys.

Industrial use

The method of protecting data, stored in the memory device of a computer system connected to an SCSI interface, against unauthorised access, and equipment for carrying out this method according to the invention can be used especially for the protection of primary sources of data (for example database sets), to ensure the consistency of configurational parameters (protection of the software configuration) for protection of files against viruses and Trojan horses and protection of all important data. The method of protection according to the invention is suitable for environments having high protection requirements against change of information, either intentional (attacks on the system from outside or within, by hackers or administrators) or accidental; environments such as the banking and finance sectors, the state administration, the army etc.

What is claimed is:

1. A method of protecting data, stored in a memory device of a computer system connected to a SCSI (Small Computer System Interface) interface bus, against unauthorized access, characterized in that:

a control unit having an authorization block is integrated into the SCSI interface bus between the memory device and a SCSI adapter connected to the computer system, said control unit receiving a memory access request control signal from the computer system;

providing an authorization level control signal from said authorization block to said control unit by means of identification of an authorized user;

evaluation said authorization level control signal to screen communication between the computer system and the memory device at the SCSI interface depending upon an authorization level of the memory access request control signal, whereby access by the computer system to the memory device, is either permitted or refused.

2. A device for carrying out the method according to claim 1, comprising:

a memory device (DS) connected to a SCSI bus to a host computer system (US); and

an additional control unit (RJ) having an authorization block (OV) having an authorized user identifier connected thereto integrated into the SCSI bus between the memory device and a SCSI adapter connected to the host computer system.

3. A device according to claim 2, characterized in that the memory device (DS) consists of a hard disk, a disk subsystem, optical disk, tape unit, re-writable compact disk or electronic memory device.

4. A device according to claim 3, characterized in that said additional control unit (RJ) is directly connected to the memory (DS) and is connected at the same time to the SCSI bus.

5. A device according to claim 2, characterized in that the additional control unit (RJ) consists of an electronic control unit, comprising microprocessors or SCSI control units with control software.

6. A device according to claim 5, characterized in that said additional control unit (RJ) is directly connected to the memory (DS) and is connected at the same time to the SCSI bus.

MTI0000842

US 6,516,999 B1

7

7. A device according to claim 2, characterized in that the authorized user identifier comprises: a lock with mechanical key with contacts.

8. A device according to claim 7, characterized in that said additional control unit (RJ) is directly connected to the memory (DS) and is connected at the same time to the SCSI bus.

9. A device according to claim 2, characterized in that said additional control unit (RJ) is directly connected to the memory (DS) and is connected at the same time to the SCSI bus.

10. A device according to claim 2, characterized in that a data portion of the SCSI bus is connected directly to the memory device (DS), while a command portion of the SCSI bus is interrupted by said additional control unit (RJ).

11. The device according to claim 2, characterized in that the authorized user identifier comprises a connector with storage memory of the EEPROM, EPROM or ROM type.

12. The device according to claim 2, characterized in that the authorized user identifier comprises a connector for inserting touch-memory.

8

13. The device according to claim 2, characterized in that the authorized user identifier comprises a chip card or magnetic card scanner.

14. The device according to claim 2, characterized in that the authorized user identifier comprises a user identification scanner.

15. The method as claimed in claim 1 wherein said control unit further performs the step of blocking of any kind of operation with the memory device.

16. The method as claimed in claim 1 wherein said control unit further performs the step of permitting access to the memory device for memory device readout only.

17. The method as claimed in claim 1 wherein said control unit further performs the step of permitting access to the memory device for readout and recording of data in the memory device.

18. The method as claimed in claim 1 wherein said control unit further performs the step of permitting access to the memory device only for recording of data in the memory device.

*  *  *  *  *

MTI0000843

VALID

Pat. No. 06004065 - 6          Group ID: C          Page 1
Issue Date: 08/30/04           User ID: Kfrison   KS: 1,616

Warning [Pages Of US References:]
     page 4 has no references
Warning [Pages Of Foreign References:]
     page 1 has no references
     page 2 has no references
     page 3 has no references
     page 5 has no references
     page 6 has no references
     page 7 has no references
     page 8 has no references
     page 9 has no references
Warning [Pages Of Other References:]
     page 1 has no references
     page 2 has no references
     page 3 has no references
     page 5 has no references
     page 7 has no references
     page 8 has no references
     page 9 has no references

MTI0000844

CHECK LIST

Rule 47        Continuing Data     PCT        Disclaimer

NO             Yes                 No         No

Microfiche Appendix          CPA tag

NO                           No

Foreign Priority Claimed: No
Acknowledged: No

State Code: MD    Country Code:

Text Endorsement: 09961417.062501

===================================================================

JACKET

SERIAL NUMBER     FILING DATE     CLASS     SUBCLASS                    GAU

09/961,417        09/25/01        711       112                        2187

FOREIGN PRIORITY
Country    Document Number     Date

DISCLAIMER

    /  /

TITLE
Write protection for computer long-term memory devices

MICROFICHE APPENDIX

ASSISTANT EXAMINER:
First:              Middle:              Last:

Ngoc                V                    Dinh

PRIMARY EXAMINER:
First:              Middle:              Last:

Donald                                   Sparks

CLAIMS ALLOWED

Pat. No. 06004065 - 6     Group ID: C     Page 2
Issue Date: 08/30/04     User ID: Kfrison

**Total    Print**

45    1

**DRAWINGS**

| Sheets | Figures | Print |
|--------|---------|-------|
| 9 | 10 | Y |

===================================================================

**BLUE SLIP INFORMATION**

| SERIAL NUMBER | CLASS | SUBCLASS | GAU |
|---------------|-------|----------|-----|
| 09/961,417 | 711 | 112 | 2187 |

**INDEP. CLAIMS**               **TOTAL CLAIMS**

1,13,25,30,40               45

===================================================================

**BLUE SLIP (Page 1)**

**INTERNATIONAL CLASSIFICATION**

| Class | SubClass |
|-------|----------|
| G06F | 12/00 |

**CROSS-REFERENCES**

| Class | SubClass |
|-------|----------|
| 711 | 163;164 |
| 713 | 161;164;165;166 |

===================================================================

**TERM EXTENSION**

266

**FIELD OF SEARCH**

| Class | SubClass |
|-------|----------|
| 711 | 112;164 |
| 713 | 161;164;165;166 |

MTI0000846

```
          Pat. No. 06004065 - 6          Group ID: C          Page 3
          Issue Date: 08/30/04           User ID: Kfrison
```

=====================================================================

OATH

INVENTOR NAME
First:                    Middle:              Last:                    Signed:
Steven                                         Bress                    Yes

City:          Rockville

State: MD     ZIP Code:    Country:     Foreign ZIP:

INVENTOR NAME
First:                    Middle:              Last:                    Signed:
Mark                      Joseph               Menz                     Yes

City:          Folsom

State: CA     ZIP Code:    Country:     Foreign ZIP:


=====================================================================

PCT INFO

=====================================================================

CONTINUING DATA (Page 1)

LINE   CODE   SERIAL NUMBER    FILING DATE    STATUS    DOCUMENT NO.    ISSUE DATE

104    68     60/237,761       09/29/2000                               /  /

=====================================================================

REFERENCES (Page 1) SERIAL NUMBER: 09/961,417
FORM 892

U.S. REFERENCES
U.S. Pat No.    Date      Patentee                      Class     SubClass

*6,654,864      11/2003   Shaath et al.                 711       163
No issue date available.

FOREIGN REFERENCES
Foreign Doc No.    Date    Country    Class    SubClass

OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)

MTI0000847

```
|=================================================================
```

**REFERENCES (Page 2) SERIAL NUMBER: 09/961,417**
**FORM 892**

**U.S. REFERENCES**

| U.S. Pat No. | Date | Patentee | Class | SubClass |
|---|---|---|---|---|
| *6,345,368 | 02/2002 | Bergsten | 714 | 11 |

No issue date available.

| | | | | |
|---|---|---|---|---|
| *6,330,648 | 12/2001 | Wambach et al. | 711 | 163 |

No issue date available.

| | | | | |
|---|---|---|---|---|
| *6,212,635 | 04/2001 | Reardon | 713 | 165 |

No issue date available.

**FOREIGN REFERENCES**

| Foreign Doc No. | Date | Country | Class | SubClass |
|---|---|---|---|---|

**OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)**

```
|=================================================================
```

**REFERENCES (Page 3) SERIAL NUMBER: 09/961,417**
**FORM 892**

**U.S. REFERENCES**

| U.S. Pat No. | Date | Patentee | Class | SubClass |
|---|---|---|---|---|
| *6,336,187 | 01/2002 | Kern et al. | 713 | 161 |

No issue date available.

| | | | | |
|---|---|---|---|---|
| *6,446,209 | 09/2002 | Kern et al. | 713 | 193 |

No issue date available.

| | | | | |
|---|---|---|---|---|
| 5,991,402 | 11/1999 | Jia et al. | 705 | 59 |
| *6,126,070 | 10/2000 | Fukuzumi | 235 | 380 |

No issue date available.

| | | | | |
|---|---|---|---|---|
| *6,230,288 | 05/2001 | Kuo et al. | 714 | 38 |

No issue date available.

| | | | | |
|---|---|---|---|---|
| *6,216,205 | 04/2001 | Chin et al. | 711 | 131 |

No issue date available.

**FOREIGN REFERENCES**

| Foreign Doc No. | Date | Country | Class | SubClass |
|---|---|---|---|---|

MTI0000848

```
Pat. No. 06004065 - 6        Group ID: C           Page 5
Issue Date: 08/30/04         User ID: Kfrison
```

<u>OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)</u>

==============================================================

<u>REFERENCES (Page 4) SERIAL NUMBER: 09/961,417</u>
<u>FORM 1449</u>

<u>U.S. REFERENCES</u>

| <u>U.S. Pat No.</u> | <u>Date</u> | <u>Patentee</u> | <u>Class</u> | <u>SubClass</u> |
|---|---|---|---|---|

<u>FOREIGN REFERENCES</u>

| <u>Foreign Doc No.</u> | <u>Date</u> | <u>Country</u> | Class | SubClass |
|---|---|---|---|---|
| WO 01/88724 A2 | 11/2001 | WOX | | |
| WO 93/13477 | 07/1993 | WOX | | |
| WO 93/09495 | 05/1993 | WOX | | |

<u>OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)</u>

Patent Abstracts of Japan, Publication No. 06337781, Dec. 6, 1994, NEC Home Electron Ltd.

==============================================================

<u>REFERENCES (Page 5) SERIAL NUMBER: 09/961,417</u>
<u>FORM 892</u>

<u>U.S. REFERENCES</u>

| <u>U.S. Pat No.</u> | <u>Date</u> | <u>Patentee</u> | <u>Class</u> | <u>SubClass</u> |
|---|---|---|---|---|
| 4,654,829 | 03/1987 | Jiang et al. | 365 | 189.03 |

<u>FOREIGN REFERENCES</u>

| <u>Foreign Doc No.</u> | <u>Date</u> | <u>Country</u> | Class | <u>SubClass</u> |
|---|---|---|---|---|

<u>OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)</u>

==============================================================

<u>REFERENCES (Page 6) SERIAL NUMBER: 09/961,417</u>
<u>FORM 1449</u>

<u>U.S. REFERENCES</u>

| <u>U.S. Pat No.</u> | <u>Date</u> | <u>Patentee</u> | <u>Class</u> | <u>SubClass</u> |
|---|---|---|---|---|
| 5,369,616 | 11/1994 | Wells et al. | 365 | 218 |

<u>FOREIGN REFERENCES</u>

MTI0000849

Pat. No. 06004065 - 6       Group ID: C            Page 6
Issue Date: 08/30/04         User ID: Kfrison

| Foreign Doc No. | Date | Country | Class | SubClass |
|---|---|---|---|---|

**OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)**

Patent Abstracts of Japan, vol. 1995, No. 05, Jun. 30, 1995 & JP 7 037207, Feb. 7, 1995; 1 page.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Peter Gutmann: [37 Secure Deletion of Data from Magnetic and Solid-State Memory, [38 [0 Proceedings of the USENIX Security Symposium, Jul. 22, 1996; 14 pages.

===============================================================

**REFERENCES (Page 7) SERIAL NUMBER: 09/961,417 FORM 1449**

**U.S. REFERENCES**

| U.S. Pat No. | Date | Patentee | Class | SubClass |
|---|---|---|---|---|
| *6,629,184 | 09/2003 | Berg et al. | 710 | 306 |

No issue date available.

**FOREIGN REFERENCES**

| Foreign Doc No. | Date | Country | Class | SubClass |
|---|---|---|---|---|

**OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)**

===============================================================

**REFERENCES (Page 8) SERIAL NUMBER: 09/961,417 FORM 1449**

**U.S. REFERENCES**

| U.S. Pat No. | Date | Patentee | Class | SubClass |
|---|---|---|---|---|
| 5,268,960 | 12/1993 | Hung et al. | 380 | 4 |
| 5,289,540 | 02/1994 | Jones | 380 | 4 |
| 5,325,499 | 06/1994 | Kummer et al. | 395 | 425 |
| *6,041,385 | 03/2000 | Shipman et al. | 710 | 200 |

No issue date available.

| *6,041,394 | 03/2000 | Halligan et al. | 711 | 166 |

No issue date available.

MTI0000850

Pat. No. 06004065 - 6          Group ID: C          Page 7
Issue Date: 08/30/04          User ID: Kfrison

```
*6,092,161      07/2000  White et al.              711      163
No issue date available.

 4,734,851      03/1988  Director                  364      200

 5,144,660      09/1992  Rose                      380      4

 4,811,293      03/1989  Knothe et al.             365      189

 5,687,379      11/1997  Smith et al.              395      726

 5,557,674      09/1996  Yeow                      380      4
```

**FOREIGN REFERENCES**
**Foreign Doc No.    Date    Country    Class    SubClass**

**OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)**

================================================================

**REFERENCES (Page 9) SERIAL NUMBER: 09/961,417**
**FORM 1449**

**U.S. REFERENCES**
**U.S. Pat No.    Date    Patentee                          Class    SubClass**

```
*6,516,999      02/2003  B[e,acu e[ee lono[e,hac z[ee nik235      382
No issue date available.
```

**FOREIGN REFERENCES**
**Foreign Doc No.    Date    Country    Class    SubClass**

**OTHER REFERENCE CITATIONS (incl. Author, Title, Date, Pertinent Pages, etc.)**

================================================================

**\*\*\*\*\*\*\*\*\*\***

MTI0000851

| L Number | Hits | Search Text | DB | Time stamp |
|---|---|---|---|---|
| - | 179 | 713/164 | USPAT | 2004/08/18 15:34 |
| - | 147 | 713/161 | USPAT | 2003/06/05 13:07 |
| - | 161 | 713/166 | USPAT | 2004/08/18 15:36 |
| - | 182707 | (block$3 prevent$3 filter$3 stop$3) near8 (commands information data) | USPAT | 2004/08/18 15:34 |
| - | 119 | 713/164 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data)) | USPAT | 2004/01/13 13:01 |
| - | 26504 | (examin$3 compar$3 test$3) near10 match$3 | USPAT | 2003/05/16 14:18 |
| - | 15 | (713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data))) and ((examin$3 compar$3 test$3) near10 match$3 ) | USPAT | 2004/01/02 15:39 |
| - | 52515 | (host and storage) | USPAT | 2003/05/16 15:05 |
| - | 3493 | ((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) ) | USPAT | 2003/05/16 15:05 |
| - | 219 | 713/165 | USPAT | 2003/05/16 15:08 |
| - | 9 | 713/165 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:08 |
| - | 6 | 713/164 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:26 |
| - | 7 | 713/161 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:19 |
| - | 4 | 713/166 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:23 |
| - | 2914 | storages near10 security | USPAT | 2003/05/16 15:26 |
| - | 9 | ((examin$3 compar$3 test$3) near10 match$3 ) same (storages near10 security) | USPAT | 2003/08/21 17:17 |
| - | 2627 | (verify$3 check$3 block$3 prevent$3 inhibit$3) near8 access near7 storages | USPAT | 2004/04/12 10:20 |
| - | 30035 | (access read write input) near10 protect$3 | USPAT | 2003/06/05 13:00 |
| - | 560 | interface adj2 emulat$3 | USPAT | 2003/06/05 13:00 |
| - | 5 | ((access read write input) near10 protect$3) same (interface adj2 emulat$3) | USPAT | 2003/06/05 13:01 |
| - | 106 | 713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands input access information data)) | USPAT | 2003/06/05 13:11 |
| - | 184 | 713/164 | USPAT | 2003/06/05 13:07 |
| - | 156 | 713/161 | USPAT | 2003/06/05 13:07 |
| - | 164 | 713/166 | USPAT | 2003/06/05 13:07 |
| - | 139 | 713/164 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands access input information data)) | USPAT | 2003/06/05 13:10 |
| - | 30238 | (storage DASD) and security | USPAT | 2003/06/05 13:12 |
| - | 7045 | (storage DASD) same security | USPAT | 2003/06/16 16:53 |
| - | 139165 | ((block$3 prevent$3 filter$3 stop$3 prohibit$3) near4 (commands input access)) | USPAT | 2003/06/16 16:53 |
| - | 298 | ((storage DASD) same security) same ( ((block$3 prevent$3 filter$3 stop$3 prohibit$3) near4 (commands input access)) ) | USPAT | 2003/06/05 13:23 |
| - | 38 | (controller interface) same ( ((storage DASD) same security) same ( ((block$3 prevent$3 filter$3 stop$3 prohibit$3) near4 (commands input access)) )) | USPAT | 2003/06/05 13:39 |
| - | 58 | (713/164 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands access input information data) ) and ((storage DASD) same security)) | USPAT | 2003/06/05 13:44 |
| - | 1 | 6126070.pn. | USPAT | 2003/06/06 11:09 |
| - | 1 | 6336187.pn. | USPAT | 2003/06/06 15:09 |
| - | 55 | IDE near4 advantag$6 | USPAT | 2003/06/06 11:10 |
| - | 1431 | LED near5 advantag$6 | USPAT | 2003/06/06 15:10 |
| - | 916 | LED near3 advantag$6 | USPAT | 2003/06/06 15:10 |
| - | 23 | (LED near3 advantag$6) and g06f$.ipc. | USPAT | 2003/06/06 15:32 |
| - | 36 | (pld near4 advantag$7) and g06f$.ipc. | USPAT | 2003/06/06 15:41 |
| - | 8 | ((dual adj2 port adj2 memory) near4 advantag$7) and g06f$.ipc. | USPAT | 2003/06/06 15:46 |
| - | 41 | ((dual adj2 port adj2 memory) same advantag$7) and g06f$.ipc. | USPAT | 2003/06/06 16:51 |
| - | 317 | virus$2 near3 (list definition file) | USPAT | 2003/06/06 16:52 |
| - | 7045 | (storage DASD) same security | USPAT | 2003/06/06 16:53 |
| - | 35 | (virus$2 near3 (list definition file) ) and ((storage DASD) same security ) | USPAT | 2003/06/09 10:22 |
| - | 35 | (virus$2 near3 (list definition file) ) and ((storage DASD) same security ) | USPAT | 2003/06/09 10:22 |
| - | 1 | (virus$2 near3 (list definition file)) near5 advantag$6 | USPAT | 2003/06/09 10:23 |
| - | 24 | (virus$2 near3 (list definition file)) same advantag$6 | USPAT | 2003/06/09 12:37 |
| - | 67 | (virus$2 near3 (list definition file scan$4)) same (storage DASD) | USPAT | 2003/06/09 10:33 |
| - | 832 | virus$2 near3 advantag$6 | USPAT | 2003/06/09 12:38 |

MTI0000852

| - | 8 | (virus$2 near3 advantag$6) same storage | USPAT | 2003/06/09 13:38 |
|---|---|---|---|---|
| - | 99 | 713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data)) | USPAT | 2003/08/21 17:17 |
| - | 2 | ((examin$3 compar$3 test$3) near10 match$3 ) same (storages near10 security) | USPAT | 2003/08/21 17:17 |
| - | 18 | (713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data))) and ((examin$3 compar$3 test$3) near10 match$3 ) | USPAT; US-PGPUB; EPO; JPO | 2003/12/04 14:49 |
| - | 17 | (713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data))) and ((examin$3 compar$3 test$3) near10 match$3 ) | USPAT | 2004/01/02 15:57 |
| - | 1 | ((examin$3 compar$3 test$3) near10 match$3 ) same (emulat$3 same ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ))) | USPAT | 2004/01/02 16:02 |
| - | 3717 | interface same (emulation emulator) | USPAT; US-PGPUB; EPO; JPO | 2004/01/02 16:01 |
| - | 115331 | (refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 14:04 |
| - | 360 | ((examin$3 compar$3 test$3) near10 match$3 ) same ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) ) | USPAT; US-PGPUB; EPO; JPO | 2004/01/02 16:02 |
| - | 1 | (((examin$3 compar$3 test$3) near10 match$3 ) same ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) ) ) same (interface same (emulation emulator) ) | USPAT; US-PGPUB; EPO; JPO | 2004/01/02 16:03 |
| - | 65 | (interface same (emulation emulator) ) same ((refus$3 block$3 prevent$3 inhibit$3 stop$4) near10 (access request ) ) | USPAT; US-PGPUB; EPO; JPO | 2004/01/02 16:03 |
| - | 142996 | ((block$3 prevent$3 filter$3 stop$3) near8 (commands access request)) | USPAT; US-PGPUB; EPO; JPO | 2004/01/13 13:32 |
| - | 2944 | interface near9 emulat$3 | USPAT; US-PGPUB; EPO; JPO | 2004/01/13 13:03 |
| - | 52 | (((block$3 prevent$3 filter$3 stop$3) near8 (commands access request)) ) same (interface near9 emulat$3) | USPAT; US-PGPUB; EPO; JPO | 2004/01/13 13:03 |
| - | 612 | (transparently independent$3) near10 (((block$3 prevent$3 filter$3 stop$3) near8 (commands access request)) ) | USPAT | 2004/01/13 13:33 |
| - | 21393 | ((block$3 prevent$3 filter$3 stop$3) near8 ( access request)) near10 (storage memory) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 13:56 |
| - | 129 | (transparently independent$3) near10 ((block$3 prevent$3 filter$3 stop$3) near8 ( access request)) near10 (storage memory)) | USPAT | 2004/01/13 13:34 |
| - | 1 | nguyen-hiep-t.xp. and bers$ | USPAT | 2004/01/13 15:01 |
| - | 1 | nguyen-hiep-t.xp. and berstis | USPAT | 2004/01/13 15:02 |
| - | 1 | nguyen-hiep-t.xp. and berst$4 | USPAT | 2004/01/13 15:02 |
| - | 50 | nguyen-hiep-t.xp. and (transparent emulat$3) | USPAT | 2004/01/13 15:52 |
| - | 17 | transparent near10 (interface near8 emulat$3) | USPAT | 2004/01/13 15:59 |
| - | 1 | "20020040418" | USPAT; US-PGPUB | 2004/01/14 09:49 |
| - | 17018 | ide (integrated adj1 device adj1 electronics) | USPAT; US-PGPUB | 2004/01/13 16:49 |
| - | 107 | (ide (integrated adj1 device adj1 electronics)) near9 advantag$8 | USPAT; US-PGPUB | 2004/01/13 17:03 |
| - | 282 | pld near10 advantag$8 | USPAT; US-PGPUB | 2004/01/13 17:17 |
| - | 1 | 6345368.pn. | USPAT; US-PGPUB | 2004/01/13 19:59 |
| - | 1 | 6336187.pn..pn. | USPAT; US-PGPUB | 2004/01/13 19:59 |
| - | 1 | 6336187.pn. | USPAT; US-PGPUB | 2004/01/13 19:59 |
| - | 46 | pld same (bus near3 driver) | USPAT; US-PGPUB | 2004/01/14 13:22 |

MTI0000853

| - | 1744 | IEEE adj2 "1394" | USPAT | 2004/01/14 13:23 |
|---|---|---|---|---|
| - | 1667 | IEEE adj1 "1394" | USPAT | 2004/01/14 13:25 |
| - | 2 | firewire same ((IEEE adj1 "1394") near8 (compatible advantag$8)) | USPAT | 2004/01/14 13:25 |
| - | 93 | (IEEE adj1 "1394") near8 (compatible advantag$8) | USPAT | 2004/01/14 13:49 |
| - | 1 | 6345368.pn. | USPAT | 2004/01/14 13:53 |
| - | 1 | 6330648.pn. | USPAT | 2004/01/14 13:53 |
| - | 1 | 6345368.pn. | USPAT | 2004/02/11 16:28 |
| - | 1 | 6336187.pn. | USPAT | 2004/02/11 16:28 |
| - | 41 | processor near10 (removable adj2 drive) | USPAT | 2004/03/18 14:59 |
| - | 8 | (processor near10 support$4) same (removable near3 drive) | USPAT; US-PGPUB; EPO; JPO | 2004/03/18 18:10 |
| - | 15082 | match$3 near10 ((predetermined adj4 commands) key parameters) | USPAT | 2004/04/12 12:13 |
| - | 14753 | (block$3 prevent$3 inhibit$3) near8 ((access) adj10 (storage memory )) | USPAT; US-PGPUB; EPO; JPO | 2004/04/12 10:38 |
| - | 5 | (write adj3 protect$3) and ((match$3 near10 ((predetermined adj4 commands) key parameters)) same ((block$3 prevent$3 inhibit$3) near8 ((access) adj10 (storage memory )) )) | USPAT; US-PGPUB; EPO; JPO | 2004/04/12 10:38 |
| - | 42 | (match$3 near10 ((predetermined adj4 commands) key parameters)) same ((block$3 prevent$3 inhibit$3) near8 ((access) adj10 (storage memory )) ) | USPAT; US-PGPUB; EPO; JPO | 2004/04/12 12:10 |
| - | 358 | (unauthorized unwanted) near20 (altered alteration  modify modifying modification) near20 (accesses i/o) | USPAT; US-PGPUB; EPO; JPO | 2004/04/12 12:14 |
| - | 28195 | match$3 near20 ((predetermined adj4 commands) keys parameters) | USPAT; US-PGPUB; EPO; JPO | 2004/04/12 12:13 |
| - | 0 | ((unauthorized unwanted) near20 (altered alteration  modify modifying modification) near20 (accesses i/o)) same (match$3 near20 ((predetermined adj4 commands) keys parameters)) | USPAT; US-PGPUB; EPO; JPO | 2004/04/12 12:14 |
| - | 51 | (unauthorized unwanted) near20 (altered alteration  modify modifying modification) near20 (accesses i/o)) and (match$3 near20 ((predetermined adj4 commands) keys parameters)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:37 |
| - | 1 | 6336187.pn. | USPAT | 2004/04/20 13:29 |
| - | 1 | 6345368.pn. | USPAT | 2004/04/20 13:32 |
| - | 1572 | (commands format) near10  (modify modyfying alternat$3 chang$3) near10 (storage) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 13:40 |
| - | 221 | (block$3 prevent$3 filter$3 stop$3) same ((commands format) near10 (modify modifying alternat$3 chang$3) near10 (storage)) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 13:40 |
| - | 943 | commands near10  (modify modyfying alternat$3 chang$3) near10 (storage) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 13:50 |
| - | 130 | (block$3 prevent$3 filter$3 stop$3) same (commands near10  (modify modyfying alternat$3 chang$3) near10 (storage)) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 14:20 |
| - | 280190 | (modify modyfying alternat$3 chang$3) near10 (storage data) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 13:59 |
| - | 124 | ((block$3 prevent$3 filter$3 stop$3) same (commands near10  (modify modyfying alternat$3 chang$3) near10 (storage))) same ( (modify modyfying alternat$3 chang$3) near10 (storage data) ) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 14:00 |
| - | 8240 | (prevent$3 prohibit$3 inhibit$3) near20 ( (modify modyfying alternat$3 chang$3) near10 (storage data) ) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 14:21 |
| - | 7079 | (prevent$3 prohibit$3 inhibit$3) near10 ( (modify modyfying alternat$3 chang$3) near10 (storage data) ) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 14:21 |
| - | 1943 | (security access control) same ( (prevent$3 prohibit$3 inhibit$3) near10 ( (modify modyfying alternat$3 chang$3) near10 (storage data) )) | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:23 |

MTI0000854

| | | | | |
|---|---|---|---|---|
| - | 1024 | (security access control) near10 ( (prevent$3 prohibit$3 inhibit$3) near10 ( (modify modyfying alternat$3 chang$3) near10 (storage data) )) | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 15:45 |
| - | 1 | 6223248.pn. | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 15:46 |
| - | 1 | 6223284.pn. | USPAT; US-PGPUB; EPO; JPO | 2004/04/20 15:46 |
| - | 1335 | ((security) (access near5 control)) and ( (prevent$3 prohibit$3 inhibit$3) near10 ( (modify modyfying alternat$3 chang$3) near10 (storage data) )) | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:47 |
| - | 134761 | (match matching compar$3) near10 (predetermined parameters keys) | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:50 |
| - | 2798 | access adj1 control.ti. | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:38 |
| - | 7433 | (prevent$3 prohibit$3 inhibit$3) near10 ((modify modifying alternat$3 chang$3) near10 (storage data)) | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:52 |
| - | 23308 | (compare comparing) near20 (match matching) | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:53 |
| - | 6 | ((prevent$3 prohibit$3 inhibit$3) near10 ((modify modifying alternat$3 chang$3) near10 (storage data))) same ((compare comparing) near20 (match matching)) | USPAT; US-PGPUB; EPO; JPO | 2004/04/21 09:52 |
| - | 202 | ((prevent$3 prohibit$3 inhibit$3) near10 ((modify modifying alternat$3 chang$3) near10 (storage data)) and ((compare comparing) near20 (match matching)) | USPAT; US-PGPUB; EPO; JPO | 2004/06/14 09:36 |
| - | 207 | ((prevent$3 prohibit$3 inhibit$3) near10 ((modify modifying alternat$3 chang$3) near10 (storage data))) and ((compare comparing) near20 (match matching)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:39 |
| - | 23618 | ((block$3 prevent$3 filter$3 stop$3) near8 (access request)) near10 (storage memory) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 13:56 |
| - | 0 | (((block$3 prevent$3 filter$3 stop$3) near8 ( access request)) near10 (storage memory) ) same 713/164 | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 13:57 |
| - | 35 | (((block$3 prevent$3 filter$3 stop$3) near8 ( access request)) near10 (storage memory) ) and 713/164 | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:41 |
| - | 262 | (match match$3) near20 ((predetermined parameter) near4 commands) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 13:58 |
| - | 17 | (((block$3 prevent$3 filter$3 stop$3) near8 ( access request)) near10 (storage memory) ) and ((match match$3) near20 ((predetermined parameter) near4 commands)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 13:58 |
| - | 127895 | (refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 14:04 |
| - | 7 | ((match match$3) near20 ((predetermined parameter) near4 commands)) same ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) ) | USPAT; US-PGPUB; EPO; JPO | 2004/08/17 14:05 |
| - | 66 | ((match match$3) near20 ((predetermined parameter) near4 commands)) and ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) ) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:36 |
| - | 208027 | (block$3 prevent$3 filter$3 stop$3) near8 (commands information data) | USPAT | 2004/08/18 15:34 |
| - | 9440 | (match match$3) near10 (parameter command instruction) | USPAT | 2004/08/18 15:38 |
| - | 253 | 713/164 | USPAT | 2004/08/18 15:35 |
| - | 8 | ((match match$3) near10 (parameter command instruction)) and 713/164 | USPAT | 2004/08/18 15:36 |
| - | 4766 | ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data) ) and ((match match$3) near10 (parameter command instruction)) | USPAT | 2004/08/18 15:36 |
| - | 6 | 713/166 and ((match match$3) near10 (parameter command instruction)) | USPAT | 2004/08/18 15:36 |

MTI0000855

| | | | | |
|---|---|---|---|---|
| - | 66 | ((match match$3) near20 ((predetermined parameter) near4 commands)) and ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) ) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:37 |
| - | 1 | (((match match$3) near20 ((predetermined parameter) near4 commands)) and ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) )) and 713/161 | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:37 |
| - | 0 | (((match match$3) near20 ((predetermined parameter) near4 commands)) and ((refus$3 block$3 prevent$3 prohibit$3 inhibit$3 stop$4) near10 (access request ) ) and 713/164 | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:37 |
| - | 57 | ((unauthorized unwanted) near20 (altered alteration  modify modifying modification) near20 (accesses i/o) and (match$3 near20 ((predetermined adj4 commands) keys parameters)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:38 |
| - | 14430 | (match match$3) near10 (parameter command instruction keys codes) | USPAT | 2004/08/18 15:38 |
| - | 748 | ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data) ) same ((match match$3) near10 (parameter command instruction keys codes)) | USPAT | 2004/08/18 15:38 |
| - | 1 | (((block$3 prevent$3 filter$3 stop$3) near8 (commands information data) ) same ((match match$3) near10 (parameter command instruction keys codes))) and 713/164 | USPAT | 2004/08/18 15:38 |
| - | 215 | ((prevent$3 prohibit$3 inhibit$3) near10 ((modify modifying alternat$3 chang$3) near10 (storage data))) and (compare comparing) near20 (match matching)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:40 |
| - | 5 | 711/163 and (((prevent$3 prohibit$3 inhibit$3) near10 ((modify modifying alternat$3 chang$3) near10 (storage data))) and ((compare comparing) near20 (match matching))  ) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:40 |
| - | 1649 | 711/163 | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:40 |
| - | 125 | 711/163 and ((match match$3) near10 (parameter command instruction keys codes)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:40 |
| - | 0 | 711/163 same ((match match$3) near10 (parameter command instruction keys codes)) | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:40 |
| - | 35 | (((block$3 prevent$3 filter$3 stop$3) near8 ( access request)) near10 (storage memory) ) and 713/164 | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:58 |
| - | 1 | 6662277.pn. | USPAT; US-PGPUB; EPO; JPO | 2004/08/18 15:59 |
| - | 1 | 6571317.pn. | USPAT | 2004/08/19 09:17 |

MTI0000856

| L Number | Hits | Search Text | DB | Time stamp |
|---|---|---|---|---|
| 34 | 99 | 713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data)) | USPAT | 2003/08/21 17:17 |
| - | 2 | ((examin$3 compar$3 test$3) near10 match$3 ) same (storages near10 security) | USPAT | 2003/08/21 17:17 |
| - | 179 | 713/164 | USPAT | 2003/06/05 13:07 |
| - | 147 | 713/161 | USPAT | 2003/06/05 13:07 |
| - | 161 | 713/166 | USPAT | 2003/06/05 13:07 |
| - | 182707 | (block$3 prevent$3 filter$3 stop$3) near8 (commands information data) | USPAT | 2003/05/16 13:04 |
| - | 119 | 713/164 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data)) | USPAT | 2003/06/05 13:08 |
| - | 26504 | (examin$3 compar$3 test$3) near10 match$3 | USPAT | 2003/05/16 14:18 |
| - | 15 | (713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands information data))) and ((examin$3 compar$3 test$3) near10 match$3 ) | USPAT | 2003/05/16 16:12 |
| - | 52515 | (host and storage) | USPAT | 2003/05/16 15:05 |
| - | 3493 | ((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) ) | USPAT | 2003/05/16 15:05 |
| - | 219 | 713/165 | USPAT | 2003/05/16 15:08 |
| - | 9 | 713/165 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:08 |
| - | 6 | 713/164 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:26 |
| - | 7 | 713/161 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:19 |
| - | 4 | 713/166 and (((examin$3 compar$3 test$3) near10 match$3 ) and ((host and storage) )) | USPAT | 2003/05/16 15:23 |
| - | 2914 | storages near10 security | USPAT | 2003/05/16 15:26 |
| - | 9 | ((examin$3 compar$3 test$3) near10 match$3 ) same (storages near10 security) | USPAT | 2003/08/21 17:17 |
| - | 2627 | (verify$3 check$3 block$3 prevent$3 inhibit$3) near8 access near7 storages | USPAT | 2003/05/16 16:15 |
| - | 30035 | (access read write input) near10 protect$3 | USPAT | 2003/06/05 13:00 |
| - | 560 | interface adj2 emulat$3 | USPAT | 2003/06/05 13:00 |
| - | 5 | ((access read write input) near10 protect$3) same (interface adj2 emulat$3) | USPAT | 2003/06/05 13:01 |
| - | 106 | 713/161 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands input access information data)) | USPAT | 2003/06/05 13:11 |
| - | 184 | 713/164 | USPAT | 2003/06/05 13:07 |
| - | 156 | 713/161 | USPAT | 2003/06/05 13:07 |
| - | 164 | 713/166 | USPAT | 2003/06/05 13:07 |
| - | 139 | 713/164 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands access input information data)) | USPAT | 2003/06/05 13:10 |
| - | 30238 | (storage DASD) and security | USPAT | 2003/06/05 13:12 |
| - | 7045 | (storage DASD) same security | USPAT | 2003/06/06 16:53 |
| - | 139165 | ((block$3 prevent$3 filter$3 stop$3 prohibit$3) near4 (commands input access)) | USPAT | 2003/06/06 16:53 |
| - | 298 | ((storage DASD) same security) same ( ((block$3 prevent$3 filter$3 stop$3 prohibit$3) near4 (commands input access)) ) | USPAT | 2003/06/05 13:23 |
| - | 38 | (controller interface) same ( ((storage DASD) same security) same ( ((block$3 prevent$3 filter$3 stop$3 prohibit$3) near4 (commands input access)) )) | USPAT | 2003/06/05 13:39 |
| - | 58 | (713/164 and ((block$3 prevent$3 filter$3 stop$3) near8 (commands access input information data)) ) and ((storage DASD) same security) | USPAT | 2003/06/05 13:44 |
| - | 1 | 6126070.pn. | USPAT | 2003/06/06 11:09 |
| - | 1 | 6336187.pn. | USPAT | 2003/06/06 15:09 |
| - | 55 | IDE near4 advantag$6 | USPAT | 2003/06/06 11:10 |
| - | 1431 | LED near5 advantag$6 | USPAT | 2003/06/06 15:10 |
| - | 916 | LED near3 advantag$6 | USPAT | 2003/06/06 15:10 |
| - | 23 | (LED near3 advantag$6) and g06f$.ipc. | USPAT | 2003/06/06 15:32 |
| - | 36 | (pld near4 advantag$7) and g06f$.ipc. | USPAT | 2003/06/06 15:41 |
| - | 8 | ((dual adj2 port adj2 memory) near4 advantag$7) and g06f$.ipc. | USPAT | 2003/06/06 15:46 |
| - | 41 | ((dual adj2 port adj2 memory) same advantag$7) and g06f$.ipc. | USPAT | 2003/06/06 16:51 |
| - | 317 | virus$2 near3 (list definition file) | USPAT | 2003/06/06 16:52 |
| - | 7045 | (storage DASD) same security | USPAT | 2003/06/06 16:53 |
| - | 35 | (virus$2 near3 (list definition file) ) and ((storage DASD) same security ) | USPAT | 2003/06/09 10:22 |
| - | 35 | (virus$2 near3 (list definition file) ) and ((storage DASD) same security ) | USPAT | 2003/06/09 10:22 |

MTI0000857

| - | 1 | (virus$2 near3 (list definition file)) near5 advantag$6 | USPAT | 2003/06/09 10:23 |
| - | 24 | (virus$2 near3 (list definition file)) same advantag$6 | USPAT | 2003/06/09 12:37 |
| - | 67 | (virus$2 near3 (list definition file scan$4)) same (storage DASD) | USPAT | 2003/06/09 10:33 |
| - | 832 | virus$2 near3 advantag$6 | USPAT | 2003/06/09 12:38 |
| - | 8 | (virus$2 near3 advantag$6) same storage | USPAT | 2003/06/09 13:38 |

MTI0000858

MTI0000859



ATTACH
DISK/FICHE
ENVELOPE
HERE

(RIGHT SIDE)

MTI0000860

| *Search Notes* | | Application No. | | Applicant(s) | |
|---|---|---|---|---|---|
| | | 09/961,417 | | BRESS ET AL. | |
| | | Examiner | | Art Unit | |
| | | NGOC V DINH | | 2187 | |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | | DATE | EXMR |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |

U.S. Patent and Trademark Office

Part of Paper No.  20040805

MTI0000861

# CLAIMS ONLY

| SERIAL NO. | FILING DATE |
|---|---|
| 0995417 | |
| APPLICANT(S) | |

## CLAIMS

| | AS FILED | | AFTER 1st AMENDMENT | | AFTER 2nd AMENDMENT | | | | * | | * | | * | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | IND. | DEP. | IND. | DEP. | IND. | DEP. | | | IND. | DEP. | IND. | DEP. | IND. | DEP. |
| 1 | \ | | | | | | 51 | | \ | | | | | |
| 2 | | \ | | | | | 52 | | \ | | | | | |
| 3 | | \ | | | | | 53 | | \ | | | | | |
| 4 | | \ | | | | | 54 | | | | | | | |
| 5 | | \ | | | | | 55 | | | | | | | |
| 6 | | \ | | | | | 56 | | | | | | | |
| 7 | | \ | | | | | 57 | | | | | | | |
| 8 | | \ | | | | | 58 | | | | | | | |
| 9 | | \ | | | | | 59 | | | | | | | |
| 10 | | \ | | | | | 60 | | | | | | | |
| 11 | | \ | | | | | 61 | | | | | | | |
| 12 | | \ | | | | | 62 | | | | | | | |
| 13 | | \ | | | | | 63 | | | | | | | |
| 14 | | \ | | | | | 64 | | | | | | | |
| 15 | \ | | | | | | 65 | | | | | | | |
| 16 | | \ | | | | | 66 | | | | | | | |
| 17 | | \ | | | | | 67 | | | | | | | |
| 18 | | \ | | | | | 68 | | | | | | | |
| 19 | | \ | | | | | 69 | | | | | | | |
| 20 | | \ | | | | | 70 | | | | | | | |
| 21 | | \ | | | | | 71 | | | | | | | |
| 22 | | \ | | | | | 72 | | | | | | | |
| 23 | | \ | | | | | 73 | | | | | | | |
| 24 | | \ | | | | | 74 | | | | | | | |
| 25 | | \ | | | | | 75 | | | | | | | |
| 26 | | \ | | | | | 76 | | | | | | | |
| 27 | | \ | | | | | 77 | | | | | | | |
| 28 | | \ | | | | | 78 | | | | | | | |
| 29 | \ | | | | | | 79 | | | | | | | |
| 30 | | \ | | | | | 80 | | | | | | | |
| 31 | | \ | | | | | 81 | | | | | | | |
| 32 | \ | | | | | | 82 | | | | | | | |
| 33 | | \ | | | | | 83 | | | | | | | |
| 34 | | \ | | | | | 84 | | | | | | | |
| 35 | | \ | | | | | 85 | | | | | | | |
| 36 | | \ | | | | | 86 | | | | | | | |
| 37 | | \ | | | | | 87 | | | | | | | |
| 38 | \ | | | | | | 88 | | | | | | | |
| 39 | | \ | | | | | 89 | | | | | | | |
| 40 | | \ | | | | | 90 | | | | | | | |
| 41 | | \ | | | | | 91 | | | | | | | |
| 42 | | \ | | | | | 92 | | | | | | | |
| 43 | | \ | | | | | 93 | | | | | | | |
| 44 | | \ | | | | | 94 | | | | | | | |
| 45 | | \ | | | | | 95 | | | | | | | |
| 46 | | \ | | | | | 96 | | | | | | | |
| 47 | | \ | | | | | 97 | | | | | | | |
| 48 | | \ | | | | | 98 | | | | | | | |
| 49 | \ | | | | | | 99 | | | | | | | |
| 50 | | \ | | | | | 100 | | | | | | | |
| TOTAL IND. | | | | | | | TOTAL IND. | 6 | | | | | | |
| TOTAL DEP. | | | | | | | TOTAL DEP. | 47 | | | | | | |
| TOTAL CLAIMS | | | | | | | TOTAL CLAIMS | 53 | | | | | | |

*MAY BE USED FOR ADDITIONAL CLAIMS OR ADMENDMENTS

FORM PTO-2022 (1-98)

U.S.DEPARTMENT OF COMMERCE
Patent and Trademark Office

MTI0000862

# PATENT APPLICATION FEE DETERMINATION RECORD
## Effective October 1, 2000

**Application or Docket Number**

0032-0003

## CLAIMS AS FILED - PART I

|  | (Column 1) | (Column 2) | | SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
| TOTAL CLAIMS | 53 | | | RATE | FEE | | RATE | FEE |
| FOR | NUMBER FILED | NUMBER EXTRA | | BASIC FEE | 355.00 | OR | BASIC FEE | 710.00 |
| TOTAL CHARGEABLE CLAIMS | 53 minus 20= | * 33 | | X$ 9= | 297 | OR | X$18= | |
| INDEPENDENT CLAIMS | 6 minus 3 = | 3 | | X40= | 120 | OR | X80= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ | | ı135= | | OR | ı270= | |
| | | | | TOTAL | 417 | OR | TOTAL | |

\* If the difference in column 1 is less than zero, enter "0" in column 2

## CLAIMS AS AMENDED - PART II

**AMENDMENT A**

|  | (Column 1) | | (Column 2) | (Column 3) | | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
| Total | * | Minus | ** | = | | X$ 9= | | OR | X$18= | |
| Independent | * | Minus | *** | = | | X40= | | OR | X80= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | | +135= | | OR | +270= | |
| | | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT B**

|  | (Column 1) | | (Column 2) | (Column 3) | | RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | | | | | |
| Total | * | Minus | ** | = | | X$ 9= | | OR | X$18= | |
| Independent | * | Minus | *** | = | | X40= | | OR | X80= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | | +135= | | OR | +270= | |
| | | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

|  | (Column 1) | | (Column 2) | (Column 3) | | RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | | | | | |
| Total | * | Minus | ** | = | | X$ 9= | | OR | X$18= | |
| Independent | * | Minus | *** | = | | X40= | | OR | X80= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | | +135= | | OR | +270= | |
| | | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
  The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev. 8/00)

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
\*U.S. GPO: 2000-460-706/30103

MTI0000863

## SEARCHED

| Class | Sub. | Date | Exmr. |
|---|---|---|---|
| 711 | 112 | 05/16/03 | NP |
|  | 167 |  |  |
| 713 | 161 | 06/09/03 |  |
|  | 164 |  |  |
|  | 165 |  |  |
|  | 166 | 8/22/03 | ↓ |
| Update East Search above | 01/13/04 | NP |
|  |  | 01/16/04 | ↓ |
| update East Search above | 04/21/04 | NP |
|  |  | 05/04/04 | ↓ |
| Updated East Search above | 08/18/04 | NP |
|  |  | 08/23/04 | ↓ |

## SEARCH NOTES
### (INCLUDING SEARCH STRATEGY)

| | Date | Exmr. |
|---|---|---|
| PALM Inventor's Search | | |
| Consulted Krep Nguyen | 05/15/03 05/21/03 | NP ↓ |
| Consulted Krep Nguyen Text Search Included "Transparent Independent Interface" | 01/13/04 | NP ↓ |
| Consulted Krep Nguyen | 04/20/04 | NP |
| IEEE + Cite Seek Search East Search List Included | 08/18/04 08/23/04 | NP ↓ |

## INTERFERENCE SEARCHED

| Class | Sub. | Date | Exmr. |
|---|---|---|---|
| 711 | 112 ↓ 167 | 08/23/04 | NP |
| 713 | 161 ↓ 166 | ↓ | ↓ |

(RIGHT OUTSIDE)

MTI0000864

ISSUE SLIP STAPLE AREA (for additional cross references)

| POSITION | INITIALS | ID NO. | DATE |
|---|---|---|---|
| FEE DETERMINATION | SF | | 9-26-01 |
| O.I.P.E. CLASSIFIER | | 49 | 10/5/01 |
| FORMALITY REVIEW | TD | SC 1125 | 10/25/01 |

## INDEX OF CLAIMS

| | | | | | |
|---|---|---|---|---|---|
| ✓ | Rejected | | N | | Non-elected |
| = | Allowed | | I | | Interference |
| – (Through numeral) | Canceled | | A | | Appeal |
| ÷ | Restricted | | O | | Objected |

If more than 150 claims or 10 actions
staple additional sheet here

(LEFT INSIDE)

MTI0000865

JC976 U.S PTO
09/961417

09961417

09/25/01

INITIALS 10/5/01  10

# CONTENTS

| | | Date received (Incl. C. of M.) or Date Mailed | | | | Date received (Incl. C. of M.) or Date Mailed |
|---|---|---|---|---|---|---|
| 1. | Application papers. 9 | 9/25/01 | | 42. | | |
| 2. | IDS | | | 43. | | |
| 3. | Change of Address | 11/3/01 | | 44. | | |
| 4. | IDS | 4/30/03 | | 45. | | |
| 5. | IDS | 5/27/03 | | 46. | | |
| 6. | Chg of address | 6-02-03 | | 47. | | |
| 8/25 7. | Rejex (3rd) | 8/27/03 | | 48. | | |
| 8. | I. DS | 11-24-03 | | 49. | | |
| 9. | Amdt A | 11-21-03 | | 50. | | |
| 1/26 10. | Resp Sopers | 02/02/04 | | 51. | | |
| 8/20 11. | Interview Summary | 2-26-04 | | 52. | | |
| 12. | Amdt B | 3-2-04 | | 53. | | |
| 13. | IDS | 3-11-04 | | 54. | | |
| 8/2 14. | Final Rejn 3rd | 05/27/04 | | 55. | | |
| 8/9 15. | Interview Summary | | | 56. | | |
| 16. | Amdt C AF As | 8-5-04 | | 57. | | |
| 8/24 17. | Notice of Allowability | 8-25-04 | | 58. | | |
| 18. | C By C | 11/8/04 | | 59. | | |
| 19. | | | | 60. | | |
| 20. | | | | 61. | | |
| 21. | | | | 62. | | |
| 22. | | | | 63. | | |
| 23. | | | | 64. | | |
| 24. | | | | 65. | | |
| 25. | | | | 66. | | |
| 26. | | | | 67. | | |
| 27. | | | | 68. | | |
| 28. | | | | 69. | | |
| 29. | | | | 70. | | |
| 30. | | | | 71. | | |
| 31. | | | | 72. | | |
| 32. | | | | 73. | | |
| 33. | | | | 74. | | |
| 34. | | | | 75. | | |
| 35. | | | | 76. | | |
| 36. | | | | 77. | | |
| 37. | | | | 78. | | |
| 38. | | | | 79. | | |
| 39. | | | | 80. | | |
| 40. | | | | 81. | | |
| 41. | | | | 82. | | |

(FRONT)

MTI0000866



MTI0000867