# EXHIBIT H

Page 1

```
1              UNITED STATES DISTRICT COURT
2             CENTRAL DISTRICT OF CALIFORNIA
3
4
5  IN RE: MYKEY TECHNOLOGY,
   INC. PATENT LITIGATION
6
   MyKey Technology, Inc.
7
        vs.              2:13-ml-02461-GAF (PLAx)
8                        MDL No. 2461
   Intelligent Computer
9  Solutions, Inc.       This Document Relates to:
                         ALL CASES
10 ------------------------
11
12            VIDEO DEPOSITION OF
13              BRIAN A. BERG
14
15            February 6, 2014
16              9:40 a.m.
17
18        100 Marine Parkway, Suite 200
19          Redwood Shores, CA 94065
20
21
22
23
24
25     Susan F. Magee, RPR, CCRR, CLR, CSR No.
```

Page 2

```
1  APPEARANCES:
2      For the Plaintiff:
3         FREITAS, TSENG & KAUFMAN LLP
4         ROBERT E. FREITAS, ESQ.
5         QUDUS B. OLANIRAN, ESQ.
6         100 Marine Parkway
7         Suite 200
8         Redwood Shores, CA 94065
9         (650) 730-5527
10        rfreitas@ftklaw.com
11        qolaniran@ftklaw.com
12
13     For Guidance Software:
14        BAKER HOSTETLER
15        DAVID A. MANCINO, ESQ.
16        KEVIN W. KIRSCH, ESQ.
17        312 Walnut Street
18        Suite 3200
19        Cincinnati, OH 45202-4074
20        (513) 929-3495
21        dmancino@bakerlaw.com
22        kkirsch@bakerlaw.com
23              //
24
25
```

Page 3

```
1  APPEARANCES (continued):
2      For CRU:
3         KOLISCH HARTWELL APC
4         OWEN W. DUKELOW, ESQ.
5         DAVID P. COOPER, ESQ.
6         DESMOND KIDNEY, ESQ. (Appearing telephonically)
7         200 Pacific Building
8         520 S.W. Yamhill Street
9         Portland, OR 97204-1324
10        (503) 224-6655
11        dukelow@khpatent.com
12        cooper@khpatent.com
13
14     Also Present:
15        THOMAS A. GAFFORD
16
17     The Videographer:
18        ONDRIETTA JOHNSON
19            --o0o--
20
21
22
23
24
25
```

Page 4

```
1              INDEX OF EXAMINATION
2  WITNESS: BRIAN A. BERG, Volume I
3  EXAMINATION                        PAGE
4  BY MR. MANCINO                       7
5  BY MR. DUKELOW                      82
6            --o0o--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1                 INDEX OF EXHIBITS
2 EXHIBITS                          MARKED
3 Exhibit 1   Expert Opinion of Brian A. Berg      8
4        on Claim Construction (25 pages)
5 Exhibit 2   Curriculum Vitae (20 pages)          8
6 Exhibit 3   U.S. Patent No. 6,813,682 (20       24
7        pages)
8 Exhibit 4   U.S. Patent No. 7,159,086 (14       50
9        pages)
10 Exhibit 6   Provisional Application for         52
11        60/443387 (56 pages)
12 Exhibit 5   U.S. Patent No. 7,228,379 (17       55
13        pages)
14 Exhibit 7   Excerpt from Microsoft Computer     57
15        Dictionary (7 pages)
16 Exhibit 8   Excerpt from Exhibit B to           85
17        Declaration (22 pages)
18                --oOo--
19
20
21
22
23
24
25

Page 6

1          REDWOOD SHORES, CALIFORNIA
2        Thursday, February 6, 2014, 9:40 a.m.:
3
4        THE VIDEOGRAPHER:  This is Tape No. 1 to the
5 videotaped deposition of Brian Berg in the matter In Re:
6 MyKey Technology, Inc., Patent Litigation, MyKey
7 Technology, Inc., vs. Intelligent Computer Solutions,
8 Inc., being heard before the United States District
9 Court for the Central District of California, MDL Case
10 No. 2:13-ml-02461-GAF (PLAx), MDL No. 2461.
11        This deposition is being held at 100 Marine
12 Parkway, Suite 200, Redwood City, California 94065 on
13 February 6, 2014, at 9:40 a.m.  My name is
14 Ondrietta Johnson, and I am the videographer.  The court
15 reporter is Susan Magee.
16        Counsel, will you please introduce yourselves
17 and affiliations, and the witness will be sworn.
18        MR. MANCINO:  David Mancino and Kevin Kirsch
19 with BakerHostetler representing Guidance Software.
20        MR. DUKELOW:  Owen Dukelow, David Cooper and
21 Des Kidney of Kolisch Hartwell representing CRU.
22        MR. FREITAS:  I'm Bob Freitas.  I represent the
23 plaintiff.
24        MR. OLANIRAN:  Qudus Olaniran representing
25 MyKey Technology, Inc.

Page 7

1              BRIAN A. BERG,
2 having been first duly sworn, testifies as follows:
3
4          EXAMINATION BY MR. MANCINO
5
6    Q.  Good morning, Mr. Berg.
7    A.  Good morning.
8    Q.  My name is David Mancino.  I'm representing one
9 of the -- I'm representing one of the defendants in this
10 case, Guidance Software, and I'll be starting your
11 deposition today.
12        In this deposition, I'll ask you questions, and
13 my questions and your answers will be recorded by the
14 court reporter and the videographer, so please
15 understand that you need to speak up and speak clearly
16 and orally so that the record could properly record your
17 answers.
18        In order to -- for the court reporter to
19 accurately record what we say, we're going to have to
20 try not to interrupt each other, and I'll do my best to
21 try not to interrupt you.  I just ask that you do your
22 best to try not to interrupt my questions.
23    A.  Sure.
24    Q.  On occasion I may ask you a question that you
25 do not understand.  If you don't understand the

Page 8

1 question, please tell me that you don't understand it,
2 and I will do my best to work with you to come up with a
3 question that you do understand and so that we can
4 proceed.
5        Is that fair?
6    A.  That's fair.
7    Q.  If you do answer my question, I'll assume that
8 you did understand it.
9        Is that fair?
10    A.  Yes.
11    Q.  And of course, anytime you think you need a
12 break, just let me know.  We'll finish the line of
13 questioning and we'll take break.
14    A.  Okay.
15    Q.  Is there any reason or any circumstance that
16 may prevent you from answering my questions fully and
17 truthfully today?
18    A.  No.
19        (Exhibit 1 and Exhibit 2 were marked for
20 identification by the court reporter and are attached
21 hereto.)
22        BY MR. MANCINO:  Q.  Okay.  So let's get
23 started with the exhibits.  I'm going to hand you what's
24 been marked as Exhibit 1 and Exhibit 2.
25        This is Exhibit 1, and this is Exhibit 2.



Page 9

1    MR. FREITAS:  So we're going straight through
2 with all the exhibits; right?  We're not going to
3 renumber anything?  I think that's what we're supposed
4 to do.
5    MR. MANCINO:  Straight through?
6    MR. FREITAS:  In other words, tomorrow's
7 deposition we'll -- we'll use the same documents,
8 they'll bear the same exhibit number.  We won't change
9 them throughout the case.
10    MR. MANCINO:  I don't have a problem with that.
11    MR. FREITAS:  I believe that's what's required.
12    MR. MANCINO:  Okay.
13    MR. FREITAS:  This one you handed me, it says
14 "Exhibit A," but I think it's Exhibit 2.
15    MR. MANCINO:  Yes.  It's marked on Brian's as
16 Exhibit 2.
17    MR. FREITAS:  Okay.
18    BY MR. MANCINO:  Q.  Okay.  You've taken a
19 chance to look through each exhibit?
20    A.  I've made sure that they appear to be complete,
21 yes.
22    Q.  Do you recognize what's been marked as
23 Exhibit 1?
24    A.  Yes.
25    Q.  What is this document?

Page 10

1    A.  This is an expert opinion document submitted in
2 this case from me.
3    Q.  What was the purpose of this expert opinion
4 submitted by you?
5    A.  Was to provide opinions about the claim
6 constructions appropriate for various terms of the three
7 patents at issue.
8    Q.  Did you write this document?
9    A.  Yes.
10    Q.  Turn to page 23.
11    A.  Okay.
12    Q.  Is that your signature?
13    A.  Yes, it is.
14    Q.  And what day did you sign it?
15    A.  January 17th, 2014.
16    Q.  And does this document contain all of your
17 opinions regarding claim construction matters in this
18 case?
19    MR. FREITAS:  Objection.  Vague.
20    THE WITNESS:  It proposes claim constructions
21 for a number of terms.  It is not necessarily exhaustive
22 of my opinions.
23    BY MR. MANCINO:  Q.  As we sit here today, do
24 you wish to change any of the opinions presented in this
25 document?

Page 11

1    A.  No, I do not.
2    Q.  Okay.
3    A.  Set that aside for just a moment.  Let's take a
4 look at what's been marked as Exhibit 2.
5      Do you recognize this document, Mr. Berg?
6    A.  Yes.
7    Q.  And what is this?
8    A.  It's my personal CV.
9    Q.  Is this CV that's marked as Exhibit 2 up to
10 date?
11    A.  It's dated November 2013, and it's up to date
12 as of that date.
13    Q.  Let's go to page 16 of the CV.
14      Can you take me through your post-high school
15 education, Mr. Berg.
16    A.  Certainly.  I earned a bachelor's degree at
17 Pacific Lutheran University, a B.S. in mathematics, in
18 1974.  I took graduate classes at Stanford University
19 from '75 through '78 on a part-time basis working
20 towards a master's degree.  And I took an online
21 copyright class from Harvard Law School last year.
22    Q.  Is this a complete list of your post-high
23 school education, Mr. Berg?
24    A.  Well, there's certainly been classes and
25 seminars that I've taken over the years, but these are

Page 12

1 the universities at which I've performed work, I've done
2 work.
3    Q.  So this list is a complete list of the
4 universities you've attended post high school?
5    A.  That's correct.
6    Q.  And the first bullet, Stanford University, this
7 was postgraduate following Pacific Lutheran University;
8 is that correct?
9    A.  That's correct.
10    Q.  And did you obtain a degree from Stanford
11 University, Mr. Berg?
12    A.  No, I did not.
13    Q.  Please, if you wish to refer to your CV, please
14 summarize your experience working with computer forensic
15 devices.
16    A.  I've worked with computer forensic devices
17 since sometime in the '90s.  I don't recall specific
18 dates, but I've worked with device blockers -- excuse
19 me, I should say write blockers, and duplication devices
20 at various times on various projects.  And like I say,
21 it's been a periodic thing since sometime in the mid to
22 late '90s until the present time.
23    Q.  Do you recall which write blockers you've
24 worked with in the past?
25    A.  There's a company.  It's a three-letter



Page 13

1 company. I think it's IDC. I can't swear to that. But
2 they make a write blocker, and I've got three or four of
3 those that I've used on various projects.
4    Q. How would you use your write blockers on your
5 various projects?
6    A. I would cable them up to a storage device as
7 well as to a host computer and analyze the data that was
8 on those devices. And in some cases, the write blocker
9 feature would be encompassed within a device that also
10 allowed for disk duplication, so the source device would
11 be blocked from having write operations occur to it, and
12 the destination would receive a copy of the source
13 drive. Source drive, excuse me.
14    Q. You said you would cable these up to a storage
15 device and to a host computer, but then you finished
16 describing a source and destination device for the
17 copying capabilities.
18       What is -- with respect to the cabling between
19 the host computer and a source device, what is the
20 source and destination device in that example?
21    A. That was another device that I recalled as I
22 was giving the description to you, another device that's
23 actually a stand-alone product.
24    Q. I see. I see. So and that stand-alone
25 product, that would be cabled between a source and

Page 14

1 destination storage device?
2    A. Right. There would be a source and destination
3 storage device cabled to that stand-alone device.
4    Q. Would that also be cabled to a host computer?
5    A. Not necessarily.
6    Q. Oh, okay. And when you refer to host computer,
7 what do you mean by that?
8    A. Well, some examples include a desktop or a
9 laptop computer.
10    Q. Is the host computer any part of the forensic
11 device itself?
12       MR. FREITAS: Objection. Vague.
13       THE WITNESS: Could you describe the scenario
14 that you're depicting?
15       BY MR. MANCINO: Q. When you say it's cabled
16 up between -- when the forensic device is cabled up
17 between a host computer and a storage device, my
18 question is, is the forensic device that you've worked
19 with separate from the host computer, not part of the
20 host computer?
21    A. Are you talking about a disk duplicator, for
22 example?
23    Q. In the examples that you've worked with.
24    A. Well, see, the -- I described two devices. One
25 of them was a write blocker hooked up to a host computer

Page 15

1 and a single drive, and I described another example in
2 which a stand-alone device was cabled to both a host --
3 excuse me, a source and a destination device. And
4 that's a device that could potentially also be cabled to
5 a separate computer.
6    Q. Okay. Let's talk about the first circumstance
7 where you have a host computer -- excuse me, where you
8 have a write blocker cabled between a host computer and
9 a storage device.
10       In that circumstance, in that prior example,
11 was the forensic write blocker part of the host
12 computer?
13    A. For that particular example that I was
14 describing, it was separate.
15    Q. And then with -- in the duplication device
16 example where you have the duplication device cabled
17 between a source and destination storage device, you
18 mentioned that it may be possible to cable a host
19 computer to that device in that circumstance; correct?
20    A. Correct.
21    Q. And that host device would not be part of the
22 forensic device in that circumstance; correct?
23    A. In that circumstance it would be separate.
24    Q. Besides write blockers that you say you've used
25 three or four times, how many times have you used

Page 16

1 duplication devices?
2    A. I believe that you're -- you mentioned write
3 blockers three or four times. I said I had three or
4 four write blocker devices.
5    Q. I see. Sorry. You've had three or four write
6 blocker devices.
7       Approximately how many times have you used
8 them?
9    A. I may have some others too. Those are the ones
10 I recall right now. But with regard to the number of
11 times those particular ones have been used, I've used
12 them just for my own purposes for looking at data on
13 storage devices. I've used them on projects in cases
14 that I've worked on. I would estimate about three
15 times I -- or three different cases that I've used those
16 on. I can look through my CV and give you -- attempt to
17 give you a more accurate number if you want me to take
18 the time to do that, but as I recall at this moment, it
19 was about three different cases, plus some general
20 investigation on my own.
21    Q. Okay. So you've used write blockers on about
22 three different cases.
23       And what about duplication devices? About how
24 many occasions do you recall using duplication devices?
25    A. Probably on the order of four or five different



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
17—20

Page 17

1  cases plus periodically for my own purposes.  If I'm,
2  for example, replacing a disk drive in a computer, I'll
3  use a duplicator for that purpose, and I'll do that
4  maybe for other family members and maybe friends as
5  well.  So there will be a number of different
6  circumstances in which I might use them.
7      Q.  When you're using a duplication device to
8  replace a drive on a computer, does that involve cloning
9  the storage device?
10     A.  Well, the term "cloning" is a term that's often
11  used as, say, a synonym for duplicating a disk.  What I
12  use the duplicator for was to make an exact copy of the
13  initial device, initial disk drive on to a second
14  device, and so that could be called cloning.
15     Q.  You just mentioned that to duplicate a storage
16  device to, I guess -- to replace in a computer.  Is that
17  what you were talking about?
18     A.  That was one example.
19     Q.  In that example, when you're duplicating a
20  storage device to replace in a computer, you mentioned
21  that you need to make an exact copy.  Am I understanding
22  --
23     A.  I think those are the words that I used.
24     Q.  In that circumstance when you're replacing a
25  storage device on a computer and you need to make an

Page 18

1  exact copy, does the copy need to include all of the --
2  all of the data that resided on the source drive?
3      A.  I use the device to copy all the sectors of
4  data on the source device to the target.
5      Q.  Do the sectors that you've duplicated need to
6  be arranged in the same way from the source drive to the
7  destination drive in that example?
8      A.  Well, each one on the source drive has a unique
9  logical block address, and there are the same set of
10  numbered logical block addresses on the target device,
11  so the logical block that's numbered 1, 2, 3, et cetera,
12  are copied to the destination logical block with that
13  same address.
14     Q.  And you wouldn't want to rearrange the logical
15  blocks; correct?
16     A.  I would want the blocks that were numbered 1 to
17  whatever on the source to be at the same logical block
18  addresses on the target.
19     Q.  Okay.  Have you used any wiping, wiper or drive
20  eraser devices in your experience?
21     A.  Yes.
22     Q.  What type of devices do you recall using in --
23  that have that functionality?
24     A.  I don't recall the brand name of the device.
25  It's a stand-alone product that I've got.  But it's a

Page 19

1  device that allows copying, for example, of a source to
2  a destination device and also allows wiping of a device.
3  And so I've used that, for example, to wipe.
4      Q.  Okay.  In your experience, have you ever
5  participated in designing any write blockers?
6      A.  Not to my recollection.
7      Q.  In your experience, have you participated in
8  programming any write blockers?
9      A.  Not any write blocker devices.  I've written
10  software that could copy a source through a destination
11  device, and I've certainly used commands under an
12  operating system that could do that as well.
13     Q.  So you wrote duplication software?
14     A.  I've written software that could duplicate one
15  storage device to another.
16     Q.  Well, what was the purpose of the software that
17  you wrote which could duplicate one storage device to
18  another?
19     A.  I don't remember all the specifics, but there
20  was a project I worked on.  I believe it was for Sony
21  sometime in the '90s.  It was an audio editing system.
22  And for reasons that I don't fully remember at this
23  point, because that was like over 15 years ago, one of
24  the functionalities included copying data from one
25  storage device to another, the data probably including

Page 20

1  audio data.
2      Q.  Do you recall what type of storage devices you
3  were working with with that project?
4      A.  They were probably SCSI disk drives.
5      Q.  My original question was:  Have you written any
6  code, write blocking code?
7          Do you recall writing any software for that
8  purpose?
9      A.  Not specifically for that, no.
10     Q.  What about drive wiping software?  Have you
11  programmed any -- participated in the programming of any
12  drive wiping capabilities?
13     A.  I've certainly written software that could wipe
14  a drive as part of the functionality of another product.
15     Q.  Okay.  Let's go back to Exhibit 1.  Please turn
16  to page 3 and III section, "Level of Ordinary Skill in
17  the Art."
18     A.  Yes.
19     Q.  Mr. Gafford opined in his declaration that a
20  person of ordinary skill in the art would have a B.S. in
21  electrical engineering or computer science with two to
22  three years of experience in computer storage systems.
23         Would you agree with Mr. Gafford?
24     A.  I think his description is similar to my
25  description.  He certainly doesn't include mention of



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
21–24

Page 21

1 computer forensic devices or work with storage systems
2 or firmware or operating systems or drivers and computer
3 operation.  He doesn't make mention of those, and I
4 think those are very helpful for somebody of ordinary
5 skill in the art.
6      So he's -- provides a more general description
7 that possibly includes the things that I've described,
8 but he doesn't specifically describe them.  So I think
9 mine is more inclusive, more appropriate, but they're
10 not terribly dissimilar.
11      Q.  In your opinion, would a person with an
12 electrical engineering degree and three years of
13 experience in computer storage systems meet your
14 qualifications as a person of ordinary skill?
15      A.  So you're saying just electrical engineering?
16 Because I believe he included computer science.
17      Q.  Let me -- let me ask the question again.
18      A.  Sure.
19      Q.  In your opinion, would a hypothetical person
20 with a bachelor's degree in electrical engineering and
21 three years of experience in computer storage systems
22 meet your qualifications as a person of ordinary skill
23 in the art?
24      A.  I think it's shy of what I described.  I think
25 it needs to be more inclusive of other disciplines for

Page 22

1 the degree.
2      Q.  How is it shy?
3      A.  It only cites electrical engineering degree.
4      Q.  Well, doesn't your definition of a person of
5 ordinary skill include the possibility of having
6 electrical engineering degree?
7      A.  Includes that as -- amongst three different
8 categories of degrees, yes.
9      Q.  Does a person of ordinary skill in your opinion
10 need to have degrees in electrical engineering, computer
11 science and mathematics or just one of those degrees?
12      A.  I'd say one of those degrees.
13      Q.  Okay.  So if a person has a bachelor's in
14 electrical engineering, which is one of those degrees,
15 and three years of experience in computer storage
16 systems on top of that bachelor's in electrical
17 engineering, would that person meet your qualifications
18 as a person of ordinary skill, just that person?
19      A.  Just that person, it certainly meets the degree
20 part, but it's shy on the other aspects, because I say
21 three to five years of technology industry experience,
22 including the experience that I list in that paragraph.
23 So it's still shy of what I described.
24      Q.  Okay.  So this person would have three years of
25 experience in computer storage systems.

Page 23

1      Q.  So it meets the three to five years; correct?
2      A.  It meets the three-to-five-year portion but not
3 the experience portion of what those three years were
4 spent doing.
5      Q.  Okay.  So those three years spent doing
6 requires computer -- work with computer forensic devices
7 or work with storage systems, firmware, operating
8 system, device drivers and computer operation.  So you
9 have two -- is it my reading that you have two different
10 categories of postgraduate experience, one working with
11 computer forensic devices and another working with
12 storage systems, firmware, operating systems, device
13 drivers and computer operation?
14      Is that my -- am I reading that correctly?
15      A.  I believe that's a reasonable recitation.
16      Q.  So this hypothetical person that has only three
17 years of experience in computer storage systems in your
18 opinion doesn't meet either of those two prongs or prior
19 graduate experience?
20      A.  Well, if it's only computer storage systems.
21 Sometimes, you know, I say computer forensic devices.
22 Sometimes people broadly include computer forensics
23 within that.  I specify this separately, and then I
24 include the storage systems in the second list.  So it
25 doesn't meet it the way I've stated it there.

Page 24

1      Q.  Doesn't meet it.  Okay.
2      Do you have an opinion of whether     Mr. Tom
3 Gafford has sufficient knowledge to opine with respect
4 to issues of relevant -- that are relevant to those of
5 ordinary skill in the art in that case?
6      MR. FREITAS:  Objection.  Vague.  Calls for
7 legal conclusion.
8      THE WITNESS:  I think I'd want to revisit his
9 CV to be able to answer that.  I don't recall his CV
10 right offhand.
11      BY MR. MANCINO:  Q.  Okay.  Let's go on in your
12 report here.  Same page.  In IV, proposed construction
13 for the '682 patent, the first term you opine upon is a
14 '682 claim term, interface emulator.
15      Do you see that?
16      A.  I do.
17      Q.  In your opinion, what is the proper
18 construction for interface emulator?
19      A.  I provide that in my paragraph 10 when I say an
20 interface component that mimics another interface.
21      (Exhibit 3 was marked for identification by the
22 court reporter and is attached hereto.)
23      BY MR. MANCINO:  Q.  I'm going to hand you
24 what's been marked as Exhibit 3.
25      Do you recognize this document, Mr. Berg?



Page 25

1    A. I do.
2    Q. What is this document?
3    A. It's the '682 patent. That's one of the three
4    patents at issue in this case.
5    Q. And this is the patent that includes the
6    interface emulator term; is that correct?
7    A. That's a claim term that is at issue with
8    regard to this patent, yes.
9    Q. Please turn to the claims. I guess we're
10   talking Column 13.
11   A. Okay.
12   Q. Is the interface emulator term present in Claim
13   1?
14   A. Yes, it is.
15   Q. Okay. Going back to your construction, in the
16   context of Claim 1 -- and if you'd like, I can give you
17   time to read Claim 1 -- which storage device is the
18   interface emulator mimicking?
19       MR. FREITAS: Objection. Vague.
20       THE WITNESS: Well, it's the same claim element
21   that introduces the interface emulator. The term also
22   introduces a storage device, and that is recited a few
23   more times in the rest of that claim as the storage
24   device, so it would be that storage device.
25       BY MR. MANCINO: Q. So the storage device

Page 26

1    referred to in the first element, an interface emulator
2    configured to emulate an interface presented by a
3    storage device and configured to connect to a host, the
4    storage device introduced in that first element is the
5    same storage device that is represented in the
6    subsequent three elements; correct?
7    A. Yes.
8    Q. So let's look at the second element. The
9    blocking device also comprises an interface for
10   connecting to the storage device.
11       Do you see that?
12   A. Yes, yes.
13   Q. So in this claim you have a blocking device
14   that is connected to the storage device, and that is the
15   storage device that the interface emulator is mimicking;
16   correct?
17   A. Well, as I say in the claim term for the
18   construction it's an interface component that mimics
19   another interface, so it's mimicking the interface of
20   that storage device.
21   Q. Okay. So the interface emulator is mimicking
22   the interface of the storage device that is connected to
23   the blocking device in the context of this claim;
24   correct?
25   A. Yes.

Page 27

1    Q. Let's go to the next page of your report.
2    Subsection B is -- reintroduces two additional terms
3    from the '682 patent.
4        Do you see them?
5    A. Yes.
6    Q. The first is transparent to normal operation of
7    the host and the storage device, and the second is
8    transparently to normal operation from the host and the
9    storage device.
10       Did I read that correctly?
11   A. I believe you did.
12   Q. What is your opinion as to the proper
13   construction of these two terms?
14   A. I provide that in my Paragraph 13, and it
15   specifically is to the host. The blocking device
16   appears to be a standard drive interface and presents to
17   the host the memory, registers and control signals that
18   a storage device would normally present to the host.
19   And to the storage device, the blocking device appears
20   to be a host and presents to the storage device the
21   memory, registers and control signals that the host
22   would normally present to the storage device, although
23   the blocking device blocks or modifies commands that
24   would result in the modification of the drive.
25   Q. The next paragraph, paragraph numbered 14 of

Page 28

1    your declaration, it talks about a first portion of your
2    construction.
3        What portion are you talking about?
4    A. I'm referring to the words that are in my
5    Paragraph 13 up through the sixth line and the comma in
6    that sixth line. That is the first portion that I'm
7    referring to.
8    Q. Well, you see, I'm a little confused.
9        Are you talking about the sixth line as shown
10   by the line numbers on the left side, or are you talking
11   about the sixth line in Paragraph 13?
12   A. The sixth line in Paragraph 13, which would be
13   roughly numbered No. 10.
14   Q. Okay. So sixth line, Paragraph 13, which
15   corresponds to what appears to be close to Line No. 10
16   on the left-hand column. Okay. I see.
17       So that is to the host, the blocking device
18   appears to be a standard drive interface and presents to
19   the host the memory, registers and control signals that
20   a storage device would normally present to the host.
21   And to the storage device, the blocking device appears
22   to be a host and presents to the storage device the
23   memory, registers and control signals that would -- that
24   the host would normally present to the storage device.
25       That is the first portion that you refer to in



Page 29

1 Paragraph 14?
2      A.  That is correct.
3      Q.  Okay.  Back to the heading there in Section B,
4 the first term transparent to normal operation of the
5 host and the storage device, is that present in Claim 1?
6      A.  Yes.
7      Q.  Okay.  Let's refer back then to Exhibit 3,
8 which is -- that includes Claim 1.
9          In the context of Claim 1, which we were just
10 discussing with respect to interface emulator, does the
11 blocking device appear to the host as any particular
12 standard drive or -- any particular storage device or
13 the storage device that is connected to the blocking
14 device?
15      MR. FREITAS:  Objection.  Vague.
16      MR. MANCINO:  Let me rephrase that.
17      BY MR. MANCINO:  Q.  In the context of the
18 first portion of your construction, specifically the bit
19 beginning that says to the host, the blocking device
20 appears to be a standard drive interface and presents
21 the host memory, registers and control signals that a
22 storage device would normally present to the host, in
23 context of Claim 1, does the blocking device appear to
24 be the storage device that's connected to the blocking
25 device or any storage device?

Page 30

1      MR. FREITAS:  Objection.  Vague.
2      THE WITNESS:  It appears to be the storage
3 device; however, because the interface is being
4 emulated, it's a storage device that is able to
5 communicate with the interface of the host to which it
6 is cabled.
7      BY MR. MANCINO:  Q.  And as you answered
8 earlier, the interface that is being emulated is the
9 interface of the storage device; correct?
10      A.  Yes.
11      Q.  So going back to the terms that are being
12 construed here in Section B, transparent to normal
13 operation of the host and the storage device and
14 transparently to normal operation of the host and
15 storage device, both of those terms include the phrase
16 "normal operation of the host and the storage device."
17      Do you see that?
18      A.  Yes.
19      Q.  Let's turn to Column 9, line 48, of the '682
20 patent, which is Exhibit 3.
21      A.  Okay.
22      Q.  Yeah.  That's the section entitled Read
23 Verification After Writing.
24      A.  Yes.
25      Q.  Do you wish to reread that section or refresh

Page 31

1 your recollection?
2      A.  How far do you want me to --
3      Q.  Until the end of that section.
4      A.  The middle column --
5      Q.  Column 10, line 32.
6      A.  Sure.  I'll look through that.
7      Q.  Sure.
8      A.  Okay.
9      Q.  Can you summarize what's discussed in that
10 section that you just read?
11      A.  That section talks about one of the embodiments
12 within the '682 patent for a blocking device, and this
13 particular embodiment is able to support the
14 read-after-write functionality that some operating
15 systems might employ.  In a nutshell, that's what it
16 described.
17      Q.  So in this embodiment disclosed in this section
18 that we're talking about, it provides the ability for
19 the blocking -- for the blocking device to support
20 reading information back that was attempted to be
21 written to the storage device; correct?
22      A.  That's certainly at least one of its features,
23 yeah.
24      Q.  In your opinion, is the embodiment -- is this
25 embodiment that's discussed in this section an example

Page 32

1 of transparent operation as disclosed by the '682
2 patent?
3      A.  It shows one way to implement the ability to
4 support that transparency.
5      Q.  And this is the embodiment that refers to
6 Figure 8; correct?
7      A.  This embodiment does refer to Figure 8, yes.
8      Q.  And Figure 8 utilizes the component Temp Drive
9 870.
10      Do you see that?
11      A.  Yes.
12      Q.  What is the purpose of component 870 temp
13 drive?
14      A.  If the write blocker is used in such a fashion
15 that it's necessary to support the read-after-write
16 capability as described in the section that we've been
17 talking about, such a capability can be implemented by
18 using a temp drive as described there.
19      Q.  How does the temp drive allow for this
20 capability to be implemented?
21      A.  It allows for data that is attempted to be
22 written to the device called 805 in that diagram to
23 instead be written to the temp drive so that the 805
24 drive is not modified.
25      Q.  And when the host attempts to read back the



Page 33

1 data, will the data be read from the device 805 or the
2 Temp Drive 870?
3      A. This passage from the specification describes
4 scenarios in which read operations would occur from
5 either of the two drives, depending on the situation.
6      Q. In which situation would the read operation
7 occur from the Temp Drive 870?
8      A. Typically if data has been written to the drive
9 870 earlier or has been attempted to be written to the
10 805 device, I should say, although there are portions of
11 that description in the spec that describe ways in which
12 you'd actually end up referencing the original drive
13 instead.
14      Q. This read verification after writing, is this a
15 normal operation in some computing environments?
16      A. There are certainly some scenarios in which a
17 read-after-write operation might be desired to be
18 performed. It's not a very typical operation, and
19 certainly it's not a typical operation for what would be
20 considered to be a normal usage of a write blocker.
21 Because typically, a write blocker is used in situations
22 where you're simply wanting to examine data on a disk
23 and you want to prevent the possibility of writing, so
24 the desire to even use a temp drive is pretty atypical
25 based on my usage of write blockers, for example.

Page 34

1      Q. Write blockers aside, I'm just talking about
2 the read verification after writing functionality with
3 respect to computing environments.
4      Is that a normal operation in certain computing
5 environments historically?
6      A. What I've seen is it's an optional environment
7 in some environments; that is, most operating systems as
8 far as I know don't support this kind of feature. There
9 might be ways to turn it on, but it's a very atypical
10 kind of operation. The situation in which the scenario
11 is described refers to the DOS operating system, which
12 is a pretty simple operating system and it's little used
13 these days, and it's a functionality that most people
14 weren't even aware of was part of it; so it's pretty
15 atypical.
16      Q. Let me read the first two sentences of this
17 section from the '682 patent. There are situations in
18 which a host writes data to a drive and immediately
19 tries to verify that the data was, in fact, written by
20 attempting to read it back. In particular, some
21 commands used by some older operating systems such as
22 DOS act in this manner.
23      At the time that the '682 patent was written
24 and filed, was this an accurate statement?
25      A. I believe it was, but there's a caveat or

Page 35

1 clarity that should be added to the second sentence.
2 There appears to be the possible implication that DOS
3 always acts in this way by doing a read-after-write. As
4 it turns out, as I mentioned a moment ago, it's actually
5 an optional feature that needs to be turned on whenever
6 you start up the operating system. It's not even
7 renumbered by the operating system.
8      So if you happen to know how to turn it on and
9 if you have the desire to turn it on, you can, and that
10 would perform the read-after-write for all subsequent
11 write operations.
12      Q. Let's go to the next page, page 6. Or not the
13 next page. Let's go to page 6. I'm sorry. The next
14 claim element, subsection C.
15      MR. FREITAS: 60?
16      MR. MANCINO: I'm sorry. Page 6 of your
17 declaration, Exhibit 1.
18      THE WITNESS: Okay.
19      BY MR. MANCINO: Q. The next term is
20 subsection C, transparently to normal operation of the
21 host and the IDE storage device
22      Do you see that?
23      A. Yes.
24      Q. What's the difference between this term's
25 construction and the previous two terms?

Page 36

1      A. This construction includes the term "IDE
2 storage device" while the earlier construction did not
3 include that. So it's harmonious with the difference
4 between how the storage devices recited on page 4
5 compared to page 6.
6      Q. Is it accurate to say that this construction
7 substitutes out the word "storage device" and replaces
8 it with "IDE storage device"?
9      MR. FREITAS: Objection. Vague.
10      THE WITNESS: Could you read the question back,
11 please.
12      (Record read.)
13      THE WITNESS: That's not precisely correct.
14 For example, I say standard drive interface in my
15 Paragraph 13, and then I say a standard IDE storage
16 device in my Paragraph 17. That's a little different
17 from what you recited, and there's some other small
18 differences. For example, I say the blocking device in
19 Paragraph 13, but I say just the device. So there's,
20 you know, some little differences to accommodate the
21 difference in the wording, but certainly one of the main
22 things it's done is the use of IDE storage interface as
23 opposed to drive interface.
24      BY MR. MANCINO: Q. In your next paragraph,
25 Paragraph 18, are you basically incorporating your



Page 37

1 analysis from Paragraphs 14 through 16 to support your
2 construction?
3    A.  In effect, yes.  And I note that I should have
4 said Section 4B above instead of 6, so just a small
5 typo, but yes.
6    Q.  Did this claim construction require any
7 additional analysis?
8       MR. FREITAS:  Objection.  Vague.
9       THE WITNESS:  When you say "additional
10 analysis," what are you referring to exactly?
11      BY MR. MANCINO:  Q.  Beyond what you've recited
12 in Paragraphs 14 through 16 in your opinion.
13   A.  So really additional support?  Is that what
14 you're saying?
15   Q.  Additional support.
16   A.  I'm basically including those three paragraphs
17 by what I say in Paragraph 18, so I'm including that
18 same support for this construction.
19   Q.  And then the next term --
20      MR. FREITAS:  Hey, Dave, if you're moving to a
21 different topic, would you mind taking a break?
22      MR. MANCINO:  We can take a break.
23      THE VIDEOGRAPHER:  One moment.
24      Off the record.  The time is 10:43 a.m.
25      (Recess taken from 10:43 a.m. to 11:04 a.m.)

Page 38

1       THE VIDEOGRAPHER:  On the record.  The time is
2 11:04 a.m.
3       You may continue.
4       BY MR. MANCINO:  Q.  Okay.  At the break, Mr.
5 Berg, I was moving on to subsection D on page 6 of
6 Exhibit 1.
7    A.  Okay.
8    Q.  And this is -- this appears to be another
9 transparent term; is that correct?
10   A.  Yes, it is.
11   Q.  And can you explain what the difference between
12 this claim term and the terms from Sections B and C are?
13   A.  Sure.  B and C have similar terms cited, and
14 there are some differences in the wording of those
15 terms, and the differences in those wordings are taken
16 into account in each of these separate constructions.
17 But the words surrounding those differences are in
18 general the same.
19   Q.  Is the primary difference the substitution of
20 computer motherboard with host?
21   A.  Well, certainly this is a method claim, and so
22 accommodation of this term being from a method claim as
23 opposed to an apparatus claim is taken into account with
24 the different wording as well.  But with regard to, for
25 example, the computer motherboard and the word "host,"

Page 39

1 in general there's -- this different construction
2 represents that change.
3    Q.  And then the next page in Paragraph 20, do you
4 basically cite to the same support in Paragraphs 14
5 through 16?
6    A.  Yes, I do.
7    Q.  Does your report include any additional support
8 for this construction?
9    A.  I don't believe it does.
10   Q.  Then the next claim term on page 7, subsection
11 E, transparently to normal operation of the host
12 computer and the long-term storage device, what's the
13 difference between this claim term and the claim terms
14 from subsection B?
15   A.  So there's two terms recited in B and one term
16 recited in header E.  The second term recited in header
17 B starts with transparently, and the difference in that
18 term compared to the term recited in header E is the
19 inclusion of the word "computer" after host in E and the
20 inclusion of the adjective "long-term" before storage
21 device also in E.
22   Q.  What effect does the addition of the word
23 "computer" to the word "host" result in your opinion?
24      MR. FREITAS:  Objection.  Vague.
25      THE WITNESS:  It's very close to the same term.

Page 40

1       BY MR. MANCINO:  Q.  What effect is the
2 addition of the word "long-term" to the word "storage
3 device" in this claim term?
4    A.  There's not much impact.
5    Q.  In Paragraph 22 it is relying upon the support
6 from Paragraphs 14 through 16; correct?
7    A.  That is correct.
8    Q.  Does your report include any additional
9 paragraphs for additional support?  Scratch that.
10      Does your report include any additional
11 support?
12   A.  Not that I recall.
13   Q.  Let's go to the next claim term, subsection F.
14 IDE emulator component?
15   A.  Yes.
16   Q.  What is your construction for this claim term?
17   A.  My construction is, as I recite in
18 Paragraph 23, a component that mimics an interface
19 compatible with the IDE or ATA interface.
20   Q.  What are some examples of ATA interfaces?
21      MR. FREITAS:  Excuse me.  Could we hear that
22 question, please.
23      (Record read.)
24      MR. FREITAS:  Thank you.
25      THE WITNESS:  Well, as I note in my Paragraph



Page 41

1  24, the terms "IDE" and "ATA" are used interchangeably
2  in the industry.  So for example, when you see the term
3  "IDE," it has the same meaning as ATA.
4          There have been a number of standards that have
5  come out in the industry as I recite in my subsequent
6  paragraphs, particularly Paragraph 26, and these all
7  have a lineage that goes back to the original ATA
8  interface, also known, as I say, as an IDE interface.
9  So I would call any of the ones that are listed here in
10  that Paragraph 26 to be examples of an IDE or ATA
11  interface.
12         BY MR. MANCINO:  Q.  So in your opinion, an
13  SATA interface is an example of an IDE interface?
14     A.  Well, it's certainly a newer version with new
15  capabilities.  There's a core command set that has been
16  pretty much carried through the different versions of
17  the interfaces.
18     Q.  Is an IDE -- I'm sorry.  Did I interrupt
19  your --
20     A.  I believe I answered that.  Maybe if you recite
21  the -- read back the question and make sure I complete
22  my answer.
23         (Record read.)
24         THE WITNESS:  Since the name SATA includes the
25  letters S-A-T-A, it's not always thought of as an IDE

Page 42

1  interface because IDE is a term that's often been used
2  with the parallel version of the -- of this interface,
3  but there's -- as the different specs have come out for
4  newer versions of these command sets, it's part of that
5  family.  And hence, I would use the term "IDE" to be
6  shown as a lineage of all those different
7  specifications.
8          BY MR. MANCINO:  Q.  So an IDE storage device
9  is not the same as an SATA storage device; correct?
10         MR. FREITAS:  Objection.  Vague.
11         THE WITNESS:  Would you read back the question,
12  please.
13         (Record read.)
14         THE WITNESS:  Well, in common parlance, SATA
15  devices are not usually called IDE devices.  But when,
16  for example, an IDE interface is used as an example of
17  an interface as is done, for example, in the '682
18  patent, I would not consider that to exclude
19  applicability of a SATA interface.
20         BY MR. MANCINO:  Q.  Well, earlier you
21  mentioned that there is at least one difference between
22  an IDE storage device and a SATA storage device;
23  correct?  You mentioned that the IDE -- scratch that.
24         At least with respect to an IDE storage device,
25  it includes a parallel interface while the SATA storage

Page 43

1  device includes a serial interface; correct?
2     A.  That is sometimes common parlance; that is, the
3  term "IDE" is not used as much anymore.
4     Q.  What type of -- is the IDE interface a parallel
5  interface or a serial interface?
6         MR. FREITAS:  Objection.  Vague.
7         BY MR. MANCINO:  Q.  Do you understand what I'm
8  asking?
9     A.  Yes.
10         The IDE interface is generally thought of as
11  parallel, and serial is a serial interface.  There's
12  certainly the compatibility of their portions of their
13  command sets.
14         BY MR. MANCINO:  Q.  Just this -- let me just
15  stick to the one question.  So an IDE interface is a
16  parallel interface; correct?
17     A.  The term "IDE" is generally thought of as a
18  parallel interface.
19     Q.  In fact, the IDE interface utilizes a parallel
20  data bus; correct?
21     A.  That's the way it's typically thought of, but I
22  remind you that the terms IDE and ADA are used as
23  synonyms.
24     Q.  I'm only talking about IDE drives and their
25  associated interfaces as you would, say, purchase one

Page 44

1  from a store.
2         Do you understand what I'm talking about?
3  Those IDE drives, the interfaces that they use, utilize
4  a parallel data bus; correct?
5     A.  Typically that would be the case.
6     Q.  And SATA drives that utilize an SATA interface,
7  those are serial interfaces; correct?
8     A.  That's correct.
9     Q.  And the SATA interface utilizes two pairs of
10  wires, one for transmit and one for receive; correct?
11     A.  Well, it certainly has more connectors than
12  just that, but it's my recollection that with regard to
13  the data transmission aspect, I believe that's the case.
14     Q.  And an SATA interface does not utilize a
15  parallel data bus; correct?
16         THE WITNESS:  Read the question again, please.
17         (Record read.)
18         THE WITNESS:  Well, I remind you that I note
19  that the terms "IDE" and "ATA" are used interchangeably.
20  So in that sense and in consideration of that fact as I
21  state in my Paragraph 24, there are different versions
22  of the interface that are encompassed by the terms IDE
23  and ATA.  There is a serial ATA interface that uses a
24  serial interface, and then there's a parallel interface
25  that is normally associated with the term IDE, but I --



BRIAN A. BERG                                    February 06, 2014
IN RE MYKEY TECHNOLOGY                                      45–48

1 the use of the term IDE and ATA are used
2 interchangeably, so that needs to be remembered in
3 consideration of that.
4       BY MR. MANCINO:  Q.  Let me repeat my question.
5 Let me actually -- let me rephrase my question.
6       Does an SATA interface utilize a parallel data
7 bus?
8    A.  No, it does not.
9    Q.  If I had a host computer with an IDE interface
10 and attempted to connect a conventional SATA drive with
11 an SATA interface to the host computer's IDE interface,
12 what would happen?
13    A.  Well, if that computer -- if by "IDE" you mean
14 that computer has a parallel interface and then you have
15 an SATA drive, they would not be compatible.
16    Q.  Can -- do you -- are you aware of any examples
17 in the art where an entity uses the term "IDE" to refer
18 to SATA?
19       MR. FREITAS:  Objection.  Vague.
20       THE WITNESS:  I'm not sure what you mean by
21 "entity."
22       BY MR. MANCINO:  Q.  Are you aware of the --
23 are you aware of any situation outside of this
24 litigation in which those of ordinary skill in the art
25 use the words -- the term "IDE" to refer to SATA?

1       MR. FREITAS:  Objection.  Vague.
2       BY MR. MANCINO:  Q.  Do you understand what I'm
3 asking?
4    A.  Sure.  Within the T13 standards group, there is
5 the -- they're the ones who work on the
6 standards-related IDE, ATA and SATA.  They're certainly
7 aware that the standards that they've developed support
8 both a parallel and a serial interface.  And within the
9 context of the documents that, for example, are included
10 on their Web site, there's a history of documents that
11 goes back to the IDE, original parallel interfaces often
12 called IDE or ATA as well as the serial ones often
13 called SATA, but they're all grouped together and
14 available on their Web site.  And so in that sense, the
15 T13 is aware of all the different variations of what is
16 known as IDE, ATA or SATA.
17    Q.  Anything else?
18    A.  Well, I have links to a number of standards
19 documents on my Web site, and there's -- I consider the
20 IDE and ATA and SATA interfaces to all be important
21 interfaces in the industry, and I looked to a number of
22 those documents on my site.
23    Q.  Anything else?
24    A.  Certainly anyone who has worked in the industry
25 with storage devices is aware of the different

1 interfaces that have come out and different specs that
2 have come out over the years for the different
3 variations on IDE, ATA and SATA.  And there's documents
4 that describe the physical interface, as I note in my
5 report, and there's also documents that describe the
6 command set; so there's this intimate lineage and
7 relationship between those standards that encompass both
8 the parallel and serial interface.  So I would say that
9 anybody who is aware of storage devices and storage
10 interfaces over at least the last ten years is certainly
11 aware of the coexistence of these interfaces.
12    Q.  Tell me if there's anything incorrect with this
13 statement:  An IDE drive interface is a 40-conductor
14 ribbon cable with a 16-bit parallel data bus, 13 control
15 wires, including address and read-and-write control
16 signals.
17    A.  Is that the end of the question?
18    Q.  That's the end of my question.
19       THE WITNESS:  Could you read that back, please.
20       (Record read.)
21 THE WITNESS:  That description is a description of a
22 physical connection for a parallel bus, but it doesn't
23 take into account the command set that is used, and so
24 it gives a broad meaning or has a broad name for what is
25 just described as a cable.  And, in fact, some cables

1 are actually kind of 80 conductors and not just 40.
2 And the use of the term "IDE" for completeness should
3 say IDE or ATA for clarity.
4       I can't swear to all the different other
5 numbers like the 13 and all.  I don't recall right
6 offhand.  I'd need to look at the spec.  I could do that
7 for you if you wanted.  So in general, it's an
8 incomplete statement.
9       BY MR. MANCINO:  Q.  Did your report include
10 the spec?
11    A.  My report cited to a number of the specs and I
12 believe had at least three of the specs that were
13 exhibits, as I recall.
14    Q.  So you say in general the statement I read to
15 you is an incomplete statement.  My question was, is it
16 an incorrect statement?
17    A.  Yes.
18    Q.  What's incorrect about it?
19    A.  It characterizes the term "IDE interface" to be
20 limited to a cable, one form of a cable, and doesn't
21 include mention of ATA for completeness.  And once
22 again, I can't swear to the accuracy of some of the
23 numbers.
24    Q.  Let me try a different way.  An example of an
25 IDE interface includes a parallel data bus and a number



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
49–52

Page 49

1 of control wires, including address and read-and-write
2 control signals.
3      Is that an incorrect statement?
4      A. It could be interpreted incorrectly because
5 there could be an inference that it's limited to this
6 physical cable when it's more than just a physical
7 cable.
8      Q. Well, listen carefully because my question
9 didn't include the word "cable."  My -- the statement I
10 read is, An example of an IDE interface includes a
11 parallel data bus and a number of control wires,
12 including address and read-and-write control signals.
13      Is that an incorrect statement?
14      THE WITNESS:  Could you read that back, please.
15      (Record read.)
16      THE WITNESS:  It's sort of oddly stated, but it
17 seems to be roughly correct.  But I would also use the
18 term "ATA" in there for clarity.
19      BY MR. MANCINO:  Q.  Let me read you another
20 one.  An SATA interface includes two pair of wires, one
21 for transmit and one for receive between the host and
22 the drive.
23      Is this an incorrect statement?
24      THE WITNESS:  Could you read that back, please.
25      (Record read.)

Page 50

1      THE WITNESS:  I believe that's correct to the
2 best of my recollection.
3      BY MR. MANCINO:  Q.  Between SATA and PATA
4 interfaces, do they use the same scheme for transporting
5 information intended for the drive's registers?
6      A. What do you mean by "scheme"?
7      Q. Do you know how device and status fields, for
8 example, are implemented as registers with respect to
9 PATA devices?
10      A. I do recall that.  I might want to reference
11 the spec to give you any detailed answers, but I do have
12 a recollection of that, yes.
13      Q. Do you recall whether or not the device status
14 fields are implemented as registers differently with
15 respect to the PATA device and the SATA device?
16      A. I don't have a specific recollection of that.
17      MR. MANCINO:  Okay.  Let's move on.  We're up
18 to Exhibit 4; is that right?
19      THE REPORTER:  Yes.
20      (Exhibit 4 was marked for identification by the
21 court reporter and is attached hereto.)
22      BY MR. MANCINO:  Q.  Okay.  I'm going to hand
23 you what's been marked as Exhibit 4.
24      A. Okay.
25      Q. Do you recognize Exhibit 4?

Page 51

1      A. Yes, I do.
2      Q. What is that?
3      A. It's the '086 patent.  It's one of the three
4 patents at issue in this case.
5      MR. MANCINO:  Okay.  I've been given a notice
6 that we have a couple minutes left for tape.  So what is
7 it?  11:50?  How do you want -- do you want to take a
8 quick break, come back?  Or do you want to take an early
9 lunch?
10      MR. FREITAS:  I would suggest a quick break and
11 come back.
12      What's everybody else want to do about lunch?
13      MR. KIRSCH:  Should we go off the record?
14      MR. MANCINO:  Let's go off the record and take
15 a quick break.
16      THE VIDEOGRAPHER:  One moment.  I'm going to
17 end this.  One moment.
18      This marks the end of Media No. 1 in the
19 deposition of Brian Berg.  The time is 11:50 a.m.
20      We are off the record.
21      (Recess taken from 11:50 a.m. to 12:02 p.m.)
22      THE VIDEOGRAPHER:  Here begins Media No. 2 in
23 the deposition of Brian Berg.  The time is 12:02.  We
24 are back on the record.
25      You may continue.

Page 52

1      BY MR. MANCINO:  Q.  Okay.  We -- before our
2 break, we just introduced the '086 patent.  Can you turn
3 to page 10 of Exhibit 1, which is your expert
4 declaration.
5      A. Okay.
6      Q. And then we have V which is proposed
7 constructions for the '086 patent; right?
8      A. Yes.
9      Q. And the first claim term you opine upon in
10 subsection A is -- or the pair of terms which are exact
11 copy and exact copies; correct?
12      A. Yes.
13      Q. And then in Paragraph 32 in that subsection,
14 you cite to a number of excerpts from the intrinsic
15 record to support your opinion; is that correct?
16      A. Yes, I do.
17      Q. Does your report include any other support
18 other than what's shown here in Paragraph 32 for your
19 opinion on this term exact copy and exact copies?
20      A. I don't believe so.
21      (Exhibit 6 was marked for identification by the
22 court reporter and is attached hereto.)
23      BY MR. MANCINO:  Q.  I'm going to hand you
24 what's been marked as Exhibit 6.  Please take a chance
25 to review this document.



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
53–56

Page 53

1    MR. FREITAS:  Did you skip 5, Dave?
2    MR. MANCINO:  Yeah.  For people keeping score
3  at home, I haven't introduced 5 yet.  So -- that's the
4  '379 patent.
5    MR. FREITAS:  Okay.
6    MR. KIRSCH:  Do you want to just do that now?
7    MR. MANCINO:  We'll get to it.
8    THE WITNESS:  I believe it's a complete copy of
9  the file history for the '086.  Excuse me.  Not the file
10  history but the application that's cited on the face of
11  the '086, which is the 387 provisional application.
12    BY MR. MANCINO:  Q.  So this is a complete copy
13  of Provisional Application No. 60/443387 filed on
14  January 29th, 2003?
15    A.  Well, I don't remember precisely how many pages
16  it had.  It appears to be complete.
17    Q.  In your analysis for construing the terms of
18  the '086 patent, did you consider this 387 provisional
19  application?
20    A.  Yes, I did.
21    Q.  Please turn to page 2 of this provisional
22  application.
23    A.  Were you talking numbered page 2?
24    Q.  Well, there are page numbers when you get to
25  the text itself.

Page 54

1    A.  Yes.
2    Q.  So the page 2 of 22.
3    A.  Yes.
4    Q.  In the third paragraph under the heading The
5  Need For a Simple Way to Make Exact Copies, can you --
6  you can read the entire section if you wish, but I'm
7  going to ask you questions about the third paragraph.
8  Tell me when you're ready.
9    A.  Okay.  I'll tell you.
10    Okay.
11    Q.  This third paragraph says, When a law
12  enforcement official confiscates a computer long-term
13  memory device such as a hard drive, the drive enters a
14  chain of custody.  Any inadvertent changes to data on
15  the drive may change important evidence.
16    In order to avoid this, a copy of the drive is
17  typically made, and this copy is used by the forensics
18  labs to instead -- by the forensics labs instead of the
19  original.  For this process to work correctly, it is not
20  enough for the copy to have all the data files of the
21  original.  The data must be arranged on the copy in the
22  exact same pattern as the original.
23    Did I read that correctly?
24    A.  Except for that little hiccup in the middle,
25  yes.

Page 55

1    Q.  Do you agree with that statement?
2    MR. FREITAS:  Objection.  Vague.
3    THE WITNESS:  I agree that it's a reasonable
4  statement, and it's a -- simply a way of stating that a
5  physical as opposed to a logical copy should be made.
6    BY MR. MANCINO:  Q.  Your report doesn't cite
7  to this provisional application to support your
8  construction for exact copy, your exact copies; correct?
9    A.  I don't believe I cite to it, no, but I
10  certainly considered it.
11    Q.  Refer back to Exhibit 1, your declaration
12  again.  I'm done with the provisional application if you
13  want to set that aside.
14    A.  Okay.
15    MR. MANCINO:  We're going to -- I'll go ahead
16  now and introduce Exhibit 5, which was skipped over.
17    (Exhibit 5 was marked for identification by the
18  court reporter and is attached hereto.)
19    BY MR. MANCINO:  Q.  I'll hand you what's been
20  marked as Exhibit 5.
21    Do you recognize this document, Mr. Berg?
22    A.  Yes, I do recognize this.  It's the '379
23  patent.  It's one of the three patents at issue in this
24  case.
25    Q.  And then turning back to Exhibit 1, page 11, at

Page 56

1  the bottom we're at VI?
2    A.  Yes.
3    Q.  That's where you have the heading Proposed
4  Constructions For the '086 and the '379 Patents?
5    A.  Yes.
6    Q.  So that's proposed constructions for Exhibit 4
7  and Exhibit 5; correct?
8    A.  Yes.
9    Q.  Okay.  Then on page 12 -- sorry.  On page 18 is
10  the -- starts at subsection C for the term
11  "standalone-dedicated function device."
12    Are you there?
13    A.  Yes.
14    Q.  Okay.  Paragraph 55 -- well, let me -- what is
15  your construction of stand-alone dedicated function
16  device for the '086 patent, Mr. Berg?
17    A.  As I state in my Paragraph 54, a physical
18  device which is not a general purpose computer system
19  that stands apart from the source drive and the one or
20  more destination devices whose hardware and software is
21  dedicated to making exact copies of long-term memory
22  devices.
23    Q.  On page 55 -- excuse me, Paragraph 55, in the
24  first sentence -- at the end of the first sentence, it
25  says dedicated is not a term of art that describes a



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
57—60

Page 57

1 device with a single purpose.
2     Do you see that?
3   A. Yes.
4   Q. What is the basis of your opinion for that
5 statement?
6   A. I certainly see the term "dedicated" used
7 sometimes technically, and it's an inexact term. It
8 doesn't have a common known term.
9   Q. Let's mark the next -- I'm sorry. Go ahead.
10   A. I think it's applies to what are often called
11 embedded devices or devices that are stand-alone, but
12 there's not the implication from that term itself from
13 my experience that it implies something with just a
14 single purpose.
15     MR. MANCINO: Let's go ahead and mark the next.
16     (Exhibit 7 was marked for identification by the
17 court reporter and is attached hereto.)
18   BY MR. MANCINO: Q. Have you seen what has
19 been marked as Exhibit 7 before?
20   A. Yes, I have.
21   Q. Where have you seen this?
22   A. I believe it was an exhibit that was part of
23 Mr. Gafford's report, and I saw it in the earlier ITC
24 case.
25   Q. What does it contain?

Page 58

1   A. It has excerpts from the Microsoft Computer
2 Dictionary, Fourth Edition.
3   Q. Do you see the copyright date for this fourth
4 edition?
5   A. 1999.
6   Q. So this fourth edition was -- do you have any
7 reason to think that this fourth edition was not
8 published before the filing dates of the patents for
9 Exhibits 4 and 5?
10   A. I believe it likely was.
11   Q. In your experience, is the Microsoft Computer
12 Dictionary a reliable dictionary?
13     MR. FREITAS: Objection. Vague.
14     THE WITNESS: "Reliable" is kind of an
15 ambiguous term. Could you elaborate on that.
16     BY MR. MANCINO: Q. In your experience, is the
17 Microsoft Computer Dictionary reliable for the purpose
18 of defining computer-related terms?
19   A. I don't really have an opinion on that. I
20 haven't really considered that question specifically.
21   Q. Do you have any copies of the Microsoft
22 Computer Dictionary?
23   A. I do.
24   Q. Have you ever used the Microsoft Computer
25 Dictionary?

Page 59

1   A. Sometimes I will look up terms in multiple
2 dictionaries inclusive of the Microsoft Computer
3 Dictionary.
4   Q. In your experience, are the definitions in the
5 Microsoft Computer Dictionary accurate?
6   A. Well, there's a whole lot of definitions that
7 you're encompassing with that question, so obviously to
8 give the best answer I need to look at every single one,
9 and I've only got a short portion of it included here,
10 and that would be, you know, a huge task.
11     What I do know is that sometimes when I have
12 questions or thoughts about certain things in my general
13 consulting business or in expert work, I might look at
14 multiple dictionaries to see what they have to say. But
15 I certainly when I'm looking at, for example, patents, I
16 look at the intrinsic evidence and use that as my first
17 source. And if I consider that adequate to cover the
18 questions, then I don't look beyond that intrinsic
19 evidence.
20   Q. Have you ever relied upon the Microsoft
21 Computer Dictionary in forming an expert opinion on
22 claim construction?
23   A. I don't recall.
24   Q. Have you ever relied upon the Microsoft
25 Computer Dictionary in forming an expert opinion in a

Page 60

1 patent case?
2   A. I don't recall.
3   Q. Take a look at page 130 that's copied here in
4 this Exhibit 7.
5     Are you there?
6   A. Yes.
7   Q. What is the definition that the Microsoft
8 Computer Dictionary gives for the term "dedicated"?
9   A. Of, pertaining to or being a device, program,
10 or procedure devoted to a single task or function.
11   Q. Is this definition consistent with your opinion
12 stated in Paragraph 55 that dedicated is not a term of
13 art that describes a device with a single purpose?
14     MR. FREITAS: Objection. Vague.
15     BY MR. MANCINO: Q. Do you understand what I'm
16 asking?
17   A. Maybe could you rephrase that?
18   Q. Sure. Is the definition of "dedicated" in the
19 Microsoft Computer Dictionary consistent with your
20 opinion in Paragraph 55 of Exhibit 1 that "dedicated" is
21 not a term of art that describes a device with a single
22 purpose?
23     MR. FREITAS: Objection. Vague.
24     BY MR. MANCINO: Q. Do you understand what I'm
25 asking?



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
61–64

Page 61

1     A. I do. It's kind of hard to answer that
2 explicitly, but I -- let me give that a whirl.
3         In my Paragraph 55, I provide part of the
4 support for my construction of this term
5 "standalone-dedicated function device," and I looked at
6 the intrinsic evidence and found the use of that term.
7 I form my claim construction based on that, and that was
8 my opinion as stated herein.
9         I think the Microsoft dictionary has a number
10 of definitions in it, including "dedicated." This was
11 somebody's opinion of what that term should mean, and I
12 form my opinion based on intrinsic evidence. It's
13 certainly a different idea on the word "dedicated." I
14 think it's too restricted -- too restrictive, but I
15 don't look to it for guidance for forming my opinion.
16     Q. That will satisfy the dictionary for now.
17         Later in Paragraph 55 it appears you rely upon
18 -- as support for your opinion you cite to Column 1. It
19 says line 49 to 50 of the '086 patent.
20         Do you see that?
21     A. Yes.
22         MR. FREITAS: Dave, where are you?
23         MR. MANCINO: I'm on Paragraph 55 of Exhibit 1.
24         MR. FREITAS: Okay. Thank you.
25         BY MR. MANCINO: Q. Now I'm going to refer to

Page 62

1 Exhibit 4, which is the '086 patent to this paragraph
2 cited in Paragraph 55 of Exhibit 1. And so this
3 paragraph that's cited here in your report, it appears
4 to start maybe line 48 of Column 1? Is that accurate?
5     A. Yes.
6     Q. And ends maybe line 57?
7     A. That's what I recite here, yes.
8     Q. Okay. And did you recite that entire paragraph
9 word for word here?
10     A. I appear to, yes.
11     Q. Okay. Well, let's, then, just focus on
12 Exhibit 1 and not go back and forth between Exhibits 1
13 and 4. Make it a little easier.
14         So what is the applicant saying here in this
15 paragraph taken from the '086 patent?
16         MR. FREITAS: Objection. Compound.
17         THE WITNESS: I think this paragraph shows that
18 there are dedicated stand-alone devices that are able to
19 make copies of long-term memory storage devices and that
20 there are other capabilities that such a device could
21 include, plus various options for invoking those various
22 capabilities and still be called a dedicated stand-alone
23 device.
24         BY MR. MANCINO: Q. And this paragraph appears
25 in the background section of the '086 patent; correct?

Page 63

1     A. Yes.
2     Q. So is it your understanding that this paragraph
3 is talking about the state of the art as of filing of
4 the '086 patent?
5         MR. FREITAS: Objection. Vague.
6         THE WITNESS: I don't know if there's
7 necessarily inference of it being a state-of-the-art
8 device or not. It's given -- as the sentence -- as the
9 paragraph says, a second class of techniques for making
10 copies and an example of a device is provided. So
11 certainly it's background for the invention as the title
12 of that section says.
13         BY MR. MANCINO: Q. Okay. So one of the
14 devices -- well, the device mentioned in this paragraph
15 as background for the invention is a Logicube device; is
16 that right?
17     A. That's what it says, yes.
18     Q. And this device -- at the end of that
19 paragraph, it says this device, this Logicube device,
20 and you boldface it, has enough options to cause
21 confusion.
22         Do you see that?
23     A. Yes, I do.
24     Q. Would that seem to imply that the Logicube
25 device has too many options?

Page 64

1         MR. FREITAS: Objection. Vague.
2         THE WITNESS: I wouldn't draw that conclusion.
3         BY MR. MANCINO: Q. One of the addition -- one
4 of the options in addition to copying is an option to
5 delete the contents of the destination drive.
6         Do you see that? You boldface that sentence
7 too.
8     A. Yes.
9     Q. Immediately following that sentence is the
10 sentence that says, This device requires a trained
11 operator and has enough options to cause confusion or
12 errors on the part of the user.
13         Does this sentence imply that having the option
14 to delete the contents of the destination drive is one
15 of the options that would cause confusion to the user?
16         MR. FREITAS: Objection. Calls for conclusion.
17 Vague.
18         THE WITNESS: Could you restate the question,
19 please.
20         (Record read.)
21         THE WITNESS: Not necessarily. In looking at
22 this paragraph, one of the items that I boldface is
23 numerous operating modes and options.
24         BY MR. MANCINO: Q. So is it your opinion that
25 a device that has numerous operating modes and options



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
65–68

Page 65

1 could result in having enough options to cause confusion
2 or errors on the part of the user?
3        MR. FREITAS: Objection. Vague. Incomplete
4 hypothetical question.
5        THE WITNESS: I think that these statements are
6 made in kind of general fashion, and there isn't enough
7 specificity in the way it's all stated to be able to
8 draw conclusions like you're asking. I think this
9 paragraph describes a device having, like it says,
10 numerous operating modes and options. And also deleting
11 the contents of a destination drive, you could call that
12 an operating mode or an option.
13        So like I say, I think it's casually stated,
14 and the specificity that you're driving for is -- can't
15 necessarily be concluded from that. I think what it
16 describes is the fact that devices can provide numerous
17 operating modes and options, and they should be made
18 easy to use.
19        There isn't, again, specificity about how to
20 make them easier to use, but certainly talks about the
21 fact that you can have lots of modes and options, and
22 that certainly might be very desirable to have in a
23 single device to make it more cost-effective.
24        And I think the key thing is making it --
25 including options and making it easy to use in a package

Page 66

1 is certainly a desirable thing.
2        BY MR. MANCINO: Q. So this paragraph talks
3 about two options. At least -- well, two options for
4 the Logicube device. One option is to make exact
5 copies, and one option is to delete the contents of a
6 destination drive.
7        Do you see any other options described in this
8 paragraph?
9        MR. FREITAS: Objection. Vague.
10        THE WITNESS: Could you read that back, please.
11        (Record read.)
12        THE WITNESS: Actually, I think that's a
13 mischaracterization of what it says. It talks about
14 numerous operating modes and options before making a
15 copy. I believe your question characterized making a
16 copy in operating mode, and that's not what this
17 paragraph says.
18        It does recite a single option of deleting the
19 contents, and I point you to my Paragraph 57 that talks
20 about other ways in which a device for the '086 patent
21 could include other capabilities such as, as I say,
22 copying while scanning or scanning only.
23        So I think you need to look at my whole opinion
24 here, which is -- or at least the opinion that I include
25 in this report at this time that goes from Paragraphs 54

Page 67

1 through 59, and I talk about different aspects of the
2 device described by the '086 patent that include
3 different operating modes and options.
4        So you seem to be concentrating just on this
5 Logicube, but in this paragraph it only gives that one
6 specific option of deleting. But there is, like I say,
7 other options that are recited elsewhere in the patent.
8        And since this paragraph about the Logicube
9 only recites one option but notes that there are many
10 options, some of those other options could be the ones
11 recited elsewhere in the patent.
12        So I think as a whole in looking at these
13 Paragraphs 54 to 59, I recite a number of instances from
14 the patent specifications that talks about capabilities
15 that a standalone dedicated-function device could
16 encompass.
17        BY MR. MANCINO: Q. These other embodiments
18 that you rely -- that you use for support in your
19 opinion from the '086 patent, none of them include an
20 option to delete the contents of what will be the
21 destination drive; correct?
22        MR. FREITAS: Objection. Vague.
23        BY MR. MANCINO: Q. Do you understand what I
24 asked?
25        A. Yes. Yes, I do. I don't recite another

Page 68

1 instance of the word "delete." There might be one else
2 where in the '086 patent. I don't recall right offhand.
3 But just because that's the case certainly doesn't make
4 the word "delete" special or whatever.
5        I think as a whole, the '086 patent needs to be
6 considered and various operating modes and options are
7 discussed, and all of this give support to the fact that
8 a stand-alone dedicated function device could include
9 other kinds of capabilities.
10        Q. Do any of the embodiments of the '086 patent
11 utilize a small display from which options may be
12 selected?
13        A. Are you looking at someplace specifically in my
14 report or the patent?
15        Q. Paragraph -- the paragraph we're citing from
16 the background says what option -- in talking about the
17 Logicube device, Options are selected through the use of
18 a number of buttons and a small display.        My
19 question was, do you know of any embodiments of the '086
20 patent that utilizes a small display from which options
21 may be selected?
22        MR. FREITAS: Objection. Vague.
23        THE WITNESS: Where -- could you point me to
24 the recitation you're quoting?
25        BY MR. MANCINO: Q. It's in your report.



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
69–72

Page 69

1    A.  Oh, okay.
2    Q.  Paragraph 55.
3    A.  Right, right, right, right, right.
4        In the '086 in Column 9 from lines 31 through
5  33, there is recitation of additional display devices
6  such as a graphical display.  In addition, in Column 10,
7  there's a recitation additionally the copying device may
8  be configured to display a report of the copying process
9  and information about the devices involved.
10       I also note that Figure 4 includes a 4120
11  RS-232 port, and but specifically with regard to those
12  two recitations from Columns 9 and 10, there is the
13  description of a display device.
14       And since the patent as a whole describes a
15  small device and the abstract includes the term a
16  "simple device" and by virtue of the fact that the
17  Logicube, for example, describes a small display, there
18  certainly are other places such as Column 9 and 10 that
19  talk about what would have to be a small display.
20       There might be other information that's in the
21  file history.  I could look at that if you wanted.  And
22  also I note that even with these two additional
23  recitations, those are not limiting for what is within
24  the scope of the device as described by the '086 patent,
25  and hence it's implementing it would be best done with

Page 70

1  some kind of a small display.
2        BY MR. MANCINO:  Q.  As you reviewed -- so you
3  found support for a small display in the specification.
4  Is that what you're saying?
5    A.  I did.  I could look more closely.  I didn't
6  read every word, but I found two instances of discussion
7  of a display and by virtue of the fact that the '086, as
8  I said, describes a small device, a simple device, those
9  would need to be small displays to fit in with that.
10       Q.  And as you were studying the specification, did
11  you see any support for a drive wiping function as part
12  of that copying device?
13   A.  I wasn't looking for that.  I could look again
14  for that.
15       Q.  Sure.
16   A.  Okay.  But once again, of course, just because
17  it's not in here doesn't say that that isn't the
18  capability that could be part of it.  And certainly the
19  delete being part of the Logicube functionality, I
20  interpret that to say that implementations of this
21  invention could certainly include a delete function,
22  even if it's only specified in this one place.  And
23  again, I don't know.
24       But as you said, I should go ahead and look for
25  that, and I can do that.

Page 71

1        MR. FREITAS:  You guys are pausing.  Can I go
2  to the men's room?
3        MR. DUKELOW:  There's a pending question.
4        MR. FREITAS:  Oh, there is?
5        MR. MANCINO:  Yeah.  Mr. Berg is looking.
6        MR. FREITAS:  What's the question?
7        MR. MANCINO:  And as you were studying the
8  specification, did you see any support --
9        MR. FREITAS:  Oh, okay.
10       MR. MANCINO:  -- for a drive-wiping function as
11  part of that copying device?
12       MR. FREITAS:  He said he could look, and you
13  said go ahead.
14       MR. MANCINO:  I said sure.
15       MR. KIRSCH:  Mr. Berg, don't provide your
16  response until your counsel comes back.
17       (Pause in proceedings.)
18  THE WITNESS:  I didn't find a specific recitation of
19  erasing or deleting data, but I do point you to Column
20  10, lines 40 through 45, which say, The foregoing
21  description of preferred embodiments of the present
22  invention provides illustration and description but is
23  not intended to be exhaustive or to limit the invention
24  to the precise form disclosed.  Modifications and
25  variations are possible in light of the above teachings

Page 72

1  or may be acquired from practice of the invention.
2  So certainly, the idea of deleting data is introduced,
3  and certainly the idea of the device having multiple
4  functionalities is included at various points, including
5  what I recite in my Paragraphs 54 to 59.  And of course,
6  the patent is not meant to be limiting to just that, so
7  certainly such a device could include a delete function
8  and be part of the scope of what the '086 patent covers.
9        BY MR. MANCINO:  Q.  When you say "the idea of
10  deleting data is introduced," what do you mean by that?
11   A.  Well, this description about the Logicube
12  device says one of the options is to delete the contents
13  of what will be the destination drive.  The Logicube
14  device description includes certainly the main
15  functionality of making a copy but also describes the
16  fact that this particular device has numerous operating
17  modes and options and only lists one of them as delete,
18  but it certainly introduces the idea of deleting being
19  something that might be desirable in a device that is
20  able to make a copy.
21       Q.  And that --
22   A.  And hence, since the patent describes copying
23  devices and other kinds of options, certainly deleting
24  is one of the lines that could certainly be included.
25       Q.  And that paragraph that you just cited with



Page 73

1 respect to the Logicube device is the same paragraph
2 that says this device requires a trained operator and
3 has enough options to cause confusion or errors on the
4 part of the user?
5     A. Yes.
6     Q. Okay. I have one more question, Mr. Berg.
7 Now, going back to the transparent -- the various
8 transparent, transparency and so forth claim
9 constructions, is it still your opinion that it is a
10 normal operation for a host computer to crash while
11 attempting to boot Windows with a blocking device
12 connected between the host and the storage device?
13     MR. FREITAS: Objection. Vague.
14     THE WITNESS: What are you referring to
15 specifically?
16     BY MR. MANCINO: Q. Well, you mentioned
17 previous opinions in the ITC case, and I'm referring
18 back to an opinion you took in the ITC case that -- and
19 so my question is, is it still your opinion that it is a
20 normal operation for a host computer to crash while
21 attempting to boot windows with a blocking device
22 connected between the host and the storage device?
23     MR. FREITAS: Objection. Vague.
24     THE WITNESS: I'd like to see the document in
25 which I make that statement if  -- to recall the whole

Page 74

1 context.
2     BY MR. MANCINO: Q. Let me ask you this: Is
3 it your opinion that it is a normal operation for a host
4 computer to crash while attempting to boot Windows with
5 a blocking device connected between the host and the
6 storage device?
7     MR. FREITAS: Objection. Vague. Incomplete
8 hypothetical question.
9     THE WITNESS: So you're asking me independent
10 of my written opinion earlier?
11     BY MR. MANCINO: Q. As you sit here today.
12     MR. FREITAS: Same objections.
13     THE WITNESS: Are you asking the question in
14 general in the context of one of the patents? Is it
15 just a general question in the computer world?
16     BY MR. MANCINO: Q. I'm asking you in the
17 context of the '682 patent.
18     MR. FREITAS: Same objections.
19     BY MR. MANCINO: Q. Is it a normal operation
20 for a host computer to crash while attempting to boot
21 Windows with a blocking device connected between the
22 host and the storage device?
23     MR. FREITAS: Pardon me. Same objections.
24     THE WITNESS: Again, I'd want to see the full
25 context of that because, indeed, you are asking me

Page 75

1 within the context of the '682 patent. So I'd like to
2 see my opinion that's set forth as regard to that.
3     BY MR. MANCINO: Q. I'm not asking you with
4 context to the previous case now. I'm just asking you,
5 as you sit here right now, is it your opinion that it is
6 a normal operation for a host computer to crash while
7 attempting to boot Windows with a blocking device
8 connected between the host and the storage device?
9     MR. FREITAS: Same objections.
10     BY MR. MANCINO: Q. In the context of the '682
11 patent.
12     MR. FREITAS: Same objections.
13     THE WITNESS: Well, since, like I say, it's in
14 the context of the '682 patent, I would like to see my
15 opinion as set forth from wherever you're reading this
16 from because that was in the context of issues with
17 regard to claim construction in that other case. So
18 there's enough context for that for me to not be able to
19 answer you without knowing exactly the context of that
20 question.
21     BY MR. MANCINO: Q. I'm asking for your
22 opinion as you sit here right now without context to the
23 ITC case. Only in context of your knowledge of the '682
24 patent, is it a normal operation for a host computer to
25 crash while attempting to boot Windows with a blocking

Page 76

1 device connected between the host and the storage
2 device?
3     MR. FREITAS: Same objections.
4     THE WITNESS: Well, that's an unclear question
5 because I don't know what you're meaning by "normal."
6     BY MR. MANCINO: Q. I mean normal as recited
7 in the claims of the '682 patent.
8     MR. FREITAS: Under whose construction?
9     MR. MANCINO: Under Mr. Berg's constructions.
10     MR. FREITAS: Which one?
11     MR. MANCINO: Every transparency term has the
12 term "normal operation of the host device and storage
13 device," and Mr. Berg provided several pages of opinions
14 on the construction of these terms that include the
15 phrase "normal operation of the host device and the
16 storage device."
17     BY MR. MANCINO: Q. So I'm asking, in the
18 context of the '682 patent and these claim terms, is it
19 a normal operation for a host computer to crash while
20 attempting to boot Windows with a blocking device
21 connected between the host and the storage device?
22     MR. FREITAS: I think what you just said is
23 incorrect, but maybe I didn't hear it right.
24     BY MR. MANCINO: Q. You could answer.
25     MR. FREITAS: Same objections.



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
77–80

Page 77

1    I don't believe there's any construction by
2 anybody of the phrase "normal operation."  At least not
3 in this case.
4         THE WITNESS:  Well, let me try to answer your
5 question this way:  If you'll look at my Paragraph 14 in
6 which -- of my report in which I recite from Column 5,
7 lines 32 to 40, of the patent, the statement is
8 basically an anthropomorphism because what it's doing is
9 it's using the word "appears to be," and it puts it in
10 the context of such as one who would be looking at this
11 device as a person, and it's talking about the operation
12 of the device, and, of course, the device itself is a
13 blocking device.
14         So this is a blocking device that is able to
15 communicate with a host computer and is able to
16 communicate with a storage device.  And since it's a
17 blocking device, it's blocking write operations to that
18 storage device.  And as a result, because a blocking
19 device prevents a storage device from being written, in
20 reference to Figure 2 of the '682 patent which is what
21 this paragraph refers to, in this context, since we have
22 a blocking device that is preventing the disk drive from
23 being written to and since this process of booting
24 Windows involves both read and write operations,
25 necessarily those read operations of

Page 78

1 previously-attempted-to-be-written data will get other
2 than the data that was expected to have been written to
3 the device.  And as a result, the process of Windows
4 booting in that environment, Windows will be getting
5 incorrect data during its read operations.
6         Performing operations as a result that are
7 nonsensical because the data it's getting is not what it
8 should have gotten in a normal context, it is not
9 surprising that Windows crashes because it's not able to
10 communicate with the storage device in the fashion in
11 which it anticipates; that is, the storage device able
12 to be written with the data earlier requested.
13         BY MR. MANCINO:  Q.  So I think you answered in
14 a nutshell that it is your opinion that in the context
15 of the '682 patent and these claim terms, the blocking
16 device is operating transparent to normal operation when
17 the host computer crashes while attempting to boot
18 Windows with a blocking device connected between the
19 host and the storage device; is that right?
20         MR. FREITAS:  Argumentative.  Misstates
21 testimony.  Same prior objections.
22         THE WITNESS:  That was a long question, but let
23 me respond this way:  The use of a write blocker is --
24 as described in the '682 patent, can be used as a tool
25 for forensic analysis of a device, storage device, so

Page 79

1 that there's no danger of it being written to.  That's
2 how the invention is described to work in many places
3 within the patent.
4         And as a result, necessarily since by
5 definition it's a blocking device, it's blocking writes.
6 So were one to attempt to write to the device and then
7 to read back from the same location, the fact that the
8 data that was written, if it doesn't match -- the data
9 that was attempted to be written, if it doesn't match
10 what was read back, that's not surprising because the
11 device wasn't written to.
12         So the operating -- the device operating with
13 all of its original data in response to any read request
14 is what you'd expect from a write blocker because you
15 weren't able to modify it, so it shouldn't give you any
16 of that attempted -- any of the data that was attempted
17 to be written earlier.  That shouldn't come back.  You
18 should get the original data back.
19         BY MR. MANCINO:  Q.  Would the host computer
20 crash with all embodiments of the '682 patent?
21         MR. FREITAS:  Objection.  Incomplete
22 hypothetical question.  Vague.
23         THE WITNESS:  So there's a number of
24 embodiments described that are in the form of figures,
25 as well as not only text supporting the figures but

Page 80

1 other information in the spec.  So there's a lot of
2 different embodiments.  Which are you referring to?
3         BY MR. MANCINO:  Q.  What about the embodiment
4 of Figure 8 that includes the temp drive?
5         MR. FREITAS:  There's no question pending.
6         BY MR. MANCINO:  Q.  If the embodiment of
7 Figure 8 including the temp drive was connected between
8 the host computer and the storage device, and the host
9 computer attempted to boot Windows, with that Figure 8
10 embodiment interposed and assuming the temp drive was
11 big enough, would the host crash in that example?
12         MR. FREITAS:  Objection.  Vague.
13         THE REPORTER:  Do you mind repeating the
14 question, please.
15         MR. FREITAS:  Incomplete hypothetical question.
16         THE WITNESS:  It's hard to say.  It's hard to
17 say.  There's a description for Figure 8 that describes
18 scenarios in which the data that was written after a
19 while will no longer be considered valid on the temp
20 drive.  So I don't know.
21         MR. MANCINO:  Let's go off the record, take a
22 break.
23         THE VIDEOGRAPHER:  One moment.
24         Off the record.  The time is 1:24 p.m.
25              //



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
81–84

Page 81

1    (Luncheon recess taken from 1:24 p.m. to
2  2:41 p.m.)
3           --o0o--
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82

1     A F T E R N O O N   P R O C E E D I N G S :
2
3     THE VIDEOGRAPHER:  On the record.  The time is
4  2:41 p.m.
5     You may continue.
6
7     EXAMINATION BY MR. DUKELOW
8
9   Q.  Mr. Berg, I'm Mr. Dukelow asking questions on
10  behalf of CRU.
11     And I'll ask you to turn to Exhibit 1 which is
12  your declaration in this case.
13   A.  Okay.
14   Q.  And I'll ask you to turn to Paragraph 57.
15   A.  Okay.
16   Q.  And in that paragraph you cite to portions of
17  the '086 patent that you say describe a device that can
18  be reconfigured by a user; is that correct?
19   A.  Yes.
20   Q.  The cited portions of the spec there do not
21  specifically mention a user; is that correct?
22     MR. FREITAS:  Could you read that, please.
23     (Record read.)
24     THE WITNESS:  That's correct.
25     BY MR. DUKELOW:  Q.  The cited portions of the

Page 83

1  spec there describe how a device may be configured and
2  do not specifically mention any reconfiguring; correct?
3     MR. FREITAS:  Objection.  Vague.
4     THE WITNESS:  What I see in these words within
5  Paragraph 57 is a description that includes the word
6  "configured" three times.  You asked me earlier did I
7  see a user mentioned.  I don't see a specific user.
8     I note that the word "configure" can be used in
9  a number of different ways.  And for example, in reading
10  these words and also in reading the words, for example,
11  that follow this paragraph, in Column 10 there's a
12  description of embodiments of the invention, and so I
13  read this -- because it also mentioned software,
14  firmware and hardware, I read this as a description of
15  different ways in which the device can be created so
16  that different options can be considered and different
17  capabilities need to exist in the device in order to
18  support those various options.
19     For example, the copying device may be
20  configured to display a report of the copying process
21  and information about the devices involved.
22     BY MR. DUKELOW:  Q.  Where are you reading from
23  now?
24   A.  To me what that says -- I'm reading from the
25  first sentence of that recitation in Paragraph 57.  So

Page 84

1  that's the sentence that appears on lines 22 to 24 of
2  Column 10.
3     So when I read that, to me that is descriptive
4  of a device that needs to have capabilities within it to
5  support, for example, the displaying -- display of
6  report of the copying process and information about the
7  devices involved.  So there needs to be a capability of
8  that, and then there needs to be potentially a selection
9  of that as an option if it is an option, or maybe it's a
10  standard way of operating.
11     So the word "configured" here needs to be
12  understood that it's not fully clear if that necessarily
13  encompasses both the capability as well as some user
14  invoking that; it certainly can be interpreted both
15  ways, but just so we're clear about the fact that
16  "configuring" itself is a potentially ambiguous term.
17     Now, you asked me about reconfiguring.  So I
18  think there's also -- that's a potentially ambiguous
19  term as well because you might set certain options up in
20  one fashion.  You might change them later.  I'm not sure
21  if you'd call that reconfiguring or not, but it -- so
22  it's an ambiguous term, so it's hard to answer your
23  question.
24   Q.  Could you please turn in Exhibit 1 to Paragraph
25  45.  And in Paragraph 45 this is where you state that

BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
85—88

Page 85

1 the hidden areas that can be created and managed by way
2 of the HPA feature set were well documented and would
3 have been understood by one of ordinary skill in the art
4 at the time that the ATA-4 was finalized in August 1998.
5        And my question is, the ATA-4s of
6 August 1998, that is your Exhibit B to your declaration;
7 is that correct?
8    A.  That's correct.
9    MR. DUKELOW:  All right.  And so I have here
10 what I'll ask to be admitted as Exhibit 8, which is the
11 Exhibit B of your declaration of excerpted portions
12 relevant to the hidden areas.
13        (Exhibit 8 was marked for identification by the
14 court reporter and is attached hereto.)
15    MR. FREITAS:  This is an excerpt of his Exhibit
16 B?
17    MR. DUKELOW:  Yes.
18    MR. FREITAS:  Okay.
19    THE WITNESS:  And how are these excerpts
20 chosen?
21    BY MR. DUKELOW:  Q.  Well, you can take a look
22 at it.  The excerpt was the beginning matter that
23 defines what version of the spec this is, including the
24 Table of Contents for all of the paragraphs, the tables
25 and the figures and the annexes through the forward.

Page 86

1 That's -- up to that point that's all of your Exhibit B.
2    A.  So up through which page again?
3    Q.  The forward which is on page V.
4    A.  So you're saying -- oh, okay.  The first
5 stapled portion is contiguous from the very start of the
6 document.
7    Q.  Yes.
8    A.  Is that what you're saying?
9    Q.  Yes, yes.  Does it appear that way to you?
10    A.  Since some of the pages are not numbered, I'm
11 willing to take you at your word on that.
12    Q.  And then there are two excerpted portions
13 relating to the host-protected area feature.
14    A.  And how did you choose these?
15    Q.  That's -- since that is the topic of your
16 declaration that I want to inquire about, which would be
17 Paragraphs 39 through 52 -- 53 -- excuse me -- where you
18 address hidden area.
19    A.  As well as hidden storage area.
20    Q.  Yes.
21    A.  Okay.  So was there a question or was that just
22 a statement?
23    Q.  Well, I just want you to understand what my
24 Exhibit 8 is here and be comfortable that it's
25 consistent with the description that I'm giving to you.

Page 87

1    A.  Okay.  Give me just a moment, please.
2        Okay.
3    Q.  Okay.  So if you could please take a look at
4 Paragraph 42 of Exhibit 1, your declaration, where you
5 state that the ATA-4 is an interface standard whose
6 final draft was completed on 19 August 1998 (see Exhibit
7 B), and I just want to clarify a term here.
8        The standard in Exhibit B is not a final draft
9 but rather a working draft; correct?
10    A.  It is called that, although the reason I cited
11 that is the fact that it is --
12    Q.  It is the most recent revision of that
13 standard?
14    A.  Well, it is -- best way to put it is the T13
15 committee makes available drafts of documents.  When
16 they reach a certain point, a draft will be accepted as
17 being able to become a final actual spec.  So they'll be
18 working toward, for example -- here they're working
19 toward the ATA-4 specification going through various
20 drafts.  The final draft for ATA-4 was rev 18, so it's a
21 publicly available document, and you can download it for
22 free off the Web.  If you wanted to actually pay for a
23 document that said this is ATA-4, you would need to pay
24 for it.  But it has identical contents to what was
25 finalized as revision 18.

Page 88

1        So that's why I cited these documents.  They're
2 final drafts that became the actual spec, but they're
3 available for free.
4    Q.  So the earlier revisions, revisions 0 through
5 17, a person of ordinary skill in the art would have
6 been equally aware of those as with this revision 18?
7    A.  They should be.
8    Q.  Well, let me ask you, then, to turn to the
9 document status section of the standard.  So that's --
10    A.  I assume that's in the first group?
11    Q.  Yes.
12    A.  Yeah, right.
13    Q.  Now, so in that revision listing, if you look
14 down at revision 5 was done on 28 June 1996.
15        Do you see in there that there was an added
16 proposal for a protected area proposal?
17    A.  Yes.
18    Q.  So a person of ordinary skill as of June 28th,
19 1996, would have been aware of the addition of the
20 protected area to the ATA-4 standard?
21    MR. FREITAS:  Objection.  Vague.
22    THE WITNESS:  This date of 28 June 1996 for
23 revision 5 is indeed -- it's my recollection that was
24 the date that I believe the editor of the document
25 finalized that revision 5.  It was -- it's either the



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
89–92

Page 89

1 date that the editor finalized it, or it was the date
2 that revision 5 was accepted by the committee. I don't
3 recall which. Those probably would have been quite
4 close in time. And then the making public of this
5 document would have occurred at some point after that
6 but probably at some close point.
7     So were one, for example, to be attending these
8 meetings, they would have been fully aware of that and
9 would have had -- needed access. Were one to be
10 watching the progress of these events, at some point
11 later you'd actually get access to revision 5. But
12 they're fairly close in time. Probably days or weeks.
13     BY MR. DUKELOW: Q. And the editor of this
14 document is a person of ordinary skill in this art?
15     A. In which art?
16     Q. The art addressed in this standard.
17     MR. FREITAS: Objection. Vague and calls for
18 speculation.
19     THE WITNESS: Okay. So the art being the ATA-4
20 spec?
21     BY MR. DUKELOW: Q. Yes.
22     A. I would expect that person to be -- to have
23 that role, yes. If I understand that question
24 correctly. Because it's just in the context of this
25 spec.

Page 90

1     Are you saying that does that person understand
2 what the spec means?
3     Q. Well, let me ask you to turn to -- let me ask
4 you to turn to Paragraph 45, please, which we looked at
5 earlier. And there's where you say that the hidden
6 areas that can be created and managed by way of the HPA
7 feature set were well documented and would have been
8 understood by one of ordinary skill in the art at the
9 time that ATA-4 was finalized in August of 1998.
10     Within that context, it's also true that that
11 same person of ordinary skill in the art would have been
12 aware by June 28th, 1996, about the addition of
13 protected area to the ATA-4 spec; correct?
14     A. Are you saying right in the month of
15 August 1998 or within that general time frame?
16     Q. Well, no. I'm actually -- I was referring to
17 June 28, 1996.
18     So in the same terms where you say that a
19 person of -- that a person of ordinary skill would have
20 a certain level of knowledge about the ATA-4 as of
21 August of 1998, that same person of ordinary skill would
22 also be aware as of June 1996 of the addition of the
23 protected area to the ATA-4 spec; correct?
24     MR. FREITAS: Objection. Vague.
25     THE WITNESS: I would say that more accurately

Page 91

1 the final dates of these revisions of documents, for
2 example, ATA-4 in August 1998, that's the kind of date
3 that is better understood by one of ordinary skill.
4 Because there's a group of people who are working on
5 standards and they go through various iterations.
6 There's also another group who implement the firmware in
7 the devices, for example, at the disk manufacturers. So
8 there's various people who are quite intimately familiar
9 with this as the progression goes through the different
10 revisions. But the one that is most respected by the
11 general public or I should say by one of ordinary skill
12 who would be needing to look at these, they're more
13 familiar with the dates or the documents when they think
14 -- the point where they've been finalized.
15     BY MR. DUKELOW: Q. All right. Let me ask you
16 to go back to the front page of the ATA-4, then, that's
17 in your Exhibit B and Deposition Exhibit 8.
18     The paragraph here in the middle of the page
19 says that this is an internal working document of T13, a
20 technical committee of accredited standards committee
21 NCITS. As such, this is not a completed standard and
22 has not been approved. The contents may be modified by
23 the T13 technical committee. This document is made
24 available for review and comment only.
25     Now, that's the spec that's Exhibit B to your

Page 92

1 declaration; correct?
2     A. Correct.
3     Q. Okay. The earlier revisions of this standard
4 had the same statement in it; correct?
5     A. I believe that's likely correct, yes.
6     Q. All right. So as of the time of August
7 of 1998, this revision 18, as far as it being a working
8 draft or -- and a working document, it's in the same
9 category as the earlier revisions; correct?
10     MR. FREITAS: Objection. Vague.
11     THE WITNESS: Well, while it's likely true that
12 every revision as these go through different revisions
13 will have that statement, the reality is that final
14 ones -- and I made that clear what the dates were in --
15 elsewhere in my report for each of the various versions.
16 I made clear that these are the ones that ended up
17 becoming the final spec.
18     So these are the ones that even to this day are
19 available on the T13 site even with this disclaimer on
20 the first page, but on the T13 site they're called that
21 version. For example, this is called the ATA/ATAPI-4
22 document, and it can be used as a reference for that
23 with confidence that the technical information in it is
24 the same as what is in the document that would be -- you
25 would pay for that would say it's the final document.



BRIAN A. BERG                                    February 06, 2014
IN RE MYKEY TECHNOLOGY                                    93—96

Page 93

1     BY MR. DUKELOW:  Q.  All right.  Let me ask you
2  to turn to the second page of the revision -- revision
3  list and look at revision 9 there.
4        You see that revision 9 was dated
5  February 10th, 1997?
6     A.  Yes.
7     Q.  And that added the set max address option;
8  correct?
9     A.  Yes.
10    Q.  And that's how hidden areas -- strike that.
11        The set max address is how one redefines the
12  maximum address of the user-accessible address space; is
13  that correct?
14        THE WITNESS:  Could you read back the question,
15  please.
16    (Record read.)
17        THE WITNESS:  Sorry.  One more time, please.
18    (Record read.)
19  THE WITNESS:  That would probably be a reasonable way to
20  depict it.  I don't think you've used the actual words,
21  for example, in the description here, but that's kind of
22  a general description of its purpose.
23        BY MR. DUKELOW:  Q.  All right.  And so if one
24  uses the set max address command to set a maximum
25  address less than the native maximum address, then that

Page 94

1  creates a protected area above that set maximum address;
2  correct?
3        MR. FREITAS:  Objection.  Vague.
4        THE WITNESS:  Read that back, please.
5    (Record read.)
6        THE WITNESS:  I think that would be a fair way
7  to state it.
8        BY MR. DUKELOW:  Q.  Let me ask you to turn to
9  the next page of the revision list and have a look at
10  revision 14 dated 26 June of 1997.
11        Do you see that revision description?
12    A.  Revision 14?
13    Q.  Yes.
14    A.  Okay.
15    Q.  Dated June 26, 1997.
16    A.  Okay.
17    Q.  And you see that that includes adding a new set
18  max/native max description; is that correct?
19    A.  Those are the words it says, yes.
20    Q.  And so as of June 26, 1997, at least the editor
21  of this standard knew how to use the set max and the
22  native max commands to handle a host-protected area;
23  correct?
24        MR. FREITAS:  Objection.  Vague.
25        THE WITNESS:  Well, really to understand this

Page 95

1  best, each of these entries that you've been pointing
2  out and that we've been discussing reference a document
3  number, which in the typical mode of operation of these
4  committees, a proposal will be put out for performing
5  some functionality, and that will go through some
6  revisions and discussions.  And then once that's agreed
7  upon, then the editor of the master document will add
8  information to the ATA standard document itself based on
9  what was agreed upon.
10        Now, these things, as you can see from all
11  these entries, they're in a state of flux, and these
12  revisions that are listed here are not meant to be
13  considered the one and only things that happened to each
14  spec between revisions.  There's often small changes
15  that happen that end up getting incorporated and getting
16  voted on at committee meetings, so it's a very dynamic
17  process with parameters coming in from different
18  directions.  This is meant to be a summary of the main
19  things that happened.
20        And as I noted earlier, as capabilities are
21  added, people realize that there's errors or
22  incompatibilities, and so there's various things that
23  need to be changed in the spec to allow for that
24  compatibility.  So it's a highly iterative process, and
25  so that's why it's best to use only -- if you're a user,

Page 96

1  it's best to only use the newest revision because
2  presumably all the kinks have been worked out.  But even
3  some things then -- there's problems that do arise.
4        So the people who watch this most closely are
5  manufacturers and of both hardware and software.  And
6  then the people who look most closely at the final
7  revisions are the people in the field, are making use of
8  this.  So there's a lot of different people involved
9  with a lot of different functionalities.  And so I'm --
10  basically I'm saying don't draw too many conclusions
11  from these statements here.  Understand the whole
12  iterative and dynamic process.
13        MR. DUKELOW:  Well, that's an interesting
14  discursion.
15        But could we just read the question back.
16        And just answer the question, please.
17    (Record read.)
18        MR. FREITAS:  Objection.  Calls for
19  speculation.  Same prior objections.
20        THE WITNESS:  It's hard to know what was the
21  rule status of this spec at this point when this was
22  added.
23        BY MR. DUKELOW:  Q.  Were there changes --
24    A.  There's a reasonable --
25    Q.  -- after that revision --



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014

97—100

Page 97

1    A.  There's a reasonable -- excuse me --

2    Q.  -- to the set max and native max address listed

3 in this revision list?

4       MR. FREITAS:  Owen.  Owen, you don't want him

5 to answer?  He'll stop if you don't want him to answer,

6 but you did ask the question.

7       THE WITNESS:  I'm not sure what to do because

8 you prevented me from completing the answer.

9       MR. DUKELOW:  All right.  Let's take a break.

10      THE VIDEOGRAPHER:  One moment.

11      This marks the end of Media No. 2 in the

12 deposition of Brian Berg.  The time is 3:17 p.m.

13      We are off the record.

14      (Recess taken from 3:17 p.m. to 3:23 p.m.)

15      THE VIDEOGRAPHER:  Here begins Media No. 3 in

16 the deposition of Brian Berg.  The time is 3:24 p.m.

17      You may continue.

18      BY MR. DUKELOW:  Q.  As of June 26, 1997, at

19 least the editor of this standard knew of a description

20 of the set max address and the native max address

21 commands for a host-protected area; is that correct?

22      A.  That's likely the case.

23      Q.  And other disk engineers would have read this

24 spec and been aware of the same things as of June 26,

25 1997; is that correct?

Page 98

1       MR. FREITAS:  Objection.  Calls for

2 speculation.  Vague.

3       THE WITNESS:  When you say "disk engineers,"

4 what do you mean?

5       BY MR. DUKELOW:  Q.  Electrical engineers

6 familiar with disk drives.

7    A.  Well, I would think that the -- a good number

8 of the people who are on the standards committee would

9 have been paying attention to this and would have been

10 aware of it.

11      There's a wide variety of people who are part

12 of the standards committee who some people work on

13 software, some people work on hardware.  There's a

14 mixture of things of the backgrounds.  And as a result,

15 certainly some of them on the committee would be aware

16 of the changes that had come to the standard as a result

17 of this line about adding the new set max/native max

18 description.

19      Q.  After that entry in the revision list, are

20 there any other listed revisions that affect the set max

21 address or the native max address commands?

22      A.  There could very well be.  It's hard to know

23 because when you add new commands to a document, a

24 standard like this, there's often ramifications.

25 Sometimes small things; sometimes major things.  Not

Page 99

1 necessarily documented in this list because this is

2 pretty much kind of an abbreviated list of the most

3 important things.  So it's hard to say.  There's a

4 reasonable chance that other changes may have been going

5 on.  It's a highly dynamic process, and it's impossible

6 to know just from looking at this.

7    Q.  Are you aware of any changes between June 26,

8 1997, and August 19th, 1998, to the set max address and

9 native max address commands in this standard?

10   A.  I don't happen to know of any.

11   Q.  When you were testifying this morning, you said

12 that you had connected a duplicator to a source drive

13 and a destination drive and a computer.

14      Is that a correct representation of what you

15 testified to this morning?

16   A.  I believe that's correct.

17   Q.  And what operations have you done with

18 components connected in that arrangement?

19      MR. FREITAS:  Objection.  Vague.

20      THE WITNESS:  I've done disk duplication.  I've

21 done disk erasing.  I've created protected areas.  I've

22 removed protected areas.  There's probably other

23 operations too.  Those are the ones that come to mind

24 initially at least.

25      BY MR. DUKELOW:  Q.  You've mentioned a

Page 100

1 manufacturer or one manufacturer for these duplicators

2 this morning.

3 Was there just one manufacturer of these duplicators?

4    A.  Well, I've certainly used other products that

5 have been at issue in the ITC case, for example.  So I

6 wasn't really thinking of those initially when I was

7 answering earlier but certainly have used those

8 products.  I've used other products independent of this

9 case for other cases and for my personal use and for my

10 professional use.

11   Q.  Who were those products manufactured by?  Not

12 the ones -- not including the ones at issue in the ITC.

13   A.  I believe I mentioned a three-letter name.  It

14 might have been IDC.  I don't recall.  I remember -- I'm

15 pretty sure it's like three letters.  And that's one

16 that I own about four different copies of.  And then

17 I've got another product of my own.  I don't recall the

18 manufacturer of it, but it allows disk duplication and

19 erasing.  And when you're doing the duplication, you're

20 not writing to the source drive; only to a destination

21 drive.

22   Q.  I would guess that if the manufacturer of that

23 product was a defendant in the present case, then you

24 would know what that manufacturer was?

25   A.  That's correct.



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
101–104

Page 101

1    Q.  So it was not made by a defendant in the
2  present case?
3    A.  Correct.
4    Q.  So other than your disk duplication, disk
5  erasing, creating protected areas and removing protected
6  areas, you have no other recollection of any other uses
7  of a duplicator in the context of a source drive and a
8  destination drive and a computer connected to the
9  duplicator; is that correct?
10    A.  Well, that wasn't meant to be a fully
11  exhaustive list of all the operations I've performed.
12  That is the primary operations.  There could have been
13  some other ones that were involved as well, but those
14  are the primary operations that I recall at least.
15        MR. DUKELOW:  No further questions.
16        MR. FREITAS:  Okay.
17        MR. DUKELOW:  Bob, you may examine.
18        MR. FREITAS:  No, thank you.
19        THE VIDEOGRAPHER:  Is this the end of the depo?
20        One moment.
21        This concludes the deposition of Brian Berg.
22  The time is 3:31 p.m.  We are now off the record.
23        THE REPORTER:  Bob, do you want a copy?
24  Mr. Freitas, would you like a copy?
25        MR. FREITAS:  Yes, please.

Page 102

1        THE REPORTER:  How about you, David?  Would you
2  like a copy?
3        MR. MANCINO:  Yes, please.
4
5        (The video deposition concluded at 3:31 p.m.)
6        --oOo--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 103

1                REPORTER'S CERTIFICATION
2        I, the undersigned, a Certified Shorthand
3  Reporter of the State of California, do hereby certify:
4        That the foregoing proceedings were taken
5  before me at the time and place herein set forth; that
6  any witnesses in the foregoing proceedings, prior to
7  testifying, were administered an oath; that a record of
8  the proceedings was made by me using machine shorthand
9  which was thereafter transcribed under my direction;
10  that the foregoing transcript is a true record of the
11  testimony given.
12        Further, that if the foregoing pertains to the
13  original transcript of a deposition in a Federal Case,
14  before completion of the proceedings, review of the
15  transcript [ ] was [ ] was not requested.
16        I further certify I am neither financially
17  interested in the action nor a relative or employee of
18  any attorney or any party to this action.
19        IN WITNESS WHEREOF, I have on February 10, 2014
20  subscribed my name.
21
22
23
24  _____
25        Susan F. Magee, RPR, CCRR, CLR
        CSR No. 11661

Page 104

1                DEPOSITION ERRATA SHEET
2  Our Assignment No. 84241
   Case Caption:  In Re: MyKey Technology, Inc. Patent
3  Litigation
4        DECLARATION UNDER PENALTY OF PERJURY
5
6        I declare under penalty of perjury that I have
7  read the entire transcript of my deposition taken in the
8  captioned matter or the same has been read to me, and
9  the same is true and accurate, save and except for
10  changes and/or corrections, if any, as indicated by me
11  on the DEPOSITION ERRATA SHEET hereof, with the
12  understanding that I offer these changes as if still
13  under oath.
14        Signed on the _____ day of _____,
15  2014.
16
17
18
19        _____
20                BRIAN A. BERG
21
22
23
24
25



BRIAN A. BERG
IN RE MYKEY TECHNOLOGY

February 06, 2014
105–106

Page 105

```
 1            DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
                  _____
 3
     Reason for change:_____
 4
     Page No._____Line No._____Change to:_____
 5   _____
 6   Reason for change:_____
 7   Page No._____Line No._____Change to:_____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   Reason for change:_____
13   Page No._____Line No._____Change to:_____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   Reason for change:_____
19   Page No._____Line No._____Change to:_____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   Reason for change:_____
23   Page No._____Line No._____Change to:_____
24   Reason for change:_____
25   SIGNATURE:_____DATE:_____
                  BRIAN A. BERG
```

Page 106

```
 1          DEPOSITION ERRATA SHEET (continued)
 2   Page No._____Line No._____Change to:_____
 3   Reason for change:_____
 4   Page No._____Line No._____Change to:_____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   Reason for change:_____
10   Page No._____Line No._____Change to:_____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   Reason for change:_____
16   Page No._____Line No._____Change to:_____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23   Reason for change:_____
24
25   SIGNATURE:_____DATE:_____
                  BRIAN A. BERG
```

