# EXHIBIT I

Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 2 of 60   Page ID #:1482

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        1—4

**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5  IN RE: MYKEY TECHNOLOGY,
    INC. PATENT LITIGATION
 6
    MyKey Technology, Inc.
 7
             vs.               2:13-ml-02461-GAF
 8  (PLAx)
                               MDL No. 2461
 9  Intelligent Computer
    Solutions, Inc.        This Document Relates to:
10                         ALL CASES
    ~~~~~~~~~~~~~~~~~~~~~~~~~
11

12          VIDEO DEPOSITION OF

13          THOMAS A. GAFFORD

14

15          February 7, 2014

16              9:42 a.m.

17

18      100 Marine Parkway, Suite 200

19        Redwood Shores, CA 94065

20

21

22

23

24

25    Susan F. Magee, RPR, CCRR, CLR, CSR No. 11661
```

**Page 2**

```
 1  APPEARANCES:

 2      For the Plaintiff:

 3          FREITAS, TSENG & KAUFMAN LLP

 4          ROBERT E. FREITAS, ESQ.

 5          QUDUS B. OLANIRAN, ESQ.

 6          100 Marine Parkway

 7          Suite 200

 8          Redwood Shores, CA 94065

 9          (650) 730-5527

10          rfreitas@ftklaw.com

11          qolaniran@ftklaw.com

12

13      For Guidance Software:

14          BAKER HOSTETLER

15          DAVID A. MANCINO, ESQ.

16          KEVIN W. KIRSCH, ESQ.

17          312 Walnut Street

18          Suite 3200

19          Cincinnati, OH 45202-4074

20          (513) 929-3495

21          dmancino@bakerlaw.com

22          kkirsch@bakerlaw.com

23              //

24

25
```

**Page 3**

```
 1  APPEARANCES (continued):

 2      For CRU:

 3          KOLISCH HARTWELL APC

 4          OWEN W. DUKELOW, ESQ.

 5          DAVID P. COOPER, ESQ.

 6          DESMOND KIDNEY, ESQ. (Appearing

 7          telephonically)

 8          200 Pacific Building

 9          520 S.W. Yamhill Street

10          Portland, OR 97204-1324

11          (503) 224-6655

12          dukelow@khpatent.com

13          cooper@khpatent.com

14

15      The Videographer:

16          ZACH WOJCIK

17              --oOo--

18

19

20

21

22

23

24

25
```

**Page 4**

```
 1              INDEX OF EXAMINATION

 2  WITNESS: Thomas A. Gafford, Volume 1

 3  EXAMINATION                              PAGE

 4  BY MR. FREITAS                             8

 5  BY MR. KIRSCH                            206

 6  FURTHER EXAMINATION BY MR. FREITAS       211

 7              --oOo--

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014

5–8

Page 5

INDEX OF EXHIBITS

EXHIBITS                                          MARKED

Exhibit 9    1/17/14 Expert Report of Thomas          8
             A. Gafford Regarding
             Construction of Claim Terms (33
             pages)

Exhibit 10   US Patent 6,336,187,                    19
             MTI0000439-MTI0000453

Exhibit 11   Joint Claim Construction and            49
             Prehearing Statement (7 pages)

Exhibit 12   11/18/11 Expert Report of              103
             Thomas A. Gafford Regarding
             Construction of Claim Terms (44
             pages)

Exhibit 13   Information Disclosure                  119
             Statement Transmittal Letter,
             MTI0000565-MTI0000596

                    --oOo--

Page 6

PREVIOUSLY MARKED EXHIBITS REFERENCED

     EXHIBIT                        PAGE

Exhibit 3                            31

Exhibit 4                           141

Exhibit 6                           187

                    --oOo--

---

Page 7

1      REDWOOD CITY, CALIFORNIA
2      Friday, February 7, 2014, 9:42 a.m.:
3
4      THE VIDEOGRAPHER:  This is Tape No. 1 to the
5  videotaped deposition of Thomas Gafford in the matter
6  of In Re: MyKey Technology, Inc. Patent Litigation
7  being heard before the United States District Court
8  for the Central District of California, Case
9  No. 2:13-ml-02461-GAF.
10     This deposition is being held at
11  100 Marine Parkway in Redwood City, California 94065
12  on February 7th, 2014 at approximately 9:42 a.m.
13     My name is Zach Wojcik, and I'm the
14  videographer.  The court reporter today is
15  Susan Magee.
16     At this time, Counsel, would you please
17  introduce yourselves, and the witness will be sworn
18  in.
19     MR. KIRSCH:  I'm Kevin Kirsch, and I'm here
20  with David Mancino on behalf of Baker -- or with
21  BakerHostetler on behalf of the Guidance entities.
22     MR. DUKELOW:  Owen Dukelow representing CRU
23  along with my colleagues David Cooper and Des Kidney
24  on the phone.
25     MR. FREITAS:  I'm Bob Freitas.  I represent

---

Page 8

1  the plaintiff.
2      MR. OLANIRAN:  Qudus Olaniran for MyKey
3  Technology, Inc., plaintiff.
4
5           THOMAS A. GAFFORD,
6  having been first duly sworn, testifies as follows:
7
8       EXAMINATION BY MR. FREITAS
9
10     Q.  Good morning, Mr. Gafford.
11     A.  Good morning, Mr. Freitas.
12     Q.  How are you doing?
13     A.  I'm well.
14     Q.  Good.  Since last we met how many
15  depositions have you given?
16     A.  It would be easier to look at my CV and tell
17  you that.
18     MR. FREITAS:  Okay.  Let's have marked as
19  Exhibit 9 a copy of a document entitled Exhibit
20  Report of Thomas A. Gafford regarding construction of
21  claim terms in re: MyKey Technology, Inc. Patent
22  Litigation January 17th, 2014.
23     (Exhibit 9 was marked for identification by
24  the court reporter and is attached hereto.)
25     THE WITNESS:  And if you'd remind me, this



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 4 of 60   Page ID #:1484

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        9–12

Page 9

1  is -- okay.  This is a CV.  And I don't recall when I
2  saw you last besides yesterday.  What time would you
3  like -- what date would you like as a starting point?
4        BY MR. FREITAS:  Q.  Why don't we -- why
5  don't we just look at all of 2012 and all of 2013 and
6  the part of 2014 that's gone by so far.
7     A.  Actually, that would easily -- most easily
8  be answered from my 26(a)(2) list.
9     Q.  Okay.
10    A.  Is that in here as well?
11    Q.  I hope so.
12    A.  Yeah, okay.  It is in back; right.  So all
13  of 2012.  In April of 2012 I was deposed in a matter
14  called eBay, et al. v. Kelora.  Above that is an
15  entry for both hearing and deposition in the ITC
16  MyKey vs. Guidance, et al. matter, which I think is
17  the last time I saw you.
18    Q.  Mm-hmm.
19    A.  And then deposition and trial sometime that
20  year, ending in a trial in December of 2012 in a
21  matter called Patent Harbor v. Funai.
22        Then in January of 2013, deposed on behalf
23  of Walker Digital in Walker Digital v. Google, et al.
24  In October of 2013, a trial with earlier in the year
25  a deposition in a matter styled as HTC vs. TPL, et

Page 10

1  al.  And last December on behalf of Honeywell in a
2  matter styled Honeywell v. ICM.
3     Q.  All right.  And all in all, how many times
4  have you given a deposition?
5     A.  I counted that recently.  Fifty times give
6  or take.  I did a first count, and I realized that I
7  had some -- I came up with 41 and I did some more
8  counting.  It's in the neighborhood of 50 times since
9  19 -- since late 1985.
10    Q.  Do you have any questions about the
11  deposition process?
12    A.  No.
13    Q.  So let's go forward.  Mr. Gafford, can you
14  tell me, please, about your personal experience
15  working with forensic devices.
16    A.  My personal experience with devices made for
17  forensic analysis of storage media is limited to --
18  that is to say manufactured devices is limited to --
19  let me see where the date is here.  The ITC hearing
20  period give or take a couple of weeks in July
21  of 2012.
22    Q.  And what do you mean by that?  The ITC
23  hearing period?  I'm not sure what you mean by that.
24    A.  When I was in Washington in advance of my
25  appearance in the hearing, I became familiar with the

Page 11

1  manner -- the operation of several of the accused
2  forensic devices, both bridges and erasers and
3  duplicators.
4     Q.  So you mean when we were in Washington, D.C.
5  for the International Trade Commission hearing in the
6  MyKey matter?
7     A.  That's right.
8     Q.  So during the time you were in Washington
9  and a little bit of time around that?
10    A.  Before it essentially by a week or two or
11  three.
12    Q.  All right.  That's the only time you've ever
13  worked with any forensic devices?
14    A.  Devices as such manufactured for forensic
15  purposes, yes.
16    Q.  Have you worked with other types of devices
17  that provide comparable functionality?
18    A.  Well, "comparable" is pretty broad.  I've
19  worked with PCs with forensic software installed.
20    Q.  Anything else?
21    A.  No.  That would be it.
22    Q.  When did you prepare -- or let me rephrase
23  that.
24        Did you prepare Exhibit 9?
25    A.  I did.

Page 12

1     Q.  And when did you do that?
2     A.  In a meeting in Los Angeles a week or so
3  before it was filed.  Early January.
4     Q.  A meeting with whom?
5     A.  With various counsel in this matter.
6     Q.  Which ones?
7     A.  I don't recall exactly.
8     Q.  How many?
9     A.  Let's see.  Scott -- well, let me just give
10  you their names, and you can do the counting.
11  Scott Stanley from Baker was there, David was there.
12    Q.  Mancino?
13    A.  No, no.
14    Q.  Cooper?
15    A.  Sorry.  David Cooper was there.  I'm trying
16  to remember now if Owen was there or on the phone.  I
17  think Owen may have been there as well, but I'm not
18  certain about that.  A fellow named Gonen Ravid, who
19  I believe is actually with one of the defendants, not
20  their law firm.
21        I believe her name was Jessica was on the
22  phone.  Or was she there?  I lose track of who was
23  there and who was on the phone.  There were several
24  people on the phone.  Brian Martinez?  Is that his
25  correct first name for -- Mr. Martinez of Arnold &



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 5 of 60   Page ID #:1485

THOMAS A. GAFFORD                                           February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                              13–16

Page 13

1  Porter was there as the host.  I can't think of
2  anyone else right now.
3      Q.  Okay.  And the Exhibit 9, the expert report
4  was prepared from start to finish in that meeting; is
5  that right?
6      A.  That except for some of the material is
7  copied from background that I've used in other
8  reports.
9      Q.  So you composed your report while sitting in
10 the room talking with the lawyers for the defendants?
11     A.  Yes.
12     Q.  Does Exhibit 9 contain all of the claim
13 construction opinions that you have formed in
14 connection with the MDL proceeding involving MyKey,
15 that is, the district court work as opposed to the
16 ITC work, if there's a difference?  So two
17 limitations in that question.  District court and
18 claim construction.
19     MR. KIRSCH:  Objection.  Vague.
20     THE WITNESS:  It can -- I'll give you an
21 answer.  We can go from there if you need to.  It
22 contains everything that I thought was appropriate
23 and responsive to the claim construction hearing
24 that's coming up.  I believe that the background of
25 this is a set of terms that the parties have put

Page 14

1  forward for construction.  I think that's the case.
2  Actually, I don't remember if that's it.  But it's
3  certainly everything that I've -- every opinion I've
4  developed for this particular process.
5      BY MR. FREITAS:  Q.  Every opinion for the
6  claim construction disputes that will be presented to
7  Judge Feess.
8      A.  That's right.  I'm -- as of this date --
9  now, I heard Mr. Berg talk yesterday.  He said some
10 things that I have to think about a little bit more,
11 but certainly as of this date and from what I
12 believe -- my understanding of this process is this
13 is my last word on this matter for the claim
14 construction hearing.  There will be no expert
15 testimony, so it's everything that I --
16     MR. KIRSCH:  So just for the record, when
17 you said "as of this date" you were pointing to a
18 document.
19     THE WITNESS:  January 17th, 2014.
20     BY MR. FREITAS:  Q.  Have you formed any
21 different opinions since January 17th, today being
22 February 7th?
23     A.  None different from what is disclosed in
24 here.  As to additional, I'm sure I have.  I'm not
25 sure I can tell you what they are.

Page 15

1      Q.  That was going to be my next question.  Can
2  you tell me about any additional opinions you've
3  formed since January 17th?
4      A.  No.
5      Q.  All right.
6      A.  Most of them would have to do with reacting
7  to some things Mr. Berg said, and I haven't had a
8  chance to digest.
9      Q.  So nothing comes to mind?
10     A.  No.
11     Q.  Okay.  Does Exhibit 9 contain a complete
12 statement of the basis and the reasons for the
13 opinions you've formed?
14     A.  Complete.  I believe it's sufficient.
15 There's always more things I can say.  If you ask
16 questions today about one of these points, as I'm
17 sure you will, it's entirely possible I'll say
18 something that isn't written down, but I believe what
19 I've written here is sufficient to support and to
20 supply foundation and basis for what I've said in
21 here.
22     Q.  Can you tell me whether it's a complete
23 statement?
24     MR. KIRSCH:  Objection.  Asked and answered.
25     THE WITNESS:  I can't give you a better --

Page 16

1      MR. KIRSCH:  Vague.
2      THE WITNESS:  I can't give you a better
3  answer than that.
4      BY MR. FREITAS:  Q.  Does Exhibit 9 have all
5  of the facts or data that you've considered in
6  forming the opinions at which you've arrived?
7      MR. KIRSCH:  Objection.  Vague.
8      THE WITNESS:  Everything -- it contains
9  everything that I've considered that I think is
10 pertinent to supporting the opinions I've given here.
11 It certainly doesn't contain every document that I've
12 read in this matter, but it's certainly all the ones
13 that I think are pertinent to supporting these
14 opinions.
15     BY MR. FREITAS:  Q.  You attempted to record
16 everything that you thought was pertinent to
17 supporting your opinions; correct?
18     A.  Yes.
19     Q.  You presented some opinions on claim
20 construction during the International Trade
21 Commission proceeding; correct?
22     A.  Yes.
23     Q.  Have you changed any of the opinions you
24 previously expressed?  I'm limiting this throughout
25 this deposition to claim construction.  So if I don't



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 6 of 60   Page ID #:1486

THOMAS A. GAFFORD                                          February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    17–20

Page 17

1 say that, that is what I mean unless I say otherwise.

2          MR. KIRSCH: Objection. Vague.

3          THE WITNESS: Yes, as I'm sure you've

4 noticed.

5          BY MR. FREITAS: Q. And which opinions have

6 you changed?

7    A. I couldn't tell you. I couldn't give you a

8 catalog. We'll have to go over this.

9    Q. Are there any that come to mind?

10    A. No.

11    Q. But you're conscious that you did change

12 some opinions?

13    A. Yes.

14    Q. This may be an unfair question given that

15 you can't remember any specifics, but I'll ask

16 anyway. Can you tell me why you changed any of the

17 opinions that you changed?

18          MR. KIRSCH: Objection on the basis of

19 attorney-client communications.

20          To the extent you can answer the question

21 without divulging attorney-client communications, you

22 can answer the question.

23          Also object to the question on the basis of

24 vague and ambiguous.

25          MR. FREITAS: Attorney-client? Why are you

Page 18

1 claiming attorney-client?

2          MR. KIRSCH: I have made my objection.

3          MR. FREITAS: Well --

4          THE WITNESS: In general I made changes to

5 make the opinions more precise.

6          BY MR. FREITAS: Q. What do you mean by

7 "more precise"?

8    A. Just that. We'll have to look at specifics

9 for . . .

10    Q. Were there any opinions you felt were

11 incorrect?

12    A. No.

13    Q. Are any of the lawyers representing the

14 defendants your lawyer?

15    A. I don't know --

16          MR. KIRSCH: Objection. Calls for legal

17 conclusion.

18          THE WITNESS: Yeah. I don't know how that

19 works. If I feel like I need counsel, I have

20 somebody I can call. There are times -- it's been my

21 experience in working as an expert there are times

22 when party's counsel will act as counsel for me. I

23 have no idea if that has happened or would happen in

24 this matter. I've certainly not retained anyone.

25          BY MR. FREITAS: Q. So did you hold back

Page 19

1 something in your answer on the basis of Mr. Kirsch's

2 attorney-client privilege objection?

3          MR. KIRSCH: You can answer "yes" or "no."

4          THE WITNESS: No.

5          BY MR. FREITAS: Q. Okay. Okay,

6 Mr. Gafford. You've said you've changed some

7 opinions.

8          Have you formed any additional opinions;

9 that is, opinions you didn't present in the

10 International Trade Commission proceeding?

11          MR. KIRSCH: Object as to form.

12          THE WITNESS: I think there's some of those.

13          BY MR. FREITAS: Q. Do any come to mind?

14    A. No.

15    Q. Are you certain that you did form some

16 additional opinions?

17          MR. KIRSCH: Same objection.

18          THE WITNESS: No. I believe that I did, but

19 as to certainty, no, I would -- that would require

20 looking at the reports side by side so that I can

21 answer your question, and I haven't done that.

22          MR. FREITAS: Let's have marked as

23 Exhibit 10 a copy of U.S. Patent 6,336,187 to Kern,

24 et al.

25          (Exhibit 10 was marked for identification by

Page 20

1 the court reporter and is attached hereto.)

2          BY MR. FREITAS: Q. Mr. Gafford, do you

3 recognize Exhibit 10?

4    A. I do.

5    Q. You've read the Kern patent before?

6    A. Yes.

7    Q. When was the first time you looked at it?

8    A. Sometime in advance of the ITC hearing.

9    Q. You weren't familiar with the patent before

10 then, but in connection with the ITC proceeding, you

11 did become familiar with the Kern patent?

12          MR. KIRSCH: Object as to form.

13          BY MR. FREITAS: Q. True?

14          MR. KIRSCH: Same objection.

15          THE WITNESS: Well, I was familiar with the

16 subject matter, the field in which its invention

17 lies, but the particular patent '187, no.

18          BY MR. FREITAS: Q. Okay. And have you

19 taken further -- have you taken -- withdraw that.

20          In connection with the district court

21 proceeding, have you again reviewed the Kern patent?

22          MR. KIRSCH: Object as to form.

23          THE WITNESS: You know, I looked at it again

24 at least once in advance of preparing this report.

25          BY MR. FREITAS: Q. All right. Can you



THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL              21-24

1 tell me, Mr. Gafford, whether there's any mention of
2 drivers in the Kern patent?
3      A.  Not without reading it.
4      Q.  Could do you that, please.
5      A.  You bet.
6          The term "driver" is not found in Kern;
7 however, the kinds of system change that is described
8 with respect to the Figure 7 flowchart and described
9 in, I believe it's Column 7 are the sorts of changes
10 that you would expect a -- I'm sorry, Column 9 is a
11 better place, the sorts of changes -- Column 10.
12 Here we go.  The sorts of changes you would expect to
13 be performed at the driver level.
14     Q.  Can you show me specifically what you're
15 referring to, please.
16     A.  Mm-hmm.  It's Figure 7, description begins
17 in Column 10 at line 37 --
18     Q.  Okay.  So is it -- okay.
19     A.  -- of the Kern patent.
20     Q.  Mm-hmm.
21     A.  And the -- as the applicants looking at the
22 bottom of page 6 in my report, 14.5.3.1, the
23 applicants told the patent office that reconfiguring
24 the interface in Step 706 amounted to something that
25 their invention doesn't require; therefore, Kern does

1 not speak to their invention.
2          That 706 step is described starting at line
3 57 in Column 10, and they give an example at line 63
4 of Column 10.  In one example the host interface may
5 already be configured to receive storage access
6 requests, and Step 706 involves reconfiguring the
7 host interface to accept submittal of input access
8 keys, which is what the '187 patent is largely about.
9          So you're -- if you have an -- the
10 interface, as they mention here, are interfaces such
11 as SCON, which is a mainframe sort of interface and
12 SCSI, which is used in a wide variety of machines.
13 And I happen to know a lot about SCSI, but using
14 SCSI -- S-C-S-I, capital letters, as an example,
15 they're saying that you may even need to change the
16 SCSI protocol to permit submission of an access key
17 in accordance with the invention of the '187, and
18 that kind of change would not only require a change
19 to the protocol, it would require a change to the
20 driver to know how to make use of that protocol to
21 submit this new type of information that wasn't
22 previously part of SCON or SCSI operations.
23         So you're changing a driver in order to --
24 the applicants are pointing out, and I agree that in
25 Kern you're changing the driver -- you're changing a

1 driver-level piece of structure -- well, they don't
2 say "driver," but I'm characterizing it as driver in
3 response to your question.
4          They're characterizing changing something
5 that would be done, in my opinion, at the driver
6 level at least in this system in order to permit Kern
7 access keys to be used.
8      Q.  Okay.  The discussion that you're referring
9 to begins in the last paragraph in Column 10 of Kern,
10 line 57; is that right?
11     A.  Yes.
12     Q.  And where does it end?
13     A.  I would say that it goes -- let's see.  It
14 goes at least to line 6.  Yeah.  The rest of this has
15 to do with bypass, which is a different animal.  It
16 goes up to Column 11, line 6.
17     Q.  All right.  The first line to which you've
18 directed our attention begins after Step 704, the new
19 host's application program reconfigures its interface
20 with the controller in Step 76 [sic]?
21         Do you see that?
22     A.  Yes.
23     Q.  You agree, don't you, that --
24     MR. KIRSCH:  You said 76 as opposed --
25     MR. FREITAS:  70 --

1      THE WITNESS:  706.
2      BY MR. FREITAS:  Q.  706 is what I meant to
3 say --
4      A.  Right.
5      Q.  -- right, Mr. Gafford?
6      A.  Yes.
7      Q.  Step 706 involves an application program;
8 correct?
9      A.  It involves -- involves is a big term.  It
10 starts with the application program reconfiguring its
11 interface, but in order to do the things that are
12 described in here the application program is going to
13 have to mess around with the driver, and they're
14 going so far as to say they're going to have to
15 change the SCSI protocol.  That's way below
16 application level.
17     Q.  So the first two lines refer to an
18 application program reconfiguring its interface;
19 right?
20     A.  Yes.  It's the driving force that gets this
21 whole step started.
22     Q.  So there's more than a driver involved
23 there?
24     A.  There is an application program that is
25 going to make changes to layers below it to



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014

25—28

Page 25

1 accomplish this function, and they described the
2 changes in the rest of this text.
3     Q. In Figure 1, please, in the Kern patent.
4        Do you see the Host Application Programs
5 110, 111, 112?
6     A. Yes.
7     Q. Those are also application programs?
8     A. Yes.
9     Q. Those aren't drivers?
10    A. Those particular elements 110, 111 and 112
11 are not drivers.
12    Q. Okay. Back to Column 10, please. The next
13 sentence at the bottom of Column 10 says, The new
14 host's interface (not shown) may comprise an SCON
15 interface, small computer standard interface (SCSI)
16 parallel or serial port, telephone modem or any other
17 digital data communication medium compatible with the
18 particular embodiment of controller used in a system
19 100.
20       You see that?
21    A. Yes.
22    Q. That is a reference, isn't it, to the
23 application program referenced in the prior sentence?
24       MR. KIRSCH: Object as to form.
25       THE WITNESS: Not quite. It's a reference

Page 26

1 to the interface with which the application program
2 must deal, which would include the actual hardware of
3 the controller and the driver for that hardware.
4 Application programs don't talk to the hardware.
5       BY MR. FREITAS: Q. What do you mean when
6 you say the application program doesn't talk to the
7 hardware?
8     A. I mean, that's how systems work for many
9 dozens of years now is that you -- your application
10 program doesn't work down in the bare iron. There
11 are layers of software in an operating system. An
12 application program is at one layer. It uses a
13 driver to talk to hardware.
14       An application -- hardware is ultimately
15 turning bits on and off in a device, and the
16 application program doesn't turn bits on and off in a
17 device. It gives a package of information to a
18 driver and asks it to turn the bits on and off in the
19 device and make things happen.
20    Q. Just so we're clear, when you said "SCSI,"
21 that was the way SCSI is pronounced; right?
22    A. Yes.
23    Q. In the final sentence in the passage to
24 which you've directed our attention, the final
25 sentence rather it says, In the case of a SCSI

Page 27

1 interface, the SCSI protocol is modified in Step 706
2 to accept the input access parameter.
3       Now, what does that mean?
4     A. That is a huge sentence. Because an
5 application would never talk at the level of SCSI
6 protocol, an application does things like read
7 something at this block location or, as they're
8 describing here, the new thing an application wants
9 to do is send a key to the storage system, which is
10 the guts of their invention. They're adding this
11 security access scheme.
12       What's happening here is you're not only
13 changing the -- you've not only got an application
14 now that is -- that wants to pass a key. It's having
15 to reconfigure the driver to accept the key. And
16 more than that, it's reconfiguring the driver to use
17 an -- what is apparently they're describing here as
18 an enhancement to the SCSI protocol to pass a key
19 through that protocol down to the hardware. So that
20 sentence is actually describing a change to at least
21 three layers of this conversation.
22    Q. And that's being accomplished by the
23 application program?
24    A. Not accomplished. It's being requested.
25 It's being accomplished by the other two layers.

Page 28

1     Q. The -- you've been referring to layers, and
2 are you placing a driver on a layer as you're using
3 the term layer?
4     A. Yes.
5     Q. And it's a layer below the application
6 program, isn't it?
7     A. Yes.
8     Q. The application program is distinct from the
9 driver; correct?
10    A. It better be.
11    Q. So when there's a reference in Figure 1 in
12 Kern to the Host Application Programs 110, 111 and
13 112, that's not a reference to a driver; right?
14    A. The reference in the drawing is not a
15 reference to these application programs, is not a
16 reference to the driver; that's correct.
17    Q. Mr. Gafford, which of the accused products
18 in this case have you inspected?
19    A. I don't recall.
20    Q. Have you inspected any?
21    A. Yes.
22    Q. How many?
23    A. At least one.
24    Q. Do you remember a specific product you've
25 inspected?



THOMAS A. GAFFORD                                          February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                              29–32

Page 29

1    A. Not its name.
2    Q. Who made it?
3    A. Guidance.
4    Q. When did you inspect that product?
5    A. Sometime in advance of the hearing in 2012.
6    Q. Advance of -- in advance of the ITC hearing?
7    A. Yes.
8    Q. Can you remember inspecting any of the other
9  accused products?
10    A. Well, at that point I think only Guidance --
11  correct me if I'm wrong, but I think only Guidance
12  and CRU were in the case. And I'm trying to
13  remember. I may have had a CRU blocker at that
14  point. I'm not certain.
15    Q. In connection with the district court
16  proceedings, have you inspected any of the accused
17  products?
18    A. No.
19    Q. Have you had the opportunity to discuss the
20  accused products with the lawyers for the defendants?
21    MR. KIRSCH: You can answer "yes" or "no."
22    THE WITNESS: No.
23    MR. KIRSCH: Bob, just so the record is
24  clear on that last question, your question was pretty
25  vague. You actually asked him whether he had the

Page 30

1  opportunity to. What I think you meant to ask him
2  was whether he had, in fact, actually discussed it.
3    MR. FREITAS: I meant to ask what I asked,
4  and he said "no."
5    MR. KIRSCH: Well, anybody has the
6  opportunity to do anything over a period of time,
7  so --
8    MR. FREITAS: Your objection is a little
9  late.
10    MR. KIRSCH: Oh, thank you.
11    Mr. Gafford, did you mean to answer the
12  question as to whether you actually have had a
13  conversation with any of the attorneys about that
14  issue?
15    THE WITNESS: As I think about it now, when
16  you asked the question, I was focusing on Guidance
17  and CRU, but of course there are additional parties
18  accused.
19    So actually thinking about -- thinking back
20  to the meeting in Los Angeles when I was writing this
21  report, the answer would be yes.
22    BY MR. FREITAS: Q. So you did discuss the
23  accused products with the lawyers for the defendants
24  when you met with them to prepare your claim
25  construction report; correct?

Page 31

1    MR. KIRSCH: Objection as to form.
2  Objection on the basis of attorney-client and
3  attorney work product privileges.
4    To the extent you can answer the question
5  without divulging attorney-client or attorney work
6  product privileges, you can answer the question.
7    THE WITNESS: All I can give you is a "yes"
8  to that question.
9    BY MR. FREITAS: Q. And you're not holding
10  anything back on the basis of Mr. Kirsch's
11  attorney-client privilege objection; right?
12    MR. KIRSCH: I made more than an
13  attorney-client privilege objection.
14    MR. FREITAS: I asked only about that.
15    THE WITNESS: Then I don't understand the
16  question. I understood I had an instruction from
17  Mr. Kirsch, and I'm following the instruction. I
18  gave you a yes and no more.
19    BY MR. FREITAS: Q. Okay. So I'm going to
20  hand you a copy of what's previously been marked as
21  Exhibit 3, which is a copy of U.S. Patent 6,813,682,
22  which we're referring to as the '682 patent.
23    Here's a copy for you if you need it.
24    You're familiar with the '682 patent; right,
25  Mr. Gafford.

Page 32

1    A. Yes.
2    Q. You've worked with it in the MyKey ITC
3  proceeding and the MyKey district court litigation?
4    A. Yes.
5    Q. You've submitted claim construction opinions
6  in both the ITC proceeding and the district court
7  proceeding?
8    A. Yes.
9    Q. And you also submitted infringement opinions
10  in the ITC proceeding --
11    A. Yes.
12    Q. -- regarding the '682 patent?
13    A. That's right.
14    Q. If your opinions, those expressed regarding
15  the '682 patent and specifically regarding the claim
16  limitations that use the word "transparent" or
17  "transparently" are applied, a device that practices
18  Figure 4 of the '682 patent does not practice any of
19  the independent claims of the '682 patent; correct?
20    MR. KIRSCH: Object as to form. Goes beyond
21  the scope of his expert opinion.
22    THE WITNESS: I think that's correct.
23    BY MR. FREITAS: Q. And why do you think
24  it's correct?
25    MR. KIRSCH: Same objection.



THOMAS A. GAFFORD                                                February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                                    33—36

Page 33

1    THE WITNESS:  In Figure 4 there is a Step
2  430 where the device accepts a written command and
3  data through drive interface emulator and then
4  discards.  And if a blocking device discards a
5  command meaning -- and the data -- and that means
6  discard the data with the command so that nothing
7  is going to be -- that data isn't going to be written
8  anywhere, then it's not going to operate in
9  accordance with what I believe transparency ought to
10 mean.
11    BY MR. FREITAS:  Q.  Your proposed
12 construction of the '682 patent would mean that a
13 device could not practice any of the independent
14 claims of the '682 patent unless the data associated
15 with a write command are actually written such that
16 they're able to be read back; correct?
17    MR. KIRSCH:  Object as to form.  Goes beyond
18 the scope.
19    THE WITNESS:  There are 45 claims in the
20 '682.  I haven't recently cataloged all of the
21 independent claims, but wherever -- so I'm going to
22 speak only to the limitation transparently.  Wherever
23 the transparently limitation is found, that
24 limitation will not be met if the write data is
25 thrown away.

Page 34

1    BY MR. FREITAS:  Q.  And specifically the
2  data must be written such that they can be read back;
3  correct --
4    MR. KIRSCH:  Same objection.
5    BY MR. FREITAS:  Q.  -- under your
6  construction --
7    MR. KIRSCH:  Same objection.
8    BY MR. FREITAS:  Q.  -- of the term
9  "transparent" or "transparently"?
10    MR. KIRSCH:  Same objection.
11    THE WITNESS:  Can I hear the question again,
12 please.
13    (Record read.)
14    THE WITNESS:  I want to make clear that
15 writing and reading back is not the language of the
16 construction that I urge, that it is an effect of --
17 it is the only way I know for the construction I urge
18 to be met as I describe in 1452, for example.
19    BY MR. FREITAS:  Q.  So regardless of the
20 fact that you don't use the words I just used, you
21 agree with me, don't you, that under your
22 construction of the term "transparent" or the term
23 "transparently," a device cannot practice any of the
24 independent claims of the '682 patent unless when a
25 write command is issued, the data are read -- are

Page 35

1  written rather such that they can be read back?
2    MR. KIRSCH:  Object as to form.  Beyond the
3  scope.
4    THE WITNESS:  I -- yeah.  I haven't
5  considered this anew in this matter, and I would say
6  cannot practice at this stage of my thinking in this
7  district court matter does not characterize my
8  opinion.  Easier would be -- I can go so far as to
9  say I don't know a way that they could be practiced
10 without that as I explain here --
11    BY MR. FREITAS:  Q.  Well, are you finished?
12    A.  -- but it's not.  No.
13    Q.  Sorry.
14    A.  Cannot is at this point anyway is too strong
15 a term.
16    Q.  Okay.  Let me rephrase then.  As far as you
17 are aware, a device cannot practice any of the
18 independent claims of the '682 patent unless when a
19 write command is issued, the data associated with
20 that command are written such that they can be read
21 back?
22    MR. KIRSCH:  Same objection.
23    BY MR. FREITAS:  Q.  Is that true,
24 Mr. Gafford?
25    MR. KIRSCH:  Same objection.  Also asked and

Page 36

1  answered.
2    THE WITNESS:  I don't hear that as a
3  different question.  If you think the question is
4  different, you're going to have to explain it to me.
5  Otherwise I'll have to give you the same -- the
6  answer I already gave you as my answer.
7    BY MR. FREITAS:  Q.  I'll be happy to do
8  that.  The last question I said as far as you are
9  aware.  The prior question I did not.
10    MR. KIRSCH:  Same objection.
11    THE WITNESS:  But the key to both questions
12 is cannot, and I was telling you that I can't
13 subscribe to cannot at this point.  The most I can
14 say is I don't know of a way.  So the -- your as far
15 as I'm aware together with cannot is not where I am
16 at right now.
17    BY MR. FREITAS:  Q.  So you --
18    A.  My opinion is as I told you I don't know of
19 a way that it could be practiced.
20    Q.  But you're not able to tell me whether under
21 your construction it's necessary that when a write
22 command is issued the data associated with that
23 command be written such that they can be read back?
24    MR. KIRSCH:  Object as to form.
25    BY MR. FREITAS:  Q.  Is that true?

Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 11 of 60   Page ID #:1491

THOMAS A. GAFFORD                                       February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                            37–40

Page 37

1    MR. KIRSCH:  Object as to form.  Beyond the
2 scope.
3    THE WITNESS:  What's necessary in my
4 construction is in the words of my construction.
5 Read and write don't come into it.  You're asking
6 about the effect should the Court adopt that
7 construction, and even were the Court to do that,
8 the -- I doubt if I would ever even need to consider
9 that question because the question then would be do
10 the accused devices operate to meet that limitation
11 or not, not because cannot's global.  Cannot would
12 require me to study every possible device on the
13 planet and perhaps invent a few new ones.  We got
14 into a whole invention discussion a couple of years
15 ago.  So "cannot" is still not a term I can subscribe
16 to.  It's just these are the words I believe are
17 correct interpretation.  Once we have a ruling, then
18 the question is -- will never be cannot in some
19 universe.  The question will be do these things
20 practice or don't they with a very limited scope of
21 just what's accused.  I don't -- I'm not making any
22 universal statements here.  I'm certainly not making
23 them at this stage of the game.
24    BY MR. FREITAS:  Q.  You agree, don't you,
25 that Step 430 in Figure 4 of the '682 patent is

Page 38

1 inconsistent with your construction of the term
2 "transparent" and the term "transparently"?
3    MR. KIRSCH:  Object as to form.
4 Argumentative.
5    THE WITNESS:  You're asking me an
6 infringement question --
7    BY MR. FREITAS:  Q.  No, I'm not.
8    A.  -- as I hear it.  I don't know any other way
9 to understand your question.  If it's not an
10 infringement question, what is it?
11    Q.  It's a claim construction question.
12    MR. KIRSCH:  There's not a pending question.
13 You don't have to answer anything.
14    MR. FREITAS:  There is a pending question.
15    THE WITNESS:  Well, I better hear it again
16 then.
17    MR. FREITAS:  Okay.  Let's have it read
18 back.  I believe it begins with "Step 430."
19    (Record read.)
20    MR. KIRSCH:  Object as to form.  Beyond the
21 scope.  Argumentative.
22    THE WITNESS:  Yeah.  I -- having heard that
23 the second time, I hear most of those objections.  I
24 don't know what you mean by "inconsistent."  The
25 disclosure is what it is.  This is a part of the

Page 39

1 disclosure.
2    BY MR. FREITAS:  Q.  What I mean by
3 inconsistent is that under your construction a step
4 such as Step 430 in which data are discarded rather
5 than written is -- I'll withdraw that.
6    What I mean is that Step 430 states that the
7 data are discarded rather than written; correct?
8    A.  Yes.  Well, whoa.  Not so fast.  It says the
9 command is discarded.  That's all it says.
10    Q.  But you understand that to mean the data are
11 discarded as well?
12    A.  I do.
13    Q.  Okay.  So Step 430 provides that the command
14 and the data are discarded; right?
15    A.  In my understanding, yes.
16    Q.  Under your construction of transparent and
17 transparently, the data must not be discarded;
18 correct?
19    A.  Under my construction the device must
20 operate transparently.  I haven't undertaken an
21 analysis to see if there is some way that a Figure 4
22 machine could ever be consistent with the
23 construction I urge or not.
24    Q.  Well, I'm asking about Step 430.  It's a
25 narrower question in Figure 4, and if you're not able

Page 40

1 to answer, tell me you're not able to answer.
2    A.  I'm not.
3    Q.  You can't tell me whether under your
4 construction of transparent and transparently data
5 must not be discarded.
6    You're not able to tell me that?
7    MR. KIRSCH:  Objection.  Argumentative.
8 Object as to form.  Asked and answered.
9    THE WITNESS:  You're using the term "must"
10 in the same way that I understand you to use the term
11 "cannot," and the process isn't that simple.  If the
12 Court adopts my construction, then a device comes
13 along that's accused, it is the burden of the
14 plaintiff to use the Court's construction to read a
15 claim, including transparently, on a particular
16 device.
17    For me to do that requires working with an
18 assignment of a level -- of devil's advocacy at a
19 level I don't normally practice.  I would just as
20 soon wait for your infringement pitch and see how it
21 works.
22    It does, on the other hand -- it would, on
23 the other hand, impact also my selection and
24 explanation of prior art.  And if this -- if this
25 construction were adopted, and I wrote -- and I were



THOMAS A. GAFFORD
February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL
41–44

Page 41

1 in the process of writing defendant's prior art
2 report, invalidity report, then I would go looking
3 for art that met the limitation as construed, and at
4 that point I'm not paying any attention to Figure 4
5 at all.  I'm paying attention to the Court's
6 construction.
7      So I haven't grappled with that issue.  I
8 don't think I can grapple with it on the fly right
9 now, and I'm not sure I'll ever have to grapple with
10 it.
11      MR. KIRSCH:  Bob, just before we go on --
12 I'm sorry.  Are you done?
13      THE WITNESS:  I am.  Thanks.
14      MR. KIRSCH:  We've been going about an hour,
15 so if you have a couple of quick follow-up questions
16 to this, I don't want to interrupt your flow, but --
17      MR. FREITAS:  I don't mind taking a break if
18 you want to take a break.  No problem.
19      MR. KIRSCH:  Yeah.  Mr. Gafford is going to
20 need a break about every single hour just because of
21 health consideration.
22      MR. FREITAS:  Whenever a break is needed,
23 that's fine with me.
24      MR. KIRSCH:  Great.  Thanks.
25      THE VIDEOGRAPHER:  The time is now

Page 42

1 10:44 a.m.  We are off the record.
2      (Recess taken from 10:45 a.m. to 11:01 a.m.)
3      THE VIDEOGRAPHER:  The time is now
4 11:01 a.m., and we are back on the record.
5      BY MR. FREITAS:  Q.  Do you have the '682
6 patent handy, Mr. Gafford?
7      A.  I do.
8      Q.  I'd like you to turn, please, to Column 5.
9 There's a heading Blocking Device.
10      Do you see that?
11      A.  Yes.
12      Q.  And then right below that the following
13 appears:  Figure 2 is a diagram illustrating a
14 Blocking Device 203 consistent with the present
15 invention.
16      Do you see that sentence?
17      A.  I do.
18      Q.  Did you take that sentence into account in
19 adopting the construction of the terms of the '682
20 patent that you've presented in your report, a copy
21 of which has been marked as Exhibit 9?
22      A.  Yes.
23      Q.  And how did you take account of it?
24      A.  I took the entire specification into
25 account.  It all speaks to the -- it all speaks to

Page 43

1 what they felt they invented and it serves as a basis
2 or for enabling various claims.
3      Q.  So you agree with me, don't you, that that
4 sentence that says that Figure 2 is a diagram
5 illustrating a Blocking Device 203 consistent with
6 the present invention, that means that what appears
7 in Figure 2 is consistent with the invention claimed
8 in the '682 patent; right?
9      MR. KIRSCH:  Object as to form.  It calls
10 for legal conclusion.  Argumentative.
11      THE WITNESS:  Thanks.
12      It's my understanding that each claim is an
13 invention so that when a patent -- when a patent
14 applicant says the present invention, he's really
15 talking about all of the inventions that may be
16 present in a disclosure.  And in my own experience,
17 sometimes you have so many inventions present in a
18 disclosure that, when you start running claims on
19 them, the patent office requires you to file a
20 divisional because they say that's really a different
21 invention.
22      So "the invention" is a broad and sometimes
23 vague term.  The -- what counts as to -- what really
24 counts as to invention is a language of the claims of
25 all of the things they disclosed what did they try to

Page 44

1 reserve for themselves and what was granted.
2      BY MR. FREITAS:  Q.  So as you read the '682
3 patent, is it your understanding that the sentences I
4 just read means that what is claimed is consistent
5 with what appears in Figure 2?
6      MR. KIRSCH:  Object as to form.  Vague.
7      THE WITNESS:  No.  It wasn't what I was
8 saying.
9      BY MR. FREITAS:  Q.  I didn't say it was.
10 I'm asking you whether what I just said is true.
11      MR. KIRSCH:  Same objection.
12      THE WITNESS:  Every statement in the spec
13 needs to be read in light of what actually is claimed
14 in a particular claim.
15      BY MR. FREITAS:  Q.  What's in the spec
16 assisted you in interpreting the claims, didn't it?
17      A.  All of the spec did, yes.
18      Q.  You read all of it, and you took it into
19 account in arriving at the construction of the claims
20 that you've presented.
21      A.  Yes.
22      Q.  And when you see a statement that says the
23 blocking device in Figure 2 is consistent with the
24 present invention, you understood that to mean it's
25 consistent with what's claimed, didn't you?



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 13 of 60   Page ID #:1493

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL              45–48

Page 45

1      MR. KIRSCH:  Object as to form.
2 Argumentative.  Asked and answered.  Calls for legal
3 conclusion.
4      THE WITNESS:  Because it is part of the
5 specification that's written before prosecution ever
6 takes place, I take a statement like this in the
7 context of it being consistent with what the
8 inventors had in mind as their invention when they
9 applied for the patent.  Sometimes you find in
10 prosecution that you're not the inventor of some of
11 the things you disclosed.
12      BY MR. FREITAS:  Q.  So in this case, did
13 you take the sentence that appears in Column 5, lines
14 23 and 24 or 24 and 25?
15      A.  Yeah, no.  I hate that.  They don't line up.
16      Q.  Yeah.
17      A.  I know what you meant.
18      Q.  Figure 2 is a diagram illustrating the
19 Blocking Device 203 consistent with the present
20 invention.
21      Did you take that as a statement that the
22 applicants believe that they had claimed a blocking
23 device consistent with Figure 2, or did you take it
24 some other way?
25      MR. KIRSCH:  Object as to form.  Asked and

Page 46

1 answered.
2      MR. DUKELOW:  Speculation.
3      THE WITNESS:  Well, first of all, I don't
4 know what they had in mind.  All I know is what they
5 wrote.  What they wrote is before prosecution, so we
6 have no idea what's going -- they had no idea what
7 would be allowed when they wrote this.  I believe it
8 is at best a representation of what they thought they
9 had invented when they filed their application.
10      BY MR. FREITAS:  Q.  You agree with me,
11 don't you, that if what you just said is true, that
12 if it was a representation of what they thought they
13 invented, that as far as they were concerned, that
14 would be carried all the way through prosecution
15 unless they said something different
16      MR. KIRSCH:  Object as to form.  Asked and
17 answered.  Speculation.
18      THE WITNESS:  I have no idea how to answer
19 that question.
20      BY MR. FREITAS:  Q.  All right.  Okay.
21 Moving further down Column 5, there's a new paragraph
22 that begins roughly line 53, I think it is.  It's a
23 reference to Figure 3.  It says, Figure 3 is a
24 diagram illustrating Blocking Device 203 in
25 additional detail.

Page 47

1      Now, you agree with me that that's the same
2 device that's mentioned in Figure 2; right?
3      MR. KIRSCH:  Object as to form.
4      THE WITNESS:  Yes.  Figure 2 contains
5 element reference numbers in the 200 range, and
6 they're -- what the inventors are telling us here is
7 that they're adding detail to Figure 2 in order to
8 create Figure 3.
9      BY MR. FREITAS:  Q.  But the Blocking Device
10 203 appears in both Figure 2 and Figure 3; right?
11      A.  Well, they've taken some liberties here.
12 The -- yes, that's right.  They intend for the block
13 labeled with no further detail 203 in Figure 2 to be
14 the same outline in dashed form also labeled 203 in
15 Figure 3.
16      Q.  Over in Column 6 in the '682 patent, there's
17 a reference to Figure 4 and it says, Figure 4 is a
18 flowchart illustrating the operation of Blocking
19 Device 203 in additional detail.
20      Do you see that?
21      A.  Yes.
22      Q.  And you agree that that's the same Blocking
23 Device 203 that appears in Figure 2 and Figure 3;
24 right?
25      MR. KIRSCH:  Object as to form.

Page 48

1      THE WITNESS:  Well, they say it is.  I'll
2 take their word for it.  Their description is that
3 what you're looking at in Figure 4 is a flowchart
4 that's operating.  It's describing the operation or
5 the software of Blocking Device 203.
6      BY MR. FREITAS:  Q.  Are you familiar with
7 the agreed constructions that the parties have
8 arrived at in this district court litigation?
9      A.  I know there are some.  I've forgotten which
10 constructions are agreed to.
11      Q.  Have you ever read the agreed constructions
12 in the district court?
13      A.  I think I have.  I don't recall it.  I don't
14 recall its contents.
15      Q.  Do you remember -- do you remember with
16 certainty that you did at some point read them or
17 some of them?
18      A.  I believe I did.  My best recollection right
19 now is that I read some of the pleadings regarding
20 claim construction that got us to here, and that that
21 was one of them.
22      Q.  Do you recall when you read them?
23      A.  No.
24      Q.  Okay.  Are you able to tell me whether you
25 read them before or after they were agreed?



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
49–52

Page 49

1    A. No.
2    Q. Okay. Are you familiar with the agreed
3 construction of the term means for returning status
4 information to the host that indicates that the block
5 command was successfully executed by the storage
6 device?
7    A. Good heavens, no. I mean, I'm aware that
8 such -- it seems reasonable from what I remember
9 reading this section agreement exists, but it would
10 be really simpler if you simply put the paper in
11 front of me.
12    Q. I'll --
13    A. I can't give you a memory examination on
14 this.
15        MR. FREITAS: Okay. All right. That's
16 fine. I just asked if you're familiar with it, but
17 that's okay.
18        I'd like to have marked as Exhibit 11 a
19 document entitled Joint Claim Construction and
20 Prehearing Statement. And looks like it's dated
21 January 28th, 2014.
22        (Exhibit 11 was marked for identification by
23 the court reporter and is attached hereto.)
24        BY MR. FREITAS: Q. If you'd like, go ahead
25 and take some time to familiarize yourself with the

Page 50

1 document. I'm going to ask you various questions
2 about it, I think.
3        MR. KIRSCH: Bob, are you sure that this is
4 the last one? I know that there were two filings for
5 this document. The first iteration wasn't complete,
6 and the second was modified.
7        Should we go off the record for a second,
8 just making sure we're right about this?
9        MR. OLANIRAN: It was only corrected Exhibit
10 A, not --
11        MR. KIRSCH: Just Exhibit A?
12        MR. FREITAS: Yeah. This is filed. We can
13 see the --
14        MR. KIRSCH: No, but there was a second
15 document --
16        MR. OLANIRAN: Right.
17        MR. KIRSCH: -- associated with this that
18 was filed. I just want to make sure that this is the
19 correct version of that.
20        MR. OLANIRAN: That's correct.
21        MR. COOPER: But Exhibit A was the claim
22 chart itself; right?
23        MR. OLANIRAN: Exhibit A was the disputed
24 claim terms, not the agreement.
25        MR. KIRSCH: Okay. Okay. Thank you.

Page 51

1        BY MR. FREITAS: Q. Okay. So, Mr. Gafford,
2 go ahead and look through it if you'd like to. I'm
3 going to ask you right now about the means for
4 returning status information limitation that begins
5 at the bottom of page 1.
6    A. Why don't we just start there.
7        MR. FREITAS: Okay.
8        MR. KIRSCH: So for -- I don't believe, and
9 I could be wrong about this and maybe you'll correct
10 me if I am, that Mr. Gafford has testified as to each
11 and every one of these agreed-upon terms. So to the
12 extent that you're going to ask questions about terms
13 that he has not actually opined as to in this report,
14 we'll object. It's outside the scope of the
15 deposition.
16        MR. FREITAS: Well, I'm going to ask him
17 about things he has talked about in his report.
18        MR. KIRSCH: Okay.
19        MR. FREITAS: And the means of doing so.
20 Maybe will be some questions about what appears in
21 the agreed constructions. But if you don't like the
22 questions, just object when they're asked.
23        BY MR. FREITAS: Q. Okay. Do you see
24 the -- at the bottom of page 1 the claim term means
25 for returning status information to the host that

Page 52

1 indicates that the blocked command was successfully
2 executed by the storage device? Do you see that?
3    A. Yes.
4    Q. And since it's an agreed construction,
5 that's not something that you're presenting an
6 opinion about, but are you familiar with that
7 construction as agreed by the parties?
8    A. I don't know what you mean by am I familiar.
9 Have I studied it? Not recently.
10    Q. Have you ever looked at it?
11        MR. KIRSCH: Asked and answered.
12        THE WITNESS: You know, I don't remember.
13        BY MR. FREITAS: Q. Okay.
14    A. This -- and I've looked at this document. I
15 couldn't tell you that I focused or reviewed it in
16 any depth each of the positions. I know the document
17 exists.
18    Q. All right. Let's go back to Exhibit 9,
19 please. And let's take a look at what you said about
20 the means-plus-function limitations. I think that
21 what I believe to be what we should look at is on
22 page 3 of Exhibit 9.
23        MR. KIRSCH: Bob. The last document was
24 Exhibit 12; right?
25        MR. FREITAS: I thought it was 11.



THOMAS A. GAFFORD                                        February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                          53–56

Page 53

1       MR. KIRSCH:  What was Kern and then '682?
2       THE WITNESS:  Kern is 10.
3       MR. FREITAS:  '682 was marked yesterday.
4       MR. KIRSCH:  Okay.  Thank you.
5       THE WITNESS:  Okay.  I have page 3.
6       BY MR. FREITAS:  Q.  Okay.  So there you say
7  that you've accepted the purpose of your analysis the
8  language of the phrase following the -- excuse me.
9  The language of the claims following the phrase means
10  for as the function for which structure must be found
11  unless you state otherwise; right?
12      A.  Yes.
13      Q.  And then you say quite a bit more there.
14      But back to Exhibit 11 and the means for
15  returning status information limitation that begins
16  in the bottom of page 1, did you give any
17  consideration at all to what the function for that
18  limitation should be?
19      A.  The function for the limitation in the
20  agreed chart?
21      Q.  That's what I'm asking, yes.  There's an
22  agreement on function, but that's an agreement.
23      That's not something you gave an opinion
24  about; correct?
25      A.  So you're asking if I gave any consideration

Page 54

1  to it?
2       Q.  Yes.
3       A.  For what purpose?
4       Q.  For any purpose.
5       A.  I don't recall.
6       Q.  Okay.  In any event, you can see that the
7  parties have agreed on the function; correct?
8       A.  Yes.
9       Q.  Did you make any effort to harmonize any of
10  the opinions in Exhibit 9 with the parties' agreement
11  on the function for the means for returning status
12  information limitation?
13      MR. KIRSCH:  Object as to form.
14      THE WITNESS:  I think I did for some.  I
15  don't know that I didn't -- thinking of the
16  proceedings where I've met with counsel to write my
17  report.  I don't think I exhaustively vetted what I
18  was writing against everything in this agreed
19  document.
20      MR. KIRSCH:  I just want to just caution you
21  not to discuss any of the communications that you had
22  with counsel on the basis of attorney-client/attorney
23  work product privileges.
24      BY MR. FREITAS:  Q.  So at this point I am
25  asking you a specific question.  Do you recall making

Page 55

1  any effort to harmonize the parties' agreed statement
2  of function for the means for returning status
3  information limitation with anything in Exhibit 9?
4       MR. KIRSCH:  Object as to form.
5       THE WITNESS:  I believe I did as to some of
6  the elements on which I opined.  I don't know if I
7  did it for every one.
8       BY MR. FREITAS:  Q.  And you don't know if
9  you did it for this particular statement of function;
10  right?
11      MR. KIRSCH:  Same objection.
12      THE WITNESS:  That's right.
13      BY MR. FREITAS:  Q.  Okay.  What about the
14  agreed statement of structure for the means for
15  returning status information limitation?  Did you
16  make any attempt to harmonize the parties' agreed
17  statement of structure with any of the claim
18  constructions that you've presented in Exhibit 9?
19      MR. KIRSCH:  Object as to form.  Outside the
20  scope.
21      THE WITNESS:  Actually, I was thinking of
22  structure.  My -- and I realize now I believe your
23  previous question went to structure in this box;
24  right?
25      BY MR. FREITAS:  Q.  It went to --

Page 56

1       A.  Sorry.  It went to function.
2       Q.  Yes, that's it.
3       A.  Right.  And generally my understanding is
4  that -- and when I read these -- when I review a
5  document like this is that the function is extracted
6  exactly from the functional recitation of the claim.
7  Seldom that's not the case.  I believe it's the case
8  here.  So the consideration I was telling you before
9  that I gave as to whether -- as to consistency was
10  actually based on the -- for the ones I did it on --
11  and I don't remember if I did it for this -- on the
12  responsive structure, making sure that the responsive
13  structure that I cited was consistent with responsive
14  structure in the agreed documents.
15      But again, I don't remember which of the
16  responsive structures in this Exhibit 11 that I
17  specifically compared to responsive structure that I
18  was urging in my report.
19      Q.  Okay.  Just so we're clear, you do not know
20  whether you made an effort to harmonize the parties'
21  agreed structure for the means for returning status
22  information limitation with any of the constructions
23  presented in your exhibit, your claim construction
24  report?
25      MR. KIRSCH:  Objection.



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL
February 07, 2014
57—60

Page 57

1        BY MR. FREITAS:  Q.  Is that right?
2        MR. KIRSCH:  Misstates testimony.  Object as
3  to form.
4        THE WITNESS:  It's my best recollection.  My
5  recollection is I don't have a -- sorry.  I don't
6  have a recollection of specifically attempting to
7  harmonize with Claim 43 structure.  I don't know if I
8  did or not.
9        BY MR. FREITAS:  Q.  And Claim 43 is a
10  reference to a claim that appears -- I mean, that's
11  what it says in the box for the means for returning
12  status information to the host that indicates that
13  the block command was successfully executed by the
14  storage device.
15        MR. KIRSCH:  Object as to form.
16        BY MR. FREITAS:  Q.  Right?
17        MR. KIRSCH:  Object as to form.
18        BY MR. FREITAS:  Q.  In the box right after
19  what I just read it says Claim 43.
20        A.  Yes.
21        Q.  And that's what you're referring to?
22        A.  Yes.
23        Q.  Okay.  So can you tell me regardless of
24  whether you've done it before whether the parties'
25  agreed structure, a processor program to perform Step

Page 58

1  30 of Figure 4 and the algorithm described in Column
2  6, lines 16 to 25; Column 6, lines 33 to 47, and
3  Column 12, lines 33 to 45 and equivalence thereof, is
4  consistent or inconsistent with your construction of
5  the term "transparent" and the term "transparently"?
6        MR. KIRSCH:  Object as to form.
7        THE WITNESS:  Okay.  Now that I've heard the
8  whole question, I need to hear the sense of what you
9  want answered, which is in the first part of it.
10        Could you read the whole question again,
11  please.
12        (Record read.)
13        MR. FREITAS:  It's Step 430.
14        THE WITNESS:  Yeah.  You said -- you
15  misspoke, but now you've fixed it.
16        No, not without further analysis.  I haven't
17  performed that analysis
18        BY MR. FREITAS:  Q.  All right.  Now, back
19  to the '682 patent, please.  Column 6, lines 22 to
20  24.
21        Are you there?
22        A.  I am.
23        Q.  Okay.  Do you agree that Column 6, lines 22
24  to 24 describes the discarding of data attempted to
25  be written to the storage device but blocked by the

Page 59

1  blocking device?
2        MR. KIRSCH:  Object as to form.
3        THE WITNESS:  This text almost says that.
4  It says -- it makes -- it says it may simply discard
5  this data.
6        BY MR. FREITAS:  Q.  So it says that the
7  data may be discarded; right?
8        A.  May be, yes.
9        Q.  Mm-hmm.  Okay.  And in the passage that
10  includes lines 22 to 24 of Column 6 of the '682
11  patent, a write command has been issued?
12        MR. KIRSCH:  Is that a question or a
13  statement?
14        THE WITNESS:  I'm hearing --
15        BY MR. FREITAS:  Q.  Is that true?
16        A.  Excuse me.  Okay.  I really didn't
17  understand that question.  Can I hear the question
18  again, please.
19        Q.  Sure.  In the passage that includes lines 22
20  to 24 of Column 6 of the '682 patent, a write command
21  has been issued; correct?
22        A.  Well, it will be simpler if you quoted the
23  whole thing.  The description begins at line 16 where
24  it says, If embedded Processor 330 determines that a
25  command received through IDE drive interface 320 is a

Page 60

1  write command, embedded Processor 330 drops the
2  command and thus does not write anything to Drive
3  205.  Blocking Device 203, however, will continue to
4  accept the correct amount of data from Host 201 as
5  specified in the write command.  Embedded Processor
6  330 may simply discard this data and may then return
7  status information to Host 201 that indicates that
8  the write was successful.
9        So the context of the description of what
10  the processor might do is the receipt of a write
11  command.
12        Q.  All right.  And in the context that's
13  presented there in Column 6 of the '682 patent, the
14  data associated with that write command are not
15  written; right?  Or let me rephrase that.  They may
16  not be written.
17        MR. KIRSCH:  Object as to form.
18        THE WITNESS:  It doesn't even say that.  It
19  says may -- it says, Does not write anything to Drive
20  205.  That's all it says.
21        BY MR. FREITAS:  Q.  Okay.  So then the
22  "may" doesn't modify "that."  If the processor 330
23  determines that a command that's received through the
24  interface 320 is a write command, the Processor 330
25  drops the command and thus does not write anything to



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 17 of 60   Page ID #:1497

THOMAS A. GAFFORD                                                  February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                            61–64

Page 61

1  Drive 205; right?
2          MR. KIRSCH:  Object as to form.
3          THE WITNESS:  Well, that's what the sentence
4  says.
5          BY MR. FREITAS:  Q.  And that means that the
6  data associated with the write command are not
7  written, doesn't it?
8      A.  To Drive 205 is what it means.
9      Q.  Yes?  Mm-hmm.
10     A.  Well, not so fast.  Your sentence -- my
11 answer is more restrictive than your question.
12 The -- this thing only talks about what's happened
13 with regard to Drive 205.
14     Q.  What we've just looked at.  I understand
15 that.  It says it's not written to Drive 205.
16     A.  Right.
17     Q.  But then it goes on and later it says
18 embedded processor 330 may simply discard this data;
19 right?
20     A.  It says it might.  That's exactly right.
21     Q.  All right.  And if the data are discarded,
22 then the data are not written anywhere, are they?
23     A.  Yes, of course.  If the data -- as it's --
24 if the data are discarded, then they're not available
25 to be written anywhere.

Page 62

1      Q.  And the write operation that would normally
2  be concluded with the writing of the data would not
3  be completed in the event that the data are
4  discarded; correct?
5          MR. KIRSCH:  Object as to form.
6          THE WITNESS:  In -- yes, of course.  If the
7  data -- in the event, which I see here is optional,
8  that the data are discarded, then of course they
9  wouldn't be written anywhere.
10         BY MR. FREITAS:  Q.  And they could not be
11 read back because they weren't written in the
12 circumstance we're describing?
13     A.  Circumstance being taking the may option as
14 doing that rather than not doing that.
15     Q.  That's right, yes.  If that option is taken,
16 the data could not be read back because they're not
17 written; correct?
18     A.  That's correct.
19     Q.  All right.  If you could go to page 4 --
20 excuse me.  Column 6 still, line 42.  We're going to
21 have a little bit of an issue about exactly which
22 line it is, but I'll say on line 42 or 43, do you see
23 a reference to Step 430?
24     A.  I do.
25     Q.  From Figure 4?

Page 63

1      A.  Yes.
2      Q.  And it's called Act 430 right there on line
3  42 or 43, whichever it is; right?
4      A.  Yes.
5      Q.  And going back to Figure 4, Step 430
6  involves the discarding of the command, the write
7  command and the data associated with the write
8  command; correct?
9      A.  Yes.
10     Q.  What's being discussed in the paragraph
11 beginning on line 34 beginning with Figure 4 as a
12 flowchart, among other things, is a discussion
13 where a write command is blocked by Blocking Device
14 203; correct?
15     A.  In particular at about line 38 or -9 it says
16 examine for whether it is a write or format command.
17     Q.  Yes?
18     A.  And if yes, the command and any associated
19 data is accepted by Blocking Device 203 and then
20 discarded, blocking it from the protected Drive 205.
21     Q.  And it's quite clear that the write command
22 and the associated data are both discarded in the
23 example that's presented in Column 6 between lines 33
24 and 47?
25     A.  In this particular embodiment it isn't

Page 64

1  equivocal about discarding.  And let's see what else
2  it says.  Hang on.
3          Yeah.  This is a -- this is a description of
4  the operation of a device that is somewhat different
5  from the description directly above.  It's another
6  wrinkle in how it would work.
7      Q.  So there's a "may" in the first passage we
8  looked at, but there's no "may" in the second
9  passage, the one we just discussed; right?
10         MR. KIRSCH:  Object as to form.
11         THE WITNESS:  The particular embodiment
12 described in the paragraph beginning with the term
13 "Figure 4" is not equivocal.  It doesn't use the word
14 -- the term "may," so I would regard that as a
15 different embodiment than is being discussed above.
16         BY MR. FREITAS:  Q.  The embodiment
17 discussed in the paragraph beginning with Figure 4 on
18 line 33 or 34 of Column 6 -- or excuse me.  Line 34,
19 I think it is, but it begins, Figure 4 is a
20 flowchart.  That unequivocally provides for the
21 discarding of the write command and the associated
22 data; correct?
23     A.  That paragraph does, yes.  I believe that's
24 correct.
25     Q.  And again, as in the example above that had



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
65–68

Page 65

1  the "may," a write command is issued; right?
2      A.  Yes.
3      Q.  And the command is to write certain data to
4  the Drive 205; right?
5      A.  That's --
6      MR. KIRSCH:  Object to form.
7      THE WITNESS:  They call it associated data
8  in the middle of that paragraph.
9      BY MR. FREITAS:  Q.  Uh-huh.  The data
10  associated with the write command, the command says
11  that those data should be written to Drive 205;
12  right?
13      MR. KIRSCH:  Same objection.
14      THE WITNESS:  That's the context I
15  understand from this Figure 4 paragraph.
16      BY MR. FREITAS:  Q.  And the write operation
17  is not completed; right?
18      A.  Not completed at least with respect to the
19  protected Drive 205.  Well, completed, now that's a
20  little tricky.  The host thinks it's completed.  This
21  paragraph makes clear that the write operation is not
22  completed with respect to protected Drive 205.
23      Q.  Well, it makes clear that the data are not
24  written anywhere, doesn't it?
25      A.  This -- not necessarily.  This paragraph

Page 66

1  uses the term -- in fact says "discarded, blocking it
2  from the protected Drive 205."  I'm not sure whether
3  it rules out the equivocal language of the other --
4  of a different embodiment described above.  The one
5  thing it's making clear is that what it means by
6  discarded here is that the command never gets to
7  protected Drive 205.
8      Q.  Is there another drive referenced other than
9  205 in Figure 4?
10      A.  No.
11      Q.  And because the data in this embodiment are
12  discarded, they cannot be read back; correct?
13      MR. KIRSCH:  Object as to form.
14      THE WITNESS:  Provided that discarded
15  means -- let's see.  In this particular embodiment --
16  this particular description together with Figure 4,
17  if discarded is to be understood in the ordinary
18  context of the English language, then it is indeed
19  thrown away.
20      BY MR. FREITAS:  Q.  Would you please take a
21  look in the '682 patent at Claim 40.
22      A.  I have it.
23      Q.  Okay.  Claim 40, that's an independent
24  claim; right?
25      A.  Yes.

Page 67

1      Q.  And it includes among other limitations a
2  requirement that the blocking device operate
3  transparently to normal operation of the host in the
4  storage device; right?
5      A.  Yes, as its last element, yes.
6      Q.  Okay.  In another element of Claim 40 is
7  means for blocking other ones of the commands from
8  being received by the storage device based on the
9  comparison; right?
10      A.  Yes.
11      Q.  And the comparison is referenced in a prior
12  limitation; correct?
13      A.  Yes.
14      Q.  And that comparison is what?
15      A.  Well, let's look at the antecedent.  The
16  second element is means for comparing commands and
17  the communications between the host and the storage
18  device to a predetermined set of commands.
19      Q.  Okay.  Now, I believe that you have
20  presented a construction of the means for blocking
21  other ones of the commands limitation?
22      Can we confirm whether that's true?
23      A.  You can.  You have -- you have it in machine
24  readable form.
25      Q.  Maybe I've got --

Page 68

1      A.  If I do it, it will take a while.
2      Q.  Maybe I've got it backwards here.  Let's see
3  if we can find that.
4      MR. KIRSCH:  I think it's at 14.3.
5      BY MR. FREITAS:  Q.  There we go.  Okay.
6  The bottom of page 3 of Exhibit 9, Section 14.3 of
7  your claim construction report?
8      A.  Yes.
9      Q.  So there you do present a construction of
10  the means for blocking other ones of the commands
11  from being received by the storage device based on
12  the comparison limitation; right?
13      A.  Yes.
14      Q.  And you explain in 14.1.1 how you've gone
15  about construing the means-plus-function terms;
16  right?
17      A.  Yes.
18      Q.  And you say that you accepted the statement
19  of function.
20      And what did you do regarding structure?
21  Please explain.
22      MR. KIRSCH:  Object as to form.
23      THE WITNESS:  I looked for structure
24  necessary to perform the recited function.
25      BY MR. FREITAS:  Q.  And you presented what



THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    69–72

Page 69

1  you believed the structure to be; correct?
2      A.  Yes.
3      Q.  Having accepted the statement of function
4  that followed the means language, you then looked for
5  the structure, and you presented in Exhibit 9 what
6  you believe the structure to be?
7      A.  Yes.
8      Q.  Okay.  So for example, in the case of
9  Section 14.3, the means for blocking other ones of
10  the commands from being received by the storage
11  device based by the comparison limitation, 14.3.1
12  presents your statement of structure; right?
13      A.  That's right.
14      Q.  And your statement of structure includes
15  Step 430; correct?
16      A.  Yes.
17      Q.  Do you recall what the parties agreed in the
18  ITC proceeding regarding the means for blocking other
19  ones of the commands from being received by the
20  storage device based on the comparison limitation?
21      A.  No.
22      Q.  Do you have any recollection whatsoever of
23  what the parties agreed?
24      A.  No.
25      Q.  All right.  Now back to Claim 40, please, in

Page 70

1  the '682 patent.  That means for blocking other ones
2  of the commands to received by the storage device
3  based on the comparison, and then in the actual claim
4  there is comma wherein.
5      Do you see that?
6      A.  Yes.
7      Q.  That's the limitation that -- for which you
8  are presenting a construction in Section 14.3 of your
9  report; right?
10      A.  Yes.
11      MR. KIRSCH:  Object as to form.
12      BY MR. FREITAS:  Q.  And so --
13      A.  Hang on.  Let me make sure the language is
14  identical --
15      Q.  Please do.
16      A.  -- because I don't identify the particular
17  claim here.  I see other ones.
18      Yeah.  That's the same language.  The 14.3
19  language is the same as the means for blocking
20  language in 40.
21      Q.  Okay.  And so that means that in your
22  opinion the means for blocking in Claim 40 include
23  Step 430; correct?
24      A.  Yes.
25      Q.  And that means that Claim 40 claims the

Page 71

1  discarding of write commands in associated data,
2  doesn't it?
3      MR. KIRSCH:  Object as to form.
4      THE WITNESS:  It means that it has -- not
5  quite.  It means that it has -- that the claim
6  requires structure -- the structure of 430 or its
7  equivalent and that blocking must take place.  430 is
8  one way to block, and the -- my opinion says that --
9  hang on.  Okay.  Yeah.  I didn't include the legal
10  phrase here, but the -- what I find for -- what I
11  wrote here for 1431 is the structure that I found
12  responsive to the recited -- to the function of the
13  recited element.  My understanding is that the law --
14  it's the language or the equivalence.
15      BY MR. FREITAS:  Q.  So you're referring to
16  35 U.S. Code Section 112(f) that refers to a
17  structure or equivalence thereof?
18      A.  Yes.
19      MR. KIRSCH:  Calls for legal conclusion.
20      BY MR. FREITAS:  Q.  And that's the wording
21  you have in mind is what the parties put in their
22  agreed construction?  If you can go back to
23  Exhibit 11, pick an example.
24      A.  An equivalence thereof.
25      Q.  Yeah.

Page 72

1      A.  Yeah.
2      Q.  That's the language you have in mind?
3      A.  Right.
4      Q.  Okay.  But the structure that you've
5  described is included, and the law would add an
6  equivalence of the structure that you've identified;
7  right?
8      A.  Yes.
9      MR. KIRSCH:  So, Bob, sometime in the next
10  five minutes --
11      MR. FREITAS:  We can take a break right now
12  if you'd like or in the five minutes.  Whatever your
13  -- what's your pleasure?  I don't care.  Either way.
14      THE WITNESS:  Now is fine.
15      MR. KIRSCH:  Okay.
16      THE VIDEOGRAPHER:  This marks the end of
17  Disk No. 1 in the deposition of Thomas Gafford.
18      The time is now 11:44 a.m., and we are off
19  the record.
20      (Recess taken from 11:45 a.m. to 12:03 p.m.)
21      THE VIDEOGRAPHER:  This marks the beginning
22  of Disk No. 2 in the deposition of Thomas Gafford.
23  The time is now 12:03 p.m., and we are on the record.
24      BY MR. FREITAS:  Q.  Mr. Gafford, putting
25  aside the fact that you disagree with Mr. Berg about



THOMAS A. GAFFORD                                      February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                          73–76

Page 73

1  various things, as far as you're concerned, he's
2  qualified to do the work that he's done thus far in
3  this case; right?
4         MR. KIRSCH: Object as to form. Calls for
5  legal conclusion.
6         THE WITNESS: Qualified to do the work. I
7  think he understands storage systems. As to how he
8  is as a forensic expert, I couldn't tell you.
9      BY MR. FREITAS: Q. All right. Well, you
10 don't believe he's not qualified; right?
11        MR. KIRSCH: Same objection.
12        THE WITNESS: In my experience he has -- he
13 has sufficient knowledge and experience about storage
14 systems to understand these terms.
15     BY MR. FREITAS: Q. You've encountered
16 Mr. Berg apart from the work that the two of you have
17 done on the various disputes MyKey has with alleged
18 infringers; right?
19     A. Yes, I have.
20     Q. In connection with what?
21     A. IEEE local counsel.
22     Q. And what do you mean by that?
23     A. I mean I gave a talk along with another
24 expert colleague of mine to a meeting down in
25 San Jose. I think it was San Jose hosted by the IEEE

Page 74

1  section of which I think he's an officer.
2      Q. What was Mr. Berg's role?
3      A. Don't recall.
4      Q. All right. Could you take a look, please,
5  at the '682 patent and specifically Claim 44.
6         Do you have that in front of you?
7      A. I do.
8      Q. Claim 44 is a dependent claim?
9      A. It is.
10     Q. And it depends from Claim 2?
11     A. Yes.
12     Q. Claim 2 in turn depends from Claim 1; right?
13     A. Yeah. Let me refresh my recollection
14 about --
15     Q. Sure.
16     A. -- what they look like.
17        Right. Two adds that the interface -- let's
18 see. See, right. That the blocking device has --
19        MR. KIRSCH: I don't think there's a
20 question pending.
21        THE WITNESS: I see its structure.
22     BY MR. FREITAS: Q. So you agree that Claim
23 2 is a dependent claim depending from Claim 1?
24     A. It is.
25     Q. Okay. In Claim 44 the interface emulator of

Page 75

1  the blocking device of Claim 2 is configured to
2  emulate an IEEE 1394 connection; correct?
3      A. That's what it says.
4      Q. And you just mentioned IEEE. That's a
5  reference to the Institute of Electrical and
6  Electronic Engineers; right?
7      A. Yes.
8      Q. And IEEE 1394 is a reference to the
9  interface known as FireWire; right?
10     A. That's right.
11     Q. Claim 2 provides that the interface is an
12 I.D. interface for a disk drive; right?
13     A. IDE just so it gets transcribed correctly.
14     Q. Yes. Did I say I.D.?
15     A. Yeah. I wasn't sure --
16     Q. IDE.
17     A. -- if it went over right. Yes, that's what
18 it says.
19     Q. And because Claim 44 depends from Claim 2,
20 that means that Claim 44 also includes an interface
21 that is an IDE interface for a disk drive; right?
22     A. Not quite. The antecedents in 2 and 44 are
23 different. The antecedent recited in 2 is the
24 interface, which is found in the second element of
25 Claim 1, which is the thing that connects to the

Page 76

1  storage device.
2      Q. Could you read the exact language, please.
3      A. An interface for connecting to the storage
4  device.
5      Q. Okay.
6      A. Distinct from element -- the previous
7  element which is an interface emulator configured to
8  emulate an interface presented by a storage device
9  and configured to connect to a host.
10        So the way I see this is that the Interface
11 2 is referring to the port on this device, blocking
12 device that connects to the drive being protected.
13 And 44 is talking about the interface emulator,
14 namely the port that talks to the host being
15 FireWire.
16     Q. We'll get to all of the details, but for
17 now, do you agree or disagree that, quote, the
18 interface of Claim 2 is the interface referenced in
19 the limitation, quote, and interface for connecting
20 to the storage device, unquote, in Claim 1?
21     A. Yes.
22     Q. And since Claim 44 depends from Claim 2, the
23 blocking device claimed in Claim 44 includes that
24 same interface, doesn't it?
25        MR. KIRSCH: Object as to form.



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
77—80

Page 77

1    THE WITNESS:  I'm sorry.  Which saying --
2    BY MR. FREITAS:  Q.  Let me do it --
3    A.  You lost me.
4    Q.  -- a little bit differently.  Just tell me
5  whether you agree or disagree.  First, in Claim 1, an
6  interface for connecting to the storage device is
7  claimed; right?
8    A.  Yes.
9    Q.  And that interface is the interface of Claim
10  2; correct?
11    MR. KIRSCH:  Object as to form.
12    THE WITNESS:  That's my understanding of the
13  language of Claim 2.
14    BY MR. FREITAS:  Q.  All right.  Okay.  Now,
15  because Claim 44 depends from Claim 2, the blocking
16  device that's claimed in Claim 44 also includes,
17  quote, the interface, unquote, of Claim 2; right?
18    A.  Yes.  You have the language of all three
19  claims as the aggregate Claim 44.
20    Q.  Okay.  So Claim 44 explicitly says that it
21  claims the blocking device of Claim 2 before it
22  further limits the claim; correct?
23    A.  I just didn't catch the way you said that.
24    Q.  I'll say it again.  Claim 44 explicitly
25  recites that it claims the blocking device of Claim

Page 78

1  2 -- it has other language as well, but it claims the
2  blocking device of Claim 2 as further limited by the
3  language following wherein; right?
4    A.  That's right.
5    MR. KIRSCH:  Object as to form.
6    THE WITNESS:  That's what it says in the
7  first six words of 44.
8    BY MR. FREITAS:  Q.  All right.  Now, so we
9  are agreed, aren't we, that the blocking device
10  claimed in Claim 44 has an IDE interface for a disk
11  drive?  Let me withdraw that and ask that
12  differently.
13    The blocking device of Claim 44 has an IDE
14  interface for connecting to a disk drive; correct?
15    MR. KIRSCH:  Object as to form.
16    THE WITNESS:  Yeah.  That's the effect of
17  Claim 2 in this aggregate.
18    BY MR. FREITAS:  Q.  All right.  The
19  interface emulator of Claim 44 emulates the IDE
20  interface to the disk drive, doesn't it?
21    A.  No, that's not what it says at all.
22    Q.  Well, let's go back to Claim 1.
23    Claim 1 claims a blocking device; right?
24    A.  Yes.
25    Q.  And the blocking device has an interface

Page 79

1  emulator; correct?
2    A.  Yes.
3    Q.  And that interface emulator is configured to
4  emulate an interface presented by a storage device
5  and configured to connect to a host; right?
6    A.  Yes.
7    Q.  And it also has an interface for connecting
8  to the storage device; right?
9    A.  Yes, as an additional antecedent recitation.
10    Q.  And everything I just read from Claim 1 is
11  also part of Claim 2, isn't it?
12    A.  Yes.
13    Q.  So the interface referred to in Claim 2 is
14  the interface for connecting the -- to the storage
15  device of Claim 1, isn't it?
16    A.  Yes, I believe that's correct.
17    Q.  And the interface emulator of Claim 1, Claim
18  2 and Claim 44 is configured to emulate an interface
19  presented by a storage device; right?
20    A.  That's the language of Claim 1.
21    Q.  And in Claim 2 and Claim 44, the interface
22  that's being emulated is an IDE interface; correct?
23    A.  I don't think that's necessarily how you
24  have to -- how you not only have to, but how you
25  should read the first limitation in Claim 1.

Page 80

1  Antecedents refer upward.  They don't refer downward.
2  Claim 1 interface emulator element says what it says.
3    Q.  Did you have more?
4    A.  No.  That's the best answer I can give
5  you --
6    Q.  All right.  Then let's try -- let's try
7  referring up.
8    In Claim 2 we have the blocking device of
9  Claim 1; right?
10    A.  Yes.
11    Q.  And referring up, the blocking device of
12  Claim 1 has an interface for connecting to the
13  storage device; right?
14    A.  Yes.
15    Q.  Isn't that the antecedent, the antecedent
16  for what appears after wherein in Claim 2?
17    A.  Yes.
18    Q.  By that I mean the interface for connecting
19  to the storage device.
20    A.  I believe that's correct.
21    Q.  Okay.  So the interface of Claim 2 is an IDE
22  interface for a disk drive; right?
23    A.  Yes.
24    Q.  And that is the interface for connecting to
25  the storage device of Claim 1 further limited; right?



Page 81

1       MR. KIRSCH:  Object as to form.
2       THE WITNESS:  I understand it to be
3  additional language that would apply to that -- an
4  interface for connecting language.
5       BY MR. FREITAS:  Q.  So in Claim 1, we
6  simply have an interface for connecting to the
7  storage device.  In Claim 2 we have a specific type
8  of interface and a specific type of storage device;
9  correct?
10      A.  Well, if -- I don't think anything in 2 says
11 anything about what the drive has to be.  It just
12 says that that interface in 1 is now an IDE
13 interface.
14      Q.  Well, it says disk drive instead of storage
15 device.
16      Do you see that?
17      A.  This disk drive?
18      Q.  No, no.  In Claim 2, the interface is an
19 interface for a disk drive?
20      A.  A disk drive.
21      Q.  Yes.  In Claim 1 it's an interface for
22 connecting to more broadly a storage device.  It says
23 "the storage device" in the second limitation, but "a
24 storage device" in the first.
25      Do you see that?

Page 82

1       A.  Yes.  The -- well, the antecedent of this
2  storage device in Claim 1 is the earlier element that
3  says that -- that recites a storage device.
4       Q.  All right.  And the disk drive of Claim 2 is
5  a specific type of storage device, isn't it?
6       A.  I don't see that in 2's language.  It
7  just -- 2 is introducing a new first recitation, a
8  disk drive.  And it's being used to describe the
9  interface that the device has.  It's not saying
10 anything about what drive might be part of a system.
11 It just says that this interface is an IDE drive
12 interface.
13      Q.  Okay.  Well, do you -- do you agree or
14 disagree that the interface of Claim 2 is the
15 interface of the first and second limitation --
16 excuse me.  I withdraw that.
17      Do you agree or disagree that the interface
18 of Claim 2 is the interface referenced in the first
19 and second limitations of Claim 1?
20      MR. KIRSCH:  I think calls for legal
21 conclusion.
22      THE WITNESS:  I don't think I can tell you
23 because I see that this -- the interface has got a
24 pair of antecedents that it could refer to, and I've
25 never considered which of the two it might be proper.

Page 83

1       BY MR. FREITAS:  Q.  And which --
2       A.  You may have a bad claim here, Counsel.
3       Q.  I don't think so.
4       Which are the two?
5       A.  You have an interface recited in the first
6  element.  I'm calling my first element the element
7  after the preamble.
8       Q.  Yes.  I see that.
9       A.  All right.  So you have an interface, an
10 antecedent in the first element, and you have an
11 interface in the second element.  I think from my
12 understanding of how to read a patent claim that
13 means those are two distinct recitations.  They're
14 different things, okay?  So now when I get down to
15 Claim 2 it says the interface and I realize as I read
16 this now that I don't know which of the two
17 antecedents that it could attach to, it should attach
18 to.
19      Q.  All right.  So you see two antecedents, and
20 you don't know whether the interface of Claim 2,
21 whether the antecedent for interface of Claim 2 is
22 one or the other; is that right?
23      A.  That's right.
24      Q.  So you can't tell me whether the interface
25 of Claim 2 is the interface of the second limitation

Page 84

1  of Claim 1?
2       A.  As I look at it now, no, I can't, because I
3  think it makes sense to read it either way.  I don't
4  think it's -- I think if you -- no.  It kind of makes
5  sense both ways.  I don't know which one you ought to
6  pick.
7       Q.  So do you know whether there are two
8  different interfaces referenced in Claim 1?
9       MR. KIRSCH:  Objection.
10      BY MR. FREITAS:  Q.  Or are you saying there
11 might be?
12      A.  No.
13      MR. KIRSCH:  Objection as to form.  Calls
14 for speculation.  Legal conclusion.
15      THE WITNESS:  There are -- Claim 1 read in
16 light of the specification is talking about a box
17 with two ports.  I'm going to use ports so we don't
18 get too tangled up in interface, the "I" word here.
19 And each of the port is an interface to something.
20 And in the general sense of -- I mean, reading the
21 patent and reading the claim in the light of the four
22 corners of the specification rather than some other
23 book entirely, that it makes sense that this blocking
24 device has these two ports, interfaces.
25      BY MR. FREITAS:  Q.  What are the two ports?



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 23 of 60   Page ID #:1503

THOMAS A. GAFFORD                                        February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        85—88

Page 85

1    A. One goes to the host; one goes to the drive.
2    Q. Okay. I didn't mean to interrupt.
3    A. No, that's fine. We're good.
4    Q. Okay. And in the first limitation of Claim
5 1 where it says that the interface emulator is
6 configured to emulate an interface presented by a
7 storage device --
8    A. Yes.
9    Q. -- is that a port that goes to the host or
10 the port that goes to the storage device?
11    A. First one is host as it says at the end of
12 that element.
13    Q. What's being emulated?
14    A. It's the language required that it emulate
15 an interface presented by a storage device.
16    Q. So that's a reference to the port between
17 the blocking device and the storage device, isn't it?
18    A. Well, we're not sure until we get to the
19 second configured two language. The second
20 configured two language and there's two configuration
21 elements, clauses, phrases in Element 1. The second
22 one configured to connect to a host tells us that, in
23 fact, this interface is configured to connect to a
24 host, and that's -- it's going to go to the host.
25    Q. So you're interpreting the first limitation

Page 86

1 where it says an interface presented by a storage
2 device? You're interpreting that to refer to the
3 port between the blocking device and the host?
4    A. No, I'm not. I'm saying that you don't know
5 which it is until you get to the rest of the element.
6 I'm saying it's simply that the interface emulator --
7 if you stop at the end of that element, you have an
8 interface element -- I'm sorry. End of that
9 language. You have an interface emulator configured
10 to emulate an interface presented by a storage
11 device. Stop there. Great.
12    You got an interface that emulates what a
13 storage device looks like. We don't know where it's
14 connected yet. We just know what it looks like. The
15 second configured language tells us what it's hooked
16 up to.
17    Q. So what's your conclusion looking at all the
18 language?
19    A. I don't think I know --
20    MR. DUKELOW: Objection. Vague.
21    THE WITNESS: I don't --
22    Thank you.
23    A conclusion as to what?
24    BY MR. FREITAS: Q. What the interface of
25 Claim 1 is.

Page 87

1    MR. KIRSCH: Objection. Vague.
2    THE WITNESS: Well, there's interfaces all
3 over Claim 1. Which one do you mean?
4    BY MR. FREITAS: Q. Tell me all of them.
5    MR. KIRSCH: Objection. Vague.
6    THE WITNESS: I'm going to get lost here in
7 my answer if you don't ask me one at a time. My
8 answer is going to turn into a narrative, and we're
9 both going to go down a rabbit hole.
10    BY MR. FREITAS: Q. Show me the first one.
11 Show me the first one
12    A. The first limitation, the first element
13 speaks to an interface that looks like a storage
14 device, and it's hooked up to a host.
15    Q. So the interface emulator is -- when you say
16 "hooked up to a host," do you mean configured to
17 connect to a host?
18    A. Yeah. It's configured -- yeah. It's not
19 actually connecting to a host, but it's configured so
20 that it could be connected -- configured to connect
21 to a host.
22    Q. So you're saying that the interface emulator
23 of the first limitation of Claim 1 is configured to
24 connect to a host?
25    A. That's what it says.

Page 88

1    Q. That's how you construe it?
2    A. It's no construction. It's the literal
3 language of the claim.
4    Q. And then in the second limitation of Claim 1
5 there's an interface for connecting to the storage
6 device?
7    A. Yes.
8    Q. Is that interface present in the first
9 limitation of Claim 1?
10    MR. KIRSCH: Objection as to form.
11    THE WITNESS: No. I think it's an
12 interface. It's a new element. It's a new
13 recitation.
14    BY MR. FREITAS: Q. All right. Then we
15 move to Claim 2, and it says the interface.
16    Can you tell me these -- and if you can't,
17 say you can't -- what the antecedent of the interface
18 of Claim 2 is?
19    MR. KIRSCH: Objection as to form. Calls
20 for legal conclusion.
21    THE WITNESS: As I'm not a lawyer, as a lay
22 engineer with some training in interpret --
23 understanding claims in the light of the law about
24 understanding claims, I don't know what the
25 antecedent to the interface in 2 is up in 1.



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 24 of 60   Page ID
#:1504

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                      89—92

Page 89

1      BY MR. FREITAS:  Q.  Okay.  That's an
2  interesting point you just raised.
3      You have given an opinion about the level of
4  ordinary skill in the art; right?
5      A.  I have.
6      Q.  Does the level of ordinary skill in the art
7  include legal knowledge?
8      A.  No.
9      Q.  So a person having ordinary skill in the art
10  has no legal knowledge or no particular legal
11  knowledge?
12      MR. KIRSCH:  Object as --
13      BY MR. FREITAS:  Q.  Is either accurate?
14      MR. KIRSCH:  Object as to form.  Calls for
15  legal conclusion.  Beyond the scope.
16      THE WITNESS:  My take on a person of skill
17  in the art -- actually, I never considered, but I
18  would think that there -- as to the law they're a
19  layperson.
20      BY MR. FREITAS:  Q.  So they're an
21  ordinarily skilled artisan in the field, but that
22  doesn't mean they know anything about the law; right?
23      MR. KIRSCH:  Same objection.
24      THE WITNESS:  Or they -- or what they think
25  they know as they read in the newspapers, and they

Page 90

1  got it all wrong.  Yeah, I would say that that
2  doesn't say anything about what they know.  PHOSITA
3  doesn't say anything about what they know about the
4  law.
5      BY MR. FREITAS:  Q.  When you said
6  "PHOSITA," you mean P-H-O-S-I-T-A, Person Having
7  Ordinary Skill in the Art; right?
8      A.  Yes, that's right.
9      Q.  Okay.  So when a person having ordinary
10  skill reads a patent disclosure or patent claims, he
11  or she does not apply legal doctrine; right?
12      MR. KIRSCH:  Objection.  Calls for legal
13  conclusion.
14      THE WITNESS:  I don't know what they apply.
15      MR. KIRSCH:  Calls for speculation.
16      THE WITNESS:  They -- I've heard some
17  engineers talk about what they think a claim means
18  and it's been exciting listening to them.  But as a
19  matter of -- as a matter of a legal framer for what
20  we're doing here, I don't know -- let me think about
21  that.
22      Sometimes courts are interested in what one
23  of ordinary skill thinks a claim term is.  I don't
24  think they're -- I think when a person of ordinary
25  skill is opining as such that they're -- I think

Page 91

1  they're opining as what the plain and ordinary
2  meaning of that term is to them if there is one.  I
3  don't think they're bringing or I don't -- I don't
4  understand them to be bringing any legal knowledge
5  into that process.
6      BY MR. FREITAS:  Q.  In your work you didn't
7  deliberately apply legal knowledge in construing the
8  claims of any of the patents-in-suit; right?
9      MR. KIRSCH:  Object as to form.
10      THE WITNESS:  It occurs to me -- may sound
11  like I'm diverting from an answer, but I'm not.  It
12  occurs to me that my infringement of the legal
13  reports always have a legal section which state my
14  understanding of the law as to infringement of
15  validity.  As to my reading of these claims for this
16  process, I apply an understanding of what the term
17  means technically, but I also have, although it's not
18  stated in this report, some legal guidance that I
19  understand.  For example, when you have a -- I know
20  that when you have a means-plus-function element that
21  the -- you need to find structure for the functional
22  language.  I suspect a lay engineer doesn't know
23  that.
24      I take these things typically as
25  instructions from counsel, although I have applied

Page 92

1  them before, so I know what they are.  I know how to
2  do them.
3      But still there is the context of -- you
4  know, of the assignment, here's this functional
5  language.  What disclosed structure do you think is
6  needed?
7      So in that sense, that's how I'm applying
8  what my understanding of the law is to read claim
9  terms properly.
10      BY MR. FREITAS:  Q.  Would it be a fair
11  statement to say that what you attempt to do is bring
12  your technical knowledge to bear in a manner that you
13  understand to be consistent with the law; is that
14  right?
15      A.  Yes.  I think that's a fair way to say it.
16  To be consistent with my understanding of the law.
17      Q.  But you don't offer legal opinions; right?
18      A.  Correct.
19      Q.  You don't attempt to apply legal rules as
20  opposed to technical understanding; correct?
21      MR. KIRSCH:  Object as to form.  Calls for
22  legal conclusion.
23      THE WITNESS:  Well, you described applying
24  legal rules, so that's not quite right.
25      BY MR. FREITAS:  Q.  Well, let me rephrase,



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 25 of 60   Page ID #:1505

THOMAS A. GAFFORD                                February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    93–96

Page 93

1  then, because I thought what you said was that you
2  attempt to bring your technical knowledge to bear in
3  a manner that isn't -- isn't inconsistent with --
4  I'll say is consistent with the legal doctrine;
5  right?
6      A. My understanding of the legal doctrine.
7      Q. Yes, yes. Okay. So you're opining on
8  technical matters, aren't you?
9      A. Yes.
10     Q. And you're saying from a technical
11 perspective what you think a person having ordinary
12 skill as you've defined it would understand on
13 reading a particular disclosure or claim; true?
14     A. Yes.
15     Q. So if there is a point of law that has found
16 its way into the report, you don't mean to be giving
17 an opinion on a point of law; right?
18     A. I think --
19        MR. KIRSCH: Object as to form. Calls for
20 legal conclusion.
21        THE WITNESS: I think that -- I'm going to
22 state this as a complete statement which I believe is
23 responsive to your question, which is that I don't
24 pick the legal points. That would be opining as to
25 law. I don't choose which legal doctrine to apply.

Page 94

1  When I'm presented something as a 112-6 type of
2  analysis, it's not my choice that that is, okay?
3  That would be legal. It's my job to apply, if I can,
4  the principles of a means-plus-function analysis to
5  claim language. That's technical.
6        BY MR. FREITAS: Q. Okay. Back to Claim
7  44.
8        MR. KIRSCH: So, Bob, just before you go on
9  there, it's now 12:30. You said you wanted to stop
10 at 12:30. We can keep going if you want.
11        MR. FREITAS: Yeah. I anticipate that the
12 next question or two will be concluded pretty
13 quickly.
14        MR. KIRSCH: No problem.
15        MR. FREITAS: And if I'm wrong, I'll do it
16 later.
17        MR. KIRSCH: Definitely don't want to
18 interrupt your line.
19        BY MR. FREITAS: Q. So in Claim 44 there's
20 a reference to the blocking device of Claim 2; right?
21     A. Yes.
22     Q. And then a further limitation wherein the
23 interface emulator is configured to emulate an IEEE
24 1394 connection.
25        Do you see that?

Page 95

1      A. I do.
2      Q. So is it true, Mr. Gafford, that you don't
3  know which interface is the subject of the
4  configuration that's described there?
5        MR. DUKELOW: Objection. Misstates the
6  evidence.
7        MR. KIRSCH: Objection. Form.
8        THE WITNESS: That's not --
9        BY MR. FREITAS: Q. I can't imagine how it
10 can be true when I say is it true that, but that's
11 okay.
12     A. That's not my testimony.
13     Q. Okay. I wasn't asking about your testimony.
14 I was asking about the fact. But anyway, let me ask
15 you a question a little less awkwardly.
16        Claim 44 claims the blocking device of Claim
17 2 as further limited; right?
18     A. Yes.
19     Q. And so that means that it has the interface
20 of Claim 2; right?
21     A. Yes.
22     Q. In Claim 44 the interface emulator is
23 configured to emulate an IEEE 1394 connection; right?
24     A. Yes.
25     Q. And the reference there to emulation of an

Page 96

1  IEEE 1394 connection is a reference to an interface,
2  isn't it?
3      A. Yes. Specifically recited as the interface
4  emulator.
5      Q. The interface emulator being configured to
6  emulate the connection.
7      A. I'm sorry. I just jumped to the wrong
8  language.
9        Yes.
10     Q. All right. Now the connection that appears
11 in the last word of Claim 44?
12     A. Yes.
13     Q. That is an interface; right?
14     A. It's a standard for interface types, yes,
15 FireWire.
16     Q. I don't mean to include the IEEE 1394. I
17 just meant the word connection.
18        That's a reference to an interface?
19     A. Sure. Connection between two things.
20     Q. And you use the term "port" to refer to a
21 connection or interface a while ago?
22     A. Yes, that's -- yes.
23     Q. Can you tell me which port is being
24 emulated?
25        MR. KIRSCH: Object as to form.



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014

97–100

Page 97

1    THE WITNESS:  The antecedent here is the
2 interface emulator.  If you go back and look at the
3 language of 2 and 1 to which this language is added,
4 there's only one interface emulator, and that's the
5 first element of Claim 1.  So Claim 44 is adding
6 language to the first element of Claim 1.
7    BY MR. FREITAS:  Q.  And the first element
8 of Claim 1 refers to an interface emulator configured
9 to emulate an interface presented by a storage
10 device; right?
11    A.  Yes.
12    Q.  And that means that the interface emulator
13 emulates which port?
14    A.  Well, that's the part that starts to get
15 tricky.  I mean, it's clear that 44 applies to the
16 first element of Claim 1.  One of the ways -- not the
17 only way, but one of the ways that I've looked at how
18 you combine claim elements in the past when you had
19 dependents is to use the dependent language to edit
20 the independent so that you can read it all at once.
21 And when I try that, I get something that's pretty
22 nutty.  So it -- at first glance, emulating it --
23 interpreting it that way, reading it that way says
24 that the first element of Claim 1 now is a -- no.
25 I'm not even going to go there because I can't even

Page 98

1 form a rational answer.
2    Claim 1, Element 1 tells us this interface
3 emulator is configured to emulate an interface
4 presented by a storage device.
5    Claim 44 tells us that it emulates a 1394
6 connection -- I'm sorry.  I keep looking at 45.  That
7 the interface emulator emulates a 1394 connection.
8 It seems to me that those are conflicting directives.
9    44 isn't modifying storage device.  It seems
10 to be providing an additional set of configured to
11 language, and I think it becomes a legal issue.  I
12 don't know -- I would need some direction.  This is
13 one of those places where I would ask for some legal
14 direction to apply technically to make sense of the
15 claims read together because this -- my first read --
16 my take on this right now is that it's nuts.  Can't
17 possibly work.
18    Q.  So you're unable to tell me which port is
19 being emulated; is that true?
20    A.  That's being emulated as in what it's made
21 to look like, yes.  I don't know what -- it's clear
22 that the interface emulator, that port, the port
23 we're talking about is the port that's hooking up to
24 the host, but what it's being asked to look like,
25 what it's being asked to emulate I don't think is

Page 99

1 clear when you read this together with the language
2 of 44.
3    Q.  So you do agree that the port that's being
4 emulated is the one that's connected to the host?
5    A.  You -- no.  You keep getting that wrong and
6 I'm sorry, and I'm taking --
7    Q.  Well, if -- just tell me if I'm wrong.
8    A.  -- taking -- I'll take responsibility.  I
9 haven't yet described to you -- haven't yet got
10 through to you what I'm saying.  It's -- Element 1
11 tells us two things:  Tells us what it's supposed to
12 look like and what it's set up to be connect to.
13    None of this modifies what it's being set up
14 to connect to.  It's being set up to connect to the
15 host.  The first part of the language tells us what
16 it's made to look like, and the language of Element 1
17 and Claim 1 is that it's being made to look like some
18 storage device.  They don't say what.  Just like a
19 storage device.
20    The language of 44 tells us that it's -- it
21 emulates a FireWire connection.  FireWire isn't
22 inherently a storage device.  FireWire can connect to
23 a lot of things.  Here's where I have to bring in
24 ordinary skill.  FireWire is a peripheral
25 interconnection technique that can talk to a lot of

Page 100

1 different devices, so I don't know how you reconcile
2 the -- 44's modification of the language of 1.
3    Q.  Are you finished?
4    A.  Yes.
5    Q.  As of September 25th, 2001, were there any
6 native FireWire storage devices?
7    MR. KIRSCH:  Objection as to form.  Outside
8 the scope.
9    THE WITNESS:  I don't remember.
10    MR. FREITAS:  Okay.  All right.  This is an
11 appropriate time for a break.
12    THE VIDEOGRAPHER:  The time is now
13 12:41 p.m., and we are off the record.
14    (Luncheon recess taken from 12:41 p.m. to
15 1:54 p.m.)
16    --o0o--
17
18
19
20
21
22
23
24
25

Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 27 of 60   Page ID
#:1507

THOMAS A. GAFFORD                                      February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        101–104

Page 101

1        A F T E R N O O N   P R O C E E D I N G S :
2
3        THE VIDEOGRAPHER:  The time is now
4  1:54 p.m., and we are back on the record.
5        BY MR. FREITAS:  Q.  Good afternoon,
6  Mr. Gafford.
7    A.  Good afternoon.
8    Q.  Back to the '682 patent, and if you could
9  look, please, in Column 5, beginning on -- I'll call
10  it line 32 where it says to Host Computer 201.
11        Do you see that?
12    A.  I do.
13    Q.  A bit down in that paragraph the following
14  sentence appears:  In other words, Blocking Device
15  203 is transparent to the system.
16        Do you see that?
17    A.  I see it about line 39.
18    Q.  You mentioned earlier that you took all of
19  the specification of the '682 patent into account in
20  forming the claim construction opinions that you
21  formed.
22        How did you make use of that sentence?
23        MR. KIRSCH:  Objection as to form.
24        THE WITNESS:  I couldn't tell you how I
25  specifically used that sentence.  This patent says a

Page 102

1  number of things about transparency.  That's one of
2  them.
3        BY MR. FREITAS:  Q.  Okay.  Do you agree
4  that the sentence, "In other words, Blocking Device
5  203 is transparent to the system," what that means is
6  that the words that appear immediately before that
7  are a description of what "transparent to the system"
8  means?
9        MR. KIRSCH:  Objection.  Calls for legal
10  conclusion.  Object as to form.
11        THE WITNESS:  As far as an English sentence,
12  the "in other words" is could be read as restating
13  what came in the previous sentence.
14        BY MR. FREITAS:  Q.  Well, that's the way
15  "in other words" should be read, isn't it?
16        MR. KIRSCH:  Object.  Calls for legal
17  conclusion.  Object as to form.
18        THE WITNESS:  That's the way this aspect --
19  that's the way I believe the inventors intended these
20  couple of sentences to be read, yes.
21        BY MR. FREITAS:  Q.  Okay.  Now, back to
22  Exhibit 9, please, which is a copy of your expert
23  report regarding construction of claim terms.
24        I believe the first place where you express
25  an opinion is on page 3; is that right?  Apart from

Page 103

1  your opinion regarding the level of ordinary skill in
2  the art.
3    A.  Yes.
4    Q.  Beginning with Section 14; right?
5    A.  Yes.
6    Q.  Do you remember whether you construed -- you
7  offered an opinion regarding the construction of the
8  means for comparing commands and the communications
9  between the host and the storage device to a
10  predetermined set of commands limitation during the
11  ITC proceeding?
12    A.  I'm sure I did.  I don't recall what I said.
13    Q.  Do you remember -- you don't remember what
14  it was if there was one?
15    A.  No.
16        MR. FREITAS:  All right.  I'm going to hand
17  you a copy of what I will ask to be marked as
18  Exhibit 12, and it's called, Expert Report of
19  Thomas A. Gafford Regarding Construction of Claim
20  Terms from the ITC proceeding dated
21  November 18th, 2011.
22        (Exhibit 12 was marked for identification by
23  the court reporter and is attached hereto.)
24        BY MR. FREITAS:  Q.  Can you review
25  Exhibit 12 as much as you need to to determine

Page 104

1  whether you offered an opinion about the means for
2  comparing commands limitation, please.
3    A.  Sure.
4        Doesn't appear that I did.  '682 section
5  appears to be over on page 10 of the report.
6    Q.  So there was no -- no opinion offered by
7  you?
8    A.  Apparently not.
9        MR. KIRSCH:  Objection as to scope.  Form.
10        BY MR. FREITAS:  Q.  Why do you have an
11  opinion in this case but you didn't offer in the
12  prior case?
13        MR. KIRSCH:  Objection on the basis of
14  attorney-client, attorney work product privilege.
15        To the extent you can answer the question
16  without divulging attorney-client, attorney work
17  product privilege, you can answer the question.
18        Object also as to form.
19        THE WITNESS:  I'll tell you that in general
20  I almost -- well, pretty much never picked the topics
21  of my report.  The topics are chosen by counsel.
22  They're putting the case together.  They know what
23  they want addressed.  They know what they want,
24  topics on which they wish opinions.  Engineers can
25  rattle on forever if turned loose on a topic with no



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
105—108

Page 105

1  -- no direction.  So the topic would have been -- the
2  topic for me to address would have been presented by
3  counsel I'm sure.
4          BY MR. FREITAS:  Q.  In paragraph 14.1.1,
5  you make the statement, There are differences between
6  how the functions of the claimed invention are
7  recited and how the functions are disclosed.  It's
8  more or less in the middle of 14.1.1.
9          Can you explain, please, what you meant by
10 that?
11     A.  Well, you need to read a little bit more of
12 that.
13     Q.  Sure.  I'm back in Exhibit 9, by the way.  I
14 should have said that.
15     A.  I see that.  The choice of -- what I meant
16 to say here by this statement is that the choice of
17 language in the claim is a particular atom of
18 information.  And with respect, for example, to
19 Figure 4, no single element corresponds exactly to
20 the functional language in this element, so the rest
21 of my opinion is going to involve pieces of the boxes
22 in the Figure 4 diagram.
23     Q.  A little bit further down you say the
24 decision boxes in the flowchart would be implemented
25 by a person having ordinary skill in the art with at

Page 106

1  least a comparison instruction followed by at least
2  one branch instruction.
3          Can you explain what you mean by that,
4  please?
5      A.  I don't know how to make it any more plain.
6  What don't you understand?
7      Q.  I can't tell you what I don't understand
8  until I know what you meant.  So let me try it this
9  way.
10         That sentence refers to Figure 4; right?
11     A.  Yes.
12     Q.  And when you say "the decision boxes," are
13 you referring to the rectangles and other structures
14 within writing appears or just the rectangles or
15 what?
16     A.  Decision boxes are the diamonds.
17     Q.  Okay.  So you say that the decision boxes
18 would be implemented with at least a comparison
19 instruction.
20         Are you referring to any of the structures
21 that appear on Figure 4, any of the rectangles or
22 diamonds?
23     A.  All of the diamonds.
24     Q.  All of the diamonds have comparison
25 instructions?

Page 107

1      A.  Yes.  At a minimum.
2      Q.  That might not be all they have, but they
3  all have comparison instructions.
4          Is that what you meant?
5      A.  Yes.
6      Q.  And then you say followed by at least one
7  branch instruction.
8          To what are you referring with your
9  expression "branch instruction"?
10     A.  An instruction that determines which exit
11 you take from the diamond.
12     Q.  Would those be the yeses or noes?
13     A.  Both.
14     Q.  But those are -- the yeses and noes are all
15 of the branch instructions?
16     A.  They are the exits that are the result of
17 executing at least one branch instruction.
18     Q.  And there are no branch instructions other
19 than those that lead to a yes or a no; is that true?
20     A.  That's not what I'm saying.  I'm not even
21 sure it's true.  It's not -- I didn't consider your
22 question.  What I'm saying is that the -- is what the
23 minimum structure necessary is for implementing the
24 decision and change of flow and alter -- decision and
25 alternate flow in each of these boxes as a way to

Page 108

1  discuss a portion of the structure each box
2  represents.
3      Q.  Okay.  I'm just trying to determine what the
4  inventory for your reference to branch instruction
5  would be.
6          And my question is, are there any branch
7  instructions in Figure 4 other than those that lead
8  to a yes or no as depicted in Figure 4?
9      A.  There could be more aggregated in Box 460
10 because it speaks to further processing because it
11 has an "or" it's -- it's a compilation of otherwise
12 unspecified process where you would have additional
13 decisions, so if you flushed out 460 for additional
14 commands, each of those decisions would have at least
15 a comparison and at least one branch.
16     Q.  When you said "at least one branch
17 instruction," were you referring to any instructions
18 other than those that would lead to a "yes" or a "no"
19 as depicted in Figure 4?
20     A.  It isn't that -- I'm not sure what you mean
21 by lead to yes or no.  A branch instruction is how
22 the choice of exits would most simply be implemented
23 by code corresponding to one of these decision boxes.
24     Q.  Okay.  Among the groups -- among the group
25 of branch instructions -- well, I'll withdraw that.



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
109–112

Page 109

1    Can you show me where all of the branch
2 instructions to which you refer are shown on Figure
3 4?
4    A.  There would be one.  At least one in 420 and
5 440 and 450.  And if anything is implemented, if
6 there are any requirements for additional commands
7 being processed in 460, then for each additional
8 command being tested, you would have another branch
9 instruction.
10    Q.  Are there any others?
11    A.  No, none that are required.  A programmer
12 might choose to -- in implementing a box like read
13 from drive past data to host through drive interface
14 emulator, I could imagine low-level details in that
15 processing that might involve branching.  But as to
16 what this -- as to this basic filtering of commands,
17 what I'm talking about is nothing more than a branch
18 in each diamond -- in each decision box.
19    Q.  So --
20    MR. DUKELOW:  Can we go off the record for a
21 sec?
22    MR. FREITAS:  Sure.
23    THE VIDEOGRAPHER:  The time is now
24 2:09 p.m., and we are off the record.
25    (Pause in proceedings.)

Page 110

1    THE VIDEOGRAPHER:  The time is now
2 2:09 p.m., and we are back on the record.
3    BY MR. FREITAS:  Q.  Let's move to
4 Section 14.2, please.
5    In there you address the means for
6 forwarding selective runs of commands in the
7 intercepted communications to the storage . . .
8 known to not permanently modify a state of the
9 storage device language; right?
10    A.  Yes.
11    Q.  In the ITC proceeding, did you offer
12 opinions on a construction of any means-plus-function
13 language?
14    A.  I don't recall if I did or not.
15    Q.  Could you look at Exhibit 12 and see if that
16 refreshes your recollection whether you did?
17    A.  You don't care what -- you want to know with
18 respect to all the patents addressed?
19    Q.  Sure.
20    MR. KIRSCH:  Bob, while he's looking at it,
21 I assume the question you're asking is strictly
22 related to claim construction because obviously
23 Mr. Gafford did offer infringement opinions and
24 invalidity opinions with respect to a number of the
25 claims which would have means-plus-function in them.

Page 111

1    MR. FREITAS:  You are correct.  I'm asking
2 about claim construction.
3    MR. KIRSCH:  Thank you.
4    THE WITNESS:  There are two means for claim
5 elements that I address in the ITC report on page 11
6 at E and on page 12 at F.  Those are the only two I
7 see in the report.
8    BY MR. FREITAS:  Q.  So that means that you
9 did not offer an opinion regarding the construction
10 of the limitation that you address in 14.2 on page 3
11 of your current report; correct?
12    MR. KIRSCH:  In the ITC action?
13    MR. FREITAS:  That's what I meant, yes.
14    THE WITNESS:  As to the claim term stage of
15 the proceedings, no.
16    BY MR. FREITAS:  Q.  Yes.  I'm -- unless I
17 say otherwise I'm only asking you about claim
18 construction.
19    A.  Right, because I seem to remember at some
20 point these steps in Figure 4 becoming part of my
21 opinion, but they clearly were not really -- not part
22 of my opinion in the claim construction phase.
23    Q.  Okay.  The last sentence of 14.2.1 says, The
24 basis for my opinion is that the flow of control for
25 forwarding commands passes through these portions of

Page 112

1 the elements in the figure in order to perform the
2 recited function of forwarding commands to the
3 storage.
4    Do you see that?
5    A.  I do.
6    Q.  Is that a complete statement of the basis
7 for your opinion?
8    A.  Yes.
9    MR. KIRSCH:  Bob, before you ask your next
10 question, I could be wrong about this, but I think
11 there was actually a rebuttal report on claim
12 construction in the ITC matter, so I don't know if
13 you have that because when you were asking him to
14 look through for which means-plus-function claim
15 limitations he actually reviewed, it's possible --
16    MR. FREITAS:  Do we have that?
17    MR. OLANIRAN:  We don't have it correctly,
18 but we do have access to it.
19    MR. FREITAS:  Okay.  Let's go get it.
20    I think you're right.  I think there was
21 one.  We'll give you a chance to take a look at that
22 to see if it changes any of the "did you offer an
23 opinion on" questions that have been asked.
24    I've been informed it's not public.
25    MR. KIRSCH:  What?



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
113–116

Page 113

1    MR. FREITAS:  The rebuttal is not public, so
2  I don't think we can use it in this case.
3    MR. KIRSCH:  That's interesting.
4    THE WITNESS:  In claim construction?
5    MR. FREITAS:  Do you disagree with that?
6  That's the working assumption that I'm using is that
7  if it's not public, we can't use things that aren't
8  public.
9    MR. KIRSCH:  Do you want to go off the
10  record?
11    MR. FREITAS:  Sure.
12    MR. KIRSCH:  Let's go off the record.
13    THE VIDEOGRAPHER:  Time is now 2:16 p.m.,
14  and we are off the record.
15    (Recess taken from 2:16 p.m. to 2:19 p.m.)
16  is
17    THE VIDEOGRAPHER:  The time is now
18  2:18 p.m., and we are back on the record.
19    BY MR. FREITAS:  Q.  In paragraph 14.3.1,
20  which begins on the bottom of page 3 of Exhibit 9,
21  your current claim construction report, Mr. Gafford,
22  you discuss elements listed in both Figure 4 and
23  Figure 5; correct?
24    A.  Yes.
25    Q.  And so you identify, for example, Steps 420,

Page 114

1  430, 440 and 450 from Figure 4 among other things;
2  right?
3    A.  Yes.
4    Q.  And you discuss 525 -- excuse me.  520, 525
5  and 530 among other things from Figure 5; correct?
6    A.  Actually it's all the hardware elements
7  except for those.
8    Q.  Oh, I'm sorry.  Yes.
9    A.  It's the upside down.
10    Q.  I got it upside down.  You're right.
11    Okay.  So all of the hardware structures in
12  Figure 5 other than 520, 525, 530 and 560?
13    A.  Yes.  That's what's in here.
14    Q.  So the items that you cite in 14.3.1 from
15  Figure 4 and Figure 5, all of them together
16  constitute the structure as you see it?
17    A.  As in regards the hardware that supports the
18  operation of the software flow in these steps.
19    Q.  So but you've identified more than hardware;
20  right?
21    A.  Well, I don't know what you mean.  I've
22  identified hardware and software here.
23    Q.  Okay.  The next term that you discuss in
24  Exhibit 9 is interface emulator, and you say that
25  that is an interface component that mimics the

Page 115

1  interface presented by the storage device; right?
2    A.  That's part of what I say.
3    Q.  Okay.  You don't identify any other
4  interface that is emulated; correct?
5    A.  Correct.
6    Q.  So the interface presented by the storage
7  device is the interface that is emulated by the
8  interface emulator; correct?
9    A.  Yes.
10    Q.  And is the basis for your conclusion that
11  the interface that is emulated is the interface
12  presented by the storage device, is the basis for
13  that conclusion what you cite in paragraph 14.4.1;
14  that is, the section in Column 2, lines 27 to 33 from
15  the '682 patent?
16    MR. KIRSCH:  Object as to form.
17    THE WITNESS:  Can I hear the question again?
18    (Record read.)
19    THE WITNESS:  Yes.  That's all I -- that's
20  all I use here as sufficient.
21    BY MR. FREITAS:  Q.  As you pointed out a
22  few moments ago when I read from your construction of
23  interface emulator, the complete construction is an
24  interface component that mimics the interface
25  presented by the storage device and operates with no

Page 116

1  reconfiguration of the host software.
2    Is a complete statement of the basis for the
3  part of that construction, quote, and operates with
4  no reconfiguration of the host software set forth in
5  Section 14.4 of Exhibit 9?
6    MR. KIRSCH:  Object as to form.
7    THE WITNESS:  I almost think your
8  question -- just so I understand it it is my report
9  my report.  This section contains all the support
10  that I have chosen to include to support this
11  construction.  14.4 is it.
12    BY MR. FREITAS:  Q.  Well, what I want to
13  know is if there's other support that you have that
14  you didn't choose to include.
15    A.  That I have is actually tricky.  I have done
16  a lot of thinking about this case and this patent
17  since I first read it in advance of the ITC hearing
18  by a year or so.  What I have written here is what I
19  think is accurate and precise and sufficient.
20    Q.  Is there any material support for the
21  opinion that does not appear in Section 14.4?
22    MR. KIRSCH:  Object to form.
23    THE WITNESS:  It's an incomplete question.
24  Is there any on -- in the solar system?  Where?
25    BY MR. FREITAS:  Q.  That has been perceived



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 31 of 60   Page ID #:1511

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                      117–120

Page 117

1 by Tom Gafford.
2    A. I -- I have no idea. I mean, I'd have to
3 sort through the content. I'd have -- to answer that
4 question, I'd have to write everything -- every
5 thought I have ever had about interface emulator in
6 this matter and then see whether I've got support for
7 all of it down here, and I couldn't tell you
8 whether -- I couldn't tell you whether I've ever had
9 an idea that is different or in addition to or that
10 would also support this. This contains what I
11 believe is sufficient. Is it every idea I've ever
12 had? I have no idea.
13    Q. Can you tell me whether or not you
14 deliberately left out material support for the
15 conclusion that a proper construction of interface
16 emulator includes the phrase and operates with no
17 reconfiguration of the host software?
18    A. Good Lord. No. I'm sure if I -- if I
19 thought something was an effective support for this
20 opinion I would have included it. I can't imagine --
21 nothing comes to mind. That's for sure.
22    Q. You state in Section 14.4.2 that the
23 interface emulator must not require a reconfiguration
24 of the host software to perform its function in
25 accordance with applicant's criticism of Kern that

Page 118

1 Kern's Application Programs 110-112 could be designed
2 to operate with any intelligent digital input/output
3 channel.
4       And then you say, Put another way, the
5 software and any configuration the software required
6 to operate the storage device without the blocker
7 needs no change to operate the storage device with
8 the blocker as applicant stated, for example, here
9 and then 14.4.2.1 appears.
10       I want to isolate first on this comment you
11 made about applicant's criticism of Kern. Where is
12 that criticism recorded?
13    A. It's in the prosecution history. I don't
14 remember where. I apologize for not including a cite
15 here.
16    Q. Okay. Do you know if it's in the office
17 action response dated November 24, 2003?
18    A. I don't know --
19    Q. I can hand you a copy, and maybe that will
20 refresh your recollection.
21    A. Sure.
22       MR. FREITAS: Let's have marked as
23 Exhibit 13 a document numbered MTI 565 through 596.
24 On the first page the title is Information Disclosure
25 Statement Transmittal Letter.

Page 119

1       (Exhibit 13 was marked for identification by
2 the court reporter and is attached hereto.)
3       THE WITNESS: Okay. It's on page 19.
4       BY MR. FREITAS: Q. Of Exhibit 13?
5    A. Of Exhibit 13.
6    Q. Okay.
7    A. Well, be a little careful. The numbering,
8 to find page 1 you have to go three pages in, and
9 then it's on page 19 of the way the exhibit is
10 stapled together. You've stapled together an IDS
11 along with an amendment.
12       But in any case, the page bears the Bates
13 No. MTI0000585.
14    Q. And where is the passage you describe as
15 applicant's criticism of Kern in 14.4.2 in Exhibit 9?
16    A. In the first full paragraph on the page.
17    Q. Yes.
18    A. Near the bottom, second -- near the end of
19 the second sentence from the last sentence.
20 Application Programs 110 to 112 could be designed to
21 operate with any intelligent digital input/output
22 channel.
23    Q. That is the language to which you refer when
24 you mention applicant's criticism of Kern?
25    A. Yes. The criticism concludes with the fact

Page 120

1 that it's a criticism is at least partly supported by
2 the following sentence: Thus, if anything, Kern
3 actually teaches away from this aspect of the
4 invention.
5    Q. In any event, the phrase "Application
6 Programs 110-112 could be designed to operate with
7 any intelligent digital input/output channel," that
8 is the entirety of what you are referring to in
9 14.4.2 as appellate's criticism of Kern; right?
10       MR. KIRSCH: Objection to form. Misstates
11 testimony.
12       THE WITNESS: That citation supports the
13 sentence that precedes it, the sentence that opens
14 the paragraph.
15       BY MR. FREITAS: Q. Well, it's a quote,
16 isn't it? Even though there weren't quote marks
17 around the entirety?
18    A. Yeah.
19    Q. Right?
20    A. Yes. And it's in support of the sentence
21 that -- at whose end it appears.
22    Q. Right. So that is the support. That's the
23 entire support for your description of -- for your
24 reference to a criticism of Kern.
25       MR. KIRSCH: Object as to form. Misstates



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 32 of 60   Page ID #:1512

THOMAS A. GAFFORD                                      February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                     121–124

Page 121

1 testimony.
2       BY MR. FREITAS:  Q.  Putting aside whatever
3 else was said about Kern, the criticism of Kern to
4 which you refer in 14.4.2 is that Kern's Application
5 Programs 110-112 could be designed to operate with
6 any intelligent digital input/output channel, full
7 stop; right?
8       MR. KIRSCH:  Is there a question pending?
9       THE WITNESS:  Yeah.  I don't have -- I know
10 where you're reading, and I -- but I'm not sure what
11 the sense of your question is.
12       BY MR. FREITAS:  Q.  The sense of my
13 question is, the entirety of what you refer to when
14 you say applicant's criticism of Kern in 14.4.2 is
15 the statement in Exhibit 13 on page MTI 585 that
16 Application Programs 110-112 could be designed to
17 operate with any intelligent digital input/output
18 channel; correct?
19       MR. KIRSCH:  Object as to form.  Misstates
20 testimony.
21       THE WITNESS:  I think this may have been my
22 way of referring to the entire paragraph in which
23 this sentence appears rather than incorporating all
24 of it into my report because in the sense of
25 applicant's criticism of Kern, actually pretty much

Page 122

1 everything on page 19 is a criticism of Kern.
2       BY MR. FREITAS:  Q.  So all you mentioned
3 was that Application Programs 110-112 could be
4 designed to operate with any intelligent digital
5 input/output channel, but you're suggesting that when
6 you mentioned applicant's criticism of Kern, you were
7 referring to something else?
8       MR. KIRSCH:  Object as to form.  Misstates
9 testimony.  Argumentative.
10       THE WITNESS:  Yeah.
11       Sorry.
12       The sentence says, In accordance with
13 application's criticism of Kern, and this is an
14 excerpt of that criticism.  Hang on.  I mean, the
15 specific phrase I used includes the term "that" which
16 in English binds the sentence together.  I think
17 that's a concise way of saying what Kern's -- the
18 guts of Kern's criticism, but the whole page talks
19 about this -- these programs 110 to 112 repeatedly.
20       I simply don't recall if I -- if I -- as I
21 sit here now, I can tell you that I think this whole
22 page criticizes Kern.  There's no question that
23 they're traversing Kern.  And what you do is when you
24 traverse is reference is you criticize it, and
25 they're giving us -- they're giving the public their

Page 123

1 criticism of Kern on page 19 and a little bit before
2 and after.  This, I think, is most fairly described
3 what I wrote as a -- as the salient point they make.
4 It's certainly not the whole of their criticism of
5 Kern.  I don't know how else to give you an answer to
6 the question.
7       BY MR. FREITAS:  Q.  Well, it is the whole
8 of their criticism that Kern's Application Programs
9 110-112 could be designed to operate with any
10 intelligent digital input/output channel, isn't it?
11       MR. KIRSCH:  Object as to form.  Misstates
12 testimony.  Asked and answered.  Argumentative.
13       THE WITNESS:  I don't know how to give you a
14 better answer than the one I just gave you.
15       BY MR. FREITAS:  Q.  Okay.  When you were
16 working on your claim construction in the ITC
17 proceeding, you gave it as good an effort as you
18 could; right?
19       MR. KIRSCH:  Object as to form.  Calls for
20 speculation.
21       THE WITNESS:  Are you speculating I did, or
22 are you asking me if I did or did not?
23       BY MR. FREITAS:  Q.  It's a leading question
24 as to which I'm expecting a yes answer.
25       MR. KIRSCH:  It's very candid of you.

Page 124

1       THE WITNESS:  I think I'd probably never get
2 another job again if I said no.  Yes, I always do
3 that.
4       BY MR. FREITAS:  Q.  I assumed as much.
5       And the work you did was directed toward
6 coming up with -- the claim construction work was
7 directed toward coming up with the most accurate
8 constructions you could given the evidence available
9 to you; right?
10       A.  Yes.
11       Q.  Now in this district court proceeding the
12 evidence available to you hasn't changed, has it?
13       A.  Yes, it has.
14       Q.  How so?
15       A.  Well, perhaps not the evidence, but the --
16 the understanding of that evidence has changed.
17 Having watched and participated in the give and take
18 of litigation and discussing and rediscussing the
19 prosecution history statements and the art to which
20 they refer, my -- this -- I suppose this is one of
21 those Zen things.  I've changed; therefore, it has
22 changed.  The -- or maybe I have that backwards.
23 Never very good at those.  But certainly my
24 perception of the evidence has changed, and that
25 informs what I've written here.



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
125–128

Page 125

1    Q.  So does that mean that you've concluded that
2  one or more of the claim construction opinions you
3  offered in the ITC proceeding was erroneous?
4    A.  No.  I'd say -- no, it doesn't mean that.
5    Q.  In Zen or otherwise, what does it mean?
6    MR. KIRSCH:  Object as to form.
7    THE WITNESS:  In any --
8    BY MR. FREITAS:  Q.  Pardon me?
9    A.  It means that having that had the experience
10  that I've had with these documents who themselves --
11  which themselves have not changed, my understanding
12  of the documents has changed, and I think that what
13  I've written in this matter is more precise than what
14  I wrote a couple of years ago.
15    Q.  So what you wrote a couple years ago was
16  less precise.
17    Was it accurate?
18    A.  It was always accurate.
19    Q.  Is it still accurate?
20    A.  This may sound like -- I've forgotten the
21  author now.  I think what I've written now is more
22  precise and better focused and more understandable to
23  the Court --
24    Q.  Well --
25    A.  -- having the --

Page 126

1    Q.  I'm sorry.  Didn't mean to interrupt.
2    A.  -- having the benefit of my experience and
3  looking at these issues for over two or three years'
4  time.
5    Q.  In the ITC proceeding you made no mention of
6  reconfiguration when you offered an opinion regarding
7  the construction of interface emulator; correct?
8    MR. KIRSCH:  Object as to form.
9    THE WITNESS:  Let's look.
10    I know that reconfiguration came up
11  eventually, but whether it's here, let's see.  If you
12  want to --
13    BY MR. FREITAS:  Q.  Page 4 of Exhibit 12.
14    A.  All right.
15    MR. KIRSCH:  Just for the record while
16  you're looking at it again, you discussed this off the
17  record -- we don't have a copy of the rebuttal report
18  for him to look at as well.
19    MR. FREITAS:  That's true.  You're right
20  about that.
21    THE WITNESS:  Reconfiguration came up in the
22  -- they're a pair of terms which are collapsed into a
23  single term.  A pair of terms from the ITC in the
24  claim language elements that are collapsed into -- in
25  the interface emulator and the interface emulator

Page 127

1  with more language configured and so on for several
2  more words, and the -- I've included under the single
3  term in this matter interface emulator the argue --
4  the position I took with regard to no reconfiguration
5  in the -- in the longer version of that claim element
6  in the ITC.  The citation to the applicants speaking
7  of reconfiguration can be found in page 7 of the --
8  of my report Exhibit 12 in the middle of the page
9  under Element V.
10    BY MR. FREITAS:  Q.  So in the ITC
11  proceeding, you said that an interface -- that the
12  correct definition for the term "interface emulator"
13  is, quote, a nonintelligent interface component
14  separate from the processor that mimics another
15  interface; right?
16    MR. KIRSCH:  Object as to form.  Incomplete
17  record.
18    THE WITNESS:  Well, do you really want me to
19  read in -- I don't think you completely stated what's
20  in the record.  That starts --
21    BY MR. FREITAS:  Q.  I did completely state
22  what you said is the correct definition, didn't I?
23    A.  Let's see.  Well, I wasn't watching it at
24  the time.  Perhaps you can have her read back the
25  question.

Page 128

1    Q.  In the ITC proceeding you stated in your
2  report on claim construction that the correct
3  definition for the term "interfaces emulator" is,
4  quote, a nonintelligent interface component separate
5  from the processor that mimics another interface,
6  unquote; right?
7    A.  Yes, that's --
8    MR. KIRSCH:  Question is overbroad.  Object
9  as to form.
10    THE WITNESS:  The -- at 15 AI on page 4 of
11  the ITC report that I filed, in the first three lines
12  of I, that's exactly what it says.  And then it goes
13  on to explain.
14    BY MR. FREITAS:  Q.  And then what you
15  present as the correct definition for the term
16  interface emulator in this proceeding is different,
17  isn't it?
18    A.  Yes, for just that term.  However -- well,
19  I've already said it's a merger of the two from the
20  ITC.  But specifically the interface emulator in this
21  matter includes the reconfiguration portion of my
22  opinion from the ITC more or less.
23    Q.  Well, which is correct?
24    A.  They're both correct.  The -- as to why
25  they're organized in the ITC under two separate



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 34 of 60   Page ID #:1514

THOMAS A. GAFFORD                                              February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                                129—132

Page 129

1 recitations of the claim language and organized under
2 only the single term in this case, I couldn't tell
3 you. That's a legal call as far as I know.
4     Q. Why did you drop "nonintelligent"?
5         MR. KIRSCH: Objection to the extent --
6 objection on the basis of attorney-client, attorney
7 work product privilege.
8         To the extent you can answer the question
9 without divulging any attorney-client or attorney
10 work product privileges, you can answer the question.
11        THE WITNESS: I can't.
12        BY MR. FREITAS: Q. So these aren't your
13 opinions? These are what the lawyers told you to
14 write down?
15        MR. KIRSCH: Don't answer that question.
16        BY MR. FREITAS: Q. Please do.
17        MR. KIRSCH: Don't answer that question.
18 Instruct you not to answer.
19        BY MR. FREITAS: Q. Does Exhibit 9 contain
20 your opinions or something you were told to write
21 down?
22        MR. KIRSCH: Objection.
23        Don't answer that question.
24        He's already answered the question before.
25        MR. FREITAS: He can answer the question?

Page 130

1         MR. KIRSCH: No. I'm instructing him not to
2 answer the question.
3         MR. FREITAS: On what basis?
4         MR. KIRSCH: You're trying to invade
5 attorney-client, attorney work product privilege, and
6 you're being argumentative. And you've already asked
7 the question before; he's already answered the
8 question before.
9         MR. FREITAS: Okay. Now that we have a
10 refusal to answer a question that appears --
11        MR. KIRSCH: If you want to ask him whether
12 he -- his opinions, whether he wrote the thing,
13 that's one line. But what you're asking is or did he
14 write what he was told to write. He's not going to
15 answer any questions at all about what he was -- you
16 know, any conversation that he had with his attorneys
17 during the course of those meetings.
18        So if you can ratchet your question down to
19 a more narrow focus, that's fine. But I'm not going
20 to allow you to invade the attorney-client, attorney
21 work product privilege.
22        MR. FREITAS: You've really got me puzzled
23 with this attorney-client thing. Because he said he
24 was at the meeting -- and I don't understand. He
25 said who was at the meeting and what the purpose of

Page 131

1 the meeting was. I just can't imagine why you're
2 saying attorney-client privilege.
3         MR. KIRSCH: Well, for one, he's actually
4 identified that one of the principals of one of the
5 companies that is involved in litigation was present
6 during the meeting, so that would actually, you know,
7 fall within that context.
8         Secondly, obviously the attorney work
9 product privilege pertains to all of that.
10        MR. FREITAS: Well, but you're mentioning
11 them all. You mentioned them all. I don't
12 understand how you can claim attorney-client
13 privilege.
14        BY MR. FREITAS: Q. But anyway, so is it
15 your opinion or someone else's opinion that appears
16 in the claim constructions in Exhibit 9?
17        MR. KIRSCH: I'm going to object. He can --
18        You can answer strictly a question of
19 whether it's your opinion -- whether these are your
20 opinions, but I'm not going to allow you to answer
21 any question that -- where you're actually asking
22 about potential attorney-client, attorney work
23 product privileges.
24        MR. FREITAS: I like the question I just
25 asked. Do I get an answer?

Page 132

1         MR. KIRSCH: If you break the question
2 down --
3         MR. FREITAS: I don't want to.
4         MR. KIRSCH: If you break the question down
5 and ask whether these are his opinions in the report,
6 he can answer that question. But when you sit there
7 and load the question the way you have, you're
8 calling for an invasion of attorney-client or
9 attorney work product privilege.
10        MR. FREITAS: No, I'm not. My question is
11 not limited in any way to attorney-client. I said,
12 is it yours or someone else's? I'd like my question
13 to be answered.
14        MR. KIRSCH: Yeah. I've already instructed
15 not to answer. You can --
16        BY MR. FREITAS: Q. All right. So you're
17 not going to answer?
18        MR. KIRSCH: He's already answered the
19 question. You've actually done this exact line of
20 questioning at the beginning of the deposition. He
21 answered the question fully and completely.
22        MR. FREITAS: So can he answer or not?
23        MR. KIRSCH: He has already answered the
24 question that he is going to offer the opinion. That
25 was his testimony before. You want to sit there and



THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    133–136

Page 133

1 ask him that question and verify that he was the one
2 that authored the opinion, you can do that. But I'm
3 not going to sit there and have you start invading
4 the actual communications that took place between
5 Mr. Gafford and the attorneys involved.
6      BY MR. FREITAS: Q. Okay. I want to know,
7 does Exhibit 9 set forth your claim construction
8 opinions or was it someone else? That's what I want
9 to know. Yes or no?
10     MR. KIRSCH: I'm instructing him not to
11 answer the question.
12     BY MR. FREITAS: Q. And you refuse to
13 answer?
14     A. I'm following counsel's instruction.
15     Q. Okay. Back to page 4 of Exhibit 9, please,
16 paragraph 14.4.2.1.
17     The part that you quote from page 18 of the
18 office action response that we've marked as Exhibit
19 13, I think, you quote an excerpt from page 18;
20 right?
21     A. Yes.
22     Q. And is it or is it not the case that the
23 "accordingly" sentence -- or excuse me. The passage
24 in 14.4.2.1 beginning with "accordingly" is part of a
25 discussion of Kern or something else?

Page 134

1      MR. KIRSCH: Object as to form.
2      THE WITNESS: This statement in the
3 prosecution history precedes the introduction of
4 Kern. It's a statement about how the disclosed
5 blocking device works, and it's an introduction to
6 the Kern -- to the Kern traversal.
7      BY MR. FREITAS: Q. Well, may I direct your
8 attention to the prior page MTI 583. See at the
9 bottom of the page it says, Certain claims stand
10 rejected under 102E in view of Kern?
11     Do you see that?
12     A. I do.
13     Q. For the following reasons, applicants
14 respectfully traverse this rejection.
15     Do you see that?
16     A. I do.
17     Q. So is it your understanding that the first
18 two paragraphs on page 18, the one that's number
19 stamped MTI584, are those addressed to Kern or
20 something else?
21     A. I think they're addressed to Kern because
22 the entire section is dealing with the -- an attempt
23 to traverse Kern. That's -- as you point out at the
24 bottom of page 17 --
25     Q. Okay.

Page 135

1      A. -- that's what they're talking about. So I
2 think the entire body of what follows all the
3 paragraphs are speaking to Kern one way or another.
4      Q. Okay. And you agree, don't you, that the
5 software that was addressed in Kern Application
6 Programs 110 to 112, that's what's being referenced
7 when special hardware or software are addressed on
8 page 18?
9      MR. KIRSCH: Object as to form.
10     BY MR. FREITAS: Q. Right?
11     A. You lost me. Could you state that again.
12     Q. Sure. Remember how in Kern there were
13 Application Programs 110 to 112?
14     A. Yes.
15     Q. Okay. That is what's being referenced as
16 special software application programs; right?
17     MR. KIRSCH: Object as to form.
18     THE WITNESS: Well, being referenced in
19 exactly which sentence here? I mean, 110 to 112
20 clearly references 110 to 112, but I don't understand
21 if your question goes any deeper than that other than
22 the literal recitation of those numbers on page 18.
23     BY MR. FREITAS: Q. Here's what I'm
24 referring to. The "accordingly" sentence on page 18
25 of Exhibit 13, that's the one number stamped MTI584?

Page 136

1      A. Right.
2      Q. You quote the "accordingly" sentence on page
3 4 of Exhibit 9, and you quote the following sentence,
4 the one that begins, "The blocking device simply
5 needs"; right?
6      A. Yes.
7      Q. Okay. In the "accordingly" sentence that
8 appears in Exhibit 13 and in Exhibit 9, there's a
9 reference to special hardware or software.
10     See that?
11     A. Yes.
12     Q. And you agree with me that the word
13 "special" modifies "hardware" and "software" in that
14 clause?
15     A. Yes.
16     Q. The special software to which reference is
17 made is the Application Programs 110, 112 -- through
18 112 of Kern; right?
19     MR. KIRSCH: Object as to form.
20     THE WITNESS: I don't believe that's
21 correct. From what we've just discussed in Kern,
22 Kern speaks to changes initiated by the application
23 programs but taking place at other layers in the
24 system. So special -- I mean, good Lord. Changing
25 the SCSI protocol is very special, and it ain't the



THOMAS A. GAFFORD                                         February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                            137–140

Page 137

1 application program.
2       BY MR. FREITAS:  Q.  So you think that
3 something that occurs without an application program
4 is embraced within that reference special hardware or
5 software.
6       Is that what you're saying?
7       MR. KIRSCH:  Object as to form.  Misstates
8 testimony.
9       THE WITNESS:  "Without" is an incorrect
10 statement of what I just said, but it doesn't matter
11 whether the application changes or not.  The fact is
12 that referencing 110 to 112 is not an unreasonable
13 way to reference what's going on in Kern because they
14 cause some other things to happen, and what they
15 cause to happen is reconfiguration done in the
16 interface level, low-level stuff, driver and below.
17       The -- Kern doesn't tell us how you do that,
18 but it tells us that you do that, and it isn't just
19 the applications that are changing in Kern.
20       MR. KIRSCH:  Bob, we've been going for about
21 an hour and eight minutes, so -- I don't want to stop
22 you --
23       MR. FREITAS:  Let me ask you couple
24 questions, and then we'll take a break.
25       MR. KIRSCH:  Sure.

Page 138

1       BY MR. FREITAS:  Q.  Well, the sentence,
2 Accordingly, neither the host nor the storage device
3 need any special hardware or software, that doesn't
4 refer to reconfiguration.
5       That just says they don't need special
6 hardware or software; right?
7       MR. KIRSCH:  Object as to form.
8       THE WITNESS:  I don't know why -- that's
9 your statement that doesn't refer to reconfiguration.
10 To me that's exactly what it refers to.  When you
11 read the whole of the reference, you whole read the
12 whole of Kern, and you read the whole of what they
13 say here.  They're talking about the twiddling at
14 levels below application that have to happen in order
15 for Kern to access the storage device once it's been
16 modified by this -- by this security blocking element
17 that goes in the controller channel.
18       BY MR. FREITAS:  Q.  So they're not talking
19 about the application programs that are needed to
20 make the invention of Kern the invention of Kern?
21       MR. KIRSCH:  Object as to form.
22       THE WITNESS:  You just misstated everything
23 that I've said about Kern.
24       BY MR. FREITAS:  Q.  Actually, what I did is
25 I tried to contrast it.  I didn't misstate anything.

Page 139

1       A.  No.  I can't --
2       MR. KIRSCH:  There's not a question pending.
3       THE WITNESS:  Sorry.  Is there a question?
4       MR. KIRSCH:  Do you want --
5       BY MR. FREITAS:  Q.  There was a question,
6 but --
7       A.  Let's go back.  Let's go back to that
8 question.  Let's go back to that question if you'd
9 like.
10       MR. FREITAS:  Could you read it, please.
11       (Record read.)
12       MR. KIRSCH:  Same objection.
13       THE WITNESS:  They are not just talking
14 about application programs.
15       BY MR. FREITAS:  Q.  So they did talk about
16 the application programs explicitly, didn't they?
17       A.  They always talk --
18       MR. KIRSCH:  Object to form.
19       THE WITNESS:  They always talk about the
20 application programs.  And what happens in Kern is
21 they cause changes to happen.  As they say here in
22 the middle of page 18, special hardware and software
23 isn't limited to the application programs.  That's
24 the hook they use to discuss it.
25       But Kern changes his storage controller.

Page 140

1 Launched from or guided by the application program,
2 Kern is changing things that are -- that would -- one
3 of ordinary skill in the art would understand to take
4 place at the driver level, and he's going farther
5 than that.  He's changing the SCSI protocol.
6       That doesn't happen in the application
7 level.  It is, according to Kern, caused by the
8 application level, and the changes propagate below
9 that.  Changes happen all over the place to make Kern
10 work.
11       MR. FREITAS:  Okay.  We're going to take a
12 break.
13       But I'd like you to read back that answer,
14 because there's one thing I want to clarify.  And I
15 don't need the whole answer.  I'll stop when we get
16 to what I'm looking for.
17       (Record read.)
18       MR. FREITAS:  Let's stop right there.
19       BY MR. FREITAS:  Q.  They don't say in the
20 middle of page 18 that special hardware and software
21 isn't limited to the application programs.
22       A.  No.  They say -- they speak to special
23 hardware and software as not -- as not being -- as
24 not being needed with their invention.
25       MR. FREITAS:  Okay.  Let's take a break.



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 37 of 60   Page ID #:1517

THOMAS A. GAFFORD                                      February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                      141–144

Page 141

1   THE VIDEOGRAPHER:  This marks the end of
2  Disk No. 2 in the deposition of Thomas Gafford.
3      The time is now 3:06 p.m., and we are off
4  the record.
5      (Recess taken from 3:06 p.m. to 3:27 p.m.)
6      THE VIDEOGRAPHER:  This marks the beginning
7  of Disk No. 3 in the deposition of Thomas Gafford.
8      The time is now 3:26 p.m., and we are on the
9  record.
10     BY MR. FREITAS:  Q.  Mr. Gafford, I'm going
11 to hand you a copy of what's been previously marked
12 as Exhibit 4.  That's U.S. Patent 7,159,086, which
13 we're referring to as the '086 patent.
14     I'd like to direct your attention, please,
15 to Column 1, and in Column 1 at about line 48 there's
16 a reference to a second class of techniques.
17     Do you see that?
18 A.  Yes.
19 Q.  And it is the -- there's a sentence that
20 says a second class of techniques for making exact
21 copies of long-term memory storage devices.  Involves
22 dedicated standalone devices.
23     Do you see that?
24 A.  Yes.
25 Q.  Then the next sentence says a company named

Page 142

1  Logicube produces such a device.
2      Do you see that?
3  A.  Yes.
4  Q.  As you understand the '086 patent, do you
5  agree that the Logicube device to which reference is
6  made is described by the '086 patent as a dedicated
7  standalone device?
8  A.  Well, that's precisely the words they use
9  here.  I mean . . .
10 Q.  So you'd agree that within the lexicography
11 of the '086 patent, the Logicube device is an example
12 of a dedicated standalone device.
13     MR. KIRSCH:  Objection as to form.
14     BY MR. FREITAS:  Q.  Right?
15 A.  Example.  It is.  I mean, they -- I'm
16 reading their English.  They say it is.
17 Q.  Okay.  Will you flip to the claims, please,
18 Column 10, Claim 1.  There's a reference to a
19 standalone dedicated function device in the preamble.
20     Do you see that?
21 A.  I do.
22 Q.  And I think you've construed that phrase,
23 haven't you?
24 A.  I'm sure I have.
25 Q.  Let's see if we can find that in Exhibit 9.

Page 143

1  It looks like on page 12 if -- there's any
2  constructions of two different phrases that include
3  "dedicated function device," although one of them
4  seems to be "dedicated function."  You've got
5  "copying" bracketed before "device."
6      Do you see that?
7  A.  Yes.
8  Q.  Okay.  In those phrases that you've
9  construed; that is, "standalone dedicated function
10 device for making exact copies of long-term memory
11 devices" and the second being "standalone dedicated
12 function [copying] device," in those two terms, is
13 the word "dedicated" used to have the same meaning
14 that it has in Column 1 where there's a reference to
15 dedicated standalone devices?
16 A.  No.
17 Q.  So the word "dedicated" in Column 1 has a
18 meaning that's different from the word "dedicated" as
19 it appears in the two phrases you've construed;
20 correct?
21 A.  Yes.
22 Q.  And in Column 1, does "dedicated" mean loyal
23 like a dog or committed or something else?
24     MR. KIRSCH:  Object as to form.
25     THE WITNESS:  May I have the line number in

Page 144

1  Column 1 again, please.
2      BY MR. FREITAS:  Q.  Sure.  It's --
3  A.  Second class.  I got it.
4  Q.  -- 48.  Yeah.
5  A.  Well, and your question was loyal like a dog
6  or what?
7  Q.  Or committed or something else.
8  A.  I have no idea.  That's not how I think
9  about it.  It would take me a while to think about
10 whether this relates to animals or commitment.
11 Q.  Well, how it -- what is the proper
12 interpretation of the word "dedicated" as it appears
13 in Column 1, lines 48 to 50?
14 A.  Well, first of all, look at the whole
15 sentence that it's in.  The -- here they say that
16 they're distinguishing from general purpose machines
17 like PCs.  The previous paragraph sets this paragraph
18 up.  They talk about one class of early techniques
19 revolved around the concept of simply using software
20 on a PC.  That describes the first class.
21     This paragraph describes a second class, and
22 it's distinguishing PCs.  And so what "dedicated"
23 means here is it's a device that is not general
24 purpose.  It is not -- it's not programmable.  You
25 can't load video games on it.  Its whole job in life



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
145–148

Page 145

1 is to do -- and without any additional gear because
2 that's what the Stedlin (phonetic) part's about. Its
3 whole job is to focus on a particular function.
4 Actually, let me back up from that. I don't want to
5 misspeak.
6       Its whole job is to focus on a particular
7 task area. It's a little broader, I think, in
8 term -- the term -- than the term "function" because
9 they don't use the word "function" here. And they
10 gave Logicube as an example. And Logicube sure
11 enough is not a PC. You can't run Pong on it. All
12 you can do is do things which include copying disk
13 drives and not a lot else. And then they go on to
14 state -- say some things about Logicube.
15     Q. Well, in fact, the Logicube device has -- is
16 stated to have numerous operating modes and options
17 that must be specified before making a copy; right?
18     A. I believe that's correct. Well, yeah,
19 that's -- they do. In fact, it comes in the form of
20 a criticism that it requires a trained operator and
21 it has enough options to cause confusion or errors on
22 the part of its user.
23     Q. And clearly it has more options than making
24 a copy; right?
25     A. Yes.

Page 146

1     Q. And the term "dedicated standalone device"
2 is used to describe that Logicube device that has
3 more than one function; right?
4     A. Yes.
5     Q. And so when the word appears in the preamble
6 to Claim 1, it also; that is, "dedicated," doesn't
7 exclude devices that perform more than one function,
8 does it, Mr. Gafford?
9       MR. KIRSCH: Objection as to form. Calls
10 for legal conclusion.
11       THE WITNESS: I want to get the sense of
12 your question right, but it -- "dedicated" in the
13 claim doesn't mean the same thing as "dedicated" here
14 because of its context. In the claim they add a very
15 important word. They add the word "function."
16 "Dedicated" doesn't standalone.
17       In the case of Column 1, it's a dedicated
18 standalone device. In the claim, either version of
19 the claim, it's -- "standalone" and "dedicated" are
20 still there, but now it's "standalone dedicated
21 function," and that's different. That's not -- they
22 are distinguishing -- in my opinion, they're
23 distinguishing Logicube.
24       BY MR. FREITAS: Q. And so you think that
25 when they said "a dedicated standalone device" and

Page 147

1 refer to a device with multiple functions, they were
2 describing something that's different from what's
3 referenced in the preamble where a dedicated
4 standalone -- or dedicated function device is
5 referenced.
6       Is that what you're saying?
7       MR. KIRSCH: Object as to form.
8       THE WITNESS: Well, I believe that is what I
9 just said. I don't know how to give you a better
10 answer, and I'm sure you're not -- if you're asking a
11 different question, I didn't hear a different
12 question, but I believe the answer I gave you is
13 still the right -- the pertinent answer, my best
14 answer to your question.
15     BY MR. FREITAS: Q. Okay. So how is
16 "dedicated" used, then, in Column 1? What's the
17 meaning of "dedicated" in Column 1?
18       MR. KIRSCH: Objection. Asked and answered.
19       THE WITNESS: They're distinguishing general
20 purpose machines like PCs in this second class of
21 techniques.
22     BY MR. FREITAS: Q. So "dedicated" is used
23 to differentiate a device that's described as
24 dedicated from a general purpose computer.
25       Is that what you said?

Page 148

1     A. I think that's the main thrust of their use
2 of the word "dedicated" in Column 1.
3     Q. Is there somewhere else in the specification
4 where they refer to a dedicated function device as
5 being different from what's referred to in Column 1?
6     A. I don't know.
7       MR. KIRSCH: Object to form.
8       BY MR. FREITAS: Q. Pardon me?
9     A. I don't know.
10     Q. So the basis for your conclusion that
11 there's a difference in meaning is based 100 percent
12 on the fact that the word "function" appears in Claim
13 1; correct?
14       MR. KIRSCH: Object as to form. Misstates
15 testimony.
16       THE WITNESS: No. That's not only the
17 existence of the word "function" in the claim.
18       BY MR. FREITAS: Q. What else, Mr. Gafford?
19     A. The context of criticism of the Logicube
20 device which, as it states here, This device has
21 numerous operating modes and options that must be
22 specified before making a copy. Options are selected
23 through the use of a number of buttons and a small
24 display. One of the options is to delete the
25 contents of what will be the destination drive, which



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 39 of 60   Page ID #:1519

THOMAS A. GAFFORD                                          February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    149–152

Page 149

1 is certainly a different function.  Not just a mode.
2        Mode in this thing refers to different ways
3 of copying, but here they're talking about an
4 additional function.  They say one of the options is
5 to delete the contents of what will be the
6 destination drive.  And then they go on to finish
7 with their critical statement that this device
8 requires a trained operator, and it has enough
9 options to cause confusion or errors on the part of
10 the user.
11        So it's that whole context in -- that I'm --
12 and not just the difference between the use of the --
13 and not just the presence of the word "function."
14     Q.  So it doesn't say in Column 1 that more than
15 one option is enough to confuse somebody, does it?
16 Or cause errors?
17        MR. KIRSCH:  Object as to form.
18        THE WITNESS:  It highlights one as being
19 enough to require a trained operator.  It uses modes
20 in the plural.  We don't know whether modes means 2
21 or 75, but they highlight "delete" to illustrate
22 their position -- their statement here that multiple
23 functions are a bad idea.
24     BY MR. FREITAS:  Q.  Where do they do that,
25 Mr. Gafford?

Page 150

1     A.  In the sentence that follows the "delete" --
2 the specific description of delete when they say the
3 device requires a trained operator, and it has enough
4 options and here they've described two.  So for them
5 in what they're stating here, two is enough to cause
6 confusion or errors on the part of its user.
7     Q.  So that's what it says there, that two is
8 enough --
9     A.  Yes.
10     Q.  -- to cause confusion?
11     A.  Yes.
12     Q.  Why didn't they say two is enough?
13     A.  Lord knows why they chose the word.
14     Q.  They said something that in simple English
15 means something other than two is enough, didn't
16 they?
17     A.  No.
18        MR. KIRSCH:  Object as to form.  Calls for
19 speculation.
20        THE WITNESS:  No.
21        BY MR. FREITAS:  Q.  No?
22     A.  No.
23     Q.  Now, this isn't expert testimony you're
24 giving, is it?
25        MR. KIRSCH:  Object as to form.

Page 151

1 Argumentative.
2        THE WITNESS:  Why wouldn't it be?
3        BY MR. FREITAS:  Q.  Because you're not
4 qualified to interpret what you just did by reference
5 to any skill or experience you have.
6        You're just reading English, aren't you?
7        MR. KIRSCH:  Object as to form.
8 Argumentative.
9        BY MR. FREITAS:  Q.  Misreading it, I might
10 add.  But isn't that what you're doing?
11        MR. KIRSCH:  You don't need to answer that
12 question.
13        THE WITNESS:  Thank you.  I won't.
14        BY MR. FREITAS:  Q.  Actually, you do need
15 to answer.  It's your responsibility to answer.
16        MR. KIRSCH:  I'm instructing him not to.
17        You can move on to the next question.
18        BY MR. FREITAS:  Q.  Mr. Gafford, you're not
19 bringing any skill or expertise you have beyond the
20 ability to read and understand English in offering
21 the argument you just offered, are you?
22        MR. KIRSCH:  Objection.  Argumentative.
23 Harassing.
24        Don't answer the question.
25        MR. FREITAS:  Are you serious, Kevin?

Page 152

1        MR. KIRSCH:  Actually, I am.
2        MR. DUKELOW:  Misstates the testimony of the
3 witness.
4        MR. FREITAS:  Are you serious you're going
5 to instruct him not to answer the question?
6        MR. KIRSCH:  Yes.  Actually, I am.
7        MR. FREITAS:  Okay.
8        BY MR. FREITAS:  Q.  All right.
9 Mr. Gafford, you're going to decline to answer?
10     A.  I am.
11     Q.  What skill or expertise are you bringing to
12 bear in presenting the argument you just presented?
13        MR. KIRSCH:  Objection as to form.
14        MR. DUKELOW:  And misstates the testimony.
15        THE WITNESS:  You -- yeah, I don't think I'm
16 giving you an argument.  You asked me for a statement
17 of support that I find, and I'm giving you an answer
18 to that question, and now you're characterizing it as
19 an argument and an opinion that I'm not qualified to
20 give.  So I'm not sure how to answer your question.
21 I don't see this as anything more than an answer to
22 your previous question.  You asked me about this
23 English.  I tell you what it means to me in the
24 context of one of ordinary skill in a description of
25 a technical device that's built out of computers and



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 40 of 60   Page ID #:1520

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        153–156

Page 153

1  has a computer driven -- has computer-driven controls
2  that a user can use.  I have some experience in that.
3        BY MR. FREITAS:  Q.  So you think that
4  because of your training and expertise, you read
5  enough to be two.
6        Is that what you're saying?
7        MR. KIRSCH:  Object as to form.
8  Argumentative.  Misstates testimony.
9        THE WITNESS:  Based on the sentence that
10  comes before "enough" where they describe a single
11  option other than copying, I believe that that's what
12  they mean when they're referring to enough.
13        BY MR. FREITAS:  Q.  So --
14     A.  And by counting -- let me finish.  And by
15  counting because it is my native tongue that count
16  equals two.
17     Q.  So the entire basis for your belief that the
18  word "dedicated" in Column 1 lines 48 to 50 and the
19  word "dedicated" in Claim 1 in the preamble have a
20  different meaning is, A, the word "function" appears
21  in the preamble; and B, there is a sentence that says
22  one of the options is to delete the contents of what
23  will be the destination drive; is that correct?
24        MR. KIRSCH:  Object as to form.  Misstates
25  testimony.

Page 154

1        THE WITNESS:  No.
2        BY MR. FREITAS:  Q.  Okay.  What else?
3     A.  It's the answer -- well, I'll keep looking.
4  It's the answer -- what I've done so far is to not
5  answer a question as to totality of all my opinion.
6  What I've done so far is to answer your questions.
7  If you'd like me to keep looking, I'll look.
8     Q.  Well, you've given the opinion.  Presumably
9  it has a basis.  I don't want you to make up a new
10  basis.  I want you to tell me what the existing basis
11  is, okay?  Please do that.
12        MR. KIRSCH:  Objection as to form.
13  Misstates testimony.  Mr. Gafford has already
14  indicated that he wants to review documents in order
15  to answer your question.
16        Are you instructing him that he's not
17  allowed to do that?
18        MR. FREITAS:  Nope.  But that doesn't change
19  my question either.
20        MR. KIRSCH:  Please feel free to review
21  whatever you want to in order to answer the question.
22        BY MR. FREITAS:  Q.  You're right about
23  that.
24     A.  I think the language that I have cited to
25  you is sufficient.  There may be -- it's all I --

Page 155

1  it's enough.  I think it's enough for me to rely on.
2     Q.  Okay.  Now, you do speak English, so you
3  know there's a difference between "sufficient" and
4  "enough" and "everything."  What I want you to tell
5  me is everything that provides the basis for the
6  opinion you've expressed that the word "dedicated"
7  has one meaning in Column 1 and another meaning in
8  the preamble.  I want a complete answer.
9        MR. KIRSCH:  Object as to form.  Misstates
10  testimony.
11        And please feel free to review whatever you
12  need to in order to answer that question.
13        THE WITNESS:  For the purpose of the report
14  that I filed and that I signed, I think it's
15  sufficient.  Part of the job of writing a report that
16  I try to implement in any report is to be succinct.
17  If you're asking me go hunting for other things that
18  I could cite, I'm sure I could find some things.
19  What I did cite is what we've just been talking
20  about.
21        BY MR. FREITAS:  Q.  What you did cite is
22  the entirety of what you've relied on in forming the
23  opinion, isn't it?
24        MR. KIRSCH:  Objection as to form.
25  Misstates testimony.

Page 156

1        THE WITNESS:  Let me state a complete answer
2  rather than a "yes" or "no" because I think the
3  context here might be a little garbled.
4        I think the description of the second class
5  and the distinction of the problem with Logicube,
6  together with the addition of the word "function" in
7  the claim together with the balance of the evidence I
8  give in this section which continues with 15.5.2 and
9  ends with 15.5.7 is the whole of my basis for this
10  opinion.
11        BY MR. FREITAS:  Q.  So now you have given
12  me an answer that includes the entirety of the basis
13  for your opinion; correct?
14        MR. KIRSCH:  Object as to form.  Misstates
15  testimony.
16        THE WITNESS:  I -- didn't I just say that?
17  I mean, I'm trying to listen for a different question
18  to give -- to honor what you're asking, but I don't
19  think I have a different answer for you.
20        BY MR. FREITAS:  Q.  Well, I tried to get
21  you to state the entirety.  I asked a whole bunch of
22  questions.  My perspective was I wasn't getting a
23  straight answer.
24        Now, I think when you use the word "whole,"
25  you meant to say, Yes, I've told you the entirety of



THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    157–160

Page 157

1 the basis for my opinion.
2      Am I correct?
3      MR. KIRSCH:  Object as to form.  Misstates
4 testimony.
5      THE WITNESS:  My basis is in Section 15.5,
6 as I've just discussed it with you.
7      BY MR. FREITAS:  Q.  Everything you have to
8 say in support of the idea that the word "dedicated"
9 is used in one meaning with Column 1 and another in
10 the preamble to Claim 1 is set forth in Section 15.5;
11 correct?
12      MR. KIRSCH:  Objection as to form.
13 Misstates testimony.  He's just been testifying for
14 the past 30 minutes on the subject.
15      THE WITNESS:  That's actually quite a wildly
16 different question than what I just stated for you.
17      BY MR. FREITAS:  Q.  Let me ask a different
18 one, then, if you think that's wildly different.  All
19 of the support that you have relied on for the
20 conclusion that the word "dedicated" is used with one
21 meaning in Column 1 and another in the preamble to
22 Claim 1 appears in Section 15.5 --
23      MR. KIRSCH:  Objection as to --
24      BY MR. FREITAS:  Q.  -- of Exhibit 9?
25      MR. KIRSCH:  Objection as to form.

Page 158

1      BY MR. FREITAS:  Q.  Is that right,
2 Mr. Gafford?
3      MR. KIRSCH:  Misstates testimony.
4      THE WITNESS:  No, it's not right.
5      BY MR. FREITAS:  Q.  What else is there?
6 What other support that you've relied on did you
7 leave out of your report?
8      A.  I don't think there's anything beyond as I
9 just said when I gave you the answer this
10 Section 15.5 plus the discussion we've already had.
11 You asked a question that caused me to clarify this
12 distinction about the presence of the word "function"
13 in one place and not the other, and I gave you
14 additional information on that.  The basis for that
15 information is in here, but that specific statement
16 which is an opinion of mine in support of 15.5 and
17 the discussion we had about it I'm incorporating in
18 what I just said is my basis.  It's not other
19 documents.  That's a piece of logic that you
20 elucidated by your question about the drilling down
21 on the word "dedicated" in the two positions.
22      Q.  So the idea that the word "functions" in the
23 preamble and not in Column 1, that doesn't appear in
24 your report, does it?
25      A.  I think it's there.

Page 159

1      Q.  Can you show me where?
2      A.  There are discussions of dedicated function.
3 What I gave you was another way to describe -- was an
4 answer to your question and another way to describe
5 the distinction between function being there and not.
6 And in 15.5.3, for example, focuses on statements
7 made to the public and the prosecution of the '379
8 eraser patent about what dedicated function means.
9 And all of these statements as you the term
10 "dedicated" together with the term "functioning."
11      And the specific discussion of the section
12 that you started -- that you began your question with
13 quoting the second class is in 15.5.7 of my report.
14      Q.  15.5.7.
15      A.  Top of page 14.
16      Q.  And what does that say?
17      A.  Well, it says what it says.  I'm reading it
18 to derive something for you.  I'll be done in a
19 moment.
20      When I told you about the idea of two being
21 excessive is another -- is a paraphrase or another
22 way to state what I stated in 15.5.7.  In here it's
23 couched in the terms of my specific opinion that
24 deletion was -- deletion as an option in such a
25 device was disavowed by this paragraph.

Page 160

1      Q.  So that's --
2      A.  I'm not quite finished.
3      Q.  I'm sorry.
4      A.  But deletion -- so we got to talking about a
5 deletion is where you get to the count of two.  The
6 idea of counting to two is not -- or the idea behind
7 counting to two is in here.  This specific statement
8 about how two is too many is not in here, but the
9 idea of the second function being disavowed is here.
10      Q.  And that idea is a legal idea.  It's not
11 expert testimony; right?
12      MR. KIRSCH:  Objection.  Calls for legal
13 conclusion.  Object as to form.
14      THE WITNESS:  I -- it is what it is.  It's
15 my statement about understanding what they have said
16 to the public and my understanding of what they mean
17 technically by another option in a user interface
18 being one option too many.
19      BY MR. FREITAS:  Q.  But aren't you
20 misapplying a legal doctrine regarding disclaimers?
21      MR. KIRSCH:  Objection.  Calls for --
22      BY MR. FREITAS:  Q.  Isn't that all you're
23 doing there?
24      MR. KIRSCH:  Objection.  Calls for legal
25 conclusion.  Argumentative.  Object as to form.



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 42 of 60   Page ID #:1522

THOMAS A. GAFFORD                                        February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        161–164

Page 161

1     THE WITNESS:  I don't think I am.  But if I
2  am, you can argue that, I suppose.
3     BY MR. FREITAS:  Q.  All right.  Now, this
4  argument that appears in 15.5.7 on page 14 of Exhibit
5  9, that argument didn't appear in your ITC report on
6  claim construction, Exhibit 12; correct, Mr. Gafford?
7     MR. DUKELOW:  Objection.  Misstates the
8  declaration.
9     THE WITNESS:  When you say "that argument,"
10  you mean the basis of -- limited functionality I'm
11  sure is in the ITC report.  The specific basis
12  supporting that of the Logicube statement in Column 1
13  I don't think is in the ITC report.
14     BY MR. FREITAS:  Q.  And in fact, the claim
15  construction adopted by Judge Bullock rejected the
16  single function point; right?
17     MR. KIRSCH:  Objection.  Calls for a legal
18  conclusion.
19     THE WITNESS:  I don't recall what Judge
20  Bullock said in that case.
21     BY MR. FREITAS:  Q.  You don't remember what
22  he said about whether dedicated was limited to a
23  single function?
24     A.  I don't.
25     Q.  Okay.  All right.  But in any event, the

Page 162

1  argument about Logicube that appears in 15.5.7,
2  because the patentee distinguished the invention from
3  the Logicube device by disavowing the ability to
4  delete the destination drive, the invention of the
5  '086 patent does not include an option to delete the
6  contents of that -- of the destination long-term
7  memory device.
8     That argument did not appear in your
9  submission in the ITC; right?
10     MR. DUKELOW:  Objection.  Mischaracterizes
11  the declaration.
12     THE WITNESS:  I -- with that objection, I
13  guess I'd better read my ITC.  If you want to --
14     BY MR. FREITAS:  Q.  Go ahead.  Yeah.
15     A.  If you want to -- if you want to stipulate
16  that the word "Logicube" doesn't show up in my
17  report, I'll take your --
18     Q.  No.
19     A.  I'll take your word for it.
20     Q.  I want you to tell me what you think.
21     MR. KIRSCH:  Again, we're only talking about
22  the specific report in front of him.
23     THE WITNESS:  We're talking now about the --
24  the -- what is it?  I'm sorry.  It's -- excuse me.
25  Exhibit 12.

Page 163

1     BY MR. FREITAS:  Q.  That's all you've got
2  in front of you.
3     A.  Yes.
4     Q.  And I will agree that I'm not imposing a
5  memory test that goes beyond that.
6     A.  Okay.  The Logicube statement is specific to
7  the '086.  And in the standalone dedicated function
8  device section of the '086 opinion on page 12 under
9  Section 16D of Exhibit 12, there's no mention of the
10  Logicube -- Logicube statement in the patent.  I'm
11  going to finish the '086 section here right, and
12  that's the end of the '086 section, so it's not in
13  here.
14     Q.  So the Logicube argument is specific to the
15  '086, and your presentation in Exhibit 12 didn't
16  include a mention of the Logicube point you make in
17  15.5.7 in Exhibit 9; correct?
18     A.  Yes.
19     MR. KIRSCH:  Misstates the --
20     MR. FREITAS:  Did you say, let's take a
21  break?
22     MR. KIRSCH:  I'm sorry.  Objection.
23  Misstates.
24     MR. FREITAS:  Oh, I'm sorry.  I was going to
25  say let's take a break.

Page 164

1     MR. KIRSCH:  Oh, we can take a break.
2     THE WITNESS:  Sure.
3     THE VIDEOGRAPHER:  The time is now 4:01 p.m.
4  We are off the record.
5     (Recess taken from 4:01 p.m. to 4:20 p.m.)
6     THE VIDEOGRAPHER:  The time is now
7  4:19 p.m., and we are back on the record.
8     BY MR. FREITAS:  Q.  Mr. Gafford, could I
9  direct your attention back to the '086 patent,
10  please.
11     A.  I have it.
12     Q.  Would you look at Figure 8, please.
13  '682 patent.  I'm sorry.  What am I doing?
14     A.  It's not my favorite Figure 8.
15     Q.  '682, please, and I do mean Figure 8.
16     MR. KIRSCH:  I thought we were making
17  progress, Bob.  We're going backwards.
18     THE WITNESS:  Okay.  If this thing will just
19  turn.  Yeah.  All right.  I have Figure 8.
20     BY MR. FREITAS:  Q.  Figure 8 is the figure
21  that contains the Temp Drive 870; right?
22     A.  Yes.
23     Q.  And based on the construction that you've
24  provided of the claim terms that include the word
25  "transparent" or the word "transparently," a device



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
165–168

Page 165

1 that would practice Figure 8 is the only type of
2 device that would practice any of the independent
3 claims of the '682 patent; correct?
4       MR. KIRSCH:  Object as to form.
5       THE WITNESS:  Not a correct statement.
6       BY MR. FREITAS:  Q.  Okay.  What's wrong
7 about it?
8       A.  Devices don't practice figures.  Devices
9 practice claims.
10      Q.  Okay.  Well, a device with the
11 characteristics of the device described in Figure 8
12 is the only type of device that could practice any of
13 the independent claims of the '682 patent; correct?
14      MR. KIRSCH:  Object as to form.  Asked and
15 answered.
16      THE WITNESS:  Not quite, but I'll -- I can
17 answer.  Figure 8 embodies the invention as I think
18 it's -- as I think the claims, the independent
19 claims -- it's correct, isn't it, that
20 "transparently" is in all the independents; right?
21 Let's get past that consideration.  I mean, I don't
22 remember, but I think you said they -- that's right.
23      BY MR. FREITAS:  Q.  Well, let's take a look
24 and see if that's right one way or the other.
25      A.  Establish that foundation.

Page 166

1       Q.  Sure.
2       A.  Okay.  "Transparent" at the end of 1;
3 "transparently" at the end of 13; "transparent to
4 normal operation" at the end of 25; "transparently"
5 in 30; "transparently" in 40.
6       That's the last independent.  All right.  So
7 "transparently" equals independent claims.
8       Q.  "Transparently" or "transparent"?
9       A.  Yeah.  So they -- this Figure 8 supports
10 those claims as an embodiment, and -- but what it
11 takes to practice temp drive is one way I know of
12 meeting the limitation transparently.  And as I
13 explained to you at some length in my claim
14 construction deposition in the ITC matter, there
15 might be others, but I have no idea what they are.
16      Q.  So you're not aware of any other way?
17      A.  That's correct.
18      Q.  And the reason that you think that the temp
19 drive embodiment that appears in Figure 8 is a way to
20 practice the independent claims is because you
21 believe that the proper construction of "transparent"
22 or "transparently" requires that when a write command
23 is issued the data are actually written such that
24 they can be read back; correct?
25      MR. KIRSCH:  Object as to form.

Page 167

1       THE WITNESS:  Almost.  Somewhere other than
2 the target drive, but yes, they've got to be stored
3 somewhere so they can be read back.
4       BY MR. FREITAS:  Q.  Yes.  Stored somewhere.
5 I didn't say the target drive.
6       A.  Right.
7       Q.  I said written such that they can be read
8 back; right?
9       A.  Right.  But I'm given -- yes.  I'm answering
10 in the context of the whole of the claim, which is
11 that you mustn't write it in the heart of drive, but
12 you need to write it somewhere.  I don't know of
13 another way to do -- to meet that transparent
14 limitation other than to write it somewhere.
15      Q.  And the Temp Drive 870 in Figure 8 is the
16 somewhere that you find in Figure 8; correct?
17      MR. KIRSCH:  Object as to form.
18      THE WITNESS:  Yes, that's -- yes, it's
19 somewhere other than the -- than the target drive I
20 find.
21      BY MR. FREITAS:  Q.  And the reason that the
22 write -- that the data cannot be written to the
23 target drive is because the invention is a blocker
24 that protects the target drive against writes;
25 correct?

Page 168

1       MR. KIRSCH:  Object as to form.
2       THE WITNESS:  It's -- well, the invention
3 has a lot of limitations, but the key idea of a
4 blocker is to protect from writes -- protect from
5 change the target drive.
6       BY MR. FREITAS:  Q.  Okay.  If I could ask
7 you, please, to look at page 10 of Exhibit 9.  At the
8 bottom of page 10 --
9       A.  Exhibit 9 is my report, right.
10      Q.  -- in Section 15.4 --
11      A.  Yep.
12      Q.  -- you refer to "exact copy" and "exact
13 copies."  And in 15.4.1 you say "exact copy" means a
14 copy that includes all of the data that resides on a
15 long-term memory device, and formatted and arranged
16 in the exact manner as on the long-term memory
17 device.
18      What I would like to know, Mr. Gafford, is
19 why you included the word "formatted" in your
20 construction.
21      A.  On the basis follows.  Hang on.  Let me
22 clarify something to make sure I know where your
23 question is going before I don't ask the wrong --
24 answer the wrong -- ask the wrong question.
25      When I say "formatting" here, I'm not



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 44 of 60   Page ID #:1524

THOMAS A. GAFFORD                                           February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                     169–172

Page 169

1 referring to low-level formatting where you lay out
2 the sector headers and things like that.  I'm
3 referring to data, the arrangement of data on the
4 drive.  Not in the low-level formatting.
5        Do you understand that to be my context?
6    Q.  I wasn't sure, but I understand what you're
7 saying now.
8    A.  Okay.  So --
9    Q.  And part of my question I asked it the way I
10 asked it, but I could have asked it a different way
11 in an attempt to get at what I'm interested in by
12 asking, why did you say "formatted" and "arranged"
13 and how is "formatted" different from "arranged"?
14    A.  It is -- it's another word.  It isn't really
15 different.  It doesn't mean -- this is -- the drive's
16 appearance -- the availability of the data in the
17 copied drive, the destination drive, is as perceived
18 by the host.  And so the host doesn't care about
19 low-level formatting down at the sector header level,
20 all that magic that goes into disk controllers.
21 That's not what this is about.  Formatting/arranging
22 are euphemisms.  I'm not sure they mean anything very
23 different from each other, but it doesn't mean that
24 low-level stuff.
25    Q.  So you didn't intend any real difference

Page 170

1 between formatted and arranged.
2        Is that fair?
3    A.  Well, we'll find out if I did, but I'm just
4 telling you what it does -- what formatting doesn't
5 mean.  Now I'll finish reading here and --
6    Q.  Okay.
7    A.  Okay.  The support for "arranged" is in
8 15.4.3, and it comes from the provisional.  I'm not
9 going to go -- I'm not going to dive into it.  I'm
10 just going to give you a higher-level view right now.
11 That's "arranged."
12        Now I'm going to look for "formatted."
13    Q.  Can you just show me where you found
14 "arranged"?
15    A.  "Arranged" is in the 15.4.3 on page 11.
16 It's -- pretty much the middle of the paragraph is
17 where it's mentioned.  Actually, it's mentioned in
18 the first sentence.
19    Q.  First sentence of what?
20    A.  First sentence of the Section 15.4.3.
21    Q.  Oh.  I see the quote in 15.4.3 that includes
22 the word "arranged."
23    A.  Yeah.  That's -- this is the arranged
24 support.  Now I'll keep looking for "format."
25    Q.  Yeah.  You're quoting there in 15.4.3 from

Page 171

1 Provisional Serial No. 60/443387; right?
2    A.  Yes, I am.
3    Q.  Okay.
4    A.  All right.  Now I'll move on to the "format"
5 bit.  "Format" comes from a statement made by -- at
6 Column 6, line 14 to 16.  Still further, the copying
7 device copies data from all partitions of the source
8 device regardless of the data's format.
9        Of course, that's what I said was format has
10 to be the same, so -- well, in that sense, whatever
11 the data's format is, whatever inventors meant by
12 that, they mean copying that which is -- it looks
13 like it's talking about things that are similar to
14 "arrangement."  It's not very distinct, but the
15 applicants used it distinctly from "arrangement," so
16 I incorporated the term because applicants used
17 "format" in one of their descriptions of their
18 invention and used "arrangement" in another, and
19 that's the place where they both show up.
20        So 16.4.2, applicants' use of format is
21 described in that paragraph.
22    Q.  Where is it described?
23    A.  15.4 -- okay.  It's --
24        MR. KIRSCH:  I think you mean to be saying
25 10.12.16.  You're --

Page 172

1        THE WITNESS:  Yeah.  I'm -- well, I'm saying
2 my 15.4.2 paragraph, and the citation is 6 -- oh,
3 wait.  Oh, I see.  The site follows the section.  I'm
4 sorry.  It's Column 10, 12 to 16.  And the quote is,
5 Still further, the copying device copies data from
6 all partitions on the source device regardless of the
7 data's format and removes any reserved or protected
8 data areas so that all of the data storage areas on
9 the target device are available for copying without
10 requiring user intervention.
11        So this is the applicants' description of
12 their invention in using the term "format."  I'm
13 using "format" and "arranged" because the applicants
14 use "format" and "arranged."
15        BY MR. FREITAS:  Q.  Okay.  In Column 10 of
16 the '086 patent, lines 12 to 16, the clause where the
17 word "format" appears, what it says is regardless of
18 the data's format; right?
19    A.  Yes.
20    Q.  And so that doesn't mean that the data are
21 copied in the same format on to the destination
22 drive.
23        It just means that the data are copied from
24 the source drive regardless of the format in which
25 they are there; right?



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 45 of 60   Page ID #:1525

THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                     173–176

Page 173

1      MR. KIRSCH: Object as to form.
2      THE WITNESS: Don't think that's quite
3 right. Let me look at this surrounding --
4      BY MR. FREITAS: Q. Okay.
5      A. I think they're saying it doesn't matter if
6 the data is expressed in one character set or another
7 or if it's the sequel database or a file maker
8 database. I think that's a level at which they're
9 using "format" here is that because this device is
10 copying data from all partitions, copying all the
11 data from one to another, that whatever -- that
12 format issues which I believe are being discussed
13 here at a high level simply aren't going to matter.
14 Whatever you have on the source device, you're going
15 to get on the destination device.
16      Q. Well, doesn't that sentence, the "still
17 further" sentence that begins on line 12, doesn't it
18 refer only to copying from the source device rather
19 than copying to the destination device?
20      MR. KIRSCH: Objection. Misstates document.
21      BY MR. FREITAS: Q. Or what's called the
22 target device in that sentence?
23      A. Well, it's a copying device which implies
24 that the data is going somewhere.
25      Q. Yes.

Page 174

1      A. There is a two.
2      Q. Okay.
3      A. And it's telling you where it's coming from.
4      Q. Yes.
5      A. I think that goes without saying that there
6 is a destination here.
7      Q. Sure there is.
8      A. I don't -- I don't know. I don't understand
9 your question.
10      Q. Okay. Let's go through it step-by-step.
11      So still further it begins, the copying
12 device copies data from all partitions on the source
13 device. I think we can agree that what that refers
14 to is that the copying device of the invention is
15 copying data and specifically it's copying data from
16 all of the partitions on a source device.
17      It says the source device; right?
18      A. Well, yes. And I believe what it's talking
19 about here to me is a person skilled in the storage
20 arts. And when I say I'm skilled in the storage
21 arts, I'm familiar with not only the way drives store
22 data at the raw data level but also the way operating
23 systems organize the space on a hard drive. I've
24 worked in both areas.
25      And you're talking here about the thing

Page 175

1 being partitioned agnostic because one of the
2 criticisms they make of prior devices is that you had
3 to worry about -- you had to know what the partitions
4 were. And they say that's -- we're better than that.
5      Q. Okay.
6      A. This is saying we're partition agnostic. We
7 don't care.
8      Q. All right.
9      A. We're going to get it all.
10      Q. Okay. Then it goes on. The next clause,
11 Regardless of the data's format, that is a reference
12 only to the copying; correct? That the data are
13 copied regardless of their format; right?
14      A. Yes.
15      MR. KIRSCH: Objection as to form.
16      THE WITNESS: In the context it's copying,
17 yes.
18      BY MR. FREITAS: Q. Okay. Then we move on.
19 And removes any reserved or protected data areas so
20 that all of the data storage areas on the target
21 device are available for copying without requiring
22 user intervention; right?
23      A. Yes.
24      Q. So it doesn't talk about the way the data
25 are formatted on the target device, does it in that

Page 176

1 sentence?
2      MR. KIRSCH: Objection as to form.
3      THE WITNESS: I think it does. My
4 implication the copying device, whatever it's
5 reading, it's writing. Whatever it's getting from
6 the source device it's putting on the target device.
7 I think it -- in fact, the second part of this
8 sentence talks about data areas -- data storage areas
9 in the target device are removed. The context of the
10 whole sentence is from the source to the target. I
11 don't know what I'm missing here in your question.
12      BY MR. FREITAS: Q. So your answer is that
13 you don't agree with me that the reference to the
14 data format or the format of the data is a reference
15 to what happens when copying occurs from the source.
16      Do you agree or disagree with that?
17      MR. KIRSCH: Object as to form.
18      THE WITNESS: It's saying that it doesn't
19 affect copying. It doesn't matter that whatever is
20 there is -- whatever the format is going to be
21 copied.
22      BY MR. FREITAS: Q. That's all it says,
23 isn't it, regarding format?
24      MR. KIRSCH: Objection as to form. Asked
25 and answered.



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
177–180

Page 177

1    THE WITNESS:  I think I already said that.
2  I mean, I don't know that -- hear that it's a
3  different question.  As I said before, it's -- this
4  is kind of actually a sales pitch part of the patent
5  of the invention that, they tell you the problems
6  that where things such as partition and partition
7  format can give you trouble, and earlier
8  generation -- earlier -- prior art copying devices
9  here, they're saying it doesn't matter.
10    Whatever is in the source -- whatever the
11  characteristics of the data on the source, whatever
12  its format, whatever its partition, is going to be
13  copied.  And by implication, it's going to end up on
14  the target.
15    BY MR. FREITAS:  Q.  So by implication, the
16  format would be the same.
17    Is that what you're saying?
18    A.  Yes.
19    Q.  Now --
20    A.  As I said, because the sentence is speaking
21  in the same sentence about source device and target
22  device.
23    Q.  Okay.  The format as it's used there, is
24  that that low-level format you were talking about a
25  few moments ago, or was that something else?

Page 178

1    A.  It's something else.
2    Q.  What is it?
3    A.  There's an illusion to the idea of format of
4  data in Column 4, lines 26 -- paragraph beginning at
5  line 26 where it says that the -- in speaking of our
6  device being operating-system independent, it does
7  not care what kind of data is on the drive.  "Kind"
8  is akin to "format."  I don't think that's the only
9  place.  Let me finish looking through the rest of
10  this.
11    There's another illusion to that idea of
12  formatting in -- or format of data at the top of
13  Column 10 where it says at line 7 on the right,
14  Additionally the copying device does not require that
15  the operator have any particular knowledge of the
16  source device.  It detects the capability in
17  settings.  Well, that's not quite the same thing.
18  Hang on.
19    Oh, right.  So here's the 10 to 12 part.
20  And similar and also back in Column 1 where they say
21  using a PC as a copier, techniques -- such techniques
22  are neither safe nor easy to implement.  To make a
23  software copy, an operator must know technical
24  information about the drive to be copied.  Secondly,
25  the computer that's to be used must be configured --

Page 179

1  to make the copy must be configured correctly.  And
2  thirdly, the simple act of running a drive under an
3  operating system -- oh, that's not it.  That's just
4  changing the drive.
5    So base -- it's -- I think it's the support
6  for the -- besides the mention of format in that
7  lines 10 to 12 area -- sorry.  Column 10, line 12
8  area, the comments about operating system specificity
9  and the kind of data also go to the same topic.
10    Q.  What is the -- what is the sense of the term
11  "format" as it's used in your construction to the
12  extent it's different from "arranged"?
13    A.  I'm sorry.  Different from what?
14    Q.  Arranged.
15    MR. KIRSCH:  Object as to form.
16    THE WITNESS:  I don't know that it is
17  different; however, because the applicants used the
18  two -- in some further analysis whether it's
19  different, but because the applicants use the two
20  terms in distinguishing, I'd use the two terms.
21    BY MR. FREITAS:  Q.  Let me ask you a
22  question about the way data might be arranged on a
23  device.  So let's suppose that there's a device that
24  has -- a storage device that has 100 sectors, okay?
25    A.  All right.

Page 180

1    Q.  And I'm interested in two files that appear
2  on the storage device.  And let's just say one is
3  guidance.doc and the other is cru.doc, okay?
4    A.  All right.
5    Q.  So the file guidance.doc, the data
6  representing that file, they might appear on
7  different sectors; right?  In different sectors?
8    MR. KIRSCH:  Objection.  Incomplete
9  hypothetical.
10    THE WITNESS:  Different from what?
11    MR. KIRSCH:  Objection as to form.
12    BY MR. FREITAS:  Q.  So they wouldn't all be
13  in Sector 1.  They wouldn't all be in Sector 5.  They
14  wouldn't all be in Sector 82.  They might be partly
15  in Sector 1, partly in Sector 5, partly in Sector 10,
16  partly in Sector 67; right?
17    MR. KIRSCH:  Same objection.
18    THE WITNESS:  It's -- your pronoun
19  references are a little fuzzy.  I'm going to give you
20  an answer to try to keep this from being ambiguous.
21    BY MR. FREITAS:  Q.  Okay.
22    A.  If -- if the file is bigger than one sector,
23  then the multiple sectors needed to store the file's
24  data could be anywhere on the drive, let's say.  They
25  actually can't for some strange reasons having to do



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
181–184

Page 181

1  with disk -- with the operating system file
2  structure, but in general if you pick a big enough
3  block of data, it can be anywhere on the drive.
4      Q.  So the same file could consist of data
5  appearing in more than one sector?
6      MR. KIRSCH:  Same objections.
7      THE WITNESS:  Well, the same as what?
8      BY MR. FREITAS:  Q.  Okay.  That was a poor
9  use of the word "same."
10     A file like guidance.doc, the data of which
11 that file consists could appear in more than one
12 sector even though it's a single file; right?
13     MR. KIRSCH:  Same objection.
14     THE WITNESS:  If it's bigger -- as I said
15 before, if it's bigger than a sector, if the sector
16 isn't enough to hold the data for that file, then the
17 file will occupy multiple sectors.
18     BY MR. FREITAS:  Q.  Is that the only
19 circumstance in which the data of which a file
20 consists can appear in more than one sector?
21     MR. KIRSCH:  Same objection.
22     THE WITNESS:  No.  Another way is if the --
23 is if the allocation quantum for a particular file
24 system is bigger than a sector, then the file might
25 occupy -- even though it doesn't need, let's say --

Page 182

1  let's suppose the allocation quantum for a particular
2  file system is four.  Then no matter how small the
3  file is, to hold any data at all, four consecutive
4  sectors are going to be allocated to that file.
5  That's pretty common.
6      BY MR. FREITAS:  Q.  Okay.  Well, let's
7  assume that guidance.doc for one reason or another
8  appears in multiple sectors, okay?
9      A.  Okay.
10     Q.  And now let's suppose that I want to look at
11 that file, and I want to copy it from the device it's
12 on to the hard drive on my computer.
13     In order to make the file accessible to me,
14 I don't need to copy it from exactly the same
15 sectors.  Or excuse me.  To comparable sectors on my
16 hard drive; right?
17     MR. KIRSCH:  Same objection.
18     THE WITNESS:  That's basically right.  For
19 -- for just plain file-level copying, the sectors
20 that it's going to appear on when you drag it over to
21 your hard drive could be anywhere.  They have no
22 relationship to the sectors that were stored on the
23 source drive if you're copying at the file level.
24     BY MR. FREITAS:  Q.  Okay.  Now, let's move
25 to a situation where we have a source drive and a

Page 183

1  target drive, and we're going to copy guidance.doc
2  off the source and to the target, okay?
3      A.  Okay.
4      Q.  And let's suppose that guidance.doc appears
5  on Sectors 4, 6 and 10, all right?
6      A.  All right.
7      Q.  If all we care about is getting that file on
8  to the source, we don't really care whether it goes
9  to 4, 6 and 10 or some other sectors; right?
10     MR. KIRSCH:  Same objection.
11     THE WITNESS:  You mean on to the
12 destination.
13     BY MR. FREITAS:  Q.  I do.
14     MR. KIRSCH:  Same objection.
15     THE WITNESS:  Right.  So if you're doing
16 file-level copying and all you care about is getting
17 the file, it is -- doesn't matter to you where that
18 file is stored on your disk just so long as it's
19 somewhere and it can be found again.
20     BY MR. FREITAS:  When you use the term
21 "arranged" in your construction, did you mean or is
22 an example of what you meant that if guidance.doc was
23 on Sectors 4, 6 and 10 on the source, when it was
24 copied to the destination or target, it would also
25 appear in 4, 6 and 10?

Page 184

1      MR. KIRSCH:  Same objection.
2      THE WITNESS:  That not what I mean by
3  arranged.
4      BY MR. FREITAS:  Q.  What do you mean by
5  arranged?
6      A.  It's in paragraph 15.4.3.  It's not enough.
7  As it says here, quoting from the provisional, for
8  this process to work correctly, it is not enough for
9  the copy to have all of the data files.  It must be
10 arranged in the same pattern.  So as a first step, it
11 does mean -- it means that -- this means the data had
12 better -- of the particular file had better be in the
13 same place on the target drive, but that isn't
14 enough.
15     Q.  Okay.
16     A.  This goes on.  It says the term "arranged"
17 includes copying the hidden area access restriction
18 that is the maximum accessible address value from the
19 source to the destination and ensuring that the
20 hidden area of the destination drive is an exact copy
21 of the hidden area of the source drive.  So
22 arrangement is -- is a higher-level idea than just
23 getting all the files over in the same place.
24     Q.  But one aspect of arranged is that the files
25 go to the same place on the target that they were on



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 48 of 60   Page ID #:1528

THOMAS A. GAFFORD                                          February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        185–188

Page 185

1 the source; is that true?
2      A. That is one aspect, yes.
3      Q. Okay. And the other aspect or aspects are
4 what?
5      A. That the hidden area must be the same size
6 and position and have the same contents.
7      Q. The same data contents?
8      A. Yes.
9      Q. And when you say -- what did you say? The
10 same size and?
11     A. The same hidden area. By "size" I mean the
12 same -- you must copy the hidden area access
13 restriction. So for example, if your source drive
14 has your 100 sectors, but let's say your source drive
15 is really 200 sectors and the file system you've been
16 talking about is in the first 100 sectors and the
17 last 100 sectors are hidden, the max address is set
18 to 99, Sector 0 through 99. I forget if sectors
19 start with 0 or 1, but let's assume it's 0 through
20 99. Then limit is set to 99. To make a proper copy,
21 what this is telling you is that, not only do you
22 have to copy 0 through 99 so that you get exactly
23 those bits in the same place in this destination
24 drive, but that you must copy whatever is in 100
25 through 199.

Page 186

1      And once it's copied, and you have to make
2 that area unhidden to do the copy, and then once it's
3 copied the destination drive must have the hidden
4 area restriction, the max address hidden area
5 restriction restored to the value or set to the value
6 of 99 on the target drive because now -- because they
7 go on to talk about forensic analysis. They want to
8 ensure that a forensic analysis of the target drive
9 produces the same results as a forensic analysis of
10 the source drive.
11     Q. And so what's necessary to make the forensic
12 analysis possible? What did you say about the access
13 restriction? What has that got to do with making the
14 forensic examination possible?
15     A. According to the inventors, quite a lot.
16 That's what I've been reading to you here, and I'm
17 interpreting it into English as I go, but they say
18 you've got to copy the hidden area access
19 restriction, which is the maximum accessible address
20 value. That's a number.
21     Q. Well, this is what you say. That's not what
22 they say. That's not a quote from them. Those are
23 words you wrote. You said the term "arranged"
24 includes copying the hidden area access restriction.
25     A. Yes. That appears -- you know what? It

Page 187

1 would help me. I don't remember now. That is my --
2 it does appear to be my conclusion based on what they
3 say. It would help if I had the provisional so I
4 could see what -- how much of this they wrote on page
5 2.
6      Q. Okay. I think we have a copy.
7      MR. MANCINO: That was an exhibit from
8 yesterday.
9      MR. FREITAS: It was? Okay. And do you
10 know the number?
11     MR. OLANIRAN: Number 6.
12     MR. FREITAS: 6.
13     MR. MANCINO: Thank you.
14     BY MR. FREITAS: Q. Here's a copy of
15 Exhibit 6, Mr. Gafford.
16     A. Do you want to mark this or am I just
17 looking --
18     Q. No. It's already been marked.
19     A. Oh. Been marked.
20     Q. That's for you.
21     A. Got it. Got it. Okay. All right. So this
22 is page 2 of the app. Here we go.
23     Oh. So right. "For this process to work
24 correctly" is just about the middle of the page.
25     Q. Which page, Mr. Gafford?

Page 188

1      A. Of page 2, which is actually about four
2 pages into the -- let's see, one, two, three, four --
3 five pages into the file.
4      Q. Page 2 of 22?
5      A. Yeah.
6      Q. Okay.
7      A. So it says, "For this process to work
8 correctly," and this quote goes down to same pattern
9 as the original.
10     Okay. And the context of this is forensic
11 analysis. So my take on that starts with the term --
12 the phrase -- the sentence that begins with the term
13 "arranged." It's -- I'm only citing a part of what
14 they said, but the -- the meaning of that comes from
15 the page as a whole talking about the need and the
16 effect that law enforcement officials have special
17 needs and so on, bad guys hiding the evidence -- in
18 this blank area and so on.
19     Q. Okay. But what the applicant said is for
20 this process to work correctly, it is not enough for
21 the copy to have all of the data files of the
22 original. The data must be arranged on the copy in
23 the exact same pattern as the original.
24     That's simply a reference to requiring a
25 physical copy instead of a logical copy, isn't it?



THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                    189–192

Page 189

1        MR. KIRSCH:  Objection.  Misstates the
2  document.  Object as to form.
3        THE WITNESS:  No.  It's not -- a physical
4  copy -- oh.  It's speaking to making a physical copy
5  of the entire medium without regard to hidden areas.
6  And then -- hang on.  Let's look at the rest of this.
7        This description on page 2 goes on to talk
8  about blank areas as -- but areas interpreted as
9  blank by an operating system as Windows must also be
10  copied because stuff could actually be hidden, and it
11  might not be blank.
12        That still goes to nothing more than a
13  bit -- than a byte-for-byte copy.
14        BY MR. FREITAS:  Q.  So that means copy all
15  of Sectors 0 to 99 instead of just the data in
16  guidance.doc, for example?
17        MR. KIRSCH:  Object to form.
18        THE WITNESS:  That's part of it.  And it
19  goes a step farther.  And in fact, there's a further
20  support in here which is the inventor's description
21  of exact -- at an earlier citation in Column 1:31-37,
22  so let me take a look and see what that says.
23        BY MR. FREITAS:  Q.  Okay.  But can we slow
24  down before we do that?
25        A.  Sure.

Page 190

1        Q.  And do you agree with me that on page 2 of
2  22 on Exhibit 6, there's no reference to copying the
3  hidden area access restriction?
4        A.  I agree that on this page 2 there's no
5  discussion of hidden area access restriction.
6        Q.  Okay.  Before you move on to the next thing,
7  and I don't want to stop you from doing that, but I
8  wanted to ask you before I forget a question.
9        Do you agree that it is a proper use of the
10  term "physical copy" to say I want to copy all of the
11  sectors in which the file -- the data constituting a
12  file may appear?  So my example before was 4, 6 and
13  10.  Guidance.doc appearing in those sectors.
14  Copying all of those sectors is making a physical
15  copy.  Just copying the file without regard for
16  whether I'm getting all of the sectors is not a
17  physical copy.
18        Is that a proper use of the terminology?
19        MR. KIRSCH:  Object as to form.
20        THE WITNESS:  Well, your sentence wasn't
21  complete.  You're trying to -- it sounded like you
22  tried to clarify it by speaking of files and all the
23  sectors, but what's the whole sentence?  Physical
24  copy of what?  What's the rest of the sentence?
25        BY MR. FREITAS:  Q.  Okay.  I'll fill that

Page 191

1  out.  So if I'm making a physical copy of a drive,
2  and let's suppose it's 0 to 99, those are the
3  sectors, no hidden area, to make a physical copy of
4  the drive, I need to copy all of those sectors.
5        It might be the case that there are data
6  only on Sectors 1, 6, 8, 27, 42, 55, but if I want to
7  make a physical copy of the drive, I have to copy all
8  of Sectors 0 to 99; right?
9        MR. KIRSCH:  Object as to form.
10        THE WITNESS:  In the context that this is
11  this 100-sector drive.
12        BY MR. FREITAS:  Q.  Yes.
13        A.  That's it.
14        Q.  Yes.
15        A.  Then I believe that's a correct use of the
16  term.  A physical copy of the 100-sector drive is to
17  copy all 100 sectors bit for bit, byte for byte to
18  the -- whatever your target is.
19        Q.  And my hypothetical said there's no hidden
20  areas, so it's just Sectors 0 through 100, and that's
21  the complete drive, okay?  Right?
22        A.  Yes.  Without elaboration of hidden areas,
23  sure.
24        Q.  Yeah, okay.  So but I could also copy all of
25  the files that appear on the drive without copying

Page 192

1  all of Sectors 0 through 99; right?
2        A.  You -- there's a number of things -- any
3  number of things you could do, but you can certainly
4  do that as well.
5        Q.  Assuming the files did not take up all of
6  Sectors 0 through 99, I could make complete copies of
7  all of the files on the drive without copying the
8  entirety of Sectors 0 through 99; right?
9        A.  Yeah.  You'd call that -- typically in the
10  industry you'd call that a file copy as opposed to a
11  physical copy.
12        Q.  Is it also called a logical copy?
13        A.  Logical is a little -- I don't think I've
14  heard the term logical.  I would say that the
15  distinction is copying the physical drive or the file
16  system on it.  I'm not sure -- I don't think I've
17  heard the word "logical" used to describe that.
18        Q.  Okay.  All right.  I stopped you when you
19  were going to go look at something else.  Please go
20  ahead and do that.
21        A.  Okay.  See, here they're talking about --
22  and I believe that --
23        Q.  Where, Mr. Gafford?
24        A.  In Column 1, line 31 to 37, here they're
25  talking about not just the data but copying the



THOMAS A. GAFFORD                                      February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                       193-196

Page 193

1 device. When you copy the device, the device has in
2 the context of this disclosure where you have data
3 storage and you have this hidden area feature, when
4 you copy the device, you're copying its data and any
5 configuration that relates to that data, and the
6 configuration that's pertinent in this disclosure is
7 hidden area. So a device copy is all the bits plus
8 the hidden area mask or setting, whatever that is.
9     Q. So on line 31 through 37 on Column 1 of the
10 '086 patent, is there a reference there to copying
11 the hidden area access restriction?
12    A. No. They talk about copying -- all this
13 talks about is copying the device.
14    Q. And why did you call that to my attention?
15    A. Because it's support for the rest of what I
16 wrote above that which is copying the hidden area.
17 You cannot copy the device if you don't copy the
18 hidden area.
19    Q. Can you tell me what you're saying is
20 supported by that specifically, please?
21    A. I just did. It's the mention of copying the
22 device.
23    Q. Oh, I know. You said above something, and I
24 just didn't understand what you're saying.
25    A. Oh. It's the -- I'm referring to my

Page 194

1 sentence starting with the term "arranged" and going
2 to the end of the paragraph.
3     Q. Okay. Now, that passage includes your
4 statement the term "arranged" includes copying the
5 hidden area access restriction (the maximum
6 accessible address value) from the source drive to
7 the destination drive.
8        What is it about Column 1, lines 31 to 37,
9 that supports the notion of copying the hidden area
10 access restriction?
11    A. Column 1, 31 to 37 talks about copying the
12 device. Not just the bits on it, not just the
13 storage data, but the device. And as we're taught in
14 this disclosure, device includes maximum accessible
15 address value.
16    Q. And where are we taught that, that it
17 includes maximum accessible address value?
18    A. We're taught that the -- elsewhere in this
19 disclosure that the hidden area setting is a -- is
20 something that is stored in the device. So what I'm
21 concluding here is that, if you're copying the
22 device, you have to copy its hidden area setting or
23 you don't have an exact copy. All of this is in
24 support of the term "exact."
25    Q. Okay. But where do you find support for the

Page 195

1 idea that you have to copy the hidden area access
2 restriction?
3     A. The term -- the use of the term "device,"
4 copying the device in Column 1:31 to 37. Doesn't say
5 copy the data on the device. It says the device.
6     Q. All right. So that's where you find the
7 support?
8     A. Yes.
9     Q. You agree, don't you, that the data from the
10 source should be readable on the target for a
11 forensic analysis?
12       MR. KIRSCH: Object as to form.
13       THE WITNESS: I don't know what you mean by
14 "readable." The -- the forensic analysis involves
15 finding out whatever the condition of the drive is.
16 In this context now where you need to consider
17 HPANDCO (phonetic) in the world of forensics, it
18 involves learning everything from the drive, which is
19 not only all of its data, but what, if any, max
20 address was set.
21       BY MR. FREITAS: Q. And why does it involve
22 that?
23    A. Because it's part of the forensic analysis.
24 You don't know the state of the drive if you don't
25 know that.

Page 196

1     Q. Have you ever performed a forensic analysis?
2     A. I have not.
3        MR. KIRSCH: Hey, Bob, can we just talk for
4 a moment? So it's about 5:15. We're going to start
5 running into some issues with flights, so I just need
6 to know.
7        MR. FREITAS: So here's what I was going to
8 do. I was going to ask a few more questions, take a
9 break and perhaps be done. And if not --
10       MR. KIRSCH: Go for it.
11       MR. FREITAS: Okay. All right.
12       BY MR. FREITAS: Q. Which operating systems
13 can be used with the invention of the '682 patent?
14    A. '682.
15    Q. Yes.
16       MR. MANCINO: Object to form.
17       THE WITNESS: I think it's operating system
18 agnostic. I don't think they even mention -- they
19 mention it as an alternative to a -- using an
20 application on an operating system to prevent
21 writing. And let's see. Hold on.
22       Talk about installing software as a way --
23 let's see. The class is right. The second class is
24 based on software protection of the drive. The first
25 class is -- oh. Blocking a write gate. Okay. So



THOMAS A. GAFFORD                                     February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                        197–200

Page 197

1  you have blocking a write gate.  Software techniques.
2  And a final class of hardware devices between the
3  drive and the -- in this case it's designed to
4  operate with particular computer configuration such
5  as a card inserted into a host PCI bus, and they say
6  this has limitations that are problematic as well.
7      So now, okay.  The disclosure doesn't talk
8  about the characteristic of this device that it is
9  operating system independent, but in fact, I think it
10  is.  What they've described blocking it the way
11  they've described it would be operating system
12  agnostic.  It wouldn't matter.
13      BY MR. FREITAS:  Q.  Would you look on
14  Column 9, please, in the '682 patent.  There's a
15  heading "Read verification after writing."
16      Do you see the heading?
17      A.  Yes.
18      Q.  At the time the application that led to the
19  '682 patent was filed, were the first two sentences
20  after that heading accurate?
21      A.  Yes, I believe they are.
22      Q.  Are those two sentences misleading in any
23  way?
24      A.  No.
25      Q.  Do you use the Microsoft computer dictionary

Page 198

1  in your work?
2      A.  I do.
3      Q.  And do you think that every definition in
4  Microsoft computer dictionary is a term of art?
5      A.  Couldn't possibly have that opinion.  That
6  would require reading the whole dictionary.
7      Q.  That's not the only dictionary you look at,
8  is it?
9      A.  For computer terms, it's the first one
10  because it tends to be the most thorough.
11      Q.  But it's not the only one you look at;
12  right?
13      A.  I believe there are others I've used from
14  time to time.
15      Q.  The -- your understanding of the use of
16  dictionaries in claim construction, is it your belief
17  that a term in a dictionary would trump what's in the
18  intrinsic record in a patent?
19      MR. KIRSCH:  Object as to form.  Calls for
20  legal conclusion.
21      THE WITNESS:  I don't know the law on that.
22  I couldn't tell you.
23      BY MR. FREITAS:  Q.  Okay.  So you're not
24  taking any sort of position that a dictionary would
25  trump the intrinsic record; correct?

Page 199

1      MR. KIRSCH:  Object as to form.
2      THE WITNESS:  I don't think I have.
3      MR. FREITAS:  Okay.  Let's take a break, and
4  let's see if we're wrapped up.
5      THE VIDEOGRAPHER:  Time is now 5:20 p.m.
6  We're off the record.
7      (Recess taken from 5:21 p.m. to 5:31 p.m.)
8      THE VIDEOGRAPHER:  The time is now 5:30 p.m.
9  We are back on the record.
10      BY MR. FREITAS:  Q.  Mr. Gafford, could you
11  get the '086 patent, please.
12      A.  I have it.
13      Q.  Okay.  At the bottom of Column 8, line 66
14  there's a reference to bit pattern.
15      What's a bit pattern?
16      A.  This is an area where they're talking about
17  additional features of the copier where, as the data
18  is moved from source drive to the target drive, you
19  can search for bit patterns in the data that's being
20  moved and you can -- you can program a PLD, a
21  Programmable Logic Device, to look for these bit
22  patterns.
23      Q.  What's the role of the PLD?
24      A.  Well, as they say here just above it in
25  Column 8, line 60, the PLD is moving the data,

Page 200

1  meaning it's doing the reading and the writing, and
2  they say it's fast enough to compare the data to a
3  bit pattern as it moves, so it's moving and comparing
4  against this pattern.
5      Q.  Where does the PLD -- where is it
6  physically?
7      A.  Physically -- well, I mean, it's in the
8  duplicator.  As to where it is in the block diagram,
9  let's see.  In the diagram in Figure 4, they have
10  a -- they show this Altera PLD as Element 4090
11  standing between the source and destination drive
12  ports and the Intel 386 processor.
13      Q.  So it's part of the copying device of the
14  invention of the '086 patent?
15      A.  Yes.
16      MR. KIRSCH:  Object as to form.
17      THE WITNESS:  That's right.  Sorry.
18      BY MR. FREITAS:  Q.  Okay.  And then it says
19  at the bottom of Column 8, "If the bit pattern to be
20  scanned are known at the time of design, the device
21  can be configured from the factory.  It would be
22  quite rare for this to happen."
23      Do you see that?
24      A.  I do.
25      Q.  It goes on.  In order to accommodate varying



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
201–204

Page 201

1 numbers of bit patterns to scan and different
2 scanning requirements for each customer, the PLD
3 would have to be reconfigured on the fly to meet the
4 customer requirements.
5       Do you see that?
6    A. Yes.
7    Q. That recognizes that customer input would be
8 required after the device came in to the hands of the
9 customer, doesn't it?
10       MR. KIRSCH: Object as to form.
11       THE WITNESS: Say that again. I don't think
12 it quite does.
13       MR. FREITAS: Do you want to hear the
14 question?
15       THE WITNESS: I do.
16       (Record read.)
17       THE WITNESS: Customer input to whom or
18 what?
19       BY MR. FREITAS: Q. Well, it recognizes
20 customer input provided after the customer has the
21 device; correct?
22       MR. KIRSCH: Object as to form. Misstates
23 the document.
24       THE WITNESS: It's hard to tell what they're
25 talking about here. Whether it's customer input to

Page 202

1 the factory to have the factory remanufacture it or
2 to have -- I'm not sure. They don't flush this idea
3 out very well other than kind of floating it as a
4 trial balloon for more clever things the box can do.
5 They go on to talk about it in the next paragraph,
6 and even the next paragraph after that. But the
7 manner in which the PLD would be altered or even if
8 it would have to be altered, I mean, it's not clear
9 what the heck they're talking about here. They don't
10 give an example of how this might work. They just
11 say in general the PLD can find patterns. You could
12 -- you could perhaps burn the pattern in it. The
13 factory, when they talk about some pattern that is
14 not known until the customer is using it, then it's
15 unclear what the heck they're talking about.
16       BY MR. FREITAS: Q. So you don't know
17 whether it's input from the customer to the factory
18 or the customer making an adjustment of some kind to
19 the device.
20    A. Exactly.
21    Q. Okay. Column 10, lines 26, 27, there's a
22 statement, The copying device may be further
23 configured to perform the scan only.
24       Do you see that?
25    A. I do.

Page 203

1    Q. That's a reference to something that the
2 user would do, isn't it?
3       MR. KIRSCH: Object as to form.
4       THE WITNESS: Well, you know, it's just
5 after accepting one or more bit patterns to scan
6 during the copying process. I don't think it's clear
7 whether this is in the customer's hands or at the
8 factory either quite frankly.
9       BY MR. FREITAS: Q. You can't tell whether
10 it's a reference to what the customer would do, what
11 the user would do or what would be done at the
12 factory; is that right?
13    A. Yeah. I don't think it's clear.
14    Q. Okay. Look at Column 9, please, lines 45
15 and 46.
16    A. Yes.
17    Q. You see it says there in another
18 implementation Interface 4120 could be used to
19 receive bit patterns to scan from a host computer?
20    A. Yes, under the heading User Communication,
21 yes, I see that.
22    Q. And is that a reference to something that
23 the user would do after the user had the device, or
24 is it something else?
25       MR. KIRSCH: Object as to form.

Page 204

1       THE WITNESS: Yeah. What's this? Oh. The
2 serial port. Okay.
3       Well, literally what it's saying here is
4 Interface 4120, which is a serial data port in that
5 block diagram could be used to receive bit patterns
6 to scan from a host computer. So let's see what they
7 say a host computer is in this.
8       Well, they say user -- and it's in the
9 general context of user communications. What do they
10 say a host computer is? Okay. They say above that,
11 in a similar implementation -- similar to what? I
12 don't know what similar to. They're trying --
13 they're describing an environment here, but I can't
14 see what the object of similar is.
15       BY MR. FREITAS: Q. Does that mean you're
16 not able to answer my question?
17    A. Yeah. The question, I think, goes to
18 whether -- your question goes to whether this is
19 something the user is doing or something the factory
20 is doing, and I think in order to understand that, I
21 need to understand what the implementation
22 environment is, what this implementation is. And
23 they say similar, and I -- they're talking about
24 alternative embodiments, and that's something the
25 factory -- embodiments is how the invention is



THOMAS A. GAFFORD
February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL
205–208

Page 205

1 arranged. So it seems like that's something the
2 factory is supplying.
3    Q. Well, there's a reference to how the
4 interface could be used, isn't there?
5    A. Maybe you could save me some trouble by
6 pointing to it.
7    Q. Line 45.
8    A. Well, the interface could be used -- that
9 doesn't tell you whether it's being used -- it says
10 it's being -- it says it's being used to receive bit
11 patterns from a host computer, but we don't know what
12 a host computer is. The host computer -- that's why
13 I was reading backwards here to find a previous
14 reference to a host computer, and that is in the
15 sentence that talks about similar implementation,
16 similar implementation, it seems to me is referring
17 to the systems described as alternate embodiments,
18 which are different ways to make this invention or to
19 provide it. So I don't think it's clear.
20    Q. Okay. Just a moment.
21       Did you have anything to add?
22    A. No.
23       MR. FREITAS: All right. Thank you,
24 Mr. Gafford. I have no further at this time.
25       THE WITNESS: Oh, thank you.

Page 206

1       MR. KIRSCH: We have some questions.
2       THE WITNESS: Oh, okay.
3
4       EXAMINATION BY MR. KIRSCH
5
6    Q. Good evening, Mr. Gafford.
7    A. Good evening, Mr. Kirsch.
8    Q. As you know, I'm Kevin Kirsch on behalf of
9 Guidance. I just have a few questions.
10       Before lunch, Mr. Freitas attempted to get
11 you to agree that Claim 44, the '682 patent, covers a
12 write blocker where one interface is an IDE interface
13 for a disk drive, and the interface emulator is
14 configured to emulate an IEEE 1394 connection.
15       Do you recall that?
16    A. Yes.
17    Q. In your opinion, does the specification of
18 the '682 patent support such a configuration?
19    A. No, it does not.
20    Q. Does Column 4, lines 8 through 13 of the
21 '682 specification support Claim 44 in your opinion?
22    A. Lines which?
23    Q. Eight through thirteen.
24       MR. FREITAS: Which column?
25       MR. KIRSCH: Column 4.

Page 207

1       MR. FREITAS: And I'm sorry. Which lines?
2       MR. KIRSCH: Column 4, lines 8 through 13.
3       THE WITNESS: No. All it -- all Column 4,
4 lines 8 through 13 to is identify other types of
5 interfaces that are available, but the idea of -- of
6 a blocker having one interface on one side and a
7 different one on the other is not supported in here
8 at all.
9       BY MR. KIRSCH: Q. Turning your attention
10 to the '086 patent, Mr. Freitas asked you about
11 Column 1, lines 48 through 57 of the '086 patent and
12 the disclosure regarding the prior art Logicube
13 device.
14       Do you see that spot?
15    A. Yes.
16    Q. Does this paragraph say which function the
17 Logicube device is dedicated to?
18    A. Yeah. They say -- the first sentence says,
19 The second class of techniques for making exact
20 copies of long-term memory storage devices involves
21 dedicated standalone devices, and then they go on to
22 list Logicube as one such device.
23    Q. In your expert opinion, what type of
24 training referenced by the applicants in the
25 paragraph was necessary to successfully operate the

Page 208

1 Logicube device?
2       MR. FREITAS: Objection. Calls for
3 speculation.
4       THE WITNESS: They --
5       MR. FREITAS: Not proper expert testimony.
6       THE WITNESS: The sentence is, This device
7 requires a trained operator, and it has enough
8 options to cause confusion or errors on the part of
9 its user. The previous sentence talks about one of
10 the things you can do with this thing is to delete
11 and to delete the contents of what will be the
12 destination drive, and that's different from copying.
13 It could cause trouble throwing away data, having the
14 option to -- having an option that you may not
15 understand because you're not trained to throw data
16 away is not a good thing in this -- as they're
17 talking about it here. It can create confusion or
18 errors.
19       MR. FREITAS: I move to strike the answer as
20 nonresponsive.
21       BY MR. KIRSCH: Q. So what type of training
22 would be necessary?
23       MR. FREITAS: Same objections.
24       THE WITNESS: Well, these kinds of things --
25 I've been to training before for equipment I've used.



THOMAS A. GAFFORD                                    February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                       209–212

Page 209

1 They sit you in a classroom and tell you all the
2 things they can do.  Give you some -- give you a
3 handout and describe the menus and describe what they
4 do.  It's . . .
5      BY MR. KIRSCH:  Q.  Mr. Freitas asked if you
6 had any new opinions.  You said you had new opinions
7 and you said you had some in response to what
8 Mr. Berg testified to yesterday.
9      Do you recall that?
10     A.  Yes.
11     Q.  Do you recall Mr. Berg testifying yesterday
12 regarding his opinion that an SATA interface is
13 compatible with an IDE interface?
14     MR. FREITAS:  Objection.  Beyond the scope
15 of his expert report.
16     THE WITNESS:  I recall him saying that, yes.
17     BY MR. KIRSCH:  Q.  Have you developed an
18 opinion since hearing Mr. Berg's testimony regarding
19 the compatibility of SATA interfaces and IDE
20 interfaces?
21     A.  Yeah.
22     Q.  What is it?
23     A.  They aren't.
24     Q.  Do you recall Mr. Berg testifying yesterday
25 regarding his opinions that the read verification

Page 210

1 after writing is not a normal operation in some
2 computing environments?
3      A.  Yes.  I heard him say that.
4      Q.  Have you developed an opinion since hearing
5 Mr. Berg's testimony regarding whether read
6 verification after writing is a normal operation in
7 some computing environments?
8      MR. FREITAS:  Objection.  Beyond the scope
9 of his report.
10     THE WITNESS:  Yeah.  I heard this.  I'm
11 thinking now I either heard this yesterday or it's
12 just a possibility it happened before I came in, but
13 I've heard him say this before, and I didn't agree
14 with it then.  I don't agree with it now.  It's a
15 command that an operating system is allowed to use in
16 a drive.  It's not whether it's common or not.  It's
17 an ordinary command.  It's used -- one of the things
18 it's used for is ensuring reliability knowing that
19 you -- that what you wrote actually got out there to
20 the medium.  It's useful.  Whether it's common or not
21 is neither here nor there.
22     MR. KIRSCH:  Okay.  I'll turn it back over
23 to you, Mr. Freitas.
24     MR. FREITAS:  Okay.
25     MR. KIRSCH:  Thank you.

Page 211

1      FURTHER EXAMINATION BY MR. FREITAS
2
3      Q.  So that read verification after writing
4 command, that's not used in all operating systems, is
5 it?
6      A.  I'm certain it's not used in all operating
7 systems because that's a huge universe.
8      Q.  Is it a default option in any operating
9 system --
10     A.  I don't know --
11     Q.  -- of which you're aware?
12     A.  I'm sorry.  I don't know.
13     Q.  Pardon me?
14     A.  I don't know if it's default in any
15 operating systems that I'm aware.
16     Q.  Is it used or available in most operating
17 systems?
18     A.  I think -- most?  I can think of a couple
19 places where you can -- where you can configure it to
20 be used.  Old DOS is one place like the disclosure
21 says.  I'm pretty sure there's something in the
22 bowels of most UNIXs that allows you to do that, but
23 as to most that would require research I haven't
24 done.  That's a lot of catalog work.
25     Q.  Are you able to identify another operating

Page 212

1 system other than old DOS or whatever you meant by
2 the bowels of most UNIXs?
3      A.  Varieties of -- well, that's close enough.
4 No.  Those are the only two I have enough familiarity
5 with to know that those kinds of things can be
6 configured at a very low level.
7      Q.  Okay.  Now, what were you portraying
8 Mr. Berg as having said about SATA and IDE?  What did
9 you say he said?
10     MR. KIRSCH:  Object as to form.
11     THE WITNESS:  The question was did you hear
12 him say they're compatible with each other?  And I
13 heard him say that, and I don't think they are.
14     BY MR. FREITAS:  Q.  So you think that
15 Mr. Berg said that -- exactly what do you think he
16 said?
17     A.  Just that, that the two interfaces are
18 compatible with each other.  Hey, if I got it wrong,
19 then it's inept, and it will have no impact on what
20 he said.  But that's what I remember that's what the
21 question was, and that's what I responded to.
22     Q.  Okay.  Assuming that you heard him
23 correctly, what did he say -- or why is what he said
24 wrong?
25     A.  Well, for one you can't plug one into the



THOMAS A. GAFFORD
February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL
213–216

Page 213

1 other.  They're wildly different hardware.
2     Q.  Okay.
3     A.  That's the main one.
4     Q.  Is there anything else that leads you to
5 conclude that what you believe Mr. Berg said is
6 incorrect?
7     A.  No.  That's the guts of it.  You can't plug
8 one into the other.
9     Q.  Okay.  Now, Mr. Kirsch just asked you some
10 questions about whether there was support in the
11 specification for something.
12     And if we -- can we go back and listen to
13 exactly what the question was?
14     A.  Which patents so I'm reading --
15     Q.  He was asking you about Claim 44 of the
16 '682.
17     A.  Oh, okay.
18     (Record read.)
19     BY MR. FREITAS:  Q.  Mr. Gafford, Mr. Kirsch
20 asked you whether there was support in a
21 specification of the '682 patent for a write blocker
22 where one interface is an IDE interface for a disk
23 drive and the interface emulator is configured to
24 emulate an IEEE 1394 connection.
25     Do you remember being asked about that?

Page 214

1     A.  Yes.
2     Q.  You agree, don't you, that Claim 44 claims a
3 write blocker where one interface is an IDE interface
4 for a disk drive and the interface emulator is
5 configured to emulate an IEEE 1394 connection
6 regardless --
7     THE REPORTER:  I'm sorry.  Do you mind
8 starting over on your question?
9     MR. FREITAS:  Sure.  I'll start over
10 completely.
11     THE REPORTER:  Thank you.
12     BY MR. FREITAS:  Q.  Mr. Gafford, you agree,
13 don't you, that Claim 44 of the '682 patent claims a
14 write blocker where one interface is an IDE interface
15 for a disk drive and the interface emulator is
16 configured to emulate an IEEE 1394 connection
17 regardless of whether such a write blocker is
18 supported by the specification?
19     MR. KIRSCH:  Objection as to form.
20 Misstates testimony.  Asked and answered.
21     THE WITNESS:  I would say regardless as a --
22 as the order of legal as well.  But in any case, the
23 -- it claims what it claims.  I mean, yes, I believe
24 the context of my answer to -- in my thinking to
25 answer Mr. Kirsch's question was that the claim

Page 215

1 indeed claims that.
2     BY MR. FREITAS:  Q.  And it indeed claims
3 what I just said, and that's why you say there's no
4 support in the specification because you agree that
5 Claim 44 very clearly claims what I just asked about;
6 correct?
7     MR. KIRSCH:  Objection as to form.
8 Misstates testimony.
9     THE WITNESS:  I'm just going to give an
10 answer from the top that I hope will do it for you.
11 I believe that 44 is claiming an emulator that
12 presents a FireWire connection to the host and is
13 meant to connect to an IDE drive, and I also believe
14 that there is no support for such an invention in the
15 specification.
16     BY MR. FREITAS:  Q.  Okay.  Let me ask the
17 question a little bit differently.  You agree that
18 Claim 44 claims a write blocker where the port
19 between the write blocker and the disk drive is an
20 IDE port; right?
21     MR. KIRSCH:  Object as to form.  Misstates
22 testimony.  Asked and answered.
23     THE WITNESS:  Yes.  The -- right.  This box
24 hooks up to the drive via IDE.
25     BY MR. FREITAS:  Q.  And that same box, the

Page 216

1 write blocker has an interface emulator that emulates
2 an IEEE 1394 connection; correct?
3     MR. KIRSCH:  Object to the form.  Misstates
4 testimony.  Asked and answered.
5     THE WITNESS:  The -- its connection between
6 the box and the host is FireWire.
7     MR. FREITAS:  We have to stop to change the
8 media.  I'm not quite finished.
9     THE VIDEOGRAPHER:  This marks the end of
10 Disk No. 3 in the deposition of Thomas Gafford.
11     The time is now 5:55 p.m., and we are off
12 the record.
13     (Recess taken from 5:55 p.m. to 6:00 p.m.)
14     THE VIDEOGRAPHER:  This marks the beginning
15 of Disk No. 4 in the deposition of Thomas Gafford.
16     The time is now 6:00 p.m., and we are on the
17 record.
18     THE WITNESS:  Let me say that, in the
19 context of Mr. Kirsch's characterization of your
20 question that was asked before noon of me and the
21 questions you've been asking, that there is a wrinkle
22 in my answer that I made clear this morning.  I don't
23 want it to be lost.
24     And that wrinkle is that the --
25 understanding 44 to mean what I just said earlier,



THOMAS A. GAFFORD                                                      February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                                217—220

Page 217

1 which is that it's got a 1394 connection to the host
2 and an IDE connection to the drive, that's the
3 very -- that's the most charitable I could possibly
4 be.
5        As I told you this morning, I think the
6 claim has some fundamental nonsense in it when you --
7 when you add all this language together from the
8 dependents.  You end up with -- and I won't go
9 further on that, but I just want to say that's
10 charitable.
11       It might also not mean anything.  It might
12 create -- 44 has the potential for introducing
13 internal inconsistencies that make the whole claim
14 impossible to parse.
15       BY MR. FREITAS:  Q.  And you're just
16 referring to what you've already testified about
17 today.
18    A.  In the morning.  I'm not making up anything
19 new.  This is the caveats I was giving you about this
20 combination of the dependent language before noon.
21 I'm not adding to that.  I'm just reminding you that
22 that's the context of -- and so what I'm saying now,
23 when we're using this shorthand of FireWire IDE,
24 that's charitable.  There are problems with that, but
25 I'm willing to speak in terms of let's suppose the

Page 218

1 Court were to rule that's what it means.  Then this
2 is the context I understand in Mr. Kirsch's question
3 is there's support for that.  I don't think there is.
4    Q.  Oh, okay.  But you went beyond let's suppose
5 the Court.  You just told me that, yeah, Claim 44
6 does claim a device with a FireWire connection on one
7 side and an IDE connection on the other side to the
8 drive.
9    A.  And I'm adding --
10       MR. KIRSCH:  Objection as to form.
11       THE WITNESS:  And I'm --
12       MR. KIRSCH:  Misstates testimony.
13       THE WITNESS:  I'm adding the caveat to that
14 that I'm not backing off of my testimony before lunch
15 today that that's the -- and characterizing it now
16 that that's the most charitable thing that it can
17 possibly mean, that there are problems with it
18 meaning that because when you try to grasp the
19 language of 44 into the first element of Claim 1,
20 things start to get shaky and strange.  The best it
21 could ever mean is what you just said.  I'm not
22 convinced it actually can mean that.  But if it were
23 to mean that, and that's the Court's job, then my
24 testimony would -- to Mr. -- my answer to
25 Mr. Kirsch's question is, is if that's what it means,

Page 219

1 it's not supported.
2       BY MR. FREITAS:  Q.  And the only reason
3 you're doubting whether that is indeed what it means
4 is what you told me this morning and what you've now
5 placed as your caveat; is that correct?
6    A.  Yes.  That's right.
7    Q.  Okay.  Well, Mr. Gafford, when was FireWire
8 first available?
9    A.  Well, obviously before this -- let's see.
10 This thing was filed when?
11    Q.  So there's a provisional?
12    A.  Provisional in 2000.
13    Q.  2000 --
14    A.  It first showed up as an Apple trademark
15 name, and Apple and Sony used it.  Sony used it for
16 cameras sometime in the '90s.  I don't remember when.
17    Q.  Well, on the cover of the '68 -- I got the
18 wrong one again.  The cover of the '682 patent has a
19 reference to the provisional of September 29th, 2000.
20    A.  Yes.
21    Q.  And you're sure that FireWire was available
22 before then?
23    A.  I believe that's correct.  I believe
24 FireWire showed up at least at some kind of a
25 high-speed interface in some work Sony and Apple were

Page 220

1 doing in the '90s.
2    Q.  And before that date, the IEEE 1394 standard
3 was available and known; right?
4    A.  It would have to have been or they wouldn't
5 have known to call it 1394 in the disclosure.
6    Q.  Okay.  Now, at that same time when the
7 provisional was filed in September 2000, it was also
8 known that there were adapters that could convert
9 FireWire signals to IDE; correct?
10       MR. KIRSCH:  Object as to form.
11       THE WITNESS:  I don't know the dates of
12 those things.  I know that I have purchased drive
13 enclosures that hooked up to one kind of drive and
14 provided FireWire off the back, but I don't know the
15 dates.
16       BY MR. FREITAS:  Q.  You don't remember the
17 dates?
18    A.  Not at all.
19    Q.  You don't remember the earliest date at
20 which an adapter that would enable a device with a
21 FireWire port to work with others?
22    A.  That's --
23    Q.  Other types of interfaces?
24    A.  -- broader and stranger.  That's converting
25 the other way.  Actually converting -- if you have



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
221–224

Page 221

1 some device that is supplied in its basic
2 configuration with FireWire only and then you're
3 converting that to IDE, I'm not sure I've ever seen a
4 box that does that except these modern bridges that
5 try to convert everything to everything.
6     Q. Well, what did you see?
7     A. I'm thinking of a -- of a -- an enclosure.
8 In fact, the first place I saw this was in a DVD that
9 I bought, external DVD drive that had USB and
10 FireWire ports on the back. And inside the drive
11 was -- was an ATAPI IDE -- IDE drive. So it
12 contained a circuit board in there that converted the
13 drive's interface parallel -- old-style parallel data
14 interface into one of two different serial
15 interfaces.
16     Q. Why did you tell Mr. Kirsch that you don't
17 think there's support for a write blocker with a
18 FireWire port on one side and an IDE connection to a
19 disk drive on the other?
20     MR. KIRSCH: Object as to form.
21     THE WITNESS: I don't believe --
22     MR. KIRSCH: Misstates the question.
23     THE WITNESS: I don't believe -- I don't
24 believe there's -- in that general area where -- I
25 don't believe there is disclosure of such a thing,

Page 222

1 and I believe it runs afoul of the idea of emulator.
2 There's nothing to emulate in FireWire that --
3 FireWire -- FireWire is practically a network
4 protocol. It's a very high-level, very modern
5 protocol.
6     And the -- using FireWire to get at an IDE
7 drive, nothing in that FireWire conversation except
8 the raw data itself is going to look like anything in
9 the IDE conversation.
10     IDE presents you, as they say in here, with
11 a set of registers, and you read and write those
12 registers to make things happen with the drive.
13 FireWire isn't even close to looking like that. It
14 can't emulate an IDE -- FireWire cannot -- inherently
15 cannot emulate a storage interface.
16     And the problem you have here -- and this
17 gets to my caveat -- is that the antecedent for
18 storage device is the thing that's being emulated in
19 the first element towards the host, and that
20 antecedent is used as being the thing to which the
21 drive interface connects, so that's nuts. You --
22 that's where the claim starts breaking down in terms
23 of making sense.
24     BY MR. FREITAS: Q. Now, are you giving me
25 your caveat, or are you telling me why you told

Page 223

1 Mr. Kirsch that there's no support in the
2 specification?
3     A. I'm -- I don't know what I'm doing. I'm
4 giving you the best answer I can to the question you
5 asked.
6     Q. All right. So you agree, don't you, that
7 there's a clear disclosure of a write blocker that
8 has a FireWire connection to the host?
9     MR. KIRSCH: Object as to form.
10     THE WITNESS: I'll give -- I'll save us both
11 time by the -- what column was that? Was it 4? I
12 don't think your -- I don't think your framing of
13 what it discloses about FireWire is correct, so I'm
14 going to go back to that paragraph at the top of 4,
15 which begins at the bottom of 3. Although concepts
16 consistent with the present invention are primarily
17 described herein in relation to an IDE magnetic hard
18 disk drive, these concepts may be implemented with
19 other types of IDE media, and it goes on to talk
20 about flashing memories, other types of media, and
21 then it says in addition to the IDE interface,
22 concepts consistent with the invention may be applied
23 in a straightforward manner to other types of
24 high-level storage interfaces, including SCSI and
25 FireWire.

Page 224

1     BY MR. FREITAS: Q. Well, what it says
2 exactly is, A straightforward manner to other types
3 of high-level storage interfaces, such as the
4 well-known Small Computer System Interface (SCSI)
5 standard or a hard drive connected through an IEEE
6 1394 (FireWire) connection; right?
7     A. Yes. That's what it says. And what it's
8 talking about is not just the host port but both
9 ports. It's telling you take the teachings within
10 these four corners. And wherever we say IDE, we --
11 you can substitute SCSI or 1394. And that means SCSI
12 in and out, 1394 in and out. That makes the
13 invention makes sense. That makes emulate make
14 sense. That makes -- that makes those two terms
15 which are described here in some detail make sense.
16     Q. Okay. So we have various disagreements that
17 we're -- we got to get try to get past in order to
18 get some questions answered, but you agree, don't
19 you, that there is a clear disclosure of a write
20 blocker with an IEEE 1394 connection to a host?
21     A. That doesn't go far enough.
22     Q. But is it true? Is it true?
23     A. Together with the -- with the -- what's the
24 other thing called? Host and -- host and target
25 both. Host and target.



Case 2:13-ml-02461-GAF-PLA   Document 38-13   Filed 02/19/14   Page 58 of 60   Page ID #:1538

THOMAS A. GAFFORD                                          February 07, 2014
MYKEY TECH vs. INTELLIGENT COMPUTER SOL                          225–228

Page 225

1    Q.  Okay.  So let me -- let me ask the question
2  a little bit differently in a way that I think
3  addresses the point I'm trying to ask about but
4  includes what you just said.  You agree that there is
5  a disclosure of a write blocker connected to a host
6  via a FireWire connection IEEE 1394, but your view is
7  that the disclosure includes only a write blocker
8  that is also connected to the storage device via a
9  FireWire connection; is that true?
10   A.  Yes.
11   Q.  So you don't -- you don't deny that there's
12  a disclosure of a FireWire connection to the host,
13  but you maintain that the disclosure of a FireWire
14  connection to the host also includes a disclosure of
15  a FireWire connection to the storage device?
16       MR. KIRSCH:  Objection.  Misstates
17  testimony.  Object as to form.
18       THE WITNESS:  It's not quite disclosure.
19  Disclosure is that requires that if you're applying
20  that -- let's see.  Concepts consistent with the
21  invention those concepts are same bus both
22  sides.
23       BY MR. FREITAS:  Q.  Okay.  You say that the
24  disclosures are all same bus both sides.
25       And by that you mean same port, same

Page 226

1  connection on both sides; right?
2    A.  Yes.
3    Q.  Okay.  You're saying that all of the
4  disclosure involves the same type of connection on
5  both sides, but you do agree that the disclosure
6  that's there includes a FireWire connection; right?
7    A.  Yes.  That one of those connections that may
8  appear on both sides is -- is FireWire.
9    Q.  And you also agree that in Claim 2, the
10  connection to the disk drive is an IDE connection;
11  right?
12       MR. KIRSCH:  Objection.  Misstates his
13  testimony.  Object as to form.
14       BY MR. FREITAS:  Q.  Putting aside your
15  caveat.
16       MR. KIRSCH:  Asked and answered.
17       BY MR. FREITAS:  Q.  I'm acknowledging the
18  caveat.
19
20   A.  Well --
21   Q.  I can rephrase it this way.  If what you
22  called the charitable view of Claim 44 is an
23  appropriate view, if that's the case, then it's true
24  that Claim 2 shows an IDE connection to the disk
25  drive; right?

Page 227

1       MR. KIRSCH:  Objection as to form.
2       THE WITNESS:  The only problem I have with
3  your -- with your scenario is that 44 has nothing to
4  do -- if we're speaking about Claim 2, 44 has nothing
5  to do with anything.  Claim 2 narrows Claim 1 to
6  require IDE.
7       BY MR. FREITAS:  Q.  Okay.  Well, let's do
8  it that way.  Claim 2 says that the connection
9  between the blocker and the storage device, which is
10  specifically stated to be a disk drive in Claim 2 is
11  an IDE connection.
12       MR. KIRSCH:  Objection.  Misstates his
13  testimony.  Object as to form.
14       BY MR. FREITAS:  Q.  Isn't that right,
15  Mr. Gafford?
16       MR. KIRSCH:  Same objection.
17       THE WITNESS:  Two adds IDE for a disk drive,
18  which is the storage device.  And in doing so,
19  requires that read together with one, that both
20  interfaces are IDE.  It creates a -- it creates an
21  altered antecedent.  And the host interface the drive
22  itself are now limited to being IDE.
23       BY MR. FREITAS:  Q.  And that antecedent is
24  changed in 44 where the interface between the write
25  blocker and the host is an IEEE 1394 connection;

Page 228

1  correct?
2       MR. KIRSCH:  Object as to form.
3       THE WITNESS:  Not quite.
4       MR. KIRSCH:  Misstates testimony.
5       THE WITNESS:  Sorry.
6       Well, in short, no.  Forty-four dynamites.
7  That bit of rapport between 2 and 1 is blown to
8  smithereens by the language of 44 because now you've
9  got IDE and 1394 mentioned in the same breath.  You
10  have created antecedent language in the first element
11  of Claim 1 that's incomprehensible.  Forty-four burns
12  the thing down.  One and two make sense together.
13  Forty-four is just nuts.  That's the caveat.
14       BY MR. FREITAS:  Q.  And it's -- why is it
15  nuts?
16   A.  It's nuts because it introduces the -- as I
17  said this morning, it introduces the -- yet another
18  configuration, yet another configured element in the
19  language of the first claim, and now we don't know
20  what -- we now know -- we now no longer know what --
21  let's see.  What is it?  I think it's -- interface
22  emulator becomes confused, and it change -- and if
23  the 1394 connection means that it's emulating a
24  storage device because it's emulating -- depending on
25  how you combine two configured, two statements, which



THOMAS A. GAFFORD
MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014
229–232

Page 229

1 are already annoying Judge Rader as we all know,
2 the -- now you've got an antecedent for the storage
3 device which is looking for some help from the
4 language above it, and how do you know whether it's
5 the antecedent as modified by IDE in 2 or the
6 antecedent as modified by 1394 in 44?  It makes the
7 claim incomprehensible.
8        MR. FREITAS:  Well, this isn't the time to
9 argue about that, so thank you, Mr. Gafford.  I have
10 no further questions at this time.
11        MR. KIRSCH:  We have no further questions
12 either.
13        MR. FREITAS:  Okay.
14        THE VIDEOGRAPHER:  This marks the end of
15 Disk No. 4 and concludes today's deposition of
16 Thomas Gafford.
17        The time is now 6:16 p.m., and we are off
18 the record.
19
20        (The video deposition concluded at
21 6:16 p.m.)
22            --o0o--
23
24
25

Page 230

1              REPORTER'S CERTIFICATION
2        I, the undersigned, a Certified Shorthand
3 Reporter of the State of California, do hereby
4 certify:
5        That the foregoing proceedings were taken
6 before me at the time and place herein set forth;
7 that any witnesses in the foregoing proceedings,
8 prior to testifying, were administered an oath; that
9 a record of the proceedings was made by me using
10 machine shorthand which was thereafter transcribed
11 under my direction; that the foregoing transcript is
12 a true record of the testimony given.
13        Further, that if the foregoing pertains to
14 the original transcript of a deposition in a Federal
15 Case, before completion of the proceedings, review of
16 the transcript [ ] was [ ] was not requested.
17        I further certify I am neither financially
18 interested in the action nor a relative or employee
19 of any attorney or any party to this action.
20        IN WITNESS WHEREOF, I have on
21 February 11, 2014 subscribed my name.
22
23        _____
24
25        Susan F. Magee, RPR, CCRR, CLR
         CSR No. 11661

Page 231

1              DEPOSITION ERRATA SHEET
2 Our Assignment No. 82646
  Case Caption:  In Re: MyKey Technology, Inc. Patent
3 Litigation
4        DECLARATION UNDER PENALTY OF PERJURY
5
6        I declare under penalty of perjury that I
7 have read the entire transcript of my deposition
8 taken in the captioned matter or the same has been
9 read to me, and the same is true and accurate, save
10 and except for changes and/or corrections, if any, as
11 indicated by me on the DEPOSITION ERRATA SHEET
12 hereof, with the understanding that I offer these
13 changes as if still under oath.
14        Signed on the _____ day of
15 _____, 2014.
16
17
18
19        _____
20             THOMAS A. GAFFORD
21
22
23
24
25

Page 232

1              DEPOSITION ERRATA SHEET
2 Page No._____Line No._____Change to:_____
  _____
3 Reason for change:_____
4 Page No._____Line No._____Change to:_____
5 _____
6 Reason for change:_____
7 Page No._____Line No._____Change to:_____
8 _____
9 Page No._____Line No._____Change to:_____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 Reason for change:_____
13 Page No._____Line No._____Change to:_____
14 Reason for change:_____
15 Page No._____Line No._____Change to:_____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 Reason for change:_____
19 Page No._____Line No._____Change to:_____
20 Reason for change:_____
21 Page No._____Line No._____Change to:_____
22 Reason for change:_____
23 Page No._____Line No._____Change to:_____
24 Reason for change:_____
25 SIGNATURE:_____DATE:_____
              THOMAS A. GAFFORD



THOMAS A. GAFFORD

MYKEY TECH vs. INTELLIGENT COMPUTER SOL

February 07, 2014

233

```
1           DEPOSITION ERRATA SHEET (continued)          Page 233

2    Page No._____Line No._____Change to:_____

3    Reason for change:_____

4    Page No._____Line No._____Change to:_____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    Reason for change:_____

10   Page No._____Line No._____Change to:_____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   Reason for change:_____

16   Page No._____Line No._____Change to:_____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   Reason for change:_____

22   Page No._____Line No._____Change to:_____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25          THOMAS A. GAFFORD
```

