# EXHIBIT M

1-35-03   6044 3387   PTO/SB/16 (10-01)

APROV

Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# PROVISIONAL APPLICATION FOR PATENT COVER SHEET

## This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

| Express Mail Label No. | EF041195726US |
|---|---|

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| Steven | Bress | Germantown, MD 20874 |

☑ Additional inventors are being named on the __1__ separately numbered sheets attached hereto

### TITLE OF THE INVENTION (500 characters max)

A Simple Device for Creating Exact Copies of Computer Long-Term Memory Devices

### CORRESPONDENCE ADDRESS

Direct all correspondence to:

☐ Customer Number    _____    →    Place Customer Number Bar Code Label here

*Type Customer Number here*

OR

☑ Firm or Individual Name : **Steven Bress**

| Address | 7851-C Beechcraft Avenue |
|---|---|
| Address | |
| City | Gaithersburg | State | MD | ZIP | 20879 |
| Country | USA | Telephone | 301-208-8373 | Fax | 301-990-6437 |

### ENCLOSED APPLICATION PARTS (check all that apply)

| | | |
|---|---|---|
| ☑ Specification  *Number of Pages* | 38 | ☐ CD(s), Number _____ |
| ☑ Drawing(s)  *Number of Sheets* | 15 | ☐ Other (specify) _____ |
| ☐ Application Data Sheet. See 37 CFR 1.76 | | |

### METHOD OF PAYMENT OF FILING FEES FOR THIS PROVISIONAL APPLICATION FOR PATENT

☐ Applicant claims small entity status. See 37 CFR 1.27.
☑ A check or money order is enclosed to cover the filing fees
☐ The Commissioner is hereby authorized to charge filing fees or credit any overpayment to Deposit Account Number: _____
☐ Payment by credit card. Form PTO-2038 is attached.

FILING FEE AMOUNT ($)

$80.00

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.
☑ No.
☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

Respectfully submitted,

SIGNATURE ___*Steve Bress*___    Date 01/29/2003

TYPED or PRINTED NAME  Steven Bress

REGISTRATION NO.
*(if appropriate)*  _____

Docket Number: _____

TELEPHONE  301-208-8373

## USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is used by the public to file (and by the PTO to process) a provisional application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the complete provisional application to the PTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Washington, D.C. 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Box Provisional Application, Assistant Commissioner for Patents, Washington, D.C. 20231.

60443387.012903

# PROVISIONAL APPLICATION COVER SHEET
## Additional Page

PTO/SB/16 (02-01)
Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| Docket Number |
|---|
|  |

| INVENTOR(S)/APPLICANT(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family or Surname | Residence (City and either State or Foreign Country) |
| Mark Joseph | Menz | Folsom, CA |

Number ___1___ of ___1___

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

6044-3387.012903

PTO/SB/17 (01-03)
Approved for use through 04/30/2003. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# FEE TRANSMITTAL
## for FY 2003
*Effective 01/01/2003. Patent fees are subject to annual revision.*

[✓] Applicant claims small entity status. See 37 CFR 1.27

**TOTAL AMOUNT OF PAYMENT**    ($) 80.00

| Complete if Known | |
|---|---|
| Application Number | |
| Filing Date | 01/29/2003 |
| First Named Inventor | Steven Bress |
| Examiner Name | |
| Art Unit | |
| Attorney Docket No. | |

## METHOD OF PAYMENT (check all that apply)

[✓] Check  [ ] Credit card  [ ] Money Order  [ ] Other  [ ] None

[ ] Deposit Account:

Deposit Account Number _____
Deposit Account Name _____

The Commissioner is authorized to: (check all that apply)
[ ] Charge fee(s) indicated below  [ ] Credit any overpayments
[ ] Charge any additional fee(s) during the pendency of this application
[ ] Charge fee(s) indicated below, except for the filing fee
to the above-identified deposit account.

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 1001 | 750 | 2001 | 375 | Utility filing fee | |
| 1002 | 330 | 2002 | 165 | Design filing fee | |
| 1003 | 520 | 2003 | 260 | Plant filing fee | |
| 1004 | 750 | 2004 | 375 | Reissue filing fee | |
| 1005 | 160 | 2005 | 80 | Provisional filing fee | 80.00 |

**SUBTOTAL (1)**   ($) 80.00

### 2. EXTRA CLAIM FEES FOR UTILITY AND REISSUE

| | Extra Claims | | Fee from below | Fee Paid |
|---|---|---|---|---|
| Total Claims | -20** = | X | | = |
| Independent Claims | - 3** = | X | | = |
| Multiple Dependent | | | | = |

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | |
| 1202 | 18 | 2202 | 9 | Claims in excess of 20 | |
| 1201 | 84 | 2201 | 42 | Independent claims in excess of 3 | |
| 1203 | 280 | 2203 | 140 | Multiple dependent claim, if not paid | |
| 1204 | 84 | 2204 | 42 | ** Reissue independent claims over original patent | |
| 1205 | 18 | 2205 | 9 | ** Reissue claims in excess of 20 and over original patent | |

**SUBTOTAL (2)**   ($) 0

**or number previously paid, if greater; For Reissues, see above

### FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 1051 | 130 | 2051 | 65 | Surcharge - late filing fee or oath | |
| 1052 | 50 | 2052 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 1053 | 130 | 1053 | 130 | Non-English specification | |
| 1812 | 2,520 | 1812 | 2,520 | For filing a request for *ex parte* reexamination | |
| 1804 | 920* | 1804 | 920* | Requesting publication of SIR prior to Examiner action | |
| 1805 | 1,840* | 1805 | 1,840* | Requesting publication of SIR after Examiner action | |
| 1251 | 110 | 2251 | 55 | Extension for reply within first month | |
| 1252 | 410 | 2252 | 205 | Extension for reply within second month | |
| 1253 | 930 | 2253 | 465 | Extension for reply within third month | |
| 1254 | 1,450 | 2254 | 725 | Extension for reply within fourth month | |
| 1255 | 1,970 | 2255 | 985 | Extension for reply within fifth month | |
| 1401 | 320 | 2401 | 160 | Notice of Appeal | |
| 1402 | 320 | 2402 | 160 | Filing a brief in support of an appeal | |
| 1403 | 280 | 2403 | 140 | Request for oral hearing | |
| 1451 | 1,510 | 1451 | 1,510 | Petition to institute a public use proceeding | |
| 1452 | 110 | 2452 | 55 | Petition to revive - unavoidable | |
| 1453 | 1,300 | 2453 | 650 | Petition to revive - unintentional | |
| 1501 | 1,300 | 2501 | 650 | Utility issue fee (or reissue) | |
| 1502 | 470 | 2502 | 235 | Design issue fee | |
| 1503 | 630 | 2503 | 315 | Plant issue fee | |
| 1460 | 130 | 1460 | 130 | Petitions to the Commissioner | |
| 1807 | 50 | 1807 | 50 | Processing fee under 37 CFR 1.17(q) | |
| 1806 | 180 | 1806 | 180 | Submission of Information Disclosure Stmt | |
| 8021 | 40 | 8021 | 40 | Recording each patent assignment per property (times number of properties) | |
| 1809 | 750 | 2809 | 375 | Filing a submission after final rejection (37 CFR 1.129(a)) | |
| 1810 | 750 | 2810 | 375 | For each additional invention to be examined (37 CFR 1.129(b)) | |
| 1801 | 750 | 2801 | 375 | Request for Continued Examination (RCE) | |
| 1802 | 900 | 1802 | 900 | Request for expedited examination of a design application | |

Other fee (specify) _____
*Reduced by Basic Filing Fee Paid

**SUBTOTAL (3)**   ($) 0

## SUBMITTED BY

(Complete (if applicable))

| Name (Print/Type) | Steven Bress | Registration No. (Attorney/Agent) | | Telephone 301-208-8373 |
|---|---|---|---|---|
| Signature | *[signature]* | | Date | 01/29/2003 |

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.17 and 1.27. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, Washington, DC 20231.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

6044338 7 . 012903

# A Simple Device for Creating Exact Copies of Computer Long-Term Memory Devices

## Abstract

A Simple Device for creating exact copies of computer long-term memory devices such as hard drives and compact flash memory. Our current invention is a stand-alone device. A user connects a long-term memory device he desires to make a copy of (source) to our device. The user also connects a long-term memory device to receive this copy (destination). Our device contains logic and circuitry, which perform operations on both the source and destination device to make an exact copy of the Source Data to the Destination Device, while protecting the Source device from any changes. Our device has a very simple user interface. This simplified user interface makes it difficult and unlikely to use our device incorrectly.

## Field of Invention

This invention relates to computers, in particular, computer long-term memory devices such as hard drives and compact flash memory. In particular it relates to making exact copies of these devices.

## Background

### Definitions

Drive. A long-term memory storage device.

Modern Drive. A long-term memory storage device, typically using rotating magnetic media for storage, and having an embedded controller. The controller may have a computer interface such as IDE, SATA, SCSI, FireWire, Ethernet, or USB.

Sector. The smallest data block size that a long-term memory device can store/retrieve. A Sector is typically 512 bytes.

**The Need For a Simple Way to Make Exact Copies**

Since the early days of computers, there have been ways of creating copies of digital computer data. Before the advent of modern long-term storage devices such as disk drives, there were magnetic tapes. It was possible to make copies of these tapes for archival purposes. More than 20 years ago, early PCs, such as the Apple ][ and Commodore 64 shipped with software that would allow them to make copies of their floppy disks. One of the most important aspects of digital data is that exact copies may be made of it, even to different physical media.

As this implies, there is nothing particularly special about the ability to make a copy of a long-term memory device. However, law enforcement officials have special needs for making copies of long-term memory devices that are not currently being met.

When a law enforcement official confiscates a computer long-term memory device, such as a hard drive,, the drive enters a chain of custody. Any inadvertent changes to data on the drive may change important evidence. In order to avoid this, a copy of the drive is typically made, and this copy is used by the forensics labs instead of the original. For this process to work correctly, it is not enough for the copy to have all of the data files of the original, the data must be arranged on the copy in the exact same pattern as the original. In addition, portions of the drive that may be interpreted as blank space by an operating system, such as Windows, must also be copied. A technically savvy bad guy may hide the evidence that is being sought in this blank area. A copy that didn't take this into account would have limited utility for the forensics lab.

For a device to be ideal for law enforcement work, it must meet the following criteria:

1. An exact copy of the source material must be made on the destination.
2. The user interface should be simple to the point that non-technical personnel can use it without risk.
3. The device should alert the user if it detects a problem, such as the source and destination drives being reversed.
4. The device should be able to create a report detailing the copy operation.

5. There are occasions when law enforcement and/or security officials may desire to make exact copies "in the field". In these instances a physically small sized device would be desired.

Copies may be made using specialized software on a PC, but if the PC uses an operating system such as Windows, simply starting the computer with an evidence (source) drive attached is enough to make changes to the source drive. A better solution would be a dedicated device to make the copies. Such devices are readily available. A company named Logicube produces a low cost device, but it has a number of copying options, some of which would render the copy useless for forensics purposes. They also have a device that is intended for law enforcement work. While closer to the ideal, it has numerous operating modes and options that must be specified before making a copy. Options are selected through the use of a number of buttons and a small display. One of the options is to delete the contents of what will be the destination drive. While this device is not overly difficult for a knowledgeable computer technician to learn, it has enough options to cause confusion or errors on the part of its user.

Imagine a non-computer savvy law enforcement profession being grilled by a defense attorney. The defense attorney will try to challenge ever step that the law enforcement professional did. Any confusion at all will be pounced upon. This is another reason why having a simple interface adds value to our device. Law enforcement officials that use our device will have their results challenged less frequently, thereby helping them get convictions.

A story circulating around the law enforcement community is that in a recent case in California, an accused pedophile had to be released because the person making a copy of the drive got confused. The Source drive was plugged into the destination cable and was essentially erased. This is an example of what could happen, but do to the nature of the case, it is difficult to get documentation on it.

Our invention simplifies the process and helps insure that the copy is usable by the forensics labs. In order to eliminate as many user errors as possible, the number of user controls is kept to a minimum. In the preferred embodiment, the only user control is a

'Start' switch. A few LED indicators show status and errors, while an LED bar graph shows percentage complete.

Various embodiments may have different feature sets, or an embodiment may have options that can be set only by a computer technician. From the point of view of the user, the device has a single function and a simple user interface. Before our invention begins the copy process, as instructed by the user, it checks to make sure that the copy makes sense. For instance, if the destination drive is smaller than the source, it will not be possible to complete the operation so the copy would not begin. An error light would be illuminated. This type of error is a sign that the source and destination drives may be reversed. Rather than start the copy and risk destroying evidence, our device simply notifies the user of a problem, so that an intelligent decision may be made as to how to proceed.

**Previous Copier Designs**

There have been many methods devised over the years to make copies of long-term storage devices. The simplest was to just run software on a computer that supports two devices to copy the contents of one device to the other. In the general case, this works quite well. It is a low cost solution, as the software typically ships as part of the operating system. One of the drawbacks to this method is that it ties up the computer for the duration of the copy procedure, preventing it from performing more valuable tasks. This can range from minutes to hours, depending on the speed of the computer and the storage devices.

Patent #5,402,270 tries to minimize the time required to make copies of floppy disk media by taking operational details of the floppy drive mechanism into account. The goal of this patent is to minimize the amount of time that the rotating magnetic media may not be written. While the read/write head moves from one track to another, the disk is still spinning. It may have covered the distance required to write a number of sectors before the head is in position to start writing. If this time is taken into account, the computer

6044338 7.012903

may start writing the next sector that will pass under the head without having to wait for the disk to complete another revolution.

While this method is fine for floppy drives that only rotate at 360 RPM, it is not nearly so relevant on a modern hard drive that can run at 7,200 or even 10,000 RPM. At these speeds, even having to wait for a rotation is not an undue burden on the user. On all modern drives, it is the job of the drive's electronics to write data efficiently. Cache memory on the drive controller provides a buffer for data waiting to be written. It may not even be possible to determine the actual physical location of the data on the magnetic media on some drives.

Patent #6,108,147 is concerned with an efficient method for selectively copying data from one or more partitions on a source drive to a destination drive. As one of the criteria for a useful copying device is that it make an exact copy of all of the data on the source disk, this method is not appropriate. An ideal device would not interpret the data on the source drive it would simply copy it. As a device based on this patent would have an option for not copying all of the source material, it has the ability to make a copy that would not be useful.

Patent #6,131,141 is concerned with creating a multitude of copies to destination drives from a single source drive. While there may be times that it would be advantageous to make a number of copies of the source material, the method described in this patent would be considered too risky for Law Enforcement work. The method described connects the data paths directly from the source drive to multiple target drives. A power surge or a glitch on the data lines could theoretically affect all copies. In addition, this method would work best if the drives to be copied were exactly the same model as the source drive.

For commercial copying operations, this is reasonable safe, as all of the drives will be from the same manufacturer and have the same electrical specifications. Problems may occur if there is a wide mismatch in capabilities between the source and the destination drives.

### Modern Long-term Memory Device Interfaces

Two of the modern drive interface specifications are Integrated Drive Electronics (IDE), also known as AT Attachment (ATA), and Small Computer System Interface (SCSI). For the sake of clarity our description is based on an IDE drive, but our invention is not limited to IDE drives. One skilled in the art would appreciate that modern long-term memory device interfaces share the same functionality and that a detailed description of our device as relates to one interface would provide enough detailed information to produce a similar device for another modern interface.

An IDE drive has two major components; interface electronics and some form of long-term storage media. For long-term storage, a spinning magnetic disk (hard drive) is most commonly used, but is by no means the only way to store data. Recently, compact flash memories have been brought to market that act as hard drives and have an IDE interface, but they use Flash random access memory (RAM) as the storage media. Flash RAM is a special type of RAM that retains its data after power has been removed from the system. Other types of media that have been used for long-term data storage on an IDE device include magnetic tape and optical media such as compact disc (CD) and digital versatile disc (DVD) devices.

For the sake of clarity, we will assume that the IDE device in question is a hard disk drive. The computer shall be called the Host and the IDE drive shall be called the Drive.

All communications with the Drive is through its IDE interface. This is a well-defined interface that has addressable memory registers to which the Host can write commands. The Host may also read these registers. When read, these registers typically have status information. The IDE interface has memory that is used to buffer data going to or coming from the Storage Media.

In order to read data from an IDE drive, a command must be written to registers in the drive. These registers are used to request operations from the drive. The drive may be asked to provide information about itself, or it may be asked to return one or more sectors of data. This point cannot be stressed enough. In order to read data from an IDE drive, data must be written to it.

This makes the process of preventing data from being written to an IDE drive non-intuitive. In order to read an IDE Drive, the read request must be written to the IDE interface on the drive. For Police Forensics work, it is vitally important that the contents of the Source drive be protected from changes. Fortunately, even though the registers need to be written, the act of writing registers by itself does not make changes to the drive's permanent storage. However, care must be taken to insure that data is not inadvertently written to the Source drive.

## Objectives

The present invention has been made in view of the above circumstances and has a first objective of protecting a long-term memory device from changes while producing an exact copy of the device on another long-term memory device.

A second objective of the present invention is to provide a method for verifying that the copy of the long-term storage device is an exact match of the original long-term storage device.

A third objective of the present invention is to make this device platform independent, through adherence to drive interface specification.

A fourth objective of the present invention is to make this device nearly fool-proof for use by an untrained user.

A fifth objective of the present invention it to make it physically small.

A sixth objective of the present invention is to identify unreadable data from the source by writing a standard bit pattern to the equivalent location on the copy.

A seventh objective of the present invention is to provide a method for scanning a long-term storage device for a specific bit pattern during the copy procedure.

A eighth objective of the present invention is to provide a method for scanning a long-term storage device for multiple specific bit patterns during the copy procedure.

An ninth objective of the present invention is to provide a method for scanning a long-term storage device for a specific bit pattern without copying the data to another device.

A tenth objective of the present invention is to temporarily remove a Host Protected Area from a source long-term storage device so that all of its data may be copied.

An eleventh objective of the present invention is to temporarily remove Device Configuration Overlay settings from a source long-term storage device so that all of its data may be copied.

A twelfth objective of the present invention is to store in non-volatile memory specific information about a source drive, including but not limited to serial number, model number, Host Protected Area settings, and Device Configuration Overlay settings, so that any changes to these settings that may be required in the copy procedure may be restored in the event of a power failure or other unexpected interruption. (As detailed in U.S. Provision Patent entitled "Systems and Methods for Restoring Critical Data to Computer Long-Term Memory Device Controllers" which is attached.)

A thirteenth objective of the present invention is to provide a simple method for interrupting a verify process.

A fourteenth objective of the present invention is to produce a status report with details concerning the original long-term storage device, the copy of the long-term storage device, the results of the copy process such as a report of bad sectors, and the results of the scan for one or more specific bit patterns.

A fifteenth objective of the present invention is to make the source and destination devices appear identical, even if the destination device is larger than the source device. This is accomplished by setting the Host Protected Area on the destination device.

In light of the above discussions and objectives our present invention describes a platform/operating system independent stand-alone device. A user connects a long-term memory device he desires to make a copy of (source) to our device. The user also connects a long-term memory device to receive this copy (destination). Our device contains logic and circuitry, which perform operations on both the source and destination device to make an exact copy of the Source Data to the Destination Device, while protecting the Source device from any changes. Our device has a very simple user interface. This simplified user interface makes it difficult and unlikely to use our device

incorrectly. Various iterations of our invention provide additional functionality and are described below.

## Summary

Please refer to Figure 6. Our invention 1000 is a physical device that connects to two long-term storage devices such as hard drives 620 and 640. The long-term storage devices are connected to our device through cables 610 and 630. One of the long-term storage devices is designated as a Source device 620 and the other is designated as a Destination device 640. Our device creates an exact copy of the data on long-term storage device (source) 620 on long-term storage device (destination) 640.

## Brief Description of the Drawings

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate the invention and, together with the description, explain the invention. In the drawings,

FIG **1** is an illustration of a functional overview of our invention.

FIG **2** is a sample printout from our invention.

FIG **3** is an illustration of the logic flow of our invention.

FIG **4** is an illustration showing major electronic components and their connections, for the preferred embodiment

FIG **5** is an illustration of the functions of a programmable logic device (PLD).

FIG **6** is a block diagram of our invention

FIG **7** is an illustration of our invention using multiple processors

## Detailed Description of a Preferred Embodiment

In the following detailed description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will be understood by those skilled in the art that the present invention may be practiced without these specific details. The use of specific electronic components is disclosed to provide a thorough understanding of the preferred embodiment. However, one skilled in the art will

appreciate that there are many electronic components with similar functionality, and the present invention is not limited to the components disclosed. In other instances, well known methods, procedures, components, and circuits have not been described in detail so as not to obscure aspects of the present invention.

For the sake of clarity, this detailed description of the preferred embodiment will describe an Integrated Drive Electronics (IDE) hard drive. One skilled in the art would appreciate that the method and system described here can be applied to other interfaces and other long-term storage devices.

Our device is able to make an exact copy of a long-term memory storage device on another long-term memory storage device of the same capacity or larger.

## Overview

In a standard configuration, our device is connected to two standard IDE hard drives. Please refer to Figure 1. A drive containing the Source data is connected through a standard cable to Interface Connector **1040**. Power for this drive is provided through an industry standard drive power connecter **1070**. A drive that will receive the copy of the source data, or Destination Drive, is connected through a standard IDE cable to Interface Connector **1060**. Power for this drive is provided through an industry standard drive power connecter **1080**.

To a drive, our device appears to be a host computer. The source and destination drives are electrically isolated from each other through the use of separate Interface Circuitry for each drive, **1030** for the Source, and **1050** for the Destination. In a standard PC, two IDE drives can share the same interface circuitry. This has three disadvantages that are overcome by our invention.

The first is that with two drives using the same interface circuit, there is only half of the bandwidth available in the circuit for each drive. When making a copy of one drive to the other on the same circuit, the speed of the copy will be no more than ½ of the maximum bandwidth of the interface circuit, as the data must be read from one drive, then written to the other.

The second major problem with two drives using the same interface circuit is that it increases the chances that the source drive will inadvertently have data written to it. In order to read or write from an IDE drive, a command must be issued to the drive. Both drives receive the command, but only one is supposed to operate on it. A single data bit in one of the drive's command registers determines which drive should respond to the command. This means that should a source drive misinterpret this bit when a write command was being issued to the destination drive, it would be possible to write data to the source drive. The likelihood of this happening increases if there is a mismatch in the performance capabilities of the Source and Destination drives.

The last problem is that if two IDE drives share the same interface circuit, they must be configured by the user correctly, typically by using small jumper blocks, so that one drive is a master and the other a slave. This is a procedure that is fairly simple to a trained operator, assuming that proper documentation is handy for the drive. However, since improper jumper settings may cause one or both drives to temporarily malfunction, it is best to get the settings correct. By having separate Interface Circuitry for each drive, jumper settings will not cause a drive to malfunction. In addition, our device may detect the current drive settings and communicate with them properly.

One advantage that our invention has over simply trying to make a copy of a drive using a computer is that our device is operating system independent. It does not care what kind of data is on the drive, it simply makes a copy of a drive. This allows it to make a perfect copy of a drive regardless of the type of system that the drive was previously in.

Please refer to Figure 6. Our invention **1000** is a physical device that connects to two long-term storage devices such as hard drives (Figure **1**.) Our device is connected to a Source storage device through a standard cable **610** and to a Destination storage device through a standard cable **630**. To each drive, our device appears to be a host computer.

In order to meet the goal of creating a perfect copy of a Source drive on a Destination drive, all of the data that resides on the Source must be copied. This would not seem to be a problem, but drives have functions that allow for data to be hidden. In order to make a copy, the hidden data must be made available to our device. There are two primary

6044387.012903

methods for hiding data on an IDE hard drive. One is by setting a Host Protected Area (HPA) and the other is by using the Device Configuration Overlay function.

Both of these methods hide data by causing the drive to report its size as smaller than it truly is. For instance, a 40 gigabyte drive could be instructed to report its size as 30 gigabytes. From that point on, any computer would see it as a 30 gigabyte drive. Any data stored in the area between 30 gigabytes and 40 gigabytes would be effectively hidden from the system

If the data is hidden using the HPA method, the drive may be instructed to make the hidden area accessible temporarily. When a temporary change command is issued, the drive resorts to its previous state the next time that the drive is powered off and on again. If, however, the DCO method is used, there is no such temporary change command. Making a change to DCO settings is permanent until changed again.

This has the potential to cause a problem, especially when working with sensitive information, such as a police evidence drive. Any permanent change to the drive has the potential to make the drive unreadable. Under normal circumstances, our device would make the change, copy the data, and restore the DCO to its original configuration. This is fine in theory, but doesn't take into account events such an unforeseen power failure. Should the power fail at a point in time when the DCO has been set away from its original settings, potentially the drive could be left in an unreadable state.

It is still vitally important to be able to copy a Source drive, even with the risk of a change to the drive. Our invention uses the method as described in the U.S. Provisional Patent entitled "Systems and Methods for Restoring Critical Data to Computer Long-Term Memory Device Controllers" (which is attached) to provide a method for restoring a drive to its original configuration. This keeps the risk down to an acceptable level.

Although our device automatically copies and then verifies the copy, there are situations where a user may be interested in just performing the copy operation. For this eventuality, one embodiment of our device allows a user to cancel the verification process through a user control.  This control only affects the verification process, and has no effect during the copy process.

In most cases, a Destination drive will be larger than a Source drive. One of the objectives of our invention is to make a copy indistinguishable from a original. If both drives were the same size, and especially if they were the same make and model, this would not be too difficult. Once all of the sectors were copied, the drives would be identical. Having a larger Destination drive causes a problem simply by virtue of it being larger. If a comparison were done of the two drives, there would be a mismatch starting at the first sector beyond the end of the Source drive. This can lead to much confusion as seen in the case: "United States of America vs Zacarias Moussaoui"
http://notablecases.vaed.uscourts.gov/1:01-cr-00455/docs/68092/0.pdf

Our invention provides a solution to this problem by taking advantage of the ability of a drive to hide data. Using either the industry standard HPA method or the DCO method of hiding data, our device can make the Destination drive appear to be exactly the same size as the host. As such any comparison of the two drives will show them to have identical data.

The DCO function is very powerful. In addition to changing the size that the drive reports itself to be, it can also be used to change other drive parameters, such as the speed at which the drive can operate. Should the need arise, our device can use this function to more accurately match the reported capabilities of a Destination drive to a Source.

**A More Detailed Look at a Preferred Embodiment**

Source drive interface 1030 allows connection to a drive through Interface Connector 1040. Similarly, Destination drive interface 1050 allows connection to a drive through Interface Connector 1060. Industry standard cables connect our device to the Source drive and the Destination drive. Our device, including cables, is physically designed to encourage an untrained user to connect it properly. When Drive Cable 610 is connected to Source Drive 620 and Drive Cable 630 is connected to Destination Drive 640, our device is ready to operate.

**A Detailed Look at Logic Flow in a Preferred Embodiment**

Please refer to Figure 3, which details the logic flow in a preferred embodiment. On power up, our device detects the presence of a Source Drive and waits for it to become ready for operations 3010. Once the Source drive is determined to be ready, our device requests information about the drive 3020, such as its size and capabilities.

In a similar manner, our device detects the presence of a Destination Drive and waits for it to become ready for operations 3030. Once the Destination drive is determined to be ready, our device requests information about the drive 3040, such as its size and capabilities.

A comparison is made 3050 to determine if the Destination drive is big enough to hold all of the contents of the Source drive. If the Destination drive is too small 3060, there is the possibility that the Source and Destination drives have been reversed. The copy procedure is aborted and the user notified 3080 through status indicators and alternatively a printout.

If the Destination drive is the same size as the source or larger, then the copy procedure may begin. All of the sectors are then copied from the Source drive to the Destination 3070.

Once the data has been copied to the Destination drive, a data comparison 3075 is initiated. This comparison checks every byte in every sector of the Source drive to be sure that the copy has completed with no errors.

When complete, the user is notified through status indicators and possibly a printout 3080.

**A Detailed Look at an Electronic Block Diagram of a Preferred Embodiment**

Figure 5 is an illustration of a block diagram of our device. Our device uses an Intel 80386 EX embedded processor **5010** for its main control and logic function. This version of Intel's 80386 processor is optimized for embedded applications. The highly integrated design of this processor means that very little additional circuitry is necessary to create a small, dedicated computer system. Some static RAM is provided in **5040**, which is used for temporary program and data storage. **5050** is an EPROM that holds the code

necessary to initialize and run the processor. Timing is generated by a 50 MHz crystal oscillator, **5070**.

The 80386EX **5010** has I/O pins available that may be used to connect additional devices. Three of these pins are used to power LED status indicators **5020** in order to provide feedback to a user. Another of these I/O pins, used as an input, may be used to connect a key lock **5030** to the processor.

A Programmable Logic Device, or PLD, is used to integrate numerous logical devices into a single chip **5090**. Configuration data for the PLD is stored in a configuration ROM **5080**. Timing for the PLD is generated by a 50 MHz crystal oscillator, **5070**. When the PLD is reset, it automatically tries to load configuration information from its ROM. When configuration is complete, this single chip **5090** can be viewed as having all of the functionality shown in Figure **6**.

Figure **5** shows a breakdown of the functions implemented by the PLD **4090**. The address, data, and control lines from the processor **4010** are routed to the PLD. They are then buffered and latched in **4020** as necessary to reduce the electrical load on the processor and to stabilize the signal timing. Buffered read **4030** and write **4040** signals control the direction of the bus drivers shown in **4050**. These buffers help control the data flow and distribution of the address and data busses from the processor to other functions in the PLD.

Buffering and signal conditioning for the Source Drive is provided by the Drive Buffers in **5100**, making this the Drive Interface. Through the Bus drivers **5050** the processor can directly read and write to the Drive Interface. Another way that the processor and the Drive may communicate is through the Dual Ported RAM Sector Buffer **5080**. This allows the drive to write one sector's worth of data to RAM at high speed, while the processor performs other tasks. By allowing the operations to overlap in this fashion, the processor is not restricted to running at the speed of the drive, and is free to handle other functions until it needs the data in the Sector Buffer.

Similarly, buffering and signal conditioning for the Destination Drive is provided by the Drive Buffers in **5110**, making this the Drive Interface. Through the Bus drivers **5050** the processor can directly read and write to the Drive Interface. Another way that the

processor and the Drive may communicate is through the Dual Ported RAM Sector Buffer **5090**. This allows the drive to read one sector's worth of data from RAM at high speed, while the processor performs other tasks. By allowing the operations to overlap in this fashion, the processor is not restricted to running at the speed of the drive, and is free to handle other functions until it needs the data in the Sector Buffer.

The 80386EX processor **4010** has a UART built in that may be used for serial communications. For versions of our device that require such communication capabilities, the UART is connected to an RS-232 transceiver **4060**. This part not only buffers the signals, it also generates the necessary voltages required for RS-232 communications. A standard DB9 connector **4120** allows our device to be connected to a computer using a standard DB9 male to female serial cable.

In the preferred embodiment, the goal of making this device foolproof for use by an untrained person is accomplished in a number of ways. The first is that the device is controlled by a single switch, such as Key Lock **4030**. This switch has only two choices, on and off. When switched on, the device starts operation and provides any required feedback to the user through one or more indicators, such as LEDs **4020**. Under normal circumstances, the only indicator that the user need be concerned with is the "Operation Complete" indicator. Additional indicators may be available for such error conditions as "Destination Drive Too Small" or "Copy in Progress." These indicators may be as simple as LEDs.

For additional detailed status, a printer may be connected to the device through communication port **4120**. Information sent to the printer may include Drive identification information to uniquely identify the drive being copied. Should any errors occur, such as a bad sector on the Source disk, the sector number may be printed.

Should an unreadable sector be identified on the Source drive, something still must be written to the Destination drive. In the case of this type of error, our device writes a standard, predefined bit pattern to the corresponding area on the Destination drive.

## Some Additional Embodiments

When our device is used for law enforcement forensics work, a detailed analysis is typically performed on the Destination drive after the copy has been completed. This eliminates the need to perform any work on the Source drive, which is typically an evidence drive.

An additional embodiment of our device helps to speed up the analysis process. As can be seen from the earlier technical description, at some point during the copy operation, all of the data from the Source drive passes through PLD **4090**. The data paths described allow for the Processor **4010** to have access to the data. With this ability, one skilled in the art could see how the processor would have the ability to perform an analysis of the data during the copy process.

For this embodiment, the user would communicate with our device through the RS-232 data port **4120**. The bit pattern being sought would be sent to our device. As the data is transferred from the Source drive to the Destination, the processor scans the data, looking for the specified bit pattern. Should the bit pattern be found, our device can report it to an attached printer or PC.

Ideally, the processor should be fast enough to scan for a specific bit pattern without causing a slowdown in the copy process. There are cases where it is desirable to scan for more than one specific bit pattern. One solution is to simply select a faster processor. This is a reasonable solution up to a point, but depending on how many bit patterns must be scanned during the copy operation, it may not be practical to select such a processor. Assuming that such a processor was available, its price could easily prohibit its use.

A more cost effective solution than just trying to use one incredibly fast processor is to use multiple lower performance, less expensive processors as shown in Fig. 7. Each processor would be able to scan for one or more bit patterns, up to their performance limits. In this case, as data is transferred from the Source Disk Drive **620** to Data Bus **7010**, Processors 1 through N **7000** each have access to the data arriving on Data Bus **7010**. Each processor may scan for one or more bit patterns within the data. The desired bit patterns may be built in to our device or may be communicated to the device through Communications Circuitry **1090**. If the bit pattern is detected by one of the processors,

this fact is communicated to the User or another computer through Communications Circuitry **1090**.

In order to reduce the cost and complexity of a multiprocessor system is to take advantage of recent advances in Programmable Logic Devices. Newer PLDs, such as the Statix devices from Altera Corporation, are large enough to have processors embedded in them. The logic to create Processors to embed in PLDs is available from many sources, including Altera. Logic for other processors may even be downloaded from the Web from such sites as OpenCores.org.

Using such off-the-shelf logic, one skilled in the art would understand the benefit of embedding the processor in the PLD. Not only does it reduce the complexity of the physical PC board, but by reducing component count, the reliability of the resulting product is increased. This is especially true of a multiprocessor system. The interconnects between the data bus and each processor are shorter and more reliable if they are all within a single chip. In addition, processor support logic, such as program memory and RAM, may also be created within the PLD. The result is a single chip with multiple processors, each having the ability to examine the same set of data.

Like many functions performed by a processor, there are multiple ways of accomplishing the same task. In this case, rather than writing code to examine each byte of data for a bit pattern, the PLD could be configured to directly test the incoming data from a Source drive against the bit pattern. When this comparison is done in the PLD, it is done at hardware speeds. This method has an advantage over a processor based scan in that it is more likely to be able to keep up with advances in data transfer speeds of long-term storage devices.

By definition, if the PLD is moving the data, it is fast enough to compare the data to a bit pattern as it moves. This may not always be the case when the PLD moves the data and a processor tries to examine it. The PLD may have to slow down so that the processors can keep up.

The PLD solution is a little more complex to implement. If the bit patterns to be scanned are known at the time of design, the device can be configured from the factory. It would be quite rare for this to happen. In order to accommodate varying numbers of bit

patterns to scan and different scanning requirements for each customer, the PLD would have to be reconfigured on-the-fly to meet the customer requirements. This raises the complexity level of the design, yet would be transparent to the user.

While having the PLD do the bit pattern comparison directly has a lot of advantages, it is not without its drawbacks. The primary one of these is that as more bit patterns need to be scanned, the complexity of the device may have to be increased. Such an increase typically comes with a higher price tag. This brings the decision as to the preferred method for scanning to a decision that can easily be made on a price/performance basis. As technology evolves, the preferred embodiment of this invention is likely to as well.

In an additional embodiment, our invention may be able to scan a long-term storage device without copying data. In the simplest case, this would be the default operation if no Destination device is detected. For a slightly more complex version of our invention, a control would be available for the user to request the scanning function.

## Descriptions of Different Iterations of our invention in the field.

Our current invention is not limited by the following descriptions, which are provided solely for the reader to have a clearer idea of the above discussions. For the purpose of the following discussion I will refer to our current invention as "DriveCopy".

### "Field" DriveCopy

This consists of a small box 3.5" x 2.5" x 1" with

- a standard interface cable/connector and standard power connector cable/connector on one side, identified in some manner as "Source"
- ; a second a standard interface cable/connector and standard power connector cable/connector on another side, identified in some manner as "Blank"
- a power cable connected to a power brick
- a start button
- a red LED to indicate "error" and a greed LED to indicate a "successful copy"

A user plugs the power brick into a standard wall outlet. The user connects a drive s/he wants to make a copy to the connectors identified as Source and connects up a blank

604433387.012903

(Destination) drive to the connectors identified as Blank. The user presses the start button to commence operations. A red LED will indicate an error of some sort and operations will be aborted. A green LED will indicate a successful copy has been made.

**"Desktop" Basic DriveCopy**

This consists of a small box 9" x 6.5" x 1.5" with

- a non-static pad on top of box
- a standard interface cable/connector and standard power connector cable/connector on the top, identified in some manner as "Source"
- ; a second a standard interface cable/connector and standard power connector cable/connector on the top, identified in some manner as "Blank"
- a printer communication cable/interface on one side
- a power cable connected to a power brick
- a start button
- a red LED to indicate "error" and a greed LED to indicate a "successful copy"
- a set of blinking LEDs to indicate the device is operating

A user plugs the power brick into a standard wall outlet. The user connects a drive s/he wants to make a copy to the connectors identified as Source and places the drive on top of the case on the non-static pad then connects up a blank (Destination) drive to the connectors identified as Blank and places the drive on top of the case on the non-static pad. The user connects a printer to the printer cable/interface. The user presses the start button to commence operations. Blinking LEDs indicate the device is operating. Upon either identifying an error or making a successful copy a report will be printed out (see Figure 2.)  A red LED will indicate an error of some sort and operations will be aborted. A green LED will indicate a successful copy has been made.

**"Desktop" Sizing DriveCopy**

The device described in "Desktop" Basic DriveCopy with the addition of:

- a two-setting switch identified as "make copy (destination) drive appear same size as source drive yes/no"

6044338? .012903

If this switch is in the no position, no addition action is taken. If this switch is in the yes position the device sets the copy (destination) drive Host Protection Area so the two drives appears to be the same size.

## "Desktop" DriveRestore DriveCopy

The device described in "Desktop" Basic DriveCopy with the addition of:

- a red LED to indicate a source drive is not in its original state, as commands have been written to its controller to access hidden areas,
- a green LED to indicate the source drive is in its original state,\
- a button identified as "restore drive to original state"

If this green LED is lit, the user is assured the source drive is in its original state and no further action is necessary. In the event of a power failure or other malfunction that stops the device from restoring the source drive, the red LED will be lit. The user can then press the button to have the device restore the source drive to its original condition.

A variation of this device would include removal memory and a standard interface. This removal memory would store information needed to restore the source drive to its original state, so in the event of a device failure, a user would transfer this removal memory to a working device, plug in the source drive and push the button to restore the source drive to its original condition.

## "Desktop" Scanning DriveCopy

The device described in "Desktop" Basic DriveCopy with the addition of:

- a standard RS-232 Port

A user connects a host (computer) to this RS232 port. The user instructs our device to search for specific bit patterns or multiple bit patterns (such as a virus, or key words) before starting operations. At the completion of a successful copy operation our device sends a report either to a printer or the host of search results.

A variation of this device would add a button "scan without copying". By pressing this button our device would perform a scan as above, but no copying activities.

60443387.012903

**"Desktop" Verify Optional DriveCopy**

The device described in "Desktop" Basic DriveCopy with the addition of:

- a two-setting switch identified as "verify destination drive is an exact copy of source drive yes/no"

There may be situations where speed is of the essence and there is no time available to verify the destination drive is an exact copy of the source.

A variation of this device would have a push button switch identified as "abort verification". Our device needs to be turned off to safely remove drives from it, so this button would abort verify and turn our device off. In addition it could issue a command to restore the source drive to its original condition before turning our device off.

# Systems and Methods for Restoring Critical Data to Computer Long-Term Memory Device Controllers

## Abstract

A restoring device provides a means to reset data in a computer long-term storage device's controller, such as hard drives. There is a need to, on occasion, change information on a device's controller. For example to access data on long-term storage devices such as hard drives that is hidden. Accessing this hidden data involves making a change to a device's controller. There is an addition requirement, on occasion, to reset the device's controller to its original state. Our current invention has systems and methods to restore a long-term storage device controller to a previous state.

## Field of Invention

The present invention relates to computer memory devices, and, more specifically, to mechanisms for restoring critical data to computer memory devices.

## Description of Related Art

Modern computer long-term memory storage devices, such as, but not limited to IDE drives, are able to "hide" data from their host computer's operating system. For example, an IDE drive might be 12 GB, with 10 GB not hidden and 2 GB hidden. The entire 12GB of the drive might have data on it, but an operating system, such as Windows®, would only be able to access the non-hidden 10 GB. Special programs that bypass the operating system and address the drive directly may read this "hidden" data.

One legitimate example of this "hiding" feature being used is a computer manufacturer, such as Hewlett Packard, putting configurations files on a drive but hiding them from users. In this fashion most users are prevented from modifying the configuration files, as they do not have the expertise and/or access to special programs, or the knowledge that there are hidden files on their computer. A manufacturer could copy an operating system installation data to a "hidden" area. Since the manufacturer knows that the operating system is in the "hidden" area, the manufacturer could write a series of

1

604420B7_010005

utilities to extract drivers and/or other files, which may be needed from time to time. The manufacturer in this case would have a reasonable expectation that these files would be available and unmodified if needed, whereas if the files were in a non-hidden area, the files may be modified and/or deleted through operator error.

Unfortunately, lawbreakers can use this "hidden" feature as well. Pedophiles may store illegal images in the "hidden" area. Terrorists may store their plans in the "hidden" area. Corporate spies may hide confidential data in the "hidden" area. There is an obvious need for Police and other law enforcement and security officers to be able to access "hidden" areas on computer long-term memory storage devices.

The commands that allow for hiding of data do not actually change the data stored on a drive, but change how a drive responds to certain commands. For instance, one of the commands reduces the effective size of the drive by making data stored above a certain location inaccessible to the host computer's operating system. In order to avoid confusing the operating system, the drive reports this smaller size as its true size. In order for the operating system to have access to data above this new reported size, a skilled operator would need to reset the drive's size back to its full size and then issue appropriate commands to have the operating system recognize the drive's larger size. These steps require changes to the data in the drive.

There are many situations in which it is desirable to allow data to be read from a non-volatile long-term memory storage device, such as a computer hard drive, but not allow data to be written to the device. For example, law enforcement officials have occasion to confiscate long-term memory storage devices. Once confiscated, the law enforcement officials need to be able to examine and copy the storage device without changing the storage state of the device. Some operating systems, such as the Windows® operating systems from Microsoft Corporation, may modify the storage device when accessing files on the device, even if the user is only trying to read files from the device. In addition, during startup, operating systems such as Windows® will write up to hundreds of megabytes of data to a storage device as the operating system initializes. These situations are not acceptable when trying to preserve the state of a storage device in its as-confiscated state. Therefore, for the purposes of law enforcement officials and

6044338 / 012903

security officers, issuing changes to a Host Computer's operating system to be able to read its hidden area is not possible.

As can be seen, there is a need for law enforcement and security agents to read hidden data on a long-term memory storage device while maintaining the integrity of the data on the storage device. Operating system independent devices that access the target drive directly can accomplish this. U.S. Patent Application 20020040418 is an example of such a device. For such a device to read the hidden drive area, it must first query the drive's controller as to the true size of the drive. It must then write a command to the drive that changes the size information that the drive will report. Note that a change has been made to data in the Drive Controller, but not the drive itself.

There are many situations where there is a need to reset the size reported by an Identify Device request. If this size information is not reset, the operating system of the host computer may not be able to access the drive properly. If a suspect's computer suddenly starts malfunctioning in this way, he may be tipped off and modify his behavior. Law enforcement officials may check a suspected and/or paroled pedophile's computer for illegal images. If illegal images are found, law enforcement officials may monitor the suspect's actions in an effort to identify his contacts. Therefore, it is important that the suspect does not know that his computer was searched. Security officers have similar concerns when investigating terrorists and spies.

One of the features of devices such as U.S. Patent Application 20020040418 is that they are easy to use. This class of stand-alone devices has minimal user interfaces. Devices such as 20020040418 could be designed with a user interface that could show a user critical drive information. A user could then write down this information. This class of device could have a user interface that would enable a user to then enter this information and in this way restore critical data. However, this would make this class of device, larger, more expensive, more difficult to use, and open to the possibility of alerting a suspect if the incorrect information is entered.

A further consideration that must be taken into account is the possibility of power failure. Systems and methods must be in place to protect this critical data in the event of a power failure. Furthermore, there is an obvious benefit if a restoring device could indicate to an operator that the drive has been correctly restored.

3

The above discussion has focused on IDE drives and restoring information reported by an Identify Device command, but our invention is not limited to these. One skilled in the art will appreciate that other drive types, such as USB and FireWire, have similar concerns and that information other than the drive size may need to be restored.

Accordingly, there is a need in the art for an improved mechanism for restoring critical drive information in a memory device, such as a disk drive.

## Summary of the Invention

Systems and methods consistent with the present invention address these and other needs by providing for an operating system independent circuit and logic.

One aspect of the invention is directed to a restoring device including a plurality of elements. Specifically, the restoring device includes a processor coupled to an interface and non-volatile memory. The processor issues a command to a storage device, which is connected to the interface and stores all or part of the response in non-volatile memory. The processor then writes to the storage device to enable a host to read data from the entire storage device. Upon receiving a command, (usually automatic/user initiated optionally) the processor writes a command to the storage device to restore the storage device to its previous state.

A second aspect of the invention is directed to a device that includes an IDE interface, and a logic circuit. The IDE interface is configured to engage a cable that connects to the IDE storage device. The logic circuit issues the necessary command(s) to the IDE storage device to determine the IDE storage device's unique identification number and reported drive size (from the Identify Device data packet). The logic circuit stores the IDE storage device's unique identification number in non-volatile memory and; associates the reported drive size from the Identify Device data packet with the unique identification. The logic circuit issues a further command(s) to the IDE storage device to obtain data to allow the logic circuit to analyze the full size of the IDE storage device. The logic circuit issues a command to the IDE storage device to change the drive size in the Identify Device Packet to allow a host machine to read data from the entire IDE storage device. Upon command, the logic circuit will issue a command(s) to the IDE

4

storage device to restore the drive size reported in the Identify Device data packet to its original state.

Yet another aspect of the invention is directed to a computer device. The computer device includes circuitry to act upon long-term storage devices, such as compute hard drives and a restoring device. The restoring device is configured to make changes to the storage device to enable a host computer to read all data stored on the storage device and to subsequently restore the storage device to its original state.

Yet another aspect of the invention is logic and circuitry, which queries a long-term storage device's controller and stores the response in non-volatile memory.

Yet another aspect of the invention is logic and circuitry, which queries a long-term storage device's controller and stores the response in non-volatile memory. The logic and circuitry then determine the proper settings to write to the device's controller to allow all hidden data on the device to be accessible and issue the proper commands.

Yet another aspect of the invention is logic and circuitry, which queries a long-term storage device's controller and stores the response in non-volatile memory. The logic and circuitry then determine the proper settings to write to the device's controller to allow all hidden data on the device to be accessible and issue the proper commands. Upon command the logic and circuitry restore the device's controller to its original state.

## Brief Description of the Drawings

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate the invention and, together with the description, explain the invention. In the drawings,

Fig. 1 is a diagram illustrating a copying device, which would be improved by our current invention;

Fig. 2 is intentionally left blank;

Fig. 3 is a flow chart illustrating the logic in determining full drive size;

Fig. 4 is block diagram illustrating a copying device of Figs. 9 in more detail;

Fig. 5 is diagram graphically illustrating the functionality of portions of the copying device shown in Fig. 4;

Fig. 6 is a flow chart illustrating the logic in determining when to restore temporarily changed drive parameters.

Fig. 7 is a block diagram illustrating the copying device shown in Fig 9 in more detail, incorporating our current invention.

Fig. 8 is a flow chart illustrating the logic in auto restoring a drive

Fig. 9 is diagram illustrating a copying device, which would benefit from our current invention.

## Detailed Description

The following detailed description of the invention refers to the accompanying drawings.  The same reference numbers in different drawings identify the same or similar elements.  Also, the following detailed description does not limit the invention.

A retrieving device is described herein that writes certain commands to a storage device and returns the storage device to its original state.  The retrieval device has an interface port through which it can communicate with a long-term memory storage device.

The storage device may be any type of long-term non-volatile memory device. For example, the storage device may be a hard disk drive or compact flash memory.  In one implementation, the storage device uses an Integrated Drive Electronics (IDE) interface.  An IDE interface is a well-known electronic interface that is frequently used to connect a computer's motherboard and disk drive.  In IDE drives, the disk drive controller is built into the physical case of the disk drive.  The IDE interface provides a relatively high level interface between the motherboard and the disk drive.

Although concepts consistent with the present invention are primarily described herein in relation to an IDE magnetic hard disk drive, these concepts may be implemented with other types of IDE media, such as flash memory with an IDE interface. Flash memories are a special type of semiconductor random access memory that retains its data after power has been removed from the system.  Other types of media useable with an IDE interface include magnetic tape and optical media, such as a compact disc (CD) and a digital versatile disc (DVD).  In addition to the IDE interface, concepts consistent with the invention may be applied in a straightforward manner to other types

6

6044358? 012903

of high level storage interfaces, such as the well known Small Computer System Interface (SCSI) standard, or IEEE 1394 FireWire interface.

For the sake of clarity, the remaining description herein will be described with reference to an IDE magnetic hard drive, although, as mentioned above, the concepts of the invention are not limited to such drives. One skilled in the art would appreciate that other modern long-term storage device interfaces share similar functionality that could be incorporated into the concepts described herein.

## IDE Drive

As previously mentioned, communications with an IDE drive occurs through its IDE interface. The IDE interface is a well-defined interface that has addressable memory registers in which the host device (e.g., the computer motherboard) can write commands. The host may also read these registers to, for example, retrieve status information. The IDE interface may additionally include memory used to buffer data going to or coming from the storage media.

An IDE drive returns its size in an IDENTIFY_DEVICE data packet. Operating Systems, such as Windows®, store information on how to access a drive based on this number. Typically this is only done once when the system is powered up. The size in the IDENTIFY_DEVICE packet can be smaller than the full drive size; thereby leaving an area that is hidden from an operating system.

In order for specialized software to read hidden data, commands must be issued to the drive that will "unhide" the data. Once done, standard commands may be used to read the previously hidden data, such as the READ_SECTOR command. In order to have access to all of the hidden data, the drive must be instructed to report its actual size.

In order to determine the true size of an IDE drive and restore it to its original state, first an IDENTIFY_DEVICE Command is issued. This command returns an IDENTIFY_DEVICE data packet. To determine the true size of a drive, we are concerned with three pieces of data in this packet. These are: the reported size of the drive, is MAX_COMMAND available (True/False), and is DEVICE_CONFIGURE available (True/False).

**Case One**. MAX_COMMAND is false and DEVICE_CONFIGURE is false.

7

The reported size of the drive is the max drive size. There is no hidden area.

**Case Two**. MAX_COMMAND is true and DEVICE_CONFIGURE is false.

The READ_NATIVE_MAX_ADDRESS is issued. If the size reported by the READ_NATIVE_MAX_ADDRESS is larger than the size reported in the IDENTIFY_DEVICE data packet, there is a hidden area. A SET_MAX_ADDRESS command is issued to change the size reported by the IDENTIFY_DEVICE data packet. Later, a SET_MAX_ADDRESS command is issued to restore the drive to its original state.

**Case Three**. MAX_COMMAND is false and DEVICE_CONFIGURE is true.

The READ_NATIVE_MAX_ADDRESS is issued. If the size reported by the READ_NATIVE_MAX_ADDRESS is larger than the size reported in the IDENTIFY_DEVICE data packet, there is a hidden area. A DEVICE_CONFIGURE_SET command is issued to change the size reported by the IDENTIFY_DEVICE data packet. Later, a DEVICE_CONFIGURE_SET command is issued to restore the drive to its original state.

**Case Four**. MAX_COMMAND is true and DEVICE_CONFIGURE is true.

The READ_NATIVE_MAX_ADDRESS is issued. If the size reported by the READ_NATIVE_MAX_ADDRESS is larger than the size reported in the IDENTIFY_DEVICE data packet, there is a hidden area. A SET_MAX_ADDRESS command is issued to change the size reported by the IDENTIFY_DEVICE data packet. If this command generates an error message, then a DEVICE_CONFIGURATION_SET command is issued. Later, if a SET_MAX_ADDRESS command was successfully used to change the state of the drive, the SET_MAX_ADDRESS command is issued to return the drive to its original state. If a SET DEVICE_CONFIGURATION command was successfully used to change the state of the drive, then a DEVICE_CONFIGURATION_SET command is issued to return the drive to its original state.

One skilled in the art will appreciate that similar commands are used when working with "Big" drives.

6044387.012903

## Device Incorporating Drive Restore Logic and Circuitry

Figure 9 illustrates a Copying Device. A source disk drive 920 is connected to the copying device 900. The copying device performs operations and makes a copy of 920 on a destination disk drive 940. A copying device is just one example of a device that would benefit from our current invention.

Figure 7 shows a block diagram of a drive copying device that incorporates drive restore logic and supporting circuitry. This device 900 can make an exact copy of a Source Drive, 920 Drive 1, on a Destination Drive, 940 Drive 2. In order to copy all of the data present on the Source drive 920, the processor 730 must interrogate the Source Drive 920 and determine if it has any hidden data.

If it is determined that the Source Drive 920 has hidden data, this data must be made available to processor 730 before a full copy can be made to the Destination Drive 940. As described earlier, information about the current configuration, along with unique drive identification information is stored in FLASH RAM 770 before making any changes to the drive. Once this information is stored in FLASH 770, the drive's settings may be changed to expose all of the hidden data.

With this change in drive settings, the processor 730 may initiate the process of copying the drive. Under ideal circumstances, the copy would complete, and the device 900 would set the Source Drive 920 back to its original configuration. In the event of a power failure, an electrical glitch, or some other accidental or intentional mishap with the device, it is possible that the copy process could be interrupted. In this case, the Source drive 920 would not have had the opportunity to be restored to its original settings.

Our invention provides a method for dealing with such a contingency. When device 900 is powered up, it interrogates drive 920 and obtains its unique drive identification number. If 920 was previously attached to device 900 it will be detected as having a recent entry in FLASH. At the end of the copy procedure, the device 900 can restore the drive 920 to its previous settings. Another option would be for device 900 to reset drive 920 to the smallest size settings. Another option would be, if there are multiple entries concerning the Source drive 920, a User may interact with the device using the RS-232 Serial port 790, and instruct the device 900 which entry to use.

## A Detailed Look at an Electronic Block Diagram
## of a Preferred Embodiment

In a standard configuration, our device is connected to two standard IDE hard drives. A drive containing Source data is connected through a standard cable to Interface Connector **1040**. Power for this drive is provided through an industry standard drive power connecter **1070**. A drive that will receive a copy of the source data, or Destination Drive, is connected through a standard IDE cable to Interface Connector **1060**. Power for this drive is provided through an industry standard drive power connecter **1080**.

To a drive, our device appears to be a host computer. The drives are electrically isolated from each other through the use of separate Interface Circuitry for each drive. **1030** for the Source, and **1050** for the Destination. In a standard PC, two IDE drives can share the same interface circuitry.

Figure **5** is an illustration of a block diagram of copying device that incorporates drive restore logic and supporting circuitry. Our device uses an Intel 80386 EX embedded processor **4010** for its main control and logic function. This version of Intel's 80386 processor is optimized for embedded applications. The highly integrated design of this processor means that very little additional circuitry is necessary to create a small, dedicated computer system. Some static RAM is provided in **5040**, which is used for temporary program and data storage. **5050** is an EPROM that holds the code necessary to initialize and run the processor. Timing is generated by a 50 MHz crystal oscillator, **5070**.

The 80386EX **4010** has I/O pins available that may be used to connect additional devices. Three of these pins are used to power LED status indicators **5020** in order to provide feedback to a user. Another of these I/O pins, used as an input, may be used to connect a key lock **5030** to the processor.

A Programmable Logic Device, or PLD, is used to integrate numerous logical devices into a single chip **5090**. Configuration data for the PLD is stored in a configuration ROM **5080**. Timing for the PLD is generated by a 50 MHz crystal oscillator, **5070.** When the PLD is reset, it automatically tries to load configuration information from its ROM. When configuration is complete, this single chip **5090** can be viewed as having all of the functionality shown in Figure **6**.

10

Figure **5** shows a breakdown of the functions implemented by the PLD **4090**. The address, data, and control lines from the processor **4010** are routed to the PLD. They are then buffered and latched in **4020** as necessary to reduce the electrical load on the processor and to stabilize the signal timing. Buffered read **4030** and write **4040** signals control the direction of the bus drivers shown in **4050**. These buffers help control the data flow and distribution of the address and data busses from the processor to other functions in the PLD.

Buffering and signal conditioning for the Source Drive is provided by the Drive Buffers in **5100**, making this the Drive Interface. Through the Bus drivers **5050** the processor can directly read and write to the Drive Interface. Another way that the processor and the Drive may communicate is through the Dual Ported RAM Sector Buffer **5080**. This allows the drive to write one sector's worth of data to RAM at high speed, while the processor performs other tasks. By allowing the operations to overlap in this fashion, the processor is not restricted to running at the speed of the drive, and is free to handle other functions until it needs the data in the Sector Buffer.

Similarly, buffering and signal conditioning for the Destination Drive is provided by the Drive Buffers in **5110**, making this the Drive Interface. Through the Bus drivers **5050** the processor can directly read and write to the Drive Interface. Another way that the processor and the Drive may communicate is through the Dual Ported RAM Sector Buffer **5090**. This allows the drive to read one sector's worth of data from RAM at high speed, while the processor performs other tasks. By allowing the operations to overlap in this fashion, the processor is not restricted to running at the speed of the drive, and is free to handle other functions until it needs the data in the Sector Buffer.

The 80386EX processor **4010** has a UART built in that may be used for serial communications. For versions of our device that require such communication capabilities, the UART is connected to an RS-232 transceiver **4060**. This part not only buffers the signals, it also generates the necessary voltages required for RS-232 communications. A standard DB9 connector **4120** allows our device to be connected to a computer using a standard DB9 male to female serial cable.

In the preferred embodiment, the goal of making this device foolproof for use by an untrained person is accomplished in a number of ways. The first is that the device is

11

controlled by a single switch, such as Key Lock **4030**. This switch has only two choices, on and off. When switched on, the device starts operation and provides any required feedback to the user through one or more indicators, such as LEDs **4020**. Under normal circumstances, the only indicator that the user need be concerned with is the "Operation Complete" indicator. Additional indicators may be available for such error conditions as "Destination Drive Too Small" or "Copy in Progress."

For additional detailed status, a printer may be connected to the device through communication port **4120**. Information sent to the printer may include Drive identification information to uniquely identify the drive being copied. Should any errors occur, such as a bad sector on the Source disk, the sector number may be printed.

Should an unreadable sector be identified on the Source drive, something still must be written to the Destination drive. In the case of this type of error, our device writes a standard, predefined bit pattern to the corresponding area on the Destination drive.

The logic for making use of the FLASH RAM is shown in Fig. 3. The Drive is interrogated using the IDENTIFY_DEVICE command **300**. If the drive does not have the ability to hide data, there is no need to make any changes to the Drive parameters, and no need to restore them later. If, however, the Drive is capable of hiding data, the true size of the drive is determined by issuing the READ_NATIVE_MAX_ADDRESS command **320**.

The information collected about the Drive's settings and information about the method to be used to make any hidden data available is stored in FLASH RAM **330**. The copying device is now free to perform its operation. When the copy is complete, a check is made to determine if the device might need to change the Drive's settings back to their original configuration **340**. If the stored Drive size does not match the Drive's current size, another check **350** is performed to see if the copying device has been presented with this Drive before. This could indicate a possibility that a power failure had left the drive in an altered state. If this is determined to be the case, the Drive's parameters are restored from the value stored in FLASH RAM **360**.

## Another Example of a Restoring Device

Another device that can make use of the our Drive Restore invention but uses it in a slightly different way is device called NoWrite, as described in Patent Application 20020040418. This device provides a write protection feature for computer long-term storage devices, such as hard drives.

A device for copying drives, as described earlier, is in full control of the copying process. It determines when and if to change any Drive parameters, and can determine when to change them back. NoWrite operates in a different manner. It plugs between the Host computer and the Drive, and only allows those commands to pass to the drive that are considered safe, in that they don't make any permanent changes to the data on the drive.

While it is important to protect the data on the drive, in many cases it is equally important to be able to find and examine any hidden data on the drive. In order for this to be done safely, NoWrite would need to store the original Drive parameters to FLASH RAM before allowing any changes to the Drive Parameters that might become permanent. Unlike a copying device that knows when to restore the original settings, a device like NoWrite has no way to determine when the changed settings are no longer necessary. This increases the likelihood that the drive could be left in a condition different than when it was first connected.

Fig. 6 illustrates the logic used in this device for typical usage to save and restore drive parameters, in order to allow a host computer to have access to all of the data on the drive. This device does not have any way to know in advance when a session will be complete or when it will be turned off. As such, there is no external condition that indicates when a drive should be restored to its initial condition. The logic in Fig. 6 shows one solution to this problem.

On power up 600, an IDENTIFY_DEVICE command is issued to the drive. The information returned by the IDENTIFY_DEVICE command is checked 610 to see if the drive supports either of the two ways to hide data. If the drive has the potential to have hidden data, a command is issued to find out the true size of the drive 620. At this point, the device has enough information to begin normal operations 630.

13

When a command is detected 635 that attempts to make a change to the reported drive size, information from the IDENTIFY_DEVICE record and the true drive size are stored in FLASH 640 for later use. The command is allowed to complete, potentially changing the reported size of the drive. The device then starts a timer 645 to keep track of time elapsed since a command last tried to make use of the data exposed by the changed drive size. If a command comes in that makes use of the newly exposed data, the timer is reset and the device continues monitoring the incoming commands.

After a preset amount of time passes without any commands trying to access the newly exposed data 660, the device will initiate the sequence to restore the drive to its previous state using the information stored in FLASH. If the currently reported size of the drive does not match the stored size of the drive 670, the values stored in FLASH are used to reset the drive to its earlier state.

Fig. 8 shows the logic for automatically restoring a drive to its previously known good state. The information returned by the IDENTIFY_DEVICE command is checked against information previously stored in FLASH 810. If the device detects that it has stored information about this drive before, it checks to see if the current state of the drive matches the previous state 820. If the new and old values do not match, the device uses the data stored in FLASH to restore the drive to its previous settings 830.

It should be noted that the device may store information about all of the drives that it has previously seen, as limited only by the amount of FLASH RAM installed. Each time the device powers up, it may make a new entry in the database stored in FLASH about the current drive. This leads to the case where it is possible for the same drive to have multiple records with multiple values, given that the drive can be removed from the device and have parameters changed elsewhere. In this situation, the Drive Restoration process may involve user input.

Using Serial port 425, the device may be connected to a PC. Using serial communications software, such as HyperTerminal as shipped with virtually every Windows PC, a user may interact with the device. In the case where there are multiple settings stored for a single drive, the device may prompt a User as to which is the preferred setting to restore. This has the obvious advantage in that in case there is some

14

confusion as to the 'correct' setting, a User has the opportunity to try any or all of the stored settings.

## Additional Features

### User Interface to Indicate Error Condition (Password protected)

There is a possibility that a long-term storage device, such as a drive, makes use of a password to prevent changes being made to its parameters. If a Drive makes use of this password feature, a device, such as a copying device, may not be able to access all of the drive's data. Using an indicator, such as an LED, our invention could visually indicate this condition to a user.

### User Interface to Indicate Storage Device Condition

One feature of our invention is its ability to indicate to a user the current state of the storage device. Using an indicator, such as an LED, our invention could visually show a user whether the storage device is in its original configuration or its modified condition.

### Autorestore after power loss

Another variations is that the FLASH could be removable, such as a compact FLASH card, so that a database of drives operated on by our current invention, could be moved from device to device. This would be useful in the event that a device that contained our current invention failed, the drive data could be easily and quickly moved to another working device.

### Stand-alone device that stores drive controller information

A stand-alone device that a target hard drive may be connected to. The device would store the hard drive's unique identifier and associated information. The device would be connected to other computer devices or systems through a standard communications cable and thus be able to be queried for this information.

15

604433387_012903

**Stand-alone device that stores drive controller information**

A stand-alone device that a target hard drive may be connected to. The device would store the hard drive's unique identifier and associated information. It would determine if there was a hidden area on the drive, and if so write commands to the drive's controller to enable the hidden area to be read. Additionally, upon command this device would reset the drive's controller to a previous state.

# Figure 1





Figure 3



Figure 4

# Figure 5



6044338? .012903



Fig. 6



Figure 7

60443387.012903



Figure 8



Figure 9

**Figure 1**



6044338 7.012903

**Figure 2**

Printout Example

```
----------------------

       Source Drive

   Model: WDC1103
     S/N: WD-1524305
 Firmware: 2.00.34C
     Size: 45.2 Gigs

  Destination Drive

   Model: WDC1406
     S/N: WD-3258741
 Firmware: 2.10.21
     Size: 59.6 Gigs


----------------------
      Copy Results

Bad Sector: 1,324,544
Bad Sector: 6,564,974

---Copy Complete---
```

## Figure 3

## Drive Copy Logic





**Figure 4**

**Figure 5**



**Figure 6**



**Figure 7**

