1   ROBERT E. FREITAS (SBN 80948)
        rfreitas@ftklaw.com
2   JESSICA N. LEAL (SBN 267232)
        jleal@ftklaw.com
3   FREITAS TSENG & KAUFMAN LLP
    100 Marine Parkway, Suite 200
4   Redwood Shores, California  94065
    Telephone:   (650) 593-6300
5   Facsimile:    (650) 593-6301

6   Attorneys for Plaintiff
    MyKey Technology Inc.

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11

12  IN RE: MYKEY TECHNOLOGY              2:13-ml-02461-GAF (PLAx)
    INC. PATENT LITIGATION
13                                       MDL NO. 2461
    MyKey Technology Inc.
14                                       This Document Relates to:
         v.                              ALL CASES
15
    Intelligent Computer Solutions, Inc.  **PLAINTIFF MYKEY
16                                       TECHNOLOGY INC.'S OPENING
                                         CLAIM CONSTRUCTION BRIEF**
17
                                         Date:    March 18, 2014
18                                       Time:    9:30 AM
                                         Ctrm:    780, Los Angeles Roybal
19                                       Judge:   Hon. Gary A. Feess
20

21

22

23

24

25

26

27

28

**Table of Contents**

I.     BACKGROUND. ...................................................................................1

    A.    The '682 Patent. ....................................................................... 1

    B.    The '086 Patent. ....................................................................... 2

    C.    The '379 Patent. ....................................................................... 3

II.    MYKEY'S CONSTRUCTION OF THE DISPUTED TERMS. ................... 3

    A.    The '682 Patent: "Interface Emulator." .................................... 3

    B.    The '682 Patent: "IDE Emulator Component." ................................ 11

    C.    The '682 Patent: "Transparency" Terms. ..................................... 12

    D.    The '682 Patent: "Host." ........................................................ 19

    E.    The '682 Patent: "Means For Intercepting."................................. 20

    F.    The '682 Patent: "Means For Blocking." ...................................... 22

    G.    The '682 Patent: "Means For Forwarding." .................................. 25

    H.    The '086 Patent: "Exact Copy/Copies." ....................................... 26

    I.    The '086 Patent: "User Controllable Switch."............................... 27

    J.    The '086 Patent: "Means [For] Initiating The Copying Procedure." 27

    K.    The '086 Patent: "Means For Making An Exact Copy."................... 28

    L.    The '086 Patent: "Means For Reading And Comparing."................. 28

    M.    The '086 Patent: "Stand-Alone, Dedicated Function Device." ......... 29

    N.    The '086 Patent: "Control Circuit Issuing Commands To… Read." 32

    O.    The '086 Patent: "Control Circuit Issuing Commands To…Restore." ..................................................................................... 33

    P.    The '086 Patent: "Means For Opening Hidden Areas." .................... 35

    Q.    The '086 Patent: "Means For Restoring." ...................................... 35

    R.    The '379 Patent: "User Controllable Switch."............................... 36

    S.    The '379 Patent: "Hidden Storage Area." ...................................... 37

    T.    The '379 Patent: "Stand-Alone, Dedicated Function Device." ......... 37

    U.    The '379 Patent: "Irretrievably Remove Data." ............................. 37

    V.    The '379 Patent: "The Control Circuit Is Further Configured."........ 38

    W.    The '379 Patent: "Casing." ..................................................... 39

X.     The '379 Patent: "The Control Circuit Open[s]." ............................ 39

III.    CONCLUSION. ............................................................................. 40

1

## **TABLE OF AUTHORITIES**

2

Page(s)

3

**Federal Cases**

4

5

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
   616 F.3d 1283 (Fed. Cir. 2010) ........................................................................ 18

6

*All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*,
   309 F.3d 774 (Fed. Cir. 2002) ......................................................................... 21

7

8

*AllVoice Computing PLC v. Nuance Commc'ns., Inc.*,
   504 F.3d 1236 (Fed. Cir. 2007) ....................................................................... 22

9

10

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991) ....................................................................... 22

11

12

*Bicon, Inc. v. The Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) ......................................................................... 39

13

14

*Budde v. Harley-Davidson, Inc.*,
   250 F.3d 1369 (Fed. Cir. 2001) ....................................................................... 21

15

16

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ....................................................................... 22

17

18

*In re Guess*,
   No. 2009-1219, 2009 WL 1598475 (Fed. Cir. Jun. 9, 2009) ............................ 29

19

20

*IMS Tech., Inc. v. Haas Automation, Inc.*,
   206 F.3d 1422 (Fed. Cir. 2000) ....................................................................... 29

21

22

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005) ....................................................................... 22

23

24

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
   177 F.3d 968 (Fed. Cir. 1999) ......................................................................... 26

25

26

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .............................................................. 33, 36, 38

27

28

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)...19, 30, 32, 39

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
344 F.3d 1205 (Fed. Cir. 2003) ............................................................. 24

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
194 F.3d 1250 (Fed. Cir. 1999) .................................................21, 24, 28

*Mycogen Plant Science, Inc. v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) .................................................19, 32, 39

*Noah Sys., Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012) ............................................................. 21

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ............................................................... 7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)...........................4, 31, 33, 34

*Pioneer Hi-Bred Int'l, Inc. v. Monsanto Tech. LLC*,
671 F.3d 1324 (Fed. Cir. 2012) ............................................................. 10

*Seachange Int'l, Inc. v. C-COR Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ...........................................................4, 7

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) (*en banc*)............................................ 24

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ............................................................. 24

*Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*,
988 F.2d 1165 (Fed. Cir. 1993) ............................................................. 39

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ............................................................. 24

*United Carbon Co. v. Binney & Smith Co.*,
317 U.S. 228, 87 L. Ed. 232, 63 S. Ct. 165 (1942) .............................. 21

**Federal Statutes**

19 U.S.C. § 1337(a)(2) ................................................................................................. 1

35 U.S.C. § 112 ........................................................................................................ 28, 39

35 U.S.C. § 112(f) .................................................................................................. 21, 23, 25

Plaintiff MyKey Technology Inc. ("MyKey") respectfully submits its opening claim construction brief.

MyKey has alleged that defendants CRU Acquisition Group LLC, Guidance Software, Inc., Guidance-Tableau, LLC, Intelligent Computer Solutions, Inc., Logicube, Inc., Digital Intelligence, Inc., Tefkat LLC, and Robert Botchek infringe three patents owned by MyKey.  The patents in suit are U.S. Patent No. 6,813,682 ("'682 patent"), U.S. Patent No. 7,159,086 ("'086 patent"), and U.S. Patent No. 7,228,379 ("'379 patent").  These patents were in issue in an International Trade Commission ("ITC") investigation in which CRU Acquisition Group LLC and the Guidance companies were respondents.  In the ITC proceeding, the claims of the patents were construed, but no decision on the merits was made because the administrative law judge concluded that MyKey did not establish that "an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established."  *See* 19 U.S.C. § 1337(a)(2).

The parties have reached agreement on the constructions of various claim terms, although some of the constructions agreed in the ITC investigation are now disputed.  This brief addresses the construction of the terms for which the parties are not presenting an agreed construction.

# I.  BACKGROUND.

## A. The '682 Patent.

It is sometimes desirable or essential to allow data to be read from a storage device, while not allowing data to be written to the device.  For example, when law enforcement officers examine a seized storage device during a criminal investigation, it is important that the examination be carried out without changing the storage state of the device, to insure that the results of the examination will be admissible and persuasive at trial.  Some operating systems may modify the state of a storage device when files are accessed on the device, even if the user does nothing

1   more than try to read files.  Ex. 1[1] ('682 patent) at 1:18-33.

2        The invention of the '682 patent is directed to a write blocking device.  The

3   device includes an interface emulator configured to emulate an interface presented by a

4   storage device and an interface for connecting to a storage device.  The device

5   prevents write commands issued by the host from resulting in modification of the

6   storage device.  In a preferred embodiment of the invention, the data associated with a

7   write command are discarded, rather than being written to the protected storage device

8   or another storage medium.  *Id.* at 6:34-47; Fig. 4 (Act 430).

9        The write blocking device includes a processor coupled to the interface

10  emulator and the storage device interface.  The processor examines commands

11  intended for the storage device and allows only those commands that match a

12  predetermined set of commands to pass.  A read command that would not result in

13  modification of the storage device would be allowed, while a write command would

14  be blocked. An exemplary device is depicted in Figure 3 of the '682 patent.

15  **B. The '086 Patent.**

16       The invention of the '086 patent is directed to a duplication device including an

17  interface connecting to a source storage device and an interface connecting to one or

18  more destination storage devices.  Additionally, the duplication device includes a

19  control circuit coupled to the source and destination interfaces.  A user controllable

20  switch, when actuated by a user, causes the duplication device to commence copying

21  the data from the source storage device to the destination storage device.  The control

22  circuit is able to compare the size of the source storage device to the size of the

23  destination storage device and communicate the result to a user, open hidden areas on

24  the source storage device, such as a host protected area ("HPA") or a device

25  configuration overlay ("DCO"), and copy the data within the hidden areas from the

26  source storage device to the destination storage device.  Ex. 2 ('086 patent) at 2:8-20.

27  An exemplary device is shown in Figure 1 of the '086 patent.

28  
---

[1] All exhibits herein referenced are found in the Declaration of Jessica N. Leal.

### C. The '379 Patent.

Confidential information, such as credit card numbers, passwords, and personal account login information, is often stored on computer storage devices. Information on storage devices is not easy to destroy. Simply deleting files does not normally remove the data from a storage device, and it is not difficult to recover "deleted" data using off-the-shelf software. Ex. 3 ('379 patent) at 1:19-47.

The invention of the '379 patent is directed to a device for irretrievably removing data from a storage device. The device includes an interface for connecting to a storage device and a control circuit configured to control the storage device to remove data from the storage device. A user controllable switch, when actuated by a user, causes the control circuit to commence removing the data from the storage device. In one embodiment, the control circuit is further configured to open a hidden storage area, such as an HPA or a DCO, on the storage device, before irretrievably removing the data, including the data in the hidden storage area. *Id.* at 4:6-15. Figure 3 of the '379 patent shows an exemplary device.

## II. MYKEY'S CONSTRUCTION OF THE DISPUTED TERMS.

### A. The '682 Patent: "Interface Emulator."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "interface emulator" | "an interface component that mimics another interface" | "an interface component that mimics the interface presented by the storage device and operates with no reconfiguration of the host software" |

The first limitation of Claim 1 of the '682 patent refers to "an interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host." The words that appear in Claim 1 following "interface emulator" do not require construction, and the definition proposed by MyKey is adequate to explain what the interface emulator is.

The defendants' proposed construction improperly adds extraneous limitations, and uses an undefined term likely to result in additional disputes. Also,

1   by changing the claim term "a" storage device to "the" storage device without

2   further explanation, the defendants *sub silentio* inject a further potential issue that is

3   not resolved by their construction.

4   The defendants' proposed construction that the interface emulator must

5   "operate[] with no reconfiguration of the host software" is not supported by the

6   intrinsic record, and they have not presented any meaningful extrinsic evidence that

7   would justify adding this concept to the definition of "interface emulator."  The

8   purported support for this addition is scant, and none of it refers to the interface

9   emulator.  There is no reason to burden the "interface emulator" term with a "no

10  reconfiguration" limitation.

11  The defendants' proposed construction and supporting evidence cites the "'682

12  specification (especially, 2:26-64; 5:53-65)" and a single passage from the prosecution

13  history.  MDL Dkt. No. 32-1.   The generic reference to the specification is not helpful,

14  and neither Column 2, lines 26-64 nor Column 5, lines 53-65 contains any mention of

15  a reconfiguration restriction, or supports the addition of such a restriction.  The word

16  "reconfiguration" does not appear in the '682 patent.

17  The defendants' claim construction expert, Thomas Gafford, did not cite to the

18  specification.  Mr. Gafford did, however, cite one passage from the prosecution history

19  of the patent.  There is no basis in that passage for the imposition of a "no

20  reconfiguration" limitation.

21  As the Federal Circuit noted in *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed.

22  Cir. 2005) (*en banc*), "the prosecution history represents an ongoing negotiation

23  between the PTO and the applicant, rather than the final product of that

24  negotiation," and accordingly "often lacks the clarity of the specification and thus is

25  less useful for claim construction purposes."  *Id*. at 1317.  Moreover, for a claim to

26  be limited on the theory that the applicant disclaimed a particular feature, the

27  disclaimer must be "clear and unambiguous."  *Seachange Int'l, Inc. v. C-COR Inc.*,

28  413 F.3d 1361, 1373 (Fed. Cir. 2005).

1        Mr. Gafford first claims that what he calls "criticism" of the prior art U.S. patent

2    no. 6,336,187 ("Kern patent"), discussed in a November 24, 2003 office action

3    response, shows that "the interface emulator must not require a reconfiguration of the

4    host software to perform its function."  Ex. 4 (Expert Report of Thomas A. Gafford

5    Regarding Construction of Claim Terms) at 14.4.2.  (The Kern patent is cited, but not

6    discussed, in the '682 patent.)  Mr. Gafford's conclusion is unsupported.

7        Mr. Gafford claims that "applicants' criticism of Kern that Kern's application

8    programs 110-112 could be designed to operate with any 'intelligent digital

9    input/output channel'" requires a "no reconfiguration" limitation, but he does not

10   explain why.  *Id.*  He merely states a conclusion, and then says "[p]ut another way, the

11   software and any configuration the software required to operate the storage device

12   without the blocker needs no change to operate the storage device without the blocker .

13   . . ."  *Id.*  That is "another way" to speak, but it is not a "way" that credibly links the

14   comment about the Kern patent and Mr. Gafford's conclusion.

15       Interestingly, Mr. Gafford attempted to use the mention of "intelligent digital

16   input/output channels" to support another extraneous limitation in the ITC proceeding.

17   There, Mr. Gafford claimed that the applicants disclaimed the use of any intelligent

18   interface.  The administrative law judge rejected Mr. Gafford's argument.  Ex.5 (ITC

19   Order No. 45) at 21-22.  Mr. Gafford's attempt to use the same comment to create

20   another unjustified limitation should also be rejected.

21       Mr. Gafford attempts to add a "no reconfiguration" limitation based on a

22   statement in a November 24, 2003 office action response that "neither the host nor the

23   storage device need any special hardware or software and neither the host nor the

24   storage device need to be reconfigured in any way.  The blocking device simply needs

25   to be inserted between the host and the storage and it is ready to operate."  Ex. 4 at

26   14.4.2.1.  This comment appears in a paragraph that contains a general description of

27   the applicant's invention during a discussion of the Kern patent, and was not a

28   comment about the interface emulator.  Rather, the applicants referred generally to

1    "the blocking device."  The context of the discussion shows that it does not justify

2    adding a "no reconfiguration" limitation to the definition of "interface emulator."

3         The Kern patent is entitled "Storage System with Data-Dependent Security."

4    Ex. 6.  Kern, unlike the blocking device of the '682 patent, required the use of

5    "application programs 110-112" on a host device and "security keys" associated with

6    storage regions on a storage device.  *See id.* at Abstract and Fig. 1.

7         In Kern, a controller device is positioned between one or more host devices with

8    application programs on the one hand, and a storage device on the other hand.  *Id.* at

9    Fig. 1.   Application programs provide "allocation commands" to the host seeking

10   storage allocation in the storage device.  The application programs also provide

11   "access keys" with the allocation commands.  The storage device stores data in regions

12   that are associated with certain "access keys," and other regions that are not associated

13   with access keys.  The host device issues commands (such as "read" or "write") to the

14   storage device via the controller, and these commands may or may not include access

15   keys provided by the application programs.  The controller evaluates the commands

16   from the host and determines whether the command includes an access key, and

17   whether the target region on the storage device is protected by an access key.  *See, e.g.,*

18   *id.* at 2:49-3:9; 3:61-67 ("the invention concerns a data dependent storage facility

19   implemented by a host-independent storage controller that selectively provides

20   security for storage regions by initially storing a security key in association with the

21   region, where that key must be presented by any host seeking access to the region").

22        The office action response summarizes these features of the Kern patent.  Ex. 7

23   (November 24, 2003 Response) at 18-19.  There is no basis on which it can be

24   concluded that the "reconfiguration" comment in the office action response was more

25   than an attempt to distinguish the specific features of Kern that were discussed in the

26   response.  Kern required separate application programs, and a key for using the

27   invention.  To distinguish Kern, there was no reason for the applicants to address any

28   other situation, and it would be wrong to assume they did.  If any weight is to be given

the effort to distinguish *Kern*, all that should be said is that the blocking device of the '682 patent does not require the "reconfiguration" necessary to add a new application program or require the use of access keys.  Without an explanation of the specific meaning the defendants ascribe to "reconfiguration," it is not possible to determine whether there is a "clear and unambiguous" disclaimer of "reconfiguration." *Seachange*, 413 F.3d at 1373; *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324, 1326-28 (Fed. Cir. 2003) (declining to find a disclaimer where "the alleged disavowal of claim scope is ambiguous," or "suitable to multiple interpretations," and not "clear and unmistakable disclaimer[s]").

In the ITC proceeding, MyKey presented expert testimony establishing that a person having ordinary skill in the art would understand that a blocking device of the type claimed in the '682 patent, like any other device, would require a device driver to operate.  *See* Ex. 8 (Rebuttal Expert Report of Brian A. Berg on Claim Construction Issues) at ¶¶ 16-18.  One of ordinary skill would not have understood the loading of a driver to involve a "reconfiguration," but the defendants most likely intend to try to create a non-infringement argument based on the idea that the loading of a driver is a "reconfiguration."  Mr. Gafford casually tosses around the terms "configuration" and "reconfiguration" in a discussion of drivers, but he speaks in conclusory terms, and he does not explain why a serious attempt to link the loading of a driver to the distinction of *Kern* can be made.  The defendants' proposed construction should be rejected because they do not explain what they think "reconfiguration" means, and because it cannot be said that the applicants "clearly and unambiguously" disclaimed everything the defendants might choose to label "reconfiguration."

A further issue is presented by the defendants' proposal to change the claim language "an interface presented by a storage device" to "the interface presented by the storage device" to which the write blocker is connected.  This modification is not needed, and does not address the underlying dispute the defendants' proposal reflects.

1       The first limitation of Claim 1 refers to "an interface emulator configured to

2  emulate an interface presented by **a** storage device and configured to connect to a

3  host." The second limitation requires "an interface for connecting to **the** storage

4  device." The defendants combine the two limitations to come up with "an interface

5  component that mimics the interface presented by **the** storage device." No problem so

6  far. It is correct, conceptually, at least, that the interface emulator mimics the interface

7  presented by the storage device that is being protected, and to which the write blocker

8  is thus connected, but that is potentially misleading. Moreover, construction of the

9  term "interface emulator" does not require comment on the interface between the

10  blocking device and the storage device.

11       The defendants seek to derive from the use of "a" and "the" in the first two

12  limitations of Claim 1 a conclusion that the interfaces, or connections, on both sides of

13  the write blocker, must use an identical technology, although they do not openly ask

14  the Court to adopt such a construction. A construction requiring identical interfaces on

15  both sides of the blocking device is clearly inconsistent with the claims of the '682

16  patent, as Mr. Gafford was more or less forced to acknowledge in his deposition.

17       The specification of the '682 patent refers to a variety of different interface

18  technologies, including Integrated Drive Electronics ("IDE"), Small Computer System

19  Interface, commonly referred to by the acronym SCSI, which is pronounced "scuzzy,"

20  and the Institute of Electrical and Electronics Engineers 1394 standard that is often

21  referred to as FireWire. *See* Ex. 1 at 3:56-4:13. The '682 patent makes it clear that its

22  invention is not limited to any single or specific interface technology. *E.g., id.* at 3:14-

23  20. The defendants do not point to any language in any of the claims, the

24  specification, or the prosecution history requiring that an identical interface technology

25  be employed on both sides of the blocking device.

26       A review of Claims 1, 2, and 44 leaves no doubt that the '682 patent covers

27  blocking devices that can connect to a host and a storage device using different

28  interface technologies. As relevant here, Claim 1 refers to "an interface emulator

configured to emulate an interface presented by a storage device and configured to connect to a host." The blocking device is thus configured to connect to a host (the device used to examine the storage device protected by the blocking device) on one side, and it has a component, the interface emulator, that is configured to emulate an interface presented by a storage device. The idea is that the emulation of the interface presented by a storage device host will lead the host to "think" that it is connected to a storage device when it is actually connected to the blocking device. As the '682 patent makes explicitly clear, the blocking device may be connected to the host through a port using one of a variety of technologies.

The defendants assert that the interface emulator is emulating the interface presented by the specific storage device to which the blocking device is connected, at least in a conceptual sense. They have tried to use this point to impose a requirement that, because the storage device will use, for example, Technology A, and the interface emulator will emulate the interface of the specific storage device, the blocking device must be connected to the host using Technology A. (On the storage device side, the blocking device will connect through Technology A.) But this is not so.

Nothing in the language of Claim 1 requires that the connection to the host be through the technology used to connect to the storage device. The interface emulator is emulating the interface presented by the storage device, but to do so it does not have to use the connection technology used by the storage device. Nothing in any claim specifies that a host using a Technology B connect to connect to the blocking device will be made to "think" it is connected a storage device other than the Technology A device the blocking device is protecting.

While the idea that a Technology A interface could be emulated by a Technology B connection might seem odd at first blush, the '682 patent explicitly claims a device that connects to the host using technology different from that which it uses to connect to the storage device. Claim 2 of the '682 patent is a dependent claim covering the blocking device of Claim 1, wherein the interface is an "[IDE] interface

for a disk drive."  As a claim depending from Claim 1, Claim 2 satisfies all of the limitations of Claim 1.  *See, e.g., Pioneer Hi-Bred Int'l, Inc. v. Monsanto Tech. LLC*, 671 F.3d 1324, 1330 (Fed. Cir. 2012).  Claim 2 is further limited in two ways.  The "interface for connecting to the storage device" is an IDE interface, and the "storage device" is a disk drive.

During his deposition, Mr. Gafford professed an inability to understand the language of Claim 2.  *See* Ex. 9 (February 7, 2014 Deposition to Thomas A. Gafford) at 88:14-25.  He claimed that it is not clear what the interface referenced in the claim language is, but there is no doubt about what Claim 2 covers.  "The interface" of Claim 2 is "the interface" of Claim 1, specifically the "interface for connecting to the storage device," in other words, the connection between the blocking device and the storage device that is being protected.

There is another dependent claim that explicitly claims a device with different interface technologies for connecting to the host and the storage device.  Claim 44 claims the blocking device of Claim 2, which means that it must satisfy all of the limitations of Claim 2 and all of the limitations of Claim 1.  Claim 44 thus covers the blocking device of Claim 1 with an IDE interface for connecting to a disk drive.

Although the connection to the storage device is an IDE connection, the interface emulator of Claim 44, which, as the defendants' proposed construction points out, emulates "the interface presented by the storage device," "is configured to emulate an IEEE 1394 [FireWire] connection."  The interface emulator "is configured to emulate a [FireWire] connection" because it connects to the host through a FireWire port.  Thus, the blocking device clearly has an IDE connection to the storage device and a FireWire connection to the host.  Because Claim 44 must satisfy all of the limitations of Claim 1, Claim 1 therefore cannot be construed in a way that requires the identical connection on both sides of the blocking device.[2]

---

[2] Claim 45, which depends from Claims 30 and 31, establishes the same point in the context of the computer system of Claim 30.

Mr. Gafford admits that MyKey's reading of Claim 44 is correct, subject to his professed inability to understand Claim 2. *See* Ex. 9 at 74:4-24. Mr. Gafford therefore retreats to a claim that the blocking device of Claim 44, with a FireWire connection to the host and an IDE connection to the storage device, is not supported by the specification of the patent. That is a fight that can be conducted at another stage in the case. As a matter of claim construction, everyone agrees that Claim 44 explicitly refers to a blocking device with different connections, and the use of "a" or "the" in the construction cannot change that.

If the Court addresses any question regarding the appropriateness of using "a" or "the" to refer to storage devices whose interfaces are emulated by the blocking device of the '682 patent, the Court's construction should include a statement to the effect that there is no requirement that the connection on both sides of the blocking device of Claim 1 be identical.

**B. The '682 Patent: "IDE Emulator Component."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 13 | "IDE emulator component" | "a component that mimics an interface compatible with the IDE or ATA interface" | "an interface component that mimics the interface presented by the IDE storage device and operates with no reconfiguration of the host software" |

The terms IDE and ATA are used interchangeably in the industry, and the construction should reflect that. As shown in the '682 patent, IDE is known as both "Integrated Device Electronics" (*see* Ex. 1 at Claims 2, 27, 32 and 41) and "Integrated Drive Electronics" (*see* Ex. 1 at 3:59-60). ATA stands for AT Attachment, a name that originated with the IBM PC AT. Ex. 10 (Expert Opinion of Brian A. Berg) at ¶ 24. ATA (IDE) is an interface standard that may be used for communication with a storage device. *Id.* at ¶ 25. The ATA standards documents are created by T13, a technical committee of the Accredited Standards Committee NCITS that is overseen by the American National Standards Institute (ANSI). *Id.*

1    The ATA (IDE) physical interface and command set are defined in a

2    series of documents published by the T13 committee.  *Id.* at ¶ 26.  The ATA

3    (IDE) command set was included in the single standard document as released

4    for ATA-1 through ATA/ATAPI-6, standards documents released between

5    1994 and 2002.  *Id.* at ¶ 27.  The command set was split out as of

6    ATA/ATAPI-7 (finalized in 2004) when both a parallel transport (PATA)

7    and serial transport (SATA) version of the standard were able to use this

8    same command set, and splitting the documents into three volumes made

9    them easier to manage and to update independently.  *Id.*

10   As the standards have evolved, all three documents have been updated

11   – some as recently as October 2013.  *Id.* at ¶ 28.  The command set as

12   defined in this evolving set of document continues to be applicable for both

13   the parallel (PATA) and serial (SATA) versions of the ATA (IDE) interface.

14   *Id.*  The '682 patent at 2:38-64 describes "[a] second aspect of the invention []

15   directed to a device that includes an IDE emulator component, an IDE

16   interface, and a logic circuit."  *Id.* at ¶ 29.  The IDE emulator component

17   interfaces with the host and allows the receipt of ATA (IDE) commands from

18   the host.  The physical interface is by way of a parallel transport protocol

19   (PATA) or a serial transport protocol (SATA).  *Id.*

20   The final clause in the defendants' construction asserts that the IDE

21   emulator component "operates with no configuration of the host software."

22   This clause is not justified for the reasons similar language is not properly

23   added to the definition of "interface emulator."

24   **C. The '682 Patent: "Transparency" Terms.**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|-----------|-------------------------------|-----------------------------------|
| 1, 40 | "transparent to normal operation of the host and the storage device" and | "to the host, the blocking device appears to be a standard drive interface and presents to the host the memory, registers, and | "the blocking device appears to the host as the storage device and appears to the storage device as the host, and |

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| | "transparently to normal operation of the host and the storage device" | control signals that a storage device would normally present to the host, and to the storage device, the blocking device appears to be a host and presents to the storage device the memory, registers, and control signals that the host would normally present to the storage device, although the blocking device blocks or modifies commands that would result in the modification of the drive" | the blocking device operates in a way that all normal operations between host and the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device" |
| 13 | "transparently to normal operation of the host and the IDE storage device" | "to the host, the device appears to be a standard IDE storage device interface and presents to the host the memory, registers, and control signals that a IDE storage device would normally present to the host, and to the IDE storage device, the device appears to be a host and presents to the IDE storage device the memory, registers, and control signals that the host would normally present to the IDE storage device, although the device blocks or modifies commands that would result in the modification of the IDE storage device" | "the blocking device appears to the host as the IDE storage device and appears to the IDE storage device as the host, and the blocking device operates in a way that all normal operations between host and the IDE storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the IDE storage device" |
| 25 | "transparent to normal operation of the computer motherboard and the storage device" | "the method is performed such that to the computer motherboard, there appears to be a standard storage device interface and the computer motherboard is presented with the memory, registers, and control signals that a storage device would normally present to the computer motherboard, and to the storage device, there appears to be a computer motherboard and the storage device is presented with the memory, registers, and control signals that the computer motherboard would normally present to the storage device, | "the blocking device appears to the host computer (which includes the computer motherboard) as the storage device and appears to the storage device as the host computer (which includes the computer motherboard), and the blocking device operates in a way that all normal operations between host computer (which includes the computer motherboard) and the storage device continue when the blocking |

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| | | although commands that would result in the modification of the storage device are blocked or modified" | device is interposed between them with no reconfiguration of the host computer (which includes the computer motherboard) and/or the storage device" |
| 30 | "transparently to the host computer and the long-term storage device" | "to the host computer, the blocking device appears to be a standard long-term storage device interface and presents to the host computer the memory, registers, and control signals that a long-term storage device would normally present to the host computer, and to the long-term storage device, the blocking device appears to be a host computer and presents to long-term storage device the memory, registers, and control signals that the host computer would normally present to the long-term storage device, although commands that would result in the modification of the long-term storage device are blocked or modified" | "the blocking device appears to the host as the storage device and appears to the storage device as the host, and the blocking device operates in a way that all normal operations between host and the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device" |

The various limitations including mention of "transparency" or "transparently" appear in the asserted independent claims 1, 13, 25, 30, and 40 of the '682 patent. Column 5 of the '682 patent contains a definition of "transparent."

> To host computer **201**, blocking device **203** appears to be a standard drive interface, such as an IDE drive interface, and presents to the host **201** the memory, registers, and control signals that a drive would normally present to host **201**. To drive **205**, blocking device [**203**] appears to be a host computer, and presents to drive **205** the memory, registers, and control signals that host **201** would normally present to drive **205**. **In other words, blocking device 203 is transparent to the system.**

Ex. 1 at 5:32-40 (emphasis added).  As Mr. Gafford admitted in his deposition, the use of "in other words" shows that transparent is defined in the immediately preceding language.  Ex. 9 at 102:3-20.  "Transparency" involves how the device "appears," and what it may "present" to the host and the storage device under certain circumstances as it operates.

Although a definition of transparent appears in Column 5, the defendants attempt to add the notion that "transparent" requires that "all normal operations continue" when the blocking device of the '682 patent is in use.  That can't be true: It's a blocking device!  The very purpose of the device is to block write commands, and the '682 patent makes explicit that blocking write commands and discarding the associated data is an aspect of the operation of the device.  "All normal operations" obviously do not continue when the blocking device is used to block write commands and discard the commands and associated data.  There is nothing in the '682 patent or the intrinsic record to support the non-infringement argument the defendants attempt to smuggle into the definition of transparent.

The phrase "all normal operations" does not appear in the '682 patent or the prosecution history.  "Continue" appears in the patent only in a passage in which it is made crystal clear that the "normal" write operation does not "continue" when the blocking device of the '682 patent is used.  *See* Ex. 1 at 6:16-25.

With the acknowledgement of the simple English language meaning of "in other words," there is little the defendants can say.  They do not point to another place in the patent or the prosecution history in which transparent is defined.  Instead, the defendants resort to an implausible reading of the language of the definition in Column 5 and wrongly accuse MyKey of failing to account for the "operation" of the device.

The defendants note that the Column 5 definition states that the blocking device is "transparent to the system," rather than "transparent to operation of the system," and attempt to make something of the difference.  Apparently, the defendants admit that

1   Column 5 defines "transparent to the system," but contend that "transparent to
2   operation of the system" has a different meaning that is not mentioned anywhere in the
3   patent.  There is no significance to the difference between "transparent to the system"
4   and "transparent to operation of the system," the phrase that is used in some of the
5   claims.  The absence of a difference in meaning is confirmed by Claim 30, which
6   refers to various steps being performed "transparently to the host computer and the
7   long-term storage device," rather than "transparently to **operation of** the host
8   computer and the long-term storage device."  The omission of an explicit reference to
9   operation makes no difference in Column 5 or Claim 30.  The concept of transparency
10  is what the patent says it is in Column 5.

11      The ITC administrative law judge accepted the idea that MyKey failed to take
12  account of the "operation" of the system, but that is not the case.  "Operation" is
13  clearly a part of what is addressed in the Column 5 definition.  The definition explains
14  how the blocking device "appears" during operation.  This is the central concept.  The
15  definition also states that the blocking device presents the host and the storage device
16  with "the memory, registers, and control signals," if any, that a host or storage device
17  would normally present to the other.  The blocking device cannot present memory,
18  registers, and control signals unless it is in "operation."  No non-operational state is
19  being described in Column 5 and the claim language referring to "normal operation of
20  the system" carries the same meaning as the definitional reference to "the system."

21      In part, the argument that MyKey has omitted consideration of the "operation"
22  of the system stems from the anthropomorphic language used in the Column 5
23  definition of transparency.  The definition refers to how the blocking device "appears"
24  to the host and the storage device.  Unlike humans, computer devices do not see, hear,
25  or feel.  A blocking device "appears" to be a host or a storage device only because it is
26  interacting with another device, in this case, perhaps by presenting control signals and
27  other things that can only "appear" during operation.  There is no difference between
28  "appearance" and "operation" in the Column 5 definition or in MyKey's proposed

1    construction of the transparency terms, no need for an alternative definition, and no

2    justification for the contradictory idea that "all normal operations continue" when a

3    blocking device blocks write commands.

4         Remarkably for a document of its length, the word "all" appears only four times

5    in the '682 patent, and none of the uses is connected to "normal" or "operations" or

6    contains any support for the idea that an invention whose *raison d'être* is the

7    prevention of the "normal" completion of write commands could only be practiced if

8    "all normal operations continue." *See* Ex. 1 at 1:45-48; 4:57-60; 10:20-21, 33-35.

9         A couple of other comments are in order.  The defendants base their

10   construction on a seemingly minor semantic adjustment they seek to parlay into a

11   major change in the meaning of the claims.  The claims refer to "normal operation,"

12   the state of operating in a normal fashion, not "normal operations," the set of

13   operations that would normally be carried out.  A system might be said to "operate

14   normally" without "all normal operations" occurring, just as a business might be

15   operating normally even if it is not filling every type of order it might receive in a

16   given day, week, month, or year.  This is especially easy to understand when, as

17   explained in the Column 5 definition the central idea behind the "transparency"

18   concept is what "appears" to the devices to be taking place.  Here, the blocking device

19   of the '682 patent prevents one type of "normal operation" while "normal operation"

20   of the host and storage device "appears" to be underway.

21        The defendants' construction would produce extravagant results.  They do not

22   take issue with the notion that a write operation is a "normal operation."  (Indeed, that

23   appears to be the basis of the non-infringement argument that provides the basis for the

24   attempt to add an "all normal operations" limitation, and Mr. Gafford explicitly argues

25   that write operations must be completed.  *See* Ex.4 at 15.5.6.  Thus, for the defendants'

26   construction to have merit, it must be the case that while the blocking device of the

27   '682 patent is in use, if a write command is issued by the host, the data associated with

28

1  the write command must be successfully written.[3]  That is not possible under the

2  preferred embodiments discussed in the '682 patent.

3       The '682 patent presents blocking device 203 of Figure 2 as a device "consistent

4  with the present invention."  Ex. 1 at 5:23-24.  Figure 4 "is a flow chart illustrating the

5  operation of blocking device 203 in additional detail."  *Id.* at 5:33-34.  Figure 4 is thus

6  explicitly presented as an example of a blocking device "consistent with the present

7  invention," and Figure 4 shows that it is not necessary for "all normal operations" to be

8  completed to satisfy the requirements of the '682 patent.

9       Act 430 in Figure 4 provides for a write command and associated data to be

10  accepted through the interface emulator, and then "discarded."  The data are not

11  written anywhere, and the "normal" write operation is not completed.  Thus, for the

12  defendants' construction to be correct, it is necessary that the '682 patent not cover the

13  preferred embodiment shown in Figure 4.  It is the rare case in which a preferred

14  embodiment is not covered by a patent, and this is not such a case.  *See Adams*

15  *Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010)

16  (construction that excludes a preferred embodiment is rarely, if ever, correct).[4]

17       The defendants attempt to fit their construction to the '682 patent by pointing

18  out that the embodiment of Figure 8 provides for write commands to be completed

19  through the use of an alternative structure called a "temp drive."  (No other

20  embodiment employs a temp drive or any structure by which the data associated with a

21  blocked write command can be written.)  The Figure 8 embodiment is a limited

22

23  [3] In the ITC investigation, Mr. Gafford attempted to define in a specific way exactly
24  what was necessary for a write operation to be "completed."  When he did so, he
   ran into trouble harmonizing his argument with the Figure 8 embodiment discussed
25  below.

26  [4] The defendants have stipulated to multiple constructions that include Act 430,
   sometimes referred to as Step 430, contradicting their "all normal operations must
27  continue" argument regarding the transparency terms.  *See* MDL Dkt. No. 31.  Mr.
   Gafford has also inconsistently opined that Act 430 is a part of the structure of
28  multiple means plus function limitations.  *See* Ex. 9 at 69:14-15, 70:21-23.

1  purpose embodiment that can be used where the "read verification after writing"

2  technique discussed in the '682 patent is used.  The '682 patent states that "some

3  commands used by some older operating systems, such as DOS act in this manner."

4  Ex. 1 at 9:50-57.  Mr. Gafford was able to identify only one operating system that uses

5  the technique. Ex. 9 at 166:8-17.

6       Figure 8 is an example of a blocking device that can be used "with an operating

7  system that uses read-back-after-write commands." Ex. 1 at 9:55-57. This limited use

8  device is obviously not the sole embodiment of the invention of the '682 patent.

9       "[I]nstead of discarding the data associated with blocked write commands," as

10 occurs in the other embodiments of the '682 patent, the processor of the Figure 8

11 embodiment stores the data in the temp drive, at least for a limited period of time.  Ex.

12 1 at 10:1-3.  The defendants present the writing of the data to the temp drive as the

13 completion of the write commands, and suggest, despite the fact that the bulk of the

14 '682 patent is devoted to other embodiments employing the data discard of Act 430 of

15 Figure 4, that the Figure 8 embodiment is the exclusive embodiment claimed.  If that

16 were the case, why would the patent mention other embodiments?  The Figure 8

17 embodiment is an alternative embodiment for use with a limited group of operating

18 systems, not the single embodiment of the invention.

19      **D. The '682 Patent: "Host."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1, 13, 30, 40 | "Host" | This claim term does not require construction and should be afforded its ordinary and customary meaning. | "a computer or motherboard distinct from the blocking device that, in the absence of the blocking device, is able to read and write the storage device" |

24      The term "host" is easily understood and does not require construction.  One

25 of the basic canons of claim construction is that a claim term is to be afforded its

26 plain and ordinary meaning unless a special definition is made explicit in the

27 specification or the prosecution history.  *Mycogen Plant Science, Inc. v. Monsanto*

28 *Co.*, 243 F.3d 1316, 1327 (Fed. Cir. 2001); *Markman v. Westview Instruments, Inc.*,

52 F.3d 967, 980 (Fed. Cir. 1995) (*en banc*), *aff'd*, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).  No such special definition exists with respect to the term "host."  One of ordinary skill in the art at the time of the invention would understand "host" to be used in the '682 patent simply to refer to the device connected to the blocking device for the purpose of inspecting a protected storage device.  *See* Ex. 1 at 2:22-3:15.

The defendants seek to narrow the meaning of host by virtue of a reference in the Summary of the Invention and Column 3 to "a blocking device that is physically inserted between a host computer and a storage device." *Id*. at 2:22-24, 3:51-54.  From this sentence, which is not amplified in the patent or the prosecution history, the defendants seek to derive a requirement that the blocking device be "distinct from the blocking device" and able to read and write the storage device in the absence of the blocking device.

There is no reason for the second addition, and the defendants may be wrong in their assertion that the host must be able to read and write.  The '682 patent is concerned with "modification" of a storage device, and the patent refers to modification of storage devices by operating systems. *Id*. at 1:17-33.  The defendants' definition might exclude a host running such an operating system.  Rather than adopt too narrow a concept, and create the potential for hair splitting, it is better to refrain from adding language of this type to a term that was not construed during the ITC proceeding.

The defendants' other proposed language is also objectionable.  The statement that blocking devices are "physically inserted" does not require that they be "distinct."  If it is necessary to address "physical insertion," no more than repeating the language of the sentence on which the defendants rely is needed.

### E. The '682 Patent: "Means For Intercepting."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|-----------|------------------------------|-----------------------------------|
| 40 | "means for | **Function**: intercepting | **Function**: intercepting |

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|-----------|-------------------------------|-----------------------------------|
|  | intercepting communications between a host and a storage device" | communications between a host and a storage device<br><br>**Structure**: an interface emulator 320, 720, 820, 920, and equivalents thereof | communications between a host and a storage device<br><br>**Structure**: Undefined |

The parties agree that this is a means-plus-function term subject to construction pursuant to 35 U.S.C. § 112(f), and they further agree that the relevant function is as recited in the claim language. MyKey contends that the specification clearly discloses a sufficient structure, an interface emulator, for implementing the claimed function. The defendants contend that the structure is "undefined" and the claim is indefinite.

The first step in construing a means-plus-function limitation is identifying the claimed function. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001). "Second, the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012). It is settled that the law does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28-29, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997)). The definiteness requirement is satisfied when claims "clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236, 87 L.

Ed. 232, 63 S. Ct. 165 (1942).  A claim is indefinite if "it does not reasonably apprise those skilled in the art of its scope."  *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005); *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1217 (Fed. Cir. 1991).  Claims should not be found indefinite unless "reasonable efforts at claim construction prove futile."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347-48 (Fed. Cir. 2005).

To be definite, a claim in means-plus-function format must explicitly disclose structure corresponding to the claimed function, and must clearly link that structure to the claimed function.  *AllVoice Computing PLC v. Nuance Commc'ns., Inc.*, 504 F.3d 1236, 1241 (Fed. Cir. 2007).  The '682 patent identifies an interface emulator as the structure corresponding to the claimed function, and links that structure to the function.  For example, one aspect of the invention of the '682 patent is a "method that intercepts communications between a computer mother-board and a local storage device and compares commands in the communications between the motherboard and the storage device to a predetermined set of commands."  Ex. 1 at 2:65-3:2.  The specification teaches how the communications are intercepted:  "When host 201 attempts to communicate with drive 205, the host 201 is actually communicating with IDE drive emulator 320."  *Id.* at 5:56-58.

In the ITC proceeding, the respondents stipulated to a construction that identified interface emulator 320 (Figure 3), 820 (Figure 8), 920 (Figure 9), and equivalents thereof.  (MyKey's proposed construction adds interface emulator 720 from Figure 7.).  *See* Ex. 5 at 11; Ex. 11 (Updated Joint Proposed Claim Construction Chart) at 1.  There is no basis for their change of position.

**F.  The '682 Patent: "Means For Blocking."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 40 | "means for blocking other ones of the commands from being | **Function**: blocking other ones of the commands from being received by the storage device based on the comparison | **Function**: blocking other ones of the commands from being received by the storage device based on the comparison |

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| | received by the storage device based on the comparison" | **Structure**: a processor programmed to perform step 430 of Fig. 4, and equivalents thereof | **Structure**: the elements of Fig. 5 (except 520, 525, 530, and 560) and programmed to perform steps 420, 430, 440, 450, and 460 of Fig. 4, and equivalents thereof |

The "means for blocking" term is another agreed to qualify for means-plus-function treatment pursuant to 35 U.S.C. § 112(f). The parties agree that the function of this limitation is as recited in the claim language.

In the ITC proceeding, the parties agreed that the structure is "a processor programmed to perform step 420 of Fig. 4, and equivalents thereof." *See id.* MyKey asserts the processor still applies but must be programmed to perform step 430, as the defendants contend in part. A processor programmed to perform Step 430 of Figure 4 is disclosed in the specification and linked to the claimed function.

The patent teaches that the blocking device "captures and holds communications until they are examined (act 410)." Ex. 1 at 6:35-38. The examination of the communication is performed by a programmed processor. *See, e.g., id.* at 6:48-7:3 (describing the role of "embedded processor 330"). Step 430 performs the function of blocking commands from being received by the storage device. *See id.* at 6:38-43 (explaining that commands are "discarded" in order to "block[] it from the protected drive 205 (acts 420 and 430)"). MyKey's proposed structure accurately identifies the means by which commands are blocked from being received by the storage device and should be adopted by the Court.

The defendants' proposed construction adds a variety of elements that are not needed to block commands from being received by the storage device based on a comparison of a command to the predetermined list of commands "known to not permanently modify a state of the storage device." First, the defendants seek to include a variety of steps identified in Figure 4 that have no role in blocking commands from being received by the storage device. *See id.* at Fig. 4, Col. 6:48-57

1    (describing Steps 440 and 450).  Next, the defendants contend that "the elements of

2    Fig. 5 (except 520, 525, 530, and 560)" are corresponding structure.  None of the

3    structure from Figure 5 of the '682 patent corresponds to the disclosed function,

4    and it is not "necessary to perform the claimed function."  *Micro Chem., Inc. v. Great*

5    *Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

6         "FIG. 5 is [a] block diagram illustrating an exemplary implementation of

7    blocking device 203 in additional detail."  Ex. 1 at 7:10-11.  The blocking device

8    includes a microprocessor, which is the embedded processor that examines the

9    commands and discards those to be blocked from the protected drive.  But Figure 5

10   includes much more than the processor that is necessary to perform the claimed

11   function, such as "ROM 580" that "stores configuration data that is initially loaded

12   into PLD 590 on start-up," and "crystal oscillator 570" that "provides clocking signals

13   to microprocessor 510 and PLD 590."  Ex. 1 at 7:22-28.  This additional structure is

14   not necessary to perform the claimed function, or clearly linked to the function, and it

15   is therefore improper to include it as structure.  *See Medical Instrumentation &*

16   *Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citing *B. Braun*

17   *Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

18        In addition, defining the structure by reference to an "exemplary

19   implementation" of the claimed blocking device would violate another canon of claim

20   construction by limiting the invention to a single embodiment.  *See SRI Int'l v.*

21   *Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (*en banc*)

22   ("That a specification describes only one embodiment does not require that each claim

23   be limited to that one embodiment"); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d

24   1313, 1328 (Fed. Cir. 2002).  While Figure 5 provides a detailed disclosure, MyKey

25   never disavowed broader claim scope or indicated that the blocking device could not

26   be constructed differently in other embodiments.  *See Thorner v. Sony Computer*

27   *Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) (requiring clear disavowal of

28   claim scope).  The opposite is true.  *See, e.g.,* Ex. 1 at 7:29-30 ("In one

1  implementation, crystal oscillator 570 generates a 50 MHz clock signal."); *id.* at 8:54-

2  64 (disclosing another embodiment of the claimed blocking device "capable of

3  supporting two drives").

4  **G. The '682 Patent: "Means For Forwarding."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 40 | "means for forwarding selected ones of commands in the intercepted communications to the storage device . . . known to not permanently modify a state of the storage device" | **Function**: The parties agree that the function is the claim language.<br><br>**Structure**: a processor programmed to perform step 470 and 480 in Fig. 4, and equivalents thereof. | **Function**: The parties agree that the function is the claim language.<br><br>**Structure**: the elements of Fig. 5 (except 520, 525, 530, and 560), and a processor programmed to perform steps 440, 450, 460, 470 and 480 in Fig. 4, and equivalents thereof. |

12      The parties agree that this term of Claim 40 is subject to construction

13  pursuant to 35 U.S.C. § 112(f), and further agree that the function is as recited in

14  the claim language.  MyKey advocates the claim construction adopted in the ITC

15  proceeding at the urging of the respondents.  The defendants now assert that all of

16  the elements of Figure 5 (except 520, 525, 530, and 560) and a processor to perform

17  steps 440, 450, and 460 in Figure 4 of the '682 patent are part of the structure.  As

18  discussed above, any reference to Figure 5 is superfluous and not necessary to

19  perform the claimed function.

20      MyKey also submits that Steps 440, 450, and 460 in Figure 4 are not a part of

21  the required structure.  The algorithm described in Step 440 relates to an

22  examination of a read command, and Step 450 relates to an examination of a

23  capabilities request.  *See* Ex. 1 at 6:48-57.  Step 460 relates to the treatment of

24  unrecognized commands.  *See id.* at 6:66-7:3.  These steps are not relevant to a

25  "means for forwarding selected ones of commands in the intercepted

26  communications to the storage device . . . known to not permanently modify a state

27  of the storage device."  In addition, Claim 42 of the '682 patent, which is dependent

28  on Claim 40, is a claim directed to the embodiment of the invention relating to

- 25 -

1   capabilities requests. *See id.* at 18:1-8.[5]  Under the doctrine of claim differentiation, it

2   is improper to import a limitation from a dependent claim into the independent claim

3   from which the claim depends. *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.,* 177

4   F.3d 968, 971-72 (Fed. Cir. 1999).

5   **H. The '086 Patent: "Exact Copy/Copies."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "exact copy" / "exact copies" | "a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas" | "a copy that includes all of the data that resides on a long-term memory device, and formatted and arranged in the exact manner as on the long-term memory device" |

10   MyKey contends that the terms "exact copy" and "exact copies" should be

11   construed to mean "a copy that includes all of the data that resides on a long-term

12   memory device, including any data in hidden areas," the precise construction

13   agreed by the parties in the ITC proceeding. *See* Ex. 5 at 35.

14   The defendants now seek to rewrite the term by adding requirements their

15   expert could not explain in his deposition.  Mr. Gafford testified that the term

16   "arranged" is based on a provisional patent application, but he could not say how

17   "formatted" is different from "arranged," or explain the term well. *See* Ex. 9 at

18   169:9-170:11.

19   These additional terms should not be added.  They were not needed in the

20   ITC proceeding, and they are not explained.  Mr. Gafford could not explain what

21   "formatted" means, and there is no reason to add "arranged" without saying what it

22   means.  Does it mean, for example, that all of the sectors on a given device are

23   copied (as opposed to those containing the data of interest), or does "arranged"

24

25   _____

26   [5] The parties agree that the corresponding structure of "means for modifying data received from the storage device relating to the capabilities request command to

27   reflect the capabilities of the blocking device" is a processor programmed to perform Steps 450 and 480 of Figure 4, and equivalents thereof.  The parties'

28   agreed constructions are identified at MDL Docket No. 31.

have a different meaning?  The defendants do not say, and it does not make sense to construe a claim by adding language that itself requires construction.

## I.   The '086 Patent: "User Controllable Switch."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "user controllable switch" | This claim term does not require construction and should be afforded its ordinary and customary meaning, which is "a switch that can be controlled by a user of the device" | "a simple physical switch having only 'on' and 'off' positions" |

No construction of this term is necessary.  In the ITC, the parties agreed that the term means "a switch that can be controlled by a user of the device."  Ex. 5 at 35-36.  The defendants' attempt to limit the term has no basis.

The '086 patent describes at least one embodiment in which the switch is a multi-function switch that allows a user to cancel commands during operation:

> Although our device automatically copies and then verifies
>
> the copy, there are situations where a user may be interested
>
> in just performing the copy operation.  For this eventuality,
>
> one embodiment of our device allows a user to cancel the
>
> verification process through a user control.  This control only
>
> affects the verification process, and has no effect during the
>
> copy process.

Ex. 2 at 5:13-19.

## J.   The '086 Patent: "Means [For] Initiating The Copying Procedure."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 18 | "means [for] initiating the copying procedure" | **Function**: initiating the copying procedure<br><br>**Structure**: a switch and equivalents thereof | **Function**: initiating the copying procedure<br><br>**Structure**: a simple physical switch having only two stable positions 'on' and 'off,' and equivalents thereof |

MyKey asserts the construction agreed in the ITC proceeding.  *See* Ex. 5 at 37.  The defendants' departure from the agreed construction is not justified.

## K. The '086 Patent: "Means For Making An Exact Copy."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 18 | "means for making an exact copy" | **Function**: making an exact copy<br><br>**Structure**: a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof | The term is invalid under 35 U.S.C. § 112. In the alternative,<br><br>**Function**: making an exact copy<br><br>**Structure**: a processor programmed to perform step 3070 in Fig. 3, and the algorithm described in col. 6, line 27 through col. 7, line 25, and equivalents thereof |

Here, also, the defendants depart from the construction agreed in the ITC proceeding. *See* Ex. 5 at 38. There is no basis for expanding the structure as the defendants propose. *See Micro Chem.,* 194 F.3d at 1258.

## L. The '086 Patent: "Means For Reading And Comparing."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 18 | "means for reading and comparing the data on the source and destination devices and communicating result to a user" | **Function**: reading and comparing the data on the source and destination devices and communicating result to a user<br><br>**Structure**: a processor programmed to perform step 3075 in Fig. 3, and equivalents thereof | The term is invalid under 35 U.S.C. § 112. In the alternative,<br><br>**Function**: reading and comparing the data on the source and destination devices and communicating result to a user<br><br>**Structure**: a processor programmed to perform step 3075 in Fig. 3 (as discussed in Col. 6, lines 17-20), and equivalents thereof |

In the ITC proceeding, the parties stipulated to the construction advocated by MyKey. *See* Ex.5 at 38. The defendants "alternatively" accept that construction, but their lead argument appears to be a claim that the term is invalid under 35 U.S.C. § 112. As indicated by the agreement of the parties in the ITC proceeding, the term is sufficiently definite.

## M. The '086 Patent: "Stand-Alone, Dedicated Function Device."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1, 18 | "stand-alone, dedicated function device for making exact copies of long term memory devices" and "stand-alone, dedicated function copying device" | "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long term memory devices." | "a device that is configured at the factory for the specific purpose of automatically making an exact copy of a source long-term memory device on a destination long-term memory device, and includes all the hardware, logic and circuitry necessary to perform such specific purpose, and does not include an option to delete the contents of the destination long-term memory device" |

The term "stand-alone, dedicated function copying device" is recited only in the '086 patent's preambles of independent Claims 1 and 18. Accordingly, MyKey contends that this preamble term is not a limitation and should not be construed.

In *Catalina Marketing International, Inc. v. Coolsavings.com, Inc*., the Federal Circuit held that "a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" 289 F.3d 801, 808 (Fed. Cir. 2002). A preamble is limiting only in the case of (i) *Jepson* claims,[6] (ii) claims using the preamble for antecedent basis, (iii) claims using the preamble to add structure or steps, and (iv) claims using the preamble to overcome prior art during prosecution. *Id*. at 808-10. In contrast, preambles that merely describe the use of an invention do not limit the claims. *Id*. at 810. A preamble phrase is not limiting when it "merely gives a descriptive name to the set of limitations in the body of the claim," which already completely sets forth the invention. *IMS Tech., Inc. v. Haas Automation, Inc*., 206 F.3d 1422, 1434 (Fed. Cir. 2000).

---

[6] "The *Jepson* form of claiming permits a patentee to recite prior art in the preamble of the claim." *In re Guess*, No. 2009-1219, 2009 WL 1598475, at *2 (Fed. Cir. Jun. 9, 2009).

1    The defendants ignore these well-settled principles, but they do not stop with

2  using the preamble as a limitation.  Instead, the defendants seek to re-write the

3  preamble of the '086 patent, adding substantial additional limitations.  The

4  preambles for the '086 patent claims in dispute refer to "a stand-alone, dedicated

5  function copying device."  Ex. 2 at 10:55-56, 12:16-17.  The defendants propose that

6  the Court re-write the preambles to require that the device perform its function

7  "without additional hardware or software components, and [is] not reconfigurable to

8  perform any other function by an end user."

9    The defendants argue that "dedicated function" should be construed to mean

10  "not reconfigurable to perform any other function by an end user."  To the extent the

11  defendants contend that the device must be capable of performing only a single

12  function, they are wrong, as the ITC administrative law judge recognized.  The

13  applicants clearly defined "stand-alone, dedicated function copying device" to include

14  a device capable of performing more than a single function.  *See Markman v.*

15  *Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (holding that a patentee

16  may act as his own lexicographer).  For example, the specification of the '086 patent

17  describes a product produced by a company named Logicube as a dedicated, stand-

18  alone device despite the fact that the Logicube device is clearly capable of performing

19  more than a single function.  Ex. 2 at 1:48-57 ("This device has numerous operating

20  modes and options that must be specified before making a copy.  Options are

21  selected through the use of a number of buttons and a small display.  One of the

22  options is to delete the contents of what will be the destination drive.").[7]  The

23  Logicube device, explicitly described in the specification as a dedicated stand-alone

24  device, is capable of performing both a copy function and an erase function.  The

25  applicants did not use the word "dedicated" to mean "single" or "only one," and

26  they obviously did not exclude a delete function.

27

28

---

[7] The defendants specifically seek to exclude a delete function in their construction.

1        As they did with the transparency terms in the '682 patent, the defendants

2    also base their position on an irrelevant difference in word usage.  In the

3    specification, the Logicube device is explicitly described as a "dedicated" device.

4    But, the defendants point out, the actual claim language refers to a "dedicated

5    function" device.  The defendants thus posit that the '086 patent uses the same word

6    – "dedicated" – to refer both to "dedicated devices" and "dedicated function

7    devices," but with a different meaning.  They have not explained, however, what

8    "dedicated" without "function" means, and there is not a plausible hypothesis

9    supporting the theory that the word is used differently.  The Logicube device

10    obviously was not portrayed as "dedicated" because it is loyal, like the family dog,

11    or committed to service, like a hard working employee.  The depiction of the multi-

12    function Logicube device as "dedicated" requires the rejection of the defendants'

13    "single function" argument.

14        Unable to cite any intrinsic evidence, the defendants point to the Microsoft

15    Computer Dictionary in support of the idea that "dedicated" means single function.

16    This is an example of exactly what the Federal Circuit put an end to in *Phillips*.  *See*

17    *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320, 1321 (Fed. Cir. 2005).  There is no

18    need to look to a dictionary when the intrinsic evidence is clear, and no justification

19    for exalting a dictionary definition over clear intrinsic evidence.

20        As the ITC administrative law judge recognized, "[t]he '086 patent describes a

21    stand-alone, dedicated function device that can be reconfigured by a user, including

22    reconfiguring it to perform variations on its functionality, such as (1) copy only, (2)

23    copy while scanning for one or more bit patterns, or (3) scanning only for one or

24    more bit patterns.  Ex. 5 at 42; *see* Ex. 2 at 10:22-27 ("Additionally, the copying

25    device may be configured to display a report of the copying process and

26    information about the devices involved. The copying device may be configured to

27    accept one or more bit patterns to scan during the copying process. The copying

28

1  device may be further configured to perform a scan only.")  The defendants'

2  proposed construction is incorrect.

3       Having lost the single function argument in the ITC, the defendants retreat to

4  an acknowledgement that the specification clearly does identify the multi-function

5  Logicube device as "dedicated," but claim that "dedicated" cannot include a multi-

6  function device because the patent portrays the Logicube device as too

7  complicated!  So, even though the multi-function Logicube device is called

8  "dedicated," "dedicated" does not include a multi-function device.  This makes no

9  sense.  The term "dedicated" is clearly used to refer to the device.  That means that

10 "dedicated" as used in the '086 patent does not mean "single function."

11      The argument that the stand-alone, dedicated function copying device must

12 perform its function "without additional hardware or software components" was

13 also rejected in the ITC proceeding.  The '086 patent describes the use of

14 "additional components," such as a printer, that are used in conjunction with the

15 stand-alone, dedicated function copying device to perform its functions.  *See* Ex. 5

16 at 43; Ex. 2 at 7:39-44; *see also id*. at 2:35-39, 2:47, Figs. 1 and 2.

17      **N. The '086 Patent: "Control Circuit Issuing Commands To… Read."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|-----------|-------------------------------|-----------------------------------|
| 1 | "control circuit issuing commands to . . . read and compare data on the source and destination devices" | This claim term does not require construction and should be afforded its ordinary and customary meaning. | "commands are issued to the source and destination devices so that, on a unit by unit basis, data on the source device is read and compared with corresponding data on the destination device" |

23      This disputed term requires no particular construction, as its meaning is plain

24 from the claim language.  Consistent with the canons of claim construction, MyKey

25 contends that the meaning of this term is readily apparent to one of ordinary skill in

26 the art and thus does not require construction.  *Mycogen Plant Science*, 243 F.3d at

27 1327; *Markman*, 52 F.3d at 980.  The defendants advocate "one of the cardinal sins

28

1   of patent law" by improperly "reading a limitation from the written description into

2   the claims." *Phillips*, 415 F.3d at 1320.

3        The defendants contend that this term should be construed to require that "on

4   a unit by unit basis, each unit of data on the source device is read and compared

5   with each unit of corresponding data on the destination device." That construction

6   was rejected in the ITC proceeding. Ex.5 at 45. To support their construction, the

7   defendants point to a discussion in the '086 patent specification involving the

8   comparison of the data between the source device and the destination device on a

9   unit-by-unit basis.

10        The defendants contend that this is the only embodiment described in the

11   specification and that it should therefore be imported into the claim language. That

12   is not consistent with the law. The Federal Circuit has explicitly rejected the

13   defendants' approach and held that even where a patent describes only a single

14   embodiment, it is wrong to read the embodiment into the claims absent a clear

15   intention to do so. *See Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 904-06

16   (Fed. Cir. 2004). Here, there is no indication of such an intention. Ex. 5 at 45.

17        **O. The '086 Patent: "Control Circuit Issuing Commands To…Restore."**

18

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|------------|-------------------------------|-----------------------------------|
| 1 | "control circuit issuing commands to . . . restore the source drive to its original condition" | This claim term does not require construction and should be afforded its ordinary and customary meaning. | "commands are issued to the source drive, automatically after copying, to restore the drive to its unaltered state after the source device has been altered to provide access to hidden areas" |

23        Because the meaning of this term is plain from the claim language, there is

24   no need for the Court to construe the limitation "control circuit issuing commands

25   to . . . restore the source drive to its original condition" as recited in Claim 1 of the

26   '086 patent.

27        The defendants urge the Court to impose an order of operations on this

28   limitation, but there is no basis for doing so. The defendants again ignore what the

1    patent says and try to import limitations from the specification into the claim

2    language.  *Phillips*, 415 F.3d at 1320.  In particular, the defendants' proposed

3    construction requires that "commands are issued to the source drive, *automatically*

4    *after copying.*"  The defendants ignore an embodiment described in the '086 patent

5    that such commands may not be issued automatically after copying and that the

6    commands may be issued prior to copying such that simply repowering the source

7    drive restores the source drive to its original condition:

8           If the data is hidden using the HPA method, the drive may be

9           instructed to make the hidden area accessible temporarily. When a

10          temporary change command is issued, the drive resorts to its previous

11          state the next time that the drive is powered off and on again.

12   Ex. 2 at 4:54-58.

13          Furthermore, while the '086 patent discusses an embodiment in which

14   multiple operations are performed together automatically, the '086 patent also

15   teaches a scenario in which one of these operations, such as the verification process,

16   may be canceled.[8]  The defendants' contention that the commands must be issued

17   automatically after copying thus ignores the '086 patent's teaching that one of the

18   commands may be canceled by a user.  The defendants' arguments were rejected in

19   the ITC proceeding.  Ex. 5 at 47-48.

20          Finally, the defendants' construction also appears improperly to impose a

21   requirement that the restoring commands must be issued after the copying commands.

22   The administrative law judge held that the restoration operation is performed "*after* the

23   hidden area is accessed to allow for copying," *id.* at 49, but that is not the same thing

24   as issuing a command after the source device has been altered.  Such an order is not

25   _____

26   [8] "Although our device automatically copies and then verifies the copy, there are
     situations where a user may be interested in just performing the copy operation. For

27   this eventuality, one embodiment of our device allows a user to cancel the
     verification process through a user control. This control only affects the verification

28   process, and has no effect during the copy process."  Ex. 2 at 5:13-19.

imposed by the claims, the '086 patent specification, or the '086 patent file history.

Like the importation of "automatically" and "unaltered state," the defendants' apparent

imposition of an order of operations is not supported by the intrinsic record.

### P. The '086 Patent: "Means For Opening Hidden Areas."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 18 | "means for opening hidden areas on the source device" | **Function**: opening hidden areas on the source device<br><br>**Structure**: a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive | **Function**: opening hidden areas on the source device<br><br>**Structure**: Undefined |

MyKey advocates the construction adopted in the ITC proceeding, over the

respondents' argument that the structure is undefined. *See* Ex.5 at 51. The

defendants repeat that argument here, and it should be rejected for the same

reasons. *See id.* at 50-51.

### Q. The '086 Patent: "Means For Restoring."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 18 | "means for restoring the source device to its original condition" | **Function**: restoring the source device to its original condition.<br><br>**Structure**: a processor programmed as set forth in 4:54-60 of the '086 patent OR processor and flash memory, where the processor is programmed (1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and (2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification | **Function**: restoring the source device to its original condition<br><br>**Structure**: Undefined<br><br>**Alternate Structure**: processor programmed as set forth in 5:5-12 of the '086 patent, and equivalents thereof |

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
|  |  | number associated with that source drive(s) and (3) to instruct the source drive(s) to restore itself to the original configuration |  |

MyKey again advocates the construction adopted in the ITC proceeding over the respondents' indefiniteness argument. Ex. 5 at 53-54. That construction should be adopted here over the restated indefiniteness argument and the "alternative" identification of structure.

**R. The '379 Patent: "User Controllable Switch."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "user controllable switch" | This claim term does not require construction and should be afforded its ordinary and customary meaning, which is "a switch that can be controlled by a user of the device." | "a simple physical switch, including two stable positions 'on' and 'off,' that when actuated by the user that causes the control circuit to issue all the commands recited herein, and is not a menu driven interface" |

As with the term "user controllable switch" of the '086 patent, MyKey contends that this term has a plain and ordinary meaning and does not require construction. MyKey's proposed plain meaning was agreed in the ITC proceeding. Ex. 5 at 35-36. The defendants now insist on a physical switch with "only two states, on and off," and seek to exclude "a menu driven interface." The defendants improperly seek to import limitations from the specification.

Even if an on/off switch were the only embodiment described in the '379 patent specification, it would be improper to read that embodiment into the construction of the term "user controllable switch." *See Liebel-Flarsheim*, 358 F.3d at 904-06. The defendants also ignore another embodiment of the '379 patent in which the switch has more than on and off states. Specifically, the '379 patent specification describes a switch that varies the data cleaning level. Ex. 3 at 10:37-40; *see also id.* at 11:36-39 ("Additionally, the cleaning device can provide different levels of data removal. The longer the cleaning device performs operations

1  on a target device, the more securely it is able to remove data."). The defendants'

2  construction plainly contradicts the explicit teachings of the '379 patent and thus

3  should be rejected.

### S. The '379 Patent: "Hidden Storage Area."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "hidden storage area" | "an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay" | "an area on a long-term memory device that is hidden from the operating system" |

9  This is another term on which the defendants seek to depart from the agreed

10  construction adopted in the ITC proceeding. *See* Ex. 5 at 55. There is no reason to

11  depart from the agreed construction.

### T. The '379 Patent: "Stand-Alone, Dedicated Function Device."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "Stand-alone, dedicated function device for removing data from a long term memory component" and "stand-alone, dedicated function device" | "a physical device, which is not a general purpose computer system, that stands apart from a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component" | "a device that is configured at the factory for the specific purpose of automatically removing data from a long-term memory component, and includes all the hardware, logic and circuitry necessary to perform such specific purpose, and the device does not have any way for a user to change its functionality, programming or configuration" |

20  MyKey again advocates the construction adopted in the ITC proceeding. *See*

21  Ex. 5 at 56-59. That construction should be adopted here.

### U. The '379 Patent: "Irretrievably Remove Data."

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "irretrievably remove data" | This claim term does not require construction and should be afforded its ordinary and customary meaning, which is "remove data permanently such that it may not be recovered by any known | "overwrite data on the tracks of a long-term memory component by writing to all the tracks multiple times with multiple data patterns and writing to the tracks non-sequentially in a pattern that forces the head to move from track to track in such a way as to introduce jitter in the position of the head in |

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| | | methods." | the long-term memory component" |

The term "irretrievably remove data" of Claim 1 of the '379 patent should be afforded its plain and ordinary meaning, which is the construction adopted in the ITC. *See* Ex. 5 at 59-60.

The defendants' construction references an embodiment of the '379 patent in which data are erased based on fuzzy data and jitter. Ex. 3 at 8:21-39. The defendants ignore "an alternative cleaning scheme" described in the '379 patent specification in which "some target disk drives have an internal command that will erase the drive" and that "[c]leaning device 300 may use these internal erase commands when erasing the drive." *Id.* at 8:55-58. Moreover, it is improper to read limitations from the patent specification into the claim language, even if the patent specification discloses only one embodiment. *See Liebel-Flarsheim*, 358 F.3d 898 at 904-06.

**V. The '379 Patent: "The Control Circuit Is Further Configured."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "the control circuit is further configured to open a hidden area . . . before irretrievably removing data" | This claim term does not require construction and should be afforded its ordinary and customary meaning. | "the control circuit automatically opens a hidden storage area on the long-term memory component before irretrievably removing the data in response to the user's actuation of the switch to command irretrievable removal of all data" |

MyKey advocates the plain and ordinary meaning construction adopted in the ITC proceeding. *See* Ex. 5 at 60-62. The defendants' contention that the control circuit must "automatically open[] a hidden storage area on the long-term memory component before removing the data" finds no support in the intrinsic record. In fact, the '379 patent specification, in describing that the device "may automatically" operate and that a password-protected hidden area cannot be automatically opened, directly contradicts the defendants' proposed construction. *See id.* at 61-62; Ex. 3 at 10:51-60.

1    The defendants' proposed construction that the data are removed "in

2    response to the user's actuation of the switch to command irretrievable removal of

3    all data" is similarly erroneous.  This portion of the defendants' proposed

4    construction renders a different limitation of claim 1 of the '379 patent – "a user

5    controllable switch that, when actuated by a user, causes the control circuit to

6    commence irretrievably removing all the data from the long-term memory

7    component" – completely redundant and superfluous.  *See Bicon, Inc. v. The*

8    *Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *Texas Instruments Inc. v. U.S.*

9    *Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993).

10   **W. The '379 Patent: "Casing."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|-----------|-------------------------------|-----------------------------------|
| 1 | "casing being of a size that is portable by the user" | This claim term does not require construction and should be afforded its ordinary and customary meaning. | The term is invalid under 35 U.S.C. § 112. "casing that is relatively small, lightweight, and easily portable, approximately 8"x10"x1.5" or smaller" |

15   The term "casing being of a size that is portable by the user" is easily

16   understood and does not require construction.  *See Mycogen Plant Science*, 243

17   F.3d at 1327; *Markman*, 52 F.3d at 980.  The defendants' argument that the term is

18   indefinite, but should "alternatively" be construed in a detailed, limiting way is not

19   credible.

20   **X. The '379 Patent: "The Control Circuit Open[s]."**

| Claim | Claim Term | MyKey's Proposed Construction | Defendants' Proposed Construction |
|-------|-----------|-------------------------------|-----------------------------------|
| 2 | "the control circuit open[s] a hidden storage area without user intervention" | This claim term does not require construction and should be afforded its ordinary and customary meaning. | "the control circuit automatically issues commands to open a hidden storage area without need for a user to request the control circuit to do so" |

25   The meaning of this term is plain from the language of the claim itself and

26   does not require construction.  *See id*.  The defendants' proposed construction is not

27   justified.

28

1

**III.    CONCLUSION.**

2

       For the foregoing reasons, MyKey respectfully requests that the Court adopt

3

MyKey's proposed claim constructions.

4

5

Dated:  February 19, 2014          Respectfully submitted,

6

                                   FREITAS TSENG & KAUFMAN LLP

7

8

                                   By:___*/s/ Robert E. Freitas*_____

9

                                       Robert E. Freitas
                                       Jessica N. Leal

10

                                       FREITAS TSENG & KAUFMAN LLP

11

                                       100 Marine Parkway, Suite 200
                                       Redwood Shores, California  94065

12

                                       Telephone:  (650) 593-6300
                                       Facsimile:   (650) 593-6301

13

14

                                       *Attorneys for Plaintiff*

15

                                       *MyKey Technology Inc.*

16

17

18

19

20

21

22

23

24

25

26

27

28