# Exhibit 5

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

In the Matter of

**CERTAIN COMPUTER FORENSIC DEVICES
AND PRODUCTS CONTAINING SAME**

Inv. No. 337-TA-799

**ORDER NO. 45:     CONSTRUING THE TERMS OF THE ASSERTED CLAIMS OF
THE PATENTS AT ISSUE**

(May 8, 2012)

Exhibit 5
1

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.   IN GENERAL..........................................................................................................2

III.  RELEVANT LAW ..................................................................................................2

IV.   LEVEL OF ORDINARY SKILL IN THE ART .........................................................5

V.    THE '682 PATENT ...............................................................................................6
      A.    Overview.......................................................................................................6
      B.    Agreed-Upon and Disputed Claim Terms ............................................11
            1.    Construction of Agreed-Upon Claim Terms.......................................11
                  a)    "means for intercepting communications between a host and a storage device"................................................................11
                  b)    "means for blocking other ones of the commands from being received by the storage device based on the comparison".......11
                  c)    "means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device." .......................................12
                  d)    "means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device"....................................................................13
            2.    Construction of Disputed Claim Terms ................................................14
                  a)    "transparent to normal operation [of the host and storage device" / "transparently to normal operation [of the host and the IDE storage device]" / "transparent to normal operation [of the computer motherboard and the storage device]" / "transparently to [the host computer and the long-term storage device]" / "transparently to normal operation [of the host and the storage device]" ...........14
                  b)    "interface emulator"...............................................................19
                  c)    "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host"........23
                  d)    "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands" .........................................................................25
                  e)    "means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the device" .............................30

Exhibit 5
2

VI.   THE '086 PATENT ........................................................................33
   A.     Overview ...............................................................................33
   B.     Agreed-Upon and Disputed Claim Terms ...............................35
       1.    Construction of Agreed-Upon Claim Term ...................35
          a)   "exact copy" ..........................................................35
          b)   "hidden areas" and "hidden area" ..........................35
          c)   "user controllable switch" ....................................35
          d)   "means for interfacing with a source drive" ...........36
          e)   "means for interfacing with one or more destination devices" ..............................................................36
          f)   "means for initiating the copying procedure" ..........37
          g)   "means for comparing the size of the source device to the size of a destination device and communicating result to a user" ..........37
          h)   "means for making an exact copy" ..........................38
          i)   "means for reading and comparing the data on the source and destination devices and communicating result to a user" ........38
          j)   "means for indicating areas on a source drive that were unreadable" ..........................................................39
       2.    Construction of Disputed Claim Terms ........................39
          a)   "stand-alone, dedicated function [copying] device" ...............39
          b)   "control circuit issuing commands to . . . read and compare data on the source and destination devices" ..........................................43
          c)   "control circuit issuing commands to . . . restore the source drive to its original condition" ..........................................46
          d)   "means for opening hidden areas on the source drive" ...........49
          e)   "means for restoring the source device to its original condition" ..........................................................51

VII.  THE '379 PATENT .......................................................................54
   A.     Overview ...............................................................................54
   B.     Agreed-Upon and Disputed Claim Terms ...............................55
       1.    Construction of Agreed-Upon Claim Terms ..................55
          a)   "hidden storage area" ............................................55
          b)   "user controllable switch" ....................................55
       2.    Construction of Disputed Claim Terms ........................56
          a)   "stand-alone, dedicated function device" ...............56
          b)   "irretrievably remove data" ...................................59
          c)   "the control circuit is further configured to open a hidden area . . . before irretrievably removing data" ..........................60

ii

Exhibit 5

3

## I.    INTRODUCTION

This Investigation was instituted by the Commission on August 29, 2011 to determine whether certain computer forensic devices and products containing the same infringe U.S. Patent Nos. 6,813,682 (the "'682 patent"), 7,159,086 (the "'086 patent"), and 7,228,379 (the "'379 patent").[1]  *See* 76 Fed. Reg. 53,695-696 (Aug. 29, 2011).  The named respondents are CRU Acquisitions Group LLC; CRU-Dataport LLC; Digital Intelligence, Inc.; Guidance Software, Inc., and Guidance Tableau LLC (collectively, "Respondents").

Pursuant to Ground Rule 5A, a *Markman* hearing was held January 19, 2012 regarding the interpretation of certain terms of the asserted claims of the patents at issue, namely:

- Claims 1–8, 11–13, 16–38, and 40–45 of the '682 patent;

- Claims 1–9, 13–18, 20, and 21 of the '086 patent; and

- Claims 1 and 2 of the '379 patent.

Prior to the hearing, Complainant MyKey Technology Inc. ("MyKey"), Respondents, and the Commission Investigative Staff ("Staff") met and conferred in an effort to reduce the number of disputed claim terms to a minimum.  The parties also filed initial and reply claim construction briefs, wherein each party offered its construction for the claim terms in dispute, along with support for its proposed interpretation.  After the hearing and pursuant to Order No. 10, the parties submitted an updated Joint Claim Construction Chart.[2]

---

[1] Complainants are the owner, by assignment, of the patents-in-suit.  (Compl. at ¶¶ 2, 4; *see also* Compl. Exs. 4, 5.)

[2] The claim terms discussed in detail in this Order were identified in the Updated Joint Proposed Claim Construction Chart as being agreed upon or remaining in dispute.  For convenience, the briefs and chart submitted by the parties are referred to hereafter as:

| | |
|---|---|
| CMIB | MyKey's Initial *Markman* Brief |
| CMRB | MyKey's Reply *Markman* Brief |
| RMIB | Respondents' Initial *Markman* Brief |
| RMRB | Respondents' Reply *Markman* Brief |
| SMIB | Staff's Initial *Markman* Brief |
| SMRB | Staff's Reply *Markman* Brief |

Exhibit 5

4

## II.     IN GENERAL

The claim terms construed in this Order are done so for the purposes of this Section 337 Investigation. Those terms not in dispute need not be construed. *See Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (noting that the administrative law judge need only construe disputed claim terms).

Hereafter, discovery and briefing in this Investigation shall be governed by this construction of the claim terms. **All** other claim terms shall be deemed undisputed and shall be interpreted by the undersigned in accordance with "their ordinary meaning as viewed by one of ordinary skill in the art." *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1073 (2003).

## III.    RELEVANT LAW

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction is a "matter of law exclusively for the court." *Id.* at 970-71. "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979. As the Federal Circuit

| JC | Updated Joint Proposed Claim Construction Chart |

Exhibit 5
5

in *Phillips* explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in art at the time of the invention.  415 F.3d at 1313.  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claims terms." *Id.* at 1314; *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and distinctly claim [ ] the subject matter which the patentee regards as his invention.'").  The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314.  Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term.  *Id.*

The specification "is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs." *Id.* at 1316.  "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of

- 3 -

Exhibit 5
6

claim scope by the inventor." *Id.* As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Id.* at 1317; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* at 1317. "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

- 4 -

Exhibit 5
7

If, after a review of the intrinsic and extrinsic evidence, a claim term remains ambiguous, the claim should be construed so as to maintain its validity. *Phillips*, 415 F.3d at 1327. Claims, however, cannot be judicially rewritten in order to fulfill the axiom of preserving their validity. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Thus, "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Id.*

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

MyKey submits that "a person of ordinary skill in the art of the inventions of the Asserted Patents would have had a bachelor's degree in a discipline such as electrical engineering, computer science or mathematics, along with three to five years of technology industry experience that included work with computer forensic devices or work with storage systems, firmware, operating systems, device drivers and computer operations." (CMIB at 16.)

Respondents, on the other hand, believe "[a] person of ordinary skill in the art of the three patents-in-suit (computer storage systems) would have a Bachelor of Science degree in Electrical Engineering or Computer Science, with 2-3 years of experience working in the field of computer storage systems. (RMIB at 13.)

In Staff's view, the level of ordinary skill proposed by Respondents is more appropriate. (SMIB at 6.) First, Staff disagrees with MyKey's inclusion of mathematics as a possible field of study for it would not be helpful in the relevant art of the asserted patents. (*Id.*) Second, Staff prefers the broader work description (*i.e.*, "in computer storage systems") in Respondents' proposal.

Accordingly, as to "one of ordinary skill in the art," the undersigned finds that, with respect to the three asserted patents, one of ordinary skill in the art would have a bachelor's

Exhibit 5
8

degree in electrical engineering, computer science, or an equivalent field, with three to four years experience working with computer storage systems. In addition, one of ordinary skill in the art shall be commensurate with the time of the respective inventions, *i.e.*, the effective filing date for each of the patents-in-suit.

## V.    THE '682 PATENT

### A.    Overview

The '682 patent is entitled "Write Protection For Computer Long-Term Memory Devices." The '682 patent issued on November 2, 2004 to named inventors Stephen Bress and Mark Joseph Menz, and was subsequently assigned to MyKey. The '682 patent relates to a blocking device that provides read and write protection for computer long-term storage devices. ('682 patent at Abstract.) The '682 patent has 45 claims of which claims 1–8, 11–13, 16–38, and 40–45 are asserted against Respondents. Claims 1, 13, 25, 30, and 40 are independent claims. Claims 2–8, 11, 12, 16–24, 26–29, 31–38, 41–45 are dependent claims. The asserted claims read as follows (with the first instance of the agreed-upon terms highlighted in *italics* and the first instance of the disputed terms highlighted in **bold**):

1. A blocking device comprising: an **interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host**; an interface for connecting to the storage device; and a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, wherein the blocking device is **transparent to normal operation of the host and the storage device**.

2. The blocking device of claim 1, wherein the interface is an integrated device electronics (IDE) interface for a disk drive.

- 6 -

Exhibit 5
9

3.    The blocking device of claim 1, wherein the processor receives data back from the storage device in response to the commands passed to the storage device and forwards the received data to the host through the interface emulator.

4.    The blocking device of claim 3, wherein, when the commands include a capabilities request command relating to the storage device, the processor modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

5.    The blocking device of claim 1, wherein the processor drops those of the commands that do not match the predetermined set of commands, and, after dropping one of the commands, returns status information to the host that indicates that the dropped command was successfully completed.

6.    The blocking device of claim 1, further comprising: additional interfaces for connecting to additional storage devices.

7.    The blocking device of claim 6, wherein each of the interfaces is independently coupled to the processor.

8.    The blocking device of claim 1, further including light emitting diodes (LEDs) coupled to the processor and configured to transmit status information relating to the status of the blocking device.

11.    The blocking device of claim 1, wherein the processor examines feature information from the storage device that relate to features supported by the storage device and the processor zeroes any features not supported by the processor before making the feature information available to the host.

12.    The blocking device of claim 1, wherein the processor supports a removable drive feature set with the host and the processor returns a write protected error code to the host when the processor drops one of the commands.

13.    A device comprising: an IDE emulator component, the IDE emulator component including a physical interface designed to engage a first cable that connects to a host that controls an IDE storage device; an IDE interface configured to engage a second cable that connects to the IDE storage device; and a logic circuit connecting the IDE emulator component to the IDE interface and configured to: compare commands received at the IDE emulator component to a predetermined set of commands that are known to not modify a state of the IDE storage device, and to allow transmission of the commands from the IDE emulator component to the IDE interface when the comparison indicates that the received command is in the predetermined set of commands, wherein the device operates **transparently to normal operation of the host and the IDE storage device**.

Exhibit 5
10

16. The device of claim 13, wherein when the logic circuit receives data back from the IDE storage device the logic circuit forwards the received data to the host through the IDE emulator component.

17. The device of claim 16, wherein, when the comparison indicates the command includes a capabilities request command relating to the IDE storage device, the logic circuit modifies data received from the IDE storage device relating to the capabilities request command to reflect the capability of the IDE storage device as affected by the presence of the device.

18. The device of claim 13, wherein the logic circuit commands not in the predetermined set of commands and, after blocking transmission of one of the commands, returns status information to the host that indicates that the blocked command was successfully executed.

19. The device of claim 13, further comprising: a second interface for connecting to a second IDE storage device.

20. The device of claim 19, wherein each of the interfaces is independently coupled to the logic circuit.

21. The device of claim 13, further including light emitting diodes (LEDs) coupled to the logic circuit and configured to transmit status information relating to the status of the device.

22. The device of claim 13, further including: a temporary storage device coupled to the logic circuit, the logic circuit storing data corresponding to commands that are not allowed to be transmitted to the IDE interface in the temporary storage device.

23. The device of claim 22, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the logic circuit returns the data from the temporary storage device to the host.

24. The device of claim 13, wherein the logic circuit examines feature information from the IDE storage device that relates to features supported by the IDE storage device and removes any feature information not supported by the device before making the feature information available to the host.

25. A method comprising: intercepting communications between a computer motherboard and a local non-volatile storage device for the motherboard; comparing commands in the communications between the motherboard and the storage device to a predetermined set of commands; forwarding selected ones of the commands to the storage only when, based on the comparison, the commands are determined to be commands that are in a predetermined set of commands known to not permanently modify a state of the storage device; and blocking other commands from being received by the storage device, wherein the intercepting communications, comparing commands, forwarding selected ones of the

- 8 -

Exhibit 5
11

commands, and blocking selected other ones of the commands is **transparent to normal operation of the computer motherboard and the storage device**.

26. The method of claim 25, further comprising: forwarding data from the storage device to the motherboard in response to a read command received from the motherboard and forwarded to the storage device.

27. The method of claim 25, wherein the storage device is an integrated device electronics (IDE) disk drive.

28. The method of claim 25, wherein the commands forwarded to the storage device include a capabilities request command, the method further comprising: modifying data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as modified by operation of the method.

29. The method of claim 28, further comprising, after blocking a command: returning status information to the motherboard that indicates that the blocked command was successfully executed by the storage device.

30. A computer system comprising: a host computer; a long-term storage device; and a blocking device coupled between the host computer and the storage device, the blocking device configured to: intercept commands from the host to the storage device, pass commands to the storage device only when the commands are in a predetermined set of commands that are known to not permanently modify a state of the storage device, and block other commands from reaching the storage device, wherein the intercepting commands, blocking commands, and passing commands are performed by the blocking device **transparently to the host computer and the long-term storage device**.

31. The computer system of claim 30, wherein the blocking device further includes: an interface emulator configured to emulate the storage device to the host; and an interface configured to connect the blocking device to the storage device.

32. The computer system of claim 31, wherein the interface emulator emulates an Integrated Device Electronics (IDE) interface and the storage device is an IDE disk drive.

33. The computer system of claim 30, wherein the blocking device receives data back from the storage device in response to one of the passed commands and forwards the received data to the host.

34. The computer system of claim 30, wherein, when the passed commands include a capabilities request command relating to the storage device, the blocking device modifies data received from the storage device relating to the capabilities request command to reflect the capability of the storage device as affected by the presence of the blocking device.

- 9 -

Exhibit 5
12

35.  The computer system of claim 30, wherein the blocking device, after blocking one of the commands, returns status information to the host that indicates that the blocked command was successfully completed.

36.  The computer system of claim 30, wherein the blocking device further includes light emitting diodes (LEDs) configured to transmit status information relating to the status of the blocking device.

37.  The computer system of claim 30, wherein the blocking device further includes: a temporary storage device, the blocking device storing data from the host corresponding to blocked commands in the temporary storage device.

38.  The computer system of claim 37, wherein when read commands are received from the host that refer to data stored in the temporary storage device, the blocking device returns the data from the temporary storage device to the host.

40.  A blocking device comprising: *means for intercepting communications between a host and a storage device*; **means for comparing commands in the communications between the host and the storage device to a predetermined set of commands; means for forwarding selected ones of commands in the intercepted communications to the storage device only when, based on the comparison, the commands that are in a predetermined set of commands are determined to be commands that are known to not permanently modify a state of the storage device;** and *means for blocking other ones of the commands from being received by the storage device based on the comparison*, wherein the blocking device operates **transparently to normal operation of the host and the storage device**.

41.  The blocking device of 40, wherein the storage device is an integrated device electronics (IDE) disk drive.

42.  The blocking device of 40, wherein the commands forwarded to the storage device include a capabilities request command, and the means for forwarding further comprises: *means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device.*

43.  The blocking device of 40, further comprising: *means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device.*

44.  The blocking device of claim 2, wherein the interface emulator is configured to emulate an IEEE 1394 connection.

45.  The computer system of claim 31, wherein the interface emulator emulates an IEEE 1394 connection and the storage device is an IDE disk drive.

- 10 -

Exhibit 5
13

**B.**     **Agreed-Upon and Disputed Claim Terms**

    **1.**     **Construction of Agreed-Upon Claim Terms**

        **a)**     **"means for intercepting communications between a host and a storage device"**

The parties agree that the term "means for intercepting communication between a host and a storage device," which appears in claim 40 of the '682 patent, should be construed as:

    Function:    intercepting communications between a host and a storage device

    Structure:    an interface emulator 320, 820, 920, and equivalents thereof.

(JC at 1.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for intercepting communications between a host and a storage device" as:

    ***Function:***    ***intercepting communications between a host and a storage device***

    ***Structure:***    ***an interface emulator 320, 820, 920, and equivalents thereof.***

        **b)**     **"means for blocking other ones of the commands from being received by the storage device based on the comparison"**

The parties agree that the term "means for blocking other ones of the commands from being received by the storage device based on the comparison," which appears in claim 40 of the '682 patent, should be construed as:

    Function:    blocking other ones of the commands from being received by the storage device based on the comparison

    Structure:    a processor programmed to perform step 420 of Fig. 4, and equivalents thereof.

(*Id.*)

Exhibit 5
14

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for blocking other ones of the commands from being received by the storage device based on the comparison" as:

> **Function:**   *blocking other ones of the commands from being received by the storage device based on the comparison*

> **Structure:**   *a processor programmed to perform step 420 of Fig. 4, and equivalents thereof.*

> c)   **"means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device"**

The parties agree that the term "means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device," which appears in claim 42 of the '682 patent, should be construed as:

> Function:   modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device

> Structure:   a processor programmed to perform steps 450 and 480 of Fig. 4, and equivalents thereof.

(*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device" as:

> **Function:**   *modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device*

> **Structure:**   *a processor programmed to perform steps 450 and 480 of Fig. 4, and equivalents thereof.*

- 12 -

Exhibit 5
15

> **d)** **"means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device"**

The parties agree that the term "means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device," which appears in claim 43 of the '682 patent, should be construed as:

> Function: returning status information to the host that indicates that the blocked command was successfully executed by the storage device

> Structure: a processor programmed to perform step 430 of Fig. 4 and the algorithm described in 6:16-25, 6:33-47, and 12:33-45, and equivalents thereof.

(*Id.* at 1-2.)

Accordingly, the undersigned hereby adopt the parties' proposed construction and shall construe the term "means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device" as:

> ***Function:*** *returning status information to the host that indicates that the blocked command was successfully executed by the storage device*

> ***Structure:*** *a processor programmed to perform step 430 of Fig. 4 and the algorithm described in 6:16-25, 6:33-47, and 12:33-45, and equivalents thereof.*

Exhibit 5
16

2.     **Construction of Disputed Claim Terms**

   a)     **"transparent to normal operation [of the host and storage device]" / "transparently to normal operation [of the host and the IDE storage device]" / "transparent to normal operation [of the computer motherboard and the storage device]" / "transparently to [the host computer and the long-term storage device]" / "transparently to normal operation [of the host and the storage device]"**

The parties agree that the different variations of the term "transparent," which appear in claims 1, 13, 25, 30, and 40 of the '682 patent should be construed the same way. The parties, however, disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| The blocking device appears to the host as a storage device and appears to the storage device as a host | The blocking device operates in a way that all normal operations of the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device | The blocking device operates in a way that all normal operations of the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device |

MyKey asserts that no construction of the term "transparent" is needed because "transparent" has a plain and ordinary meaning. (CMIB at 25-26.) Should, however, the undersigned deem construction necessary, MyKey contends that the intrinsic evidence supports construing the term as "the blocking device appears to the host as a storage device and appears to the storage device as a host." (*Id.* at 26 (citing '682 patent at 5:32-40 ("To host computer 201, blocking device 203 appears to be a standard drive interface . . . and presents to the host 201 the memory, registers and control signals that a drive would normally present to host 201. To drive

- 14 -

Exhibit 5
17

205, blocking device 20[3][3] appears to be a host computer, and presents to drive 205 the
memory, registers, and control signals that host 201 would normally present to drive 205.  In
other words, blocking device 203 is transparent to the system.")).)

     MyKey objects to Staff's and Respondents' construction on two grounds.  First, MyKey
argues nothing in the intrinsic record requires that "all normal operations" of the host and the
storage device must continue when the blocking device is interposed between the host and the
drive.  (CMIB at 26; CMRB at 10-11.)  Instead, MyKey contends that the specification defines
"transparent" in reference to the appearance of the blocking device and not in reference to the
operation of the device.  (CMIB at 26-27 ("There is no mention of 'all normal operations,' and
no requirements that they 'continue.'").)  Second, MyKey disputes that "reconfiguration" was
disclaimed during prosecution (CMIB at 26; CMRB at 6-10 (arguing that Staff and Respondents
improperly rely on language that recites an advantage of the invention over the prior art).)
MyKey insists that U.S. Patent No. 6,336,187 ("*Kern*") was traversed based on its explicit
communication steps and not on the fact that one of those steps was the reconfiguration of the
interface of the host application.  (CMRB at 8.)

     Because they believe "transparent to normal operation" does not have a plain and
ordinary meaning,[4] Staff and Respondents argue that it should be construed as "the blocking
device operates in a way that all normal operations of the host and all normal operations of the
storage device continue when the blocking device is interposed between them with no
reconfiguration of the host and/or the storage device."  (RMIB at 22; RMRB at 11; SMIB at 11;

---

[3] The '682 patent mistakenly refers to "blocking device 205" in this sentence.  It is clear from the rest of the
specification that the blocking device is labeled 203 in the diagrams and 205 is the identifier given to the drive.  (*See*
'682 patent at 5:23-52.)
[4] Staff and Respondents concede that "transparent" on its own, as well as in the context of computers, has an
ordinary and customary meaning, but argue that the larger phrase "transparent to normal operation" requires
construction.  (*See* RMIB at 22-23; SMIB at 11 (citing 1999 Microsoft Computer Dictionary definition of transparent
as "pertaining to, or characteristic of a device, function or part of a program that works so smoothly and easily that it
is invisible to the user.").)

- 15 -

Exhibit 5
18

SMRB at 3.)  According to Staff and Respondents, their construction is not only supported by the claim language itself, but required by the prosecution history.  MyKey's proposed construction, in Staff's and Respondents' view, fails because it ignores the contextual language of the disputed claim terms (*i.e.*, "transparent to normal operation") and the unequivocal disclaimer made during prosecution to secure the issuance of the '682 patent.  (RMRB at 11; SMRB at 4-5.)

Staff and Respondents assert that in the context of the claim language, "['transparent'] is not directed to transparent appearance; rather, it is directed to transparent operation of the blocking device."  (RMIB at 23; SMIB at 11.)  Staff and Respondents submit that transparent operation of the blocking device is only possible if all normal operations of the host and storage device continue.  (RMRB at 13; SMIB at 12 ("any change in the normal operation of the storage device or host, would, in the context of the claimed invention, indicate that the interaction with the blocking device were not transparent.").)[5]  Staff and Respondents further contend that during prosecution of the '682 patent, the Applicant made certain unequivocal statements about the meaning of the "transparent to normal operation" limitation. (RMIB at 22; RMRB at 14-15; SMIB at 12; SMRB 4-5.)  Specifically, Staff and Respondents claim in responding to the rejection over *Kern,* the Applicants distinguished the '682 invention on the basis that "neither the host nor the storage device need any special hardware or software" and "neither the host nor the storage device need to be reconfigured in any way," thereby disclaiming any devices that would require reconfiguration.  (SMRB at 4-5; RMIB at 24-26.)

As an initial matter, the undersigned agrees with Respondents and Staff that there is no ordinary and customary meaning for these terms.  Thus, the first issue to be resolved is whether "transparent" refers only to the appearance of the blocking device or whether it refers to the

---

[5] Staff also contends that if the host or storage device must be reconfigured when the blocking device is interposed, the blocking device is not transparent.  (SMRB at 4.)

- 16 -

Exhibit 5
19

operation of the blocking device.  The undersigned finds Respondents' and Staff's arguments

persuasive.  While the specification highlights both the transparent appearance of the blocking

device and its transparent operation, the plain language of the asserted claims refers *only* to

transparent operation.  (*Compare* '682 patent at 5:31-42; 10:1-12 *with* 12:35-36 ("the blocking

device is transparent to normal operation of the host and the storage device"), 14:34-35 ("the

device operates transparently to normal operation of the host and the IDE storage device"),

15:50-54 (the blocking of selected commands "is transparent to normal operation of the

computer motherboard and the storage device"), 16:19-21 (command intercepting, blocking,

and passing "are performed by the blocking device transparently to the host computer and the

long-term storage device"), 17:16-17 ("the blocking device operates transparently to normal

operation of the host and the storage device").)  Moreover, consistent with the claim language,

the specification states that the "blocking device is physically inserted between a host computer

storage system and the storage device and is transparent to the host and storage device."  (*Id.* at

3:50-55.)  Because MyKey's proposed construction wholly ignores the requirement for

transparent operation, its alternative construction fails.

　　　The next issue is whether the claimed transparency excludes any blocking device that

requires the host or storage device to be reconfigured before the blocking device can be inserted

between the host and storage device.  First, the undersigned agrees with Staff and Respondents

that implicit in the phrase "transparent to normal operations" is the requirement that all normal

operations of the host and storage drive continue.  In other words, no reconfiguration of the host

or storage drive is needed.  Common sense dictates that if the blocking device interrupts or

alters the normal operation of the host or storage device, the blocking device is not transparent.

- 17 -

Exhibit 5
20

Second, during prosecution of the '682 patent, the Applicants made the following statements in order to overcome the §102(e) rejection based on *Kern*:

- Advantages associated with transparent operation of the blocking device are discussed in numbered paragraph 38 of the specification. As discussed, the blocking device appears as a standard storage device to the host. Accordingly, *neither the host nor the storage device need to be reconfigured in any way*. The blocking device simply needs to be inserted between the host and the storage device and it is ready to operate. ('682 Prosecution History, 11/24/03 Amendment at 18 (emphasis added).)

- Claim 1 further recites that the blocking device is transparent to normal operation of the host and the storage device. *Kern clearly does not disclose or suggest this feature of the invention*. (*Id.* at 19 (emphasis added).)

- As described in these sections, a number of explicit communication steps are taken between a new host and controller 120 before a host can use the storage device(s) 108, including exchanging a key (step 704) and reconfiguring the interface of the host application (step 706). *Applicants submit that this disclosure of Kern clearly teaches away from a blocking device that is transparent to normal operation of the host and storage device*. (*Id.* at 20 (emphasis added).)

The undersigned therefore finds that the '682 Applicants did indeed disclaim devices that would require reconfiguration. As Respondents rightly noted in their *Markman* presentation, there can be no clearer disavowal of claim scope than arguing that a certain prior art structure teaches away from the claimed invention. *See Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.,* 400 F.3d 910, 915 (Fed. Cir. 2005); *Am. Calcar, Inc. v. Am. Honda Motor Co.,* 651 F.3d at 1318, 1339-40 (Fed. Cir. 2011); *Omega Eng'g., Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed. Cir. 2003). As a result, the construction of "transparent to normal operation" must reflect Applicants' disclaimer. *See Omega Eng'g.,* 334 F.3d at 1324.

Accordingly, the undersigned hereby construes all of the "transparent" operation limitations to mean that *"the blocking device operates in a way that all normal operations of*

- 18 -

Exhibit 5
21

*the host and all normal operations of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device."*

   **b)**  **"interface emulator"**

  The term "interface emulator" appears in claims 1, 31, 32, 44, and 45 of the '682 patent. While the parties agree that the "interface emulator" mimics another interface, they disagree on the proper claim construction, and have proposed the following constructions:

| MyKey | Respondents | Staff |
|---|---|---|
| This claim term does not require construction and should be afforded its ordinary and customary meaning, which is "a component that emulates an interface" | A non-intelligent interface component that mimics another interface and operates with no reconfiguration of the host software | An interface component that mimics another interface and operates with no reconfiguration of the host software |

  MyKey argues that the term "interface emulator" is easily understood by one of ordinary skill, and as such, does not require construction. (CMIB at 17 ("One of ordinary skill in the art at the time of the invention would understand 'interface emulator' to simply mean a component that emulates an interface.").) MyKey objects to both Respondents' and Staff's constructions, disputing that any claim scope was surrendered in order to traverse *Kern* during prosecution of the '682 patent. (CMRB at 1-3 ("Nothing in this passage provides an unequivocal statement that the interface emulator of the '682 patent must be either intelligent or non-intelligent . . . nothing in this passage contains a disclaimer of any interface that operates with a change to, or reconfiguration of, the host software.").) Rather, MyKey contends that *Kern* was distinguished on the basis that it "does not disclose, suggest, or teach an interface emulator." (CMIB at 18-19 (citing '682 Prosecution History, 11/24/03 Amendment at 19 ("Although Kern discloses a 'controller interface 120,' the controller interface 120 of Kern does not emulate an interface presented by a storage device.")).) MyKey reiterates its argument against the "no reconfiguration" limitation set forth in regard to "transparent to normal operations," again

Exhibit 5
22

asserting that Staff and Respondents are improperly reading an advantage of the invention into

the claims.  (*Id.* at 21-23; CMRB at 3-5.)

Respondents dispute that the term "interface emulator" has a plain and ordinary

meaning,[6] and contend that the prosecution history requires that the term "interface emulator" be

construed as "a non-intelligent interface component that mimics another interface and operates

with no reconfiguration of the host software."  (RMIB at 17-18; RMRB at 2.)  Respondents

assert that an intelligent interface and reconfiguration were both unequivocally disavowed when,

in differentiating the claims of the '682 patent application from *Kern,* the applicants argued:

> Although Kern discloses a "controller interface 120," the controller
> interface 120 of Kern does not emulate an interface presented by a
> storage device. The interface 120 of Kern is described as "an
> intelligent digital input/output communication channel, or other
> interface suitable to the particular application." (Kern, col. 4, lines
> 48-50).  Nothing in Kern discloses or suggests that interface 120
> emulates the interface presented by storage device(s) 108.  Because
> Kern discloses host application programs 110-112 that are
> specifically designed to operate with controller 106, Applicants
> submit that there would be no need for interface 120 to emulate
> storage devices, as application programs 110-112 could be designed
> to operate with any 'intelligent digital input/output channel. Thus, if
> anything, Kern actually teaches away from this aspect of the
> invention.

(RMRB at 4-5 (citing '682 Prosecution History, 11/24/03 Amendment at 19); *see also* RMIB at

20-21.)  This passage, according to Respondents, distinguishes the '682 patent on the bases that

[1] *Kern's* interface was an intelligent input/output communication channel; and [2] *Kern*

"required the host computer to be configured with software specifically designed to operate with

the device."  (RMRB at 5.)

---

[6] Respondents note that, alone, the term "emulator" has a plain meaning to one of ordinary skill.  (RMIB at 17
(quoting the 1999 version of the Microsoft Computer Dictionary's definition of emulator as  "[h]ardware or software
designed to make one type of computer or component act as if it were another").)

Exhibit 5
23

Staff submits that "interface emulator" should be construed as "an interface component that mimics another interface and operates with no reconfiguration of the host software." (SMIB at 15; SMRB at 5-6.) Staff agrees with MyKey that there was no disclaimer of an intelligent interface emulator. (SMIB at 18.) In Staff's view, the statements relied upon by Respondents "do not rise to the level of a disclaimer of any device that is 'intelligent,'" but rather, describe why the controller in *Kern* would not need an interface emulator." (*Id.*) Staff, however, agrees with Respondents that the '682 "[a]pplicants disclaimed any possible interface emulator that reconfigures the host in any way." (*Id.* at 17.) In support, Staff relies on the '682 patent's discussion regarding blocking device 203, of which the interface emulator is a component. (*Id.* (quoting '682 patent at 5:32-36).) Staff further submits "that a blocking device that is required to reconfigure the host would not 'emulate' an interface to the host." (SMRB at 5-6 (arguing that implicit in "emulate" is that the blocking device must operate without reconfiguration).)

The parties agree that the "interface emulator" mimics another interface. (CMIB at 17; RMIB at 17-18; SMIB at 15.) The dispute therefore centers on whether the applicants disclaimed any reconfiguration of the blocking device and an "intelligent" interface component. The undersigned has already determined hereinabove that the applicants disclaimed any reconfiguration of the blocking device. (*See* Section V.B.2(a), *supra*.) The interface emulator is a component of the blocking device. (*See* '682 patent at 5:32-36.) Thus, because the claimed "interface emulator" is a component of the blocking device, its construction – like that of "transparent to normal operation" – must reflect the applicants' disclaimer.

As to whether the applicants disclaimed an "intelligent" interface component, the undersigned agrees with Staff and MyKey, finding that there was no prosecution history disclaimer. Rather than differentiating based on intelligent and non-intelligent interface

- 21 -

Exhibit 5
24

components, the Applicants drew a distinction based on *Kern*'s failure to disclose an interface emulator, stating: "Although Kern discloses a 'controller interface 120,' the controller interface 120 of Kern does not emulate an interface presented by a storage device." ('682 Prosecution History, 11/24/03 Amendment at 19.)  The Applicants then describe why the *Kern* controller interface — "an intelligent digital input/output communication channel, or other interface suitable to the particular application"— would not need such an interface.  (*Id.* (quoting *Kern* at 4:48-50 and reiterating that "[n]othing in Kern discloses or suggests that interface 120 emulates the interface presented by storage device(s) 108.")  Thus, contrary to Respondents' assertion, the passage relied upon by Respondents' and Applicants' use of the word "intelligent" therein to describe the *Kern* controller interface does not rise to the level of a "clear and unambiguous" disavowal of all intelligent interface components.  *See Seachange Int'l Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005) ("A disclaimer must be clear and unambiguous.").

Accordingly, the undersigned hereby construes the term "interface emulator" to mean "*an interface component that mimics another interface and operates with no reconfiguration of the host software.*"

- 22 -

Exhibit 5
25

    **c)**    **"interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host"**

The term "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host" appears in claim 1 of the '682 patent. The parties disagree on the proper claim construction, and construe the term as follows:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This claim term does not require construction and should be afforded its ordinary and customary meaning | A non-intelligent interface component, separate from the processor, configured to present to the host an interface identical to the interface of the storage device connected to the blocking device, and that operates with no reconfiguration of the host software | None |

MyKey submits that no construction is necessary as the meaning of this term is readily apparent to one of ordinary skill in the art. (CMIB at 24.) MyKey reiterates its objection to Respondents' contention that the "interface emulator" must be non-intelligent and that it operates with no change to the host software. (*Id.*) MyKey also objects to Respondents' requirement that the interface to the host be "identical" to the interface to the storage device, arguing that the claim language and other intrinsic evidence include no such requirement. (*Id.*) In addition, MyKey claims that the "'682 patent explicitly teaches that the host interface may be an IEEE 1394 connection and that the storage device interface may be an IDE connection, which is not identical to the IEEE 1394 connection." (*Id.* at 24-25.) Thus, one of ordinary skill in the art, MyKey asserts, would understand that the interface presented to the host may not be identical to the interface of the storage device connected to the blocking device. (*Id.* at 25 (citing MyKey Ex. 4, Berg Rebuttal Rpt. at 7).)

- 23 -

Exhibit 5
26

Respondents assert that this term requires the interface emulator to be separate from the processor and configured to present to the host an interface identical to the interface of the storage device connected to the blocking device. (RMRB at 8.)  In response to MyKey's arguments, Respondents contend that nowhere in the specification is a non-identical interface structure disclosed and supported.  (*Id.* at 9 (arguing that the invention does not allow, as MyKey alleges, for a first type of interface (*e.g.*, IEEE 1394 interface) on the blocking device to connect with a second type of interface (*e.g.*, IDE interface) on the host computer).)  Respondents also contend that claim 45 does not implicate the doctrine of claim differentiation for the claim was added late in prosecution and thus, does not qualify as supporting disclosure.  (*Id.* at 10.)

In the Staff's view, "[t]he requirements that the claimed 'interface emulator' mimic an interface and that the blocking device be 'transparent to normal operation' each set forth the only type of interaction required by the claim."  (SMRB at 6.)  Staff therefore submits that the additional language proposed by Respondents is "not necessary and is, to some extent, redundant."  (*Id.*)

The undersigned has already construed the term "interface emulator" as an "an interface component that mimics another interface and operates with no reconfiguration of the host software."  (*See* Section V.B.2(b), *supra*.)  Thus, only "configured to emulate an interface presented by a storage device and configured to connect to a host" need be construed.  In this regard, the undersigned agrees with MyKey and Staff, finding this language to be plain on its face.[7]  The undersigned therefore declines to include Respondents' "identical" limitation in the construction of this term.

_____

[7] The undersigned notes that Respondents, in their *Markman* presentation, concede that construction of this term is redundant.  (*See* RDX-682-36 (stating that they agree that construction of this term is redundant, but "seek to clarify the relationship of the emulator to the host and the storage device.").)

Exhibit 5
27

Accordingly, the undersigned hereby construes the phrase "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host" to have its plain and ordinary meaning.

> d)      "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands"

The phrase "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands" appears in claim 40 of the '682 patent. The parties agree that this term is subject to 35 U.S.C. § 112(6) and also agree on the claimed function. The parties, however, disagree on the structure, and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| Function: The parties agree that the function is the claim language<br><br>Structure: a processor programmed to perform steps 420, 440, and 460 in Fig. 4, and equivalents thereof. | Function: The parties agree that the function is the claim language<br><br>Structure: a processor programmed to perform steps 420, 440, 450, and 460 in Fig. 4, and equivalents thereof. | Function: The parties agree that the function is the claim language<br><br>Structure: a processor programmed to perform steps 420, 440, 450, and 460 in Fig. 4, and equivalents thereof. |

The parties' dispute centers on whether this limitation requires a processor to perform step 450 in Figure 4 of the '682 patent. Respondents and Staff believe it does. MyKey believes it does not.

MyKey contends that algorithm step 450 relates to a capabilities request and is therefore not relevant to "means for comparing commands in the communications between the host and storage device to a predetermined set of commands." (CMIB at 29.) MyKey cites to dependent claim 42 in support, arguing that claim 42 is the claim directed to the embodiment of the invention relating to the capabilities requests. (*Id.*) In particular, MyKey states:

- 25 -

Exhibit 5
28

Claim 42, which depends from claim 40, further limits the invention
of claim 40 by reciting "wherein the commands forwarded to the
storage device include a capabilities request command." If the
scope of "means for comparing commands" . . . must be limited by
requiring a capabilities request command, as Respondents and Staff
contend, the limitation of claim 42 "wherein the commands
forwarded to the storage device include a capabilities request
command" would be completely superfluous.

(CMRB at 13.) MyKey further argues that under the doctrine of claim differentiation, it is

improper for Respondents to import a limitation (*i.e.*, step 450) from a dependent claim into the

dependent claim from which it depends. (*Id.*)

Respondents assert that the specification expressly describes the "capabilities request

command" of step 450 as part of the algorithm defining the structure for this term. (RMIB at 29

(quoting '682 patent at 6:34-7:3); RMRB at 17-19.) Respondents insist that it is improper for

MyKey to "arbitrarily" remove the capabilities request command (step 450) from the algorithm.[8]

(*Id.*) Removing step 450 from the algorithm would not only result in an incomplete process in

Figure 4, but also, Respondents argue, reject express language in the specification describing this

part of the algorithm. (RMIB at 29 (citing '682 patent at 6:34-7:3); RMRB at 19 (arguing that

either both step 440 and 450 are necessary components or neither step is necessary and since

MyKey has conceded that step 440 is necessary, step 450 is also necessary).)

Staff, like Respondents, believes step 450 is required by the claimed function. (SMIB at

19.) Staff submits that "[b]ecause the claim language refers to 'a predetermined *set* of

command*s*,'" meaning more than one command, it is the Staff's view that steps associated with

the only two disclosed commands (*i.e.,* the read command and the capabilities request command)

must be included in the corresponding structure. (SMIB at 21 (emphasis original); SMRB a 7.)

---

[8] To the extent MyKey argues that capabilities requests are not commands, Respondents contend that the term
"capabilities request" is repeatedly described as a "command" throughout the specification. (RMIB at 30 (citing
'682 patent at 6:3-6, 6:52-55).)

- 26 -

Exhibit 5
29

Staff explains that without the capabilities request step 450, there would be no "predetermined set of commands," as required by the claim; instead, "[t]here would be only one pre-approved command – the read command." (*Id.*) Staff further asserts that MyKey's claim differentiation argument must fail because dependent claim 42 adds the structure of step 480, which is not part of the Staff's construction (or Respondents') for this term.[9] (SMIB at 21; SMRB at 7 ("step 480 differentiates the Staff's construction of independent claim 40 and dependent claim 42.").)

All parties agree that the relevant disclosure of the corresponding structure is set forth in Figure 4:



('682 patent at Fig. 4.)  The parties also agree that the "means for comparing" must include a processor programmed to perform steps 420, 440, and 460.  As discussed *supra*, the sole dispute among the parties is whether this limitation requires a processor to perform step 450.  The

---

[9] Respondents adopt Staff's position rejecting MyKey's claim differentiation argument.  (RMRB at 19.)

Exhibit 5
30

undersigned agrees with Respondents and Staff, finding the specification to be dispositive. *See*

*Phillips*, 415 F.3d at 1315.

The algorithm shown in Figure 4 is described in the specification as follows:

> FIG. 4 is a flow chart illustrating the operation of blocking device
> 203 in additional detail. To begin, host 201 communicates a
> command to drive 205 (act 400). The blocking device 203 captures
> and holds communications until they are examined (act 410). The
> communication is examined for whether it is a write or format
> command and/or any command that changes data on the drive 205.
> If yes, the command and any associated data is accepted by
> blocking device 203, and then discarded, blocking it from the
> protected drive 205 (acts 420 and 430). Because the blocking
> device 203 accepts the command and any data associated with the
> command, such as the data the host 201 intends to write to drive
> 205, the host 201 believes the command and associated data has
> been successfully sent to drive 205.
>
> Host communications that are not data changing commands are
> examined to determine if they are read commands (act 440). If it is
> a read command, embedded processor 330 passes the command to
> the protected drive 205 and any returned data is passed to host 201
> (act 470). ***If the command is not a read command, embedded
> processor 330 examines the command to determine if it is a
> capabilities request (act 450). If the command is a capabilities
> request, embedded processor 330 reports the drive's capabilities
> back to host 201 (act 480).*** In some cases, certain drive capabilities
> may be modified by the processing time required by blocking
> device 203. Accordingly, in this situation, embedded processor 330
> may modify the reported capabilities to reflect the actual capability
> of the drive 205 including any latency introduced by blocking
> device 203 (act 480). For example, embedded processor 330 may
> report back the actual drive storage space but may report a
> modified drive throughput rate that reflects any delay introduced
> by the blocking device 203. Finally, if the command is not
> recognized by embedded processor 330, the embedded processor
> 330 may discard the command (act 460). By discarding non-
> recognized commands, embedded processor 330 can ensure that
> only safe commands are passed.

('682 patent at 6:34-7:3 (emphasis added).)  As this passage makes clear, the algorithm disclosed

in Figure 4 expressly *includes* the capabilities request command (step 450).  In other words,

- 28 -

Exhibit 5
31

nothing in the '682 patent suggests that this part of the algorithm is, as MyKey wrongly suggests, optional.

MyKey attacks Respondents' and Staff's construction under the doctrine of claim differentiation. The undersigned finds MyKey's arguments unpersuasive. Claim 42 defines a specific algorithm for forwarding data in step 480 if the step 450 capabilities request command comparison is a match. Because step 480 is not part of Staff's or Respondents' construction, adopting their construction will not result in claim 40 and 42 having identical scope. Moreover, as the Federal Circuit has noted, "claim differentiation is a rule of thumb but does not trump the clear import of the specification." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("the doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence.").

Accordingly, the undersigned hereby construes the term "means for comparing commands in the communications between the host and the storage device to a predetermined set of commands" as:

| | |
|---|---|
| **Function:** | ***comparing commands in the communications between the host and the storage device to a predetermined set of commands*** |
| **Structure:** | ***a processor programmed to perform steps 420, 440, 450, and 460 in Fig. 4 and equivalents thereof.*** |

- 29 -

Exhibit 5
32

e)   **"means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the device"**

The phrase "means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device" appears in claim 40 of the '682 patent.  The parties agree that this element should be construed under § 112(6) and also agree on the claimed function.  The parties, however, disagree on the corresponding structure[10], and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| Function:  The parties agree that the function is  forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device | Function:  The parties agree that the function is forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device | Function:  The parties agree that the function is forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device |
| Structure:  a processor programmed to perform step 470 in Fig. 4, and equivalents thereof. | Structure:  a processor programmed to perform steps 470 and 480 in Fig. 4, and equivalents thereof. | Structure:  a processor programmed to perform steps 470 and 480 in Fig. 4, and equivalents thereof. |

The parties have proffered essentially the same arguments here as they did for the "means for comparing" limitation.  Like that limitation, the parties agree that support in the specification is found in Figure 4 of the '682 patent and that the "means for forwarding" must include a processor programmed to perform step 470.  The sole point of dispute is whether step 480 is required by the claimed function.  Staff and Respondents insist that the "capabilities request" command (step 480) should be part of the algorithm.  MyKey disagrees.

In the undersigned's view, Figure 4 makes clear that the algorithm expressly *includes* the capabilities request command (step 480).

---

[10] The corresponding structure set forth herein differs from the one originally proposed (and briefed) by the parties.  As the parties noted at the *Markman* hearing, "there was an error that was shared by MyKey, by [Respondents], and also by the Staff attorney, concerning the steps that are supposed to be in the corresponding structure related to that claim function for the 'means for forwarding' term."  (1/19/12 Tr. at 137:19-24.)

- 30 -

Exhibit 5
33



Fig. 4

('682 patent at Fig. 4.)  The specification, in describing Figure 4, confirms that step 480 is indeed required by the claimed function:

> FIG. 4 is a flow chart illustrating the operation of blocking device 203 in additional detail. To begin, host 201 communicates a command to drive 205 (act 400). The blocking device 203 captures and holds communications until they are examined (act 410). The communication is examined for whether it is a write or format command and/or any command that changes data on the drive 205. If yes, the command and any associated data is accepted by blocking device 203, and then discarded, blocking it from the protected drive 205 (acts 420 and 430). Because the blocking device 203 accepts the command and any data associated with the command, such as the data the host 201 intends to write to drive 205, the host 201 believes the command and associated data has been successfully sent to drive 205.
>
> Host communications that are not data changing commands are examined to determine if they are read commands (act 440). If it is a read command, embedded processor 330 passes the command to the protected drive 205 and any returned data is passed to host 201 (act 470). ***If the command is not a read command, embedded processor 330 examines the command to determine if it is a capabilities request (act 450). If the command is a capabilities***

- 31 -

Exhibit 5
34

> ***request, embedded processor 330 reports the drive's capabilities***
> ***back to host 201 (act 480).*** In some cases, certain drive capabilities
> may be modified by the processing time required by blocking
> device 203. Accordingly, in this situation, embedded processor 330
> may modify the reported capabilities to reflect the actual capability
> of the drive 205 including any latency introduced by blocking
> device 203 (act 480). For example, embedded processor 330 may
> report back the actual drive storage space but may report a
> modified drive throughput rate that reflects any delay introduced
> by the blocking device 203. Finally, if the command is not
> recognized by embedded processor 330, the embedded processor
> 330 may discard the command (act 460). By discarding non-
> recognized commands, embedded processor 330 can ensure that
> only safe commands are passed.

(*Id.* at 6:34-7:3 (emphasis added).)

MyKey again attacks Respondents' and Staff's construction under the doctrine of claim

differentiation.  For MyKey's argument to succeed, claim 40 and 42 must be identical in scope

under Respondents' and Staff's proposed construction.  Claim 40, however, encompasses both

the read command and the capabilities request command and both of those associated means for

forwarding those commands.  In contrast, claim 42 only addresses the step 450 capabilities

request command the associated means for forwarding that command.  Because claim 40 is

broader than claim 42, MyKey's claim differentiation argument fails.  Furthermore, as the

undersigned noted hereinabove, while claim differentiation is a "rule of thumb," it does not

"trump the clear import of the specification."  *Eon-Net LP*, 653 F.3d at 1323.

Accordingly, the undersigned hereby construes the "means for forwarding commands in

the communications between the host and the storage device to a predetermined set of

commands" as:

> **Function:** ***forwarding selected ones of commands in the intercepted***
> ***communications to the storage . . . known to not permanently modify a***
> ***state of the storage device***

- 32 -

Exhibit 5
35

> **Structure:** *a processor programmed to perform steps 470 and 480 in Fig. 4, and equivalents thereof.*

## VI.    THE '086 PATENT

### A.    Overview

The '086 patent is entitled "Systems And Methods For Creating Exact Copies Of

Computer Long-Term Storage Devices." The '086 patent issued on January 2, 2007 to named

inventors Steven Bress and Mark Joseph Menz and was subsequently assigned to MyKey. The

'086 patent describes a device for creating exact copies of computer long-term memory devices.

('086 patent at Abstract.) The '086 patent has 21 claims of which MyKey has asserted claims 1–

9, 13–18, and 20–21. Claims 1 and 18 are independent claims. The asserted claims read as

follows (with the first instance of the agreed-upon terms highlighted in *italics* and the first

instance of the disputed terms highlighted in **bold**):

1.    A **stand-alone, dedicated function device** for making exact copies of long-term memory
      devices comprising: an interface for connecting to a storage device (source); one or more
      interfaces for connecting to the storage device(s) (destination); wherein the interfaces are
      electronically isolated from each other through the use of separate interface circuitry for
      each interface; a *user controllable switch* that, when actuated by a user, causes the device
      to commence a copy; and a control circuit coupled to the interface (source) and the
      interface(s) (destination), the **control circuit issuing commands to**: compare the size of
      the source device to the size of a destination device and communicate result to a user,
      open *hidden areas* on the source device, make an *exact copy* of the storage device
      connected to the interface (source), **read and compare data on the source and
      destination devices** and communicate result to a user, **restore the source drive to its
      original condition**, wherein the copying device is operating system independent.

2.    The copying device of claim 1, wherein a user controllable switch is connected to the
      control circuit to interrupt the verification procedure.

3.    The copying device of claim 1, wherein the interface is an integrated device electronics
      (IDE) interface for a disk drive.

4.    The copying device of claim 1, wherein the hidden area the control circuit removes or
      modifies is a Host Protected Area (HPA).

5.    The copying device of claim 1, wherein the hidden area the control circuit removes or
      modifies is Device Configuration Overlay settings (DCO).

- 33 -

Exhibit 5
36

6.   The copying device of claim 1, wherein the control circuit sets the size of a copied device to the size of a source device.

7.   The copying device of claim 1, further comprising: one or more additional interfaces for connecting to display and/or output devices, to produce a report.

8.   The copying device of claim 1, wherein the control circuit writes a standard bit pattern on a copy device to indicate unreadable data on the source device.

9.   The copying device of claim 1, further including light emitting diodes (LEDs) coupled to the control circuit and configured to transmit status information relating to the status of the copying device.

13.  The copying device of claim 1, further comprising: a casing configured to contain the control circuit and the interface, the user controllable switch being mounted on the casing, the casing being of a size that is portable by the user.

14.  The copying device of claim 13, further comprising: cables emanating from the casing and connected to the interfaces, the cables being configured to connect to long-term memory devices.

15.  The copying device of claim 14, wherein the cables are Integrated Device Electronics (IDE) cables.

16.  The copying device of claim 1, further comprising: a power supply configured to supply power to the control circuit.

17.  The device of claim 16, further comprising: drive power cords emanating from the casing and configured to supply power from the power supply to the long-term memory components.

18.  A stand-alone, dedicated function copying device comprising: *means for interfacing with a source drive*, wherein the source device is protected from accidental state changes; *means for interfacing with one or more destination devices*; *means initiating the copying procedure*; *means for comparing the size of the source device to the size of a destination device and communicating result to a user*; **means for opening hidden areas on the source device**; *means for making an exact copy*; *means for reading and comparing the data on the source and destination devices and communicating result to a user*; **means for restoring the source device to its original condition**, wherein the copy device is operating system independent.

20.  The copying device of 18, further comprising: *means for indicating areas on a source device that were unreadable*.

21.  The copying device of 1, wherein the source and destination devices have different interfaces.

- 34 -

Exhibit 5
37

**B.      Agreed-Upon and Disputed Claim Terms**

    **1.      Construction of Agreed-Upon Claim Terms**

        **a)      "exact copy"**

The parties agree that the term "exact copy," which appears in claims 1–9, 13–18, and 20–21, should be construed as "a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas."  (JC at 4.)

The undersigned hereby adopts the parties' proposed construction and shall construe "exact copy" to mean "*a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas.*"

        **b)      "hidden areas" and "hidden area"**

 The parties agree that the terms "hidden areas" and "hidden area," which appear in claims 1–9, 13–18, and 20–21, should be construed as "an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay."  (*Id.*)

The undersigned hereby adopts the parties' proposed construction and shall construe the terms "hidden area" and "hidden areas" and to mean "*an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay.*"

        **c)      "user controllable switch"**

The parties agree that the term "user controllable switch," which appears in claims 1–9, 13–17, and 21, should be construed as "a switch that can be controlled by a user of the device." (*Id.*)

- 35 -

Exhibit 5
38

The undersigned hereby adopts the parties' proposed construction and shall construe the term "user controllable switch" to mean "*a switch that can be controlled by a user of the device.*"

### d)     "means for interfacing with a source drive"

For the term "means for interfacing with a source drive," which appears in claims 18 and 20, the parties agree that the function is "interfacing with a source drive" and the corresponding structure is "Source drive interface circuitry 1030, Interface connector 1040, and Drive cable 610 in Figs. 1 and 6, and equivalents thereof." (*Id.* at 4-5.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for interfacing with a source drive" as:

> **Function:**    *interfacing with a source drive*
>
> **Structure:**   *Source drive interface circuitry 1030, Interface connector 1040, and Drive cable 610 in Figs. 1 and 6, and equivalents thereof.*

### e)     "means for interfacing with one or more destination devices"

For the term "means for interfacing with one or more destination devices," which appears in claims 18 and 20, the parties agree that the function is "interfacing with one or more destination devices" and the corresponding structure is "Destination drive interface circuitry 1050, Interface connector 1060, and Drive cable 630 in Figs. 1 and 6, and equivalents thereof." (*Id.* at 5.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for interfacing with one or more destination devices" as:

> **Function:**    *interfacing with one or more destination drives*
>
> **Structure:**   *Destination drive interface circuitry 1050, Interface connector 1060, and Drive cable 630 in Figs. 1 and 6, and equivalents thereof.*

- 36 -

Exhibit 5
39

### f)  "means [for] initiating the copying procedure"

For the term "means [for] initiating the copying procedure," which appears in claims 18 and 20, the parties agree that the function is "initiating the copying procedure" and the corresponding structure is "a switch and equivalents thereof."  (*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means [for] initiating the copying procedure" as:

**Function:**  *initiating the copying procedure*

**Structure:**  *a switch and equivalents thereof.*

### g)  "means for comparing the size of the source device to the size of a destination device and communicating result to a user"

For the term "means for comparing the size of the source device to the size of a destination device and communicating result to a user," which appears in claims 18 and 20, the parties agree that the function is "comparing the size of the source device to the size of a destination device and communicating result to a user" and the corresponding structure is "(a) processor 4010 or 7000 programmed to perform steps 3020, 3040, 3050 of Fig. 3, and (b) status LEDs 4020 in Fig. 4, or a printer, printer communication circuitry 1090 and printer communication interface 1100, and equivalents thereof."  (*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for comparing the size of the source device to the size of a destination device and communicating result to a user" as:

**Function:**  *comparing the size of the source drive to the size of a destination device and communicating result to a user*

**Structure:**  *(a) processor 4010 or 7000 programmed to perform steps 3020, 3040, 3050 of Fig. 3, and (b) status LEDs 4020 in Fig. 4, or a printer, printer communication circuitry 1090 and printer communication interface 1100, and equivalents thereof.*

- 37 -

Exhibit 5
40

h)      **"means for making an exact copy"**

For the term "means for making an exact copy," which appears in claims 18 and 20, the parties agree that the function is "making an exact copy" and the corresponding structure is "a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof." (*Id.*)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for making an exact copy" as:

**Function:**      *making an exact copy*

**Structure:**     *a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof.*

i)      **"means for reading and comparing the data on the source and destination devices and communicating result to a user"**

For the term "means for reading and comparing the data on the source and destination devices and communicating result to a user," which appears in claims 18 and 20, the parties agree that the function is "reading and comparing the data on the source and destination devices and communicating result to a user" and the corresponding structure is "a processor programmed to perform step 3075 in Fig. 3, and equivalents thereof." (*Id.* at 6.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for reading and comparing the data on the source and destination devices and communicating result to a user" as:

**Function:**      *reading and comparing the data on the source and destination devices and communicating results to a user*

**Structure:**     *a processor programmed to perform steps 3075 in Fig. 3, and equivalents thereof.*

- 38 -

Exhibit 5
41

j)    **"means for indicating areas on a source device that were unreadable"**

For the term "means for indicating areas on a source device that were unreadable," which appears in claim 20, the parties agree that the function is "indicating areas on a source device that are unreadable" and the corresponding structure is "a processor 4010 or 7000, and status LEDs 4020 in Fig. 4, or a printer, Printer Communication Circuitry 1090 and Printer Communication Interface 1100, and equivalents thereof." (*Id.* at 6.)

Accordingly, the undersigned hereby adopts the parties' proposed construction and shall construe "means for indicating areas on a source device that were unreadable" as:

*Function:*    *indicating areas on a source device that are unreadable*

*Structure:*    *a processor 4010 or 7000, and status LEDs 4020 in Fig. 4, or a printer, Printer Communication Circuitry 1090 and Printer Communication Interface 1100, and equivalents thereof.*

2.    **Construction of Disputed Claim Terms**

a)    **"stand-alone, dedicated function [copying] device"**

The term "stand-alone, dedicated function [copying] device" appears in claims 1–9, 13–18, and 20–21 of the '086 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term should be afforded its plain and ordinary meaning: "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long term memory devices." | A physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long-term memory devices without additional hardware or software components, and not reconfigurable to perform any other function by an end user. | This is a limitation that should be given its plain and ordinary meaning: "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software [are] dedicated to making exact copies of long term memory devices." |

- 39 -

Exhibit 5
42

MyKey argues that this term is not a claim limitation and thus does not require construction because it appears in the preamble of independent claims 1 and 18 and the body of the claims recites a structurally complete invention without the preamble.  (CMIB at 30.) MyKey asserts that if the undersigned determines this term is indeed a limitation, then its construction is preferable because Respondents add limitations to this term that are lacking in both the claims and specification.  (*Id.* at 32; CMRB at 15.)  To counter Respondents' added limitation of "not reconfigurable to perform any other function by an end user," MyKey points to the specification as reciting both an example of a prior-art stand-alone device that is reconfigurable, (CMIB at 32 (citing '086 patent at 1:48-57)), as well as reconfigurable aspects of the '086 invention, such as printing or bit pattern parameters, (*id.* at 33 (citing '086 patent at 10:22-27)).  MyKey also disagrees with Respondents' inclusion of "without additional hardware or software components" to define "dedicated function" because the specification recites components such as a printer that connect to the device.  (*Id.*)

Respondents argue that their inclusion of "without additional hardware or software components, and not reconfigurable to perform any other function by an end user" is consistent with the plain and ordinary meaning of the term "stand alone, dedicated function."  (RMIB at 34.)  In support, Respondents cite the Microsoft Computer Dictionary as defining "dedicated" as "devoted to a single task" and argue that their construction is consistent with MyKey's and Staff's construction of the same term in the '379 patent.  (*Id.*)  Furthermore, Respondents argue that MyKey's construction is erroneous because it proposes that any device can be a dedicated function device, including the prior art devices listed in their prosecution history, so long as one of those functions is copying.  (RMRB at 22-23.)  Respondents also argue that the specification defines prior art long-term memory devices as (1) dedicated stand-alone devices and (2) non-

- 40 -

Exhibit 5
43

dedicated devices that employ software on a PC, asserting that MyKey's invention is a sub-class

of "dedicated stand-alone devices" that is uniquely "dedicated function" devices.  (RMIB at 35

(citing '086 patent at 1:38-58).)

   Staff argues that the phrase in the preamble of claims 1 and 18 "stand-alone, dedicated

function" is a claim limitation because it was added during prosecution of the '086 patent to limit

the claim scope.  (SMIB at 40.)  Staff argues that its construction of this limitation in the '086

patent is different from that in the '379 patent because (1) the patents are not of the same

ancestry and (2) the '379 specification defines the phrase in detail whereas the plain meaning is

sufficient for the '086 patent.  (*Id.* at 40-41.)  Staff disagrees with Respondents' assertion that

Staff's construction is circular because one skilled in the art would understand the plain meaning

of having "hardware and software dedicated to making exact copies of long term memory

devices."  (*Id.* at 42.)  Further, Staff asserts that neither the claim language nor the specification

require Respondents' additional limitations.  (SMRB at 14-15.)

   The undersigned finds Staff's arguments persuasive.  This term is indeed a claim

limitation, despite appearing in the preamble, because deletion of the preamble "phrase does

[affect] the structure or steps of the claimed invention." *Catalina Mktg., Int'l v.

Coolsavings.com*, 289 F.3d 801, 809 (Fed. Cir. 2002).  Here, the specification of the '086 patent

repeatedly refers to a "stand-alone, dedicated function device" as possessing particular attributes

that are reflected in its structure.  For instance, the invention is "operating system independent,"

('086 patent at 2:19-20), portable, (*id.* at 9:64-65), and requires structure that can implement

logic such that the "copying device does not require that the operator have any particular

knowledge of the source device" (*id.* at 10:7-8; *see also id.* at Figs. 4-5 (disclosing structure of an

operating-system independent preferred embodiment)).  These excerpts from the specification

- 41 -

Exhibit 5
44

also support Staff's construction that the devices in claims 1 and 18 are "not a general purpose computer system" that operates via operating system software. (*See also id.* at 10:31-39.) MyKey's reliance on the '379 prosecution history carries little weight because the prosecution history of that patent is extrinsic evidence to the '086 patent. *Phillips*, 415 F.3d at 1317 (holding that extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history).

For the reasons set forth below, Staff's construction (and MyKey's alternate proposed construction) that claims 1 and 18 have "hardware and software [that] is dedicated to making exact copies of long term memory devices" shall be adopted. All parties agree that the claim construction should include the language: "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long-term memory devices." (JC at 6-7.) Respondents, however, propose the inclusion of the additional phrase "without additional hardware or software components, and not reconfigurable to perform any other function by an end user."

The '086 patent describes a stand-alone, dedicated function device that can be reconfigured by a user, including reconfiguring it to perform variations on its functionality, such as (1) copy only, (2) copy while scanning for one or more bit patterns, or (3) scanning only for one or more bit patterns:

> Additionally, the copying device may be *configured* to display a report of the copying process and information about the devices involved. The copying device may be 25 *configured* to accept one or more bit patterns to scan during the copying process. The copying device may be further *configured* to perform a scan only.

- 42 -

Exhibit 5
45

('086 patent at 10:22-27 (emphasis added).)  Thus, Respondents' proposal to add the language
"not reconfigurable to perform any other function by an end user" is not persuasive.

Respondents' contention that the stand-alone, dedicated function [copying] device must
perform its function "without additional hardware or software components" is also incorrect.
The '086 patent describes the use of "additional components," such as a printer, that is used in
conjunction with the stand-alone, dedicated function [copying] device to perform its function:

> For additional detailed status, a printer may be connected to
> the device through communication port 4120.  Information
> sent to the printer may include Drive identification
> information to uniquely identify the drive being copied.
> Should any errors occur, such as a bad sector on the Source
> disk, the sector number may be printed.

(*Id.* at 7:39-44; *see also id.* at 2:35-39, 2:47, Figs. 1 and 2.)  Therefore, Respondents' proposal to
add the phrase "without additional hardware or software" shall also not be adopted.

Accordingly, the undersigned hereby construes "stand-alone, dedicated function
[copying] device" according to its plain and ordinary meaning, which is "***a physical device,
which is not a general purpose computer system, that stands apart from the source drive and
the one or more destination devices whose hardware and software are dedicated to making
exact copies of long term memory devices***."

    **b)**  **"control circuit issuing commands to . . . read and compare
data on the source and destination devices"**

The term "control circuit issuing commands to . . . read and compare data on the source
and destination devices" appears in claims 1–9, 13–17, and 21 of the '086 patent.  The parties
disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| The claim term does not require construction and should be afforded its ordinary and customary meaning. | Commands are issued to the source and destination devices so that, on a unit by unit basis, each unit of data on the source device | This claim term does not require construction and should be given its ordinary and customary meaning, which is: "a circuit |

- 43 -

Exhibit 5
46

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| | is read and compared with each unit of corresponding data on the destination device. | coupled between the source interface and the destination interface(s), which issues commands to read the data from the source drive, read the data from the destination device(s), and compare the data read from the source drive with the data read from the destination device(s)." |

MyKey argues that this claim term does not require construction because its meaning is apparent to one skilled in the art. (CMIB at 34.) MyKey asserts that Respondents' construction improperly limits the claim to a single embodiment as the claim itself and specification do not require a "unit by unit" comparison. (*Id.* at 35.) MyKey cites the specification as not restricting the reading function to a particular embodiment because it states that "[a]s technology evolves, the preferred embodiment of this invention is likely to as well." (*Id.* (quoting '086 patent at 9:14-15).) As an example, MyKey proposes that the present invention could compare data using a hash checksum algorithm or by reading the error code of the destination device. (*Id.*) MyKey also rejects the Staff's construction because it improperly limits the claim to a specific type of comparison between source and destination devices where *all* data must be compared. (*Id.* at 36.) Rather, MyKey supports a broad conception of "read and compare" where only some of the drives' data can be compared. (*Id.*)

Respondents argue that their construction clarifies that data are read and compared on a unit-by-unit basis. (RMIB at 43.) Respondents cite the specification as stating that "every byte in every sector" of the source drive is read and compared to the corresponding byte/sector in the destination drive. (RMIB at 43 (quoting '086 patent at 6:17-22, Fig. 3).) Respondents also argue that the device makes an exact copy, requiring the device to read and compare the entire copy. (*Id.* at 44.) Respondents assert that MyKey's arguments are erroneous because MyKey fails to

- 44 -

Exhibit 5
47

provide a construction for the disputed term and MyKey's examples, including comparing a hash checksum, ignore the claim limitation that the comparison be made using "data on" the drives. (RMRB at 39.)

Staff agrees with MyKey that Respondents improperly narrow the claim via its "unit by unit" limitation because that limitation is neither required by the claim nor the specification. (SMIB at 43.) Rather, Staff asserts that the claim merely requires that the device compare the data without restriction on the particular manner of doing so, agreeing with MyKey's alternative examples of data comparison. (*Id.*) However, Staff asserts that MyKey's construction is too broad because the specification requires that the data are copied exactly from the storage device, which means *all* data stored on the storage device. (*Id.* at 44 (citing '086 patent at 6:16-20).)

The undersigned agrees with Staff's construction, which is consistent with the specification's description of the device's reading and comparing control circuitry. *Phillips*, 415 F.3d at 1313. The specification does not limit this term to a particular embodiment, thereby precluding Respondents' construction that the data must be compared on a unit-by-unit basis. ('086 patent at 9:7-15.) That the '086 patent only discloses an embodiment with a unit by unit comparison is not determinative of this issue. *See Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("even when a patent describes only a single embodiment, claims will not read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction."). The language in the construction adopted herein that the "circuit [is] coupled between the source interface and the destination interface(s)" is accurate in light of the general structure of the device as disclosed in Figure 6 of the '086 patent.

- 45 -

Exhibit 5
48

Additionally, the undersigned finds that the construction adopted requires the conclusion that the device reads and compares *all* of the data on the source and destination drives because of the parties' agreed construction of "exact copy," a term appearing in independent claim 1.  ('086 patent at 10:56.)

Accordingly, the undersigned hereby construes "control circuit issuing commands to . . . read and compare data on the source and destination devices" as "*a circuit physically coupled between the source interface and the destination interface(s), which issues commands to read the data from the source drive, read the data from the destination device(s), and compare the data read from the source drive with the data read from the destination device(s)*."

        **c)**     **"control circuit issuing commands to . . . restore the source drive to its original condition"**

The term "control circuit issuing commands to . . . restore the source drive to its original condition" appears in claims 1–9, 13–17 and 21 of the '086 patent.  The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This claim term does not require construction and should be afforded its plain and ordinary meaning, which is "a circuit coupled between the source interface and the destination interface(s), which issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive." | Commands are issued to the source drive, automatically after copying, to restore the drive to its unaltered state after the source device has been altered to provide access to hidden areas. | Plain and ordinary meaning, which is "a circuit coupled between the source interface and the destination interface(s), which issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive." |

MyKey argues that its construction, in agreement with Staff's, is the plain and ordinary meaning of the claim term.  (CMIB at 38.)  MyKey asserts that Respondents' inclusion of the limitation "*automatically* after copying" (emphasis added) is improper as neither the claim nor

- 46 -

Exhibit 5
49

the specification require automatic commands after copying.  (*Id.*)  Rather, MyKey argues that the '086 patent's specification discloses one embodiment where such commands are issued *prior* to copying and another where verification can be cancelled by the user, precluding automatic operation.  (*Id.* (citing '086 patent at 4:54-58, 5:13-19).)  Similarly, MyKey asserts that Respondents' construction is wrong to require that the verification commands are issued after the copying commands because the intrinsic evidence has no such limitation.  (*Id.* at 39.)

Respondents argue that their construction is similar to Staff's except that the restore commands are issued automatically after copying.  (RMIB at 45.)  One reason for the "automatic" limitation, Respondents argue, is the '086 patent's criticism of devices that do not automatically copy and restore.  (*Id.* at 45-46.)  Respondents also stress that the order of the copying, verification, and restoration steps is important because, otherwise, the device would not restore all changes properly.  (*Id.*)  Further, Respondents argue that MyKey is wrong to imply that the fact that a command can be cancelled is tantamount to the command never having been issued.  (*Id.* at 46.)

Staff agrees with MyKey that the plain and ordinary meaning of this claim term suffices, and that MyKey's and Staff's constructions properly include "the power-on restoration embodiment" where restoration of HPA areas occurs after a power on/off cycle.  (SMIB at 48-49 (quoting '086 patent at 4:54-58).)  Staff disagrees with Respondents' construction because although it is consistent with the specification, the intrinsic evidence does not require the "automatic" limitation.  (*Id.* at 49.)  However, Staff agrees with Respondents' argument that the phrase "original condition" in claim 1 requires the restoration operation to be performed *after* the hidden area is accessed to allow for copying.  (*Id.* at 50.)

- 47 -

Exhibit 5
50

The undersigned agrees with Staff's construction, finding its proposed construction does not improperly limit the device to automatic restoration. *Vitronics*, 90 F.3d at 1580 (holding that the plain meaning of a claim term controls unless the patentee disavows that full scope of a claim term in the intrinsic evidence). The undersigned also agrees with Staff's construction including the language "a circuit coupled between the source interface and the destination interface(s)" because that language is consistent with the general, broad device design disclosed in the '086 patent where there are three basic elements, as shown in Figure 6 (*i.e.*, the source disk drive, the copying device, and the destination disk drive). ('086 patent at Fig. 6.) Similarly, the plain meaning of drive restoration as defined in the intrinsic evidence, such as at column 4, lines 54 through 61 of the '086 patent, parallels the following language in Staff's construction: ". . . issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive."

The undersigned disagrees with Respondents that the criticism of non-automatic verification in the prior art requires that the present invention include automatic verification after copying. The Federal Circuit has stated that "even a direct criticism of a particular technique [does] not rise to the level of clear disavowal." *Thorner v. Sony Computer Entm't Am. LLC*, 699 .3d 1362, 1366 (Fed. Cir. 2012) (citing *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)). Here, the criticism of non-automatic verification processes in the prior art does not rise to a clear disavowal of those processes that would warrant Respondents' claim construction. *Id.* Furthermore, Staff's construction, unlike Respondents', properly allows for the "power-on restoration embodiment," which may be *manually* enacted by the user powering on and off the device. ('086 patent at 4:54-58.)

- 48 -

Exhibit 5
51

The undersigned agrees with Staff and Respondents that the phrase "original condition" in claim 1 requires the restoration operation to be performed *after* the hidden area is accessed to allow for copying.  The '086 patent discloses restoration occurring after copying, which is the logical progression of operations for this art.  (*E.g.*, '086 patent at 4:64-65 ("Under normal circumstances, our device would make the change, copy the data, and restore the DCO to its original configuration."), claims 1, 18 (reciting the restoration function or structure after the copying function or structure).)

Accordingly, the undersigned hereby construes "control circuit issuing commands to . . . restore the source drive to its original condition" as "*a circuit coupled between the source interface and the destination interface(s), which issues commands to the source drive to restore the source drive to the condition the source drive was in prior to when the control circuit issues the command to open hidden areas on the source drive*."

### d)   "means for opening hidden areas on the source device"

The term "means for opening hidden areas on the source device" appears in claims 18 and 20 of the '086 patent.  The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| This term is subject to 35 U.S.C. § 112(6). | This term is subject to 35 U.S.C. § 112(6). | This term is subject to 35 U.S.C. § 112(6). |
| **Function**: opening hidden areas on the source device. | **Function**: opening hidden areas on the source device. | **Function**: opening hidden areas on the source device. |
| **Structure**: a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive. | **Structure**: Respondents contend that this element lacks sufficient structure and so violates 35 U.S.C. § 112. | **Structure**: a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive. |

- 49 -

Exhibit 5
52

MyKey argues that the specification discloses sufficient structure for implementing the

claimed function – *i.e.*, "a processor programmed to issue a temporary change command to the

source instructing the device to make its hidden area temporarily accessible to the copying

device." (CMIB at 40-41 (citing '086 patent at Figs. 1, 4, 5, and 6, 4:54-61); CMRB at 25.)

MyKey agrees with Staff that the cases relied upon by Respondents—who argue that the '086

patent improperly incorporates structure by reference—are clearly distinguishable from the

present case where sufficient structure is recited in the '086 patent's specification alone in the

form of a processor. (CMRB at 25-26.)

Respondents contend that this element lacks sufficient structure in violation of 35 U.S.C.

§ 112(6) because "a processor programmed as set forth in column 4 of the '086 patent" is

insufficient. (RMIB at 48.)  That is, Respondents argue that "a bare processor, without

programming, does not satisfy § 112," and MyKey and Staff incorrectly rely on another patent

for programming to instruct that processor. (RMRB at 51.)  Furthermore, Respondents assert

that MyKey's failure to disclose sufficient structure also renders claim 18 invalid as indefinite

under 35 U.S.C. § 112(2).  (RMIB at 48.)

Staff argues that the relevant structure here is properly disclosed by the '086 patent.

(SMRB at 18-19.)  Staff argues that the '086 patent indicates that there is a temporary change

command that allows a HPA hidden area to be made accessible, (SMIB at 52 (citing '086 patent

at 4:54-61)), and the DCO hidden area is accessible without such command, (SMRB at 19 (citing

'086 patent at 4:47-58)).  Thus, "unhiding" the data requires using a processor to instruct the

source drive to report its true size.  (*Id.* (citing '086 patent at 4:47-58).)  Further, Staff argues that

- 50 -

Exhibit 5
53

the '388 provisional patent application[11] that is incorporated in the '086 patent by reference, also supports this reading. (*Id.*)

For the reasons set forth below, the undersigned adopts MyKey's and Staff's construction. It is well known in the art of computer engineering that the function of opening hidden areas on a source drive is accomplished via a processor programmed to unhide those areas. (*E.g.*, '086 patent at 4:46-64, Fig. 5.) The '086 patent clearly contemplates the device opening hidden areas on the source drive by issuing commands, and the processor disclosed therein is sufficient structure for opening those areas—as exemplified by the Intel 80386 EX embedded processor disclosed in Figure 5. (*Id.*) The undersigned believes that reference to other documents, such as the '388 application, is not necessary for one skilled in the art to practice the invention. (*Id.*)

Accordingly, the undersigned hereby construes "means for opening hidden areas on the source drive" as:

| | |
|---|---|
| ***Function:*** | ***opening hidden areas on the source drive*** |
| ***Structure:*** | ***a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive.*** |

> e)   **"means for restoring the source device to its original condition"**

The term "means for restoring the source device to its original condition" appears in claims 18 and 20 of the '086 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

---

[11] *See* '086 patent at 5:5-12 for a discussion of the '388 provisional patent application.

- 51 -

Exhibit 5
54

| MyKey | Respondents | Staff |
|---|---|---|
| This term is subject to 35 U.S.C. § 112(6).<br><br>**Function**: restoring the source device to its original condition.<br><br>**Structure**: processor programmed as set forth in 4:54-60 of the '086 patent<br>OR<br>processor and flash memory, where the processor is programmed<br>(1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and<br>(2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and<br>(3) to instruct the source drive(s) to restore itself to the original configuration. | This term is subject to 35 U.S.C. § 112(6).<br><br>**Function**: restoring the source device to its original condition.<br><br>**Structure**: Respondents contend that this element lacks sufficient structure and so violates 35 U.S.C. § 112. | This term is subject to 35 U.S.C. § 112(6).<br><br>**Function**: restoring the source device to its original condition.<br><br>**Structure**: processor and flash memory, where the processor is programmed<br>(1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and<br>(2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and<br>(3) to instruct the source drive(s) to restore itself to the original configuration. |

MyKey argues that one skilled in the art would find that the '086 patent provides sufficient structure for the disputed term. (CMIB at 44 (citing '086 patent at 4:54-58, Figures 1, 4-6).) MyKey asserts that for HPAs, such structure is a processor that instructs the drive to either make its hidden area available or power on and off the drive so that it is restored to its original state—with the areas hidden again—when powered back on. (*Id.*) Similarly, MyKey asserts that for DCOs, where a temporary change command is inapplicable, such structure is a processor and flash memory where the processor issues commands to retrieve and change

- 52 -

Exhibit 5<br>55

command settings and the memory stores the drive's original settings with a unique identifier for the drive.  (*Id*. at 45.)

Respondents argue that the '086 patent at column 4, lines 54-60 provides insufficient structure for this disputed claim term.  (RMIB at 50.)  Respondents assert that the specification acknowledges the technical problems associated with restoring DCO areas but fails to disclose how a permanent change to that device—*i.e.*, opening a DCO area—is undone.  (*Id.*) Respondents conclude that the specification fails to disclose a processor structure that is programmed to restore DCO areas.  (*Id.*; RMRB at 61.)

Staff argues that the '086 patent discloses sufficient structure for restoring HPA and DCO areas and also discloses how to program that structure to restore the source drive.  (SMIB at 57.) Staff asserts that the specification states that the invention uses the method or algorithm disclosed in the '388 application for both HPA and DCO areas, but reference to the '388 application is not required to define the structure in the claim as the '086 patent alone is sufficient.  (SMIB at 57; SMRB at 22.)  That is, Staff contends that the '086 patent correctly *identifies* the structure required by § 112(6) for this claim term and Respondents are incorrect to require that the patent fully *describes* the structure without reference to incorporated documents. (SMRB at 23-24.)  Staff asserts that a processor and flash memory are properly disclosed such that one skilled in the art would be able to use the algorithm in the '086 patent to program the processor.  (SMIB at 60.)

For the reasons set forth below, the undersigned adopts Staff's construction.  The specification recites the technical problem of restoring DCO and HPA areas and one skilled in the art of computer engineering reading the '086 patent would understand how to create a program operating on processor and flash memory structures that solves the problem.  ('086

- 53 -

Exhibit 5
56

patent at 4:54-61.) That is, in light of the patent's description of accessing both DCO and HPA

hidden areas in column 4, lines 54-61, one skilled in the art could program a processor and flash

memory to restore hidden areas according to the steps listed in Staff's construction of this term.

(*Id.*) The undersigned believes that reference to other documents such as the '388 application is

not necessary for one skilled in the art to practice the invention. (*Id.*)

Accordingly, the undersigned hereby construes "means for restoring the source device to

its original condition" as:

> **Function:**      *restoring the source to its original device*
>
> **Structure:**     *processor and flash memory, where the processor is programmed (1) to, prior to accessing the hidden area(s) on that source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and (2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and (3) to instruct the source drive(s) to restore itself to the original configuration.*

## IV.    THE '379 PATENT

### A.    Overview

The '379 patent is entitled "Systems And Methods For Removing Data Stored On Long-

Term Memory Devices." The '379 patent issued on June 5, 2007 to named inventors Steven

Bress, Dan Bress, Mike Menz, and Mark Joseph Menz, and was subsequently assigned to

MyKey. The '379 patent describes an application-specific device for erasing data from a long-

term storage device. (*See* '379 patent at Abstract.) The '379 patent has 3 claims of which

MyKey has asserted independent claim 1 and dependent claim 2. These claims read as follows

(with the first instance of the agreed-upon terms highlighted in *italics* and the first instance of the

disputed terms highlighted in **bold**):

- 54 -

Exhibit 5
57

1.   A **stand-alone, dedicated function device** for removing data from a long-term memory
     component, comprising: an interface for connecting the stand-alone, dedicated function
     device to the long-term memory component; a control circuit configured to control the
     long-term memory component through the interface to **irretrievably remove data** from
     the long-term memory component without regard to data content or data storage format
     of the data on the long-term memory component by overwriting the data of the long-term
     memory component; a *user controllable switch* that, when actuated by a user, causes the
     control circuit to commence irretrievably removing all the data from the long-term
     memory component; a casing configured to contain the control circuit and the interface,
     the casing being of a size that is portable by the user; a power supply configured to
     supply power to the control circuit; wherein **the control circuit is further configured to
     open a *hidden storage area* on the long-term memory component before
     irretrievably removing the data**.

2.   The device of claim 1, wherein the control circuit opens a hidden storage area without
     user intervention.

## B.      Agreed-Upon and Disputed Claim Terms

### 1.      Construction of Agreed-Upon Claim Terms

#### a)      "hidden storage area"

The parties agree that the term "hidden storage area," which appears in claims 1 and 2,

should be construed as "an area on a long-term memory device that is not counted towards a

reported size of the device, such as a Host Protected Area and/or a Device Configuration

Overlay." (JC at 10.)

The undersigned hereby adopts the parties' proposed construction and shall construe

"hidden storage area" to mean "*an area on a long-term memory device that is not counted*

*towards a reported size of the device, such as a Host Protected Area and/or a Device*

*Configuration Overlay*."

#### b)      "user controllable switch"

The parties agree that the term "user controllable switch," which appears in claims 1 and

2, should be construed as "a switch that can be controlled by a user of the device." (*Id.*)

- 55 -

Exhibit 5
58

The undersigned hereby adopts the parties' proposed construction and shall construe "user controllable switch" to mean "*a switch that can be controlled by a user of the device*."

### 2. Construction of Disputed Claim Terms

#### a) "stand-alone, dedicated function device"

The term "stand-alone, dedicated function device" appears in claims 1 and 2 of the '379 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MyKey | Respondents | Staff |
|---|---|---|
| This term should be afforded its plain and ordinary meaning: "a physical device, which is not a general purpose computer system, that stands apart from a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component." | A physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to irretrievably remove data from a long-term memory without additional hardware or software components, and not reconfigurable to perform any other function by an end user. | A physical device which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices and is dedicated to irretrievably remove data from a long-term memory without additional hardware or software components, and not reconfigurable to perform any other function by an end user. |

MyKey argues that Respondents' and Staff's constructions are erroneous because the specification gives examples of how the device can have more than a single function, citing the Logicube example in the '086 patent and optional formatting, copying, partitioning, and printing functions in the '379 specification. (CMIB at 47-49 (citing '379 patent at 10:64-11:6).) MyKey asserts that the prosecution history does not preclude multiple functions because the applicants merely distinguished the device from a general purpose computer. (*Id.* at 48; CMRB at 32.) Further, MyKey argues that this term includes reconfigurable devices because the specification discloses reconfiguration to perform partitioning, copying, formatting, multiple device erasure, and to accommodate various interfaces and cleaning levels. (CMIB at 49; CMRB at 33-34.)

- 56 -

Exhibit 5
59

Respondents argue that MyKey's position is inconsistent with statements made in the prosecution history. (RMIB at 51-52.) For example, during prosecution, the applicants stated that "[they] understand 'dedicated function' to mean a device that is configured at the factory for a specific purpose . . . [and] does not allow a user to change its functionality." (RMRB at 64 (citing to August 8, 2006 Amendment and quoting Applicants stating they "understand 'dedicated function' to mean a device that is configured at the factory for a specific purpose.").) Respondents conclude that these statements mean that the single-function claimed device is not able to be reconfigured by a user. (RMIB at 53.) Respondents argue that MyKey's conclusion that any device can be a dedicated function device so long as one of the functions is erasing is illogical because it dismisses the words "dedicated function." (RMRB at 62.) Further, Respondents disagree with MyKey's argument that the device has multiple functions like partitioning and copying because that is a breakdown of the device's single function into sub-functions. (*Id.* at 63.)

Staff asserts that the applicants of the '379 patent disclaimed that the device could be reconfigured during prosecution. (SMIB at 26.) Staff points to applicants' argument that their device contrasts with that in the Holzhammer reference that includes a personal computer system and conventional operating system. (*Id.* at 28.) Staff notes that because that argument by applicants did not overcome the rejection, they further limited the scope of the device by arguing that "stand-alone [means] all the hardware, logic and circuitry necessary to perform a task . . . dedicated function [means] a device that is configured at the factory for a specific purpose . . . [and] does not allow a user to changes [sic] its functionality." (*Id.* at 28-29.) Staff argues that MyKey's examples of reconfiguration, such as changing the cleaning level, relate to the single function of data removal and thus, do not actually require device reconfiguration, while the

- 57 -

Exhibit 5
60

printing and graphical display options do not perform data removal and are not part of the stand-alone device. (*Id.* at 30.)

The undersigned finds MyKey's arguments persuasive. The prosecution history clarifies that "stand-alone [means] all the hardware, logic and circuitry necessary to perform a task" and "dedicated function [means] a device that is configured at the factory for a specific purpose . . . [and] does not allow a user to changes [sic] its functionality." (MyKey Ex. 10, Amendment (Aug. 4, 2006) at 13.) Here, "stand-alone" means that the device may operate independent of additional hardware—such as a general purpose computer—to perform the device's main function of erasing a drive. (*Id.*) However, there is no limitation on the possibility of additional hardware or software components to achieve ancillary functions such as device control, partitioning, or formatting the target drive. (*See* '379 patent at 10:64-11:6.) "Stand-alone" also means that the device is operating system independent and thus, is not a general purpose computer. (*Id.* at Abstract.) Similarly, while "dedicated function" requires that the device is always capable of performing its essential function of drive erasure, that term does not preclude that aspects of the device may be reconfigured to perform optional functions. (*Id.* at 10:64-11:6; *Thorner*, 699 F.3d at 1366. Staff and Respondents are incorrect to argue that the functions disclosed at column 10, line 64 *et seq.* are sub-functions of the device's single function of erasing data from a long-term device. This argument is incorrect because the optional functions of partitioning and formatting are not included in claim 1 and thus, are not sub-functions required for the device to perform its dedicated function of drive erasure. (*See* '379 patent at 12:22-44.)

Accordingly, the undersigned hereby construes "stand-alone, dedicated function device" as "***a physical device, which is not a general purpose computer system, that stands apart from***

- 58 -

Exhibit 5
61

*a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component.*"

### b) "irretrievably remove data"

The term "irretrievably remove data" appears in claims 1 and 2 of the '379 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MyKey | Respondents | Staff |
|-------|-------------|-------|
| This term does not require construction and should be afforded its plain and ordinary meaning, which is: "remove data permanently such that it may not be recovered by any known methods." | To eliminate previously recorded information such that it is unrecoverable, by doing more than merely writing one or more data patterns to the data areas. | Plain and ordinary meaning, which is: "remove data permanently such that it may not be recovered by any known methods." |

MyKey argues that Respondents' construction is limited to one of multiple embodiments where data are erased based on fuzzy data and jitter. (CMIB at 50 (citing '379 patent at 8:21-39).) MyKey argues that the specification discloses a simple cleaning embodiment that is inconsistent with Respondents' construction requiring multiple commands. (*Id.* at 51 (citing '379 patent at 8:55-58).) MyKey thus asserts that the claim language merely requires "irretrievably remov[ing] data" without regard to a particular removal method. (CMRB at 36.)

Respondents argue that "irretrievably remove data" is not expressly defined by the specification, but various excerpts recite embodiments where removal involves more than just writing one or more data patterns to the data areas. (RMIB at 53-54 (citing '379 patent at 2:47-63 (noting incomplete edge-data removal by overwriting the data with zeros), 8:1-18 (discussing jitter in addition to writing multiple times with multiple data patterns)).) Respondents also cite the underlying Provisional Application Number 60/299,783 as describing alternative methods of eliminating data, such as applying a magnetic field to the disk, concluding that "irretrievably remove data" must mean something more than simple overwriting. (*Id.* at 54-55.)

- 59 -

Exhibit 5
62

Staff argues that its construction does not cover a device that simply overwrites data patterns with data, (SMRB at 11), because the specification notes that there are conventional methods that allow some of the original data to be recovered, (SMIB at 32 (citing '379 patent at 2:30:67).) Staff contends that Respondents' construction is vague and begs the question whether there are any methods that do less than "writing one or more data patterns to the data areas." (*Id.* at 31.)

The undersigned finds Staff's arguments persuasive. The claim term "irretrievably remove data" in this case is to be accorded its plain and ordinary meaning. The citation by Respondents to various parts of the specification does not alter the plain and ordinary meaning of the claim term "irretrievably removing data."

Accordingly, the undersigned hereby construes "the control circuit is further configured to open a hidden area . . . before irretrievably removing data" as "***remove data permanently such that it may not be recovered by any known methods***."

c)   **"the control circuit is further configured to open a hidden area
. . . before irretrievably removing data"**

The term "the control circuit is further configured to open a hidden area . . . before irretrievably removing data" appears in claims 1 and 2 of the '379 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| MYKEY | RESPONDENTS | STAFF |
|---|---|---|
| Plain and ordinary meaning | The control circuit automatically opens a hidden storage area on the long-term memory component before irretrievably removing the data in response to the user's actuation of the switch to command the irretrievable removal of all data | Plain and ordinary meaning |

- 60 -

Exhibit 5
63

MyKey argues that this claim term's meaning is apparent to one skilled in the art so a construction limiting the language to a particular embodiment is inappropriate. (CMIB at 51.) In particular, MyKey asserts that Respondents' construction, which limits the claim to an embodiment where the hidden areas are opened "automatically," is erroneous. (*Id.*) Rather, MyKey argues that the '379 patent's specification explicitly states that whether or not hidden areas are opened automatically is an optional implementation. (*Id.* at 52 (citing '379 patent at 10:51-60); CMRB at 36-37.) MyKey also argues that Respondents' language regarding the "user controllable switch" is superfluous in light of other language in claim 1. (CMIB at 52.)

Respondents contend that in light of the specification and prosecution history, this term requires that the hidden storage areas are "automatically" opened. (RMIB at 59.) Respondents argue that this feature is "automatic" because the specification emphasizes that the operations of the device do not require specialized knowledge or operator training. (*Id.* at 59-60 (citing '379 patent at 11:15-40); RMRB at 69-70.) Respondents also argue that the prosecution history limits the invention to a single function that is easy to use via a single button that performs all operations. (RMIB at 60.)

Staff argues that this term does not require construction and/or should be given its plain and ordinary meaning. (SMIB at 35.) Staff rejects Respondents' construction because it adds limitations to a claim that is plain and clear on its face, (*id.*), and the specification's general statements about the device's simplicity do not rise to the level of a disclaimer of subject matter. (SMRB at 13.)

The undersigned finds MyKey's and Staff's arguments persuasive. The claim language would be understood by one skilled in the art to encompass a variety of embodiments where commands, such as opening hidden areas, may or may not be automatic. (*See* '379 patent at

- 61 -

Exhibit 5
64

10:51-55 ("In *__one__ __implementation__*, cleaning device 300 may issue appropriate commands to target drives that contain hidden data to release the hidden data.  Cleaning device 300 *__may__ __automatically__* issue these commands without the need for human intervention.") (emphasis added).)  Therefore, this claim term does not require construction and should be afforded its plain and ordinary meaning.  Respondents' construction both improperly limits the claim to a particular embodiment.  *See Laitram*, 863 F.2d at 865.  Contrary to Respondents' contentions, the general statements in the specification regarding the device's simplicity do not rise to the level of an express intent to limit the claim's scope.  *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).

Accordingly, the undersigned hereby construes "irretrievably remove data" in accordance with its plain and ordinary meaning.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

- 62 -

Exhibit 5
65

IN THE MATTER OF CERTAIN COMPUTER FORENSIC          337-TA-799
DEVICES AND PRODUCTS CONTAINING THE SAME

CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER NO. 45** has been served upon, **Daniel E. Valencia, Esq.**, Commission Investigative Attorney, and the following parties via first class mail and air mail where necessary on _____ May 9 _____, **2012.**

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, DC   20436

**FOR COMPLAINANT MyKEY TECHNOLOGY INC.:**

James H. Lin, Esq.                           ( ) Via Hand Delivery
**FREITAS, TSENG, BAIK & KAUFMAN LLP**       ( ) Via Overnight Mail
100 Marine Parkway                           (✓) Via First Class Mail
Suite 200                                    ( ) Other:_____
Redwood City, CA  94065

**FOR RESPONDENTS GUIDANCE SOFTWARE, INC. & GUIDANCE TABLEAU LLC:**

William C. Bergmann, Esq.                     ( ) Via Hand Delivery
**BAKER & HOSTETLER LLP**                     ( ) Via Overnight Mail
1050 Connecticut Avenue NW                    (✓) Via First Class Mail
Washington, DC  20036                         ( ) Other:_____

**FOR RESPONDENTS DIGITAL INTELLIGENCE, INC.:**

Alejandro Menchaca, Esq.                      ( ) Via Hand Delivery
**MCANDREWS, HELD & MALLOY, LTD**             ( ) Via Overnight Mail
500 West Madison Street, 34th Floor           (✓) Via First Class Mail
Chicago, IL  60661                            ( ) Other:_____

Exhibit 5
66

IN THE MATTER OF CERTAIN COMPUTER FORENSIC          337-TA-799
DEVICES AND PRODUCTS CONTAINING THE SAME


**FOR RESPONDENTS YEC CO. LTD.:**

Lizbeth R. Levinson, Esq.                    ( ) Via Hand Delivery
**KUTAK ROCK LLP**                           ( ) Via Overnight Mail
1101 Connecticut Avenue, NW                  (✓) Via First Class Mail
Washington, DC  20036                        ( ) Other:_____


**FOR RESPONDENTS CRU ACQUISITIONS GROUP LLC & CRU-DATA PORT LLC:**

David Cooper                                 ( ) Via Hand Delivery
**KOLISCH HARTWELL, P.C.**                   ( ) Via Overnight Mail
520 S.W. Yamhill Street, Suite 200           (✓) Via First Class Mail
Portland, OR  97204                          ( ) Other:_____


Exhibit 5

**IN THE MATTER OF CERTAIN COMPUTER FORENSIC**
**DEVICES AND PRODUCTS CONTAINING THE SAME**

337-TA-799

PUBLIC  MAILING  LIST

Heather Hall
**LEXIS – NEXIS**
9443 Springboro Pike
Miamisburg, OH  45342

( ) Via Hand Delivery
( ) Via Overnight Mail
( ✓ ) Via First Class Mail
( ) Other:_____

Kenneth Clair
**THOMSON WEST**
1100 – 13th Street NW
Suite 200
Washington, DC  20005

( ) Via Hand Delivery
( ) Via Overnight Mail
( ✓ ) Via First Class M ail
( ) Other:_____

Exhibit 5
68