Exhibit 8

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN COMPUTER FORENSIC DEVICES AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-799** |

**REBUTTAL EXPERT REPORT OF BRIAN A. BERG**
**ON CLAIM CONSTRUCTION ISSUES**

Exhibit 8
1

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

**Table of Contents**

I.    INTRODUCTION ........................................................................................... 4

II.   REBUTTAL OF MR. GAFFORD'S OPINIONS REGARDING THE '682
      PATENT ...................................................................................................... 4

      A.   '682 Claim Term "a" Rebuttal: "interface emulator" ........................... 4

           1.   Comments re: Gafford Initial Report at 15(a)(i) and 15(a)(iv) ................. 5

           2.   Comments re: Gafford Initial Report at 15(a)(ii) and 15(a)(iii) ............... 5

      B.   '682 Claim Term "b" Rebuttal: "interface emulator configured to emulate
           an interface presented by a storage device and configured to connect to a
           host" ...................................................................................................... 6

           1.   My Rebuttal of this Construction ('682): "a non-intelligent
                interface component" ................................................................ 6

           2.   My Rebuttal of this Construction ('682): "configured to present to
                the host an interface identical to the interface of the storage device
                connected to the blocking device" ........................................... 7

           3.   My Rebuttal of this Construction ('682): "and that operates with no
                change to host software" ........................................................... 7

      C.   '682 Claim Term "c" Rebuttal: "transparent to normal operation [of the
           host and the storage device]" and "transparently to normal operation [of
           the host and the IDE storage device]" and "transparent to normal operation
           [of the computer motherboard and the storage device]" and "transparently
           to [the host computer and the long-term storage device]" and
           "transparently to normal operation [of the host and the storage device]" ............. 9

           1.   My Rebuttal of this Construction ('682): "for the blocking device
                to operate in such a way that all normal operations of the host, and
                all normal operations of the storage device, continue when the
                blocking device is interposed between them" ............................................. 9

           2.   My Rebuttal of this Construction ('682): "with no need for
                reconfiguration of the host or storage device" ........................................ 11

III.  REBUTTAL OF MR. GAFFORD'S OPINIONS REGARDING THE '086
      PATENT ...................................................................................................... 12

      A.   '086 Claim Term "d" Rebuttal: "stand-alone, dedicated function device" ......... 12

           1.   My Rebuttal of this Construction ('086): "manufactured to perform
                only a single function (making exact copies of long-term memory
                devices) that cannot be reconfigured by a user" ...................................... 12

           2.   My Rebuttal of this Construction ('086): "and which performs that
                function with no additional components" ................................................. 13

Exhibit 8
2

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

        3.     Summary of Reasons to Reject Mr. Gafford's Construction of "stand-alone, dedicated function device" .................................. 14

   B.    '086 Claim Term "e" Rebuttal: "control circuit issuing commands to ... read and compare data on the source and destination devices" and "means for reading and comparing the data on the source and destination devices and communicating result to a user".......................................................... 15

   C.    '086 Claim Term "f" Rebuttal: "control circuit issuing commands to ... restore the source drive to its original condition" and "means for restoring the source device to its original condition"........................................... 16

   D.    '086 Claim Term "g" Rebuttal: "a user controllable switch that, when actuated by a user, causes the device to commence a copy" ............................. 17

   E.    '086 Claim Term "h" Rebuttal: "hidden areas" ................................... 18

IV.   REBUTTAL OF MR. GAFFORD'S OPINIONS REGARDING THE '379 PATENT....................................................................................................... 19

   A.    '379 Claim Term "j" Rebuttal: "irretrievably remove data" and "control circuit configured to ... irretrievably remove data"............................................. 19

   B.    '379 Claim Term "l" Rebuttal: "the control circuit is further configured to open a hidden storage area on the long-term memory component before irretrievably removing the data" .......................................................... 20

        1.     Mr. Gafford's First Inappropriate Importation ........................................ 21

        2.     Mr. Gafford's Second Inappropriate Importation is an Additional Step ....................................................................................................... 22

        3.     Summary of Reasons to Reject Mr. Gafford's Construction.................... 22

   C.    '379 Claim Term "m" Rebuttal: "user controllable switch"................................ 22

   D.    '379 Claim Term "n" Rebuttal: "stand-alone, dedicated function device" ......... 23

        1.     My Rebuttal of this Construction ('379): "manufactured to perform only a single function (irretrievably removing data from a long-term memory component)" .................................................................... 23

            a)    Devices With More Than a Single Function in '379 Specification ................................................................................ 23

            b)    Devices With More Than a Single Function in '379 File History........................................................................................ 24

        2.     My Rebuttal of this Construction ('379): "that is not reconfigurable by a user" .................................................................................... 24

        3.     My Rebuttal of this Construction ('379): "and which performs that function without additional components, such as drivers or a BIOS"....................................................................................... 26

        4.     Summary of Reasons to Reject Mr. Gafford's Construction of "stand-alone, dedicated function device" .................................. 26

Exhibit 8
3

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

## I. INTRODUCTION

1.     On November 18, 2011, I submitted my *Initial Expert Report of Brian A. Berg on Claim Construction Issues* ("Berg Initial Report") in this investigation.

2.     I am submitting this Rebuttal Expert Report to rebut the opinions presented in the *Expert Report of Thomas A. Gafford Regarding Construction of Claim Terms* as submitted on November 18, 2011 ("Gafford Initial Report") in this investigation.  Mr. Gafford's opinions related to U.S. Patent No. 6,813,682 (the "'682 patent"), U.S. Patent No. 7,159,086 (the "'086 patent") and U.S. Patent No. 7,228,379 (the "'379 patent"), the three patents-in-suit in this investigation.

3.     The Gafford Initial Report presented proposed constructions for 14 claims terms in sections numbered "a" through "n."  For ease of reference, I include those letters in section headers within this report.

## II. REBUTTAL OF MR. GAFFORD'S OPINIONS REGARDING THE '682 PATENT

4.     Mr. Gafford construed three claim terms from the '682 patent, and I rebut those constructions in this section.

### A.     '682 Claim Term "a" Rebuttal: "interface emulator"

5.     It is my opinion that the meaning of this claim term is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

6.     Mr. Gafford construes this claim term as "a non-intelligent interface component, separate from the processor, that mimics another interface."  *See* Gafford Initial Report at p. 4, ¶

Exhibit 8
4

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

15(a)(i).

### 1.   Comments re: Gafford Initial Report at 15(a)(i) and 15(a)(iv)

7.   Mr. Gafford's arguments for support of his construction include a vacuous implication from a recitation of the '682 patent specification at 2:27-33.  Mr. Gafford incorrectly argues that the "processor [being] coupled to the interface emulator" ('682 patent at 2:32-33) "implies that the interface emulator is non-intelligent because the interface emulator is coupled to an intelligent processor."  *See* Gafford Initial Report, at 4, ¶ 15(a)(i).  One of ordinary skill in the art at the time of the invention would recognize that a processor being coupled to the interface emulator does not necessarily mean that the interface emulator is non-intelligent. Indeed, one of ordinary skill in the art would understand that the interface emulator may be intelligent or non-intelligent regardless of whether it is coupled to a processor.  I also do not see any intrinsic evidence supporting Mr. Gafford's opinion that the interface emulator must be non-intelligent.

### 2.   Comments re: Gafford Initial Report at 15(a)(ii) and 15(a)(iii)

8.   Mr. Gafford continues with his erroneous reading of the word "intelligent" when discussing the Kern reference (U.S. Patent No. 6,336,187) in the '682 patent file history at the Response filed November 24, 2003, p. 19:

> In contrast to Kern, the device of claim 1 includes, among other things, an interface emulator configured to emulate an interface presented by a storage device. Although Kern discloses a "controller interface 120," the controller interface 120 of Kern does not emulate an interface presented by a storage device. The interface 120 of Kern is described as "an intelligent digital input/output communication channel, or other interface suitable to the particular application." (Kern, col. 4, lines 48-50).

*See* Gafford Initial Report, at pp. 4-5, ¶ 15(a)(iii).

9.   One of ordinary skill in the art at the time of the invention reading the above excerpt from the '682 patent file history would understand that the applicants distinguished the

Exhibit 8
5

Kern reference from the claimed invention based on the fact that "the controller interface 120 of Kern does not emulate an interface presented by a storage device" and thus the Kern reference does not teach or disclose an interface emulator.  *See* '682 patent file history at the Response filed November 24, 2003, p. 19.  One of ordinary skill in the art would further understand that the applicants' statement that "[t]he interface 120 of Kern is described as 'an intelligent digital input/output communication channel, or other interface suitable to the particular application'" is merely a description of the interface disclosed by the Kern reference and does not imply or require that the interface emulator claimed in the '682 patent must be non-intelligent.  Hence, since the applicants' statements to distinguish the '682 patent from the Kern reference had nothing to do with the word "intelligent," Mr. Gafford's inclusion of the word "non-intelligent" in his proposed construction is totally without merit.

> **B.**    **'682 Claim Term "b" Rebuttal: "interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host"**

10.    It is my opinion that the meaning of this claim term is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

11.    Mr. Gafford construes this claim term as "a non-intelligent interface component, separate from the processor, configured to present to the host an interface identical to the interface of the storage device connected to the blocking device, and that operates with no change to host software."  *See* Gafford Initial Report, at pp. 5-6, ¶ 15(b)(i).

12.    I address Mr. Gafford's proposed construction in the following three sections:

> **1.   My Rebuttal of this Construction ('682): "a non-intelligent interface component"**

Page 6 of 27

Exhibit 8
6

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

13.     Mr. Gafford repeated the arguments he offered in support of his proposed construction of the claim term "interface emulator" within the arguments for his proposed construction of this claim term.  As those arguments are in support of the "a non-intelligent interface component" portion of his proposed construction, my rebuttal of the proposed construction of "interface emulator" as provided in the preceding section applies here, and thus this portion of Mr. Gafford's proposed construction must be rejected.

### 2.   My Rebuttal of this Construction ('682): "configured to present to the host an interface identical to the interface of the storage device connected to the blocking device"

14.     Mr. Gafford offers no support for this "identical" portion of his proposed construction, and there is nothing about the term "emulate" that requires identical operation.  The intrinsic evidence includes no requirement that the host interface and the storage device interface be identical.  Claim 45 of the '682 patent actually teaches away from this concept when it recites "the interface emulator emulates an IEEE 1394 connection and the storage device is an IDE disk drive."  *See* '682 patent at 18:15-17.  Accordingly, one of ordinary skill in the art at the time of the invention would understand that the interface presented to the host is different from and hence not identical to the interface of the storage device connected to the blocking device.  Hence, this portion of Mr. Gafford's proposed construction is improper and therefore must be rejected.

### 3.   My Rebuttal of this Construction ('682): "and that operates with no change to host software"

15.     The Gafford Initial Report at p. 5, ¶ 15(b)(v) offers arguments in support of this construction when it recites "neither the host nor the storage device need any special hardware or software and neither the host nor the storage device need to be reconfigured in any way" from the Office Action Response of November 24, 2003.

Page 7 of 27

Exhibit 8
7

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

     16.    One of ordinary skill in the art at the time of the invention of the '682 patent would understand that a host always needs software or firmware in order to communicate with a storage device, or any external device for that matter, and this software or firmware is normally in the form of a device driver.  Operating systems sometimes come pre-loaded with device drivers for communication with a number of external devices, but one of ordinary skill in the art would know that many external devices require extra software or firmware to be installed in order for the external devices to work with the host.  Therefore, a person of ordinary skill in the art would recognize that for the transparent operation to occur according to the claimed invention, one may need to first install, either automatically or manually, additional software, firmware, or device drivers on the host (or otherwise reconfigure the host) in order for the blocking device to work with the host.  Once this installation or reconfiguration takes place, normal operations can transpire without the need for additional software or firmware to be installed.

     17.    If the operating system is pre-loaded with device drivers or other firmware or software, the '682 patent describes this scenario as one potential advantage of the invention because device driver, software or firmware is not required to be installed for communication with a blocking device and thus the blocking device is operating system independent.  *See* '682 patent at 5:40-42.  This potential advantage, however, is not required for transparent operation to occur.  As the Office Action Response of November 24, 2003 cited by the Gafford Initial Report, at p. 7, ¶ 15(b)(v) is only a description of one potential advantage of an embodiment of the claimed invention as opposed to being a requirement, Mr. Gafford's proposed construction is unnecessarily restrictive and thus must be rejected.

     18.    I also disagree with Mr. Gafford's opinion that for the transparent operation to

Exhibit 8
8

occur, "neither the host nor the storage device need to be reconfigured in any way."  One of ordinary skill in the art at the time of the invention would understand that whenever a new external device is attached to a host, there may be a reconfiguration of the host through the use of software, firmware, or device drivers in order to install the external device with the host and to allow the external device to work with the host.  This reconfiguration occurs regardless of whether the operating system is pre-loaded with such software, firmware, or device drivers or whether a user would need to manually install such software, firmware, or device drivers.

19.    My opinion in the preceding two paragraphs applies equally to other terms of the '682 patent relating to an interface emulator, such as the "IDE emulator component" of claim 13 and the limitations relating to the connection between the blocking device and the host computer, such as a step or structure for intercepting, found in claims 25, 30 and 40.

**C.    '682 Claim Term "c" Rebuttal: "transparent to normal operation [of the host and the storage device]" and "transparently to normal operation [of the host and the IDE storage device]" and "transparent to normal operation [of the computer motherboard and the storage device]" and "transparently to [the host computer and the long-term storage device]" and "transparently to normal operation [of the host and the storage device]"**

20.    It is my opinion that the meaning of these five claim terms is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

21.    Mr. Gafford construes each of these five claim terms as "for the blocking device to operate in such a way that all normal operations of the host, and all normal operations of the storage device, continue when the blocking device is interposed between them, with no need for reconfiguration of the host or storage device."  *See* Gafford Initial Report, at pp. 8, ¶ 15(c)(i).

22.    I address Mr. Gafford's proposed construction in the following three sections:

Exhibit 8
9

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

          **1.   My Rebuttal of this Construction ('682): "for the blocking device to operate in such a way that all normal operations of the host, and all normal operations of the storage device, continue when the blocking device is interposed between them"**

    23.    I disagree with Mr. Gafford's construction that these five claim terms require that "**all** normal operations of the host, and **all** normal operations of the storage device, continue when the blocking device is interposed between them." *See Id.* (emphasis added).  There is nothing in the intrinsic evidence that supports Mr. Gafford's construction that **all** normal operations of the host and the storage device must continue.  At most, the specification of the '682 patent merely states:

> To host computer 201, blocking device 203 appears to be a standard drive interface, such as an IDE drive interface, and presents to the host 201 the memory, registers, and control signals that a drive would normally present to host 201. To drive 205, blocking device 205 appears to be a host computer, and presents to drive 205 the memory, registers, and control signals that host 201 would normally present to drive 205. In other words, blocking device 203 is transparent to the system.

*See* '682 patent at 5:32-40, and

> In this manner, blocking device 803 and drive 805 appear to the host as a normally functioning disk drive.

*See* '682 patent at 10:10-12.  There is no teaching or implication in the '682 patent specification and file history that **all** normal operations must continue.

    24.    Mr. Gafford further states:

> If, in the course of normal operation, the host then wishes to read that information from the drive, the information returned by the drive will NOT be what was previously sent by the host in the write operation, which was blocked by the device.  The structure of 803 solves this problem by using a 'temp' drive to receive the information written by the host, and a data structure in the RAM 840 to keep track of such writes, so that a subsequent read to the same location returns to the host data from the temp drive.  In the disclosure, only the structure of element 803 is capable of providing the claimed transparent <u>operation</u>.

*See* Gafford Initial Report, at p. 9, ¶ 15(c)(i).  I disagree with Mr. Gafford's opinion that only the

Exhibit 8
10

structure of element 803 is capable of providing the claimed transparent operation.  The temp drive of element 803 is merely one embodiment of the invention described in Figure 8 of the '682 patent and the accompanying text.  Other embodiments of the '682 patent, including those described in Figures 3, 6, 7 and 9 and the accompanying text, are lacking a temp drive but all are capable of providing the claimed transparent operation.  Independent claims 1, 13, 25, 30 and 40 do not recite a temp drive, yet all of these independent claims provide the transparent operation. I also understand that Mr. Gafford's improper reading of a temp drive into independent claims 1, 13, 25, 30 and 40 is also inconsistent with the doctrine of claim differentiation.  Claims 9 and 10, which depend from claim 1, claims 22 and 23, which depend from claim 13, and claims 37 and 38, which depend from claim 30, recite a temporary storage device and claim the embodiment shown in Figure 8 of the '682 patent.  Because of the claim dependency, one of ordinary skill in the art would understand that independent claims 1, 13, 25, 30 and 40 do not require a temp drive or a temporary storage device in order to provide the claimed transparent operation.

### 2.  My Rebuttal of this Construction ('682): "with no need for reconfiguration of the host or storage device"

25.     Mr. Gafford opines that for transparent operation to occur, there must be "no need for reconfiguration of the host or storage device."  Mr. Gafford further states that

> [I]n order to practice the claimed transparent operation, all of the host's normal operations such as reading and writing and verifying, and all of the storage device's normal operations, must continue with no change in host software or configuration when the blocking device is installed.

*See* Gafford Initial Report, at p. 10, ¶ 15(c)(iii).  I disagree with this opinion.  In the last of the three rebuttal sections for the previous claim term, I rebutted the construction "and that operates with no change to host software."  My entire rebuttal of that proposed construction applies here, and thus Mr. Gafford's proposed construction must be rejected.

Exhibit 8
11

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

### III.   REBUTTAL OF MR. GAFFORD'S OPINIONS REGARDING THE '086 PATENT

26.   Mr. Gafford construed several claim terms from the '086 patent, and I rebut his constructions in this section.

### A.   '086 Claim Term "d" Rebuttal: "stand-alone, dedicated function device"

27.   I understand that as this term only appears in the preamble of the two independent claims of the '086 patent, this term does not limit the scope of the claims and thus requires no construction.

28.   Mr. Gafford construes this term to mean "portable device manufactured to perform only a single function (making exact copies of long-term memory devices) that cannot be reconfigured by a user and which performs that function with no additional components." *See* Gafford Initial Report, at p. 10, ¶ 16(d)(i).

### 1.   My Rebuttal of this Construction ('086): "manufactured to perform only a single function (making exact copies of long-term memory devices) that cannot be reconfigured by a user"

29.   Mr. Gafford makes the assertion that "'dedicated' is a term of art that describes a device with a single purpose, so that 'dedicated function' is a device designed to perform exactly one function."  As a general matter, one of ordinary skill in the art at the time of the invention would understand that the applicants used the term "dedicated stand-alone devices" ('086 patent at 1:49-50) to include devices with more than a single function, as described here:

> A second class of techniques for making exact copies of long-term memory storage devices involves **dedicated stand-alone devices**. A company named **Logicube produces such a device**. This device has **numerous operating modes and options** that must be specified before **making a copy**. Options are selected through the use of a number of buttons and a small display. **One of the options is to delete the contents of what will be the destination drive.** This device requires a trained operator and it **has enough options to cause confusion** or errors on the part of its user.

*See* '086 patent at 1:48-57 (emphasis added).

Page 12 of 27

Exhibit 8
12

**REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES**

30.     I also understand that applicants can be their own lexicographers in defining terms of a patent.  The Logicube device, described above by the applicants to be a dedicated stand-alone device, includes both a copy function and an erase function and thus is capable of performing more than a single function.  It is also clear that the applicants used the term "dedicated stand-alone devices" in a manner consistent with the prosecution of the '379 patent application to mean a non-general purpose computer system.  Mr. Gafford is therefore incorrect when he opines that this term means a portable device manufactured to perform only a single function.

31.     The following recitation shows that the '086 patent describes a device that can be reconfigured by a user, including reconfiguring it to perform these variations on its functionality: (1) copy only, (2) copy while scanning for one or more bit patterns, or (3) scanning only (for one or more bit patterns):

> Additionally, the copying device may be **configured** to display a report of the copying process and information about the devices involved. The copying device may be 25 **configured** to accept one or more bit patterns to scan during the copying process. The copying device may be further **configured** to perform a scan only.

*See* '086 patent at 10:22-27 (emphasis added).  Accordingly, I disagree with Mr. Gafford's opinion that "stand-alone, dedicated function device" means a device that cannot be reconfigured by a user.

### 2.  My Rebuttal of this Construction ('086): "and which performs that function with no additional components"

32.     The following recitation shows that the '086 patent describes the use of additional components, and in fact could not perform any of its primary functions without the use of additional components:

> A method consistent with aspects of the invention includes connecting a power

supply to a copying device, connecting an interface cable associated with the copying device to a **long-term memory component (source)** in a computer and powering up the computer. The method further includes connecting an interface cable and a power cable associated with the copying device to another **long-term memory component (destination)**. The method further includes activating the copying device via a switch attached to the copying device, making an exact copy, and signaling completion of the copy process.

*See* '086 patent at 2:21-31 (emphasis added).

33.     The '086 patent specification includes further descriptions of long-term memory components used in conjunction with a stand-alone, dedicated function device at '086 patent at 2:35-36, 38-39 and 47.  Accordingly, I disagree with Mr. Gafford's opinion that "stand-alone, dedicated function device" means a device which performs a function with no additional components.

### 3.   Summary of Reasons to Reject Mr. Gafford's Construction of "stand-alone, dedicated function device"

34.     Mr. Gafford's construction that limits the device to perform only a single function must be rejected based on at least (1) the description of the Logicube dedicated stand-alone device's ability to perform both copy and erase functions, and (2) the description of how the copying device of the invention can perform both copy and scan functions.

35.     In addition, Mr. Gafford's construction that the device cannot be reconfigured must be rejected based on at least the description of how the copying device of the invention can indeed be reconfigured as described above.

36.     Further, Mr. Gafford's construction disallowing performing its functions without the use of additional components must be rejected based on at least the description of how the copying device of the invention underlines requires the use of long-term memory components.

37.     Finally, I understand that Mr. Gafford's reference to the '379 patent file history is inaccurate as discussed below in reference to the "stand-alone, dedicated function device" term.

Exhibit 8
14

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

38.     Thus, Mr. Gafford's construction must be rejected.

**B.     '086 Claim Term "e" Rebuttal: "control circuit issuing commands to ... read and compare data on the source and destination devices" and "means for reading and comparing the data on the source and destination devices and communicating result to a user"**

39.     It is my opinion that the meaning of these two claim terms is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

40.     Mr. Gafford construes these two claim terms as "commands are issued to the source and destination devices so that, on a unit by unit basis, each unit of data on the source device is read and compared with each unit of corresponding data on the destination device." *See* Gafford Initial Report, at p. 11, ¶ 16(e)(i).

41.     Mr. Gafford's construction is improper because one of ordinary skill in the art would not limit the interpretation of the claim terms based on one embodiment of the invention, and it ignores the fact that "[a]s [comparison] technology evolves, the preferred embodiment of this invention is likely to as well." *See* '086 patent at 9:14-15.

42.     One of ordinary skill in the art at the time of the invention would understand that there are multiple alternatives to a byte-by-byte comparison, which include computing a hash code or evaluating error codes amongst others.

43.     For example, devices can be compared by calculating a hash checksum of the contents of both the source device and the destination device and insure that these two hash checksums are identical.  Two widely-used approaches for producing a hash checksum are (1) MD5, which takes as input a data block of arbitrary length and uses a hash function algorithm to produce as output a 128-bit "message digest," also known as a "hash checksum" or "fingerprint," of the input block, and (2) SHA (Secure Hash Algorithm), which encompasses a group of hash

Exhibit 8
15

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

function algorithms that process an input block to produce as output a message digest whose most common lengths are 160, 256 and 512 bits.  One of ordinary skill in the art would know that hash checksum algorithms are alternative techniques that can be used to read and compare the data on the source and destination devices to insure that data copied to a destination device is identical to the data on a source device.

44.     In addition to computing a hash result, a comparison can be achieved by evaluating the error codes that result from reading data from a source device and writing data to a destination device as one additional alternative to a byte-by-byte comparison.  As stated in the patent specification, "[the] comparison checks every byte in every sector of the Source drive to be sure that the copy has completed with no error."  *See* '086 patent at 6:17-20.  One of ordinary skill in the art would understand that any error codes that result from reading data from a device or writing data to a device indicate that the contents of the source and destination device create the potential that the devices are not identical.

45.     Thus, Mr. Gafford's construction is too limiting and must be rejected.

C.     '086 Claim Term "f" Rebuttal: "control circuit issuing commands to ... restore the source drive to its original condition" and "means for restoring the source device to its original condition"

46.     It is my opinion that the meaning of these two claim terms is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

47.     Mr. Gafford construes these two claim terms as "commands are issued to the source drive, automatically after copying, to restore the drive to its unaltered state after the source device has been altered to provide access to hidden areas."  *See* Gafford Initial Report, at p. 12, ¶ 16(f)(i).

Page 16 of 27

Exhibit 8
16

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

48.     Mr. Gafford's requirement that at least two commands are required to "restore the source drive to its original condition" is improper.  Although he argues that certain commands are used to restore a source drive to its original condition, this is not a requirement since it is possible to simply repower a source drive containing an HPA to restore it to its original condition:

> If the data is hidden using the HPA method, the drive may be instructed to make the hidden area accessible temporarily. When a temporary change command is issued, the drive resorts to its previous state the next time that the drive is powered off and on again.

*See* '086 patent at 4:54-58.

49.     Mr. Gafford's use of "automatically" is also improper since the portion of the specification that he cites simply gives some background about prior art devices.  The '086 patent does discuss an embodiment that can perform multiple operations together automatically, but which allows one of these operations to be cancelled:

> Although our device automatically copies and then verifies the copy, there are situations where a user may be interested in just performing the copy operation. For this eventuality, one embodiment of our device allows a user to cancel the verification process through a user control. This control only affects the verification process, and has no effect during the copy process.

*See* '086 patent at 5:13-19.

50.     Mr. Gafford's construction also improperly imposes a requirement that the restoring commands must be issued after the copying commands, and such an order is not imposed by the claims, the specification or the file history of the '086 patent.  Hence, Mr. Gafford's construction must be rejected because of its improper limitations.

**D.     '086 Claim Term "g" Rebuttal: "a user controllable switch that, when actuated by a user, causes the device to commence a copy"**

51.     It is my opinion that the meaning of this claim term is readily apparent to one of

Page 17 of 27

Exhibit 8
17

ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

52.    Mr. Gafford construes this claim term as "an on/off switch activated by the user that causes the control circuit to issue all the commands recited herein."  *See* Gafford Initial Report, at p. 13, ¶ 16(g)(i).

53.    Mr. Gafford's reference to the embodiment of a user controllable switch at '086 patent at 7:28-33 must be rejected as it is improperly limiting, particularly in light of the embodiment at '086 patent at 5:13-19 that I cited in the previous section which allows the verification process to be cancelled and hence the avoidance of "to issue all the commands recited herein."

54.    In addition, this embodiment: "activating the copying device via a switch attached to the copying device" (*see* '086 patent at 2:29-30) includes no provision for verification, nor does it include a provision for the user's ability to cancel a verification operation.  Further, the portion of the specification cited describes a method of performing a copy, which includes starting the copy process without describing all of the possible intermediary steps.

55.    Finally, I understand that Mr. Gafford's reference to the '379 patent file history is inaccurate as discussed below in reference to the "user controllable switch" term.

56.    Thus, Mr. Gafford's construction must be rejected.

**E.    '086 Claim Term "h" Rebuttal: "hidden areas"**

57.    My Berg Initial Report construes this claim term as "a reserved area on a storage device, including without limitation a Host Protected Area ('HPA') and/or a Device Configuration Overlay ('DCO')."

58.    Mr. Gafford construes this claim term as "[a]n area on a long-term memory

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

device that is not counted towards the reported size of the device, such as a Host Protected Area." *See* Gafford Initial Report, at p. 13, ¶ 16(h)(i).

59. Mr. Gafford's construction is incomplete in that it does not mention the DCO hidden area.

60. In addition, Mr. Gafford's construction is ambiguous since there is potentially more than one possible value for "the reported size of the device" depending on whether you use the ATA READ NATIVE MAX ADDRESS/READ NATIVE MAX ADDRESS EXT command or the ATA IDENTIFY command for querying a storage device.

61. Hence, as Mr. Gafford's construction is both incomplete and ambiguous, it must be rejected.

## IV. REBUTTAL OF MR. GAFFORD'S OPINIONS REGARDING THE '379 PATENT

62. Mr. Gafford construed five claim terms from the '379 patent, and I rebut those constructions in this section.

### A. '379 Claim Term "j" Rebuttal: "irretrievably remove data" and "control circuit configured to ... irretrievably remove data"

63. It is my opinion that the meaning of these two claim terms is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

64. Mr. Gafford construes these two claim terms as "eliminate previously recorded information such that it is unrecoverable, by doing more than merely writing one or more data patterns to the data areas." *See* Gafford Initial Report, at p. 14, ¶ 17(j)(i).

65. Mr. Gafford's references to the embodiments involving fuzzy data and jitter are the basis of the phrase "by doing more than merely writing one or more data patterns to the data

Page 19 of 27

Exhibit 8
19

**REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES**

areas" in his construction.  This construction precludes "an alternate cleaning scheme [in which] some target disk drives have an internal command that will erase the drive. Cleaning device 300 may use these internal erase commands when cleaning the drive."  See '379 patent at 8:55-58. Hence, Mr. Gafford's construction must be rejected as it is improperly limiting.  '379 Claim Term "k" Rebuttal: "hidden storage areas"

66.    My Berg Initial Report construes this claim term as "a reserved area on a storage device, including without limitation a Host Protected Area ('HPA') and/or a Device Configuration Overlay ('DCO')."

67.    Mr. Gafford construes this claim term as "one or more areas on a long-term memory device that are not counted towards the reported size of the device, such as a Host Protected Area."  See Gafford Initial Report, at p. 15, ¶ 17(k)(i).

68.    For the same reasons cited above for "hidden areas" in the '086 patent, Mr. Gafford's construction is both incomplete and ambiguous, and so it must be rejected.

**B.        '379 Claim Term "l" Rebuttal: "the control circuit is further configured to open a hidden storage area on the long-term memory component before irretrievably removing the data"**

69.    It is my opinion that the meaning of this claim term is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

70.    Mr. Gafford construes this claim term as "control circuit automatically opens a hidden storage area on the long-term memory component before irretrievably removing the data in response to the user's actuation of the switch to command irretrievable removal of all data." See Gafford Initial Report, at p. 16, ¶ 17(l)(i).

71.    Mr. Gafford's claim construction includes two inappropriate importations which

Exhibit 8
20

he attempts to justify on the basis that the device "has a single function and is easy to use, and thus a single button (like toasting bread) initiates all its functions."  *See Id.*

### 1.  Mr. Gafford's First Inappropriate Importation

72.    Mr. Gafford's first inappropriate claim construction importation is the word "automatically," but doing so makes his construction directly counter to one of the '379 patent embodiments which describes how the device "<u>may</u> automatically" operate, and which further shows that a password-protected hidden area <u>cannot be automatically opened</u>:

> In one implementation, cleaning device 300 may issue appropriate commands to target drives that contain hidden data to release the hidden data. Cleaning device 300 **may automatically** issue these commands without the need for human intervention, thus making the entire contents of the drive accessible for data removal. **In situations where the hidden data is protected by a password, the operator of cleaning device 300 may be informed that the device is protected by a password and that additional steps are necessary to complete the data removal.**

*See* '379 patent at 10:51-60 (emphasis added).

73.    Hence, the inclusion of the word "automatically" makes Mr. Gafford's construction counter to two aspects of the above-cited embodiment.

### 2.  Mr. Gafford's Second Inappropriate Importation is an Additional Step

74.    Mr. Gafford's second inappropriate claim construction importation adds an additional step by way of this appended phrase: "in response to the user's actuation of the switch to command irretrievable removal of all data."  As above, the inclusion of this phrase makes this construction counter to at least two embodiments from the '379 patent specification: (1) the embodiment at '379 patent at 10:51-60 (shown just above) because "irretrievable removal of all data" is not possible for a password-protected hidden area, and (2) the embodiment of a "switch" whose purpose is to vary the cleaning level as opposed to "command irretrievable removal of all data" as would be required by Mr. Gafford's construction.  This second embodiment is described

Exhibit 8
21

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

here:

> In an alternate embodiment, cleaning device 300 may include a **switch** that a user can set to **vary the cleaning level**. Cleaning device 300 would then vary its number of cleaning passes based on the switch setting.

*See* '379 patent at 10:37-40 (emphasis added).  This second embodiment is also described here:

> Additionally, the cleaning device can provide **different levels of data removal**. The longer the cleaning device performs operations on a target device, the more securely it is able to remove data.

*See* '379 patent at 11:36-39 (emphasis added).

### 3. Summary of Reasons to Reject Mr. Gafford's Construction

75.    As Mr. Gafford's claim construction includes two inappropriate importations, each of which is in conflict with two embodiments from the '379 patent specification, his construction must be rejected.   Moreover, if the Court adopts Mr. Gafford's proposed construction that "in response to the user's actuation of the switch to command irretrievable removal of all data," it would render the construction of the claim limitation "a user controllable switch that, when actuated by a user, causes the control circuit to commence irretrievably removing all the data from the long-term memory component" completely redundant and superfluous.

### C.    '379 Claim Term "m" Rebuttal: "user controllable switch"

76.    It is my opinion that the meaning of this claim term is readily apparent to one of ordinary skill in the art at the time of the invention, and that accordingly no construction is necessary.

77.    Mr. Gafford construes this claim term as "an electrical switch with only two states, on and off."  *See* Gafford Initial Report, at p. 16, ¶ 17(m)(i).

78.    Mr. Gafford's arguments for his construction, particularly regarding the word

Page 22 of 27

Exhibit 8
22

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

"only," conveniently ignore the embodiment at '379 patent at 10:51:60 which is discussed in the preceding section.  This embodiment shows that the switch of the '379 patent can have a purpose besides that of an on/off switch, *viz.*, it can also be a switch that can vary the cleaning level. Hence, Mr. Gafford's construction is in conflict with the '379 patent specification and so must be rejected.

      **D.**    **'379 Claim Term "n" Rebuttal: "stand-alone, dedicated function device"**

79.    I understand that as this claim term only appears in the preamble of claim 1 of the '379 patent, this term does not limit the scope of the claim and thus requires no construction.

80.    Mr. Gafford construes this claim term as "portable device manufactured to perform only a single function (irretrievably removing data from a long-term memory component) that is not reconfigurable by a user, and which performs that function without additional components, such as drivers or a BIOS."  *See* Gafford Initial Report, at pp. 17-18, ¶ 17(n)(i).

        **1.**    **My Rebuttal of this Construction ('379): "manufactured to perform only a single function (irretrievably removing data from a long-term memory component)"**

           **a)**    **Devices With More Than a Single Function in '379 Specification**

81.    Mr. Gafford makes the assertion that "'dedicated' is a term of art that describes a device with a single purpose, so that 'dedicated function' is a device designed to perform exactly one function."  *See* Gafford Initial Report, at p. 18, ¶ 17(n)(i).  As a general matter, one of ordinary skill in the art at the time of the invention would understand that the applicants used the terms "stand-alone device" ('379 patent at 6:19), "stand alone device" ('379 patent at 11:24) and "small, dedicated computer system" ('379 patent at 6:38-39) to include devices with more than a single function, as described here:

Exhibit 8
23

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

> Still further, cleaning device 300, **after erasing** a target 65 drive, may **partition and/or format the target drive**. For example, cleaning device 300, after erasing a target drive, may then automatically **partition the drive into a single partition and format the drive under FAT32 drive format**. In additional embodiments, cleaning device 300 may proceed, after formatting the target drive, to **copy an image to the drive** that defines an operating system. This may help to speed up the process of reusing drives in refurbished computer systems.

*See* '379 patent at 10:64-11:6 (emphasis added).

82.    The embodiments described above thus support functions in addition to removing data that include (1) partitioning, (2) formatting and (3) copying an image.

### b)  Devices With More Than a Single Function in '379 File History

83.    While the Office Action Response of August 4, 2006 cited by the Gafford Initial Report at p. 18, ¶ 17(n)(ii) references the fact that although "a Toaster Oven, such as the Cuisanart Convection Oven Toaster Broiler with Exact Heat ... does not have any provisions to allow the user to change its basic functionality," this Convection Oven Toaster Broiler has more than a single function, e.g., it can toast bread, frozen waffles or Pop Tarts; it can bake French Fries, cookies or a cake; and it can broil fish, fowl or meat.

84.    Additionally, the Braun 8595 electric shaver included in this same Office Action Response at pp. 15, 21, 26 and 27 has more than the single function of cutting whiskers, e.g., it can cut hairs elsewhere on the body such as on the back of the neck, and it can be a nose hair trimmer.

85.    Further, the digital watch included in the same Office Action Response at p. 15 could have more than the single function of providing the time-of-day, e.g., it could also be a stopwatch or a countdown timer.  It is clear that the applicants used the term "stand-alone dedicated function device" in a manner that distinguishes the term from a general purpose computer system.

### 2.  My Rebuttal of this Construction ('379): "that is not reconfigurable by a

Page 24 of 27

Exhibit 8
24

user"

86.     The '379 patent includes at least four descriptions of ways in which the device can be reconfigured by a user.

87.     The first description shows how a user can choose to configure the cleaning device with either one or two target devices for erasure:

> In yet another implementation, cleaning device 300 could have multiple drive interface cables, through which it could simultaneously clean two or more target devices.

*See* '379 patent at 10:61-63 (emphasis added).

88.     The second description at '379 patent at 10:64-11:6 (included in the previous section) shows how a user can optionally configure the cleaning device to perform one or more operations following erasure that include (1) partitioning, (2) formatting and (3) copying an image.

89.     The third description shows how the cleaning device could support any or all of a set of interfaces, and hence a user could configure the cleaning device to erase long-term storage devices having any or all of the interfaces supported by the particular cleaning device:

> Although the cleaning device discussed above was primarily described as cleaning an IDE device, in other implementations, long-term storage devices having other interfaces, such as **FireWire**, **USB2**, or **SCSI** could be cleaned using concepts similar to those discussed herein.

*See* '379 patent at 11:7-11 (emphasis added).

90.     The fourth description shows how a user could configure the cleaning device to perform erasure at a particular cleaning level.  This is described here:

> In an alternate embodiment, cleaning device 300 may include a **switch** that a user can set to **vary the cleaning level**. Cleaning device 300 would then vary its number of cleaning passes based on the switch setting.

*See* '379 patent at 10:37-40 (emphasis added).  This is also described here:

Exhibit 8
25

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

> Additionally, the cleaning device can provide **different levels of data removal**. The longer the cleaning device performs operations on a target device, the more securely it is able to remove data.

*See* '379 patent at 11:36-39 (emphasis added).

### 3. My Rebuttal of this Construction ('379): "and which performs that function without additional components, such as drivers or a BIOS"

91.     The following recitation shows that the '379 patent describes the use of additional components, and  in fact could not perform its erasure function without the use of additional components:

> One aspect of the invention is directed to a device for removing data from a **long-term memory component**. The device includes an interface for connecting the device to the **long-term memory component** and a control circuit configured to control the **long-term memory component** through the interface to permanently remove data from the **long-term memory component**. A user controllable switch, when actuated by a user, causes the control circuit to commence permanently removing the data from the **long-term memory component**.

*See* '379 patent at 4:6-15 (emphasis added).

92.     The '379 patent specification includes further descriptions of the use of long-term memory components in eleven location within '379 patent at 4:16-48 as well as in claim 1.  *See* comment above regarding "additional component" in the '086 patent.

### 4. Summary of Reasons to Reject Mr. Gafford's Construction of "stand-alone, dedicated function device"

93.     Mr. Gafford's construction that limits the device to perform only a single function must be rejected based on at least the embodiments that support functions in addition to removing data that include (1) partitioning, (2) formatting and (3) copying an image.

94.     In addition, Mr. Gafford's construction that the device cannot be reconfigured must be rejected based on at least the four descriptions of how the device could be reconfigured by a user.

95.     Further, Mr. Gafford's construction requiring the claimed device to perform its

REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES

functions without the use of additional components must be rejected based on at least the description of how the claimed device of the invention <u>requires</u> the use of long-term memory components.

Brian A. Berg

2 December 2011

Date

Page 27 of 27

Exhibit 8
27

*In the Matter of* Certain Computer Forensic
Devices and Products Containing the Same

Inv. No. 337-TA-799

## CERTIFICATE OF SERVICE

I, Elizabeth Kim, hereby certify that the attached **REBUTTAL EXPERT REPORT OF BRIAN A. BERG ON CLAIM CONSTRUCTION ISSUES** has been served upon, the following parties via first class mail and air mail where necessary on December 2, 2011.

| COMMISSION INVESTIGATIVE ATTORNEY | |
| --- | --- |
| Daniel E. Valencia, Esq.<br>Office of Unfair Import Investigations<br>U.S. International Trade Commission<br>500 E. Street, S.W., Room 401-O<br>Washington, D.C. 20436<br><br>*Via e-mail to* daniel.valencia@usitc.org | [   ] Via Electronic Filing<br>[   ] Via Hand Delivery<br>[   ] Via Federal Express<br>[   ] Via First Class Mail<br>[ x ] Via Electronic Mail |
| **CRU ACQUISITIONS GROUP LLC and CRU-DATA PORT LLC** | |
| David P. Cooper<br>Owen D. Dukelow<br>Carla C. Todenhagen<br>Kolisch Hartwell P.C.<br>520 SW Yamhill Street, Suite 200<br>Portland, Oregon 97204<br><br>*Via e-mail to* coop@khpatent.com;<br>owen@khpatent.com; rdsefiling@mnat.com | [   ] Via Electronic Filing<br>[   ] Via Hand Delivery<br>[   ] Via Federal Express<br>[   ] Via First Class Mail<br>[ x ] Via Electronic Mail |
| **DATA PROTECTION SOLUTIONS BY ARCO** | |
| Aimee E. Dominguez<br>Dominguez Law Group<br>3250 Wilshire Blvd., Suite 1750<br>Los Angeles, CA  90010<br><br>Lizbeth R. Levinson<br>Kutak Rock LLP<br>1101 Connecticut Avenue, N.W., Suite 100<br>Washington, DC 20036-4374<br><br>*Via e-mail to a*imee @dominguezlawgroup.com<br>YEC@kutakrock.com | [   ] Via Electronic Filing<br>[   ] Via Hand Delivery<br>[   ] Via Federal Express<br>[   ] Via First Class Mail<br>[ x ] Via Electronic Mail |

DMS:100735.1

1

Exhibit 8
28

*In the Matter of* Certain Computer Forensic
Devices and Products Containing the Same

Inv. No. 337-TA-799

| DIGITAL INTELLIGENCE, INC. | |
|---|---|
| Alejandro Menchaca<br>Yufeng Ethan Ma<br>Matthew N. Allison<br>McAndrews, Held & Malloy, LTD<br>500 West Madison Street, 34th Floor<br>Chicago, Illinois 60661<br>Tel: (312) 775-8000<br>Fax: (312) 775-8100<br>*Via e-mail to* digital.itc@mcandrews-ip.com | [　] Via Electronic Filing<br>[　] Via Hand Delivery<br>[　] Via Federal Express<br>[　] Via First Class Mail<br>[ x ] Via Electronic Mail |
| DISKOLOGY, INC. | |
| 9350 Eton Avenue<br>Chatsworth, CA 91311 | [　] Via Electronic Filing<br>[　] Via Hand Delivery<br>[　] Via Federal Express<br>[ x ] Via First Class Mail<br>[　] Via Electronic Mail |
| GUIDANCE SOFTWARE, INC. and GUIDANCE TABLEAU LLC | |
| William C. Bergman<br>A. Neal Seth<br>Baker & Hostetler LLP<br>1050 Connecticut Avenue NW<br>Washington, DC 20036<br><br>Kevin W. Kirsch<br>David A. Mancino<br>John F. Bennett<br>312 Walnut Street, Suite 3200<br>Cincinnati, OH  45202<br><br>*Via e-mail to* Guidance799@bakerlaw.com | [　] Via Electronic Filing<br>[　] Via Hand Delivery<br>[　] Via Federal Express<br>[　] Via First Class Mail<br>[ x ] Via Electronic Mail |
| Ji2, INC., MULTIMEDIA EFFECTS, INC., and YEC CO.LTD | |
| Lizbeth R. Levinson<br>Kutak Rock LLP<br>1101 Connecticut Avenue, N.W., Suite 100<br>Washington, DC 20036-4374<br><br>*Via e-mail to* YEC@kutakrock.com | [　] Via Electronic Filing<br>[　] Via Hand Delivery<br>[　] Via Federal Express<br>[　] Via First Class Mail<br>[ x ] Via Electronic Mail |

DMS:100735.1

2

Exhibit 8
29

*In the Matter of* Certain Computer Forensic
Devices and Products Containing the Same

Inv. No. 337-TA-799

Dated: December 2, 2011

_____
Elizabeth Kim