# Exhibit 10

1   ROBERT E. FREITAS (SBN 80948)
        rfreitas@ftklaw.com
2   KAIWEN TSENG (SBN193756)
        ktseng@ftklaw.com
3   QUDUS B. OLANIRAN (SBN 267838)
        qolaniran@ftklaw.com
4   FREITAS TSENG & KAUFMAN LLP
    100 Marine Parkway, Suite 200
5   Redwood Shores, California  94065
    Telephone:   (650) 593-6300
6   Facsimile:    (650) 593-6301

7   Attorneys for Plaintiff
    MyKey Technology Inc.
8

9               UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  IN RE: MYKEY TECHNOLOGY              2:13-ml-02461-GAF (PLAx)
    INC. PATENT LITIGATION
13                                       MDL NO. 2461
    MyKey Technology Inc.,
14                                       This Document Relates to:
            v.                           ALL CASES
15
    Intelligent Computer Solutions, Inc.
16                                       **EXPERT OPINION OF BRIAN A.
                                         BERG ON CLAIM CONSTRUCTION**
17
                                         **DEMAND FOR JURY TRIAL**
18

19

20

21

22

23

24

25

26

27

28

Exhibit 10
1

## I.      INTRODUCTION

1.      I am submitting this declaration on some claim construction issues relevant to U.S. Patent No. 6,813,682 (the "'682 patent"), U.S. Patent No. 7,159,086 (the "'086 patent") and U.S. Patent No. 7,228,379 (the "'379 patent"), the three patents-in-suit in these cases.

## II.     BACKGROUND

2.      I am an independent computer consultant with extensive experience in consumer electronics devices, including computer storage and computer storage interfaces.  I have worked in the industry as a computer engineer since 1974, and have worked extensively with computer hardware, including buses, software and device interfaces.  I have designed, implemented and debugged device drivers, embedded firmware, middleware and applications, and have integrated hardware and software in the process of creating consumer products.  I have also been a project leader, industry analyst, marketing team member and seminar leader, and I have extensive public speaking experience at computer conferences and industry events as detailed in paragraph 4 below.  A true and correct copy of my *Curriculum Vitae* is attached as **Exhibit A**.

3.      I have worked extensively with data storage technologies including flash memory (*e.g.*, memory cards such as SD and microSD, embedded flash memory chips, solid state disks and USB thumb drives), magnetic disk drives, disk arrays (RAID), magnetic tape, optical storage (Compact Disc, CD-ROM, DVD and various writable formats), and library autochangers for removable storage media, as well as storage interfaces such as USB, IDE/ATA/ATAPI/SATA, Fibre Channel, SCSI, iSCSI, FireWire 1394 and PCMCIA.

4.      I have been a session speaker, conference session chair, program chair, conference chair and conference advisory board member for over 60 industry events which have encompassed technologies including flash memory, server design, magnetic storage, optical storage, storage interfaces and Storage Area

Networks.  For example, I have been the Technical Chair of the Flash Memory Summit (FMS) in Santa Clara, CA since 2011.  My publications include books that I co-edited and/or co-wrote, and articles for journals, periodicals and newsletters.  I have also been a book reviewer, and have been actively involved in professional computer societies and organizations for over 30 years.  More details on these publications, societies and organizations can be found in my *CV*.

5.     I am an IEEE Senior Member, and was Chair, Vice Chair and Secretary of the IEEE Santa Clara Valley (SCV) Section (the largest IEEE Section in the world at about 12,800 members) during the years 2010-2012, and remain active in the SCV Section.  I am a Director and past Chair of the IEEE Consultants' Network of Silicon Valley (IEEE-CNSV), and am SCV Section Liaison for the IEEE Women in Engineering Affinity Group.  I was the recipient of 2012 *Outstanding Leadership and Professional Service Award* for the SCV Section, for the Central Area of IEEE Region 6, and also for Region 6 itself (which includes 10 western states and portions of two others).  I was also the Champion for an IEEE Milestone dedicated in 2012 which recognized the importance of the Floating Gate EEPROM and how it led to the invention of Data Storage in Flash Memory[1].

6.     I received a Bachelor of Science degree in Mathematics in 1974 from Pacific Lutheran University in Tacoma, WA.  Before starting a consulting company with some associates, I completed about 90% of the Electrical Engineering and Computer Science coursework toward a Master of Science in Computer Engineering degree at Stanford University from 1975 to 1978 – this was while I was employed full-time as an engineer at NASA-Ames Research Center in Mountain View, CA (1974-1976) and at Ford Aerospace and Communications Corporation in Palo Alto, CA (1976-1979).

7.     In 1978, I co-founded Digital Software Corporation (DSC), a

---

[1] *See* www.ieeeghn.org/wiki/index.php/Milestones:The_Floating_Gate_EEPROM,_1976_-_1978 , with Dedication Ceremony video at www.youtube.com/watch?v=WXcwFQ6KK8g

EXPERT OPINION OF BRIAN A. BERG ON
CLAIM CONSTRUCTION–NO. 2:13-ML-02461 GAF

Exhibit 10
3

consulting company.  While employed full-time as a consultant at DSC from 1979
to 1985, my work focused on device drivers for various kinds of hardware
including satellite systems.  In 1985, I founded Berg Software Design (BSD), and I
have worked as a consultant there since that time.  I have performed consulting
services for well over 100 companies.

8.     I am being compensated for my services at the rate of $475 per hour.
My compensation does not depend on the outcome of this litigation, and I have no
personal interest in the outcome of this litigation.

### III.   LEVEL OF ORDINARY SKILL IN THE ART

9.     It is my opinion that one of ordinary skill in the art at the time of the
inventions would have had a bachelor's degree in a discipline such as electrical
engineering, computer science or mathematics, along with three to five years of
technology industry experience that included work with computer forensic devices
or work with storage systems, firmware, operating systems, device drivers and
computer operation.

### IV.   PROPOSED CONSTRUCTIONS FOR THE '682 PATENT

#### A. '682 Claim Term: "interface emulator"

10.     It is my opinion that the meaning of this claim term should be "an
interface component that mimics another interface."

11.     My opinion is directly supported by the specification, which states
"[s]pecifically, the blocking device includes an interface emulator configured to
emulate an interface presented by a storage device and an interface for connecting
to a storage device.  Additionally, the blocking device includes a processor coupled
to the interface emulator and the interface."  *See* '682 patent at 2:27-33.

12.     Further, a person of ordinary skill in the art would understand that an
"emulator" is an electronic device that imitates another electronic device.  As such,
an "interface emulator" would be understood to mean an interface component that

- 3 -

Exhibit 10
4

mimics or imitates another interface as presented by a storage device.

**B.    '682 Claim Term: "transparent to normal operation of the host and the storage device" and "transparently to normal operation of the host and the storage device"**

13.    It is my opinion that the meaning of these claim terms should be "to the host, the blocking device appears to be a standard drive interface and presents to the host the memory, registers, and control signals that a storage device would normally present to the host, and to the storage device, the blocking device appears to be a host and presents to the storage device the memory, registers, and control signals that the host would normally present to the storage device, although the blocking device blocks or modifies commands that would result in the modification of the drive."

14.    The first portion of this construction is directly supported by the '682 patent:

> To host computer 201, blocking device 203 appears to be a standard drive interface, such as an IDE drive interface, and presents to the host 201 the memory, registers, and control signals that a drive would normally present to host 201. To drive 205, blocking device 205 appears to be a host computer, and presents to drive 205 the memory, registers, and control signals that host 201 would normally present to drive 205. In other words, blocking device 203 is transparent to the system.

*See* '682 patent at 5:32-40

15.    The last portion of this construction reflects the fact that the invention of the '682 patent provides "write protection for computer long-term memory devices." In addition to the title of the '682 patent, the invention is described in various other citations in the '682 patent, including the Abstract:

> Certain commands, such as commands that may modify the storage device, may be discarded.

*See* '682 patent at Abstract (emphasis added), and

- 4 -

Exhibit 10
5

One way to minimize or prevent damage from such attacks is to **block the modification of all of or of certain predetermined sensitive areas** of the computer's storage device.

*See* '682 patent at 1:45-48 (emphasis added), and

The logic circuit connects the IDE emulator component to the IDE interface and compares commands received at the IDE emulator component to a predetermined set of commands and **blocks transmission of one or more of the commands** from the IDE emulator component to the IDE interface when the comparison indicates that the logic circuit does not recognize the received command or the comparison indicates that **the received command is a command that modifies the storage device**.

*See* '682 patent at 2:44-53 (emphasis added), and

Additionally, with certain commands, embedded processor **360** may **modify the command such that it will not modify the drive before passing the modified command to the drive**.

*See* '682 patent at 6:8-11 (emphasis added), and

Further, because the blocking device **203 only allows commands that it knows are safe (i.e., commands that will not modify the drive) to pass, the drive cannot be modified by the host**.

*See* '682 patent at 6:30-33 (emphasis added), and

In one implementation, blocking device **203** (FIG. 3) may examine the data structure received from drive **205** and zero out any features not supported by the blocking device **203**. In this manner, **if a future version of an IDE drive supports a command, such as an erase command, that embedded processor 330 was not programmed to recognize**, blocking device **203** could inform the host that the drive does not support this feature. Accordingly, **the host would not attempt to modify the drive using that command**.

*See* '682 patent at 11:52-60 (emphasis added).

- 5 -

16.    A person of ordinary skill in the art would understand that the blocking device of the '682 patent would block or modify commands as described in the various methods and embodiments disclosed in the '682 patent.

**C.    '682 Claim Term: "transparently to normal operation of the host and the IDE storage device"**

17.    It is my opinion that the meaning of this claim term should be "to the host, the device appears to be a standard IDE storage device interface and presents to the host the memory, registers, and control signals that a IDE storage device would normally present to the host, and to the IDE storage device, the device appears to be a host and presents to the IDE storage device the memory, registers, and control signals that the host would normally present to the IDE storage device, although the device blocks or modifies commands that would result in the modification of the IDE storage device."

18.    My opinion is consistent with and is supported by the various citations quoted in support of the construction for the term "transparent to normal operation of the host and the storage device" in section VI.B above.

**D.    '682 Claim Term: "transparent to normal operation of the computer motherboard and the storage device"**

19.    It is my opinion that the meaning of this claim term should be "the method is performed such that to the computer motherboard, there appears to be a standard storage device interface and the computer motherboard is presented with the memory, registers, and control signals that a storage device would normally present to the computer motherboard, and to the storage device, there appears to be a computer motherboard and the storage device is presented with the memory, registers, and control signals that the computer motherboard would normally present to the storage device, although commands that would result in the

- 6 -

Exhibit 10
7

modification of the storage device are blocked or modified."

20.     My opinion is consistent with and is supported by the various citations quoted in support of the construction for the term "transparent to normal operation of the host and the storage device" in section VI.B above.

**E.     '682 Claim Term: "transparently to normal operation of the host computer and the long-term storage device"**

21.     It is my opinion that the meaning of this claim term should be "to the host computer, the blocking device appears to be a standard long-term storage device interface and presents to the host computer the memory, registers, and control signals that a long-term storage device would normally present to the host computer, and to long-term storage device, the blocking device appears to be a host computer and presents to long-term storage device the memory, registers, and control signals that the host computer would normally present to the long-term storage device, although commands that would result in the modification of the long-term storage device are blocked or modified."

22.     My opinion is consistent with and supported by the various citations quoted in support of the construction for the term "transparent to normal operation of the host and the storage device" in section VI.B above.

**F.     '682 Claim Term: "IDE emulator component"**

23.     It is my opinion that the meaning of this claim term should be "a component that mimics an interface compatible with the IDE or ATA interface." This construction is consistent with the constructions I proposed above for "interface emulator."

24.     The terms IDE and ATA are used interchangeably in the industry.  As shown in the '682 patent, IDE is known as both "Integrated Device Electronics" (*see* claims 2, 27, 32 and 41) and "Integrated Drive Electronics" (*see* 3:59-60).

- 7 -

Exhibit 10
8

1    ATA stands for AT Attachment, a name that originated with the IBM PC AT.

2         25.    ATA (IDE) is an interface standard which may be used for

3    communication with a storage device.  The ATA standards documents are created

4    by T13, a Technical Committee of the Accredited Standards Committee NCITS that

5    is overseen by the American National Standards Institute (ANSI).  T13 maintains a

6    website at www.t13.org.

7         26.    The ATA (IDE) physical interface and command set are defined in a

8    series of documents published by the T13.  Here are the various final drafts of the

9    documents produced over the years, along with the latest drafts:

10
11
12
13
14
15

- ATA-1 Final Draft (Rev. 7d; Jan. 1, 1994)[2]
- ATA-2 Final Draft (Rev. 4c; March 18, 1996)[3]
- ATA-3 Final Draft (Rev. 7b; Jan. 27, 1997)[4]
- ATA/ATAPI-4 Final Draft (Rev. 18; Aug. 19, 1998)[5]
- ATA/ATAPI-5 Final Draft (Rev. 3; Feb. 29, 2000)[6]
- ATA/ATAPI-6 Final Draft (Rev. 3b; Feb. 26, 2002)[7]
- ATA/ATAPI-7 Final Drafts (Rev. 4b; April 21, 2004): Volume 1: Command Set[8], Volume 2: Parallel Transport Protocol (PATA)[9] [10],

16

---

17   [2] Available at
18   http://www.t13.org/Documents/UploadedDocuments/project/d0791r4c-ATA-1.pdf
     [3] Available at
19   http://www.t13.org/Documents/UploadedDocuments/project/d0948r4c-ATA-2.pdf
     [4] Available at
20   http://www.t13.org/Documents/UploadedDocuments/project/d2008r7b-ATA-3.pdf
21   [5] Available at
     http://www.t13.org/Documents/UploadedDocuments/project/d1153r18-ATA-
22   ATAPI-4.pdf
23   [6] Available at
     http://www.t13.org/Documents/UploadedDocuments/project/d1321r3-ATA-
24   ATAPI-5.pdf
25   [7] Available at
     http://www.t13.org/Documents/UploadedDocuments/project/d1410r3b-ATA-
26   ATAPI-6.pdf
27   [8] Available at
     http://www.t13.org/Documents/UploadedDocuments/docs2007/D1532v1r4b-
28   AT_Attachment_with_Packet_Interface_-_7_Volume_1.pdf

- 8 -

Volume 3: Serial Transport Protocol (SATA)[11] [12]
- ATA/ATAPI-8 Command Set Final Draft (Rev. 6a; Sep. 6, 2008)[13]
- ATA/ATAPI Command Set 2 Final Draft (Rev. 7; June 22, 2011)[14]
- ATA/ATAPI Command Set 3 (Rev. 5; Oct. 28, 2013)[15]
- ATA-8 Serial Transport (SATA) Final Draft (Rev. 8; Aug. 16, 2011)[16]
- ATA-8 Parallel Transport (PATA) (Rev. 5; July 1, 2013)[17]

27.     The ATA (IDE) command set was included in the single standard document as released for ATA-1 through ATA/ATAPI-6, standards document released between 1994 and 2002.  The command set was split out as of ATA/ATAPI-7 (finalized in 2004) when both a parallel transport (PATA) and serial transport (SATA) version of the standard were able to use this same command set, and splitting the documents into three volumes made them easier to manage and to

---

[9] PATA is Parallel ATA.

[10] Available at http://www.t13.org/Documents/UploadedDocuments/docs2007/D1532v2r4b-AT_Attachment_with_Packet_Interface_-_7_Volume_2.pdf

[11] SATA is Serial ATA.

[12] Available at http://www.t13.org/Documents/UploadedDocuments/docs2007/D1532v3r4b-AT_Attachment_with_Packet_Interface_-_7_Volume_3.pdf

[13] Available at http://www.t13.org/documents/UploadedDocuments/docs2008/D1699r6a-ATA8-ACS.pdf

[14] Available at http://www.t13.org/Documents/UploadedDocuments/docs2011/d2015r7-ATAATAPI_Command_set_-_2_ACS-2.pdf

[15] Available at http://www.t13.org/Documents/UploadedDocuments/docs2013/d2161r5-ATAATAPI_Command_Set_-_3.pdf

[16] Available at http://www.t13.org/documents/UploadedDocuments/docs2011/d1697r8-1697D_AT_Attachment-8_-_Serial_Transport_ATA8-AST.pdf

[17] Available at http://www.t13.org/documents/UploadedDocuments/docs2013/d1698r5-1698D_AT_Attachment-8_-_Parallel_Transport_ATA8-APT.pdf

- 9 -

1    update independently.

2        28.    As the standards have evolved, all three documents have been updated

3    – some as recently as October 2013.   The command set as defined in this evolving

4    set of document continues to be applicable for both the parallel (PATA) and serial

5    (SATA) versions of the ATA (IDE) interface.

6        29.    The '682 patent at 2:38-64 describes "[a] second aspect of the

7    invention [] directed to a device that includes an IDE emulator component, an IDE

8    interface, and a logic circuit."  The IDE emulator component interfaces with the

9    host and allows the receipt of ATA (IDE) commands from the host.  The physical

10   interface is by way of a parallel transport protocol (PATA) or a serial transport

11   protocol (SATA).

12   **V.     PROPOSED CONSTRUCTIONS FOR THE '086 PATENT**

13       30.    This section provides constructions that apply to only the '086 patent.

14   Section VI below includes constructions that apply to both the '086 and '379

15   patents.

16       **A.     '086 Claim Terms: "exact copy" and "exact copies"**

17       31.    One of ordinary skill in the art would understand that the '086 patent

18   claim terms "exact copy" and "exact copies" mean "a copy/copies that

19   includes/include all of the data that resides on a long-term memory device,

20   including any data in hidden areas."

21       32.    This construction is supported by these six excerpts from the '086

22   patent and its file history:

23       A Simple Device for creating exact copies of computer long-term
24       memory devices such as hard drives and compact flash memory. Our
         current invention is a stand-alone device. A user connects a long-term
25       memory device he desires to make a copy of (source) to our device.
         The user also connects a long-term memory device to receive this copy
26       (destination). Our device contains logic and circuitry, which perform
         operations on both the source and destination device to make an exact
27       copy of the Source Data to the Destination Device, while protecting
         the Source device from any changes. Our device has a very simple user
28       interface. This simplified user interface makes it difficult and unlikely

- 10 -

Exhibit 10
11

to use our device incorrectly.

*See* '086 patent at Abstract (emphasis added), and

> Our device creates an exact copy of the data on long-term storage device (source) 620 on long-term storage device (destination) 640.

*See* '086 patent at 3:41-43 (emphasis added), and

> Our invention provides a solution to this problem by taking advantage of **the ability of a drive to hide data**. **Using either the industry standard HPA method or the DCO method of hiding data**, our device can make the Destination drive appear to be exactly the same size as the host. As such any comparison of the **two drives** will show them to have **identical data**.

*See* '086 patent at 5:33-39 (emphasis added), and

> Once the data has been copied to the **Destination drive**, a data comparison **3075** is initiated. This comparison checks every byte in every sector of the **Source drive** to **be sure that the copy has completed with no errors**.

*See* '086 patent at 6:17-20 (emphasis added), and

> Still further, the copying device copies data from all partitions on the source device, regardless of the data's format, and removes any reserved or protected data areas, so that all of the data storage areas on the target device are available for copying without requiring user intervention.

*See* '086 patent at 10:12-16 (emphasis added), and

> Another key difference [in distinguishing applicants' invention over the cited prior art references] is that the current invention teaches reading and comparing data on the **source and destination devices** and communicating the result to a user. In computer forensic and security work a copy is made of a suspect's **drive** and this copy is used for discovery purposes. It is of vital importance in this process for a user to know that **the copy is an exact copy of the source**.

*See* Amendment dated May 12, 2006, page 9, last full paragraph (emphasis added).

33.     All six of these excerpts from the intrinsic evidence of the '086 patent support my proposed construction.

## VI.     PROPOSED CONSTRUCTIONS FOR THE '086 AND THE '379 PATENTS

34.     This section provides constructions that apply to both the '086 patent and the '379 patent.  Section V above provides constructions that apply to just the

- 11 -

Exhibit 10
12

'086 patent.

### A.   '086 and '379: "HIDDEN AREA" AND "HIDDEN STORAGE AREA"

#### 1.  Recitations of "hidden area" in the '086 patent

35.     The terms "hidden area" or "hidden areas" are recited in the '086 patent at 1:59, 1:60, 4:55, and claims 1, 4, 5 and 18.  In addition, the following similar recitations are found in the specification of the '086 patent:

- "data to be hidden": 4:41-42
- "hidden data": 4:42
- "hiding data": 4:44, 5:36
- "hide data": 4:47, 5:34
- "data … area … hidden from the system": 4:51-53
- "data is hidden": 4:54

#### 2.  Recitations of "hidden storage area" in the '379 patent

36.     The term "hidden storage area" is recited in the '379 patent at claims 1, 2 and 3.  In addition, the following similar recitations are found in the specification of the '379 patent:

- "data may appear 'hidden'": 3:19
- "'hidden' data": 10:42
- "area … is … hidden": 10:45-46
- "hidden data": 10:50, 10:52-53, 10:53, 10:57

#### 3.  Construction of "hidden area" and "hidden storage area"

37.     All of the various recitations of the terms "hidden area" and "hidden storage area" in the two patents as cited in the two previous paragraphs refer to a single concept, i.e., that of a "hidden area" residing on a storage device.

38.     One of ordinary skill in the art would understand that the terms "hidden area" in the '086 patent and the term "hidden storage area" in the '379 patent both mean "a reserved area on a storage device, including without limitation a Host Protected Area ('HPA') and/or a Device Configuration Overlay ('DCO')."

- 12 -

**B.    '086 and '379: "HIDDEN AREA" AND "HIDDEN STORAGE AREA" INCLUDE HPA AND DCO**

### 1.    The ATA (aka IDE) Interface Standard

39.    As noted in paragraph 25 above, ATA, also known as IDE, is an interface standard which may be used for communication with a storage device. The ATA standards documents are created by T13, a Technical Committee of the Accredited Standards Committee NCITS that is overseen by the American National Standards Institute (ANSI).  T13 maintains a website at www.t13.org.

### 2.  The ATA Interface Standard as Referenced by the Patents

40.    The '086 patent recites the term ATA at 9:57: "the copying device may copy from an ATA device."  The '086 patent recites the term IDE twelve times, including "this detailed description of the preferred embodiment will describe an Integrated Drive Electronics (IDE) hard drive" at 3:23-25.  The '379 patent recites the term IDE 18 times, including "the cleaning device discussed above was primarily described as cleaning an IDE device" at 11:7-8.

### 3.  ATA Descriptions of HPA and DCO

41.    Various revisions of the ATA interface standard provide descriptions of two kinds of hidden areas that may be created and managed on a storage device: (1) a Host Protected Area (HPA), and (2) a Device Configuration Overlay (DCO).

#### a)  ATA/ATAPI-4: HPA Description

42.    ATA/ATAPI-4 ("ATA-4") is an interface standard whose final draft was completed on 19 August 1998[18].  *See* **Exhibit B**.  ATA-4 was the first interface standard to include a description of the "Host Protected Area feature set" ("HPAFS"), and all subsequent revisions of the ATA/ATAPI standard have included an HPAFS description.  The ATA-4 HPAFS description includes the following:

A reserved area for data storage outside the normal operating system file

---

[18] *See* FN 5.

EXPERT OPINION OF BRIAN A. BERG ON
CLAIM CONSTRUCTION–NO. 2:13-ML-02461 GAF

Exhibit 10
14

system is required for several specialized applications. Systems may wish to store configuration data or save memory to the device in a location that the operating systems cannot change. The Host Protected Area feature set allows a portion of the device to be reserved for such an area when the device is initially configured. A device that implements the Host Protected Area feature set shall implement the following minimum set of commands: READ NATIVE MAX ADDRESS and SET MAX ADDRESS.

*See* Section 6.12.

[The] SET MAX ADDRESS command allows the host to redefine the maximum address of the user-accessible address space[.] … After successful command completion, all read and write access attempts to addresses greater than specified by the successful SET MAX ADDRESS command shall be rejected[.]

*See* Section 8.38.8.

### b) ATA/ATAPI-5: HPA Description Additions

43.     ATA/ATAPI-5 ("ATA-5") is an interface standard whose final draft was completed on 29 February 2000[19].  *See* **Exhibit C**.  ATA-5 was the first interface standard to include optional security extensions to the HPAFS, and all subsequent revisions of the ATA/ATAPI standard have included these HPAFS security extensions.  The ATA-5 HPAFS description includes the following:

In addition a device supporting the Host Protected Area feature set may optionally include the security extensions. The SET MAX commands [include] … SET MAX SET PASSWORD. … The SET MAX SET PASSWORD command allows the host to define the password to be used during the current power-on cycle.

*See* Section 6.15.

### c) ATA/ATAPI-6: DCO Description

44.     ATA/ATAPI-6 ("ATA-6") is an interface standard whose final draft was completed on 26 February 2002[20].  *See* **Exhibit D**.  ATA-6 was the first interface standard to include a description of the "Device Configuration Overlay feature set" ("DCOFS"), and all subsequent revisions of the ATA/ATAPI standard have included a DCOFS description.  The ATA-6 DCOFS description includes the following:

---

[19] *See* FN 6 above.
[20] *See* FN 7 above.

- 14 -

> The optional Device Configuration Overlay feature set allows a utility program to modify … the capacity reported [by a device].
>
> Commands unique to the Device Configuration Overlay feature set … are DEVICE CONFIGURATION FREEZE LOCK, DEVICE CONFIGURATION IDENTIFY, DEVICE CONFIGURATION RESTORE and DEVICE CONFIGURATION SET.
>
> The Device Configuration Overlay feature set [allows for] … the maximum capacity of the device [to] be reduced. … The address value returned by a READ NATIVE MAX ADDRESS or READ NATIVE MAX ADDRESS EXT command is modified by the DEVICE CONFIGURATION SET command modifying the maximum capacity of the device.

*See* Section 6.21.

### d)   HPA and DCO Were Well Documented in 1998, 2000 and 2002

45.    As shown in the three preceding paragraphs, the hidden areas that can be created and managed by way of the HPA feature set were well documented and would have been understood by one of ordinary skill in the art at the time that ATA-4 was finalized in August 1998 and at the time that ATA-5 was finalized in February 2000.  In addition, the hidden areas that can be created and managed by way of the DCO feature set were well documented and would have been understood by one of ordinary skill in the art at the time that ATA-6 was finalized in February 2002.

### 4.  The HPA and DCO are Referenced in the Patents

#### a)  The HPA and DCO are Referenced in the '086 Patent

46.    The acronym "HPA" and the term "Host Protected Area" are recited in the '086 patent as follows:

- "HPA": 1:59, 4:45, claim 4
- "Host Protected Area": 4:45, claim 4
- "HPA method": 4:54, 5:35

47.    The acronym "DCO" and the term "Device Configuration Overlay" are recited in the '086 patent as follows:

- "Device Configuration Overlay Proposal": cited under "Other

- 15 -

EXPERT OPINION OF BRIAN A. BERG ON
CLAIM CONSTRUCTION–NO. 2:13-ML-02461 GAF

Exhibit 10
16

Publications"
- "DCO": 1:59, 4:66, 5:2, claim 5
- "Device Configuration Overlay function": 4:46
- "Device Configuration Overlay settings": claim 5
- "DCO method": 4:58, 5:35
- "DCO settings": 4:60
- "DCO function": 5:40

48.      Based on these recitations of HPA and DCO as well as the remainder of the '086 patent specification, one of ordinary skill in the art would understand that the term "hidden area" and the other uses of the term "hidden" in the '086 patent include an HPA and a DCO.

### b) The HPA and DCO are Referenced in the '379 Patent

49.      The '379 patent recites as follows:

Some target drives may contain data that the drive has been instructed to classify as **"hidden"** data. For example, a **command** supported by many commercially available hard drives allows a skilled programmer to **reserve** a portion of the storage media. Once reserved, this area of the media is effectively **hidden** from the computer by the drive. **Standard queries about the amount of storage on the drive return the full amount of storage minus the reserved amount**. This prevents standard data removal methods from working as the computer is unaware that there is **hidden data**.

In one implementation, cleaning device 300 may issue appropriate **commands** to target drives that contain **hidden data** to release the **hidden data**. Cleaning device 300 may automatically issue these **commands** without the need for human intervention, thus making the entire contents of the drive accessible for data removal. In situations where the **hidden data** is protected by a **password**, the operator of cleaning device 300 may be informed that the device is protected by a **password** and that additional steps are necessary to complete the data removal.

*See* '379-10:41-60 (emphasis added).

50.      While the terms Host Protected Area, HPA, Device Configuration Overlay and DCO are not explicitly recited in the '379 patent, the fact that the HPAFS and DCOFS are referenced in the '379 patent can be seen by comparing the ATA-4, ATA-5 and ATA-6 excerpts above with the excerpts from the '379 patent in the preceding paragraph.  These excerpts from both the ATA documents and the '379 patent cite reserved area, reported size, enabling commands and use of a

- 16 -

Exhibit 10
17

password.  The "reserved area" term as shown to be used in these ATA interface standards supports my use of this term in my construction of "hidden area" and "hidden storage area" above.

51.   The '379 patent file history recites both the HPA and DCO terms.  In a 24 March 2005 U.S. Patent and Trademark Office rejection, the examiner understood the meaning of "hidden" and stated that "[a]s for claims 15-17 [issued as claims 1-3], the claims recite the control circuit is further configured to release hidden data (**data in the reserve area**) on the long-term memory component …" *See Id.* at p. 12 (emphasis added).  In overcoming the rejection, the inventors further explained that "Assaf describes the use of a subset of the commands in the ATA specifications that allow for the setting of a 'Host Protection Area' (HPA). Assaf does not address the option of decoding and releasing a Device Configuration Overlay (DCO) area, nor does it teach the necessity to scan for **both types of 'hidden' areas** …."  *See* '379 patent file history, 24 August 2005 Amendments/Remarks at p. 21 (emphasis added).  Assaf recites the term "reserve area" or "reserve storage area" 119 times, and has a filing date of 2 December 1996. These statements from the '379 patent file history along with Assaf make it clear that the term "reserve area" was well known in the art far in advance of the 20 June 2002 filing date of the '379 patent, and thus support my construction for the terms "hidden area" and "hidden storage area."

52.   ATA-4 was completed on 19 August 1998, ATA-5 was completed on 29 February 2000, and ATA-6 was completed on 26 February 2002.  Hence, they would have all been known by one of ordinary skill in the art before the 20 June 2002 filing date of the '379 patent.

- 17 -

EXPERT OPINION OF BRIAN A. BERG ON
CLAIM CONSTRUCTION–NO. 2:13-ML-02461 GAF

Exhibit 10
18

53.     Based on a comparison of these ATA and '379 patent excerpts, in consideration of the remainder of the '379 patent specification, and in consideration of the '379 patent file history, one of ordinary skill in the art would understand that the term "hidden storage area" and the other uses of the term "hidden" in the '379 patent include an HPA and a DCO.

### C.     '086 Claim Term: "stand-alone, dedicated function device"

54.     It is my opinion that the meaning of this claim term should be "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long term memory devices."

### 1.   This '086 Claim Term is Not Limited to the Performance of a Single Function or an Inability to Be Reconfigured

55.     This term should not be interpreted to mean that the device can perform only a single function (*e.g.*, making exact copies of long-term memory devices) or that it cannot be reconfigured by a user since, for example, "dedicated" is not a term of art that describes a device with a single purpose.  As a general matter, one of ordinary skill in the art at the time of the invention would understand that the applicants used the term "dedicated stand-alone devices" ('086 patent at 1:49-50) to include devices with more than a single function, as described here:

> A second class of techniques for making exact copies of long-term memory storage devices involves **dedicated stand-alone devices**. A company named **Logicube produces such a device**. This device has **numerous operating modes and options** that must be specified before **making a copy**. Options are selected through the use of a number of buttons and a small display. **One of the options is to delete the contents of what will be the destination drive.** This device requires a trained operator and it **has enough options to cause confusion** or errors on the part of its user.

*See* '086 patent at 1:48-57 (emphasis added).

56.     I also understand that applicants can be their own lexicographers in

- 18 -

Exhibit 10
19

defining terms of a patent.  The Logicube device, described above by the applicants to be a dedicated stand-alone device, includes both a copy function and an erase function and thus is capable of performing more than a single function.  It is also clear that the applicants used the term "dedicated stand-alone devices" in a manner consistent with the prosecution of the '379 patent application to mean a non-general purpose computer system.

57.     The following recitation shows that the '086 patent describes a device that can be reconfigured by a user, including reconfiguring it to perform these variations on its functionality: (1) copy only, (2) copy while scanning for one or more bit patterns, or (3) scanning only (for one or more bit patterns):

> Additionally, the copying device may be **configured** to display a report of the copying process and information about the devices involved. The copying device may be 25 **configured** to accept one or more bit patterns to scan during the copying process. The copying device may be further **configured** to perform a scan only.

*See* '086 patent at 10:22-27 (emphasis added).

## 2. This '086 Claim Term is Not Limited to Mean Performing a Function With No Additional Components

58.     The following recitation shows that the '086 patent describes the use of additional components, and in fact could not perform any of its primary functions without the use of additional components:

> A method consistent with aspects of the invention includes connecting a power supply to a copying device, connecting an interface cable associated with the copying device to a **long-term memory component (source)** in a computer and powering up the computer. The method further includes connecting an interface cable and a power cable associated with the copying device to another **long-term memory component (destination)**. The method further includes activating the copying device via a switch attached to the copying device, making an exact copy, and signaling completion of the copy process.

*See* '086 patent at 2:21-31 (emphasis added).

59.     The '086 patent specification includes further descriptions of long-term memory components used in conjunction with a stand-alone, dedicated

EXPERT OPINION OF BRIAN A. BERG ON
CLAIM CONSTRUCTION–NO. 2:13-ML-02461 GAF

Exhibit 10
20

function device at '086 patent at 2:35-36, 38-39 and 47.

**D.    '379 Claim Term: "stand-alone, dedicated function device"**

60.    It is my opinion that the meaning of this claim term should be "a physical device, which is not a general purpose computer system, that stands apart from a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component."

### 1. This '379 Claim Term is Not Limited to Mean Performance of a Single Function

61.    This term should not be interpreted to mean that the device can perform only a single function (*e.g.*, irretrievably removing data from a long-term memory component) since, for example, "dedicated" is not a term of art that describes a device with a single purpose.  As a general matter, one of ordinary skill in the art at the time of the invention would understand that the applicants used the terms "stand-alone device" ('379 patent at 6:19), "stand alone device" ('379 patent at 11:24) and "small, dedicated computer system" ('379 patent at 6:38-39) to include devices with more than a single function, as described here:

> Still further, cleaning device 300, **after erasing** a target 65 drive, may **partition and/or format the target drive**. For example, cleaning device 300, after erasing a target drive, may then automatically **partition the drive into a single partition and format the drive under FAT32 drive format**. In additional embodiments, cleaning device 300 may proceed, after formatting the target drive, to **copy an image to the drive** that defines an operating system. This may help to speed up the process of reusing drives in refurbished computer systems.

*See* '379 patent at 10:64-11:6 (emphasis added).

62.    The embodiments described above thus support functions in addition to removing data that include (1) partitioning, (2) formatting and (3) copying an image.

/./././

/././.

- 20 -

### a) Devices With More Than a Single Function in '379 File History

63.     While the Office Action Response of August 4, 2006 references the fact that although "a Toaster Oven, such as the Cuisanart Convection Oven Toaster Broiler with Exact Heat ... does not have any provisions to allow the user to change its basic functionality," this Convection Oven Toaster Broiler has more than a single function, e.g., it can toast bread, frozen waffles or Pop Tarts; it can bake French Fries, cookies or a cake; and it can broil fish, fowl or meat.

64.     Additionally, the Braun 8595 electric shaver included in this same Office Action Response at pp. 15, 21, 26 and 27 has more than the single function of cutting whiskers, e.g., it can cut hairs elsewhere on the body such as on the back of the neck, and it can be a nose hair trimmer.

65.     Further, the digital watch included in the same Office Action Response at p. 15 could have more than the single function of providing the time-of-day, e.g., it could also be a stopwatch or a countdown timer.  It is clear that the applicants used the term "stand-alone dedicated function device" in a manner that distinguishes the term from a general purpose computer system.

### 2. This '379 Claim Term is Not Limited to Mean That It is Not Reconfigurable by a User

66.     The '379 patent includes at least four descriptions of ways in which the device can be reconfigured by a user.

67.     The first description shows how a user can choose to configure the cleaning device with either one or two target devices for erasure:

> In yet another implementation, cleaning device 300 could have multiple drive interface cables, through which it could simultaneously clean two or more target devices.

*See* '379 patent at 10:61-63 (emphasis added).

68.     The second description at '379 patent at 10:64-11:6 (included in the

- 21 -

Exhibit 10
22

previous section) shows how a user can optionally configure the cleaning device to perform one or more operations following erasure that include (1) partitioning, (2) formatting and (3) copying an image.

69.   The third description shows how the cleaning device could support any or all of a set of interfaces, and hence a user could configure the cleaning device to erase long-term storage devices having any or all of the interfaces supported by the particular cleaning device:

> Although the cleaning device discussed above was primarily described as cleaning an IDE device, in other implementations, long-term storage devices having other interfaces, such as **FireWire**, **USB2**, or **SCSI** could be cleaned using concepts similar to those discussed herein.

*See* '379 patent at 11:7-11 (emphasis added).

70.   The fourth description shows how a user could configure the cleaning device to perform erasure at a particular cleaning level.  This is described here:

> In an alternate embodiment, cleaning device 300 may include a **switch** that a user can set to **vary the cleaning level**. Cleaning device 300 would then vary its number of cleaning passes based on the switch setting.

*See* '379 patent at 10:37-40 (emphasis added).  This is also described here:

> Additionally, the cleaning device can provide **different levels of data removal**. The longer the cleaning device performs operations on a target device, the more securely it is able to remove data.

*See* '379 patent at 11:36-39 (emphasis added).

### 3.   This '379 Claim Term is Not Limited to the Performance of Its Function Without Additional Components

71.   The following recitation shows that the '379 patent describes the use of additional components, and  in fact could not perform its erasure function without the use of additional components:

> One aspect of the invention is directed to a device for removing data from a **long-term memory component**. The device includes an interface for connecting the device to the **long-term memory component** and a control circuit configured to control the **long-term memory component** through the interface to permanently remove data from the **long-term memory component**. A user controllable

- 22 -

Exhibit 10
23

switch, when actuated by a user, causes the control circuit to commence permanently removing the data from the **long-term memory component**.

*See* '379 patent at 4:6-15 (emphasis added).

72.    The '379 patent specification includes further descriptions of the use of long-term memory components in eleven locations within the '379 patent at 4:16-48 as well as in claim 1.  *See* comment regarding "additional component" in the '086 patent in paragraph 58 above.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed this 17th day of January 2014, in Redwood Shore, CA.


_____
Brian A. Berg

- 23 -

Exhibit 10
24