LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Stephen Montes Kerr | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| None | None | |

**Proceedings:**

**ORDER RE:  CLAIM CONSTRUCTION**

**I.
INTRODUCTION**

This is an MDL proceeding involving six lawsuits in which Plaintiff MyKey Technology ("MyKey" or "Plaintiff") charges the named Defendants with infringing at least one of its three software patents.  (Docket No. 39 [Plaintiff's Opening Brief ("PB")] at 1.)

The patents at issue are United States Patent No. 6,813,682 (the "'682 patent"), United States Patent No. 7,159,086 (the "'086 patent"), and United States Patent No. 7,228,379 (the "'379 patent").  The '682 patent describes a device to prevent write commands issued by a host computer from modifying data on a storage device such as a hard drive.  (Docket No. 39-1 [Leal Decl.], Ex. 1 ['682 Patent]; PB at 2.)  The '086 patent claims a duplication device that purportedly copies to a destination storage device an identical copy of data from a source storage device, including data maintained in hidden areas.  (Leal Decl., Ex. 2 ['086 Patent]; PB at 2.)  The '379 patent claims a device that irretrievably removes or deletes data from a storage device, including stored data in hidden areas.  (Leal Decl., Ex. 3 ['379 Patent]; PB at 3.)

Of the 45 claims in the '682 patent, Claims 1, 13, 25, 30, and 40 are at issue, and the Parties dispute the meaning of 10 terms or phrases found in those claims.  Of the 21 claims in '379 patent, Claims 1 and 18 are at issue, and the Parties dispute the meaning of 10 terms or phrases found in those claims.  Lastly, of the 3 claims in the '086 patent, Claims 1 and 2 are at issue, and the Parties dispute the meaning of 7 terms or phrases found in those claims.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|-------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

The Court has considered the written submissions of the Parties regarding the disputed terms, and it has conducted a hearing where the Parties offered further argument. The following sets forth the Court's resolution of the issues presented.

## II.
## BACKGROUND

### A. PROCEDURAL HISTORY

Over the past several years, Plaintiff has filed several cases alleging that multiple Defendants infringe on at least one of the three patents at issue in this case. On August 16, 2013, the Judicial Panel on Multidistrict Litigation transferred these actions, pending in district courts throughout the country, to this Court. (Docket No. 1 [Transfer Order].) Defendants in the resulting matter, In re: MyKey Technology, Inc., Patent Litigation, have filed various answers and counterclaims. The Parties now come before the Court for a claim construction hearing.

### B. OVERVIEW OF THE PATENTS

#### 1. THE '682 PATENT

The '682 patent, entitled "Write Protection for Computer Long-Term Memory Devices," describes an invention that allows data to be read from a device, while not allowing data to be written to or modified by the device. ('682 Patent at 1:13–48; PB at 1.) As an example of its possible uses, this type of device would allow law enforcement officers to examine seized computer storage devices while ensuring that the data stored on the device would not be altered in any way. (Id. at 1:21–33.) The write-blocking device described in the '682 patent is physically inserted between the host computer (which reads the storage device) and the storage device (which the blocking device is meant to preserve). (Id. at 2:23–26.) It includes an interface emulator that mimics both an interface presented by the storage device and an interface for connecting to the storage device, and a processor coupled to both. (Id. at 2:27–33.) This processor examines commands that are generated by the host and intended for the storage device, and allows only those commands that match a predetermined set of commands to pass. (Id. at 2:33–37.) Through this mechanism, data associated with a read command are allowed, while data associated with a write command are blocked. (Id. at 6:34–47.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

### 2. THE '086 PATENT

The '086 patent, entitled "Systems and Methods for Creating Exact Copies of Computer Long-Term Storage Devices," describes an invention that makes an exact copy of a source storage device to the destination storage device, and subsequently verifies that the copying operation was performed correctly. ('086 Patent at 2:8–20; PB at 2.) Using the law enforcement example above, this device allows data on storage devices to be duplicated and then examined without altering the original device. ('086 Patent at 1:19–30.) The device includes an interface connecting to a source storage device and an interface connecting to one or more destination storage devices and a user controllable switch that initiates copying. (Id. at 2:8–20, 48–51.) The control circuits perform various functions, such as comparing the size of the source storage device to the destination storage device, opening hidden areas, copying the data within the hidden areas, and restoring the source drive to its original condition. (Id. at 10:65–11:6.)

### 3. THE '379 PATENT

The '379 patent, entitled "Systems and Methods for Removing Data Stored on Long-Term Memory Devices," describes an invention that relates to a method for irretrievably removing data from a long-term storage device. ('379 Patent at 1:14–16; PB at 3.) By way of explanation, the patent indicates that erasing confidential information, like credit card numbers and passwords stored on one's computer hard drives, is not as easy as it appears to be. ('379 Patent at 1:19–26.) The simple "delete" keystroke does not actually remove data; instead, it causes a change to the File Allocation Table, which keeps track of where data is stored on the hard drive. (Id. at 1:40–45.) Even if the hard drive were physically destroyed, long-term memory storage devices frequently can still be read. (Id. at 1:27–29.)

The '379 patent describes a small device that includes a power supply, user controllable switch, control circuit, and an interface to the storage device. (Id. at 12:22–44.) The control circuit controls the targeted long-term memory component in order to remove data from the storage device. (Id. at 12:26–29.) The control circuit can open hidden storage without user intervention, and notifies a user when opening areas that require a password for release. (Id. at 12:45–49.)

///

///

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

**III.**
**DISCUSSION**

**A. LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION**

**1. INTRINSIC AND EXTRINSIC EVIDENCE**

The construction of a patent is a matter of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). To determine the meaning of a patent claim, the Court focuses its attention first on what the Federal Circuit calls "intrinsic evidence:" (1) the claims; (2) the specification; and (3) the prosecution history. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir.1995) (en banc), aff'd, 517 U.S. 370 (1996). In most cases, it is these sources from which the meaning of the patent terms is to be derived. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court turns to extrinsic evidence only when the intrinsic evidence fails to resolve ambiguity in any disputed term. Id. at 1583.

*a. The Claims*

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Accordingly, in construing disputed terms, the Court first looks to the words of the claims. Vitronics Corp., 90 F.3d at 1582. Generally, the Court ascribes the words of a claim their ordinary and customary meaning. Id. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313.

Other claims of the patent in question can also assist in determining the meaning of a claim term, Vitronics, 90 F.3d at 1582; terms used consistently throughout the claims should be construed consistently. Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). Conversely, use of a term in a different way in another claim may also be useful in determining the particular meaning of the disputed term. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir. 1991). The existence of a dependent claim that adds a particular limitation creates a presumption that the limitation in question is not present in the independent claim. Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004); Tandon Corp. v. U.S.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987). "[T]hat presumption can be overcome if the circumstances suggest a different explanation, or if the evidence favoring a different claim construction is strong . . . ." Liebel-Flarsheim Co., 358 F.3d at 910. However, "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." Id. (citing SunRace Roots Enter. Co. v. SRAM Corp., 336 F.3d 1298, 1302–03 (Fed. Cir. 2003)). The Federal Circuit has also made clear that this presumption is "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." SunRace Roots, 336 F.3d at 1303. However, an en banc panel of the Federal Circuit addressing the claim differentiation doctrine in Retractable Techs., Inc. v. Becton, Dickinson & Co., reiterated that "[c]laim language must always be read in view of the written description, and any presumption created by the doctrine of claim differentiation 'will be overcome by a contrary construction dictated by the written description or prosecution history.'" 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citing Phillips, 415 F.3d at 1315; Seachange Int'l, Inc. v. C–COR, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005)).

### b. The Specification

Because the claims are part of a fully integrated written instrument comprised principally of the specification, the Court must next review the specification. Markman, 52 F.3d at 978–79. Because the specification must contain a description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it, the specification is "always highly relevant" to the Court's claim construction analysis. Vitronics, 90 F.3d at 1582. Phillips confirmed the primacy of the specification in construing patent claim terms: "[u]sually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582). This is because the statute requires that the inventor provide a 'full' and 'exact' description of the claimed invention. Phillips, 415 F.3d at 1316. Thus, examination of the specification may reveal that the patentee has given a special definition to a claim term that differs from its ordinary meaning. "In such cases, the inventor's lexicography governs." Id. Likewise, the specification may reveal the patentee's intentional disclaimer or disavowal of claim scope. "In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. In sum, through review of the specification one may determine that a claim term has unambiguously been redefined "without an explicit statement of redefinition." Bell Atl. Network Servs. v. Covad Commc'ns. Grp., 262 F.3d 1258, 1268 (Fed. Cir. 2001).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

Even so, there are limitations on how much can be gleaned from the specification because the specification is not, and should not be conflated with, the claims. Thus, "[a]lthough the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000). While "claims must be read in view of the specification, of which they are a part . . . it is improper to read a limitation from the specification into the claims." Liebel-Flarsheim Co., 358 F.3d 898, 904 (Fed. Cir. 2004). The Federal Circuit has rejected the contention that if a "patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"—unless there is a clear intention to limit the claim scope. Id. at 906; see Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1301 (Fed. Cir. 2003).

### c. The Prosecution History

Next, in addition to reviewing the specification, the Court should consider the patent's prosecution history, if it is in evidence. Markman, 52 F.3d at 980. The prosecution history is intrinsic evidence and consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the examination of the patent. Phillips, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.; see also Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

### d. Extrinsic Evidence

In addition to the foregoing intrinsic evidence, the Federal Circuit has also authorized district courts to rely on extrinsic evidence in claim construction, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. However, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004). "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." Phillips, 415

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|--------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

F.3d at 1318.  Accordingly, the Court may consider this evidence, if the Court deems it helpful in properly construing the claim terms.  Id.

### 2. PATENTEE AS LEXICOGRAPHER

Case law shows that a patentee can act as his own lexicographer, where an "explicit definitional format" is not required.  Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004).  "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.  There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal citations omitted).  Phillips held that:

> [R]equiring that any definition of claim language in the specification be express[] is inconsistent with our rulings that the specification is the single best guide to the meaning of a disputed term, and that the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.

415 F.3d at 1320–21 (internal quotations and citation omitted).  Phillips openly embraced the notion that "a claim term may be clearly redefined without an explicit statement of redefinition."  Bell Atl. Network Servs., 262 F.3d at 1268.

### 3. MEANS-PLUS-FUNCTION CLAIMS

So-called "means-plus-function" terms may also be subject to 35 U.S.C. § 112.  Construing a means-plus-function claim limitation requires two steps, where the Court must identify (1) the claimed function and (2) the structure in the written description necessary to perform that function.  Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999).  This "encompasses all structure[s] in the specification corresponding to that element and equivalent structures."  Id.  The specification's adequacy in disclosing the corresponding structure is considered from the viewpoint of one skilled in the art.  35 U.S.C. § 112(a).  "Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  Minks v. Polaris Indus., 546 F.3d 1364, 1377 (Fed. Cir. 2008).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

Section 112 does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function." Micro-Chem., 194 F.3d at 1258. However, "failure to disclose adequate structure corresponding to the recited function . . . results in the claim being of indefinite scope, and thus invalid." Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001). Because patents are afforded a statutory presumption of validity, "[a]ny fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." Intel Corp. v. VIA Technologies, Inc., 319 F.3d 1357, 1366 (Fed. Cir. 2003).[1]

Additional rules apply when a "disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm." WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999). In these cases, the "disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." Id. The specification can express the algorithm in any understandable term that provides sufficient structure—such as a mathematical formula, prose, flow chart, or any other means—but simply disclosing software without providing some detail about the means to accomplish the function is not enough. Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1312 (Fed. Cir. 2012). This requirement prevents a patentee from "pure functional claiming," which occurs when he discloses only a generalized computer as the structure for a more specific device, and therefore does not provide the means for performing the claimed function. Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008). Accordingly, the mere disclosure of software without providing some detail about the means to accomplish the function is insufficient—rather, the algorithm itself must be disclosed. Function Media, LLC v. Google, Inc., 708 F.3d 1310, 1318 (Fed. Cir. 2013).

**4. PREAMBLES IN A CLAIM**

The determination of whether a preamble limits a claim is resolved based on a review of the entire patent, "to gain an understanding of what the inventors actually invented and intended to encompass by the claim." Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989)). A preamble may limit an invention for many reasons; for instance,

---

[1] Whether this standard survives Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120 (2014), is an open question. Addressing questions regarding whether a permissive definiteness standard "accords respect for" the presumption of validity, and how the new standard might affect that presumption, the Supreme Court stated only that "[w]e leave these questions for another day." Id. at 2132 n.10. Until then, this Court will apply the presumption as it is articulated in Intel and similar cases.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

if it "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim" or if there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." Id. (quotations omitted). However, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997).

### 5. PROSECUTION HISTORY ESTOPPEL

"As a general proposition, prosecution history estoppel is based upon a showing that an applicant amended a claim to avoid a cited prior art reference." Texas Instruments Inc. v. U.S. Int'l Trade Comm'n, 988 F.2d 1165, 1174 (Fed. Cir. 1993). It "precludes a patentee from obtaining in an infringement suit patent protection for subject matter which it relinquished during prosecution in order to obtain allowance of the claims." Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co., 66 F.3d 285, 291 (Fed. Cir. 1995). In analyzing whether prosecution history estoppel applies, two questions must be answered. The first asks whether an amendment filed with the PTO narrowed the literal scope of the claim—if the amendment is not narrowing, estoppel does not apply. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1366 (Fed. Cir. 2003). The second question, applicable only if the amendment is found to be narrowing, asks "whether the reason for that amendment was a substantial one relating to patentability." Id. Thus, to rebut the presumption that the patentee made a narrowing amendment for patentability reasons, "the patentee must show that the reason for the amendment was not one relating to patentability." Id. at 1367. In answering these questions, the Court must consider the prosecution history record. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1364 (Fed. Cir. 2008).

### B. DISPUTED CLAIM TERMS

#### 1. THE '682 PATENT

The relevant claims of the '682 patent—claims 1, 13, 25, 30, 40, 42, and 43—read as follows, with the dispute terms underlined:

1. A blocking device comprising:
   an interface emulator configured to emulate an interface presented by a storage device and configured to connect to a host;
   an interface for connecting to the storage device; and

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

a processor coupled to the interface emulator and the interface, the processor examining commands received through the interface emulator that are generated by the host and intended for the storage device, the processor allowing only those of the commands that match a predetermined set of commands to pass to the storage device via the interface, the predetermined set of commands being commands that are known to not permanently modify a state of the storage device, wherein

the blocking device is <u>transparent to normal operation of the host and the storage device</u>.

. . .

13. A device comprising:

an <u>IDE emulator component</u>, the IDE emulator component including a physical interface designed to engage a first cable that connects to a <u>host</u> that controls an IDE storage device;

an IDE interface configured to engage a second cable that connects to the IDE storage device; and

a logic circuit connecting the IDE emulator component to the IDE interface and configured to: compare commands received at the IDE emulator component to a predetermined set of commands that are known to not modify a state of the IDE storage device, and to allow transmission of the commands from the IDE emulator component to the IDE interface when the comparison indicates that the received command is in the predetermined set of commands, wherein

the device operates <u>transparently to normal operation of the host and the IDE storage device</u>.

. . .

25. A method comprising:

intercepting communications between a computer motherboard and a local non-volatile storage device for the motherboard;

comparing commands in the communications between the motherboard and the storage device to a predetermined set of commands;

forwarding selected ones of the commands to the storage only when, based on the comparison, the commands are determined to be commands that are in a predetermined set of commands known to not permanently modify a state of the storage device; and

blocking other commands from being received by the storage device, wherein

the intercepting communications, comparing commands, forwarding selected ones of the commands, and blocking selected other ones of the commands is <u>transparent to normal operation of the computer motherboard and the storage device</u>.

. . .

30. A computer system comprising:

a <u>host</u> computer;

a long-term storage device; and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|--------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

    a blocking device coupled between the host computer and the storage device, the blocking
      device configured to:
          intercept commands from the host to the storage device,
          pass commands to the storage device only when the commands are in a predetermined
          set of commands that are known to not permanently modify a state of the storage device,
          and block other commands from reaching the storage device,
  wherein the intercepting commands, blocking commands, and passing commands are
    performed by the blocking device transparently to the host computer and the long-term
    storage device.

. . .

40.  A blocking device comprising:
    <u>means for intercepting communications between a host and a storage device</u>;
    <u>means for comparing commands in the communications between the host and the storage
      device to a predetermined set of commands</u>;
    <u>means for forwarding selected ones of commands in the intercepted communications to the
      storage</u> device only when, based on the comparison, the commands that are in a
    predetermined set of commands are determined to be commands that are <u>known to not
    permanently modify a state of the storage device</u>; and
    <u>means for blocking other ones of the commands from being received by the storage device
      based on the comparison</u>, wherein
    the blocking device operates <u>transparently to normal operation of the host and the storage
      device</u>.

. . .

42.  The blocking device of **40**, wherein the commands forwarded to the storage device include
a capabilities request command, and the means for forwarding further comprises:
    <u>means for modifying data received from the storage device relating to the capabilities request
      command to reflect the capabilities of the blocking device</u>.

. . .

43.  The blocking device of **40**, further comprising:
    <u>means for returning status information to the host that indicates that the blocked command
      was successfully executed by the storage device</u>.

('682 Patent at 13:20–36, 14:17–35; 15:35–54; 16:6–22; 17:1–18; 18:1–12) (emphasis added.)

      Thus, based on the foregoing, the disputed claim terms with respect to the '682 patent are
the following:
    a.       "interface emulator"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

  b.    "IDE emulator component"
  c.    transparent/transparently terms:
       (1) "transparent to normal operation of the host and the storage device" and
       "transparently to normal operation of the host and the storage device"
       (2) "transparently to normal operation of the host and the IDE storage device"
       (3) "transparent to normal operation of the computer motherboard and the storage
       device"
       (4) "transparently to the host computer and the long-term storage device"
  d.    "host"
  e.    "means for intercepting communications between a host and a storage device"
  f.    "means for blocking other ones of the commands from being received by the storage
       device based on the comparison"
  g.    "means for comparing commands in the communications between the host and the
       storage device to a predetermined set of commands"
  h.    "means for forwarding selected ones of commands in the intercepted communications
       to the storage . . . known to not permanently modify a state of the storage device"
  i.    "means for modifying data received from the storage device relating to the
       capabilities request command to reflect the capability of the blocking device"
  j.    "means for returning status information to the host that indicates that the blocked
       command was successfully executed by the storage device"

(Docket No. 32-1, [Proposed Construction for Disputed Claim Terms ("DCT")] at 1–12.)

**2. THE '086 PATENT**

    The relevant claims of the '086 patent—claims 1 and 18—read as follows with the
disputed terms underlined:

  1. A <u>stand-alone, dedicated function device for making exact copies of long-term memory
     devices</u> comprising:
       an interface for connecting to a storage device (source);
       one or more interfaces for connecting to the storage device(s) (destination);
       wherein the interfaces are electronically isolated from each other through the use of
          separate interface circuitry for each interface;
       a <u>user controllable switch</u> that, when actuated by a user, causes the device to commence a
          copy;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

and a control circuit coupled to the interface (source) and the interface(s) (destination), the underline control circuit issuing commands to: compare the size of the source device to the size of a destination device and communicate result to a user, open hidden areas on the source device, make an exact copy of the storage device connected to the interface (source), read and compare data on the source and destination devices and communicate result to a user, restore the source drive to its original condition, wherein the copying device is operating system independent.

. . .

18. A stand-alone, dedicated function copying device comprising:
    means for interfacing with a source drive,
    wherein the source device is protected from accidental state changes;
    means for interfacing with one or more destination devices;
    means [for] initiating the copying procedure;
    means for comparing the size of the source device to the size of a destination device and communicating result to a user;
    means for opening hidden areas on the source device;
    means for making an exact copy;
    means for reading and comparing the data on the source and destination devices and communicating result to a user;
    means for restoring the source device to its original condition,
    wherein the copy device is operating system independent.

('086 Patent at 10:55–11:8, 12:16–36) (emphasis added.)

Accordingly, the disputed claim terms in the '086 patent are the following:

a. "exact copy" or "exact copies"
b. "user controllable switch"
c. "means [for] initiating the copying procedure"
d. "means for making an exact copy"
e. "means for reading and comparing the data on the source and destination devices and communicating result to a user"
f. "stand-alone, dedicated function device for making exact copies of long term memory device" and "stand-alone, dedicated function copying device"
g. "control circuit issuing commands to . . . read and compare data on the source and destination devices"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

    h.    "control circuit issuing commands to . . . restore the source drive to its original condition"
    i.    "means for opening hidden areas on the source device"
    j.    "means for restoring the source device to its original condition"

(DCT at 13–21.)

    **3. THE '379 PATENT**

    Claims 1 and 2 of the '379 patent read as follows, with the disputed terms underlined:

1. A <u>stand-alone, dedicated function device for removing data from a long-term memory component</u>, comprising:
    an interface for connecting the <u>stand-alone, dedicated function device</u> to the long-term memory component;
    a control circuit configured to control the long-term memory component through the interface to <u>irretrievably remove data</u> from the long-term memory component without regard to data content or data storage format of the data on the long-term memory component by overwriting the data of the long-term memory component;
    a <u>user controllable switch</u> that, when actuated by a user, causes the control circuit to commence irretrievably removing all the data from the long-term memory component;
    a casing configured to contain the control circuit and the interface, the <u>casing being of a size that is portable by the user</u>;
    a power supply configured to supply power to the control circuit;
    wherein <u>the control circuit is further configured to open a hidden storage area</u> on the long-term memory component <u>before irretrievably removing the data</u>.

2. The device of claim 1, wherein the <u>control circuit open[s] a hidden storage area without user intervention</u>.

('379 Patent at 12:22–46) (emphasis added.)

    Thus, the disputed claim terms in the '379 patent are the following:

    a.    "user controllable switch"
    b.    "hidden storage area"

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|-------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

c.  "stand-alone, dedicated function device for removing data from a long term memory component" and "stand-alone, dedicated function device"
d.  "irretrievably remove data"
e.  "the control circuit is further configured to open a hidden area . . . before irretrievably removing data"
f.  "casing being a size that is portable by the user"
g.  "the control circuit open[s] a hidden storage area without user intervention"

(DCT 22–26.)

## C. CONSTRUCTION

### 1. THE '682 PATENT

#### a. *"interface emulator"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|------------|--------------------------|--------------------------|
| "interface emulator"<br><br>Claim 1 of '682 Patent | "an interface component that mimics another interface" | "an interface component that mimics the interface presented by the storage device and operates with no reconfiguration of the host software" |

The Parties' disagreement as to this term stems from two potential limitations. Defendants use Plaintiff's basic definition, and add (1) a requirement that the emulator "operates with no reconfiguration of the host software," and (2) a requirement that the emulator mimic a specific interface ("<u>the</u> interface") rather than a more generic interface ("another interface"). (PB at 4.)  Plaintiff argues that the "no reconfiguration" provision is not based in prosecution history, that no extrinsic evidence exists to support it, and that it will cause more ambiguity.  As for the requirement that the emulator mimic "<u>the</u> interface presented by <u>the</u> storage device," Plaintiff claims that Defendants' limitation is misleading because it requires both sides of the write blocker to use identical technology.  (<u>Id.</u> at 8.)

First, the Court finds that there is support for Defendants' "no reconfiguration" language; the lack of the word "reconfiguration" in the '682 patent itself is not preclusive.  To justify their construction, Defendants point the Court to the prosecution history, which demonstrates "how

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." Phillips, 415 F.3d at 1317. The prosecution history reveals a statement made by the inventor in order to overcome rejection based on prior art ("the Kern patent"):

> Advantages associated with transparent operation of the blocking device are discussed in numbered paragraph 38 of the specification. As discussed, the blocking device appears as a standard storage device to the host. Similarly, to the storage device, the blocking device appears to be the host. Accordingly, neither the host nor the storage device need to be reconfigured in any way. The blocking device simply needs to be inserted between the host and the storage device and it is ready to operate.

(Docket No. 39-8, Leal Decl., Ex. 7 [Response to Office Action ("ROA")], at 22.) Even if this description were made in connection with the "blocking device" in general, it would speak to the function of the interface emulator as well, since it is a component of the blocking device, as described in Figures 2, 3, and 5.[2] ('682 patent 5:23–6:33, 7:10–54.)

Further, the Court notes the manner in which the inventor expressly steers his patent away from prior art. He states:

> In contrast to Kern, the device of claim 1 includes, among other things, an interface emulator configured to emulate an interface presented by a storage device. Although Kern discloses a "controller interface 120," the controller interface 120 of Kern does not emulate an interface presented by a storage device. The interface 120 of Kern is described as "an intelligent digital input/output communication channel, or other interface suitable to the particular application." . . . Nothing in Kern discloses or suggests that interface 120 emulates the interface presented by storage device(s) 108. Because Kern discloses host application programs 110–112 that are specifically designed to operate with controller 106, Applicants submit that there would be no need for interface 120 to emulate storage devices, as

---

[2] The '682 patent allows configuration of the blocking device with a list of passwords or authorization information to allow access. ('682 Patent at 11:17–20.) This "configuration" language does not preclude a "no reconfiguration" requirement, because it appears to refer to actions taken before the blocking device is operational, and thus does not result in a "reconfiguration" of either the host or storage device, as intended by this term.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|--------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

application programs 110–112 could be designed to operate with any "intelligent digital input/output channel." <u>Thus, if anything, Kern actually teaches away from this aspect of the invention</u> . . . .

As described in these sections, a number of explicit communication steps are taken between a new host and controller 120 before a host can use the storage device(s) 108, including exchanging a key (step 704) and <u>reconfiguring the interface of the host application</u> (step 706). Applicants submit that <u>this disclosure of Kern clearly teaches away from a blocking device that is transparent to normal operation of the host and storage device,</u> as recited in amended claim 1.

(ROA at 19–20.)  Together, these statements reflect a clear disclaimer, as the inventor seeks to patent around the prior art by emphasizing that the claimed device does not reconfigure the host.

The Court next turns to the dispute regarding the use of definite and indefinite articles when modifying "interface" and "storage device" in Claim 1.  Plaintiff argues that the terms should be read as "another interface" and "a storage device," while Defendants argue for "the interface" and "the storage device."

Plaintiff agrees that "the interface emulator mimics the interface presented by the storage device that is being protected, and to which the write blocker is thus connected." (PB at 8; Docket No. 38-12, Ex. H [Berg Deposition] at 27:25–26:25.)  However, the blocking device also has a feature that allows for two drives to be connected to the host, where the host then provides a "unique and isolated IDE interface to each drive" so that the blocking device can still independently communicate with each drive. ('682 patent 9:19–25.)  Thus, construing "storage device" as applicable only to a single, specific device would inappropriately limit Plaintiff's claim.

For the same reasons, the Court finds "an interface" rather than "the interface" to be an appropriate claim construction.  The patent does not limit itself to any single or specific interface technology for use with the write blocker between the host and the storage device, nor is there any indication that identical technology must be employed on both sides of the blocking device. (PB at 8.)  In fact, Plaintiff's '682 patent includes several interface technologies. ('682 Patent 3:56–4:13.)  Defendants do not contest this point; instead, they simply argue that the interface emulator must mimic the interface of the actual storage device attached to the write blocker.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

(Docket No. 40 [Defendants' Response to PB ("Def. Resp.")] at 5.) However, as stated above, Defendants' definition would create an unwarranted limit on Plaintiff's claim.

Based on the reasoning above, the Court finds that Defendants' construction is too narrow. It therefore adopts the following construction:

> **interface emulator:** an interface component that mimics another interface and operates with no reconfiguration of the host software

> **b.** *"IDE emulator component"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "IDE emulator component"<br><br>Claim 13 of '682 Patent | "a component that mimics an interface compatible with the IDE or ATA interface" | "an interface component that mimics the interface presented by the IDE storage device and operates with no reconfiguration of the host software" |

The dispute over this term centers on whether the "IDE emulator component" should be limited based on interface technology; that is, whether it should be confined to an IDE interface, or whether it also encompasses ATA interfaces. Plaintiff asserts that "IDE emulator component" should include an ATA interface because it is customary in the industry to use "IDE" and "ATA" interchangeably. (PB at 11.) Defendants argue that only extrinsic evidence is used to support Plaintiff's claims. (Docket No. 38 [Defendants' Opening Brief ("DB")] at 10.) In point of fact, both Parties present extrinsic evidence.

If "intrinsic evidence is insufficient to enable the court to determine the meaning of asserted claims . . . extrinsic evidence . . . may also properly be relied on to understand the technology and to construe the claims." Vitronics, 90 F.3d at 1584. If the patent document is unambiguous, "expert testimony regarding the meaning of a claim is entitled to no weight." Id.

The '682 patent makes no mention of ATA interfaces, but rather describes its aspects and functions in relation to an IDE emulator component, an IDE interface, and a logic circuit. ('682 Patent at 2:37–40.) However, because the patent does not unambiguously reject ATA interfaces, the Court considers the extrinsic evidence presented by the Parties in order to understand the technology involved.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|--------------------------|------|---------------|
| Title    | MyKey Technology Inc Patent Litigation | | |

Plaintiff presents the Court with an expert opinion, which states that IDE and ATA are used interchangeably, and that T13[3] created ATA standards attesting to this.  (Docket No. 39-11 [Ex. 10, Berg's Expert Opinion ("Berg Op.")], at 7–10.)  Plaintiff also relies on the Microsoft Computer Dictionary, (Microsoft Press, 4th ed. 1999), which defines ATA and IDE as "one and the same thing."

Admittedly, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips, 415 F.3d at 1313.  The dictionary Plaintiff cites to is from 1999, and the patent application was initially filed in 2001, indicating that the definition should be given some weight.  However, since that time, T13 has split ATA into two standards:  parallel interfaces ("PATA") and serial interfaces ("SATA").  (Berg Op. ¶¶ 27–28.)  At the time of the filing of the '682 patent in September 2001, the SATA standard had not yet been developed, and thus a person of the ordinary skill in the art could not have contemplated SATA when evaluating the patent claims.

Moreover, IDE and SATA interfaces are not interchangeable.  (See DB at 10.)  Specifically, Berg states that if a computer with a parallel interface (or IDE) were connected to a SATA interface, they would not be compatible.  (Berg Depo. at 45:9–15; see Docket No. 38-13 [Ex. I, Gafford Deposition], at 209:17–23.)  Further, Berg states that "in common parlance, SATA devices are not usually called IDE devices."[4]  (Berg Depo. at 42:14–15.)

Based on this evidence, "ATA" and "IDE" were used interchangeably at the time the patent application was filed.  However, SATA interfaces are a separate and newer T13 standard.  (Id. at 43:4–5.)  Further, SATA technologies are not compatible with IDE interfaces.  Accordingly, the Court focuses on the concept of compatibility, and adopts the following construction:

> **IDE emulator component:** a component that mimics an interface compatible with the IDE interface and operates with no reconfiguration of the host software

---

[3] T13 is a technical committee of the National Committee for Information Technology Standard by the American National Standards Institute.

[4] Though he goes on to explain that if "an IDE interface is used as an example of an interface," he would "not consider that to exclude applicability of a SATA interface."  (Berg Depo. at 42:15–19.)

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

c.     *"transparency" terms*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "transparent to normal operation of the host and the storage device"<br><br>Claim 1 of '682 Patent,<br>and<br><br>"transparently to normal operation of the host and the storage device"<br><br>Claim 40 of '682 Patent<br><br>///<br><br>///<br><br>///<br><br>///<br><br>///<br><br>///<br><br>///<br><br>/// | "to the host, the blocking device appears to be a standard drive interface and presents to the host the memory, registers, and control signals that a storage device would normally present to the host, and to the storage device, the blocking device appears to be a host and presents to the storage device the memory, registers, and control signals that the host would normally present to the storage device, although the blocking device blocks or modifies commands that would result in the modification of the drive" | "the blocking device appears to the host as the storage device and appears to the storage device as the host, and the blocking device operates in a way that all normal operations between host and the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device" |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "transparently to normal operation of the host and the IDE storage device"<br><br>Claim 13 of '682 Patent | "to the host, the device appears to be a standard IDE storage device interface and presents to the host the memory, registers, and control signals that a IDE storage device would normally present to the host, and to the IDE storage device, the device appears to be a host and presents to the IDE storage device the memory, registers, and control signals that the host would normally present to the IDE storage device, although the device blocks or modifies commands that would result in the modification of the IDE storage device" | "the blocking device appears to the host as the IDE storage device and appears to the IDE storage device as the host, and the blocking device operates in a way that all normal operations between host and the IDE storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the IDE storage device" |
| "transparent to normal operation of the computer motherboard and the storage device"<br><br>Claim 25 of '682 Patent | "the method is performed such that to the computer motherboard, there appears to be a standard storage device interface and the computer motherboard is presented with the memory, registers, and control signals that a storage device would normally present to the computer motherboard, and to the storage device, there appears to be a computer motherboard and the storage device is presented with the memory, registers, and control signals that the computer motherboard would normally present to the storage device, although commands that would result in the modification of the storage device are blocked or modified" | "the blocking device appears to the host computer (which includes the computer motherboard) as the storage device and appears to the storage device as the host computer (which includes the computer motherboard), and the blocking device operates in a way that all normal operations between host computer (which includes the computer motherboard) and the storage device continue when the blocking device is interposed between them with no reconfiguration of the host computer (which includes the computer motherboard) and/or the storage device" |
| Claim Term | Plaintiff's Construction | Defendants' Construction |

       

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

| | | |
|---|---|---|
| "transparently to the host computer and the long-term storage device"<br><br>Claim 30 of '682 Patent | "to the host computer, the blocking device appears to be a standard long-term storage device interface and presents to the host computer the memory, registers, and control signals that a long-term storage device would normally present to the host computer, and to the long-term storage device, the blocking device appears to be a host computer and presents to long-term storage device the memory, registers, and control signals that the host computer would normally present to the long-term storage device, although commands that would result in the modification of the long-term storage device are blocked or modified" | "the blocking device appears to the host as the storage device and appears to the storage device as the host, and the blocking device operates in a way that all normal operations between host and the storage device continue when the blocking device is interposed between them with no reconfiguration of the host and/or the storage device" |

The Parties present these terms as needing several, separate definitions.  However, they all hinge on an interpretation of the words "transparent" or "transparently."  The dispute between the Parties focuses on whether transparency is defined solely with regard to the appearance of the blocking device as it receives and delivers signals, or with regard to its actual operation as well.

As the claims themselves do not expressly define the transparency terms, the Court turns to the specification, which provides insight:

> To host computer 201, blocking device 203 appears to be a standard drive interface, such as an IDE drive interface, and presents to the host 201 the memory, registers, and control signals that a drive would normally present to host 201.  To drive 205, blocking device 205 appears to be a host computer, and presents to drive 205 the memory, registers, and control signals that host 201 would normally present to drive 205.  In other words, blocking device 203 is transparent to the system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

('682 Patent at 5:31–40; see also, id. at 3:52–54) (emphasis added.)  Plaintiff asserts that the phrase "[i]n other words" demonstrates the inventor's intent to define transparency throughout the patent.  (PB at 15.)  Plaintiff seeks to bring the issue within the scope of the rule that provides that a "claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."  Rexnord, 274 F.3d at 1342.  Because the term is described in language suggesting a consistent definition, Plaintiff contends that it should be construed similarly wherever used in the claims.  The Court agrees, and in light of the repeated indication that the blocking device "appears to be . . ." one thing or another, the Court finds that transparency refers at least to the blocking device's appearance.  ('682 Patent at 5:31–40.)

But that conclusion does not address the question of "transparent to the operation" of the host.  Plainly, the blocking device alters commands from the host to avoid modification to any data on the target drive.  Thus, Plaintiff argues that the blocking device, under Defendants' construction of transparent to include transparency to all normal operations, would not properly operate as a blocking device because it would allow all delivered commands from the host to be executed.  In other words, a definition of "transparent" that allowed "all normal operations [to] continue," as Defendants repeatedly assert, would be contrary to the purpose of a blocking device.  Plaintiffs fret that a blocking device, qua blocking device, prevents commands from being transmitted, and thus does not allow "all normal operations to continue."  (PB at 15.)

The question, therefore, is what is contemplated by "normal operations."  On that question the Parties agree that "normal operations" refers simply to the state of operating in a normal fashion.  (PB at 17; Def. Resp. at 4.)  Accordingly, if the blocking device can operate in such a way that "all normal operations of the host and storage device continue," then the device can be said to be transparent even as it intercepts and blocks operations without detection.  In other words, as Defendants observe, any change in the normal operations of the host or storage device would indicate that the blocking device's operation was not transparent.  (DB at 5; Docket No. 38-6 [Ex. F-1, ITC Proceeding Part I] at 16.)  Accordingly, so long as the blocking device's interception of commands that would alter the stored data are not detectable, the device can be said to be transparent to normal operations of the system.  The prosecution history indicates that this is exactly what the inventor contemplated.  The inventor distinguished the '682 patent from the prior art precisely because it both appeared and operated transparently, whereas the Kern patent had to go through a series of interactive communicative steps between the host and controller—thereby precluding both transparent appearance and operation.  (Docket No. 38-10 [File History, 11/4/2003] at MTI 585–586.)  In short, the intrinsic evidence suggests that transparency includes both the operation and the appearance of the blocking device when it

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

is interposed between the host and storage device with the blocking device precluding modification of the storage device without detection.

Finally, with regard to the "no reconfiguration" portion of the definition, the Court relies upon the reasoning provided above. That is, if the blocking device interrupts or alters the normal operation of the host or the storage device, the blocking device would not be considered transparent. Instead, the host and the storage device must continue in their respective "normal operations," while the blocking device is at work between them.

The Court applies this interpretation to the disputed terms as follows.

### i. "Transparent to normal operation of the host and the storage device" and "transparently to normal operation of the host and the storage device"

"**transparent to normal operation of the host and the storage device**" and "**transparently to normal operation of the host and the storage device**": the blocking device appears to the host as the storage device and appears to the storage device as the host, and the blocking device operates in a way that all normal operations of the host and of the storage device continue when the blocking device is interposed between them with no reconfiguration of the host or the storage device, although the blocking device blocks or modifies commands that would result in the modification of the storage device without detection

### ii. "Transparently to normal operation of the host and the IDE storage device"

Claim 13 involves the transparent operation of the device to the normal operation of the host computer and the IDE storage device. The IDE storage device includes an IDE emulator component, an IDE interface, and a logic circuit—which describes a portion of the blocking device in more detail. ('682 Patent at 2:26–31, 37–54.) This term's construction turns on the same reasoning as provided above. Thus, the Court adopts the following construction:

"**transparently to normal operation of the host and the IDE storage device**": the blocking device appears to the host as the IDE storage device and appears to the IDE storage device as the host, and the blocking device operates in a way that all normal operations of the host and of the IDE storage device

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

continue when the blocking device is interposed between them with no reconfiguration of the host or the IDE storage device, although the blocking device blocks or modifies commands that would result in the modification of the IDE storage device without detection

### iii. "Transparent to normal operation of the computer motherboard and the storage device"

Claim 25 refers to another aspect of the invention: a method where "the intercepting communications, comparing commands, forwarding selected commands, and blocking selected other ones of the commands is transparent to normal operation of the computer motherboard and the storage device." The computer motherboard can be understood from the specifications to be the motherboard of the host computer. ('682 Patent at 2:65–3:6.) Claim 25 provides further support for the position that "appearance" is not enough to capture the essence of the transparency phrases, as this method is not about transparent appearance or presentation alone, but largely focuses on the way the blocking device operates. Thus, the Court adopts the following construction:

> "**Transparent to normal operation of the computer motherboard and the storage device**": the blocking device appears to the computer motherboard as the storage device and appears to the storage device as the computer motherboard, and the blocking device operates in a way that all normal operations of the computer motherboard and of the storage device continue when the blocking device is interposed between them with no reconfiguration of the computer motherboard or the storage device, although the blocking device blocks or modifies commands that would result in the modification of the storage device without detection

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

### iv. "Transparently to the host computer and the long-term storage device"

Claim 30[5] involves a computer system comprised of the host computer, storage device, and blocking device (that intercepts, passes, and blocks commands), wherein these commands are "performed by the blocking device transparently to the host computer and the long-term storage device."  This combines Claim 1's blocking device components and Claim 25's method in order to describe the system generally.  Thus, the Court adopts the following construction:

> "**transparently to the host computer and the long-term storage device**":
> the blocking device appears to the host as the long-term storage device and appears to the long-term storage device as the host, and the blocking device operates in a way that all normal operations of the host and of the long-term storage device continue when the blocking device is interposed between them with no reconfiguration of the host or the long-term storage device, although the blocking device blocks or modifies commands that would result in the modification of the long-term storage device without detection

### d. "host"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "host" <br><br> Claims 1, 13, 30, and 40 of '682 Patent | This claim does not require construction. | "a computer or motherboard distinct from the blocking device that, in the absence of the blocking device, is able to read and write the storage device" |

Plaintiff asserts that no definition is needed for the term "host" because one of ordinary skill in the art at the time of the invention would understand that the "host" is "the device connected to the blocking device for the purpose of inspecting a protected storage device."  (PB at 20.)  Here, Defendants try to limit the construction by arguing that the blocking device must

---

[5] During the claim construction hearing, Plaintiff's attorney repeatedly indicated that the phrase "normal operations" appeared nowhere in the '682 patent.  This was apparently a reference to Claim 30, because each of the other transparency claims does refer to "normal operations."  Admittedly, the phrase is not used in Claim 30. However, that claim instead describes "normal operations."  The Court therefore sees no reason why the transparency term of Claim 30 should be construed differently from any other transparency term.

LINKS: 38, 39

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

be "distinct" from the host and storage device, because it must be "physically inserted" between them.  (DB at 11.)

Defendant's argument is persuasive, although the Court concludes that its proposed construction is too narrow.

Plaintiff's patent implicitly requires that the "host" be separate from the blocking device. See Phillips, 415 F.3d at 1321 (stating that patentee can define terms by implication without explicit statement of redefinition).  In Claim 30 and in the specification, Plaintiff describes:  "A computer system comprising:  a host; a long-term storage device; and a blocking device coupled between the host computer and the storage device"—indicating that these are each distinct parts. ('682 Patent at 16:7–10; 3:7–10.)  Further, the specification states that the "blocking device . . . is physically inserted between a host computer and a storage device," and that "[w]hen cables 202 and 204 are plugged into blocking device 203, the blocking device is completely installed and ready to cooperate."  (Id. at 2:22–25, 46–48; 3:52–54.)  Figure 2 of the '682 patent also shows that the host computer is physically distinct from the blocking device, as it is connected to the blocking device through a drive cable.  (Id. at Fig. 2, 5:23–31.)  Though Figure 2's description uses the phrase "[b]locking device 203 may be a physical device inserted between a host computer 201 and a long-term storage device," the '682 patent also states that "[h]ost computer 201 may be connected to blocking device 203 through a standard cable 202."  (Id. at 5:23–31) (emphasis added.)  Together, these two phrases indicate only that the blocking device may be physically inserted between the host and storage device using a cable, such as a standard cable.[6]

Finally, the blocking device is used to prevent any modifications.  (Id. at 1:33–34, 1:45–46, 2:5.)  One way to do so is by intercepting and blocking certain commands from the host from reaching the storage device.  (Id. at 2:65–3:14.)  But the specification also shows that it can include catching virus files, dealing with other host communications that are not data-changing commands, and preventing other forbidden commands.  (Id. at 2:60–64, 6:48–50, 7:4–7, 12:57–60.)  As Plaintiff states in its brief, modification may encompass more than just reading or writing to the storage device, and Defendants' too-limited definition would exclude this possibility.  (PB at 20.)  The Court therefore adopts the following construction:

---

[6] Plaintiff's specification of multiple drive support also supports this construction, as the blocking device operates by being connected to the two separate drives using two independent cables.  ('682 Patent at  at 9:12–14.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|--------------------------|------|----------------|
| Title | MyKey Technology Inc Patent Litigation | | |

**host**: a device distinct from the blocking device that, in the absence of the blocking device, is able to modify the storage device

    **e.**    ***"means for intercepting communications between a host and a storage device"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|------------|--------------------------|---------------------------|
| "means for intercepting communications between a host and a storage device"<br><br>Claim 40 of '682 Patent | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: intercepting communications between a host and a storage device.<br><br>Structure: an interface emulator 320, 720, 820, 920, and equivalents thereof. | This term is invalid under 35 U.S.C. § 112.<br><br>This term is subject to 35 U.S.C. § 112(6).<br><br>Function: intercepting communications between a host and a storage device.<br><br>Structure: undefined. |

The Parties agree that the function in this means-plus-function term is recited in the language of Claim 40 as "intercepting communications between a host and a storage device." (PB at 21; DCT at 8.)  Thus, the dispute focuses on whether the term's structure has been properly defined.

Plaintiff claims that the structure is appropriately defined by interface emulator 320, 720, 820, 920, and equivalents thereof (as seen in Figures 3, 7, 8, and 9, and their descriptions). Defendants argue that the structure is unidentified, that Plaintiff's proposed "structure" is merely

///

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

a box, and that no algorithm[7] is disclosed to accompany the desired function of "intercepting communications."[8]  (DB at 11–12.)

The four figures that Plaintiff uses to describe its structure are each identified as an "IDE Drive Interface Emulator."  To support this identification, Plaintiff points to language in its specification that the '682 patent is a "method that intercepts communications between a computer motherboard and the storage device to a predetermined set of commands."  (Id. at 2:65–3:2).  However, this phrase only describes the function without shedding any light on the required algorithm.

It is helpful to survey the relevant uses of the IDE drive emulator in reference to the proposed structures.  Figure 3's description states, "When host 201 attempts to communicate with drive 205, the host 201 is actually communicating with IDE drive emulator 320.  Drive 320 delays the communication from host 201 until embedded processor 330 has examined the communication."  ('682 Patent at 5:53–60.)  Figure 4 states, "The blocking device 203 captures and holds communications until they are examined (act 410)."  (Id. at 6:34–38.)  Figure 7's description is less helpful, with "That is, blocking device 703 is connected to the host through IDE drive interface emulator 720, which connects the host to embedded processor 730."  (Id. at 8:57–60.)  Also, Figure 8 states "blocking device 803 includes an embedded processor 830 that is coupled to drive interface emulator 820, drive interface 860, and temp drive 870."  (Id. at

---

[7] Plaintiff argued, in its briefs and at the claim construction hearing, that the heightened algorithm requirements for computers, imposed to prevent inventors from "simply disclosing software without providing some detail about the means to accomplish the function," should not apply.  Noah Sys., 675 F.3d at 1312; (Docket No. 41 [Pl. Response Br. ("P. Resp.")] at 7).  The theory, surprisingly, is that the claimed device is not itself "a computer, or microprocessor, programmed to carry out an algorithm."  WMS Gaming, 184 F.3d at 1349.

This argument misreads the Federal Circuit's means-plus-function guidelines.  In any case "involving a computer-implemented invention . . . the structure disclosed in the specification [must] be more than simply a general purpose computer or microprocessor."  Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008).  That is, the heightened algorithm requirements apply not only to claims for a "general purpose computer," but to patents whose claims are "computer-implemented."  See, e.g., Neurografix v. Regents of the Univ. of Cal., 2012 U.S. Dist. LEXIS 188350, at *35-36 (C.D. Cal. June 13, 2012).  The '682 patent clearly falls into the "computer-implemented"category—after all, it "relates to computer memory devices," and operates using computer software.  ('682 Patent at 1:13–14.)

[8] Some of the Parties have previously stipulated to using interface emulator 320, 820, 920, and equivalents thereof for the structure.  (Docket No. 39-5 [5/8/12 ITC Investigation] at 11.)  However, this is not conclusive.  Not all Parties had been joined at that time, and this stipulation still does not show that an algorithm is present.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

9:62–64.)  Figure 9's description makes no mention of IDE drive interface emulator 920.  None of these descriptions provide sufficient structure to disclose how the IDE drive emulator actually intercepts the communication.

Similar to the problem faced in <u>Function Media</u>, Plaintiff cannot rely on generic claims of a "method that intercepts communications," or a flow chart showing the text "IDE Drive Interface Emulator" (320, 720, 820, and 920) in a box.  <u>See</u> <u>Function Media</u>, 708 F.3d at 1319 (holding that a patent claim was invalid for lack of structure because the patentee merely referenced software and provided flow charts, without explaining how the software performed the function).  The specification only reiterates the function, while the figures merely show a box without further instruction regarding how this structure accomplishes its means.

The Court accepts for the moment that the IDE drive interface emulator is the identified structure.  (<u>See</u> P. Resp. at 6.)  However, this does not disclose how the IDE drive interface emulator actually intercepts, or captures and holds, the communication from the host computer (i.e., it does not provide an algorithm).  Thus, the Court agrees with Defendants that the structure is currently unidentified.  Accordingly, the Court finds that the "means for intercepting communications between a host and a storage device" claim in Claim 40 is undefined.

**Structure:** unidentified

///

///

///

///

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

> **f.** *"means for blocking other ones of the commands from being received by the storage device based on the comparison"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "means for blocking other ones of the commands from being received by the storage device based on the comparison"<br><br>Claim 40 of '682 Patent | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: blocking other ones of the commands from being received by the storage device based on the comparison.<br><br>Structure: a processor programmed to perform step 420 and 460 of Fig. 4, and equivalents thereof. | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: blocking other ones of the commands from being received by the storage device based on the comparison.<br><br>Structure: the elements of Fig. 5 (except 520, 525, 530, and 560), and programmed to perform steps 420, 430, 440, 450, and 460 of Fig. 4, and equivalents thereof. |

The Parties agree as to the function of this term. (Docket No. 31-1 [Disputed Term Constructions ("DTC")] at 9.) However, Plaintiff contends that a processor programmed to perform steps 420 and 460[9] identifies the structure, while Defendants argue that additional elements in Figure 5 (excluding steps 520, 525, 530 and 560) and steps 430, 440, and 450 are also required. (PB at 23.)

Figure 5 is extraneous to the definition of this term; the elements of Figure 4 speak for themselves. As for the algorithm used, Plaintiff argues that only step 430 (blocks commands from being received by the storage device) need be identified as the structure, while Defendants argue that steps 420 (examination of whether communication is write or format command), 440 (examination of read commands), 450 (examination of capabilities requests), and 460 (treatment of unrecognized commands) must also be included. (PB at 23.)

Plaintiff attempts to construe the structure for the means of blocking too narrowly. Plaintiff's "means for blocking" claim does not encompass "any" type of communication. Rather, it blocks specific communications—those that have been compared to listed commands

---

[9] In the Parties' proposed construction, Plaintiff refers to steps 420 and 460. (DTC at 9.) In its opening brief, Plaintiff refers to 430. (PB at 23.) The Court evaluates each of the steps described.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|--------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

and deemed to be commands that should be blocked. Thus, in order to block the correct communications, step 420 is necessary. Steps 440, 450, and 460, perform similar functions to step 430—given an alternative answer to step 420—and therefore must also be incorporated. ('682 Patent 6:66–7:3.)

For these reasons, the Court adopts the following structure for the "means for forwarding" means-plus-function construction:

> **Structure:** A processor programmed to perform steps 420, 430, 440, 450, and 460 of Fig. 4, and equivalents thereof.

> **g.**   ***"means for comparing commands in the communications between the host and the storage device to a predetermined set of commands"***

The Parties identify this term as one in dispute in their jointly filed proposed constructions of disputed terms. (DTC at 9–10.) However, neither side discusses this term in its briefing. The Court therefore declines to make any ruling regarding its interpretation.

///

///

///

///

///

///

///

///

///

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

h.      ***"means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "means for forwarding selected ones of commands in the intercepted communications to the storage . . . known to not permanently modify a state of the storage device"<br><br>Claim 40 of '682 Patent | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: The parties agree that the function is the claim language.<br><br>Structure: a processor programmed to perform step 470 and 480 in Fig. 4, and equivalents thereof. | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: The parties agree that the function is the claim language.<br><br>Structure: the elements of Fig. 5 (except 520, 525, 530, and 560), and programmed to perform steps 440, 450, 460, 470 and 480 in Fig. 4, and equivalents thereof. |

The Parties agree that the function is the claim language.  (DCT at 10–11; see '682 Patent at 17:8–13.)  However, the Parties dispute the proper structure.  Plaintiff contends that the structure is a processor programmed to perform steps 470 and 480.  Defendants argue that additional elements in Figures 4 and 5 must be included as they are necessary to perform the forwarding function.  (DB at 13.)

Defendants again assert that the elements of the microprocessor in Figure 5 (except 520, 525, 530 and 560) must be included in the structure.  Again, the Court finds Figure 5 to be extraneous.

Turning to the algorithm, Figure 4 describes the operation of the blocking device, where both Parties agree that steps 470 and 480 must be included in the operation of the blocking device.  Thus, only steps 440 (examination of a command), 450 (examination of a capabilities request), and 460 (treatment of unrecognized commands) must be inspected.  (PB at 25.)  As stated in the claim, the blocking device includes a means for forwarding selected commands.  ('682 Patent at 17:7–13.)  This selection process occurs at steps 440 and 450, which then lead to steps 470 and 480.  Step 460 in Figure 4 discards non-recognized commands, and thus is not necessary for forwarding.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

For these reasons, the Court adopts the following structure for the "means for forwarding" construction:

> **Structure:** A processor programmed to perform steps 440, 450, 470, and 480 in Fig. 4, and equivalents thereof.

> **i.**   ***"Means for modifying data received from the storage device relating to the capabilities request command to reflect the capabilities of the blocking device"***

The Parties identify this term as one in dispute in their jointly filed proposed constructions of disputed terms. (DTC at 11.) However, neither side discusses this term in its briefing. The Court therefore declines to make any ruling regarding its interpretation.

> **j.**   ***"means for returning status information to the host that indicates that the blocked command was successfully executed by the storage device"***

The Parties identify this term as one in dispute in their jointly filed proposed constructions of disputed terms. (DTC at 12.) However, neither side discusses this term in its briefing. The Court therefore declines to make any ruling regarding its interpretation.

## 2. THE '086 PATENT

> **a.**   ***"exact copy" or "exact copies"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "exact copy"/ "exact copies"  Claims 1 and 18 of '086 Patent | "a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas" | "a copy that includes all of the data that resides on a long-term memory device, and formatted and arranged in the exact manner as on the long-term memory device" |

Plaintiff asserts that its construction should be unchanged from a prior ITC proceeding, and that Defendants' "formatted and arranged" clause is unclear. (PB at 26.) Defendants argue that their construction is more complete, as it ensures that the copy is indistinguishable from and has the same arrangement as the original. (DB at 26–27.) While an ITC proceeding may be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|-------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

instructive, patent "claim construction is reviewed without deference." <u>Kyocera Wireless Corp. v. ITC</u>, 545 F.3d 1340, 1346 (Fed. Cir. 2008).

To support their position, Defendants rely on the '086 patent's specification, which states that the invention allows the device to "make a perfect copy" and that "[o]ne of the objectives of our invention is to make a copy indistinguishable from a [sic] original." ('086 Patent at 4:30, 5:21–22.) Defendants also rely on the provisional application, which is incorporated by reference, and which states that the "data must be arranged on the copy in the exact same pattern as the original." (<u>Id.</u> at 1:7–10; Docket No. 38-18 [Ex. M, '086 Patent's Provisional Application] at 2.)

When indicating that the '086 patent's device makes exact copies, the specification also states that "all of the data that resides on the Source must be copied," which includes hidden data. ('086 Patent at 4:38–46.) The copying device "can make the Destination drive appear to be exactly the same size as the host. As such any comparison of the two drives will show them to have identical data." (<u>Id.</u> at 5:33–39.)

Using the terms of the patent specification, it is clear that Plaintiff's copying device is used to create copies that are indistinguishable from the original and, thus, identical copies. To more fully clarify the "exact" nature of the copy, the provisional application shows that Plaintiff intended this to mean not only the data in the source drive, but also the particular arrangement of the data. As discussed above, because the prosecution history is significant in understanding the claims, it "can and should be used to understand the language used in the claims, [but] it . . . cannot enlarge, diminish, or vary the limitations in the claims." <u>Markman</u>, 52 F.3d at 980 (quotations omitted).

While Defendants' definition excludes the "data in hidden areas" portion of Plaintiff's construction, in light of the language used in the provisional application, the Court finds Plaintiff's phrase to be both relevant and supported by the prosecution history. (<u>See</u> '086 Patent at 4:38–46.) Finally, there is nothing in the patent to support Defendants' insistence on the use of "formatted" in construing the term. The word "format" appears only once in that patent, and not in a context that would have any application here. (<u>Id.</u> at 10:12–14) ("[T]he copying device copies data from all partitions on the source device, regardless of the format.") This usage does not truly touch upon the issue now before the Court, and it therefore will not be included in the Court's construction.

For these reasons, the Court adopts the following claim construction:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

**"exact copy"/"exact copies":** a copy that includes all of the data that resides on a long-term memory device, including any data in hidden areas, and is arranged in the exact same pattern as on a long-term memory device

### b. *"user controllable switch"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "user controllable switch"<br><br>Claim 1 of '086 Patent | This claim should be afforded its plain and ordinary meaning, which is "a switch that can be controlled by a user of the device." | "a simple physical switch having only 'on' and 'off' positions" |

Plaintiff asserts that the definition of "user controllable switch," again settled by some Parties during the ITC proceeding, should persist. (PB at 27.) Defendants propose limiting language by suggesting that the switch must be physical, and may only include "on" and "off" positions. (DB at 28.)

While claim terms should be construed consistently in a patent, if the term is used in slightly different contexts, the term need not have the same meaning in both phrases. <u>Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1030–31 (Fed. Cir. 2002) (finding that the term "substantially" used in "substantially below" and "substantially constant" had different interpretations based on their contexts).

Claim 1 involves a device—a switch—for making exact copies. To support their assertion that the switch is limited to only the "on" or "off" position, Defendants point to language in the specification:

> <u>In the preferred embodiment</u>, the goal of making this device foolproof for use by an untrained person is accomplished in a number of ways. The first is that the <u>device is controlled by a single switch</u>, such as Key Lock 4030. This switch has <u>only two choices, on and off</u>.

('086 Patent at 7:26–33) (emphasis added.) However, this language merely highlights the two choices of "on" and "off" in a preferred embodiment, when the device would be at its most foolproof state for untrained persons. (<u>Id.</u> at 7:26–33.) While the device is made to be used by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

non-technical people, the patent also provides for more complex features, and thus the Court does not find that it must be limited to just two switch positions.  (See id. at 7:53–9:21.)

Additionally, Plaintiff points to further language in the specification:

> A <u>user controllable switch</u>, when actuated by a user, causes the control circuit to perform the copying procedure.
> . . .
> Although our device automatically copies and then verifies the copy, there are situations where a user may be interested in just performing the copy operation.  For this eventuality, one embodiment of our device allows a user to cancel the verification through a <u>user control</u>.  This control only affects the verification process, and has no effect during the copy process.

(<u>Id.</u> at 2:16–17; 5:13–19) (emphasis added.)  Plaintiff's definition of "user controllable switch" appears to include a switch both for initiating the copying function, and for interrupting the verification process.  (<u>Id.</u> at 11:9–11.)[10]  Also, the specification describes a "user controllable switch" and a "user settable switch," which, when actuated or switched by the user, makes the exact copy.  (<u>Id.</u> at 2: 16–17, 42–54.)  Therefore, the switch—while undeniably limited to something "simple," so that non-technical persons may use it—need not be limited to "on" and "off" positions.

Finally, contrary to Defendants' interpretation, the '086 patent does not state at any point that the user controllable switch must be a physical switch.[11]

> **"user controllable switch":** a simple switch that can be controlled by a user of the device

> **c.**     ***"means [for] initiating the copying procedure"***

---

[10] And Dependent Claim 2 of the '086 patent states that the "user controllable switch is connected to the control circuit to interrupt the verification process." ('086 Patent at 11:9–11.)  "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." <u>Phillips</u>, 415 F.3d at 1314.

[11] This is in contrast to the switch, discussed below, in the '379 patent.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
| --- | --- | --- | --- |
| Title | MyKey Technology Inc Patent Litigation | | |

| Claim Term | Plaintiff's Construction | Defendants' Construction |
| --- | --- | --- |
| "means [for] initiating the copying procedure" Claim 18 of '086 Patent | This term is subject to 35 U.S.C. 112(f).<br><br>Function: initiating the copying procedure.<br><br>Structure: a switch and equivalents thereof. | This term is subject to 35 U.S.C. 112(6).<br><br>Function: initiating the copying procedure.<br><br>Structure: a simple physical switch having only two stable positions 'on' and 'off,' and equivalents thereof. |

Here, the Parties dispute the construction of a means-plus-function claim, though they agree that the function is "initiating the copying procedure." (DCT at 14–15.) Plaintiff argues that the ITC's defined structure should prevail. (PB at 27.) Defendants argue that the "user controllable switch" (or their proposed construction for "user controllable switch") is the structure used to initiate the copying procedure. (DB at 30.)

Again, the Court finds that the presence of a "physical" switch is not supported by the patent's language. The switch can either be "switched" or "actuated" to initiate a copying function; Defendants have not shown that "actuation" requires a physical switch. ('086 Patent at 2:15–17.)

Defendants support their construction by stating that Plaintiff "disparaged and disclaimed [the] menu-driven user interface of the Logicube prior art." (Id.; see '086 Patent at 1:48–57.) In the Court's reading, however, this is merely a comparison of the conventional techniques that exist for making exact copies, rather than a "clear and unambiguous" disclaimer of subject matter to narrow the scope of the claim terms. Seachange Int'l, 413 F.3d at 1373. In describing Logicube's design, Plaintiff's specification states that Logicube's device has "numerous operating modes and options that must be specified before making a copy," which use "a number of buttons on a small display" and requires a trained operator. ('086 Patent at 1:48–57.) The specification then states there is a need for an "improved" mechanism to make exact copies. (Id. at 1:65–67.)

Based on the intrinsic evidence, and the discussion of "user controllable switch" provided above, the Court adopts the following structure as the "means [for] initiating the copying procedure":

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

**Structure:**  a simple switch and equivalents thereof

> **d.**     ***"means for making an exact copy"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "means for making an exact copy"<br><br>Claim 18 of '086 Patent | This term is subject to 35 U.S.C. 112(f).<br><br>Function: making an exact copy.<br><br>Structure: a processor programmed to perform step 3070 in Fig. 3, and equivalents thereof. | Invalid under 35 U.S.C. § 112.<br><br>In the alternative,<br><br>This term is subject to 35 U.S.C. 112(6).<br><br>Function: making an exact copy.<br><br>Structure: a processor programmed to perform step 3070 in Fig. 3, and the algorithm described in col. 6, line 27 through col. 7, line 2, and equivalents thereof. |

Plaintiff again contends that the agreed upon construction at the ITC proceeding should apply to the means-plus-function structure.  (PB at 28.)  Defendants argue that the claim is invalid as "copy all sectors" in a box on Figure 3 is an insufficient algorithm for the structure.  (DB at 30.)  Alternatively, Defendants state that the algorithm may be defined in lines 6:27 through 7:2 of the '086 patent.  (Id.)  As this is a means-plus-function claim, involving a computer or processor, both a structure and its algorithm must be disclosed for the structure.  WMS Gaming, 184 F.3d at 1349.

The Court agrees with Defendants; "copy all sectors" in step 3070 of Figure 3 is merely the function or outcome that the structure is meant to perform, and not the means for achieving the outcome.  (DB at 31); Blackboard, Inc. v. Desire2Learn, Inc., 574 F.3d 1371, 1384 (Fed. Cir. 2009) (finding a means-plus-function claim to be indefinite because the specification language simply described the function to be performed without explaining how the function was to be performed).  Further, inspecting Figure 5's description in lines 6:27–7:2 for an alternative algorithm, the Court finds that this language does not delineate how the copying should be done.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

However, the specification elsewhere reveals how the copying device operates to perform its required function.  (See '086 Patent at 3:33–5:45.)  This includes the speed of the bandwidth, and requires steps that the data be read from one drive and written to the other.  (Id. at 3:62–67.)  Accordingly, the Court adopts the following definition:

> **Structure:** a processor programmed to perform step 3070 in Fig. 3 and the algorithm described in lines 3:33 to 5:45, and equivalents thereof

> e.    ***"means for reading and comparing the data on the source and destination devices and communicating result to a user"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "means for reading and comparing the data on the source and destination devices and communicating result to a user"<br><br>Claim 18 of '086 Patent | This term is subject to 35 U.S.C. 112(f).<br><br>Function: reading and comparing the data on the source and destination devices and communicating result to a user.<br><br>Structure: a processor programmed to perform step 3075 in Fig. 3, and equivalents thereof. | Invalid under 35 U.S.C. § 112.<br><br>In the alternative,<br><br>This term is subject to 35 U.S.C. 112(6).<br><br>Function: reading and comparing the data on the source and destination devices and communicating result to a user.<br><br>Structure: a processor programmed to perform step 3075 in Fig. 3 (as discussed in Col. 6, lines 17–20), and equivalents thereof. |

Again the Parties agree on a function, but disagree on structure.  Plaintiff contends that the construction adopted in the ITC proceeding should prevail, whereas Defendants argue that Plaintiff only provides a box in a flow chart that states "compare all structures."  (PB at 28; DB at 31.)

Step 3075 in Figure 3, indeed, only says "compare all sectors," and does not account for the "reading" aspect of the function.  ('086 Patent at Fig. 3.)  The specification states, "Once the data has been copied to the Destination drive, a data comparison 3075 is initiated.  This

**LINKS: 38, 39**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|-------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

comparison checks every byte in every sector of the Source drive to be sure that the copy has completed with no errors.  When complete, the user is notified through status indicators and possibly a printout 3080."  (<u>Id.</u> at 6:16–22.)

    Similar to the <u>Function Media</u> case, Plaintiff has only indicated that a processor and the step "compare all sectors" (a box in Figure 3) are necessary.  This is inadequate to satisfy the structure requirement as it does not state how the function is being performed.[12]  <u>Function Media</u>, 708 F.3d at 1317 (requiring that patentee must disclose at least some structure and details on how function is accomplished).  Further, the specification provides no help, as it only states what the comparison feature does, without saying how it performs the function or with what algorithm.  The Court therefore finds as follows:

    **<u>Structure</u>:** unidentified

///

///

///

///

///

///

///

---

[12] Again Plaintiff has argued that the heightened algorithm requirement is inapplicable.  Again, Plaintiff errs.  (<u>See</u> Footnote 6, above.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

> **f.**  ***"stand-alone, dedicated function device for making exact copies of long term memory device" and "stand-alone, dedicated function copying device"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "stand-alone, dedicated function device for making exact copies of long term memory devices" and "stand-alone, dedicated function copying device" Claims 1, 18 of '086 Patent | "a physical device, which is not a general purpose computer system, that stands apart from the source drive and the one or more destination devices whose hardware and software is dedicated to making exact copies of long term memory devices" | "a device that is configured at the factory for the specific purpose of automatically making an exact copy of a source long-term memory device on a destination long-term memory device, and includes all the hardware, logic and circuitry necessary to perform such specific purposes, and does not include an option to delete the contents of the destination long-term memory device" |

Plaintiff argues that this term is only recited in the preambles of Claims 1 and 18 and is not intended to be a limitation.  (PB at 29.)  Defendants seek to limit Plaintiff's term by adding hardware and software constraints, and they suggest that the words "dedicated function" indicate that the device is not reconfigurable to perform any other function.  (DB at 32–33; PB at 30.)  Plaintiff contends that the device should not be limited to performing only one function simply because it is "stand-alone" and "dedicated."  (PB at 30.)

The determination of whether a preamble limits a claim is resolved based upon a review of the entire patent, "to gain understanding of what the inventors actually invented and intended to encompass by the claim."  Catalina Mktg, 289 F.3d at 808.  A preamble may limit the invention for many reasons, including if the preamble "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim" or if there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art."  Id. However, a preamble is not limiting when "a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose[,] . . . intended use for the invention," or to merely give a descriptive name to the set of limitations in the body of the claim. Id. (internal quotations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

    Defendants argue that the term here is a limiting preamble because it gives "life, meaning, and vitality" to the claims, and because Plaintiff clearly relied on the preamble during prosecution to distinguish it from prior art.  (DB at 32; Def. Resp. at 21.)  The Court disagrees.[13] The phrase "stand-alone, dedicated function device" is merely a descriptive name, which introduces the invention; separate claim limitations are fully set forth in the body.  After the preamble, Claim 1 describes what is included in the device to make exact copies, such as the interfaces, the user controllable switch, and the control circuit.  Similarly, Claim 18 describes a copying device's means for performing its functions.  See IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1434 (Fed. Cir. 2000) (finding that "control apparatus" in the claim "A programmable microcomputer control apparatus for controlling" was a preamble that merely gave a descriptive name, and did not limit the claim to an apparatus separate from the machine).

    Further, the specification and application state that other stand-alone devices have limitations because they cannot perform certain functions; however, neither indicates any specific hardware or software limitations.  ('086 Patent at 1:58–64; '086 App. at 3.)  Based in part on this absence, the phrase "stand-alone" should not mean that all the hardware, logic, and circuitry necessary to perform the device's function are limited to a factory-shipped version of the device.  Rather, the Court interprets "stand-alone" to mean that the device is physically separate from the source and destination devices.[14]

    In light of this, the Court declines to accept Defendants' construction, which limits the device to a single and specific purpose of automatically making an exact copy.  As described in Claim 18, the copying device also functions to verify data and to restore the source device. ('086 Patent at 12:16–36.)  Further, as Plaintiff points out, the copying device can be "configured to display a report of the copying process and limitations[,] . . . to accept one or more bit patterns to scan during the copying process[, and] to perform a scan only."  (Id. at 10:22–27.)  Thus, Plaintiff's device may clearly be configured to perform more than one function.  The phrase "dedicated function" is therefore a descriptive, non-limiting portion of the

---

[13] The '379 patent uses a similar term, and Defendants suggest that the Court must read them together. However, rather than using the '379 patent's prosecution history and claim terms, which are extrinsic evidence for the '086 patent, the Court first turns to intrinsic evidence found in the context of the claims, specification, prosecution history of the '086 patent itself.  See Markman, 52 F.3d at 980.

[14] In the prosecution history, Plaintiff states, "Our current invention is a stand-alone device. A user connects a long-term memory device he desires to make a copy of (source) to our device. The user also connects a long-term memory device to receive this copy (destination)." ('086 App. at 30.)  This further supports the interpretation of a device separate and physically apart from the source and destination devices.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

preamble, indicating that the main function of the copying device is to make an exact copy, but that it is not the only function.

Further, Plaintiff does not make a clear and unambiguous disavowal of a delete function for its copying device in the '086 patent.  See Seachange Int'l, Inc., 413 F.3d at 1373.  While Plaintiff does provide an example of a device that includes numerous operating modes and options, including a delete function, this does not explicitly disclaim delete functionality.  See also Liebel-Flarsheim Co., 358 F.3d at 904 ("[I]t is improper to read a limitation from the specification into the claims.")

Based on this analysis, the Court accepts the following construction:

**"stand-alone, dedicated function device for making exact copies of long term memory devices" and "stand-alone, dedicated function copying device":**  a physical device, which is not a general purpose computer system, that stands apart and is physically separate from the source drive and the one or more destination devices, whose hardware and software are configured for a main purpose of making exact copies of long term memory devices

> *g.*  *"control circuit issuing commands to . . . read and compare data on the source and destination devices"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "control circuit issuing commands to . . . read and compare data on the source and destination devices"<br><br>Claim 1 of '086 Patent | This claim term does not require construction. | "commands are issued to the source and destination devices so that, on a unit by unit basis, data on the source device is read and compared with corresponding data on the destination device" |

Plaintiff contends that this claim term does not require construction, as it is readily apparent to one of ordinary skill in the art.  (PB at 32.)  Defendants argue for a construction that includes a unit by unit basis for reading and comparing data.  (DB at 33.)

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

The specification reads:

> Once the data has been copied to the Destination drive, a data comparison 3075 is initiated. This comparison checks every byte in every sector of the Source drive to be sure that the copy has completed with no errors. When complete, the user is notified through status indicators and possibly a printout 3080.

('086 Patent at 6:17–22.)  The specification states that the comparison checks every byte in every sector, but again specification limitations should not improperly be read into claims. Liebel-Flarsheim Co., 358 F.3d at 904.  Here, Plaintiff did not make a clear disavowal or intention to limit the claim scope by stating that "every byte in every sector" is compared, nor does Plaintiff state how the comparison is done—whether the comparison occurs unit-by-unit or by groups of bytes.  Furthermore, while the specification states that the comparison is being done on the source drive, Claim 1 allows for comparisons on both the source and destination drive.  See Brookhill-Wilk 1, LLC, 334 F.3d at 1301.

Thus the Court agrees with Plaintiff and adopts the following construction:

> **"control circuit issuing commands to . . . read and compare data on the source and destination devices":** This claim term does not require construction and should be afforded its ordinary and customary meaning.

///

///

///

///

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
| --- | --- | --- | --- |
| Title | MyKey Technology Inc Patent Litigation | | |

>    **h.**    ***"control circuit issuing commands to . . . restore the source drive to its original condition"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
| --- | --- | --- |
| "control circuit issuing commands to . . . restore the source drive to its original condition"<br><br>Claim 1 of '086 Patent | This claim term does not require construction. | "commands are issued to the source drive, automatically after copying, to restore the drive to its unaltered state after the source device has been altered to provide access to hidden areas" |

The central disputes regarding this term are:  (1) when the restoration commands are issued and when they are performed; (2) whether the restoration of the drive to its original state requires a manual step or is performed automatically by the duplicator; and (3) whether the restoration includes full restoration of the hidden areas.  (DB at 35.)  Plaintiff states that no construction is necessary for the claim term "control circuit issuing commands to . . . restore the source drive to its original," as the meaning is plain from the claim language.  (PB at 33.)  On the other hand, Defendants contend that the invention works in sequence, where the device is activated, makes a copy, and restores the drive to its original condition.  (DB at 34.)

In comparing other devices to its own, Plaintiff's specification states that "[current stand-alone devices] do not restore hidden areas automatically," and thus an improved mechanism—like Plaintiff's, which can restore devices automatically—is necessary.  ('086 Patent at 1:58–62.)  Hidden areas may be issued commands and restored at different times depending on the method used.  If the host protected area ("HPA") method is used, then the restoration occurs after the drive is powered off and on again.  ('086 Patent at 4:54–58.)  This shows that the commands are not issued automatically after copying; rather, such commands could possibly be issued prior to copying, or even after an extra, manual step—such as powering the device off and on—is taken.  (PB at 34.)

Defendants contend that the restoration command is issued to the source automatically after copying.  (DCT at 18–19.)  As just indicated, however, this is not the only interpretation allowed by the specification or the claims.  The language Defendants use to support their construction refers to the <u>performance</u> of the restoration command, and not to the <u>issuing</u> of the command.  Further, Defendants support their argument by pointing to the '086 patent's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

disclosure that it uses the device described in U.S. Provisional Patent No. 60/443,388, "Systems and Methods for Restoring Critical Data to Computer Long-Term Memory Device Controllers," as a method to restore a drive to its original configuration. ('068 Patent at 5:5–12; Docket No. 38-20 [Ex. O, Provisional Patent No. 60/443,388 ("'388 Provisional")].) Careful review of the provisional demonstrates that it tends to support Plaintiff's position. While the '388 Provisional has an algorithm to "automatically restore[] a source drive without room or need for additional user intervention after initiating the copy," (DB at 35), the summary of the invention also states that "[u]pon receiving a command, (usually automatic/user initiated optionally) the process writes a command to the storage device to restore the storage device to its previous state." ('388 Provisional at 4) (emphasis added.) Non-automatic commands are therefore expressly contemplated.

Accordingly, the patent language does not describe, and should not be construed to describe, a procedure that follows an unvarying sequence of events. Even though the source drive—including the hidden areas—must be restored to its original state after the copying command is issued and the hidden area has been accessed for copying, nothing in the patent or its prosecution history suggests that the command must be issued automatically. Thus, the Court adopts the following construction:

> **"control circuit issuing commands to . . . restore the source drive to its original condition":** control circuit issues commands to the source drive so that the source drive, including hidden areas, is restored to its original condition after copying

///

///

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

      i.      *"means for opening hidden areas on the source device"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "means for opening hidden areas on the source device"<br><br>Claim 18 of '086 Patent | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: opening hidden areas on the source device.<br><br>Structure: a processor programmed to issue a command to the source device to make hidden data available to be read from the source drive by changing the reported size of the source device to allow data to be read from the entire source drive. | Invalid under 35 U.S.C. § 112.<br><br>This term is subject to 35 U.S.C. § 112(6).<br><br>Function: opening hidden areas on the source device.<br><br>Structure: Undefined. |

      Plaintiff again states that the construction adopted in the ITC proceeding should prevail. (PB at 35.)  Defendants argue that Plaintiff fails to provide an algorithm and fails to clearly link an algorithm to the claimed function, and thus the structure is unidentified and the claim invalid. (DB at 37–38.)

      In the specification, Plaintiff describes how data may be hidden, and how hidden areas may be restored after copying, but does not describe how the hidden areas are opened or accessed.  ('086 Patent at 4:54–5:19.)  The only insight the specification gives is a statement that, to allow all data to be copied, hidden data must be made available as well, and that a drive hiding data using the HPA method may be instructed to make the hidden area accessible temporarily.  (Id. at 4:38–43, 54–55.)  The patent does not state how this is done, nor does it indicate how data hidden using other methods may be opened.  See Function Media, 708 F.3d at 1318 (simple assertions are not sufficient to disclose software without some details of how a function may be accomplished).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|----------|-------------------------|------|---------------|
| Title | MyKey Technology Inc Patent Litigation | | |

Further, the figures provide no insight and do not describe any algorithm to show how a hidden area is opened.  Plaintiff cannot simply provide in its specification and claims that the hidden areas are opened without further explaining how this is done.[15]

Because Plaintiff has failed to disclose an algorithm describing how hidden areas are opened, and has not linked any structure to the claimed structure, the Court finds that this means-plus-function structure is unidentified.

**Structure**:  unidentified

///

///

///

///

///

///

///

///

[15] The Court notes that the '388 Provisional is referenced for its restoration function, not for its ability to open hidden areas.  See Med. Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1216 (Fed. Cir. 2003) (declining to incorporate a "structure that is disclosed in the specification but is not associated with the particular claimed function").

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

*j.*    ***"means for restoring the source device to its original condition"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "means for restoring the source device to its original condition"<br><br>Claim 18 of '086 Patent | This term is subject to 35 U.S.C. § 112(f).<br><br>Function: restoring the source device to its original condition.<br><br>Structure: processor programmed as set forth in 4:54–60 of the '086 patent.<br><br>OR<br><br>processor and flash memory, where the processor is programmed<br><br>(1) to, prior to accessing the hidden area(s) on the source drive(s), instruct the flash memory to store information about an original configuration of a source drive(s) associated with a unique identification number(s) for that source drive(s) and<br><br>(2) to, after accessing the hidden area(s) on that source drive(s), access the stored information about the original configuration of the source drive(s) stored in the flash memory by referencing the unique identification number associated with that source drive(s) and<br><br>(3) to instruct the source drive(s) to restore itself to the original configuration | Invalid under 35 U.S.C. § 112.<br><br>This term is subject to 35 U.S.C. § 112(f).<br><br>Function: restoring the source device to its original condition.<br><br>Structure: Undefined.<br><br>Alternate Structure: processor programmed as set forth in 5:5–12 of the '086 patent, and equivalents thereof |

Plaintiff argues that the restoration structure is clearly provided in lines 4:54–60, which refers to the HPA method, and 5:5–12, which relates to the use of the '388 Provisional for another method (the device configuration overlay ("DCT") method).  (P. Resp. at 21–22.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

Defendants argue that the '388 Provisional was not properly incorporated and thus cannot be a proper structure for which this means-plus-function claim relies. (DB at 38–39.)

In referencing the '388 Provisional, Plaintiff states, "Our invention uses the method as described in the U.S. Provisional Patent No. 60/443,388 entitled 'Systems and Methods for Restoring Critical Data to Computer Long-term Memory Device Controllers' to provide a method for restoring a drive to its original configuration." ('086 Patent at 5:5–12.) This direct incorporation of the '388 Provisional is the precise situation contemplated by the Federal Circuit in <u>Oatmeal Corp. v. Information Storage Devices</u>, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (discussing the prospect of a world without incorporation by reference: "[the specification would be of enormous and unnecessary length if one had to literally reinvent and describe the wheel.")

Thus, the Court agrees with Plaintiff that the structure is identified by the patent. The Court therefore adopts the following interpretation:

> **Structure:** processor programmed as set forth in 4:54–60 and 5:5–12 of the '086 patent.

### 3. THE '379 PATENT

#### a. *"user controllable switch"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "user controllable switch"<br><br>Claim 1 of '379 Patent | This claim term should be afforded its plain and ordinary meaning, which is "a switch that can be controlled by a user of the device." | "a simple physical switch, including two stable positions 'on' and 'off', that when actuated by the user that causes the control circuit to issue all the commands recited herein, and is not a menu driven interface" |

Plaintiff argues that a construction is not required because the plain and ordinary meaning is enough. (PB at 36.) Defendants argue that the patent specification, figures, and the prosecution history show that the "user controllable switch" refers to a physical switch with only two positions of "on" and "off." (DB at 15.)

The prosecution history shows that, in August 2005, Plaintiff amended its claim to include a "user controllable <u>physical</u> switch," distinguishing it from prior art (specifically, "the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

Holzhammer patent").[16]  (Docket No. 38-14 [Ex. J-1, '379 Patent Filed History, Part 1 ("'379 File-1")], at 100.)  In doing so, Plaintiff stated that the "amendments in claim 1 emphasize that the device is a stand-alone device that includes a physical switch" and that the Holzhammer patent "does not disclose or suggest, for example as is recited in amended claim 1, 'an interface for connecting the stand-alone device to a long-term memory component,' or 'a user controllable physical switch.'"  ('379 File-1 at 120–21.)  In January 2007, the claims were amended to remove the word "physical," reverting back to "user controllable switch" without explanation.  (Docket No. 38-15 [Ex. J-2, '379 Patent Filed History, Part 2 ("'379 File-2")], at 150.)

If a plaintiff files a narrowing amendment to its claim, it has the burden of showing that prosecution history estoppel does not apply.  Festo, 344 F.3d at 1366.  Here, Plaintiff amended its '379 patent in 2005 to clearly distinguish it from the Holzhammer patent prior art.  Plaintiff's retraction of the word "physical" does not mean that the inventor can automatically expand its claim and the Court finds no evidence that the inventor intended such a result here.  Having introduced the idea of including a physical switch to patent around the prior art, the Court will not re-expand the claim in this Markman proceeding.

Additionally, there are some linguistic and pictorial indications of the "user controllable switch" with only two positions of "on" and "off."  ('379 Patent at Figs. 7, 8, 9, and 10, and accompanying language 9:4–5, 13–35, 39–44, 49–62.)  For example, the specification shows that the user begins with the "off" state to connect the cleaning device, turns the switch to the "on" position to begin the cleaning process, and then switches it back "off" to disconnect the device.  However, the depiction of this embodiment does not necessarily limit Plaintiff's claim.  See KCJ Corp., 223 F.3d at 1356.  The claim language merely speaks of a switch, and Plaintiff has never clearly disavowed a multi-position switch.  Claim 1 plainly allows for a broader reading than just two stable positions of "on" and "off," though even this reading still requires a relatively "simple" operation—much like the switch described above in the '086 patent.

For these reasons, the Court adopts the following construction for the "user controllable switch" as described in Claim 1:

> **"user controllable switch":**  a simple physical switch that can be controlled by a user of the device

---

[16]  This history stands in contrast to a similar term used in the '086 patent.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

### b. *"hidden storage area"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "hidden storage area" <br><br> Claim 1 of '379 Patent | "an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay" | "an area on a long-term memory device that is hidden from the operating system" |

Plaintiff argues for a construction that was adopted in the ITC proceeding, and relies on extrinsic testimony that "hidden areas" are understood to include both (1) a host protected area (HPA) and (2) a device configuration overlay (DCT). (PB at 37; P. Resp. at 14.) Defendants argue that neither HPA nor DCT were mentioned in the intrinsic evidence. (DB at 19.) Instead, Defendants argue that Plaintiff has only mentioned "hidden storage areas" in reference to data hidden from the operating system that the cleaning device seeks to wipe. (Id.) Defendants seek to further limit the claim by arguing that the data is hidden from the "operating system" and not the computer. (Id. at 20.)

The specification must contain a description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it. Vitronics, 90 F.3d at 1582. It is true that in the language of the patent itself does not mention HPA or DCT. However, the prosecution history is instructive.

First, the prosecution history shows that the patentee distinguished its '379 patent from a prior patent (the "Assaf patent") by stating that Assaf did not disclose a method to decode or release "hidden data," and did not address either DCT or HPA. ('379 File-1 at 128.) By contrast, Plaintiff indicates that its patent exists to remove all hidden data, which necessarily includes HPA and DCT. (Id.) Thus, although the language of the patent did not expressly specify that HPA and DCT are types of hidden storage areas, it is clear that this is what Plaintiff intended.[17]

Defendants also argue that the term should be limited to data hidden from the operating system, rather than data hidden from the computer itself. But the specification states:

---

[17] Further, expert testimony indicates that HPA and DCT have been known since 1998, prior to the effective filing date of Plaintiff's patent. (Berg Op. at 15.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

> Some target drives may contain data that the drive has been instructed to classify as 'hidden' data. For example, a command supported by many commercially available hard drives allows a skilled programmer to reserve a portion of the storage media. Once reserved, this area of the media is effectively hidden from the computer by the drive. Standard queries about the amount of storage on the drive return the full amount of storage minus the reserved amount. This prevents standard data removal methods from working as the computer is unaware that there is hidden data.

('379 Patent at 10:41–50.) The context of this specification indicates that target drives may classify data as "hidden" from a computer. While this might include the operating system, it is not necessarily so limited.

The Court therefore adopts the following construction:

**"hidden storage area":** an area on a long-term memory device that is not counted towards a reported size of the device, such as a Host Protected Area and/or a Device Configuration Overlay

///

///

///

///

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

c.   ***"stand-alone, dedicated function device for removing data from a long term memory component" and "stand-alone, dedicated function device"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "stand-alone, dedicated function device for removing data from a long term memory component"<br><br>and<br><br>"stand-alone, dedicated function device"<br><br>Claim 1 of '379 Patent | "a physical device, which is not a general purpose computer system, that stands apart from a long-term memory component and is dedicated to irretrievably remove data from the long-term memory component" | "a device that is configured at the factory for the specific purpose of automatically removing data from a long-term memory component, and includes all the hardware, logic and circuitry necessary to perform such specific purpose, and the device does not have any way for a user to change its functionality, programming, or configuration" |

Defendants claim that the terms "stand-alone" and "dedicated function" mean that the device has a specific purpose that it performs automatically, contains everything necessary to perform that function, and is not user-configurable.  (DB at 16–17; Def. Resp. at 14.)  Plaintiff contends that having an essential function does not necessarily mean the device can never be changed.  (P. Resp. at 13.)   While the user cannot reconfigure the device,[18] this does not mean that it cannot originally be configured to perform multiple functions.  (Id. at 13–14.)

The specification shows that the cleaning device may have an additional display device or printer, ability to vary the level of cleaning, and clean multiple devices simultaneously.  ('379 Patent at 8:51–58, 10: 12–14, 37–40, 61–64.)  Based on the specification, it is apparent that Plaintiff intends the essential purpose of the cleaning device to be "to clean," but also allows that it may be configured by Plaintiff and its manufacturers to perform this function in multiple ways. Thus, there is nothing in the specification that limits the invention in the ways suggested by Defendants' proposed construction.

---

[18] Unlike the '086 patent, the prosecution history for the '379 patent clearly indicates that it "is not able to be reconfigured by a user."  (Docket No. 38-15 ['379 History] at MTI 2097.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

For these reasons, the Court adopts the following construction:

**"stand-alone, dedicated function device for removing data from a long term memory component" and "stand-alone, dedicated function device":** a device that is configured for a main purpose of removing data from a long-term memory component, that cannot be reconfigured by a user, and that includes all the hardware, logic, and circuitry necessary to perform such purpose

### d.    *"irretrievably remove data"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "irretrievably remove data"<br><br>Claim 1 of '379 Patent | This claim term should be afforded its plain and ordinary meaning, which is "remove data permanently such that it may not be recovered by any known methods." | "overwrite data on the tracks of a long-term memory component by writing to all the tracks multiple times with multiple data patterns and writing to the tracks non-sequentially in a pattern that forces the head to move from track to track in such a way as to introduce jitter in the position of the head in the long-term memory component" |

Plaintiff argues that the plain and ordinary meaning suffices, and that Defendants' construction captures only one embodiment of Plaintiff's device.  (PB at 38); see Liebel-Flarsheim, 358 F.3d at 904.  Defendants argue that Plaintiff cannot include methods that were not known at the time of the filing of Plaintiff's patent in 2001, as "a claim cannot have different meanings at different times."  See PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1363 (Fed. Cir. 2005).  Essentially, Defendants argue that this "meaning" includes only known technology and that their construction describes the only contemporaneously known technology.

The specification provides a method for the cleaning device to permanently erase data and render it unrecoverable:  writing to all data tracks on a drive multiple times with multiple data patterns to remove data from the hard drive.  ('379 Patent at 8:1–3.)  Data tracks are not written sequentially, but rather in a pattern that forces the head to move from track to track such that there is jitter in the head position.  (Id. at 8:3–7.)  This process of writing, with the head position

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

jumping, is done a minimum of seven times in different data patterns.  (Id. at 8:14–18.)  Alternate implementations allow for simple, fast cleans, or for more complex patterns for specific media types.  (Id. at 8:51–54.)  Further, the specification provides for a scheme that alternatively provides internal commands that will erase the drive.  (Id. at 8:55–58.)  Plaintiff distinguishes its method and device from then-current methods due to the imprecise head movements on the tracks that may not completely erase data.  (Id. at 2:30–50.)

The Court finds that Plaintiff's construction is overbroad, because it would encompass technologies that did not exist at the time the patent was filed.  However, Defendants' claim construction is too narrow, as it does not provide for the alternate methods provided by the inventor in later specifications.

The Court adopts the following construction:

> **"irretrievably remove data":**  remove data permanently by any method known prior to the patent's filing date such that the data may not be recovered

> **e.** ***"the control circuit is further configured to open a hidden area . . . before irretrievably removing data"***

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "the control circuit is further configured to open a hidden area . . . before irretrievably removing data"<br><br>Claim 1 of '379 Patent | This claim term does not require construction. | "the control circuit automatically opens a hidden storage area on the long-term memory component before irretrievably removing the data in response to the user's actuation of the switch to command irretrievable removal of all data" |

Plaintiff has pointed out that Defendants neither presented an argument for this limitation, nor responded to Plaintiff's brief regarding this claim limitation.

///

///

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

Thus, the Court adopts the following construction:

**"the control circuit is further configured to open a hidden area . . . before irretrievably removing data":** This claim term does not require construction.

  **f.**  *"casing being a size that is portable by the user"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "casing being of a size that is portable by the user"<br><br>Claim 1 of '379 Patent | This claim term does not require construction. | Invalid under 35 U.S.C. § 112.<br><br>"casing that is relatively small, lightweight, and easily portable, approximately 8"x10"x1.5" or smaller" |

The disagreement here centers on whether "portable" must be defined. Plaintiff asserts that Case law indicates that it does not, while Defendants assert that without a limitation the term is indefinite. (PB at 15; DB at 24.)

In a case involving a much more material dispute, Cordis Corp. v. Medtronic Ave, Inc., the Federal Circuit refused to impose a precise numeric constraint on the term "substantially uniform thickness," reasoning that courts attempt to avoid strict numerical boundaries. 339 F.3d 1352, 1361 (Fed. Cir. 2003); see also Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 907 (Fed. Cir. 2005) (refusing to put a numeric limitation on "substantially flattened surface," but instead finding that Playtex claimed "more than flat surfaces"). These cases both looked to the prosecution history to determine whether the general descriptive terminology used in the claim had been disclaimed in favor of a numerical or other quantitative limitation on the term. Having found no such disclaimer, the Circuit refused to impose a numerical limitation on the term through claim construction. Cordis, 339 F.3d at 1362; Playtex, 400 F.3d at 907.

Here Defendants seek to impose a quantitative limitation, including specific dimensions of the device, when none appears necessary. Plainly, no evidence has been produced that the inventor accepted a narrowing interpretation of the term "portable" to obtain the patent. Moreover, in the specification, Plaintiff references the casing as portable, physically compact, and—in one of its embodiments—approximately 8"x10"x1.5" or smaller. ('379 Patent at

LINKS: 38, 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

5:22–24; 6:21–25; 8:55–57, 67–69.)  While stating that the casing could be 8"x10"x1.5" or smaller, the inventor indicated that this was just one embodiment of its machine, as shown in Figure 9.  Again, as stated in <u>KCJ Corp.</u>, certain embodiments may appear in a specification, but they will not be read into the claims if the claim language is broader than the embodiment.  223 F.3d at 1356.  Claim 1 does not limit itself to numerical constraints, and thus the Court will not read that limitation into the claim.

Thus, the Court adopts the following definition:

**"casing being a size that is portable by the user":**  This claim term does not require construction.

g. *"the control circuit open[s] a hidden storage area without user intervention"*

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "the control circuit open[s] a hidden storage area without user intervention"<br><br>Claim 2 of '379 Patent | This claim term does not require construction. | "the control circuit automatically issues commands to open a hidden storage area without need for a user to request the control circuit to do so" |

The dispute here focuses on whether the opening of hidden areas may only be performed automatically.  Defendants argue that the term should be limited to a control circuit that automatically issues commands, and thus precludes any use of user intervention.  (DB at 25.)  However, Plaintiff believes that such a definition would take its specification out of context.  (PB at 16.)

The specification states that the cleaning device "may automatically" issue commands to target drives, without need of human intervention, to release or open hidden data.  ('379 Patent at 10:51–56.)  In cases where the hidden data is password-protected, the user may be informed that additional steps may be necessary to complete the data removal.  (<u>Id.</u> at 10:56–60.)  The specification therefore shows that there are cases in which the hidden areas may require user

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 13-02461 GAF (PLAx) | Date | June 17, 2014 |
|---|---|---|---|
| Title | MyKey Technology Inc Patent Litigation | | |

intervention at some point.  However, after the password is provided, it appears that the opening of the hidden area begins again automatically.  Another portion of the specification states that the "cleaning device removes all data . . . so that all of the data storage areas on the target device are available for cleaning <u>without requiring user intervention</u>."  (<u>Id.</u> at 11:30–35) (emphasis added.)

The Court therefore adopts the following construction:

**<u>"the control circuit open[s] a hidden storage area without user intervention"</u>:** the control circuit automatically issues commands to open a hidden storage area without need for a user to request the control circuit to do so

**IV.
CONCLUSION**

For the reasons set forth above, the Court adopts the foregoing constructions.

**IT IS SO ORDERED.**